**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | Case No. |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, JOANN | ) | |
| HALVORSEN as PERSONAL | ) | |
| REPRESENTATIVE to the ESTATE of | ) | |
| ERNEST HALVORSEN, DARRYL DALEY, | ) | |
| WILLIAM ERICKSON, JOHN HEALY, and | ) | **JURY TRIAL DEMANDED** |
| the CITY OF CHICAGO | ) | |
| | | |
| *Defendants*. | | |

## COMPLAINT

NOW COMES Plaintiff, DEMETRIUS JOHNSON, by his attorneys LOEVY &

LOEVY, and complaining of Defendants REYNALDO GUEVARA, the ESTATE OF ERNEST

HALVORSEN, DARRYL DALEY, WILLIAM ERICKSON, JOHN HEALY, and the CITY OF

CHICAGO, states as follows:

### INTRODUCTION

1.      Plaintiff Demetrius Johnson was wrongly convicted of the 1991 shooting death of

Edwin Fred. He was just 15 years old when he was arrested, and he spent more than 13 years in

prison for a crime that he did not commit.

2.      Johnson had nothing to do with the shooting and he has always maintained his

innocence.

3.      Not one piece of physical evidence connected Johnson to the Fred murder, and he

had no motive to commit the crime.

4.      Instead, Johnson's arrest, prosecution, and conviction were based on shocking misconduct by notorious Chicago police officer Reynaldo Guevara and the other Defendants.

5.      For example, Defendants fabricated a false lineup report, which stated that key eyewitness Aby Gonzalez had viewed a lineup on the day of the Fred murder and had not made any identification from that lineup. In fact, Aby Gonzalez had identified an alternative suspect who was not Johnson in that lineup, and the false lineup report was manufactured later to conceal the fact that the alternative suspect had been identified.

6.      But before the fabricated report was written, the Defendants had initially created a different lineup report, which accurately documented that Aby Gonzalez had identified the alternative suspect. That accurate report was suppressed in police files throughout Johnson's wrongful prosecution and conviction. The accurate report was never disclosed to state prosecutors, to Johnson, or to his attorneys.

7.      As a result of these fabrications and this suppression of evidence, Johnson was wrongly convicted of murder. He spent more than 13 years in prison for a crime that he did not commit.

8.      The Defendants' misconduct resulting in Johnson's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and his colleagues at Detective Area Five of the Chicago Police Department. Indeed, Johnson is one of twenty men exonerated after being convicted on murder charges resulting from corrupt homicide investigations led by Defendant Guevara.

9.      In court proceedings after Johnson's wrongful conviction, Defendant Guevara has pleaded his Fifth Amendment right not to incriminate himself in response to questions about his

misconduct as a police officer, and specifically about his misconduct during the investigation of the Fred murder.

10.     In 2017, Cook County Judge James Obbish found that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

11.     In December 2019, after a new investigation, Johnson's conviction was vacated and all charges against him were dropped. More than 28 years after his terrible ordeal began, Johnson was finally exonerated.

12.     Johnson now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

13.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Johnson's rights secured by the U.S. Constitution.

14.     This Court has jurisdiction of Johnson's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). Johnson resides in this judicial district. The events and omissions giving rise to Johnson's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Johnson's conviction.

## PARTIES

16.     Plaintiff Demetrius Johnson spent more than 13 years wrongly incarcerated for a murder that he did not commit.

17.    At all times relevant to the events described in this Complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, William Erickson, and Darryl Daley, and other unknown law enforcement officers were police officers in the Chicago Police Department.

18.    At all times relevant to the events described in this Complaint, John Healy and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

19.    Ernest Halvorsen died before this Complaint was filed, and the Estate of Ernest Halvorsen is sued as successor in interest to Ernest Halvorsen.

20.    The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Fred murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

21.    Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

**FACTS**

**The Crime**

22.     On the evening of June 12, 1991, the night that the Chicago Bulls would win their first NBA Championship, a single gunman opened fire near the intersection of Claremont and North Avenue in Chicago.

23.     Edwin Fred, Raul Ortiz, and Forrest Garnett were standing near that intersection.

24.     The gunman shot at them with a handgun, striking Edwin Fred with numerous bullets and hitting Raul Ortiz once in the right shoulder.

25.     After the shooting, the gunman fled south on Claremont.

26.     Edwin Fred died from his wounds.

**The Initial Lineup with the Alternative Suspect**

27.     Chicago police immediately focused on an alternative suspect who was not Johnson, and Defendant Daley responded to the scene to locate the alternative suspect.

28.     Defendant Daley arrested the alternative suspect and recovered a handgun from a van in which the alternative suspect had ridden.

29.     The alternative suspect was taken to Area Five that night and placed in a lineup.

30.     Defendant Guevara wrote a police report stating that four witnesses viewed that lineup at 11 p.m., approximately three hours after the shooting. Those people were Aby Gonzalez, Forrest Garnett, Fina Montanez, and Rosa Burgos.

31.     Defendant Guevara's police report states that none of the individuals who viewed the lineup identified the alternative suspect.

32.     That police report was placed in the Chicago Police Department's official file, and it was turned over during Johnson's criminal proceedings.

**The Suppressed Police Report**

33.    A different police report documenting the same lineup was not turned over during Johnson's criminal proceedings.

34.    This suppressed police report instead emerged publicly for the first time decades later.

35.    The suppressed report was written by Defendant Erickson, and it lists Defendant Guevara as being present during the lineup. It states that six individuals viewed the lineup. Along with the four listed on Defendant Guevara's false report discussed above, Defendant Erickson reported that Rosaline Morales and Angel Cordova had also viewed the lineup.

36.    The suppressed report states that, on the night of the crime, eyewitness Aby Gonzalez identified the alternative suspect as the perpetrator of the Fred murder.

**Fabricated Identifications of Johnson Obtained by Defendants**

37.    According to the Defendants, there were four purported eyewitnesses to the Fred murder: Raul Ortiz, Rosa Burgos, Ricardo Burgos, and Elba Burgos.

38.    None of these individuals could give Defendants any description of the perpetrator of the Fred murder close in time to the crime.

39.    Ricardo Burgos had viewed the shooting from a moving car. He first spoke with Defendant Guevara nine days after the shooting. During that meeting, Defendant Guevara showed him a photograph of Johnson. Defendant Guevara did not document these events in any police report.

40.    Elba Burgos was sitting on her front porch on Claremont when the crime occurred, and after the shooting she saw a man running from the scene for only a few seconds. Approximately a month after the shooting, Defendants Daley and Guevara obtained and showed Elba Burgos a photograph of Johnson's brother.

41.     Rosa Burgos viewed a lineup on the night of the shooting and selected a person in that lineup, but the Defendants told her that she had selected the wrong person. In addition, Rosa informed the Defendants on the night of the shooting that everything happened so fast that she was not sure who the perpetrator was.

42.     According to the Defendants, however, after all of this occurred, Rosa Burgos, Ricardo Burgos, and Elba Burgos all selected Johnson in a lineup. That lineup occurred on July 22, 1991, approximately five weeks after the Fred murder.

43.     These identifications of Johnson occurred only because the Defendants manipulated the eyewitnesses and caused them to select Johnson.

44.     Like the fabricated police report, these fabricated eyewitness identifications were used to arrest, prosecute, and convict Johnson of the Fred murder.

### Johnson's Alibi

45.     The Defendants also ignored Johnson's alibi for the night of the crime.

46.     Johnson's girlfriend and another mutual friend were both with Johnson at his home watching the Chicago Bulls championship game when the crime occurred.

### Policy and Practice of Wrongly Convicting Innocent Individuals

47.     The Chicago Police Department is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one endured by Johnson.

48.     Since 1986, no fewer than 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

49.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Johnson in this case, including fabricating evidence, concealing exculpatory evidence, manipulating witnesses in order to influence their eyewitness

identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

50.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

51.     The municipal policy and practice described in this Complaint was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

52.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information, including evidence of a police report indicating the identification of a perpetrator in a different lineup in this case. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants in the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

53.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Johnson.

54.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

55.     The policies and practices of file suppression at issue in *Rivera*, *Fields*, and *Jones* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Fred murder and the investigation at issue here.

56.     In addition, a set of clandestine files related to Area 5 homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

57.     In fact, the suppressed police lineup report at issue in this case was itself discovered in the clandestine homicide files produced in the *Rivera* litigation.

58.     The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division, during the investigation into the Fred murder.

59.     In addition, at all relevant times, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

60.     Prior to and during the period in which Johnson was falsely charged with and convicted of the Fred murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

61.     The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

62.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The

City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

63. The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

64. Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases. The City recommended disciplinary action in fewer than 4% of those cases and did not conduct any disciplinary investigations in over half of those cases.

65. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. Charlie Beck, the former interim superintendent of the CPD, recently acknowledged the existence of the CPD's code of silence. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

66.     Former Mayor of the City of Chicago Rahm Emanuel acknowledged during his tenure that a "code of silence" exists within the Chicago Police Department.

67.     In December 2016, the president of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

68.     In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

69.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that, as of 1994, the Chicago Police Department maintained a code of silence that facilitated police misconduct.

70.     In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

71.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a consequence of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

72.     This includes Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identifications as well as fabricating and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and other Chicago police officers engaged in the serious investigative misconduct described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

73.     The City of Chicago and its police department also failed in the years before Johnson's wrongful charging and conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.      The conduct of live lineup, photographic, and other identification procedures.

b.      The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.      The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.      The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.      The risks of engaging in tunnel vision during investigation.

f.      The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

74.     The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Johnson's wrongful conviction and his injuries.

75.     The City's failure to train, supervise, and discipline its officers, including Guevara, Halvorsen, Daley, Erickson, and other Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Johnson in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

76.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Johnson's ongoing injuries.

77.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

78.     As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men over the span of two decades. Like Johnson, these men have lodged independent accusations of similar misconduct against Defendant Guevara.

79.     As of the filing of this complaint, 20 men have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Johnson, the other 19 men are Jacques Rivera,

Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, and Geraldo Iglesias.

80. Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

81. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its police department condoned his behavior.

82. Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. These allegations include the manipulation of dozens of witnesses to provide false identifications, as well as every single instance of misconduct detailed below.

83. Examples of Defendant Guevara's misconduct include the following:

a. Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license plate

of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. In response, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Dorsch later spoke to the two juveniles outside of Defendant Guevara's presence, and they admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.      Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.      In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made

Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Perez went on to falsely identify Johnson as one of the murderers.

d.    In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.    Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.    In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.    Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim identified Jacques Rivera as his shooter before he died. Defendant Guevara reported that he obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.    After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded

Rivera $17 million in damages, as well $175,000 in punitive damages against Defendant Guevara, his partner Defendant Gawrys, and his supervisor Ed Mingey.

i.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.  In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking Velazquez to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if Velazquez did not talk. All of the false details in Velazquez's eventual statement were provided by Guevara.

m.  In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

n.  In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

o.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was not involved, Guevara orchestrated a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses previously told the police that they had not been able to see the shooter.

p.  In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening that, if Diaz did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

q.  In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

r.    In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

s.    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

t.    In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

u.    In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

v.      In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

w.      In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion.

x.      In 2011, the First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

y.      In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a

metal bracelet he was wearing and called her a "nigger bitch." Turner sought

medical treatment and filed a complaint with the Chicago Police Department's

Office of Professional Standards (OPS).

z.  In 1982, Defendant Guevara and three other officers broke through Almarie

Lloyd's locked front door and conducted a warrantless search of her home. When

Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd,

her brother, and her two children, and left the home in shambles. Lloyd filed a

complaint with OPS the next day.

aa. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt

from his home and handcuffed him to a ring in the wall at the police station where

he was beaten about the head, face, and body until he confessed to murder and

robbery charges. Hunt was detained for approximately 23 hours and deprived of

food, water, and sleep until after he confessed. Hunt sought medical treatment for

his injuries and filed a complaint with the Office of Professional Standards.

Witnesses who saw Hunt while in custody corroborated his claims that the Area 5

police beat him. The criminal court judge suppressed Hunt's confession, and a

jury returned a favorable verdict in a related civil rights action against the City of

Chicago on Hunt's claim of excessive detention.

bb. In 1984, Defendant Guevara and other officers physically assaulted Graciela

Flores and her 13-year old sister, Anna, during a search of their home. During the

search, officers did not identify themselves as police. Guevara repeatedly slapped

Graciela, called her a "bitch," and pulled her hair. As a result of this incident,

Graciela's arm was put in a sling and she spent one week in the hospital.

cc.     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

dd.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

ee.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ff.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car

and began to choke him. Two eyewitnesses confirmed that Guevara initiated the

beating. In response to this incident, Warren sought medical treatment and filed a

complaint with OPS. OPS sustained Warren's allegations that Guevara had

physically and verbally assaulted him and recommended that Guevara be

reprimanded.

gg.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by

transporting him to rival gang territory and threatening to release him unless he

confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to

falsely confess to a crime that he had nothing to do with.

hh.     In 1991, Defendant Guevara coerced David Rivera into signing a confession for

murder using intimidation, threats, and inducements. Guevara told Rivera that if

he confessed, he would serve seven years in prison; if he did not confess, he

would be sent away for fifty years. Guevara then promised Rivera that if signed a

statement, he could go home.

ii.     In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez

through the use of threats and intimidation. While en route to the police station,

Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at

Area 5, Rodriguez was chained to a wall, denied food, water, and use of a

restroom, and beaten by Guevara's partner, Defendant Halvorsen, in the chest and

torso. Guevara provided details of the crime to Rodriguez to include in

Rodriguez's false confession.

jj.     In 1992, Defendant Guevara engaged in misconduct when he interrogated

Jacqueline Montanez without a youth officer present. The appellate court reversed

and remanded Ms. Montanez's conviction for murder, noting that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

kk.   In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ll.   In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

mm.   In 1993, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente

claimed that Iglesias spontaneously confessed to him that he was guilty of the crime for which Guevara had arrested him. Vicente has since testified that his statements were false, and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

nn.     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

oo.     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

pp.     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate,

and without a Polish language interpreter. Dembski could not read the statement he eventually signed, as it was written in English.

qq.    In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses named Ruth Antonetty, Debbie Daniels, and Maria Castro to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

rr.    In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

ss.    In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite the fact that she did have real knowledge of the crime he was questioning her about.

tt.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in order to coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement implicating himself in a murder that he was not involved in.

uu.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false

statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

84.     As set forth above, the City of Chicago failed to meaningfully discipline its police officers, including Defendant Guevara and the other Defendants, for their misconduct. Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## Johnson's Wrongful Prosecution and Conviction

85.     Between 1991 and 1992, as the result of the Defendants' misconduct and based on the false evidence described in this Complaint, Johnson was arrested, prosecuted, and convicted of murder.

86.     In the absence of the Defendants' misconduct, Johnson would never have been arrested, indicted, prosecuted, or convicted. At no point in time between 1991 and the present day has there been any credible evidence giving rise to probable cause to suspect Johnson of Fred's murder.

87.     The Defendants' fabrication of evidence was not disclosed to state prosecutors, Johnson, or his criminal defense attorneys in advance of his criminal trial. In fact, Defendants suppressed all evidence that exonerated Johnson.

88.     The Defendants used false police reports to cover up their misconduct. They provided those false reports to state prosecutors, and those reports became the basis for charging and prosecuting Johnson.

89.     Defendants also gave false statements to state prosecutors and provided false testimony at Johnson's criminal trial.

90.     No inculpatory evidence other than the evidence fabricated by Defendants was introduced at Johnson's criminal trial.

91.     At all times, Defendants suppressed the true circumstances of their identification and lineup procedures.

92.     At all times, Defendant Healy was aware of Defendants' misconduct and their fabrication of a case against Johnson. As a supervisor, he nevertheless intentionally ignored the Defendants' misconduct and decided to make Johnson liable for a crime he did not commit, rather than directing the investigating officers to find the person who had actually committed the crime. In addition, Defendant Healy and the other supervisors of the Defendants explicitly authorized their investigative misconduct.

93.     In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Johnson, which would also have shown Johnson's innocence.

94.     Johnson maintained his innocence throughout the proceedings.

95.     However, because of Defendants' false and manufactured evidence, Johnson was wrongly convicted and sentenced to decades in prison.

96.     Johnson was only 15 years old when his ordeal began. He spent the next 13 years of his life imprisoned for a crime that he did not commit.

97.     Johnson's whole life was turned upside down without any warning. His teenage years and his young adulthood were entirely consumed by the horror of his wrongful imprisonment.

98.     The conviction took a large toll on Johnson's family. His mother passed away shortly after he was arrested, and Johnson was not given permission to attend his mother's funeral.

99.     At the time of his arrest, Johnson also had a young son. As a result of Defendants' misconduct, Johnson was imprisoned for most of his son's childhood and adolescence. Johnson lost his chance to raise his child, which has had a profound impact not only on his life, but also on his relationship with his son and his son's mother.

100.     In addition, Johnson was taken away from and missed out on the lives of his family and friends. He returned home to relationships changed by or lost to over a decade of wrongful incarceration.

101.     Johnson was robbed of his teenage years and his young adulthood. He was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Johnson has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

102.     During his 13 years of wrongful imprisonment, Johnson was detained in harsh and dangerous conditions in maximum-security prisons.

103.     Johnson never knew whether the truth would come out or whether he would ever be exonerated.

104.     In addition to the severe trauma of wrongful imprisonment and Johnson's loss of liberty, the Defendants' misconduct continues to cause Johnson extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

105.     Johnson has been branded as a murderer. He has suffered profound reputational harm as a result.

**Johnson's Exoneration**

106.    Johnson fought hard to prove his innocence. He appealed and filed requests to have his conviction thrown out.

107.    On November 12, 2019, Johnson's collateral petition requesting to have his conviction vacated was granted, and his conviction was set aside.

108.    On December 20, 2019, all charges against Johnson were dropped.

109.    At the time of his exoneration, Johnson had been fighting the false charges against him for more than half his life.

**COUNT I**

**42 U.S.C. § 1983 – Due Process**
**(Fourteenth Amendment)**

110.    Johnson incorporates each paragraph of this Complaint as if fully restated here.

111.    As described in detail above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Johnson of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

112.    In the manner described more fully above, Defendants fabricated police reports falsely implicating Johnson in the crime.

113.    Defendants obtained Johnson's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Johnson during his criminal case.

114.    Defendants also procured supposed eyewitness identifications implicating Johnson in the crime by using unduly suggestive identification techniques during photo identifications and during live lineups. Defendants knew that these identifications were false and

unreliable, but they caused them to be used during Johnson's criminal trial. These fabricated identifications caused Johnson's wrongful conviction.

115.     In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Johnson, and Johnson's criminal defense attorneys, including evidence that an eyewitness had selected a different man as the perpetrator of the crime out of a lineup, as well as evidence that Defendants had manufactured identifications, thereby misleading and misdirecting the criminal prosecution of Johnson.

116.     In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Johnson.

117.     The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Johnson and the deprivation of Johnson's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Johnson could not have and would not have been pursued.

118.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Johnson's clear innocence.

119.     As a result of Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

120.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT II

### 42 U.S.C. § 1983 – Unlawful Detention
### (Fourth and Fourteenth Amendments)

121.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

122.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Johnson of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Johnson without any probable cause for doing so and in spite of the fact that they knew Johnson was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

123.     In so doing, these Defendants caused Johnson to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

124.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Johnson's clear innocence.

125.     As a result of Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

126.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT III

### 42 U.S.C. § 1983 – Failure to Intervene

127.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

128.     In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Johnson's constitutional rights, even though they had the duty and the opportunity to do so.

129.     As a result of the Defendants' failure to intervene to prevent the violation of Johnson's constitutional rights, Johnson suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

130.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Johnson's clear innocence.

131.     As a result of Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

132.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT IV

### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

133.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

134.     In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Johnson for the Fred homicide, regardless of Johnson's guilt or innocence, and thereby to deprive him of his constitutional rights.

135. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Johnson of these rights.

136. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

137. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Johnson's clear innocence.

138. As a result of Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

139. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT V

### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

140. Johnson incorporates each paragraph of this Complaint as if fully restated here.

141. As described in detail above, the City of Chicago is liable for the violation of Johnson's constitutional rights because Johnson's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

142. At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup

procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

143.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

144.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Johnson, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

145.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been instructed by police on which suspect to identify; (2) suspects were

shown suggestive photo arrays; (3) suspects were shown suggestive live lineups; (4)

identification procedures were not accurately documented; and (5) supervisors with knowledge

of permissible and impermissible identification techniques did not properly supervise or

discipline police officers and employees such that the fabricated and improper identifications

continued unchecked.

146. In addition, at all times relevant to the events described in this Complaint and for

a period of time prior thereto, the City of Chicago had notice of widespread practices by officers

and agents of the Chicago Police Department and the City of Chicago, which included one or

more of the following: (1) officers did not record investigative information in police reports, did

not maintain proper investigative files, or did not disclose investigative materials to prosecutors

and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers

fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed

to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful

convictions through profoundly flawed investigations.

147. These widespread practices, individually and together, were allowed to flourish

because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged

and were thereby the moving force behind the very type of misconduct at issue by failing to

adequately train, supervise, and control their officers, agents, and employees on proper

interrogation techniques and by failing to adequately punish and discipline prior instances of

similar misconduct, thus directly encouraging future abuses such as those affecting Johnson.

148. The above widespread practices and customs, so well settled as to constitute de

facto policies of the City of Chicago, were able to exist and thrive, individually and together,

because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

149.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

150.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Johnson were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

151.    Johnson's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI

### State Law Claim – Malicious Prosecution

152.    Johnson incorporates each paragraph of this Complaint as if fully restated here.

153.    In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Johnson of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Johnson without any probable cause for doing so.

154.    In so doing, the Defendants caused Johnson to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

155.    The judicial proceedings were terminated in Johnson's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in December 2019.

156.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Johnson's clear innocence.

157.    As a result of the Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### State Law Claim – Intentional Infliction of Emotional Distress

158.    Johnson incorporates each paragraph of this Complaint as if fully restated here.

159.    The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Johnson, as is more fully alleged above.

160.    As a result of the Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

### State Law Claim – Willful and Wanton Conduct

161.    Johnson incorporates each paragraph of this Complaint as if fully restated here.

162.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Fred murder investigation.

163.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Johnson's rights.

164.     As a result of the Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IX

### State Law Claim – Civil Conspiracy

165.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

166.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Johnson for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Johnson of these rights.

167.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

168.     The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Johnson and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

169.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Johnson's clear innocence.

170.     As a result of the Defendants' misconduct described in this Count, Johnson suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X

### State Law Claim – *Respondeat Superior*

171.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

172.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

173.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI

### State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

174.     Johnson incorporates each paragraph of this Complaint as if fully restated here.

175.     Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

176.     The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

177. The City of Chicago is responsible to pay any judgment entered against the Defendants. Johnson therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Johnson against the individual Defendants as damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff DEMETRIUS JOHNSON, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, the ESTATE OF ERNEST HALVORSEN, DARRYL DALEY, WILLIAM ERICKSON, JOHN HEALY, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, DEMETRIUS JOHNSON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

DEMETRIUS JOHNSON

BY:  /s/ Steve Art_____
     *One of Johnson's Attorneys*

Arthur Loevy
Jon Loevy
Anand Swaminathan
Steven Art
Rachel Brady
Sean Starr
John Hazinski
LOEVY & LOEVY
311 N. Aberdeen
Chicago, Illinois 60607
(312) 243-5900