**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | Case No. 20-cv-4156 |
| *Plaintiff*, | ) | |
| | ) | Judge Sara L. Ellis |
| *v.* | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, DARRYL DALEY, | ) | |
| WILLIAM ERICKSON, JOHN HEALY, and | ) | |
| the CITY OF CHICAGO | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

---

# EXHIBIT 19

# Kevin Sheehan Deposition - Prosecuting Assistant State's Attorney at Plaintiff's criminal trial April 27, 2022

IN THE UNITED STATES DISTRICT COURT

**ORIGINAL**

FOR THE NORTHERN DISTRICT OF ILLINOIS

CIVIL ACTION NO. 20 C 4156

DEMETRIUS JOHNSON,

Plaintiff

V.

CITY OF CHICAGO, ET AL.,

Defendants

DEPONENT:  KEVIN SHEEHAN

DATE:      APRIL 27, 2022

REPORTER:  KORTNEY CHASE



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1              APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, DEMETRIUS JOHNSON:
4   Rachel Brady, Esquire
5   Loevy & Loevy
6   311 North Aberdeen Street
7   3rd Floor
8   Chicago, Illinois 60607
9   Telephone No.: (312) 243-5900
10  E-mail: brady@loevy.com
11  (Appeared via videoconference)
12
13  ON BEHALF OF THE DEFENDANTS, JOANN HALVORSEN, JOHN
14  HEALY, DARRYL DALEY, WILLIAM
15  ERICKSON:
16  Josh Engquist, Esquire
17  The Sotos Law Firm, P.C.
18  141 West Jackson Boulevard
19  1240A
20  Chicago, Illinois 60604
21  Telephone No.: (630) 735-3300
22  E-mail: jengquist@jsotoslaw.com
23  (Appeared via videoconference)
24
25
```

Page 3

```
1              APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
4   Eileen E. Rosen, Esquire
5   Theresa Carney, Esquire
6   Jessica Zehner, Esquire
7   Rock Fusco & Connelly, LLC
8   321 North Clark Street
9   Chicago, Illinois 60654
10  Telephone No.: (312) 494-1000
11  E-mail: erosen@rfclaw.com
12  tcarney@rfclaw.com
13  jzehner@rfclaw.com
14  (Appeared via videoconference)
15
16  ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
17  Megan McGrath, Esquire
18  Leinenweber Baroni & Daffada LLC
19  120 North Lasalle Street
20  Suite 2000
21  Chicago, Illinois 60602
22  Telephone No.: (866) 786-3705
23  E-mail: mkm@ilesq.com
24  (Appeared via videoconference)
25
```

Page 4

```
1              APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE WITNESS, KEVIN SHEEHAN:
4   Sean O'Callaghan, Esquire
5   O'Mara & O'Callaghan, LLC
6   230 West Monroe Street
7   Suite 2620
8   Chicago, Illinois 60606
9   Telephone No.: (312) 600-5588
10  E-mail: sean.ocallaghan@o2lawyers.com
11  (Appeared via videoconference)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1                INDEX
2                       Page
3   PROCEEDINGS                       7
4   DIRECT EXAMINATION BY MS. BRADY        8
5   CROSS EXAMINATION BY MR. ENGQUIST         70
6
7                EXHIBITS
8   Exhibit                          Page
9   1 - Portion of Transcript of Defense Closing  31
10     Arguments During the Criminal Trial -
11     Johnson 001261
12  2 - Portion of Transcript of Kevin Sheehan's  34
13     Closing Arguments During the Criminal
14     Trial - Johnson 001278
15  3 - Detective Guevara's Line Up Report from   36
16     June 2, 1991 - RFC_Johnson 000040
17  4 - Detective Erickson's Line Up Report from  38
18     June 12, 1991 - RFC_Johnson 000026-000027
19  5 - Kevin Sheehan's Handwritten Notes from    43
20     the Criminal Trial - CCSAO 003
21  6 - Chicago Police Yellow Slip from November  66
22     4th - RFC_Johnson 000012
23
24  [Will forward exhibits upon receipt]
25
```

Page 6

```
1          STIPULATION
2
3   The deposition of KEVIN SHEEHAN was taken at KENTUCKIANA
4   REPORTERS, 30 SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO,
5   ILLINOIS 60606, via videoconference in which all
6   participants attended remotely, on WEDNESDAY the 27TH
7   day of APRIL, 2022 at approximately 10:05 a.m.; said
8   deposition was taken pursuant to the FEDERAL Rules of
9   Civil Procedure. The oath in this matter was sworn
10  remotely pursuant to FRCP 30.
11
12  It is agreed that KORTNEY CHASE, being a Notary Public
13  and Court Reporter for the State of ILLINOIS, may swear
14  the witness.
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1          PROCEEDINGS
2      COURT REPORTER:  We are now on the record.
3   Will all parties except for the witness please state
4   your appearance, how you are attending and your
5   location?
6      MS. BRADY:  Yes, good morning, everyone.
7   This is Rachel Brady on behalf of the plaintiff,
8   attending via Zoom from Chicago.
9      MR. ENGQUIST:  Josh Engquist on behalf of
10  Defendants Daley, Halvorsen, Erikson and Healy, via
11  Zoom from my office here in Chicago.
12     MS. MCGRATH:  Megan McGrath for Defendant
13  Guevara, attending via Zoom from my office in
14  Chicago.
15     MS. ROSEN:  Eileen Rosen for the City of
16  Chicago, attending via Zoom from my office in
17  Chicago.
18     MR. O'CALLAGHAN:  And Sean O'Callaghan
19  representing the deponent Kevin Sheehan, appearing
20  from my office in Chicago.
21     THE WITNESS:  And I'm Kevin Sheehan.
22     COURT REPORTER:  And Mr. Sheehan, will you
23  state your full name for the record?
24     THE WITNESS:  My full name is Kevin Michael
25  Sheehan, S-H-E-E-H-A-
```

Page 8

```
1   N.
2      COURT REPORTER:  And do all parties agree that
3   the witness is, in fact, Kevin Sheehan?
4      MR. BRADY:  Yes.
5      MS. ROSEN:  Yes.
6      MR. O'CALLAGHAN:  Yes.
7      COURT REPORTER:  Okay.  Mr. Sheehan, will you
8   please raise your right hand.  Do you solemnly swear
9   or affirm that the testimony you are about to give
10  will be the truth, the whole truth and nothing but
11  the truth?
12     THE WITNESS:  I do.
13     COURT REPORTER:  Thank you.  You may begin.
14          DIRECT EXAMINATION
15  BY MS. BRADY:
16     Q   Good morning, Judge Sheehan.  My name is
17  Rachel Brady and I represent the plaintiff in this case,
18  a man by the name of Demetrius Johnson. I know you've
19  been deposed relatively recently in another one of our
20  cases, but I'll just go over the ground rules very
21  briefly for you.  So I'm going to do my best to ask
22  questions that make sense, but if you don't understand
23  my question, please ask me to clarify and I'll do my
24  best to ask a better question.  Are you having any tech
25  issues right now?
```

Page 9

```
1      A   No, I think they were just -- your -- the
2   audio was a little low, but now it's been corrected.
3      Q   Okay.  And just because there's a court
4   reporter transcribing everything we say, please do your
5   best to let me finish my complete question before you
6   start your answer.  From time to time one of the lawyers
7   might object, so please just give everybody a second to
8   put all of their objections on the record and then you
9   can give your answer.  And also, please keep your
10  answers verbal, so say "yes" or "no" rather than nodding
11  your head or shrugging your shoulders, and that way, we
12  can get a clean record.  And from time to time your
13  attorney or one of the other attorneys in -- on the Zoom
14  might object to one of my questions, so just like I said
15  before please just give everybody a second to put all of
16  their objections on the record and then you can go ahead
17  and answer the question unless your attorney instructs
18  you not to, okay.
19     A   Yes, ma'am.
20     Q   All right.  And we can take a break any time
21  you need one.  The only thing I would ask is that if
22  there is a question pending you answer my question and
23  then just let me know that you need a break, okay?
24     A   Thank you, understood.
25     Q   Okay.  Is there any reason that you cannot
```

Page 10

1  provide complete and accurate answers to my questions
2  today?
3      A   I mean I -- kind of definition of complete and
4  accurate, no there's no reason why I cannot do that.
5      Q   Okay.  Do you have any conditions that affect
6  your memory?
7      A   No.
8      Q   And do you take any medications that --
9      A   No.
10     Q   -- affect your memory?
11     A   No.
12     Q   Are you familiar with the allegations in this
13  case?
14     A   I'm not really familiar with the allegations.
15  I've never seen a complaint.  I have an idea based on
16  the defendant in this case.  I believe the last
17  deposition I did in the office there, it involved
18  Detective Guevara was on the case.  At that point I had
19  previously been the head of felony review, so I -- I'm
20  aware of generally what the issues are.
21     Q   Okay.  You're not aware of the specific
22  allegations in this case?
23     A   I am not; I have not seen the complaint.
24     Q   Okay.  Have you heard about Demetrius
25  Johnson's case in the media or on the news?

Page 11

1      A   Yeah, I have heard scatterings here and there.
2  I am not a technologically savvy guy, I still get
3  newspapers.  And I know within the last year or so I
4  read something about it, so I do know about it, yes.
5      Q   And when you saw Demetrius Johnson's case in
6  the newspaper, did you have any independent recollection
7  of working on the case?
8      A   No, I didn't.  Although, you know, I was
9  contacted by Carol Ragala from the Post-Conviction Unit
10  talking about how the case was in a state of flux or
11  something and that you might hear something about it and
12  then I saw it in the newspaper, so I had -- I did
13  remember the case at the time by the defendant's name.
14     Q   Okay.  And what did you read about the case in
15  the newspaper?
16     A   I can't tell you what I read.  I read about
17  it, I read about whatever the text of the article was.
18  I can't tell you factually what it was, but I did make
19  an association that something was up with the case at
20  the post- conviction level.
21     Q   Okay.  And you understand you are not a
22  defendant in this civil lawsuit, right?
23     A   I do understand that, I do.
24     Q   And you're not being accused of any
25  misconduct, right?

Page 12

1      A   I do understand that.
2      Q   Okay.  All right.  So you are represented for
3  the purpose of this deposition, right?  Sean O'Callaghan
4  is your attorney?
5      A   That is correct.
6      Q   And he's there in the room with you?
7      A   He is.
8      Q   Did you review any documentary material or
9  transcripts or anything like that to prepare for this
10  deposition?
11     A   I have reviewed the transcript because another
12  attorney on the case about a year ago, he represents one
13  of the defendants, Mr. Engquist, called and he said we
14  represent this person on this case and I don't even know
15  if that was before or after I knew about it.  I don't
16  remember.  And he said is there anything about this case
17  that you remember?  Is there anything -- and I said,
18  "no, there's not."  I said, "I tried a lot of cases as a
19  State's attorney" and he goes, "well, this person is
20  being sued and we represent" -- I don't even know if he
21  said he represented, but obviously one of the defendants
22  in the case.  And he said, "if I sent you a transcript,
23  do you think you can take look to see if it jogs your
24  memory about remembering anything about the case?"
25  And I said, "look, you can send me whatever you want".

Page 13

1  And he did, and I reviewed the transcript, and I believe
2  actually within that transcript, an attachment was the
3  blue back of the actual State's Attorney Criminal File
4  was in there.  And I recognized that because my
5  handwriting is on it.  And I read through the transcript
6  itself of the trial and had I not seen my name in there
7  as a prosecutor I would not have recognized the case,
8  the people, or otherwise.  I saw that it was before
9  Judge Collie.  I know who he is, and I did know the
10  defense attorney Debby Gubin, she had previously been a
11  public defender in that era, and I knew she was in
12  private practice.  And I do remember trying a case
13  against her only one, which is probably this, but
14  outside of that the transcript -- not to say it didn't
15  mean anything to me, but it was like I was reading
16  someone else's transcript.
17     Q   Sure.  When you had that conversation with the
18  attorney for one of the defendants, do you remember
19  anything else that he said to you?
20     A   No, it was a very brief conversation because I
21  had a message on my answering machine.  I still have a
22  landline.  And I called the person back not even knowing
23  what it was about and then learned it was about a
24  Demetrius Johnson and that I tried the case, and he may
25  have mentioned who was sitting with me on the case, a

Page 14

1  David Lavin. That didn't jog anything. And then the
2  discussion about the transcript that I got it a couple
3  of days later, then I called him and simply said, "look,
4  nothing that I read here jogs my memory about this
5  case", and that was the extent.
6     Q  Okay. Did you have any other conversations
7  with any of the attorneys for the defense in this case?
8     A  No. No.
9     Q  All right. So I'm not going to go over your
10 background extensively, because I know that you
11 testified about that relatively recently -
12             -
13    A  Sure.
14    Q  -- but I just kind of a couple of brief
15 background questions. So when did you join the Cook
16 County State Attorney's office?
17    A  I think it was -- I got the offer either in
18 December or January of 1984 and shortly thereafter I
19 reported and was assigned to appeals.
20    Q  And by 1990 -- or strike that. In 1992, what
21 was your job title?
22    A  I was assigned to the gang prosecution's unit
23 in 1992. Very recently. I think I went there in late
24 '91, because previously I had been a first chair in the
25 courtroom in the felony trial divisions, so I was in the

Page 15

1  gang unit then.
2     Q  Okay. And by 1992, how many violent crimes
3  cases had you prosecuted, would you say?
4     A  Well, by violent crimes you probably mean
5  outside of retail theft and narcotics cases. So
6  robberies on up?
7     Q  Yes.
8     A  I couldn't give you a count, but a lot. I
9  have been in a number of assignments as a third chair,
10 second chair, and first chair. So I prosecuted a good
11 number of violent crimes.
12    Q  Can you give me an approximation of the number
13 of violent crimes you prosecuted per year?
14    A  You know I've tried to figure how many juries
15 I had by that point. I -- I can't give you a number
16 because I don't want to say I did 500 a year.
17 Obviously, on a court call you have a plethora of cases,
18 so -- and I don't even know what number this case was --
19 the Demetrius Johnson case, in gangs is a violent crime.
20 I don't know if it was one of the first ones, or
21 whatever, but I can only tell you just a lot. A lot.
22    Q  Okay. And do you recall by 1992 how many
23 murder cases you'd worked on?
24    A  You know? I'm trying to estimate because when
25 I was elected judge in 1998 I had gone through all of

Page 16

1  that for the bar reviews and stuff and I think I had 50
2  some odd juries at that point if I remember correctly,
3  and I think somewhere in the early 30's were the amount
4  of murders I tried, you know, six years later. So I
5  would say if you back that up -- if you're equating
6  violent crimes with murder, probably somewhere in the
7  teens or 20's. And that would be a guess.
8     Q  Okay. It just helps me get an idea of the
9  scale --
10    A  Sure.
11    Q  -- so thank you. And did you take your
12 responsibilities as a prosecutor seriously?
13    MR. O'CALLAGHAN: Objection to the form.
14    A  Yes.
15    Q  And did you take murder prosecution seriously?
16    MR. O'CALLAGHAN: Objection to the form.
17    A  Yes, I did.
18    Q  And as a prosecutor you knew that your job was
19 to seek justice and not merely convict, right?
20    A  Yes, I did.
21    Q  Were you ever a first-chair prosecutor in a
22 violent crime trial?
23    A  Sure. Prior to going to the gang unit I was a
24 first chair and there were murders and rapes and armed
25 robberies on those calls, so absolutely.

Page 17

1     Q  Can you give me an idea of approximately how
2  many violent crimes you first chaired?
3     A  No. Again, I'm trying to trace my career from
4  appeals to when I was in the trial division and a first
5  chair. I can't. It would be a good number. I'm not
6  trying to minimize it or maximize it, but generally the
7  first chairs -- first chair are the most important cases
8  on the call. So I would have been a part of any violent
9  crime prosecution on the court calls when I was a first
10 chair.
11    Q  So would it be fair to say that by the time
12 you prosecuted Demetrius Johnson's case, considered
13 yourself an experienced trial prosecutor?
14    A  Yes.
15    Q  And as lead prosecutor, am I correct that you
16 were responsible for knowing the contents of the
17 prosecution's file?
18    A  Oh, sure. Yes.
19    Q  And am I correct that as the lead prosecutor
20 you would have reviewed the documents in the file
21 thoroughly as you prepared for a prosecution?
22    A  Yes, ma'am.
23    Q  All right. So I want to discuss with you now
24 the obligations of state prosecutors under Brady versus
25 Maryland. So am I correct that in the 1991-1992

Page 18

1 timeframe you were aware of your obligation under Brady
2 versus Maryland to produce to a criminal defendant all
3 exculpatory evidence that was available to you?
4     A  Yes.
5     Q  Okay.  And did you follow the Brady rule
6 throughout your time as a prosecutor?
7     A  Yes.
8     Q  And did you take your Brady obligations
9 seriously?
10    A  Very serious.  It's your reputation.
11    Q  And can you tell me what your understanding of
12 exculpatory evidence is?
13    A  Well, if you look at the common definition of
14 exculpatory, it's anything that's favorable to the
15 defense.  Now that's obviously subject to
16 interpretation, but I had an open file policy that
17 anything I got went right to the defense, you know, via
18 subpoena, etc.  Everything went right to the defense, so
19 you weren't going to take a conservative view of the
20 Brady rule, you were assuming that somebody could
21 ultimately say this may be exculpatory.  It just isn't
22 exculpatory because it blatantly exculpatory.  Anything
23 I got could be viewed as exculpatory based on the theory
24 of the defense case.
25    Q  And would you consider exculpatory if an

Page 19

1 eyewitness to a shooting homicide viewed a live line-up
2 and identified someone other than the criminal
3 defendant?
4     MS. ROSEN:  Objection form.  Objection form and
5 incomplete hypothetical.
6     MS. BRADY:  Go ahead.
7 BY MS. BRADY:
8     A  Yes, that would be the definition of
9 exculpatory.
10    Q  And would you consider a police -- I'm sorry,
11 strike that.  Would you consider a police report
12 documenting a live line-up procedure in which an
13 eyewitness identified someone other than the defendant,
14 to be exculpatory.
15    A  Yes.
16    MS. ROSEN:  Objection.  Form.  Incomplete
17 hypothetical.
18    Q  Would you consider it to be exculpatory if
19 police spoke to a witness about one of the photos in a
20 photo array, before displaying the photo array?
21    MS. ROSEN:  Objection.  Form.  Incomplete
22 hypothetical.
23    A  Well, I don't know what they've discussed.  I
24 don't know what the answer was, it may be exculpatory,
25 so I can't answer that.  Just showing a photo is

Page 20

1 exculpatory.  I would have to know more.  But,
2 obviously, that goes to the core issue of
3 identification, so anything about that particular
4 discussion could very well be exculpatory.
5     Q  And you would be sure to turn over all
6 documents that reflected any conversations that police
7 had with witnesses about particular photos in an array,
8 right?
9     A  Absolutely.
10    Q  Would you consider it to be exculpatory if
11 police used suggestive identification procedures during
12 a photo array?
13    MS. ROSEN:  Objection.  Form.  Incomplete
14 hypothetical.  Vague.
15    A  Well, you know, again, it's suggestive
16 procedures used by law enforcement obviously.  They're
17 not looking to put that on someone else, they're trying
18 to have a target to identify.  But, again, exculpatory
19 is such a wide definition, that if that was done, that's
20 Brady material in my opinion because it's going to be
21 interpreted to that way, so it would be tendered.
22    Q  And if an eyewitness to a shooting -- strike
23 that.  If a witness to a shooting identified a criminal
24 defendant in a line-up, but did not actually see the
25 shooter, is the fact that the witness didn't see the

Page 21

1 shooter exculpatory?
2     MS. ROSEN:  Objection.  Form.  Incomplete
3 hypothetical.
4     MR. O'CALLAGHAN:  And just real quick,
5 Ms. Brady, for the purposes of the record, can we
6 just agree that an objection by one party is an
7 objection for all so that I don't have to join in
8 these objections?
9     MS. BRADY:  Yes.
10    MR. O'CALLAGHAN:  Okay, thank you.
11    A  Well, the line-up would be turned over.  I
12 don't know if at the time I knew that the witness didn't
13 see anything but said -- identified somebody, but all of
14 that's got to go to the other side, and the other side
15 can make what they want of it with a motion to suppress
16 or whatever, but --
17    Q  Okay.
18    A  -- would all be turned over.
19    Q  Okay.  Well let me ask a little bit of a
20 different question.  So if a witness identified a
21 criminal defendant, would you consider it exculpatory if
22 the witness had not actually seen the shooting take
23 place, or had not actually seen the shooter?
24    MS. ROSEN:  Objection.  Form.  Incomplete
25 hypothetical.

Page 22

1    A  I don't know if I would consider it
2  exculpatory, because she's identifying someone, but that
3  whole scenario with whatever resulting reports came of
4  it and witness interviews needs to be tendered.  I don't
5  know if it meets the definition of exculpatory, but I
6  think you should assume that any issue like that that
7  comes up in a case she sees a prosecutor is Brady
8  material.
9    Q  And if a witness told police that she hadn't
10  seen the shooter, but then went on to identify someone
11  as the shooter, would you agree that that's something
12  that witness could be crossed on at trial?
13    MS. ROSEN:  Objection.  Form.  Incomplete
14  hypothetical.
15    Without question.
16    Q  And by that definition it's exculpatory then,
17  right?
18    A  Well, I -- I don't know --
19    MS. ROSEN:  Objection.  Form.  Sorry, Judge.
20  Incomplete hypothetical.
21    Q  Go ahead.
22    A  Look, what you're talking about is all kinds
23  of things that, you know, would be trial issues for
24  credibility and impeachment.  So I don't know if it's
25  technically under the umbrella of exculpatory, but it

Page 23

1  certainly to be tendered for the reasons that should be
2  tendered, which is it's conflicting evidence.
3    Q  Okay.  All right.  You touched on this a
4  little bit earlier, but did you have a practice in the
5  early 90's for disclosing exculpatory evidence to
6  criminal defendants or their attorneys?
7    A  A practice?  I wouldn't describe it as a
8  practice, I would describe it as a moral obligation for
9  my law license.  So it's not a practice - - it's not
10  something I practiced doing, it's something I must do.
11    Q  And so was it -- strike that.  It wasn't your
12  practice to pick and choose which parts of the police
13  file to turn over, right?
14    A  I'm not comfortable with the term "practice".
15  It's as though I invented some method to do something.
16  It's just the right thing to do.  It's not a practice,
17  it's the right thing to do.
18    Q  Okay, that's fair.  I'll ask it differently.
19  You didn't pick and choose which parts of the police
20  file to turn over to the defense, right?
21    MR. O'CALLAGHAN:  Objection to the form of the
22  question.
23    MS. BRADY:  Go ahead.
24    A  I would never do that.
25    Q  And am I correct in understanding that the

Page 24

1  Cook County State Attorney had an obligation to respond
2  to something called a discovery request?
3    A  Yeah, that's a defense motion.  Motion for
4  discovery.  It's in the Supreme Court Rules, it operates
5  by operational law and there's no time limit on it or
6  anything like that.  And, yes, so when a defense --
7  usually at an arraignment, the state to file its motion
8  of discovery.  And when the attorney comes in the case
9  being employed as a public defender or private, they
10  then file their motions for discovery and the process
11  begins.  So, yes, it's our obligation to respond.
12    Q  Okay.  And did you memorialize what documents
13  you tendered to the defense in response to a discovery
14  request or otherwise?
15    A  We always do that in the blueback, which is
16  the State Attorney's record of court dates, what's
17  ordered and what's tendered, etc.
18    Q  And would it be fair to say that you looked at
19  all of the documents before you tendered them in
20  response to a discovery request?
21    A  Well, I looked at all the documents I had.  I
22  don't know what the term "all the documents" means --
23    Q  Fair.
24    A  -- or whatever was subpoenaed or requesting,
25  given to me, I looked at those and tendered everything I

Page 25

1  got to the defense.
2    Q  Did you consider yourself thorough in how you
3  prepared for murder trials as a first chair prosecutor?
4    MR. O'CALLAGHAN:  Objection to the form.
5    A  I would consider myself thorough in
6  preparation of any case I was charged with prosecuting.
7    Q  And for you, would you say being thorough
8  included knowing all of the documents that were in the
9  police file?
10    A  Well --
11    MS. ROSEN:  Objection.  Form.
12    Q  That had been provided to you.
13    A  Right.  I can't tell you what's in the police
14  file.  I can tell you what was forwarded to us, that's
15  what I would know in a filing sense and whatever I got,
16  I tendered.
17    Q  All right.  So I want to talk now about the
18  Demetrius Johnson case and the prosecution, and the
19  investigation into the shooting homicide of a person
20  named Edwin Fred in Humboldt Park in June of 1991.  Does
21  the Edwin Fred jog any memories for you?
22    A  No.  Other than the memory you just gave me
23  when you said he was the victim, but I don't know the
24  name of the victim and defendant.
25    Q  Okay.  You recall from reviewing the

Page 26

1  transcript that you gave the closing argument and
2  questioned all of the witnesses in Demetrius Johnson's
3  prosecution, right?
4      A  I do.
5      Q  Would that make you the lead prosecutor on
6  that case?
7      A  I think I was the only prosecutor because in
8  reviewing the transcript, I don't think the person who
9  was with me ever put anybody on, so anybody that went
10  on, anything that was introduced, it was all done by me.
11      Q  Okay. And you said you recalled Deborah
12  Gubin, who was the defense attorney?
13      A  Yes.
14      Q  And she's currently a Cook County
15  administrative law judge, or at least was recently?
16      A  I don't know. I know she ran for judge. She
17  might have been a Cook County Circuit Judge for a period
18  of time, but I'm aware that she's still in the criminal
19  justice system.
20      Q  Okay. And do you have an opinion about
21  Deborah Gubin as a defense attorney?
22      A  You know what? I thought she was a straight
23  shooter. I thought she put on a vigorous defense
24  theory. She had a theory of the case, and she tried the
25  case. So as far as I know she was a very experienced

Page 27

1  lawyer. I think she was a public defender before that,
2  so, you know, I thought she was a good lawyer.
3      Q  Did you think that she was ethical and honest?
4      A  I had no problem with her ethics or honesty.
5  I don't think the transcript shows me challenging
6  anything that happened, but I have no memory of her
7  being anything but, you know, a competent attorney.
8      Q  And did she seem well prepared to you?
9      A  She did. She -- I mean she came in later on
10  the case. There had been a public defender on the case,
11  I could see from the transcripts of Jack Carey, but she
12  seemed to hit the ground running. I believe she filed a
13  couple of defense motions. I don't know if they ever
14  were litigated. I seem to remember a motion to suppress
15  and a motion to suppress ID, so she did her due
16  diligence in reviewing the case and seeing what motions
17  might be appropriate.
18      Q  And did she strike you as someone who knew how
19  to cross-examine and impeach witnesses using documents?
20      A  Well, you know, that's a technical type of
21  question. I mean obviously cross examinations is the
22  other side's chance to challenge the witness.
23  Impeachment? I don't know if it was technically solid
24  impeachment. If there was impeachment in the transcript
25  and did she try to attempt and I didn't think was

Page 28

1  correct foundation I probably would have objected. It
2  was a bench trial Judge Cawley made the ruling and we
3  moved on.
4      Q  Did she strike you as a person who would have
5  impeached a witness with a document if it was available?
6        MS. ROSEN:  Objection. Calls for speculation.
7      A  If there were grounds. I mean if there was a
8  prior inconsistent statement, I -- I'm assuming that she
9  would climb on to that and do her job.
10      Q  Okay. And do you recall a defense attorney in
11  private practice named Ruth Miller, who is now a federal
12  Magistrate Judge in the Virgin Islands?
13      A  I did not know her latest foray in the legal
14  world, but I do remember Ruth -- Ruth Miller. She was a
15  long-time public defender at 26th Street. Long time. I
16  do -- did she appear on cases? I can't remember trying
17  anything against her, but she always was in the room
18  appearing on cases.
19      Q  And do you recall that now Judge Miller was
20  involved in the Demetrius Johnson case?
21      A  Was there what?
22      Q  That now Judge Miller was involved in the
23  Demetrius Johnson case?
24      A  She may well have been. I don't know, I don't
25  have an independent recollection of it, but the fact

Page 29

1  that you're suggesting it, leads me to believe that she
2  may have had some peripheral involvement in the case.
3      Q  Okay. And do you have an opinion about her as
4  a defense attorney?
5      A  You know, I really don't because I don't know
6  if I've ever tried a case with her or where she was a
7  partner to someone else in the public defender's office.
8  I have no recollection of that.
9      Q  And you mentioned a couple of minutes ago that
10  Demetrius Johnson had a public defender named John or
11  Jack Carey before --
12      A  Yeah.
13      Q  -- he retained private counsel. Had you
14  worked many cases with Mr. Carey?
15      A  Well, in working cases, yeah because he was on
16  murder task force. He would come in on murders, so he
17  would appear periodically when I -- before I was in a
18  gang unit in the court call representing various people.
19  I did try a case against him in another venue, another
20  courtroom, but I saw Jack Carey often. I knew Jack
21  Carey well. Now, deceased now. He passed away a number
22  of years ago, but he was one of those public defenders
23  you'd see in the hallway, you'd see in the courtroom
24  etc. So I do -- I'm familiar with Jack Carey.
25      Q  And by 1991, was -- did you have an opinion

Page 30

1  that he was an ethical and honest attorney?
2      A  Well, my opinion of him was he had risen in
3  the ranks of the public defender's office. And if I'm
4  correct that he was in murder task force at that time,
5  you don't get to be in that elite unit without having
6  some chops of legal ability.
7      Q  Did you ever get the impression that he was
8  unethical in any way?
9      A  No, not specifically in my interaction with
10  him.
11      Q  Do you recall a public defender by the name of
12  Mr. Carlos?
13      A  Mr. Carlos? Is that a first name or last
14  name?
15      Q  I believe Carlos is the last name.
16      A  That's not ringing a bell.
17      Q  All right. From your review of the transcript
18  in the Demetrius Johnson case, do you recall the
19  defense's theory was that a person named Brian Johns, or
20  the nickname Little D, was the one who actually
21  committed the murder?
22      A  I don't know if that was their theory. I do
23  know that they had an alibi, and it was reasonable
24  doubt, and it may have been insinuated by an
25  identification case, so, yeah, I'm aware of that being

Page 31

1  in there, yes.
2      Q  Okay. I want to put up what we'll call
3  Exhibit 1, this –
4      A  Sure.
5          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
6      MS. ROSEN: Rachel, can you tell us what's
7  Exhibit 1 by Bates?
8      MS. BRADY: Yes, I can, just a second here.
9  Okay, so for the record, this is an 18-page document
10  beginning at Bates Labeled Johnson1261, and I'll
11  represent to you, Judge Sheehan, that this is the
12  transcript from the closing argument in the
13  Demetrius Johnson case.
14      THE WITNESS: Okay.
15  BY MS. BRADY:
16      Q  Can you see this on your screen?
17      MR. O'CALLAGHAN: Can you give us one minute.
18  Judge, can you see the text of that?
19      THE WITNESS: I can't. I could see it better
20  if I stood and walked up, but I don't know what that
21  would do with my picture.
22      MR. O'CALLAGHAN: Do not do that.
23      THE WITNESS: Okay. I can –
24      MR. O'CALLAGHAN: Hold on. Ms. Brady, if you
25  need to refer to a portion of the transcript, can

Page 32

1  you just please zoom in on it?
2      MS. BRADY: Yes.
3      MR. O'CALLAGHAN: It's on our screen, but it is
4  small font.
5      MS. BRADY: Yes.
6  BY MS. BRADY:
7      Q  So I don't need you to take a look at this
8  whole argument, but I'm going to direct you to a
9  specific portion of this closing argument. But you can
10  see here on this first page of this document that the
11  Court says, "are both sides ready for final arguments?"
12  And you say, "yes." You said that you'll waive opening
13  and then Ms. Gubin stays up – stands up to give her
14  closing argument. Does that look right to you?
15      A  Yes.
16      Q  Okay. So I'm going to scroll down now to page
17  Johnson1266, which is labeled as B90 at the bottom, and
18  I'll zoom in for you here. Okay, can you see this?
19      A  I can.
20      Q  Okay. And there's a portion that's
21  highlighted. I have highlighted that for you, but I
22  feel like potentially the highlighting makes it a little
23  more difficult to read.
24      A  No, the text is fine. It's fine.
25      Q  Okay. All right. So take a look at this.

Page 33

1      A  Okay.
2      Q  And let me know you're ready for me to flip to
3  the next page.
4      A  Sure.
5      Q  Okay. Did you have a chance to read that?
6      A  I did. I did.
7      Q  Okay. So I can put it back up if you need me
8  to, but do you agree that in closing, Attorney Gubin
9  suggested that Brian Johns or Little D was the shooter?
10      A  Sure.
11      MS. ROSEN: Objection to form.
12      A  But closing arguments are not evidence, so I
13  don't know what supported that in the trial transcript,
14  but that obviously was part of the theory of the case.
15      Q  Okay. And do you recall your closing argument
16  at trial at all?
17      A  Not at all. It was a bench trial and, you
18  know, benches – sometimes remember juries, I don't
19  remember benches, or my closing argument.
20      Q  Okay. So I'm going to put up what we'll
21  Exhibit 2, and this is a transcript of your –
22      A  Sure.
23      Q  – closing rebuttal. And for the record this
24  is a 12-page document beginning at Johnson1278. Okay.
25  Can you see this on your screen?

Page 34

1     (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2     A   I can see it, it's very, very tiny though.
3   I know that you enhanced it before.
4     Q   Yes, I will blow it up for you, but I'll
5   represent to you that the top of this page is the tail
6   end of Ms. Gubin's closing and then you stand up and
7   give your rebuttal.
8     A   Okay.
9     Q   So I'm going to flip now to page B104, which
10  is Johnson1280, and I'll zoom in for you.
11    A   Okay.
12    Q   Can you see this highlighted section at the
13  top?
14    A   I can.
15    Q   And it says, "how much ado has been
16  made in this case about this Brian Johns, this other
17  maniac Latin Disciple who is known as Little D." Do you
18  see that?
19    A   I do.
20    Q   And then flipping down to the bottom you say,
21  "what does that tell you about Rosa Burgos' credibility?
22  Here she had a chance to finger Brian Johnson, she
23  didn't. Nor did four other people that Ms. Gubin asked
24  Detective Guevara that he interviewed. Yes, Forest
25  Garnett, yes, Aby Gonzalez. Did they look at that first

Page 35

1   line-up, did they pick out Brian Johns? No, it was a
2   negative line-up."
3     A   Yes.
4     Q   And then the top of the next page says,
5   "people on the scene; it isn't Brian Johns, he did not
6   do it. So what you have now here is Brian Johns out of
7   the way and she can bring out this Mr. Weeks
8   (phonetic)." Do you see that?
9     A   I do.
10    Q   Okay. So do you agree here that your closing
11  argument was that no one picked Brian Johns out of a
12  line-up?
13    A   As far as I knew. I know there was a negative
14  line-up, and I had no evidence that he was picked out,
15  so that would be correct.
16    Q   And do you agree here that you argued
17  specifically that a witness named Aby Gonzalez looked at
18  Brian Johnson in a line-up and did not identify him?
19    A   If that's what is written, that's what I
20  argued.
21    Q   Okay. And do you recall what document you
22  relied on to make this argument?
23    A   You're assuming I relied on a document with
24  the argument, but arguments are kind of ethereal. They
25  encompass everything you've learned about the case --

Page 36

1     Q   Okay.
2     A   -- so I can't point to a document that caused
3   me to argue that.
4     Q   Okay. I'm going to put up now what we'll call
5   Exhibit 3. Can you see this document on your screen
6   here?
7     (EXHIBIT 3 MARKED FOR IDENTIFICATION)
8     A   I can.
9     Q   I'll blow it up for you when I ask about
10  specific portions. For the record this is a three-page
11  document beginning at RFC40. And here we have -- I'll
12  represent to you a SUP report written by Ronaldo Guevara
13  and signed by Guevara and Erikson. It says it's a line-
14  up report. The date of the line-up is 12, June '91 and
15  the person -- one of the persons viewing the line-up is
16  Aby Gonzalez. Do you recall that you mentioned Aby
17  Gonzalez in your closing argument?
18    A   I do.
19    Q   Okay. So I'm turning down now to the third
20  page of this document. Here it says "Brian Johns is one
21  of the people participating in the line-up", and then it
22  says "persons identify line-up, negative line-up."
23    A   Yes.
24    Q   And then it says here "history and
25  investigation, four witnesses viewed this line-up, the

Page 37

1   results of it was negative." Because the results of the
2   line-up subject Johns, Brian was released without
3   charging. Do you see that?
4     A   I do.
5     Q   Okay. Would it be fair to say that you based
6   your closing argument at least in part on the
7   information contained in this line-up report?
8     MS. ROSEN: Objection. Objection. Sorry,
9     Judge, can I just get my objection in.
10    THE WITNESS: Sorry.
11    MS. ROSEN: Objection. Form. Incomplete
12    hypothetical. Calls for speculation. Foundation.
13    A   Yes, I'm assuming if that document was part of
14  the file it was tendered and there was a negative
15  line-up as far as I remember. At least more than one
16  negative line-up. I would have based my argument in
17  part at least on what was contained in that document.
18    Q   Okay. I'm going to put up what we'll call
19  Exhibit 4, which for the record is a two-page document
20  beginning at Bates Label RFC26. And I will represent to
21  you that this is a line-up report written by Detective
22  William Erikson of a line-up that occurred in this case.
23  And I will represent to you that this was not in the RD
24  file produced to us by the City, but was instead in a
25  different police file produced in this case, okay?

Page 38

1  (EXHIBIT 4 MARKED FOR IDENTIFICATION)
2  MS. ROSEN: That's not true. What you just
3  said is not true.
4  MS. BRADY: Yep, you're right, Eileen. Let me
5  say that over.
6  Q  I will represent to you that this report was
7  not in the investigative file produced to us by the
8  City.
9  MS. ROSEN: Object to form. Foundation. And I
10  don't think you're accurately representing what's
11  going on, but you do what you want.
12  BY MS. BRADY:
13  Q  So this report – can you see this on your
14  screen, Judge?
15  A  I can.
16  Q  So this is a line-up report listing some folks
17  who stood in this line-up, including Brian Johns.
18  A  Okay.
19  Q  I'm scrolling back up to the first page. It
20  lists Aby Gonzalez as one of the people who viewed the
21  line-up. Can you see that right here?
22  A  I can.
23  Q  And here this section in the middle it says,
24  "Aby Gonzalez then viewed the line-up. He viewed the
25  line-up as the participants were sitting side by side in

Page 39

1  chairs. The participants were not required to make any
2  movements or repeat any phrases. After viewing this
3  line-up he identified the Number 2 participant,
4  Brian Johns as the offender in this said homicide."
5  Do you see that?
6  A  I do.
7  Q  You did not have this document when you said
8  in your closing argument that Aby Gonzalez did not
9  identify Brian Johns in the line-up, did you?
10  A  No, I didn't know that existed.
11  MS. ROSEN: Objection. Objection. Form.
12  Foundation.
13  MR. O'CALLAGHAN: You may answer.
14  A  I've never seen this document at the time of
15  trial. This is the first time I've seen that document
16  with that person getting picked out.
17  Q  And if you'd this line-up or line-up report
18  marked as Exhibit 4 at the time of trial, you would not
19  have made the argument that you made in closing, would
20  you?
21  MS. ROSEN: Objection. Form. Foundation.
22  Calls for speculation.
23  MS. BRADY: Go ahead.
24  THE WITNESS: Absolutely not.
25  Q  If you would have had this report marked as

Page 40

1  Exhibit 4, documenting that Aby Gonzalez identified
2  Brian Johns in the line-up, you would have turned it
3  over the defense, right?
4  A  Immediately.
5  Q  And do you agree that this report is
6  exculpatory for Demetrius Johnson?
7  MS. ROSEN: Objection. Form. Foundation.
8  A  Yes, it's exculpatory as to anybody, because
9  it's someone else.
10  Q  And you're certain that you would have turned
11  it over, right?
12  A  Without question.
13  Q  And we discussed and looked at the closing
14  argument from Mr. Johnson's attorney, and do you recall
15  her argument was that Brian Johns was the shooter?
16  A  If you say so. I haven't looked at her
17  closing argument, but if you say so, I would recall that
18  and it's in the transcript, so
19  Q  Yeah, let me just put the transcript up so you
20  can take a look. This was Exhibit 1 and I'll zoom in.
21  And this is just a snippet from the closing argument.
22  A  Yes, I see it.
23  Q  Okay. All right. Does this refresh your
24  recollection that one of the arguments the defense made
25  in closing was that Brian Johns was the shooter?

Page 41

1  A  Well, the transcript speaks for itself. Those
2  are the words she used and those are the words I used,
3  so –
4  Q  Okay.
5  A  – I don't remember it, but the transcript
6  backs it up. It speaks for itself. Yes, that's the
7  argument she made.
8  Q  Okay. Based on your experience working with
9  Ms. Gubin, now Judge Gubin, if she would have had the
10  report that we just looked at saying that Aby Gonzalez
11  identified Brian Johns in a line-up, would you have
12  expected the defense to cross-examine witnesses about
13  this report?
14  MS. ROSEN: Objection. Form. Foundation.
15  Calls for speculation. Incomplete hypothetical.
16  A  Well, you're asking me to give the operation
17  of Ms. Gubin's mind. I would think as a seasoned
18  attorney with competing evidence that she would do that.
19  Q  And if the defense would have had that report
20  we just looked at, would you have expected the defense
21  to try and interview Aby Gonzalez and maybe call him at
22  trial?
23  MS. ROSEN: Objection. Form. Foundation.
24  Incomplete hypothetical. Calls for speculation.
25  A  Yes.

Page 42

1    Q   And if the defense had that Erikson report,
2 would you have expected them to call Detective Erikson
3 at trial and ask him about the line-up?
4       MS. ROSEN: Objection. Form. Foundation.
5 Incomplete hypothetical. Calls for speculation.
6    A   Well, they certainly could have. They could
7 just call the ID witness themselves; they could
8 corroborate it as the state often does of positive IDs
9 with the detective who was present for that. So could
10 they have done it? Absolutely.
11   Q   And would you expect the defense to raise this
12 issue that Aby Gonzalez -- that there is a report
13 documenting that Aby Gonzalez did identify Brian Johns?
14 Would you have expected the defense to raise that in
15 closing?
16   A   I don't --
17      MS. ROSEN: Objection. Form. Foundation.
18 Calls for speculation. Incomplete hypothetical.
19   A   Well, police reports are not evidence, so they
20 could not say that the police reports says this, it's
21 not evidence. But, certainly, they can make a logical
22 inference from testimony that's what happened.
23   Q   All right. So we've been discussing the
24 arguments that were and were not made at trial. I have
25 to ask this question, but is there any chance that you

Page 43

1 were tendered that report that we looked at Exhibit 4 --
2    A   You're talking about the line-up where Brian
3 Johns was picked out?
4    Q   Yes.
5    A   No, because if I had it, I have to sleep at
6 night. It goes to the defense.
7    Q   And does the information in the transcripts we
8 just reviewed, including your closing argument, confirm
9 to you or give you confidence that you had not been
10 provided a copy of that report marked as Exhibit 4?
11      MS. ROSEN: Objection. Form. Foundation.
12 Incomplete hypothetical. Calls for speculation.
13   A   It's not the argument that gives me
14 confidence. What gives me confidence is the truth, I
15 never got it.
16   Q   All right. So I will also represent that we
17 were produced pursuant to a subpoena a bunch of
18 documents from the State attorney's office, including
19 what I believe is some of your handwritten notes, so I'm
20 going to ask you some questions about those. So we'll
21 mark this as Exhibit 5. All right. So Exhibit 5 is a
22 14-page document beginning at CCSAO3. Can you see this
23 on your screen here?
24      (EXHIBIT 5 MARKED FOR IDENTIFICATION)
25   A   I can.

Page 44

1    Q   Okay, I'll zoom in so you can take a look, and
2 I'm going to ask you about some specific portions, but
3 I'm just going to flip through the pages so you can --
4    A   Sure.
5    Q   -- so you can see what's in here. Does this
6 look like your handwriting?
7    A   The whole page is all my handwriting.
8    Q   Okay. And I'm just flipping through the pages
9 so you can look at the whole document.
10   A   That's all my handwriting.
11   Q   Okay.
12   A   I don't know what that is.
13   Q   Okay. So here I'm on CCSA14, it looks like a
14 synopsis of the facts, and there's some handwriting, but
15 this is not your handwriting, right?
16   A   No, that was not produced by me.
17   Q   Okay. And then we're back on page CCSAO16, it
18 looks like your handwriting again.
19   A   It is.
20   Q   Okay. All right. So I'm going to direct your
21 attention to CCSAO7. Here in the top there's a box, I'm
22 just going to ask if you can help translate some of the
23 handwriting.
24   A   Sure.
25   Q   Can you see this?

Page 45

1    A   Yes, I can.
2    Q   Okay. Can you read what it says here in this
3 top note?
4    A   Yes. The first line is "simulcast?" which
5 leads me to believe, I was wondering if there was
6 simulcast from the police.
7    Q   Okay.
8    A   And 6-21-90 -- 6-12-91, which I take it is the
9 around the time of the occurrence, with Little D
10 italicized. So looking back at that now I can't tell
11 you what I was thinking then, but is there a simulcast
12 with Little D mentioned.
13   Q   Okay.
14   A   And then it says line-up photo, no ID,
15 6-13-91. So I mean that's what it says.
16   Q   Okay. What does this mean, 6-13-91 line-up
17 photo no ID?
18   A   It could well refer to the negative line-up
19 where there was no ID. I assume that's what the
20 negative line-up is.
21   Q   Okay.
22   A   I can't think about it being anything else.
23   Q   And according to your notes --
24   A   Right.
25   Q   -- this note, that there was potentially a

Page 46

1 line-up on 6-13 and no identification made; is that
2 right?
3 A I don't know if there was potentially a line-
4 up. I don't have a question mark there. It appears to
5 me that I'm aware of some line-up where there was no ID
6 and that's -- I mean it says what it says, yeah.
7 Q Okay. All right. And there's a couple of
8 other spots in this document where you refer to
9 conversations that you had with Detective Guevara.
10 A Right.
11 Q I'm here kind of right in the middle half of
12 this CCSAO7.
13 A Yes.
14 Q It looks like, "talked to Detective Guevara
15 3-24" --
16 A Right.
17 Q -- "gave him SUP, will locate photos." Is
18 that what that says?
19 MR. O'CALLAGHAN: Can you enlarge it please?
20 MS. BRADY: Sure.
21 A It looks like, "gave him SUP, will locate
22 photos."
23 Q Okay. And then here just a couple of lines
24 down it looks like another note that says,
25 "Guevara calls for 4-27." Do you see that?

Page 47

1 A I do.
2 Q Okay. Does this suggest to you that Detective
3 Guevara was your point of contact at the police
4 department for this case?
5 A No it suggests to me that if you look at the
6 above thing "talked to Guevara, will locate photos",
7 it appears to be, like, a second type of communication
8 where he called and then he was notified to bring in
9 pictures on 4-28. So I think it's the same subject
10 matter.
11 Q Okay.
12 A Because it says right here "for pictures,
13 April 30th for pictures."
14 Q Are you looking here at the bottom entry?
15 A I'm looking at the next thing you're now
16 highlighting April --
17 Q Okay.
18 A -- 30, 1992.
19 Q Okay.
20 A That was the date, if you look above it was
21 taken, to get the picture.
22 Q Okay. So would you agree that Detective
23 Guevara was the one contacting you about this case?
24 A Well because I think I contacted him about
25 pictures and -- yes, the answer would be yes.

Page 48

1 Q Okay. And do you believe it was Detective
2 Guevara who told you that the Johns' line-up resulted in
3 no identification?
4 MS. ROSEN: Objection. Form. Foundation.
5 Calls for speculation.
6 A I don't know if he had a conversation with me
7 about that. Obviously, I was in communication with him
8 saying I want these pictures and we have to tender them.
9 So I can't tell you we talked about it other than
10 notified and bring pictures, so that's all I can
11 remember.
12 Q Okay. Do you know where the information came
13 to you that was contained in the report that says there
14 was no identification of Brian Johns?
15 A No, I would just know that somewhere in the
16 report it said negative line-up. Where that information
17 stemmed from, I have no idea.
18 MS. ROSEN: I'm going to object. Sorry,
19 belatedly to there's nothing in the notes that says
20 anything about Brian Johns in the June 13th entry,
21 so form, foundation.
22 Q Is there any way to tell which Detective
23 provided you the information that there was no
24 identification made of Brian Johns in a line-up?
25 A No --

Page 49

1 MS. ROSEN: Objection. Form. Sorry, Judge.
2 Objection. Form.
3 THE WITNESS: I apologize.
4 MS. ROSEN: Yep, no worries. Objection. Form.
5 Foundation.
6 Q You can answer.
7 A Yeah, I would have no idea if -- who provided
8 what via oral or whatever other than I was looking for
9 pictures.
10 Q Okay. At least you agree though that you were
11 communicating with Detective Guevara about this case.
12 A Oh, in some way, shape or form, absolutely.
13 Q All right. So I'm turning now to the document
14 Bates labeled CCSAO5, and I'm going to ask you about
15 this portion at the top where it says ordered.
16 A Sure.
17 Q So let me zoom in, the part in red pen and
18 black here. Can you see this?
19 A I can.
20 Q Okay. So this says, "ordered 9-19-91."
21 What does that mean?
22 A It means -- I don't know where that date is in
23 reference to the arraignment. It might have been one of
24 the first dates, and as soon as I was assigned a case
25 and he was arraigned, you go to your office, and you

Page 50

1  begin the discovery process by perusing the reports you
2  have and finding out what's next to the order.
3     Q  Okay.
4     A  So that would be a common thing that would be
5  ordered on a murder case, that one through, I believe
6  it's nine.  The bruise sheets, everything read there,
7  protocol, morgue photos, that would be the typical
8  initial order for discovery in a murder case.
9     Q  Great.  Okay.  So what is this category one
10 say?
11    A  Bruise Sheet – I'm sorry.
12       MR. O'CALLAGHAN:  I'm sorry.  Judge, can you
13 read that or –
14    A  I can.  I can.  It says "bruise sheets, meds,
15 photos from audio."  What does that mean?  Well it means
16 that the bruise sheets are always ordered, that's when
17 the intake photographs are taken in the jail, so I don't
18 know at this point probably what statements were made,
19 were not made, anticipating a voluntary motion to
20 suppress statements.  I would always order the bruise
21 sheets initially.  Meds, if there was – I believe there
22 was, for the transcript an attempt murder victim on
23 here, that would be meds for that.  And something from
24 audio.  Somewhere along the line I glean that there was
25 juvenile involved or something and there may be records

Page 51

1  there that could be germane to be turned over.
2     Q  Okay.  And the Audy Home was the juvenile
3  detention –
4     A  It was – that kind of shows my age.
5     Q  Okay.  What is number two mean?
6     A  Number two is a protocol.  That's the medical
7  examiner's report.  I don't know if that term is still
8  the term that is used, but that would be what used to be
9  called the post-mortem, the report.  Cause, manner of
10 death by the Cook County Medical Examiner and any photos
11 that were taken by the medical examiner regarding the
12 cause of death or injuries.
13    Q  Okay.  What is this number 3 mean?
14    A  That's scene or line-up photos.  In a murder
15 case when the detectives go out they take photographs of
16 the scene, they make measurements.  If there's any
17 bullets, or fragments or evidence of value they
18 photograph those, so I would order the scene photos and
19 line-up photos on all murder cases.
20    Q  Okay.  What is number 4?
21    A  Street files –
22    Q  Okay.
23    A  – they're commonly known now and through the
24 years as the handwritten notes or investigative notes
25 detectives take at the scene in their own handwriting

Page 52

1  that later turn into typed police reports, so that would
2  be street files.
3     Q  What's number 5?
4     A  Five is juvenile record.  Again, there's must
5  have been some reference to someone who was not at the
6  adult age at the time and due diligence is to find out
7  if there's any juvenile records for that individual.
8     Q  Okay.  What's number 6?
9     A  Vic's meds.  That could be the second victim
10 not the murder victim who was treated along the side.
11 I don't know if the murder victim was treated along the
12 side, but whenever is someone is injured or received
13 hospitalization and then died, you order all medical
14 reports.
15    Q  Okay.  What's number 7?
16    A  IRs, that would be a request to see if those
17 particular witnesses; Edwin Fred and Raul Ortiz had any
18 criminal background or convictions.
19    Q  Okay.  And that's V-I-C as victim?
20    A  VIC, yes.
21    Q  Okay.  What's number 8?
22    A  Number 8 is a CV and photo.  The CV, that was
23 the arrest slip.  In those days it was a one-page
24 orangey-pink arrest slip written by the arresting
25 officer and there would be an accompanied CV photo.

Page 53

1  If he had been arrested before it would be on file, if
2  it was the first time, that photo would be taken so we
3  would order that.
4     Q  Okay.  And then what's number 9?
5     A  That's RDs, that's general police reports.
6  Any police report generated in a case is RDs.
7     Q  Okay.  And I think you mentioned this a little
8  bit earlier, but you had no way of knowing if you
9  received all of the police reports, you only know about
10 the ones that were given to you, right?
11    A  I can only tell you what I had; I can't tell
12 you what exists.
13    Q  Okay.
14    A  When we put those subpoenas and orders in, we
15 get what we get, and that's what we think we have based
16 on the subpoenas and the order in those reports.
17    Q  All right.  And then just real quickly asking
18 about these street files again.
19    A  Yeah.
20    Q  As you use this term, it was the handwritten
21 notes and then the reports that were typed up using the
22 handwritten notes about investigations that detectives
23 conducted in the field, right?
24    A  Right.
25       MS. ROSEN:  Objection.  Form.

Page 54

1  A  Sorry. Yeah, they're the initial notes taken
2  by the detective at the – it could be the scene, it
3  could be talking to a witness, it could be anything.
4  It ultimately are formally put in a police report.
5  They're the source of the police report. People call
6  them street files, people call them investigative files,
7  investigative notes, and they're the impressions and
8  notes taken by the police officers during the course of
9  the investigation.
10  Q  Okay. And you didn't consider a line-up
11  report to be a street file, right?
12  A  Well, the final line-up report may have
13  emanated from a street file, I don't know because I
14  don't know what people who ran the line-ups if they took
15  candid notes and then typed them onto a formal line-up
16  report or that was typed contemporaneously when the
17  line-up was done. I can't speak to the investigative
18  process of the detectives or the police officers.
19  Q  Okay. Was it your – I'm going to take this
20  down. Was it your understanding that the RD file should
21  contain all of the typed SUP reports in the case?
22  A  Well –
23  MS. ROSEN: Objection. Form. Foundation.
24  A  Not initially. You get reports sporadically
25  because obviously the RD is on the initial report, which

Page 55

1  I used to call it a beat report where the beat officers
2  respond to the scene and type up initial, basic
3  information of the scene and whoever they had a chance
4  to talk to there. That's the initial report called the
5  beat report. From that, when the detectives become
6  involved in the investigation and they make handwritten
7  notes, and street file notes, and so they ultimately
8  turn into more police reports. Those would be
9  supplementary reports, it may be a line-up report, there
10  may be an additional supplemental report from someone
11  else's interview. So RDs – obviously the case is under
12  our RD number and that number is consistent through all
13  the reports, until everything is gotten, and I think
14  there's a clarity closing that indicates the state
15  attorneys that that's everything, because it's closed
16  with the arrest and charge, so that's what we look for,
17  for all RDs.
18  Q  Okay. So in your experience, line-up reports
19  and notes about line-up reports should have been
20  tendered to you as part of the street file or the RD
21  file, right?
22  A  Well, yes, if they took notes for line-up
23  reports, but the line- up reports certainly will be
24  tendered. But, no, any and all reports generated by the
25  police whether in the form of handwritten notes or

Page 56

1  titled typed reports, should come to the state's
2  attorney.
3  Q  Okay. And you'll recall we looked at that
4  line-up report written by Detective Erikson –
5  A  Right.
6  Q  – saying that Brian Johns was identified in
7  the line-up, that Exhibit 4.
8  A  Yes.
9  Q  If you would have received that line-up
10  report, it would have been in the RD category.
11  MS. ROSEN: Objection to form. Foundation.
12  Calls for speculation. this
13  Q  Sorry, I'm going to back it up here, so
14  we're looking at Exhibit 5 and you have this RD category
15  which you said it included all of the, like, the line-up
16  reports. So my question is, if you would have been
17  given that line-up report, that's Exhibit 4 –
18  A  Right.
19  Q  – would you have expected it to be here in
20  this RD category.
21  A  Absolutely –
22  MS. ROSEN: Objection.
23  A  – they have the same consistent RD number on
24  it who was part of the investigation so, yes. It would
25  be part of the RDs in general. And if you look at all

Page 57

1  police reports they all reflect the RD number on them
2  for that particular case. So the answer to your
3  question is yes.
4  Q  Okay. And did you use the term GPRs in your
5  practice?
6  A  You know, they're called a number of things:
7  investigative file, GPRs, street files, so I may have
8  used GPRs in my writing here or there or street files.
9  In my mind it was interchangeable to me.
10  Q  Okay. All right. So we're still on page on
11  CCSAO5 of this Exhibit 5, but I'm going to direct your
12  attention now to this handwritten list underneath the
13  one we've just been looking at. I'll zoom in for you.
14  A  Okay.
15  Q  All right. Can you see this?
16  A  I can.
17  Q  Okay. So here it looks to me like it says
18  10-22 or 10-21-91 possibly 11-27-91, tendered to
19  defense. Do you –
20  A  Yes.
21  Q  – see that? Okay.
22  A  I do.
23  Q  What does that mean?
24  A  It means if you go to the earlier dates when I
25  ordered all kinds of stuff, so if this is what I

Page 58

1 received by this particular date. And in-person, in-
2 court and in front of the bench, you tender a packet to
3 the defense of what you copied and what you got from the
4 previous subpoenas or orders. And it appears there as
5 to exactly what it says there. RD, CV, BFI, victim's
6 BFI, felony review, oral summary, firearms reports.
7 That would be the officer in the firearm section,
8 Richard Chenew. Evidence reports. I don't recognize
9 this Hogan Bloomfield. I don't know if there was any
10 type of other evidence reports. I don't know what that
11 is, but whatever it is, I ordered it, I got it and I
12 tendered it. The protocol, of course, is the medical
13 examiner's report. GPRs interchangeable with street
14 files or investigative file. And what I put - - I
15 delineated what was including in that GPR packet, which
16 would include RD, the police report, the CV and the
17 arrest report, and the evidence reports, which goes back
18 to perhaps ballistics or something. Things found at the
19 scene, inventory slips, what was recovered in inventory.
20 And I – that last thing – and, oh, handwritten notes.
21     Q     That says HW notes?
22     A     I'm assuming that's handwritten notes.
23     Q     Okay.
24     A     I don't know what else it could be, which
25 would refer back to the general category GPR.

Page 59

1     Q     Okay. So here in number 1 where it says RD –
2     A     Right.
3     Q     – would this have been the same RD file that
4 you ordered?
5     A     Yes it's almost duplicitous, because when they
6 send you GPRs they send you everything, the handwritten
7 notes, and everything that emanated from them, so you're
8 actually giving a lot of excessive or duplicitous
9 discovery because as you see in the bottom in the GPRs,
10 that includes the RDs.
11     Q     Okay.
12     A     Any police reports generated a number of times
13 in that GPR packet.
14     Q     Okay. And if you – oh, strike that. This RD
15 set of reports and these GPRs, you would have looked at
16 them and read through them before tendering them to the
17 defense, right?
18     A     Actually, maybe, maybe not. I got what I got
19 and obviously, I looked through them because I counted
20 the pages –
21     Q     Okay.
22     A     – so I would peruse them to make sure of what
23 I'm tendering and then actually delineate and describe
24 with some particular detail what I could tender.
25     Q     Okay. And eventually, you would have learned

Page 60

1 the contents of the documents that you tendered to the
2 defense, right?
3     A     Oh, certainly, they would be read and reviewed
4 in anticipation of prep for trial, yes.
5     Q     And are you familiar with the court attendance
6 form?
7     A     Court attendance form – by your naming it, it
8 may have been a way of getting police officers to come
9 to court. I – I think –
10     Q     Right.
11     A     – there was some form. I don't know back in
12 1992 what it was. I know there's court attendance slips
13 in the ensuing years. I left the state attorney's
14 office in 1998 when I got elected, so I don't know that
15 it was called that, but I know there was some form of
16 notification.
17     Q     Okay. And you didn't consider a court
18 attendance report to be a GPR, right?
19     A     Well that was actually a personnel report
20 generated by the police department to get officers in,
21 so I don't think there's anything about the case on
22 there or evidentiary value, so if you're asking me now,
23 I don't think it's germane to the case. It's germane to
24 notifying officers to come in to bring evidence or
25 whatever.

Page 61

1     Q     Okay. And so when you refer to GPRs, for
2 instance, in your note taking, you didn't consider a
3 court attendance report to be a GPR, did you?
4     A     I don't know if I considered it, maybe they
5 shipped it, I don't know. I think I would have put that
6 there when I delineated all the other paperwork that
7 came.
8     Q     Okay. Do you recall ever seeing a court
9 attendance report as part of a GPR – a packet of GPRs?
10     A     I do not recall that.
11     Q     Okay. I'm going to ask you a question that
12 may require you to review all of these notes, so if you
13 want to take some time and look over them, you can. But
14 we talked a little bit about this note on page CCSAO7,
15 which is the one that says line-up photo – or 6-13-91
16 line-up photo, no ID. And I had asked you a lot of
17 questions about the report documenting that someone did,
18 in fact, identify Brian Johns out of a line-up. And it
19 looks to me like this is the only note that you have
20 about the line-up that occurred around 6-12 or 6- 13,
21 but I want to ask you if you see anything else in any of
22 your other notes that suggest you were ever told the
23 opposite?
24         MS. ROSEN: Objection. Form.
25     Q     So I'm just going to start here. Well,

Page 62

1  actually, I'll start at page one --
2      A   Yes, go ahead.
3      Q   -- and just give you a chance to review it in
4  a little bit more detail, and just let me know you're
5  ready for me to flip to the next page.
6      A   Sure.
7      MR. O'CALLAGHAN:  Excuse me one minute, Ms.
8  Brady.  Do you understand the question, or do you
9  want her to re-ask?
10     A   Well if you want to take it back to that
11  section you highlighted about that line-up or on around
12  June 13th.  I believe I saw the word negative there, did
13  I not?
14     Q   No ID.
15     A   And no ID which in my mind there was no -- no
16  one was ID'd.
17     Q   Yes.
18     A   But you seem to refer to that as the Brian
19  Johns line-up where he was picked out, which is untrue.
20     Q   Oh -- yeah, okay, let me clarify.  So I think
21  what you mentioned earlier is that this note reflects
22  that there was a line-up, and no ID was made.
23     A   Right.
24     Q   Which seems to me, and correct me if I'm
25  wrong, to be consistent with the closing argument that

Page 63

1  you made at trial.
2      MS. ROSEN:  Objection.  Form.  Foundation.
3  Incomplete hypothetical and ignores all the other
4  line-ups.
5      MS. BRADY:  I wasn't done asking my question,
6  so if you could please let me finish my question
7  before stating your objection, I'd appreciate that.
8      MS. ROSEN:  I'm sorry.
9      Q   So my question was this note says that there
10  was no identification made, which seems to me consistent
11  with your closing argument that Brian Johns was not
12  identified out of a line-up.  Would you agree?
13     MS. ROSEN:  Objection.  Form.  Foundation.
14  Incomplete hypothetical.
15     A   Right.  The only other line-up I know about
16  was the negative one, which that refers to, and I
17  wouldn't have argued that in my closing argument.
18     Q   Okay.  So what I'm asking you what to do now
19  is just take a look through your notes and see if you
20  can recognize a handwritten note anywhere where you may
21  have learned that there was a line-up in which Brian
22  Johns was identified.
23     A   Okay, be happy to do that.
24     Q   Okay.  So I'm starting back at page one and
25  just let me know you're ready to flip.

Page 64

1      A   You can flip.  You can flip.  This is where
2  I'm just ordering things, I don't know what exists, so
3  you can flip.
4      Q   Okay.
5      A   Yeah, can you enhance that a bit, it's kind of
6  small.
7      Q   Sure.
8      A   Yeah, I don't see anything there.  You know I
9  see polaroids ordered or displayed, so I got some photos
10  and displayed them to Ms. Gubin, so nothing on that
11  page.  I don't see anything there.  Again, I'm looking
12  for pictures at that point.
13     Q   Sure.  Okay.
14     A   So I don't see anything there about a
15  reference to that line-up where Mr. Johns is picked out.
16  That's just the term counter, you know, the old speedy
17  trial act.
18     Q   Okay.
19     A   Yeah, I don't see anything there.  That's
20  primarily referring to motions that was filed by the
21  defense.  That talks about -- apparently there's a
22  reference there to having interviewed some of the
23  witnesses in the police reports and if anything was
24  documented by Mr. Carey's investigator we were entitled
25  to see those, so that's what that's about.  So nothing

Page 65

1  about the line- up you refer to in question is on there.
2  Nothing there.  Nothing there.
3      Q   And then this CCSAO12 and 13 are the same.
4  It looks like there was just a post-it that was removed,
5  so I'll just show you CCSAO13.
6      A   Okay.  Yeah, I don't see anything there.  That
7  -- that's obviously in trial, and we're being set for a
8  bench trial, and witnesses are being served, so I don't
9  see anything there.
10     Q   Oh, and this you said wasn't your hand --
11     A   Because those are documents I -- actually, you
12  can see the name of the producer there was a Susan
13  Ziggler.  So I have no -- I don't know what that is.
14     Q   Okay.
15     A   Obviously this is a recitation of the trial
16  itself, of the witnesses who were called by us, then the
17  defense put a case on and so this is the trial posture
18  here and if you could go up a little more I can see what
19  happens next.  Yeah, and then the defense rest.  There
20  was a rebuttal with a firearm stip, and the judge's
21  findings, so nothing there.
22     Q   Okay.  So would you agree that there's nothing
23  in your handwritten notes to suggest that you ever
24  learned that Brian Johns had been identified out of a
25  line-up?

Page 66

1 MR. ENGQUIST: Objection. Foundation. Calls
2 for speculation.
3 A You're talking about the blueback which is a
4 record of each day in court --
5 Q Yes.
6 A -- and I saw nothing that would lead me to
7 believe that such a thing existed.
8 Q Okay. All right. I'm going to put up another
9 document that we'll call Exhibit 6. I'm very close to
10 being done here, so in case anyone's getting antsy, I'm
11 pretty close. Okay. So, I'm putting up now what we'll
12 call Exhibit 6. This is a one-page document labeled
13 RFCJohnson12.
14 (EXHIBIT 6 MARKED FOR IDENTIFICATION)
15 A Okay.
16 Q There's nothing on this page other than this
17 note, so I'll zoom in --
18 A Sure.
19 Q -- for you so you can see the whole thing.
20 All right. Can you see this on your screen?
21 A I can.
22 Q Okay. Do you know what this note is?
23 A You know I don't because it's obviously a
24 Chicago Police Department piece of paper, and it's to
25 Detective Halvorsen from me. Now I don't know if

Page 67

1 someone -- I called the area looking for Halvorsen and
2 he wasn't there, and that's a message he got from
3 another policeman to call me or maybe I said tell them
4 to bring the file, but that's not something generated by
5 me.
6 Q Okay. And you don't recall what file you were
7 asking him to bring, right?
8 A You know what? Often times when you get
9 discovery, and you get bits and pieces of different
10 kinds of street file, in those days, I would have a
11 detective if I thought I didn't have something or
12 thought there was additional stuff, I'd say just bring
13 your whole file from the beginning to the end with the
14 clear and closing stuff. It was not something in the
15 normal course of business, I just wanted to see
16 everything they had with their complete file.
17 Q Okay. And do you have a specific recollection
18 of doing that in this case or is that just your general
19 kind of --
20 A That wouldn't be -- not past recollection, but
21 obviously I reached out to the police department to give
22 -- tell Halvorsen to bring his file, that's all I can
23 tell you.
24 Q Okay.
25 A I have no independent recollection of that.

Page 68

1 Q Okay. And then if Halvorsen did bring you a
2 file you would have read the contents, right?
3 A Yes, I would have. I mean that was the whole
4 point of getting the file so I could review it for
5 discovery purposes, etc. And I don't know if there's a
6 date on that, vis-a-vis when the trial was, that's
7 November. So that's well before the trial, so I was
8 still looking to make sure discovery could be complete.
9 Q Okay. And if the line-up report documenting
10 the line-up in which Brian Johns was identified had been
11 in this file, you would have disclosed it, right?
12 A I would have disclosed it with great speed and
13 immediacy.
14 Q Okay.
15 A I would have called Ms. Gubin, immediately.
16 Q Okay.
17 A Or if Mr. Carey was on the case at that time,
18 immediately.
19 Q Okay. All right. I have just a couple
20 obnoxious questions I have to ask so that we get it on
21 the record, so please just bear with me here.
22 A I'm surprised nobody objected when you said
23 obnoxious.
24 Q Oh, they all agree that these are obnoxious
25 questions, I'm sure. All right. Did you withhold any

Page 69

1 exculpatory evidence from the defense in this case?
2 A Absolutely not.
3 Q Are you aware of any prosecutor in the Cook
4 County State Attorney's office who withheld exculpatory
5 evidence from the defense in this case?
6 A I was the only prosecutor -- are you talking,
7 like, through felony review and all that? I was the
8 only prosecutor who tried the case. I cannot speak for
9 what anybody else did. I would think not.
10 Q Okay. Do you have any reason to believe that
11 any Cook County prosecutor did withhold exculpatory
12 evidence from the defense in this case?
13 A No, I have no reason to believe that.
14 Q Okay.
15 MS. BRADY: I think that I'm done. I want to
16 take a look at my notes, so let's take a ten-minute
17 break and I'll review my notes.
18 THE WITNESS: That's fine, thank you.
19 MS. BRADY: Okay. Thank you.
20 COURT REPORTER: We're off the record at 11:21
21 a.m.
22 (OFF THE RECORD)
23 COURT REPORTER: We're back on the record at
24 11:35 a.m.
25 MS. BRADY: All right. I do not have anymore

Page 70

1   questions for you, so I will thank you for your time
2   and turn you over in case any of the other attorneys
3   have questions for you.
4         THE WITNESS:  Thank you.
5         CROSS EXAMINATION
6  BY MR. ENGQUIST:
7   Q   Good morning, Mr. Sheehan.
8   A   How are you?
9   Q   Just fine and dandy.  I just have some
10  questions for you.  I'll represent to you that
11  currently, from this office we do not have your trial
12  file.  Really what we have are -- what you looked at
13  today was your notes.  Okay?
14  A   Okay.
15  Q   So I'm just trying to get a general idea, in
16  your trial file when you're going to trial in a murder
17  case like this case was, what kind of things would be as
18  part of your file?
19  A   Well --
20       MS. BRADY:  Objection to form.  Sorry, go
21  ahead.  It was a form of objection.  Go ahead.
22  A   In those days, we had the big vanilla
23  expandable files and as you saw from the blueback, my
24  notes, of what I tendered in order.  It would almost be
25  in row fashion, RD, CV, BFI, street files, ballistics,

Page 71

1   whatever it was in the title.  You got that report, you
2   xeroxed it, tendered it and put it in there.  You may
3   have a line-up photo filed, you may have a photo file,
4   an insert, a line-up report insert, kind of separating
5   all of the components of the Chicago Police Department's
6   documents they sent you.
7   Q   Okay.  So you would have kept all of the
8   documents that were turned over to you by the Chicago
9   Police Department, correct?
10  A   Not me personally.  I don't keep anything.
11  When that file was done -- when sentencing was
12  accomplished, it was sent to the file room.  After the
13  defendant was sentenced, motions for new trial were
14  heard, defendant sentenced, et cetera, then that file
15  was disposition, and that file would have been sent to
16  the file room in the State Attorney's office wherever
17  that was then and is now.
18  Q   Yeah, I'm sorry, my question wasn't that
19  exact.  I guess I'm not just trying to imply that you
20  were the keeper of the records for the State Attorney's
21  office --
22  A   No, no, you said you would keep this.  I said,
23  no, the file was done.
24  Q   Yeah.
25  A   The next trial comes my way, that one goes.

Page 72

1   Q   When you were done with your file, before you
2   passed it off after the case was over, you would have
3   all the records and -- that were given to you by the
4   police department in your file, correct?
5   A   Sure, yes.
6   Q   So at that time, you could actually open it
7   up, and you would be able to see every document, what it
8   was, and you would know that that was turned over to the
9   defense, correct?
10  A   Yes, because it was a trial file and when
11  you're trying the case, and you're going to question
12  somebody, say with a line-up report or a police report
13  or some type of statement by a witness, you go right to
14  that section in the file, pull it out because you have
15  the originals -- you mark it, so it was very easy then
16  to try the case.
17  Q   Yeah, I just want to make sure that if someone
18  had your file which doesn't exist now --
19  A   Yeah.  I don't know where --
20  Q   -- they could go to and pull out, and you
21  would see all the police reports --
22  A   Correct.
23  Q   -- that you had, correct?
24  A   Correct.
25  Q   Okay.  And they would be able to see all the

Page 73

1   notes that the detectives tendered to you would be in
2   there, too, correct?
3   A   Whatever I did would be in that file.  They
4   could see everything.
5   Q   And would you have your own notes having to do
6   with witness interviews and your own investigation into
7   the case before the trial?
8   A   No -- you mean in the file or --
9   Q   Yes, in the file.
10  A   I normally just interview witnesses -- I just
11  didn't -- the police reports were there; I knew what
12  they said to the police --
13  Q   Okay.
14  A   -- so I'd bring them in for prep and talk to
15  them.
16  Q   Okay.
17  A   I wouldn't have handwritten notes of that
18  because I would go off the police report which was there
19  to review initially.
20  Q   And if there were witness statements taken by
21  felony review that would be part of your file, too,
22  correct?
23  A   Without a question.
24  Q   Okay.  And as you said, you used the blueback
25  to kind of memorialize what was being turned over to the

Page 74

1 defense file -- to the defendants, correct?
2    A   Well, that was done contemporaneously in
3 court.  When you want your court called and you tender
4 everything, you put on the record I'm tendering RD, CV,
5 BFI and then I'm at the bench up there -- that's not
6 recorded when I go back upstairs.  That's recorded right
7 there contemporaneously, with me saying what I tendered.
8    Q   Okay.  And I just want to be clear, as you sit
9 here today, you know, I know you've looked at the
10 transcript and you've looked at your notes here, but you
11 don't have the independent recollection of every report
12 that you were given, every report that you looked at in
13 this case; is that correct?
14    A   No, I don't, it's 30 years ago and I don't
15 have the file, so I don't have an independent
16 recollection of those things.  I do not.
17    Q   Okay.  Did you have -- or I mean, did you ever
18 practice when you were working in attorney's office of
19 having basically an open file practice with the opposing
20 counsel?
21    A   Did you say practice?
22    Q   Yes.
23    A   Again, I don't like the word practice, it was
24 just the course of business in the courtroom.  I mean
25 you knew the PDs who are assigned, you knew the criminal

Page 75

1 defense attorneys who came in.  So I would open my file
2 and say, look, if there's things you don't got, take a
3 look here to make sure before we go to trial that
4 everybody has everything.
5    Q   Okay.  And do you recall specifically if you
6 did that in this case?
7    A   I can't say I did, or I didn't.  It would --
8 first of all, in a murder case you want to make sure
9 that if there's an conviction you're protecting the
10 integrity of that, so you would want to make sure the
11 defense has everything they need to proceed at trial.
12        MR. ENGQUIST:  That's all I have.  Anybody else
13 have anything?
14        MS. ROSEN:  I don't have any questions.
15        MS. MCGRATH:  I don't have any questions.
16        MS. BRADY:  I don't have anything.  So, thank
17 you very much for your time, Judge.  We --
18        MS. ROSEN:  Waive or reserve?  Rachel?  Waive
19 or reserve?
20        MR. BRADY:  Sean?
21        MR. ENGQUIST:  Sean?
22        MR. O'CALLAGHAN:  We'll waive.
23        (DEPOSITION CONCLUDED AT 11:41 A.M.)
24
25

Page 76

1            CERTIFICATE OF REPORTER
2              STATE OF ILLINOIS
3
4 I do hereby certify that the witness in the foregoing
5 transcript was taken on the date, and at the time and
6 place set out on the Title page hereof by me after first
7 being duly sworn to testify the truth, the whole truth,
8 and nothing but the truth; and that the said matter was
9 recorded digitally by me and then reduced to typewritten
10 form under my direction, and constitutes a true record
11 of the transcript as taken, all to the best of my skills
12 and ability. I certify that I am not a relative or
13 employee of either counsel, and that I am in no way
14 interested financially, directly or indirectly, in this
15 action.
16
17
18
19
20
21
22 KORTNEY CHASE,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 09/24/2025
25 SUBMITTED ON: 05/10/2022

**1**

**1** 31:3,5,7 40:20 59:1

**10-21-91** 57:18

**10-22** 57:18

**11-27-91** 57:18

**11:21** 69:20

**11:35** 69:24

**11:41** 75:23

**12** 36:14

**12-page** 33:24

**13** 61:20 65:3

**13th** 48:20 62:12

**14-page** 43:22

**18-page** 31:9

**1984** 14:18

**1990** 14:20

**1991** 25:20 29:25

**1991-1992** 17:25

**1992** 14:20,23 15:2,22 47:18 60:12

**1998** 15:25 60:14

**2**

**2** 33:21 34:1 39:3

**20's** 16:7

**26th** 28:15

**3**

**3** 36:5,7 51:13

**3-24** 46:15

**30** 47:18 74:14

**30's** 16:3

**30th** 47:13

**4**

**4** 37:19 38:1 39:18 40:1 43:1,10 51:20 56:7,17

**4-27** 46:25

**4-28** 47:9

**5**

**5** 43:21,24 52:3 56:14 57:11

**50** 16:1

**500** 15:16

**6**

**6** 52:8 66:9,12, 14

**6-** 61:20

**6-12** 61:20

**6-12-91** 45:8

**6-13** 46:1

**6-13-91** 45:15, 16 61:15

**6-21-90** 45:8

**7**

**7** 52:15

**8**

**8** 52:21,22

**9**

**9** 53:4

**9-19-91** 49:20

**90's** 23:5

**91** 14:24 36:14

**A**

**a.m.** 69:21,24 75:23

**ability** 30:6

**absolutely** 16:25 20:9 39:24 42:10 49:12 56:21 69:2

**Aby** 34:25 35:17 36:16 38:20,24 39:8 40:1 41:10,21 42:12,13

**accompanied** 52:25

**accomplished** 71:12

**accurate** 10:1, 4

**accurately** 38:10

**accused** 11:24

**act** 64:17

**actual** 13:3

**additional** 55:10 67:12

**administrative** 26:15

**ado** 34:15

**adult** 52:6

**affect** 10:5,10

**affirm** 8:9

**age** 51:4 52:6

**agree** 8:2 21:6 22:11 33:8 35:10,16 40:5 47:22 49:10 63:12 65:22 68:24

**ahead** 9:16 19:6 22:21

23:23 39:23 62:2 70:21

**alibi** 30:23

**allegations** 10:12,14,22

**amount** 16:3

**answering** 13:21

**answers** 9:10 10:1

**anticipating** 50:19

**anticipation** 60:4

**antsy** 66:10

**anymore** 69:25

**anyone's** 66:10

**apologize** 49:3

**apparently** 64:21

**appeals** 14:19 17:4

**appearance** 7:4

**appearing** 7:19 28:18

**appears** 46:4 47:7 58:4

**approximately** 17:1

**approximation** 15:12

**April** 47:13,16

**area** 67:1

**argue** 36:3

**argued** 35:16, 20 63:17

**argument** 26:1 31:12 32:8,9,14 33:15,19 35:11, 22,24 36:17 37:6,16 39:8,19

40:14,15,17,21 41:7 43:8,13 62:25 63:11,17

**arguments** 32:11 33:12 35:24 40:24 42:24

**armed** 16:24

**arraigned** 49:25

**arraignment** 24:7 49:23

**array** 19:20 20:7,12

**arrest** 52:23,24 55:16 58:17

**arrested** 53:1

**arresting** 52:24

**article** 11:17

**assigned** 14:19,22 49:24 74:25

**assignments** 15:9

**association** 11:19

**assume** 22:6 45:19

**assuming** 18:20 28:8 35:23 37:13 58:22

**attachment** 13:2

**attempt** 27:25 50:22

**attendance** 60:5,7,12,18 61:3,9

**attending** 7:4, 8,13,16

**attention** 44:21 57:12

**attorney** 9:13,

17 12:4,12,19
13:3,10,18
24:1,8 26:12,21
27:7 28:10 29:4
30:1 33:8 40:14
41:18 56:2

**attorney's**
14:16 24:16
43:18 60:13
69:4 71:16,20
74:18

**attorneys** 9:13
14:7 23:6 55:15
70:2 75:1

**audio** 9:2
50:15,24

**Audy** 51:2

**aware** 10:20,21
18:1 26:18
30:25 46:5 69:3

———————

**B**

**B104** 34:9

**B90** 32:17

**back** 13:3,22
16:5 33:7 38:19
44:17 45:10
56:13 58:17,25
60:11 62:10
63:24 69:23
74:6

**background**
14:10,15 52:18

**backs** 41:6

**ballistics**
58:18 70:25

**bar** 16:1

**based** 10:15
18:23 37:5,16
41:8 53:15

**basic** 55:2

**basically**
74:19

**Bates** 31:7,10
37:20 49:14

**bear** 68:21

**beat** 55:1,5

**begin** 8:13
50:1

**beginning**
31:10 33:24
36:11 37:20
43:22 67:13

**begins** 24:11

**behalf** 7:7,9

**belatedly**
48:19

**bell** 30:16

**bench** 28:2
33:17 58:2 65:8
74:5

**benches**
33:18,19

**BFI** 58:5,6
70:25 74:5

**big** 70:22

**bit** 21:19 23:4
53:8 61:14 62:4
64:5

**bits** 67:9

**black** 49:18

**blatantly** 18:22

**Bloomfield**
58:9

**blow** 34:4 36:9

**blue** 13:3

**blueback**
24:15 66:3
70:23 73:24

**bottom** 32:17
34:20 47:14
59:9

**box** 44:21

**Brady** 7:6,7
8:4,15,17 17:24
18:1,5,8,20
19:6,7 20:20
21:5,9 22:7
23:23 31:8,15,

24 32:2,5,6
38:4,12 39:23
46:20 62:8 63:5
69:15,19,25
70:20 75:16,20

**break** 9:20,23
69:17

**Brian** 30:19
33:9 34:16,22
35:1,5,6,11,18
36:20 37:2
38:17 39:4,9
40:2,15,25
41:11 42:13
43:2 48:14,20,
24 56:6 61:18
62:18 63:11,21
65:24 68:10

**briefly** 8:21

**bring** 35:7 47:8
48:10 60:24
67:4,7,12,22
68:1 73:14

**bruise** 50:6,11,
14,16,20

**bullets** 51:17

**bunch** 43:17

**Burgos'** 34:21

**business**
67:15 74:24

———————

**C**

**call** 15:17 17:8
29:18 31:2 36:4
37:18 41:21
42:2,7 54:5,6
55:1 66:9,12
67:3

**called** 12:13
13:22 14:3 24:2
47:8 51:9 55:4
57:6 60:15
65:16 67:1
68:15 74:3

**calls** 16:25
17:9 28:6 37:12
39:22 41:15,24
42:5,18 43:12

46:25 48:5
56:12 66:1

**candid** 54:15

**career** 17:3

**Carey** 27:11
29:11,14,20,21,
24 68:17

**Carey's** 64:24

**Carlos** 30:12,
13,15

**Carol** 11:9

**case** 8:17
10:13,16,18,22,
25 11:5,7,10,
13,14,19 12:12,
14,16,22,24
13:7,12,24,25
14:5,7 15:18,19
17:12 18:24
22:7 24:8 25:6,
18 26:6,24,25
27:10,16 28:20,
23 29:2,6,19
30:18,25 31:13
33:14 34:16
35:25 37:22,25
47:4,23 49:11,
24 50:5,8 51:15
53:6 54:21
55:11 57:2
60:21,23 65:17
66:10 67:18
68:17 69:1,5,8,
12 70:2,17
72:2,11,16 73:7
74:13 75:6,8

**cases** 8:20
12:18 15:3,5,
17,23 17:7
28:16,18 29:14,
15 51:19

**category** 50:9
56:10,14,20
58:25

**caused** 36:2

**Cawley** 28:2

**CCSA14** 44:13

**CCSAO12**
65:3

**CCSAO13**
65:5

**CCSAO16**
44:17

**CCSAO3** 43:22

**CCSAO5** 49:14
57:11

**CCSAO7** 44:21
46:12 61:14

**cetera** 71:14

**chair** 14:24
15:9,10 16:24
17:5,7,10 25:3

**chaired** 17:2

**chairs** 17:7
39:1

**challenge**
27:22

**challenging**
27:5

**chance** 27:22
33:5 34:22
42:25 55:3 62:3

**charge** 55:16

**charged** 25:6

**charging** 37:3

**Chenew** 58:8

**Chicago** 7:8,
11,14,16,17,20
66:24 71:5,8

**choose** 23:12,
19

**chops** 30:6

**Circuit** 26:17

**City** 7:15 37:24
38:8

**civil** 11:22

**clarify** 8:23
62:20

**clarity** 55:14

**clean** 9:12

**clear** 67:14
74:8

climb 28:9

close 66:9,11

closed 55:15

closing 26:1
31:12 32:9,14
33:8,12,15,19,
23 34:6 35:10
36:17 37:6
39:8,19 40:13,
17,21,25 42:15
43:8 55:14
62:25 63:11,17
67:14

Collie 13:9

comfortable
23:14

committed
30:21

common 18:13
50:4

commonly
51:23

communicating 49:11

communication 47:7 48:7

competent
27:7

competing
41:18

complaint
10:15,23

complete 9:5
10:1,3 67:16
68:8

components
71:5

CONCLUDED
75:23

conditions
10:5

conducted
53:23

confidence
43:9,14

confirm 43:8

conflicting
23:2

conservative
18:19

considered
17:12 61:4

consistent
55:12 56:23
62:25 63:10

contact 47:3

contacted
11:9 47:24

contacting
47:23

contained
37:7,17 48:13

contemporaneously 54:16
74:2,7

contents 17:16
60:1 68:2

conversation
13:17,20 48:6

conversations
14:6 20:6 46:9

convict 16:19

conviction
11:20 75:9

convictions
52:18

Cook 14:15
24:1 26:14,17
51:10 69:3,11

copied 58:3

copy 43:10

core 20:2

correct 12:5
17:15,19,25
23:25 28:1 30:4
35:15 62:24
71:9 72:4,9,22,
23,24 73:2,22
74:1,13

corrected 9:2

correctly 16:2

corroborate
42:8

counsel 29:13
74:20

count 15:8

counted 59:19

counter 64:16

County 14:16
24:1 26:14,17
51:10 69:4,11

couple 14:2,14
27:13 29:9
46:7,23 68:19

court 7:2,22
8:2,7,13 9:3
15:17 17:9
24:4,16 29:18
32:11 58:2
60:5,7,9,12,17
61:3,8 66:4
69:20,23 74:3

courtroom
14:25 29:20,23
74:24

credibility
22:24 34:21

crime 15:19
16:22 17:9

crimes 15:2,4,
11,13 16:6 17:2

criminal 13:3
18:2 19:2 20:23
21:21 23:6
26:18 52:18
74:25

cross 27:21
70:5

cross-
examine 27:19
41:12

crossed 22:12

CV 52:22,25
58:5,16 70:25
74:4

D

Daley 7:10

dandy 70:9

date 36:14
47:20 49:22
58:1 68:6

dates 24:16
49:24 57:24

David 14:1

day 66:4

days 14:3
52:23 67:10
70:22

death 51:10,12

Debby 13:10

Deborah
26:11,21

deceased
29:21

December
14:18

defendant
7:12 10:16
11:22 18:2
19:3,13 20:24
21:21 25:24
71:13,14

defendant's
11:13

defendants
7:10 12:13,21
13:18 23:6 74:1

defender
13:11 24:9
27:1,10 28:15
29:10 30:11

defender's
29:7 30:3

defenders
29:22

defense 13:10
14:7 18:15,17,
18,24 23:20
24:3,6,13 25:1

26:12,21,23
27:13 28:10
29:4 40:3,24
41:12,19,20
42:1,11,14 43:6
57:19 58:3
59:17 60:2
64:21 65:17,19
69:1,5,12 72:9
74:1 75:1,11

defense's
30:19

definition 10:3
18:13 19:8
20:19 22:5,16

delineate
59:23

delineated
58:15 61:6

Demetrius
8:18 10:24 11:5
13:24 15:19
17:12 25:18
26:2 28:20,23
29:10 30:18
31:13 40:6

department
47:4 60:20
66:24 67:21
71:9 72:4

Department's
71:5

deponent 7:19

deposed 8:19

deposition
10:17 12:3,10
75:23

describe 23:7,
8 59:23

detail 59:24
62:4

detective
10:18 34:24
37:21 42:2,9
46:9,14 47:2,22
48:1,22 49:11
54:2 56:4 66:25
67:11

Case: 1:20-cv-04156 Document #: 213-10 Filed: 02/21/23 Page 25 of 32 PageID #:3820
The Deposition of KEVIN SHEEHAN, taken on April 26, 2023

80

**detectives** 51:15,25 53:22 54:18 55:5 73:1

**detention** 51:3

**died** 52:13

**differently** 23:18

**difficult** 32:23

**diligence** 27:16 52:6

**direct** 8:14 32:8 44:20 57:11

**Disciple** 34:17

**disclosed** 68:11,12

**disclosing** 23:5

**discovery** 24:2,4,8,10,13, 20 50:1,8 59:9 67:9 68:5,8

**discuss** 17:23

**discussed** 19:23 40:13

**discussing** 42:23

**discussion** 14:2 20:4

**displayed** 64:9,10

**displaying** 19:20

**disposition** 71:15

**division** 17:4

**divisions** 14:25

**document** 28:5 31:9 32:10 33:24 35:21,23 36:2,5,11,20 37:13,17,19 39:7,14,15 43:22 44:9 46:8

**detectives** 49:13 66:9,12 72:7

**documentary** 12:8

**documented** 64:24

**documenting** 19:12 40:1 42:13 61:17 68:9

**documents** 17:20 20:6 24:12,19,21,22 25:8 27:19 43:18 60:1 65:11 71:6,8

**doubt** 30:24

**due** 27:15 52:6

**duplicitous** 59:5,8

———

**E**

**earlier** 23:4 53:8 57:24 62:21

**early** 16:3 23:5

**easy** 72:15

**Edwin** 25:20, 21 52:17

**Eileen** 7:15 38:4

**elected** 15:25 60:14

**elite** 30:5

**else's** 13:16 55:11

**emanated** 54:13 59:7

**employed** 24:9

**encompass** 35:25

**end** 34:6 67:13

**enforcement** 20:16

**Enquist** 7:9 12:13 66:1 70:6 75:12,21

**enhance** 64:5

**enhanced** 34:3

**enlarge** 46:19

**ensuing** 60:13

**entitled** 64:24

**entry** 47:14 48:20

**equating** 16:5

**era** 13:11

**Erikson** 7:10 36:13 37:22 42:1,2 56:4

**estimate** 15:24

**ethereal** 35:24

**ethical** 27:3 30:1

**ethics** 27:4

**eventually** 59:25

**evidence** 18:3, 12 23:2,5 33:12 35:14 41:18 42:19,21 51:17 58:8,10,17 60:24 69:1,5,12

**evidentiary** 60:22

**exact** 71:19

**EXAMINATIO N** 8:14 70:5

**examinations** 27:21

**examiner** 51:10,11

**examiner's** 51:7 58:13

**excessive** 59:8

**exculpatory** 18:3,12,14,21, 22,23,25 19:9,

14,18,24 20:1, 4,10,18 21:1,21 22:2,5,16,25 23:5 40:6,8 69:1,4,11

**Excuse** 62:7

**exhibit** 31:3,5, 7 33:21 34:1 36:5,7 37:19 38:1 39:18 40:1,20 43:1, 10,21,24 56:7, 14,17 57:11 66:9,12,14

**exist** 72:18

**existed** 39:10 66:7

**exists** 53:12 64:2

**expandable** 70:23

**expect** 42:11

**expected** 41:12,20 42:2, 14 56:19

**experience** 41:8 55:18

**experienced** 17:13 26:25

**extensively** 14:10

**extent** 14:5

**eyewitness** 19:1,13 20:22

———

**F**

**fact** 8:3 20:25 28:25 61:18

**facts** 44:14

**factually** 11:18

**fair** 17:11 23:18 24:18,23 37:5

**familiar** 10:12, 14 29:24 60:5

**fashion** 70:25

**favorable** 18:14

**federal** 28:11

**feel** 32:22

**felony** 10:19 14:25 58:6 69:7 73:21

**field** 53:23

**figure** 15:14

**file** 13:3 17:17, 20 18:16 23:13, 20 24:7,10 25:9,14 37:14, 24,25 38:7 53:1 54:11,13,20 55:7,20,21 57:7 58:14 59:3 67:4,6,10,13, 16,22 68:2,4,11 70:12,16,18 71:3,11,12,14, 15,16,23 72:1, 4,10,14,18 73:3,8,9,21 74:1,15,19 75:1

**filed** 27:12 64:20 71:3

**files** 51:21 52:2 53:18 54:6 57:7,8 58:14 70:23,25

**filing** 25:15

**final** 32:11 54:12

**find** 52:6

**finding** 50:2

**findings** 65:21

**fine** 32:24 69:18 70:9

**finger** 34:22

**finish** 9:5 63:6

**firearm** 58:7 65:20

**firearms** 58:6

Case: 1:20-cv-04156 Document #: 213-10 Filed: 02/21/23 Page 26 of 32 PageID #:3821
The Deposition of KEVIN SHEEHAN, taken on April 20, 2023

81

**first-chair** 16:21

**flip** 33:2 34:9 44:3 62:5 63:25 64:1,3

**flipping** 34:20 44:8

**flux** 11:10

**folks** 38:16

**follow** 18:5

**font** 32:4

**foray** 28:13

**force** 29:16 30:4

**Forest** 34:24

**form** 16:13,16 19:4,16,21 20:13 21:2,24 22:13,19 23:21 25:4,11 33:11 37:11 38:9 39:11,21 40:7 41:14,23 42:4, 17 43:11 48:4, 21 49:1,2,4,12 53:25 54:23 55:25 56:11 60:6,7,11,15 61:24 63:2,13 70:20,21

**formal** 54:15

**formally** 54:4

**forwarded** 25:14

**found** 58:18

**foundation** 28:1 37:12 38:9 39:12,21 40:7 41:14,23 42:4, 17 43:11 48:4, 21 49:5 54:23 56:11 63:2,13 66:1

**fragments** 51:17

**Fred** 25:20,21 52:17

**front** 58:2

**full** 7:23,24

_____

**G**

**gang** 14:22 15:1 16:23 29:18

**gangs** 15:19

**Garnett** 34:25

**gave** 25:22 26:1 46:17,21

**general** 53:5 56:25 58:25 67:18 70:15

**generally** 10:20 17:6

**generated** 53:6 55:24 59:12 60:20 67:4

**germane** 51:1 60:23

**give** 8:9 9:7,9, 15 15:8,12,15 17:1 31:17 32:13 34:7 41:16 43:9 62:3 67:21

**giving** 59:8

**glean** 50:24

**Gonzalez** 34:25 35:17 36:16,17 38:20, 24 39:8 40:1 41:10,21 42:12, 13

**good** 7:6 8:16 15:10 17:5 27:2 70:7

**GPR** 58:15,25 59:13 60:18 61:3,9

**GPRS** 57:4,7,8 58:13 59:6,9,15 61:1,9

**great** 50:9 68:12

**ground** 8:20 27:12

**grounds** 28:7

**Gubin** 13:10 26:12,21 32:13 33:8 34:23 41:9 64:10 68:15

**Gubin's** 34:6 41:17

**guess** 16:7 71:19

**Guevara** 7:13 10:18 34:24 36:12,13 46:9, 14,25 47:3,6,23 48:2 49:11

**guy** 11:2

_____

**H**

**half** 46:11

**hallway** 29:23

**Halvorsen** 7:10 66:25 67:1,22 68:1

**hand** 8:8 65:10

**handwriting** 13:5 44:6,7,10, 14,15,18,23 51:25

**handwritten** 43:19 51:24 53:20,22 55:6, 25 57:12 58:20, 22 59:6 63:20 65:23 73:17

**happened** 27:6 42:22

**happy** 63:23

**head** 9:11 10:19

**Healy** 7:10

**hear** 11:11

**heard** 10:24 11:1 71:14

**helps** 16:8

**highlighted** 32:21 34:12 62:11

**highlighting** 32:22 47:16

**history** 36:24

**hit** 27:12

**Hogan** 58:9

**Hold** 31:24

**Home** 51:2

**homicide** 19:1 25:19 39:4

**honest** 27:3 30:1

**honesty** 27:4

**hospitalizatio n** 52:13

**Humboldt** 25:20

**HW** 58:21

**hypothetical** 19:5,17,22 20:14 21:3,25 22:14,20 37:12 41:15,24 42:5, 18 43:12 63:3, 14

_____

**I**

**ID** 27:15 42:7 45:14,17,19 46:5 61:16 62:14,15,22

**ID'D** 62:16

**idea** 10:15 16:8 17:1 48:17 49:7 70:15

**identification** 20:3,11 30:25 31:5 34:1 36:7 38:1 43:24 46:1

48:3,14,24 63:10 66:14

**identified** 19:2,13 20:23 21:13,20 39:3 40:1 41:11 56:6 63:12,22 65:24 68:10

**identify** 20:18 22:10 35:18 36:22 39:9 42:13 61:18

**identifying** 22:2

**IDS** 42:8

**ignores** 63:3

**immediacy** 68:13

**immediately** 40:4 68:15,18

**impeach** 27:19

**impeached** 28:5

**impeachment** 22:24 27:23,24

**imply** 71:19

**important** 17:7

**impression** 30:7

**impressions** 54:7

**in-** 58:1

**include** 58:16

**included** 25:8 56:15

**includes** 59:10

**including** 38:17 43:8,18 58:15

**incomplete** 19:5,16,21 20:13 21:2,24 22:13,20 37:11 41:15,24 42:5, 18 43:12 63:3,

14

**inconsistent** 28:8

**independent** 11:6 28:25 67:25 74:11,15

**individual** 52:7

**inference** 42:22

**information** 37:7 43:7 48:12,16,23 55:3

**initial** 50:8 54:1,25 55:2,4

**initially** 50:21 54:24 73:19

**injured** 52:12

**injuries** 51:12

**insert** 71:4

**insinuated** 30:24

**instance** 61:2

**instructs** 9:17

**intake** 50:17

**integrity** 75:10

**interaction** 30:9

**interchangeab le** 57:9 58:13

**interpretation** 18:16

**interpreted** 20:21

**interview** 41:21 55:11 73:10

**interviewed** 34:24 64:22

**interviews** 22:4 73:6

**introduced** 26:10

**invented** 23:15

**inventory** 58:19

**investigation** 25:19 36:25 54:9 55:6 56:24 73:6

**investigations** 53:22

**investigative** 38:7 51:24 54:6,7,17 57:7 58:14

**investigator** 64:24

**involved** 10:17 28:20,22 50:25 55:6

**involvement** 29:2

**IRS** 52:16

**Islands** 28:12

**issue** 20:2 22:6 42:12

**issues** 8:25 10:20 22:23

**italicized** 45:10

**J**

**Jack** 27:11 29:11,20,24

**jail** 50:17

**January** 14:18

**job** 14:21 16:18 28:9

**jog** 14:1 25:21

**jogs** 12:23 14:4

**John** 29:10

**Johns** 30:19 33:9 34:16 35:1,5,6,11 36:20 37:2 38:17 39:4,9

40:2,15,25 41:11 42:13 43:3 48:14,20, 24 56:6 61:18 62:19 63:11,22 64:15 65:24 68:10

**Johns'** 48:2

**Johnson** 8:18 13:24 15:19 25:18 28:20,23 29:10 30:18 31:13 34:22 35:18 40:6

**Johnson's** 10:25 11:5 17:12 26:2 40:14

**Johnson1261** 31:10

**Johnson1266** 32:17

**Johnson1278** 33:24

**Johnson1280** 34:10

**join** 14:15 21:7

**Josh** 7:9

**judge** 8:16 13:9 15:25 22:19 26:15,16, 17 28:2,12,19, 22 31:11,18 37:9 38:14 41:9 49:1 50:12 75:17

**judge's** 65:20

**June** 25:20 36:14 48:20 62:12

**juries** 15:14 16:2 33:18

**justice** 16:19 26:19

**juvenile** 50:25 51:2 52:4,7

**K**

**keeper** 71:20

**Kevin** 7:19,21, 24 8:3

**kind** 10:3 14:14 35:24 46:11 51:4 64:5 67:19 70:17 71:4 73:25

**kinds** 22:22 57:25 67:10

**knew** 12:15 13:11 16:18 21:12 27:18 29:20 35:13 73:11 74:25

**knowing** 13:22 17:16 25:8 53:8

**L**

**Label** 37:20

**labeled** 31:10 32:17 49:14 66:12

**landline** 13:22

**late** 14:23

**latest** 28:13

**Latin** 34:17

**Lavin** 14:1

**law** 20:16 23:9 24:5 26:15

**lawsuit** 11:22

**lawyer** 27:1,2

**lawyers** 9:6

**lead** 17:15,19 26:5 66:6

**leads** 29:1 45:5

**learned** 13:23 35:25 59:25 63:21 65:24

**left** 60:13

**legal** 28:13 30:6

**level** 11:20

**license** 23:9

**limit** 24:5

**line-** 36:13 46:3 55:23 65:1

**line-up** 19:1,12 20:24 21:11 35:1,2,12,14,18 36:14,15,21,22, 25 37:2,7,15, 16,21,22 38:16, 17,21,24,25 39:3,9,17 40:2 41:11 42:3 43:2 45:14,16,18,20 46:1,5 48:2,16, 24 51:14,19 54:10,12,15,17 55:9,18,19,22 56:4,7,9,15,17 61:15,16,18,20 62:11,19,22 63:12,15,21 64:15 65:25 68:9,10 71:3,4 72:12

**line-ups** 54:14 63:4

**lines** 46:23

**list** 57:12

**listing** 38:16

**lists** 38:20

**litigated** 27:14

**live** 19:1,12

**locate** 46:17,21 47:6

**location** 7:5

**logical** 42:21

**Long** 28:15

**long-time** 28:15

**looked** 24:18, 21,25 35:17 40:13,16 41:10,

20 43:1 56:3 59:15,19 70:12 74:9,10,12

**lot** 12:18 15:8, 21 59:8 61:16

**low** 9:2

—————

**M**

**machine** 13:21

**made** 28:2 34:16 39:19 40:24 41:7 42:24 46:1 48:24 50:18,19 62:22 63:1,10

**Magistrate** 28:12

**make** 8:22 11:18 21:15 26:5 35:22 39:1 42:21 51:16 55:6 59:22 68:8 72:17 75:3,8,10

**makes** 32:22

**man** 8:18

**maniac** 34:17

**manner** 51:9

**mark** 43:21 46:4 72:15

**marked** 31:5 34:1 36:7 38:1 39:18,25 43:10, 24 66:14

**Maryland** 17:25 18:2

**material** 12:8 20:20 22:8

**matter** 47:10

**maximize** 17:6

**Mcgrath** 7:12 75:15

**means** 24:22 49:22 50:15 57:24

**measurements** 51:16

**media** 10:25

**medical** 51:6, 10,11 52:13 58:12

**medications** 10:8

**meds** 50:14,21, 23 52:9

**meets** 22:5

**Megan** 7:12

**memorialize** 24:12 73:25

**memories** 25:21

**memory** 10:6, 10 12:24 14:4 25:22 27:6

**mentioned** 13:25 29:9 36:16 45:12 53:7 62:21

**message** 13:21 67:2

**method** 23:15

**Michael** 7:24

**middle** 38:23 46:11

**Miller** 28:11,14, 19,22

**mind** 41:17 57:9 62:15

**minimize** 17:6

**minute** 31:17 62:7

**minutes** 29:9

**misconduct** 11:25

**moral** 23:8

**morgue** 50:7

**morning** 7:6 8:16 70:7

**motion** 21:15 24:3,7 27:14,15 50:19

**motions** 24:10 27:13,16 64:20 71:13

**moved** 28:3

**movements** 39:2

**murder** 15:23 16:6,15 25:3 29:16 30:4,21 50:5,8,22 51:14,19 52:10, 11 70:16 75:8

**murders** 16:4, 24 29:16

—————

**N**

**named** 25:20 28:11 29:10 30:19 35:17

**naming** 60:7

**narcotics** 15:5

**negative** 35:2, 13 36:22 37:1, 14,16 45:18,20 48:16 62:12 63:16

**news** 10:25

**newspaper** 11:6,12,15

**newspapers** 11:3

**nickname** 30:20

**night** 43:6

**nodding** 9:10

**normal** 67:15

**note** 45:3,25 46:24 61:2,14, 19 62:21 63:9, 20 66:17,22

**notes** 43:19 45:23 48:19

51:24 53:21,22 54:1,7,8,15 55:7,19,22,25 58:20,21,22 59:7 61:12,22 63:19 65:23 69:16,17 70:3, 24 73:1,5,17 74:10

**notification** 60:16

**notified** 47:8 48:10

**notifying** 60:24

**November** 68:7

**number** 15:9, 11,12,15,18 17:5 29:21 39:3 51:5,6,13,20 52:3,8,15,21,22 53:4 55:12 56:23 57:1,6 59:1,12

—————

**O**

**O' CALLAGHAN** 7:18 8:6 12:3 16:13,16 21:4, 10 23:21 25:4 31:17,22,24 32:3 39:13 46:19 50:12 62:7 75:22

**object** 9:7,14 38:9 48:18

**objected** 28:1 68:22

**objection** 16:13,16 19:4, 16,21 20:13 21:2,6,7,24 22:13,19 23:21 25:4,11 28:6 33:11 37:8,9,11 39:11,21 40:7 41:14,23 42:4, 17 43:11 48:4

49:1,2,4 53:25 54:23 56:11,22 61:24 63:2,7,13 66:1 70:20,21

**objections** 9:8,16 21:8

**obligation** 18:1 23:8 24:1, 11

**obligations** 17:24 18:8

**obnoxious** 68:20,23,24

**occurred** 37:22 61:20

**occurrence** 45:9

**odd** 16:2

**offender** 39:4

**offer** 14:17

**office** 7:11,13, 16,20 10:17 14:16 29:7 30:3 43:18 49:25 60:14 69:4 70:11 71:16,21 74:18

**officer** 52:25 58:7

**officers** 54:8, 18 55:1 60:8, 20,24

**one-page** 52:23 66:12

**open** 18:16 72:6 74:19 75:1

**opening** 32:12

**operates** 24:4

**operation** 41:16

**operational** 24:5

**opinion** 20:20 26:20 29:3,25 30:2

opposing 74:19

opposite 61:23

oral 49:8 58:6

orangey-pink 52:24

order 50:2,8,20 51:18 52:13 53:3,16 70:24

ordered 24:17 49:15,20 50:5, 16 57:25 58:11 59:4 64:9

ordering 64:2

orders 53:14 58:4

originals 72:15

Ortiz 52:17

**P**

packet 58:2,15 59:13 61:9

pages 44:3,8 59:20

paper 66:24

paperwork 61:6

Park 25:20

part 17:8 33:14 37:6,13,17 49:17 55:20 56:24,25 61:9 70:18 73:21

participant 39:3

participants 38:25 39:1

participating 36:21

parties 7:3 8:2

partner 29:7

parts 23:12,19

party 21:6

passed 29:21 72:2

past 67:20

PDS 74:25

pen 49:17

pending 9:22

people 13:8 29:18 34:23 35:5 36:21 38:20 54:5,6,14

period 26:17

periodically 29:17

peripheral 29:2

person 12:14, 19 13:22 25:19 26:8 28:4 30:19 36:15 39:16 58:1

personally 71:10

personnel 60:19

persons 36:15, 22

peruse 59:22

perusing 50:1

phonetic 35:8

photo 19:20,25 20:12 45:14,17 52:22,25 53:2 61:15,16 71:3

photograph 51:18

photographs 50:17 51:15

photos 19:19 20:7 46:17,22 47:6 50:7,15 51:10,14,18,19 64:9

phrases 39:2

pick 23:12,19 35:1

picked 35:11, 14 39:16 43:3 62:19 64:15

picture 31:21

pictures 47:9, 12,13,21,25 48:8,10 49:9 64:12

piece 66:24

pieces 67:9

place 21:23

plaintiff 7:7 8:17

plethora 15:17

point 10:18 15:15 16:2 36:2 47:3 50:18 64:12 68:4

polaroids 64:9

police 19:10, 11,19 20:6,11 22:9 23:12,19 25:9,13 37:25 42:19,20 45:6 47:3 52:1 53:5, 6,9 54:4,5,8,18 55:8,25 57:1 58:16 59:12 60:8,20 64:23 66:24 67:21 71:5,9 72:4,12, 21 73:11,12,18

policeman 67:3

policy 18:16

portion 31:25 32:9,20 49:15

portions 36:10 44:2

positive 42:8

possibly 57:18

post- 11:20

Post-conviction 11:9

post-it 65:4

post-mortem 51:9

posture 65:17

potentially 32:22 45:25 46:3

practice 13:12 23:4,7,8,9,12, 14,16 28:11 57:5 74:18,19, 21,23

practiced 23:10

prep 60:4 73:14

preparation 25:6

prepare 12:9

prepared 17:21 25:3 27:8

present 42:9

pretty 66:11

previous 58:4

previously 10:19 13:10 14:24

primarily 64:20

prior 16:23 28:8

private 13:12 24:9 28:11 29:13

problem 27:4

procedure 19:12

procedures 20:11,16

proceed 75:11

PROCEEDINGS 7:1

process 24:10 50:1 54:18

produce 18:2

produced 37:24,25 38:7 43:17 44:16

producer 65:12

prosecuted 15:3,10,13 17:12

prosecuting 25:6

prosecution 16:15 17:9,21 25:18 26:3

prosecution's 14:22 17:17

prosecutor 13:7 16:12,18, 21 17:13,15,19 18:6 22:7 25:3 26:5,7 69:3,6,8, 11

prosecutors 17:24

protecting 75:9

protocol 50:7 51:6 58:12

provide 10:1

provided 25:12 43:10 48:23 49:7

public 13:11 24:9 27:1,10 28:15 29:7,10, 22 30:3,11

pull 72:14,20

purpose 12:3

purposes 21:5 68:5

pursuant 43:17

Case: 1:20-cv-04156 Document #: 213-19 Filed: 02/21/23 Page 30 of 32 PageID #:3825
The Deposition of KEVIN SHEEHAN, taken on April 27, 2023

85

**put** 9:8,15
20:17 26:9,23
31:2 33:7,20
36:4 37:18
40:19 53:14
54:4 56:13
58:14 61:5
65:17 66:8 71:2
74:4

**putting** 66:11

___

**Q**

**question** 8:23,
24 9:5,17,22
21:20 22:15
23:22 27:21
40:12 42:25
46:4 56:16 57:3
61:11 62:8
63:5,6,9 65:1
71:18 72:11
73:23

**questioned**
26:2

**questions**
8:22 9:14 10:1
14:15 43:20
61:17 68:20,25
70:1,3,10
75:14,15

**quick** 21:4

**quickly** 53:17

___

**R**

**Rachel** 7:7
8:17 31:6 75:18

**Ragala** 11:9

**raise** 8:8 42:11,
14

**ran** 26:16 54:14

**ranks** 30:3

**rapes** 16:24

**Raul** 52:17

**RDS** 53:5,6
55:11,17 56:25
59:10

**re-ask** 62:9

**reached** 67:21

**read** 11:4,14,
16,17 13:5 14:4
32:23 33:5 45:2
50:6,13 59:16
60:3 68:2

**reading** 13:15

**ready** 32:11
33:2 62:5 63:25

**real** 21:4 53:17

**reason** 9:25
10:4 69:10,13

**reasonable**
30:23

**reasons** 23:1

**rebuttal** 33:23
34:7 65:20

**recall** 15:22
25:25 28:10,19
30:11,18 33:15
35:21 36:16
40:14,17 56:3
61:8,10 67:6
75:5

**recalled** 26:11

**received** 52:12
53:9 56:9 58:1

**recently** 8:19
14:11,23 26:15

**recitation**
65:15

**recognize** 58:8
63:20

**recognized**
13:4,7

**recollection**
11:6 28:25 29:8
40:24 67:17,20,
25 74:11,16

**record** 7:2,23
9:8,12,16 21:5
24:16 31:9
33:23 36:10
37:19 52:4 66:4
68:21 69:20,22,

23 74:4

**recorded** 74:6

**records** 50:25
52:7 71:20 72:3

**recovered**
58:19

**red** 49:17

**refer** 31:25
45:18 46:8
58:25 61:1
62:18 65:1

**reference**
49:23 52:5
64:15,22

**referring** 64:20

**refers** 63:16

**reflect** 57:1

**reflected** 20:6

**reflects** 62:21

**refresh** 40:23

**released** 37:2

**relied** 35:22,23

**remember**
11:13 12:16,17
13:12,18 16:2
27:14 28:14,16
33:18,19 37:15
41:5 48:11

**remembering**
12:24

**removed** 65:4

**repeat** 39:2

**report** 19:11
36:12,14 37:7,
21 38:6,13,16
39:17,25 40:5
41:10,13,19
42:1,12 43:1,10
48:13,16 51:7,9
53:6 54:4,5,11,
12,16,25 55:1,
4,5,9,10 56:4,
10,17 58:13,16,
17 60:18,19
61:3,9,17 68:9
71:1,4 72:12

73:18 74:11,12

**reported** 14:19

**reporter** 7:2,22
8:2,7,13 9:4
69:20,23

**reports** 22:3
42:19,20 50:1
52:1,14 53:5,9,
16,21 54:21,24
55:8,9,13,18,
19,23,24 56:1,
16 57:1 58:6,8,
10,17 59:12,15
64:23 72:21
73:11

**represent** 8:17
12:14,20 31:11
34:5 36:12
37:20,23 38:6
43:16 70:10

**represented**
12:2,21

**representing**
7:19 29:18
38:10

**represents**
12:12

**reputation**
18:10

**request** 24:2,
14,20 52:16

**requesting**
24:24

**require** 61:12

**required** 39:1

**reserve** 75:18,
19

**respond** 24:1,
11 55:2

**response**
24:13,20

**responsibilitie
s** 16:12

**responsible**
17:16

**rest** 65:19

**resulted** 48:2

**resulting** 22:3

**results** 37:1

**retail** 15:5

**retained** 29:13

**review** 10:19
12:8 30:17 58:6
61:12 62:3 68:4
69:7,17 73:19,
21

**reviewed**
12:11 13:1
17:20 43:8 60:3

**reviewing**
25:25 26:8
27:16

**reviews** 16:1

**RFC26** 37:20

**RFC40** 36:11

**RFCJOHNSO
N12** 66:13

**Richard** 58:8

**ringing** 30:16

**risen** 30:2

**robberies** 15:6
16:25

**Ronaldo** 36:12

**room** 12:6
28:17 71:12,16

**Rosa** 34:21

**Rosen** 7:15 8:5
19:4,16,21
20:13 21:2,24
22:13,19 25:11
28:6 31:6 33:11
37:8,11 38:2,9
39:11,21 40:7
41:14,23 42:4,
17 43:11 48:4,
18 49:1,4 53:25
54:23 56:11,22
61:24 63:2,8,13
75:14,18

**row** 70:25

Case: 1:20-cv-04156 Document #: 213-19 Filed: 02/21/23 Page 31 of 32 PageID #:3826
The Deposition of KEVIN SHEEHAN, taken on April 10, 2023

86

rule 18:5,20

rules 8:20 24:4

ruling 28:2

running 27:12

Ruth 28:11,14

_____

S

S-H-E-E-H-A-
7:25

savvy 11:2

scale 16:9

scatterings
11:1

scenario 22:3

scene 35:5
51:14,16,18,25
54:2 55:2,3
58:19

screen 31:16
32:3 33:25 36:5
38:14 43:23
66:20

scroll 32:16

scrolling
38:19

Sean 7:18 12:3
75:20,21

seasoned
41:17

section 34:12
38:23 58:7
62:11 72:14

seek 16:19

sees 22:7

send 12:25
59:6

sense 8:22
25:15

sentenced
71:13,14

sentencing
71:11

separating
71:4

served 65:8

set 59:15 65:7

shape 49:12

Sheehan 7:19,
21,22,25 8:3,7,
16 31:11 70:7

Sheet 50:11

sheets 50:6,
14,16,21

shipped 61:5

shooter 20:25
21:1,23 22:10,
11 26:23 33:9
40:15,25

shooting 19:1
20:22,23 21:22
25:19

shortly 14:18

shoulders
9:11

show 65:5

showing 19:25

shows 27:5
51:4

shrugging
9:11

side 21:14
38:25 52:10,12

side's 27:22

sides 32:11

signed 36:13

simply 14:3

simulcast
45:4,6,11

sit 74:8

sitting 13:25
38:25

sleep 43:5

slip 52:23,24

slips 58:19

60:12

small 32:4 64:6

snippet 40:21

solemnly 8:8

solid 27:23

source 54:5

speak 54:17
69:8

speaks 41:1,6

specific 10:21
32:9 36:10 44:2
67:17

specifically
30:9 35:17 75:5

speculation
28:6 37:12
39:22 41:15,24
42:5,18 43:12
48:5 56:12 66:2

speed 68:12

speedy 64:16

spoke 19:19

sporadically
54:24

spots 46:8

stand 34:6

stands 32:13

start 9:6 61:25
62:1

starting 63:24

state 7:3,23
11:10 14:16
17:24 24:1,7,16
42:8 43:18
55:14 60:13
69:4 71:16,20

state's 12:19
13:3 56:1

statement
28:8 72:13

statements
50:18,20 73:20

stating 63:7

stays 32:13

stemmed
48:17

stip 65:20

stood 31:20
38:17

straight 26:22

street 28:15
51:21 52:2
53:18 54:6,11,
13 55:7,20
57:7,8 58:13
67:10 70:25

strike 14:20
19:11 20:22
23:11 27:18
28:4 59:14

stuff 16:1 57:25
67:12,14

subject 18:15
37:2 47:9

subpoena
18:18 43:17

subpoenaed
24:24

subpoenas
53:14,16 58:4

sued 12:20

suggest 47:2
61:22 65:23

suggested
33:9

suggesting
29:1

suggestive
20:11,15

suggests 47:5

summary 58:6

supplemental
55:10

supplementar
y 55:9

supported
33:13

suppress
21:15 27:14,15
50:20

Supreme 24:4

surprised
68:22

Susan 65:12

swear 8:8

synopsis
44:14

system 26:19

_____

T

tail 34:5

taking 61:2

talk 25:17 55:4
73:14

talked 46:14
47:6 48:9 61:14

talking 11:10
22:22 43:2 54:3
66:3 69:6

talks 64:21

target 20:18

task 29:16 30:4

tech 8:24

technical
27:20

technically
22:25 27:23

technologicall
y 11:2

teens 16:7

ten-minute
69:16

tender 48:8
58:2 59:24 74:3

tendered
20:21 22:4
23:1,2 24:13,
17,19,25 25:16
37:14 43:1
55:20,24 57:18

58:12 60:1 70:24 71:2 73:1 74:7

**tendering** 59:16,23 74:4

**term** 23:14 24:22 51:7,8 53:20 57:4 64:16

**testified** 14:11

**testimony** 8:9 42:22

**text** 11:17 31:18 32:24

**theft** 15:5

**theory** 18:23 26:24 30:19,22 33:14

**thing** 9:21 23:16,17 47:6, 15 50:4 58:20 66:7,19

**things** 22:23 57:6 58:18 64:2 70:17 74:16 75:2

**thinking** 45:11

**thought** 26:22, 23 27:2 67:11, 12

**three-page** 36:10

**time** 9:6,12,20 11:13 17:11 18:6 21:12 24:5 26:18 28:15 30:4 39:14,15, 18 45:9 52:6 53:2 61:13 68:17 70:1 72:6 75:17

**timeframe** 18:1

**times** 59:12 67:8

**tiny** 34:2

**title** 14:21 71:1

**titled** 56:1

**today** 10:2 70:13 74:9

**told** 22:9 48:2 61:22

**top** 34:5,13 35:4 44:21 45:3 49:15

**touched** 23:3

**trace** 17:3

**transcribing** 9:4

**transcript** 12:11,22 13:1, 2,5,14,16 14:2 26:1,8 27:5,24 30:17 31:12,25 33:13,21 40:18, 19 41:1,5 50:22 74:10

**transcripts** 12:9 27:11 43:7

**translate** 44:22

**treated** 52:10, 11

**trial** 13:6 14:25 16:22 17:4,13 22:12,23 28:2 33:13,16,17 39:15,18 41:22 42:3,24 60:4 63:1 64:17 65:7,8,15,17 68:6,7 70:11,16 71:13,25 72:10 73:7 75:3,11

**trials** 25:3

**true** 38:2,3

**truth** 8:10,11 43:14

**turn** 20:5 23:13,20 52:1 55:8 70:2

**turned** 21:11, 18 40:2,10 51:1

71:8 72:8 73:25

**turning** 36:19 49:13

**two-page** 37:19

**type** 27:20 47:7 55:2 58:10 72:13

**typed** 52:1 53:21 54:15,16, 21 56:1

**typical** 50:7

———————

**U**

**ultimately** 18:21 54:4 55:7

**umbrella** 22:25

**underneath** 57:12

**understand** 8:22 11:21,23 12:1 62:8

**understanding** 18:11 23:25 54:20

**understood** 9:24

**unethical** 30:8

**unit** 11:9 14:22 15:1 16:23 29:18 30:5

**untrue** 62:19

**upstairs** 74:6

———————

**V**

**V-I-C** 52:19

**Vague** 20:14

**vanilla** 70:22

**venue** 29:19

**verbal** 9:10

**versus** 17:24

18:2

**VIC** 52:20

**Vic's** 52:9

**victim** 25:23,24 50:22 52:9,10, 11,19

**victim's** 58:5

**view** 18:19

**viewed** 18:23 19:1 36:25 38:20,24

**viewing** 36:15 39:2

**vigorous** 26:23

**violent** 15:2,4, 11,13,19 16:6, 22 17:2,8

**Virgin** 28:12

**vis-a-vis** 68:6

**voluntary** 50:19

———————

**W**

**waive** 32:12 75:18,22

**walked** 31:20

**wanted** 67:15

**Weeks** 35:7

**wide** 20:19

**William** 37:22

**withheld** 69:4

**withhold** 68:25 69:11

**witnesses** 20:7 26:2 27:19 36:25 41:12 52:17 64:23 65:8,16 73:10

**wondering** 45:5

**word** 62:12

74:23

**words** 41:2

**worked** 15:23 29:14

**working** 11:7 29:15 41:8 74:18

**world** 28:14

**worries** 49:4

**writing** 57:8

**written** 35:19 36:12 37:21 52:24 56:4

**wrong** 62:25

———————

**X**

**xeroxed** 71:2

———————

**Y**

**year** 11:3 12:12 15:13,16

**years** 16:4 29:22 51:24 60:13 74:14

———————

**Z**

**Ziggler** 65:13

**zoom** 7:8,11, 13,16 9:13 32:1,18 34:10 40:20 44:1 49:17 57:13 66:17