IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | |
|     *Plaintiff*, | ) | Case No. 20-cv-4156 |
| | ) | |
|     *v.* | ) | Judge Sara L. Ellis |
| | ) | |
| REYNALDO GUEVARA, the ESTATE of ERNEST HALVERSON, DARRYL DALEY, WILLIAM ERICKSON, JOHN HEALY, and the CITY OF CHICAGO | ) ) ) ) | Magistrate Judge Heather K. McShain |
| | ) | |
|     *Defendants*. | ) ) | JURY TRIAL DEMANDED |

**DEFENDANT GUEVARA'S STATEMENT OF ADDITIONAL FACTS**

Defendant Reynaldo Guevara, through his counsel, Leinenweber Baroni and Daffada, submits this Statement of Additional Material Facts ("SOAF"), pursuant to Local Rule 56.1(b)(3), in opposition to Plaintiff's Partial Motion for Summary Judgment. (Dkt. 210).

**A.    Demetrius Johnson, Terrell Agee & Bryan Johns: MLDs and Best Friends.**

1.    In 1991, Demetrius Johnson ("Johnson") was associated with the Maniac Latin Disciples ("MLD").

Supporting Evidence: JSOF[1] Ex. 35 -- Demetrius Johnson Dep. at 45:18-22; Deposition of Terrell Agee, attached hereto as Ex. A at 12:24-14:12 ("I used to be a Maniac Latin Disciple. We all were at the time. We all - you know, we didn't grow up - you know, we were some bad kids. I'll put it to you that way, and we had names on the streets.")

2.    His best friends, Terrell Agee ("Agee") and Bryan Johns, ("Johns") were fellow MLDs. Johnson's older brother Darrell was also an MLD.

---

[1] To the extent that the supporting evidence comes from exhibits that have previously been filed with the Parties Joint Statement of Facts (Dkt. 212), Defendant Guevara refers to the exhibits attached as "JSOF Ex." Any exhibits that were not included in the JSOF are attached to Defendant Guevara's SOAF.

Supporting Evidence: JSOF Ex. 35 – Demetrius Johnson Dep. at 56:12-21, 58:1-3; Ex. 55 – Darrell Johnson Dep. at 39:1-12; Ex. A – Agee Dep. at 10:18-19 ("A. Mr. Johnson is one of my best friends. We grew up together."); *Id*. at 41:4-11 ("Q. [Y]ou met Demetrius's brother, right? A. Yes. Q. Okay. And his name was Darrell? A. Yes. Q. Was he also an MLD? A. Yes."); *Id*. at 12:24-13:4 ("Q. [Y]ou and Bryan Johns and Mr. Johnson were all best friends? A. Yes.")

3. Johnson, along with Agee and Johns, would often go "hunting," which meant looking for someone to beat up. They specifically would go catch a King (referring to a Latin King), and just beat them up, and let them know who it was that beat them up.

Supporting Evidence: Ex. A – Agee Dep. at 66:1-16 ("...back then we would go over there and just beat up Kings, you know, go over there in the car, park somewhere two blocks away and catch a King or something like that and just beat him up but then let them know who it was that beat him up"); *Id*. at 67:21-68:1 (This included Johnson and Johns); *Id.* at 77:19-21 ("[W]e probably was out messing around at that time again, out hunting as we called it, looking for somebody to beat up.")

4. The Kings' response to these attacks was to get back at the MLDs by trying to "put a case on" them, so the Kings would lie to police to try and get them off the street.

Supporting Evidence: Ex. A – Agee Dep. at 66:17-67:11 ("I believe that was -- that was [the Latin Kings] way of getting back at us, always trying to put cases on us… they would lie and say,[...] he did this or he did that to get us off the street.")

5. Johnson, Agee, and Johns recognized the Chicago Police Officers who patrolled their neighborhood because they had many encounters with them. Specifically, with Detective Guevara and Officer Daley.

Supporting Evidence: Ex. A – Agee Dep. at 125:20-126:2 ("A. I believe it was Daley that was there because he was – like I say, when Guevara would – from what I was noticing, like they would send the policemen to the neighborhood that we was real familiar with or who was always patrolling our block, and Daley was one of them guys that always was in our neighborhood patrolling.")

6. Officer Daley was known in the neighborhood as a fair officer.

Supporting Evidence: Ex. A – Agee Dep. at 65:15-20 ("Daley was cool with us. He was a fair officer. If he caught you, he caught you, you know. He never tried to put nothing on us, never

harassed us or nothing like that. He always tried to talk positive to us and, you know, get us to get away from that gang life.")

7.  Officers, including Guevara, who Agee would refer to as "G" or "Officer G," would often come into the community and ask them (some, or all, of the guys hanging out in a particular area) to come to the station, or the Area, to stand in lineups.

Supporting Evidence: Ex. A – Agee Dep. at 11:4-9 ("[T]hey used to always come and get us sometimes in the neighborhoods, asked us to come stand in lineups for him, that they needed extra bodies, you know, that it didn't have nothing to do with us, things of that nature."); *Id.* at 68:22-69 (Agee was frequently brought to Grand and Central, 14th District, California and Shakespeare and other stations); *Id.* at 71:4-10 (Agee states that usually, police would grab four or five of the group he was with to be fillers in lineups.)

8.  During this time, Agee recalled being picked up to stand in a lineup three to four times a week. He had been to Grand and Central "too many times to count."

Supporting Evidence: Ex. A – Agee Dep. at 68:22-69:1 (Q: And you said that you were asked to stand in a lineup or picked up to stand in a lineup at the height three to four times a week? A: Yes.); *Id.* at 69:8-13; *Id.* at 122:20-123:3 ("Like I say, they would come and grab us like three to four times a week[.]"), asked us like – it was okay, cool because, like I said, we knew – if I knew I ain't had nothing to do with it, I ain't got no problem with being in a lineup, but if I knew I done did something earlier in that day, I'm running. I am not going to stand in no lineup because I'm not -- no. Catch me.")

9.  Agee testified that he had no issues standing in lineups because he knew he had not done anything wrong. According to Agee, "it was okay, cool because, like I said, we knew – if I knew I ain't had nothing to do with it, I ain't got no problem with being in a lineup, but if I knew I done did something earlier in that day, I'm running. I am not going to stand in no lineup because I'm not -- no. Catch me."

Supporting Evidence: Ex. A – Agee Dep. at *Id.* at 122:22-123:3.

10.  Sometime in the summer of 1991, Agee recalled hanging out on the MLD's main block with 10-15 guys, when Chicago Police officers came and asked him and Johns to stand in a lineup. He could not recall which month that occurred.

Supporting Evidence: JSOF Ex. 41, Agee Declaration ¶¶ 4– 9 (Johnson 2627 – 2628); Ex. A – Agee Dep. 62:11-63:23.

3

11. After the lineup, Agee and Johns were driven back to their neighborhood by Chicago Police Officers, which was what typically occurred since Area 5 was located in rival gang territory.

Supporting Evidence: Ex. A – Agee Dep. at 129:20-24, 130:2-12 ("A: Yeah … well, they took us back because we couldn't – in that area [] by Grand and Central it's like for or five different People gangs over there, in that area[.] Q: You were driven there by police officers, right? A: By police officers. [] When they come pick you up for a line up, they usually take you back after they pick you up.")

12. Sometime later, Agee estimates about two months after the lineup, while Johns and Agee were out "messing around" or "hunting," as they called it, the two were discussing the lineup, and Johns told Agee he was picked out of the lineup that night, but he did not tell Agee how he found out.

Supporting Evidence: Ex. A– Agee Dep. at 77:14-78:5; 131:20-133:5.

13. According to Agee, he knew of a Milwaukee King named Aby, but he did not know if his last name was Gonzalez.

Supporting Evidence: Ex. A – Agee Dep. at 92:11-24.

**B.    Johnson is Indicted by a Grand Jury.**

14. On August 19, 1991, ASA Susan Ziegler presented her case to a Grand Jury, seeking charges against Demetrius Johnson for the offenses of first degree murder, attempt murder, aggravated battery and aggravated discharge of a firearm committed against Edwin Fred, Raul Ortiz, Forrest Garnett and Rosa Burgos.

Supporting Evidence: Grand Jury Transcript, Aug. 19, 1991, attached hereto as Ex. B, at 2:1-11 (JGS_JOHNSON 404).

15. Ziegler presented Defendant Guevara as a witness to the Grand Jury to confirm that the victims (Edwin Fred, Raul Ortiz) and witnesses (Forrest Garnet and Rosa Burgos), were in the area of 2333 West North Ave. in Chicago on June 12, 1991, at approximately 7:45 p.m. Guevara also testified that Demetrius Johnson was present in the same area.

Supporting Evidence: Ex. B – Grand Jury Trans. at 2:22-3:23 (JGS_JOHNSON 404-405).

16. Ziegler also asked Guevara to confirm that Fred was alive at the start of June 12, that at or near 7:45 p.m. he was shot by Johnson, and that Fred later died from his injuries.

Supporting Evidence:  Ex. B – Grand Jury Trans. at 3:12-20, 4:13-20 (JGS_JOHNSON 405-406).

17. Ziegler did not ask Guevara about any lineups, including the lineup where Johnson was identified.

Supporting Evidence:  Ex. B – Grand Jury Trans. at 2:2-5:17 (JGS_JOHNSON 403-409).

18. The Grand Jury returned a True Bill, and Johnson was formally indicted on all charges.

Supporting Evidence:  Ex. B – Grand Jury Trans. at 5:13 (JGS_JOHNSON 407).

**D.     Johnson's Criminal Defense.**

19. Johnson was initially represented by Cook County Public Defender Jack Carey.

Supporting Evidence: JSOF Ex. 35 – Johnson Dep. at 128:10-19 (Johnson recalls being represented by a public defender); JSOF Ex. 22 – Criminal Trial Trans., Nov. 23, 1992, at B-9:10-14 (Johnson 001185) (Carey testified to representing Demetrius Johnson in 1991.)

20. At some point during his representation, APD Carey met with Johnson. APD Carey took notes regarding that meeting. Those notes reflect the following:



Supporting Evidence:  CCPD Notes, attached hereto as Ex. C at CCPDO 00003.

21. APD Carey also noted the following:



Supporting Evidence:  CCPD Notes, attached hereto as Ex C at CCPDO 00004.

5

22. According to the notes, on August 28, 1991, APD Carey went to visit Bryan Johns in jail.

Supporting Evidence: CCPD Notes, attached hereto as Ex. C at CCPDO 00001.

23. On October 22, 1991, Carey filed a request for discovery with the CPD and the CCSAO.

Supporting Evidence: JSOF Ex. 25, Motion for Discovery, *Illinois v. Johnson*, No. 91-19833, Impound Evidence 328-333.

24. Carey then began to interview witnesses identified in the police reports along with his investigator, Darryl Ellis.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Trans., Nov. 23, 1992, at B-9:10-14, B-10:2-5: (Johnson 001185-6) (Carey testified that in January 1992, he visited the crime scene and interviewed witnesses listed in the police reports.)

25. On January 9, 1992, APD Carey and his investigator interviewed Angel Cordova. APD Carey took notes on the interview. Those notes reflect the following:



Supporting Evidence: CCPD Notes, attached hereto as Ex. C at CCPDO 00014.

26. On January 9, 1992, APD Carey and his investigator interviewed Ricardo Burgos. APD Carey took notes on the interview. Those notes reflect the following:



Supporting Evidence: CCPD Notes, attached hereto as Ex. C at CCPDO 00012.

27. In February 1992, Johnson's family hired a private attorney, Debra Gubin, to represent him. This change was made at the suggestion of his grandmother and his father.

Supporting Evidence: JSOF Ex. 20, Debra Gubin Dep. at 14:9-11 (Gubin was retained in February 1992), *Id*. at 73:2-18 (Gubin does not recall the details of being retained but recalls that she was retained and not appointed.); Ex. 35, Johnson Dep. at 132:15-133:8 (Johnson hired a private attorney on the suggestion of his grandmother and dad.)

28. When Gubin took over Johnson's representation from APD Carey, he tendered to her police reports, photos and "anything else that [was] not propriety to the public defender's office." The two discussed the case as well.

Supporting Evidence: JSOF Ex.20, Gubin Dep. at 52:9-20.

29. After her review of the file and meeting with APD Carey, Gubin filed a Motion for Additional Discovery.

Supporting Evidence: JSOF Ex.20, Gubin Dep. at 52:21-25.

30. Gubin had the original case report, documenting when CPD received the call about the underlying murder, the officers who first reported to the scene, and the witnesses there to whom they spoke, including Aby Gonzalez, Fina Montanez, Jewel Stanley, and Forrest Garnett, and detectives continuing investigation, including reports of photo arrays and a lineup. According to these reports Aby Gonzalez was at the scene and then took part in a photo array. Gubin reviewed this material that APD Carey had collected, which included the police reports that had been produced to Carey by Sheehan.

Supporting Evidence: JSOF Ex.20, Gubin Dep. at 52:1-20; 76:9-13.

31. At her deposition, Gubin testified as to the specific reasons she filed a Motion for Additional Discovery on February 18, 1992. When asked about line 2 of the motion, which listed "The photo of the line-up taken 6/13/1991" she stated that she included that because she "didn't have a copy of the photo lineup of June 13th. And I knew that there was a lineup, and I wanted a copy of it."

Supporting Evidence: JSOF Ex. 27, Defense Motion for Additional Discovery; JSOF Ex. 20, Gubin Dep at 19:20-20:19 ("Q: And can you take us through to why you made these *additional* requests for discovery? A: Sure … I obviously didn't have a copy of the photo lineup of June 13th. And I knew that there was a lineup, and I wanted a copy of it.")(emphasis added)

32. Pursuant to the Chicago Police Department policies in place at the time, an evidence technician or an authorized member of the Detective Division was required to take photographs of

7

any formal lineup *which resulted in the identification of a suspect*. In the event that the lineup did not result in an identification, no photos were required.

Supporting Evidence: CPD General Order 88-18, attached hereto as Ex. D; Deposition of James Hickey, June 10, 2014, attached hereto as Ex. E at 261:24-262:6.

33. In 1991, Gubin was aware of the Chicago Police Department policies regarding lineup identifications, specifically that a photograph would have only been taken if the lineup resulted in a positive identification.

Supporting Evidence: JSOF Ex. 20, Gubin Dep at 46:19-23 ("There would've been a photo of this lineup because there was a positive ID, and this lineup is the one that Erickson is the only one who signed the report. And a negative ID – a negative lineup where nobody's identified, they don't photo.")

34. Gubin further testified that she would have talked to some of the eyewitnesses identified in the reports, but can only remember talking to Rosa, a man named Raul, and two other unnamed witnesses. She explained she would not have interviewed Aby Gonzalez because there was no other mention of him in police reports after the first day of the investigation.

Supporting Evidence: JSOF Ex. 20, Gubin Dep. at 30:6-14 ("Q...Do you recall what witnesses you talked to? A. I know I spoke to Rosa. I'm sorry. I'm terrible with names. I'm not going to remember the last names. I spoke to Rosa, Raul, the gentleman who was in the car, and the woman who lived down the street who saw somebody running and she thought dropped a gun in the bushes.")

35. Gubin knew that Plaintiff's brother, Darrell Johnson went by the nickname "D" and that he had a connection to Johns, who was called "Little D". However, she did not recall having any conversations with Darrell in preparation of Johnson's defense.

Supporting Evidence: JSOF Ex.20, Gubin Dep. at 29:9-17 ("Little D, according to my information, Little D had gotten the name Little D because Darrel Johnson, Demetrius' older brother was D, and so Little D, who is Bryan Johns, was called Little D"); 68:1-11 ("Q: Okay. So is it – did you – is it fair to assume that you understood that Bryan Johns at least knew Darrel Johnson? A: Yes…. Q: Okay. Did you ever ask Darrell Johnson about Bryan Johns, the person that you believed was that was your theory at least was, he was the real murderer? A: I don't remember having a conversation with Darrel John[son]").

36. Gubin chose not to interview Bryan Johns because he had initially been arrested for this and released, and therefore she didn't know if he had an attorney. She also knew he was a gang member, who possibly could have been the real killer, and she thought he might not talk to her at all.

Supporting Evidence: JSOF Ex. 20, Gubin Dep. at 29:15-30:5 ("Q. Was there a reason why you didn't interview Bryan Johns? A. Because of the potential that he had initially been arrested for

8

this and released. I didn't know if he had an attorney. I didn't know if I would be creating problems, for interviewing somebody when they didn't have their attorney present. And I also knew he was a gang member who possibly could have been the real shooter, and I don't think he would have talked to me at all.").

37. Gubin filed a motion to suppress Johnson's identification in his criminal case, but determined the "chances legally of getting it suppressed were so-so. Were [sic] not really that great[]" and withdrew it. She further explained that, because it was a bench trial, she was concerned that if she presented the motion to suppress and it was not successful, it would be difficult for her to make her planned argument at trial that Johnson's identification was not reliable. Specifically, Gubin said she was concerned she would "bore the judge to tears" and it would be a better strategy to present the theory about unreliable identifications all at once.

Supporting Evidence: JSOF, Ex. 20, Gubin Dep. at 37:1-19.

38. Gubin and Ruth Miller, another attorney who was assisting Gubin on the Johnson case, were unable to produce their defense files related to Johnson's case because Gubin had shredded the file and Miller did not believe she had any records involving Johnson's case.

Supporting Evidence: JSOF Ex 20, Gubin Dep. at 48:1-12 (Gubin testified that the files from the Johnson case were shredded in either 2005 or around 2015 or 2016); JSOF Ex. 21, Ruth Miller Dep. at 45:23-25 (Miller testified that she did not think she had any records involving the Johnson case.)

39. In 2016, in another litigation matter involving Guevara, *Rivera v. Guevara*, 12-CV-4428 (N.D. Ill.), the Cook County Public Defender's Office ("CCPD"), in response to a record subpoena seeking files relate to Johnson, produced a total of 67 pages that did not include any Chicago Police Department documents. In addition, 23 of the 67 pages produced consisted of medical records for an individual named Levon Jefferson, a criminal defendant in 1992 who was facing murder charges, and whose criminal proceedings are wholly unrelated to Johnson's case.

Supporting Evidence: Johnson's CCPD File, bates-stamped RFC-Johnson 034611-034677, attached hereto as Ex. F.

40. In response to a subpoena in this litigation, the CCPD produced the same file, but for the first time, included 20 pages of "notes" from APD Carey during his representation of Johnson, including interviews with various witnesses.

Supporting Evidence: CCPD Privilege Log, attached hereto as Ex. G; CCPD Notes, attached hereto as Ex. C at CCPDO 00001.

41. Johnson's assigned APD, Jack Carey, passed away in January 2002.

Supporting Evidence: JSOF Ex. 19 – Kevin Sheehan Dep. at 29:13-24; Jack Carey Obituary, Chicago Tribune, Jan. 8, 2002, attached as Ex. H

9

42. The Cook County State's Attorney's Office ("CCSAO") could not locate its trial file for the criminal prosecution of Demetrius Johnson.

Supporting Evidence: Correspondence from CCSAO re: status of Johnson Criminal File, attached hereto as Group Ex. I–Letter from CCSAO Investigator G. Carroll to CPD, Dec. 5, 2019 (CCSAO 718) (Carroll states that "[t]he State's Attorney's Office is conducting a post-conviction review and are unable to locate our trial file."); Demetrius Johnson Box/File Identifier (CCSAO 749) (noting that 91 CR 19833 file contains "Blue Back only.")

43. The CCSAO was only able to locate the prosecutor's "Blue back," which contains notes of ASA Sheehan, including a record of court dates, what documents were ordered and what documents were tendered to the defense.

Supporting Evidence: JSOF Ex. 19 Kevin Sheehan Dep. at 24:12-17; Ex. I at CCSAO 718, CCSAO 749.

44. Based on the CCSAO Blue back, Attorney Sheehan tendered a packet of information, likely in court and in front of the bench. This packet of information included the Chicago Police Department RD file as well as GPRs, which he used interchangeably with the term "street file" or "investigative file."

Supporting Evidence: JSOF Ex. 19 – Sheehan Dep.at 57:23-58:14.

45. Sheehan's Blue back also delineated what was included in the "GPR" packet, or investigative file, included the "RD [file], the police report, the C[B] and arrest report, the evidence reports … and handwritten notes."

Supporting Evidence: JSOF Ex. 19, Sheehan Dep. at 58:14-20.

46. Sheehan's Blue back also noted the requests made in Gubin's Motion for Additional Discovery. Specifically on February 28, 1992, Sheehan noted that Gubin was requesting the following *additional* information:

> SIMULCAST? 6/12/91 "LINED"
> 6/13/91 Lineup photo No 10

Supporting Evidence: JSOF Ex. 18, at CCSAO 7.

47. Sheehan confirmed that the note referenced a **June 13, 1991,** lineup.

Supporting Evidence: JSOF Ex. 19, Sheehan Dep. at 45:13-15 ("And then it says line-up photo, no ID, 6-13-91. So I mean, that's what it says.")

10

48. Sheehan does not remember if "No ID" references the "6/13/91 Lineup photo" phrase. Specifically, Sheehan said, "I don't know if there was potentially a lineup. I don't have a question mark there. It appears to me that I am aware that there was some sort of lineup[.]"

Supporting evidence: JSOF, Ex. 19, Sheehan dep, 45:25-46:6.

49. The June 13, 1991, Supplementary Report (that Johnson calls the Erickson report) is not an authenticated or verified Chicago Police Document, as it was not signed by a supervising officer and therefore bears no indication of it was ever reviewed and/or approved. It is not even clear who actually wrote the report.

Supporting Evidence: Deposition of Charlotte Galvez, attached hereto as Ex. J at 56:19-57:4 (Doesn't dispute a report that has a sergeant's signature "saying they reviewed the report" but the June 13 report "doesn't have any signature…I cannot say it transpired.")

50. The June 13, 1991, Supplementary Report (that Johnson calls the Erickson report) lists **Raymond** Guevara, not Reynaldo Guevara, as a person conducting the lineup. Guevara is not listed as a reporting officer and his signature is not on the report.

Supporting Evidence: JSOF Ex. 11.

51. Gubin interviewed only the witnesses her client gave her. She did not interview family members or friends because she was not putting on a character defense.

Supporting Evidence: JSOF Ex. 20 – Gubin Dep. at 67:13-68:12. ("Q. Did you ever interview any of Bryan – any of your client's family members in preparation for this case? A. I interviewed the witnesses he gave me. I did not go out and interview any of the other family members…")

52. Gubin refused to answer a deposition question about Plaintiff's relationship with Bryan Johns, citing attorney-client privilege.

Supporting Evidence: JSOF Ex. 20 – Gubin Dep. at 67:5-11. ("Q. Did your client know who Bryan Johns was?" A: I'm going to refrain from answering that question based on attorney-client privilege.")

**F.     After Prison**

53. Johnson was released from prison in 2004.

Supporting Evidence:  JSOF Ex. 35- Johnson Dep. at 11:13-15.

54. Agee was released from prison in 2013. Sometime between 2014 and 2015, Agee and Johnson reconnected. The two last saw each other at Bryan Johns' funeral, which they attended together after he passed in March 2021.

Supporting Evidence: Ex. A - Agee Dep. at 11:13-19; 89:8-24. ("Q. You and Demetrius went to Bryans Johns' funeral? A. Yes, we did."); Ex. K – Certificate of Death for Bryan Lamar Johns.

**G.     Eyewitnesses' Criminal Trial Testimony and subsequent Deposition Testimony.**

55. At Johnson's criminal trial, Rosa Burgos, Ricardo Burgos, and Elba Burgos, three witnesses who viewed the July 22, 1991, lineup which included Johnson, testified, and confirmed that they identified Johnson as the shooter in that lineup.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Trans., Nov. 18, 1992, Rosa Burgos at A-38:17-39:4 (Q: Do you see the person in the courtroom who you picked out? A: Yes; uh-huh. Q: Would you point to him please? A: (Indication) Mr. Sheehan: Indicating for the record that she has pointed to Demetrius Johnson;" (Johnson 001050-1051); Ricardo Burgos at A-73:12-15, A-73:24-74:15 "Q: Okay. And did you look at a lineup at that time? A: Yes, I did. Q: And was that a live lineup with people standing in it? A: Yes. Q; And did you pick someone out of that lineup? A: Yes, I did. Q: And is the person that you picked out of that lineup is he in court today? A: Yes, he is. Q: Would you please point to him? A: The gentleman sitting right there. Mr. Sheehan: Again for the record, he has identified Demetrius Johnson.") (Johnson 001085-1086); Elba Burgos at A-97:8-14 ("Q: Now, Ms. Burgos, I'll direct your attention to a few days later on July the 22nd of 1991, did you have the opportunity to go to the police station and view a lineup? A: Yes. Q: And did you pick someone out of that lineup? A: Yes…. ) (Johnson 001109).

56. Rosa Burgos, Ricardo Burgos and Elba Burgos are not related to each other.

Supporting Evidence: Ricardo Burgos Deposition, attached hereto as Ex. L, at pp: 64:20-65:11.

57. At Johnson's criminal trial, when asked directly if Bryan Johns was the person who shot Raul Ortiz, Rosa Burgos answered "no." She further testified that she saw the shooter's face for about four seconds before she ran upstairs.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Trans., Nov. 18, 1992 at A-37:8-11 ("Q: Was Little D the person you saw shoot Raul? A: No."), A-37:15-23 (Q: When you say you saw the person shoot Raul did you have the opportunity to see his face? A; Yes. Q: Could you tell his Honor Judge Cawley how many seconds you saw his face? A: Well, I looked the gun first then I turned to him, it was but four seconds…") (Johnson 001049).

58. Rosa Burgos also testified that she had known Bryan Johns for a "long time" prior to the shooting because of an incident involving her son.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Trans., Nov. 18. 1992 at A-36:24-A-37-3 ("Q: And how do you know a person by the name of Little D? How do you know that person? A: Because it was an incident with my son before."); A-37:12-14 ("Q: And how long had you known Little D before June the 12th, 1991? A: Long time." ); A-44:11-13 ("Q: Little D's real name is Brian Johns, isn't that right? A: Yes.") (Johnson 001048-49; 001056)

59. At her deposition in this case, Rosa Burgos testified that she currently suffers from hereditary memory issues but confirmed that she would not have lied to the police if asked questions about a shooting and would have told the truth when under oath and giving testimony in a court room.

Supporting Evidence: Rosa Burgos Deposition, May 12, 2022, attached hereto as Ex. M, at 18:5-7, 22:9-24; 23:12-14.

60. Ricardo Burgos testified at Johnson's criminal trial that he saw the person who shot Edwin Fred for "forty to forty-five seconds" prior to identifying Mr. Johnson in open court.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Test. Nov. 18, 1992, at A-70:8-22. (Johnson 001082)

61. At his deposition in this case, Ricardo Burgos, who suffered a serious head injury in 1996 or 1997 that impacts his memory, testified that while he doesn't recall testifying in Johnson's criminal case, he would not have lied under oath in front of a judge.

Supporting Evidence: Ex. L, Ricardo Burgos dep. at 79:5-80:20.

62. Elba Burgos was living in Puerto Rico in 1992 and came back to Chicago to testify at Johnson's criminal trial. She testified that on June 11, 1991, she was living at 1535 N. Claremont and sitting on her front porch when she heard shots, and then saw a man running towards her with a gun in his hand, whom she identified in court as Demetrius Johnson. She also confirmed she had picked Mr. Johnson out of a lineup on July 22, 1991.

Supporting Evidence: JSOF Ex. 22, Criminal Trial Test. Nov. 18, 1992, at A-90:9-91:5, A-91:11-92:12, A-93:2-13, A-97:8-98:7 (Johnson 001102-1105, 1109-1110).

63. In 2022, a woman named Ada Elba Burgos was subpoenaed and testified during a civil deposition in this case that she had no recollection of living in at 1535 N. Claremont, of talking to police after a shooting in 1991 or of testifying at a criminal proceeding in 1992. She could not recall when she got married or her husband's name. She testified that she was not the Elba Burgos who was a witness in this case.

Supporting Evidence: Elba Burgos Deposition, April 26, 2022, attached hereto as Ex. N, at 10:17-20; 15:19-16:2; 26:11-27:4; 44:7-25; 48:9:15.

64. Aby Gonzalez did not testify at Johnson's criminal trial but was interviewed the day of the shooting and viewed a lineup. He further gave a deposition in the instant case where he testified about where he grew up in Humboldt Park, and identified the area as one that had a lot of gangs in it. Gonzalez denied being a member of a gang, but admitted when he was younger, he used to hang out with gang members, specifically Cobras in his neighborhood. He further explained that Cobras are Latin Kings.

Supporting Evidence: JSOF Ex. 7, General Offense Case Report; Ex. 22, Criminal Trial Trans. At A-2; JSOF Ex. 47, Aby Gonzalez dep. at 101:22-102:3, 106:22-107:10.

65. Detective Erickson retired from the Chicago Police Department on August 2, 1991.

Supporting Evidence: Detective Erickson CPD Employment Status form, attached hereto as Ex. O.

Dated: June 12, 2023

Respectfully submitted,

/s/ Thomas L. Leinenweber
THOMAS M. LEINENWEBER
*One of the Attorneys for Defendant Guevara*

Thomas M. Leinenweber
Megan K. McGrath
Leinenweber Baroni & Daffada, LLC
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
thomas@ilesq.com
mkm@ilesq.com