**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 4156 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After a judge vacated his conviction, Plaintiff Demetrius Johnson filed this civil suit

against the City of Chicago and multiple officers of the Chicago Police Department ("CPD")

asserting state and federal law claims. Johnson brings this motion for partial summary judgment

on his claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), against officer Reynaldo

Guevara, alleging that Guevara suppressed a favorable and material lineup report indicating

another person's guilt. Because the Court cannot determine as a matter of law that Guevara

suppressed the lineup report, the Court denies Johnson's motion.

## BACKGROUND[1]

### I.       July 12, 1991 Shooting and Immediate Aftermath

On the evening of June 12, 1991, the night the Chicago Bulls won their first NBA

championship, a person opened fire near the intersection of Claremont and North Avenue in

Chicago, killing Edwin Fred and injuring Raul Ortiz. Guevara responded to the shooting and

---

[1] The Court derives the facts in this section from the parties' Revised Joint Statement of Undisputed Material Facts and Guevara's Statement of Additional Facts. The Court has considered the parties' responses and objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Guevara, the non-movant.

subsequently investigated the case. On or around the night of the incident, Guevara interviewed Ortiz and various eyewitnesses, including Forest Garnett, Aby Gonzalez, Fina Montanez, and Jewel Stanley. Ortiz relayed that he saw the shooter run south on Claremont after the shooting, but had no other information.

Minutes after the incident, officers received flash messages indicating that there were two offenders, one Black male and one Hispanic Male. The messages indicated that the Black male went by "Little D" or "Bryan Johnson," and possibly belonged to a gang known as the Maniac Latin Disciples ("MLD"). Officer Darryl Daley received the flash messages and knew of a person named Bryan Johns who matched the description—he went by the nickname "Little D" and belonged to the MLD. Daley immediately suspected Johns as the shooter.

Daley had seen Johns about an hour before the shooting and returned, with other officers, to that location. He saw Johns leave a van with two Hispanic males. He detained Johns and transported him and the van to Area 5 of CPD for further investigation. When officers checked the van, they recovered a handgun.

## II.     The Johns Lineups

Lineup reports from the night of the shooting reflect that officers conduced two different lineups including Johns. Detective William Erickson authored one report (the "Erickson Report") and Guevara authored the other (the "Guevara Report"). Daley did not participate in any lineups. Both lineup reports contained the same Records Division ("RD") number. The Guevara Report—which both Johnson and the State had at their disposal throughout Johnson's criminal case—indicates that Guevara and Erickson conducted a lineup approximately three hours and fifteen minutes after the shooting with Johns as the suspect. No other officers participated. The other individuals in the lineup included Dewan Patterson, Carlos McFadden,

2

Dwayne David, and Michael Robinson. The CPD has no arrest reports for Dwayne David, and the criminal histories for Patterson and McFadden indicate that they were not arrested in June 1991.

The Guevara Report states that four witnesses viewed the lineup—Aby Gonzalez, Forrest Garnett, Fina Montanez, and Rosa Burgos—with "negative" results, meaning that no one identified Johns. Because of this, officers released Johns. Guevara testified at Johnson's criminal trial that no photographs existed of the lineup because no witness identified the suspect, and "[n]o photos are taken in a negative lineup." Doc. 213-8 at 39. Although a supplementary report submitted by Guevara on June 13, 1991, indicates that a photo of the lineup was subject to a separate report, *see* Doc. 265-2 at 3, Guevara testified at trial that "[t]his [language] is put on practically all reports," Doc. 213-8 at 40. The Guevara Report bears a marking of "Permanent Retention File," contains a "submitted" date of June 12, and a supervisor approval date of July 24, 1991. Doc. 213-15.

In contrast, the Erickson Report—which documents a lineup with Johns approximately two hours and forty-five minutes after the shooting—does not bear a marking of "Permanent Retention File" and the CPD did not maintain it the case's Permanent Retention File. Doc. 213-11. Instead, someone placed the Erickson Report in the CPD's Investigative File. The Erickson Report lists "Raymond Guevara" as being present and Erickson as the reporting officer. *Id.* It contains Erickson's signature, but not Guevara's. Unlike the Guevara Report, the Erickson Report does not contain a signature for a supervisor's approval.

The lineup described in the Erickson Report included Johns, Jozell Hobbs, Terrell Agee, James Brown, and Fabian Wells. CPD reports show that Hobbs, Brown, and Wells were all arrested on June 12 or 13, 1991. Wells further recalls standing in a lineup on the night the

Chicago Bulls won their first NBA championship. Agee swore that he stood in a lineup with Johns in the summer of 1991, but testified that he could not recall when. As for witnesses, the Erickson Report indicates that six witnesses viewed the lineup: Aby Gonzalez, Forrest Garnett, Fina Montanez, Rosaline Morales, Angel Cordova, and Rosa Burgos. Montanez, the last to view the lineup, did so at 1:15 a.m. on June 13, which the report lists as the date submitted. The Erickson Report reflects that Gonzalez identified Johns as the offender in the homicide.

At his deposition in this civil case, Gonzalez testified that he did not recall identifying anyone on the night of the shooting. He also stated that despite being in the vicinity of the shooting, he did not see the shooter, does not recall participating in a lineup relating to it, and does not recall going to Area 5. Although the case notes of one of Johnson's current attorneys, Josh Tepfer, from an October 2019 meeting indicate that Gonzalez confirmed that he identified someone on the night of the shooting, Gonzalez denied making this statement, among many other statements transcribed in Tepfer's notes.

Kevin Sheehan, the trial prosecutor, testified that he never had the Erickson Report. He said that if he had it, he would have "immediately" and "without question" produced it to Johnson's defense attorneys, Deborah Gubin and Ruth Miller. Doc. 213-19 at 12. Gubin and Miller also testified that they never had the Erickson Report. No one mentioned the Erickson Report at Johnson's trial.[2]

---

[2] The parties' Joint Statement does not explain when Johnson learned of the Erickson Report, but his Complaint, Petition for Relief from Judgment, and Tepfer's deposition indicate that CPD produced the Erickson Report in connection with another case, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), and the report became public during the case's trial. *See, e.g.*, Doc. 1 ¶ 57; Doc. 213-29 at 4; Doc. 213-15 at 9. The Court need not take this as an undisputed fact to reach its decision, but instead includes it for the sake of completeness.

### III.    Demetrius Johnson

On July 22, 1991, Guevara and Officer Ernest Halvorsen arrested Johnson—a then

fifteen-year-old tenth grader at Roberto Clemente High School who associated with the MLD—

for the June 12 crimes.  Halvorsen completed a supplementary report that indicates that CPD

sought Johnson out because someone identified him as the shooter via a photograph.  The

officers conducted a lineup with Johnson, and three witnesses identified him as the shooter: Elba

Burgos, Ricardo Burgos, and Rosa Burgos.  Angel Cordova and Victor Cordova also viewed the

lineup, but they did not make any identifications.  Assistant States Attorney ("ASA") Buckley

approved the charge of first degree murder against Johnson.  ASA Susan Zeigler presented the

case to a grand jury and the grand jury indicted Johnson for murder, attempted murder,

aggravated battery, and aggravated discharge of a firearm.  Her grand jury synopsis includes no

mention of any positive identification of Johns by Gonzalez.

In preparation for trial, Johnson's criminal defense attorneys visited the scene of the

crime, filed discovery motions, obtained answers to discovery requests, made oral requests for

discovery, viewed the prosecution's file, developed a theory of the case, and pursued an alibi

defense.  One of Gubin's discovery requests sought the "photo of the line-up taken 6/13/91."

Doc. 241 ¶ 59.  During Gubin's deposition, she discussed her expectation that the prosecution

would produce any requested documents if the documents existed.  With respect to Sheehan in

particular, Gubin explained that she believed Sheehan would produce existing documents

because he had a reputation of being an "aggressive prosecutor . . . but an honest prosecutor."

Doc. 213-20 at 9.

Johnson's defense counsel filed, but ultimately withdrew, a motion to suppress the July

22, 1991 lineup identification of Johnson.  Gubin testified that had she possessed the Erickson

5

Report indicating that someone identified Johns as the perpetrator, she would not have withdrawn her motion to suppress.  Johnson has no opinion about the quality of his attorneys' work.

While in custody at Cook County Jail before trial, Johnson interacted with Johns, who was also detained there.  Johnson knew Johns from their neighborhood and their association with the MLD.  Johns told Johnson that he knew about Johnson's situation, and Johns informed him that someone pointed Johns out in a lineup on the night of the shooting.  Johnson testified that when he asked Johns if he did it—in other words, if he perpetrated the shooting—Johns responded that he did.  Johns told Johnson that he would not testify.  Johnson stated that he relayed all of this information to Gubin.  Johnson did not recall Gubin ever raising the possibility of subpoenaing Johns.

## IV.    Johnson's Criminal Trial

Johnson's criminal trial began on November 18, 1992.  Daley and Guevara both testified.  Daley discussed his arrest of Johns on the night of the shooting and testified that no witnesses identified Johns in a lineup that night.  Guevara testified similarly, discussing the negative lineup that occurred on June 12, 1991.  Guevara also testified that CPD officers maintained all supplemental reports for the investigation with the same RD number in the same central location so that all of the reports would be available if subpoenaed.

Johnson's defense counsel argued, among other things, that witnesses misidentified Johnson during suggestive police identification procedures weeks after the shooting.  Counsel suggested that Johns, not Johnson, committed the crime on June 12, and noted that the fact that Johnson looked like Johns may have contributed to the misidentification.  The defense also emphasized the credibility of Johnson's alibi, explaining that the night was memorable for him—

6

the Bulls won their first NBA championship, and he watched with friends who would not normally have watched a Bulls game. In response to counsel's argument implicating Johns, Sheehan emphasized in his closing statement that none of the witnesses who viewed the June 12, 1991 lineup identified Johns.

The judge ultimately convicted Johnson of the charged crimes and sentenced him to twenty-five years in prison for the murder of Fred and ten years in prison for the attempted murder of Ortiz, to be served concurrently.

## V.    Post-Conviction Proceedings

Johnson maintained his innocence throughout his criminal proceedings. The appellate court denied his direct appeal. In their opinion, the panel noted that "Johns was placed in a lineup that night, but he was not selected by the witnesses viewing the lineup." Doc. 213-4 at 5. On March 20, 1996, Johnson filed a post-conviction petition asserting his innocence, wherein he swore that Johns admitted responsibility for the crime. Johnson did not mention the Erickson Report in his petition, which the post-conviction court denied. In September 1996, the appellate court affirmed the dismissal of Johnson's petition.

In September 2019, Johnson again challenged his conviction, and this time, the prosecution did not oppose Johnson's request for a new trial. On November 12, 2019, a judge vacated Johnson's conviction and ordered a new trial. On December 20, 2019, state prosecutors dropped all charges against Johnson. In June 2020, Johnson filed a petition for a certificate of innocence pursuant to 735 Ill. Comp. Stat. 5/2-702. On April 7, 2021, a judge granted Johnson a certificate of innocence.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

**ANALYSIS**

Johnson moves for partial summary judgment on his *Brady* claim. He contends that Guevara suppressed the Erickson Report in violation of *Brady*, which requires the government to

8

"disclose evidence materially favorable to the accused." *Youngblood v. W. Virginia*, 547 U.S. 867, 869 (2006). To prevail on his *Brady* claim, Johnson must show that (1) Guevara suppressed the Erickson Report; (2) the Erickson Report was favorable to him; and (3) the Erickson Report was material, *i.e.* that a reasonable probability exists that prejudice ensued. *Anderson v. City of Rockford*, 932 F.3d 494, 504–05 (7th Cir. 2019). Guevara contends that Johnson has failed to establish any of the required *Brady* elements, arguing that Johnson's counsel either had the Erickson Report or failed to exercise reasonable diligence to obtain it and that disputed questions of material fact exist regarding Guevara's knowledge of the Erickson Report, the favorability of the Erickson Report, and the materiality of the Erickson Report. Because the Court need not address favorability or materiality unless it finds, as a matter of law, that Guevara suppressed or participated in the suppression of the Erickson Report, the Court begins by analyzing suppression.

Suppression of evidence results when "(1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Although the suppression standard focuses on prosecutors' conduct, *Brady* applies to police officers and prosecutors alike. *See id.* at 566. ("While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor."). "[A] plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it," *Moran v. Calumet City*, 54 F.4th 483, 492 (7th Cir. 2022), and "[e]vidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant," *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). Moreover, "evidence is considered

suppressed in a § 1983 suit only if a police officer acted intentionally or at least recklessly in failing to turn it over to the prosecution." *Moran*, 54 F.4th at 493 (assuming, without deciding, "that a reckless failure to disclose exculpatory evidence constitutes suppression").

Johnson points to the following undisputed facts in support of his argument that Guevara suppressed the Erickson Report: Guevara investigated the June 12, 1991 shooting; the Erickson Report lists "Guevara" as attending the lineup; both the prosecutor and defense attorneys involved in the case testified, in no uncertain terms, that they never received the Erickson Report; the Erickson Report is not part of the case's Personal Retention File; ASA Zeigler's grand jury synopsis does not mention the Erickson Report; no one mentioned the Erickson Report at trial; and Guevara pleaded his Fifth Amendment right to avoid self-incrimination when asked about the Erickson Report, which necessarily implies that a truthful answer would "have some tendency to subject [Guevara] . . . to criminal liability." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 663–64 (7th Cir. 2002).

In response, Guevara asserts that questions of fact exist regarding whether he knew about the Erickson Report, whether the prosecution and defense knew about the Erickson Report, and whether the defense exercised sufficient diligence. Guevara points to the following evidence to show a genuine issue of fact regarding his knowledge of the Erickson Report: he did not author the report, he did not sign the report, and the report lists "Raymond" Guevara as attending the lineup. He also argues that he "would not expect there to be a report in which Gonzalez was stated as positively identifying Johns because it did not happen."[3] Doc. 259 at 19. Although

---

[3] This argument does not create a genuine issue of material fact. The Court need only draw *reasonable* inferences from the record. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). Guevara's "expectation" about the existence of a report today has no bearing on his knowledge of the report when made. The Court's "favor toward the nonmoving party does not extend to drawing inferences that are supported only by speculation or conjecture." *See Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016) (stating that the party opposing summary judgment

Johnson has presented evidence that certainly supports a conclusion that Guevara suppressed the Erickson Report—including the fact that he refused to answer questions during his deposition, *see Evans v. City of Chicago*, 513 F.3d 735, 741 (7th Cir. 2008) ("[Drawing a] negative inference against a witness who invokes the Fifth Amendment in a civil case is permissive, not required.")—drawing all reasonable inferences in Guevara's favor, the Court cannot determine that *no* reasonable jury could conclude that Guevara did not know about the Erickson Report. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022) ("Even if a judge might believe a moving party has more and/or better evidence in its favor, a motion for summary judgment does not authorize or invite the judge to weigh evidence and decide whose story is more credible or persuasive."); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (a court should grant summary judgment only "when no reasonable jury could have found" for the opposing party). A reasonable jury could believe that Guevara did not know about the Erickson Report based on the fact that, although the report lists his name, it appears incorrectly and Guevara neither neither signed nor authored the report. *Ziccarelli*, 35 F.4th at 1083 ("[W]e must consider the evidence in the light most favorable to the party opposing summary judgment, drawing all reasonable inferences in that party's favor.").

Johnson emphasizes Guevara's decision to invoke his Fifth Amendment right against self-incrimination to argue that he may not use silence as a shield during his deposition and then as a sword to oppose summary judgment. *See Laborers' Pension Fund v. Surface Dimensions, Inc.*, No. 07 C 3860, 2011 WL 841515, at *5 (N.D. Ill. Mar. 8, 2011) ("It is well-established that the privilege against self-incrimination 'cannot be invoked as a shield to oppose depositions while discarding it for the limited purpose of making statements to support [or oppose] a motion

"must do more than raise some metaphysical doubt as to the material facts; [he] must come forward with specific facts showing that there is a genuine issue for trial").

for summary judgment.'" (alteration in original) (quoting *In re Edmond*, 934 F.2d 1304, 1308 (4th Cir. 1991)). Courts abide by this rule "to protect the integrity and truth-seeking function of the judicial system" and to ensure that undue prejudice does not result to the adverse party. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640 (9th Cir. 2012) ("The purpose of this rule [allowing a court to strike the testimony of a witness to avoid the improper use of the Fifth Amendment privilege] is to protect the integrity and truth-seeking function of the judicial system from the distortions that could occur if a witness could testify and then use the Fifth Amendment privilege to prevent any adversarial testing of the truth of that testimony."); *see also S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 192 (3d Cir. 1994) ("A trial court must carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side."); *Surface Dimensions, Inc.*, 2011 WL 841515, at *5 (explaining that "[t]he court may strike an affidavit (or paragraphs thereof) in support of or in opposition to a motion for summary judgment when the affidavit seeks to establish facts about which the affiant refused to testify pursuant to the Fifth Amendment privilege against self-incrimination" because "it is unfair to invoke the Fifth Amendment to avoid answering an opponent's inquiries during discovery, only to surprise the other side with favorable, self-serving testimony at the summary judgment stage").

Here, Guevara has not attempted to "manipulate or gain an unfair strategic advantage over" Johnson by invoking and then tossing aside the Fifth Amendment. *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 3139570, at *1 (N.D. Ill. Aug. 5, 2022). Guevara did not refuse to answer questions during his deposition and then proffer his own testimony that he

did not in fact know about the Erickson Report to defeat Johnson's motion. *Cf. $133,420.00 in U.S. Currency*, 672 F.3d at 640 (district court did not abuse its discretion by striking party's interrogatory response that he owned the property at issue because he previously invoked his Fifth Amendment right to refuse to respond to questions about the nature of his alleged ownership interest in the property); *In re Edmond*, 934 F.2d at 1309 (district court properly struck affidavit from party who previously refused to answer questions in deposition). Instead, Guevara points to other evidence in the record—evidence that Johnson has known about and does not cause Johnson prejudice—in order to create a genuine dispute of material fact. The Court finds this appropriate at the summary judgment stage. *See Graystone Nash, Inc.*, 25 F.3d at 191 (rejecting the district court's decision to preclude a party who invoked the Fifth from presenting evidence in opposition to summary judgment because "a complete bar to presenting any evidence, from any source . . . would be an inappropriate sanction"); *Brown v. Certain Underwriters at Lloyds, London*, 777 F. App'x 34, 35 & n.1 (3d Cir. 2019) (approving the district court's decision to bar party who invoked the Fifth Amendment during his deposition from testifying at trial but still allow the party "to advance his case with other competent evidence"); *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 922 (N.D. Ill. 2013) (drawing adverse inference from defendant's invocation of the Fifth Amendment but still allowing defendant to present evidence to undercut the plaintiff's version of events). Because a reasonable jury could conclude that Guevara did not know about the Erickson Report based on the record in front of the Court, the Court denies Johnson's motion for partial summary judgment on his *Brady* claim.[4]

---

[4] Because the Court determines that a question of fact exists as to Guevara's knowledge of the Erickson Report, it does not address the parties' remaining arguments.

## CONCLUSION

For the foregoing reasons, the Court denies Johnson's motion for partial summary

judgment [210].

Dated: July 31, 2023

SARA L. ELLIS
United States District Judge