**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | Case No. 20 cv 4156 |
| Plaintiff, | ) | |
| | ) | Judge Sara L. Ellis |
| *v.* | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, DARRYL DALEY, | ) | |
| WILLIAM ERICKSON, JOHN HEALY, and | ) | |
| the CITY OF CHICAGO | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS**

The Parties submit their Joint Statement of Undisputed Material Facts (JSOF), relative to Defendant Officers' Motion for Summary Judgment Against Plaintiff:

**I.    Jurisdiction and Venue**

1.    This matter is brought pursuant to 42 U.S.C. §1983 and Illinois law. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367. Venue is proper under 28 U.S.C. § 1391(b). **(Supporting Evidence: Ex. 1 - Defendants Daley and Yanow's Answer to Plaintiff's Complaint and Affirmative Defenses, Dkt. #70, p 5, ¶ 13-15.)**

**II.    The Parties**

2.    Plaintiff Demetrius Johnson was arrested, prosecuted, and convicted of the 1991 murder of Edwin Fred. **(Supporting Evidence: Ex. 1 - Defendants Daley and Yanow's Answer to Plaintiff's Complaint and Affirmative Defenses, Dkt. #70, pp. 1–2, ¶ 1, 4.)**

3.    In June 1991, Defendants Reynaldo Guevara, Daryl Daley, William Erickson (deceased), and Ernest Halvorsen (deceased) were employed by the City of Chicago's Police Department. In July 1991 Defendant John Healy was a sergeant in Area 5. **(Supporting Evidence: Ex. 1 - Defendants Daley and Yanow's Answer to Plaintiff's Complaint and Affirmative Defenses, Dkt. #70, pp. 6, ¶ 17; Ex. 2 - Chicago Police Records RD File at RFC-Johnson 40, 62, 72, and 76 (Sgt. Healy's signature on reports).)**

4.    Geri Lynn Yanow, Special Representative for Ernest Halvorsen, deceased, William Erickson, deceased, and John Healy, deceased is named as a Defendant in her capacity as Special Representative of the deceased, as successor in interest to defend this action on their behalf. **(Supporting Evidence: Ex. 1 - Defendants Daley and Yanow's Answer to Plaintiff's**

**Complaint and Affirmative Defenses, Dkt. #70, p. 7, ¶ 19; Ex. 3 - Order Appointing Special Rep., Dkt. #48.)**

5. Defendant City of Chicago is a municipal corporation duly incorporated under the laws of the State of Illinois and was the employer of the Individual Defendants. (**Supporting Evidence: Ex. 1 - Defendants Daley and Yanow's Answer to Plaintiff's Complaint and Affirmative Defenses, Dkt. #70, p. 7, ¶ 20.)**

## III. The June 12, 1991 Shooting of Edwin Fred and Raul Ortiz

6. At approximately 7:45 p.m. on the Wednesday evening of June 12, 1991, a single gunman opened fire near the intersection of Claremont and North Avenue in Chicago where Edwin Fred, Raul Ortiz, and Forrest Garnett were standing. (**Supporting Evidence: Ex. 4 – Appellate Order in Johnson's Criminal Case at Johnson 921-922; Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 50-52 (noting gunman came up to Fred, Ortiz, and Garnett on intersection and started shooting); Ex. 5 – Criminal Trial Transcript (Raul Ortiz) at JGS_JOHNSON 27-31 (A16:3-20:3) (at approximately a quarter to 8:00 p.m., Raul Ortiz was coming out of his house and was shot in the right shoulder and then he heard a few more shots).)**

7. The gunman shot at Fred, Ortiz, Garnett with a handgun, striking Fred with numerous bullets and hitting Ortiz once in the right shoulder. After the shooting, the gunman fled south on Claremont. (**Supporting Evidence: Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 50 (noting that the gunman struck Fred numerous times and Ortiz in right shoulder and then fled southbound on Claremont); *id.* at 52 (Ortiz told Guevara he observed a person running southbound on Claremont).)**

8. Fred died from his wounds. Ortiz survived and went to St. Elizabeth's Hospital before returning to the scene. (**Supporting Evidence: Ex. 2 – General Offense Case Report at RFC-Johnson 39 (Fred taken to hospital and pronounced deceased) (Ortiz went to hospital and was released); Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 50 (Ortiz returned to scene after treatment at hospital).)**

## IV. Police Investigation

### a) June 12, 1991

9. Chicago police Officers Hernandez and Johnson responded to the scene and conducted an initial canvas identifying four initial witnesses (Aby Gonzalez, Stanley Jewel, Fina Martinez, and Omar Ortiz). (**Supporting Evidence: Ex. 2 – General Offense Case Report at RFC-Johnson 38-39.)**

10. Defendant Guevara was assigned to investigate the case and, at the scene, interviewed Raul Ortiz (victim), Forrest Garnett, and Aby Gonzalez. Ortiz relayed that while exiting his building (2333 W. North Ave.) he heard a gunshot, felt pain in his shoulder and then observed a person running southbound on Claremont and had no other information. Garnett stated that he was with Fred (victim) in front of 2337 W. North Ave. when he saw a male black shoot Fred. Gonzalez relayed that he was standing on the southeast corner of North Ave. and

Claremont when he saw a male black run toward him. The person stopped and pulled a gun and pointed it at him, then stood there for several seconds, and then ran toward Fred and shot Fred and Ortiz. The gunman put the gun in his waistband and then ran past Gonzalez a second time, going southbound on Claremont and then westbound on LeMoyne. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 210 (B35:13-21) ("Q. At any time were you assigned to investigate the shooting of Edwin Fred? A. Yes, I was. Q. On what date were you so assigned? A. I was the investigating detective on the scene. Q. What does that mean? A. That means as soon as the shooting goes down, I was there."); *id.* at JGS_JOHNSON 214, 216 (B39:9-14, 41:7-23); Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 50, 52 (summaries of Ortiz Garnett and Gonzalez interviews).)**

11.     Officer Darryl Daley also responded to the shooting. Initial flash messages sent out minutes after the shooting indicated that the shooter was a "male Black," with the name "Little D" or "Bryan Johnson." The messages included that the second offender was a male Hispanic. Daley, who knew Bryan Johns to match the description, go by the nickname "Little D," and to be a member of the Maniac Latin Disciples street gang, immediately suspected Johns committed the shooting. **(Supporting Evidence: Ex. 6 – Daley Deposition at 78:8-81:4; 90:20-22; Ex. 7 – Daley 6/13/91 Supp Report at RFC-Johnson 34; Ex. 2 – General Case Report at RFC-Johnson 38-39 (second offender was male Hispanic); Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 52 ("The RD then learned that…a person [was taken] into custody in connection with this shooting one Bryan JOHNS, also known as "LITTLE D" a member of the MANIAC LATIN DISCIPLES street gang. It was further learned that several people who live in the area …had said that the shooter was a member of the Maniac Latin Disciples and used the street name of "Little D".").)**

12.     Daley had seen Johns approximately an hour before the shooting at 2632 W. Wabansia, and drove to that location. Officer Daley saw Johns exiting a van with two male Hispanics. He detained Johns. Daley observed two of the individuals that were in the van with Johns enter the vestibule of a two flat house before police could apprehend them, providing an opportunity to drop off a weapon. They were not arrested until after they exited the building. The van was checked and a weapon was found, and no warrant was ever sought to search any part of the apartment building. **(Supporting Evidence: Ex. 6 – Daley Deposition at 80:22-84:14, 185:5-187:1, 195:19-24, 196:10-13; Ex. 7 - Daley 6/13/91 Supp Report at RFC-Johnson 34-35 (Daley heard on broadcast that attacker was Lil D and went to 2632 W. Wabansia, where he had last seen Bryan Johns); Ex. 5 – Criminal Trial Transcript (Daley) at JGS_JOHNSON 198 (B23:4-13) ("Q. Did you go to Talman and Wabansia to look for anyone in particular? A. Yes. Q. Who were you looking for? A. I was looking for a person by the name of Brian Johns. Q. Did you know Brian Johns to have a nickname? A. Yes. Q. What was his nickname? A. Little D."); Ex. 2 – RFC-Johnson 84.)**

13.     The same night of the shooting, Officer Daley took Johns to Area 5. Johns was placed in a lineup viewed by some of the eyewitnesses. Officer Daley was not involved in the line-up process. **(Supporting Evidence: Ex. 6 – Daley Deposition at 130:20-131:5; 200:13-201:6; Ex. 7 – Daley 6/13/91 Supp Report at RFC-Johnson 34 (Johns put in lineup); Ex. 7 – Six-witness lineup Report at RFC-Johnson 26-27; Ex. 5 – Criminal Trial Transcript (Daley) at JGS_JOHNSON 202 (B27:11-19) ("Q Where did you take them when you arrested them? A. I took them back to the area of North and Western in the Pizza Hut**

parking lot and eventually took them over to Area Five, Violent Crimes at 5555 West Grand. Q. Do you know whether or not Little D, Brian Johns, participated in a lineup that night? A. Yes, he did."); Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 248-249 (B73:22-74:9) (Montanez, Garnett, Gonzalez, and Rosa Burgos all viewed a lineup with Johns in it).)

14.     A Six-witness lineup report authored by Detective Erickson indicates that Detectives Erickson and Guevara conducted a lineup with Johns approximately three hours after the shooting and six individuals viewed the lineup: Aby Gonzalez, Forrest Garnett, Fina Montanez, Rosaline Morales, Angel Cordova, and Rosa Burgos. Detective Erickson's lineup report states that one of the eyewitnesses, Aby Gonzalez, positively identified Johns as the perpetrator of the Fred murder. Aby Gonzalez had known Bryan Johns prior to the shooting. (Supporting Evidence: Ex. 7 - Six-witness lineup Report at RFC-Johnson 26-27.)

15.     At his civil deposition in this case, Aby Gonzalez denied he identified someone as the offender on the night of the shooting and denied that he saw the shooting. (Supporting Evidence: Ex. 8 - Gonzalez Deposition 60:18-61:1, 75:4-8.)

16.     The six-witness lineup report of the 6/12/91 lineup indicates it was submitted on June 13, 1991, at 5 p.m. The Erickson six-witness lineup report was produced as part of the Investigative File as it existed at the time of the City's Initial 26(a) Disclosures in this case; it was not in the Permanent Retention File produced in this case, and Erickson's report does not have a Permanent Retention File stamp. (Supporting Evidence: Ex. 7 – Six-witness lineup Report at RFC-Johnson 26-27; Ex. 44 – Defendants' Initial Rule 26(a)(1) Disclosures at 4 (noting the CPD's Permanent Retention File is bates-stamped RFC-Johnson 38-87); Ex. 44 – Defendants' Initial Rule 26(a)(1) Disclosures at 4 (noting the CPD's Investigative File is bates-stamped RFC-Johnson 1-37).)

17.     Under CPD policy, completed lineup reports were supposed to be included in the Records Division File. (Supporting Evidence: Ex. 41 – CPD General Order 83-5 (Foster 30(b)(6) 00001-00002) (when a lineup is held, a supplementary report must be completed); Ex. 50 – 30(b)(6) Deposition of Eric Winstrom at 176:13-177:122 (supplementary reports were kept in the records division or permanent retention file).)

18.     Detective Erickson's lineup report lists five individuals as standing in a lineup: Johns (listed as a volunteer), Jozell Hobbs (listed with CB# 8853977), Terrell Agee (listed as a volunteer), James Brown (listed with CB# 8854359), and Fabian Wells (listed with CB# 8854072). (Supporting Evidence: Ex. 7 - Erickson Lineup Report Submitted 6/13/91 (RFC-Johnson 26-27).)

19.     Terrell Agee swore under penalty of perjury that he stood in a lineup with Johns in the summer of 1991. Much later, Agee was told by Johns that Johns had been selected in that lineup. (Supporting Evidence: Ex. 16 - Agee Declaration at Johnson 2627-2628), Ex. 9 – Agee Deposition at 77:14-78:22.)

20.     Fabian Wells also recalls standing in a lineup in 1991 on the same night the Chicago Bulls won their first NBA championship. And CPD reports show Hobbs, Brown, and

Wells were all arrested on June 12 or 13, 1991, with the same arrest numbers as listed in Erickson's report. **Supporting Evidence: Ex. 48 - Wells Declaration (Johnson 5726-5728); Ex. 7 – Six-witness (Erickson) Lineup Report Submitted 6/13/91 (RFC-Johnson 26-27); Ex. 49 - Filler Criminal Histories (RFC-Johnson 25901-25931); Ex. 51 – Hobbs IR Jacket (RFC- Johnson 32198); Ex. 52 – Brown Criminal History (RFC-Johnson 32206-32211); Ex. 53 – Wells IR Jacket (RFC-Johnson 32275); Ex. 54 – Wells Criminal History RFC-Johnson 32193-32197.)**

21.     Detective Erickson's name does not appear on any police records after the June 12/13, 1991 lineup report. There is no evidence in the record that Detective Erickson was involved in the investigation of Fred's murder after the first night. **(Supporting Evidence: Ex. 10 - Detective Erickson CPD Employment Status form (RFC 034610); Ex. 7 - CPD Investigative File at RFC-Johnson 1-37; Ex. 2 – CPD RD file at RFC-Johnson 38-87.)**

22.     Detective Erickson retired from the Chicago Police Department on August 2, 1991. **(Supporting Evidence: Ex. 10 - Detective Erickson CPD Employment Status form (RFC 034610).)**

23.     Defendant Guevara wrote a different four-witness lineup report stating that he and Detective Erickson conducted a lineup on the night of the shooting with Johns as the suspect. Guevara's lineup report is marked "Permanent Retention File." The report says that the lineup with the four witnesses occurred at 11pm on June 12, 1991, which is also the same time the report indicates it was submitted. The report was approved over a month later on July 24, 1991. The report does not identify any other police officers as being present for the lineups. According to Guevara's report, four witnesses viewed a lineup: Aby Gonzalez, Forrest Garnett, Fina Montanez, and Rosa Burgos. **(Supporting Evidence: Ex. 2 - Four-witness Lineup report at RFC-Johnson 40-42.)**

24.     The Four-witness lineup report states that "After four witnesses viewing this line-up the results of it was negative." **(Supporting Evidence: Ex. 2 – Four-witness lineup report at RFC-Johnson 42 ("After four witnesses viewing this line-up the results of it was negative."); Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 248-249 (B73:22-74:9)("Q. Counsel initially asked you about a number of people that you interviewed in connection with this case, among those were a Fina Montanez, a Forest Garnett and Abbey Gonzalez and a Rosa Burgos. You interviewed those people? A. I interviewed some of them, yes. Q. As a matter of fact those people stood and viewed that negative first lineup, did they not? A. Yes, they did. Q. That's the one with Brian Johns, aka Little D was in? A. That's correct.").)**

25.     Defendant Guevara's lineup report listed five individuals as standing in the lineup. All but Johns are different individuals than listed in Detective Erickson's report. The other four individuals listed are: Dewan Patterson, Carlos McFadden, Dwayne David, and Michael Robinson. CPD has no arrest reports for any individual named Dwayne David at any period, including June 1-15, 1991. The criminal histories of Carlos McFadden and Dewan Patterson show they were not arrested in June 1991. **(Supporting Evidence: Ex. 2 – Four-witness (Guevara) Lineup Report Submitted 6/12/91 (RFC-Johnson 40-42); Ex. 55 – City's Response to Plaintiff's Third Set of Requests to Admit at Nos. 1-2; Ex. 56 - Patterson**

4

Criminal History (RFC-Johnson 32259-32269); Ex. 57 – McFadden Criminal History (RFC-Johnson 28099-28107).)

26.    At his civil deposition in this case, Aby Gonzalez testified that he was in the vicinity of Edwin Fred shooting but did not see the shooter and does not recall participating in a lineup related to it or going to Area Five. **(Supporting Evidence: Ex. 8 - Gonzalez Deposition at 35:4-36:8.)**

27.    The police file in this case contains no photos related to either the six-person lineup documented by Defendant Erickson or the four-person lineup documented by Defendant Guevara. Defendant Guevara testified that he did not take any photos of the Johns lineup because "[no] photos are taken in a negative lineup." **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 246-247 (B71:19-72:22).)**

28.    Officer Daley was informed that Bryan Johns was not identified in the lineup and that he would be subsequently released. **(Supporting Evidence: Ex. 6 – Daley Deposition at 76:22-77:12.)**

29.    Bryan Johns was released from custody that same night. **(Supporting Evidence: Ex. 6 - Daley Deposition at 76:22-77:6, 132:20-133:12, 160:8-19; Ex. 7 – Daley 6/13/91 Supp Report at RFC-Johnson 34; Ex. 2 – Four-person lineup report at RFC-Johnson 42 ("Because the results of the line-up was negative the subject JOHNS, Bryan was released without charging.").)**

30.    There is no evidence that Defendant Halvorsen was involved in the Edwin Fred homicide investigation on the first night, June 12-13, 1991. There is no evidence that Defendant Halvorsen was involved in the Edwin Fred homicide investigation before June 29, 1991. **(Supporting Evidence: Ex. 2 – Four-person lineup report at RFC-Johnson 40-42; Ex. 7 – Six-witness lineup Report at RFC-Johnson 26-27; Ex. 2 – Guevara 6/13/91 Supp Report at RFC-Johnson 46-53; Ex. 2 - Original Offense Case Report at RFC- Johnson 38-39; Ex. 2 - Patrol Supp. Report of 6/29/91 at RFC-Johnson 66 (earliest record of Halvorsen's name in the records).)**

b)    *Continuing Investigation*

31.    On July 11, 1991, Defendants Guevara and Halvorsen showed a photo array to Elba Burgos in which she indicated that the male she saw running from the scene of the murder with a gun in his hand resembled Darrell Johnson, but a little younger. **(Supporting Evidence: Ex. 2 - 7/17/91 supp report at RFC-Johnson 68-70; Ex. 5 - 11/18/92 Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 106 (A95:2-12); Ex. 39 – Photos from Photo Array containing Darrell Johnson – Impound Evidence 398-407.)**

32.    Having knowledge that Darrell Johnson had a younger brother, Defendants Guevara and Halvorsen contacted Officer Daley to ask if he had a photo of the younger brother. On July 15, 1991, Officer Daley located a photo of the younger brother, Plaintiff Demetrius Johnson, along with two other individuals and gave the requested photo to the investigating detectives. This was Officer Daley's last involvement in the Edwin Fred Homicide investigation. Officer Daley had no contact with Plaintiff regarding this investigation or any witness that

identified Plaintiff. (**Supporting Evidence: Ex. 2 - 7/17/91 supp report at RFC-Johnson 68-70; Ex. 6 – Daley Deposition at 243:24-244:5; 245:6-10, 130:21-131:5.**)

33.     Later that day on July 15, 1991, Defendants Halvorsen and Guevara showed the three-person photo to Elba Burgos, who made a positive identification of Plaintiff Demetrius Johnson as the person she saw running with a gun from the scene of the shooting. (**Supporting Evidence: Ex. 2 - 7/17/91 supp report at RFC-Johnson 68-70; Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 106-107 (A95:24-96:24); Ex. 11 – 3-person polaroid (trial exhibit 6B) Impound Evidence 410-411.**)

### c)     *The Arrest and Charging of Plaintiff*

34.     On July 22, 1991, Johnson was arrested by Defendants Guevara and Halvorsen for the murder of Edwin Fred and attempted murder of Raul Ortiz. The arrest report listed Defendants Guevara and Halvorsen, and was signed by Guevara. Guevara and Halvorsen's arrest report stated during a live lineup Elba Burgos, Ricardo Burgos, and Rosa Burgos identified Johnson as the shooter. (**Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 104:3-13; Ex. 13 - Johnson 07/22/91 Arrest Report at RFC-Johnson 88; Ex. 2 – July 22, 1991 Lineup Report at RFC-Johnson 72-74.**)

35.     On July 22, 1991, at 8:30 p.m., Elba Burgos, Rosa Burgos, Angel Cordova, Victor Cordova, and Ricardo Burgos all viewed a lineup conducted by Halvorsen and Guevara. Elba Burgos identified Demetrius Johnson as the person "she saw run past her home, with gun in his hand, immediately after hearing gunshots being fired at the corner of North Ave. & Claremont." Rosa Burgos identified Demetrius Johnson as the person "she saw shot Edwin Fred." Ricardo Burgos identified Demetrius Johnson as the person "he saw shoot Edwin Fred." Neither Victor nor Angel Cordova identified Demetrius Johnson as the person who shot Edwin Fred. (**Supporting Evidence: Ex. 2 - July 22, 1991 Lineup Report at RFC-Johnson 72-74; Ex. 5 – Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 108-109 (A97:8-98:7); Ex. 14 - Line up photo (Impound Evidence 389); Ex. 5- Criminal Trial Transcript (Rosa Burgos) at JGS_JOHNSON 49-50 (A38:3-39:16); and Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 85-86 (A74:12-75:14).**)

36.     Following the lineups, felony review ASA Buckley was contacted and came to Area 5. After ASA Buckly reviewed the evidence, interviewed the witnesses, and conducted an interview of Demetrius Johnson, ASA Buckley approved felony charges against Plaintiff. (**Supporting Evidence: Ex. 7 – Cleared/Closed supp. Report at RFC-Johnson 16-17.**)

37.     During ASA Buckley's interview with Demetrius Johnson, Johnson told ASA Buckley that he knew of the murder from his friend, Brian Johns. Johnson also stated he was a member of the Disciples Street Gang and that he did not recall his whereabouts on the night of the murder, but it was his habit to pick up his girlfriend from work at 6:40 p.m. and then to go to her house until 9:30 p.m. on every day except for Wednesdays or Sundays. (**Supporting Evidence: Ex. 7 – Cleared/Closed supp. Report at RFC-Johnson 15-17.**)

d)    *Sgt. Healy's Involvement in the Investigation*

38.    Sgt. Healy's name appears in the police records on four documents as the approving sergeant, all of which are signed by him on July 24, 1991. These four documents include the four-witness lineup report of Defendants Guevara and Erickson claiming there were no positive identifications of Bryan Johns on the night of the shooting, as well as the cleared closed report and the lineup report of Defendants Guevara and Halvorsen. There is no evidence that Sgt. Healy had any other involvement in the Fred murder investigation other than signing the four documents. **(Supporting Evidence: Ex. 2 – Chicago Police Records RD File at RFC-Johnson 40, 62, 72, and 76 (Sgt. Healy's signed reports).)**

39.    There is no evidence in the record that Sgt. Healy was at Area 5 on any date other than July 24, 1991. **(Supporting Evidence: Ex. 7 - CPD Investigative File at RFC-Johnson 1-37; Ex. 2 – CPD RD file at RFC-Johnson 38-87.)**

e)    *Demtrius Johnson, Terrell Agee & Bryan Johns*

40.    In 1991, Demetrius Johnson ("Johnson") was associated with the Maniac Latin Disciples ("MLD"). **(Supporting Evidence: Ex. 12 - Demetrius Johnson Deposition at 45:18-22; Ex. 9 - Agee Deposition at 12:24-14:12 ("I used to be a Maniac Latin Disciple. We all were at the time. We all - you know, we didn't grow up - you know, we were some bad kids. I'll put it to you that way, and we had names on the streets.").)**

41.    His best friends, Terrell Agee ("Agee") and Bryan Johns, ("Johns") were fellow MLDs. Johnson's older brother Darrell was also an MLD. **(Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 56:12-21, 58:1-3; Ex. 15 – Darrell Johnson Deposition at 39:1-12; Ex. 9 – Agee Deposition at 10:18-19 ("A. Mr. Johnson is one of my best friends. We grew up together."); *Id*. at 41:4-11 ("Q. [Y]ou met Demetrius's brother, right? A. Yes. Q. Okay. And his name was Darrell? A. Yes. Q. Was he also an MLD? A. Yes."); *Id*. at 12:24-13:4 ("Q. [Y]ou and Bryan Johns and Mr. Johnson were all best friends? A. Yes.").)**

42.    Johnson, along with Agee and Johns, would often go "hunting," which meant looking for someone to beat up. They specifically would go catch a King (referring to a Latin King), and just beat them up, and let them know who it was that beat them up. **(Supporting Evidence: Ex. 9 – Agee Deposition at 66:1-16 ("...back then we would go over there and just beat up Kings, you know, go over there in the car, park somewhere two blocks away and catch a King or something like that and just beat him up but then let them know who it was that beat him up"); *id*. at 67:21-68:1 (This included Johnson and Johns); *id*. at 77:19-21 ("[W]e probably was out messing around at that time again, out hunting as we called it, looking for somebody to beat up.").)**

43.    The Kings' response to these attacks was to get back at the MLDs by trying to "put a case on" them, so the Kings would lie to police to try and get them off the street. **(Supporting Evidence: Ex. 9 – Agee Deposition at 66:17-67:11 ("I believe that was -- that was [the Latin Kings] way of getting back at us, always trying to put cases on us… they would lie and say,[...] he did this or he did that to get us off the street.").)**

44. Agee testified regarding Officer Daley that "Daley was cool with us. He was a fair officer. If he caught you, he caught you, you know. He never tried to put nothing on us, never harassed us or nothing like that. He always tried to talk positive to us and, you know, get us to get away from that gang life." **(Supporting Evidence: Ex. 9 – Agee Deposition at 65:15-20 ("Daley was cool with us. He was a fair officer. If he caught you, he caught you, you know. He never tried to put nothing on us, never harassed us or nothing like that. He always tried to talk positive to us and, you know, get us to get away from that gang life.").)**

45. Consistent with Erickson's six-witness lineup report, Terrell Agee stood in a lineup with Bryan Johns on June 12, 1991. **(Supporting Evidence: Ex. 16 - Agee Declaration (Johnson 2627-2628).)**

46. Sometime later, Agee estimates about two months after the lineup, while Johns and Agee were out "messing around" or "hunting," as they called it, the two were discussing the lineup, and Johns told Agee he was picked out of the lineup that night, but he did not tell Agee how he found out. **(Supporting Evidence: Ex. 9 – Agee Deposition at 77:14-78:5; 131:20-133:5.)**

47. According to Agee, he knew of a Milwaukee King named Aby, but he did not know if his last name was Gonzalez. **(Supporting Evidence: Ex. 9 – Agee Deposition at 92:11-24.)**

## V. Plaintiff's interactions with Bryan Johns after his arrest

48. While Plaintiff was detained at Cook County Jail before his trial, Brian Johns was also in custody there. Plaintiff knew Johns and considered him an associate from the neighborhood. **(Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 300:14-24; 56:12-21, 57:21-58:6.)**

49. In the summer of 1991, Plaintiff was associated with the Maniac Latin Disciples because the people in the gang were guys he grew up with, and who hung out on the same block. **(Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 43:5-7, 44:4-9, 45:18-46:3.)**

50. According to Plaintiff's brother Darrell Johnson, Johns was a member of the Maniac Latin Disciples. **(Supporting Evidence: Ex. 15 - Darrell Johnson Deposition at 121:6-122:1.)**

51. Johns told Plaintiff he knew about Plaintiff's "situation" and Johns had been "pointed out in the lineup" the day the crime happened. Johns did not say and Johnson did not ask who picked Johns out of the lineup. Plaintiff did not learn that the person who identified Johns was Aby Gonzalez until decades later. **(Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 300:4-24; 306:19-307:20; 310:3-9, 13-311:4, 314:10-15 (Johns told him he stood in a lineup the day the murder happened before Plaintiff's trial, but did not tell him who picked him out of lineup; 318:23-319:8.)**

52. Plaintiff testified that he asked Johns "did he do it," and Johns said "yes." When Plaintiff asked Johns if he would testify, Johns said no; he would not help Plaintiff at trial.

(**Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 307:21-308:2, 315:2-10, 317:20-318:11).**)

53.     The next time Plaintiff saw his criminal trial attorney, Ms. Gubin, he told her about this conversation, specifically that Johns told him he had been identified in a lineup on the night Fred was shot and had committed the murder, but that he was not willing to testify or to help Plaintiff by testifying. (**Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 307:5-7; 313:5-314:9; 315:2-15; 322:7-323:4.**)

54.     When Gubin learned this information from Plaintiff she told him they needed proof. (**Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 314:16-22 ("We need proof"); 315:18-19 ("Q: And what did she say to that [Johns admitted to committing the crime]? A: Same thing. We need proof.").**)

## VI.     Criminal prosecution

### a)     *Johnson is Indicted by a Grand Jury.*

55.     On August 19, 1991, ASA Susan Ziegler presented her case to a Grand Jury, seeking charges against Demetrius Johnson for the offenses of first-degree murder, attempt murder, aggravated battery and aggravated discharge of a firearm committed against Edwin Fred, Raul Ortiz, Forrest Garnett and Rosa Burgos. Her grand jury synopsis and the grand jury testimony make no mention of the June 12, 1991 positive identification of Johns by Aby Gonzalez. (**Supporting Evidence: Ex. 17 - Grand Jury Transcript, Aug. 19, 1991 at JGS_JOHNSON 404 (2:2-11, 15, 17, 18, 20).**)

56.     The Grand Jury returned a True Bill, and Johnson was formally indicted on all charges. (**Supporting Evidence: Ex. 17 – Grand Jury Transcript at JGS_JOHNSON 407 (5:13).**)

### b)     *Johnson's Criminal Defense.*

57.     Johnson was initially represented by Cook County Public Defender Jack Carey. (**Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 128:10-19 (Johnson recalls being represented by a public defender); Ex. 5 – Criminal Trial Transcript (Carey) at JGS_JOHNSON 184 (B9:10-14) (Carey testified to representing Demetrius Johnson in 1991.).**)

58.     The prosecuting Assistant State's Attorney requested documents on September 19, 1991 and Plaintiff's criminal defense attorney issued a subpoena for documents on July 23, 1991 that was returnable on August 13, 1991. (**Supporting Evidence: Ex. 30 – CCSAO Blue back notes at CCSAO 005; Ex. 37 - CCPDO subpoenas at CCPD 5-7.**)

59.     At some point during his representation, APD Carey met with Johnson. APD Carey took notes regarding that meeting. Those notes reflect the following:

(**Supporting Evidence**: Ex. 18 - CCPD Notes at CCPDO 00003; Ex. 12 – Demetrius Johnson Deposition at 134:-136:11; Ex. 26 – CCPD Privilege Log.)

60.     According to the notes, on August 28, 1991, APD Carey went to visit Bryan Johns in jail. (**Supporting Evidence**: Ex. 18 - CCPD Notes (CCPDO 00001); Ex. 26 – CCPD Privilege Log.)

61.     On October 22, 1991, Carey filed a request for discovery with the CPD and the CCSAO. (**Supporting Evidence**: Ex. 19 - Motion for Discovery, *Illinois v. Johnson*, No. 91-19833, Impound Evidence 328-333.)

62.     Carey and his investigator Darryl Ellis then began to interview witnesses identified in the police reports. (**Supporting Evidence**: Ex. 5 - Criminal Trial Transcript (Carey) at JGS_JOHNSON 184-185 (B9:10-14, B10:2-5) (Carey testified that in January 1992, he visited the crime scene and interviewed witnesses listed in the police reports).)

63.     In February 1992, Johnson's family hired a private attorney, Debra Gubin, to represent him. (**Supporting Evidence**: Ex. 20 - Gubin Deposition at 14:9-11 (Gubin was retained in February 1992); *id.* at 73:2-18 (Gubin does not recall the details of being retained but recalls that she was retained and not appointed.); Ex. 12 – Demetrius Johnson Deposition at 132:15-133:8 (Johnson hired a private attorney on the suggestion of his grandmother and dad).)

64.     When Gubin took over Johnson's representation from APD Carey, he tendered to her police reports, photos and "anything else that [was] not propriety to the public defender's office." The two discussed the case as well. (**Supporting Evidence**: Ex. 20 - Gubin Deposition at 52:9-20.)

65.     After her review of the file and meeting with APD Carey, Gubin filed a Motion for Additional Discovery. (**Supporting Evidence**: Ex. 20 - Gubin Deposition at 52:21-25.)

66.     Gubin received material from APD Carey, which she expected would include the police reports that had been produced to Carey by ASA Sheehan. (**Supporting Evidence**: Ex. 20 - Gubin Deposition at 52:1-20; 76:9-13.)

67.     At her deposition, Gubin testified as to the specific reasons she filed a Motion for Additional Discovery on February 18, 1992. When asked why the motion sought "The photo of the line-up taken 6/13/1991" she stated that she included that because she "didn't have a copy of the photo lineup of June 13th. And I knew that there was a lineup, and I wanted a copy of it." Gubin was not asked what particular report she was referring to that referenced a June 13 photo

lineup, and was not referring to the Erickson six-witness lineup report because she testified as the defense she never received that report, as did her co-counsel Ruth Miller Nor was Gubin asked if she was referring to the June 13 police report written by Defendant Guevara stating, "Photos of line up, subject to separate Supp. Report." **(Supporting Evidence: Ex. 21 - Defense Motion for Additional Discovery; Ex. 20, Gubin Deposition at 19:20-20:19 ("Q: And can you take us through to why you made these *additional* requests for discovery? A: Sure … I obviously didn't have a copy of the photo lineup of June 13th. And I knew that there was a lineup, and I wanted a copy of it.") (emphasis added); 34:20-35:2 ) (defense "absolutely did not have Erickson's lineup report in preparation for Johnson's criminal trial or at any point during Johnson's criminal proceedings."), 37:1-23; Ex. 24 - Miller Dep. at 75:11-18; 27:4-27:14; RFC-Johnson 29.)**

68.     Pursuant to the Chicago Police Department policies in place at the time, an evidence technician or an authorized member of the Detective Division was required to take photographs of any formal lineup *which resulted in the identification of a suspect*. In the event that the lineup did not result in an identification, no photos were required. **(Supporting Evidence: Ex. 22 - CPD General Order 88-18; Ex. 23 - Deposition of James Hickey at 261:24-262:6.)**

69.     Gubin further testified that she spoke to several of the witnesses identified in the reports. She specifically remembered talking to Rosa, a man named Raul, and two other unnamed witnesses. She explained she did not interview Aby Gonzalez because based on the lineup report that she had Gonzalez had not made any identification of Johns on the night of the shooting, he did not view the later lineup of Demetrius Johnson, and there was no other mention of him in police reports after the first day of the investigation. If the defense had the Erickson lineup report documenting that Gonzalez had identified Johns, she "absolutely" would have interviewed Gonzalez. **(Supporting Evidence: Ex. 20 - Gubin Deposition at 30:6-14 ("Q...Do you recall what witnesses you talked to? A. I know I spoke to Rosa. I'm sorry. I'm terrible with names. I'm not going to remember the last names. I spoke to Rosa, Raul, the gentleman who was in the car, and the woman who lived down the street who saw somebody running and she thought dropped a gun in the bushes."), 31:20-33:16; 36:11-25; 38:5-25 (if Gubin had received Erickson's lineup report at the time of trial, among other things, she "absolutely" would have gone out and interviewed Gonzalez, subpoenaed him and Erickson for trial, and cross-examined Guevara; and the report would have increased her chances of winning the suppression motion).)**

70.     Gubin knew that Plaintiff's brother, Darrell Johnson went by the nickname "D" and that he had a connection to Johns, who was called "Little D".  However, she does not know if she had any conversations with Darrell in preparation of Johnson's defense. **(Supporting Evidence: Ex. 20 - Gubin Deposition at 29:9-17 ("Little D, according to my information, Little D had gotten the name Little D because Darrel Johnson, Demetrius' older brother was D, and so Little D, who is Bryan Johns, was called Little D"); *id.* at 68:1-11 ("Q: Okay. So is it – did you – is it fair to assume that you understood that Bryan Johns at least knew Darrel Johnson? A: Yes…. Q: Okay. Did you ever ask Darrell Johnson about Bryan Johns, the person that you believed was that was your theory at least was, he was the real murderer? A: I don't remember having a conversation with Darrel John[son]").)**

71.     Gubin testified that she chose not to interview Bryan Johns because he had initially been arrested for this and released, and therefore she didn't know if he had an attorney. She also knew he was a gang member, who possibly could have been the real killer, and she thought he might not talk to her at all. (**Supporting Evidence: Ex. 20 - Gubin Deposition at 29:15-30:5 ("Q. Was there a reason why you didn't interview Bryan Johns? A. Because of the potential that he had initially been arrested for this and released. I didn't know if he had an attorney. I didn't know if I would be creating problems, for interviewing somebody when they didn't have their attorney present. And I also knew he was a gang member who possibly could have been the real shooter, and I don't think he would have talked to me at all.").)**

72.     Gubin testified that she never received the Erickson report or any evidence that Johns had been positively identified, but that if she had she would not have withdrawn her motion to suppress the identifications of Johnson. Gubin also testified that, without the Erickson report or evidence that Johns had been positive identified, her thinking was as follows: she filed a motion to suppress Johnson's identification in his criminal case, but determined the "chances legally of getting it suppressed were so-so. Were [sic] not really that great[]" and withdrew it. She further explained that, because it was a bench trial, she was concerned that if she presented the motion to suppress and it was not successful, it would be difficult for her to make her planned argument at trial that Johnson's identification was not reliable. Specifically, Gubin said she was concerned she would "bore the judge to tears" and it would be a better strategy to present the theory about unreliable identifications all at once. (**Supporting Evidence: Ex. 20 - Gubin Deposition at 37:1-19.)**

73.     Gubin and Ruth Miller, another attorney who was assisting Gubin on the Johnson case, were unable to produce their defense files related to Johnson's case because Gubin had shredded the file and Miller did not believe she had any records involving Johnson's case. (**Supporting Evidence: Ex. 20 - Gubin Deposition at 48:1-12 (Gubin testified that the files from the Johnson case were shredded in either 2005 or around 2015 or 2016); Ex. 24 - Miller Deposition at 45:23-25 (Miller testified that she did not think she had any records involving the Johnson case).)**

74.     In 2016, in another litigation matter involving Guevara, *Rivera v. Guevara*, 12-CV-4428 (N.D. Ill.), the Cook County Public Defender's Office ("CCPD"), in response to a record subpoena seeking files related to Johnson, produced a total of 67 pages that did not include any Chicago Police Department documents. In addition, 23 of the 67 pages produced consisted of medical records for an individual named Levon Jefferson, a criminal defendant in 1992 who was facing murder charges, and whose criminal proceedings are wholly unrelated to Johnson's case. (**Supporting Evidence: Ex. 25 - Johnson's CCPD File at RFC-Johnson 034611-034677.)**

75.     In response to a subpoena in this litigation, the CCPD produced the same file, but for the first time, included 20 pages of "notes" from APD Carey during his representation of Johnson, including interviews with various witnesses. (**Supporting Evidence: Ex. 26 - CCPD Privilege Log; Ex. 18 - CCPD Notes at CCPDO 00001.)**

76.     Johnson's assigned APD, Jack Carey, passed away in January 2002. (**<u>Supporting</u> <u>Evidence</u>: Ex. 27 – Sheehan Deposition at 29:13-24; Ex. 38 - Jack Carey Obituary, Chicago Tribune, Jan. 8, 2002.)**

77.     The Cook County State's Attorney's Office ("CCSAO") could not locate its trial file for the criminal prosecution of Demetrius Johnson. (**<u>Supporting Evidence</u>: Ex. 28 - Correspondence from CCSAO re: status of Johnson Criminal File at CCSAO 718 (Carroll states that "[t]he State's Attorney's Office is conducting a post-conviction review and are unable to locate our trial file."); Ex. 29 - Demetrius Johnson Box/File Identifier at CCSAO 749 (noting that 91 CR 19833 file contains "Blue Back only.").)**

78.     The CCSAO was only able to locate the prosecutor's "Blue back," which contains notes of ASA Sheehan, including a record of court dates, what documents were ordered and what documents were tendered to the defense. ASA Sheehan's entire set of Blue back notes do not contain a single specific notation or specific indication that Sheehan had ever been provided the Erickson lineup report, or any other evidence that CPD had disclosed to him that there was a positive identification of Johns. (**<u>Supporting Evidence</u>: Ex. 27 - Sheehan Deposition at 24:12-17, 61:11-66:7; Ex. 28 - Correspondence from CCSAO re: status of Johnson Criminal File at CCSAO 718; Ex. 29 - Demetrius Johnson Box/File Identifier at CCSAO 749.)**

79.     Based on the CCSAO Blue back, Attorney Sheehan tendered a packet of information, likely in court and in front of the bench. This packet of information included the Chicago Police Department RD file as well as GPRs, which he used interchangeably with the term "street file" or "investigative file." The Blue back does not specify which particular police reports were part of the packet that was tendered to the defense, or what particular documents were documents were contained among the "GPRs," or "street file," that Sheehan received and tendered. However, Sheehan made clear that the Erickson lineup report was not among the documents he received. (**<u>Supporting Evidence</u>: Ex. 27 – Sheehan Deposition at 57:23-58:14, 39:7-24 ("I've never seen this document at the time of trial. This is the first time I've seen that document with that person getting picked out."), 43:7-15 ("What gives me confidence is the truth, I never got [the Erickson lineup report]"); Ex. 30 – CCSAO Blue back notes at CCSAO 5.)**

80.     Sheehan's Blue back also delineated what was included in the "GPR" packet, or investigative file, included the "RD [file], the police report, the C[B] and arrest report, the evidence reports … and handwritten notes." The Blue back does not specify which particular police reports, notes or other documents were included among the documents characterized as "GPRs," and neither the RD file or Investigative File as exist at this time and produced by the City of Chicago in this case contain any handwritten notes generated by the detectives during the homicide investigation. (**<u>Supporting Evidence</u>: Ex. 27 - Sheehan Deposition at 58:14-20; Ex. 30 – CCSAO Blue back notes at CCSAO 5; Ex. 7 – Investigative File; Ex. 2 – RD/Permanent Retention File.)**

81.     Sheehan's Blue back also noted the requests made in Gubin's Motion for Additional Discovery. Specifically on February 28, 1992, Sheehan noted that Gubin was requesting the following *additional* information:

*Simulcast ? 6/12/91 "wired"*
*6/13/91 Lineup photos No 10*

Sheehan believes the notation, "6/13/91 Lineup photo No ID" refers to the lineup report documenting that there was no identification. **(Supporting Evidence:  Ex. 30 – CCSAO Blue back notes at CCSAO 6-7; Ex. 27 - Sheehan Dep. at 45:16-46:6 ("It could well refer to the negative line-up where there was no ID. I assume that's what the negative line-up is. . . . I can't think about it being anything else.".)**

82.      ASA Sheehan requested that Defendant Halvorsen bring him the file related to the Fred homicide investigation, as indicated in a note in the Investigative File containing the Erickson six-witness lineup report. **Ex. 7 - RFC-Johnson 12; Ex. 27 - Sheehan Dep. at 67:6-23 ("[O]bviously I reached out to the police department to give—tell Halvorsen to bring his file, that's all I can tell you.".)**

83.      The June 13, 1991, Six-witness lineup Report is not signed by a supervising officer. **(Supporting Evidence: Ex. 31 – Galvez Deposition (56:19-57:4) (Doesn't dispute a report that has a sergeant's signature "saying they reviewed the report" but the June 13 report "doesn't have any signature…I cannot say it transpired.").)**

> ### c)     *Criminal Trial*

84.      Sgt. Healy, Detective Erickson and Detective Halvorsen did not testify at Plaintiff's pre-trial proceedings or trial and no police reports themselves were admitted into evidence as exhibits at trial. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript at JGS_JOHNSON 10-309 (complete transcript), JGS_JOHNSON 11-12 (A2, B2) (index of witnesses); Ex. 17 – JGS_JOHNSON 403-409 (Grand Jury Testimony).)**

85.      Johnson's criminal trial began on November 18, 1992. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript at JGS_JOHNSON 10 (A1).)**

86.      No police officer witnesses were called by the State. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript at JGS_JOHNSON 11-12 (index of witnesses), JGS_JOHNSON 10-114 (State's case), JGS_JOHNSON 258-259 (State's rebuttal).)**

87.      Aby Gonzalez did not testify at Johnson's criminal trial but was interviewed the day of the shooting. He further gave a deposition in the instant case where he testified about where he grew up in Humboldt Park, and identified the area as one that had a lot of gangs in it. Gonzalez denied being a member of a gang, but admitted when he was younger, he used to hang out with gang members, specifically Cobras in his neighborhood. He further explained that Cobras are Latin Kings. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript at JGS_JOHNSON 11-12 (A2, B2); Ex. 7 - General Offense Case Report at RFC-Johnson 36-37; Ex. 8 - Gonzalez Deposition at 101:22-102:3, 106:22-107:10.)**

**d)** ***Trial Testimony of the Three Eyewitnesses***

      i.    <u>Ricardo Burgos:</u>

88.      Ricardo Burgos testified that on June 12, 1991, at approximately 7:45, he was driving with a friend East down North Ave. At that time he saw a black guy wearing a T-shirt and gray pants walking North down Claremont with a gun in his hand. **(<u>Supporting Evidence</u>: Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 79 (A68:16-21), JGS_JOHNSON 80-81 (A69:22-70:7).)**

89.      Mr. Burgos testified he viewed this guy with a gun from across the street and he estimated the distance being about sixty feet. **(<u>Supporting Evidence</u>: Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 80 (A69:18-24).)**

90.      Mr. Burgos testified that he then saw this man fire the gun. **(<u>Supporting Evidence</u>: Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 81 (A70:8-10).)**

91.      Mr. Burgos testified that he looked at this man who fired the gun for about forty-five seconds and could see his face. Mr. Burgos then identified Demetrius Johnson as the person he saw fire the gun that day. **(<u>Supporting Evidence</u>: Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 81 (A70:12-15), JGS_JOHNSON 85 (A74:3-14).)**

92.      Mr. Burgos also testified to two events that are not documented in any police reports in the case: he was shown Polaroid photos of the suspect before the July 22, 1991 lineup, and he was shown photos on June 21, 1991 at his mother's home. **(<u>Supporting Evidence</u>: Ex. 5 - Criminal Trial Transcript (Ricardo Burgos) at JGS_JOHNSON 82-83 (A71:11-A72:19), JGS_JOHNSON 97 (A86:3-24).)**

93.      Ricardo Burgos testified at his civil deposition that he was 60-70 feet away when the shooting occurred, that he only saw the shooter running away from behind and never saw his face, and that any claim by police that he could identify the shooter was false. **(<u>Supporting Evidence</u>: Ex. 7 – RFC Johnson 25 (police report stating Ricardo "notice[d] a male hispanic coming out of Claremont pulling out a big gun from his waist"); Ex. 46 - Ricardo Affidavit, Johnson 601-603; Ex. 32 - Ricardo Deposition at 17:10-19:4, 38:5-14 (if the police said he could of identified the shooter, that it would have been false), 45:5-11 ("Q. "[I]s is it fair to say that if you were shown photos or lineups, you would not have been able to identify anyone? A. That's correct."); Ex. 5 - Ricardo Burgos Criminal Trial Testimony, Ex. 42 - Guevara Dep. at 23:12-26:1 (Ricardo did not see shooter's face); 29:21-30:1; 53:8-54:12 (Ricardo shown June 1991 photo array in which he could not identify anyone); 78:23-81:15 (Guevara told Ricardo who to pick); Ex. 47 - Dysart Expert Report (opining as to the circumstances that made the identification highly unreliable and unlikely without prompting).)**

ii.  Elba Burgos

94.  On June 12, 1991, Elba Burgos lived on the 1500 block of Claremont, on the East side of the street, which runs north/south. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 101 (A90:12-23).)**

95.  At about 7:45 p.m., Elba was sitting on her front porch and heard gunshots. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 101-102 (A90:24-91:5).)**

96.  She testified that after she heard the shots she stood up and looked towards North Ave and next saw a man running in her direction with a gun going southbound on Claremont. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 102 (A91:14-21).)**

97.  Elba Burgos testified that the person she saw with a gun was young and black and about 25 feet from her on the opposite side of the street (West side). **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 103 (A92:1-4, 8-24).)**

98.  At trial, Elba Burgos identified Demetrius Johnson as the person she saw that night with the gun. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 104 (A93:2-12).)**

99.  Elba Burgos testified that on July 11, 1991, Det. Guevara came to her house and showed her photographs. She viewed photographs 7A-7E and told Det. Guevara that the person looked like 7C but younger. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 105-106 (A94:3-95:12); Ex. 39 - Photo array (7A-7E) Impound Evidence 398-407.)**

100.  Elba Burgos testified that on July 15, 1991, Det. Guevara came to see her at her home and showed her a photograph and she identified Demetrius Johnson as the person she saw running past her with a gun. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 106-107 (A95:24-96:24); Ex. 11 – 3-person polaroid (trial exhibit 6B) Impound Evidence 410-411.)**

101.  Elba testified that on July 22, 1991, she viewed a lineup at the police station and identified Demetrius Johnson as the person she saw carrying a gun on Claremont. **(Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Elba Burgos) at JGS_JOHNSON 108-109 (A97:8-98:7) Ex. 14 - Line up photo (Impound Evidence 389).)**

102.  Elba Burgos was on her front porch on the East side of the street, and the shooter was running down the sidewalk on the West side of the street. She only had a few seconds to see the shooter as he was running by, and any identification came only weeks later. Elba's trial identification came after she was shown Plaintiff's picture multiple times, including in a single photo containing Plaintiff and two dissimilar individuals, and a lineup in which he was the only person from prior photos. **(Supporting Evidence: Ex. 7 – Police Report of Elba Interview, at RFC-Johnson 19 (sitting on her front porch, saw person with gun running down the sidewalk on West side of street); Ex. 5 – JGS_JOHNSON 111-112 (A-100:19-A-101:13**

16

(person running was on other side of street),  JGS_JOHNSON 121 (A-110:18-20) (she had only a few seconds to see the shooter's face ); Ex. 11 – 3-person polaroid (trial exhibit 6B) Impound Evidence 410-411; Ex. 14 - Line up photo (Impound Evidence 389); Ex. 42 - Guevara Dep: 27:4-9 (Elba did not give police a description of shooter when she first spoke to them),30:2-7 (Elba said she could not give good description of the shooter and could not identify him), 54:20-55:25 (Photo array shown to Elba and Guevara made up that she ID'd Darrell but younger), 56:1-11 ("what you showed Elba was not a proper photo array, was it?"), 56:12-59:12 (improper fillers and improper ID procedures and did not disclose manipulation), 64:18-65:13 (tainting Elba's live lineup ID), 72:10-22 (only evidence was you telling her who to pick), 77:15-78:1; Ex. 47 - Dysart Expert Report (opining as to the circumstances that made the identification highly unreliable and unlikely without prompting).)

    iii. <u>Rosa Burgos</u>

103. Rosa Burgos testified that on June 12, 1991, at about 7:45 p.m., she was coming out of her building with Raul Ortiz. She saw the person shoot Raul Ortiz, then she ran back upstairs. She was approximately 10 feet from the person who shot Raul Ortiz, and saw his face for four seconds. The person who shot Raul was short, black and young. (**Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Rosa Burgos) at JGS_JOHNSON 43-44 (A32:16-33:20), JGS_JOHNSON 45 (A34:6-13), JGS_JOHNSON 45-46 (A34:22-35:8), JGS_JOHNSON 46 (A35:13-20).**)

104. Rosa Burgos identified Demetrius Johnson as the person who shot Raul Ortiz in court. (**Supporting Evidence: Ex. 5 - Criminal Trial Transcript at JGS_JOHNSON 46-47 (A35:21-36:8).**)

105. Rosa Burgos testified she viewed a lineup at Area 5 violent crimes on June 12, 1991 and did not identify anyone. (**Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Rosa Burgos) at JGS_JOHNSON 47 (A36:9-18).**)

106. Rosa Burgos testified that she knew "Little D" prior to the shooting and testified it was not "Little D" who shot Raul Ortiz. Rosa Burgos knew that Little D's real name was Brian Johns. (**Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Rosa Burgos) at JGS_JOHNSON 47-48 (A36:21-37:14), JGS_JOHNSON 55 (A44:11-13).**)

107. Rosa testified that on July 22, 1991, she went to Area 5 to view a lineup and identified Demetrius Johnson as the person who shot Raul Ortiz. (**Supporting Evidence: Ex. 5 - Criminal Trial Transcript (Rosa Burgos) at JGS_JOHNSON 49-50 (A38:3-39:16); Ex. 14 - Line up photo (impound Evidence 389).**)

108. Rosa Burgos's statement to police and other sworn testimony include that Rosa Burgos was in a building walking down a staircase behind Raul Ortiz, and ran back upstairs when the shooting started. (**Supporting Evidence: Ex. 7 - RFC-Johnson 20-21, Rosa Dep. at 40:21-42:19; Ex. 42 - Guevara Dep. 27:15-29:20 (Rosa did not see the shooter's face and could not make identification).**)

      *e)*     ***Det. Guevara and Officer Daley Called in the defense case***

109.     Detective Guevara and Officer Daley did not testify on behalf of the state at Plaintiff's trial but were called by the Plaintiff's defense attorney. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript at JGS_JOHNSON 10-309 (complete trial transcript), JGS_JOHNSON 11-12 (A2, B2) (index of witnesses); Ex. 17 – JGS_JOHNSON 403-409 (Grand Jury Testimony).)**

110.     Officer Daley testified about his arrest of Johns. Daley testified that Johns was not identified in a lineup on the night of the shooting. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Daley) at JGS_JOHNSON 206-207 (B31:15-32:10).)**

111.     Defendant Guevara testified that there was a lineup conducted on June 12, 1991 in which Johns was the suspect. Guevara testified that all supplemental reports with the RD number for the Fred homicide investigation were kept in the same, centrally kept location so that they would all be available if subpoenaed. The Six-witness lineup Report indicating Aby Gonzalez identified Bryan Johns as the gunman lists the same RD# (P270878) as Guevara's report, but it is contained in the Investigative File only, not the Permanent Retention File. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 229 (B54:5-14), JGS_JOHNSON 232 (B57:7-10); Ex. 2 – Four-witness lineup report (RFC-Johnson 40-42); Ex. 7 – Six-witness lineup Report (RFC-Johnson 26-27).)**

112.     Defendant Guevara testified that no one identified anyone in the lineup in which Johns was the suspect on June 12, 1991, the day of the shooting. Guevara did not testify to the existence of any June 13 lineup, or any lineup in which there was any positive identification of Johns. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Guevara) at JGS_JOHNSON 248-249 (B73:22-74:9) ("Q. Counsel initially asked you about a number of people that you interviewed in connection with this case, among those were a Fina Montanez, a Forest Garnett and Abbey Gonzalez and a Rosa Burgos. You interviewed those people? A. I interviewed some of them, yes. Q. As a matter of fact those people stood and viewed that negative first lineup, did they not? A. Yes, they did. Q. That's the one with Brian Johns, aka Little D was in? A. That's correct.").)**

113.     The defense argued that Johnson was misidentified during suggestive police identification procedures weeks after the shooting. The defense also argued that Johnson looked like Johns—the original suspect and the man arrested on the day of the crime—which may have contributed to the misidentification. In addition, they argued that Johnson's alibi was uniquely credible because of the significance of the night: the Bulls first championship was on TV and Reyes and Martinez with whom Johnson watched the game were not basketball fans and did not usually watch games, so the night was memorable. Defense counsel also argued that Guevara's failure to report on much of his investigation, including photo identifications, was suspicious and showed he didn't care about the truth. If defense counsel had known about the positive identification documented in the Erickson lineup report, they would have definitely used it at trial in cross examining witnesses and in support of their argument at trial. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript (Gubin Closing) at JGS_JOHNSON 260-277 (B85:15-102:2); Ex. 20 – Gubin Deposition at 28:18-29:17 (defense theory was that Johns committed the shooting based on Johns' being mentioned in the broadcast the night of the**

**crime and his getting arrested.), 31:20-33:16; 36:11-25; 38:5-25 (if Gubin had received Erickson's lineup report at the time of trial, among other things, she "absolutely" would have gone out and interviewed Gonzalez, subpoenaed him and Erickson for trial, and cross-examined Guevara; and the report would have increased her chances of winning the suppression motion), 47:3-5 (would've been argued in opening statement); Ex. 24 – Miller Deposition at 29:2-9 (Johns was the perpetrator according to the defense's theory), 36:10-24 (in response to Sheehan closing argument would have gotten up and used the report, the report "would have been all over this case"); Ex. 27 – Sheehan Deposition at 40:19-41:3 (recalled the defense argued that Johns was the real shooter in closing).)**

114.     In the State's closing argument, in rebutting the defense argument that Johns was the true perpetrator, Prosecutor Sheehan stated that none of the witnesses who viewed the June 12, 1991, lineup that included Johns identified him. Prosecutor Sheehan mentioned Aby Gonzalez as not identifying Johns. ASA Sheehan would have never argued in closing argument that no one identified Johns in a June 12 lineup if he had been given the Erickson six-witness lineup report. **(Supporting Evidence: Ex. 5 – Crim. Tri. Transcript at JGS_JOHNSON 277-288; Ex. 27 – Sheehan Dep. at 35:10-15 (agreed his closing argument was that no one had picked Johns out of a lineup in the case), 39:17-24.)**

115.     There was no mention of any positive identification of Johns or of the six-witness lineup report (Erickson's) report at Johnson's criminal trial. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript, JGS_JOHNSON 10-308.)**

116.     Johnson was convicted and sentenced to 25 years in prison for the murder of Fred and 10 years in prison for the attempted murder of Ortiz to be served concurrently. **(Supporting Evidence: Ex. 5 – Criminal Trial Transcript at JGS_JOHNSON 288 (B113:6-12), JGS_JOHNSON 305 (C15:18-23).)**

**VII.     Deposition Testimony of the Three Eyewitnesses**

**a)     *Ricardo Burgos*:**

117.     At his deposition in this case, Ricardo Burgos, who suffered a serious head injury in 1996 or 1997 that impacts his memory, testified that while he doesn't recall testifying in Johnson's criminal case, he would not have lied under oath in front of a judge. **(Supporting Evidence: Ex. 32 - Ricardo Burgos Deposition at 79:5-80:20.)**

**b)     *Elba Burgos:***

118.     In 2022, a woman named Ada Elba Burgos was subpoenaed and testified during a civil deposition in this case. She testified that she recalled living in the area of North Avenue and Claremont, but that she did not recall living at 1535 N. Claremont, of talking to police after a shooting in 1991 or of testifying at a criminal proceeding in 1992. She could not recall when she got married or her husband's name. **(Supporting Evidence: Ex. 33 - Elba Burgos Deposition, April 26, 2022, (10:17-20; 15:19-16:2; 26:11-27:4; 44:7-25; 48:9:15).)**

**c)** *Rosa Burgos:*

119.    At her deposition in this case, Rosa Burgos testified that she currently suffers from hereditary memory issues but stated that she would not have lied to the police if asked questions about a shooting and would have told the truth when under oath and giving testimony in a court room. **(Supporting Evidence: Ex. 34 - Rosa Burgos Deposition, May 12, 2022 (at 18:5-7, 22:9-24; 23:12-14).)**

## VIII.    Post-Conviction:

120.    On November 12, 2019, Cook County Judge LeRoy K. Martin, Jr. granted Johnson relief, vacating his conviction and ordering a new trial. **(Supporting Evidence: Ex. 35 – Order Vacating Conviction (Johnson 513).)**

121.    On December 20, 2019, state prosecutors dropped all charges against Johnson. **(Supporting Evidence: Ex. 12 – Demetrius Johnson Deposition at 37:8-12; Ex. 36 – Johnson Criminal Docket.)**

## IX.    Plaintiff's Claims

122.    One of Johnson's contentions is that Defendants "knowingly procured false identifications of Plaintiff as the person responsible for the Fred murder from Richard Burgos, Rosa Burgos, and Elba Burgos, after which they concealed the falsity of the identification for decades." **(Supporting Evidence: Ex. 40 - Plaintiff's Fourth Supplemental Responses to Defendant Daley's First Set of Interrogatories at p. 3.)**

123.    Johnson alleges that Defendants suppressed the six-witness lineup report ("Erickson Report") and also argues that Defendants failed to disclose their fabrication of witness statements and non-descript general personal documents allegedly created. **(Supporting Evidence: Ex. 40 - Plaintiff's Fourth Supplemental Responses to Defendant Daley's First Set of Interrogatories at p. 2-3.)**

124.    Johnson also makes the contention that "'street files' and/or 'personal notes' and/or 'personal files' kept by detectives working on and in regard to the Edwin Fred murder were fabricated, withheld, destroyed or concealed, and that such documents contained exculpatory and impeaching information that would have permitted Johnson to demonstrate his innocence." **(Supporting Evidence: Ex. 40 - Plaintiff's Fourth Supplemental Responses to Defendant Daley's First Set of Interrogatories at p. 2.)**

126.    According to a police report from the day of the shooting, June 12, 1991, Aby Gonzalez did see the shooting, stating that the shooter "pulled a gun and pointed it at him and stood there for several seconds," and then "fire two shots at Fred [the victim] . . . and ran past Gonzalez again. . . ." And according to the Erickson six-witness lineup report documenting a lineup occurring on the same day, Aby Gonzalez made a positive identification of Bryan Johns as the shooter. **(Supporting Evidence: Ex. 2 – RFC Johnson 52; Ex. 7 – Erickson Six-Witness Lineup Report at RFC-Johnson 26-27.)**

127.     On October 7, 2019, attorney Josh Tepfer met with Aby Gonzalez and spoke about his memories of the shooting. Mr. Tepfer testified, consistent with his notes of that meeting, that Aby Gonzalez stated that he did identify someone as the shooter on the night of the shooting. **(Supporting Evidence: Ex. 43 - Tepfer Dep. Vol. II at 88:17-90:20; Ex. 45 - Johnson 911-912 (Tepfer Report, detailing that Gonzalez told him that he positively identified someone in a lineup on the night of the shooting).)**

128.     Aby Gonzalez testified at his civil deposition that he could not dispute whether he gave this statement to Mr. Tepfer on October 7, 2019, because he did not remember one way or the other what his statement was. At that deposition, Gonzalez also testified that he was not disputing the information contained in the Erickson police report documenting his positive identification. **(Supporting Evidence: Ex. 8 - Aby Gonzalez Dep. at 23:2-11; 29:12-16; 30:5-11; 44:24-45:22; 74:24-75:10; 93:4-94:11 (where he states that he cannot say if Erickson report is true or not); 55:10-15, 77:14-78:2, 78:15-79:3.)**

129.     Ricardo Burgos testified at this civil deposition that he was 60-70 feet away when the shooting occurred, that he only saw the shooter running away from behind and never saw his face, and that any claim by police that he could identify the shooter was false. **(Supporting Evidence: Ex. 46 - Ricardo Affidavit, Johnson 601-603; Ex. 32 - Ricardo Deposition at 17:10-19:4, 38:5-14 (if the police said he could of identified the shooter, that it would have been false), 45:5-11 ("Q. "[I]s is it fair to say that if you were shown photos or lineups, you would not have been able to identify anyone? A. That's correct.").)**

130.     Elba Burgos's criminal trial testimony, and the police report of the initial interview of Elba, indicate that Elba was on her front porch on the East side of the street, and saw the shooter running down the sidewalk past her house on the West side of the street (opposite her home on the East side of the street), and she had only four to five seconds to see the shooter's face. **(Supporting Evidence: Ex. 7 – Police Report of Elba Interview, at RFC-Johnson 19 (sitting on her front porch, saw person with gun running down the sidewalk on West side of street); Ex. 5 – JGS_JOHNSON 111-112 (A-100:19-A-101:13) (person running was on other side of street). Ex. 5 – JGS JOHNSON 121 (A-110:18-20); see also Ex. 42 - Guevara Dep: 27:4-9 (Elba did not give police a description of shooter when she first spoke to them), 30:2-7 (Elba said she could not give good description of the shooter and could not identify him).)**

131.     The police report documenting officers' initial interview of Rosa Burgos indicates that Rosa was in a building walking down a staircase behind Raul Ortiz, and ran back upstairs as soon as the shooting started. Rosa testified that she "had trouble distinguishing between black people because all those people look alike"; and that when she viewed a lineup she did not make a positive identification but instead told the police she was unsure. **(Supporting Evidence: Ex. 7 – Police Report of Rosa Interview, RFC-Johnson 20-21; Ex. 34 - Rosa Deposition at 40:21-42:19; Ex. 5 – Rosa Trial Testimony at JGS_Johnson 66 (R. A-55:6-10), 1188-1189 (B-12:19 –B-13:11).)**

132.    Demetrius Johnson's Public Defender, Jack Carey, testified at trial that when he interviewed Rosa Burgos, she told him that she had gone to the police station on an earlier occasion (before the lineup in which Demetrius Johnson was the suspect) to view a different lineup. At that time, three individuals had identified someone and she was told by police that they had the wrong guy. (**Supporting Evidence: Ex. 5 – PD Carey Trial Testimony, JGS_Johnson 187 (B-12:2-18) (Public Defender testifying that Rosa told him there were three identifications previously and the police told them it was wrong guy).**)

133.    When Reynaldo Guevara was asked at his deposition whether Elba, Rosa and Ricardo told him they could not identify the shooter, whether he told them who to pick, and whether he ultimately fabricated police reports falsely claiming that they had identified Plaintiff without his interference, Guevara pleaded the Fifth. (**Supporting Evidence: Ex. 42 – Guevara Deposition at p. 22:22-23:1, 24:5-30:25, 78:17-81:20, 82:6-84:7, 91:23-92:21, 101:23-104:4, 110:4-111:8 (pleading Fifth on these issues throughout deposition).**)

134.    Based on the initial police report documenting Defendant Guevara's interview of Ricardo Burgos, Ricardo told police that the shooter was a "male hispanic," not a "black guy." (**Supporting Evidence: Ex. 7 - RFC Johnson 25 ("he noticed a male hispanich"); Ex. 5 – Guevara Trial Testimony at JGS_Johnson 227 (B-52:5-9) (Q. What is the description given by Ricardo Burgos? A. . . . male Hispanic").**)

135.    In a sworn statement given on October 8, 2020, Ricardo Burgos swore that he was 60-70 feet away when the shooting occurred, "did not see the man with a weapon," and only saw the shooter running away from behind and never saw his face. (**Supporting Evidence: Ex. 46 - Ricardo Affidavit, Johnson 601-603.**)

136.    As set forth in Paragraphs 94, 95, 97, and 102 above, Elba Burgos also testified that she was on her front porch on the East side of the street, and saw the shooter running down the sidewalk on the opposite side of the street. (**Supporting Evidence: Ex. 7 – Police Report of Elba Interview, at RFC Johnson 19 (sitting on her front porch, saw person with gun running down the sidewalk on West side of street); Ex. 5 – JGS_JOHNSON 111-112 (A-100:19-A-101:13 (person running was on other side of street)), 101-102 (A90:12-91:5).**)

137.    Rosa Burgos testified at her civil deposition that she did not know an individual named Bryan Johns. The police report documenting the police interview of Rosa Burgos contains no reference to Rosa recognizing the shooter or Bryan Johns as someone she knew from the neighborhood, nor does the Erickson police report documenting a lineup viewed by Rosa Burgos in which Johns was the suspect. (**Supporting Evidence: Ex. 34 – Rosa Deposition at 19:23-20:2 ("Q. Did you know an individual named Bryan Johns? A. Who? Q. Bryan Johns. A. No."), 20:3-20:5 (same), 64:7-65:5; Ex. 7 – Erickson Lineup Report, at RFC-Johnson 27; Ex. 7 – Supplementary Report of Interview of Rosa Burgos, at RFC-Johnson 21.**)

138.    At trial, Ricardo Burgos denied telling Detective Guevara that he "noticed a male Hispanic coming out of Claremont pulling out a big gun from his person" and testified that he

told him "it was a black guy." **(Supporting Evidence: Ex. 5 - Ricardo Burgos Criminal Trial Testimony, JGS_JOHNSON 89 (A-78:10-19) (Q: And you told Detective Guerra that you noticed a male Hispanic coming out of Claremont pulling out a big gun from his person? A: No, I didn't. Q: So you never told him that you saw a male Hispanic? Are you saying no you did not say a male Hispanic or no you didn't say you saw somebody pulling out a gun? A: I told him it was a black guy.).)**

139.    Assistant Public Defender Carey interviewed Rosa Burgos. He testified at trial that when he asked her whether she identified anyone in the "lineup she viewed the night of the shooting," she said "everything happened so fast and that she wasn't sure." **(Supporting Evidence: Ex. 5 –Trial Testimony (APD Carey) at JGS_Johnson 187 (B12:2-10).)**

Dated: April 12, 2024                          Respectfully Submitted,


/s/ Anand Swaminathan                          /s/ Josh M. Engquist
Anand Swaminathan                              Josh M. Engquist, Atty. No. 6242849
Jon Loevy                                      *One of the Attorneys for the Individual*
Anand Swaminathan                              *Defendants*
Steve Art
Rachel Brady                                   Josh M. Engquist
LOEVY & LOEVY                                  James G. Sotos
311 N. Aberdeen                                Josh M. Engquist
Chicago, IL 60607                              David A. Brueggen
(312) 243-5900                                 Elizabeth R. Fleming
*Attorneys for Plaintiff*                      Daniel McGinnis
                                               Special Assistant Corporation Counsel
                                               THE SOTOS LAW FIRM, P.C.
                                               141 W. Jackson, Suite 1240A
                                               Chicago, IL 60604
                                               (630) 735-3300
                                               jengquist@jsotoslaw.com


                                               /s/ Thomas M. Leinenweber
                                               Thomas M. Leinenweber, Atty. No.
                                               6209086
                                               *One of the Attorneys for Defendant Reynaldo*
                                               *Gueavra*

                                               Thomas M. Leinenweber
                                               Michael J. Schalka
                                               James V. Daffada
                                               Leinenweber Baroni & Daffada
                                               120 N. LaSalle St., Suite 2000
                                               Chicago, IL 60602
                                               (312) 663-3003
                                               thomas@ilesq.com

## CERTIFICATE OF SERVICE

I, Josh M. Engquist, certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on Friday, April 12, 2024, I electronically filed the foregoing **Joint Statement of Undisputed Material Facts** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

*Attorneys for Plaintiff:*

Jon Loevy
Anand Swaminathan
Joshua Tepfer
Rachel Brady
Steven Art
Sean Starr
Alyssa Martinez
Margaret Gould
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312-243-5900
jon@loevy.com
anand@loevy.com
josh@loevy.com
brady@loevy.com
steve@loevy.com
sean@loevy.com
alyssa@loevy.com
gould@loevy.com

*Attorneys for City of Chicago:*

Eileen E. Rosen
Austin G. Rahe
Catherine M. Barber
Theresa B. Carney
Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200
Chicago, Illinois 60654
312-494-1000
erosen@rfclaw.com
arahe@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com

*Attorneys for Defendant Guevara:*

Thomas M. Leinenweber
Michael J. Schalka
James V. Daffada
Leinenweber Baroni & Daffada
120 N. LaSalle St., Suite 2000
Chicago, IL 60602
(312) 663-3003
thomas@ilesq.com
mjs@ilesq.com
jim@ilesq.com

/s/ Josh M. Engquist
Josh M. Engquist