## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

DEMETRIUS JOHNSON )
                                     ) Case No. 20 CV 4156
        Plaintiff, )
                                       ) Judge Sara L. Ellis
        v. )
                                         ) Magistrate Judge Heather K. McShain
REYNALDO GUEVARA, et al. )
                                       )
        Defendants. ) JURY TRIAL DEMANDED
                                       )

## PARTIES' JOINT STATEMENT OF FACTS

1.     Plaintiff's *Monell* claim includes the following theories: that as a matter of widespread municipal policies and practices, Chicago police officers (1) "routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate," (Ex. 25, Plaintiff's Complaint (Dkt. 1) at ¶50); (2) "systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information," (*id.* at ¶52); (3) "routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person," (*id.* at ¶58); (4) "operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct," (*id.* at ¶60); (5) "condoned and facilitated a code of silence within the Chicago Police Department," (*id.* at ¶65); (6) failed to "track and identify police officers who are repeatedly accused of serious misconduct," (*id.* at ¶71); and (7) "declined to provide adequate training to Chicago police detectives." (*id.* at ¶73).

2.     Plaintiff's Complaint and Interrogatory Responses together include at least 39 pages and 64 paragraphs describing Plaintiff's *Monell* claims, which include theories that the City

of Chicago failed to train, supervise and discipline Chicago Police officers who engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, withholding evidence from criminal defendants and their counsel, and the repeated failure to comply with documentation and disclosure obligations; maintained a widespread practice of expressly permitting Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the repeated failure to comply with documentation and disclosure obligations; and expressly authorized Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the repeated failure to comply with documentation and disclosure obligations, thorough obviously inadequate and incomplete policies. (Ex. 25, Plaintiff's Compl. (Dkt. 1) at ¶¶ 47-84; Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, Response Nos. 1, 2, 3, 4, 6.)

3. Plaintiff has only developed evidence related to his theories based upon (i) Plaintiff's eyewitness identification theory and (ii) Plaintiff's file suppression or street files theory. (Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, ¶ 2.)

4. Plaintiff's eyewitness identification Monell theory is that "[CPD] had a widespread practice of manipulating eyewitness identification procedures to create false positive identifications of police suspects, and also failed to document identification procedures." (Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, p. 11).

5. Plaintiff's "street files" *Monell* theory is that CPD had a "pattern and practice of *Brady* violations – *i.e.,* related to the repeated failure to disclose exculpatory information to criminal defendants – include express policy theories (*e.g.,* documentation, notetaking and file

2

keeping policies that were plainly inadequate on their face); widespread practice theories (*e.g.,* a widespread practice of failing to document investigative steps, permitting officers to keep street file (sic) that were not later disclosed); and failure to train, supervise and discipline theories (*e.g.,* the failure to train detectives on documentation, notetaking and file keeping policies, the failure to conduct audits to ensure such policies were being following (sic), the failure to discipline officers for violating documentation, notetaking and file keeping policies." (Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, pp. 6-7).

6. Plaintiff was asked in written discovery to "identify all evidence known to Plaintiff that establishes why" the City's policies on eyewitness identification and "street files" were unconstitutional. (Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, ¶ 3). Plaintiff responded regarding the street files theory by incorporating the expert report of Thomas Tiderington from the *Solache/Reyes*, *Sierra*, and *Iglesias* cases, and the eyewitness identification theory by incorporating the expert report of Dr. Nancy Steblay from the *Velez v. City of Chicago* case. (*Id*. at pp. 13-14).

7. Plaintiff was asked in written discovery, "For each alleged policy identified in answer to [the City's interrogatories], identify all evidence known to Plaintiff that establishes why each alleged policy is unconstitutional." (Ex. 20, Plaintiff's Response to the City's First Set of Interrogatories, ¶ 3). Plaintiff responded by explaining his *Monell* theories in detail as set out in paragraph 2, above, and incorporated the expert reports and 30(b)(6) depositions of Gary Wells and Jennifer Dysart in *Rivera v. City of Chicago*, Dr. Steblay in *Velez v. City of Chicago*, Michael Brasfield in *Fields v. City of Chicago* and *Rivera v. Chicago*, Anthony Finnell in *Reyes/Solache, Sierra, Bouto, Rodriguez,* and *Iglesias*, Mr. Tiderington in *Reeyes/Solache, Sierra*, and *Iglesias*, Timothy Longo in *Hood/Washington v. City of Chicago. See supra* at ¶2 (discussing Ex. 20,

3

Plaintiff's Response to the City's First Set of Interrogatories, at pp. 2-14).

8.     Plaintiff did not supplement his Responses to the City's First Set of Interrogatories.

**THE CITY'S POLICIES AND PRACTICES[1]**

9.     The "R.D." number is the Records Division number, which is assigned to each case that has been referred to the detective area for investigation.  The number is assigned in a numerical sequence.  (Ex. 17, Deposition of James Hickey, *Kluppelberg v. Burge*, N.D. Ill. 13-CV-03963, at 113:16-24).

10.     The Records Division File ("RD File") would contain the General Offense Case Report, the original report that begins any investigation and any and all supplemental reports that are created.  This file is physically maintained in the Records Division.  This file is sometimes referred to as the "Permanent Retention File" as that stamp is affixed to each page of the file by Records Division personnel for records maintained by the Records Division that are required to be kept permanently, such as homicide files or other files that do not have a statute of limitations.  (Ex. 18, Deposition of Hickey *Rivera* 189:21-190:2; 192:2-20; 194:6-7; Ex. 16, Winstrom Deposition *Solache/Reyes,* 176:22-177:8).

11.     Rule 30(b)(6) representative James Hickey testfied in 2014 that "the Records Division['s] historical mission is to preserve the original case report and any supplementary reports generated with that RD number. Never in its design since 1961 has it been the place where miscellaneous police reports," such as notes (or subsequent to 1982, General Progress Reports ("GPRs")), "are kept physically in the same filing cabinet."  (Ex. 18, Deposition of Hickey in

---

[1] The headers used throughout this document are not intended to limit the document in anyway, nor are they intended to be viewed as facts or allegations.  Rather, the headers are simply goal posts to guide the Court will reading the document.

Rivera 192:2-20; Ex. 16, Winstrom Deposition *Solache/Reyes*, 176:22-177:8).

12.    The RD file, the investigative file, and arrest reports were kept in three separate locations before 2005, and a single homicide investigation could also have files in other places such as the auto pound section, the crime lab, the crime processing unit, and the forensic division. (Ex. 18, Deposition of Hickey in *Rivera* 192:21-22, 192:23-195:9; Ex. 16, Winstrom Deposition *Solache/Reyes*, 177:5-179:25; Ex. 5, Tiderington Report, at 54-64).

13.    Prior to 1982, CPD maintained what were commonly referred to as "working files" but also known as "running files" or "street files" which were manila folders which normally contained photocopies of reports, criminal history statements, photographs, mugshots and memorandums requesting assistance on investigations.  (Ex. 17, Deposition of James Hickey, July 29, 2014 in *Kluppelberg v. Burge*, N.D. Ill. 13-CV-03963, at 106:3-22).

14.    "Working files," "running files," or "street files" include anything an officer might use to record information related to an investigation, including officers' notes in their personal notebooks, or pads, or scraps of paper, or to-from memoranda. (*See* Ex. 5, Tiderington Report, Attachment I, at 52; Ex. 8, Hickey Dep. in Fields, at 18:5-19 (notes including "notes on scrap paper and backs of matchbooks and all that stuff"); Ex. 18, Hickey Dep. in Rivera, 139:8-24; Ex. 17, James Hickey Testimony, July 29, 2014, in *Kluppelberg*, N.D. Ill. 13-CV-03963 at 163:2-8.) In 2014, Rule 30(b)(6) witness Hickey testified that Chicago Police "Department members are aware that sometimes detectives are not signing out the investigative file and have personal copies of some of the documents," but that no special or general orders were modified in response to this discovery about detectives' retention of personal files.  (*See* Ex. 17, James Hickey Testimony, July 29, 2014 in *Kluppelberg*, at 327:4-23; Ex. 43, Hickey trial testimony in *Rivera*, at 3429:10-15.)

15.     Detective Division Notice 82-2 ("DDN 82-2"), was issued on April 20, 1982, and formally identified the "working files, street files, running files" as "Investigative Files" and mandated their preservation.  "Investigative Files" were defined as "any document or group of documents the subject of which relates to criminal incidents and which are maintained and stored under Detective Division control within a unit."  DDN 82-2 did not cover documents that were not maintained or stored under the control of the Detective Division.  (Ex. 19, Detective Division Notice 82-2; Ex. 18, Hickey Dep. in Rivera 80:19-81:10).

16.     Detective Division Special Order 83-1 ("S.O. 83-1"), issued on January 13, 1983, was "designed to institutionalize the control of all [Detective Division] violent crime field investigation documents and files, which previously may have been referred to as working files, running files, or detective's personal files and notes."  S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation."  S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." (Ex. 21, S.O. 83-1, pp. 1-2; Ex. 17, Deposition of James Hickey, *Kluppelberg v. Burge*, N.D. Ill. 13-CV-03963, at 169:20-170:1).

17.     SO 83-1 does not specifically instruct personnel to disclose the Investigative File to prosecutors and criminal defendants. (Ex. 21, S.O 83-1).

18.     SO 83-1 reads that "It is the policy of the Chicago Police Department to conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during

the subject investigation, initial court hearing or subsequent reviews." (Ex. 21, S.O 83-1).

19.    83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as "an 8 ½" x 11" inch case folder complete with two (2) two-hole metal punch fasteners designed to secure all documents relating to the subject criminal case." The Investigative File is also required to contain an Investigative File Inventory Sheet that lists each document contained within the file.  To standardize note taking, CPD created GPRs, which are preprinted forms that detectives use to take notes.  Detectives use GPRs to document "handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation," (Ex. 21, SO 83-1, pp. 2-3; Ex. 17, Deposition of James Hickey, *Kluppelberg v. Burge*, N.D. Ill. 13-CV-03963, at 170:7-9).

20.    S.O. 83-1 did not cover regular participants in homicide investigations, like gang crimes officers, and provides no information about what type of information is deemed relevant and should be disclosed. (Ex. 21, SO 83-1; Ex. 5, Tiderington Report, at 39).  Tiderington's report opines that from 1991 to 1995, approximately 50% of files reviewed contained handwritten notes that were not recorded on GPRs, and 10% of the files contained to-from memos (not on GPRs) not on official police forms. (Ex. 5, Tiderington Report, at 48).  Tiderington's report further opines that from 1995 to 1998,  approximately 46% of the files reviewed contained handwritten notes not on GPRs and 28% of the contained to-from memos not on official police forms. *Id*.

21.    Tiderington's Report includes his summary of the conclusions made by District Judge Milton Shadur on March 31, 1983, when Judge Shadur issued an order to the CCSAO relating to SO 83-1, in which he found the following deficiencies: (1) there was no obligation to

7

create an Investigative Case File Folder unless the crime fit certain violent crime categories and felony charges were approved, leaving the risk of selective retention or disclosure during the investigation; (2) it offered no guidance on what information a detective should deem "relevant" information to include in official reports, leaving discretion for detectives to withhold information on their subjective assessment of relevance; (3) it failed to ensure that any detective receiving information relating to an investigation not assumed to him would forward the information to the assigned detective to be included in the Investigative File Case Folder; and it (4) omits any proivsion defining how the CPD responds to a subpoena or request to produce informaiton related to a criminal proceeding.  (Ex. 5, Tiderington Report, at 39-40 (referencing Ex. 53 (Shadur Order in *Palmer*) at 16-17; *Palmer v. City of Chicago*, 562 F. Supp. 1067, 1082 (N.D. Ill. 1983)); *see also* Ex. 21, S.O. 83-1.

22.     Detective Division Special Order 83-2 ("S.O. 83-2"), issued May 2, 1983, was issued to improve on the procedures set forth in S.O. 83-1 where possible, and was "designed to institutionalize the control of all violent crimes field investigation documents and files, which previously may have been referred to as Street files, working files, running files, or detectives personal files and notes."  (Ex. 22, S.O. 83-2, p.1).

23.     S.O. 83-2 did not require a single repository for all investigative information maintained by a lead investigator; applied only to detectives, and excluded all other officers involved in investigating major crimes; provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed "relevant," or about how information should be communicated or documented among detectives; provided no policy directive or procedure to ensure production of investigative files; relied on inventory sheets instead of actual file disclosures; and lacked an audit/oversight mechanism. (Exhibit 22, SO 83-2; Ex. 5,

8

Tiderington Report, at 48; Ex. 17, Hickey Dep. in *Kluppelberg*, at 236:7-238:12.)

24.     The City's Rule 30(b)(6) representative Hickey stated that a paragraph in S.O. 83-2, directing a detective who receives information relating to a Violent Crimes field investigation not assigned to him to forward the information to the assigned detective for the investigation and to include it in the Investigative File Case Folder, "reinforces our longstanding, but unwritten policy that everyone has an obligation to pass on information." (Ex. 22, SO 83-2, p. 1; Ex. 17, Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill. 13-CV-03963, at 233:11-234:3).

25.     Detective Division Special Order 86-3 ("S.O. 86-3"), issued May 19, 1986, was issued to further clarify the directions to the Detective Division regarding the creation and maintenance of Investigative Files, mandating "periodic, unscheduled inspections of the subject files be completed to ensure compliance." (Ex. 23, S.O. 86-3, p. 3).

26.     Hickey, the City's 30(b)(6) representative, was not aware that any auditing as required under S.O. 86-3 ever occurred. (*See* Ex. 42, Hickey testimony from 2016 Fields Trial (hereinafter "Hickey Fields Trial Testimony") at 2036:13-23; *see also* Exhibit 18, Hickey Dep in *Rivera*, dated 6/10/2014, at 244, 246-249, 174).

27.     CPD detectives were trained on identification procedures, including photo identifications, show ups, and lineups. (Ex. 13, Detective Division Training Materials from 1988-1996 at Foster 30(b)(6) 000039-46; Ex. 14, Deposition of Lt. John Foster, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated June 29, 2022 (hereinafter "Foster Dep"), 160:17-21; 281:3-20; 282:13-17).

28.     On September 23, 1988, CPD issued General Order ("G.O.") 88-18 regarding lineup procedures, effective the next day, September 24, 1988. (Ex. 11, G.O. 88-18 at Foster

30(b)(6) 000003-4). Detectives were trained, and G.O. 88-18 mandated, that when a lineup is held, a supplementary report will be completed. (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ J; Ex. 13, Training Materials at Foster 30(b)(6) 000043). G.O. 88-18 stated that "in no case will a lineup be conducted without a Supplementary Report being completed." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ J). G.O. 88-18 also stated: "In cases where there is only one suspect in the lineup, the lineup, whenever possible, should consist of at least five persons. When more than one suspect is placed in the lineup, the lineup ideally should consist of at least four non-suspects in addition to the number of suspects in the lineup. Insofar as possible, suspects in a lineup should generally be the same height and weight and should have similar hair and skin color." (*Id*. at Foster 30(b)(6) 000003, ¶ G).

29.     G.O. 88-18 required that "the watch commander of the facility wherein the lineup is conducted or other supervisory officer will require that either an evidence technician or an authorized member of the Detective Division take two photographs of any formal lineup <u>which results in the identification of a suspect</u>." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ H) (emphasis in original).

30.     G.O. 88-18 required "When a lineup is held, a Supplementary Report (CPD-11.411-1 or B as appropriate) will be completed. A detective will be present during the lineup proceedings, whenever possible, and will complete the Supplementary Report. If circumstances are such that a detective is not present at the lineup, the Supplementary Report will be prepared by a supervisory officer of the facility wherein the lineup is conducted. <u>In not case will a lineup be conducted without a Supplementary Report being completed</u>. The narrative portion of the Supplementary Report will include: 1. The date, time and location of the lineup; 2. the name, rank, star number and unit of assignment of the person(s) conducting the lineup; 3. the name and address

10

of each person viewing the lineup; 4. the name and address of each person present during the lineup (other than those conducting, viewing or participating in the lineup); 5. all available information concerning each person participating in the lineup, e.g., name, sex, race, age, height, weight, Central Booking (C.B.) and/or Identification Record (I.R.) numbers, etc.; 6. the name(s) of persons identified in the lineup; 7. the name, rank and star number of the person photographing the lineup; 8. any comments made by counsel for the arrestee; 9. any additional information or unusual circumstances occurring during the lineup, e.g., requiring participants to wear certain articles of clothing or to speak certain words or phrases, etc." (Ex. 11, G.O. 88-18 at Foster 30(b)(6) 000004, ¶ J.9; Ex. 14, Foster Dep, 311:12-15).

31.     While the policy stated that "the name(s) of persons identified in the lineup" had to be reported, it did not provide any guidance on what had to be reported in the event of a lineup procedure in which someone was not identified, tentatively identified, or a filler was selected. (Ex. 24, General Order 83-5; Ex. 18, Rivera Hickey Dep. at 264:6-265:19.)   Likewise, neither that policy nor any other policies in effect in 1988 governed the conduct of photographic lineups. (Ex. 11, G.O. 88-18; Ex. 18, *Rivera* Hickey Dep at 264:6-265:19).

32.     "When Hickey was asked if a witness identified a filler as opposed to the suspect, the "clearest direction [from the order was] Subsection H, which results in the identification of a suspect, by definition, the filler is a non-suspect…so the report would indicate that there was not an identification of the suspect."  (Ex. 18, Rivera Hickey Dep. at 264:6-265:19.)

33.     The policy did not require lineups to be conducted by administrators who were not aware of the identity of the suspect.  (Ex. 11, G.O. 88-18; Ex. 18, Rivera Hickey Dep. at 266:5-9.)

34.     Under CPD policy, completed line up reports were supposed to be included in the Records Division File.  (*See* Joint Statement of Undisputed Material Facts for Plaintiff's Partial

11

Motion for Summary Judgment, Dkt. 212, ¶ 15; Ex. 16, Winstrom Dep, 176:13-177:22; Ex. 24, CPD General Order 83-5, Foster 30(b)(6) 000001-2).

35.     The training suggested to detectives that, although not required, photo arrays should contain eight total photographs. (Ex. 13, Training Materials at Foster 30(b)(6) 000040). The training also stated that individuals in the photo arrays should have "roughly the same physical characteristics, to ensure fairness and impartiality." (*Id*. at Foster 30(b)(6) 000040-41). The training stated that "photo spreads will be shown to victims and witnesses separately and independently" and that the photos shown to witnesses where an identification is made are to be inventoried. (*Id*. at Foster 30(b)(6) 000041).

36.     The training materials were from 1996, and do not indicate they were in effect before this year. (Ex. 13, Training Materials at Foster 30(b)(6), 000011, 000040.)

37.     CPD published Standard Operating Procedures ("SOP") for the detective division in 1988, which incorporated all of the former detective division special orders. (Ex. 15, CPD Detective Division Standard Operating Procedures from 1988, RFC-Solache/Reyes 117553-87; Ex. 16, Deposition of Commander Eric Winstrom, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated 12/17/21 (hereinafter "Winstrom Dep"), 46:3-23; 122:6-25).

38.     The 1988 SOPs regarding documentation for homicide investigations were not materially different from any previous order between 1986-1998. (Ex. 15, CPD Detective Division Standard Operating Procedures from 1988, RFC-Solache/Reyes 117553-87; Ex. 16, Deposition of Commander Eric Winstrom, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated 12/17/21 (hereinafter "Winstrom Dep"), 46:3-23; 122:6-25; *See* Exhibit 18, Hickey Dep. in Rivera, at 119:7-9 (testifying to consistent policies from 1983 to 2011); Exhibit 16, Winstrom Dep, at 43:7-46:2 (agreeing that the policies applying to documentation in homicide investigations from

1986 to 1998 were "nearly identical," and despite some "difference[s] in wording," the "overall policy is the same" across this time frame); 46:19-23 ("Q. Okay. So in the period from 1986 through 1998, is it correct that the policies with regard to documentation of homicide investigations were the same across all detective areas? A: Correct."); Ex. 44, Defendant City of Chicago's Answers to Plaintiff's Fifth Set of Interrogatories in *Fields* (stating that Special Order 83-1 and its "successor directives" applied after 1983 to the plaintiff's sample set of cases, which included cases until 2006).

39.    The 1988 SOPs were in effect until 1992, and detectives were trained on the SOPs. (Ex. 16, Winstrom Dep, 124:6-9; 130:12-24).

40.    The 1992 SOPs did not reflect any changes to City policies governing the documentation of homicide investigations or their creation, maintenance, storage, or production of homicide files and applied only to the Detective Division.  (*See* Ex. 27, City's Responses to Requests for Production and Requests to Admit (Apr. 7, 2022) (admitted that 1992 SOPs were in effect from 1992 until the end of 1999, and admitting that these directives did not reflect any changes to City policies governing documentation of homicide investigations or their creation, maintenance, storage, or production of homicide files); Ex. 16, Winstrom Dep., at 44:5-46:-2) (stating that the 1992 SOP was "nearly identical" to the 1988 SOPs on the topic documentation for homicide investigations, and that the "overall policy is the same").)

41.    The training detectives received did not provide guidance as to what they should consider relevant or irrelevant information or that they should document everything they learned during an investigation.  (Ex. 16, Winstrom Dep, 124:6-9; 130:12-24, 148:16-19, 149:2-6).

42.    The procedures required detectives to "preserve and record information and materials obtained, including that which might aid in the defense of the accused."  (Ex. 15, 1988

SOPs, 18.1(B) at RFC-Solache/Reyes 117582; Ex. 16, Winstrom Dep, 126:8-13). Detectives were trained that they should thoroughly and accurately document their investigation steps in a homicide investigation. (Ex. 16, Winstrom Dep, 74:17-21)..

43. The training that detectives received on the use of GPRs was three hours long. The training on the use of GPRs did not include training on what information was to go into supplementary reports. When asked if "part of the training instruction [regarding the use of GPRs] to the detectives [was] that they should document everything they learned during an investigation," 30(b)(6) representative Winstrom stated, "I don't believe so, but I haven't – I don't believe so.". (Ex. 16, Winstrom Dep, 147:1-4, (training on the use of GPRs three hours long), 148:1-4, (confirming training on use of GPRs did not include training on supplemental reports), 149:2-6 (statement about whether training instruction regarding use of GPRs included that they should "document everything they learned during an investigation").)

**PLAINTIFF'S POLICE PRACTICES EXPERT, THOMAS TIDERINGTON**

44. Plaintiff retained Thomas Tiderington, to provide opinion testimony on Plaintiff's *Monell* claim as well as the police investigation in this case. (Ex. 5, Tiderington report, p. 4).

45. Tiderington was disclosed as a police practices expert with over forty years of experience in law enforcement, who was hired by Plaintiff to provide opinion testimony about the Chicago Police Department's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as well as the police investigation in this case. (Ex. 5, Tiderington Report, p. 4). Tiderington's report includes a review of the relevant Special Orders, deposition testimony, and many other documents to for the purpose of assessing the Chicago Police Department's practices and adherence to its policies. (Ex. 5, Tiderington Report, at 6-7, 47; see also Attachment B to Tiderington Report (materials reviewed)).

14

46.     In his capacity as Police Chief over twenty years, Tiderington's report states that reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. (Ex. 5, Tiderington Report, at 2; *see also* Ex. 5, Attachment D to Tiderington Report (curriculum vitae)).

47.     Tiderington was previously retained by Plaintiff's counsel to provide opinion testimony in three other cases involving defendant Guevara before he was retained in this case: *Solache/Reyes*, *Sierra*, and *Iglesias*.  (Ex. 5, Tiderington Report, p. 7).  Tiderington was separately retained by other counsel in another unrelated case, Maysonet, involving defendant Guevara.  (Ex. 5, Tiderington Report, p.7).

48.     His opinions in those cases with respect to Plaintiff's *Monell* claims in each of the cases are nearly identical to his opinions in this case and rely upon the same materials. (*Id*.).

49.     Tiderington's reportstates that his opinions in *Johnson* are corroborated by and consistent with his review of materials and evidence in preparing his expert reports in those cases, in those cases, and are consistent with the findings of Michael Brasfield when he conducted expert reports in Rivera and Fields. (Ex. 5, Tiderington Report, at 48; *see also* Ex. 6, Tiderington Dep. in *Solache/Reyes* dated 10/6/22, 495:15-496:7).

50.     In the first case in which Tiderington was retained by Plaintiff's counsel, Loevy & Loevy, was *Solache/Reyes*. Tiderington billed 78.25 hours in connection with the work he did in preparation of that report, which included both his opinions related to the *Solache/Reyes* plaintiffs' *Monell* claims as well as Tiderington's opinions related to the police investigation in those cases. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 362:11-18).  Tiderington estimates that

he also anywhere from 20 to 50 hours of unbilled time in connection with the work he did in preparation of that report that he did not keep track of. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 362:19-363:4; Ex. 33, Tiderington Dep. from *Solache/Reyes* dated 10/5/22, 125:10-14). Tiderington further estimates that he spent another 15 to 20 hours reviewing materials in preparation for his deposition in the *Solache/Reyes* case. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 363:5-8).

51. In the second case in which he was retained by Plaintiff's counsel, *Sierra*, Tiderington billed 65.75 hours in connection with the work he did in preparation of that report, which included both his opinions related to the *Sierra* plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 28, Tiderington Deposition from *Sierra* dated 12/8/22, 105:17-20; Ex. 29, Tiderington Invoice from *Sierra* dated 9/18/22, TIDERINGTON 002475-76).

52. In the third case in which he was retained by Plaintiff's counsel, *Iglesias*, Tiderington billed 58.15 hours in connection with the work he did in preparation of that report, which included both his opinions related to the *Iglesias* plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 30, Tiderington Deposition from *Iglesias* dated 2/13/23, 20:23-22:10; Ex. 31, Tiderington Invoice from *Iglesias* dated 11/19/22).

53. In an unrelated case in which he was retained by other counsel, *Maysonet*, Tiderington billed 87.65 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case. (Ex. 32, Tiderington Deposition from *Maysonet* dated, 4/28/23; Ex. 59, Tiderington Invoice from *Maysonet* dated 1/18/23).

54. In this case, Tiderington billed 40.25 hours in connection with the work he did in

16

preparation of his initial report, which included both his opinions related to Plaintiff's *Monell* claims as well as his opinions related to the police investigation in that case. (Ex. 7, Tiderington Dep from Johnson (Part II) dated 9/20/23, 53:5-17; Ex. 34, Tiderington Invoice from Johnson dated 4/8/23, TIDERINGTON 2479).

55.    After the date of his initial report, Tiderington received the Cook County Public Defender's file for Demetrius Johnson's criminal proceedings, including notes from Mr. Johnson's public defender, Jack Carey, of his interviews with Mr. Johnson and various witnesses. (Plaintiff's Ex. 46, Tiderington Supp. Report, at 2). His supplemental report states that his review of these notes "corroborate[d] and strengthen[ed] his opinions," as the notes remained consistent with his opinions. (Ex. 46, at 2.)

**Tiderington's opinions related to Plaintiff's *Monell* claim**

56.    According to Tiderington, as it relates to Plaintiff's Monell claim, "I was asked to assess…whether Chicago Police Department's policies and practices related to photo arrays/lineups, documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, were at the time adequate and consistent with acceptable police practices around the country." (Ex. 5, Tiderington Report, p. 4).

57.    Tiderington was also asked to assess "whether there were deviations from generally accepted police practices in the investigation into the murder of Edwin Fred that was conducted by various Chicago Police officers." (Ex. 5, Tiderington Report, p. 4.)

58.    Tiderington's Report does not assess CPD's policies and practices related to photo arrays/lineups. (Ex. 5, Tiderington Report, p. 31-68).

59.    Tiderington's Report includes an assessment of certain policies and practices that are related to photo arrays/lineups. As part of his assessment of CPD's policy and practices,

Tiderington opines that criminal defense files show that important investigative materials, including photo arrays, request for photo forms, and mugshot photos, are regularly withheld from criminal defendants. (Ex. 5, Tiderington Report, at 51, 57).

60.     Regarding CPD's policies and practices concerning the documentation and disclosure of documents and information learned during homicide investigations, Tiderington has testified that he had two global criticisms.  (Ex. 5, Tiderington Report, p. 33; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 415:10-416:7).  The first is what he describes as a routine failure to document information. (*Id.*).  The second is a routine failure to disclose the documents and information learned.  (*Id.*).

61.     Tiderington's report includes multiple criticisms, some of which he summarizes into the following, non-exhaustive categories: that (1) handwritten notes, not on general progress reports, are still routinely used, despite the Special Order's prohibition of that practice; (2) to-from memos are still being used, despite the Special Orders' direction to stop using such means and instead include that information on GPRs and supplemental reports; (3) inventory sheets–required by policy to be included in the investigative file to track all of the documents in the file–are routeinly not included in investigative files, and when they are used, they are incomplete; and (4) all relevant information in unofficial documents is not transcribed into official reports, flouting official requirements.  (Ex. 5, Tiderington Report, p. 33, 48-50).

62.     Tiderington's Report includes a review of  police files and criminal defense files for the period from 1991-1995 and 1995-1998. His report relied on the accuracy of the spreadsheets created and provided to him by Plaintiff's counsel at Loevy & Loevy, based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides

that were investigated by Area 5 detectives of the Chicago Police Department ("CPD") from 1991-1998. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24; 401:10-402:7; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 230:9-21; Ex. 28, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

**Data provided to Tiderington by Plaintiff's counsel**

63.     Tiderington was first provided a spreadsheet based on information gathered from Area 5 homicide investigations and criminal defense files for the period from 1995-1998 in the *Solache/Reyes* case. (Ex. 5, Tiderington Report, Attachment E; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 224:18-225:14).

64.     Tiderington's Report states that, using this spreadsheet and its underlying data, Tiderington reviewed investigative files for 344 different homicide investigations conducted by Area 5 detectives from 1995-1998 to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs. (Ex. 5, Tiderington Report, at 47.) It also states that he used this spreadsheet and its underlying data to review, compare, and contrast investigative files, permanent retention files, and public defenders files. (*Id*. at 48).

65.     Tiderington was also provided a spreadsheet based on information gathered from the homicide files from homicides investigated by Area 5 detectives of CPD from 1991-1995 in the *Sierra* case. (Ex. 5, Tiderington Report, Attachment F; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 231:11-23).

66.     Tiderington's Report states that, using this spreadsheet and its underlying data, he reviewed investigative files for 475 different homicide investigations conducted by Area 5 detectives for the period from 1991-1995 to evaluate whether, standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs. (Ex. 5, Tiderington Report, at 47-48.) He

also used this spreadsheet and its underlying data to review, compare, and contrast investigative files and permanent retention files during this time frame. (*Id*. at 48).

67.     Both the *Solache/Reyes* spreadsheet and the *Sierra* spreadsheet are attachments to Tiderington's report in Johnson's case, attachments E and F respectively.  (Ex. 5, Tiderington Report, p.  7 and Attachment E and F).

68.     Tiderington was also provided the expert reports of Michael Brasfield in *Fields v. Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files for different time periods (Rivera) or different areas (Fields), as well as the police homicide files for the underlying criminal investigations in several other cases: *Iglesias, Sierra, Solache/Reyes, Rivera, Fields,* and *Kluppelberg*. (Ex. 5, Tiderington Report.)

69.     As Tiderington was provided the spreadsheets by Plaintiff's counsel, he does not know exactly who or how many people worked on the spreadsheet and was not involved in the decision-making or creation of the spreadsheet.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 389:1-23).

70.     Tiderington's Report states that he spot-checked, reviewed and double-checked these spreadsheets, and reviewed numerous files to ensure his familiarity with the information contained in the spreadsheets and how they were compiled. (Ex. 5, Tiderington Report, at 52).

71.     Tiderington received the spreadsheets in "hard copy large pages," and if he received it electronically, it was only in pdf format.  (Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 234:12-24).

72.     The *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9772 separate cells of data.  (Ex. 5, Tiderington Report, Attachment E).

73.     The *Sierra* spreadsheet (for the years 1991-1995) is 68 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate cells of data.   (Ex. 5, Tiderington Report, Attachment F).

74.     The *Sierra* spreadsheet (1991-1995) is based on 475 Area 5 investigative files and 475 corresponding RD Files. (Ex. 5, Tiderington Report, p. 47, 52).   The *Solache/Reyes* spreadsheet (1995-1998) is based on 344 investigative files, 341 corresponding RD Files, and 72 corresponding criminal defense files. (Ex. 5, Tiderington Report, p. 47.)  Tiderington did not know how many of those files from 1995 overlap between the two spreadsheets without returning to the data to review.  (Ex. 5, Tiderington Report, p. 47; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 513:21-514:1; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 237:21-239:7).

75.     Tiderington was also provided the investigative files and the RD files that the spreadsheets are based on.  (Ex. 5, Tiderington Report, Attachments B; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 389:24-390:21).

76.     There are no GPRs in RD files by design, .  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 515:12-517:23).

77.     Tiderington testified that notes in connection with a homicide investigation "were supposed to be transcribed into the official police reports," but if one was interested in looking at notes, then one had to look in the investigative file.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 516:1-13).

78.     Tiderington agreed that the "investigative file" is an "official file."   (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/222 at 518:19-24).

79.     Tiderington testified that he began his review by examining the RD files to assess whether, standing alone, they communicated a complete picture of the investigation.  He could

have begun his review by examining the investigative files, and there was no particular reason why he started with the RD files. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 514:12-515:15, 519:1-11).

80.      For both time periods, Tiderington's report opines that the RD files "communicate a story about how the detectives got from arrest to charges of their suspect, they communicated little else in terms of investigation into other leads or suspects. The report further opines that rarely was there ever documentation of investigation into avenues that led to a dead end, something that happens in homicide investigations all the time (even those that eventually result in catching the correct perpetrator)." (Ex. 5, Tiderington Report, at 50).

81.      Tiderington's report includes a comparison of the number of RD files with their corresponding investigative files. (Ex. 5, Tiderington Report, at 50).

82.      Tiderington did not review each and every investigative file he was provided in *Solache/Reyes*. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 400:16-18).

83.      Tiderington "probably looked at every one of the files" when reviewing the files provided in *Solache/Reyes*. (Ex. 6, Tiderington Dep from Solache/Reyes, 401:20-24).

84.      For the 344 investigative files he was provided in *Solache/Reyes*, Tiderington sought to verify the information contained in the spreadsheet he received. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:7-8.)   He "spot-checked several of them" but he does not know if he has an exact number, he "probably looked at every one of the files, but some in greater detail than the others" meaning he "skimmed through each of the files," and would stop if something "unusual" caught his eye. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 401:10-402:7, 403:1-8).

85.      Tiderington's report opines that 46% of homicide files contained notes not taken on

general progress reports, and 28% of files contained fo-from memos not on official police forms. (Ex. 5, Tiderington Report at 48). Further, his report opines that almost 17% of total investigative files from 1995-1998 did not contain an inventory sheet at all - and that 81% of total investigative files during this time period contained inventory sheets that were incomplete. (Ex. 5, Tiderington Report at 49).

86.     Tiderington's report also opines that –from 1995-1998, only 13 of 341 RD files had an inventory sheet. His review revealed that "the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files." (Ex. 5, Tiderington Report, at 51).

87.     Finally, Tiderington's Report states that his review of the 1995 to 1998 data compared 105 criminal defense files to 72 corresponding investigative files (there were some cases with multiple defendants, so multiple criminal defense files for a single investigative file; or where the PD file produced did not have a corresponding investigative file; or where the PD file either contained no police documents or so few that it was treated as incomplete and not counted). His Report states that, after excluding partial or incomplete PD files, he analyzed a total of 64 criminal defense files. (Ex. 5, Tiderington Report, at 53).

88.     Tiderington's report states that he gave the City the benefit of the doubt for purposes of this analysis by excluding incomplete criminal defense files, assuming that all material in the criminal defense file had been there at the time of the original criminal trial, and assuming that the only police documents related to an investigation were those in the investigative file and the permanent retention file the City produced in this case.  (Ex. 5, Tiderington Report, at 53.)

89.     Tiderington's report opines that a case-by-case comparison of investigative files to corresponding defense attorney files found that 59% of the files analyzed were missing

23

handwritten notes that were present in the investigative files, and 41% of the criminal defense files were missing GPRs that were present in the investigative files. (Ex. 5, Tiderington Report, at 54). Additionally, the report opines that 43 of the 63 criminal defense files (68%) did not have an inventory, as required in the wake of Jones/Palmer, and not all the documents in an investigative file were disclosed in response to subpoenas. (Ex. 5, Tiderington Report, at 55).

90.     Of the 475 investigative files he was provided in *Sierra*, he "did spot checks on probably 30 or 40 cases." (Ex. 28, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

91.     For the 1991-1995 dataset, Tiderington's report opines that approximately 50% of investigative files contained notes not taken on general progress reports, and 10% of files contained fo-from memos not on official police forms. (Ex. 5, Tiderington Report at 48). Further, his report opines that 24% of total investigative files from 1991-1995 did not contain an inventory sheet and that 88% of total investigative files during this time period contained inventory sheets that were incomplete. (Ex. 5, Tiderington Report at 49).

92.     Tiderington's report also opines that, for this time period (1991-1995), only 13% of RD files had an inventory sheet. His report opined that "the continuation of the street files practice, including the failure to follow the special orders, was so rampant that it would have been confirmed through even a cursory auditing of files." (Ex. 5, Tiderington Report, at 51).

93.     Tiderington did not utilize "any great methodology" in deciding which files to spend more time with – "if something caught [his] interest, or … if it was something unusual, [he] spent more time on that." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 403:1-8).

94.     Since *Solache/Reyes*, Tiderington testified that he has "probably looked ... at all of these files much close than [he] did during Reyes and Solache. (Ex. 7, Tiderington Dep from *Johnson*, at 229:7-11.)

95.     Tiderington's goal in reviewing the investigative files was "to verify the information that was contained in the chart." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:3-8).

96.     Tiderington's report states that reviewed the investigative files in both the Sierra and Solache/Reyes datasets "to evaluate, whether standing alone, they demonstrated compliance with the 1986 special orders and 1988 SOPs." (Exhibit 5, Tiderington Report, at 47.)

97.     In the *Solache/Reyes* litigation in 2022, Tiderington stated that there was no "specific reason or rhyme or methodology in determining whether [Tiderington was] going to look at one file in greater detail than the other, but [his] goal was not to become familiar with each of the 300 files." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:14-19).

98.     In the *Solache/Reyes* litigation, Tiderington did not "think it would have been humanly possible" to become familiar with each of the investigations that underlie the 344 files he reviewed because each of the files contained "many, many pages," sometimes hundreds of pages. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:20-405:7).

99.     Tiderington was asked, "How did you conclude that these notes were not contained in the Public Defender File? To which he said "I don't remember that one specifically, the take-away, if you will, on this is this information that's contained here, you know, should have — and if you are telling me it was turned over, it should have been turned over because it could be exculpatory." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 526:23-527:19).

100.     Tiderington believes anything in an investigative file can be exculpatory but did not do any analysis of the information in the file that lead him to conclude the information was exculpatory. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 527:21-528-9).

101.     The 344 investigative files that are identified in the spreadsheet in *Solache/Reyes*

(1995 to 1998) are 55,474 pages in total.  (Ex. 5, Tiderington Report, Attachment B at ¶ 69).

102.    The 341 RD files that are identified in the spreadsheet in *Solache/Reyes* are 24,422 pages in total.  (Ex. 5, Tiderington Report, Attachment B at ¶ 71).

103.    Tiderington skimmed through all of the 341 RD files he was provided in Solache/Reyes and took a closer look at 15 to 20 of them.  (Ex. 6, Tiderington Dep from Solache/Reyes dated 10/6/22, 514:2-11).

104.    Since Solache/Reyes, Tiderington has reviewed this material multiple times and even more closely than he did during that case. (Ex. 7, Tiderington Dep. from Johnson, at 229:7-11.)

105.    The 475 investigative files that are identified in the spreadsheet in Sierra (1991 to 1995) are 74,607 pages in total.  (Ex. 5, Tiderington Report, Attachment B at ¶ 73).

106.    The 496 RD files that that are identified in the spreadsheet in *Sierra* are 27,603 pages in total.  (Ex. 5, Tiderington Report, Attachment B at ¶ 72).

107.    Although 496 RD files were produced, 21 of those lacked a corresponding investigative file. Thus, only 475 of the RD files were compared to an investigative file.  (Ex. 5, Tiderington Report, at 47.)

108.    Tiderington's report does not include a comparison of criminal defense files to investigative files and RD files from Area 5 homicide investigations for the years 1991, 1992, 1993, or 1994, because no criminal defense files were provided for comparison. (Ex. 5, Tiderington Report, at 52.).

109.    In addition, Tiderington based his opinion on whether CPD had a pattern and practice of not disclosing material exculpatory evidence to criminal defendants on 63 criminal defense files from the Cook County Public Defender's Office (hereinafter "CCPDO files")

26

associated with the 1995-1998 investigative files and RD Files. (Ex. 5, Tiderington Report, p. 53; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 596:9-599:21; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 239:8-22).

110.    Tiderington thinks he went through each of the CCPDO files but did not review in detail every document that was contained in the files. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 406:11-18).

111.    Tiderington spot-checked the investigative files, RD files, and any criminal defense files in the "1995 to 1998 dataset" for purposes of comparison with "the spreadsheet that was provided to [him] and prepared by individuals at Plaitniff's counsel's office." (Ex. 7, Tiderington Dep from *Johnson*, 227:17-228:7.).

112.    Tiderington did not verify everything that was in the spreadsheet. (Ex. 7, Tiderington Dep from *Johnson*, 228:8-15.)

113.    Tiderington was not provided by Plaintiff's counsel any files from the Cook County State's Attorney's Office (hereinafter "CCSAO files") that corresponded with any of the investigative files and RD Files from 1991-1998, other than files provided from the full discovery in the cases for which he served as a specific expert. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 658:7-24; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 239:8-22 ("you've received no state's attorney files for the 1991 to 1998 time period other than perhaps the state's attorney files you were provided in the six cases – right? – from the discovery in the cases? A: That's correct.").

114.    As a result, Tiderington never reviewed any files from the Cook County State's Attorney's Office (hereinafter "CCSAO files") that corresponded with any of the investigative files and RD Files from 1991-1998 to determine if any of the materials that Tiderington claims were

not in the CCPDO files were contained within the CCSAO files (other than perhaps six cases provided to him in this case), even though the CCSAO files were produced in this case. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 658:7-24; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 239:8-22).

115.    When Tiderington first examined the files, he was instructed or told by Plaintiff's counsel that the CCSAO files were not available. *See* Ex. 6, Tiderington Dep. in *Solache/Reyes,* 659:14-19.

116.    Tiderington learned the corresponding CCSAO files had been previously produced to Plaintiff just before (within a couple of days) his October 6, 2022, deposition in the first case where he is a retained expert in the Guevara related cases, *Solache/Reyes*. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 659:12-660:6).

117.    Tiderington's Report in this case was disclosed on March 8, 2023, and regarding the CCSAO files, Tiderington stated at his deposition that he had "not been provided those files in any of the other five cases that [he has] reviewed materials for and rendered opinions for[.]" (Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 225:10-226:7).

**Failure to document**

118.    At his deposition, Tiderington identified the George Jones case that happened in 1981 as an example of failure to document information. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 420:3-17, 422:23-423:2).

119.    Tiderington states that the example of the Soto homicide is "probably the best example" of a "the Chicago Police Department's policies and practices result[ing] in a routine failure to document information learned during a homicide investigation," and that he "think[s] it's detailed pretty comprehensively" in his report. (Ex. 6, Tiderington Dep from *Solache/Reyes*

dated 10/6/22, 423:3-426:16); *see also* Ex. 5, Tiderington Report, at 56.

120.    As to the George Jones case, in the *Solache/Reyes* litigation, Tiderington stated that there was "false or misleading documentation of a photo lineup --- well, I'm sorry, of information that was used to convict a young man that was contrary to the reports that were found in a street file at some point later." (*Id*.). Tiderington further testified that "Officer Laverty documented his portion of the investigation in which he concluded that Jones could not have possibly been the suspect. There was a separate street file that failed to document how they concluded that Jones was a suspect adequately to document how they concluded that Jones committed the crime." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 421:18-422:6).

121.    In his report, Tiderington includes the Jones case in the section titled: **"Street Files": the George Jones Case and the Palmer class action**, (Ex. 5, Tiderington Report, p. 34), which is a portion of a section entitled "The CPD's policies and practices related to the documentation, storage/preservation, and disclosure of documents and information learned during homicide investigations was contrary to generally accepted police practices." (Ex. 5, Tiderington Report, p. 31-36).

122.     Tiderington's report states that detective Laverty interviewed the victim's brother, Purvy, who told detective Laverty that there were two assailants and both were wearing masks. (*Id*. at 37). Tiderington's report further states that "Laverty documented this and other evidence that Jones was not the perpetrator and that Jones could have used to help defend himself. However, this information was placed 'not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." (*Id*.)

123.    In the *Solache/Reyes* litigation, Tiderington testified that he found other examples

29

of a failure to document information while spot-checking the information in the spreadsheet. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 423:3-424:1).

124. In the *Solache/Reyes* litigation, Tiderington determined that information was not being documented from spot-checking the information in the spreadsheet by identifying cases "where the police report would attribute statements to a witness, but then there were no notes." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 424:2-20).

125. Tiderington testified that he did not specifically list the examples in his report. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 424:22-425:1).

126. When asked why he did not identify certain cases in his report in support of his opinion that there was a failure to document information, Tiderington stated "I did identify several instances," including the Soto homicide, and pointed defense counsel through cases on page 50 of his Report for further examples of detectives failing to document information they learned in a homicide investigation. (Ex. 6, Dep from *Solache/Reyes* at 426:6-427:3; 423:3-8 (the question "What other examples are in your report that support the notion that the Chicago Police Department's policies and practices resulted in a routine failure to document information learned during a homicide investigation?", to which the quoted text was in reference); *see also* Ex. 5, Tiderington Report, at 50.)

127. Specifically, Tiderington was asked "Q: How were you able to determine when you were spot-checking the other cases that information was not being documented.?" To which he responded that he did not list any specific examples in his report, and that he could only identify them if he were to "pull them up and go through them." (Ex. 6, Dep from *Solache/Reyes* at 424:2-426:16).

128. In the *Solache/Reyes* litigation, Tiderington testified that he did list the RD numbers

of cases that were examples at page 50 of his report. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 426:18-23).

129.    The 8 RD numbers of cases listed at page 49 of Tiderington's report in the *Johnson* case are in the section titled **Missing or Incomplete Inventory Sheets**.  (Ex. 5, Tiderington Report, p. 49).  In the report, those 8 RD numbers are cited as examples of why inventory sheets were "not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.).  (*Id.*).

130.    In the *Solache/Reyes* litigation, Tiderington testified that the spreadsheet he was provided confirms this opinion.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 428:12-21).

131.    There is no column in the spreadsheet that says failure to document but according to Tiderington, there is a column that lists the numbers of cases that do not have GPRs. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 428:22-429:5).

132.    Attachment E to Tiderington's report contains columns documenting whether there is anything in the investigative file missing from the RD file, as well as columns documenting whether any investigative material is missing from a criminal defense file; where the criminal defense file contains an inventory sheet; and whether any GPRs, handwritten notes, and/or to-from memos including in the investigative file are missing from the criminal defense file. (Ex. 5, Tiderington Report, Attachment E).

133.    Tiderington states in his *Solache/Reyes* deposition testimony that, if an investigative file does not have a GPR: "it may [support his conclusion of a failure to document].

31

I don't want to say in every case, but it would be something that I would be concerned about. If I was a supervisor looking over a file, I would be concerned about that, yes. . . . I would expect in the vast majority of homicide cases that there would be some type of notes by the investigator." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 429:6-17).

134.    The police department where Tiderington was chief did not require the use of GPRs. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 489:7-8).

135.    Tiderington identified the columns that say, "Are there handwritten notes in that file that are not GPRs"; "Are there significant documents missing from the investigative file inventory? List report, type and dates."; "Are there any handwritten notes?" as the columns he reviewed to determine whether the investigative file contained a GPR.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 430:23-431:5; 431:23-432:8; 434:21-435:4).

136.    Tiderington testified that his interpretation of the columns entitled "Are significant documents missing from the investigative file inventory?" and "Are there any handwritten notes?"—were meant "to capture whether or not there is any piece of paper in the file that contains handwriting"—to review to determine whether "there are investigative files that contain no GPRs." (Ex. 6, Tiderington Dep. from *Solache/Reyes* dated 10/6/22, 432:2-21, 437:3-9.)

137.    Tiderington identified files that did not contain any handwritten notes by officers while he was spot-checking the files, but did not tabulate that number. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 437:10-438:15).

138.    Other than the data discussed during his deposition, Tiderington testified that there was no other data within his report that supported his conclusion that there was a routine failure to document.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 438:16-20).

139.    Tiderington's report states that a  review of permanent retention files compared with

32

investigative files revealed that "All relevant information in unofficial documents is not transcribed in official reports," as required by the special orders. (Ex. 5, Tiderington Report, pp. 49-50.)  In his 2022 deposition in *Solache/Reyes,* when asked to explain this phrase, he stated: "what I am explaining there is I think it's indisputable that the officers have taken notes. There is no other possible way for them to be able to create police reports a month later without the virtue of having taken some notes. And if you see a case file that does not have any notes but it has a very lengthy report with names and addresses and so on, you have to conclude the only way they could have done that is by taking notes that were . . . not placed into one of the - either the retention file or in the investigative files." (Ex. 6, Tiderington Dep from *Solache/Reyes*, 512:1-17.) Thus, he agreed that his reference to "unofficial documents" resulted from discovering  no notes in files he believes should contain notes.  (Ex. 5, Tiderington Report, pp. 49-50; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 509:23-513:1).

140.    In the *Solache/Reyes* litigation, Tiderington testified that his reference to "unofficial documents" are "documents that [he] has inferred exist because in [his] review of the files there are files that contain no notes, and [he] believe[s] that those files should contain notes."  He further testified that he has never seen those files or "unofficial documents" because the files were not produced in the 344 investigative files that he reviewed for that portion of the analysis.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 512:18-513:20).

141.    Tiderington testified that handwritten notes that are not written on GPRs that are still included in the investigative file would not constitute a violation of a criminal defendant's constitutional rights. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:2-17).

142.    Tiderington's criticism of the use of handwritten notes not on GPRs is limited to whether CPDs policies were being followed.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated

10/6/22, 491:17-20).

143.    When asked whether or not handwritten notes not on GPRs, but are still included in the investigative file still constitutes a violation of a criminal defendant's constitutional rights, Tiderington testifies that, "what I was offering an opinion on is whether or not the officers were following the Chicago Police Department's policies on – and their apparent attempt to have their officers understand that these notes that they were taking were not their personal property, and that they had to be maintained. They had to be disclosed, and they had to be turned over." See (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:18-492:2).

144.    The evidence upon which Tiderington relies in support of his opinion that police officers were treating notes as their personal property is the fact that "there were no notes on investigations that you would reasonably expect to see notes and that many files were void of notes as well." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 494:10-24).

145.    Tiderington's report includes opinions that police officers were treating notes as personal property also includes, but is not limited to: (a) historical evidence of police officers' treatment of notes as personal property, including from testimony of Commander Stibich and judicial rulings regarding the practice; (b) observations that separate investigative files were maintained; (c) prior testimony from CPD designee Hickey regarding a training session during which "there was confusion" among detectives "not only about whether personal notes had to be retained, but also about whether the Special Orders applied to the entire detective division or just to violent crimes" (id. at 67); and evidence that handwritten notes are still routinely used but were not included in GPRs. (*See* Ex. 5, Tiderington Report, at 38, 39, 48, 67.)

146.    Tiderington's Report does not identify data that specifically establishes a routine failure to document.  (Ex. 5, Tiderington Report).

34

147.    Tiderington's Report includes data which he opines demonstrates that permanent retention files routinely lacked an inventory sheet  and that "virtually all of the defense attorney files were missing information from the investigative file," including important investigative materials. (*See* Ex. 5, Tiderington Report, at 51.)

**Street files**

148.    Tiderington's understanding of the phrase "street file" are files that were used that were not considered a formal file that would have to be turned over.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 438:21-439:6).

149.    Tiderington's Report describes "street files" as "parallel files containing unofficial reports," or "running files," "office files" or "working files," (Ex. 5, Tiderington Report, at 36), that were part of a multiple, parallel file system. (*Id*. at 43-44; see also Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 438:21-439:6).

150.    Tiderington testified that Investigative files are considered formal files that are to be turned over by the CPD.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 439:7-441:2).

151.    Tiderington also testified  that "any documentation relating to a criminal case should be considered a formal file." (Ex. 6, Tiderington Dep from *Solache/Reyes,* 439:7-21).

152.    Tiderington's Report does not identify any investigative files that were completely missing from a criminal defense file (other than from files that he eliminated from his analysis because they were incomplete).  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22, 442:7-14, 598:1-599:13).

153.    Tiderington's Report identifies at least two homicide investigations for which a permanent retention file was produced, but no investigative file, and therefore did not review those

files for compliance with the Special Orders. (Ex. 5, Tiderington Report, at 47, 47 n. 103).

**Failure to disclose**

154.    There are redacted documents contained in the CCPDO files, including redactions of full pages, and Tiderington's report assumes that the redacted documents are not police documents, but he also agrees that information relevant to his analysis could have been redacted. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 599:22-601:10; 607:14-613:6; Ex. 7, Tiderington Dep from Johnson dated 9/20/23, 251:13-254:9).

155.    Tiderington believes he was told to operate under the assumption that redactions were made only of redacted privileged information and not police reports, and, even if a document had redacted information, he would still recognize a document as a GPR. (Ex. 7, Tiderington Dep from *Johnson*, 253:6-15, 253:19-24.)

156.    In the *Solache/Reyes* litigation, Tiderington testified that he recalled being told by Plaintiff's counsel that police reports were not redacted from the CCPDO files.  (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 607:14-608:1).

157.    In the *Solache/Reyes* litigation, Tiderington agrees that some of the CCPDO files were missing entire investigative files, otherwise contained no police documents or so few that he treated the files as being incomplete, and that some of the files may not be complete because they were likely transferred from the Public Defender's Office to private criminal defense attorneys. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22; 598:1-599:13).

158.    Tiderington's Report states that the criminal defense files available for his report "came from the Public Defender's Office, so it is likely that in many of these instances, the case was transferred to private counsel, and so the criminal defense file may be incomplete."  (Ex. 5, Tiderington Report, at 53.)

36

159. In the *Solache/Reyes* litigation, Tiderington agreed "that if the materials or the majority of materials that [he has] identified as being withheld because [he] didn't find them in the [CCPDO] files, if they, in fact, are there and redacted for some reason, then, obviously, that would change [his] opinions[.]" (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 612:22-613:6).

160. In the *Solache/Reyes* litigation, Tiderington agreed he had no understanding of where or how the CCPDO maintained their 1995-1998 files. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 613:7-16).

161. Tiderington's report includes the opinion that: "My comparison of the investigative files to corresponding defense files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files." (Ex. 5, Tiderington Report, p. 54; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 601:11-18).

162. There were 63 CCPDO files that had corresponding CPD investigative files ("companion files"). Tiderington did not personally compare page by page the 63 CCPDO files to the companion files; he "spot-checked several cases, and it was consistent with what the analysis was." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 601:19-601:7).

163. Tiderington personally compared under 10 of the 63 sets of companion files. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 603:4-8).

164. Tiderington's Report includes a statement that he "conducted a case-by-case analysis of what documents are included in the police investigative files but are missing from criminal defense files." (Exhibit 5, Tiderington Report, at 54; Ex. 7, Tiderington Dep from *Johnson*, at 229:7-11.)

165. In the *Solache/Reyes* litigation, Tiderington testified that, "if all the materials in the

37

police department investigative files were turned over to the State's Attorney's office, I think that it would have been proper and reasonable conduct on the part of the investigators." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18).

166. Tiderington's report provides five cases as "[e]xamples of relevant information in police files that was withheld from criminal defendants but should have been disclosed," which he also describes as "examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed:" Kim Mathis (C687989), Ardell Clemons (Z475236), Oscar Soto (B442532), Leon Fields (B023979), and Guy Rainey (A403252). (Ex. 5, Tiderington Report, p. 55-58).

167. *Rivera, Fields, Kluppelberg, Reyes*, *Iglesias,* and *Sierra* are additional examples included in Tiderington's Report of cases in which he opines that previously missing street files containing exculpatory information were discovered in civil litigation decades after the original criminal trials. (Ex. 5, Tiderington Report, at 58).

168. Tiderington identified some of the examples of CCPDO files which were missing documents from the investigative files on his own and some were pointed out to him by Plaintiff's counsel but he cannot identify which cases were pointed out by Plaintiff's counsel for closer review. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 663:1-24).

169. Tiderington testified that when he says "withheld," he means generally speaking that criminal defendants didn't receive them, (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 592:24-593:10), and elaborates that "I guess you could conclude if it's the responsibility of the police department to provide all of this information and it's not being done, it's being withheld." (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 592:24-593:10, 595:1-5).

170. In Tiderington's first example in his report, the Kim Mathis case, Tiderington alleges that Terry Mathis, the criminal defendant's sister, being a potential witness to the crime was not disclosed, yet Tiderington testified at his deposition that the public defender's file shows that "the defense attorney was in contact with the criminal defendant's sister." (Ex. 5, Tiderington Report, p. 55; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 591:7-13; 591:24-592:9). Defendants' *Monell* expert, Bernard "Bernie" Murray, agrees that the public defender's file contains an extensive diary of the public defender's interviews with Terry Mathis. (Ex. 26, Bernie Murray's Expert Report in *Johnson*, p. 18).

171. Tiderington's Report summarizes what he opines to be the relevant facts of the case as follows:

> This case involves the beating death of a child. The investigation revealed that Kim Mathis, the child's mother, admitted hitting the child on the back with a belt four to five times, and that he died two days later. The child died from blunt trauma to the abdomen. (RFC-Solache/Reyes 65178.) Detectives pursued Mathis, and, according to her testimony, beat, threatened, and intimidated her into signing a statement that she had not read. (AR-PD 30237-60.) The handwritten statement and corresponding supplementary report say that Mathis admitted hitting the child in the back with a belt and also stomping on his abdomen with her heel. (RFCSolache/Reyes 65192, 110155-60.) Mathis denied to the CCPD that she kicked or stomped on her son. (AR-PD 29833)
> The Investigative file IIes handwritten notes with a potential witness to the beating. The handwritten note states that Mathis's sister had been at the apartment when the beating occurred (RFC-Solache/Reyes 110176), but the cleared/closed report says that Mathis's sister was not at the apartment during the beating and did not see the child at that time (RFC-Solache/Reyes 65212). Given that Mathis disputed that she had stomped on her son's abdomen and testified that she was coerced into giving her statement, it would have been critical for the defense attorney to know of all witnesses who were at the house when the supposed beating occurred." (Ex. 5, Tiderington Report, at 55.)

172. In the *Solache/Reyes* litigation, Tiderington agreed at his deposition that the public defender's file shows that "the defense attorney was in contact with the criminal defendant's sister." (Ex. 5, Tiderington Report, p. 55; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 591:7-13; 591:24-592:9).

39

173.     Defendants retained Bernard Murray. *See* Ex. 26 (Murray Report).

174.     In *Sierra* and *Iglesias*, Murray was paid $200 per hour for his review of materials and report preparation, and $300 per hour for deposition testimony. (Ex. 47, Murray Dep. in *Iglesias*, at 14:11-15:4).

175.     Murray testified that he has no expertise in police policies, and was not retained to opine on whether City of Chicago policies were or were not being followed, or to assess the spreadsheets contained in Tiderington's report, but rather simply to look at the missing pages in certain files. (Ex. 47, Murray Dep. in *Iglesias*, at 35:3-11, 67:11-13).

176.     Defendants retained expert Ronald Muich. (*See* Ex. 36, Muich Report, at 1). His report does not include any opinions regarding Special Orders 83-1, 83-2, or 86-3, and he testified that he was not offering any opinions about whether those were adequate policies from a police practices perspective, (*see* Ex. 37, Muich Dep., at 55:9-20), and that he had not reviewed those policies. (*Id.* at 47:7-9, 53:14-54:12 ("Special Orders 83-1 does not ring a bell with my documentation. I – that's the first I've ever heard of Special 83-1 . . . I think that would've been an easy one to remember."), 54:13-17 (same for Special Orders 83-2 and 86-3)).

177.     Additionally, Murray has also testified in his previous and incorporated testimony that, when he received the complete investigative and RD files in *Iglesias* and *Sierra*, he did not read those files in their entirety; rather, he focused specifically on the pages cited by Tiderington as missing from the public defender file. ( Ex. 47, Murray Dep. in *Iglesias*, at 39:8-16 (attesting to only focusing on allegations of withheld documents by Plaintiff's expert in *Sierra*); 42:17-43:17 (providing the same opinions in *Iglesias*, without "re-analyz[ing] those specific pages between *Iglesias* and *Sierra*"); 90:19-91"2 ("I did not review the public defender file" or CCSAO file in *Sierra*); 115:4-12 (in *Iglesias*, stating that "I could reply to those specific examples [provided by

Tiderington] without reviewing all those other files");122:22-124:22 (stating that, for *Iglesias*, he

had access to the whole report, but "would review what I needed to reply to the examples he gave

me").).

178.    As to the Mathis case, Murray testified that Tiderington identified a note that

appears to be on the back of a GPR, and Murray did not find that information on the back of a

GPR in the prosecutor or public defender file. (Ex. 39, Murray Dep. in *Reyes*, 2/7/23, at 249:1-15,

251:1-6). Murray agreed that the note was part of the investigative file, and that it "should have

been provided. I'm not disagreeing with that." (Ex. 39, Murray Dep. in *Reyes*, 2/7/23, at 252:4-8,

252:14-22).

179.    Murray also agrees that "[a]ll investigative material should be provided, even that

one sentence on the back of the report."  (Ex. 39, Murray Dep. in *Reyes*, 2/7/23, at 254:6-18); Ex.

26, Bernie Murray's Expert Report in *Johnson*, p. 18). Murray states that he is "not saying" that,

"if information that's contained in a police report can then be subsequently learned by the attorney

through other means that it's no longer the case that that police report should be tendered to the

prosecution and defense." (Ex. 39, Murray Dep. in *Reyes*, at 256:7-17.)

180.    In Tiderington's second example in his report, the Ardell Clemons case, Tiderington

alleges that "[t]he investigative file includes several documents that could have been relevant to

the defense but were not in the public defender's file," and more specifically that there were

documents of potential alternative suspects that were not in the CCPDO file, yet testified that he

did not review the CCSAO file to determine if those documents were contained in it and "vaguely

recall[ed]" other documents from the file that the criminal defendant had called CPD and admitted

to the crime and also subsequently confessed to the officers in Key West, Florida.  (Ex. 5,

Tiderington Report, pp. 55-56; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-

18; 660:23-662:8). Defendants' expert Murray's Report states that he found the documents Tiderington alleged were missing in the CCSAO file. (Ex. 26, Murray Report in *Johnson*, p. 19).

181. Tiderington's Report summarizes what he opines to be the relevant facts as follows:

> This case involves the stabbing death of a woman named Nyree Johnson. The investigation revealed that Ardell Clemons, the victim's friend, had been living with the victim at the time of the murder. (RFC-Solache/Reyes 51121.) Detectives pursued Clemons, who had fled to Florida. Clemons was arrested just a few days after the crime.
> The investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file. One handwritten note not in the PD file documents another potential suspect who had previously worked with the victim and was dating the victim. (RFC-Solache/Reyes 44288). While the police report lists this individual as a witness and states that he had briefly stayed with the victim, it also stated that they were "only friends. (RFCSolache/Reyes 51121.). Another document in the investigative file but not in the PD file is an apartment lease noting that the victim left her former residence due to domestic violence, what would have been a lead into another potential alternate suspect (RFC-Solache/Reyes 044260). Another document in the investigative file but not in the PD file is a handwritten note that lists the name of another potential alternate suspect named Harold. (RFC-Solache/Reyes 44290). (Ex. 5, Tiderington Report, at 55-56).

182. Tiderington was not provided the CCSAO file in the Ardell Clemons case, as it was produced "after disclosure" of Tiderington's report in that litigation, and testified that he was unaware of precisely what Clemons told investigators from Key West and whether it comported with what Clemons told Chicago investigators. (Ex. 5, Tiderington Report, pp. 55-56; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18; 660:23-662:8, 658:7-659:19).

183. Defendants' expert Murray found the documents that Tiderington alleged were missing in Ardell Clemons criminal defense file in the CCSAO file. (Ex. 26, Murray Report in *Johnson*, p. 19).

184. The City's 30(b)(6) witness, James Hickey testified that he was "not aware" of any "logs or anything that were utilized by the the Records Division Department showing what went off to the state's attorney." . (*See* Ex. 8, Hickey Dep. in *Fields*, 46:16-20).

42

185.    In Tiderington's third example in his report, the Oscar Soto case, Tiderington alleges that GPRs from the investigative file are not in the CCPDO file and that arrest reports of two alternative suspects that were also suspects in another case, but were not identified in the lineup in the Soto case, were in the investigative file but not the CCPDO file, yet agreed in his deposition in the *Solache/Reyes* matter that the CCPDO file contains two supplementary reports related to those two suspects and he does not know what is contained in the redacted pages of documents in the CCPDO file.  (Ex. 5, Tiderington Report, p. 56; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 669:24-672:20; 671:3-11).  Murray's Report opines that the public defender's file for the Soto case is incomplete because the CPD files were 158 pages, and the produced public defender's file contains only 112 pages, 47 of which are redacted, 28 of which are photographs, 2 are blank, 2 are copies of envelopes, and 33 pages are subpoenas.  (Ex. 26, Murray Report in *Johnson*, p. 20).

186.    In Tiderington's third example in his report, the Oscar Soto case, Tiderington summarizes that his opinion of the relevant facts as follows:

This case involves a gang-involved shooting from one vehicle to another vehicle. The victim was a man named Miguel Salas who was shot on July 17, 1997, and died a few days later. Detectives investigating an unrelated aggravated battery decided to show a photo array from that case to the witnesses to the Salas shooting. Three witnesses allegedly identified two individuals as a passenger and the shooter on July 20, 1997. (RFC-Solache/Reyes 093896-97). Later, on July 23, 1997, after Detective Guevara was apparently assigned to the case (RFC-Solache/Reyes 093922), a different man, Oscar Soto, was identified as shooter. (RFC-Solache/Reyes 093917).

Two supplementary reports identifying the initial two suspects (RFC-Solache/Reyes 059529) and indicating that witnesses could not identify those suspects in a lineup (RFC-Solache/Reyes 059532) are in the permanent retention file. However, other documents related to these alternate suspects were not: officers believed that this shooting was linked to a separate aggravated battery in which the same two initial suspects were suspected and were identified in the other case by a witness who was familiar with them. The arrest reports for those suspects, providing this information—including that they were suspected in a related shooting and had been identified in a familiar-perpetrator

identification—is contained in the investigative file but is not in the PD file (RFC 93896-97).

The Investigative file also contains several handwritten GPRs (RFC-Solache/Reyes 93888-93; 95; 93924-25) which do not appear to be in the public defender's file, along with other missing documents. These GPRs contain conflicting information regarding whether the witnesses were able to identify the initial suspects and vehicle used in the crime, as well as police notes documenting interviews with the witnesses. (See Ex. 5, Tiderington Report, at 56).

187.    In Tiderington's fourth example in his report, the Leon Fields case, Tiderington's report states that the 2nd page of 3 pages of GPRs that are numbered at the bottom, of an interview of eyewitness Tierre Moton is not in the CCPDO file, but contains details that the suspect had a "scar and bumps," which is not reflected in any supplementary report, and Tiderington states this is important because Leon Fields does not have a scar and bumps.  (Ex. 5, Tiderington Report, pp. 56-57).

188.    Tiderington's fourth example in his report, the Leon Fields case, Tiderington summarizes that his opinion of the facts as follows:

A 1997 shooting of two victims, Howard Ervin (aka Charles Johnson) and Michael Welch in a game room. One of two offenders, Leon Fields, was identified in a line up by the surviving victim, Welch (RFC-Solache/Reyes 81373).

Critically, the PD file is missing a handwritten GPR that appears to be the 2nd pg. of an interview with eyewitness, Tierre Moton, (RFC-Solache/Reyes 81464) and includes details not in any supplemental report. For example, it includes the fact that shooter had a "scar and bumps" (RFC-Solache/Reyes 81465). It is notable that defendant Fields does not appear to have "scars and bumps" in photos contained in the investigative file (RFC-Solache/Reyes 81365, 81417-18). The supplementary report of the interview of Moton omits the information about "scar and bumps" contained in the GPR (RFC-Solache/Reyes 81368).

Other items missing from the PD file include one typed GPR containing information not in any typed supplementary report, including details from an interview with the surviving victim Welch (RFC-Solache/Reyes 81445), in which Welch provides numerous details about the crime, is noted to "very reluctant to identify who shot him," discusses potential motives, and provides information about other individuals (including someone named "Noon" Curtis Henderson) with potential information about the crime. It also contains a handwritten note referencing the name "Calvin Morris. " This interview of Welch is not documented in any supplementary report, and the reference to Calin Morris

is unexplained and does not appear in any other report, including in the PD file. (Ex. 5, Tiderington Report, at 56-57).

189.    Murray opines that the CCPDO file is heavily redacted, and "[b]y examining the page that Plaintiff's Expert claims was never provided to defense counsel in the investigative file, (814650, it is obvious that it is page 2 of 3 consecutively numbered pages."  Specifically that the GPRs are labeled at the bottom with page numbers and the same detective information and date, and that "if defense counsel was missing this page (one of three) they would have … inquire[ed] about its absence."  (Ex. 26, Murray Report in *Johnson*, p. 20).  Murray also opines that there is another photo in the file that appears to show bumps or scars on Fields' face and that Fields' arrest report lists a scar near his right eye.  (Ex. 26, Murray Report, p. 21).

190.    Tiderington's report opines that the public defender file for Leon Fields is missing the second page of an interview with an eyewitness and includes details not found in any supplemental report. (Ex. 5, Tiderington Report, at 57.)

191.    Tiderington opines that a GPR is missing, but Murray identified a supplementary report of that GPR that contains all of the information from the GPR and in "far greater detail." (Ex. 26, Murray Report, p. 21)

192.    Tiderington's Report opines that the PD file is missing (1) a handwritten GPR with information not contained in a supplementary report and (2) a typed GPR that contains information not included in any typed supplementary report. (Ex. 5, Tiderington Report, at 57). Murray's Report opines that all the information from the purported missing typed GPR was included in the supplementary report, but does not address the information contained in the handwritten GPR that was not included in any supplementary report.  (See Ex. 5, Tiderington Report, at 57; Ex. 26, Murray Report, p. 21).

193.     In Tiderington's fifth and final example in his report, the Guy Rainey case, Tiderington alleges detectives did not disclose all of the names and mugshots they obtained of potential suspects when detectives requested numerous photographs of individuals with the documented nickname "Little," but Tiderington testified that he assumed that the alleged mugshots of individuals nicknamed "Little" were compiled to conduct photo arrays.   In the same file, Tiderington alleges that detectives did not disclose a handwritten note in the investigative file with Donnie Morris' name on it that says "Kevin Haas pull file to see if he is still wanted" because alternative suspects should be disclosed, yet Tiderington agrees that Kevin Haas was a detective at Area 5 in charge of record keeping investigative files and was not a suspect, and that Donnie Morris was not a suspect as documents in the file show that it was disclosed that Donnie Morris was with his nephew Cedric Morris when Cedric Morris was shot.  (Ex. 5, Tiderington Report, pp. 57-58; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 672:11-23; 673:2-674:17; 674:22-677:4).

194.     In Tiderington's Report, he  summarizes his opinion of the facts relevant to the Guy Rainey case as follows:

> Cedric Morris was shot to death on June 10, 1996. Witnesses reported seeing one or two assailants with dark hoodies pulled over their faces, and an eyewitness heard that one of the offenders went by a street name containing "Little." RFC-Solache/Reyes 53995, 54002-03. Detectives requested over a dozen IR photos of individuals with nickname containing "Little," sufficient to compile multiple photo arrays. See RFC Solache-Reyes 72767, 72788, 72802, 72831, 72838, 72768-87, 72789-90, 72792-801, 72803-30, 72832-7, 72839-55. This indicates that there were multiple potential suspects and potentially multiple photo identification procedures performed, but the defense file does not include the Request for Photos forms listing the individuals requested, or any of the mugshot photos that were received in response to the more than one dozen individuals whose photos were requested. Many of these names are contained on a GPR that was in the investigative file and in the PD file, but not all, meaning at least one alternate suspect was not disclosed. In addition, even if many of the names were disclosed in a note, the photos themselves in the investigative file should have been disclosed, as they are independently of value (e.g.,

46

defense counsel might find some of the alternate suspects looked like his client, or fit the witness descriptions, supporting defense of mistaken identity).

Further, according to a lineup and supplementary report, Donnie Morris identified Guy Rainey out of a line-up. Rainey was ultimately charged. Morris's identification appears to be the only 58 inculpatory evidence in the file. But there is a handwritten note in the investigative file, RFCSolache/ Reyes 72857, with Morris's name on it and the statement, "Kevin Haas pull file to see if he is still wanted." If Morris was possibly wanted at the time, that should have been disclosed, as it might be relevant to the sole eyewitness's motivation to cooperate with police, his credibility, etc. (Ex. 5, Tiderington Report, at 57-58.)

195. Tiderington's assumption that the mugshots of individuals nicknamed "Little" were compiled to conduct photo arrays was "part of the criticism that [he] ha[d]," as the absence of documentation in the police report or in a supplemental report of the purpose for requesting these photos left him "making assumptions." (Ex. 6, Tiderington Dep from *Solache/Reyes*, at 672:11-23). Tiderington believes that Detective Haas was "probably not" a suspect and thinks he wrote it in his report as a "mistake." (*Id.* at 674:11-17.)

**Training**

196. Tiderington's Report states that there was inadequate training and monitoring/auditing to ensure compliance with the special orders, referencing Special Order 83-1. (Ex. 5, Tiderington Report, p. 46; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:1-10).

197. Tiderington's Report states that the CPD's policies, including the Teletype and Detective Division Notice 82-2, Special Order 83-1, Special Order 83-2, Special Order 86-3, and the Standard Operating Procedures (SOP) 1988, (Ex. 5, Tiderington Report, at 38-43), were inadequate to ensure disclosure of all relevant investigative materials due to deficiencies that included inadequate training and monitoring/auditing to ensure compliance with the special orders. (*Id*. at 43-46.)

198.    Tiderington's report does not address any training that was done after CPD issued the 1986 directive or the 1988 SOP.  (Ex. 5, Tiderington Report, p. 46; Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:11-48).

199.    The only information Tiderington has about training that was done on the 1986 directive or the 1988 SOP is based on his memory on the testimony of James Hickey and Eric Winstrom, two of the City's Rule 30(b)(6) witnesses. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:10-485:10).

200.    Hickey testified that detectives, youth officers, sergeants, lieutenants, and exempt commanding officers in the Bureau of Investigative Services were provided training on the 1982, 1983 and 1986 police orders "related to the street files problem," but that gang crime specialists were not provided any training on the orders because they were not in the Bureau of Investigative Services.  (Ex. 18, Hickey Dep. in *Rivera* 54:12-55:7, 56:1-7).

201.    Winstrom testified that, in the early 1980's, the police department introduced the GPR as a "major change and something that the department was concerned about," so they held an "in-service training for all current detectives during that time." (Ex. 16, Winstrom Dep., at 146:1-18). Winstrom testified that only detectives were trained in 1983, and it "was not about supplementary reports," but "just note-taking." (Ex. 16, Winstrom Dep. at 148:14-15.) Winstrom did not believe that the training provided guidance to detectives about what they should consider relevant or not relevant information, (*Id*. at 148:16-19), or that it taught them that they should document everything they learned during the investigation. (*Id*. at 149:2-6).

202.    Winstrom testified that the detectives who were trained on this new policy "likely wouldn't have received another in-service training like that." (Ex. 16, Winstrom Dep, at 151:14-16.) Further, when Order 86-3 came out, "if you were already a detective," it would've been

48

presented to you in a hard copy form at the area and discussed at roll calls, and any changes that were in place from 86-3 and its predecessor would've been addressed." (Ex. 16, Winstrom Dep, at 152:4-8). Winstrom testified that "roll call training" consisted of a few sentences read aloud for five or seven "straight days:" "There's a new order. DDSO 86-3. This is the change in it. If anybody has questions, let me know." That's roll call training." (Ex. 16, Winstrom Dep. at 152:11-24).

203.    Winstrom testified that detectives were trained on the SOPs, and more specifically that they were required to report all substantive or relevant information learned in an investigation, and notetaking. (Ex. 16, Winstrom Dep, 130:12-131:18; 145:13-21). Winstrom testified that new detectives received training on the 86-3 police and SOPs in pre-detective training, including the purpose of notes—although he could not say what training they were given on this subject—the circumstances in which they needed to take notes—in that notetaking was a "useful tool and that it can be extremely helpful in your investigation;" that notetaking was a tool they could use to write their own accurate reports," and that they should never destroy their notes. (Ex. 16, Winstrom Dep, 152:25-154:14; 166:7-168:18).

204.    Winstrom also testified that a pre-service detective training was provided to detectives from 1986-1998 on the information to include in supplementary reports for violent crimes cases, including homicides. (Ex. 16, Winstrom Dep, 152:25-154:14; 166:7-168:18, 167:7-25).

**Tiderington's understanding of the process in Cook County criminal cases**

205.    In the *Solache/Reyes* litigation, Tiderington testified that he "probably" does not have any understanding of what a motion for discovery is in the context of criminal case in Chicago. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 622:10-14).

206.    In the *Solache/Reyes* litigation, Tiderington testified that he did not know the

49

distinction between a "00MC1" court number and a "00CR" number. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 625:12-23).

## PLAINTIFF'S EYEWITNESS ID EXPERT, DR. NANCY STEBLAY'S OPINIONS AND TESTIMONY REGARDING LINEUPS

207. In *Rivera*, the City designated James Hickey as a 30(b)(6) witness to speak on behalf of the Chicago Police Department regarding policies, procedures, and practices concerning the conduct of lineups in the late 1980s. Hickey testified that the policy and practice at the time was that a photographic record would not be made of a lineup in which a filler was selected, and further, that if a filler was identified the report would indicate there was not an identification of the suspect. (Ex. 18, *Rivera* Hickey Dep at 254:23-255:8, 261:10-262:6, 264:11-265:19).

208. Plaintiff retained Nancy Steblay, Ph.D., to provide opinion testimony about eyewitness identification procedures related to Plaintiff's *Monell* claim. (Ex. 1, Steblay Report, p. 2).

209. Dr. Steblay is Professor Emeritus of Psychology at Augsburg University in Minneapolis, Minnesota, where she has taught and done research on eyewitness topics since 1988. She is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. Her research has contributed to scientific recommendations regarding procedures of collecting and documenting eyewitness identification evidence that can help to prevent mistaken eyewitness identifications. She has authored over 45 publications, including peer-reviewed research, chapters, and law review articles on topics of eyewitness memory, identification procedures in lab and field tests, police eyewitness evidence practice and policy (including lineups and showups), and jury decisions. Many of her publications involve the review of bodies of literature, a quantitative

50

method called meta-analysis. Other publications involve the analysis of empirical data from the lab and from real witnesses to crime in the field. . (Ex. 1, Steblay Report in *Johnson*, at 1).

210. Dr. Steblay has never taught statistics at the graduate level. (Ex. 1, Steblay Report at pg. 30).

211. Dr. Steblay's complete curriculum vita listing her experience, qualifications, and publications is attached to Exhibit 1 to these facts. (Ex. 1, Steblay Report at pg. 30).

212. As stated in Steblay's report, she "agreed to analyze and review data collected from the Chicago Police Department files for a set of homicide cases that involved eyewitness identification evidence. The question of interest [for her report] was whether the rate at which eyewitnesses made suspect identifications is within numerical ranges that would be expected based on what we know about eyewitness lineup identifications. If the Chicago rates are different, in what ways do they differ? And, if they differ, what are the possible explanations for the differences." (Ex. 1, Steblay Report, p. 2).

213. Steblay prepared a report in this case which included the "Dataset," a coding spreadsheet of information that she believed to be gathered by Plaintiff's legal team from supplemental reports of lineups performed by CPD in hundreds of closed homicide investigations from 1989-1998 at Area 5 in Chicago. (Ex. 1, Steblay Report, p. 3 and "Steblay Area Five Homicide File Data 1989-1998" from pp. 38-110).

214. According to Steblay's report, the dataset includes 2786 eyewitness decision outcomes from Chicago police lineups, (*See* Ex. 1 at 3, 38-110 ("Steblay Area Five Homicide File Data 1989-1998")), and was made by Loevy & Loevy coding all of the reports of lineups in all homicide files produced by the City of Chicago for the years 1989 to 1998. (Ex. 1, Steblay Report, p. 3, 12, and "Steblay Area Five Homicide File Data 1989-1998" from pp. 38-110).

51

215.     Steblay also provided an expert report in *Iglesias v. Guevara,* 19-CV-6508 (N.D. Ill.) prior to providing a report in this case, and in providing her report in this case "just opened the Iglesias report, saved it as a new file, and made [small changes]" such as changing the title of the document.  (Ex. 2, Steblay Deposition from *Johnson* dated 7/12/23, 16:22-17:24).

216.     Dr. Steblay testified that "The Johnson case in terms of the files examined are the same as the Iglesias case," and so "all I really needed to do was go through the Iglesias report, and make sure that everything was up to date for Johnson; so I  justchecked, double-checked, and – provided that report" with changes that she caught between the documents. (Ex. 2, Steblay Dep. from *Johnson* dated 7/12/23, 17:2-18).  As noted in her Supplemental Report, Steblay's report included three changes on page 12 of her Report as she moved from the Iglesias Report to the Johnson Report, where she had not carried a preferred number from the original report to the summary sentence. She notes that the suspect identification percentages reporting on the listing under Question 3 remain the same and were correct in all reports. (Ex. 54, Steblay Supp. Report at 1.)

217.     The Dataset and coding upon which Steblay based her opinions was prepared by Plaintiff's counsel at Loevy & Loevy.  Plaintiff's counsel provided Dr. Steblay with the Dataset in the form of an Excel spreadsheet.  (Ex. 1, Steblay Report, pp. 5)

218.     Dr. Steblay's report states that the data pertained to information regarding witness identifications that were coded from investigation files and RD files corresponding to homicide investigations from 1989-1998.   (Ex. 1, Steblay Report, pp. 5; Ex. 3, Steblay Deposition (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 87:20-22; 91:11-12).

219.     Dr. Steblay's report describes her understanding of the coding process for the dataset as follows:

Loevy & Loevy provided me with an Excel spreadsheet detailing 2786 Chicago lineups reported in Area Five homicide files for the time period from 1989 to 1998. This Excel spreadsheet is attached, and it includes a description of the information coded. I also was allowed access to the homicide case files associated with the line-ups.

I examined these data assuming that the data provided to me were reliable extractions from the case files, and subject to the discussion of reliability below.

I discussed with Loevy & Loevy how the coding for the files would be most efficient and effective for my analyses. As discussed below, I spot-checked some case files to confirm that my understanding of the eyewitness detail matched the data on the supplied spreadsheet.

Otherwise, I did not use the case files in my subsequent analyses; I relied on the coded data sheet.

I am satisfied that the coding procedure was effective, and that the data presented to me is of high integrity. The process followed was a scientifically-sound coding system and more than sufficient to yield a scientifically-sound dataset.

### What is the basis for reliable coding?

First, I ensured that the coding team was using objective and clear definitions for the coded variables. This was accomplished by referring to critical variables in earlier datasets (e.g., the Wells, et al., 2020 White Paper), and by documenting the definitions for the coded variables in the Excel spreadsheet. The primary variable of interest was the witness's decision as per three possible categories: suspect identification, filler identification, or non-identification. The current dataset also included suspect IDs that were tentative. These were defined as a witness's expression of "any degree of equivocation."

Second, the coding was done by at least two independent coders, who then compared their work to catch discrepancies. The means to resolve discrepancies was clear. The variables coded in this current set are for the most part objective with no interpretation necessary. Still, a review between coders can catch errors that stem from an overlooked item in the file or mis-keyed data.

When a variable involves the possibility of subjectivity or confusion (e.g., "Is there any evidence of equivocation such that this ID is tentative as opposed to positive?"), the comparison between coders will help to maintain consistency in the coded results.

Third, the data analyst (me) spot-checked a subset of files in order to ascertain whether there is clear agreement and understanding between the coders and the analyst about each variable in the set. In addition, the data analyst (me) independently examined a randomly selected subset of lineups (approximately 200) as a means to verify coding accuracy for witness decisions.

Agreement surpassed 98%.

53

(Ex. 1, Steblay Report, pp. 5).

220. The coding categories are in the headings of the columns in the dataset attached to Steblay's report. (Ex. 1).

221. The City's expert rebutting Steblay, Dr. Wixted, did not identify any error in any coding category, did not identify any error in the coding of any police report, did not review any police report, did not identify any error in any data included in the dataset on which Steblay relied, and did not review the dataset. (*See generally* Ex. 10, Wixted Report in *Johnson*).

222. Dr. Wixted's Report states "I should note at the outset that the Chicago PD data were apparently compiled by Loevy & Loevy, and Dr. Steblay says she assumed that the data were reliability extracted from the case files. She also says that 'the coding was done by at least two independent coders, who then compared their work to catch discrepancies.' However, contrary to standard practice in the field, measures of interrater reliability (such as the kappa statistic) were not reported. Also, it is unclear if the rates were blind to which sider they were working for (plaintiff or defense.) Simply noting that some unknown number of raters worked to catch discrepancies does not measure up to academic standards. For example, without more information about how the data were extracted, datasets like these would probably not be considered reliable enough to support any analysis or conclusions that might reported in a strong, peer-reviewed scientific journal. In what follows, I take the Chicago PD data at face value, but in so doing I do not endorse the reliability and the validity of the data. My comments have to do only with (1) analyses of the data as they have been compiled and (2) conclusions drawn from the results of analyses performed by Dr. Steblay. Whether the data on which her analyses and conclusions are based are both reliable and valid is a separate question that I do not address." (*See* Ex. 10, Wixted

Report at pgs. 1-2.)

223.     Steblay also provided an expert report in *Iglesias v. Guevara,* 19-CV-6508 (N.D. Ill.), Ex. 50, Steblay Report from *Iglesias*, which is materially the same as her report in this case, Ex. 1. Dr. Steblay relied on the same dataset for her opinions in this case and *Iglesias v. Guevara,* 19-CV-6508 (N.D. Ill.)  (Ex. 2, Steblay *Johnson* Dep., 7/12/23, p. 10:14-21).

224.     At the time of her report in this case, Dr. Steblay had at least seven additional Chicago Police Department lineup outcome datasets from legal cases. One of the datasets came from a FOIA study, in which Dr. Steblay personally managed the coding of the data, and where the lineup data was from the years 2004-2005. (Ex. 1 at 12.)  The others were provided by Plaintiff's counsel and came from data compiled by the law firm of Loevy & Loevy in the cases *Velez* (where the lineup data was from the years 1996-2001), *Rivera* (where the lineup data was from the years 1985-1997), *Sierra* (where the lineup data was from the years 1991-1995), *Rodriguez* (where the lineup data was from the years 1995-1998), *Bouto* (where the lineup data was from the years 1989-1993), and *Iglesias* (where the lineup data was from the years 1989-1988). (*See* Ex. 1, Steblay Report, pp. 5, 11-12, 697 (FOIA report); Ex. 49, Appendix A to Gary Wells' Report from *Rivera*; Ex. 55, Steblay Report and Data from *Bouto;* Ex. 38, Steblay Report and Data from *Sierra;* Ex. 57, Steblay Report and Data from *Rodriguez*; Ex. 50, Steblay Expert Report from *Iglesias*; Ex. 48, Steblay Expert Report from *Velez*).

225.     Steblay examined the CPD homicide data "assuming that the data provided to me were reliable extractions from the case files, and subject to the discussion of reliability below," and she did not independently verify all the data in the Dataset.  (Ex. 1, Steblay Report, p. 5; Ex. 3, Steblay Deposition (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 97:23-98:15).

226.     A good, scientifically sound method has a way of identifying discrepancies for the

same case file or across different data sets.  Steblay does not know how many discrepancies there were in the data that overlapped between *Sierra*, *Rodriguez*, *Bouto*, *Iglesias*, and *Rivera* Datasets. She was not provided any documentation of any discrepancies between the coders.  She was only provided the final spreadsheets. Dr. Steblay does not know how many errors there are in the Dataset. (Ex. 3, Steblay Deposition (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 261:2-262:11; Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 572:12-17; 574:16-575:21).

227.    Steblay spot-checked approximately two dozen cases.  (Ex. 3, Steblay Dep (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 220:19-221:7; 222:22-223:1).

228.    Steblay did what she calls a "reliability analysis" on 195 randomly selected lineup outcomes in the data that she had received.  (Ex. 3, Steblay Dep (Part I) from *Sierra/Iglesias/Bouto/Rodriguez*, 177:16-18; 220:20-221:7; 225:21-227:24; 233:19-234:6). Steblay testified that her reliability analysis randomly selected a subset of 195 lineup outcomes from the Dataset, and "looking at those lineup outcomes," she "went back into the case files in order to make sure that, yep, there were those outcomes with the circumstances appropriately coded."  (Ex. 3, Steblay Dep (Part I) from *Sierra/Iglesias/Bouto/Rodriguez*, 225:21-226:13). Stebaly testified that she found that "[she] matched the – the coders in 191 of 195.  So that was a 98 percent agreement. . . . which is very, very good." (Ex. 3, Steblay Dep (Part I) from *Sierra/Iglesias/Bouto/Rodriguez*, 225:21-226:13; 237:20-238:13).  When asked, "So, you didn't review all of the lineups in any of the case files identified by RD number here?," Steblay responded, "Yeah, I guess I'm  -- I just told you that I did look at lineups that were in that row in that case number. I didn't look at all of them. If there were other rows for that case that were not selected from the lineup generator, I did not look for the lineups that were in those rows. I looked

for the lineups that met these characteristics [of the line up selected by the random number generator]." Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 565:10-565:21.

229.     Steblay aggregated data collected from 11 published field studies that were conducted in the United States and United Kingdom and concluded that witnesses identify a suspect at an average of 40.8% of the time, identify fillers an average of 23.7% of the time, and make no pick an average of 35.5% of the time. (Ex. 1, Steblay Report, pp. 3, 26).

230.     Steblay's report states that the 11 published field studies in peer-reviewed scientific journals tracked the outcomes of lineups conducted by police in actual cases across a broad number of jurisdictions, including Northern California, San Diego, Houston, TX, Tucson, AZ, Austin, TX, Charlotte, NC, and London, England. Collectively, these 11 field studies include 6,734 attempts by eyewitnesses to identify perpetrators from lineups. Each study collected data on the rates at which eyewitnesses identify the suspect in a lineup (who might or might not be the guilty person), identify fillers (known-innocents who are placed in the lineup for the purpose of making it fair to the suspect), or make no identification. Among the 6,734 attempts by eyewitnesses to identify the perpetrator from a lineup, 2,746 (40.8%) identified the suspect, 1,599 (23.7%) identified a known-innocent filler, and 2,389 (35.5%) identified no one. For every suspect identification that occurs, we would expect about .58 filler identifications (i.e., 1,599 filler IDs divided by 2,746 suspect IDs). (See Ex. 1, Steblay Report in *Johnson*, at 7-13, 25; Ex. 58, Steblay Rebuttal Report in *Johnson*; Ex. 56, Wells Report in Rivera, at 4-7; Ex. 48, Steblay Report in Velez, at 3, 14; Ex. 51, Steblay rebuttal to Gideon in Velez, at 3-6, 21; Ex. 52, 2020 White Paper, at Steblay 182-83).

231.     Steblay's report includes the opinion that eyewitness scientists concur that the aggregated data from the 11 field studies (Steblay's "Table 1") is valid, reliable, and valuable to

illuminate the behavior of real eyewitnesses in the field. Table 1 has been endorsed in the 2020 White Paper, a peer-reviewed, published, consensus document authored by six eyewitness scientists (including the City's expert John Wixted), that was sponsored and approved by the prestigious American Psychology and Law Society. Table 1 has been used independently in other published, peer-reviewed articles in multiple journals and at least one successful research grant. (Ex. 1, Steblay Report in *Johnson*, at 7-13, 25; Ex. 58, Steblay Rebuttal Report in *Johnson*; Ex. 56, Wells Report in *Rivera*, at 4-7; Ex. 48, Steblay Report in *Velez*, at 3, 14; Ex. 51, Steblay rebuttal to Gideon in *Velez*, at 3-6, 21; Ex. 52, 2020 White Paper, at Steblay 182-83).

232.    The range of suspect identification rates in the field studies vary, and are as low as 27% and as high as 58%, as follows:

| | |
|---|---|
| Wright & Skagerburg | 58% |
| Behrman & Richards | 52% |
| Behrman & Davey | 50% |
| Horry, Halford, et al. | 46% |
| Memon | 44% |
| Valentine | 41% |
| Horry, et al. | 39% |
| Wright & McDaid | 39% |
| Klobuchar | 35% |
| Wixted | 33% |
| Wells | 27% |

(Ex. 1, Steblay Report, p. 11; Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 55:22-56:1).

233.    Steblay's report includes the following observations based on her analysis of the

58

dataset:

**Descriptive statistics of 2786 Chicago lineups.**

|  | N | % | Suspect ID rate |
|---|---|---|---|
| Familiar (non-stranger) perpetrators | 733 | 26% | 92% |
| Stranger perpetrators | 2052 | 74% | 68% |
| Repeated IDs | 565 | 20% | 88% |
| Multiple Suspect lineups | 651 | 23% | 52% |

For lineups that reported multiple suspect lineups (n = 651), most had two suspects (59%); 17% had three suspects; 17% had four suspects; 5% had five suspects; 4% had six suspects.

When the lineup included two suspects, 7% failed to report the witness's decision. When the lineup included three suspects, 27% failed to report the witness's decision, and when four suspects were in the lineup, 45% failed to report the witness's decision.

Note: Repeated IDs, multiple-suspect lineups, and prior familiarity between witness and offender (stranger or non-stranger) are not mutually exclusive categories.

Lineup size

2273 lineups included documentation of lineup size. The CPD requirement (as of 1983) was to have at least four fillers in the lineup. CPD failed to meet this requirement in 17% of the lineups (that is, the number of lineup members was fewer than five). If a standard of size six (5 fillers) is applied, 58% of the lineups fell short of this mark, with fewer than six lineup members.

These figures likely underestimate the number of lineups with insufficient fillers because they do not take into account the number of suspects in the lineup (23% of lineups had more than one suspect).

Witness Lineup Decisions

| | | |
|---|---|---|
| Suspect Identifications | 1824 | 69% |
| Tentative Suspect ID | 152 | 6% |
| Filler Identification | 9 | <1% (.003) |

59

|                         |      |        |
|-------------------------|------|--------|
| No Identification       | 664  | 25%    |
| Total                   | 2649 | 100%   |
| No report of witness decision: | 137 | (5%) |
|                         | 2786 |        |

(Ex. 1, Steblay Report, pp. 6-7.)

234.    Steblay's report also included an analysis of the data to arrive at what she calls the Chicago Comparison Subset, which she describes as follows:

### I.  Dataset preparation for the comparison of Chicago Lineups with 11 Field Studies (4 steps).

According to my calculations, it was necessary to sample at least $N = 196$ lineups from Chicago in order to be able to detect a significant percentage difference between the Chicago data and extant field data, with statistical power at 80% and alpha at the traditional level of .05. I anticipated a medium effect size (percentage difference) based on prior work I have done with other samples of Chicago lineups (Steblay, 2011; Steblay, 2018). If the effect size turns out to be small, the sample size necessary to detect a meaningful difference would be 346. The sample here exceeds acceptable power ($n = 1092$ for this analysis).

Eleven published field studies (Wells, et al. 2020) provide a basis for comparison to these Chicago data. These 11 field studies each report the frequencies of lineup outcomes (suspect IDs, filler IDs, and non-identifications) for a total of 6,734 field lineups. The field studies include both photo and live lineups.

Each of the Wells, et al. (2020) field lineups has a *single suspect* (no multiple-suspect lineups).

Each of these field lineups represents a *stranger-perpetrator* lineup. If a study reported lineup outcomes from eyewitnesses with prior familiarity with the offender, those lineups were removed from the Table 1 data. It should be noted, however, that three studies of Table 1 (Behrman 2001, 2005; Wright & Skagerburg, 2007) did not provide information about the relationship between witness and offender. My conservative assumption that Table 1 data are all stranger IDs is therefore favorable to the defense case. That is, the presence of unreported familiar-perpetrator identifications would potentially increase suspect ID rates in those three studies.

Each of the field lineups represents a first-identification attempt. No study reported repeated identification tasks with the same witness and suspect. My conservative

assumption that all lineups in the set were first-identification attempts is favorable to the defense case. The presence of unreported repeated identifications would potentially inflate suspect ID rates.

In sum, the field lineups (Wells, et al. 2020) provide an aggregate summary of published field data of each witness's *first attempt* to identify a *stranger-perpetrator* in a *single-suspect* lineup.

The Chicago lineups include non-stranger offenders, multiple-suspect lineups, and repeated identification procedures with the same witness viewing the same suspect. Each of these factors can elevate suspect identification rates. Therefore, these three components of police practice will be screened out prior to the comparison with the 11 field studies, through the sequential steps reported below.

A more complete discussion regarding the resulting three subsets—non-stranger perpetrators, multiple-suspect lineups, and repeated identifications with the same suspect and witness—is included in Section VII of this report.

### (1) Non-stranger perpetrators

A first step is to consider the relationship between the witness and perpetrator prior to the crime (stranger or familiar) for each Chicago lineup. This factor (stranger vs. non-stranger perpetrator) can differentially affect identification rates, as is apparent below.

| Non-stranger perpetrators (n = 733) | | | Strangers (n = 2052)   (+1 Unknown) | | |
|---|---|---|---|---|---|
| Suspect IDs | 661 | 90% | Suspect IDs | 1162 | .....0. |
| Tentative IDs | 15 | 2% | Tentative | 137 | 7% |
| Filler | 2 | <1% (.003) | Filler | 7 | <1% (.004) |
| No ID | 53 | 7% | No ID | 611 | 32% |
| Total | 731 | | Total | 1917 | |

No outcome reported: 2 (+ 731 = 733) No outcome reported: 135 (+ 1917 = 2052)

The removal of 733 non-stranger identification decisions from the initial dataset leaves 2053 stranger-perpetrator identification attempts. [2786 lineups minus 733 non-

stranger lineups equals 2053 stranger lineups. I have retained the one "unknown" in the stranger category.]

Two additional groups of the 2053 stranger lineups must be removed to create the Comparison Subset: multiple-suspect lineups and repeated identification procedures. These two categories are not mutually exclusive (that is, they can co-occur within the same lineup). Similarly, both stranger-perpetrator and familiar perpetrator lineups may include multiple-suspect lineups and repeated lineups.

### (2) Multiple-suspect lineups (among stranger lineups)

Among the 2053 stranger lineups, there were 581 multiple-suspect lineups (28%). The number of suspects in these multiple-suspect lineups ranged from 2-6 (Mode = 2), with 57% having two suspects in the lineup; 17% with three suspects in the lineup; 17% of lineups with four suspects; 5% with five suspects and 4% with six suspects.

| Multiple-Suspect Lineups (n = 581) | | | Single-Suspect Lineups (n = 1472) | | |
|---|---|---|---|---|---|
| Suspect ID | 213 | 45% | Suspect ID | 950 | 66% |
| Tentative ID | 16 | 3% | Tentative | 121 | 8% |
| Filler | 5 | 1% | Filler | 2 | <1% (.001) |
| No ID | 242 | 51% | No ID | 369 | 26% |
| Total | 476 | 100% | Total | 1442 | 100% |

No outcome reported 105 (+ 476 = 581)         No outcome reported: 30 (+ 1442 = 1472)

### (3) Repeated identification attempts with same-suspect same-witness (stranger lineups)

The 2053 Chicago stranger-perpetrator lineups included 396 lineups in which the eyewitness was reported to have previously viewed the suspect in a prior identification procedure (19%). The second identification attempt is redundant.

| Repeated lineups (n = 396) | | | Not repeated lineups (n = 1657) | | |
|---|---|---|---|---|---|
| Suspect ID | 298 | 79% | Suspect ID | 865 | 56% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Tentative ID | 25 | 7% | | Tentative ID | 112 | 7% |
| Filler | 1 | < 1% | | Filler | 6 | <1% |
| No ID | 55 | 14% | | No ID | 556 | 36% |
| | Total 379 | 100% | | | Total 1539 | 100% |

No outcome reported: 17 (+ 379 = 396)    No outcome reported: 118 (+ 1539 = 1657)

**(4) Single-suspect stranger-perpetrator first-identification lineups (n = 1092)**

At this point, familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups can be screened out of the data set. The reports for 16 of the lineups are missing the witness's decision (the outcome of the lineup). These leaves **1076** Chicago lineups for the Comparison Subset.

| | | |
|---|---|---|
| Suspect IDs | 658 | 61% |
| Tentative IDs | 98 | 9% |
| Filler | 1 | <1% (.0009) |
| No IDs | 319 | 30% |
| Total | 1076 | 100% |

(Ex. 1, Steblay Report, at 7-9).

235.    Steblay's report compared the results of the "single-suspect, first attempt, stranger-perpetrator" lineups in the CPD homicide files using "a subset of the lineups (n = 1,076)" to the "aggregate 6,734 lineus" from the 11 field studies.  (Ex. 1, Steblay Report, p. 4).

236.    Using a Chi-Square statistical analysis, Steblay's interpretation of the data within her report concluded that: "There is a significant difference between the pattern of Chicago lineup outcomes and that of extant field studies. Chicago lineups produced 70% suspect identifications, one filler pick (.0009%), and 30% non-identifications, a significantly different pattern of outcomes

63

compared to the field studies (averages of 41%, 24%, and 35%, respectively), X2 (2, N = 7810) = 442.28, p < .00001. This X2 statistic tells us that there is less than one chance in 100,000 that this pattern has occurred simply by chance. This is a statistically significant result." (Ex. 1, Steblay Report, pp. 10).

237.    In addition, Steblay's report concluded that based on her interpretation of the data provided: "The Chicago suspect ID rate is 70%; field studies average 41%; This is a significant difference, with Chicago yielding more suspect identifications, 29% higher. (This analysis simply collapses the one filler into no-IDs.) X2 (1, N = 7810) = 326.03, p < .00001. . . . If the 98 tentative suspect IDs are considered to be non-IDs instead of suspect IDs, the Chicago suspect ID rate is 61%, still a significantly higher level than that of field studies, X2 (1, N = 7810) = 156.63, p < .00001. In sum, the most generous interpretation of these data would move the 98 tentative suspect IDs and 16 unreported outcomes to the no-ID category. This change for 153 lineups would change the results only minimally, decreasing suspect ID rate to 60% and increasing non-IDs to 40%. The statistically significant outcome remains, X2 (1, 7826) = 145.05, p < .00001." (Id. at 10-11).

238.    Dr. Steblay's report includes an analysis of seven additional Chicago Police Department lineup outcome datasets from legal cases. One of the two datasets came from a FOIA study, in which Dr. Steblay personally managed the coding of the data. (Ex. 1 at 12.)  The others came from the cases *Velez*, *Rivera*, *Sierra*, *Rodriguez*, *Bouto*, and *Iglesias,* which contained data compiled by Loevy & Loevy. The suspect identification rate of 70% in this case was consistent with the suspect identification rate in other cases:

- (2004-2005) 54% (FOIA)
- (1996-2001) 55% (Velez)
- (1985-1997) 55% (Rivera)
- (1991-1995) 74% (Sierra)
- (1995-1998) 70% (Rodriguez)

64

- (1989-1993) 73% (Bouto)
- (1989-1998) 70% (Iglesias)

*Id.*

239. Dr. Steblay's report notes that several of the 11 field studies were conducted in the United Kingdom. Dr. Steblay's report opines that when only the field studies from United States jurisdictions are considered, the difference in suspect identification rates in the Chicago data and the U.S. field studies remains statistically significant: 70% in this case and 37% in the U.S. field studies. Dr. Steblay's report opines that the Chicago sample posts higher suspect identification rates than any other U.S. study. (Ex. 1, Steblay Report, at 11).

240. Dr. Steblay testified that "estimator variables" may "influence a witness's memory" and that one of those is the type of crime that the witness witnesses. (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 545:14-18). When asked "Do you know of these field studies which one exclusively relied on homicide cases?" Dr. Steblay responded, "No, I would have to look into that. I know, for example, that Wixted, Klobuchar, Wells, those that I'm very familiar with dealt with more just homicide." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 545:19-23).

241. Steblay included tentative identifications in reaching the CPD suspect identification rate of 70%, but does not know if the 11 published field studies included tentative identifications in the suspect identification rate. (Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 49:3-24; 52:3-17; 54:12-55:1).

242. When asked "which one of these field studies included tentative identifications in their positive identification rate?" Dr. Steblay responded, "Well, it must have been all of them because they either categorized the outcome as a suspect ID, a filler ID or no ID.· And so a tentative

suspect ID, we don't have the numbers about that, but you would assume they would have included it as suspect IDs.· That's what they're reporting it as." (Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 51:14-22).

243.    If Steblay did not consider tentative identifications as positive identifications in the Dataset, the CPD suspect identification rate from the Dataset would be 61% instead of 70%. (Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 54:12-55:1).

244.    When asked why she did not address the 61%, Steblay explained that she was "moving toward a comparison of the Chicago Police Department data to the existing field studies so I want to be able to do that comparison.  In the field studies they do not include tentative IDs.  You saw that table one, you see it's either a suspect or a filler or no identification.· So in order to do that comparison I need to figure out, well, where should I put those tentative IDs.· They are suspect IDs, they're just tentative.· So I put them in the suspect ID category." (Ex. 9, Steblay Rebuttal Dep. from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 50:8-17.)

245.    The City's Rule 30(b) witness, Lieutenant Foster, testified that neither the CCSAO nor CPD considered tentative identifications as positive identifications.  (Ex. 14, Foster 30(b)(6) Dep, 244:22-245:25).

246.    Foster was unaware of any policy or any training about how tentative identifications were to be documented, and confirmed that detectives were not trained to ask witnesses if they were 100 percent confident in their identifications.  Tentative identifications would occur if the witness themselves volunteered that they were not 100 percent certain.  (Ex. 14, Foster 30(b)(6) Dep., 246:1-7, 246:24-247:3, 247:8-1.)

247.    When asked what the practice was with regard to the documentation of tentative identifications, Foster testified that they were considered non-identifications and documented as

66

such. Further, when asked if the fact that a person was tentative about their identification was documented, he said yes. (Ex. 14, Foster 30(b)(6) Dep., 246:1-247:11).

248. Steblay does not know if the CCSAO used tentative identifications in prosecutions. (Ex. 3, Steblay Dep 2/9/23 (Part I), 209:23-210:6).

249. According to Steblay's report the possible explanations for the increase in suspect identification rate are (a) familiar (non-stranger) perpetrator identifications; (b) lineup structure, including lineup size and multiple suspects; (c) first identification attempts vs. repeated procedures among single-suspect stranger-perpetrator lineups; (d) suggestion from line-up administrators; (e) fewer filler selections recorded; (f) lineup quality, which she describes in detail at pages 12-19 of her report marked as Exhibit 1. (Ex. 1, Steblay Report, pp. 12-19).

250. Steblay is not opining that these factors necessarily resulted in the difference between the CPD identification rate and the averaged identification rate from the 11 field studies she considered, but rather, that they are possible factors or "what [Steblay] thought might be reasons for the high suspect ID rate, familiar perps, multiple perps, repeated identifications[.]" As Steblay testified in her deposition on the same possible factors in *Velez v. City of Chicago,* 18-CV-8144, "What I'm reporting here is factors that might be associated with the greater suspect identifications in Chicago…so we have established that there are higher suspect ID rates in Chicago done in these other (inaudible) studies, and what I'm providing here are some of the reasons that that might be so," and "No. What I'm saying is, I'm offering information about each of those possible factors. And how they might play – for example, lineup size." (Ex. 1, Steblay Report, p. 2; Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 69:20-24; 84:11-15; Ex. 12, Steblay Deposition from *Velez v. City of Chicago,* 18-CV-8144 dated 2/10/22, pp. 385:21-387:23).

67

251.    Steblay's report opines that of the six factors (a)-(f) above that might explain Chicago's high suspect-identification rate, factor (a) (familiar (non-stranger) perpetrator IDs), factor (b) (multiple suspects), and factor (c) (repeated identification procedures) are already accounted for in her Comparison Subset, which excludes all lineups falling in these categories, and includes only stranger, single-perpetrator, first-identification lineups. Steblay further opines that these factors therefore cannot explain Chicago's high suspect-identification rate. (Ex. 1, Steblay Report, p. 12).

252.    When "looking at the section regarding repeated identifications attempts, Steblay identifies four separate "confounds," which she described as: "A confound means that there are multiple explanations for an outcome, so that the exact explanation cannot be teased apart from the other." (Ex. 1, Steblay Report, pp. 13, 15-16; Ex. 4, Steblay Deposition (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 495:5-12).

253.    According to Steblay's report, after excluding factors (a), (b), and (c), evidence-based explanations that remained were problematic suggestion from the CPD officers administering the line-ups, truncated line-up size, and structurally biased lineups that tended to indicate the suspect as the correct choice. (Ex. 1 at 12-19.)

***Lineup structure***

254.    Steblay's report states that the article, "Policy and procedure recommendations for the collection and preservation of eyewitness identification evidence," published by Wells, et al. in 2020, states that the "minimum lineup size is six: one suspect plus five fillers." (Ex. 1, Steblay Report, p. 13). Steblay acknowledges that an earlier publication from the National Institute of Justice published in 1999 recommended five fillers for photo arrays and four fillers for lineups. *Id*

255.    Throughout her Report, Steblay referred to and relied on the 1998 White Paper, and

68

agreed that the 1998 White Paper states, "Our formal recommendation regarding lineup structure does not state how many people should be in a lineup.  The reason for this is because it would be arbitrary to pick a number."  (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 465:15-466:20).

256.    In response to a question regarding the difference in recommendations for photo arrays as opposed to live line ups, Steblay answered, in part that, "We know that a lineup since early days in eyewitness research, a lineup should be only one suspect per lineup – one suspect, and then the recommendation is for five fillers."    (Ex. 4, Steblay Dep. from *Sierra/Iglesias/Bouto/Rodriguez* (Part II), 462:6-9.)

257.    Steblay does not have the information about which police departments in the United States from 1989 to 1998 consistently only used five fillers in every lineup and photo array, or which ones used one suspect in every lineup, which ones used repeated identification procedures, or if any police departments used double blind lineups as a matter of policy.  (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 467:4-11; 479:15-19; 488:6-12; 506:11-22).

### *Repeated identification procedures*

258.    Steblay agrees that repeated identification procedures are allowed and sometimes required for eyewitness evidence in many jurisdictions in the United States and elsewhere, and that "once a suspect is in custody, additional photo or live identification evidence may be necessary for the prosecution to present at trial," and that the 1998 White Paper on recommended eyewitness identification procedures and the National Institute of Justice 1999 report titled "Eyewitness Evidence: A Guide for Law Enforcement" ("1999 NIJ Guide") that outlines best practices for the selection of eyewitness evidence do not discuss repeated identification procedures with the same

suspect. (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 492:22-494:13).

259.    When asked if any confounds apply to any individual identification attempts in any of the data sets that she was using, Steblay states that, once you make a second identification attempt and make an ID "it's impossible to know for any of those [attempts] whether the identification is based on the familiar face from the scene of the crime or the familiar face from the earlier identification attempt. So, it would apply to all of those second attempts." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 495:13-496:12).

*Non-blind lineups*

260.    Steblay testified that she knew who was involved in the 1999 NIJ working group: "Yes, I knew that Sergeant Carroll was part of that Attorney Generals technical working group. That was a very big deal at the time.· And the individuals involved, you know, we all came to know them, respect them, et cetera.· So, that's why when I saw that he also wrote the training manual I thought oh, okay, there it is and was the 1999 NIJ Guide was part of the Attorney General's technical working group and was "a very big deal at the time." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 527:16-529:8). Sergeant Paul Carroll and another CPD officer, Patricia Marshall, are listed as members of the NIJ working group. (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 527:16-529:8).

261.    The 1999 NIJ Guide states that "However, blind procedures, which are used in science to prevent inadvertent contamination of research results, may be impractical for some jurisdictions to implement. Blind procedures are not included in the *Guide* but are identified as a direction for future exploration and field testing." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 507:6-8; 507:19-508:3). When asked if she

agreed with the authors of the 2020 White Paper, that tt the time of the 1998 White Paper, there was limited information as to who a lineup's administrator's knowledge of which lineup member was the suspect influenced witnesses' identifications, Steblay agreed, and stated "that speaks to that bigger question that I talked about earlier, that the research is very broad that shows the impact of other people on our beliefs, opinions, or behaviors, particularly in a context of administering a treatment such as would be a lineup.· But there was at that time limited specific information about the lineup context, how that played out in a lineup.") (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 509:6-19).

262.     Suggestive lineups from lineup administrators may be intentional or unintentional as suggestive behavior can occur outside the awareness of the administrator and the witness.  (Ex. 4, Steblay Deposition (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 499:6-18; 504:10-19).

263.     Steblay assumes that every lineup in the Dataset was delivered to a witness by a police officer who knew which lineup member was the suspect and which were fillers because CPD did not have a policy to administer lineups in a double-blind fashion during the relevant time period, although she did not independently verify her assumption in any of the lineups from the Dataset.  (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 499:19-500:10; Ex. 9, Steblay Rebuttal Dep in *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 81:16-82:1).  Steblay conceded that it is possible that some of the lineups in the Dataset were conducted by detectives who did not know which participant was the suspect.  (Ex. 9, Steblay Rebuttal Dep in Sierra/Iglesias/Bouto/Rodriguez dated 11/9/23, 81:16-82:6).

264.     Steblay testified that every lineup in the Dataset "were done not blinded, not blind" and that her basis for saying that was "there was no policy for blind procedures at the time."  (Ex.

11, GO 88-18; Ex. 9, Steblay Rebuttal Dep *in Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23,

81:16-82:1). Steblay testified that she "supposed" that there could be a "circumstance where any

detective conducting a lineup was blind to who the suspect was in the files that [she] reviewed."

(Ex. 9, Steblay Rebuttal Dep in *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 81:16-82:6).

265. It is possible for witnesses in a non-blind lineup to make an identification based on

their true memory, and that suspect identifications in non-blind lineups are not always inaccurate.

(Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 513:8-14).

266. Steblay testified that she "did not see any video or audio tape records of these

lineups" in the Dataset, and so she could not assess "if any of the lineups in the –represented in the

data set that you reviewed and was provided to you in these four cases involved an instance where

there was a nonverbal cue such as a smile when the witness was looking at the suspect versus a

filler." Steblay was also asked if she knew if any of the lineups in the data set she reviewed

concerned circumstances where "non-blind lineup administrators (a) put more pressure on the

witness to choose someone from the lineup, with pressure especially directed toward the suspect,

(b) [we]re more likely to emit nonverbal clues . . . , or (c) [we]re more likely to ask about the

suspect (rather than the filler)." Steblay testified that it was "difficult to know because we don't

have audio or video or very complete reports about the exchange between the witness and the . . .

lineup administrator." (Ex. 1, Steblay Report, p. 17; Ex. 4, Steblay Dep (Part II) from

*Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 514:23-515:6; 516:2-13).

267. When asked whether she knew of any particular identification attempt in any of the

data sets where a witness was steered either intentionally or unintentionally from a filler to a

suspect, Steblay answered: "I can't point out an individual case, but again, what I'm referring to

here is the aggregate that when you see a group of the set of data in which you have such high

rates of suspect identifications and such low rates of filler identifications, it suspects -- it is consistent with the notion that there is being some effect of non-blind lineup administrators..  (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 519:24-520:4).

### *Fillers*

268.    Steblay opines in her report that the near absence of filler identifications in the homicide cases within the Dataset is significantly different from the 11 field studies, which average 24% filler selections.  (Ex. 1, Steblay Report, pp. 18-19).

269.    Steblay's report opines that there are only 9 filler picks documented in the 2786 lineups in this Chicago data and only one in the Comparison Subset. She concludes "Chicago's outcomes are significantly different from field studies, which average 24% filler selections, X2 (1, N = 7810) = 318.62, p < .00001." (Ex. 1, Steblay Report, pp. 18-19).

270.    Steblay's report determined that it is not possible for the filler identifications to be collapsed into the non-identification category because mathematically there are not enough non-identifications in the Dataset to include both categories.  (Ex. 1, Steblay Report, p. 19; Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 140:23-142:8). Steblay opined that there are not enough non-identifications in the Dataset to include both non-identifications and filler identifications because there are too many positive identifications in that dataset. (*Id.*).

271.    Steblay's report opines that it is not possible for the filler identifications to be labeled non-identifications, stating: "The Wells, et al., 2020 Table 1 shows a pattern running through these eleven studies of approximately a 2:1 ratio of Suspect/Filler IDs among witnesses who made a pick from the lineup (choosers). So, if that ratio (more specifically 1.7:1) held for Chicago PD, one could estimate that about 41% of the remaining witness decisions should be

categorized as fillers—but this is more than there are non-IDs. An explanation that the filler IDs are simply labelled non- IDs is not consistent with the data. Either filler picks are systematically not entered into the record or witnesses are being steered away from fillers (explicitly or implicitly), or both." (Ex. 1, Steblay Report, p. 19; Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 140:23-142:8). Steblay opines: "The near-absence of recorded filler picks underscores the problems of non-blind lineup administration. The implications are that 1) witnesses are steered to the suspect and away from fillers; 2) filler selections are uniformly and incorrectly recorded as non-identifications; and/or 3) lineups with the crucial information of filler selections are never entered into the record. I do not see a Chicago policy regarding the recording of filler picks. A practice or policy of not reporting filler identifications can result in elevated suspect identification rates." (Ex. 1 at 18).

272. From 1986-1998, the CPD documented filler identifications as negative identifications. (Ex. 14, Foster 30(b)(6) Dep, 244:1-13).

273. From 1986-1998, the CPD written policy General Order 88-18 did not expressly require the documentation of filler identifications; rather, the policy states that "[t]he narrative portion of the Supplementary report will include: 6. The name(s) of the persons identified in the lineup." (Ex. 11, GO 88-18 at Section J.6).

274. Steblay does not know of any U.S. police departments from 1989-1998 that recorded filler identifications as "non-identifications in a binary sense, meaning the identification was either positive or negative." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 520:12-19).

### *Lineup Quality*

275. With respect to lineup quality, Dr. Steblay's report opines: "The quality of lineup

fillers underpins effective lineup size. One standard measure of lineup fairness is the "mock witness procedure," in which persons who did not witness the crime are given the real witness's description of the perpetrator and then asked to examine the lineup and make a best guess (absent any memory of the crime, of course) about which lineup member is the police suspect. If these "mock witnesses" can identify the police suspect at a rate higher than chance (1/6 in a six-person lineup), the lineup is biased against that suspect. I recently evaluated five subsets of field data from eight U.S. cities (Steblay & Wells, 2021). Depending on the jurisdiction, between 33% and 68% of lineups sampled from 1,548 real police lineups were suspect-biased, and the proportion of well-constructed (unbiased) lineups never exceeded 50%. Of note is that the highest bias rate (68%) occurred with a set of 59 Chicago live lineups conducted between 2004-2005. That is, in 68% of the Chicago lineups sampled, mock- witnesses—with no memory of a culprit—were able to identify the police suspect at a rate significantly higher than chance. Hence, for the real witnesses in the current cases, higher suspect identification rates may be associated with poor lineup construction that allows the police suspect to stand out in the lineup. However, I cannot assess this possibility with the data in the present Chicago set." (Ex. 1 at 19).

***Limitations in Steblay's analysis***

276.     Steblay did not evaluate whether any of the eyewitness identifications from the Dataset were fabricated because "[t]here's no way to know that from my data set – the data set." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 314:3-18).

277.     In response to the question, "Did you evaluate whether any of the eyewitness identifications in any of the data sets you reviewed were false identifications?" Dr. Steblay states, "Let me back up a little bit. False identifications, you're referring to a suspect was identified who was not the offender?" before continuing, "Yeah, kind of big picture here, in field data as you know

we have suspect identifications, filler identifications, no identifications at all. Because in these real lineups we don't know ground truth or whether the suspect in the lineup is really the perpetrator or is the suspect.· We cannot determine from those suspect identifications which are accurate and which are inaccurate. Similarly, for the no identifications, a witness who doesn't make an identification may be making an accurate decision or inaccurate decision. We don't know in the field because we don't have ground truth. But, for fillers there's ground truth. If a witness identifies a filler, a person that is known to be innocent of that particular crime, that's ground truth.· That would be a false identification of a filler." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 314:23-316:2).

278.    Steblay testified that she did not evaluate whether any of the eyewitness identifications in any of the data sets she reviewed were witnesses who had been intentionally manipulated by the police because "that's not the purview of what I was asked to study." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 316:3-9).

279.    Steblay testified that she did not evaluate whether any of the eyewitness identifications in any of the data sets she reviewed were identifications that the witnesses made that were not based on their true memory because "that's not the purpose of my data analysis." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 316:10-17).

280.  When Dr. Steblay was asked if she evaluated whether any of the eyewitness identifications in any of the data sets she reviewed were mistaken identifications, she responded "when you have a filler identification, we know that's mistaken.· But suspect identifications and no IDs are impossible to know because we don't have ground truth in the field." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 316:18-317:3).

281.    Steblay did not conduct any interviews of any of the participants of any of the

lineups in the data sets that she reviewed or review any court transcripts or court materials or records related to any of the lineups in the Dataset. (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 317:6-13).

282. When asked whether or not she did any analysis of the criminal court records to see if lineups were challenged as suggestive or violative of due process, Steblay responded: "So, you're asking me if I have knowledge of the court proceedings?," to which she answered, "No, I do not." (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 469:14-22).

283. Steblay did not conduct any analysis of the CPD files to determine the amount of evidence there was against the suspects before they were placed in a lineup. (Ex. 9, Steblay Rebuttal Deposition from *Sierra/Iglesias/Bouto/Rodriguez* dated 11/9/23, 146:23-147:2).

284. Steblay has no understanding of the Cook County State's Attorney's Office felony review process from 1989-1998, nor any knowledge of instances where the CCSAO would request a physical lineup even after a positive identification was made in a photo array. (Ex. 4, Steblay Dep (Part II) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/10/23, 487:18-488:5).

285. Steblay testified that the "2020 White Paper sets out, as we know today, the best practices[]" and "pristine procedures would be ones that follow the recommendations in the White Paper." (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 84:18-24). When asked "So does that mean that there is always a risk that an innocent suspect might be chosen from a lineup, even under prestine conditions?" Steblay responded: "Yes. "If you have a lineup of six members and it's a perfectly constructed lineup, pristine *procedures*, a witness who guesses might pick the suspect without any memory or very little memory." (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 84:18-24; 136:14-17).

**DEFENDANTS' EYEWITNESS ID EXPERT, DR. JOHN WIXTED**

286.    Defendants' retained John Wixted, Ph.D., to provide opinion testimony about eyewitness identification procedures related to Plaintiff's *Monell* claim in response to Steblay's expert report on the same topic.  (Ex. 10, Wixted Report, p. 1).

287.    Wixted's Report states that the 11 field studies used and relied upon by Steblay in her analysis is an unrepresentative statistical comparison to the CPD lineup data because (a) three of the field studies are from the United Kingdom ("UK"); (b) the UK police use lineup procedures unique to the UK (video lineups); (c) the UK field studies used eight or more fillers, which would result in lower suspect ID rates; (d) two of the U.S. field studies used sequential lineups where CPD only used simultaneous lineups.  (Ex. 10, Wixted Report, pp. 2-3).  Steblay testified that one of the field studies used entirely sequential lineup procedures, and two others used both simultaneous and sequential lineup procedures, while there were no sequential lineup procedures in the Dataset.  (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 107:3-10).  Steblay agrees that witnesses are less likely to identify anyone in a sequential lineup.  (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 150:7-151:10).   The three U.S. field studies that have the lowest suspect identification rate used sequential lineups.  (Ex. 1, Steblay Report, p. 11 table; Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 107:3-7).

288.    Steblay' report opines that, with a sequential lineup, witnesses are "less likely to choose a guilty suspect but they're also less likely to choose an innocent suspect, or conversely stated with simultaneous lineup there is more picking of suspects both guilty and innocent." (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 150:6-13.) She also states that her study with Wells and Dysart looking at sequential and simultaneous lineups in the field "found that the suspect ID rate was approximately the same between the two formats but the filler identification rate was lower

78

with sequential lineups." (*Id*. at 150:18-24.)

289.    According to Wixted's Report, he opines that if he assumes Steblay's comparison set of 11 field studies is representative of U.S. law enforcement agencies is correct, the possible explanations for the increase in suspect identification rate are that CPD could require more evidence of guilt before placing a suspect in a lineup than the 11 field studied police departments do, which would increase positive ID rate.  (Ex. 10, Wixted Report, pp. 5, 7).

290.    Steblay's rebuttal report does not dispute that having more evidence of guilt before placing the suspect in a lineup could increase the rate of suspect identifications.  (Ex. 58, Steblay's Rebuttal Report in *Johnson*, p. 16).  Steblay disagrees with Wixted that an evidence-based suspicion standard is a possible explanation for a higher suspect ID rate because the CPD written policy regarding lineups did not include such a provision.  (Ex. 9, Steblay Rebuttal Dep, 148:6-11).  Steblay did not conduct any analysis of the CPD files as to what level of evidence there was against a suspect before the suspect was placed in a lineup.  (Ex. 9, Steblay Rebuttal Dep., p. 146:23-147:2).

291.    Steblay's rebuttal report challenges Dr. Wixted's speculation that "perhaps the police in Chicago require more evidence of guilt before placing a suspect in a lineup than the other 11 police departments do," which, he opines, "could account for a relatively high suspect ID rate," by stating that Wixted (1) "provided no evidence that an evidence-based suspicion standard existed at CPD," (2) makes an explicit, unsupported assumption about evidence-based suspicion "that CPD's high suspect ID rate means high levels of guilty and very few innocent suspects in CPD lineups," and (3) implicitly assumes "that every witness in Chicago has a perfect or near perfect memory."  (Ex. 58, Steblay's Rebuttal Report in *Johnson*, p. 16.)  Her report also states that the

79

White Paper "cited evidence of the lack of evidence-based suspicion, including Wixted's own modeling data." Id.

292. When asked, "[b]esides the fact that the written policy doesn't specifically state it, is there any other evidence that you're relying on that CPD did not have an evidence-based standard for their line-ups?" Steblay responded, "No, in the same way that Dr. Wixted has provided no evidence that they did." (Ex. 9, Steblay Rebuttal Dep, 148:6-11).

293. Wixted opined that there is no "correct" suspect ID rate. Steblay agrees that the 2020 White Paper does not claim there should be a certain suspect identification rate. (Ex. 3, Steblay Deposition (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 213:14-16). When asked, whether "additional data from field studies could potentially change the average rate of positive identifications?" Steblay answered "it could be." (Ex. 9, Steblay Rebuttal Dep dated 11/9/23, 62:17-20).

294. Steblay was asked: "Does the 2020 White Paper say what the rate of suspect identifications should be?" to which she responded: That is kind of a meaningless point. Why would they . . do that? There's so many components – so that's what the 2020 White Paper is about, how the suspect identification rates can be pushed around by using different kinds of procedures." (Ex. 3, Steblay Deposition (Part I) from *Sierra/Iglesias/Bouto/Rodriguez* dated 2/9/23, 212:21-213:6).

295. Steblay acknowledged that two of the field studies with higher suspect identification rates included cases that were referred to the researchers from defense attorneys. (Ex. 9, Steblay Rebuttal Dep, 83:3-84:17). Steblay testified that she would expect the rate of suspect identifications to be higher in those cases. (*Id.*). In Steblay's rebuttal report to Wixted in *Velez*, Steblay stated that "[o]ne could expect disproportionately high suspect IDs in

referred consulting cases (lawyers contact the consultants because they were defending an identified suspect). This is important to know; any future field study should also take the sources of lineups that might inflate suspect ID rates." (Ex. 40, Steblay Rebuttal Report in *Velez*, p. 10).

296.    In reference to two field studies that were referred to the authors of those studies for consultation purposes, Steblay's report opines "that's important to know in order to try and understand why their suspect ID rates may have been higher than the other studies.· It's also important in that the Chicago PD data were not based on cases referred to consultants; they were based on a court order to come up with the homicide files. . . . [W]hat I did with the Chicago PD data is try to look at why might that rate be higher, just in the same way that, if you wanted to, it would be an interesting research question why are some rates lower in other studies, but that wasn't the question here. The question here was what about Chicago PD." (Ex. 9, Steblay Rebuttal Dep, 84:5- 17).

DATE: April 12, 2024                                  Respectfully Submitted,

*/s/ Meg Gould*                                          */s/ Eileen E. Rosen*
Attorney for Plaintiff                              Special Assistant Corporation Counsel for
                                                              Defendant City of Chicago

Jon Loevy
Anand Swaminathan                              Eileen E. Rosen
Steve Art                                              Austin G. Rahe
Meg Gould                                          Catherine M. Barber
Alyssa Martinez                                  Theresa B. Carney
LOEVY & LOEVY                                  Lauren M. Ferrise
311 N. Aberdeen                                  ROCK FUSCO & CONNELLY, LLC
Chicago, Illinois 60607                          333 West Wacker Drive, 19th Fl.
(312) 243-5900                                      Chicago, IL 60606
                                                              (312) 494-1000
                                                              erosen@rfclaw.com