## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

DEMETRIUS JOHNSON,       )
                                )    No. 20 C 4156
       *Plaintiff*,           )
                                  )    Hon. Sara L. Ellis,
       *v.*                      )    District Judge
                                  )
REYNALDO GUEVARA, *et al.*,       )
                                  )    JURY TRIAL DEMANDED
       *Defendants*.        )

## PLAINTIFF'S STATEMENT OF DISPUTED FACTS IN SUPPORT OF HIS
## OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

I. **Demetrius Johnson is Innocent**

*Demetrius Johnson did not kill Edwin Fred.*

1. Plaintiff Demetrius Johnson was 15 years old in June 1991, when he was arrested for the shooting death of Edwin Fred. At the time, Johnson was in the ninth grade at Roberto Clemente High School and lived with his mother and siblings. Ex. 1 at RFC-Johnson 88 (listing Johnson's age as 15 and his occupation as student at Clemente).

2. Johnson did not kill Edwin Fred, and had no involvement in the crime. Ex. 2 at ¶15 (Answer).

3. None of the following types of evidence connected Johnson to Mr. Fred's death:

    a. Defendants did not locate the murder weapon or connect Plaintiff to a weapon used in the shooting in any way. Ex. 3 & Ex. 4 (absence of such evidence in entire Fred police files).

    b. There was no physical evidence—such as a fingerprint, a fiber, a shred of DNA evidence, or any other forensic evidence—that connected Johnson to the shooting. Ex. 3 & Ex. 4 (absence of such evidence in entire Fred police files).

    c. Johnson never confessed. Ex. 3 & Ex. 4 (absence of such evidence in entire Andujar police files); Ex. 5 at 108:6-8.

*Johnson Has Always Maintained His Innocence.*

4. Johnson proclaimed his innocence from the first time he was interrogated by the police on July 22, 1991. He steadfastly denied any involvement in the crime when he was interrogated by Defendants. Ex. 6 at RFC-Johnson 80; Ex. 2 at ¶15 (Interrogatory Response to Request No. 15); Ex. 5 at 108:6-109:13.

5. Johnson refused to enter into a plea deal of any kind in exchange for a shorter sentence and instead went to trial. *See generally* Ex. 7 (pleading not guilty); Ex. 8 (complete trial transcript).

1

6.      Johnson has repeatedly reaffirmed his claims of innocence since, including through his post-conviction proceedings, certificate of innocence proceedings, and this civil case. Ex. 2 at 11-12 (Answer to Request No. 15); Ex. 9.

### *Demetrius Johnson Had an Alibi.*

7.      The shooting at issue in this case occurred during the NBA Finals basketball game on June 12, 1991, the night the Bulls won their first NBA Championship. Ex. 8 at A-76:2-8, A-126:16-18, A-161 (stipulation as to NBC records showing game was on at the time of the shooting), B-98:6-13.

8.      At the time of the shooting, Demetrius Johnson was at his home, watching the Bulls championship game with his girlfriend, Magdalia Reyes, and other friends. Ex. 5 at 173:1-22; Ex. 10 at A-133:16-134:11.

9.      Two witnesses, Madalia Reyes and Elizabeth Martinez, both testified at Plaintiff's criminal trial that they were with Demetrius Johnson, at his home, watching the Chicago Bulls clinch their first NBA Championship at the time the shooting occurred. Demetrius never left the house while the game was on television. The women had a particular memory of this day because they were not basketball fans, so they did not regularly watch basketball games but did so that evening. They also remembered that classmates, including Martinez's sister, were particularly invested in the Bulls winning that Wednesday night because if they did not win, the next game would have been on Friday, which was the Clemente High School graduation day and they would miss the game. Ex. 10 at A-129:7-13, A-133:5-22, A-147:13-A-149:1; Ex. 11 at A-154:12-A-155:7.

### *Johnson's Conviction Was Vacated, and Charges Against Him Were Dropped.*

10.     In November 2019, Johnson's murder conviction was vacated. Ex. 12.

11.     The Cook County State's Attorney's Office then dropped all charges against Johnson. He was finally exonerated. Ex. 13.

### Johnson was Certified Innocent by the State of Illinois.

12.     On June 19, 2020, Johnson filed a petition for a certificate of innocence. The State responded to the petition by acknowledging that Defendants' suppression of the Erickson lineup report was an "obvious *Brady* violation." Ex. 9; Ex. 294 at 7.

13.     On April 7, 2021, Johnson was certified innocent by the State of Illinois. Cook County Circuit Court Judge Erica Reddick wrote: "And key evidence that established that as a result of actions taken by this particular Detective [Guevara], that there was strong evidence to believe that a key report, indicating a witness, an eyewitness, Aby Gonzalez, had actually identified a different person as the actual shooter of Edwin Fred, as well as Mr. Ortiz. That information was not revealed to the defense, and as a result of other information— important information about the actions of this particular Detective, and the numerous cases that his actions impacted negatively, wherein individuals were accused and convicted, based on information, it was determined was wrongfully withheld . . . as it pertains to this case, the particular evidence and information showed that there was key evidence that was hidden and not revealed, that would likely have made a difference in the trial result." Ex. 13; Ex. 14 at Johnson 1002-03.

## II.     The Shooting of Edwin Fred and Raul Ortiz

14.     Around 7:45 p.m. on June 12, 1991, Edwin Fred was shot and killed. Raul Ortiz was shot and injured. They were near 2345 W. North Avenue, by the door to a building facing North toward North Avenue, west of Claremont. Ex. 15; Ex. 16 at RFC-Johnson 48..

15.     The patrol officers at the scene identified four witnesses: Aby Gonzalez, Stanley Jewell, Fina Martinez, and Omar Ortiz, all four of whom indicated that they had seen the shooting and had seen the perpetrator shoot the victims. Aby Gonzalez and Omar Ortiz were

particularly close to the victims and the perpetrators when the shooting occurred. Aby reported to police he had come face to face with the shooter right before he shot. And Omar reported that he was so close to one of the victims that the victim almost fell on top of him when he was shot. Ex. 15.

16.     The description the patrol officers recorded was that the first offender was a Black male, age 17, and that the second was a Latino male of the same age, 5'6", 150 pounds, with black hair and dark complexion, wearing a white T-shirt and gray shorts. Ex. 15.

17.     None of these four witnesses ever identified Johnson as the perpetrator. In fact, Omar Ortiz is not mentioned in any other report and there is no indication that Defendants ever spoke with him after the patrol officers' initial interview, despite the fact that he had been with Fred at the time of the shooting. Ex. 3 & Ex. 4 (absence of such evidence in the entire police file).

18.     Defendant Reynaldo Guevara was assigned to investigate the case and interviewed several eyewitnesses immediately. Guevara submitted a report dated June 13, 1991, documenting his interviews with witnesses. His report listed the witnesses to the shooting as the victim Raul Ortiz, as well as Aby Gonzalez, Fina Montanez, Stanley Jewell, Rosa Burgos, and an additional witness named Forrest Garnett, who also had been with Fred at the time of the shooting and saw him shot. Ex. 16; Ex. 17 at B-35:13-24, B-39:9-22, B-41:7- 42:3, B-47:1-50:15.

19.     Guevara's June 13 report documented interviews with only the victim Raul Ortiz, Aby Gonzalez, and Forrest Garnett. Raul Ortiz described the shooting and said he saw a person run southbound on Claremont, but he could not provide additional information. Aby Gonzalez described the shooter as a Black male, and he said that the shooter had put the gun in his

4

waistband after the shooting, before running south of Claremont and west on LeMoyne (one block south of North). Forrest described the shooter as a Black male but could provide no additional information. Guevara's report contains no further description of the perpetrators. Ex. 16.

20.     Guevara admitted at trial that he interviewed Rosa Burgos, Fina Montanez and Stanley Jewell on the night of the shooting. Indeed, Rosa Burgos and Fina Montanez were both at Area 5 on the night of the shooting to view a lineup conducted by Guevara and Erickson. However, Guevara's June 13 report did not document any interview of Fina Montanez, Stanley Jewell, or Rosa Burgos. Ex. 17 at Johnson B-41:7-11, B-47:1-48-3 (testifying about who he interviewed that night); Ex. 18 (Fina and Rosa at Area 5 night of shooting viewing lineup); Ex. 16 (absence of any documentation of interviews of Fina, Rosa, and Stanley).

21.     Stanley Jewell is not mentioned in any other report after Guevara's June 13 report, and there is no indication that Guevara or any of the other Defendants ever documented an interview of Stanley, despite the fact that he had been with Fred at the time of the shooting. Ex. 3 & Ex. 4 (absence of such information in the entire police file).

22.     Other than Rosa Burgos, none of these witnesses—Omar Ortiz, Raul Ortiz, Aby Gonzalez, Fina Montanez, Forrest Garnett, Rosaline Morales, and Stanley Jewell—ever identified Plaintiff as the perpetrator. In fact, Defendants never conducted identification procedures of Plaintiff with these seven eyewitnesses who had been in close proximity to the shooter, including the surviving victim Raul Ortiz. Ex. 3 & Ex. 4 (absence of any such identifications in the entire police file).

23.     That same night Defendants learned of a likely perpetrator named Bryan Johns. According to Defendant Guevara's police report: "The RD then learned that…a person [was

taken] into custody in connection with this shooting one Bryan JOHNS, also known as "LITTLE D" a member of the MANIAC LATIN DISCIPLES street gang. It was further learned that several people who live in the area . . . had said that the shooter was a member of the Maniac Latin Disciples and used the street name of "Little D"." Ex. 16 at RFC-Johnson 52.

### III. Defendant Daley Develops Strong Evidence That Bryan Johns Was the Perpetrator

24. Initial simulcast messages sent out minutes after the shooting indicated that the shooter was a "male Black," with the name "Little D" or "Bryan Johnson." The messages included that the second offender was a male Hispanic. Ex. 19 at RFC-Johnson 44; Ex. 15 at RFC-Johnson 38 (second offender was male Hispanic).

25. Officer Daley, who knew Bryan Johns to match the description, go by the nickname "Little D," and to be a member of the Maniac Latin Disciples street gang from the area near the shooting, immediately suspected Johns committed the shooting. Daley had also seen Johns in the area about an hour before the shootings. Ex. 19; Ex. 20 at B-23:4-13 ("Q. Did you go to Talman and Wabansia to look for anyone in particular? A. Yes. Q. Who were you looking for? A. I was looking for a person by the name of Brian Johns. Q. Did you know Brian Johns to have a nickname? A. Yes. Q. What was his nickname? A. Little D."); Ex. 21 at 78:8-80:25, 85:24-87:11.

26. Johns was a 15-year old Black male, consistent with the limited descriptions of the shooter that had been provided to date. Ex. 21 at 79:3-8.

27. Daley drove to the location he had seen Johns earlier, an area Johns was known to frequent. Daley observed Johns along with two Latino males, Elliott Berverena, and Jose Medina. Ex. 19.

28. Daley observed Berverena and Medina, followed by Johns, exit a black van and rapidly cross the street toward a building at 1652 N. Talman. Ex. 19.

29.     Johns was apprehended before he could enter the building. Berverena and Medina went into the building, but eventually came out of the building and were stopped as well. They were all arrested and transported to Area 5 Detective Division. Ex. 19; Ex. 20 at B-26:6-19, B-27:6-16.

30.     Defendant Daley wrote and signed a report memorializing these events, dated June 13, 1991. Ex. 19.

### *Search of the Black Van Johns Had Exited Revealed Two Handguns.*

31.     The black van Johns and the other two men had exited before rapidly approaching the building was searched, revealing two handguns: (1) a .25 caliber, and (2) a 380-9mm Kurz. Ex. 19 (describing a "2-inch chrome AMT .25 cal handgun secreted under a vinyl covering for the motor cover"); Ex. 22 at RFC-Johnson 82 (describing a "AMT 380-9mm Kurz semi-auto. Pistol with 4" barrel stainless S[teel]" found on the front floor of the van).

32.     The 2-inch chrome AMT .25 caliber handgun was not inventoried. There is no evidence report, crime scene processing report or other report documenting that the .25 caliber handgun was inventoried, or that it was ever tested or analyzed. Ex. 3 & Ex. 4 (absence of such information in the police files).

33.     When Berverena and Medina went inside the building at 1652 N. Talman, they were out of sight of Daley and other officers. They could have stashed or dropped off a weapon at that location without being seen. Ex. 21 at 80:22-84:14, 185:5-187:1, 195:19-24, 196:10-13.

34.     No search warrant was ever sought and no search was ever executed at 1652 N. Talman to locate any weapons that could be matched to the bullets and casings from the Fred shooting. Ex. 21 at 196:10-198:1; Ex. 3 & Ex. 4 (absence of such information in the police files).

35.     Defendants took no steps to match the second gun found in Johns' van to the crime scene evidence. Ex. 3 & Ex. 4 (absence of such information in the police files); Ex. 23 at 9-10.

## IV.     Witnesses Identify Bryan Johns in a Lineup

36.     About three hours after the shootings, several witnesses viewed a lineup in which Bryan Johns was the suspect. Six witnesses viewed the lineup between 10:37 p.m. on June 12, 1991 and 1:15 a.m. the next morning. Ex. 18.

### *Three Eyewitnesses Identify Johns*

37.     Three witnesses who viewed the lineup identified Johns. Rosa Burgos testified that after three individuals had identified Johns, they were told by the police that Johns was the wrong guy. Ex. 24 at B-12:2-18; Ex. 25.

### *Defendant Erickson Writes a Lineup Report Documenting One of the Three Identifications of Johns*

38.     Defendant Erickson wrote a police report documenting the lineup. Six individuals viewed the lineup: Aby Gonzalez, Forrest Garnett, Fina Montanez, Rosaline Morales, Angel Cordova, and Rosa Burgos. Daliz Bergangzo, victim Edwin Fred's aunt, is listed as present for the lineups of Montanez and Morales. Ex. 18.

39.     Erickson's lineup report identified that Defendant Guevara helped conduct the lineup. Ex. 18.

40.     Erickson's lineup report documents that on June 12, 1991 at 2243 hours, Aby Gonzalez identified Bryan Johns as the shooter. Ex. 18.

41.     Aby Gonzalez had been previously interviewed by Defendant Guevara about what he had seen and observed. Gonzalez stated that he was standing on the corner when he saw a Black male running toward him. He saw the man stop, pull out a gun, and "pointed it at him and

8

stood there for several seconds." The gunman then ran to where Edwin Fred was standing, shot

Fred and Raul Ortiz, and then ran past Gonzalez a second time as the gunman fled. Ex. 16 at

RFC-Johnson 52.

42. Detective Erickson's lineup report was submitted on June 13, 1991 at 5 p.m. and

placed in the investigative file. Ex. 3 & *id.* at RFC-Johnson 26. The box for the date the report

was approved is blank. Erickson's signature on the report is as follows:



Ex. 18 at RFC-Johnson 26.

### *Corroboration of the Veracity of the Erickson Report*

43. Detective Erickson's lineup report lists five individuals as standing in a lineup:

Johns (listed as a volunteer), Jozell Hobbs (listed with CB# 8853977), Terrell Agee (listed as a

volunteer), James Brown (listed with CB# 8854359), and Fabian Wells (listed with CB#

8854072). Ex. 18.

44. CPD reports show Hobbs, Brown, and Wells were all arrested on June 12 or 13,

1991, with the same arrest numbers as listed on Erickson's report. Ex. 26 at RFC-Johnson 25907

(Hobbs), RFC-Johnson 25904 (Brown), RFC-Johnson 25931 (Wells).

45. Two of the fillers confirmed that they did indeed stand in a lineup that night.

Terrell Agee swore that he stood in the lineup with Johns. And Fabian Wells also stood in a

lineup in 1991 on the same night the Chicago Bulls won their first championship. Ex. 27; Ex. 28 at 77:14-78:22; Ex. 29.

46.     Johnson acknowledges that Johns told him that Johns had committed the Fred murder and that Johns had been identified in a lineup in connection with the Fred murder. Ex. 5 at 306:19-308:14. In addition, some time later on, Johns told Agee that Johns had been identified in the lineup that took place that night. Ex. 27; Ex. 28 at 77:14-78:22.

47.     An initial scene supplementary report written by Defendant Guevara, submitted on June 13, states that Aby Gonzalez was interviewed and "viewed a line up in [Area 5] which is the subject of a separate report." The report also identifies "Evidence" and lists, "Photos of lineup, subject to separate Supp. report." Ex. 16 at RFC-Johnson 50, 52.

48.     Guevara's June 13 supplementary report, was submitted for supervisor approval on June 13, 1991, approved the same day, and received in central record on June 18. Ex. 16.

49.     Photos are taken of lineups that result in positive identifications. If it is a negative lineup, meaning there is no positive identification during the lineup, then the lineup is not photographed. Ex. 30 at Foster 4 ("take two photographs of any formal lineup which results in the identification of a suspect"); Ex. 17 at B-71:19-22 (Guevara's criminal trial testimony: "[no] photos are taken in a negative lineup.").

50.     Aby Gonzalez has stated that at the time of the Fred shooting, he knew Johns. Ex. 32 at Johnson 911-914.

51.     On October 7, 2019, attorney Josh Tepfer met with Aby Gonzalez and spoke about his memories of the shooting. Mr. Tepfer testified, consistent with his notes of that meeting, that Aby Gonzalez stated that he identified someone as the shooter on the night of the

10

shooting. Ex. 31 at 88:17-90:20; Ex. 32 at Johnson 911-912 (Tepfer Report detailing that Gonzalez told him that he positively identified someone in a lineup on the night of the shooting).

52.     Aby Gonzalez testified at his deposition that he was not disputing the information contained in the Erickson police report documenting his positive identification. Ex. 33 at 44:4-45:22; 55:10-15, 77:14-78:2.

## V.     Guevara, Erickson, and Daley Fabricate Reports Concealing that Johns Had Been Identified

53.     A different lineup report written by Defendant Guevara (the "Guevara lineup report") also states that he and Defendant Erickson conducted a lineup on the night of the shooting with Johns as the suspect. The report contains signatures for both Guevara and Erickson. Ex. 34.

54.     This report states that four witnesses viewed this lineup, including Aby Gonzalez, Forrest Garnett, Fina Montanez, and Rosa Burgos—four of the same people who are listed in Erickson's lineup report. *Compare* Ex. 34 *with* Ex. 18.

55.     According to the Guevara lineup report, all four witnesses viewed the lineup and the results were negative. Ex. 34.

56.     In other words, Erickson's lineup report says that Aby Gonzalez viewed the lineup containing Johns and positively identified him. Guevara's lineup report says that Aby Gonzalez viewed the lineup containing Johns and did *not* identify him. *Compare* Ex. 34 *with* Ex. 18.

57.     According to the Guevara lineup report, Johns was the suspect, but the four fillers were different than those listed in Erickson's report. *Compare* Ex. 34 *with* Ex. 18.

58.     The four fillers listed on the Guevara lineup report are: Dewan Patterson, Carlos McFadden, Dwayne David, and Michael Robinson. CPD has *no* documents for any individuals

11

named Dwayne David. The criminal histories of Patterson and McFadden show that they were not arrested in June of 1991. Ex. 34 at RFC-Johnson 42; Ex. 26 at RFC-Johnson 25924 (no June 1991 arrests for Patterson), RFC-Johnson 25916-17 (no June 1991 arrests for McFadden).

59.     One of the individuals listed as a filler in Guevara's report, Carlos McFadden, has sworn under oath that he never stood in a lineup. Ex. 35.

60.     Defendant Guevara's lineup report is marked "Permanent Retention File." It lists a date submitted of June 12, 1991 at 11 p.m., but it was not approved by the Sergeant until July 24, 1991, and the date stamp on the report reflects that it was first received in central records on July 25, 1991. Defendant Guevara and Detective Erickson are listed as reporting officers. The signatures and stamps on Guevara's lineup report are as follows:





Ex. 34.

61. Every other report that lists a June 12 or June 13 date of submission was approved by a Sergeant the same day, and stamped as received in central records by June 16, 1991. Ex. 4 at RFC-Johnson 44-45 (submitted and approved June 13, stamp on second page shows received in central records June 14), 46-52 (submitted and approved June 13, stamp near bottom of each page page shows received in central records June 18), 54-57 (submitted June 13, approved June 15, stamp near bottom shows received in central records on June 18).

62. Defendant Guevara's report is contained in the Permanent Retention File. Ex. 36 at 4 (noting the CPD's Permanent Retention File is Bates stamped RFC-Johnson 38-87); Ex. 34 (Bates of Guevara lineup report is RFC-Johnson 40-43, within the range of the CPD Permanent Retention File, and containing "Permanent Retention File" stamp).

63. Guevara's lineup report was disclosed to prosecutors. Ex. 37 at CCSAO 7 (providing that the 6/12/91 lineup with "Little D" had "no ID"); Ex. 38 at 86:20-88:24; 90:11-91; Ex. 39 at 36:7-37:17 (Guevara lineup report with negative ID was part of the tendered file to State's Attorney and ASA Sheehan based his closing argument on it).

64. Defendant Daley wrote a report dated June 13, 1991 stating that a lineup had been conducted and that "no one was able to make a positive identification," and so Johns was released. Ex. 19.

65. There is no police justification for why two lineups featuring the same suspect would be conducted with the same eyewitnesses at nearly the same time. Ex. 23 at 19; Ex. 21 at 169:12-25.

66. Johns was released after the lineup without charging. There is no documentation of a single interview or interrogation of Johns. There is no evidence detectives made any effort to learn what Johns knew, what alibi he could provide, or any other information about his possible

13

involvement in, or knowledge about, the crime. Ex. 34 at RFC-Johnson 42 ("Johns was released with out charging."); Ex. 16 (absence of such information in June 13 initial scene report when Johns was in custody); Ex. 3 & Ex. 4 (absence of such information in the entire police files).

## VI.    The Erickson Lineup Report Was Not Disclosed to the Prosecution or Defense

67.    Detective Erickson's lineup report is not in the Permanent Retention File. And, Erickson's report does not have a Permanent Retention File stamp. Ex. 18; Ex. 36 at 4 (noting the CPD's Permanent Retention File is Bates stamped RFC-Johnson 38-87); Ex. 4 (absence of report in Permanent Retention File).

68.    Under CPD policy, the lineup report was supposed to be included in the Permanent Retention File. Ex. 40 at RFC-Johnson 26277-79 (CPD Standard Operating Policy 86-3).

69.    Defendant Erickson's lineup report was found in the Investigative File kept at the Area Five Detective Division during litigation in *Rivera v. Guevara*. Ex. 18; Ex. 36 at 4 (noting the CPD's Investigative File is Bates stamped RFC-Johnson 1-37); Ex. 3 (existence of report in Investigative File); Ex. 41 at Johnson 812-13, 814.

70.    The Investigative File contains a note to Halvorsen from prosecutor Sheehan instructing Halvorsen to "bring file." Ex. 3 at RFC-Johnson 12.

71.    Through the time of his conviction, Johnson had no knowledge whatsoever of the existence of the Erickson lineup report or the information contained in it. Ex. 2.

72.    Johnson's criminal defense counsel sent subpoenas and motions for discovery to the Police Department and the prosecutor's office to obtain all police reports and other evidence developed by the Chicago Police Department including any "street files." Ex. 42 (subpoenas); Ex. 43 at 11:6-12:21, 15:23-18:16.

73. Johnson's original defense attorney, Jack Carey, sent a motion for discovery requesting the prosecution inform him "as to whether any person has identified anyone other than the accused as the perpetrator or participant in the offense charged." Ex. 44 at Impound Evidence 331.

74. Johnson's criminal defense attorneys, former Cook County Judge Deborah Gubin and now-federal Magistrate Judge Ruth Miller, also testified unequivocally that they never had Erickson's lineup report. Former Judge Gubin testified that the defense "absolutely did not have Erickson's lineup report in preparation for Johnson's criminal trial or at any point during Johnson's criminal proceedings." Judge Miller testified that she is "absolutely certain" the defense never had the lineup report at any time during the criminal proceedings. Ex. 43 at 34:20-35:2; Ex. 45 at 75:11-18; 27:4-27:14.

75. Former Cook County Judge Kevin Sheehan, who was the trial prosecutor, testified unequivocally that the Erickson's lineup report was never disclosed to the prosecution:

> Q. And does the information in the transcripts we just reviewed, including your closing argument, confirm to you or give you confidence that you had not been provided a copy of [the Erickson Report of the 6/12/91 Lineup)?
> A. It's not the argument that gives me confidence. *What gives me confidence is the truth, I never got it.*

Ex. 39 at 43:7-15 (emphasis added); *see also id.*, at 39:7-24 ("I've never seen this document at the time of the trial. This is the first time I've seen that document with the person getting picked out.").

76. Prosecutor Sheehan's handwritten notes in the prosecutor file also indicate that he was told by Guevara that the June 12 lineup resulted in "no ID." Ex. 37 at CCSAO 7 (providing that the 6/12/91 lineup with "Little D" had "no ID"); Ex. 39 at 45:14-20 (his note referred to the

6/12/91 negative lineup report), 48:12-17 (received information in the State's Attorney file that there was no ID of Johns in the lineup report).

77.     If Prosecutor Sheehan would have had the Erickson lineup report, he would have, without question, turned it over to the defense immediately. Ex. 39 at 39:25-40:12 ("Q: If you would have had this [Erickson lineup report], you would have turned it over to the defense, right? A: Immediately. . . . Q: And you're certain that you would have turned it over, right? A: Without question.").

78.     Erickson's report is not in the permanent retention file, the prosecutor's file produced by the Cook County State's Attorney's Office, and was not disclosed to Johnson or his criminal defense attorneys. Ex. 32; Ex. 23 at 14.

79.     At Johnson's criminal trial, Guevara testified with his version of the lineup report, and contrary to Erickson's version: Guevara testified that Gonzalez and other eyewitnesses did not identify Johns. Guevara never acknowledged the existence of a separate lineup report written by Erickson stating that the lineup Guevara and Erickson conducted *did* result in the identification of Johns. Ex. 17 at B-73:22-74:9 ("Q. Counsel initially asked you about a number of people that you interviewed in connection with this case, among those were a Fina Montanez, a Forest Garnett and Abbey Gonzalez and a Rosa Burgos. You interviewed those people? A. I interviewed some of them, yes. Q. As a matter of fact those people stood and viewed *that negative first lineup*, did they not? A. *Yes, they did.* Q. That's the one with Brian Johns, aka Little D was in? A. That's correct.") (emphasis added).

80.     At the criminal trial, the Erickson report was not used in cross examination, and in fact there was no mention or reference at all to the Erickson lineup report, or a positive

16

identification of Johns by Aby Gonzalez or by any other witness. Ex. 8 (absence of such mention or reference in the entire trial transcript).

81.     The Erickson report was not referenced during Johnson's direct appeal or his post-conviction petition filed in 1996. In fact, Johnson's 1996 post-conviction petition explicitly asserted his innocence, but nowhere in that petition did Johnson mention the Erickson lineup report or the information contained in it. Ex. 46; Ex. 47.

## VII.     Defendant Guevara Does Not Deny That He Wrote a Fabricated Lineup Report and Suppressed Evidence of Aby Gonzalez's Identification

82.     When Defendant Guvara was asked whether in fact witnesses had identified Johns on the night of the shooting, and whether he concealed that fact by creating a false lineup report claiming that Aby Gonzalez (and other witnesses) did not select Bryan Johns, he invoked his Fifth Amendment right. Ex. 38 at 45:2-12 ("Q. In fact, at least three people who viewed that lineup identified Johns as the shooter, didn't they? A. I plead the Fifth. Q. And you told them that they got the wrong person, right? A. I plead the Fifth."), 18:25-19:7 ("Q: And one of the ways you concealed this critical evidence from Demetrius Johnson is that you created a false lineup report claiming that Aby Gonzalez and the other eyewitnesses did not select Bryan Johns from the lineup, right? A: I plead the Fifth.")

83.     When asked whether he concealed the fact that Aby Gonzalez viewed the lineup and identified Johns, Defendant Guevara pleaded the Fifth. Ex. 38 at 18:13-18 ("Q: And you concealed the fact that Aby Gonzalez viewed the lineup on the night of the crime and that he selected Brian Johns, correct? A: I plead the Fifth."), 19:8-20 ("Q: And in addition to creating a false lineup report, you hid the real lineup report written by another detective which stated that Aby Gonzalez had selected Bryan Johns, right? A: I plead the Fifth. Q: You buried that real lineup report so that it would never be seen by the prosecutors and criminal defense, didn't you?

A: I plead the Fifth."), 44:21-45:1 ("Q: And you concealed Aby Gonzalez's identification of Johns for decades, didn't you?" A: I plead the Fifth."), 106:14-23 ("Q. And you also falsely testified that Aby Gonzalez did not view a lineup on the night of the shooting, didn't you? A. Take the Fifth. Q. So you knew Aby had viewed a lineup and picked out Bryan Johns, didn't you? A. Take the Fifth.").

## VIII.   Defendants Suppressed the Identifications of Johns and Released Him Because He Was Cooperating with Defendants in a Different Homicide Investigation

84.     At the time he was identified in the Fred investigation, Johns was a cooperating witness who was working with Defendants Guevara and Halvorsen, so they were protecting him. Ex. 38 at 36:4-37:20 ("Q. Was Bryan Johns cooperating with you on other investigations? A. Plead the Fifth. Q. Were you conspiring with Bryan Johns as part of a criminal enterprise? A. Plead the Fifth."), 48:15-2.

85.     Defendant Halvorsen was involved in investigating the June 10, 1990 shooting death of Ramon Pagan. After initial investigation into the Pagan homicide came up with no leads, Area Five detectives found a new witness who was not identified in any of the original reports—Bryan Johns. Defendant Halvorsen interviewed Johns and allegedly learned that the shooter was a man known as "Baby Face." Halvorsen then conducted a lineup in which Johns purportedly identified Jose Baez, resulting in charges against Baez. Ex. 48 at 162766-68 (supplementary report reflecting Johns not initial witness), RFC162775-778 (supplementary report reflecting Johns became witness week later), RFC162779-162786 (supplementary reports showing Halvorsen arrests Baez and obtains Johns' identification of Baez).

86.     The prosecution of Baez was ongoing at the time of the Fred homicide investigation. Johns was called as the key prosecution witness in the Baez case, on July 17, 1991,

just over a month after he was arrested, identified and released in the Fred homicide investigation. Defendant Halvorsen testified about the Johns identification as a prosecution witness at Baez's trial. Baez was found not guilty at trial on a directed verdict finding by the Court. Ex. 49 at 28-46, 49-54; 54:24-55:7.

87.     None of this information about Johns' cooperation in the Pagan investigation against Baez was documented in the Fred homicide files, or mentioned at any point at Plaintiff's criminal trial. Ex. 3 & Ex. 4 (omitted from police files), Ex. 154 (no mention in prosecution file); Ex. 8 (absence of such information at trial).

## IX.     <u>Defendants Fabricate Identifications from Ricardo Burgos, Elba Burgos, and Rosa Burgos</u>

88.     Contained in the CPD file for the Fred homicide investigation is a supplementary report dated July 17, 1991. The report lists the reporting detectives as Defendants Halvorsen and Guevara. Both of their signatures are on the report. The report was reviewed, approved and signed by Sergeant Epplen. Ex. 50 at RFC-Johnson 68, 70.

89.     Contained in the CPD file for the Fred homicide investigation is a closing report dated July 23, 1991. The report lists the reporting detectives as Defendants Halvorsen and Guevara. Both of their signatures are on the report. The report was reviewed, approved and signed by Defendant Healey. Ex. 6 at RFC-Johnson 76, 80.

90.     According to the July 17 supplementary report, on July 11, 1991, Defendants Guevara and Halvorsen interviewed Elba Burgos and showed her a five-person photo array, in which Elba stated that the person she saw run by after the shooting "resembled" one of the people in the photo array, Darrell Johnson. A photo of Darrell's younger brother, Plaintiff Demetrius Johnson, was then obtained from Defendant Daley. The photo contained Demetrius

Johnson, and two others. On July 15, that photo was then shown to Elba Burgos, who identified Demetrius Johnson. Ex. 50 at RFC-Johnson 70.

91.     According to the July 23 closing report, after Elba's photo identification, on July 22, 1991 Johnson was arrested and brought to Area 5, where he was positively identified in lineups by Elba, Rosa, and Ricardo Burgos. Ex. 51 at RFC-Johnson 76-78.

92.     Defendants Guevara and Halvorsen also prepared a lineup report dated July 22, 1991, containing both of their signatures, which was reviewed, approved and signed by Defendant Healey. The report states that Elba, Rosa, and Ricardo Burgos all identified Johnson from a live lineup. It also states that Angel and Victor Cordova viewed the lineup, but does not indicate that either of them made an identification. Ex. 51 at RFC-Johnson 72, 74.

**A. Defendants Fabricated an Identification from Elba Burgos**

> *Elba Burgos never saw the shooter's face and could not make an identification without being told who to pick.*

93.     Elba Burgos was not initially identified as a witness. She was first mentioned as a witness in Guevara and Halvorsen's July 17, 1991, more than a month after the crime. No explanation is contained in the police file for how Guevara identified Elba Burgos as a witness a month later. Ex. 50 at RFC-Johnson 70.

94.     Elba Burgos testified that she was on her front porch on Claremont on the East side of the street, when she heard shots. She did not see the shooting. She looked up and saw someone running southbound down the sidewalk on the opposite side of the street. Ex. 50 at RFC Johnson 70 (sitting on her front porch, saw a person with a gun running down the sidewalk on the West side of street); Ex. 52 at A-100:19-101:2 (the person running was on the other side of the street).

95.     The person she saw was running the whole time. At no point did Elba testify that the person ever stopped and looked up at her. Ex. 52 (absence of any testimony about the person running ever stopping or looking over in her direction); *id*. at A-98:14-23.

96.     She had only four to five seconds to see the person's face. She was also looking at the gun in the person's hand as he ran by. Ex. 52 at A-110:18-20, A-111:18-112:2.

97.     She could only see the side of the shooter's face. Ex. 52 at A-101:8-13.

98.     From Elba's front porch to the person she saw running on the other sidewalk, there were: concrete steps in front of her porch, and then several steps to the yard fence, then the sidewalk, then the grassy area before the curb, and then a street wide enough for cars to park on both sides, and then another grassy area on the other side of the street before the sidewalk. Ex. 52 at 98:24-101:2.

99.     This distance from Elba's porch to the sidewalk on the opposite side of the street is greater than 60 feet.



https://www.google.com/maps/place/1535+N+Claremont+Ave,+Chicago,+IL+60622/@4
1.9095777,-
87.6861167,21z/data=!4m6!3m5!1s0x880fd2bb0f072c99:0xa77d7f27010a5c51!8m2!3d4
1.9095638!4d-87.6856714!16s%2Fg%2F11c181t_8w?entry=ttu.

***Elba Burgos could not provide any description of the person she saw running down the street
when she was first interviewed by Defendants.***

100.     According to Defendants Guevara and Halvorsen's July 17 report, they
interviewed Elba Burgos on July 11, 1991, a month after the shooting. This is the first
documented interview of Elba Burgos, and the first time her name appears in the file. No
explanation is contained in the police file for how Guevara identified Elba Burgos as a witness
a month later. She was not identified as a witness on the night of the crime or during the initial
canvas. Ex. 50; Ex. 3 & Ex. 4 (absence of any other report in the police file of an interview of
Elba Burgos before July 17 report documenting a July 11 interview).

101.     Defendants Guevara and Halvorsen's July 17 report does not indicate that, other
than "male black," Elba Burgos provided any other description of the person she saw running by.
Ex. 50 at RFC-Johnson 70.

102.     According to Guevara and Halvorsen's July 17 report, after seeing the person
with a gun running by, Elba Burgos "followed him to see where he was going and lost [sic] on
Western Ave." Elba testified at trial that this was false; she did not follow the person or go
looking for him. Ex. 50 at RFC-Johnson 70; Ex. 52 at A-102:24-103:3.

103.     Defendant Guevara took notes of his conversation with Elba Burgos on a general
progress report. Ex. 17 at B-58:20-59:2; *cf.* Ex. 17 at B-42:10-20 (Guevara would write
handwritten notes, called progress reports, on which his typed reports were based).

104.     The CPD file contains no General Progress Reports or other notes of this
interview. And the general progress report of Guevara's interview of Elba Burgos was not

tendered to the prosecution or defense. Ex. 3 & Ex. 4 (absence of any such notes in the police files); Ex. 17 at B-59:3-13 (stipulated by prosecution they had not received them from CPD).

***Defendants fabricated photo array and lineup identification of Johnson from Elba Burgos.***

105.    During the interview of Elba Burgos, Defendants Guevara and Halvorsen also showed her a five-person photo array containing a photo of Darrell Johnson, the older brother of Demetrius Johnson. Ex. 50 at RFC-Johnson 70; Ex. 53 at IMPOUND EVIDENCE 402-403; Ex. 52 at A-94:15-95:15.

106.    The police file contains no explanation of how or why Defendant Guevara decided to include Darrell Johnson's photo in this array in the first place. Ex. 3 & Ex. 4 (absence of such information in police files).

107.    Instead, when asked at trial how he selected the five photos used in the photo array, Guevara testified that it was random: he "just chose five male blacks." Ex. 17 at B-65:15-17.

108.    However, Darrell Johnson's records, including his criminal history and identification photo, was requested by Detective Maher, another Area 5 detective in 1991, on June 15, 1991, just three days after the Fred shooting. But Darrell Johnson had not been arrested for any crime on or around June 15, 1991. Ex. 54 at RFC-Johnson 32448, RFC-Johnson 32450; Ex. 55 at 14:7-10; https://cpdp.co/officer/16973/richard-maher/ (joined Detective Division Area 5, Unit 652, prior to 1991).

109.    Moreover, when Elba Burgos was shown the photo array containing Darrell Johnson, Guevara singled out Darrell Johnson's photo from the array and "asked if it was this one." Ex. 52 at A-95:5-15.

110.     Defendants Guevara and Halvorsen's July 17 report states that when they showed Elba the photo array she said the photo of Darrell Johnson "resembled" the person that ran down Elba's street. But at trial, Guevara claimed for the first time that Elba had said the person running by looked "a little younger." *Compare* Ex. 50 at RFC-Johnson 70 *with* Ex. 52 at A-95:5-15.

111.     According to Guevara and Halvorsen's report, they knew Darrell Johnson had a younger brother, and contacted Defendant Daley, who then gave them a Polaroid photo, which contained a picture of Demetrius Johson and two other Black males. There is no earlier mention of Plaintiff at any point, or on any other basis. Ex. 50 at RFC-Johnson 70.

### *The photo and photo array shown to Elba Burgos were unduly suggestive.*

112.     Based on the initial interviews of witnesses at the scene, Defendants knew the Black male had been described as being short, and relatively young. Indeed, the original suspect, Bryan Johns, was just 15 years old and 5'6". Ex. 15 ("M, 1, 17" or male, Black, 17 years old); Ex. 16 at RFC-Johnson 48; Ex. 34 at RFC-Johnson 42.

113.     Guevara admits that based on their interviews of witnesses the Defendants were looking for a short, young Black male. Ex. 17 at B-39:5-8, B-65:24-66:3.

114.     In the five-person photo array, only Darrell Johnson was even arguably close to the age of a juvenile. The other four witnesses all appeared to be middle-aged or older. For several of them, the date of arrest was visible and showed that the photo had been taken years earlier (in one case 1980), revealing to the witness that the individuals were even older at the time of the shooting in 1991. Ex. 53.

115.    Darrell's photo:



The others:

25





Ex. 53.

116.    Detectives had access to photobooks and drawers full of photos to be able to

gather photos of similar looking individuals to their suspect to make fair photo arrays. Ex. 56 at

74:15-85:12; Ex. 57 at 101:15-102:22 (Area 5 had a drawer and room full of photos for use in

photo arrays); Ex. 58 at 272:5-9.

117.    Elba acknowledged that the four additional individuals in the photo array were all

too old to be the person she saw in June 1991. Ex. 52 at A-106:2-18.

118.    When Defendants Guevara and Halvorsen returned on July 15 with the single

photo they received from Defendant Daley, it contained just Demetrius Johnson and two others.

27

Demetrius Johnson was the youngest and by far the shortest person in the photo, and he was the only one who was a sibling of Darrell Johnson and resembled him closely:



Ex. 59.

119.    According to Guevara and Halvorsen's report, Elba Burgos identified Demetrius Johnson as the person she saw run past her with a gun. The report does not indicate how confident she was in her purported identification. Ex. 50 at RFC-Johnson 70.

120.     Elba Burgos agrees that Demetrius Johnson appeared younger and shorter than the other two people in the photo. Ex. 52 at A-106:19-107:8.

### B.     Defendants Fabricated an Identification from Ricardo Burgos

***The only information Ricardo Burgos could provide was that the shooter he saw was a Hispanic male, not a Black male like Demetrius Johnson.***

121.     Ricardo Burgos was not initially identified as a witness. He was first mentioned as a witness in Guevara's June 23, 1991, report more than a week after the crime, without any indication of how he came to be a witness. This report also documents an interview with Fina Montanez, in which she said the shooter was Black or Latino. Neither witness implicated Johnson. Ex. 60 at RFC-Johnson 60.

122.     When Ricardo Burgos was first interviewed by Defendant Guevara, he identified the shooter as being a "male Hispanic," who he saw "pulling out a big gun from his waist" and then shoot at Edwin Fred and Raul Ortiz. Ex. 60 at RFC-Johnson 60; Ex. 17 at B-52:5-7.

123.     Ricardo Burgos provided no further description of the perpetrator, nor did he indicate that he ever saw a Black male perpetrator at all. Ex. 60 (absence of such information in report of interview of Ricardo Burgos).

124. Demetrius Johnson was not Hispanic, nor did he remotely look Hispanic. He was a dark-skinned Black male. This is a picture of Demetrius Johnson from that time:



Ex. 61.

***Ricardo Burgos never saw the shooter's face and could not make an identification without being told who to pick.***

125. Ricardo Burgos was in a car driving East on North Avenue when he heard the shooting. He did not see the actual shooting; he only heard the shots and saw a man running South on Claremont Avenue, who he assumed was the shooter. The person was running directly away from him and so he only saw this person from behind. Ex. 62 at ¶¶3-4; Ex. 63 at 17:10-20:14, 37:21-38:14.

126. The person he saw was 60-70 feet away. Ex. 63 at 18:1-3.

127. Ricardo has given a sworn declaration and testified at his deposition that he did not see the shooter's face and could not make an identification. Ex. 62 at ¶¶4, 10. Ex. 63 at 7:10-20:14, 37:21-38:10, 38:11-14 ("Q. And if the police said that you could have identified that shooter, that would've been false, correct? A. Correct.").

128.    After the shooting, Burgos got out of the car to see if he could help the victim. It turned out to be someone he knew, Edwin Fred. He stayed around and was there when officers arrived at the scene and were asking people what they saw. Ricardo told police at the scene that he heard the shots and saw someone running away, but did not see the person's face.  Ex. 62 at ¶5.

129.    The only way Ricardo could have made an identification is if the Defendants told him who to pick. Ex. 63 at 38:5-14, 92:22-94:3 ("Q. So if you identified someone, it was someone the police told you—were telling you did the crime, correct? A. Correct. Yes.").

### *Defendants fabricated a photo array identification of Demetrius Johnson from Ricardo Burgos.*

130.    At Demetrius Johnson's criminal trial, Defendant Guevara testified that he showed Ricardo Burgos a photo array on June 21, 1991, in which Ricardo Burgos identified Plaintiff Johnson. Ex. 17 at B-52:20-23.

131.    But there is no documentation in the entire police file that Ricardo Burgos was ever shown a photo array at any point. Showing a photo array is something that was important enough that it should have been documented, if it actually occurred. Ex. 3 & Ex. 4 (absence of such information in homicide files); Ex. 17 at B-54:19-24 (Guevara testifies that showing a photo array would be important enough to document in a supplemental report); Ex. 73 (City 30(b)(6) designee) at 91:7-20 and Ex. 58 (City 30(b)(6) designee) at 239:6-19 (both positive and negative identifications always documented as a matter of training and practice).

132.    Demetrius Johnson did not even become a suspect in the case until mid-July, 1991, when Elba Burgos purportedly indicated that the perpetrator "resembled" Darrell Johnson, and so Defendants then focused on Darrell's brother Demetrius. *See supra* at ¶110.

***Defendants concealed the identity of the person Ricardo Burgos actually identified in June 1991.***

133.     Ricardo Burgos testified at the criminal trial, consistent with Defendant Guevara, that he identified someone from photos "a couple of days after" the shooting. Ex. 64 at A-71:11-72:6.

134.     At that time, the only person who was a suspect in the case was Bryan Johns. Ex. 3 & Ex. 4 (absence of any suspects identified in the police files in the first few weeks of the investigation, other than Bryan Johns).

135.     Nowhere in the police file did Defendants document Ricardo Burgos' positive identification of Johns, or anyone else, in June of 1991. Ex. 3 & Ex. 4 (absence of such information in police file).

### C.     Defendants Fabricated an Identification from Rosa Burgos

***Rosa Burgos never saw the shooter's face and could not make an identification without being told who to pick.***

136.     Rosa Burgos was in a building walking down a staircase behind Raul Ortiz. Raul had just stepped out of the door when he got shot. Rosa was behind him, and immediately her eyes went to the gun. She wanted to get out of there, so she "closed the door immediately" and "ran upstairs." Ex. 65 at RFC-Johnson 64, Ex. 24 at A-45:13-47:13.

137.     Rosa had just four seconds to see the shooter before running back upstairs, during which the shooter had a gun pointed in the direction of her and Ortiz. Ex. 24 at A-37:18-23.

138.     Rosa told police "everything happened so fast and that she wasn't sure" who the shooter was. Ex. 66 at B-12:5-10 (Rosa admitted this to PD Jack Carey when he interviewed her before trial); Ex. 25 (Carey notes of Rosa interview)); Ex. 24 (Rosa does not dispute that she told Carey this).

139. Rosa provided police with no description of the shooter's physical appearance. Ex. 24 at A-49:6-50:4.

140. Rosa admitted that when she was interviewed by Johson's criminal defense attorney, she said that she "had trouble distinguishing between black people because all those people look alike." Ex. 24 at A-55:6-10.

### D. Defendants Fabricated Lineup Identifications from Ricardo, Rosa and Elba Burgos
***The lineup was unduly suggestive and designed to obtain a false identification of Plaintiff***

141. The live lineup shown to Ricardo, Rosa and Elba Burgos consisted of the following individuals:



Ex. 67.

142. Unlike the Erickson lineup report, the July 22 lineup report submitted by Defendants Guevara and Halvorsen does not indicate that it was shown to each witness separately. Ex. 51 at RFC-Johnson 74.

143. Demetrius Johnson was, again, the shortest person in the identification procedure. He was 5'5"; two of the others were listed as 5'9" and 5'10". Ex. 51 at RFC-Johnson 74.

144. The lineup participants were not wearing shirts, but the police file contains no explanation for why the participants were instructed to be shirtless for the lineup. Ex. 51 (absence of such information in the lineup report); Ex. 3 & Ex. 4 (absence of such information in the entire police file).

145. Demetrius Johnson was the only person in the lineup with a visible tattoo. Ex. 67 at RFC-Johnson 95, 98.

146. Because the earliest indications from witnesses, including on the simulcast, were that the perpetrator was a member of the Maniac Latin Disciples street gang, the presence of a tattoo on only Plaintiff Johnson, along with Johnson being the youngest and shortest person in the lineup, would have stood out and biased the lineup against him. Ex. 128 at 17.

### *The lineup identifications of Ricardo, Rosa, and Elba Burgos were fabricated*

147. Given that Elba had not been initially identified as a witness at all, had not seen the shooting, and had only seen the side of the face of a person running down the sidewalk on the other side of the street, the positive lineup identification of Plaintiff Johnson documented in Guevara and Halvorsen's lineup report and closing report was fabricated. *See supra* at ¶¶93-120.

148. Given that Ricardo had initially identified the perpetrator as being Hispanic, had not seen the shooter's face, had previously identified someone other than Johnson as the perpetrator, and could only have made an identification of Johnson if the police told him to pick,

the positive lineup identification of Plaintiff Johnson documented in Guevara and Halvorsen's lineup report and closing report was fabricated. See supra at ¶¶121-135.

149.     When Rosa Burgos was interviewed by Public Defender Jack Carey before trial about her July 22, 1991 lineup identification, Rosa told Carey that she did not make a positive identification but instead told the police she was unsure. All she could say was that the person in the lineup looked similar to the shooter, not that he was the shooter. Ex. 24 at B-12:19-B-13:11; Ex. 25.

150.     According to Public Defender Jack Carey's notes, Rosa informed him that when she viewed the July lineup, Defendants Guevara and Halvorsen asked her "which one you going to pick." Carey's notes state—twice—that at the July lineup Rosa told the police that she was "NOT SURE." Ex. 25.

151.     In addition, Rosa Burgos told PD Carey that she had already attended an earlier lineup on the night of the shooting. At that lineup, three individuals had already identified someone else and she was told by police that they had the wrong guy. Ex. 24 at B-12:2-18; Ex. 25.

152.     All of this information—that Rosa Burgos had told police that it all happened so fast and she wasn't sure who the shooter was; that she had been unsure when she viewed Plaintiff Johnson in a lineup; that she had been asked "which one you going to pick" to implicitly create a requirement that she select someone; that she had said to them that Johnson looked similar to the shooter, not that he was the shooter, and that she had been told that the person identified on the night of the shooting was the wrong guy—was omitted from Defendants Erickson, Guevara, and Halvorsen's police reports in the police files. Ex. 3 & Ex. 4 (absence of such information in police files).

**X.    Defendant Guevara Does Not Deny That Defendants Fabricated Identifications from Ricardo, Rosa and Elba Burgos**

153.    Guevara pleaded the Fifth Amendment when asked whether he fabricated Elba Burgos' identification. Ex. 38 at 27:4-9 (Elba did not give police a description of shooter when she first spoke to them), 29:8-14 (impossible for Elba to make an identification), 30:2-7 (Elba said she could not give good description of the shooter and could not identify him), 56:1-11 ("what you showed Elba was not a proper photo array, was it?"), 58:10-59:12 (told Elba to pick Demetrius Johnson out of the photo lineup, knew that the photo identification procedure was improper, did not disclose that he manipulated Elba into picking Demetrius Johnson, and intentionally wrote a false report about Elba's identification), 64:18-65:13 (tainted Elba's live lineup identification and intentionally suppressed true circumstances of identifications).

154.    Guevara pleaded the Fifth Amendment when asked whether he fabricated Ricardo Burgos' identification. Ex. 38 at 29:8-25 (impossible for Ricardo Burgos to identify the shooter, Ricardo told Guevara he could not identify the shooter), 53:17-21 (Ricardo Burgos could not make an identification); 79:10-15 ("Q: The only reason Ricardo Burgos selected Demetrius Johnson out of the lineup was because you told him to, right? A: Plead the Fifth."), 91:10-92:15 (closing report falsely states that Ricardo Burgos identified Demetrius Johnson); 107:23-108:4 (falsely testified at trial that Ricardo Burgos picked Johnson out of a lineup without influence).

155.    Guevara pleaded the Fifth Amendment when asked whether he fabricated Rosa Burgos' identification. Ex. 38 at 29:8-25 (impossible for Rosa Burgos to identify the shooter, Rosa told Guevara she could not identify the shooter), 82:6-11 ("Q: And the only reason Rosa Burgos picked Demetrius Johnson out of the lineup was because you told her to, correct? A: Plead the Fifth."), 91:10-92:20 (closing report falsely states that Rosa Burgos identified

Demetrius Johnson out of a live lineup), 107:23-108:4 (falsely testified at trial that Rosa Burgos

picked Johnson out of a lineup without influence).

XI.  **Professor Dysart's Opinions Regarding the Eyewitness Identifications of Elba Burgos, Ricardo Burgos, and Rosa Burgos**

156.  By 1992 and 1993, the International Association of Chiefs of Police Law

Enforcement Policy Center was releasing papers and model policies that were premised on the

inherent unreliability of eyewitness identification procedures. As the IACP papers in 1992 and

1993 noted, "Police frequently rely on eyewitness identifications. Unfortunately, civilian

eyewitnesses frequently prove to be unreliable observers, and erroneous identifications are often

the result. Misidentifications by eyewitnesses are normally the result of a combination of

factors." Both papers explained the primary reasons that eyewitness identifications were

"frequently unreliable": frailties of human memory and perception, especially under stress; and

the ease with which eyewitnesses could be influenced by suggestion. Ex. 23 at 24-25.

157.  Dr. Jennifer Dysart, Plaintiff's retained expert in eyewitness identifications,

identified several factors that rendered the identifications of Elba Burgos, Ricardo Burgos, and

Rosa Burgos unreliable and generally increased the likelihood that they would identify an

innocent person. *See generally* Ex. 128. Each of these factors alone would negatively impact the

identifications, but taken in combination, they further undermine the identifications. Ex. 128 at

10-15.

158.  First, each witness had a limited opportunity to view the shooter's face.

Dr. Dysart referenced the following: that Elba Burgos testified that she saw the shooter's face for

4-5 seconds, that Rosa Burgos testified that she saw the shooter's face for about 4 seconds, and

that Ricardo Burgos repeatedly testified that he did not see the shooter's face. According to

Dysart, these factors make it extremely difficult for a witness to observe/remember (encode) a

perpetrator's face and make an accurate identification. Where, as here, the duration of viewing opportunity was less than 12 seconds, the likelihood of a false identification of an innocent person increased to 90%. Ex. 128 at 11-12.

159. Second, all three witnesses had limited opportunity to view and identify the shooter's face because they observed the shooter's weapon, which created a weapon focus effect. Rosa Burgos stated that she looked at the shooter's gun first, then looked at the shooter's face. Ricardo Burgos told police that he saw a Hispanic male pull a big gun from his waist and shoot Mr. Ortiz and Mr. Fred. Elba Burgos told police she heard gunshots and saw a person run past with a gun in his hand. In other words, Dr. Dysart observed, it appears that all of these witnesses looked at the gun or toward the gun for a period of time during their observations, and "attending to the weapon impairs memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited." Ex. 128 at 12.

160. Third, Ricardo and Elba Burgos viewed the shooting at a significant distance: Ricardo Burgos testified that the shooter was 60-70 feet away, and Elba Burgos' distance from the shooting was estimated to be 25 feet. According to Dr. Dysart, the distance of Ricardo and Elba Burgos from the shooting is a relevant estimator variable, as "distance can significantly impact a person's ability to view the details of another person's face." Ex. 128 at 12-13.

161. Fourth, Rosa Burgos testified that she was scared and upset when she saw Mr. Ortiz get shot. The stress/arousal experienced by Ms. Burgos could have significantly reduced the reliability of her eyewitness identification. Ex. 128 at 13-14.

162. Fifth, cross-race identification is a relevant factor to consider in this case, as all three witnesses who selected Mr. Johnson at trial are White Hispanics and Mr. Johnson is Black

and non-Hispanic. At trial, Rosa Burgos testified that she had difficulty distinguishing Black people because they all look alike to her. Cross-race identifications are 1.56 times more likely to lead to misidentifications. Ex. 128 at 14.

163. Sixth, there was a significant time delay between the shooting of Mr. Ortiz and Mr. Fred and the identification of Mr. Johnson by all three witnesses. The shooting occurred on June 12, 1991. Elba Burgos first viewed Mr. Johnson as a suspect on July 15, 1991, Rosa Burgos first viewed Mr. Johnson as a suspect on July 22, 1991, and it is unclear when Ricardo Burgos first viewed Mr. Johnson as a suspect. Dr. Dysart noted that "memory decreases relatively quickly after an event and then continues to decrease with the passage of time." Ex. 128 at 14-15.

164. Dysart also noted a number of variables that occurred during the identification procedures themselves that rendered the identifications unreliable and inflated the witness's confidence in their own identifications. Ex. 128 at 15-25. Those include:

165. Post-event contamination: Ricardo Burgos initially indicated that the shooter was a Hispanic male, yet at trial he testified that Mr. Johnson, a Black male, was the shooter. All three witnesses were together preparing for their testimony, and likely heard information regarding the event from others. Witness memories can be altered by information learned after the event, and given that the witness's descriptions of the shooter changed over time, this suggests their memories were contaminated. Ex. 128 at 15-16.

166. Description "Accuracy": There is very little to no description of the perpetrator associated with the three witnesses who selected Mr. Johnson at trial: Ricardo Burgos initially told police that the perpetrator was a Hispanic male, Rosa Burgos did not give any description of the perpetrator on the night of the shooting, and Elba Burgos simply identified the perpetrator as a Black male. Dr. Dysart states that "The lack of detail in the various witness' descriptions of the

shooter should have been a red flag for investigators that these witnesses did not have a strong memory for the shooter and would therefore not likely be reliable eyewitnesses in the investigation." Ex. 128 at 16-17.

167.    Photo Array and Lineup Bias: Elba Burgos identified Mr. Johnson as the perpetrator based on a Polaroid photo of only three people, in which Mr. Johnson was the shortest and in the middle position. This photo did not include careful selection of fillers, as is necessary to conduct unbiased identification procedure. A properly constructed lineup should include a minimum of five fillers, none of whom should stand out—the opposite of the "photo array" in this case. Ex. 128 at 17-18.

168.    Ultimately, Dr. Dysart opines: "After being selected from an unnecessarily suggestive procedure (the Polaroid or the lineup) the results from any subsequent procedure (e.g., in-court) are relatively meaningless. That is the bias from the first suggestive procedure renders any second procedure's outcome irrelevant for the purposes of determining witness accuracy." Ex. 128 at 18.

169.    In the July 22, 1991 live lineup, Mr. Johnson was again the shortest person in the lineup. Additionally, all of the participants in the lineup are shirtless and Mr. Johnson is the only individual with a tattoo. Dr. Dysart stated that "with respect to the lineup in this case, there was a very strong likelihood that the witnesses would select Mr. Johnson from the procedure." Ex. 128 at 17-18.

170.    Pre-identification Warnings/Instructions: Failing to tell a witness that the perpetrator may or may not be present implies that the perpetrator is in the identification task, which encourages witnesses to make a selection and leads to an increase in identification errors,

Ex. 128 at 18-19. There are no records in this case suggesting that witnesses were provided with pre-identification instructions.

171.     Non-blind Lineup Administration: The detectives who conducted the identification procedures in this case knew Mr. Johnson was the suspect, so the procedure was non-blind. In one study, witnesses were more than two times as likely to pick an innocent person from a photo array when the identification procedure was non-blind. Ex. 128 at 19-20.

172.     Repeated Identification Procedures, Unconscious Transference and Commitment Effects: Elba and Ricardo Burgos both viewed Mr. Johnson in a 3-person Polaroid and later selected him in a live lineup and at trial. "Research shows if an individual has been selected in one identification procedure, that person is considerably more likely to be selected in a subsequent procedure regardless of whether or not they are the actual perpetrator." By the time an identification is made in court, it is "mere theater." Ex. 128 at 20-22.

173.     Poor Witness Confidence: Because there is no contemporaneous documentation of the witness's confidence levels at the time they made their first identification attempts, their post-hoc statements about their confidence are relatively meaningless. Ex. 128 at 22-23.

174.     Post-Identification Feedback: Rosa Burgos stated that in the first lineup she viewed on the night of the shooting, three witnesses were told by police that they had picked the wrong person. Post-identification feedback or confirmation of an identification decision can lead a witness to believe that they had a better opportunity to see a perpetrator than was actually the case. Ex. 128 at 23-25.

**XII.     Defendants' Retained Expert, Dr. John Wixted, Opines about Eyewitness Identifications**

175.     Defendants' retained expert in eyewitness identifications and memory, Dr. John Wixted, opines that both Cordova's and Elba Burgos' purported identifications of Demetrius

Johnson from the three-person photo are not probative of guilt. Wixted observes that Cordova's purported identification from the three-person photo followed by his negative lineup identification is "scientifically inexplicable" and therefore uninformative. Ex. 129 at 7.

176.    Wixted also says Elba Burgos' purported identification of Demetrius Johnson from the three-person photo is also of little probative value because she had already seen a photo of someone who she thought looked like the shooter (Darrell Johnson). Ex. 129 at 7.

## XIII.    Defendants Ignore Strong Leads Pointing to Other Suspects Because Their Intent Was to Frame Demetrius Johnson

177.    On June 29, 1991, Officers Crespo and Roman received a phone call from a man named Juan Lopez, who stated that he had observed the Fred murder and followed the shooter to an apartment above a tire shop at LeMoyne and Western. Ex. 138.

178.    Lopez described the shooter as 5'7", 20 years old, and 150 lbs. Ex. 138.

179.    On that same day, officers arrested a man named Robert Weeks for disorderly conduct. Weeks fit the description of the shooter. Ex. 138.

180.    The officers conducted a follow-up investigation and learned that Weeks frequented the apartment above the tire shop at LeMoyne and Western. Ex. 138.

181.    This information was turned over to Defendant Halvorsen. Halvorsen came to the Fourteenth District and the investigation was turned over to him. Ex. 138.

182.    Defendant Guevara admits that they interviewed Weeks. However, he did not document the interview, and the police file contains no information about the interview or any other follow up investigation of Weeks. Guevara suppressed evidence of the investigation into Weeks. Ex. 17 at B-55:5-10; Ex. 3 & Ex. 4 (absence of such information in police files); Ex. 38 at 20:1-6 ("Q. You concealed evidence of your investigation into another person named Robert Weeks, correct? A. I Plead the Fifth.").

## XIV.    Angel Cordova

183.    Angel Cordova had been brought to Area 5 on the night of the shooting. The Erickson lineup report indicates that Angel Cordova viewed the six-witness lineup containing Johns that night. However, there is no documentation in the police file of what Angel Cordova told Defendants he saw and heard when he was at Area 5 that night. Ex. 18; Ex. 3 and Ex. 4 (absence of documentation of Cordova interview from the night of the crime in the entire police file).

184.    According Guevara and Halvorsen's July 17 report, however, they re-interviewed Angel Cordova around July 15, at which time he stated that he had been standing on the *back* porch of his apartment at 2325 North Avenue. The shooting occurred in *front* of 2345 W. North Avenue, so Angel was on the wrong side of his apartment to see the shooting. Nevertheless, Guevara and Halvorsen showed him the same 3-person photo that they showed Elba Burgos. The report states that Cordova identified Demetrius Johnson as the shooter. Ex. 50 at RFC-Johnson 68, 70 (Cordova was '"standing on [his] back porch when the shooting took place'").

185.    Based in part on Angel Cordova's purported identification, the defendants submitted a stop order for Demetrius Johnson for the murder of Edwin Fred. Ex. 50 at RFC-Johnson 70.

186.    Defendants Guevara and Halvorsen then had Angel Cordova view the same live lineup viewed by Ricardo, Elba and Rosa Burgos that included Plaintiff. Cordova did not identify Plaintiff. Ex. 17 at B-69:21-70:4; Ex. 51 at RFC-Johnson 74. He was not called at trial. Ex. 8 (absence of Cordova testimony from complete trial transcript).

187.    Defendants' retained expert in eyewitness identifications and memory, John Wixted, notes that "fillers IDs and lineup rejections provide evidence (not proof) that the suspect in the lineup is innocent." Ex. 129 at 7.

188.     The CPD file does not contain any contemporaneous notes, GPR's or details of Cordova's interview with Guevara and Halvorsen. The July 22 lineup report also contains no information about what Cordova said at the live lineup; it simply says nothing about whether Angel indicated the shooter was not in the lineup, or he could not tell. Ex. 51; Ex. 3 & Ex. 4 (omitted from police files).

## XV.     Defendants' Reports Contain Fabricated Information and Johnson is Charged Based on this Fabricated Information

### *Defendants' Fabrication of the June 12 Guevara Lineup Report Regarding Bryan Johns.*

189.     Defendants Guevara and Erickson wrote and signed a June 12 lineup report, approved by Defendant Healey, stating that the six-person lineup viewed on the night of the shooting resulted in no identifications of Bryan Johns. Ex. 34.

190.     However, this information was false, given the Erickson lineup report stating that Aby Gonzalez had identified Johns, Rosa Burgos' statement that multiple people had made an identification that night, and the multiple individuals listed as fillers in the Guevara lineup report who stated that they were not in a lineup that night, and/or for whom the City has no records to show they had been arrested or at the police station that night. *See supra* ¶¶36-41, 57-59, 151.

### *Defendants' Fabrication of the June 20 Supplementary Report Regarding Rosa Burgos.*

191.     Defendant Guevara wrote a supplementary report submitted on June 20, 1991, approved by Defendant Healey, purporting to document an interview of Rosa Burgos and Victor Cordova, who had not previously been identified as a witness. The report states that Rosa Burgos told the detectives she could make an identification of the person who shot Raul Ortiz. Victor did not see the shooting, and could say only that after the shooting he saw a Black male with a gun running away. Ex. 65 at RFC-Johnson 64; Ex. 3 & Ex. 4 (Victor Cordova is not mentioned in the entire Fred police files until June 20, 1991).

44

192.     However, Rosa could not make an identification of the person she saw for a brief moment from behind Raul Ortiz, before turning around and running back upstairs. Rosa stated that it all happened so fast that she could not make an identification, and that she had a hard time distinguishing among Black people because "all those people look alike." *See supra* ¶¶136-140.

***Defendants' Fabrication of the July 17 Supplementary Report Regarding Elba Burgos.***

193.     Defendants Guevara and Halvorsen wrote a supplementary report submitted on July 17, 1991, purporting to document an interview of Elba Burgos. The report states that Elba Burgos told the detectives she could make an identification of the person she saw running on the night of the shooting, more than a month earlier. Ex. 50 at RFC-Johnson 70.

194.     However, Elba was not even identified as a witness until mid-July, a month after the shooting. She did not provide any detailed description of the shooter, and Elba could not make an identification of the person she saw running down the sidewalk across the street, from the side and with just a few seconds to observe him. And although Defendant Guevara took notes of his conversation with Elba, there are no notes contained in the police file indicating that Elba ever told Defendants that she could make an identification. *See supra* ¶¶93-104.

195.     The July 17 supplementary report also purported to document that Elba Burgos was shown a photo array in which she independently selected Plaintiff's brother Darrell Johnson as "resembling" the person Elba saw running down the street. Ex. 50 at RFC-Johnson 70.

196.     However, the photo of Darrell Johnson was actually singled out, and Elba was "asked if it was this one." *See supra* ¶¶105-111.

45

***Defendants' Fabrication of the July 22 Lineup Report.***

197.    Defendants Guevara and Halvorsen wrote a supplementary report submitted on July 22, 1991, approved by Defendant Healey, claiming that Ricardo, Rosa and Elba Burgos all positively identified Demetrius Johnson from a lineup. Ex. 51.

198.    However, Ricardo, Elba and Rosa did not get an opportunity to see the shooter's face well enough, or for long enough, to make an identification without police manipulation. The lineup they viewed was also highly suggestive, including because Johnson was the shortest, youngest, and the only one with a visible tattoo. *See supra* ¶¶88-152.

***Defendants' Fabrication of the July 23 Closing Report.***

199.    Defendant Guevara and Halvorsen wrote and signed the July 23 closing report, approved by Defendant Healey, in which they claimed to have obtained a photo array identification of Plaintiff from Elba Burgos, followed by lineup identifications of Plaintiff from Ricardo, Rosa, and Elba Burgos. Ex. 6.

200.    However, these photo array and lineup identifications were fabricated. *See supra* ¶¶118-120, 130-133, 141-152.

201.    In addition, the closing report also states that when Johnson was interviewed by Defendant Halvorsen and an Assistant State's Attorney, he told them that it was his habit to pick up his girlfriend from work at 6:40 p.m. and then to go to her house until 9:30 p.m. on every day except for Wednesdays or Sundays. According to the report, it was then revealed to Johnson that the shooting had occurred on a Wednesday night. Ex. 6 at RFC-Johnson 80.

202.    However, Johnson testified that he was not interviewed by ASA Buckley. Ex. 5 at 148:21-22 ("No, I didn't talk to any ASA"), *see also id.,* at 88:21-91:18 (when describing interrogations and treatment in police station, identifying only Guevara and Halvorsen), 104:7-9

(does not recall ever speaking with a State's Attorney), 146:11-19 (answering "No" when asked if he recalled ever speaking with ASA Buckley).

203.     In addition, Johnson never made the statement that he picked up his girlfriend from work every day, except Wednesdays and Sundays. Ex. 147; Ex. 5 at 150:17-151:5.

***Guevara Does Not Deny Fabricating Police Reports***

204.     When asked at his deposition whether he intentionally included false information in his written reports, Defendant Guevara invoked his Fifth Amendment right. Ex. 38 at 18:25-19:7 ("Q: And…you created a false lineup report claiming that Aby Gonzalez and the other eyewitnesses did not select Bryan Johns from the lineup, right? A: I plead the Fifth."), 59:7-12 ("Q: And the part of your report about Elba Burgos identifying Demetrius Johnson from a photograph is intentionally false, isn't it?" A: Plead the Fifth."), 86:20-87:18 ("Q: You fabricated a different report of a lineup that same night, and that report was false, correct? A: Plead the Fifth. . . . Q: A lineup report you fabricated falsely stated that no one picked out Johns in the lineup that occurred on the night of the shooting, right? A: Plead the Fifth. Q: You intentionally fabricated that false lineup report, didn't you? A: Plead the Fifth.), 91:10-92:21 (closing report filled with false statements that you had fabricated, including Elba Burgos, Ricardo Burgos, and Rosa Burgos' false identifications of Demetrius Johnson). In fact Guevara invoked his Fifth Amendment right to all questions about the Fred investigation, including whether he decided on Demetrius Johnson as a suspect and then manufactured evidence to frame him. Ex. 38 at 40:17-41:1.

***Defendants Deny That There Are Any Destroyed or Discarded Documents, or There Were Previously Disclosed Documents That Are Now Missing***

205.     At trial, no Defendants testified, and the State did not argue, that the police files were incomplete or that there were any documents missing or deleted. Likewise, every one of the

Defendants denied destroying or discarding any documents. Ex. 151 at Response to Request No. 15; Ex. 153 (same).

## XVI. Defendants Concealed from the Prosecution and Defense the True Circumstances Related to the Evidence Used to Implicate Demetrius Johnson

206.    Nowhere in the investigative file or permanent retention file did Defendants document that three witnesses had identified Johns as the perpetrator on the night of the Fred shooting. Likewise, the Erickson lineup report, and the information contained in it about Johns having been identified by Aby Gonzalez, was not disclosed to the prosecution or defense. *See supra* ¶¶38-52, 67-83.

207.    Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances or interactions with Ricardo Burgos that cast doubt on their purported identifications of Plaintiff, including the fact that he had not actually seen the shooting or that he only saw the shooter from behind and so he could only make an identification of Defendants' suspect if they told him who to pick. The prosecution file contains no records indicating that such information was disclosed to them by the police, and this information is not mentioned at any point during the criminal trial. *See supra* ¶¶125-129; Ex. 3 & Ex. 4 (omitted from police files), Ex. 154 (no mention in prosecution file); Ex. 8 (absence of such information at trial).

208.    Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances or interactions with Rosa Burgos that cast doubt on her purported identification of Plaintiff, including the fact that she had told police that it all happened so fast, she was not sure, she had trouble distinguishing between Black males because they all looked alike, that at the lineup she was asked which one she was going to pick, and that she had

been told that the multiple identifications made on the night of the shooting had been of the wrong guy. *See supra* ¶¶136-140, 149-152; Ex. 3 & Ex. 4 (omitted from police files).

209.    Nowhere in the investigative file or permanent retention file did Defendants document any of the circumstances or interactions with Elba Burgos that cast doubt on her purported identifications of Plaintiff, including the fact that Guevara had singled out a photo of Darrell Johnson and "asked if it was this one." *See supra* ¶¶93-120; Ex. 3 & Ex. 4 (omitted from police files).

210.    Nowhere in the investigative file or permanent retention file are Defendant Guevara's notes of his interview of Elba Burgos, which he testified that he took. The prosecution and defense at trial made clear that they had never been tendered such notes. *See supra* ¶¶103-104.

211.    Nowhere in the investigative file or permanent retention file did Defendants document that they had shown a photo array to Ricardo Burgos in June 1991, before Plaintiff had ever been a suspect in the investigation. Nor did they document who Ricardo Burgos identified in that June photo array. The prosecution file contains no records indicating that such information was disclosed to them by the police; and information about the true identity of the person that was the suspect in that June photo array before Plaintiff became a suspect is not mentioned or referenced at any point during the criminal trial. *See supra* ¶¶121-135; Ex. 3 & Ex. 4 (omitted from police files); Ex. 154 (no mention in prosecution file); Ex. 8 (absence of such information at trial).

212.    Nowhere in the investigative file or permanent retention file did Defendants document that Bryan Johns was a cooperating witness in another murder case involving some of the same Defendants, and that at the time Johns was released in this case he was about to testify

in the other murder case. The prosecution file contains no records indicating that such information was disclosed to them by the police; and this information is not mentioned or referenced at any point during the criminal trial. *See supra* ¶¶53-66, 84-87; Ex. 3 & Ex. 4 (omitted from police files); Ex. 154 (no mention in prosecution file); Ex. 8 (absence of such information at trial).

213.     Nowhere in the investigative file or permanent retention file did Defendants document that they had followed up on a lead provided by officers Crespo and Roman regarding Robert Weeks, nor did they document what they learned during their interview and investigation of Weeks. The prosecution file contains no records indicating that any investigation by Defendants into the Weeks lead provided by Crespo and Roman was disclosed to them by the police; and there is no mention of, or reference to, what information was learned during the investigation into Weeks, including what he said (or didn't say) when questioned about the Fred homicide. *See supra* ¶¶177-182; Ex. 3 & Ex. 4 (omitted from police files), Ex. 154 (no mention in prosecution file); Ex. 8 (absence of such information at trial).

### *The felony review prosecutor and trial prosecutor did not conduct any independent investigation and never learned of any of the misconduct set forth above.*

214.     The Defendant Officers fabricated false evidence and hid evidence from prosecutors. *See supra* ¶¶206-213.

215.     ASA Buckley, the felony review prosecutor, did not conduct any independent investigation of the crime. Based on the identifications of Ricardo, Elba and Rosa Burgos, he approved murder charges against Johnson. Ex. 157; Ex. 1; Ex. 6 at RFC-Johnson 78-80.

216.     Kevin Sheehan was a Cook County Assistant State's Attorney who was the sole prosecuting trial attorney at Johnson's criminal trial. By the time of Johnson's trial in 1992, ASA Sheehan was an experienced trial attorney and had prosecuted many violent crimes. In any case

he prosecuted, ASA Sheehan would carefully and thoroughly review all documents in the file provided to him. ASA Sheehan took his responsibility as a prosecutor and his *Brady* obligations seriously. Ex. 39 at 14:20-16:7, 16:11-17, 17:11-14, 17:19-22, 18:5-10, 59:25-60:4.

217.    ASA Sheehan relied on the police to investigate crimes and provide him with all pertinent information they learned in the course of the investigation, including whether they had discovered any exculpatory evidence. In anticipation for Johnson's trial, ASA Sheehan specifically requested that Defendant Halvorsen bring him the file related to the Fred homicide investigation. ASA Sheehan expected Defendants to have documented their entire investigation and that "any and all reports generated by the police whether in the form of handwritten notes or titled typed reports, should come to the state's attorney." Ex. 39 at 25:12-16, 39:25-40:12, 53:7-16, 55:18-56:2, 56:16-57:3, 66:22-67:23, 68:1-8; Ex. 3 at RFC-Johnson 12.

218.    Attorney Sheehan tendered a packet of information to Johnson's defense counsel and disclosed all the evidence provided to him. Sheehan does not know what specific police reports and records were received and tendered to the defense, but ASA Sheehan is confident that the Erickson lineup report was not among the documents he received from CPD. Ex. 39 at 25:15-16, 39:7-24, 42:23-43:6, 43:7-15, 43:7-15, 57:17-58:20.

219.    When ASA Sheehan went through the entire set of Blueback notes, he could not find a single notation or indication that he had ever been provided the Erickson lineup report, or any other evidence that CPD had disclosed to him that there was a positive identification of Johns. The only lineup he references in the Blueback is the negative lineup from Guevara's report. Ex. 39 at 24:12-17, 45:14-46:6, 61:11-66:7.

220.    In the State's closing argument, in rebutting the defense's argument that Johns was the true perpetrator, Sheehan stated that none of the witnesses who viewed the June 12, 1991

51

lineup that included Johns identified him. Sheehan mentioned Aby Gonzalez as not identifying

Johns. ASA Sheehan would have "absolutely not" made the argument in closing that no one

identified Johns in a June 12 lineup if he had been given the Erickson six-witness lineup report.

There was no mention of any positive identification of Johns, or of Erickson's report, at

Johnson's criminal trial. Sheehan believes that if Johnson's defense attorneys had the Erickson

lineup report, they would have crossed and impeached witnesses with the document, further

bolstering his certainty that he had not received and tendered the report. Ex. 8 at Johnson 1010-

1312 (closing argument at 1278-1289); Ex. 39 at 28:4-9, 35:4-20, 39:17-24, 41:8-18, 63:9-17;

Ex. 43 at 38:20-25, 39:5-18.

221.    If Sheehan had received the Erickson lineup report, he would have disclosed it

"with great speed and immediacy" to Johnson's defense counsel because a lineup where a

positive identification is made of someone who is not the criminal defendant is "the definition of

exculpatory." Sheehan believed tendering all exculpatory evidence to a criminal defendant's

defense counsel is a "moral obligation," and would have never withheld exculpatory evidence.

Ex. 39 at 18:25-19:9, 23:3-10, 39:25-40:9, 10-12, 68:9-17, 24-69:2.

222.    While prosecuting the case, Sheehan never learned that Defendants committed

misconduct during the Fred homicide investigation. Sheehan never learned that Defendants had

engaged in any sort of improper identification procedures or suppressed evidence. If he had, he

would have tendered it to Plaintiff's criminal defense attorney "immediately" along with other

*Brady* material. Ex. 39 at 19:18-20:9, 20:10-21, 39:25-40:4, 40:10-12, 68:9-13, 68:15-17.

223.    Sheehan was familiar with Johnson's criminal defense attorneys. He believed that

Carey had elite "chops of legal ability" and that Gubin was a "very experienced" lawyer who put

on a "vigorous defense." He also believed Gubin conducted her due diligence in Johnson's

defense and was well prepared at trial. Ex. 39 at 26:20-27:2, 8-17, 29:25-30:6.

> ***Despite their best efforts, Plaintiff's defense attorneys did not learn the exculpatory and impeaching evidence discussed above.***

224.    Jack Carey was a Cook County Public Defender who initially represented

Johnson during his criminal proceedings. In 1991, Jack Carey was an experienced public

defender who regularly defended murder cases. Ex. 5 at 128:10-19 (Johnson recalls being

represented by a public defender.); Ex. 66 at JGS_JOHNSON 184 (B9:10-14).

225.    During his representation of Johnson, Carey served discovery requests and issued

a subpoena for documents to the Chicago Police Department seeking all the police reports and

records. His subpoenas included a request for all notes that would have been part of any

investigative files or street files. Ex. 42 at CCPD 5-7; Ex. 44 at IMPOUND EVIDENCE 328-33.

226.    In February 1992, Johnson's family hired a private attorney, Debra Gubin, to

represent him. When Gubin took over Johnson's representation from APD Carey, he tendered to

her police reports, photos, and "anything else that [was] not proprietary to the public defender's

office." Ex. 43 at 14:9-11, 52:9-20, 73:2-18; Ex. 5 at 132:15-133:8.

227.    After her review of the file and meeting with APD Carey, Gubin filed a Motion

for Additional Discovery seeking lineup photos; the contents of the simulcast after the shooting

stating that "Little D" was involved; "[t]he photo array shown to witnesses"; and "[t]he single

photo of Defendant shown to witness prior to his arrest." Ex. 161 at IMPOUND EVIDENCE

343; Ex. 16 at RFC-Johnson 000048; Ex. 43 at 19:20-20:19.

228.    Ruth Miller, an attorney from Mayer, Brown, and Platt, assisted Gubin in

defending Johnson. Gubin and Miller investigated Johnson's case together. Gubin and Miller

went out to the crime scene and interviewed eyewitnesses and alibi witnesses. Gubin subpoenaed

all the police records and all the relevant information on the witnesses. Ex. 43 at 14:15-15:10, 17:1-18:2, 24:20-25:12.

229.    Gubin believed and trusted that she received all the evidence and documents that prosecutors had. Gubin recalled Sheehan as an honest prosecutor, and is confident that he would not have withheld any exculpatory documents or evidence. Ex. 43 at 24:9-19, 38:20-25, 43:14-44:16.

230.    Once they submitted discovery requests and subpoenas, Johnson's defense counsel had no way of knowing whether CPD had produced all responsive documents. Ex. 43 at 21:8-12, 22:8-22, 22:24-23:13.

231.    Despite their diligent investigation and subsequent discovery request, Gubin and Miller "absolutely did not have Erickson's lineup report in preparation for Johnson's criminal trial or at any point during Johnson's criminal proceedings." Gubin's theory, which she argued at trial, was that Brian Johns was the real killer. Gubin believes that if she would have had the Erickson lineup report, her defense of Johnson, the prosecution of Johnson, and the outcome of the trial would have all been very different. Ex. 43 at 18:14-16, 28:18-29:17, 34:20-35:2, 37:1-23, 62:12-15; Ex. 45 at 75:11-18; 27:4-27:14; Ex. 34 at RFC-Johnson 40-43.

232.    As part of her investigation, Gubin would always attempt to interview witnesses or have an investigator interview them. She determined what witnesses to interview based on the police reports. If there were police notes not disclosed that contradicted other police reports, she would have wanted them. She interviewed Rosa, Raul, and two other witnesses. She did not interview Aby Gonzalez because, based on the lineup report that she had, Gonzalez had not made any identification of Johns on the night of the shooting, he did not view the later lineup of Demetrius Johnson, and there was no other mention of him in police reports after the first day of

the investigation. If there were notes that indicated that Gonzalez made a positive identification the night of the shooting, Gubin would have wanted to know about it during her representation of Johnson. She "absolutely" would have interviewed Gonzalez, and it would have changed her approach to her defense of Johnson, including her cross-examination of Guevara and Daley, and her approach to opening and closing argument, and her likelihood of winning a motion to suppress the identification. Ex. 43 at 30:6-14, 31:20-33:16; 36:11-25; 38:5-40:13, 41:23-42:8.

233.    Gubin did not interview Bryan Johns because she was told by Johnson that Johns refused to testify and help Johnson, and so she had reason to believe he would not even talk to her. Gubin also was not sure if Johns was represented by counsel. Ex. 43 at 19:18-30:5; Ex. 5 at 315:2-10 (Gubin asked Plaintiff if Johns would testify and admit his guilt, and Plaintiff told Gubin that Johns had said he would not).

234.    Gubin filed a motion to suppress Johnson's identification in his criminal case. However, she rescinded the motion because she did not believe she would win based on the evidence she had, and she did not want to lose the judge's attention when she made the same arguments at trial. If Gubin had been aware of the Erickson report or the suggestive identification procedures employed by Defendants, she "definitely would've gone forward" with the motion and thinks she would have been likely to succeed. Ex. 43 at 37:1-23; 45:13-47:2.

235.    Gubin defended Johnson at trial to the best of her ability. She argued that Johnson was misidentified during suggestive police identification procedures weeks after the shooting and vigorously cross-examined the three individuals who identified Demetrius Johnson as the shooter—trying to demonstrate that they could not have seen the shooter well enough to make an identification and that things happened too fast, and that there were other factors that would undermine their identifications—and the other shooting victim. Gubin also argued that Johnson's

alibi was uniquely credible because of the significance of the night: the Bulls first championship was on TV and Reyes and Martinez with whom Johnson watched the game were not basketball fans and did not usually watch games, so the night was memorable. Ex. 167 at Johnson A22:1-30:9 (cross examination of Raul Ortiz); Ex. 24 at A42:7-A59:11 (cross examination of Rosa Burgos); *id.* at A-62:17-A-67:4 (re-cross examination of Rosa Burgos); Ex. 64 at A-75:14-87:15 (cross examination of Ricardo Burgos); Ex. 52 at A-98:12-112:5 (cross examination of Elba Burgos); Ex. 10 at A-116:11-A-136:15 (direct examination of Madalia Reyes); *id.* at A-149:5-152:3 (re-direct examination of Madalia Reyes); Ex. 11 at A-152:11-A-159:7 (direct examination of Elizabeth Martinez); Ex. 169 at B-3:18-B-7:11 (direct examination of Madeline Rodriguez); Ex. 17 at B-34:12-73:2 (direct examination of Reynaldo Guevara); *id.* at B-79:5-82:18 (redirect examination of Reynaldo Guevara); Ex. 8 at B-85:15-102:21 (the defense's closing argument). Ex. 43 at 28:18-29:17, 31:20-33:16; 36:11-25; 38:5-25; Ex. 45 at 29:2-9.

236. Gubin and Miller also attempted to defend Johnson by arguing that Johns was the real perpetrator, given that he was identified on the initial dispatch as the shooter. If Gubin or Miller had known about the positive identification documented in the Erickson lineup report, or ever learned that Defendants suppressed the Erickson lineup report and fabricated another lineup report, that would have been important information that they would have used in their defense of Johnson. Ex. 43 at 28:18-29:17 (defense theory was that Johns committed the shooting based on Johns' being mentioned in the broadcast the night of the crime and his getting arrested), 37:11-38:25; Ex. 45 at 29:2-9 (Johns was the perpetrator according to the defense's theory); Ex. 39 at 40:19-41:3 (recalled the defense argued that Johns was the real shooter in closing); Ex. 45 at 36:10-24 (if the defense would have had the Erickson report, it "would have been all over this case").

**XVII.** **The Evidence Defendants Fabricated Was Used in Charging Johnson, Continuing His Prosecution, and at His Criminal Trial**

237.     Demetrius Johnson was arrested on July 22, 1991. Ex. 1.

238.     The arrest report used to justify Johnson's arrest identifies the probable cause as three eyewitness identifications. Specifically it states: "Above subject arrested for FIRST DEGREE MURDER after being identified by three eye witnesses as the person that shot and killed Edwin FRED. . . ." Ex. 1.

239.     Defendants Guevara and Halvorsen performed the arrest and wrote the arrest report. Ex. 1; Ex. 6 at RFC-Johnson 76.

240.     The CCSAO Felony Minute Sheet, or "Form 101," states that ASA Buckley approved murder charges against Plaintiff, and identifies three eyewitnesses as prosecuting witnesses: Ricardo, Elba and Rosa Burgos. Defendants Guevara and Halvorsen are both also listed as prosecuting witnesses involved in the arrest and investigation. Ex. 157.

241.     Defendants Guevara and Halvorsen are listed along with Ricardo Burgos, Elba Burgos, and Rosa burgos, as the prosecuting witnesses in the Felony 101. Ex. 154 at CCSAO31.

***Defendant Guevara and Defendant Daley testify at Plaintiff's criminal trial about the fabricated non-identification of Bryan Johns on the night of the shooting.***

242.     The purported fact that Bryan Johns was not identified in a lineup came up multiple times during trial. For instance, Defendant Daley testified that became involved in the case when he heard a dispatch about a shooting near North Avenue and Claremont. He headed to the area looking for a specific alleged shooter named Bryan Johns. He testified that he got to the area and arrested Bryan Johns and two other people and found a handgun in their van. Finally, he testified that  Johns participated in a lineup and was not selected from the lineup. Ex. 20 at B-22:2-5, B-22:14-23:13, B-24:2-11, B-26:5-27:10, B-27:17-19, B-31:15-22, B-32:8-10.

243.    Defendant Guevara also testified that Johns stood in a negative lineup. Ex. 17 at B-73:22-74:9.

### *Ricardo Burgos, Rosa Burgos, Elba Burgos, and Defendant Guevara testify about the fabricated photo array and lineup identifications of Johnson.*

244.    Defendant Guevara testified that Rosa, Elba, and Ricardo picked Demetrius Johnson out of a lineup on July 22. Ex. 17 at B-77:3-78:8.

245.    Elba Burgos and Ricardo Burgos both testified that they identified Johnson out of a three-person photo, and it was admitted into evidence (People's 6-B). Ex. 64 at A-72:12-73:7; Ex. 52 at A-95:24-96:24.

246.    The photo of the live lineup was presented to Ricardo, Rosa, and Elba, and was admitted into evidence (People's 8.). All three witnesses indicated on the lineup photo that they had selected Johnson. Ex. 24 at A-39:6-20; Ex. 64 at A-74:15-75:6.; Ex. 52 at A-97:8-98:3.

### *Ricardo Burgos*

247.    Ricardo Burgos testified at Plaintiff's criminal trial about his purported identification of Demetrius Johnson. He testified that, while riding in the passenger seat of a moving car, he looked at the shooter for 40-45 seconds. He testified that he identified Demetrius Johnson out of a photo array and a live lineup. And he identified Demetrius Johnson in court as the shooter. Ex. 64 at A-70:8-15-24, A-71:15-73:7, A-73:24-74:14.

### *Rosa Burgos*

248.    Rosa Burgos testified at Plaintiff's criminal trial about her fabricated live lineup identification of Demetrius Johnson. Specifically, she testified that she was behind Ortiz when he was shot, that she looked at the shooter's gun and then looked at the shooter's face for four seconds. She testified that she went to Area 5 on July 22, 1991, to view a live lineup, and picked

Demetrius Johnson. And she identified Demetrius Johnson in court as the shooter. Ex. 24 at A-34:13-20, A-35:21-36:7, A-37:18-23, A-38:3-39:4.

### Elba Burgos

249.    Elba Burgos testified that while she was sitting on her porch, she heard shots, looked toward North Avenue and saw a crowd of people, and then saw a young Black man with a gun running across the street. According to Burgos' testimony, Guevara brought photos to her house on July 11 and said the person with the gun looked like Darryl Johnson's photo but younger. She said that Guevara came back a few days later and showed her a polaroid with three people in it, and, upon reviewing the polaroid in court, said she identified Demetrius Johnson. Finally, she testified that she viewed a live lineup about a week after that and, upon looking at a photo of the lineup, marked an X over Demetrius Johnson. She also identified Demetrius Johnson in court as the person she saw running with the gun. Ex. 52 at A-91:3-92:4, A-93:2-8, A-94:2-95:12, A-95:24-96:24, A-97:8-98:3.

### All of Guevara's false reports, including those documenting false statements, false identifications, and a fake alibi, were introduced and admitted at trial.

250.    All of Guevara's reports that prosecutors and defense counsel possessed— including the Johns negative lineup report, the June 20 report reflecting that Rosa Burgos said she could identify the shooter, July 22 lineup report, and the closing report documenting the fabricated identifications and attributing to Johnson a false alibi, *see supra* ¶¶189-205—were shown to Guevara at trial and admitted at trial as Defendant's Group Exhibit 6. Ex. 17 at B-43:18-21; Ex. 34; Ex. 65; Ex. 51; Ex. 6.

### Defendant Daley fabricates other evidence at trial

251.    Daley testified that he personally knew Demetrius Johnson to have the nickname "Little D." Ex. 20 at B-30:14-31:7.

252.    Johnson did not have the nickname "Little D." No one ever called him that. Ex. 147; Ex. 11 at A-158:13-16.

**_Neither a positive identification of Johns or the six-witness Erickson lineup report was ever referenced or mentioned at Johnson's criminal trial._**

253.    In the State's closing argument, in rebutting the defense argument that Johns was the true perpetrator, Prosecutor Sheehan stated that none of the witnesses who viewed the June 12, 1991, lineup that included Johns identified him. Prosecutor Sheehan mentioned Aby Gonzalez as not identifying Johns. ASA Sheehan would have never argued in closing argument that no one identified Johns in a June 12 lineup if he had been given the Erickson six-witness lineup report. Ex. 8 at B-104:1-24 ("She had a chance to finger Brian Johns and she didn't nor did four other people that Miss Gubin asked Detective Guevara that he interviewed . . . . Yes, Abbey Gonzales. Did they look at that first lineup? Did they pick out Brian Johns? No. It was a negative lineup."); Ex. 39 at 35:10-15 (agreed his closing argument was that no one had picked Johns out of a lineup in the case), 39:17-24 (would have never said that in closing if he had received the Erickson lineup report).

254.    There was no mention of any positive identification of Johns or of the six-witness Erickson lineup report at Johnson's criminal trial. Ex. 8. As a result, Johnson was convicted of murder and attempted murder and sentenced to 25 years in prison. Ex. 8 at C-15:18-23.

## XVIII.    Each of the Defendants Was Involved in Material Parts of the Investigation and Framing Demetrius Johnson

255.    Defendants Guevara, Halvorsen, and Erickson were the principal detectives working the case when critical evidence of Johnson's innocence was concealed, and evidence used to charge and prosecute Johnson was developed. Ex. 18, Ex. 34, Ex. 16, Ex. 60, Ex. 65, Ex. 50, Ex. 51, Ex. 6, Ex. 22, Ex. 170, Ex. 1 (signing some or all of the reports submitted in June and July 1991).

256.     Defendants Guevara and Halvorsen are listed as the reporting detectives on the closing report, and they were both involved in preparing the closing report. Ex. 6; Ex. 171 at 67:23-68:21 (Area 5 detective, Guevara's former partner: their names at bottom of report means they were involved in preparing the report).

257.     Defendants Guevara and Halvorsen were the detectives listed on the arrest report related to Johnson's arrest and charging for the Fred murder. Ex. 1.

258.     Detectives would share information with one another about any developments and anything they learned during the course of an investigation, including specifically with the assigned detectives on the case. This information would be shared one way or another, including through detectives and through supervisors. Ex. 172 (Area 5 detective) at 73:22-74:7, 85:9-16; Ex. 173 (Area 5 detective) at 25:25-26:16; Ex. 174 (Area 5 detective) at 26:22- 27:14; Ex. 175 (Area 5 detective) at 245:11:-245:24 (Riccio received information from Guevara and Halvorsen and documented in report).

259.     Supervisors such as Healey were kept abreast of the homicide investigations they supervised, including the results of any positive or negative identifications, and investigative interviews and developments occurring at the Detective Division Area. Ex. 58 (City 30(b)(6) designee) at 262:18-266:5 (inter alia, "Every aspect of a homicide investigation is monitored by a supervisor in the Detective Division"; characterizing monitoring day-to-day conduct of homicide investigations as "integral role that a supervisor in the Detective Division serves or performs"); Ex. 176 (Sergeant overseeing Area 5 Detectives) at 22:5-25:6, 32:20-33:2, 41:3-42:5, 46:19:24. It was important for supervisors to become familiar with the information contained in reports during a homicide investigation. Ex. 186 (Sergeant overseeing Area 5 detectives) at 230:8-14.

260.    Moreover, the investigative file for the Fred investigation, which should contain all investigative information learned during the homicide investigation, was kept in the Sergeants' office. Ex. 73 (City 30(b)(6) designee) at 199:24-200:18.

### *Detective Ernest Halvorsen*

261.    Guevara and Halvorsen were partners and routinely investigated and closed homicide investigations together. Ex. 187 at 53:3-11 (Guevara and Halvorsen were partners for 8-9 years), 186:16-20 (he was usually with Guevara, and he types up dozens of their reports every week), 187:4-7, 230:15-16 (investigating together); Ex. 188 at 193:17-23 (Guevara and Halvorsen's supervising sergeant, testifying that the two of them worked together and solved more gang-related cases than other detectives), 314:12-24 (same).

262.    When asked about Halvorsen's involvement in the investigation, and his role in the misconduct alleged throughout the investigation, Defendant Guevara pleaded the Fifth regarding Halvorsen's involvement, both generally and specifically. Ex. 38 at 15:5-16 (pleading Fifth on solving the case with Halvorsen); 39:19-40:2, 40:17-41:1 (deciding to frame Plaintiff); 41:2-23 (working with Guevara every step of the way); 76:16-77:14, 78:22-79:4, 81:21-25, 115:21-117:4 (conspired with Halvorsen against Plaintiff), 118:1-8 (same); 138:16-139:3 (conspire with EH against others); 141:12-19 (same); 142:7-11 (same); 144:3-22 (same); 145:8-25 (same); 146:7-13, 20-24 (same).

263.    As discussed above, Halvorsen is listed as a reporting detective on, and signed, the July 23 closing report (documenting the purported photo array identification of Plaintiff by Elba Burgos, the purported lineup identifications of Elba, Rosa and Ricardo Burgos, and the purported statement from Demetrius Johnson about not picking his girlfriend up on Wednesdays, the day of the shooting), the July 22 lineup report (documenting the three purported lineup identifications), the July 17 supplementary (documenting Elba's purported photo array

identification). The fabricated Guevara lineup report falsely stating that Johns was not identified was also written in and around the time that Guevara and Halvorsen were writing reports and closing their case against Plaintiff in late July 1991. Ex. 6; Ex. 51, Ex. 50; *see supra* ¶¶58-66.

264.    At the time Fred was murdered and Johns was brought to Area 5 and placed in a lineup, Johns was Halvorsen's star witness in a separate murder prosecution, in which Halvorsen also testified against the defendant. Neither Halvorsen nor any other Defendant documented or disclosed this information in the Fred investigation; instead, the identifications of Johns were concealed and Johns was released. *See supra* at ¶¶53-66, 84-87, 212.

265.    Halvorsen was informed by Officers Crespo and Roman of a credible lead pointing to Robert Weeks as the possible perpetrator, and took custody of Weeks at the 14th District on June 29, 1991. Halvorsen did not document any investigative efforts regarding Mr. Weeks, despite the fact that Weeks was, at minimum, questioned about the murder. Ex. 189; *see supra* ¶¶177-182, 213.

266.    Halvorsen was involved in the arrest of Plaintiff on July 23, 1991, despite the lack of any non-fabricated probable cause for his arrest, and was listed as a prosecuting witness by the Felony Review ASA Buckley. Ex. 1; Ex. 154; *see supra* ¶¶88-92, 199-203.

267.    ASA Sheehan specifically requested that Defendant Halvorsen bring him the file related to the Fred homicide investigation, as indicated in a note in the Investigative File—the same file that contains the Erickson six-witness lineup report. Ex. 3 at RFC-Johnson 12; Ex. 39 at 67:6-23.

### *Detective William Erickson*

268.    Defendant Erickson was with Defendant Guevara on the night of the shooting, and involved in the lineup that took place that night in which Johns was the suspect and viewed by multiple witnesses. Ex. 18; Ex. 34.

269.    Erickson conducted a lineup on the night of the shooting and wrote and signed a lineup report documenting that Johns had been identified by Aby Gonzalez. However, this report did not include the information from Rosa Burgos that in fact three people had made identifications that night; and that the detectives had told the witnesses that they had identified the wrong person. *See supra* at ¶¶36-42, 269.

270.    Erickson did not take steps to ensure his report documenting one of the three eyewitness identifications would be included in the permanent retention file and disclosed to prosecutors and criminal defendants, such as submitting the report for approval from the sergeant so that a copy could be placed in the permanent retention file/Records Division file. Ex. 73 (City 30(b)(6) designee) at 176:13-177:12.

271.    Erickson signed and is listed as a reporting detective on the Guevara lineup report, which contradicts Erickson's lineup report and claims neither Aby Gonzalez nor any other witness identified Johns. *See supra* at ¶¶53-66.

272.    Erickson permitted Johns to be released that night. Ex. 21 at 76:22-77:24 (Daley was surprised Johns was not identified and then released that same night).

### *Officer Darryl Daley*

273.    Defendant Daley was involved in the initial arrest of Bryan Johns, and was present at Area 5 and knew about the lineup in which Aby Gonzalez viewed Johns as a suspect.

Ex. 21 at 75:5-77:2; Ex. 20 at B-27:11-19 ("Q. Do you know whether or not Little D, Brian Johns, participated in a lineup that night? A. Yes, he did.").

274.     When Daley was questioned at Plaintiff's criminal trial about the Johns lineup, he did not respond that he did not know what happened, or that he had not participated in the lineup, or that he lacked foundation to testify about the line, or that his knowledge about the lineup was based on hearsay. Instead, he testified about the lineup and the results, stating that none of the witnesses identified Johns. Ex. 20 at B-27:11-19, B-31:15-B-32:10.

275.     Daley wrote a June 13 report in which he falsely stated that none of the witnesses who viewed the Johns lineup identified him. Ex. 19.

276.     Daley was involved in the search and processing of the van that Johns and two others were seen exiting shortly after the shooting. Despite recovering two different guns from the vehicle, only one was inventoried. *See supra* at ¶¶24-35.

277.     Daley provided Defendants Guevara and Halvorsen with a photo of Demetrius Johnson to be used in an unduly suggestive, three-person photo array. *See supra* at ¶¶118-120.

278.     Daley fabricated a claim that Plaintiff was known by the nickname "Little D." *See supra* at ¶¶251-252.

### *Sergeant William Healey*

279.     Supervisors such as Healey were kept abreast of the investigation they conducted and of the results of lineups that occurred at Area 5, including all positive and negative identifications, meaning Healey would have been informed of the two different lineup results from June 12 regarding Bryan Johns. *See, e.g.*, Ex. 58 (City 30(b)(6) designee) at 262:18-265:5 (*inter alia*, "Every aspect of a homicide investigation is monitored by a supervisor in the

Detective Division"; characterizing monitoring day-to-day conduct of homicide investigations as "integral role that a supervisor in the Detective Division serves or performs").

280. Healey reviewed, approved and signed numerous reports that the evidence shows were fabricated and/or omitted exculpatory information, including the June 12 Guevara lineup report claiming that no identification of Johns had been made; the June 20 supplementary report documenting Guevara's interview of Rosa Burgos and omitting the statements she made indicating that she could not make an identification; the July 22 lineup report documenting the purported lineup identifications of Plaintiff; and the July 23 closing report. Ex. 34; Ex. 65; Ex. 51; Ex. 6.

281. Healey signed and approved the June 12, 1991 Guevara lineup report on July 24, 1991, despite the fact that it was being presented for his approval more than a month later and despite the Erickson lineup report in the investigative file in the Sergeant's office, containing contradictory information. Ex. 34; Ex. 73 (City 30(b)(6) designee) at 200:12-18.

282. Healey failed to take steps to ensure that the Erickson lineup report was submitted for approval and placed in the permanent retention file in accordance with CPD policy. Ex. 73 (City 30(b)(6) designee) at 176:13-177:12.

283. Healey did not ensure that the credible lead regarding Robert Weeks was meaningfully pursued, or that any interviews or investigation into Weeks was documented in progress reports and/or supplementary reports. *See supra* at ¶¶177-182.

[PARAGRAPHS 284 THROUGH 300 INTENTIONALLY OMITTED]

## XIX.   Monell Theories

301. Plaintiff's Monell theories include failure to train, supervise and discipline claims, widespread practice claims, and express policy claims. Within each of those categories, Plaintiff is pursuing multiple theories of liability, including the following: (a) the failure to train,

supervise and discipline Chicago Police officers who engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations; (b) widespread practices, amounting to de facto policies, of allowing Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations; and (c) deficient policies—both in express terms and through obvious omissions—that authorized Chicago Police officers to engage in investigative misconduct of all types, including witness coercion and abuse, eyewitness manipulation, lying, fabrication and suppression of evidence, and the failure to comply with documentation and disclosure obligations. Ex. 68 (Pl.'s Resps. to Def. City's First Set of Interrogatories to Pl) at 1-2. In particular:

    a. **Evidence Suppression:** Plaintiff's Monell theories based on the CPD's pattern and practice of Brady violations—i.e., related to the repeated failure to disclose exculpatory information to criminal 7 defendants—include express policy theories (e.g., documentation, notetaking and file keeping policies that were plainly inadequate on their face); widespread practice theories (e.g., a widespread practice of failing to document investigative steps, permitting officers to keep street file that were not later disclosed); and failure to train, supervise and discipline theories (e.g., the failure to train detectives on documentation, notetaking and file keeping policies, the failure to conduct audits to ensure such policies were being following, the failure to discipline officers for violating documentation, notetaking and file keeping policies). These theories based on the CPD's pattern and practice of Brady violations are supported by the deposition testimony in this case, including from the individual officers (regarding their documentation and file keeping practices), and the City's 30(b)(6) designees disclosed in this case and others (Foster, Winstrom, Hickey, Sullivan); the homicide file in this case; the hundreds of additional Area 5 homicide files produced in Reyes/Solache, Rivera, and Fields, including but not limited to the common Guevara productions; the ongoing production of Cook County Public Defender files in this case, as well as in Reyes/Solache, Rivera, and Fields; the expert reports previously produced in Reyes, Rivera, and Fields; the City's

documentation, notetaking and file keeping policies, and lack thereof; the Jones and Palmer litigation, and the findings and revelations therein related to CPD's street files practice and the wrongful prosecution of George Jones; and the qualitative and quantitative findings of Plaintiffs' experts. Answering further, Mr. Tiderington's expert reports in Reyes/Solache, Sierra, and Iglesias lists his materials reviewed, which identify in detail evidence supporting Plaintiffs' Brady-related theories. Plaintiff's evidence supporting these theories show that CPD maintained a policy and widespread practice of permitting officers to keep informal files containing evidence that could be, and was, withheld from criminal defendants. . . . Not surprisingly, then, CPD's own homicide files reveal that in case after case, the new policy was not being followed, and that instead the widespread practice of failing to document all investigative steps (including exculpatory and impeaching information) and of withholding investigative documentation not turned over into an official file continued unabated. The result of these broken policies and widespread practice of withholding, is that constitutional Brady violations occurred far too often. Likewise, secret files of investigative information not accounted for or disclosed has kept turning up across CPD. . . .Moreover, the numerous Guevara-related exonerations alone reflect case after case in which exculpatory information was not documented, and was not disclosed. Demetrius Johnson's case is emblematic: in that case, a highly exculpatory lineup report documenting the identification of an alternate suspect was buried in a file at Area 5, but was not included in the official permanent retention file or disclosed to the prosecutors and criminal defendant. In Iglesias, a lead police pursued indicating witnesses during the initial investigation implicated the Spanish Cobras—and thus pointing away from Plaintiff—was never disclosed to Iglesias; that information was suppressed. In Gomez, multiple witnesses told police highly exculpatory information indicating that individuals other than Mr. Gomez fired weapons at the intersection where the victim was killed, but that evidence was suppressed. . . Plaintiff references and incorporates the expert reports of Michael Brasfield in *Fields* and *Rivera*, and Anthony Finnell in *Reyes/Solache, Sierra, Bouto, Rodriguez*, and *Iglesias*, which discuss many of these theories and the evidence supporting them, in tremendous detail. Ex. 68 (Pl.'s Resp. to Def. City's First Set of Interrogatories to Pl) at 6-11.

b. **Eyewitness Identifications**: Plaintiff will also pursue a theory that the Chicago Police Department had a widespread practice of manipulating eyewitness identification procedures to create false positive identifications of police suspects, and also failed to document identification procedures. Plaintiff's Monell theories based on the CPD's pattern and practice of improper eyewitness identification tactics—i.e. suggestive, coercive and manipulated lineups and photo identification procedures—include express policy theories (e.g., policy omitting photo arrays

and all other identification procedures other than live lineups, permitting non-documentation and misidentification of filler identifications and tentative identifications, and omitting witness statements of confidence or lack thereof); widespread practice theories (e.g. a widespread practice of using suggestive identification procedures); and failure to train, supervise, and discipline theories (e.g. the failure to supervise and discipline detectives who used improper identification tactics to secure eyewitness identifications from witnesses who had no meaningful opportunity to view the perpetrator). Those widespread practices have a direct connection to this case, and in particular the false and manipulated eyewitness identifications of Ricardo Burgos, Elba Burgos, and Rosa Burgos, none of whom had any meaningful opportunity to view the shooters, and communicated as much to the initial detectives who interviewed them. Yet, weeks after the crime they somehow identified Plaintiff, who just happened to be the police suspect.Plaintiff incorporates his responses to the Individual Defendants' interrogatories, which further discuss the constitutional misconduct in this case. In addition, Plaintiff references and incorporates the expert reports of Gary Wells and Jennifer Dysart in Rivera v. City of Chicago, and Dr. Steblay in Velez v. City of Chicago. Plaintiff also incorporates his objections and response to Request No. 4, below. Plaintiff reserves the right to supplement this response. Finally, Plaintiff intends to incorporate his expert reports and expert depositions in this matter. Ex. 68 (Pl.'s. Resps. to Def. City's First Set of Interrogatories to Pl) at 11-12.

## XX.    Notice of Evidence Suppression

302.    In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: Palmer v. City of Chicago and Jones v. City of Chicago. In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression practice that caused his wrongful prosecution. Ex. 70 (Palmer v. City of Chicago, 562 F. Supp. 1067, 1073 (N.D. Ill. 1983) (J. Shadur) (hereinafter "Shadur Order") (Brzeczek testified at hearing); Ex. 71 (Hickey Dep. in Rivera) at 207:15-209:8, 83:21-84:4 (Brzeczek testified at injunction hearing); Ex. 72 (2016 Hickey Fields Trial Testimony) at 11:9-23, 12:3-7 ("It is true that the City got put

on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."); 19:13-22; Ex. 73 (Winstrom Dep. in Reyes) at 159:5-23.

303.    In Jones, a detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." Jones v. City of Chicago, 856 F.2d 985, 995-96 (7th Cir. 1988). In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones's criminal defense attorney about the information in the undisclosed file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative information in an undisclosed file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants. Jones, 856 F.2d at 988; see also Ex. 71 (Hickey Dep. in Rivera) at 61:3-23, 63:6-9, 67:9-68:3.

304.    In 1988, in Jones v. City of Chicago, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants. The appellate decision included the following: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his

70

fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the practice of evidence suppression existed, caused Jones injuries, and was "consciously approved at the highest policy-making level." 856 F. 2d 985, at 988, 991, 993, 996.

305.     In April 1982, shortly after the Laverty revelations about the non-disclosure of important investigative materials, a class action lawsuit called Palmer v. City of Chicago was filed to challenge the use of informal files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all investigative materials not included in formal police files. Ex. 70 (Shadur Order) at 2. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter. Id. at 1; Ex. 71 (Hickey Dep. in Rivera) at 69:22-70:12; 79:21-80:6. The files in Palmer were never analyzed in a systematic fashion. Ex. 152 (Haas affidavit) at 2-5.

306.     James Hickey authored the policies regarding the file disclosure policies for homicide investigations for the City of Chicago in 1983. Ex. 74 (Hickey Dep. in Fields) at 50:12-16 ("I was the primary drafter of this order [83-1] on behalf of the chief of detectives."); Ex. 71 (Hickey Dep. in Rivera) at 116:22-23 ("When 83-2 was generated you wrote it? A. I drafted it, yes.").

307. Hickey was designated by the City of Chicago under Rule 30(b)(6) in subsequent litigation, including Fields v. Chicago, and Rivera v. Chicago. See Ex. 74 (Hickey Dep. in Fields); Ex. 71 (Hickey Dep. in Rivera, 5/6/14) at 47:21-48:18.

308. In his capacity as the City's Rule 30(b)(6) witness, Hickey testified that, in light of Palmer and Jones, and as early as 1982, City policymakers knew they had a city-wide problem with the practice of evidence suppression and non-disclosure resulting from using a "decentralized" file system for homicide investigations. Ex. 75 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2043:22-2044:11, 2044-2045:7; 2048:2- 2052:9; Ex. 71 (Hickey Dep. in Rivera) at 222:11-22, 228:9-229:3.

309. As a result of the developments in Jones and Palmer, Hickey conducted an internal review of Chicago Police Department practices related to evidence suppression, the results of which he shared with senior Department officials including Chief of Detectives, William Hanhardt. Ex. 71 (Hickey Dep. in Rivera) at 200-201, 223:5-225:13; Ex. 75 (2014 Hickey Fields Trial Testimony) at 2049-2051.

310. Hickey found that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files that were not subject to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were

72

instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. Ex. 71 (Hickey Dep. in Rivera) at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, 215:10-16:15, 219:9-221:6; Ex. 75 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2043:22-25; 2044-45, 2050-51, 2051:2-5; Ex. 76 (Hickey Dep. in Kluppelberg (pt. 1) at 85-89, 94:14-20 ("Q. Generally speaking, what happened to a detective's notes prior to 1983? A. The detective kept the notes until such time as they prepared the supplementary report, at which time they destroyed their notes, threw them in the garbage can or whatever, including myself.").

311.    City officials were aware of resistance within the Police Department to changing the practice of keeping parallel, "personal" files not available to the criminal justice system, and of the risk of wrongful prosecutions and convictions if the policy of evidence suppression was not solved. See infra AS 311-312.

312.    Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting "highly relevant and sometimes exculpatory"

information that "the preparer does not deem 'pertinent.'" Ex. 70 (Shadur Order) at 5-6, 13; Ex. 71 (Hickey Dep. in Rivera) at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24.

313.     City officials were aware at the time that the practice of evidence suppression and non-disclosure documented above resulted in wrongful prosecutions and convictions. Ex. 71 (Hickey Dep. in Rivera) at 102:2-23, 205:18-206:12; Ex. 72 (Hickey 2016 Fields Trial Testimony) at 12:3-13:20; Palmer v. City of Chicago, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain documents with investigative information "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").

## XXI.     Policy of Withholding Exculpatory Evidence

314.     In April 1982, after a Temporary Restraining Order was issued in the Palmer litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.94. See Ex. 77 (S.O. 82-2 and Memo) at 4; Ex. 76 (Hickey Dep. in Kluppelberg) at 201.

315.     CPD Rule 30(b)(6) designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable." Ex. 76 (Hickey Dep. in Kluppelberg) at 221-22, 224-25.

316.     Notice 82-2 and the corresponding teletype did not require detectives to put notes or memos into a central repository, and it did not require detectives to preserve notes or memos that had not already been turned into a police file. Ex. 77 (S.O. 82-2 and Memo) at 7; Ex. 76 (Hickey Dep. in Kluppelberg ) at 212-13.

317.     Notice 82-2 lacked procedures to gather or inventory notes, memos, or other documents, and did not require that detectives put notes or memos into unit investigative files, or

even whether they had to preserve such notes not in the file. Ex. 77 (S.O. 82-2 and Memo); Ex. 76 (Hickey Dep. in Kluppelberg) at 161, 212-13.

318.    Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them into a department file, or even preserve them at all. Ex. 70 (Shadur Order) at 12. Commander Stibich acknowledged that "[w]hat's pertinent to one [detective] might not be to another." Id. at 6-7.

319.    Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2." Ex. 70 (Shadur Order) at 12.

320.    In January 1983, Special Order 83-1 replaced Detective Division Notice 82-2. It applied only to detectives assigned to Violent Crimes. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved. Special Order 83-1 also created General Progress Reports ("GPRs"). The GPR forms were to be used by detectives for taking handwritten notes or writing "to-from memos" to their colleagues. Ex. 78 (S.O. 83-1); Ex. 76 (Hickey Dep. in Kluppelberg) at 170:7-9; Ex. 71 (Hickey Dep. in Rivera ) at 227.

321.    Special Order 83-1 created a requirement for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill

out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents. Ex. 78 (S.O. 83-1).

322.    Hickey considered S.O. 83-1 a "major change in the way notes were considered within the police department," yet acknowledged there was never a survey or audit about how its implementation went.  Ex. 75 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2053:24-2054:1; Ex. 74 (Hickey Dep. in Fields) at 43:1-4 ("Q. Was there anything done after the implementation of 83-1 to survey or to audit how the process was going, the new process? A. Not to my knowledge.").

323.    Judge Shadur found Special Order 83-1 to be deficient, including for the following reasons: (1) there was no obligation to create an investigative case file folder until someone was arrested and charges were approved, leaving the risk of selective retention/disclosure during the investigation; (2) it offered no guidance on what information a detective should deem "relevant" information to include in official reports, leaving discretion for detectives to withhold information on their subjective assessment of its relevance; (3) it failed to ensure that any detective receiving information related to an investigation not assumed to him will forward the information to the assigned detective, so that information is included in the investigative file folder; and (4) it lacks any provision defining how the CPD responds to a subpoena or request to produce information related to a criminal proceeding. Ex. 70 (Shadur Order) at 16-17.

324.    Special Order 83-1 was replaced by Special Order 83-2 in May 1983. Ex. 78 & Ex. 79 (Special Orders 83-1, 83-2); Ex. 71 (Hickey Dep. in Rivera) at 225, 227:7-229:6.

325.    Special Order 83-2 made a few changes: (1) to require detectives to create records reflecting all relevant information; (2) to require detectives to pass along information they

receive about another crime to the detective investigating that other crime; (3) to transmit a copy of the investigative file inventory sheet to either the Office of Legal Affairs or State's Attorney's Office for its proper disclosure to criminal defendants; and (4) to create an Investigative File Control Card. Ex. 79 (S.O. 83-2).

326.    S.O. 83-2 still: (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) applied only to detectives, and explicitly excluded from its directives all other officers involved in investigative major crimes; (3) provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant, (4) provided no guidance about how information should be communicated or documented among detectives; (5) provided no policy directive or procedure to ensure production of investigative files; (6) relied on inventory sheets instead of actual file disclosures; and (7) lacked an audit/oversight mechanism. Ex. 79 (S.O. 83-2); Ex. 76 (Hickey Dep. in Kluppelberg) at 236-38.

327.    Special Order 86-3 replaced S.O. 83-2 in May 1986. It was substantively identical to S.O. 83-2, except for the addition of an auditing provision. Compare Ex. 79 (Special Order 83-2) with; Ex. 80 (Special Order 86-3); Ex. 71 (Hickey Dep. in Rivera) at 100:9-101:12, 227, 245-47, 249.

328.    The modifications in S.O. 86-3 eliminated the requirement that the inventory sheet be forwarded to defense attorneys when a criminal subpoena or discovery motion was received and eliminated the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)." Compare Ex. 79 (Special Order 83-2) at 4 with Ex. 80 (Special Order 86-3); Ex. 73 (Winstrom Dep in Reyes) at 106-07.

329.    S.O. 86-3 still (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) permitted detectives to maintain handwritten notes as personal files for longer periods of time, by removing the requirement of "prompt" documentation; (3) still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant; (4) and left defense attorneys with no mechanisms to determine whether their materials were complete without an inventory sheet. Ex. 80 (S.O. 86-3); Ex. 73 (Winstrom Dep. in Reyes) at 98-99. The order contained only one express instruction that only one thing from the investigative file needed to be disclosed: the inventory log. Ex. 81 (Rivera Trial Tr. 6/18/18) at 2247-2248, Ex. 82 (Rivera Trial Tr. 6/21/18) at 3229-3231; 3247-3248.

330.    In 1988, Standard Operating Procedures (SOP) were created to govern the work of detectives. Chapter 18 of the SOP, the relevant portion of the new SOPs dealing with the documentation and disclosure of investigative information, contains "no substantive changes of any kind" from S.O. 86-3. Ex. 71 (Hickey Dep. in Rivera) at  249:19-251:5; Ex. 80 (Winstrom Dep in Reyes) at 125:5-126:7 ("Q. And would you agree with me that looking at the [SOP] policy here, it is basically the same policy as what is contained in [S.O.] 86-3? A. I agree."), 208-210.

331.    30(b)(6) representative Hickey described the City's process of disclosing police records to prosecutors and criminal defendants as an "art form" of informal, on-the-job training, and could not think of any directives written to ensure proper disclosure of necessary information, including exculpatory information, in response to a subpoena request.  (Ex. 71, Hickey Dep in Rivera, at 160:7-22, 161:10-163:24).

78

## XXII. The City's Admissions Regarding Policy Deficiencies

332. Despite an auditing requirement added to Special Order 86-3, the City's designated representatives were unaware of a single instance of such auditing ever taking place, or of any document in existence indicating that someone had done the type of inspection required by S.O. 86-3. Ex. 71 (Hickey Dep. in Rivera) at 178:4-13, 244-45, 249:11-17; Ex. 73 (Winstrom Dep. in Reyes) at 208-210, 120-121; Ex. 72 (Hickey Fields Testimony) at 43:1-4.

333. Detectives were not disciplined for failure to comply with the new Special Orders, and Hickey testified that he had no knowledge whether, after the implementation of S.O. 83-1, there was anything done to survey or audit the implementation of the policy. Ex. 71 (Hickey Dep. in Rivera) at 178:15-179:2, 187:6-10; Ex. 74 (Hickey Fields Dep) at 10:12-22, 43:1-4.

334. Hickey admitted that he did not know if every detective followed S.O. 86-3. Ex. 72 (Hickey Fields Testimony) at 37:13-20.

335. Despite Judge Shadur's guidance regarding the deficiencies in the CPD policies, CPD never included a statement or directive in its policy to produce the entire contents of the investigative files, including the newly created General Progress Reports. Instead, the Special Orders contained only an instruction to forward a copy of the inventory sheet to the CPD's Record Division, without ever stating that the actual police reports in the files must be disclosed to prosecutors and criminal defendants. See, e.g., Ex. 80 (S.O. 86-3) (lacking any instruction to disclose entire investigative file and/or all supplementary reports and general progress reports to prosecutors and/or criminal defendants); Ex. 78 (S.O. 83-1) (same); Ex. 73 (Winstrom Dep. in Reyes) at 106:7-14, 20-24 ("Q. Is there some document that -- is there some other policy document that says, copy the entire investigative file and distribute this file in response to subpoenas? A. Policy document? Not that I'm aware of, no."), 107:21-24.

79

336. Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, CPD never updated its policy to stop permitting a system of multiple, parallel files rather than a single centralized file. Ex. 80 (S.O. 86-3); Ex. 81 (Noble Testimony) at 4832, 4818-19 ("[T]he Chicago Police Department has . . . essentially, three separate filing systems"--the investigative file, permanent retention file, and "working file"); Ex. 71 (Hickey Dep. in Rivera) at 192-94; Ex. 76 (Hickey Dep. in Kluppelberg) at 295:20-296:4;  Ex. 73 (Winstrom Dep. in Reyes) at 110-115.

337. The City acknowledges that its continued system of having multiple files of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations. Ex. 71 (Hickey Dep. in Rivera) at 36-37, 162-64, 253-54 (testifying to subpoena clerks and detectives questioning what they were required to produce in response to subpoenas, including whether investigative files had to be produced); Ex. 82 (Hickey/Spratte Trial Testimony in Rivera) at 3285:5-8; Ex. 73 (Winstrom Dep. in Reyes) at 106-107, 189, 192-94, 209; Ex. 80 (S.O. 86-3); Ex. 70 (Shadur Order) at 9-10.

338. Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy applied only to the Detective Division, and not investigators in other divisions and special units, including patrol officers and gang crimes officers. Ex. 80 (S.O. 86-3); Ex. 71 (Hickey Dep. in Rivera) at 54-55, 86-88; Ex. 82 (Hickey/Spratte Trial Testimony in Rivera) at 3388:9-3389:5.

339. Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy failed to provide any definition of what was "relevant" or "pertinent" information that needed to be documented, thus permitting detectives to make subjective

80

decisions about what was relevant, and could do so based on subsequent information learned during the investigation. The City's designees acknowledged that given this lack of instruction, detectives could reach different decisions about what needed to be documented. Detectives could, for example, determine that leads and investigative efforts into an alternate suspect could be deemed not pertinent or irrelevant, and thus would not need to be documented or disclosed. Ex. 80 (S.O. 86-3); Ex. 70 (Shadur Order) at 5-6; Ex. 76 (Hickey Dep. in Kluppelberg) at 237-38, 339; Ex. 73 (Winstrom Dep. in Reyes) at 64-66, 89-90, 99:6-10 ("Q. Does this policy provide any guidance about what information is to be treated as relevant and not relevant? A. This policy just says relevant information, no.").

340.    The Subpoena Service Unit in the Records Division handled requests for discovery from prosecutors and criminal defendants, but CPD had no policies, procedures, checklists, or other documents requiring, or explaining, how the Subpoena Service Unit staff were supposed to gather all responsive documents, or providing guidance to assist them in requesting material from all the right repositories. As a result, the process of responding to requests for police files was more of an "art," and whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck. Ex. 82 (Hickey Trial Testimony in Rivera) at 3284:17-19; Ex. 76 (Hickey Dep. in Kluppelberg) at 362-63; Ex. 71 (Hickey Dep. in Rivera) at 36:11-37:4, 43-46, 185-87; Ex. 83 (City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago) at 2-3; Ex. 73 (Winstrom Dep. in Reyes) at 192-94.

341.    In 2020, the City of Chicago's Office of Inspector General issued a report regarding the CPD's practices concerning the disclosure of police records to criminal defendants and civil plaintiffs, which included a review of case studies from 2010-2013, information

regarding nine instances in which the City was sanctioned by federal judges from May 2011 through February 2018, and interviews with more than a dozen CPD employees. The OIG found that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Ex. 84 (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"). The Inspector General issued a follow-up report in 2021, following an inquiry into the status of corrective actions taken by the City of Chicago in response to its 2020 recommendations. In that report, the Inspector General concluded that "CPD has yet to implement most of the improvements to which it committed. Specifically, CPD has yet to conduct a comprehensive staffing and resource analysis, develop and implement standard operating procedures for the management and production of records, or develop necessary trainings."  In particular, it found that the CPD "cannot ensure that it identifies and produces all relevant records in its possession as required." Without making these improvements, the Inspector General's follow-up report concluded that "Not having made these improvements, CPD is now—just as it was when OIG published its 2020 report—unable to ensure that it can meet legal and constitutional obligations which are at the core of its function as a law enforcement agency. This is an area of very serious risk for CPD and for the City." Ex. 85 (Sept. 2021 OIG Follow-Up Report) at 2, 3, 4, 11.

## XXIII.    Policies Did Not Meaningfully Change Over Time

342.    The City of Chicago has admitted that its written policies regarding the documentation and disclosure of investigative information did not change between 1983 and 2012. Ex. 86 (Loughran Dep. in Taylor) at 40:12-16 (testifying that the CPD policy regarding

homicide files did not change from 1992 to 2012); Ex. 73 (Winstrom Dep. in Reyes) at 43:7-46:2

(agreeing that the policies applying to documentation in homicide investigations from 1986 to

1998 were "nearly identical," and despite some "difference[s] in wording," the "overall policy is

the same"); see also id. at 46:19-23 ("Q. Okay. So in the period from 1986 through 1998, is it

correct that the policies with regard to documentation of homicide investigations were the same

across all detective areas? A. Correct."); Ex. 71 (Hickey Dep. in Rivera) at 119:7-9 (testifying

that the policy regarding records retention was consistent from 1983 to 2011); see also id. at

123:11-17 (same); Ex. 73 (Hickey Dep. in Fields) at 43:1-7 (noting that nothing was done after

S.O. 83-1, effective in 1983,  to review the document retention process, nor was there any new

directive as to documentation in investigative or other informal files); see also Ex. 87 (City's

Responses to Request for Production and Requests to Admit in Iglesias litigation (Apr. 7, 2022))

(admitting no changes in 1980s and 90s, and providing no documentation to the contrary).

343.    Even though S.O. 83-1 was considered a "major change" in policy, no auditing or

other steps were ever taken to ensure that the "major change" required by the Special Order were

actually being implemented and followed. Ex. 75 (April 10, 2014 Hickey Testimony, Fields v.

City of Chicago) at 2053:24-2054:1; Ex. 71 (Hickey Dep. in Rivera) at 244, 247, 249; Ex. 72

(Hickey Testimony from 2016 Fields Trial) at 35:11-25.

344.    Rather than checking out the investigative file, where all memos and notes were

supposed to be stored and preserved (on general progress reports), detectives reverted back to

keeping personal files with their own copies of investigative material. Ex. 76 (Hickey Dep. in

Kluppelberg) at 327-29.

345.    The substantively unchanged documentation policy resulted in other wrongful

prosecutions and convictions in which relevant investigative information was withheld from

criminal defendants, including for example, Nathson Fields, James Kluppelberg, Jacques Rivera, Arturo Reyes, and Gabriel Solache. Ex. 71 (Hickey Dep. in Rivera) at 250:2-251:5 (testifying to unchanged nature of policy); Ex. 88 (Fields Street File); Ex. 89 (Rivera Street File); Ex. 90 (Rivera Permanent Retention File); Ex. 91 (Order on Kluppelberg Certificate of Innocence); Ex. 92 (Brasfield Report) Attachment I at 11, Attachment H at 40-45; Fields v. City of Chicago, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017), aff'd, 981 F.3d 534 (7th Cir. 2020).

346. Nathson Fields: Nathson Fields was convicted of the 1984 double murder of Jerome Smith and Talman Hickman. Fields' conviction was thrown out after a court granted his petition for post- conviction relief; he was retried in 2009 and acquitted. During discovery in his subsequent civil lawsuit, a file of over a hundred pages of police reports and notes concerning the Smith/Hickman murders was located in a file cabinet at Area Central, along with files relating to other murders. The City admitted that the file had not been previously disclosed to Mr. Fields or to prosecutors. The documents newly produced in the previously undisclosed file, which were not contained in any of the earlier files, include handwritten notes, memos, and other documents identifying multiple alternate suspects and potential leads demonstrating that Nathson Fields was not involved in the Hickman and Smith homicides. It also included a previously undisclosed rap sheet for an alternate suspect with an issued on inquiry date stamp that undermined the prosecution's theory of the case. Nathson Fields's name, meanwhile, was never mentioned as a possible suspect in any of the non-disclosed documents. Ex. 88, Fields Street File; see also Ex. 93, Brasfield Report at 67- 68; Ex. 94, Fields Opinion on Post-Trial Motion; Ex. 93, Brasfield Report, Attachment H at 40-45.

347. Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas 1, 2, 3, and 4. Ex. 95 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files).

348. Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. Ex. 96 (Fields Trial Tr. 11/29/16) at 3:6-4:13 (PM Transcript), 7:7-8:8 (PM Transcript), 126:4-130:19 (AM Transcript, regarding missing documents in permanent retention files).

349. In December 2016, the jury in Fields found that the failure to disclose the file of investigative information to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded Mr. Fields compensatory damages of $22 million. Discovery in Fields revealed dozens of other undisclosed files in the Area Central basement. Ex. 95 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files). At the trial in Mr. Fields's case, additional evidence in support of the conclusion that the City had a practice of evidence suppression was presented, including the following:

    a. Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for reporting missing investigative materials. *See* Ex. 97 (*Fields* Trial Tr. 11/23/16) at

78:8-25, 79:1-8; Ex. 98 (*Fields* Trial Tr. 12/1/16) at 124:25-125:23; Ex. 99 (*Fields* Trial Tr. 11/17/16) at 103:5-8, 112:3-9; Ex. 100 (*Fields* Trial Tr. 11/28/16) at 30:23-31:22, 31:23- 25, 32:14-24, 52:5-112; Ex. 101 (*Fields* Trial Tr. 12/6/16) at 85:8-86:7, 95:22-96:5, 97:2-19; Ex. 102 (*Fields* Trial Tr. 12/5/16) at 137:5-22.

  b. Files of important investigative material were kept and suppressed in violation of Brady in the cases of Jon Fulton, Timothy Malone, and James Crockett. Ex. 97 (*Fields* Trial Tr. 11/23/16) at 12:3-14:15, 17:1-21:12, 18:10-17; Ex. 96 (*Fields* Trial Tr. 11/29/16) at 133-136 (PM Transcript); 111:2-115:18 (AM Transcript); Ex. 103 (Fields Trial Tr. 12/8/16) at 29:13-31:8, 31:9-34:5, Ex. 104 (Fields Trial Tr. 12/7/16) at 69:8-21; Ex. 105 (Fields Trial Tr. 11/30/16) at 31:2-15, 32:11-33:20, 41:8-42:8; 58:1-61:1.

350.  James Kluppelberg: James Kluppelberg was convicted for a 1984 fire that killed six people, and later exonerated for that crime. In 2014, during Kluppelberg's subsequent civil case, a new file was discovered that had never been disclosed in the criminal proceedings. That file contained investigative materials from the 1984 Area Three investigation, and included critical exculpatory information such as handwritten notes that a neighbor had reported there was loose and dangerous wiring in the basement that got wet sometimes (undermining the arson determination and supporting the evidence that the fire was accidental); numerous references to individuals who had had arguments or fights with the victims; and a memo between detectives that recounted a statement from an alternate suspect named Isabel Ramos who had started another porch fire in a building nearby just hours before the fire for which Kluppelberg was convicted. Ramos also reported that she had been intoxicated at the time, could not remember what she had done, but thought she perhaps set other fires. (Ex. 107, Opinion on Kluppelberg Certificate of Innocence; Ex. 108, Brasfield Report in Kluppelberg, at 11, 33; Ex. 106, Kluppelberg Street File, at CITY-KLUP_004329-4356 (produced by the City and referenced in Ex. 108); Ex. 191 (City's Resp. to Plaintiff's Third Set of Request to Admit Nos. 4, 8, 12, 16, 20, 24, 28, 32, 36, 40, 44, 48, 52, 56, 60, 64).

351.    Jacques Rivera: In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2010, the Area investigative file for the Valentin file was produced for the first time, and was compared against the original file from Rivera's criminal defense attorney, now-Judge Wadas, who had preserved it. Ex. 109 (Rivera Post-Trial Mot, June 15, 2018 Tr. of Proceedings) at 2202. It turned out that Wadas never received a number of important documents from the investigative file during the criminal proceedings, including an August 27 GPR containing the critical first memorialization of an eyewitness's account that put him "by the store" (instead of coming from the store, as was recorded in the police report), and an August 27 GPR regarding the witness that contradicted Defendants' story about an identification procedure that happened on that date. Ex. 110, (Rivera Trial Tr. 6/12/18) at 1385-1389, 1403-12, Ex. 81 (Rivera Trial Tr. 6/18/18) at 2244-2251. Wadas testified that, if he had received the documents, they would have provided powerful evidence of his client's innocence, and the trial prosecutor admitted as much as well. Ex. 110 at 1387-88 (Rivera Trial Tr. 6/12/18); Ex. 82 (Rivera Trial Tr. 6/21/18) at 3108. Hickey, the City's 30(b)(6) designee, admitted that all of these documents should have been disclosed. Ex. 109 (Rivera Trial Tr. 6/15/18) at 3289:24-3290:3, 3292:15-3295:9);

352.    Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Ex. 115 (9/16/88 Supplementary Report) at 2. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Ex. 116 (9/1/88 Supplementary Report) at 2-3. Valentin could not possibly

have provided the information that Defendant Guevara attributed to him. Additionally, Defendant Guevara requested Rivera's rap sheet before any witness had provided evidence making him a suspect. Ex. 209 at 135-138. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. Ex. 111 (Amended Petition for Post-Conviction Relief Based on Actual Innocence). In 2011, Lopez testified at an evidentiary hearing that, after seeing the shooter give another man a gang handshake, he testified there was "no doubt in my mind" that man was the shooter and that Rivera was the "wrong guy." Ex. 112 (Rivera PC Hearing Tr. 5/23/11) at 58; Ex. 114 (9/5/12 Order granting Petition for Certificate of Innocence) at 4-5. As a result, Rivera received a new trial. Ex. 113 (9/13/11 Order granting new trial). Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. Ex. 114 (9/5/12 Order granting Petition for Certificate of Innocence).

353.    After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. During trial, Rivera's expert, Michael Brasfield, as well as the City's own witness, James Hickey, testified that the CPD was fully aware that it had an evidence suppression problem in 1982 and 1983. Ex. 109 (Rivera Post-Trial Mot., June 15, 2018, Tr. of Proceedings) at 2182-2184; Ex. 82 (Hickey/Spratte Testimony in Rivera at 3210:21-3211:16, 3275:17-3276:10, 3279:11-3280:7). Brasfield testified that the City's written policies were plainly deficient. Among other things, he opined that the new policy: (a) retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files at the heart of the Jones and Palmer litigation; (b) did not cover gang crimes units and other investigators involved in homicide investigations; (c) did not define what constitutes relevant information that must be documented in reports; and (d) did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and

produced in response to criminal court subpoenas. Ex. 109 (Rivera Post-Trial Mot., June 15, 2018, Tr. of Proceedings) at 2186-2193.

354.    A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. Ex. 117, Rivera Judgment.

355.    Reyes/Solache:  In 1998, Detective Guevara repeatedly struck Gabriel Solache on the side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop.  Solache sustained permanent hearing loss to his left ear as a result of his abuse. (See Ex. 118, Suppression Hearing Testimony of Gabriel Solache, People v. Solache & Reyes, 98 CR 12440, at Bluhm 018579, 018586-97). In that same investigation, Detective Guevara repeatedly threatened and beat Arturo Reyes in an attempt to coerce Reyes into falsely implicating himself.  After two days of isolation and interrogation, Reyes finally gave in and falsely confessed.  (See Ex. 119, Suppression Hearing Testimony of Arturo Reyes, People v. Solache & Reyes, 98 CR 12440, at Bluhm 018478, 018482-502). The City of Chicago subsequently determined that Solache and Reyes were abused during their interrogations and that their convictions should not stand. (See Ex. 120, Lassar Report Regarding Solache and Reyes, Dated 12/12/14, at AR-L 522127, AR-L 522138-39). Guevara has taken the Fifth in regard to all allegations regarding Solache and Reyes. (Ex. 121, Testimony of Reynaldo Guevara in People v. Arturo Reyes & Gabriel Solache, 98 CR 12440, at JR-L 049858-65).

356.    The Defendant Officers in this case testified to having no knowledge of the requirements in the new Special Orders, to any training on the relevant Special Orders, or the obligation to preserve notes or disclose exculpatory information. Ex. 21 at 51:15-52:9 (Daley

testifying that he would document investigative efforts he took if he believed them "pertinent to the investigation."), Ex. 21 at 150:21-152:4 (Daley testifying that he would not say there was a "hard, fast rule" to what had to be documented) Ex. 38 at 185:2-7 (Guevara invoking the Fifth when asked if, under Chicago Police Department policy and training, he had to document circumstances when he showed gang books to eyewitnesses), Ex. 38 at 95:11-98:13 (Guevara repeatedly invoking the Fifth when asked questions about note-taking policies generally as a detective and taking notes specifically during the Fred homicide investigation).

## XXIV. <u>Report of Plaintiff's Retained Expert Thomas Tiderington</u>

357.    Plaintiff retained Thomas Tiderington, a police practices expert with over forty years of experience in law enforcement, to provide opinion testimony about the Chicago Police Department's policies and practices related to the creation, maintenance, storage, preservation, and disclosure of investigative materials in homicide cases, as well as the police investigation in this case.  Ex. 23 (Tiderington Report) at 2, 4.

358.    Tiderington spent 44 years as a law enforcement officer, including serving as a Police Chief for two decades. He served with three different police departments and as a Group Supervisor for the United States Drug Enforcement Administration's South Florida Regional Task Force. Tiderington has trained over 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations, and has been an instructor and lecturer at numerous regional, national, and international law enforcement training events on a wide variety of police practices and criminal investigations. In his capacity as Police Chief over twenty years, Tiderington reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and

employee discipline. Ex. 23 (Tiderington Report) at 2-3; see also Attachment D to Tiderington Report (curriculum vitae)).

359.    Tiderington reviewed the Special Orders promulgated in the wake of Jones and Palmer, discussed above. Ex. 23 (Tiderington Report) at 38-43. He concluded that the policies were deficient on their face to solve the official policy of evidence suppression of which the City was on notice. Id. at 43.  He also concluded that the CPD, through its policies and practices, created an environment where officers could routinely and systematically ignore city policies and the law with impunity and encouragement of that behavior, and despite formal written policies related to investigations and accountability, detectives routinely violated common and accepted investigative practices as a matter of unofficial policy or widespread investigative practices. Ex. 23 (Tiderington Report) at 6-7. Among other things, he concluded that the policymakers were aware of policy deficiencies, and that the policies (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) allowed for too much discretion to detectives about determining what is relevant and needs to be documented in official reports and disclosed; (c) did nothing to ensure that the subpoena responders ensured that investigative material from all locations is disclosed; and (d) lacked adequate training and monitoring/auditing to ensure compliance with the special orders. Ex. 23 (Tiderington Report) at 43-46.

360.    In addition to reviewing the relevant Special Orders, deposition testimony, and many other documents to assess the Chicago Police Department's practices and adherence to its policies, Tiderington reviewed and analyzed the 475 Area 5 investigative files from 1991-1995 that were provided to him for analysis, as well as the 344 Area 5 investigative files from 1995-

1998 that were provided to him for analysis, and compared them to available permanent retention files for those time periods. Ex. 23 (Tiderington Report) at 47; see also Attachment B to Tiderington Report (materials reviewed), Attachments E & F. In addition, Tiderington compared corresponding criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. Id. at 47. The case-by-case comparison of all of these file types is contained in Attachments E and F to Tiderington's Report. Ex. 23 (Tiderington Report) at 52; see Attachments E and F.

361.     Tiderington also reviewed the expert reports of Michael Brasfield in Fields v. City of Chicago and Rivera v. City of Chicago, which involve a similar review of hundreds more homicide files and corresponding files, as well as the police homicide files in Iglesias, Sierra, Reyes/Solache, Rivera, Fields and Kluppelberg. Ex. 23 (Tiderington Report) at 32.

362.     First, Tiderington analyzed the investigative files from each time period to see whether they demonstrated compliance to the new special orders. Tiderington found that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports. Ex. 23 (Tiderington Report) at 48. Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. Ex. 23 (Tiderington Report) at 50. His findings were consistent with Brasfield's findings in Rivera (61%) and Fields (82%). Ex. 23 (Tiderington Report) at 48; see also Ex. 23 (Attachments G and H to Tiderington's report) at 8. Relatedly, Tiderington found no handwritten notes or GPRs in the entire

investigative file from Guevara or Halvorsen, the lead detectives in this case. In his decades of experience, he was "not aware of a single homicide investigation in which the lead detectives took no notes." Ex. 23 (Tiderington Report) at 29.

363. Tiderington also found that detectives continued using to-from memos, which were also not included in official forms–despite the Special Orders' requirements and the City's knowledge of this deficiency. Ex. 70 (Shadur Order) at 4-6; Ex. 23 (Tiderington Report) at 48. In his review, he found that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms.  Id. at 48. Again, his findings were consistent with Brasfield's findings in Rivera (20%) and Fields (43%). Ex. 23 (Tiderington Report) at 48.

364. Further, Tiderington found that inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete). From 1991-1995, his review revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files he reviewed contained no inventory sheet that the Special Orders required as a means to ensure disclosure. Ex. 23 (Tiderington Report) at 49.

365. Second, Tiderington reviewed the permanent retention files, which contain only official reports, standing alone. He concluded that, while in most police departments around the country the official reports contain multiple storylines, including leads that point to other suspects and to dead-ends, CPD official reports only tell one storyline, the evidence developed against the person ultimately charged. Ex. 23 (Tiderington Report) at 49-50. He found that permanent retention files routinely lacked an inventory sheet as required by policy. Ex. 23 (Tiderington Report) at 51.

366.     Third, Tiderington compared the investigative files to 64 corresponding criminal defense files for the years 1995-1998. He concluded that important investigative materials were regularly withheld from the criminal defense files for criminal defendants, as every one  of the criminal defense files he reviewed were missing documents contained in the corresponding homicide files.  Ex. 23 (Tiderington Report) at 51-54 ; Attachment E to Tiderington Report; Ex. 70 (Shadur Order) at 17.

367.     The case-by-case comparison of all of these file types is contained in Attachments E to Tiderington's Report. Ex. 23 (Tiderington Report) at 52-54; see Attachment E.

368.     Tiderington also identified examples of files where documents contained in the homicide files and missing from the criminal defense files were important investigative materials, where significant discoverable items that should have been disclosed were routinely absent. Ex. 23 (Tiderington Report) at 54. The five examples for which he discussed at length the withheld investigative material that would have aided the defendant and therefore should have been disclosed under standard police procedures are the following: (1) RD # C687989 (Defendant Kim Mathis); (2) RD #Z475236 (Defendant Ardell Clemons); (3) RD #B442532 (Defendant Oscar Soto); (4) RD #B023979 (Defendant Leon Fields); and (5) RD #A403252 (Defendant Guy Rainey). For each of the five cases, Tiderington reviewed corresponding State's Attorney's Office files. In each, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors. Ex. 23 (Tiderington Report) at 55-58; Ex. 126 (Tiderington Deposition in Reyes) at 601:11-603:8.

369.     Tiderington stated that his findings in each of these cases and in the Fred investigation itself are consistent with the facts and circumstances of other wrongful conviction cases involving CPD in which exculpatory information was held and that Tiderington reviewed

for his report, including Fields v. City of Chicago, Kluppelberg v. City of Chicago, Rivera v.

City of Chicago, Reyes/Solache v. City of Chicago, Sierra v. City of Chicago, and Iglesias v.

City of Chicago. Ex. 23 (Tiderington Report) at 58-64.

370.    The analysis that Tiderington conducted in this case is the same one he conducted

in Iglesias, Sierra, and Reyes/Solache, and the one Michael Brasfield conducted in Rivera and

Fields, and his findings are consistent with Brasfield's. Ex. 23 (Tiderington Report) at 58-64. In

Fields, Brasfield testified that approximately 80% of the criminal defense files were missing

handwritten notes from the CPD files, 46% were missing general progress reports (on which

detectives take notes), and 36% were missing inventories. Ex. 96 (Fields Trial Tr. 11/29/16) at

3:6-4:13 (PM Transcript), 7:7-8:8 (PM Transcript), 126:4-130:19 (AM Transcript, regarding

missing documents in permanent retention files). In particular, Tiderington's finding that the

1991-1995 Area 5 investigative files demonstrate that the City's problems with filekeeping,

documentation, and disclosure of investigative information first identified in Jones/Palmer

persisted under the policies of the CPD is the same conclusion that he reached with regard to the

1995-1998 Area 5 investigative files, and that Brasfield reached with regard to 1985-1991 Area 5

investigative files, and 1984-1989 Area 1 (primarily) investigative files. Ex. 23 (Tiderington

Report) at 48; Ex. 92 (Brasfield Report in Rivera) at 43-45; Ex. 93 (Brasfield Report in Fields) at

15-19.

371.    Tiderington also reviewed the homicide files in the case of James Kluppelberg,

and appended Mr. Brasfield's report in *Kluppelberg* to his expert report. In that case, Mr.

Brasfield's expert report revealed that, of the investigative files produced to Brasfield (from

1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity,

including that there was a widespread practice of disregarding the use of Major Crime

Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. Ex. 23 (Tiderington Report) at pgs. 423-439 (pgs. 43-59 of Brasfield's Report in Kluppelberg).

372.     Tiderington also confirms that his findings—that the CPD's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations was contrary to generally accepted police practices—are consistent with the findings of the City of Chicago's own Office of Inspector General, whose 2020 report stated that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Ex. 23 (Tiderington Report) at 32; Ex. 84 (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"); see also Ex. 85 (Sept. 2021 OIG Follow-Up Report) at 2.

373.     On May 25, 2023, Mr. Tiderington supplemented his report after receiving the Cook County Public Defender's file for Demetrius Johnson's criminal proceedings, including

notes from Mr. Johnson's public defender, Jack Carey, of his interviews with Mr. Johnson and various witnesses. Ex. 230 (Tiderington Supp.) at 2.

374.    After reviewing Mr. Carey's notes, Mr. Tiderington concluded that his opinions expressed in his expert report have not changed, but in fact that his review of the notes "corroborates and strengthens [his] opinions, since the notes are entirely consistent with [his] opinions" that Defendants displayed tunnel vision when conducting improperly suggestive lineups and that they failed to disclose the Erickson Report, which is contrary to generally accepted police practices. Ex. 230 (Tiderington Supp.) at 2.

375.    During expert discovery, the Defendants disclosed four retained experts. Among them, they disclosed two former law enforcement practitioners, Ronald Muich and Ralph Rider, to opine about the underlying investigation in this matter. Neither of them offers any opinions about whether CPD's policies regarding documentation and disclosure generally, and Special Orders 83-1 and its progeny specifically, are adequate or sound policies. In addition, the City also disclosed a former prosecutor, Bernard Murray, to opine about criminal discovery in Cook County; Mr. Murray has never worked in a police department, does not consider himself an expert in police policymaking, and is not offering any opinions about whether the documentation and disclosure policies at issue are adequate or sound policies. Ex. 127 (Defendants' Rule 26(a)(2) Disclosures); Ex. 231 (Rider Report) (no opinions regarding Monell claims, including the policies at issue or their adequacy to address problems identified during Jones/Palmer); Ex. 232 (Muich Report) (same); Ex. 130 (Murray Deposition) at 53:10-20, 67:11-13, 74:7-13; Ex. 278 (Muich Dep). at 55:9-14 (". . . you are not giving opinions in your report about CPD policies or widespread practices as being appropriate or not, correct? A. That is correct.").

## XXV.     Adjudication of Issue in Past Cases

376.     The existence of the City of Chicago's official policy of suppressing exculpatory

and/or impeaching investigative information was established in the cases of, inter alia, *Rivera v.*

*Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); *Palmer*

*v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536

(N.D. Ill.).

377.     In *Fields*, the jury was instructed that, to find against the City of Chicago on the

plaintiff's policy claim, Fields had to prove, in pertinent part, that "[a]t the time of the

concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or

impeachment evidence," and that this policy (as defined in the instructions) caused the

concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case,

which harmed plaintiff as a result. Ex. 132 (*Fields* Final Jury Instructions) at 14-15.

378.     During trial, both sides presented extensive Monell evidence, which is collected

in the parties' post-trial submissions in *Fields*. Ex. 133 (Defs.' Combined Post-Trial Mot. in

*Fields*) at 9-16, 18-24; Ex. 134 (Pl.'s Resp. to Defs.' Post-Trial Mot. in *Fields*) at 12-25; Ex. 135

(Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

379.     The City lost the jury trial in *Fields*. Ex. 136 (*Fields* Verdict Summary). A

judgment was entered against the City on the jury's verdict. Ex. 137 (*Fields* Judgment). After

fully briefing the issues, the City's post-trial motion was denied. *Fields v. City of Chicago*, 2017

WL 3987356 (N.D. Ill. Sept. 11, 2017); Ex. 133 (Defs.' Combined Post-Trial Mot. in *Fields*) at

9-16, 18-24; Ex. 134 (Pl.'s Resp. to Defs.' Post-Trial Mot. in *Fields*) at 12-25; Ex. 135 (Defs.'

Reply in Support of Post-Trial Mot.) at 5-10.

380.     The denial of the City's post-trial motion was affirmed on direct appeal, where the

U.S. Court of Appeals for the Seventh Circuit concluded that the City had notice of deficient

policies with respect to withholding/disclosure of evidence "as a result of prior litigation that the use of street files and the failure to ensure the production of the evidence within those files presented a constitutional problem," and that in Fields, the evidence presented sufficiently allowed the jury "to conclude that the City had failed to take the necessary steps to address that unconstitutional practice." *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020).

381.    In Rivera, the jury was instructed that to find against the City of Chicago on the policy claim, Rivera had to prove by a preponderance of the evidence, in pertinent part, that "[t]he City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence," and that this policy (as defined in the previous paragraph) caused the violation of the plaintiff's constitutional rights. Ex. 139 (*Rivera* Final Jury Instructions) at 26.

382.    Based on that jury instruction, in June 2018, a federal jury entered a verdict for Rivera and against the City, and a judgment was entered against the City on the jury's verdict. Ex. 117 (*Rivera* Judgment); Ex. 140 (*Rivera* Verdict).

383.    During trial, both sides presented extensive Monell evidence, which was collected in the parties' post-trial submissions in *Rivera*. Ex. 141 (City's Mot. for New Trial) at 2-11; Ex. 142 (Pl.'s Resp. to City's Mot. for New Trial) at 78-109; Ex. 143 (City's Reply In Support of Mot. for New Trial) at 3-23, 30-34.

384.    During trial, Rivera's expert, Michael Brasfield testified that the CPD was fully aware that it had an evidence suppression and non-disclosure problem in 1982 and 1983. Ex. 109 (*Rivera* Post-Trial Mot., June 15, 2018, Tr. of Proceedings) at 2182-2184.  Brasfield testified that the City's written policies were plainly deficient. Among other things, he opined that the new policy: (a) retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files at the heart of the Jones and Palmer litigation; (b) did not cover

gang crimes units and other investigators involved in homicide investigations; (c) did not define what constitutes relevant information that must be documented in reports; and (d) did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. Ex. 109 (*Rivera* Post-Trial Mot., June 15, 2018, Tr. of Proceedings) at 2186-2193.

385.    Brasfield conducted an analysis of 435 CPD Area Five homicide files for the years 1985 to 1991, and his analysis of the data revealed that, in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to the criminal justice system. Ex. 109 (*Rivera* Trial Tr. 6/15/18) at 2210-15, 2248. A full 100% of the files contained evidence of failures to follow the post-Palmer policies. Id. at 2214-15. Defendants' expert, Bernard Murray, chose not to conduct his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. Ex. 144 (*Rivera* Trial Tr. 6/26/18) at 3912-3919.

386.    Brasfield also testified that his review of the City's official permanent retention files also revealed that the problems identified in Jones and Palmer persisted, as the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Ex. 109 (*Rivera* Trial Tr. 6/15/18) at 2218-20. Defendants' expert, Bernard Murray, failed to rebut this testimony. Ex. 144 (*Rivera* Trial Tr. 6/26/18) at 3912-19.

387.     Brasfield also compared criminal defense files to their corresponding investigative files and determined that materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial material that had been the subject of Jones and Palmer. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Ex. 109 (*Rivera* Trial. Tr. 6/15/18) at 2226. Brasfield and Murray testified about multiple cases—e.g., Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. Ex. 81 (*Rivera* Trial Tr. 6/18/18) at 2252-2271; Ex. 144 (*Rivera* Trial Tr. 6/26/18) at 3846-54 (Defense expert Murray), 3857-61, 3870-71 (Murray re: Robinson), 3872-83 (Murray re: Johnson, Quinones, Borrotto, Kirkland), 3884-85 (Murray re: Pacheco), 3886 (Murray re: Fields). Murray conceded that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. Ex. 144 (*Rivera* Trial Tr. 6/26/18) at 3846-54, 3857-61, 3870-71, 3872-83, 3884-85, 3886, 3912-19).

388.     Brasfield's testimony also revealed that Gang Crimes officers were fully involved in homicide investigations, as they were in the Valentin investigation. Ex. 145 (*Rivera* Trial. Tr. 6/22/18) at 3347-51, 3386-88, 3397, Ex. 146 (*Rivera* Trial Tr. 6/14/18) at 1694; 1702; 1766-1767. Gang Crimes officers should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. Ex. 109 (*Rivera* Trial Tr. 6/15/18) at 2191. But Gang Crimes officers were permitted to keep their own personal notes in their own set of parallel files. Ex. 145 (*Rivera*

Trial Tr. 6/22/18) at 3347-53, 3355, 3359-63, 3386-91, 3397, 3411, 3415, 3425-29; Ex. 109 (*Rivera* Trial Tr. 6/15/18) at 2198-2200. They were exempt from these rules despite the City designee Hickey's recommendation in the early 1980s that gang crime experts be included in the new Special Orders. Ex. 145 (*Rivera* Trial Tr. 6/22/18) at 3290-91, 3481; Ex. 109 (*Rivera* Trial Tr. 6/15/18) at 2195.

389.    The City's own witness, James Hickey, confirmed in his trial testimony that the CPD was fully aware of its evidence suppression problem, *see* Ex. 82 (Hickey/Spratte Testimony in *Rivera* at 3210:21-3211:16, 3275:17-3276:10 (aware of Palmer/Jones litigation presenting a problem of non-disclosure of exculpatory information, and that Hickey's subsequent investigation confirmed procedural flaws resulting in non-disclosure), yet did not implement any policy or formal training to ensure disclosure. Ex. 82 (Hickey/Spratte Testimony in *Rivera* at 3279:11-3280:7). He confirmed that there was no auditing of detectives following Special Orders, either. Ex. 82 (Hickey/Spratte Testimony in *Rivera* at 3297:4-13).

390.    Finally, there was testimony that, as a result of the pattern of evidence suppression, Rivera and his criminal attorney never received a number of important documents from the investigative file during the criminal proceedings, although the police department was responsible for ensuring their production. Ex. 82 (Hickey/Spratte Testimony in *Rivera* at 3289:24-3290:3, 3292:15-3295:9); Ex. 110, (*Rivera* Trial Tr. 6/12/18) at 1385-1389, 1403-12, Ex. 81 (*Rivera* Trial Tr. 6/18/18) at 2244-2251.

391.    The jury found that the failure to disclose evidence to Mr. Rivera was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Rivera compensatory damages of $17 million. Ex. 117 (*Rivera* Entered Judgment).

392.     The City's post-trial motion was denied. *Rivera v. Guevara*, No. 12-CV-4428, 2019 WL 13249674, at *4 (N.D. Ill. Sept. 20, 2019).

393.     In *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017), the district court granted Kluppelberg's motion to apply collateral estoppel, stating that:

> To establish that the issues are the same and were necessarily decided, Kluppelberg must show that the jury in *Fields*, in order to have reached its verdict, had to have found that the City had a policy or practice of withholding material exculpatory and/or impeachment evidence, specifically street files…. The court finds that Kluppelberg has met that burden. That the jury must have found a policy or practice of withholding evidence is clear from the jury instructions in *Fields*, which stated that, to succeed on his *Monell* claim, Fields must prove by a preponderance of the evidence that 'it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence.'…. Kluppelberg's motion to apply collateral estoppel barring the City from arguing that it did not have a policy or practice of withholding material exculpatory and/or impeachment evidence contained in street files is granted."

*Id*. at 776-79.

## XXVI.     <u>Fabricating Identifications</u>

394.     Since before the 1991 Fred murder investigation, it was common knowledge in law enforcement that a large percentage of erroneous convictions were the result of incorrect or improper eyewitness identifications. Even in 1967, the International Association of Chiefs of Police (IACP) was releasing training material for law enforcement about the failures in witness perception, writing that "Eye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts[.]" Ex. 150 (IACP Training Key #67, "Witness Perception," 1967).

395.     From the 1967 Training materials until the time of the Fred investigation and thereafter, the risks of improper identification procedure continued to be acknowledged within

law enforcement. For example, in February of 1992, the IACP confirmed notice of that risk within a Model Policy pertaining to Show-ups, Photographic Identifications, and Line-ups, which cautioned law enforcement that "[w]ords or conduct of any type by officers that may suggest to the witness that the individual is or may be the perpetrator should be scrupulously avoided" to "minimize unjust accusations of innocent persons and to establish evidence that is reliable." Ex. 148 (1992 IACP Model Policy) at 1.

396.    The 1993 Concepts and Issues Paper on Showups, Lineups and Photograph Identification  accompanying the 1992 Model Policy explained the primary reasons that eyewitness identifications were frequently unreliable: frailties of human memory and perception, especially under stress; and the ease with which eyewitnesses could be influenced by suggestion Ex. 149 (1993 Concept and Issues Paper) at 1.

397.    The 1993 IACP Concepts and Issues Paper also notes that eyewitness identifications are often erroneous and eyewitnesses are easily influenced by law enforcement. IACP advised that "[i]t is even desirable to tell the witness that the perpetrator may not be among those in the lineup"; and suggested that detectives should not pressure tentative witnesses to make positive identifications. It also notes that if more than one witness views the same lineup, the witnesses should be kept separate. It also says that witnesses should not be shown photographs of the suspect immediately before the lineup, and that detectives should "scrupulously avoid" doing anything that could suggest to the witness who the suspect is. Ex. 149 (1993 IACP Concepts and Issues Paper) at 2.

398.    Building upon decades of the awareness of such a risk of improper suggestion, the 1993 IACP Concepts and Issues Paper quoted from the Supreme Court's 1967 decision in *United States v. Wade*, 388 U.S. 218 (1967), stating that "The influence of improper suggestions upon

identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." Ex. 149 (1993 IACP Concept and Issues Paper,) at 1; *see also* Ex. 150 (IACP Training Key #67, "Witness Perception," 1967) (confirming that the weakness of eyewitness identification and description has "long been recognized by the courts[.]").

399.    The City's Rule 30(b)(6) designee, Lt. Foster, established that the City understood this big-picture IACP guidance. For instance, Lt. Foster testified that "[detectives] could generate unduly suggestive photo arrays, which . . . definitely erodes their authenticity and their value." Ex. 58 (Foster Dep.) at 282:23-283:7; *see also id.* at 55:12-18 (Foster providing binding testimony regarding City of Chicago's policies and practices from 1986 to 1998 related identification procedures). Foster also testified that it was understood by supervisory staff, including sergeants, lieutenants, and commanders of detectives that there were risks that an unduly suggestive photo array could lead to an identification that was not "authentic," and that noncompliance with proper procedure could result "in identification of the photographs being abused" or being quashed by a motion in court. Ex. 58 (Foster Dep.) at 284:5-16, 286:6-287:10, 288:19-25.

*Policies*

400.    The City of Chicago's policy regarding lineup procedures, effective at the time of the Fred investigation, was General Order ("GO") 88-18. Ex. 30 (G.O. 88-18).

401.    Foster testified that homicide detectives' supervisors were aware that these policies applied to homicide detectives, and that the command staff, commanders, lieutenants, sergeants, and supervising homicide detectives knew why this policy existed, and if policies

were not followed, it could result in false identifications or misidentifications. Ex. 58 (Foster Dep.) at 285:4-15, 287:8-10.

402.    A witness's identification of a filler can be highly exculpatory information. It is a greater indicator that a witness is unreliable, and therefore more exculpatory, than when a witness fails to make any identification at all in a lineup; this is because when an eyewitness looks at a lineup and identifies a filler, the eyewitness is saying (in effect) that the filler looks more like the culprit than does the suspect. Ex. 71 (Hickey Dep in Rivera) at 262:12:24; Ex. 282 (Steblay Rebuttal Report) at 19.

403.    Neither G.O. 88-18 nor any other policies in effect in 1991 governed the conduct for filler identifications or photographic lineups. Ex. 30 (G.O. 88-18) (no instructions for filler identifications, no instructions for photographic lineups); Ex. 58 (Foster Dep.) at 201:1-20 (G.O. 88-18 references lineups, but not photo arrays, gang books or photo books), 242:13-243:5 (G.O. 88-18 was in place from 1988 to 1998), 243:6-25 (Special Order S06-02 went into effect after 1998, and was the first policy providing policy guidance as to the conduct of photo arrays), 303:11-15, 304:5-11, 307:5-11 (G.O. 88-18 was the only policy guidance about conducting or documenting live lineups from 1988 to 1998).

404.    Regarding live lineups, G.O. 88-18 required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for the arrestee, and any additional information or unusual circumstance occurring during the lineup. Ex. 30 (G.O. 88-18) at 2.

405.    G.O. 88-18 does not require blind administration of lineups. Ex. 30 (G.O. 88-18).

406.     G.O. 88-18 did not require documentation of the selection of a filler in a live lineup. Ex. 58 (Foster Dep) at 244:1-13 (identifications only considered positive or negative identifications of suspects), 309:7-10 (under G.O. 88-18, "if the person identified in the lineup was a filler, that [designation] would not be documented."). Indeed, policies provided no guidance on what to report when a filler was selected. Ex. 71 (Hickey Dep. in Rivera), 264:11-265:19.

407.     The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were documented as negative identifications, Ex. 58 (Foster Dep.) at 244:9-13, and that filler identifications were not documented. Ex. 72 (Hickey Dep. in Rivera), at 261:24-262:6, 264:11-265:19.

408.     G.O. 88-18 contains no instruction regarding what was required before a supervisor approved a live lineup report. Ex. 30 (G.O. 88-18) at 1-3.

409.     G.O. 88-18 contains no requirement to document the comments of what police conducting lineups said to witnesses or vice versa, and contains no requirement to document exculpatory or impeachment information arising from lineup procedures. Ex. 30 (G.O. 88-18) at 1-3.

410.     Lt. Foster also testified that there was no policy against showing a single photo during a stranger identification procedure and that there was no policy against showing a witness a single photo before the witness views a live lineup. Ex. 58 (Foster Dep.) at 206, 207:24-208:9 (agreeing that, as a matter of policy, there was no prohibition on single photos being shown, and no direction or instruction given to detectives that single photo identifications were prohibited), 267-68, 271-72.

411.    He also testified that CPD had no policies instructing detectives that once they obtained a positive identification from a photo array, they should not conduct an additional identification procedure with that witness, or that a subsequent live lineup identification is less reliable if the suspect is the only person who appears in both the photo array and live lineup. Ex. 58 (Foster Dep.) at 293:21-25, 294.

412.    Foster also testified that a photo array only required four fillers. Ex. 58 (Foster Dep.) at 197:1-22. The 1992 IACP model policy states that at least six photos, including the suspect (meaning five fillers), should be used in a photo array. Ex. 148 (1992 IACP Model Policy) at 1.

413.    Foster testified that there was no applicable policy ensuring that a suspect did not have restraints or other indications that they were a person in custody during the course of a lineup. Ex. 58 (Foster Dep.) at 316:3-10.

414.    In *Rivera*, the City was asked to identify a single file—from anywhere at any time—in which a lineup report reflected the identification of a filler. Ex. 155 (Doc. No. 64, Plaintiff's Motion to Compel Regarding Filler Lineups (describing the history of this issue and Rivera's discovery requests].) The City responded that it would identify such a file if it found it, and it never updated that response. Ex. 156  (City Supp. Response to Plaintiff's First Interrogatories, Request No. 14, July 2013.)

415.    Foster agreed that a gang specialist could interview a witness and learn information pertinent to the homicide investigation outside the presence of any detective, and there was no requirement that the gang specialists had to document that interview. Ex. 58 (Foster Dep.) at 319:19-323:4. Even if the gang specialist did document pertinent information the

specialist acquired, there was no policy requiring that information to get to the Detective Division, or training on the issue. Ex. 58 (Foster Dep.) at 332:11-20.

416.　　Special Order S06-02 went into effect after 1998, and was the first policy providing policy guidance as to the conduct of photo arrays; it did not apply from 1986-1998. Ex. 58 (Foster Dep.) at 243:6-25. Foster was unaware of any other policy applying to the conduct of photo book procedures. Ex. 58 (Foster Dep.) at 202:20-23.

## XXVII.　Dr. Nancy Steblay's Testimony

417.　　Plaintiff disclosed Nancy Steblay as an expert in eyewitness identification, with specific expertise in eyewitness identification evidence collection procedures, memory, social-influence, decision-making, jury decision processes, and law enforcement eyewitness evidence procedures, in support of Plaintiff's Monell claim against the City of Chicago. Ex. 279 (Pl.'s March 8, 2023 Rule 26(a)(2) Disclosure) at 1; Ex. 281 (Steblay Report) at 1-2; *see also* CV attached to her Report. In addition to disclosing an initial report, Dr. Steblay disclosed a rebuttal report responding to opinions of defense expert Dr. Wixted, which incorporates an earlier rebuttal to Dr. Wixted (July 3, 2023) in *Bouto v. Guevara, et al., Sierra v. Guevara, et al., Rodriguez v. Guevara, et al.*, and *Iglesias v. Guevara, et al*. Ex. 282 (Steblay Rebuttal Report, Nov. 18, 2023). Finally, Dr. Steblay also supplemented her report with an explanation of three minor changes she made as she moved from her expert report in *Iglesias* to the instant case. Ex. 288 (Dr. Steblay Supp.).

418.　　Plaintiff retained Nancy K. Steblay, Ph.D., Professor Emeritus of Psychology at Augsburg University in Minneapolis, Minnesota, where she has been teaching and doing research on eyewitness topics since 1988. She is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification

evidence collection procedures. She has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has conducted workshops, information sessions, and lectures on eyewitness identification evidence to attorneys, prosecutors, police, and judges in the United States and Canada, and has worked with prosecutors, law enforcement, and other public officials and policy makers to help reform eyewitness identification procedures. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. Ex. 281 (Steblay Report) at 1; see also CV attached to her Report).

419.    In *Sierra*, the City was required to produce 523 homicide files across a time period of five years (1991 – 1995) from Area Five. Ex. 159 (12/3/2019 Order Compelling Production, Sierra Dkt. 154); Ex. 160 (6/20/2020 Amended Joint Scheduling Order on Monell Discovery, Sierra Dkt. 195), Likewise, in *Bouto v. Guevara*, No. 19-c-2441, the City was required to produce Area Five homicide files from 1989 to 1993. Ex. 192 (8/3/20 Mem. Op. & Order on Pl.'s Mot. to Compel, Bouto Dkt. 153). Additionally, in *Reyes* and *Rodriguez*, the City was required to produce homicide files from 1995-1998. Ex. 64 (Dkts. 224, 384, *Reyes v. Guevara*, No. 18-c-1028 (1995-1998 Area Five homicide files ordered to be produced)); Ex. 193 (Dkt. 186, *Rodriguez*, 5/3/2022 Order Compelling Production, Rodriguez). Collectively, these files constituted the compelled homicide files for this time period that were provided to Dr. Steblay in *Iglesias* and *Johnson*. Ex. 281 (Steblay Report) at 3, 5; *see* Ex. 291 (Iglesias Dkt.. 167) at 1, 4.

420.    Plaintiff's counsel compiled an Excel spreadsheet detailing the 2786 identification procedures (live lineups and photo arrays) reported in the compelled Monell homicide files for the time period from 1989 to 1998 and provided it to Dr. Steblay, along with a description of the

information coded. Dr. Steblay was provided access to all of the underlying files. Ex. 281

(Steblay Report) at 5. The dataset included a range of identification practices (e.g., showups,

photo lineups, live lineups) and variations in lineup size, number of suspects in the lineup, and

circumstances of the identification (e.g., prior relationship between suspect and eyewitness as

strangers or non-strangers). Ex. 281 (Steblay Report) at 4.

421.    Dr. Steblay discussed with Plaintiff's counsel how the coding for the files would

be most efficient and effective for her analysis. Dr. Steblay was assured that the coding was

reliable by taking the following steps:

> First, I ensured that the coding team was using objective and clear definitions for
> the coded variables. This was accomplished by referring to critical variables in
> earlier datasets (e.g., the Wells, et al., 2020 White Paper), and by documenting the
> definitions for the coded variables in the Excel spreadsheet. The primary variable
> of interest was the witness's decision as per three possible categories: suspect
> identification, filler identification, or non-identification. . . . Second, the coding
> was done by at least two independent coders, who then compared their work to
> catch discrepancies. The means to resolve discrepancies was clear. The variables
> coded in this current set are for the most part objective with no interpretation
> necessary. Still, a review between coders can catch errors that stem from an
> overlooked item in the file or mis-keyed data. When a variable involves the
> possibility of subjectivity or confusion . . . the comparison between coders will
> help to maintain consistency in the coded results. Third, the data analyst (me) will
> spot-check a subset of files in order to ascertain whether there is clear agreement
> and understanding between the coders and the analyst about each variable in the
> set. In addition, the data analyst (me) will independently examine a randomly-
> selected subset of lineups (approximately 200) as a means to verify coding
> accuracy. Agreement surpassed 98%.

Ex. 281 (Steblay Report) at 5-6.

422.    Dr. Steblay concluded that her interrater agreement surpassed 98%. Ex. 281

(Steblay Report) at 5-6; Ex. 282 (Steblay Rebuttal Report) at 2. The strong interrater agreement

gave Dr. Steblay confidence in the quality of the underlying data. Ex. 282 (Steblay Rebuttal) at

2-3; Ex. 162 (Steblay 2/9/23 Dep.) at 225:21-226:15, 93:22-94:19, 241:11-241:18. The data coding process does not call for subjective decision-making. Ex. 282 (Steblay Rebuttal Report) at 2-3; Ex. 281 (Steblay Report) at 5; Ex. 162 (Steblay 2/9/23 Dep.) at 88:5-90-91:23.

423.     The data summary first released to Dr. Steblay in *Sierra* underwent ongoing quality control measures and was not finalized until it was re-released to Dr. Steblay in *Iglesias* (and used, in turn, in this case), in a finalized *Iglesias/Johnson* dataset covering all Area Five homicide files from 1989-1998, which incorporated Dr. Steblay's reliability review and quality control measures. Ex. 162 (Steblay 2/10/23 Dep.) at 390:3-392:7, 407:12-407:24; Ex. 282 (Steblay Rebuttal) at 4-5, 10-12, 21). The results of Dr. Steblay's analysis were highly consistent both before and after completion of the quality control process, finding abnormally high suspect identification rates and abnormally low filler identification rates across all of the cases. Ex. 162 (Steblay 2/10/23 Dep.) at 527:4-527:8, 573:3-574:15; Ex. 282 (Steblay Rebuttal Report) at 4-5, 10-12, 21.

424.     The *Iglesias/Johnson* Data Summary identified specific page references for each lineup procedure, and were shared with all parties in that litigation and with Defendant City of Chicago in both. Ex. 276 (Sierra Data Summary); Ex. 277 (Iglesias Data Summary); *see also* Ex. 289. The City also had the underlying homicide files, which were the City's documents produced in previous cases. Ex. 160, 159. Defendants' expert responding to Dr. Steblay concedes that he does not challenge the data on which Dr. Steblay relies and he has not identified any error in that data. Ex. 163 (Wixted Report (Field Studies) at 1-2; Ex. 282 (Steblay Rebuttal) at 34. Wixted also did not opine that Dr. Steblay's reliability check was unsound. *Id.* at 1-2.

425.     Dr. Steblay observed that, between 1989 and 1998 in the Chicago dataset, witnesses participating in Chicago identification procedures picked the police officer's suspect

75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). Five percent of the lineup reports did not document the outcome of the lineup. Ex. 281 (Steblay Report) at 3.

426.    Additionally, of the 2786 lineups in the Chicago dataset, 23% of them included multiple suspects, and 20% concerned a repeat identification procedure with the same witness and suspect. Most lineups were smaller than six people in the procedure (58%). In 74% of identification procedures, the witness did not know the suspect, and in the remaining 26% of procedures the witnesses reported that the suspect was a familiar person at the time of the crime. Ex. 281 (Steblay Report) at 3.

427.    In addition to making these observations, Steblay compared the results of the Chicago dataset with data reported in the 2020 White Paper, a peer-reviewed, consensus document signed by leading eyewitness scientists. Ex. 281 (Steblay Report) at 2-3; Ex. 164 (2020 White Paper). The 2020 White Paper aggregated the data from the eleven available peer-reviewed field studies reporting lineup outcome data and found the compilation valuable to illuminate the behavior of real eyewitnesses in the field.  Ex. 281 (Steblay Report) at 2-3; Ex. 164 (2020 White Paper) at 4-5.  The field data reported in the 2020 White Paper reflects the outcomes of 6,734 lineups (both live and photo) conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. Ex. 281 (Steblay Report) at 7**;** Ex. 282 (Steblay Rebuttal) at 6; *see also* Ex. 164 (2020 White Paper) at 4-5. The data from the field studies is aggregated and compiled in Table 1 of Dr. Steblay's report. Ex. 281 (Steblay Report) at 3. This data has been used independently in other published, peer-reviewed work. Ex. 281 (Steblay Report) at **3;** Ex. Ex. 282 (Rebuttal to Wixted) at 5; Ex. 164 (2020 White Paper) at 5.

428.    The 11 field studies comprising the Table I data "are from highly varied jurisdictions." Ex. 164 (2020 White Paper) at 5; Ex. 282 (Steblay Rebuttal Report) at 6. Steblay reports that the data from these samples show regularities in the pattern of eyewitness decisions, despite the police practice variations in the jurisdictions. She reports that "[d]ifferences in practices among the 11 field studies are a strength, not a weakness, of this dataset because they support generalizability of the eyewitness decision patterns across many practices. That is, we can expect these patterns from eyewitnesses across varied police practices." Ex. 282 (Steblay Rebuttal) at 6-7. She also explains that, because the studies show variability in eyewitness responses to lineups, an examination of the police practices can help explain the variability in that data. Ex. 282 (Steblay Rebuttal) at 7.

429.    The eleven published field studies report the frequencies of lineup outcomes (suspect IDs, filler IDs, and non-identifications) for a total of 6,734 field lineups (including both photo and live lineups), each with a single suspect in the field lineup (no multiple-suspect lineups) making a first identification attempt.  Ex. 281 (Steblay Report) at 7. Dr. Steblay noted that three of the studies in Table 1 did not provide information about the relationship between witness and offender, and so her conservative assumption that all Table 1 data are stranger IDs was "favorable to the defense case," as the presence of unreported familiar-perpetrator identifications would potentially increase suspect ID rates in those three studies. Likewise, no study reported repeated identification tasks with the same witness and suspect, so she reported that her conservative assumption that all lineups in the field data were first identifications was favorable to the defense case as the presence of unreported repeated identifications would potentially inflate suspect ID rates.  Ex. 281 (Steblay Report) at 7. Double-blind (meaning using pristine procedures) lineup procedures were not required. Ex. 282 (Steblay Rebuttal) at 7.

114

430.    The aggregated field studies revealed that witnesses selected the police suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time.  Ex. 281 (Steblay Report) at  3, 10; Ex. 164 (2020 White Paper) at 4-5.

431.    To compare the Chicago dataset to the eleven field studies, Dr. Steblay removed lineups with benign, evidence-based components of police practice that might otherwise inflate the suspect identification rate. Ex. 281 (Steblay Report) at 4, 9 (noting the field data involving eyewitnesses making first identification attempts of stranger-perpetrators from a single-suspect lineup).

432.    For instance, the Chicago lineups include non-stranger suspects, multiple-suspect lineups, and repeated identification procedures with the same witness viewing the same suspect, factors that could elevate suspect identification rates. Therefore, she screened out those three components of police practice prior to the comparison with the 11 field studies.  Ex. 281 (Steblay Report) at 7-10. First, Dr. Steblay excluded familiar-perpetrator lineups, where the witness knew the perpetrator, as such lineups have inflated suspect identification rates.  Ex. 281 (Steblay Report) at 8; Ex. 282 , Steblay Rebuttal, at 9.  Dr. Steblay also excluded multiple-suspect lineups, and repeat lineups with the same witness and filler, as those were excluded in the field study data and can elevate suspect identification rates. Ex. 281 (Steblay Report) at 8-9.  Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first identification, single-suspect lineups (the "Comparison Subset").  Ex. 281 (Steblay Report) at 3-4, 9.

433.    After removing lineups associated with the above police practice components, the total number of lineups included in the comparison subset was 1076. Ex. 281 (Steblay Report) at 9. When Dr. Steblay compared the Chicago lineup outcomes in the Comparison subset with

outcomes in the aggregation of the 11 field studies, she found as follows: in the aggregated 11 peer-reviewed studies, among the 6,734 attempts by eyewitnesses to identify the perpetrator from a lineup, only 40.8% identified the suspect, 24% identified a known-innocent filler, and 35% identified no one. In comparison, the Chicago lineups produced 70% suspect identifications, 0.09% filler picks, and 30% non-identifications, a significantly different pattern of outcomes. Ex. 281 (Steblay Report) at 4, 9-11.

434. To test the statistical significance of the findings, Dr. Steblay used a Chi-Square test to calculate a probability (called a p-value) that the two samples would yield the difference being observed based on mere chance. The results were statistically significant; the Chi-Square test yielded a p-value of less than 0.00001. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was therefore statistically significant, and that there was less than a 1 in 100,000 chance that the difference could be explained by chance. Ex. 281 (Steblay Report) at 10.

435. At the time of her report in this case, Dr. Steblay had seven Chicago Police Department lineup outcome datasets: Velez, Rivera v. City of Chicago, Sierra, Rodriguez, Bouto, Iglesias, and a set from a FOIA study, in which Dr. Steblay personally managed the coding of the data. Ex. 281 (Steblay Report) at 12-13. In all of these sets, the Chicago suspect identification rate (54-74%) is significantly higher than the aggregate field studies (41%). The suspect identification rate in those cases, shown together, are as follows:

> (2004-2005) 54% (*FOIA*)
> (1996-2001) 55% (*Velez*)
> (1985-1997) 55% (*Rivera*)
> (1991-1995) 74% (*Sierra*)
> (1995-1998) 70% (*Rodriguez*)
> (1989-1993) 73% (*Bouto*)
> (1989-1998) 70% (*Iglesias*)

Ex. 281 (Steblay Report) at 12; *see also Velez* Report, *Rivera* Report, *Sierra* Report, *Rodriguez* Report, *Bouto* Report, *Iglesias* Report, and FOIA Study (attached to Steblay's Report).

436.     Dr. Steblay then analyzed all evidence-based explanations for why Chicago has a statistically significant lower filler identification rate and statistically significant higher suspect identification rate than other jurisdictions: (a) familiar perpetrator identifications (where the witness knows the suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated identification procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the line-up; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. Ex. 281 (Steblay Report) at 12-20.

437.     Dr. Steblay eliminated explanations (a), (b), and (c) from the Chicago database before it was compared to the field studies, and so these explanations could not explain the significantly higher suspect identification rate. Ex. 281 (Steblay Report) at 19-20.

438.     Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policy—and so that explanation can be eliminated. Ex. 30 (General Order 88-18) at 2; Dkt. 330 at PageID 26375. That leaves fabrication of identifications using the improper techniques identified in explanations (d) and (f) —steering and suggestion to witnesses and presenting lineups where the suspect stands out–as the remaining explanations for Chicago's statistically significant higher suspect identification rate. Ex. 281 (Steblay Report) at 19-20.

439.     Dr. Steblay confirms that CPD eyewitness filler picks cannot simply collapse into non-identifications in the CPD lineups. She describes that, even if all of the non-identifications

were fillers, adjusting for that in the analysis "would not bring the CPD numbers into alignment with the 11 field studies—and there would be no non-IDs left." Ex. 282 (Steblay Rebuttal) at 18.

440.    With that explanation removed, Dr. Steblay opined that the anomalous absence of filler picks in Chicago lineups reflects that "either filler picks are systematically not entered into the record or witnesses are being steered away from fillers (explicitly or implicitly), or both." Ex. 281 (Steblay Report) at 19. The City itself denies that filler picks were systematically unrecorded. E.g., Dkt. 330 at PageID 26375. The City's own policy directly contradicts that filler picks were unrecorded, stating that "In no case will a lineup be conducted without a Supplemental Report being completed" Ex. 30 (General Order 88-18) at 2 (emphasis in original). This leaves systemic steering away from known-innocent fillers toward the police suspect as the remaining explanation for Chicago's absence of filler identifications.

441.    Regarding (f), lineup quality such that the suspect stands out, Dr. Steblay opined that it was a suggestive mechanism known to facilitate false positive identifications, and referenced her evaluation in a separate Chicago study that found a high bias rate. In that study, Dr. Steblay also relied on five subsets of field data from eight U.S. cities (Steblay & Wells, 2021), that she evaluated in order to study structural line-up bias in lineups. Dr. Steblay found that the highest bias rate (68%) occurred with a set of 59 Chicago live lineups conducted between 2004-2005. That is, in 68% of the Chicago lineups sampled, mock-witnesses—with no memory of a culprit—were able to identify the police suspect at a rate significantly higher than chance. Ex. 281 (Steblay Report) at 19.

442.    Regarding (d), Dr. Steblay notes the occurrence of suggestion from administrators in Chicago lineups and that they present a danger of strong suggestiveness to influence a witness and lack of protections for an innocent suspect. Ex. 281 (Steblay Report) at 16-18.

443.     The City's lineup outcomes are so anomalous that mere innocuous conduct cannot explain them. As Dr. Steblay notes, "[a]mong the 11 field studies, there were some with better practices and some with more problematic practices (such as non blind lineup administration)." Ex. 282 (Steblay Rebuttal) at 12. Yet "the CPD suspect ID rate (70%) is significantly higher than *any* of the 11 field studies." *Id.* (emphasis in original); *see also id.* at 6-7 (the idea that "eyewitnesses in CPD cases had the incredible memory strength to find a guilty suspect in the lineup (70% of lineup decisions) and never make an affirmative error (<1% filler picks) . . . . defies what we know about eyewitness decisions—from the lab or the field.").

444.     Dr. Steblay performed an additional analysis of the association between Detective Guevara's presence in lineups and the rate of suspect identifications, and did not find a significantly different suspect identification rate in investigations in which Detective Guevara was involved than in investigations when he was not involved. Ex. 281 (Steblay Report) at 20.

445.     Dr. Steblay's rebuttal report concludes that there is no evidence that Chicago used evidence-based suspicion to place a suspect in a lineup. Ex. 282 (Steblay Rebuttal) at 16. It also refers to the 2020 White Paper, which states that there are no jurisdictions in the United States that have a policy to require independent evidence that a suspect committed the crime before placing him in the lineup, which includes Chicago. *Id.*

446.     After Dr. Steblay wrote her report in *Sierra*, the City produced additional homicide files in *Bouto*, *Rodriguez*, and *Iglesias*:

   a. **Bouto**: Dr. Steblay's dataset in *Bouto* included 1335 eyewitness decision outcomes from Chicago police lineups in 457 homicide files, for the time period from 1989 to 1993. Ex. 165 (Steblay Report in *Bouto*) at 5. The comparison subset in *Bouto* included 540 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id.* at 10. In this study, the suspect identification rate was 73%, compared to the field study average of 41%. *Id.* at 10-11. That revealed a statistically

significant difference. *Id.* at 10-11. In the *Bouto* data, of the 1335 eyewitness decision outcomes in the full dataset, only one was a filler pick; and among the comparison subset, there were zero. *Id.* at 18. This revealed another statistically significant difference from the field studies, which average 24% filler identifications. *Id.* at 18-19.

b. **Rodriguez**: Dr. Steblay's dataset in *Rodriguez* included 1103 eyewitness decision outcomes from Chicago police lineups, for the time period from 1995 to 1998. Ex. 166 (Steblay Report in *Rodriguez*) at 3, 5. The comparison subset in *Rodriguez* included 403 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id.* at 9-10. In this study, the suspect identification rate was 70%, compared to the field study average of 41%. *Id.* at 10-11. That revealed a statistically significant difference. *Id.* at 10-11. In the *Rodriguez* data, of the 1103 eyewitness decision outcomes in the full dataset, only four were filler picks; and among the comparison subset, there were zero. *Id.* at 18. This revealed another statistically significant difference from the field studies, which average 24% filler identifications. *Id.* at 18-19.

c. **Iglesias**: Dr. Steblay's dataset in *Iglesias* included 2786 eyewitness decision outcomes from Chicago police lineups, for the time period from 1989 to 1998. Ex. 158, Steblay Report in *Iglesias*, at 5. The comparison subset in *Iglesias* included 1076 Chicago lineups, after removing familiar-perpetrator lineups, multiple-suspect lineups, and repeated identification lineups from the dataset. *Id.* at 9. In this study, the suspect identification rate was 70%, compared to the field study average of 41%. *Id.* at 10-11. That revealed a statistically significant difference. *Id.* at 10-11. In the *Iglesias* data, of the 2786 eyewitness decision outcomes in the full dataset, only nine were filler picks; and among the comparison subset, there was only one filler pick. *Id.* at 17. This revealed another statistically significant difference from the field studies, which average 24% filler identifications. *Id.* at 18.

447. These rates were consistent across all cases. Indeed, after these productions, Dr.

Steblay had seven data sets, all secured from legal cases: *Velez* (n = 523 for the comparison subset); *Rivera v. City of Chicago* (2016, n = 666); *Sierra* (n = 591); *Bouto* (n = 540), *Rodriguez* (n = 403), *Iglesias* (n = 1076) and a set from a FOIA lawsuit (discussed in Steblay, 2011, n = 228). Ex. 281 (Steblay Report) at 9, 12; Ex. 288 (Steblay Supp.) at 1-2; Ex. 166 (Steblay Report in Rodriguez) at 4. In all sets, Dr. Steblay concluded that the Chicago suspect identification rate (54-74%) is statistically significantly higher than the aggregate field studies (41%).

120

(2004-2005) 54% (*FOIA*)
(1996-2001) 55% (*Velez*)
(1985-1997) 55% (*Rivera*)
(1991-1995) 74% (*Sierra*)
(1995-1998) 70% (*Rodriguez*)
(1989-1993) 73% (*Bouto*)
(1989-1998) 70% (*Iglesias*)

Ex. 281 (Steblay Report) at 12.

448.    Dr. Steblay supplemented her report to indicate three minor changes that she

made as she moved from the *Iglesias* report to the *Johnson* report. She explained that there were

three instances in which she had not carried a preferred number from the original report to the

summary sentence included on page 12 of the *Johnson* Report, and explained in detail those

changes. Ex. 288 (Steblay Supplement) at 1-2.

## XXVIII.    <u>The City Had a Pattern of Fabricating Evidence Against Suspects and Was On Notice of Such Allegations</u>

449.    In 1987, the Illinois Appellate Court reversed the conviction of Melvin Jones for

murder based on evidence that officers had fabricated an eyewitness identification against him.

*See* People v. Jones, 157 Ill. App. 3d 1006, 1025-27 (1987); *see also, e.g.*, Ex. 180 (Chicago Sun

Times, Burge tortured me, too, ex-suspect says, 1992 WLNR 5316085); Ex. 181 (Melvin Jones,

Nat'l Registry of Exonerations,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4176).

450.    In 1988, the Seventh Circuit upheld a jury verdict in favor of George Jones, who

was convicted after CPD detectives suppressed the victim's initial failure to identify him as the

suspect and conducted a repeat photo identification procedure which was disclosed without any

indication that it had been performed before; CPD subsequently disciplined the police

whistleblower who brought the misconduct to light, but declined to discipline any of the detectives involved in the investigation. *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

451.     In 1989, James Newsome, who had been wrongly convicted of murder, obtained a court order requiring the CPD to run unidentified fingerprints from the murder scene through its fingerprint identification system, and CPD officers hid the results for five years until in 1994 they revealed that the fingerprints matched another man convicted of murder, leading to Newsome's conviction being overturned in 1994 and him subsequently being granted a pardon based on innocence in 1995. *See Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *2, 16 (N.D. Ill. Apr. 26, 2000); *see also* Ex. 177 (*Newsome v. James*, No. 96 C 7680, Dkt. 150, N.D. Ill. May 16, 2000) at 3-9;  *See* Ex. 178 (Chicago Tribune, Lineup suit nets $15 million, 2001 WLNR 10747375); Ex. 179 (James Newsome, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3504).

452.     In 1993 and 1994, Chicago police officers obtained several purported identifications of Vincent Goldstein as the robber of four grocery stores and arrested him; those identifications were proven false after Mr. Goldstein's alibi was established by his employer and another man confessed. Ex. 182 (Chicago Tribune, Wrong Guy Looked Right in Lineups, 1994 WLNR 4312248).

453.     Robert Brown was released after previously being convicted of murder, following his identification in a CPD lineup. Ex. 183 (Robert Brown, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3063).  In 1997, the convictions of Donald Reynolds and Billy Wardell were vacated based on DNA evidence. *See* Ex. 184 (Donald Reynolds, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=3574).

454. Evidence of Defendants Guevara and Halvorsen's misconduct is found in sworn testimony by Officer Ron Malczyk, as part of the investigation of the Ruben Gonzalez murder. Malczyk testified that Guevara and Halvorsen fabricated evidence about the murder, including a fabricated conversation with Malczyk himself that falsely included a fabricated identification of the gang that committed the shooting and the vehicle that was used. Ex. 280 (Deposition of Officer Ron Malczyk, May 11, 2022, Sierra v Guevara, 18-cv-3029 (N.D. Ill.) at 126-129, 131-135).

455. CPD sergeants, lieutenants, and commanders of detectives widely understood that false identifications could result if photo identification procedures weren't conducted properly, and understood that photo identification procedures could be abused if they were not done correctly. Ex. 58 (Foster Dep.) at 284.

456. From 1986-1998, the Chicago Police Department conducted no audits into the City's witness identification procedures or practices or patterns of misconduct involving such procedures. Ex. 185 (30(b)(6) Deposition of Commander Denham) at 32.

### *Widespread Lack of Training, Supervision, or Monitoring on Documentation Procedures and Identification Procedures*

### *Documentation*

457. 30(b)(6) representative Hickey testified that he was not aware of any punishment when an individual did not comply with S.O. 83-1. Ex. 74 (Hickey Fields Dep.) at 10:12-22.

458. Hickey testified that he had no knowledge whether, after the implementation of S.O. 83-1, there was anything done to survey or audit the implementation of the policy. Ex. 74 (Hickey Fields Dep.) at 43:1-4.

459.    Hickey himself admitted that he learned that unit detectives were reverting back to keeping their own files to take out on investigations after Special Order 83-1. Ex. 76 (Hickey Kluppelberg Dep,) at 321, 327

460.    The only training that happened after the 1983 changes was a "three-hour training" on note taking. Ex. 73 (Winstrom Dep.) at 146:25-147:4. He confirmed that the training did not cover supplementary reports, did not provide guidance to detectives about what they should consider relevant or not relevant information, and did not include instruction to detectives that they should document everything they learned during the investigation. Ex. 73 (Winstrom Dep.) at 148:14-149.

461.    Tiderington concluded that the one three-hour training session on the first iteration of the policy change, where CPD senior leaders already knew detectives were opposed to the change, was wholly insufficient to overcome a decades-long practice. Ex. 23 (Tiderington Report) at 46.

462.    30(b)(6) representative Winstrom confirmed that detectives who received that training would not have received that kind of in-service training on the policies again. Ex. 73, Winstrom Dep., at 151:11-16. In fact, he testified that he was not aware of any in-service training like that occurring after S.O. 86-3 was issued. Ex. 73, Winstrom Dep., at 151:20-24. The only further training that did occur for the revised Special Orders, for those detectives who received the 3-hour training, was receiving the revised Order and having any changes in the order read aloud for five or seven straight days.  Id. at 152:1-24.  Yet S.O 86-3 was substantively identical to its previous iterations except for the addition of an auditing provision. Compare Ex. 79 (Special Order 83-2) with; Ex. 80 (Special Order 86-3); Ex. 71 (Hickey Dep. in Rivera) at 100:9-101:12, 227, 245-47, 249.

463.    Winstrom testified that he had no personal knowledge of any inspection, was not aware of any inspection that occurred, and was not aware of any documentation reflecting the performance of any audits or inspections occurring from 1986 to 1988 as required by section six of S.O. 86-3. Ex. 73 (Winstrom Dep.) at 118:23-120:24.

464.    Likewise, Winstrom testified that he was not aware of any documents reflecting any training provided to commanders or other supervisors to conduct audits of investigative files. Ex. 73 (Winstrom Dep.) at 121:12-16.

465.    Hickey described the City's process of disclosing police records to prosecutors and criminal defendants as an "art form" of informal, on-the-job training, and could not think of any directives written to ensure proper disclosure of necessary information, including exculpatory information, in response to a subpoena request.  Ex. 71 (Hickey Dep. in Rivera) at 160:7-22, 161:10-163:24. Hickey confirmed there was no training on this after the 1983, three-hour training on S.O. 83-1. Ex. 71 (Hickey Dep. in Rivera) at 185-87.

466.    Winstrom admitted that subpoena clerks would simply ready the subpoena and send a request for documents to whichever units they thought might have documents, and that they were not provided with any policies, directives, checklists, guidelines or training materials to guide their decision about where to obtain documents, nor were they given any forms or lists that identified all the repositories in which documents related to a homicide investigation might be found. Ex. 73 (Winstrom Dep.) at 189, 192-94; see also Ex. 23 (Tiderington Report) at 31 (concluding that there were no checklists, procedures, or any other guidelines or guidance to assist subpoena responders in making sure they were requesting material from all the right repositories, or to check on the back end whether they got everything they should, or even formal training to set the proper expectations and practice).

467.     30(b)(6) representative Winstrom testified that he was not aware of any auditing done to ensure that the investigative file was getting to the criminal justice system. Ex. 73 (Winstrom Dep. in Reyes) at 208:20-209:2. He testified that he was not aware of an inspection where a court inspection group ever randomly checked a file to ensure that a subpoena was receiving all of the documents of the investigative file. Id. at 209:3-9. He testified that he was not aware of CPD conducting any audit or inspection to ensure that all documents related to homicide investigations were being produced in response to subpoenas for all homicide files, or that all documents that exist in different places within CPD were being gathered and produced in criminal investigations. Id. at 209:10-22.

468.     CPD did nothing to monitor and assess whether the policy was being followed, or to reprimand those detectives and supervisors who refused to comply. Hickey and Winstrom admit they are not aware of, and could not identify, any sampling or auditing that occurred after the Special Orders were put in place. Ex. 69 (Tiderington Report in Iglesias) at 55.

469.     Hickey and Winstrom admit that there was no discipline of detectives who did not comply with the Special Orders. Ex. 76, Hickey Kluppelberg Deposition 213; Ex. 71 (Hickey Dep. in Rivera) at 187:6-10; Ex. 73 (Winstrom Dep.) at 209-210. Further, Foster stated that no Special Orders in the Detective Division would apply to gang crime specialists. Ex. 58 (Foster Dep.) at 99:7-25.

470.     Tiderington stated that he was unaware "of the City having produced a single document demonstrating that any audit or inspection ever occurred," and he reviewed the City's 30(b)(6) testimony confirming that there was no discipline of detectives that did not comply with the Special Orders. Ex. 23 (Tiderington Report) at 46.

*Identification Procedures*

471.     Foster stated that he was not aware of any training prior to 1996 for gang crime specialists related to their assistance in homicide investigations or with regard to their use of street sources. Ex. 58 (Foster Dep. in Iglesias) at 111:17-112:5. Likewise, he was unaware of any training for detectives in the period from 1986 to 1998 with regard to their use of street sources or registered confidential informants in homicide investigations. Ex. 58 (Foster Dep. in Iglesias) at 112:11-19. There was also no training as to photo show-ups whatsoever. Ex. 58 (Foster Dep. in Iglesias) at 229:19-24.

472.     The City of Chicago did not produce any training policies or manuals regarding eyewitness identifications for the time period leading up to Johnson's wrongful conviction. Instead, the only training materials provided are from 1996. Ex. 58 (Foster Dep. in Iglesias) at 158:2-11, 279:18-280:7. The training was not provided to gang crime specialists nor does its content apply to gang book procedures. Ex. 58 (Foster Dep. in Iglesias) at 161:1-4, 163:21-164:1

473.     When asked whether detectives were trained that they should document eyewitness descriptions of suspects, or whether they could choose not to do that, Winstrom testified "there[] [were] times that you would not document that." Ex. 73 (Winstrom Dep.) at 80:12-20.

474.     30(b)(6) representative Winstrom testified that detectives were "not necessarily" trained that any field interviews of a potential suspect should be documented. Ex. 73 (Winstrom Dep.) at 84:21-85:5.

475.     Gang specialists were not provided any training relative to their participation in homicide investigations in general. Ex. 58 (Foster Dep.) at 166:2-14, 168:1-8, 169:18-25.

476.    There was no policy or training for detectives or gang crime specialists about documenting gang book identifications, although both detectives and gang specialists used gang books during homicide investigations. Ex. 58 (Foster Dep.) at 166:2-14, 168:1-8, 169:18-25; 192-93, 315-16, 194:5-11. Foster also testified that, from 1986-1998, detectives were not trained that there were any prohibitions on what they could say to a witness before a lineup procedure or a gang book showing. Ex. 58 (Foster Dep.) at  166:2-14, 168:1-8, 169:18-25; 192-93, 315-16. Yet the 1992 IACP Model Policy states that detectives should scrupulously avoid saying anything suggestive to the witness about who the suspect is. Ex. 148 (1992 IACP Model Policy) at 1.

477.    In fact, the only training provided to detectives covered documenting positive identifications in live lineup procedures. Ex. 58 (Foster Dep.) at 203:4-6, 164:11-25.

478.    The City's 30(b)(6) representative Commander Denham agreed that, in the time frame of 1986 to 1998, the IAD had the authority to conduct audits relating to misconduct during eyewitness investigation procedures, but did not actually conduct any audits during that time frame. Ex. 185 (Denham Dep. in Sierra) at 30:8-31:14, 32:4-8.

479.    Likewise, Commander Denham agreed that OPS had the authority to conduct audits into misconduct relating to eyewitness identifications from 1986 to 1998 but he is not aware that OPS actually conducted any audits during this time frame. Ex. 185 (Denham Dep. in Sierra) at 32:9-19.

480.    Commander Denham agreed that the Mayor, Superintendent, Chief of Internal Affairs, and the Chief or administrator of OPS would have the authority to request an audit to find out whether there was a problem of misconduct among detectives or gang crime specialists

128

in a particular area relating to eyewitness investigations, which would only be carried out by IAD, OPS, or the IG's office. Ex. 185 (Denham Dep. in Sierra) at 38:12-39:15.

481.    Commander Denham conceded that he was not aware of any audits conducted between 1986 and 1998 by the CPD to evaluate whether G.O. 88-18 was being followed— including as to the requirement to complete a supplementary report when a lineup is conducted— or to determine whether G.O. 88-18 needed any policy changes. Ex. 185 (Denham Dep. in Sierra) at 42:5-15, 50:51:1-10.

482.    Commander Denham agreed that the City of Chicago did not carry out any investigations or audits between 1986 to 1998 that evaluated whether detectives or gang specialists were properly documenting eyewitness identification procedures, whether detectives were unfairly influencing eyewitness identification procedures through improper suggestion, or whether gang crime specialists were engaging in any misconduct relating to eyewitness identification procedures. Ex. 185 (Denham Dep. in Sierra) at 43:14-44:5, 44:6-19.

483.    Other than CR investigations between 1986 and 1998, Denham confirmed that the City of Chicago did not conduct any investigations or audits as to live-lineups, photo arrays, or clothing lineups, or to evaluate the identification practices amongst a particular group of CPD detectives, or to identify any problems with the conduct of any eyewitness procedures. Ex. 185 (Denham Dep. in Sierra) at 45:8-23, 47:2-7, 50:21-51:6.

484.    Denham was also unaware of any audits or investigations by the City after receiving information that a witness's lineup identification had been a false positive to determine whether it was caused by an officer's misconduct. Ex. 185 (Denham Dep. in Sierra) at 47:8-48:4.

485.    Denham was unaware of any city investigations or audits that were prompted by individual CR investigations from 1986 to 1998, or that evaluated whether there were problems

129

with supervision of eyewitness procedures, or that the city conducted any criminal investigations of CPD officers for misconduct in connection with eyewitness identifications in this timeframe. Ex. 185 (Denham Dep. in Sierra) at 48:19-49:7, 49:16-20.

486.     Denham also was unaware of any audits or investigations by the City prompted by a court throwing out a conviction, or prompted by evidence in which a court found a problematic or concerning eyewitness identification – including for the cases of Melvin Jones, Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, and Billy Wardell. Ex. 185 (Denham Dep. in Sierra) at 51:17-53:18.

487.     The City's 30(b)(6) representative Commander Moore stated that the City did not attempt to track the number of allegations of misconduct relating to lineups, nor did IAD take any corrective steps to monitor motions to suppress witness identifications in criminal court. Ex. 168 (Moore Dep. in Velez) at 82:4-9, 84:12-84:15. IAD did not receive notice when a motion to suppress a witness identification was granted, nor did it take any affirmative steps to find out when such motions were granted and CPD officers were found to have engaged in improper conduct in an identification procedure. Ex. 168 (Moore Dep. in Velez) at 85:2-86:4.

488.     Plaintiff's retained expert Jennifer Dysart opined on the similarities between the cases she has reviewed involving Detective Guevara, which include Rivera, Montanez v. Guevara, et al., Case No. 17-cv-4560, Serrano v. Guevara, et al., Case No. 17-cv-2869, Sierra, Bouto, and Iglesias. She stated that "It seems that a common theme in the Guevara cases I have reviewed  is [for Guevara to] manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in these cases were likely vulnerable to

130

suggestion and influence due to the presence of multiple estimator variables that can lead to a

weak memory for a perpetrator." Ex. 128 (Dysart Report) at 25.

### *Notice of Guevara's Bad Acts*

489.    Since at least 1982, the City had notice of the pattern of  illegal misconduct of

Detective Guevara, who has been involved in physical assaults and coercive manipulation of

witnesses, suspects, victims, and defendants, primarily in the process of obtaining false

statements, across multiple decades. For instance:

   a.  In 1982, Guevara physically assaulted Annie Turner by hitting her across the face
       with a metal bracelet and called her a "n***** bitch;" although Ms. Turner
       complained to OPS, no discipline was imposed on Guevara. *See* Ex. 194,
       (Testimony, Medical Records, and OPS Complaint of Annie Turner);

   b.  In 1982, Detective Guevara broke through Almarie Lloyd's locked front door and
       conducted a warrantless search of her home; again, Ms. Lloyd complained to
       OPS, but no discipline was imposed. *See* Ex. 195 (OPS Complaint of Almarie
       Lloyd, Testimony of Almarie & Job Lloyd, *Hunt v. Jaglowski*, 85 C 1976);

   c.  In 1983, Guevara and others beat Leshurn Hunt until he confessed to murder; that
       statement was suppressed and Mr. Hunt sued Guevara and complained to OPS
       about Guevara's misconduct. *See* Ex. 196 (Affidavit of Leshurn Hunt); Ex. 197
       (Trial Transcript of *Hunt v. Jaglowski*, 85 C 1976) at AR-L 544934, 544946,
       545016-19; Ex. 198 (Letter from Leshurn Hunt to Eugene Hudson, Dated
       2/28/86);

   d.  In 1984, Guevara physically assaulted Graciela Flores. *See* Ex. 197 (Testimony of
       Graciela Flores & Anna Flores, from Trial Transcript of *Hunt v. Jaglowski*, 85 C
       1976) at AR-L 544684-544714;

   e.  In 1985, Detective Guevara used threats and violence to attempt to coerce a false
       identification from Reynaldo Munoz, *See* Ex. 199 (Affidavit of Reynaldo
       Munoz);

   f.  In 1986, Guevara beat Rafael Garcia by grabbing him by the shirt and throwing
       him against a bar; handcuffing him and striking him in the face several times;
       throwing him to the floor and kicking him; and throwing him against the wall and
       hitting him in the head. After the incident was reported, Guevara then denied
       striking Garia and throwing him onto the floor, into the wall, and handcuffing him
       to the wall.  The City's disciplinary body found that Guevara had indeed lied
       about the incident and had given false information to investigators. For that

behavior, Guevara was only suspended for two days. *See* Ex. 200 (OPS Complaint of Rafael Garcia, CR #152902);

g. In 1986, Guevara coerced a confession from Daniel Pena by beating him about the face and ribs with his hands and about the groin and thighs with flashlights, *see* Ex. 201 (Testimony of Daniel Pena, Armador Rivera, and Jamie Velez in *People v. Pena*, 86 CR 1458);

h. In 1986, Guevara called Melvin Warren a "n***** dog" and beat him, and the City's OPS initially sustained Warren's allegations, recommending a five-day suspension, but OPS later downgraded the discipline to a reprimand for calling a citizen "n*****;" *See* Ex. 202 (OPS Complaint and Testimony of Melvin Warren, *Hunt v. Jaglowski*, 85 C 1976);

i. In 1989, Guevara coerced a false confession from Victor Vera, *see* Ex. 203 (Affidavit of Victor Vera);

j. In 1989, Guevara coerced Virgilio Muniz to falsely implicate Manuel Rivera, *see* Ex. 204 (Affidavit of Virgilio Muniz).

k. In 1989, Guevara threatened Virgilio Calderon Muniz (unrelated to the Virgilio Muniz) into falsely identifying Victor Vera, *see* Ex. 205 (Affidavit of Virgilio Calderon Muniz);

l. In 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos, *see* Ex. 206 (Testimony of Wilfredo Rosario & Appellate Court Opinion, *People v. Arcos*, 91 CR 743)[1];

m. In approximately 1990, former Chicago police detective Bill Dorsch was present when Detective Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license plate of the shooter's car. While the first juvenile was viewing a photo array, and before he identified any of the photographs, Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. *See* Ex. 207 (Testimony of William Dorsch, *People v. Serrano & Montanez*, 93 CR 1873) at JR-L 076819, JR-L 076824-48. Mr. Dorsch then directed Guevara to leave the room and had the other juvenile view the same photo array—that juvenile was unable to make any identification. *Id.* Subsequently, Dorsch spoke to the two juveniles without Guevara present. The juveniles admitted that they had been paid to falsely claim that the suspect was the shooter. *Id.* Dorsch's supervisors in the CPD knew about Guevara's misconduct in that case, but instead of disciplining Guevara, instead Guevara was promoted. *Id.* at JR-L 076888-90, JR-L 076906-09, JR-L 076928-32; *see also* Ex. 208 (Dysart Report in *Johnson*) at 25 ("It seems that a common theme in the Guevara cases I have reviewed [including *Sierra*] is [for him to]

---

[1] Mr. Arcos was convicted based on the false evidence, but the appellate court overturned his conviction based on a lack of evidence. *See People v. Arcos*, 228 Ill App. 3d 870, 876 (1st Dist. 1996).

manipulate witnesses who had poor opportunities to view the perpetrator"). Guevara has taken the Fifth in regard to all allegations regarding Bill Dorsch's accusations. ex. 209 (Guevara Testimony from Jacques v. Rivera et al. 12-cv-004428, at 402-15).

n. In 1991, Guevara coerced David Rivera falsely confessing to murder, *see* Ex. 210 (Affidavit of David Rivera);

o. In 1991, Detective Guevara coerced a false confession from Daniel Rodriguez, *See* Ex. 211 (Affidavit of Daniel Rodriguez);

p. In 1991, Guevara physically coerced sixteen year-old David Velazquez into falsely identifying Daniel Rodriguez, *see* Ex. 212 (Testimony of David Velazquez in People v. Velazquez, 91 CR 13938);

q. In 1992, Guevara obtained an involuntary confession from 15 year-old Jacqueline Montanez; *see People v. Montanez*, 273 Ill. App. 3d 844, 855 (1st Dist. 1995);

r. In 1993, Guevara tried to coerce 15 year-old Eleizar Cruzado into implicating himself in a murder; *see* Ex. 213 (Suppression Hearing Testimony of Eleizar Cruzado, *People v. Cruzado*, 93 CR 24896);

s. In 1993, Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz; *See* Ex. 214 (Affidavit of Adolfo Frias Munoz);

t. In 1994, Guevara used violence to coerce a confession from Adrian Duta, *see* Ex. 215 (Affidavit of Adrian Duta);

u. In 1995, Guevara and others coerced an involuntary confession from Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney, *see People v. Flores*, 315 Ill. App. 3d 387, 393-94 (1st Dist. 2000), and coerced Gloria Ortiz Bordoy into falsely implicating Santos Flores; Ex. 216 (Deposition of Gloria Ortiz Bordoy, *Johnson v. Guevara*, 05 C 1042);

v. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter. *See* Ex. 217 (Affidavit of Edwin Davila).

w. In 1995, Guevara coerced Evelyn Diaz into falsely identifying Luis Serrano, *see* Ex. 218 (Deposition of Evelyn Diaz, *Johnson v. Guevara*, 05 C 1042);

x. In 1995, Guevara told Luis Figueroa to falsely identify Angel Diaz, *see* Ex. 219 (Testimony of Luis Figueroa, *People v. Diaz*, 95 CR 610901 & Supplemental Police Report);

y. In 1995, Guevara coerced Rodolfo Zaragoza into falsely identifying Ricardo Rodriguez, *see* Ex. 220 (Affidavit of Rodolfo Zaragoza);

z. In 1996, Guevara coerced Maria Rivera into falsely identifying Angel Gaya and all charges were later dropped in the case, *see* Ex. 221 (Suppression Hearing Testimony of Maria Rivera, *People v. Solache and Reyes*, 98 CR 12440);

aa. In 1997, Guevara coerced Robert Ruiz into falsely identifying Freddy and Concepcion Santiago as the murderers of Guevara's nephew; Ex. 222 (Testimony of Robert Ruiz, *People v. Santiago & Santiago*, 97 CR 20973);

bb. In 1997, Guevara falsely reported that witness Ruth Antonetty implicated Ariel Gomez in a murder, when she had not; Ex. 223 (Post-Conviction Petition in *People v. Gomez*, 97 CR 18961);

cc. In 1997, Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Ex. 224 (Affidavit of Jed Stone);

dd. In 1998, Guevara used violence against Rosauro Mejia in an attempt to coerce a confession from him. Ex. 225 (Suppression Hearing Testimony of Rosauro Mejia, *People v. Solache & Reyes*, 98 CR 12440);

ee. In 1998, Guevara used violence against Adriana Mejia during her interrogation; Ex. 226 (Suppression Hearing Testimony of Adriana Mejia, *People v. Solache & Reyes*, 98 CR 12440);

ff. In November 2001, Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and conferred with Guevara after observing the trial testimony of trial witnesses, even though the Court had ordered for all witnesses to be excluded from the courtroom to prevent witness collusion. Ex. 227 (Lassar Report regarding Robert Bouto Dated 3/3/15).

490. Detective Guevara has refused to testify about his interactions with: **Anna Flores**, Ex. 228 (Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173) at JR-L 077143, JR-L 077171-72; Ex. 121 (Testimony of Reynaldo Guevara in P*eople v. Arturo Reyes & Gabriel Solache*, 98 CR 12440) at JR-L 049883-85; **Graciela Flores**, Ex. 228 at JR-L 077143, JR-L 077171-72, Ex. 121 at JR-L 049883-84; **David Velazquez**, Ex. 228 at JR-L 077143, JR-L 077168-71; Ex. 121 at JR-L 049873-75; **Efrain Sanchez**, Ex. 228 at JR-L 077144, JR-L 077172-73; **Julio Sanchez**, Ex. 228 at JR-L 077144, JR-L 077173-74; **Adolfo Frias Munoz**, Ex. 228 at JR-L 077144-45, JR-L 077174-75; Ex. 121 at JR-L 049869-70; **Jose Melendez**, Ex. 228 at JR-L 077145, JR-L 077177-79; Ex. 121 at JR-L 049886, JR-L 049888, **Gabriel Solache**, Ex. 228 at JR-L 077145-46; Ex. 121 at JR-L 049861-64, **Arturo Reyes**, Ex.

228 at JR-L 077146; Ex. 121 at JR-L 049858-61, JR-L 049893-94; **Virgilio Muniz**, Ex. 228 at JR-L 077147, JR-L 077180; **Luis Figueroa**, Ex. 228 at JR-L 077176; Ex. 121 at JR-L 049890-92; **Angel Diaz**, Ex. 228 at JR-L 077176-77; Ex. 121 at JR-L 049891-92, JR-L 049894; **Wilfredo Rosario**, Ex. 228 at JR-L 077181-82; **Xavier Arcos**, Ex. 228 at JR-L 077182; Ex. 121 at JR-L 049880-81; **Gloria Ortiz Bordoy**, Ex. 228 at JR-L 077182-83; **Robert Ruiz**, Ex. 228 at JR-L 077184, Ex. 121 at JR-L 049877-79; **Leshurn Hunt**, Ex. 121 at JR-L 049867-68; **Adrian Duta**, Ex. 121 at JR-L 049868-69; **Voytek Dembski**, Ex. 121 at JR-L 049871-72; **Daniel Pena**, Ex. 121 at JR-L 049875-77; **Annie Turner**, Ex. 121 at JR-L 049881-82; **Thomas Sierra**, Ex. 121 at JR-L 049887-88; **Juan Johnson, Jacques Rivera, Orlando Lopez, Jose Montanez, Armando Serrano, Timothy Rankins, Jorge Pacheco, Robert Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Ariel Gomez, Ricardo Rodriguez, Robert Bouto, Carl Richmond, Rey Lozada, Rosendo Ochoa, Hugo Rodriguez, Jacqueline Grande, Sam Perez, Salvador Ortiz, David Colon, Luis Serrano, Evelyn Diaz, Freddy and Concepcion Santiago, Ricardo Rodriguez, Aurelio Martinez, Demetrius Johnson, Gamalier Rivera, Antonio Diaz, Richardini Lopez, Maria Diaz, Antonio McDowell, Marilyn Mulero, David Gecht, Richard Kwil, Colleen Miller, Ruben Hernandez, Eruby Abrego, Ramon Torres, Isidro Quinonez, Julio Lugo, Bernard Turner, Melvin Warren, Rafael Garcia, Jossie Martinez, Semara Johnson, Juan** and **Rosendo Hernandez, Edgar Perez,** Ex. 293 (Guevera Dep. in *Sierra*) at 13-18, 29-65, 66-121, 139-229.; **Francisco Vicente**, Ex. 228 at JR-L 077138-43, JR-L 077148-62; and **Geraldo Iglesias,** Ex. 228 at JR-L 077141, JR-L 077185-86; *see also* Ex. 290 (Def. Guevara's Answers to Pl.'s First Set of Interr.) at 1-8, as well as other individuals listed *infra* at ¶492.

491.    Other reports and investigations gave the City notice of the pattern of illegal

misconduct of Detective Guevara:

    a.  In 1996, Defendant Guevara was accused of physically striking his stepdaughter in the face. Defendant Guevara again denied all allegations. Although the Command Channel Review and IAD concurred in a sustained finding and recommended three-day discipline in February 1996, Defendant Guevara only served a one-day suspension, and no Rule 14 violation was added despite finding that Guevara provided false information. Ex. 190 (CR No. 223928).

    b.  In 1999, Defendant Guevara stating "fuck you" to Sergeant David Oravetz; engaged Sergeant Oravetz in an unjustified verbal altercation when Guevara threatened to kick Sergeant Oravetz's ass and pushed and poked Sergeant Oravetz in the chest; and failed to comply with a direct order to leave the district station— all when observed by several on-duty members of CPD. Throughout the OPS investigation, Guevara still denied all allegations against him despite the presence of others and the statements supporting the allegations. The allegations were sustained. Yet, even after the disciplinary history described above and the allegations at hand, a Police Commander still recommended reducing his recommended 30-day discipline by ten days, "considering the circumstances and his complementary and disciplinary history." In 2000, Guevara's discipline was reduced to 20 days, and he was compensated for 10 days of back pay for the suspension he had already served. No Rule 14 violation was added or sustained, despite Guevara making false statements during the investigation. Ex. 190 (CR No. 251502).

    c.  In 2001, The FBI authored a 302 report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Detective Guevara, in the 1980s and 1990s.  The report explains that Guevara would apprehend drug and gun dealers and then allow them to "buy their way out of trouble." Guevara also took bribes to alter the results of lineups.  Guevara, using an attorney as a conduit, would also receive cash in exchange for the dismissal of murder cases he investigated.  *See* Ex. 229 (FBI Report Dated June 23, 2001) at JR-L 02444-45. The report contained no indication that Guevara was questioned or that the IAD tried to find the people mentioned as having cases that were fixed by Guevara. Guevara has taken the Fifth in regard to all allegations regarding the topics covered in the report, as he has done in this case. ex. 209 (Guevara Deposition in *Rivera v. Guevara et al.*,) at 418-26; *see also* Ex. 283  (Guevara's Resp. to Pl's First Set of Inter in *Iglesias*) at 1-6.

    d.  ***Delgado Prompts Investigation:*** That same year, in 2001, a perjury investigation was initiated by State Representative William Delgado in response to complaints received from his constituents. Mr. Delgado alleged that Defendants Guevara and

Halvorsen gave false testimony in 17 homicide cases ranging from 1984 to 1997, and requested that the State's Attorney's office also investigate the matter to determine possible misconduct on the part of the detectives. Ex. 292 (CR Delgado Investigation) at RFC-Johnson 1977-1990. The CPD Internal Affairs Division interviewed Delgado, who related that the 17 defendants convicted primarily on the false testimonies of Guevara and Halvorsen stated that "we're tired of busting you on petty crime and we're gonna get you. We'll bust you for murder." *Id.* at RFC-Johnson 001983. Delgado stated that in at least one case it was impossible for Guevara to obtain a detailed statement from the defendant due to Guevara's poor Spanish. *Id.* Yet the State's Attorney's office closed its separate investigation without providing a report on the complaint, and without reviewing 3 of the 17 cases. *Id.* at RFC-Johnson 001987-90. However, based on the closure of the case by the State's Attorney's office (without actually seeing that report) and the alleged "fruitless" attempts to contact witnesses regarding the complaint, the CPD closed the case with a finding of "Not Sustained" in 2002. *Id.* at 001979.

492.     Despite notice of the misconduct, there continued a widespread failure to

discipline, that resulted in wrongful convictions, including but not limited to the following:

    a.     ***Jacques Rivera:*** In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin, and falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. As a result of this misconduct, Rivera was convicted. In 2011, Rivera filed a post-conviction petition based on actual innocence and received an evidentiary hearing. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. Ex. 112 (*Rivera* PC Hearing Tr. 5/23/11) at 58. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey. Ex. 114 (Rivera COI); Ex 113 (Order Granting Rivera New Trial), at 2; Ex. 110 (Rivera 6.12.18 Trial Tr.) at 1313:1-4; Ex. 117, Rivera Judgment.

    b.     ***Juan Johnson***: In 1989, Detective Guevara framed Juan Johnson for murder by coercing Samuel Perez into falsely implicating Johnson. To accomplish this feat, Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told

137

Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer. Ex. 233 (Testimony of Samuel Perez, *People v. Johnson*, 89 CR 21806). Johnson filed his post-conviction petition in 1996, and appealed its denial in 2001—and in May 2002, the appellate court reversed the denial, vacated his convictions, and remanded for a new trial. At his new trial, Johnson was acquitted by a jury. He sued Guevara in *Johnson v. Guevara*, 05-C-1042, eventually obtaining a verdict against him for $21 million. Ex. 234 (Jury Verdict in *Johnson v. Guevara*, 05 C 1042). Guevara took the Fifth in regard to all allegations regarding Juan Johnson. ex. 209 (Guevara Deposition in Jacques v. Rivera et al.) at 398-402.

c. ***Johnny Flores:*** Johnny Flores was wrongfully convicted of a 1989 murder that he did not commit, a conviction attributable to the misconduct of Defendant Guevara, who fabricated an identification to inculpate Mr. Flores. In 2022, the State asked the Court to vacate his convictions and subsequently dismissed all charges against him.  Flores now seeks justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. Defendant Guevara took the Fifth regarding all allegations regarding Johnny Flores. Ex. 235 (Johnny Flores, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63 97); Ex. 236 (Amended Successive Post-Conviction Pet.) at 1-5; ex. 209 (Guevara Dep. in *Rivera*) at 445; *see also Flores v. Guevara, et al.,* Case No. 1:23-cv-01736.

d. ***Jaime Rios:*** In 1989, Rios was wrongfully arrested, charged, and convicted for a murder that he did not commit– a conviction that was ultimately dismissed after evidence was presented showing that a witness had been threatened by Defendant Guevara into implicating Rios. In 2022, the Cook County State's Attorney's Office agreed to dismiss his conviction; within days, he had obtained a certificate of innocence; and he has now filed a federal lawsuit against Defendant Guevara and the City of Chicago. Ex. 237 (Jaime Rios, Nat'l Exoneration Registry, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63 87).

e. ***Jose Maysonet***: In 1990, Defendant Guevara repeatedly beat Jose Maysonet until he confessed to a double homicide that rested solely on that coerced confession. In 2016, Maysonet's double murder conviction was vacated and he was granted a new trial. Over a year later, the Cook County State's Attorney dropped charges against Jose after five retired Chicago police officers, including Defendants Guevara, Halvorsen, and Mingey, invoked their fifth amendment right and refused to testify. Ex. 238 (Megan Crepeau, Prosecutors Drop Murder Charges after 5 Ex-Chicago Cops Plan to Take the 5th, Chicago Tribune (Nov. 15, 2017), https://www.chicagotribune.com/2017/11/15/prosecutors-drop-murder-charges-

after-5-ex-chicago-cops-plan-to-take-the-5th/). Another victim of this same string of misconduct as Maysonet, **Alfredo Gonzalez's** conviction for the same homicide was vacated in 2022, and both Maysonet and Gonzalez have filed lawsuits against the City of Chicago and Guevara seeking justice for their wrongful convictions. Ex. 239 (Alfredo Gonzalez, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63 82); see *Gonzalez v. Guevara*, et al., Case No. 22-cv-6496; *see also* Ex. 293 (Guevera Dep. in *Sierra*); *see supra* at ¶490.

f.  ***David Lugo (Colon)***: In 1991, David Lugo was just 20 years old when he was framed for murder by Defendant Guevara and his fellow officers, when Defendant Guevara coerced Efrain and Julio Sanchez to pick David Colon out of a lineup, *See* Ex. 240 (Affidavits of Efrain & Julio Sanchez, Police Reports from *People v. Colon*, 93 CR 23750). In 2022, his conviction was vacated. He has since filed a lawsuit against Guevara and other officers for their misconduct. Guevara has invoked the Fifth Amendment regarding Lugo. Ex. 241 (Order Vacating Conviction); *see Lugo v. Guevara, et al*; Ex. 293 (Guevera Dep. in Sierra); *see supra* at ¶490.

g.  ***Marilyn Mulero:*** Marilyn was wrongfully convicted of a 1992 double murder based on evidence fabricated by notoriously corrupt Chicago Police Defendants Guevara and Halvorsen. Marilyn was pressured to enter a guilty plea without a trial and was sentenced to death. In 2022, all charges against her were dropped. She has also filed suit against Defendants Guevara—who has invoked the fifth amendment regarding Mulero--and Halvorsen. Ex. 242 (Michelle Gallardo, Marilyn Mulero sues Chicago, disgraced CPD detectives for allegedly framing her for murder, ABC News (July 25, 2023), https://abc7chicago.com/marilyn-mulero-reynaldo-guevara-chicago-police-misconduct-sued/13547189/); *see* Ex. 293 (Guevera Dep. in *Sierra*) at 181-186.

h.  ***Madeline Mendoza***: Mendoza was arrested in 1992, and convicted in 1993, for a crime she did not commit, based on false statements obtained by Defendants Guevara and Halvorsen. In 2023, the prosecution agreed to vacate Mendoza's conviction and the case was dismissed. Ex. 243 (Madeline Mendoza, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=65 19).

i.  ***Serrano & Montanez:*** In 1993, Detective Guevara used physical violence and inducements to coerce Francisco Vicente into falsely testifying against Armando Serrano, Jorge Pacheco, and Jose Montanez. *See* Ex. 244 (Affidavit of Francisco Vicente) at ¶¶4-14. In that same investigation, Detective Guevara beat Timothy Rankins with a flashlight, threw him out of his chair, and placed him in a chokehold to induce a statement implicating Serrano and Montanez, causing

139

Rankins to testify falsely against the men in the Grand Jury. Ex. 245 (Testimony of Timothy Rankins in *People v. Serrano*, 93 CR 18173) at JR-L 02899-912. Further, Serrano, Montanez, and Pacheco had their criminal histories pulled in this case before they even became suspects. *See* Ex. 248 (Lassar Report Dated 3/3/15) at 5. In 2004, Jose Montanez filed a post-conviction petition based on the recantation affidavit of the State's key witness Vicente, who provided a detailed statement describing how his false testimony was given as a result of threats, intimidation and physical abuse by Defendant Guevara. *See* Ex. 246 (Montanez PC Petition, 2004). Likewise, in 2005, Armando Serrano filed a post-conviction petition alleging actual innocence based on Vicente's affidavit and multitudes of other affidavits, transcripts, OPS complaints, and other supporting documentation, revealing that Guevara had engaged in a pattern and practice of coercing evidence through the use of threats, intimidation, lies, and physical abuse. Ex. 247 (Serrano PC Pet.) at 1-2. The City of Chicago then determined that Montanez and Serrano were wrongfully convicted. *See* Ex. 248 (Lassar Report Dated 3/3/15). In 2016, both men were exonerated and received certificates of innocence. Ex. 249 (Certificates of Innocence for Jose Montanez and Armando Serrano). Guevara has taken the Fifth in regard to all allegations regarding Vicente, Rankins, Montanez, and Serrano. Ex. 228 (Testimony of Reynaldo Guevara in *People v. Serrano & Montanez*, 93 CR 18173) at JR-L 077138-43, JR-L 077148-62. Montanez and Serrano's lawsuit against, *inter alia*, Defendants Guevara, Halvorsen, and the City of Chicago was settled for $20.5 million after Defendants' motion for summary judgment was denied as to the plaintiffs' claims of fabricated evidence, pretrial detention, malicious prosecution, federal and state-law conspiracy, Brady claims, IIED, and failure to intervene. Ex. 284 (Dkt. 261, Mem. Op. & Order, Serrano v. Guevara, et al., No. 17-cv-2869 (June 4, 2020) at 59-60; *see also* Ex. 285 (Don Babwin, Chicago Awards $20.5M to 2 Men Allegedly Framed by Detective, NBC News (Sept. 14, 2021), https://www.nbcchicago.com/news/local/chicago-awards-20-5m-to-2-men-allegedly-framed-by-detective/2612309/

j. **Robert Bouto**: in 1993, Detective Guevara manipulated the results of the line-up in which Mr. Bouto was identified. Specifically, Detective Guevara allowed witnesses to see Mr. Bouto in the police station prior to the line-up, allowed them to view photographs Mr. Bouto and confer with one another before the line-up, and threatened a witness that Guevara would "put a case" on him if he did not cooperate. (*See* Ex. 250, Affidavit of Rey Lozada, at ¶¶ 3-5, 6-11; Ex. 251, Affidavit of Carl Richmond, at ¶¶ 5, 7-9) (stating he was threatened to make an identification from Carl Richmond, with Det. Guevara saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends). Ultimately, the City of Chicago investigated Mr. Bouto's claims and concluded that Mr. Bouto is more likely than

not innocent. (*See* Ex. 227, Lassar Report, at JR-L 055738-39). Guevara has taken the Fifth in regard to all allegations regarding Bouto's case. Ex. 209, Guevara Deposition in Jacques Rivera v. Guevara et al., at 560); *see also* Ex. 293 (Guevera Dep. in Sierra); *see supra* at ¶490.

k. ***Geraldo Iglesias***: In 1993, Geraldo Iglesias became yet another "victim of now-disgraced and former Detective Reynaldo Guevara's pattern and practice of misconduct and framing innocent persons" when he was wrongfully convicted of murder and sentenced to 35 years. The state finally dismissed charges against him in 2019, and Iglesias was granted a Certificate of Innocence in 2022. Ex. 252 (COI Order) at 1.

l. ***Jose Cruz:*** In 1993, Cruz was arrested and ultimately wrongly convicted of a murder, based on fabricated and coerced statements caused by Defendant Guevara and other officers. In 2022, the prosecution agreed to vacate and dismiss his conviction. In 2023, he obtained a certificate of innocence, and filed a lawsuit against the City of Chicago, Defendant Guevara, and others for his wrongful conviction. Ex. 253 (Jose Cruz, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=6343).

m. ***Almodovar & Negron***: The City of Chicago has also determined that Roberto Almodovar was wrongfully convicted in another case investigated by Guevara in 1994. (*See* Ex. 254, Lassar Report regarding Roberto Almodovar, Dated 2/9/15, at JR-L 042869, JR-L 042882). In that case, Guevara was alleged to have framed Almodovar for a murder he did not commit by surreptitiously showing his photograph to witnesses before they viewed a lineup and then falsifying reports to make it seem as if the witnesses had picked Almodovar out of a line-up without any influence by Guevara. *See* Ex. 255 (Affidavit of Melinda Power); Ex. 256 (Post-Trial Testimony of Kennelly Saez in People v. Negron, 94 CR 24318). Almodovar, and his co-defendant William Negron, have both since been exonerated. *See* Ex. 257 (Order Vacating Judgment and Sentence in *People v. Negron*, 94 CR 24318). Guevara has taken the Fifth in regard to all allegations regarding the case against Almodovar and Negron. Ex. 209 (Guevara Deposition in Jacques v. Rivera et al., at 434-39); *see also* Ex. 293 (Guevera Dep. in Sierra); *see supra* at ¶490.

n. ***Nelson Gonzalez:*** Nelson Gonzalez was framed with a 1994 murder, resulting from a fabricated identification conducted by Defendant Guevara. In 2022, Gonzalez's convictions were vacated and the case dismissed, and in 2023, he was granted a certificate of innocence. He has also filed suit against Defendant Guevara, among others involved in his wrongful conviction. Ex. 258 (Nelson Gonzalez, Nat'l Registry of Exonerations,

https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63
79).

o.  ***Carlos Andino:*** In 1994, Defendants Guevara and Halvorsen, among other
    officers, manufactured false identifications that resulted in the wrongful arrest and
    conviction of Carlos Andino. In 2021, Andino filed for post-conviction relief, and
    in 2022, the Cook County State's attorney's office agreed to vacate Andino's
    conviction. In 2023, he was awarded a certificate of innocence, and filed suit
    against Guevara and other officers to seek compensation for his wrongful
    conviction. Ex. 259 (Carlos Andino, Nat'l Registry of Exonerations,
    https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63
    81).

p.  ***Thomas Sierra***: In 1995, Defendant Guevara told Jose Melendez to falsely
    identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez
    had not seen the shooter and told Defendant Guevara as much. In addition,
    Defendant Guevara wrote fabricated reports falsely saying that Jose Melendez and
    Alberto Rodriguez had identified a car as the one used in the Andujar shooting.
    Defendant Guevara invoked the fifth amendment when questioned about all
    aspects of Sierra's case. Ex. 121 at 34-35. The state finally dismissed charges
    against Mr. Sierra in 2019, and Mr. Sierra was granted a Certificate of Innocence
    in 2022.  He spent over 22 years in prison due to Guevara's misconduct and is
    suing the City of Chicago and defendant officers, including Defendant Guevara,
    due to that misconduct. Ex. 252 (COI Transcript) at 43, 53-73; Ex. 286 (COI in
    Sierra); *see also Sierra v. Guevara, et al.*, 1:18-cv-03029 (N.D.Ill).

q.  ***Edwin Davila:*** In 1995, Davila was framed for murder by Defendant Guevara and
    his fellow corrupt officers based on fabricated identifications. In 2022, after
    spending over 24 years in prison for a crime he did not commit, all charges
    against Mr. Davila were dismissed. Davila now seeks justice for the harm that
    Defendant Guevara and other officers caused him in a federal lawsuit. Guevara
    has invoked the Fifth Amendment regarding Davila. Ex. 260 (Edwin Davila, Nat'l
    Registry of Exonerations,
    https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=65
    07); *see also Davila v. Guevara, et al.* Case No. 1:23-cv-01739; Ex. 293 (Guevera
    Dep. in Sierra); *see supra* at ¶490.

r.  ***Gamalier Rivera***: In 1996, Gamalier Rivera was wrongfully arrested and
    convicted for murder resulting from fabricated identifications caused by
    Defendant Guevara and other officers. After years of seeking post-conviction
    relief, the state dismissed charges against him, and he was granted a certificate of
    innocence in 2022. Ex. 261 (Gamalier Rivera, Nat'l Registry of Exonerations,
    https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63
    98).  Rivera has filed a lawsuit against Guevara and other officers for their

misconduct. Guevara has invoked the Fifth Amendment regarding Rivera. *See Rivera v. Guevara, et al.,* Case. No. 1:23-cv-01743; *see also* Ex. 293 (Guevera Dep. in Sierra); *see supra* at ¶490.

s. ***Louis Robinson:*** Louis Robinson was wrongfully convicted of a 1996 drive-by shooting that killed Kelly Velez, based on coercive identification and fabricated evidence caused by Defendant Guevara. In 2023, his post-conviction petition was granted following an evidentiary hearing, and the State dismissed all charges. Ex. 262 (Louis Robinson, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=66 39).

t. ***Juan and Rosendo Hernandez***: Juan and Rosendo Hernandez were wrongfully convicted of the 1997 shooting of Jorge Gonzalez and collectively spent decades for a crime they did not commit due to the misconduct of Defendant Guevara and other officers, including the disgraced Joseph Miedzianowski, and Halvorsen. In 2022, their convictions were vacated, and they received certificates of innocence in 2023. Ex. 263 (Juan Hernandez Certificate of Innocence); Ex. 264 (Rosendo Hernandez Certificate of Innocence). They have filed a lawsuit against Guevara and other officers for their misconduct. *See Hernandez et al. v. Guevara et al.,* Case No. 1:23-cv-01737. Guevara has invoked the Fifth Amendment regarding the Hernandez brothers. *See* Ex. 293 (Guevera Dep. in Sierra); *see supra* at ¶490.

u. ***John Martinez***: John Martinez was wrongfully convicted of a homicide due to falsified evidence, including fabricated identifications and coercive interrogations, caused by Defendant Guevara and other officers. In 2023, Martinez's conviction was vacated, and less than a month later, his case was dismissed. In 2024, two others involved in this case – Thomas Kelly and Jose Tinajero – also had their wrongful convictions resulting from the same homicide dismissed based on Guevara's misconduct. Martinez has filed a lawsuit against the City of Chicago and Defendant Guevara, seeking justice for his wrongful conviction. Ex. 265 (John Martinez, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=65 52). *See Martinez v. Guevara, et al.,* Case No. 1:23-cv-01741.

v. ***David Gecht and Richard Kwil:*** In 1999, David Gecht and Richard Kwil were both wrongfully convicted  of a murder due to Defendants Guevara and Halvorsen's misconduct. During a single night, Defendants Guevara, Halvorsen, and other officers subjected both Gecht and Kwil to torturous investigations, breaking their wills and coercing them into signing false confessions. They also obtained a false confession from Ruben Hernandez, falsely implicating all three in the crime. In 2022, Gecht and Kwil's charges were dismissed, and both were granted certificates of innocence. Ex. 266 (Gecht Court of Claims Order); Ex. 267 (Kwil COI Order). The charges against Hernandez were also dismissed, and all

three have pending lawsuits against Defendants Guevara—who has taken the Fifth regarding allegations against all three—and Halvorsen, among other officers, and the City of Chicago. *See Gecht v. Guevara, et al.*, Case No. 23-1742*; Kwil v. Guevara, et al.*, Case No. 23-cv-1742; *Hernandez v. Guevara, et al.*, Case No. 23-cv-15375; *see also* Ex. 287 (Richard Kwil, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=65 81); *see also* Ex. 293 (Guevara Dep. In *Sierra*); *see supra* at ¶490.

w. ***Eruby Abrego and Jeremiah Cain:*** Eruby Abrego and Jeremiah Cain were wrongly convicted of the 1999 murder of Jose Garcia and aggravated battery of Julio Lugo, despite having nothing to do with the murder, due to the false identifications, falsified confessions obtained through torture, and other evidence manufactured by Defendants Guevara, Halvorsen, and others. In 2022, their wrongful convictions were vacated and the charges were dismissed. Both now seek justice for the harm that Defendant Guevara and other officers caused him in a federal lawsuit. Ex. 268 (Eruby Abrego, Nat'l Registry of Exonerations, https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=63 75); *see also Abrego v. Guevara, et al.,* Case No. 1:23-cv-01740*; Cain v. Guevara, et al.*, 1:23-cv-14282 (N.D. Ill.).

x. On February 29, 2024, seven men – Jayson Aguiar, who served 20 years, David Kruger, who served 14 years, Juan Molina, who served 12.5 years, Edwin Ortiz, who served 25 years, Oscar Soto, who served 3 years, Victor Vera, who served 19 years, and Tyrece Williams, who served 20 years–filed petitions seeking to reverse their decades-old convictions tied to disgraced former Chicago Police Detective Reynaldo Guevara. The men—who have completed their sentences and are out of custody—all claim their innocence. Ex. 269 (Aguiar Pet.); Ex. 270 (Kruger Pet.); Ex. 271 (Molina Pet.); Ex. 272 (Ortiz Pet.); Ex. 273 (Soto Pet.); Ex. 274 (Vera Pet.); Ex. 275 (Williams Pet.).

y. Plaintiff's retained expert Jennifer Dysart stated that "It seems that a common theme in the Guevara cases I have reviewed is [for Guevara to] manipulate witnesses who had poor opportunities to view the perpetrator. Most of the cases had several estimator variables factors: a limited opportunity to see the perpetrator, the presence of stress and arousal, the presence of a weapon, and issues with perpetrator descriptions. In summary, the witnesses in these cases were likely vulnerable to suggestion and influence due to the presence of multiple estimator variables that can lead to a weak memory for a perpetrator." Ex. 58 (Dysart Report) at 24.

493.     It was not until 2013 that the City first investigated Guevara, hiring Sidley Austin to conduct a review of a portion of his cases. When the reports were concluded in late 2014 and

2015, the reports found that Guevara had engaged in investigative misconduct including through improper identification procedures, falsifying reports, and physical abuse during interrogations. Ex. 120 (Lassar Report regarding Solache and Reyes, dated 12/12/14); Ex. 254 (Lassar Report on Almodovar, dated 2/9/15); Ex. 227 (Lassar Report regarding Bouto, dated 3/3/15); Ex. 248 (Lassar Report regarding Serrano and Montanez, dated 3/3/15).

RESPECTFULLY SUBMITTED,

**DEMETRIUS JOHNSON**

By:      /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

**CERTIFICATE OF SERVICE**

I, Steve Art, an attorney, hereby certify that, on June 11, 2024, I filed the foregoing PLAINTIFF'S DEMETRIUS JOHNSON'S STATEMENT OF FACTS IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

146