**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | No. 20 C 4156 |
| *Plaintiff*, | ) | |
| | ) | Hon. Sara L. Ellis, |
| *v.* | ) | District Judge |
| | ) | |
| REYNALDO GUEVARA, *et al.*, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants*. | ) | |

**PLAINTIFF DEMETRIUS JOHNSON'S CONSOLIDATED RESPONSE
IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ........................................................................................................1

SUMMARY OF DISPUTED MATERIAL FACTS .....................................................4

I.   JOHNSON IS INNOCENT OF THE FRED MURDER ....................................4

II.  EDWIN FRED AND RAUL ORTIZ ARE SHOT IN WICKER PARK.................4

III. DEFENDANTS RESPOND TO THE CRIME AND INTERVIEW
     WITNESSES..................................................................................................5

IV.  DEFENDANTS IMMEDIATELY IDENTIFY BRYAN JOHNS AS THE
     KILLER .........................................................................................................6

V.   BRYAN JOHNS IS IDENTIFIED IN A LINEUP RIGHT AFTER THE
     CRIME ...........................................................................................................7

VI.  DEFENDANTS RELEASE JOHNS WITHOUT CHARGES BECAUSE HE IS
     A COOPERATING WITNESS .........................................................................8

VII. DEFENDANTS PRE-SELECT DEMETRIUS JOHNSON AS THEIR
     SUSPECT .......................................................................................................8

VIII. DEFENDANTS FRAME JOHNSON ON TWO DAYS IN JULY 1991 ...........10

     A.   Elba Burgos Did Not See the Shooter and Could Not Identify Anyone
          Without Direction from Defendants About Who To Pick ...........................10

     B.   Guevara and Halvorsen Fabricate A Photo Identification from Elba
          Burgos .................................................................................................11

     C.   Ricardo Burgos Did Not See the Shooter and Could Not Identify
          Anyone Without Direction from Defendants About Who To Pick .............12

     D.   Guevara Fabricates A June 21 Photo Identification from Ricardo Burgos
          ...........................................................................................................12

     E.   Rosa Burgos Did Not See the Shooter and Could Not Identify Anyone
          Without Direction from Defendants About Who To Pick ...........................13

     F.   Defendants Fabricate July 22 Lineup Identifications from Rosa Burgos,
          Ricardo Burgos, and Elba Burgos..............................................................14

     G.   Defendants Did Not Show Their July 22 Lineup to Key Witnesses...........15

     I.   Defendants Knowingly Fabricated the Burgos Identifications ...................15

     J.   Guevara and Halvorsen Fabricate A False Closing Report and False
          Lineup Report .......................................................................................17

i

K.  Guevara and Halvorsen Attempt to Fabricate An Identification from Angel Cordova, Who Refuses to Play Along ...................................................18

L.  Defendants Fabricate A False and Backdated Lineup Report to Cover Up the Johns Identification ..............................................................................19

IX. DEFENDANTS HIDE KEY EVIDENCE FROM THE PROSECUTION AND DEFENSE THROUGHOUT JOHNSON'S PROSECUTION, LYING SO THAT THE EVIDENCE CANNOT BE DISCOVERED ..........................................20

X. JOHNSON IS CONVICTED AT TRIAL .............................................................22

XI. THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED JOHNSON'S WRONGFUL CONVICTION ...............................................................................23

XII.  JOHNSON FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED ...................................................................................................24

XIII. GUEVARA REFUSES TO TESTIFY IN THIS CIVIL CASE ...........................25

ARGUMENT .................................................................................................................26

I.  DEFENDANTS FORFEIT CHALLENGES TO JOHNSON'S THEORIES .........27

II.  SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE ............................................................30

III. SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT ..................................31

A.  Guevara Cannot Meet His Burden of Production At Summary Judgment ........................................................................................................32

B.  Guevara Cannot Meet His Burden of Persuasion At Summary Judgment ........................................................................................................33

C.  Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law .................................................................................................................35

D.  Guevara Cannot Assert His Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record ...........................37

IV. SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS ...........................................................................................................38

A.  A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence ........................................................................................................40

1.  Defendants Knowingly Fabricated the Burgos Identifications ...............42

2.  Erickson, Daley, and Healey Were Involved In This Misconduct 53

3.  Defendants' Fabrication of Guevara's False Lineup Report Was Used to Deprive Johnson of His Liberty .................................................55

ii

B. Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence ...................59

  1. Defendants Suppressed Their Own Fabrications ....................................61

  2. Defendants Suppressed Many Items of Evidence Independent of Their Fabrications, Which They Do Not Address In Their Motions ....................................................................................................66

  3. Defendants' Arguments About Their Suppression of the Johns Identifications Lack Merit....................................................................75

  4. Defendants' Arguments for Summary Judgment On Johnson's Document Suppression Claim Should Be Rejected..............................85

C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Johnson's Criminal Trial...............................................................................................87

  1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983...........................................................................................................87

  2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Johnson's Criminal Case and Violated His Right to Due Process...........................................................................................91

  3. Defendant Erickson, Daley, and Healey Were Involved In the Burgos Identification Procedures.......................................................102

  4. Defendants Are Not Entitled To Summary Judgment Merely Because They Disclaim Intent ...........................................................102

  5. Defendants Are Not Entitled To Qualified Immunity on This Theory ................................................................................................105

D. A Jury Must Decide Johnson's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims .................................................109

  1. Erickson, Daley, and Healey Are Liable for Malicious Prosecution...........................................................................................110

  2. The Parties Hotly Dispute Whether the Burgos Identifications Established Probable Cause .............................................................111

  3. Defendants Are Not Entitled To Qualified Immunity on This Theory ................................................................................................114

E. Defendant Healey Participated In the Misconduct and Is Not Entitled to Summary Judgment ................................................................................116

F. A Jury Must Decide Johnson's Failure-To-Intervene Claims ...................118

G. A Jury Must Decide Johnson's State-Law Claim of Intentional Infliction of Emotional Distress.................................................................................119

H. A Jury Must Decide Johnson's Section 1983 Conspiracy Claims............120

      1.   The Parties Dispute Whether Defendants Reached An Agreement to Frame Johnson ........................................................121

      2.   Defendants Are Not Entitled To Qualified Immunity on This Theory ...................................................................................................124

  I.    A Jury Must Decide Johnson's State Law Negligence Claim ...................126

V. SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO .....................................................................................................127

  A.    The City Misstates the Legal Framework Governing *Monell* Claims ......................130

  B.    The City Does Not Move for Summary Judgment On A Number of Johnson's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What .............................................................................................131

  C.    The City Does Not and Cannot Challenge Johnson's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression ..........................................................................134

  D.    A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression ..........................................138

      1.   The City's False Premise Regarding Expert Evidence ........................138

      2.   The City Invokes the Wrong Legal Standard for Widespread Practice Claims ...................................................................................138

      3.   The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous ......................................140

      4.   Non-Expert Evidence Establishing the City's Evidence Suppression Practice ......................................................................141

      5.   Expert Evidence Demonstrating the City's Evidence Suppression Practice ......................................................................146

      6.   The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit ...........................................148

  E.    A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures ........................................................153

      1.   Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications ..............................................................154

      2.   Expert Evidence Supporting the Widespread Practice of Fabricating Identifications Using Suggestive Identification Procedures ....................................................................................157

      3.   The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit ..........................................163

F.   The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit ............................................................................ 165

  1.  The City's Liability Does Not Necessarily Depend on Individual Liability ........................................................................................ 166

  2.  The City's Causation Argument Is Meritless ................................... 167

G.   The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment ...................................................................................... 168

**CONCLUSION** ........................................................................................................ 168

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adickes v. S.H. Kress & Co.,*
    398 U.S. 144 (1970)........................................................................ *passim*

*Alexander v. City of South Bend,*
    433 F.3d 550 (2006)........................................................................ *passim*

*Alexander v. United States,*
    721 F.3d 418 (7th Cir. 2013) ........................................................................111

*Anderson v. City of Rockford,*
    932 F.3d 494 (7th Cir. 2019) ..............................................................53, 56, 69

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................26, 42, 51

*Armstrong v. Daily,*
    786 F.3d 529 (7th Cir. 2015) ............................................................86, 113, 124

*Avery v. City of Milwaukee,*
    847 F.3d 433 (7th Cir. 2017) ........................................................................ *passim*

*Banks v. Dretke,*
    540 U.S. 668 (2004)........................................................................................81

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976)................................................................................33, 34

*Beam v. IPCO Corp.,*
    838 F.2d 242 (7th Cir. 1988) ......................................................................140

*Beaman v. Freesmeyer,*
    183 N.E.3d 767 (Ill. 2021)........................................................................73, 109

*Belangen v. Schreiber,*
    407 F.3d 34 (2d Cir. 2005) ............................................................................34

*Bell v. City of Milwaukee,*
    746 F.2d 1205 (7th Cir. 1984) ..............................................................121, 123

*Blackmon v. City of Chicago,*
    No. 19 CV 767, 2023 WL 7160639 (N.D. Ill. Oct. 31, 2023) ....................88, 90, 93

vi

**Cases**                           **Page(s)**

*Blasius v. Angel Auto., Inc.,*
 839 F.3d 639 (7th Cir. 2016) ............................................149

*Board of Comm'rs v. Brown*,
 520 U.S. 397 (1997).........................................................129

*Bolden v. Pesavento,*
 623 F. Supp. 3d 897 (N.D. Ill. 2022) .....................87, 99, 112

*Bonds v. City of Chicago,*
 No. 16-CV-5112, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018)............................................165

*Boss v. Pierce,*
 263 F.3d 734 (7th Cir. 2001) .............................................82

*Branion v. Gramly,*
 855 F.2d 1256 (7th Cir. 1988) ............................................51

*Brown v. Mississippi,*
 297 U.S. 278 (1936)...........................................................89

*Bryant v. Whalen,*
 759 F.Supp. 410 (N.D. Ill. 1991) .......................................111

*Buckley v. Fitzsimmons,*
 509 U.S. 259 (1993)...........................................................57

*Byrd v. Brishke,*
 466 F.2d 6 (7th Cir. 1972) ................................................117

*Cage v. City of Chicago,*
 No. 9 C 3078, 2010 WL 3613981 (N.D. Ill. Sept. 8, 2010).................................................165

*Calhoun v. Ramsey,*
 408 F.3d 375 (7th Cir. 2005) ......................................130, 131

*Camm v. Faith,*
 937 F.3d 1096 (7th Cir. 2019) ................................... *passim*

*Canton v. Harris,*
 489 U.S. 378 (1989)..........................................................131

*Carmichael v. Village of Palatine,*
    605 F.3d 451 (7th Cir. 2010) ...................................................... *passim*

*Cartwright v. City of Chicago,*
    450 Fed. App'x 539 (7th Cir. 2011) ..................................................114

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)..........................................................................28, 33

*Chavez v. Martinez,*
    538 U.S. 760 (2003)..........................................................................89, 90

*Chelios v. Heavener,*
    520 F.3d 678 (7th Cir. 2008) ..........................................................114

*City of Chicago v. Reliable Truck Parts Co., Inc.,*
    822 F.Supp. 1288 (N.D. Ill. 1993) ....................................................35

*City of Los Angeles v. Heller,*
    475 U.S. 706 (1986)..........................................................................166

*Coleman v. City of Peoria,*
    925 F.3d 336 (7th Cir. 2019) ..........................................87, 108, 112

*Collier v. City of Chicago,*
    2015 WL 50814408, (N.D. Ill. Aug. 26, 2015) ..............................111

*Costello v. Grundon,*
    651 F.3d 614 (7th Cir. 2011) ...................................................... *passim*

*Currie v. Chhabra,*
    728 F.3d 626 (7th Cir. 2013) ..........................................................113, 115

*Daniel v. Cook County,*
    833 F.3d 728 (7th Cir. 2016) ..........................................138, 139, 149

*Davis v. Carter,*
    452 F.3d 686 (7th Cir. 2006) ..........................................129, 132, 139

*Dixon v. Cook County,*
    819 F.3d 343 (7th Cir. 2016) ..........................................................139

*Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors,*
    593 F.3d 507 (7th Cir. 2010) ..........................................................126

*Dominguez v. Hendley,*
    545 F.3d 585 (7th Cir. 2008) ...................................................................59

*Donald v. Outlaw,*
    No. 2:17-CV-32-TLS, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023) ............................87, 101

*Doxtator v. O'Brien,*
    39 F.4th 852 (7th Cir. 2022) ...................................................................118

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
    504 U.S. 451 (1992)................................................................................50

*Engel v. Buchan,*
    710 F.3d 698, 699 (7th Cir. 2013).............................................................63

*Escobedo v. Ram Shirdi,*
    No. 10 C 6598, 2013 WL 1787819 (N.D. Ill. Apr. 25, 2013).............................168

*Estate of Moreland v. Dieter,*
    395 F.3d 747 (7th Cir. 2005) ...................................................................139

*Evans v. City of Chicago,*
    2010 WL 3075651 (N.D. Ill. Aug. 5, 2010) ...............................................166

*Evans v. City of Chicago,*
    2006 WL 463041 (N.D. Ill. Jan. 6, 2006) ..................................................132

*Ezell v. City of Chicago,*
    No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) ..........................*passim*

*Fields v. Chicago,*
    981 F.3d 534 (7th Cir. 2020) .................................................................*passim*

*Fields v. City of Chicago,*
    2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ..................................................85

*Fields v. Wharrie,*
    672 F.3d 505 (7th Cir. 2012) ...................................................................60

*Fields v. Wharrie,*
    740 F.3d 1107 (7th Cir. 2014) .................................................................52

*Fox v. Hayes,*
    600 F.3d 819 (7th Cir. 2010) ...........................................................114, 119

*Fox v. Peters,*
    2011 WL 6378826 (N.D. Ill. 2011) ....................................................132

*Franks v. Delaware,*
    438 U.S. 154 (1978)...........................................................................111

*Gauger v. Hendle,*
    349 F.3d 354 (7th Cir. 2003) ..............................................................64

*Geinosky v. City of Chicago,*
    675 F.3d 743 (7th Cir. 2012) ............................................................123

*Gerstein v. Pugh,*
    420 U.S. 103 (1975)...........................................................................109

*Giglio v. United States,*
    405 U.S. 150 (1972)..................................................................... *passim*

*Glisson v. Ind. Dep't of Corrections,*
    849 F.3d 372 (2017)..................................................................... *passim*

*Godinez v. City of Chicago,*
    No. 16-CV-07344, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) .........167

*Goudy v. Cummings,*
    922 F.3d 834 (7th Cir. 2019) ...................................................... *passim*

*Gray v. City of Chicago,*
    No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) .........94, 113

*Graystone Nash, Inc.,*
    25 F.3d 187 (3d Cir. 1994)..................................................................34

*Green v. Thomas,*
    No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133 (S.D. Miss. May 20, 2024)....................108

*Hampton v. City of Chicago,*
    2017 WL 2985743 (N.D. Ill. July 13, 2017)................................. *passim*

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979) ............................................................121

*Harris v. City of Chicago,*
    No. 20-CV-4521, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020)............125

x

*Hart v. Mannina*,
798 F.3d 578 (7th Cir. 2015) ............................................................112

*Henry v. Ramos*,
1997 WL 610781 (N.D. Ill. Sept. 28, 1997) .......................................120

*Hensley v. Carey*,
818 F.2d 646 (7th Cir. 1987) ...............................................89, 90, 108

*Hoggard v. Rhodes*,
141 S. Ct. 2421 (2021)........................................................................106

*Holland v. City of Chicago*,
643 F.3d 248 (7th Cir. 2011) ...............................................................59

*Holloway v. City of Milwaukee*,
43 F.4th 760 (7th Cir. 2022) ...............................................87, 100, 103

*Hope v. Pelzer*,
536 U.S. 730 (2002)............................................................................114

*Hudson v. City of Chicago*,
No. 16-CV-4452, 2019 WL 1112260 (N.D. Ill. Mar. 11, 2019)...........167

*Hunter v. Bryant*,
502 U.S. 224 (1991)............................................................................115

*Hurt v. Wise*,
880 F.3d 831 (7th Cir. 2018) .................................................................57

*J&J Sports Productions, Inc. v. Resendiz*,
2009 WL 1953154 (N.D. Ill. July 2, 2009)..........................................105

*J.K.J. v. Polk County*,
960 F.3d 367 (7th Cir. 2020) ...............................................129, 162, 164

*Jackson v. Marion County*,
66 F.3d 151 (7th Cir. 1995) .................................................................132

*Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*,
973 N.E.2d 880 (Ill. 2012)..................................................................126

*Jenkins v. Bartlett*,
487 F.3d 482 (7th Cir. 2007) ...............................................130, 131, 132

*Jimenez v. City of Chicago,*
    830 F. Supp. 2d 432 (N.D. Ill. 2011) ............................................................ *passim*

*Jones v. City of Chicago,*
    856 F.2d 985 (7th Cir. 1988) ...................................................59, 124, 140

*Kailin v. Gurnee,*
    77 F.4th 476 (7th Cir. 2023) ...........................................................81, 102

*Kimm v. Rosenberg,*
    363 U.S. 405 (1960) ...................................................................................34

*King v. Kramer,*
    680 F.3d 1013 (7th Cir. 2012) ...............................................................131

*Kingdomware Techs., Inc. v. United States,*
    579 U.S. 162 (2016) ...............................................................................106

*Kislea v. Hughes,*
    138 S. Ct. 1148 (2018) ..........................................................................107

*Kluppelberg v. Burge,*
    No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) ...........................84

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ....................................................................... *passim*

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse,*
    991 F.2d 1249 (7th Cir. 1993) ..............................................................103

*LaPorta v. City of Chicago,*
    277 F. Supp. 3d 969 (N.D. Ill. 2017) ..........................................149, 167

*LaSalle Bank Lake View v. Seguban,*
    54 F.3d 387 (7th Cir. 1995) .....................................................................33

*Lawson v. Veruchi,*
    637 F.3d 699 (7th Cir. 2011) .................................................................111

*Lee v. Foster,*
    750 F.3d 687 (7th Cir. 2014) ...................................................................91

*Lewis v. City of Chicago,*
    914 F.3d 472 (7th Cir. 2019) ...................................................................63

*LiButti v. United States,*
    178 F.3d 114 (2d Cir. 1999)............................................................................33

*Liggins v. City of Chicago,*
    2021 WL 2894167 (N.D. Ill. July 9, 2021)...........................................125

*Logan v. Caterpillar,*
    246 F.3d 912 (7th Cir. 2011) ...................................................................109

*Logan v. City of Chicago,*
    891 F. Supp. 2d 897 (N.D. Ill. 2012) ......................................................35

*Lopez v. City of Chicago,*
    464 F.3d 711 (7th Cir. 2006) ...................................................................120

*Lopez v. Davis,*
    531 U.S. 230 (2001).....................................................................................106

*Lyons v. Johnson,*
    415 F.2d 540 (9th Cir. 1969) .....................................................................36

*Malley v. Briggs*
    475 U.S. 335 (1986).....................................................................................114

*Manson v. Brathwaite,*
    432 U.S. 98 (1977).............................................................................89, 108

*Manuel v. Joliet,*
    580 U.S. 357 (2017).............................................................................109, 114

*Martinez v. Cook County,*
    No. 11 C 1794, 2011 WL 4686438 (N.D. Ill. Oct. 4, 2011) ...............166

*Maxwell v. City of Indianapolis,*
    998 F.2d 431 (7th Cir. 1993) .............................................................112, 114

*McCottrell v. White,*
    933 F.3d 651 (7th Cir. 2019) ...................................................................105

*McDonough v. Smith,*
    139 S. Ct. 2149 (2019)...........................................................................52, 57

*Monell v. Department of Social Services,*
    436 U.S. 658 (1978).................................................................... *passim*

xiii

*Mooney v. Hollohan,*
   294 U.S. 103 (1935) ................................................................................40

*Moore v. City of Chicago,*
   2011 WL 1231318 (N.D. Ill. 2011) ......................................................120

*Moran v. Calumet City,*
   54 F.4th 483 (7th Cir. 2022) ................................................................112

*Mwangangi v. Nielsen,*
   48 F.4th 816 (7th Cir. 2022) ........................................................118, 119

*Nanda v. Bd. of Trustees of Univ. of Illinois,*
   219 F. Supp. 2d 911 (N.D. Ill. 2001) ....................................................68

*Napue v. Illinois,*
   360 U.S. 264 (1959) ................................................................................59

*National Acceptance v. Bathalter,*
   705 F.2d 924 (7th Cir. 1983) ................................................................35

*Neil v. Biggers,*
   409 U.S. 188 (1972) ......................................................................97, 108

*Nelson v. LaCrosse Cty,*
   301 F.3d 820 (7th Cir. 2002) ..............................................................132

*Newsome v. McCabe,*
   256 F.3d 747 (7th Cir. 2001) ................................................................59

*Newsome v. McCabe,*
   319 F.3d 301 (7th Cir. 2003) ....................................................60, 61, 69

*Ocean Tomo, LLC v. Barney,*
   133 F. Supp. 3d 1107 (N.D. Ill. 2015) ..................................................79

*Olson v. Tyler,*
   771 F.2d 277 (7th Cir. 1985) ..............................................................111

*Otto v. Variable Annuity Life Ins. Co.,*
   134 F.3d 841 (7th Cir. 1998) ..............................................................118

*Padilla v. City of Chicago,*
   2013 WL 1208567 (N.D. Ill. Mar. 26, 2013) ......................................109

*Palmer v. City of Chicago,*
    82 C 2349 (N.D. Ill.) ....................................................................................... *passim*

*Patrick v. City of Chicago,*
    974 F.3d 824 (7th Cir. 2020) ...............................................................52, 56

*Pembaur v. City of Cincinnati,*
    475 U.S. 469 (1986) ..............................................................................129

*Pennington v. Flora Cmty. Unit Sch. Dist. No. 35,*
    2023 WL 348320 (S.D. Ill. Jan. 20, 2023) ...........................................125

*Pepper v. Village of Oak Park,*
    430 F.3d 806 (7th Cir. 2005) ...............................................................54

*Petty v. City of Chicago,*
    754 F.3d 416 (7th Cir. 2014) ...........................................................40, 52

*P.H. Glatfelter Co. v. Voith,*
    784 F.2d 770 (7th Cir. 1986) ..............................................................103

*Pickett v. Dart,*
    2014 WL919673 (N.D. Ill. Mar. 10, 2014) ...........................................165

*Pierson v. Ray,*
    386 U.S. 547 (1967) ..............................................................................106

*Proffitt v. Ridgway,*
    279 F.3d 503 (7th Cir. 2002) ..............................................................121

*Purghoraishi v. Flying J, Inc.,*
    449 F.3d 751 (7th Cir. 2006) ................................................................47

*Reeves v. Jewel Food Stores,*
    759 F.3d 698 (7th Cir. 2014) ..............................................................126

*Rehberg v. Paulk,*
    566 U.S. 356 (2012) ...............................................................................58

*Reyes v. Nurse,*
    38 F.4th 636 (7th Cir. 2022) .................................................................87

*Richardson v. McKnight,*
    521 U.S. 399 (1997) ..............................................................................107

*Rivera v. Guevara,*
    319 F. Supp. 3d 1004 (N.D. Ill. 2018) ........................................................................... *passim*

*Rivera v. Guevara,*
    No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019) .............................24, 126, 133

*Rogers v. Jarrett,*
    63 F.4th 971, 980 (5th Cir. 2023) ...........................................................................107

*Ross v. Blake,*
    578 U.S. 632, 638 (2016) ........................................................................................105

*S.E.C. v. Colello,*
    139 F.3d 674 (9th Cir. 1998) ...................................................................................33

*Sanders v. City of Chicago Heights,*
    No. 13 C 0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ......................................99, 108

*Saunders-El v. Rohde,*
    778 F.3d 556 (7th Cir. 2015) ...................................................................................64

*Savory v. Cannon,*
    947 F.3d 409 (7th Cir. 2020) ...................................................................................88

*Serrano v. Guevara,*
    No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020) .......................................122

*Simmons v. United States,*
    390 U.S. 377, 382-83 (1968) ...............................................................................94, 108

*Smith v. Burge,*
    222 F. Supp. 3d 669 (N.D. Ill. 2016) .........................................................................65

*Smith v. Cain,*
    132 S. Ct. 627 (2012) ............................................................................................59

*Smith v. Ne. Illinois Univ.,*
    388 F.3d 559 (7th Cir. 2004) ............................................................................. *passim*

*Sornberger v. City of Knoxville,*
    434 F.3d 1006 (7th Cir. 2006) ...........................................................................129, 131

*Standard Ins. Co. v. VanLanduit,*
    551 F. Supp. 3d 854 (N.D. Ill. 2021) ........................................................................103

*Steidl v. Fermon,*
    494 F.3d 623 (7th Cir. 2007) ........................................116

*Steidl v. Gramley,*
    151 F.3d 739 (7th Cir. 1998) ................................131, 132

*Sterk v. Redbox Automated Retail, LLC,*
    770 F.3d 6187 (7th Cir. 2014) ........................31, 32, 67

*Stevenson v. City of Chicago,*
    No. 17 CV 4839, 2018 WL 1784142 (N.D. Ill. Apr. 13, 2018)....................125, 126

*Stinson v. Gauger,*
    868 F.3d 516 (7th Cir. 2017) *(en banc)* ........................56, 62

*Stovall v. Denno,*
    388 U.S. 293 (1967)........................................89

*Streckenbach v. Vandensen,*
    868 F.3d 594 (7th Cir. 2017) ........................133

*Strickler v. Greene,*
    527 U.S. 263 (1999)........................................83

*Sublett v. John Wiley & Sons, Inc.,*
    463 F.3d 731 (7th Cir. 2006) ........................28, 47, 132

*Swanigan v. Chicago,*
    775 F.3d 953 (7th Cir. 2015) ........................165

*Swanigan v. City of Chicago,*
    881 F.3d 577 (7th Cir. 2018) ........................90

*Taylor v. City of Chicago,*
    2021 WL 4401528 (N.D. Ill. Sept. 27, 2021) ........................58

*Thomas v. Cook County,*
    604 F.3d 293 (7th Cir. 2010) ........................139, 165, 167

*Thompson v. Boggs,*
    33 F.3d 847 (7th Cir. 1994) ........................132

*Thompson v. City of Chicago,*
    472 F.3d 444 (7th Cir. 2006) ........................151

*Thompson v. City of Chicago*,
   722 F.3d 963 (7th Cir. 2013) ...........................................................................75

*Thompson v. City of Chicago*,
   2009 WL 674353 (N.D. Ill. Mar. 12, 2009)..................................................35

*Thompson v. Clark*,
   596 U.S. 36 (2022)..............................................................................107, 108

*Titran v. Ackman*,
   893 F.2d 145 (7th Cir. 1990) .......................................................28, 67, 132

*Tolan v. Cotton*,
   572 U.S. 650 (2014) ................................................................... *passim*

*United States v. $39,000.00 in U.S. Currency*,
   951 F.3d 740 (6th Cir. 2020) ........................................................................36

*United States v. 4003-4005 5th Ave.*,
   55 F.3d 78 (2d Cir. 1995)...............................................................................34

*United States v. Agurs*,
   427 U.S. 97 (1976)........................................................................................60

*United States v. Bagley*,
   473 U.S. 667 (1985).................................................................................61, 69

*United States v. Certain Real Prop. & Premises*,
   55 F.3d 78 (2d Cir. 1995)...............................................................................33

*United States v. Holm*,
   326 F.3d 872 (7th Cir. 2003) ........................................................................29

*United States v. Jackson*,
   546 F.3d 801 (7th Cir. 2008) ......................................................................123

*United States v. Rylander*,
   460 U.S. 752 (1983)......................................................................................32

*United States v. Taylor*,
   975 F.2d 402 (7th Cir. 1992) ........................................................................32

*United States v. Useni*,
   516 F.3d 634 (7th Cir. 2008) ......................................................................119

*United States v. Wade,*
   388 U.S. 218 (1967)..................................................................................................154

*Vega v. Tekoh,*
   597 U.S. 134 (2022)............................................................................... *passim*

*Velez v. City of Chicago,*
   No. 1:18-CV-08144, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023).....................................127

*Vodak v. City of Chicago,*
   639 F.3d 738 (7th Cir. 2011) ..................................................................131, 132

*Washington v. Boudreau,*
   No. 16-CV-01893, 2022 WL 4599708, (N.D. Ill. Sept. 30, 2022) .................................88, 123

*Washington v. City of Chicago,*
   No. 22-2467, 2024 WL 1615022 (7th Cir. Apr. 15, 2024) ....................................113

*Wearry v. Cain,*
   577 U.S. 385 (2016)................................................................................59, 60, 69

*Wehrs v. Wells,*
   688 F.3d 886 (7th Cir.2012) ..................................................................................79

*Wells v. Coker,*
   2014 WL 716518 (C.D. Ill. Feb. 25, 2014)..........................................................166

*Whren v. United States,*
   517 U.S. 806 (1996)................................................................................115

*Whitlock v. Brueggemann,*
   682 F.3d 567 (7th Cir. 2012) ............................................................... *passim*

*Williams v. City of Chicago,*
   733 F.3d 749 (7th Cir. 2013) ..................................................................111

*Williams v. Florida,*
   399 U.S. 78 (1970)......................................................................................32

*Woodward v. Corr. Med. Servs,*
   368 F.3d 917 (7th Cir. 2004) ..................................................................166, 167

*Yang v. Hardin,*
   37 F.3d 282 (7th Cir. 1994) ..................................................................118

xix

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) ................................................................................107, 124

**Other Authorities**

10A Wright & Miller, Federal Practice & Procedure §2727 ................................................ *passim*

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023)

.............................................................................................................................106, 107

Civil Rights Act of 1871, Stat. 13 (1871) .................................................................................107

William Baude, *Is Qualified Immunity Unlawful?*, 106 CALIF. L. REV. 45 (2018) ...................105

## INTRODUCTION

Demetrius Johnson was 15 years old when he was wrongly arrested and then convicted of the 1991 shooting murder of Edwin Fred and attempted murder of Raul Ortiz based solely on false identifications that Defendants fabricated from three supposed eyewitnesses to the crime—Ricardo Burgos, Rosa Burgos, and Elba Burgos—who the Defendants knew from the start could not identify the shooter and who only identified Johnson because Defendants forced them to select their chosen suspect, Johnson.

No real evidence ever implicated Johnson in the shooting. No weapon ever connected him to the crime. None of the physical evidence implicated him. Johnson never said anything to anyone suggesting he was involved. He had no motive to commit the crime. And Johnson had a rock-solid alibi: He was with his girlfriend and friends watching the Chicago Bulls win their first NBA Championship at the time that the shooting occurred on June 12, 1991.

Within minutes of the shooting, Defendants had a strong lead that the perpetrator was a man named Bryan Johns, who was caught minutes later, near the scene, rapidly exiting a van with two others, in possession of multiple weapons. Throughout Johnson's criminal prosecution, Defendants suppressed that they had developed strong evidence implicating Johns, which they hid. Among that suppressed evidence was the fact that three eyewitnesses, including Aby Gonzalez, had identified Johns as the perpetrator in a live lineup conducted by Defendants on the night of the crime. Defendants documented that lineup in a typed police report, but they secreted this report in their police files, keeping it hidden until just a few years ago, when the City produced it in another case. Moreover, throughout Johnson's ordeal, Defendants hid that they were using Johns as a cooperating witness in another case at the time, and that the witnesses from whom they had claimed

1

to have obtained identifications of Johnson had told Defendants that they could not and did not identify the shooter.

At age 16, Johnson was tried as an adult, wrongfully convicted, and sentenced to 25 years in prison for the murder of Fred and the attempted murder of Ortiz. While Johnson attempted to defend himself at his criminal trial by suggesting Bryan Johns committed the crime, he and his lawyers failed in the face of Defendants' fabricated evidence of Johnson's guilt, and their active efforts to hide the evidence they had against Johns, including by fabricating evidence negating the evidence they had implicating Johns.

Johnson served more than 15 years in prison before his release. Throughout, Johnson maintained his innocence and fought to clear his name. In 2019, based on the revelation that Defendants had suppressed material exculpatory evidence, a state court vacated Johnson's convictions, and state prosecutors dropped all charges against him. In 2021, the State of Illinois granted Johnson a Certificate of Innocence. There is no dispute that Johnson is innocent, and Defendants do not contest that fact at summary judgment.

In 2020, Johnson brought this § 1983 lawsuit to hold the Defendants accountable for violating his constitutional rights and causing his wrongful conviction. Johnson's conviction is one of more than 44 obtained by notorious Chicago Police detective Reynaldo Guevara, his partner Ernest Halvorsen, and their colleagues at the Chicago Police Department's Area Five Detective Division, whose misconduct has spawned dozens of civil rights cases in this District. But these Defendant Officers are not solely to blame. Johnson's ordeal was also caused by the City of Chicago's official policies, which caused the suppression of evidence in homicide investigations, permitted the fabrication of identifications using suggestive identification procedures.

2

None of the Defendants is entitled to summary judgment on any of Johnson's claims. This Court has already considered a motion for summary judgment in this case filed by Johnson, which the Court denied based on the conclusion that genuine disputes of fact preclude summary judgment on the question whether Guevara suppressed the report documenting that Johns had been identified in the lineup. Dkt. 273. Certainly, the same disputes of fact preclude summary judgment for Defendants on the same issue.

Moreover, the motion filed by Guevara is frivolous, considering he has asserted his Fifth Amendment right not to incriminate himself in response to all questions about his misconduct at issue in this case. Halverson, Daley, Erickson, and Healey are also liable. Halvorsen worked with Guevara to develop every one of the fabricated identifications used to frame Johnson, and wrote the police reports documenting all of it. Erickson and Daley participated in the fabrication of police reports falsely claiming that Johns had not been identified by any witnesses viewing a lineup, and concealing the positive identifications of Johns by Aby Gonzalez and others. And Healey was the supervisor who oversaw all of it, including by assisting in the frame-up by approving the reports of the fabricated identifications, and burying the evidence that Johns had been identified in an undisclosed file.

For its part, the City moves for summary judgment on *Monell* theories that it has already lost repeatedly at trial. A vast evidentiary record supports Johnson's *Monell* theories. And the City cannot establish as a matter of law that it is entitled to judgment on any theory.

Defendants' remaining arguments lack merit and are made in the face of overwhelming evidence that the Defendant Officers and the City violated Johnson's rights protected by the U.S. Constitution and Illinois law, and so summary judgment is inappropriate on those claims. This Court should deny Defendants' motions.

3

## SUMMARY OF DISPUTED MATERIAL FACTS

Defendants' motions depend on a factual account that impermissibly construes the evidence for the moving Defendants and improperly draws inferences for them. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Johnson has prepared an extensive account of the facts relevant to summary judgment in his statement of additional facts and in the parties' joint statement.[1] Given space constraints, the number of Defendants' arguments, and the vast record, Johnson summarizes the material disputes here, rather than repeating all of the facts. Additional facts are discussed below within the argument sections. Properly viewing the record in Johnson's favor, the following facts cannot be disputed at summary judgment.

## I.    JOHNSON IS INNOCENT OF THE FRED MURDER

Johnson is innocent of the Fred shooting. PSOF ¶¶1-13. He had nothing to do with the crime. No evidence connects him to the crime. He has a solid alibi for the time of the crime. He has always maintained his innocence. The State of Illinois has certified that he is innocent. PSOF ¶¶12-13.

## II.    EDWIN FRED AND RAUL ORTIZ ARE SHOT IN WICKER PARK

Around 7:45 p.m. on June 12, 1991, two individuals shot Edwin Fred and Raul Ortiz at 2345 North Avenue in Chicago, by the door to the building facing North toward North Avenue, west of Claremont. PSOF ¶14. Fred died and Ortiz survived. PSOF ¶14.

---

[1] Johnson's statement of additional facts in support of this response is cited as "PSOF ¶" (Dkt. 340), and the parties joint statement is "JSOF ¶" (Dkt. 320). The Defendant Officers' brief (Dkt. 323) is cited "OB," the City's brief (Dkt. 330) is "CB," and Guevara's (Dkt. 309) is "GB."

Johnson preserves his argument lodged in connection with the joint statement of facts that the Court's procedure for requiring a non-moving party to agree to a joint statement of facts that includes material facts that are genuinely disputed in the case is contrary to law. *See* Dkts. 302, 305.

### III.    DEFENDANTS RESPOND TO THE CRIME AND INTERVIEW WITNESSES

Chicago police officers, including Guevara and Daley, responded to the shooting and spoke with witnesses, victims, and suspects. PSOF ¶¶18, 25, 27-30. Patrol officers initially identified Aby Gonzalez, Fina Montanez, Stanley Jewell, and Omar Ortiz as witnesses. PSOF ¶15. Aby and Omar were very close to Fred and Ortiz and the perpetrators when the shooting occurred. PSOF ¶15. Aby had come face to face with the shooter right before he shot, and Omar reported that he was so close to one of the victims that the victim almost fell on top of him when he was shot. PSOF ¶15;  JSOF ¶10. The description the patrol officers recorded was that the first offender was a Black male, age 17, and that the second was a Latino male of the same age, 5'6", 150 pounds, with black hair and dark complexion, wearing a white T-shirt and gray shorts. PSOF ¶16. None of these four witnesses ever identified Johnson as the perpetrator. PSOF ¶¶17, 22. In fact, Omar Ortiz is not mentioned in any other report and there is no indication that Defendants ever spoke with him after the patrol officers' initial interview, despite the fact that he had been with Fred at the time of the shooting. PSOF ¶¶17, 22.

Shortly after the shooting, on June 13, Guevara submitted a report that listed the witnesses to the shooting as the victim Raul Ortiz, Aby Gonzalez, Fina Montanez, Stanley Jewell, Rosa Burgos, and an additional witness named Forrest Garnett, who also had been with Fred at the time of the shooting. PSOF ¶18. Guevara's June 13 report did not document any interview of Fina Montanez, Stanley Jewell, or Rosa Burgos. PSOF ¶19. In fact, Stanley Jewell is not mentioned in any other report after Guevara's June 13 report, and there is no indication that Guevara or any of the other Defendants ever interviewed him after the patrol officers' initial interview, despite the fact that he had been with Fred at the time of the shooting. PSOF ¶21. None of these six witnesses

5

ever identified Johnson as the perpetrator. PSOF ¶¶17, 22; *see* Statement VIII & Argument IV(A) *infra*.

Guevara's June 13 report did document interviews with the victim Raul Ortiz, Aby Gonzalez, and Forrest Garnett. PSOF ¶¶19. Raul Ortiz described the shooting and said he saw a person run southbound on Claremont, but he could not provide additional information. PSOF ¶19. Aby Gonzalez described the shooter as a Black male, and he said that the shooter had put the gun in his waistband after the shooting, before running south of Claremont and west on LeMoyne (one block south of North). Forrest described the shooter as a Black male but could provide no additional information. PSOF ¶19. Guevara's report contains no further description of the perpetrators. PSOF ¶19.

## IV.   DEFENDANTS IMMEDIATELY IDENTIFY BRYAN JOHNS AS THE KILLER

Simulcast messages sent out by the Chicago police minutes after the shooting identified the shooter as a Black male, named "Bryan Johnson," who went by the nickname "Little D" and was a member of the Maniac Latin Disciples street gang. PSOF ¶24. Daley knew Bryan Johns matched the general description given by eyewitnesses, went by the name Little D, and was a member of the Maniac Latin Disciples street gang from the area near the shooting. PSOF ¶25; JSOF ¶11.

Daley had seen Johns just a few blocks away an hour before the shooting, near the corner of Talman and Wabansia. PSOF ¶25. He drove to where he had seen Johns and found him there with two Latino males, Elliott Berverena and Jose Medina. PSOF ¶27. Daley saw the three hurriedly exit a black van and cross the street to enter a building. PSOF ¶28. The black van Johns had gotten out of was searched, and two handguns were found—one .25 caliber and one 380-9 mm

semi-automatic. PSOF ¶31.[2] Johns and the two other men were arrested and transported to Area Five. PSOF ¶29; JSOF ¶12.

## V.    BRYAN JOHNS IS IDENTIFIED IN A LINEUP RIGHT AFTER THE CRIME

Starting approximately three hours after the crime, six witnesses—Aby Gonzalez, Forrest Garnett, Fina Montanez, Rosaline Morales, Angel Cordova, and Rosa Burgos—viewed a live lineup, in which Johns stood as the suspect, which was conducted by Erickson and Guevara at Area Five. PSOF ¶¶36, 38. Aby Gonzalez knew Johns, and identified Johns as the shooter during the lineup. PSOF ¶¶38-41; *see also* PSOF ¶¶43-52; JSOF ¶14, 126-128.

Erickson wrote and signed a report documenting the lineup (the "Erickson lineup report"). PSOF ¶38-40; JSOF ¶126. The Erickson lineup report was placed in the police investigative file. PSOF ¶42, 67, 69. As discussed below, the Erickson lineup report was suppressed throughout Johnson's criminal proceedings. *See* Statement IX *infra*.

Evidence independent of the Erickson report establishes that three of the witnesses to the June 12-13 live lineup procedure positively identified Johns as the shooter during the live lineup procedure on the night of the crime. PSOF ¶¶37, 82. Guevara and Erickson informed these witnesses that they had selected the wrong person. PSOF ¶¶37, 82, 151, 174.

During the identification procedure, Rosa Burgos told Guevara and Erickson that the shooting happened so fast that she was not sure who had committed the shooting. PSOF ¶138. She also told them that all Black people looked alike to her. PSOF ¶140.

---

[2] Defendants did not inventory the .25 caliber or conduct any testing of that gun against the ballistics evidence recovered at the scene. PSOF ¶32, 35. When Berverena and Medina went inside the building at 1652 N. Talman, they were out of sight of Daley and other officers. They could have stashed or dropped off a weapon at that location without being seen, but no efforts to search that location for additional weapons were ever made. PSOF ¶33-34.

## VI.   DEFENDANTS RELEASE JOHNS WITHOUT CHARGES BECAUSE HE IS A COOPERATING WITNESS

Although information related from the scene at the time of the crime identified Johns as the suspect, although he was caught immediately afterwards blocks from the scene in possession of guns, and although he was selected in a lineup as the perpetrator, Defendants did not charge Johns in the Fred shooting. Instead, as discussed below, they suppressed the evidence that Johns had been identified as the killer. *See* Statement IX *infra*.

Defendants let Johns go because at the time Johns was assisting Defendants as a witness implicating a man named Jose Baez in the June 1990 murder of a man named Ramon Pagan. Defendants Guevara and Halvorsen had obtained a purported identification of Baez from Johns. In July 1991, just a month after Johns was arrested, identified, and released in the Fred investigation, he and Defendant Halvorsen testified against Baez. Baez was found not guilty on a directed verdict finding. PSOF ¶¶84-87.

On June 13, Daley submitted a fabricated report, which stated falsely that Johns had not been identified in the lineup conducted after Daley had arrested him. PSOF ¶¶273, 275. Daley would later testify consistent with his false report. PSOF ¶274. Moreover, he later invented an account that Johnson's nickname was Little D, even though he knew that to be Johns's nickname. PSOF ¶¶251-252.

## VII.   DEFENDANTS PRE-SELECT DEMETRIUS JOHNSON AS THEIR SUSPECT

Having let the real killer go, Defendants immediately turned to another suspect: Demetrius Johnson's older brother, Darrell Johnson. On June 15, 1991, three days after the shooting, detective Richard Maher, another Area Five detective, obtained a complete criminal record and photograph of Darrell from the Chicago Police Department's identification section. PSOF ¶¶106-108.

8

On June 20, Guevara interviewed Rosa Burgos, and he interviewed Victor Cordova, who had not been identified previously as a witness. PSOF ¶191. In that report, Guevara falsely reported that Rosa told him she could make an identification, when she had already told him the shooting happened so fast she could not identify the shooter. PSOF ¶¶136-140, 155, 191-192. Victor Cordova did not see the shooting, and could report only that the person he saw with a gun after the shooting was a Black male. PSOF ¶191.

On June 21, Guevara interviewed Fina Montanez and Ricardo Burgos, who also had not been previously documented as a witness. PSOF ¶121. Again, neither of these witnesses implicated Johnson in these interviews, or provided a description of the shooters beyond sex and race—Fina said the shooter was Black or Latino; Ricardo said he was Latino. PSOF ¶¶121-124; JSOF ¶134.

On July 11, Guevara and Halvorsen interviewed a witness named Elba Burgos, who also had never been identified as a witness in the case. PSOF ¶¶93, 100. There is no indication in the file how Guevara knew Elba Burgos was a witness. PSOF ¶93. Guevara and Halvorsen showed Elba a five-person photo array, which included a photo of Darrell Johnson. PSOF ¶90. According to Guevara's criminal trial testimony, he selected the photos he used randomly: He "just chose five male blacks." PSOF ¶107. However, during the photo identification procedure, Guevara singled out Darrell's photo and "asked if it was this one." PSOF ¶109. Guevara and Halvorsen reported that Elba said the photo was not the perpetrator, but that it "resembled" the person she had seen. PSOF ¶100.

According to their reports, Guevara and Halvorsen knew Darrell had a younger brother, and so they contacted Daley, who gave them a Polaroid photo of Demetrius Johnson with two other Black males. PSOF ¶111. Accordingly, Demetrius Johnson became Defendants' suspect in the case in an arbitrary fashion not based on any evidence: Guevara and Halvorsen had

9

preemptively selected Demetrius's older brother Darrell as a suspect; they tried to obtain an identification of Darrell from Elba Burgos; Elba Burgos had rejected that effort; and so Guevara, Halvorsen, and Daley simply decided Demetrius, Darrell's younger brother, was their new suspect. PSOF ¶¶105-111.

## VIII.  DEFENDANTS FRAME JOHNSON ON TWO DAYS IN JULY 1991

On July 17 and July 22, Defendants fabricated three eyewitness identifications—from Elba Burgos, Ricardo Burgos, and Rosa Burgos—implicating Johnson in the murder, closed the case, and charged Johnson with murder. PSOF ¶¶88-132, 136-174.

### A.  Elba Burgos Did Not See the Shooter and Could Not Identify Anyone Without Direction from Defendants About Who To Pick

Guevara and Halvorsen reported on July 17 for the first time that Elba Burgos was a witness in the case, even though she was never previously identified as a witness in any document or by any witness. PSOF ¶93. Elba did not get a look at the shooter that allowed her to make an identification, and she could not make an identification of anyone without being told by Defendants who she should pick. PSOF ¶¶94-104, 194, 198. She heard the shooting from her front porch on Claremont, on the east side of the street, and looked up to see someone running southbound more than 60 feet away, on the opposite side of the street—between her and the individual was the steps of her porch, her fence, the sidewalk, the parkway and trees on her side, a row of parked cars, the street, another row of parked cars, and the parkway and trees on the other side. PSOF ¶¶94-99. In addition, the person was holding a gun, on which Elba was focused, she only had 4-5 seconds to view the individual, the person was running the entire time, and the person's face was in profile throughout—the individual never stopped to look in her direction. PSOF ¶¶95-97; JSOF ¶130.

10

Elba Burgos was first interviewed by Guevara and Halvorsen a month after the shooting on July 11. PSOF ¶100. There are no contemporaneous reports or notes of the interview. PSOF ¶104. According to Guevara and Halvorsen's report, Elba could not provide any description of the shooter beyond saying he was a Black male. PSOF ¶101. Guevara and Halvorsen falsely wrote in their report that Elba had the opportunity to view the person running because she had followed him around the corner onto LeMoyne and all the way to Western Avenue, where she lost him. PSOF ¶102. That account was made up—Elba did not follow the person she saw running. PSOF ¶102.

**B.     Guevara and Halvorsen Fabricate A Photo Identification from Elba Burgos**

On July 11, Guevara and Halvorsen first showed Elba a five-photo array that included Darrell Johnson among four much older suspects, who could not possibly have been the young person who committed the shooting, and Guevara singled out Darrell's photo and "asked if it was this one." PSOF ¶¶105, 109, 112-117, 153, 196. When Elba said Darrell was not young enough to be the shooter, Guevara and Halvorsen obtained a single Polaroid photo of Demetrius Johnson standing in front of two other individuals. PSOF ¶¶90, 110-111, 117. A few days after Guevara and Halvorsen had pointed out to Elba a photograph of Darrell, they showed the single Polaroid photograph of Demetrius to Elba. PSOF ¶¶110, 117-118, 249. Demetrius strongly resembled the photo of Darrell that Guevara and Halvorsen had pointed out to Elba, and he appeared younger and shorter than the other two individuals depicted in the photo array. PSOF ¶¶118, 120. Elba knew who Guevara and Halvorsen's suspect was in this show-up procedure, and she identified Demetrius as the person she had seen with a gun. PSOF ¶¶119, 249.

11

C. **Ricardo Burgos Did Not See the Shooter and Could Not Identify Anyone Without Direction from Defendants About Who To Pick**

Guevara reported on June 23 for the first time that Ricardo Burgos was a witness in the case. PSOF ¶121. Ricardo did not see the shooting and could not make an identification without being told who to pick. PSOF ¶¶125-129, 148, 154. Ricardo was driving in a car eastbound on North Avenue when he heard the shooting. PSOF ¶125. He did not see the shooting occur. PSOF ¶¶125-129, 148. From his car, he saw a person running southbound on Claremont, directly away from him, who he assumed was the shooter. PSOF ¶125. He only saw this person's back. PSOF ¶¶125, 128; JSOF ¶135. The person was 60-70 feet away at the time. PSOF ¶¶126, 160; JSOF ¶135.

When Guevara interviewed Ricardo Burgos on June 21, Ricardo told Guevara that the shooter he saw had been Hispanic. PSOF ¶122. He never provided a further description. PSOF ¶123. He never told any Defendant that the shooter had been Black. *Id*. Demetrius was a dark complected Black male. PSOF ¶124.

In a sworn declaration and at his deposition in this case, Ricardo testified that he did not see the shooter's face and could not make an identification. PSOF ¶127; JSOF ¶129, 135. He testified that if Defendants ever said that he could have identified the shooter, that would have been false. PSOF ¶¶127, 129; JSOF ¶129.

D. **Guevara Fabricates A June 21 Photo Identification from Ricardo Burgos**

Guevara testified at Johnson's criminal trial that Ricardo selected Johnson's photo from a photo identification procedure during Guevara's June 21 interview of Ricardo. PSOF ¶130. That photo identification procedure is not documented anywhere in the police file. PSOF ¶¶131, 135, 211. Moreover, according to Defendants' own reports, Demetrius Johnson did not become a

12

suspect in the case until mid-July (when Elba was first shown photos of Darrell and then Demetrius on July 11 and 15, respectively); and so Guevara could not have shown Ricardo a photo of Demetrius Johnson in June, before he was a suspect. PSOF ¶¶90, 110, 131-35, 154, 211. This photo array identification either did not occur or Ricardo identified someone who was not Demetrius. PSOF ¶¶154, 211. The identity of the person who Ricardo identified on June 21 has never been revealed. PSOF ¶¶130-132.

E.    **Rosa Burgos Did Not See the Shooter and Could Not Identify Anyone Without Direction from Defendants About Who To Pick**

The first documented witness account from Rosa Burgos in the police file is Guevara's June 20 interview with her, two weeks after the crime. PSOF ¶191. Rosa did not see the shooting and could not make an identification without being told who to pick. PSOF ¶¶138, 155, 192, 204.

Rosa was inside of a building, walking down the interior front staircase behind victim Raul Ortiz, when Raul stepped out the front door of the building and was shot. PSOF ¶136. She closed the door immediately and ran back upstairs. PSOF ¶¶136, 192. She had at most four seconds to see the shooter, during which time the shooter had a gun pointed in her direction. PSOF ¶¶137, 248.

She told Guevara and Erickson that everything happened so fast that she was not sure who the shooter was. PSOF ¶¶138, 152, 192. She never provided the police with any physical description of the shooter. PSOF ¶139. Later, Rosa testified and confirmed that she could not make an identification, saying she "had trouble distinguishing between Black people because all those people look alike." PSOF ¶¶140, 192.

13

## F. Defendants Fabricate July 22 Lineup Identifications from Rosa Burgos, Ricardo Burgos, and Elba Burgos

On July 22, Guevara and Halvorsen placed Demetrius Johnson in a live lineup, which Rosa Burgos, Ricardo Burgos, Elba Burgos, Victor Cordova, and Angel Cordova viewed simultaneously. PSOF ¶¶92, 141, 142, 186. Guevara and Halvorsen reported that Rosa, Ricardo, and Elba positively identified Johnson as the perpetrator. PSOF ¶¶91, 92. According to their report, the Cordovas did not make any identification. PSOF ¶¶92, 186.

In the live lineup, Johnson was noticeably the shortest of the five participants. PSOF ¶¶141, 143, 146, 169. All five participants appeared shirtless, a departure from normal practice, and Johnson was the only participant with a visible tattoo showing that he was affiliated with the Maniac Latin Disciples street gang, who the witnesses knew was the gang suspected of committing the shooting. PSOF ¶¶141, 144-146, 169.

Given that Ricardo had not seen the shooter's face and could not make an identification himself, had described the perpetrator as Hispanic, and had picked someone who was not Johnson in an earlier photo array conducted by Guevara, Ricardo could only have selected Johnson from the array if Guevara and Halvorsen had told him what lineup participant to pick. PSOF ¶¶121-135, 148.

Given that Elba also had not seen and could not describe the shooting, and had been shown both Johnson's brother and Johnson in photographs before the live lineup, Elba's selection of Johnson from the live lineup procedure was based on Guevara and Halvorsen's instructions about who to select in the earlier photo identification procedures. PSOF ¶¶93-120, 147.

Finally, Rosa had not seen the shooter and had told police that the incident happened so fast that she did not know who the shooter was. PSOF ¶¶138, 152, 192, 155, 204. Contrary to

14

Halvorsen and Guevara's report of the July 22 lineup, Rosa told Guevara and Halvorsen twice during the lineup that she was not sure who the shooter was, they asked her "who are you going to pick," implying she had to make a selection, and she responded that Johnson looked *similar* to the shooter, but not that he *was* the shooter. PSOF ¶¶149-152. And Rosa had participated in the earlier lineup on the night of the crime, in which Johns had been selected by three witnesses, and Guevara and Erickson had told the witnesses they had selected the wrong person. PSOF ¶¶37, 82, 151-152, 208. Rosa's reported identification of Johnson was manufactured by Guevara and Halvorsen. PSOF ¶¶149-152, 155, 204, 208.

### G. Defendants Did Not Show Their July 22 Lineup to Key Witnesses

Importantly, Guevara and Halvorsen did not show the July 22 live lineup to any of the key eyewitnesses in the case. Of the nine eyewitnesses who were identified shortly after the shooting—Raul Ortiz (the victim), Aby Gonzalez, Omar Ortiz, Forrest Garnett, Fina Montanez, Stanley Jewel, Rosaline Morales, Angel Cordova and Rosa Burgos—Guevara and Halvorsen presented the lineup to only two, Rosa Burgos and Angel Cordova, and Cordova did not make an identification. PSOF ¶¶92, 186. The others never viewed an identification procedure that included Johnson, and none identified him. PSOF ¶22. Instead, other than Rosa and Angel, Guevara and Halvorsen showed the live lineup exclusively to individuals who were first identified as witnesses weeks after the crime occurred. PSOF ¶¶92-93, 100, 121, 141-142, 186, 191.

### I. Defendants Knowingly Fabricated the Burgos Identifications

The facts that Johnson was not involved in and has been certified innocent of the Fred murder, PSOF ¶¶2-6, 12-13; that the Defendants decided first that Johnson's brother Darrell was their suspect before any identification had occurred, without any evidence to implicate him, PSOF ¶¶106, 108; that Defendants then arbitrarily swapped in Demetrius Johnson as the suspect because

15

Elba said that Darrell looked too old, again without any evidence to implicate Demetrius and before any identification occurred, PSOF ¶¶90, 249; that Ricardo and Elba were not identified as witnesses until weeks after the crime, PSOF ¶¶100, 121; that none of the Burgoses had the opportunity to see the shooter, and none could provide a description of the shooter, PSOF ¶¶94-95, 101, 123, 125-27, 136-40; that Ricardo said he had not seen the shooter's face and could not identify the shooter, PSOF ¶¶125-129, 148, 154; that Ricardo said the shooter was Latino, not Black, PSOF ¶¶122-123, 148; that Rosa told the police it had happened so fast she could not tell who the shooter was, PSOF ¶¶138, 152, 192; that Guevara and Halvorsen pointed out to Elba that Darrell Johnson was their suspect when they conducted their first photo array with her, PSOF ¶¶105-110, 196, 209; that Guevara made up the fact that Ricardo identified Johnson in a June photo identification procedure, PSOF ¶¶130-135, 154, 211; that Guevara made up a story that Elba had followed the suspect, to make it appear she had gotten a better look at the perpetrator, PSOF ¶102; that Guevara and Halverson falsely reported that Rosa positively identified Johnson in the live lineup, when in fact Rosa twice said during the lineup said was not sure who the shooter was, and responded to Guevara and Halverson pressuring her to pick someone by saying that Johnson looked similar to the shooter, and not that he was the shooter, PSOF ¶¶136-140, 149-152, 208; that Guevara and Halvorsen suppressed what Rosa had told them, PSOF ¶¶149-152; that at least seven of the key eyewitnesses who saw the crime were not asked to participate in an identification procedure involving Johnson, PSOF ¶22; that at least three witnesses picked Johns as the perpetrator in a lineup on the night of the crime, in which Rosa participated, and were told they had picked the wrong person, PSOF ¶¶37, 82, 151-152, 269; that Defendants suppressed all information about the Johns lineup and identifications, PSOF ¶¶36-66, 82; and that Guevara has asserted the Fifth Amendment when asked if he fabricated the identifications of Elba, Rosa, and

16

Ricardo Burgos, PSOF ¶¶153-155, 204, collectively have an important consequence at the summary-judgment stage of this case: This Court must draw the inference from these facts alone that any identifications that Elba, Ricard, and Rosa Burgos made of Johnson were false and fabricated by the Defendant Officers. Put differently, with the facts construed for Johnson, Defendants arbitrarily identified an innocent person as their suspect, and then got three witnesses who had not seen the perpetrator of the crime to each identify that same innocent person. Construing the evidence for Johnson and drawing inferences in his favor, there is no explanation at summary judgment other than that Defendants fabricated these identifications.

The identifications of Johnson obtained from all three of the Burgoses were false. PSOF ¶¶141-152, 157, 204. They were the result of improperly suggestive identification procedures. PSOF ¶¶112-120, 164-174, 198; *see* Argument IV(C) *infra* (discussing the suggestive identification procedures in more detail). Defendants did not document the true circumstances of these identification procedures, reporting instead that the three witnesses independently selected Johnson without suggestion. PSOF ¶¶195, 207-209.

## J. Guevara and Halvorsen Fabricate A False Closing Report and False Lineup Report

To wrap the case up, Defendants Guevara, Halvorsen, and Healey fabricated a closing report and a false lineup report that included an entirely false account of how they "solved" the crime. PSOF ¶¶89, 91, 147-148, 154-155, 199-203. That report included the false claims that Elba Burgos, Ricardo Burgos, and Rosa Burgos had accurately and without influence identified Johnson as the shooter, and it omitted any mention that Johns had been identified as the shooter by Aby Gonzalez. PSOF ¶¶199-200, 204, 206.

17

During an interview with Johnson on July 22, Johnson told Guevara and Halvorsen that he had nothing to do with the crime. PSOF ¶4. In order to undermine any alibi at trial, in their closing report, Guevara and Halvorsen wrote a false statement that Johnson had told them he routinely picked up his girlfriend from work at 6:40 p.m. and went to her house until 9:40 p.m., *except* Wednesday nights, at which point they revealed that the shooting had occurred on a Wednesday night. This was made up. PSOF ¶¶201-203.

### K. Guevara and Halvorsen Attempt to Fabricate An Identification from Angel Cordova, Who Refuses to Play Along

Guevara and Halvorsen attempted to fabricate a false identification from witness Angel Cordova as well. PSOF ¶¶183-188. Cordova had viewed the Johns lineup at Area 5 on the night of the crime, but there are no reports or notes of any interview with Cordova early in the investigation. PSOF ¶183.

Guevara and Halvorsen reported that they interviewed Cordova on July 15, and claimed that he had identified Johnson in the same Polaroid they had shown to Elba Burgos that day. PSOF ¶184. But Cordova lived at 2325 North Avenue, and had been "standing on [his] back porch when the shooting took place." PSOF ¶184." But the shooting occurred in *front* of 2345 North Avenue, so Cordova was on the opposite side of the building from the scene of the shooting on the sidewalk on North Avenue. So, it would have been impossible for Cordova to have witnessed the shooting or shooters. PSOF ¶184.

Ultimately, Angel Cordova refused to play along. He did not identify Johnson in the July 22 lineup. And he was not called at trial. PSOF ¶186.

18

**L.      Defendants Fabricate A False and Backdated Lineup Report to Cover Up the Johns Identification**

There was one more loose end for Defendants to tie up: the initial scene supplementary report Guevara wrote on June 13, and that had already been approved and sent to central records, stated that Aby Gonzalez had viewed a lineup, which was the "subject of a separate report" PSOF ¶47-48. Defendants therefore needed to create a supplementary report other than the Erickson lineup report, so after Johnson had been charged on July 22, Guevara wrote a falsified lineup report, which he backdated to June 12, 1991 (the "Guevara lineup report"). PSOF ¶¶60-61.[3] That report states that it was written and signed by Guevara and Erickson. PSOF ¶¶53, 60. It stated falsely that Aby Gonzalez, Forrest Garnett, Fina Montanez, and Rosa Burgos had viewed a lineup that included Bryan Johns on the night of the crime, that all four had not identified him, and that as a result Johns was released without charging. PSOF ¶¶53-61, 63, 66. Unlike the Erickson lineup report, the false Guevara lineup report was sent to central records and made part of the permanent retention file, so that it would be turned over during the criminal prosecution. PSOF ¶¶60, 62.

Based on the reporting of Guevara and Halvorsen, the fabricated identifications from Elba, Ricardo, and Rosa Burgos, and without any independent investigation of any witness or suspect, state prosecutors brought murder charges against Johnson. PSOF ¶215.

---

[3] The false Guevara lineup report states that it was submitted on June 12, 1991, but it was not submitted for supervisor approval until July 24, 1991, and the date stamp on the report reflects that it was first received in central records on July 25, 1991. PSOF ¶¶60-61. Compare that to Guevara's June 13 real supplementary report, which was submitted June 13, 1991, approved the same day, and received in central record on June 18. PSOF ¶48. If Guevara had actually submitted a lineup report on June 12, then it would have been approved and received in central records before the supplementary report submitted on June 13. PSOF ¶¶48, 60-61.

19

IX.     **DEFENDANTS HIDE KEY EVIDENCE FROM THE PROSECUTION AND DEFENSE THROUGHOUT JOHNSON'S PROSECUTION, LYING SO THAT THE EVIDENCE CANNOT BE DISCOVERED**

Throughout the criminal proceedings, Defendants suppressed that they had fabricated the evidence just discussed, including the July 22 live lineup identifications of Johnson by Ricardo Burgos, Elba Burgos, and Rosa Burgos, the July photo identification of Johnson by Elba Burgos, the June photo identification of Johnson by Ricard Burgos, the false account that Elba Burgos had followed the shooter as he ran, the false closing report, the false July 22 lineup report, the false Guevara lineup report, Daley's June 13 report falsely denying that Johns had been identified, and Guevara's June 20 report falsely saying that Rosa had said she could make an identification. PSOF ¶¶206-213. In addition, they suppressed many other items of exculpatory and impeachment information they had uncovered during their investigation.

Guevara, Halvorsen, and Daley suppressed that they had decided on Johnson's brother Darrell as a suspect first, on June 15, without any evidence implicating him. PSOF ¶¶107-108.

Guevara, Halvorsen, and Erickson suppressed ample exculpatory and impeachment evidence regarding their interactions with the Burgoses, including that Rosa Burgos had told Guevara and Erickson that he shooting had happened so fast she could not tell who the shooter was, PSOF ¶208, that Ricardo Burgos told Guevara and Halvorsen he had not seen the shooter's fact and therefore could not identify the shooter, PSOF ¶207, and that Guevara pointed out Darrell's Johnson's photo to Elba Burgos in the first identification procedure conducted with her. *See* PSOF ¶¶207-211. Guevara also suppressed all information about his interviews of Rosa Burgos, Fina Montanez, and Stanley Jewell that he conducted on the night of the shooting. PSOF ¶¶20-22.

20

Guevara suppressed that Ricardo Burgos had been shown a photo identification procedure in June 1991, before Johnson was a suspect, and had made a selection of the shooter. PSOF ¶¶130-132. There is no documentation of that identification procedure in the file, but Guevara and Burgos testified that it occurred. PSOF ¶¶130-131. Because Demetrius Johnson was not even identified as a suspect until July 11, 1991, Ricardo Bugos's identification must have been of someone else. PSOF ¶133-135.

Critically, Guevara and Halvorsen suppressed that at the July 22 lineup, Guevara and Halvorsen told Rosa "who are you going to pick," suggesting that she had to pick someone. Guevara and Halvorsen reported that Rosa then positively identified Johnson, but they suppressed that Rosa had actually told them that the person in the lineup looked similar to the shooter but that she was unsure if it was the shooter. They also suppressed that on the night of the shooting, when three people identified Johns, she was told they had picked the wrong guy. PSOF ¶¶138, 149-152, 208; JSOF ¶132.

In addition, Guevara and Halvorsen suppressed their investigation of alternative suspect Robert Weeks. PSOF ¶213. On June 29, 1991, CPD Officers Crespo and Roman received a call from a man who had followed the shooter to an apartment, and on the same day arrested a man named Robert Weeks who was known to frequent that apartment and fit the description of the shooter provided by the caller. PSOF ¶¶177-180. This information was relayed to Defendant Halvorsen, and the investigation was turned over to him. PSOF ¶181. Defendant Guevara admits that he interviewed Weeks, but nowhere in the investigative or permanent retention file did he or Defendant Halvorsen document this interview in any way or any other follow-up investigation into Weeks. PSOF ¶182.

21

Finally, all Defendant Officers suppressed critical exculpatory and impeachment evidence about the real killer, Bryan Johns. PSOF ¶212. Guevara, Erickson, and Daley suppressed that Bryan Johns was selected by three witnesses in a lineup on the night of the crime, they told witnesses that they had selected the wrong person, and they released Johns after the identification. PSOF ¶¶37, 151. Guevara and Erickson conducted that identification procedure. PSOF ¶¶37-38.

All Defendants also suppressed the Erickson lineup report documenting Aby Gonzalez's identification of Johns. Neither prosecution nor defense mentioned Erickson's lineup report at the trial or used it as evidence. PSOF ¶¶67-81, 219-223, 253, 254. ASA Sheehan's handwritten notes in the prosecution file note that the June 12 lineup resulted in "no ID," confirming he did not have the Erickson report stating otherwise. PSOF ¶76. And ASA Sheehan and Plaintiff's criminal defense attorneys have sworn unequivocally that they never received, or knew about, the Erickson lineup report. PSOF ¶¶74-77. Had they known about the identification, it "would have been all over this case," including through interviews with Aby Gonzalez, a motion to suppress, and trial. PSOF ¶¶231-236.

Some of these items of exculpatory and impeachment evidence were documented in reports and notes, such as the Erickson lineup report. PSOF ¶¶42, 67-81. All of the Defendants had access to the investigative file, as it was kept in the Sergeant's office. PSOF ¶¶260. But all of the Defendants also shared all of this exculpatory and impeachment information about the investigation with the small team in which they worked, and with their supervisors who tracked "every aspect of a homicide investigation" as one of their "integral roles." PSOF ¶¶258-259.

## X.   JOHNSON IS CONVICTED AT TRIAL

At Johnson's criminal trial, the fabricated evidence discussed above was introduced against Johnson and was the sole basis for his conviction. PSOF ¶¶237-251. This included the fabricated

identifications of Ricardo, Elba and Rosa Burgos, and all of Guevara's fabricated reports. PSOF ¶¶247-250. Daley and Guevara testified that a lineup had been conducted on the night of the crime, June 12, 1991, and that Johns had not been identified by anyone in the lineup. PSOF ¶242-243.

At the criminal trial, Johnson's attorneys issued subpoenas and served multiple requests for discovery to obtain all of the records from the police investigation. PSOF ¶¶225, 228, 230. They also attempted to defend Johnson by moving to suppress the July 22 identifications of Johnson,[4] by arguing that Johnson had been misidentified by witnesses, and by putting on evidence that Johns was the likely suspect. PSOF ¶¶235-236. In addition, Johnson presented his uniquely credible alibi: that he and his friends had been watching the Bulls win their first championship at the time of the shooting. PSOF ¶¶9, 235.

But unknowingly relying on Defendants' false testimony and their fabricated evidence, the State was able to effectively combat this attempted defense. PSOF ¶¶63, 75-81, 216-223; 242-252. The State argued expressly that none of the witnesses in the June 12 lineup had identified Johnson, and the lead prosecutor ASA Sheehan said specifically that Aby Gonzalez had not identified Johns. PSOF ¶253.

Johnson was convicted of murder and attempted murder and sentenced to 25 years in prison. PSOF ¶254.

## XI.  THE CITY OF CHICAGO'S OFFICIAL POLICIES CAUSED JOHNSON'S WRONGFUL CONVICTION

The suppression of evidence during Johnson's case was the result of the official policies of the City of Chicago, which caused the widespread suppression of evidence in homicide cases,

---

[4] Johnson's attorneys withdrew this motion, concluding they lacked the evidence to make it viable. PSOF ¶234.

including Johnson's. PSOF ¶¶301-355, 359, 362-374, 380-393, 457-470. Moreover, the City's official policies let officers fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings like Johnson's criminal case. PSOF ¶¶394-416, 425-447, 449-456, 471-488.

These official policies led to historic corruption and police misconduct across the Chicago Police Department in the years leading up to the Fred murder investigation, including at the Area Five Detective Division on the northwest side of Chicago. During the relevant timeframe, Guevara framed at least 44 innocent individuals for murder. In the past 15 years, at least 44 murder convictions engineered by Guevara have been overturned by Illinois courts, and Guevara has been widely recognized as a blight on the criminal legal system. PSOF ¶¶351-356, 454, 489-493. Guevara was able to use his police powers to dismantle families and an entire community because the City did nothing to ensure its police officers conducted themselves according to law.

## XII. JOHNSON FIGHTS TO PROVE HIS INNOCENCE AND IS EXONERATED

Defendants' misconduct caused Johnson to be wrongfully arrested, prosecuted as an adult, and convicted when he was only a child. PSOF ¶1. He spent more than 13 of the most formative years of his life incarcerated in dangerous conditions for something he had not done. PSOF ¶¶1-11. At all times, Johnson maintained his innocence. PSOF ¶¶4-6. At all times during his incarceration, Johnson did not know that the Erickson report existed. PSOF ¶¶67-81.

Johnson's conviction was affirmed on direct appeal. In its decision, the Illinois appellate court stated, consistent with Defendants fabricated evidence, "Johns was placed in a lineup, but he was not selected by the witnesses viewing the lineup." PSOF ¶¶189-190. Johnson also filed a post-conviction petition asserting his innocence, which the Illinois courts denied. PSOF ¶81.

24

Following his release, he continued to proclaim his innocence and fight the false charges against him. PSOF ¶6. During discovery in the litigation *Jacques Rivera v. Reynaldo Guevara*, No. 12 C 4428 (N.D. Ill.), the City of Chicago produced its investigative file in the Fred homicide, revealing the suppressed Erickson report for the first time. PSOF ¶¶67-81. Based on the revelation that Defendants had introduced false evidence in Johnson's criminal case and had suppressed exculpatory and impeachment evidence demonstrating that Johns was the perpetrator, Johnson filed a successive post-conviction petition, and Judge LeRoy Martin vacated Johnson's petition without the need for an evidentiary hearing. PSOF ¶10. On December 20, 2019, the Cook County State's Attorney dropped all charges against Johnson. PSOF ¶11. In total, Johnson's ordeal lasted 28 years, from 1991, when he was just 15 years old, until 2019, when he was exonerated at age 43. PSOF ¶¶1, 11.

Johnson filed a petition for a certificate of innocence. PSOF ¶¶12. The state responded to the petition by acknowledging that Defendants' suppression of the Erickson lineup report was an "obvious *Brady* violation." PSOF ¶12. On April 7, 2021, Judge Erica Reddick granted a certificate of innocence. PSOF ¶¶12-13.

## XIII.   GUEVARA REFUSES TO TESTIFY IN THIS CIVIL CASE

The only evidence that implicated Johnson in Fred's murder and Ortiz's attempted murder, and the only evidence that caused his wrongful prosecution and conviction, was fabricated by Defendants. PSOF ¶¶237-252. At Johnson's criminal trial, Guevara testified consistent with that false story, helping to put Johnson behind bars. PSOF ¶¶242-243, 250.

But today, Guevara does not stand by his story. He has instead asserted his Fifth Amendment right against self-incrimination in response to every question about every material disputed fact discussed above. PSOF ¶¶82-84, 153-155, 182, 204, 262.

25

**ARGUMENT**

This is not a summary judgment case. The record properly construed unambiguously supports the conclusion that Defendants fabricated all of the evidence used to arrest, charge, prosecute, and to convict Johnson of Fred's murder and Ortiz's attempted murder, that Defendants hid from prosecutors and from Johnson and his attorneys a large volume of exculpatory and impeachment evidence that would have halted Johnson's prosecution and shown his innocence, and that Defendants conducted suggestive identification procedures and fabricated identifications that fatally tainted Johnson's criminal case. A similar volume of evidence supports Johnson's claim that this misconduct occurred because of the official policies of the City of Chicago. All material facts are disputed, and Defendants' legal arguments lack merit. This Court should deny Defendants' motions.

Though Defendants ignore the legal standard throughout their motions, this Court must examine the evidence in the light most favorable to Johnson and draw all inferences in his favor. *Tolan*, 572 U.S. at 656-57. Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of Johnson's claims such that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This brief proceeds in five parts. First, it outlines those of Johnson's theories on which Defendants do not move for summary judgment, on which there will be a trial. Second, it explains that Seventh Circuit law holds that this Court need not parse sub-theories of liability and items of evidence at summary judgment in a case like this one, where it is clear the case will proceed to trial on a fair trial claim against Defendants. Third, it describes the reasons summary judgment is

26

categorically unavailable to Guevara, given his assertion of his Fifth Amendment rights. Fourth, it sets out why the Defendant Officers' legal arguments must be rejected and outlines the hotly disputed facts that preclude summary judgment for the Defendant Officers. And fifth, it explains why genuine disputes of fact preclude summary judgment on Johnson's *Monell* claims that the City's official policies caused the widespread suppression of evidence in homicide cases, and let officers fabricate witness identifications using unduly suggestive identification techniques, which caused unreliable identifications to be used and to taint criminal proceedings, as occurred in Johnson's criminal case.

## I.    DEFENDANTS FORFEIT CHALLENGES TO JOHNSON'S THEORIES

It is first important to note that Defendant Officers do not include any argument in their motions for summary on the following due process theories:

- Daley fabricated a June 13 report claiming falsely that witnesses had not identified Bryan Johns during a live lineup the night of June 12, 1991, see Argument IV(A) *infra*;

- Guevara and Halvorsen suppressed that Johns was a cooperating witness in another pending homicide case, see Argument IV(B) *infra*;

- Guevara, Halvorson, and Erickson suppressed key evidence undermining the Burgos identifications, see Argument IV(B) *infra*;

- Guevara fabricated a June 20 report claiming falsely that Rosa Burgos told them that she could identify the shooter, when she said the opposite, see Argument IV(A) *infra*;

- Guevara fabricated that Ricardo Burgos identified Johnson in a photo identification procedure in June 1991, see Argument IV(A) *infra*;

- Guevara fabricated a story that Elba Burgos had followed the shooter through the neighborhood, to bolster her identification, see Argument IV(A) *infra*;

- Guevara, Halvorsen, and Daley suppressed the fact that Johnson was made a suspect before any evidence implicated him, see Argument IV(B) *infra*;

- Guevara and Halvorsen suppressed their entire investigation of alternative suspect Robert Weeks, see Argument IV(B) *infra*;

27

- Defendant Daley fabricated a false account that Demetrius Johnson's nickname was "Little D," when he knew that was in fact Bryan Johns's nickname, see Argument IV(A) *infra*;

- Guevara, Halvorsen, and Healey fabricated a July 22 closing report for their investigation, which included a summary of the evidence that they had fabricated implicating Johnson, see Argument IV(A) *infra*;

- Guevara, Halvorsen, and Healey fabricated a July 22 lineup report claiming falsely that the Burgos witnesses had each positively identified Johnson in a live lineup, independently and without police manipulation, see Argument IV(A) *infra*;

- Defendants all suppressed that Guevara had committed similar fabrications and suppressions of evidence in multiple homicide cases, see Argument IV(B) *infra*.

In addition, the City of Chicago does not move for summary judgment on multiple of Johnson's *Monell* theories, as outlined at the start of Argument V(B) *infra*.

Because Defendants do not move for summary judgment on a number of Johnson's theories that they violated his right to a fair trial, they are not entitled to summary judgment. Defendants *each* bear the burden of showing there is no evidence on which a reasonable jury could find for Johnson on *any* of his claims against *each* of them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331-32 (1986). The fact that Defendants have not moved for summary judgment on many theories supporting Johnson's claims, means that those uncontested theories must be tried, and that Defendants are not entitled to judgment on any claim. *Id.* at 332 ("Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. . . . [A] party who moves for summary judgment . . . must affirmatively show the absence of evidence in the record."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"); *see also Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731,

736 (7th Cir. 2006). Any arguments Defendants might have made for summary judgment on the above theories are now forfeited, and it will be too late for Defendants to raise them in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

Independent of these forfeitures, Guevara does not develop an argument that *he* is entitled to summary judgment at all. Instead, Guevara has filed a boilerplate motion to "join" the other Defendants' motions for summary judgment, which is devoid of substance. Dkt. 309. The problem for Guevara, among other things, is that the other Defendants do not make *any* argument that he in particular is entitled to summary judgment. *See* Dkt. 323. Guevara has thus failed to satisfy his burden of production at summary judgment, and his motion should be denied without the need for a response. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)); 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. In addition, his argument is too cursory to justify relief. *United States v. Holm*, 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived).

Moreover, by forfeiting any argument on the fabrication and suppression theories discussed above, and by then "joining" a motion filed by other Defendants without additional discussion, Guevara necessarily concedes that a trial is necessary on all other claims that arise from those he has forfeited. Put differently, Guevara does not address multiple items of evidence that he fabricated or suppressed himself, joining a motion that does not address those fabrications and suppressions, and so Guevara cannot possibly claim an entitlement to summary judgment on the malicious prosecution, Fourth Amendment, IIED, conspiracy, and other claims that flow from the same misconduct. This Court should deny Guevara's motion summarily.

29

## II. SEVENTH CIRCUIT LAW DICTATES THAT THIS COURT SHOULD NOT PARSE SUB-THEORIES OF LIABILITY AT SUMMARY JUDGMENT IN A FAIR TRIAL CASE

Defendants' forfeiture of any argument on several of Johnson's due process theories set out above has an additional consequence. The Seventh Circuit has directed that courts at summary judgment need not weed through theories of liability nor parse items of evidence once it has been established that there is a material dispute of fact about whether a Defendant contributed to violating a plaintiff's right to a fair trial. *Goudy v. Cummings*, 922 F.3d 834, 844 (7th Cir. 2019) (holding that once it is established at summary judgment that a trial is required on due process theories, the court "need not and do[es] not address [the plaintiff's] allegation that the alleged [additional theory of liability] independently constituted a basis for liability"); *see also Camm v. Faith*, 937 F.3d 1096, 1108–09 (7th Cir. 2019) ("It's worth noting that while the parties sometimes refer to three '*Brady* claims,' it's more accurate to say that [the plaintiff] has a single *Brady* claim alleging the suppression of three baskets of evidence."); *Goudy*, 922 F.3d at 838 (stating that "[i]t is important to clarify that although the parties occasionally refer to [the plaintiff's] '*Brady* claims' or 'identification procedure claim,' his allegations do not give rise to separate *claims* under section 1983. [The plaintiff] has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights"); *id.* (holding that "all defendants who can be shown to have 'suppressed' evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.").

As a result, once this Court decides Johnson has shown a genuine dispute of fact on any of his fair trial theories against a Defendant, it can move forward with a trial on Johnson's fair trial claims without exploring every argument made by Defendants in their motion, and it can deny summary judgment on that basis. This Court need not parse every theory addressed in Defendants'

motion to conclude that a trial against each Defendant is necessary and to deny summary judgment. Given that Defendants forfeit a number of fair trial theories, this Court need not belabor the analysis of Johnson's different theories and their supporting evidence. In light of these Seventh Circuit precedents, this Court should simply deny the motions and proceed to trial.

## III.    SUMMARY JUDGMENT IS UNAVAILABLE TO GUEVARA IN LIGHT OF HIS INVOCATION OF THE FIFTH AMENDMENT

Guevara's motion is frivolous for another reason. He cannot obtain summary judgment given his assertion of his Fifth Amendment right to remain silent in response to questions about the material facts at issue. This Court should independently deny his summary judgment motion based solely on his assertion of this privilege.

Guevara asserted his Fifth Amendment right not to incriminate himself in response to hundreds of questions about his specific misconduct during the Fred murder investigation and Johnson's arrest, prosecution, and conviction, including every one of the specific disputed material facts at issue in this case. Guevara pleaded the Fifth in response to questions about making Johnson a suspect, fabricating identification procedures and identifications, fabricating police reports about this false evidence, suppressing their misconduct, and testifying falsely at trial. PSOF ¶¶82-84, 153-155, 182, 204, 262.

Because Guevara exercised his right to remain silent in response to every question regarding disputed material facts, he cannot *seek* summary judgment. Because he cannot meet his initial burden of production, and he cannot meet his ultimate burden of persuasion, at this stage of the case. It is critical that this Court send a clear message that police officers cannot assert their Fifth Amendment right to avoid self-incrimination in civil cases, refuse to participate in discovery, and then ask the Court to take the issue of their liability away from a jury before trial.

31

### A.     Guevara Cannot Meet His Burden of Production At Summary Judgment

At summary judgment, the moving party bears the initial burden of establishing the absence of genuine disputes of material fact for trial. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727, at 455-56 (3d ed. 1998) ("The movant is held to a stringent standard."). That initial burden is satisfied either when the moving party affirmatively produces evidence negating an essential element of the non-moving party's claim, or when the movant establishes that the record demonstrates the non-moving party will be unable to meet its burden at trial. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The movant "cannot sustain its burden merely by denying the allegations in the opponent's pleadings, or merely by asserting that the nonmovant lacks evidence to support its claim." 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727.1, at 455-56 (4th ed. 2016). If the moving party neither offers evidence to negate an element of the non-movant's claim, nor points to evidence establishing that the nonmovant cannot satisfy its trial burden, then the moving party fails to satisfy its initial burden, the burden does not shift to the non-moving party, and summary judgment must be denied, even without a responsive brief. *Adickes*, 398 U.S. at 160 ("Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits."); *Sterk*, 770 F.3d at 627.

A moving party who asserts their Fifth Amendment right to remain silent in response to questions about every material fact cannot satisfy the initial burden of production at summary judgment, because that party can neither point to evidence negating an essential element of the claim nor establish that proof will be lacking on material facts at trial. The Seventh Circuit has emphasized that an assertion of the Fifth Amendment does not "relieve a litigant in civil litigation of the need to establish elements on which he bears a burden of production or persuasion." *United*

*States v. Taylor*, 975 F.2d 402, 404 (7th Cir. 1992); *see also United States v. Rylander*, 460 U.S. 752, 758 (1983) ("But while the assertion of the Fifth Amendment privilege against compulsory self-incrimination may be a valid ground upon which a witness . . . declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production."). "A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence. . . . If this be seen as a 'price' on the assertion of the privilege, so be it." *Taylor*, 975 F.2d at 404; *see also Williams v. Florida*, 399 U.S. 78, 83-84, (1970) (explaining that forcing a litigant to choose "between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination"). And "the claim of privilege will not prevent an adverse finding even at summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *United States v. Certain Real Prop. & Premises*, 55 F.3d 78, 83 (2d Cir. 1995).

While there may be cases in which a party asserts the Fifth Amendment on a peripheral issue unimportant to the material facts at summary judgment, here Guevara, one of the principal Defendants, asserted the privilege as to all material aspects of his illegal conduct in this case. "[A] district court has discretion in its response to a party's invocation of the Fifth," *S.E.C. v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998), and it is a sound exercise of that discretion in this situation to hold that the party invoking the Fifth Amendment cannot satisfy its burden of production at summary judgment.

**B.    Guevara Cannot Meet His Burden of Persuasion At Summary Judgment**

Even assuming Guevara could meet his burden of production, he certainly cannot satisfy his burden of persuasion at this stage: He must show that no material fact regarding his own liability is disputed. *Celotex*, 477 U.S. at 323. The Supreme Court holds that jurors *must* be

33

expressly instructed that they can draw adverse inferences against a party asserting the Fifth Amendment in civil litigation. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387 (7th Cir. 1995); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (An "adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader"). As Rule 56 requires, this Court at summary judgment *must* draw an inference like this one in favor of the non-moving party, here Johnson, and against the movant, here Guevara. *Tolan*, 572 U.S. at 656-57.

Accordingly, where a Defendant asserts his Fifth Amendment rights to avoid answering questions about material facts, then moves for summary judgment, the Court must draw an inference against that Defendant on those material facts. *Belangen v. Schreiber*, 407 F.3d 34, 55 (2d Cir. 2005) (noting that while a jury may decide whether to draw an inference from the assertion of privilege, the court is "required at summary judgment to draw all reasonable inferences in favor of the non-moving party"); *see also Seguban*, 54 F.3d at 390 (holding that this inference based on an assertion of the privilege may be drawn against even the *non*-moving party at summary judgment). Applied to this case, this Court must draw the adverse inference at summary judgment against Guevara on those material facts about which he has asserted his Fifth Amendment rights, and so Guevara cannot satisfy his burden of showing there are no disputes of material fact at this stage.

The prospect of losing a claim on the merits in the future because of an assertion of the Fifth Amendment is certainly not the type of cost of invoking the privilege that is prohibited—in fact, this prospect of losing on the merits is considered a wholly permissible consequence of asserting the privilege in non-criminal cases. *E.g.*, *Kimm v. Rosenberg*, 363 U.S. 405, 408 (1960) (*per curiam*) (imposing adverse immigration consequences where burden could not be met under

34

a federal statute because of an assertion of the privilege); *Baxter*, 425 U.S. at 318-20 (declining to extend the *Griffin* rule to civil cases and expressly permitting inferences against the asserting party in a civil action); *Graystone Nash, Inc.*, 25 F.3d 187, 191 (3d Cir. 1994) ("The principle that the invocation of the privilege may be too 'costly' does not mean that it must be 'costless.'"). A party who invokes the privilege deprives the opponent of an essential source of information, obstructs discovery and proceedings, and hinders the search for truth. *Seguban*, 54 F.3d at 390 n.4; *United States v. 4003-4005 5th Ave.*, 55 F.3d 78, 84 (2d Cir. 1995). Moreover, a party cannot use the privilege as a shield to avoid self-incrimination and then as a sword to obtain a litigation advantage. *City of Chicago v. Reliable Truck Parts Co., Inc.*, 822 F.Supp. 1288, 1293 (N.D. Ill. 1993).

Importantly, the circumstance here is unlike what the Court confronted earlier in the case, where Johnson was the moving party at summary judgment, and the Court determined that Guevara was entitled to defend himself against a motion for summary judgment, despite his invocation of the Fifth. Dkt. 273 at 11-13. At this stage, Johnson is no longer asking for a judgment in his favor based on Guevara's assertion of privilege. Instead, he contends only that Guevara cannot himself ask for judgment in his favor before trial, given that he is asserting his Fifth Amendment rights. This Court should deny Guevara's motion because of his assertions of the Fifth Amendment.

### C. Requiring More Evidence In Addition to the Assertion of Fifth Amendment Rights Before Denying Summary Judgment Is Contrary to Law

Based on a misunderstanding of the law, some district courts have required an examination of additional evidence before denying summary judgment to a moving party who has asserted the Fifth Amendment privilege. *See Rivera*, 319 F. Supp. 3d at 1039-40; *Logan v. City of Chicago*, 891 F. Supp. 2d 897, 901 (N.D. Ill. 2012); *Thompson v. City of Chicago*, 2009 WL 674353, at *3

(N.D. Ill. Mar. 12, 2009). These courts have held that there must be "some evidence" in the record apart from the moving party's assertion of the Fifth Amendment to deny the motion for summary judgment. These cases are incorrectly decided and depart from established law.

In some situations, courts have said that judgment should not be entered on the pleadings against a party merely because that party asserts the Fifth Amendment privilege. *National Acceptance v. Bathalter*, 705 F.2d 924, 932 (7th Cir. 1983). In other cases, courts have decided not to grant summary judgment to a *moving* party merely because the *non-moving party* asserted the Fifth Amendment, *Seguban*, 54 F.3d at 391, as this Court decided in response to Johnson's motion for summary judgment, Dkt. 273 at 11-13. Unfortunately, District courts have read these cases incorrectly to say that summary judgment cannot be *denied* based on the *moving* party's assertion of the Fifth Amendment. *Rivera*, 319 F. Supp. 3d at 1039-40. But the cases cited do not support such a proposition, and there is nothing in the law that would justify such a logical leap.

Consider the question this way: Suppose there were a blanket rule that judgment cannot be entered against a party merely because that party has asserted the Fifth Amendment privilege.[5] This rule would not justify the conclusion that a summary judgment motion filed by a party asserting the privilege cannot be denied on that basis. Entering a judgment *against a party* who asserts the Fifth is much different than denying a motion for summary judgment *filed by a party* who asserts the Fifth. The former situation imposes a high cost for asserting the Fifth Amendment and ends the litigation; the latter merely requires the party asserting the Fifth to face a trial. In

---

[5] And the rule is not so simple in the case law. In some circumstances, parties *are* granted judgment merely because the opposing party has asserted their Fifth Amendment rights. *Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969) (holding that a plaintiff who asserted the Fifth could not sustain a burden of proof and that judgment for the defendants was appropriate); *see also United States v. $39,000.00 in U.S. Currency*, 951 F.3d 740, 742 (6th Cir. 2020). That issue was the one raised by Johnson in his own motion for summary judgment, and the Court resolved that issue against Johnson.

response to Johnson's motion, Guevara was in the former situation; now that he has moved for summary judgment against Johnson, he is in the latter.

District courts have cited *Seguban*, 54 F.3d at 391, in support of the incorrect "more evidence" rule. But that case undermines rather than supports that rule. There, a motion for summary judgment was denied on the logic that the *non-moving party's* assertion of privilege could not justify a grant of judgment to the moving party, without consideration of other evidence. That situation is doubly different than this case: First, here the *moving* party is asking for summary judgment *and* asserting the Fifth. Second, the consequence for the moving party here of asserting the privilege is not a judgment in the non-movant's favor, but instead is the mere denial of the moving party's motion. Courts who have held that summary judgment cannot be denied based on an assertion of the Fifth Amendment privilege alone get the law wrong.

### D.   Guevara Cannot Assert His Fifth Amendment Rights and Then Obtain Summary Judgment Given Other Evidence in the Record

Regardless, even if the erroneous "more evidence" standard were applied here, requiring Johnson to point to evidence beyond Guevara's assertion of the Fifth to defeat summary judgment, his motion for summary judgment remains frivolous. There is ample additional evidence. Indeed, when one considers the record evidence in the light most favorable to Johnson and the misconduct it establishes, along with Guevara's assertion of his Fifth Amendment rights when asked about that same misconduct, plainly Guevara is not entitled to summary judgment.

*   *   *

The discussion above illustrates many independent reasons that it makes little sense for Defendants to have filed summary judgment motions in this case. Parties do not have an absolute right to move for summary judgment in every case, and the Federal Rules establish a preference

37

for speedy resolution of claims. It is a waste of this Court's and the parties' time and resources to litigate hundreds of pages of summary judgment motions in a case where summary judgment is plainly not warranted, and a trial is sure to occur.

## IV.    SUMMARY JUDGMENT IS UNAVAILABLE TO THE DEFENDANT OFFICERS

Examining the record in the light most favorable to Johnson and drawing inferences in his favor, this Court should deny summary judgment on all claims and theories on which Defendants have moved. No material factual issues are undisputed. Instead, the facts are hotly contested and must be resolved by a jury. Moreover, Defendants' limited purely legal arguments lack merit and contradict deeply established Supreme Court and Seventh Circuit cases.

Defendants move for summary judgment on portions of Johnson's due process fair trial claim. But the evidence in the record supports Johnson's due process claim on each of three, independent theories of liability—fabrication of evidence, suppression of evidence, and fabrication of identifications using suggestive identification procedures.

On fabrication, Defendants do not discuss much of the fabricated evidence they used to implicate Johnson and none of Defendants makes a complete argument that he is entitled to summary judgment. Instead, Defendants' arguments are limited: all Defendant Officers argue that there is no evidence in the record that they knowingly manufactured identifications from Elba Burgos, Ricardo Burgos, and Rosa Burgos; Erickson, Healey, and Daley contend they were not involved in the identification procedures used with Elba, Ricardo, and Rosa, and so cannot be liable for fabricating their identifications; and Defendants argue that they cannot be liable for fabricating the Guevara lineup report, which falsely stated that Bryan Johns was not identified on the night of the crime, because that report was not admitted as evidence at Johnson's criminal trial. This Court could accept each of Defendants' arguments (which it should not do, for the reasons

38

discussed below), and still no Defendant would be entitled to summary judgment on this due process theory, given the theories not addressed by Defendants. Nonetheless, Defendants' limited arguments are based on a version of the facts that impermissibly construes the record untenably in Defendants' own favor and that gets the law wrong.

On suppression, Defendants similarly do not address the vast majority of the key items of evidence they suppressed. They do not discuss Guevara, Halvorson, and Erickson's suppression of key evidence undermining the Burgos identifications; or Guevara, Halvorsen, and Daley's suppression of the fact that Johnson was made a suspect before any evidence implicated him; or Guevara and Halvorsen's suppression of their entire investigation of alternative suspect Robert Weeks; or Guevara and Halvorsen's suppression of the fact that Johns was a cooperating witness in another pending homicide case; or Defendants' suppression of the fact that Guevara had committed similar fabrications and suppressions of evidence in multiple homicide cases. By forfeiting any challenge on those issues, Defendants cannot obtain summary judgment on Johnson's suppression theory. Moreover, when Defendants do discuss the evidence they suppressed, they ignore disputed facts. They assert that the law permitted them to suppress their fabrications of evidence with impunity, a position contrary to Supreme Court and Seventh Circuit precedents. They argue that Johnson's attorneys should have discovered the evidence they were hiding by exercising more diligence, a view that is disputed and is incompatible with controlling law.

With respect to Johnson's unduly suggestive identification theory, Defendants incorrectly argue—contrary to Seventh Circuit precedents—that such a claim is not cognizable under § 1983. In addition, they repeat their arguments that there is no evidence they used suggestive identification procedures with Elba, Ricardo, and Rosa, and that Erickson, Daley, and Healey were uninvolved

39

in these identifications, which again are hotly contested issues. But even accepting some of *Defendants'* own view of the facts—an approach opposite to the summary judgment standard that applies—Defendants are still liable for intentionally using improperly suggestive identification techniques, resulting in false identifications of Johnson, which tainted Johnson's criminal trial. The law prohibiting Defendants' illegal tactics was clearly established long before 1991.

Finally, Defendants' other arguments on Johnson's Fourth Amendment illegal seizure claim, Illinois malicious prosecution claim, federal failure-to-intervene claim, federal and state conspiracy claims, and Illinois negligence claim lack merit and require reviewing the factual record in the light most favorable to Defendants, which this Court cannot do at this stage. So, too, for the interspersed arguments from Erickson, Daley, and Healey that they were not involved in the misconduct at issue (which begs the question why the other Defendant Officers have moved for summary judgment as all). Johnson's claims must go to trial against the Defendant Officers on all theories.

### A. A Reasonable Jury Could Conclude That Defendants Fabricated False Evidence

The Supreme Court and Seventh Circuit "'have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Mooney v. Hollohan*, 294 U.S. 103, 112 (1935); *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). This due process theory is entirely distinct from the due process theory based on suppression of evidence, discussed below. *Petty v. City of Chicago*, 754 F.3d 416, 421-24 (7th Cir. 2014).

40

There are multiple fabrication theories, each of which would independently justify denying summary judgment:

1. Defendant Guevara fabricated entirely that Ricardo Burgos had identified Johnson in a photo identification procedure in June 1991, when no array occurred on that date, and when Johnson was not even a suspect at that time, PSOF ¶¶129-132;

2. Defendants Guevara, Halvorsen, and Daley fabricated that there was a reason to suspect Johnson in the Fred homicide in July 1991, before there was any evidence implicating him and before any witness identified him, when they actually had arbitrarily swapped Johnson into the case as the suspect in the place of Johnson's older brother, who they also had no reason to suspect, PSOF ¶¶90, 105-11, 132, 195-96;

3. Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Elba Burgos's identification of Johnson in a photograph show-up on July 15, 1991, and a live lineup procedure on July 22, 1991, PSOF ¶¶105-115, 117-120, 197-98;

4. Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Ricardo Burgos's identification of Johnson in a live lineup procedure on July 22, 1991, PSOF ¶¶91-92, 141-48, 197-98;

5. Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Rosa Burgos's identification of Johnson in a live lineup procedure on July 22, 1991, PSOF ¶¶91-92, 141-48, 152, 197-98;

6. Defendant Guevara fabricated a story that Elba Burgos had followed the shooter through the neighborhood, to bolster her identification, even though she had never followed the shooter, PSOF ¶¶90, 105-120;

7. Defendants Guevara, Halvorsen, and Healey fabricated a July 23 closing report for their investigation (Ex. 6), which included a summary of the evidence that they had fabricated implicating Johnson, PSOF ¶¶89, 147-48, 199-203, 256, 259, 263, 260;

8. Defendants Guevara, Halvorsen, and Healey fabricated a July 22 lineup report (Ex. 51) claiming falsely that the Burgos witnesses had each positively identified Johnson in a live lineup, independently and without police manipulation, PSOF ¶¶92, 142-48, 197-98, 263, 280;

9. Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated a lineup report, backdated to June 12 (Ex. 34) claiming falsely that witnesses had not identified Bryan Johns during a live lineup conducted on the night of the shootings (the "Guevara lineup report"), PSOF ¶¶36-37, 53-66, 279-81;

41

10. Defendant Daley fabricated a June 13 report (Ex. 19) claiming falsely that witnesses had not identified Bryan Johns during a live the night of June 12, 1991, PSOF ¶¶64, 275;

11. Defendant Guevara fabricated a June 20 report (Ex. 65) claiming falsely that Rosa Burgos told them that she could identify the shooter, when she repeatedly said the opposite, PSOF ¶¶191-92;

12. Defendant Daley fabricated a false account that Demetrius Johnson's nickname was "Little D," when he knew that was in fact Bryan Johns's nickname, PSOF ¶¶251-52, 278.

Importantly, Defendants do not challenge many of Johnson's due process fabrication theories. All Defendant Officers argue that the Burgos identifications were not fabricated, OB-11-13; GB-2-3, and Erickson, Daley, and Healey argue they were uninvolved in those identifications, OB 13-14 (items 3, 4, and 5, above). All Defendant Officers argue they cannot be liable for fabricating Guevara's false lineup report because it was not introduced as evidence, OB-14-15; GB-2-3 (item 9). Otherwise, none of Defendant Officers contest that the other items of evidence listed above were fabricated or deny that they were used to deprive Johnson of his liberty (items 1, 2, 6, 7, 8, 10, 11, 12). *See* OB-11-16; GB-2-3. Any such argument is now forfeited. *Smith v. Ne. Illinois Univ.*, 388 F.3d 559, 569. Accordingly, no Defendant makes a complete argument for summary judgment on Johnson's fabrication theories. Again, given that the Court need not parse every theory of liability and every piece of evidence in a case concerning violations of the right to a fair trial, once it has determined that the fair trial claims must be considered by a jury, *see* Argument II *supra*, this Court can simply hold that these Defendants are not entitled to summary judgment on the due process theory and move to trial.

### 1. Defendants Knowingly Fabricated the Burgos Identifications

Defendant Officers all contend that there is no dispute of fact about whether the Burgos identifications were fabricated. OB-11-13; GB-2-3. This argument depends entirely on a reading of the record that turns the summary judgment standard upside down. Defendants cherry pick

snippets of the record relating to the Burgoses and contend those witnesses made legitimate identifications, always told the truth, and never recanted. *Id.* That is hotly contested, and the Court cannot at this stage credit Defendants' version of events or draw inferences for them; nor can it judge the credibility of witnesses or decide what parts of witness testimony to believe. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). Defendants' argument flies in the face of strong direct and circumstantial evidence that Defendant Officers fabricated the Burgos identifications.

Properly construing the record for Johnson and drawing inferences for him, as this Court must at this stage, neither Elba, Ricardo, nor Rosa could have made an identification given the circumstances of what they observed: Rosa was coming downstairs inside a building behind the victim Ortiz, who was shot as soon as he opened the front door, at which time she immediately shut the door and ran back upstairs. PSOF ¶¶136-38, 192. Ricardo was driving his car during the shooting, did not see the crime but heard shots, and was 60-70 feet away from a person he saw running southbound down Campbell away from him, such that he only saw his back and never saw his face. PSOF ¶¶125-27, 160; JSOF ¶135. Elba did not see the shooting either, and instead heard the shots and saw a person running down the sidewalk more than 60 feet away, across a street, and she only saw the individual in profile. PSOF ¶¶94-99; JSOF ¶¶94, 95, 97, 102, 136. Elba and Rosa had at most a few seconds during which they could have observed the shooter. PSOF ¶¶96, 137, 248; JSOF ¶¶130-131. Elba and Ricardo did not see the crime at all—both just saw a person running down the street after the crime occurred. PSOF ¶¶94-95, 125. The Burgoses reported this information to Guevara and Halvorsen. PSOF ¶¶128, 138.

43

Consistent with their lack of opportunity to view the crime or the perpetrators, none of the Burgoses could provide a description of the perpetrator. PSOF ¶¶101, 123, 139. Elba could only tell Guevara and Halvorsen that the shooter was a Black male. PSOF ¶101. The same was true for Rosa. PSOF ¶140. Ricardo told Guevara and Halvorsen the shooter was a Latino male, which Johnson was not, and provided no further description. PSOF ¶¶122-24; JSOF ¶134. None described clothing or any distinguishing features. PSOF ¶¶101, 123, 139.

Ricardo and Rosa independently told Guevara and Halvorsen they would not be able to identify the perpetrator. Ricardo told them he had not seen the shooter's face and therefore could not identify the shooter. PSOF ¶128. Rosa told Guevara and Erickson that the shooting had happened so fast she could not tell who the shooter was. PSOF ¶138. At the July 22 lineup, she told Guevara and Halvorsen she was not sure who the shooter was. PSOF ¶150. Later, Rosa confirmed that all Black people look alike to her, so she could not have made an identification. PSOF ¶140. Throughout the criminal proceedings, Defendants suppressed that the Burgoses had told them they could not make an identification, and Guevara instead testified that the Burgos identifications were legitimate. PSOF ¶¶127, 152-155, 192, 194, 207-211.

Importantly, Johnson is innocent of the Fred murder and Ortiz shooting, a fact this Court must take as true at summary judgment based on the record evidence. PSOF ¶¶1-9. That means, as a factual matter, that he was not the perpetrator, and therefore any identification of Johnson was by definition wrong. That three witnesses all then selected the same wrong person—the Defendants' chosen suspect—is itself evidence that the identifications were fabricated.

On the night of crime, Guevara, Erickson, and Daley had immediately suspected Bryan Johns based on information from the scene, arrested him close to the crime in possession of guns, and placed him in a live lineup three hours after the crime, which was viewed by six of the key

eyewitnesses, including Rosa Burgos. PSOF ¶¶24-31, 36-42. Three eyewitnesses, including Aby Gonzalez, identified Johns as the shooter in that lineup. But these Defendants told the witnesses they had identified the wrong person, and they set Johns free because he was a cooperator in other pending Area Five cases. PSOF ¶¶37, 84-87. Erickson wrote a report documenting the identification procedure, which was suppressed. PSOF ¶¶67-81. Daley wrote a false report saying that Johns had not identified anyone in the lineup (and testified consistent with that false report at Johnson's trial). PSOF ¶¶64, 242. At the end of the investigation, Guevara and Erickson also wrote a false report saying that Johns had not been identified, and back dated it to the night of the crime. PSOF ¶¶53-66, 189-190. Throughout Johnson's criminal proceedings, Defendants suppressed the Johns identifications, the fact that he had been identified by three witnesses, the Erickson report, and the fact that Johns was a cooperator. PSOF ¶¶37, 206-213, 269-270.

After Guevara, Erickson, and Daley let the real killer go on the night of the crime, Defendants never again used most of the key eyewitnesses in the investigation. PSOF ¶¶15, 18, 22. Of the nine eyewitnesses identified by Defendants shortly after the shooting, Guevara and Halvorsen presented identification procedures that included Johnson to only two—Rosa Burgos and Angel Cordova. PSOF ¶¶15, 18, 22, 92. The other key eyewitnesses—who all had a better opportunity to view the perpetrator than the Burgoses—were never shown any identification procedure that included Johnson. PSOF ¶¶15, 18, 22. The reasonable inference is that Defendants abandoned the real witnesses because they had seen Bryan Johns commit the shooting, and they would not identify the wrong perpetrator.

Not only did Defendants jettison the key eyewitness, but they also focused on new witnesses—Elba Burgos and Ricardo Burgos—who materialized as witnesses for the first time after the shooting. PSOF ¶¶93, 100, 121. The police files do not reflect how Elba Burgos came to

Defendants' attention weeks after the shooting. As discussed already, neither she nor Ricardo had seen the crime, gotten a look at the perpetrator that would permit identification, or could provide a description. PSOF ¶¶93-99, 121-129. Good eyewitnesses were swapped for bad ones, and the reasonable inference is that Defendants did this so they could implicate a different suspect.

That Guevara and Halvorsen selected a new suspect first and created evidence second is not speculative. The killer had been identified and released already, so Guevara and Halvorsen knew any new suspect could not be the shooter. And the record reflects a new suspect was selected quickly: Demetrius Johnson's brother, Darrell Johnson. Darrell's photograph was requested at Area Five on June 15, just a couple of days after Johns was released. PSOF ¶¶108. No evidence in the record suggests Defendants had any reason at all to suspect Darrell in the Fred murder, not even Guevara and Halvorsen's report documenting their identification procedure using Darrell's photograph. PSOF ¶¶106-107.

Defendants presented Darrell to Elba Burgos on July 11 in a suggestive photo array, which included fillers who were obviously and deliberately significantly older than how witnesses described the shooter. PSOF ¶¶114-117. Compounding the suggestive nature of the array, and demonstrating that Guevara and Halvorsen were simply seeking a positive identification of their suspect, Guevara and Halvorsen did not ask her to look at pictures and pick someone, they showed her the picture of Darrell and asked her "if it was this one." PSOF ¶109.

Even if the selection of Darrell was not random, Guevara, Halvorsen, and Daley certainly made Demetrius the suspect arbitrarily. There is no dispute of fact on this point: When Elba looked at Darrell's photo and told Guevara and Halvorsen he was not the shooter but had some similarities, Guevara, Halvorsen, and Daley did not search for evidence suggesting who the shooter might have been (again, because they had already let the shooter go). PSOF ¶¶34-35, 90, 110. Instead, they

46

simply decided to switch Darrell for his 15-year-old little brother, Demetrius. PSOF ¶¶90, 111, 132. Again, there is zero evidence in the record, including any of the police reports, suggesting that there was any reason to suspect Demetrius in the crime before Guevara, Halvorsen, and Daley designated him as the suspect. PSOF ¶132. Daley obtained a Polaroid photo of him, and Defendants sought to obtain an identification of him. PSOF ¶111.

Defendants do not address anywhere in their motion the fact that they selected Johnson as a suspect before any evidence existed implicating him, which was itself based on the dubious claim by Defendants that they "just chose five black males" to include in the photo array. PSOF ¶107. In other words, Defendants just got lucky, and happened to include the brother of the perpetrator in the photo array; this is far-fetched, and further evidence of fabrication. Indeed, the fact that Defendants pre-selected Darrell as a suspect first, then Demetrius when that failed, and then obtained evidence implicating him, are of course intimately related—the fabrication of identifications was merely the execution of a plan hatched when Defendants invented a suspect without evidence. Again, Guevara took the Fifth when asked if he settled on Johnson as a suspect first and then manufactured evidence to implicate him. PSOF ¶¶153-155, 204. Defendants cannot hope for summary judgment on Johnson's fabrication claims having failed to even address the fabricated origin of their scheme. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006) ("[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Purghoraishi v. Flying J*, 449 F.3d 751, 765 (7th Cir. 2006) (same). It will obviously be too late for Defendants to raise these arguments in their reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply).

47

Nonetheless, Defendants somehow got three different witnesses who had not seen the perpetrator, could not describe the shooter, and could not identify the perpetrator, to each independently identify their chosen suspect Johnson. The evidence discussed so far would permit a reasonable jury to conclude that Defendants had released the real killer, had chosen new witnesses, were trying to obtain an identification of their randomly chosen new suspect, and were willing to direct witnesses to Johnson during identification procedures.

And so they did. Guevara and Halvorsen showed Elba a single Polaroid photo (not an array), in which Demetrius is depicted in the middle of three people, appearing shorter and younger than both of the others depicted, consistent with the description of the shooter as a short, young Black male. PSOF ¶¶111-113, 118. Johnson is entitled to the inference at this stage that Defendants pointed him out in that picture to Elba, given that they had done so a few days earlier with his brother's photo. PSOF ¶¶109, 196. But even if they did not, Johnson in the Polaroid looked nearly identical to the photo of his brother that Guevara and Halvorsen had shown to Elba a few days before, which Guevara had pointed out to Elba. PSOF ¶¶109, 115, 118. 124, 196. And Johnson was highlighted in the composition of the Polaroid. PSOF ¶¶118, 167. Given these facts, the inference is that the three-person photo directed Elba to who she should pick. Guevara and Halvorsen reported that Elba had selected Johnson without any suggestion. PSOF ¶¶193-196.

To bolster Elba's untenable identification, Guevara and Halvorsen fabricated an account that Elba had followed the shooter as he fled down Campbell, turned on LeMoyne, and only lost him after following him to Western Avenue. PSOF ¶102. That never happened. PSOF ¶102.

Guevara also fabricated a false account that Ricardo Burgos had selected Johnson during a photo identification procedure in June 1991. PSOF ¶¶121-132. That photo identification procedure

48

also never occurred. PSOF ¶¶130-131. Indeed, Demetrius Johnson had not even been made the suspect in June—that did not happen until July. PSOF ¶132.

The parties agree that Guevara and Halvorsen showed Elba and Ricardo the Polaroid photo of Demetrius Johnson before conducting the July 22 live lineup. JSOF ¶92. Johnson is entitled to the inference that if Defendants showed two of their chosen eyewitnesses the Polaroid before the live lineup, then they showed their third chosen eyewitness, Rosa Burgos, as well. And so the witnesses all knew that Johnson was Defendants' suspect, and they had seen a recent photo of him, before they viewed the July 22 lineup. PSOF ¶¶105, 109-120, 130-132; JSOF ¶¶92, 100, 102. Defendants' own expert admits this renders the July 22 lineup "relatively meaningless." PSOF ¶¶168, 172; *see also* PSOF ¶¶175-176.

In addition, the composition of the July 22 lineup again highlighted Johnson as the shortest and youngest participant, in the middle of the lineup. Guevara and Halvorsen made the lineup participants appear shirtless for no reason except to show that Johnson had a tattoo, which showed the Burgoses he was affiliated with the street gang they knew police suspected of being behind the murder. Johnson was the only one with a visible tattoo. PSOF ¶¶141-146, 169. This course of conduct highlighted for each witness that they should select Johnson in the lineup.

Rosa told Guevara and Halvorsen during the July 22 live lineup that she was not sure who the shooter was. PSOF ¶¶149-150. In response, Defendants pressured her to select someone, saying words to the effect of "who are you going to pick," which made it appear that Rosa had to select someone. PSOF ¶150. Rosa told Guevara and Halvorsen that Johnson resembled the shooter, but she did not tell them that Johnson was the shooter, and made clear that she was not sure if he was the shooter at all. PSOF ¶¶149-150. Defendants suppressed these interactions with Rosa and

49

instead falsely reported that she had positively identified Johnson in the July 22 lineup. PSOF ¶152.

In sum, Defendants obtained identifications from their three designated witnesses of the same innocent person Defendants had decided in advance to frame for the Fred murder. Based on the facts above alone, Johnson is entitled to the inference at summary judgment that Defendant Officers fabricated the identifications, telling Elba, Ricardo, and Rose who to pick, and reporting falsely that they had made positive identifications of Johnson without suggestion. When asked if Defendants did exactly this, Guevara asserted his Fifth Amendment rights. PSOF ¶¶153-155, 204.

There is still more circumstantial evidence supporting the inference that the Burgos identifications were fabricated. The very fact that they suppressed the Erickson lineup report and other identifications of Johns, PSOF ¶¶67-81, is itself evidence that they were fabricating evidence to frame Johnson. So too are the multiple fabricated police reports documenting the false evidence in the case, including Guevara and Erickson's fabricated lineup report regarding Johns, Daley's June 13 report, and the fabricated trial testimony of Guevara and Daley that Johns had not been identified on the night of the shooting, and that Johnson was known by the nickname "Little D." PSOF ¶¶189-203, 251-252. So is the evidence that Guevara and Halvorsen attempted to fabricate an identification from Angel Cardova, when it was impossible that he had seen the crime. PSOF ¶¶183-86. This unchallenged evidence that Defendants knowingly fabricated and suppressed evidence separate from the Burgos identifications firmly supports the inference at this stage that they did the same thing with the Burgos identifications. Put differently, if Defendants had obtained legitimate identifications of Johnson, they would have had no need to make up other evidence incriminating him or covering up that other witnesses had selected Johns from a lineup on the night of the crime.

50

A reasonable jury could hear the above direct evidence without the circumstantial evidence, or it could hear the circumstantial evidence without the direct evidence, and easily conclude either way that all Defendant Officers knowingly fabricated the Burgos identifications implicating Johnson and knew they were false. When the direct and circumstantial evidence are considered together, Defendants cannot win the argument at summary judgment that these identifications were legitimate and that they had no knowledge that they were unreliable. At this stage, Johnson's "version of any disputed issue of fact . . . is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

Defendants' argument that they did not fabricate the Burgos identifications asks the Court to disregard or to disbelieve facts in the record. To the extent Defendants contest the facts above or pick and choose from the Burgoses testimony, they must present those factual arguments at trial. For instance, Defendants emphasize selected parts of these witnesses testimony, asserting that they testified at Johnson's criminal trial and later testified in civil depositions that they would not have lied under oath, OB-12, but they ignore parts of these witnesses' testimony that undermines Defendants' position, including the many sworn statements discussed above–in declarations, trial, and in the same civil depositions Defendants cite. PSOF ¶¶109, 127, 129 (Burgos civil deposition, affirming he did not see the shooter's face and could not make identification without police telling him who to pick), 138, 140, 149-151; JSOF ¶¶93. Defendants will perhaps be able to impeach testimony at trial with the evidence they cite, but this Court cannot credit this view or draw conclusions about credibility at this stage. *Anderson*, 477 U.S. at 255. Nor can this Court credit parts of conflicting testimony Defendants cite at this stage—that is a job for a jury. *Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) (noting that "selective disbelief"— crediting part of conflicting evidence—"is an ordinary incident of trial").

51

Moreover, to the extent Defendants' argument implies that Johnson's theories concern not the fabrication of false identifications but instead the coercion of truthful ones, their argument again depends on an improper view of the facts in their own favor. Where a due process violation concerns witness statements, the Seventh Circuit has been careful to distinguish between coerced evidence and fabricated evidence. Police coercion of witnesses that produces truthful testimony does not by itself violate due process, absent a violation of the *Brady* duty to disclose facts about the police coercion that was used to obtain the testimony, which Johnson discussed above. *Avery*, 847 F.3d at 439 (citing *Fields v. Wharrie*, 740 F.3d 1107, 1123 (7th Cir. 2014) (*Fields II*)). Police fabrication of witness testimony that the officers know to be false, however, violates due process without need for further analysis. *Id.* at 439-40 (citing *Petty*, 754 F.3d at 423). All of the fabrication theories at issue in this case concern the creation of evidence that Defendants knew was false, and not an assertion that Defendants coerced truthful testimony. The facts construed in the light most favorable to Johnson necessarily mean that Plaintiff was innocent, and that Johns was the true perpetrator. By letting Johns go, and targeting Plaintiff, the Defendants Officers created fake evidence that they knew was fake in order to implicate an innocent person in the Fred murder. Any conclusion that these were coercions of truthful evidence from witnesses necessarily would require construing facts for the Defendants, at minimum, which is inappropriate at this stage.

Finally, there can be no doubt that the fabricated Burgos identifications were material to the criminal case, and Defendants do not appear to suggest otherwise. OB-14-26. The Burgos identifications were the only evidence that caused the charges and conviction of Johnson. PSOF ¶¶237-241. As the Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." 682 F.3d

at 580 (7th Cir. 2012) (emphasis added). The Supreme Court and Seventh Circuit have held that precisely the type of fabrication of witness accounts at issue here violates the Constitution, *McDonough v. Smith*, 139 S. Ct. 2149, 2154 (2019) (permitting claim to proceed where falsified affidavits and witness coaching led to a prosecution); *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Whitlock*, 682 F.3d at 582-84, and it has held that evidence far less voluminous than that at issue here requires a jury trial on this issue, *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial). This Court should reject Defendants' argument that they are entitled to summary judgment on Johnson's claims that they fabricated the Burgos identifications.

### 2. Erickson, Daley, and Healey Were Involved In This Misconduct

Erickson, Daley, and Healey each contend that they were not personally involved in the course of misconduct just described in a manner sufficient to hold them liable under § 1983. OB-13. Their argument amounts to an assertion that they were not present for the Burgos identification procedures. OB-14. These Defendants are not entitled to summary judgment on Johnson's fabrication theory.

For starters, these Defendants do not acknowledge their involvement in the fabrication or suppression of any of the items of evidence that directly enabled the false Burgos identifications, outlined above, including: Erickson's authorship of the false Guevara lineup report denying the Johns identification, which Healey approved; Erickson's and Daley's suppression of the Johns

identification; all Defendants' suppression of Erickson's report documenting that identification; Daley's false report denying the Johns identification; Rosa's statement to Erickson that she could not identify the shooter; Daley's participation in selecting Demetrius Johnson as the suspect with Guevara and Halvorsen; Daley's identification of a three-person show up photo to show the Burgoses; and Healey's approval of numerous false reports by Guevara and Halvorsen. Argument IV(A)(1) *supra*. To the extent that Defendants contend in their brief that their involvement was more limited, they are contesting facts in the record and inferences in Johnson's favor.

Defendants' view that this participation in fabricating the Burgos identifications is deficient represents too narrow a view of personal responsibility under § 1983. The law requires each defendant to have caused or participated in conduct leading to a constitutional violation. *Pepper v. Village of Oak Park*, 430 F.3d 806, 810 (7th Cir. 2005) ("[T]o be liable under § 1983 , the individual defendant must have caused or participated in a constitutional deprivation."). It does not require each defendant to have participated in each event in a causal chain leading to a constitutional violation.

Moreover, these actions—working with Guevara and Halvorsen to fabricate the initial lead against Johnson, working with them to obtain incriminating evidence, suppressing an alternative suspect identification, and drafting, signing, and approving the closing report, lineup reports, and other reports full of fabrications—are all evidence that Erickson, Daley, and Healey conspired with Guevara and Halvorsen to file charges and prosecute Johnson for a crime he had not committed. PSOF ¶¶24-35, 38-42, 53-66, 251-252, 259, 268-283.

In light of this record evidence, Erickson, Daley, and Healey cannot assert at summary judgment that they were uninvolved as a factual matter in fabricating the Burgos identifications. They had knowledge of this false evidence. They reported it. They reached an agreement to

54

prosecute Johnson based on it—the identifications were the central part of their conspiracy to frame Johnson. A trial is required against these three Defendants on the fabrication of these items of evidence.

### 3. Defendants' Fabrication of Guevara's False Lineup Report Was Used to Deprive Johnson of His Liberty

Finally, Defendant Officers argue for summary judgment on Johnson's fabrication due process theory, asserting that they cannot be held liable for the fabrication of the false Guevara lineup report—the one stating falsely that Johns was not selected during an identification procedure on the night of the crime—because that report was not introduced as evidence at trial. OB-15. This one-paragraph argument is too cursory to justify summary judgment, *Smith*, 388 F.3d at 569, and it is wrong on the law and the facts.

However, before turning to that argument, it is important to observe that Defendants do not argue that the other items of fabricated evidence above had no impact on Johnson's criminal trial. OB-15-16. Those fabrications were used in the criminal case to deprive Johnson of his liberty, and they are alone enough for each of the Defendant Officers to be held liable on Johnson's fabrication due process theory, without the need to resolve the question of whether the Guevara false lineup report alone violated Johnson's due process rights. Defendants have forfeited an argument about these items of fabricated evidence and their effect on Johnson's trial, *Smith*, 388 F.3d at 569, and again this Court need not address sub-theories and items of evidence one by one once it is already clear there will be a trial on due process claims, see Argument II *supra*.

On the law, Defendants' position that they cannot be liable for fabrication of evidence unless the particular item of evidence fabricated is itself admitted as evidence by the State at the criminal trial fundamentally misunderstands Seventh Circuit law governing fabrication due

55

process claims. An officer who fabricates evidence violates due process if their fabrication causes *any* deprivation of liberty. This is true whatever form the initial fabricated evidence takes (*e.g.*, a false report, a manufactured statement, a fabricated identification, invented physical evidence, or planned testimony, etc.), regardless of the stage of the criminal case at which the fabrication causes a liberty deprivation (*e.g.*, issuance of a warrant, filing of charges, an indictment, a conviction, etc.), and however the evidence comes to impact the criminal proceedings (*e.g.*, introduced as an exhibit, offered as testimony, or used to preclude other evidence from being used in the criminal case).

The question is simply whether the fabrication caused a deprivation of liberty. As the Seventh Circuit put it in *Whitlock v. Brueggemann*, "We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty *in some way*." 682 F.3d at 580 (emphasis added). The cases unanimously hold that due process is violated when fabricated evidence causes a liberty deprivation at any stage of the criminal proceedings, even when the initial fabrication is not admitted in its original form in those proceedings. *See*, *e.g.*, *Patrick v. City of Chicago*, 974 F.3d 824, 835-36 (7th Cir. 2020) (affirming a due process fabrication verdict against multiple defendants where a plaintiff's coerced confession and a fabricated lineup report were introduced at the criminal trial in the form of oral testimony); *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) (holding that summary judgment not available where police officer fabricated witness statements before trial and then instructed witnesses to testify consistent with those fabricated statements at trial); *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017) (due process violated when fabricated confession of the plaintiff was introduced at trial through police testimony); *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (*en banc*) (due process violated

when police collude with a witness to fabricate expert testimony before a criminal trial and the fabrication is later introduced as trial testimony); *Whitlock*, 682 F.3d at 582-84 (due process violated when witness testimony fabricated by police before trial is introduced at trial by an immune prosecutor).[6]

Fabricated evidence violates due process when it is admitted as evidence, when it comes in at trial through the testimony of police or witnesses, where it used to affect the outcome of the criminal case, or where it "furthered the prosecution" in any other way. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018).; *see also Avery*, 847 F.3d at 441 (recognizing that evidence often comes in at trial through oral testimony, and rejecting the proposition that witness testimonial immunity renders a state actor not liable for a pre-trial act of fabrication). Accordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial in its original form.

On the facts, there is ample evidence that the Guevara false lineup report was used to deprive Johnson of his liberty during the criminal proceedings. A trial is required to resolve these disputes. *Washington*, 2022 WL 4599708, at *21 (where arguments about the use of fabricated evidence involve disputes of fact about the effect of evidence on a criminal case, a trial is necessary). First and foremost, the report was admitted as evidence at trial, while Guevara was testifying on the stand, PSOF ¶¶250, and so Defendants' argument that it was not introduced as evidence is factually incorrect. Even if it were not, the Guevara false lineup report need not itself

---

[6] In addition, the Supreme Court implicitly rejected Defendants' myopic view of a fabricated evidence claim in both *Buckley v. Fitzsimmons*, which approved a fabrication claim where physical evidence of a boot print was fabricated before trial and then introduced through the testimony of a witness at trial. 509 U.S. 259, 262-64 (1993), and more recently in *McDonough v. Smith*, where the Court recognized that a claim that falsified affidavits, witness coaching, and a bogus DNA analysis fabricated before trial violated the Constitution when that evidence was later introduced though witness testimony. 139 S. Ct. 2149, 2154 (2019).

have been introduced as an exhibit at trial, because its contents were introduced through the testimony of Guevara and Daley, who testified to the contents of the fabricated report: that Johns had not been identified by anyone in the lineup on the night of the shooting. PSOF ¶¶242-243. This is enough to demonstrate that the report violated Johnson's due process rights. *Taylor v. City of Chicago*, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021) ("Although the report itself was not admitted into evidence, as the Court has previously noted, the contents of the fabricated report certainly were.").[7] But in addition, the report was admitted as evidence at trial, while Guevara was testifying on the stand, PSOF ¶250, and so Defendants' argument that it was not introduced as evidence is factually incorrect.[8]

That is enough to dispose of Defendants' argument, without even considering the many other ways that Defendants' false reports led to a detention without any legal basis, false charges, and ultimately a wrongful conviction. A jury must consider the claim that Defendants' pre-trial fabrication of the false Guevara lineup report violated Johnson's due process rights when the fabrications outlined in those reports were used against Johnson during his criminal proceedings.[9]

---

[7] Defendants rightly do not raise any argument for testimonial immunity in their summary judgment briefs. Testimonial immunity does not extend to pre-trial acts of fabrication that are then presented by way of testimony at trial. *Rehberg v. Paulk*, 566 U.S. 356, 370 n.1; *Avery*, 847 F.3d at 441-42 (an officer cannot immunize himself simply by testifying about his false evidence at trial and noting that "[i]f an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false 'facts' in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter.").

[8] The fact that Guevara was called and crossed by the defense makes no difference to the due process analysis. The due process prohibition on the State's use of fabricated evidence at trial applies to all witnesses, whoever examines them. *Avery*, 847 F.3d at 439 ("Falsified evidence will never help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process.").

[9] Halvorsen, Daley, and Healey contend in a conclusory paragraph that they cannot be liable for this fabricated report because they did not create it. OB-16. Factual disputes preclude this argument: Healey signed the report in question as supervisor, PSOF ¶¶280-281; the report was created at the conclusion of the investigation, when Halvorsen was intimately involved, and backdated, to cover up the Johns identification, PSOF ¶¶60-61, 261-263; and Daley knew Johns had been selected from the lineup, he had access to the file in which the false report was kept, he wrote a similar false report himself, and he testified consistent with false report at trial, PSOF ¶¶242, 273, 275.

\* \* \*

All of Defendants' fabricated evidence outlined above was used to deprive Johnson of his liberty. Indeed, all of the evidence that ever implicated Johnson in the Fred and Ortiz shootings was created by the Defendants. To the extent Defendants disagree, it is because there are genuine disputes of fact. Summary judgment on Johnson's fabrication theories should be denied.

**B.      Independently, A Reasonable Jury Could Conclude That Defendants Suppressed Material Exculpatory and Impeachment Evidence**

This Court should also deny summary judgment on Johnson's evidence suppression due process theories. *Brady* requires that exculpatory and impeachment evidence material to the criminal case be disclosed to the prosecution and defense, "[a]nd police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors[.]" *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011); *see also Kyles v. Whitley*, 514 U.S. 419, 438 (1995). The Seventh Circuit has long recognized that section 1983 due process claims may be brought against police who withhold evidence, causing wrongful convictions. *Whitlock*, 682 F.3d at 572; *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).

The Supreme Court holds that "[e]vidence qualifies as material when there is '"any reasonable likelihood"' it could have '"affected the judgment of the jury."'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959)). A litigant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citing *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)); *see also Kyles*, 514 U.S. at 434.

The question whether suppressed evidence was material must be answered considering all of the suppressed evidence together in the aggregate, and not by assessing evidence piece by piece. *Wearry*, 577 U.S. at 394. Whether evidence is material also depends on the strength of other evidence used in the criminal proceedings—it might take only a little evidence to disturb an already-weak conviction. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

A group of defendants who each suppress different items of evidence that are material, considered in the aggregate, are each liable for the resulting due process violation, even if one defendant may have an argument that the item of evidence they suppressed was not material standing alone. *Goudy*, 922 F.3d at 843 ("[A]ll defendants who can be shown to have suppressed evidence in violation of *Brady* . . . should be liable for the aggregate impact on the outcome of the trial [the plaintiff] ultimately received.") (internal quotations and citations omitted).

It is firmly established that evidence that would impeach a key witness is material. *Giglio*, 405 U.S. at 153-54; *see also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness material when eyewitness was the only evidence connecting defendant to the crime); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense."); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred").

The case against Johnson could not have been thinner. There was no evidence implicating him other than the fabricated evidence discussed above. Any one of the pieces of exculpatory evidence suppressed by Defendants would have undermined confidence in his prosecution and

conviction. Any piece of it would have impeached key witnesses at trial—the eyewitnesses and the Defendant Officers. When the suppressed evidence is considered collectively, there is no chance any Defendant is entitled to summary judgment on the suppression claim.

### 1. Defendants Suppressed Their Own Fabrications

The Defendant Officers suppressed that they had fabricated the false evidence discussed in the previous section. *See* Argument IV(A) *supra*. Had the Defendants disclosed that they had fabricated this evidence incriminating Johnson, it would have immediately halted the criminal prosecution and conclusively shown Johnson's innocence. The suppression of the fact that items of incriminating evidence were invented by police is precisely the sort of impeachment evidence that is material as a matter of law, within the meaning of *United States v. Bagley*, 473 U.S. 667, 676 (1985), and *Giglio*, 405 U.S. at 154-55. It could have been used to cross-examine literally every state's witness at trial, including the Burgoses, as well as Guevara and Daley, in a manner that would have left the State without any evidence to prosecute or convict. *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05.

A jury must decide whether Defendants are liable for suppressing the material exculpatory and impeachment information relating to their fabrications of false evidence. The record construed for Johnson would permit a reasonable juror to decide that Defendants are liable because they did not disclose to state prosecutors, to Johnson, or to his criminal defense attorneys that they had fabricated the July 22 live lineup identifications of Johnson by Ricardo Burgos, Elba Burgos, and Rosa Burgos or the July photo identification by Elba Burgos, which would have immediately halted the criminal prosecution. PSOF ¶¶88-92, 105-120, 147-155, 193-198, 200, 204, 207-210. Or that Ricardo Burgos had not made a photo identification of Johnson, which would have impeached both Ricardo and Guevara at trial. PSOF ¶¶130-135, 154, 204. Or that Elba Burgos had

not followed the shooter through the neighborhood, which would have undermined her identification and impeached Guevara at trial. PSOF ¶102. Or that the Defendants had fabricated false police reports saying that Johns had not been identified, which would have impeached Defendants' entire investigation at trial. PSOF ¶¶53-66, 250, 263, 271, 275. The list of ways that disclosing Defendants' fabrications would have been exculpatory and impeaching goes on and on.

The disclosure of any one piece of this evidence would have been material to Johnson's criminal case, within the meaning of *Brady*, and collectively this evidence was certainly material. *Goudy*, 922 F.3d at 843. Just as none of Defendants is entitled to summary judgment on Johnson's fabrication theories, none is entitled to summary judgment on his suppression theories. Defendants' suppression of their own fabrications is enough for Johnson's suppression claims to survive summary judgment, without the need for the Court to consider other suppression theories. See Argument II *supra*.

### (a) Defendants' Position That Suppressions of Fabricated Evidence Cannot Violate Due Process Is Wrong

Defendants incorrectly assert that facts giving rise to a due process fabrication claim cannot also give rise to a due process suppression claim. OB-27-28. This made-up legal rule has no support in the law and Defendants cite none. Contrary to Defendants' position, the Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim. The *en banc* Seventh Circuit in *Stinson* endorsed due process claims brought against defendants who violated due process by "(1) fabricating the principal evidence of [the plaintiff]'s guilt (the opinions that his detention matched the bite marks on [the victim]), and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence." 868 F.3d at 524-25. Similarly, *Avery* explained that a claim regarding fabricated informant

statements used in a criminal case gave rise not only to a fabrication due process theory but also a *Brady* theory because, although the plaintiff "knew that the informants' statements were false, . . . he did *not* know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." 847 F.3d at 443-44. In *Engel v. Buchan*, the Court recognized a *Bivens* claim where "[the plaintiff] claim[ed] that [the defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*." 710 F.3d 698, 699 (7th Cir. 2013). And in *Lewis v. City of Chicago*, the court said expressly that when fabricated evidence causes a conviction, it gives rise to liability for a due process violation for fabrication of evidence, and that "misconduct of this type that results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication." 914 F.3d 472, 480 (7th Cir. 2019).

Consider how illogical Defendants' proposed rule would be. According to Defendants, a police officer could beat a witness until he agreed to provide a false manufactured statement implicating a criminal defendant, and though the fabricated statement might violate the criminal defendant's due process rights, the police officer is under no *Brady* obligation to disclose that he beat the witness. Or an officer could plant a criminal defendant's blood on an item of physical evidence found at the scene to connect the defendant falsely to a crime, violating due process, but the state would face no obligation under *Brady* to disclose that the item of evidence contained no blood at the time it was collected from the scene. The suggestion that such suppressions do not violate the Constitution is patently absurd. The *Brady* case line is not a hyper-technical system of disclosure rules. Instead, the Supreme Court has for decades made clear that *Brady* imposes an affirmative duty on the government "to learn of any favorable evidence known to the others acting

63

on the government's behalf in the case, including the police," and then to disclose all of that exculpatory and impeachment evidence, even if it has not been requested, if the evidence considered collectively had a reasonable probability of impacting the criminal case. *Kyles*, 514 U.S. at 432-38. This Court should reject Defendants' novel new legal rule.

### (b) *Gauger*'s Rule Regarding Suppressions Relating to False Confessions Cannot Apply To This Case

Because the argument Defendants make has sown some confusion in cases decided by courts in this Circuit, it is worth explaining a bit more why the cases Defendants rely upon do not apply in the context presented by Johnson's case. In support of their argument, Defendants cite to *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), part of the line of Seventh Circuit cases that started with *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003), which hold that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant that results in a false confession because, according to these cases, the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. The logic of these decisions is that police are not required to turn over evidence already known to the criminal defendant because that evidence has not been "suppressed" within the meaning of *Brady*.

This is not a false confession case, and the Seventh Circuit has emphasized that *Gauger*'s logic does not extend to the type of evidence suppression claims presented here. In *Avery*, the Court held that *Gauger*'s rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. There, the Court confronted the situation where police fabricated witness statements to implicate a plaintiff at his criminal trial, causing his wrongful conviction. *Id.* Though the plaintiff

64

all along knew those statements were false, given their very nature, the Court held that *Gauger* did not apply, and that the police had an obligation to disclose and could not remain silent about how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Avery*, 847 F.3d at 443-44. Put simply, where the police know of evidence that the criminal defendant does not, including evidence that might impeach a third-party witness or police officer who testifies falsely, that evidence must be turned over and *Gauger* does not apply, even though the criminal well knows that the evidence used against him is false. *Avery*, 847 F.3d at 443-44.

Applying this rule, this Court and others have limited *Gauger* to the context of cases where police interrogate and coerce a confession from a criminal defendant, and the criminal defendant then contends that the police should have disclosed the circumstances of the interrogation and false confession, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *22 (N.D. Ill. Jan. 24, 2024), and they have not applied the same rule in cases, like this one, where police have suppressed the true circumstances of their own conduct and their interactions with third-party witnesses who inculpate the suspect, *Smith v. Burge*, 222 F. Supp. 3d 669, 680 (N.D. Ill. 2016) ("Courts in this district have concluded that similar allegations state a *Brady* claim based on events that transpired outside of the interrogation room.").

The *Gauger* rule has no application to any of the claims or theories in this case. Consider the Burgos's false identifications. Johnson obviously knew that statement was false because he had not committed the crime. But he did not have the evidence he needed to impeach the Defendants' fabricated identifications. This is precisely what happened in *Avery*, where the criminal defendant knew that the witnesses' statements were false, and the police suppressed information about how they had obtained those false statements, which the defendant could have

65

used to impeach the witnesses at trial. 847 F.3d at 443-44. Moreover, the Seventh Circuit held recently in *Camm* that a police officer's lie about evidence in an investigation is itself actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d at 1110.

Given these cases, there is no argument that Defendants can escape liability on *Brady* claim merely because Johnson knew the evidence they had fabricated was false. The *Gauger* rule should not be overread in a way that eliminates the meritorious *Brady* claims in this case in advance of trial. This Court should reject the application of the *Gauger* rule in this case, as *Avery* instructs.

### 2. Defendants Suppressed Many Items of Evidence Independent of Their Fabrications, Which They Do Not Address In Their Motions

But Johnson's evidence suppression claim is not based solely on the suppression of Defendants' fabrications, because Defendants suppressed many other items of material exculpatory and impeachment evidence. Summary judgment independently should be denied based on these other suppression theories.

### (a) Defendants Forfeit Any Argument On These Theories

Importantly, Defendants fail to move for summary judgment on all but one of Johnson's evidence suppression theories. Their motions focus exclusively on one piece of evidence: the suppressed Erickson report. OB-28-31; GB-3. Daley, Halvorsen, and Healey argue they were unaware of the Erickson report, OB-28-29; Erickson argues he cannot be responsible for failing to turn over that report to prosecutors because he retired, OB-29-31; and all Defendants argue

Johnson and his attorneys knew of or could have discovered all of the information in the Erickson report, OB-31; GB-3. Other than those arguments, Defendants amorphously suggest that Johnson cannot contend that undefined reports and documents give rise to a *Brady* claim. OB-31-33. They do not make another argument of any kind about any other item of suppressed evidence, who was involved in the suppression, or whether it was material to Johnson's criminal proceedings. See OB-28-33.

As a result, Defendants forfeit any argument for summary judgment on other items of evidence that they suppressed, which are discussed in this section. It is not this Court's job or Johnson's job to construct and then defeat arguments at summary judgment. *Titran*, 893 F.2d at 148 ("[T]he number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Instead, it is Defendants' burden at this stage to show that there is no dispute of fact on which a jury could decide they suppressed material exculpatory evidence. *Sterk*, 770 F.3d at 627. If they cannot do so, they are not entitled to summary judgment on this claim, *Adickes*, 398 U.S. at 160, and this Court need not address their arguments to deny summary judgment, see Argument II *supra*; *Goudy*, 922 F.3d at 844. This Court should enforce the forfeiture and hold that summary judgment can be denied based on the theories discussed directly below, on which Defendants have not moved for summary judgment. The Court should not accept new arguments in reply. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue raised in a reply).

**(b) Guevara, Halvorsen, and Erickson Suppressed Evidence Undermining the Burgos Identifications**

Defendants suppressed ample evidence about their interactions with the Burgoses that undermined the Burgos identifications. As discussed, Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-28-33, and thus have forfeited any argument on it, *Smith*, 388 F.3d at 569. In particular, Guevara and Halvorsen suppressed that Ricardo Burgos told them he had not seen the shooter's face and could not identify the shooter. PSOF ¶¶127-28. Guevara and Erickson suppressed that Rosa Burgos told them that the shooting had happened so fast she could not tell who the shooter was, and therefore could not make an identification. PSOF ¶¶138, 20 (Guevara and Erickson at Area Five conducting lineup with Rosa on night of shooting, when Rosa was interviewed). Guevara and Halvorsen suppressed what information caused them to identify Elba Burgos weeks after the shooting. PSOF ¶¶93, 121. Defendants Guevara and Erickson suppressed his interviews with Rosa Burgos, Fina Montanez and Stanley Jewell on the night of the crime. PSOF ¶¶20. Guevara suppressed that Ricardo Burgos selected a different suspect during a photo identification procedure conducted in June 1991, before Demetrius Johnson was a suspect. PSOF ¶¶133-135. And Guevara and Halvorsen suppressed that they pointed out Darrell's Johnson's photo to Elba Burgos in the first identification procedure conducted with her. PSOF ¶109.

Critically, Guevara and Halvorsen also suppressed that during the July 22 live lineup they told Rosa Burgos "who are you going to pick," suggesting that she had to pick someone, and that Rosa told them she was not sure who the shooter was. And they suppressed the critical information that Rosa Burgos in fact did not positively identify Johnson as the shooter in the July 22 lineup—

instead, she told them that Johnson resembled the shooter, not that he was the shooter. PSOF ¶¶149-150.

The evidence Defendants possessed about their interactions with the Burgoses was both exculpatory because it exonerated Johnson, and it could have been used to impeach these eyewitnesses, as well as Guevara and Daley, and all other evidence and testimony about Johnson's guilt in the criminal case. The Supreme Court and Seventh Circuit have reaffirmed that suppression of evidence that would impeach a key third-party witness violates due process in countless cases. See *Wearry*, 577 U.S. at 392-96 (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith*, 565 U.S. at 74-75 (police records of statements by witness that contradicted that witness's later identification of the defendant at trial were material); *Kyles*, 514 U.S. at 441-42 (contemporaneous witness statement, in which he described the perpetrator differently than the way the suspect looked); *Bagley*, 473 U.S. at 683-84 (evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material); *Anderson v. City of Rockford*, 932 F.3d 494, 507 (7th Cir. 2019) ("Due process entitled the plaintiffs to learn before their trial" that witness's statement "was the product of police coercion or fabrication"); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (affirming judgment where police officers were held liable "under the due process clause because they concealed exculpatory evidence—the details of how they induced the witnesses to finger [plaintiff]"); *Jones*, 856 F.2d 985; *Whitlock*, 682 F.3d at 574.

Moreover, this evidence impeached not only the testimony of the Burgoses, but also the Defendants—Guevara and Daley—who interacted with the Burgoses as well. The Seventh Circuit held in *Camm v. Faith*, that a police officer's lie about evidence in an investigation is itself

69

actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt." 937 F.3d 1096, 1110 (7th Cir. 2019).

A reasonable jury could conclude based on any one piece of this evidence that Defendants knew that their eyewitnesses could not identify the perpetrator. It is hard to conceive of more powerful impeachment evidence in a case that turned on identifications from three eyewitnesses than testimony that one did not actually identify the criminal defendant and two of them told the police they could not identify the perpetrator. Defendants cannot dispute these facts at this stage. This suppressed evidence was, without question, material. *Jones*, 856 F.2d 985 (affirming a due process verdict in a case with nearly the same fact pattern); *Whitlock*, 682 F.3d at 574 (affirming denial of summary judgment in similar circumstances).

### (c) Guevara, Halvorsen, and Daley Suppressed That the Decided Johnson Was Their Suspect Before There Was Any Evidence Implicating Him

Guevara, Halvorsen, and Daley also suppressed the fact that Johnson was their suspect before any witness identified him or any evidence implicated him. This is another profound suppression in this case. Again, Defendants do not discuss this *Brady* theory at all in their summary judgment motion, OB-28-33, and thus have forfeited the issue, *Smith*, 388 F.3d at 569.

Defendants had no evidence at all implicating Johnson at any point following the crime or initial investigation. In fact, after Johns was identified on the night of the crime and Defendants let him go, there was no evidence developed in the case for more than five weeks that even hinted that Demetrius Johnson was a suspect. PSOF ¶¶105-111.

70

Instead, on June 15, 1991, Defendants decided that Derrell Johnson, Demetrius's brother, was their suspect, and his photograph was pulled from the identification section of the Chicago Police Department. PSOF ¶108. That information remained in Chicago police files until civil discovery in this case. After receiving the photo, Guevara and Halvorsen put together a photo array, which they conducted with Elba Burgos on July 11. PSOF ¶¶100, 105. During the array, Guevara pointed out Darrell's photo to Elba and asked if Darrell had committed the crime, but Elba responded that the perpetrator had been younger. PSOF ¶¶109-110.

Instead of evaluating the evidence and investigating new subjects, Guevara, Halvorsen, and Daley simply decided to swap in Demetrius Johnson, Darrell's younger brother, as their suspect. PSOF ¶¶111. There is nothing in the summary judgment record that suggests an evidence-based reason to suspect Demetrius Johnson, and Demetrius is fully entitled to the inference at this stage of the case that this sequence of events demonstrates that Defendants decided he was a suspect first and created evidence to implicate him second. That information was never turned over to prosecutors, Johnson, or his defense attorneys.

This is far from the only Guevara case in which Guevara and others decided on a suspect first, pulled that suspect's rap sheet, and then suppressed the rap sheet showing what they had done. In fact, it is quite a common and disturbing pattern for these Defendants. In the cases of Jacques Rivera and Jose Montanez, both resulting in exonerations, Defendant Guevara and other Area 5 detectives requested their rap sheets before any witness had provided evidence making them a suspect. PSOF ¶¶352, 492(i). So too in the case of Geraldo Iglesias. *See Iglesias v. Guevara*, No. 1-cv-6508 (N.D. Ill.), at Dkt. 278, PageID# 94954-55.

If Johnson could have told the criminal court that Defendants had chosen him as their suspect before any evidence existed, it would have exonerated him immediately, and it would have

impeached the State's entire case. Particularly so if Defendants had disclosed that they had done this in multiple cases.

### (d) Guevara and Halvorsen Suppressed Their Investigation of Alternative Suspect Robert Weeks

Guevara and Halvorsen also suppressed their investigation into alternative suspect Robert Weeks, including their interview of him. PSOF ¶¶177-182, 213. There is no discussion of this theory in Defendants' motion, OB-34-41, which forfeits the issue, *Smith*, 388 F.3d at 569.

On June 29, 1991, before Defendants had decided on Demetrius Johnson as a suspect, a witness to the Fred murder named Juan Lopez called the Chicago Police Department, and informed officers that he had seen the shooting occur and had followed the shooter to an apartment located above a tire shop at LeMoyne and Western (which was the direction the shooter had run after the shooting). PSOF ¶177. That same day, the same officers arrested Robert Weeks for disorderly conduct, and they noticed that he matched the description of the suspect wanted for the Fred homicide. PSOF ¶¶178-179. Following up, they discovered that Weeks often went to an apartment above the tire shop at LeMoyne and Western. PSOF ¶180. Understanding that they had developed a strong lead pointing to a potential suspect in the Fred murder, the officers handed over this information to Halvorsen, who came to the Fourteenth District and took over the investigation. PSOF ¶181. Halvorsen and Guevara investigated Weeks and they interviewed him at least once, but there is no record of their investigation or interview in the police files produced in this case, and no such information was disclosed to prosecutors, Johnson, or his defense attorneys. PSOF ¶¶182, 213. Johnson is entitled to the inference based on the above evidence that the information Guevara and Halvorsen learned about Weeks exculpated Johnson, possibly by inculpating

Weeks—if it had not, there was no reason that Guevara and Halvorsen would not have documented it in the file.

Information implicating an alternative suspect is material within the meaning of *Brady* as a matter of law. See, e.g., *Kyles v. Whitley*, 514 U.S. 419, 441-42 (1995) (undisclosed contradictory statements by a key witness that pointed to alternative suspect were material); *Goudy v. Cummings*, 922 F.3d 834, 842-43 (7th Cir. 2019) (videotape of lineup in which witnesses identified alternative suspect "alone [was] enough" for jury to find materiality); *Beaman v. Freesmeyer*, 776 F.3d 500, 508 (7th Cir. 2015) (evidence was material because it presented a viable alternative suspect); *Goudy v. Basinger*, 604 F.3d 394, 400–01 (7th Cir. 2010) (evidence inculpating another suspect was material, even when that evidence did not necessarily point to the defendant's innocence). Defendants are not entitled to summary judgment on this theory.

### (e) Guevara and Halvorsen Suppressed that Johns Was A Cooperating Witness In Another Case

Guevara and Guevara suppressed that Johns was a cooperating witness participating in another case they were investigating at Area Five, and they suppressed that this was the reason Johns was released after being identified in a lineup on the night of the murder. While Defendants do move for summary judgment on their suppression of the Erickson report, they do not discuss anywhere in their motions their suppression of the evidence that Johns was a cooperator, OB-28-33, which would give rise to a *Brady* theory independently, and they thus forfeit the issue, *Smith*, 388 F.3d at 569.

Evidence revealed by the City during discovery in the Guevara cases reveals that a month after Johns was released on the night of June 12-13, 1991, he testified in the prosecution of a man named Jose Baez for the murder of Ramon Pagan. PSOF ¶86. The shooting of Pagan had occurred

on June 10, 1990, and Halvorsen had arrested Baez for that murder. PSOF ¶85. Halvorsen put Baez in a lineup, in which Johns identified him as a witness, which led to the murder charges against Baez. PSOF ¶85. In that case, Halvorsen obtained an identification from Johns, even though Johns had never been listed as a witness on any of the initial Pagan homicide investigation police reports. PSOF ¶85. Halvorsen testified during the Pagan homicide trial about Bryan Johns's identification of Baez, as did Johns. PSOF ¶86. When asked in his deposition whether Johns was a cooperating witness who he and Halvorsen were protecting at the time of the Fred homicide, Guevara asserted his Fifth Amendment rights. PSOF ¶84. Had Guevara and Halvorsen charged Johns with the Fred murder following his identification, it would have jeopardized their cooperating witness in the ongoing Pagan murder investigation, and by releasing Johns they preserved that investigation. None of this information was turned over prior to this civil case. PSOF ¶87.

This evidence could have been used to implicate Johns, the real killer, to exculpate Johnson and support his defense, and to impeach the police account of the investigation. Indeed, one of the key missing pieces of evidence for Johnson's defense was an answer to the question: Why would the police have released Johns if he had been identified as a murderer? The answer was that they had a relationship Johns they needed to preserve, and they hid that information from sight. This information implicating the true killer in a conspiracy with the police was unquestionably material. *Kyles*, 514 U.S. at 441–42 (1995); *Camm*, 937 F.3d at, 1110; *Goudy*, 922 F.3d at 842-43; *Beaman*, 776 F.3d at 508.

### (f) Defendants Suppressed Their Own Pattern of Misconduct

Last but not least, as described below in great detail, by the time of Johnson's criminal trial Guevara had been involved in a number of cases where he fabricated and suppressed evidence, coerced false statements from witnesses and suspects, obtained false identifications using

74

suggestive procedures, and wrote false police reports. *See* Argument V(E)(1) *infra*; see also PSOF ¶¶489-493. Defendants did not disclose any of this pattern of extreme police misconduct by the officers who investigated Johnson to prosecutors or defense attorneys. The suppression of this other misconduct, which could have been used to impeach Guevara and others on the stand, is also a violation of *Brady. Thompson v. City of Chicago*, 722 F.3d 963, 972 (7th Cir. 2013). As with all of the suppression theories just discussed, Defendants do not address this theory in their motion, OB-28-33, forfeiting the issue, *Smith*, 388 F.3d at 569.

* * *

Each of the suppression theories above are not addressed by Defendants Officers in their motions for summary judgment. Accordingly, Defendant Officers have not met their burden of production or persuasion to show that summary judgment is warranted on these theories. Once the Court has concluded that these theories will go to trial, it can deny summary judgment and move on, without addressing Defendants arguments about particular items of evidence they suppressed.

### 3. Defendants' Arguments About Their Suppression of the Johns Identifications Lack Merit

With respect to the suppressed evidence Defendants do actually discuss in their motion, Defendants' arguments for summary judgment depend on a version of the facts skewed in their own favor and legal arguments that are contrary to law. OB-28-33. This Court should reject Defendants' arguments.

### (a) Defendants Suppressed Multiple Pieces of Evidence That Eyewitnesses Selected Bryan Johns In A Live Lineup On the Night of the Crime

Defendants suppressed evidence that eyewitnesses selected Bryan Johns during a live lineup on the night of the crime. This theory encompasses the suppression of multiple items of evidence. First, Guevara, Erickson, and Daley participated in the identification procedure with

75

Johns on the night of June 12-13, 1991, during which three eyewitnesses identified Johns as the shooter, these Defendants told the witnesses they had selected the wrong person, Johns was released, and these witnesses later wrote false reports stating that Johns had not been identified in the lineup procedure. PSOF ¶¶37, 53-66. Second, Erickson documented this identification of Johns in a lineup supplementary report, which was made part of the investigative file available in the Sergeant's office, but was not sent to central records, to prosecutors, or to Johnson or his attorneys (the Erickson report). PSOF ¶¶38-42, 67-81, 206, 218-223, 231-236. That report documented that key eyewitness Aby Gonzalez, who was closest to the shooter at the scene, selected Johns as the shooter, and it documented that eyewitnesses Forrest Garnett, Rosa Burgos, Rosaline Morales, Angel Cordova, and Fina Montanez also participated in the identification procedure. PSOF ¶¶38-41.

Importantly, none of the Defendant Officers contends in their motions that they turned this evidence over to prosecutors, to Johnson, or to Johnson's criminal defense attorneys. OB-28-31. Such an argument would be meritless. Ample record evidence, including unequivocal sworn testimony from the lead prosecutor on the case and Johnson's defense attorneys, establishes that Defendants did not turn this evidence over. PSOF ¶¶74-75, 206, 218-223, 231-236. Indeed, as discussed above, Defendants did not simply fail to disclose this evidence, they created false evidence and testified falsely to prevent the discovery of this evidence, and they suppressed evidence that Johns was their cooperator to cover their tracks.

Nor do Defendants contend that this evidence was immaterial to Johnson's criminal case, which would be similarly meritless. As discussed already, alternative suspect evidence is material as a matter of law. *Kyles*, 514 U.S. at 441–42 (1995); *Camm*, 937 F.3d at, 1110; *Goudy*, 922 F.3d at 842-43; *Beaman*, 776 F.3d at 508. Particularly when eyewitnesses have identified the police's

immediate suspect as the real killer, and police have let that suspect go for nefarious purposes. There can be no reasonable argument on materiality, and certainly not at summary judgment.

### (b) Halvorsen, Daley, Erickson, and Healey Knew of and Did Not Disclose This Evidence

Instead, all Defendant Officers but Guevara contend that they either did not know about this evidence or did not have the opportunity to disclose it. OB-28-31. This argument can be easily dismissed. Daley and Erickson participated in the identification procedure on the night of the crime when Johns was identified. PSOF ¶¶40, 42, 268-69, 273-75.[10] Erickson wrote a report on the identification and placed it in the investigative file, but did not submit it for approval or placement in the permanent retention file, as CPD policy required. PSOF ¶¶42, 67-68, 270-271. During their work on the Fred murder investigation, each one of these Defendants had access to the investigative file sitting in the Sergeant's office, which contained the Erickson report, starting on June 13, 1991; but it was not produced until *Rivera*, many decades after Johnson's prosecution. PSOF ¶69. At a very minimum, Johnson is entitled to the inference that the investigating officers knew the evidence in their own file. Thus, all of the Defendant Officers saw the Erickson report in the file.

None of these Defendants did anything to disclose the Erickson report or any other evidence. All of them knew how to ensure that evidence was disclosed to the criminal justice system—each of them submitted or approved reports that were immediately sent to central records and made part of the permanent retention file that was produced in Johnson's case. Erickson and Guevara wrote the false lineup report saying Johns had not been identified and immediately

---

[10] Daley identified Johns as the suspect, arrested him, brought him to Area Five for the lineup, falsely reported the result of the lineup right after it occurred, and testified consistent with his false report about the lineup at Johnson's trial. PSOF ¶¶24-30, 64, 242. He cannot possibly contend that he had no knowledge of the identification procedure and its results.

submitted it to central records. Ex. 34. Daley wrote a report on June 13 saying Johns had not been identified and immediately submitted it to central records. Ex. 19. Multiple of Halvorsen's reports were submitted to central records. Ex. 51; Ex. 6. Indeed, Halvorsen was even asked to bring the whole file to court and didn't. PSOF ¶¶70-71. Part of Healey's job was to ensure "every aspect of a homicide investigation is monitored" and to ensure that reports were submitted for approval and made it to central records. PSOF ¶¶48, 61, 259, 279, 282. The argument that these Defendants were incompetent to transmit a report to the criminal justice system—but only in the case of the Erickson report—should be rejected.[11]

Moreover, Halvorsen, Daley, Erickson, and Healey all did the opposite of disclosing the Johns evidence—they wrote and approved false reports covering up the existence of that evidence. Daley's June 13 report covered it up. PSOF ¶64. So did Erickson and Guevara's backdated report, which was created after Guevara and Halvorsen finished their investigation, and which was approved by Healey. PSOF ¶¶53, 60-64. Halvorsen was expressly instructed by ASA Sheehan to bring the entire CPD file to the prosecutor to be reviewed, but did not tender the Erickson report. PSOF ¶¶70, 75. The evidence that these Defendants participated in a cover up fatally undermines their argument that they are entitled to summary judgment because of lack of involvement.

---

[11] Erickson makes much of the fact that he retired in August 1991, before Johnson's trial. OB-29-31. It is irrelevant. Erickson knew material exculpatory information and had an obligation to disclose. PSOF ¶¶38-42, 268-271. Some of that information he knew about but did not report. PSOF ¶269. Other information he wrote down but did not disclose to central records. PSOF ¶270. He was easily able to disclose other documents, including the false Guevara lineup report, to central records before his retirement, and he should have done so with the Erickson report as well. PSOF ¶¶60-62, 64, 67-69. One Defendant who does not comply with Brady obligations cannot point to another who does not and assert that he thought the other one would.

### (c) Defendants Are Not Entitled to Summary Judgment on Their Arguments That Johnson and His Attorneys Possessed of Should Have Discovered Their Suppressed Johns Evidence

Defendants also contend that Johnson knew of all of the information in the suppressed Erickson report, or that Johnson's attorneys should have discovered that information. Their argument occupies a paragraph and four or five sentences of substance in the individual Defendants' brief. See OB-31. As a preliminary matter, Defendants' arguments are fatally undeveloped, and this Court should be strict in not even entertaining these undeveloped arguments. *Wehrs v. Wells*, 688 F.3d 886, 891 n.2 (7th Cir. 2012).[12] In addition, Defendants' contention would be a *defense* at trial, and Defendants in their cursory arguments are far from meeting the heavy burden of establishing that all elements of the defenses are established by unrebutted evidence. *Ocean Tomo, LLC v. Barney*, 133 F. Supp. 3d 1107, 1114 (N.D. Ill. 2015).

If the Court addresses the merits, the record demonstrates that Defendants are factually incorrect, though this Court need only conclude at this stage that there is a dispute of fact. Defendants note that Johnson was told by Johns that Johns had committed the Fred murder and had been identified in a lineup. OB-8. That is true. PSOF ¶46. Johnson and his attorneys strenuously attempted to defend Johnson with this information, pursuing a theory at trial that Johns was the true perpetrator.

But Johnson and his attorneys failed because they did not have all of the information that Defendants were hiding: they did not know that Guevara, Erickson, and Daley had conducted the lineup; they did not know that three eyewitnesses had identified Johns as the shooter; they did not

---

[12] It is an extreme burden responding to a summary judgment motion where moving parties make hundreds of assertions in single sentences, without any analysis, and the nonmoving party has to expend multiple paragraphs responding to each. Johnson has done his best in this response to address all of Defendants contentions as efficiently as possible. But Defendants should not be permitted to create this amount of work for the Court and parties with bald assertions.

know that one of the witnesses who had identified Johns was Aby Gonzalez, the eyewitness who had been closest to the shooter; they did not know that eyewitnesses Forrest Garnett, Rosa Burgos, Rosaline Morales, Angel Cordova, and Fina Montanez had viewed the live identification procedure; they did not know that Guevara, Erickson, and Daley had told the witnesses that they had selected the wrong person; they did not know that Guevara and Erickson's disclosed report on the lineup (the false Guevara lineup report), saying Johns had not been identified, was false; they did not know that Daley's disclosed report, saying Johns had not been identified, was false; they did not know that there was a police report written by Guevara and Erickson in the Defendants' investigative file for the Fred murder that firmly corroborated the defense they were attempting to pursue; and they did not know that multiple investigating officers had seen the Erickson report and had not taken steps to send it to central records or to provide it to the prosecution or defense. PSOF ¶¶37-42, 53-81, 224-236; JSOF ¶51-54. Prosecutors did not have any of this information either. PSOF ¶¶75-77, 214-223. As a factual matter, Defendants are incorrect that Johnson possessed the information that they were hiding. Had they disclosed all of this information, Johnson and his attorneys would have easily perfected the defense they were trying in vain to pursue. PSOF ¶¶224-236.

To the extent Defendants are attempting to suggest that Johnson and his attorneys possessed some information they were suppressing and so they did not have to turn over additional evidence, that argument collides with controlling law. Defendants are not permitted to point to evidence in the record and contend that the additional evidence they suppressed was not material and need not have been disclosed. Long before Johnson's conviction, the Supreme Court held that all exculpatory and impeachment information must be disclosed, not just some of it. *Giglio v. United States*, 405 U.S. 150 (1972). Moreover, to show materiality, Johnson need only

"demonstrate that there is a 'reasonable probability' that the result would have been different had the suppressed evidence been put before the jury. . . . [T]he reasonable probability standard for materiality . . . is less rigorous than a preponderance of the evidence standard." *Goudy*, 922 F.3d at 842 (cleaned up). Defendants cannot contest that this standard has been met, particularly given the summary judgment standard, which prohibits Defendants from taking the approach that they do here, of construing the record in their own favor and attempting to discount the value of the evidence they suppressed. *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023) ("A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true."). The disclosure of any one part of the Johns evidence would have been material to Johnson's criminal case, within the meaning of *Brady*. The Seventh Circuit reached that conclusion based on much less important evidence in *Camm*, 937 F.3d at 1108. Particularly so considering that the disclosure of this information would have allowed Johnson to support his defense in the criminal case with evidence generated by the investigating officers who were accusing him of misconduct. *Kyles*, 514 U.S. at 441-54 (holding that evidence gathered by the police corroborating the defense must be disclosed). Collectively the Johns evidence was certainly material, particularly when considered in the context of all of the other suppressed items of evidence, which Defendants do not challenge. *Camm*, 937 F.3d at 1109 (citing *Kyles*, 514 U.S. at 436).

To the extent that the Defendants are contending that Johnson's attorneys should have discovered the evidence they were suppressing through the exercise of reasonable diligence, that argument does not pass the straight-face test. Defendants did the opposite of disclose the Johns evidence: they wrote false reports and they testified falsely to ensure the evidence did not come to light. Where police officers take steps to actively suppress evidence by fabricating a false account, they cannot later contend that the evidence was disclosed or should have been discovered. *Banks*

81

*v. Dretke*, 540 U.S. 668, 695 (2004) ("A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system of constitutionally bound to accord defendants due process"). Police officers who lie to perpetuate the suppression of evidence are liable under *Brady* solely on that basis as well. *Camm*, 937 F.3d at 1110 (holding that a *Brady* claim may be based on "exposing the lie" of a police officer, which would have "eroded the jury's trust in both the prosecutor and the lead case investigator").

Even were that not the case, disputes of fact would preclude summary judgment. As in *Jimenez*, "[w]hat was available through reasonable diligence . . . is very much in dispute." 830 F. Supp. 2d at 446. Johnson's attorneys had learned that Johns was not going to cooperate or agree to help Johnson, so Johnson's attorneys went to heroic lengths to learn everything they could about the information detectives had developed during their investigation, including any exculpatory or impeachment evidence regarding Johns. The record shows that defense attorneys tried to get everything they could on Johns. They filed discovery requests and issued multiple subpoenas to get all of the investigative information available in the police files related to the Fred investigation, and they expected and trusted that all such information was being disclosed to them. JSOF ¶¶52-53; PSOF ¶¶225-230. They needed proof, but despite their best efforts they could not get it. JSOF ¶54. But the idea that he should have divined the Johns evidence, even though that information is assiduously omitted from the police reports regarding the investigation, and even though there were fabricated reports negating the Johns evidence, is simply wrong both factually and legally.

Fundamentally, Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and

the Seventh Circuit regards "as untenable a broad rule that any information possessed by *a defense witness* must be considered available to the defense for *Brady* purposes." *Id.* at 740, 743 (emphasis added). The Court observed that such defense witnesses "may be uncooperative or reluctant," it can be difficult to "extract all the favorable evidence a defense witness possesses," and "the defense may have forgotten or inadvertently omitted some important piece of evidence[.]" *Id.* Importantly, this is the view of the Seventh Circuit in the case of a witness *controlled by the defense*. "These concerns have even more weight in a case, like this one, involving information possessed by a *prosecution* witness." *Hampton v. Chicago*, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

As Judge Kennelly observed in *Jimenez*, reasonable diligence would not be a tenable legal rule if courts determined that stories in the minds of prosecution witnesses were discoverable through the exercise of reasonable diligence:

> Defendants' argument seems to assume the existence of a Perry Mason-like world in which prosecution witnesses readily give up impeaching information when interviewed or questioned by defense counsel. Real life does not work that way, or at least the governing legal rule cannot realistically be premised on the assumption that it always works that way. Witnesses coerced or persuaded to testify in a particular way often tend to identify with, and to ally themselves with, their persuaders. A legal rule that assumes that such a witness will readily describe the circumstances of the coercion or persuasion simply because the other side's lawyer asks the witness the right question would defy common sense.

830 F. Supp. 2d at 444-45. And as Judge Dow observed in *Hampton*, in cases where "the evidence that was allegedly withheld was in the minds of the prosecution witnesses, . . . and there is some evidence that the prosecution witnesses provided misleading information about the detectives' use of suggestive identifications with them," summary judgment should not be granted on reasonable diligence grounds. 2017 WL 2985743, at *22.

83

Moreover, Defendants' position that Johnson's attorney could have discovered the Johns evidence they were suppressing is fundamentally inconsistent with the Supreme Court's *Brady* line of cases. The Court in *Strickler v. Greene*, 527 U.S. 263 (1999), imposed a duty on the state to disclose material exculpatory or impeachment evidence, even when there has been no request for that evidence by the accused. Included in that is evidence that would impeach witnesses known by the state. *Giglio*, 405 U.S. 150. For these constitutional rules to have effect, any understanding of reasonable diligence along the lines of the one that Defendants advance in this case must be rejected. Defendants had an obligation under *Brady*, *Giglio*, and *Strickler* to disclose evidence about Johns even without an effort on the part of Johnson and his attorneys to obtain that evidence. That constitutional obligation is in irreconcilable tension with Defendants' proposed legal rule that they were not required to turn over suppressed evidence about their interactions with the real killer because there was some chance that Johnson and his attorneys could have discovered it on their own. As Judge Kennelly put it in *Jimenez*, adopting Defendants' position "would effectively render *Brady* and its progeny, including *Giglio* . . . , a dead letter: if the governing rule is predicated on the assumption that a prosecution witness will, if interviewed by the defense, disclose impeaching information, then the prosecution effectively is relieved of the legal responsibility under *Brady* and *Giglio* to disclose that information." *Jimenez*, 830 F. Supp. 2d at 445; *accord Kluppelberg v. Burge*, No. 13 C 3963, Dkt. 635 at 3 (N.D. Ill. Aug. 4, 2017) (rejecting reasonable diligence defense and concluding that "defense counsel's diligence is irrelevant if the suppressed information was material"). Here there is no support in the record for a conclusion that Johnson's attorney could have discovered what Defendants were hiding, particularly given Defendants' active efforts to suppress the evidence.

### 4. Defendants' Arguments for Summary Judgment On Johnson's Document Suppression Claim Should Be Rejected

Defendant Officers assert that Johnson cannot succeed on a claim that they suppressed documents because, in their view, documents they suppressed and destroyed no longer exist, and so Johnson cannot prove that what was in those documents was exculpatory or impeaching. OB-31-33. This cynical and self-serving argument should be rejected. First, as just discussed, Johnson has pointed to particular exculpatory and impeachment information, and documents suppressing that information, from the Defendants police files that they did not disclose in his case: they suppressed the Erickson report documenting the Johns identification; they suppressed documents showing that they had selected Darrell Johnson a suspect on June 15; and they suppressed documents showing Johns was a cooperating witness in another investigation. Defendants suppressed exculpatory police files, consistent with the City's long standing official policy. See *Jones*, 856 F.2d 985 (noting that suppression of exculpatory evidence in clandestine police files violates due process); see also *Fields v. City of Chicago*, 2014 WL 477394, at *6-7 (N.D. Ill. Feb. 6, 2014) (denying summary judgment on similar claims); Argument V *infra*.

Second, at this stage of the case Defendants are not entitled to the inference in their favor that notes and reports they made during the course of their investigation, and then failed to preserve and place in the investigative file and permanent retention file as required by policy, had no exculpatory or impeachment value. The opposite is true. Construing the record for Johnson, it would be reasonable for a jury to infer that notes and documents that Defendants destroyed or otherwise failed to preserve would have undermined their case. For example, Guevara admits that he took notes of an interview of Elba Burgos, but those notes are not contained in the police file and the prosecution and defense stated on the record at trial that neither side had them. PSOF

¶¶103-104. Given the circumstances related to Elba's identification–*inter alia*, that she had not been identified as a witness for more than a month after the shooting, that she only saw a person running away on the opposite side of the street with a profile view, that she could provide hardly any description of the shooter, that Defendants singled out a photo of Darrell Johnson in an initial photo array but she remained unsure, that the claim that she followed the perpetrator was falsified, PSOF ¶¶93-110–Johnson is entitled to the inference that Defendants notes would have been exculpatory or impeaching.

Likewise, Guevara and Erickson interviewed Rosa Burgos at Area Five on the night of the crime. PSOF ¶20. The evidence also shows that it all happened so fast and she was not sure who the shooter was, PSOF ¶138, which if documented would have severely undermined her fabricated identification. Johnson is entitled to the inference that the suppressed information from this interview of Rosa on the night of the shooting would have been exculpatory or impeaching.

The same is true of Guevara's admission that they interviewed Stanley Jewell and Fina Montanez on the night of the crime, which is corroborated by the fact that they are identified as witnesses on Guevara's June 13 report and Fina viewed the Johns lineup that night. PSOF ¶¶18-21. There is evidence that in fact three identifications of Johns were made that night, and that witnesses had clearly identified Johns by name immediately after the shooting given the simulcast that went out for Bryan Johns by name within minutes of the shooting, PSOF ¶¶24, 37; again, Johnson is entitled to an inference at summary judgment that the information provided in these interviews that went undisclosed would have been impeaching or exculpatory.

Defendants position that they can avoid a trial on whether they suppressed exculpatory evidence because they destroyed that evidence "strains *Brady* to the point of absurdity." *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) ("*Brady* would mean nothing if, . . . a prosecutor could

comply with its command by deliberately destroying exculpatory evidence and then disclosing the fact of destruction to the defense."). Defendants' arguments for summary judgment on Johnson's document-suppression theories should be rejected.

### C. Independently, A Reasonable Jury Could Conclude That Defendants Utilized Unduly Suggestive Lineup Procedures That Tainted Johnson's Criminal Trial

#### 1. Unduly Suggestive Identification Procedures That Taint A Criminal Case Violate Due Process and Are Actionable Under § 1983

Defendants argue that, following the Supreme Court's decision in *Vega v. Tekoh*, 597 U.S. 134, 141 (2022), § 1983 does not render a state actor liable for using unduly suggestive identification procedures to obtain a false identification that taints a criminal case. OB-13-18. Defendants are wrong on the merits, but this Court should reject the argument before even reaching the merits, because it is not within this Court's prerogative to overrule Seventh Circuit precedents.

#### (a) The Seventh Circuit Recognizes This Type of § 1983 Claim

The Seventh Circuit held in *Alexander v. City of South Bend* that while "[t]he Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality," it does "guarantee the right to a fair trial . . . and that right is violated if unduly suggestive identification techniques are allowed to taint the trial," and so state actors are liable under § 1983 if they use identification techniques that make a criminal trial unfair. 433 F.3d 550, 555. Since then, the Seventh Circuit has recognized that this theory of § 1983 liability is viable repeatedly and recently. *Holloway v. City of Milwaukee*, 43 F.4th 760, 766 (7th Cir. 2022); *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019); *see also Reyes v. Nurse*, 38 F.4th 636, 644 (7th Cir. 2022) (recognizing the same in the federal habeas context). In *Holloway*, the Seventh Circuit considered whether and what effect *Vega* might have on this line of cases, but it "conclude[d] that [the question] need not be resolved" and went on to address the suggestive

87

identification § 1983 claim on the merits. 43 F.4th at 766-67. Accordingly, the Seventh Circuit currently recognizes this theory of § 1983 liability, having applied it in a recent case, and it will consider whether *Vega* affects it at an appropriate time.

Since *Holloway*, five district courts in this Circuit have considered Defendants' argument that *Vega* eliminated § 1983 suggestive identification claims, and all but one have followed Seventh Circuit precedent and have rejected Defendants' argument.[13] This Court is bound to follow existing precedent of the Seventh Circuit and cannot overrule it. *E.g.*, *Savory v. Cannon*, 947 F.3d 409, 421 (7th Cir. 2020) (*en banc*); *Nanda v. Bd. of Trustees of Univ. of Illinois*, 219 F. Supp. 2d 911, 914 (N.D. Ill. 2001). Defendants have preserved an argument, which they can present to the court of appeals at an appropriate time, and this Court should reject Defendants' invitation to overrule Circuit precedents, without reaching the merits of Defendants' argument.

### (b) *Vega* Does Not Affect This Type of § 1983 Claim

On the merits, Defendants are wrong that *Vega* changes anything. In fact, quite contrary to Defendants' argument, the logic of *Vega* is *already applied* to § 1983 due process claims asserting

---

[13] In *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 908-09 (N.D. Ill. 2022), Judge Seeger rejected a Rule 50 challenge to a $25 million verdict on the theory, and concluded in rejecting the argument in post-trial motions that the Defendants' "argument might have a surface appeal. But digging deeper, there isn't much there," 2024 WL 1243004, at *18 (N.D. Ill. Mar. 23, 2024). In *Donald v. Outlaw*, No. 2:17-CV-32-TLS, 2023 WL 2346270, at *11-12 (N.D. Ind. Mar. 3, 2023), Judge Springman rejected the argument and denied summary judgment. In *Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *14 & n.19 (N.D. Ill. Oct. 31, 2023), Judge Jenkins also recognized consistent with Seventh Circuit precedent that a § 1983 claim for improper identification procedures is viable when those procedures affected the criminal trial. Similarly, *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *22-23 (N.D. Ill. Sept. 30, 2022), denied summary judgment on this theory (except as to two defendants, who were granted qualified immunity).

Only this Court in *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *23-24 (N.D. Ill. Jan. 24, 2024) (Ellis, J.), concluded that such an unduly suggestive identification claim is not viable under § 1983. In that case, the parties hardly briefed the issue: the defendants presented the argument that the Court should rely on *Vega* to overrule Seventh Circuit precedents in four sentences of their motion, 18 C 1049, Dkt. 462 at 33; the issue was not address in response, except that the plaintiffs said that multiple courts recognize the claim as viable, 18 C 1049, Dkt. 475 at 29; and there was a limited discussion in reply, 18 C 1049, Dkt. 505 at 29-30. Those briefing decisions in *Ezell* meant that this Court was not presented with a cogent legal analysis of binding Seventh Circuit precedents or the merits. With the benefit of full briefing, this Court should reach a different conclusion here.

that a police officer's improper identification techniques resulted in an unreliable identification that is used in and taints a criminal case. In both instances, a police officer's violation of a prophylactic rule does not by itself violate the Constitution and is not actionable under § 1983, but where illegally obtained evidence is actually used in and taints a criminal case, there is a violation of core Constitution rights, and a corresponding claim under § 1983.

*Vega* holds that there is no § 1983 claim for a mere violation of *Miranda*'s prophylactic rules. 597 U.S. at 150. The Court reasoned that *Miranda*'s prophylactic rules exist to guard against Fifth Amendment violations in criminal cases. *Id.* at 149. But a police officer's violation of those rules does not automatically violate the Fifth Amendment. *Id.* at 149-50. As a result, the violation of *Miranda*'s prophylactic rules is not necessarily a violation of the Fifth Amendment actionable under § 1983. *Id.* However, the Court was careful to say that "[i]f a *Miranda* violation were tantamount to a violation of the Fifth Amendment, our answer would of course be different," *id.* at 141, and it said that because a long line of Supreme Court cases recognizes that statements that are illegally compelled by police interrogations and then are used in a criminal case violate the Fifth Amendment, *Brown v. Mississippi*, 297 U.S. 278 (1936), and are actionable under § 1983, *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003). As the Court emphasized throughout its opinion in *Vega*, it was not breaking any new ground. 597 U.S. at 142. Just as the Court has long held that compulsive questioning without *use of the resulting confession in the criminal case* does not violate the Fifth Amendment and is not actionable under § 1983, *Chavez*, 538 U.S. at 767, a mere violation of *Miranda*'s prophylactic rules without more does not violate the Fifth Amendment and is not actionable under § 1983, *Vega*, 597 U.S. at 149-50.

Precisely the same framework already applies to unduly suggestive identification claims. As the Seventh Circuit explained in *Hensley v. Carey*, "The rule [from *Stovall v. Denno*, 388 U.S.

89

293 (1967), and *Manson v. Brathwaite*, 432 U.S. 98 (1977)] against admission of evidence from unnecessarily suggestive lineups is a prophylactic rule designed to protect a core right, that is the right to a fair trial, and it is only the violation of the core right and not the prophylactic rule that should be actionable under § 1983." *Hensley v. Carey*, 818 F.2d 646, 649 (7th Cir. 1987). As was the case in *Vega* for violations of *Miranda*'s prophylactic rules, a violation of the prophylactic rules prohibiting unnecessarily suggestive identification procedures does not by itself violate due process, and is not by itself actionable under § 1983. *Alexander*, 433 F.3d at 555. Instead, the plaintiff must show "how the flaws [in the defendants'] identification techniques made his trial unfair." *Id.*; *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that there is no § 1983 claim regarding suggestive identification procedures if the identifications are never used in the criminal case). If the plaintiff can show that improper identification procedures resulted in an unreliable identification that tainted the criminal proceedings, then a violation of due process is established, and that violation is actionable under § 1983. *Blackmon*, No. 19 CV 767, 2023 WL 7160639, at *14; *Hampton*, 2017 WL 2985743, at *23.

*Vega*'s logic governing Fifth Amendment § 1983 claims is identical to the law that governs due process suggestive identification § 1983 claims. In *Vega* and *Chavez*, a violation of a prophylactic rule or the use of coercive interrogation techniques alone is not actionable under § 1983, but the use of an illegally obtained confession in the criminal case, in violation of the core Fifth Amendment right against self-incrimination, is actionable under § 1983. In the context of suggestive identification procedures, the use of improper identification procedures is not alone actionable under § 1983, but an unreliable identification obtained from such procedures that is used in and taints the criminal case, in violation of the core due process right to a fair trial, is actionable under § 1983. Because the law governing § 1983 suggestive identification claims is

90

already in harmony with *Vega*, this Court should reject Defendants' argument that *Vega* eliminates this type of § 1983 claim.

### 2. Defendants Used Unduly Suggestive Identification Procedures That Tainted Johnson's Criminal Case and Violated His Right to Due Process

Disputed facts preclude summary judgment on Johnson's claim that Defendants used improper identification techniques to obtain false identifications that were introduced in and tainted Johnson's criminal case. "A plaintiff with this kind of [section 1983] claim must demonstrate, by reference to the *Brathwaite* standard, that unduly suggestive identification procedures led to an unreliable identification that undermined the fairness of his trial." *Alexander*, 433 F.3d at 555-56. The assessment of whether identification procedures were so unduly suggestive that they gave rise to a misidentification turns on two questions, assessed considering the totality of circumstances: (1) whether the procedures were unnecessarily suggestive; and (2) whether there is evidence that the identifications were nonetheless reliable. *Hampton*, 2017 WL 2985743, at *23 (citing *Lee v. Foster*, 750 F.3d 687, 691 (7th Cir. 2014)). Defendants assert there is no genuine dispute of fact on either of these questions, arguing that the procedures were not suggestive and the Burgos identifications were reliable. OB-18-21; GB-3.

Once a Court decides that identification procedures were unduly suggestive, the next question is whether those procedures rendered the criminal proceeding unfair. *Hampton*, 2017 WL 2985743, at *23 (citing *Alexander*, 433 F.3d at 555). Defendants raise no separate argument on this element of Johnson's claim, *see* OB-18-21, forfeiting the issue, *Smith*, 388 F.3d at 569; *Costello*, 651 F.3d at 635. Regardless, each of these questions must be resolved in Johnson's favor at summary judgment.

**(a) The Identification Procedures Were Unduly Suggestive**

*1. Evidence of Fabrication Establishes That the Identification Procedures Were Unduly Suggestive.* As discussed at length already, the identifications of Elba, Ricardo, and Rosa were fabricated. See Argument IV(A)(1) *supra*. None of the three saw the perpetrator's face well enough to make an identification. *Id.* None could provide a description, beyond sex and race, and Ricardo saying he had seen a Latino male, a description that did not match Johnson. *Id.* Ricardo told Guevara and Halvorsen he had not seen the shooter's face and could not make an identification. *Id.* Rosa told Guevara and Erickson that the shooting happened so fast that she could not tell who the shooter was. *Id.* She told Guevara and Halvorsen at the live lineup she was not sure who the shooter was. *Id.* This information was suppressed. *Id.*

Before Johnson was ever a suspect, on the night of the crime, at least three of the key eyewitnesses identified Guevara, Erickson, and Daley's immediate suspect, Bryan Johns, during a live lineup. *Id.* But these Defendants told the witnesses they had selected the wrong person, set Johns free, and then all Defendant Officers suppressed this evidence, including by suppressing the Erickson report documenting the identification. *Id.*

Moreover, Johnson is an innocent man and was not involved in the crime, so he was not the person who any witness saw commit the crime. *Id.* Guevara, Halvorsen, and Daley selected Demitrius Johnson as their suspect arbitrarily, without any evidence implicating him. *Id.*

After letting the real killer go and selecting a new suspect, Guevara and Halvorsen abandoned the original good eyewitnesses and replaced them with new, bad eyewitnesses who had not seen the crime. *Id.* They never conducted identification procedures that included Johnson with the vast majority of the eyewitnesses to the crime. *Id.*

Guevara pointed out Darrell Johnson to Elba in the first array with Halvorsen. *Id.* Then they showed her a single Polaroid, highlighting Demetrius in the middle of three people, shorter and younger than both. *Id.* Johnson is entitled to the inference that Guevara pointed him out to Elba as well. *Id.* But even if they did not, Johnson looked extremely like his brother and was highlighted in the composition of the photo. *Id.*

Moreover, Guevara fabricated an account that Elba had followed the shooter as he fled. *Id.* He fabricated a June photo identification of Johnson by Ricardo. *Id.* Guevara and Halvorsen showed Elba and Ricardo the Polaroid photo of Johnson before the July 22 lineup. *Id.* An inference is warranted that they showed Rosa, too. *Id.* Thus, the witnesses all knew that Johnson was Defendants' suspect, and they saw a photo of him, before the July 22 lineup. *Id.*

Compounding the suggestiveness, the construction of the July 22 lineup again highlighted Johnson as the shortest and youngest participant, in the middle of the lineup, and was performed shirtless, to highlight that he was the only one with a visible tattoo affiliating him with the street gang know by the witnesses to have been suspected to be involved in the crime. *Id.*

Rosa told Guevara and Halvorsen during the July 22 live lineup that she was not sure who the shooter was. *Id.* In response, they pressured her to select someone. *Id.* Rosa told them Johnson resembled the shooter, but she did not tell them that Johnson was the shooter. *Id.* They suppressed these interactions with Rosa and instead falsely reported that she had positively identified Johnson. *Id.*

In sum, Defendants got all three witnesses to each to identify the same innocent person who Defendants had selected as their suspect. The only way this could have happened is if Defendants fabricated the identifications, telling Elba, Ricardo, and Rosa who to pick, and reporting falsely that they had made positive identifications of Johnson without suggestion. When

93

Guevara was asked if he did exactly that, he pleaded his Fifth Amendment right not to incriminate himself. *Id.*

This extreme misconduct is far more than enough at summary judgment to establish that the identification procedures were improperly suggestive. *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (denying summary judgment where the police defendants convinced a witness to select a particular photo); *see also Blackmon v. City of Chicago*, No. 19 CV 767, 2023 WL 7160639, at *17 (N.D. Ill. Oct. 31, 2023) (holding that evidence that Defendants intended to obtain an identification of a suspect relevant to dispute of fact about whether the identification procedures were unduly suggestive); *Hampton*, 2017 WL 2985743, at *23 (denying summary judgment where the officer suggested who the witness should pick). Indeed, on this view of the facts, Defendants did all the things (and more) that the Supreme Court said in 1968 would make an identification procedure unduly suggestive in *Simmons v. United States*, 390 U.S. 377, 382-83 (1968).

2. *Additional Evidence Establishes That the Identification Procedures Were Unduly Suggestive*. But even pretending for a moment that this blatant misconduct was not in the record—so, construing some of the facts in *Defendants' favor*, for purposes of this argument only—there would still be sufficient evidence to show that the identification procedures Defendants used were unduly suggestive.

Analyzing the identifications and applying eyewitness expert science, Johnson's largely unchallenged expert, Dr. Dysart, explains how these variables reduce the risk of accurate identifications, according to established, peer-reviewed eyewitness science. She opined that they were obtained using suggestive techniques from eyewitnesses who could not have made identifications.

94

For one, Dr. Dysart notes that each of the three witnesses had limited opportunities to see the shooter's face and form memories of it that would allow them to make accurate identifications. PSOF ¶¶157-163. This is either because they did not have enough time, they were too far away, their attention was not on the shooter's face, or the shooter's face was obstructed in some way. PSOF ¶¶158-160. For instance, Elba Burgos and Rosa Burgos may have seen the shooter's face for 4-5 seconds. PSOF ¶158; JSOF ¶¶130-131. Such a brief viewing window creates a 90% likelihood of a false identification. PSOF ¶158. Also, Rosa and Ricardo both admitted that they started off looking at the shooter's gun, which would "impair[] memory for the characteristics of the person(s) wielding the weapon(s) and reduces eyewitness description and identification accuracy, especially when the opportunity to see the perpetrator is short or limited. PSOF ¶159. Additionally, Ricardo and Elba both observed the shooter from 60 or 70 feet—distances that significantly impacted their abilities to view the details of the shooter's face and thus seriously impaired their abilities to make an accurate identification. PSOF ¶160. Adding to that, Rosa testified that she was scared when she saw the shooter, which could significantly reduce the reliability of her identification, and all three witnesses were identifying a perpetrator of a different race than them, which increased the likelihood of mistaken identifications. PSOF ¶162. This is especially true for Rosa, who testified that she had difficulty distinguishing Black people. PSOF ¶162. Finally, none of the witnesses provided accurate or detailed descriptions of the shooter, which should have been a "red flag that these witnesses did not have a strong memory for the shooter and would therefore not likely be reliable eyewitnesses." PSOF ¶166. That these three people all identified the same innocent person, despite abysmal viewing and memory conditions, allows for an inference of suggestion.

But on top of that, Dr. Dysart observed a number of factors during the identification procedures themselves that impacted the witness' identifications. PSOF ¶¶164-174. For one, Ricardo Burgos's identification shows signs of being contaminated, since he originally described the shooter as Hispanic, yet ended up identifying a Black man. PSOF ¶165. Dr. Dysart also observed that the three-person photo shown to Elba Burgos did not demonstrate a careful selection of fillers—a step necessary to conduct unbiased identification procedures—since Johnson clearly stood out as the shortest person. PSOF ¶167.

And the witnesses were shown an unduly suggestive photo, the results from any subsequent procedure were relatively meaningless. PSOF ¶168. That is, the bias from the first suggestive procedure renders the outcomes of the subsequent lineup procedures' irrelevant for the purposes of determining witness accuracy. PSOF ¶168. After these identification procedures, the risk of unconscious transference and commitment—the phenomena where witnesses believe that the suspect's face is familiar from the crime, but it has merely been encoded as the result of repeated identification procedures—was high, explaining the view held by the Burgoses that they had selected the right person. PSOF ¶172. For this reason, even Defendants' retained expert opined that Elba Burgos's purported identification of Johnson from the three-person Polaroid had little probative value because she had already seen a photo of someone who looked just like Johnson. PSOF ¶176.

But in addition, the live lineup was not conducted blind, meaning that the detectives who conducted the procedure knew Johnson was the suspect, thus creating the potential to double the risk that the Burgoses would identify an innocent person. PSOF ¶171. Combining that with the fact that the live lineup itself was suggestive, says Dr. Dysart—since Demetrius Johnson was again the shortest person, and the only one with a tattoo, which created "very strong likelihood that the

96

witnesses would select Mr. Johnson from the procedure"—the witness' identifications of Johnson were little more than a foregone conclusion. PSOF ¶169.

Accordingly, the totality of circumstances reveals a robust dispute about whether the identification procedures used with Elba, Ricardo, and Rosa were unduly suggestive, even setting aside the evidence that Defendants fabricated the identifications out of whole cloth. Defendants' arguments otherwise, OB-18-20, are nothing more than a statement of their own version of the facts, which the Court cannot accept at this stage.[14]

### (b) The Burgos Identifications Were Not Reliable

Defendants next argue that the Burgos identifications were sufficiently reliable that their use did not violate due process. OB-20-21. This argument depends on a self-serving and slanted view of the facts, and it should be rejected.

The Burgos identifications were undeniably unreliable. Most importantly, the record viewed in Johnson's favor shows that each Burgos identified Johnson as the shooter even though Johnson had nothing to do with the crime and was not at the scene, and even though none of the Burgoses got a look at the shooter that would have allowed them to make an identification. PSOF

---

[14] In this section of their brief, Defendants make an undeveloped, paragraph-long argument that the fact that the Polaroid photo shown to the Burgoses was introduced at trial somehow implies that the identification procedures were not suggestive. There are a number of problems with the argument. First, it is undeveloped and forfeited. *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014). Second, it is not really an argument about whether the identification procedures were unduly suggestive. Instead, Defendants seem to make an assertion about whether the identification procedures tainted the criminal proceedings, though they do not really explain that assertion.

Third, the argument is unsupported in the case law. There is no legal support for the proposition that due process is not violated at a criminal trial so long as evidence relating to the suggestive identification procedure is introduced at the criminal trial. Often evidence of the suggestive procedure and its result is introduced in the criminal trial—indeed, that is the point of the claim—and courts routinely find that due process has been violated. *E.g.*, *Hampton v. City of Chicago*, No. 12-CV-5650, 2017 WL 2985743, at *22 (N.D. Ill. July 13, 2017).

Fourth, Defendants' argument focuses on one of many facts that would allow a reasonable jury to conclude that Defendants' identification procedures were unduly suggestive, ignoring the others, which is untenable at this stage of the case. Moreover, the argument construes the effect of the introduction of the Polaroid at trial in favor of the Defendants, not Johnson. Thus, the argument inverts the summary judgment standard and can be disregarded for that reason as well.

¶¶1-13, 93-99, 125-129, 136-140. The Burgoses incorrectly picked an innocent person, and so of course the identification of Johnson cannot be said to be reliable. This factor of the suggestive identification due process analysis is meant to assess whether the suggestiveness of the identification procedure created a substantial likelihood of *misidentification*. *Neil v. Biggers*, 409 U.S. 188, 198-201 (1972). In a case where the record reflects an *actual misidentification* of an innocent person, it is established that the identification was not reliable.

Nonetheless, even applying the *Biggers* factors—the opportunity of the witness to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation, 409 U.S. at 199-200—there is ample evidence on which a jury could conclude that the identifications were not reliable. Elba and Ricardo did not even see the shooting occur, and they had no opportunity to view the perpetrator, and Ricardo never saw his face at all. PSOF ¶¶94, 125-127; JSOF ¶93. None could provide a description of the shooter beyond saying he was a male and identifying a race. PSOF ¶¶101, 122-123, 139. Ricardo said the shooter was Latino, which Johnson is not. PSOF ¶¶122, 124; JSOF ¶134. There was no further description at all. These facts are strong evidence that Elba, Rosa, and Ricardo could not identify the perpetrator at all, let alone accurately identify Johnson. Indeed, Rosa and Ricardo both have testified that they could not identify the shooter. PSOF ¶¶125-128, 140, 149-150.

In addition to the poor descriptions, environmental circumstances confirm the identifications were unreliable, all of which are discussed at length above—*e.g.*, they had only seconds to view the shooter, were too far away to make accurate identifications, their attention was

98

not on the shooter's face, or they were scared, among others. PSOF ¶¶158-161. *See* Argument IV(A)(1) *supra*.

Finally, on the questions of the time between the crime and identification procedures, and the witnesses' confidence at the confrontation, those factors also demonstrate unreliability. PSOF ¶¶163-174. Rosa participated in the live lineup with Johns the night of the shooting, but then didn't participate in an identification procedure that included Johnson until six weeks after the shooting. PSOF ¶¶20, 244. At that procedure she told Defendants she did not know who the shooter was. PSOF ¶¶136-138, 149. Elba did not view a photo of Johnson until five weeks after the crime. PSOF ¶¶193-197. There is no documentation of her confidence in the identification recorded in police reports. PSOF ¶119. Ricardo was shown a photo of Johnson at some point before the July 22 lineup; he too did not participate in any identification procedure for weeks after the crime; and he told Defendants that he could not identify the perpetrator. PSOF ¶¶121-135. These witnesses' memories certainly decreased during the weeks-long delay between the shooting and the identification procedures. PSOF ¶163

All factors support the conclusion that the Burgos identifications of Johnson were unreliable, and no evidence even suggests otherwise. *Washington*, 2022 WL 4599708, at *23 (holding that a witness's identification of the plaintiffs at night from a distance was enough to create a genuine dispute of fact about whether the identification was reliable and procedures were suggestive); *Bolden*, 623 F. Supp. 3d at 915-19 (affirming jury verdict as supported by sufficient evidence when unreliability of the identification was supported by nearly the same factors present here). *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *9 (N.D. Ill. May 17, 2016) (noting that limited opportunity to view the crime, a lack of detail, and misidentification of the wrong person created a dispute of fact for trial).

In response to these arguments, Defendants suggest that the witnesses had a great opportunity to view the perpetrator. OB-20-21. That is a factual view they will have to present to a jury. As discussed above, the witnesses had almost no opportunity to form a memory of the perpetrator. In addition, they suggest the Burgoses were confident in their identifications. OB-21. Defendants improperly focus on portions of the trial testimony in 1992, OB-21, but the issue of confidence is obviously disputed—there is zero evidence in the record suggesting that Defendants obtained a confident identification from Elba, Rosa or Ricardo when they obtained the identifications (they did not record their confidence in the lineup or other police reports), and there is ample evidence in the record to the contrary: Ricardo said that he could not identify the shooter without being told who to pick, and Rosa directly expressed a lack of confidence. PSOF ¶125-129, 138, 140, 149-150, 173. Defendants also assert that a span of five or six weeks between a crime does not raise any question about reliability. OB-21. That, too, is a disputed fact question for a jury, PSOF ¶163, and not something that the Court can decide as a legal matter at summary judgment.

Defendants' contentions about witness certainty are arguments the Seventh Circuit has discounted at summary judgment, saying it is "too much of a leap at the summary-judgment stage" to decide as a matter of law that a witness identification was reliable where the witness confidently identified a suspect and testified that the identification was not influenced, particularly given the problems of unconscious transference. *Holloway*, 43 F.4th at 766-67; *see also* PSOF ¶¶266-267. Therefore, even accepting Defendants' view of the Burgoses confidence, it would not entitle Defendants to summary judgment.

### (c) The Identifications Tainted Johnson's Criminal Proceedings

The final factor necessary to support this due process theory is whether the unduly suggestive and inaccurate identifications rendered Johnson's criminal case unfair. As noted, Defendants do not address this issue, forfeiting it, and so Johnson only addresses it briefly.

Under Seventh Circuit case law, whether unduly suggestive identifications made criminal proceedings unfair is answered by reference to the following questions: "What identification evidence was actually admitted at trial? What did the victims, eyewitnesses, and police officers say? Were they cross-examined? Were the circumstances surrounding the identification and the police procedures put before the jury? What exhibits were admitted on this issue? Was any objection or motion to suppress the identification evidence made? What other evidence tended to link the defendant to the crime?" *Alexander*, 433 F.3d at 555.

At Johnson's criminal trial, all three Burgoses testified that they positively identified Johnson; Elba and Ricardo testified that they did so twice–once in a photo identification and once in a lineup. Defendant Guevara, too, testified about the identifications of Rosa, Elba, and Ricardo Burgos, and the police reports documenting those identifications were admitted into evidence at trial. PSOF ¶¶244-250.

Though Johnson's attorneys attempted to cross examine these witnesses, Defendants' suppression of the true circumstances of the Burgos identifications—that Ricardo and Rosa said they could not identify the shooter, that Ricardo had selected a photo of someone other than Johnson, that they had pointed out Darrell's photo to Elba, and that Rosa had not positively identified Johnson, see Argument IV(B)(2)(b) *supra*—rendered cross examination effectively impossible. *See, e.g.*, PSOF ¶¶80, 220, 232.

101

The identifications were used to convict Johnson at trial. Indeed, no other evidence—apart from Defendants' own fabricated evidence—even implied Johnson was guilty. The record shows conclusively that the unduly suggestive false identifications made Johnson's trial unfair. *Donald*, 2023 WL 2346270, at *11 (deciding in nearly identical circumstances that material disputes of fact required a jury to determine whether identifications tainted a criminal trial).

### 3. Defendant Erickson, Daley, and Healey Were Involved In the Burgos Identification Procedures

Defendants again argue based on their own view of the facts that Erickson, Daley, and Healey were uninvolved in the identifications obtained from the Burgoses. OB-23-24. Johnson has addressed already how Defendants present an untenable reading of the record, particularly so if the record is construed for Johnson, drawing inferences in his favor, and Johnson incorporates that argument here. Argument IV(A)(2) *supra*. The evidence that these Defendants were involved in obtaining the Burgos false identifications is substantial. PSOF ¶¶88-155. The arguments otherwise depend on piling inference in Defendants' favor, which the Court cannot do at this stage. "Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. . . . A court's job on summary judgment is not to resolve swearing contests or decide which party's facts are more likely true. . . . These credibility disputes are for fact finders to resolve." *Kailin v. Gurnee*, 77 F.4th 476, 483 (7th Cir. 2023). The law of personal responsibility does not displace normal summary judgment standards that apply in § 1983 cases. See Argument IV(A)(2) *supra*.

### 4. Defendants Are Not Entitled To Summary Judgment Merely Because They Disclaim Intent

Defendants' also assert incorrectly that there is no dispute of fact about whether they possessed the requisite mental state to be held liable for conducting the suggestive identification

procedures that resulted in their tainted identifications being used at Johnson's criminal trial. OB-21-23. After setting out case law establishing that Defendants must have knowingly used unduly suggestive identification procedures, Defendants merely assert again their view that Erickson, Daley, and Healey were not involved with the July 22 identification procedures, and they assert in a single sentence that there is no evidence Halvorsen knew the identification procedures were suggestive. OB-23. Guevara does not make any independent argument. *See* GB-3.[15]

Johnson explains above how all Defendants participated in obtaining Elba Burgos', Ricardo Burgos', and Rosa Burgos' fabricated identifications. *See* Argument IV(A) *supra*. Moreover, Halvorsen's one-sentence argument, OB-23, and Guevara's one-sentence assertion that he "joins and adopts" Halvorsen's one-sentence argument, are both so perfunctory that they are forfeited. *Smith*, 388 F.3d at 569. Even if it were not, Guevara cannot possibly take the Fifth about whether he knowingly obtained false identifications of Johnson, and then argue that he is entitled to summary judgment because he has established that there is no genuine dispute of fact about whether he had the necessary intent. It is highly problematic for a party's lawyers to argue for judgment by disclaiming that the party acted with intent when the party has exercised his right to remain silent. *See* Argument III *supra*.

Moreover, the Seventh Circuit long has reminded that "[d]ue to the difficulty of proving a subjective state of mind, cases involving motivation and intent are usually not appropriate for summary judgment." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse*, 991 F.2d 1249, 1258 (7th Cir. 1993); *see also P.H. Glatfelter Co. v. Voith*, 784 F.2d 770,

---

[15] Defendants begin the section by suggesting that an unduly suggestive identification sounds in "substantive due process," *see* OB-21, which is incorrect. This is a procedural due process claim about the violation of the right to a fair trial enumerated in the due process clause of the Fourteenth Amendment. *Holloway*, 43 F.4th at 765.

774 (7th Cir. 1986) (noting that, "as a general principle, questions of motive and intent are particularly inappropriate for summary adjudication and that resolution by summary judgment of the issues raised by an allegation of fraud is often difficult or impossible") (internal quotation marks and citations omitted). "There is especially good reason to follow the general rule where, as here, evaluating whether a party had an actual intent to deceive requires credibility determinations." *Standard Ins. Co. v. VanLanduit*, 551 F. Supp. 3d 854, 868 (N.D. Ill. 2021) (internal quotation marks omitted).

In this case, the record is replete with evidence from which a reasonable jury could draw the inference that Defendant Officers had the intent to obtain fabricated identifications using unduly suggestive procedures. One officer involved in those procedures, Guevara, has taken the Fifth. Guevara and Halvorsen, with the help of Defendant Daley, decided on Johnson's older brother Darrell as their suspect without evidence, and then arbitrarily switched to Demetrius the younger brother. Guevara, Halvorsen, and Daley obtained identifications from individuals who told them they had not seen the shooter. Guevara, Halvorsen, and Erickson falsely reported what eyewitnesses had said. Guevara, Halvorsen, Erickson, and Daley falsely reported the results of identification procedures, and these false statements were included on reports that were approved by Healey. All Defendants fabricated multiple pieces of evidence independent of the identifications. All Defendants suppressed that Johns was identified as the perpetrator, including a report documenting that procedure. All Defendants suppressed information that would have undermined the identifications made by the Burgoses, including statements from those witnesses that they could not make an identification, throughout Johnson's criminal case. All Defendants suppressed additional exculpatory and impeachment evidence on other subjects. Guevara and Daley testified falsely at trial. All Defendants wrote and approved police reports that were false.

104

The list of circumstantial evidence of intent goes on and on. Based on much less evidence the Seventh Circuit decided that "[a] jury would not be compelled to find that the officers acted with that intent, but it could so find." *McCottrell v. White*, 933 F.3d 651, 670–71 (7th Cir. 2019). This Court should reject Defendants' intent argument.

### 5. Defendants Are Not Entitled To Qualified Immunity on This Theory

Finally, Defendants contend they are entitled to qualified immunity on this theory. OB-24-26.[16] Defendants argue only that the law was not clearly established in 1991 that they could not "show a photo containing multiple people including the suspect prior to a live lineup" and that they could not use a "single polaroid photo or lineup contain[ing] an insufficient number of quality fillers that made it so suggestive that witnesses would only have picked him." OB-25. That qualified immunity argument depends on a view of the facts where Defendants did not violate Johnson's rights at all, but as discussed already material disputes of fact foreclose such an argument.[17] The Court can reject the qualified immunity argument on that basis alone.

Setting factual disputes to the side, there are two additional reasons that qualified immunity cannot apply in this case. First, police officers are not entitled to immunity under § 1983. Second, it was clearly established in 1991 that police could not use the suggestive identification procedures with witnesses who had not seen a perpetrator to secure a false identification for use in a criminal trial.

---

[16] Defendants do not argue they are entitled to qualified immunity on any of Johnson's other due process theories, and so they have now forfeited any argument for immunity on those claims. *J&J Sports Productions, Inc. v. Resendiz*, 2009 WL 1953154 (N.D. Ill. July 2, 2009).

[17] In fact, this whole section of Defendants' brief really repeats factual arguments addressed above about whether Defendants violated Johnson's rights, OB-25-26, but now Defendants have dressed them up as arguments about the contours of clearly established law.

## (a) Police Officers Are Not Entitled to Qualified Immunity

Defendants are not entitled to qualified immunity on any of Johnson's claims because there is no statutory or common law basis to afford immunity to police officers who are sued under § 1983 for violations of constitutional rights. This Court should reject Defendants' immunity arguments for that reason alone.

The Supreme Court has said that "statutory interpretation, as we always say, begins with the text," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and the U.S. code version of the text of § 1983 is clear: "Every person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities . . . shall be liable to the party injured in an action at law." 42 U.S.C. § 1983 (emphasis added). The word "shall" typically means "must." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171, (2016) ("Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement."); *Lopez v. Davis*, 531 U.S. 230, 241 (2001) (explaining that "shall" connotes a mandatory duty is used by Congress "to impose discretionless obligations"). The statutory text does not permit a construction where the statute says that the officer *must* be liable, but courts read that to mean *may* be liable only if the law was "clearly established" at the time of the conduct. In fact, Congress does not mention immunity in the statute at all, and the judicially created two-step qualified immunity test "cannot be located in § 1983's text and may have little basis in history." *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2421 (2021) (Thomas, J., respecting denial of certiorari). Qualified immunity thus contradicts the text of § 1983.

But making matters worse, qualified immunity is actually expressly foreclosed by the actual text of § 1983 that did not make it into the U.S. Code. Qualified immunity arises from the premise that Congress did not intend to abrogate existing common-law immunities when it first

passed § 1983 in 1871. *E.g.*, *Pierson v. Ray*, 386 U.S. 547, 556-57 (1967). But it turns out that premise is wrong. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023). As passed by the Reconstruction Congress, Section 1 of the Civil Rights Act of 1871—now known as § 1983—provided:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, **any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding**, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added).

The italicized notwithstanding clause in Congress's originally promulgated text of § 1983 expressly displaces common-law defenses—it states that common law immunities will *not* protect state actors from suit under § 1983. Reinert, *supra* at 235 & n.230. But the notwithstanding clause was accidentally omitted from the first compilation of the law in 1874, and it has been missing— but never amended—from then until 2023. Reinert, *supra* at 207, 236-37, 244. Today, we know that "the Supreme Court's original justification for qualified immunity—that Congress wouldn't have abrogated common-law immunities absent explicit language—is faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). As a result, "modern immunity jurisprudence is not just atextual but *counter*textual." *Id.*

Lastly, even if there were no textual argument against qualified immunity, there is nothing in the common law of 1871 that would permit the conclusion that police officers who violated the constitutional rights of civilians enjoy immunity from suit. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring) (citing William Baude, *Is Qualified Immunity Unlawful?*,

107

106 CALIF. L. REV. 45 (2018)); *Kislea v. Hughes*, 138 S. Ct. 1148 (2018) (Sotomayor, J., dissenting); *Richardson v. McKnight*, 521 U.S. 399 (1997). An officer who maliciously prosecuted an innocent individual based on false evidence would certainly have been subject to suit at common law in 1871. *See generally Thompson v. Clark*, 596 U.S. 36, 43-44 (2022). A fiction that Congress afforded common-law immunity to officers who commit such misconduct without saying so stretches the judge-made conception of qualified immunity far beyond its breaking point.

This Court is bound to apply the statutory text of § 1983. Multiple courts have expressed that qualified immunity should not be afforded to police officers, given the express statutory text. *See*, *e.g.*, Green v. Thomas, No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133, at *25 (S.D. Miss. May 20, 2024). And based on that text, Defendants are not entitled to qualified immunity here. As with the *Vega* argument above, however, this Court is bound by Seventh Circuit precedents, and so Johnson makes this argument here to preserve it for appeal.

### (b) The Law Was Clearly Established in 1991

To the extent Defendants are actually arguing that the law governing Johnson's identification theory was not clearly established in 1991, that is plainly incorrect. The illegality of the Defendants' conduct was established long before the events at issue in this case. In 1968, the Supreme Court announced that identification procedures that highlight who the suspect is are unduly suggestive. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). Moreover, it has been the law since at least 1977 that subjecting a criminal defendant to unduly suggestive identification procedures that taint the criminal proceedings violates due process. *Manson v. Brathwaite*, 432 U.S. 98 (1977); *see also Neil v. Biggers*, 409 U.S. 188 (1972). It was clear in the Seventh Circuit that police officers could be held liable for this misconduct at latest in 1987, five years before Johnson's prosecution. *Hensley*, 818 F.2d at 648-50; *see also Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016

108

WL 2866097, at *10 (N.D. Ill. May 17, 2016) (holding that it was clearly established in 1993 that police officers violated a criminal defendant's due process rights by conducting impermissibly suggestive identification procedures).[18] Defendants are not entitled to qualified immunity on Johnson's due process identification theory.

### D.     A Jury Must Decide Johnson's Fourth Amendment Illegal Seizure and State Law Malicious Prosecution Claims

Johnson also brings a § 1983 claim for illegal detention without probable cause, as well as a state-law claim for malicious prosecution. Defendant Officers treat these as though they were a single claim, OB-33-36, but they are not. The Supreme Court held in *Manuel v. Joliet*, 580 U.S. 357, 363-64 (2017), and *Thompson v. Clark*, 596 U.S. 36, 42 (2022), that it has long recognized a Fourth Amendment claim for illegal seizure pursuant to legal process where the detention is without probable cause. That claim, like all other Fourth Amendment claims, requires proof of (1) a seizure, (2) without probable cause. *Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975). By contrast, an Illinois malicious prosecution claim requires proof of (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011).

---

[18] Defendants cite Coleman *v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019), in support of their qualified immunity argument. OB-26. But in *Coleman*, the Seventh Circuit found that police officers used no improper identification procedures at all. *Id.* at 347-48. In addition, the witness had seen the suspect's fact for three minutes during the incident in question, and the witness recognized the suspect because they had lived in the same place for years. *Id.* During the happenstance meeting at the police station, the witness recognized the suspect, who was in a hallway, and pointed him out as the perpetrator. *Id.* Based on those facts, the Court determined that the witness's identifications did not clearly taint the suspect's trial. *Id.* at 349. It would be difficult to find a more different case.

### 1. Erickson, Daley, and Healey Are Liable for Malicious Prosecution

Erickson, Daley, and Healey start by repeating the assertion that they were not involved in the investigation. OB-33. This argument should be rejected for the reasons discussed above. *See* Argument IV(A)(1) *supra*.

In addition, Erickson, Daley, and Healey assert that they did not initiate the prosecution of Johnson. OB-33-34. Halvorsen and Guevara do not join this argument. *See id.*; GB-3-4. This argument is wrong on the law and facts. The Seventh Circuit holds, "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision," as these Defendants did here. *Jones*, 856 F.2d at 994. As a matter of Illinois law, liability extends to all persons who played a significant role in causing the prosecution of the plaintiff. *Beaman v. Freesmeyer*, 183 N.E.3d 767, 782 (Ill. 2021). Police who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (police who engage in misconduct cannot blame others involved in the prosecution). Accordingly, the misconduct of Erickson, Daley, and Healey identified above is alone enough to hold that they are liable for malicious prosecution, even if they had nothing to do with the state criminal proceedings themselves.

But these Defendants' contention that they did not cause Johnson's criminal proceedings cannot be reconciled with the record either. The charges were based entirely on the Burgos identifications, and the suppression of evidence, and each of the Defendants was involved intimately in those fabrications and suppressions, as discussed at length. See Arguments IV(A)-(B) *supra*. Moreover, Daley testified at trial, providing testimony that implicated Johnson. PSOF

110

¶¶251-252, 274.[19] The record construed in Johnson's favor shows that Erickson, Daley, and Healey directly influenced the decision to prosecute and the course of the criminal proceedings.

### 2. The Parties Hotly Dispute Whether the Burgos Identifications Established Probable Cause

Next, on both federal and state claims, all Officer Defendants contend that there is no genuine dispute about whether there was probable cause to suspect that Johnson shot Fred and Ortiz. OB-34-35; GB-3-4. Defendants assert that they believed at the time that the Burgoses accurately identified Johnson, and they cite cases saying that probable cause can be based on eyewitness identifications. *Id.* Again, Defendants' argument is founded on utterly disputed facts and inapplicable case law.

"In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013). It is firmly established that knowingly fabricated evidence and false statements never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander*, 721 F.3d at 423; *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Along the same lines, police cannot manufacture their own probable cause. *Collier v. City of Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

---

[19] Without citation to any case, Defendants imply that a defendant who testifies falsely at a criminal trial only helps cause the criminal prosecution when they testify for the prosecution, and not the defense. OB-33-34. There is no legal support for a principle that would permit officers to lie if called in one part of a criminal case. *Avery*, 847 F.3d at 439

111

Moreover, probable cause is a quintessential question of fact. The Seventh Circuit holds that a court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993); *see also Bryant v. Whalen*, 759 F.Supp. 410, 417 (N.D. Ill. 1991). "Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause[.]" *Maxwell*, 998 F.2d at 434.

As discussed at length already, there is a huge difference of opinion about whether Defendants had any evidence whatsoever to entertain an "honest and sound" suspicion that Johnson committed the crime. Viewed in Johnson's favor, the record demonstrates that Defendants wholly fabricated the evidence they contend gave rise to probable cause—the three Burgos identifications. *See* Argument IV(A) *supra*.[20] There is similarly strong evidence that Defendants hid evidence demonstrating that Johnson was innocent and that someone else had committed the crime. *See* Argument IV(B) *supra*. In other words, there is nothing that the Defendants can point to that establishes probable cause independent of their own misconduct. A jury must decide whether there was probable cause to suspect Johnson of the Fred murder.

Defendants cite cases that they say hold that a single identification, even if questionable, is sufficient to create probable cause. *See* OB-35. That position overstates the case law.[21] The

---

[20] Guevara and Halvorsen's arrest report documenting the charges against Johnson states the following and nothing more in the entry for "facts for probable cause": "identified by three eye witnesses as the person that shot and killed Edwin, FRED on 12 Jun 91 at 2333 W North Ave." PSOF ¶238.

[21] The Seventh Circuit in *Coleman* said that a particular witness's identification provided probable cause, even if it was questionable, given the circumstances. *See* 925 F.3d at 351. *Moran v. Calumet City* adapted that statement from *Coleman*, generalizing it a bit, but still applied it in the context of two identifications that were not challenged. 54 F.4th 483, 499-500 (7th Cir. 2022). The Seventh Circuit has never said that a questionable identification *necessarily* establishes probable cause.

112

probable cause analysis often depends on context, and also the resolution of disputed facts, as this Court recognized in *Ezell*. 2024 WL 278829, at *25. While an identification may in some circumstances support probable cause, even if questionable, it is also true that "'[t]o supply probable cause, witness identifications cannot be the product of coercion or manipulation,'" *id.* (quoting *Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015)), and courts routinely hold that where probable cause rests on an identification, summary judgment is not warranted where there is a dispute about whether the identifications are legitimate, *see id.* ("Plaintiffs point to several facts that they claim would allow a jury to find that the Defendant Officers would have known that the eyewitness identifications were tainted, meaning they could not provide probable cause to detain [a plaintiff].").[22]

Defendants cannot point to any basis to suspect Johnson independent of their own misconduct. Prosecutors relied solely on Defendants' false evidence to prosecute him, without conducting any independent investigation. *See* Statement VIII(L) & X *supra*. In that context, Defendants' fabrications and suppressions are the but-for cause of Johnson's prosecution, and his Illinois and Fourth Amendment malicious prosecution claims must go to trial. *Washington v. City of Chicago*, 98 F.4th 860 (7th Cir. 2024). Just as it did in *Ezell*, this Court should conclude that facts in the summary judgment record, including expert testimony on eyewitness identifications, mean a jury could reasonably conclude that police "could not have reasonably relied on [the identifications]," and it should deny summary judgment. *Ezell*, 2024 WL 278829, at *25-26.

---

[22] *See also Bolden v. Pesavento*, 623 F. Supp. 3d 897, 922 (N.D. Ill. 2022) ("Probable cause rested on the identification, and the record was loaded with evidence supporting an inference that identification was problematic[.]"); *Gray v Chicago*, 2022 WL 910601, at *9 (N.D. Ill. Mar. 29, 2022) (denying summary judgment on probable cause grounds when "the validity of [the] lineup [used to identify plaintiff was] in question" (citation omitted)); *Jimenez*, 830 F. Supp. 2d at 450 ("Without the [eyewitness] statements ... [t]he only other evidence against [the plaintiff] was the existence of an alleged motive. In sum, there is far less evidence to support probable cause[.]")..

### 3. Defendants Are Not Entitled To Qualified Immunity on This Theory

Finally, Defendants argue that they are entitled to qualified immunity on Johnson's federal Fourth Amendment claim, asserting that they had so-called "arguable probable cause" to charge Johnson based on the Burgos identifications. OB-35-36. First, for the reasons already discussed, Johnson preserves the argument that Defendants are not entitled to immunity. *See* Argument IV(C)(5)(a) *supra*.

Second, qualified immunity considers whether state actors were on notice that their conduct was unlawful according to established law, and not whether a prior case gave notice that particular pieces of evidence added up to probable cause. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a remedy are settled. The qualified immunity defense focuses instead on whether the official defendant's conduct violated a clearly established constitutional right."); see also *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"). It was clearly established that Defendants' fabrications and  suppressions of evidence were illegal far before 1991. Moreover, it was established that officers who submit false evidence to secure charges violate the constitution and are not entitled to immunity. *Malley v. Briggs*, 475 U.S. 335, 345 (1986). The Supreme Court held recently that the right to be free of prosecution without probable cause has been established for decades. *Manuel v. City of Joliet*, 580 U.S. 357, 364-65 (2017). That is enough to defeat immunity.

Third, arguable probable cause does not add any protection for Defendant Officers at this stage of the case. The Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a Fourth Amendment claim, there is "substantial, if not

complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986). The probable cause and arguable probable cause standards are objective, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). The officer's subjective state of mind is irrelevant to this analysis. *Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Just as a jury must decide whether Defendant Officers had probable cause to suspect Johnson, it must decide whether a reasonable officer would have believed that there was probable cause, to the extent there is any difference between those two inquiries. *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. City of Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011).

Moreover, a claim of qualified immunity can be defeated even if the precise conduct in question had not previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002) ("[O]fficials can still be on notice that their conduct violates established law . . . in novel factual circumstances."); *see also Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving

115

fundamentally similar or materially similar facts"). Finally, qualified immunity does not protect officers "who knowingly violate the law." *Hunter*, 502 U.S. at 229. Defendant Officers are not entitled to qualified immunity on this theory. Ezell, 2024 WL 278829, at *26 ("But whether the lineups provided them with arguable probable cause is also an issue of disputed fact, so the Court will not grant qualified immunity on this basis.").

### E. Defendant Healey Participated In the Misconduct and Is Not Entitled to Summary Judgment

Defendant Healey argues in a separate section that he is entitled to summary judgment because, in his view, supervisors cannot be liable for subordinates' misconduct under § 1983. OB-36-37. This argument should be rejected for two reasons. First, Healey is not liable merely because of his supervision of others. As explained at length already, he was intimately involved in the misconduct described above. A supervisor who approves the key police reports in a case is not a passive rubber-stamper who signs whatever crosses his desk. Instead, he leads the investigative team, responsible for oversight of investigative tasks and verification of results. PSOF ¶¶255-260. CPD supervisors are kept fully abreast of the homicide investigation as it proceeds, including the results of any positive or negative lineup identification procedures, witness interviews and other developments. Indeed, tracking the day-to-day progress of the investigation was one of their main roles. PSOF ¶259. The record supports the conclusion at summary judgment that Healey was involved in misconduct that occurred in the investigation he oversaw. PSOF ¶¶279-283.

Moreover, Healey approved a) the June 12, 1991 lineup report describing a six-person lineup and stating that there were no identifications of Bryan Johns, PSOF ¶¶189-190; b) the June 20, 1991 report purporting to document an interview of Rosa Burgos and Victor Cordova— neither of whom had been identified as witnesses before (despite the initial canvas)—which now stated

116

that Rosa Burgos could make an identification, PSOF ¶¶191-192; c) the July 22, 1991 lineup report stating that Elba, Rosa, and Ricardo Burgos identified Plaintiff in a lineup, PSOF ¶¶92, 197; and d) the July 23, 1991 closing report which shows Plaintiff being charged with the murder of Edwin Fred, PSOF ¶¶89, 199. These reports contain obvious contradictions, omissions, and fabrications, and resulted in the suppression of exculpatory evidence. PSOF ¶¶189-204.

Healey acknowledged that as a supervisor, he remained involved and informed of what was going on during the investigation, and he took steps to understand what had occurred during the investigation to ensure reports were accurate. PSOF ¶¶255-260, 279-83. Accordingly, Plaintiff is entitled to the inference that Healey learned about the fabrication and suppression that had occurred during the course of the investigation, and nevertheless approved reports that he knew were fabricated, and that concealed exculpatory and impeachment evidence.

Second, Defendants are wrong on the law. Supervisors like Healey can be liable "for their subordinates' violation of others' constitutional rights when they 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Steidl v. Fermon*, 494 F.3d 623, 631-32 (7th Cir. 2007). Healey was the direct supervisor of the other Defendant Officers, had direct knowledge of their investigation, and approved reports, thereby ratifying the misconduct contained in those reports. PSOF ¶¶88-92, 189-203, 279-283. His participation as a supervisor was essential to the scheme. *Id.* He is liable on that basis as well.

Finally, Healey's arguments otherwise ignore substantial disputes of fact. OB-36-37. For example, he argues that he "cannot be held liable for alleged misconduct of which he had no knowledge," OB-37, but that is an unsustainable view of the record. Healey worked with the other Officer Defendants as a team at the conclusion of their investigation, when the evidence implicating Johnson was developed, which led to the charges against Johnson. He approved reports

117

that became part of the investigative file, which directly contradicted earlier reports in the same file showing that Johns had been identified. He failed to ensure that the Erickson lineup report was submitted for approval and placed in the permanent retention file in accordance with CPD policy. And he did not ensure that leads implicating Robert Weeks were meaningfully pursued, or that the details of this investigation were documented in progress reports and/or supplementary reports. PSOF ¶¶279-283. He cannot now simply assert that he had no knowledge of misconduct and obtain a summary judgment.

### F.     A Jury Must Decide Johnson's Failure-To-Intervene Claims

All Defendant Officers argue for summary judgment on Johnson's failure-to-intervene claim. OB-37-39, GB-4. They argue that such a claim is not viable under § 1983, a position they admit is incompatible with Seventh Circuit law. OB-39. As the Seventh Circuit reaffirmed in the very case Defendants cite for the proposition that a failure-to-intervene claim is not viable, a defendant who has a realistic opportunity to step forward and prevent a fellow officer from violating the constitutional rights of another but who fails to do so is liable. *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

In addition, all Defendant Officers argue that Johnson's failure-to-intervene claims fail because they are entitled to summary judgment on all of Johnson's other constitutional claims. OB-37-38. This Court should reject this argument because material disputes of fact require a trial on Johnson's other claims. *See* Argument IV(A)-(D) *supra*.

Finally, Halvorsen, Daley, Erickson, and Healey assert that they had no opportunity to intervene to prevent the violation of Johnson's rights. OB-38. (Guevara does not join this argument. GB-4). This one-paragraph argument is not developed in a way that permits a response

and is therefore forfeited. *Smith*, 388 F.3d at 569 (holding that an undeveloped argument is forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments). To the extent that Defendants argue they were uninvolved in aspects of the investigation, Johnson has addressed those arguments already, and he incorporates that response here. Argument IV(A)(2) & IV(E) *supra*.

To the extent that they are arguing that they did not have any opportunity to intervene, their argument lacks merit. "Whether a bystander officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact[.]" *Mwangangi*, 48 F.4th at 832. The discussion of Johnson's due process claims above demonstrates that a reasonable jury could find that each of these Defendants individually had the opportunity to intervene to prevent the fabrication and suppression of evidence that caused Johnson's wrongful conviction. *See* Argument IV(B)-(D) *supra*. Indeed, Defendants had decades to intervene while Johnson was languishing in prison, and they did not intervene.[23] These Defendants' arguments otherwise are plainly dependent on the Court drawing inferences—and many untenable inferences—in their favor, an approach the Court cannot take at this stage. Summary judgment is not appropriate on this claim.

### G. A Jury Must Decide Johnson's State-Law Claim of Intentional Infliction of Emotional Distress

In a single sentence, the Defendant Officers assert that Johnson's state-law claim of intentional infliction of emotional distress fails because Johnson's other claims fail, OB-39, and Guevara joins that argument, GB-4. In the next section, the Defendant Officers other than Guevara

---

[23] Defendants compare this case to *Doxtator v. O'Brien*, where the Seventh Circuit held that officers did not have time to intervene in a shooting that happened "instantaneously," 39 F.4th 852, 864-65 (7th Cir. 2022), which is plainly different than this case.

assert "Johnson cannot demonstrate the 'extreme and outrageous' conduct necessary to support his IIED claim," OB-39, without further discussion. These bald assertions are insufficient to shift the burden at summary judgment. *Carmichael*, 605 F.3d at 460; *United States v. Useni*, 516 F.3d 634, 658 ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). Additional arguments on this point are forfeited. *Costello*, 651 F.3d at 635 (7th Cir. 2011).

Even if they were not, as discussed above, Defendants manufactured evidence to prosecute and convict Johnson of a murder he did not commit, and they withheld other evidence that would have allowed him to defend himself against the false charges. *See* Argument IV(A)-(B) *supra*. As a result, Johnson spent more than a decade in prison. "For conduct to be extreme and outrageous it must go 'beyond all bounds of decency' and be 'considered intolerable in a civilized community.'" *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (quoting *Lopez v. City of Chicago*, 464 F.3d 711, 721 (7th Cir. 2006)). An important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842. Johnson's allegations fit this tort perfectly, and disputes of fact prevent summary judgment for Defendants on this claim. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

### H. A Jury Must Decide Johnson's Section 1983 Conspiracy Claims

Defendant Officers all argue for summary judgment on Johnson's federal and state conspiracy claims in a single section, OB-40-42, and Guevara adopts the argument, GB-4. First, on both federal and state claims, these Defendants assert that Johnson's conspiracy claims are

derivative of his due process claims and unsupported by evidence. OB-40. To the extent that argument is based on a purported deficiency in Johnson's due process claims, that argument is rebutted by the discussion above of the reasons that the due process claims survive. *See* Argument IV(A)-(C) *supra*. Moreover, Defendants' bald assertion that there is no evidence of conspiracy, OB-40-41, is insufficient to shift the summary judgment burden. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010) ("The defendants, the moving party on the summary judgment motion, never fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."). Regardless, there is ample evidence supporting Johnson's conspiracy claims.

### 1. The Parties Dispute Whether Defendants Reached An Agreement to Frame Johnson

To prove a § 1983 or civil conspiracy, Johnson must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979), *rev'd in part*, 446 U.S. 754. "To be liable as a conspirator you must be a voluntary participant in a common venture," the Seventh Circuit has explained, "although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire," and so "circumstantial

121

evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

There is ample evidence on which a jury could infer an agreement between the Defendant Officers, and Johnson's conspiracy claims against each of them should proceed to trial. The facts viewed in Johnson's favor show Defendants all worked together as a small team on the Fred homicide investigation, each having access to the investigative file, and each participating in witness interviews, identification procedures, and report writing and approval. PSOF ¶¶255-260. Guevara, Erickson, and Daley knew Johns had immediately been identified as the perpetrator, was arrested with guns near the scene, and was identified in a lineup by at least three key eyewitnesses, and then was let go. PSOF ¶¶36-52, 261-283. All Defendants knew there was a report of that identification hidden in their investigative file. PSOF ¶¶67-83, 261-283. All knew that a false lineup report saying that Johns had not been identified was included in their investigative file and was made part of the permanent retention file. PSOF ¶¶53-83, 261-283. In addition, Guevara, Halvorsen, and Daley made Johnson the suspect before there was any evidence or eyewitness implicating him, based solely on the fact that they had suspected his older brother without any evidence. PSOF ¶¶105-120, 261-278. Those three participated in identification procedures with Elba Burgos. Guevara and Halvorsen participated in identification procedures with Ricardo Burgos and Rosa Burgos as well. PSOF ¶¶88-155, 261-267. They suppressed evidence they had obtained from all three Burgos witnesses, and they suppressed their investigation into alternative suspects. PSOF ¶¶88-155, 177-182, 261-267. All Defendants knew that the identifications of the Burgos witnesses were fabricated, and all participated in essential parts of that fabrication. PSOF ¶¶88-155, 261-283. Guevara, Halvorsen, Erickson, and Daley all wrote false reports documenting the investigation, which Healey approved. ¶¶88-155, 261-278. By the end of July 22, 1991, each

of the Defendant Officers had engaged in a scheme to suppress the identity of the Johns, the real killer, to generate evidence implicating Johnson, and to suppress any evidence that contradict their official version of the investigation. *Id.*; *see Jones*, 856 F.2d at 992 ("We cannot say that the jury acted unreasonably in finding that all of the individual defendants were voluntary participants in a common venture to railroad [the plaintiff].").

The conspiracy continued after Johnson was charged, with Defendants' efforts to prepare the Burgoses to identify Johnson at trial, and their ongoing efforts to suppress information about Johnson, but its object and scope remained the same. *See United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance in the scheme," and a "participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of the conspiracy[.]"). Throughout, Defendants conspired with Elba, Ricardo, and Rosa to provide false statements and evidence in Johnson's criminal case. PSOF ¶¶88-174.

The Seventh Circuit has warned that "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton*, 600 F.2d at 621; *Serrano v. Guevara*, 2020 WL 3000284, at *21 ("Who actually was in the conspiracy, if one existed, its aims, and its extent are for the jury to decide."); *Washington v. Boudreau*, 2022 WL 4599708, at *23 (denying officers summary judgment on conspiracy claim there was a material dispute of fact as to whether they fabricated or withheld evidence). The summary judgment record reveals a genuine dispute of fact about whether each of the Defendants reached an agreement with the others, and a reasonable jury could find for Johnson on his conspiracy claims.

### 2. Defendants Are Not Entitled To Qualified Immunity on This Theory

Defendant Officers also argue they are entitled to qualified immunity on Johnson's § 1983 conspiracy claims because, in their view, it is unclear in 1993 whether officers working for the same police department could be liable for participating in a conspiracy. For the reasons already discussed, Johnson preserves the argument that Defendants are not entitled to immunity. *See* Argument IV(C)(5)(a) *supra*.

Defendants' argument follows from the incorrect contention that the law is unclear about whether the so-called intra-corporate conspiracy doctrine bars Johnson's conspiracy claims against the Defendant Officers. OB-50. The argument is wrong on a number of levels. For starters, the Supreme Court and Seventh Circuit long before the Fred case held that § 1983 conspiracy claims can be pursued against members of a single law enforcement agency. *See Adickes*, 398 U.S. at 152; *Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (conspiracy among supervisory officers within the Chicago Police Department); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253-61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the  Milwaukee Police Department).

In addition, neither the Supreme Court nor the Seventh Circuit has ever applied the intra-corporate conspiracy doctrine to § 1983 claims, and cases applying that doctrine in other contexts but not to § 1983 claims do not *unsettle* established law. Moreover, the intra-corporate conspiracy doctrine has no place in § 1983 cases. The doctrine arose in the antitrust context and provides that "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017).

124

It arose because the presumption for a conspiracy among agents of a single corporate entity is that the actions of employees are attributed to the corporate principal. But for § 1983 claims that presumption cannot apply because *Monell* holds that actions of municipal employees can never be imputed to their municipal employer. So, applying the doctrine to §1983 claims does not make sense. This is why "district courts have overwhelmingly declined to dismiss conspiracy claims against police officers pursuant to the intracorporate conspiracy doctrine." *Liggins v. City of Chicago*, 2021 WL 2894167, at *5-*6 (N.D. Ill. July 9, 2021).

Moreover, qualified immunity considers whether state actors were on notice that their *conduct* was unlawful according to established law, which it was, not whether prior cases gave notice of a *defense* to a civil claim. *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."). Accordingly, "[r]ecent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases does not create an opening for qualified immunity on behalf of defendant officers." *Harris v. City of Chicago*, No. 20-CV-4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020).

Lastly, the intra-corporate conspiracy doctrine applies to conspiracy wholly among members of a single entity, and here Johnson's conspiracy claims include an agreement between Defendants and private individuals, including Elba, Ricardo, Rosa, and Johns, and so the intra-corporate conspiracy doctrine would not apply in this case, even if there were some argument for its application more generally.

125

I.       **A Jury Must Decide Johnson's State Law Negligence Claim**

In their final argument, Defendant Officers assert in a paragraph that Johnson's Illinois negligence claim that they breached a duty to him and acted willfully and wantonly in so doing must be dismissed because, Defendants say, there is no separate tort of willful and wanton misconduct in Illinois. OB-42. Guevara joins the argument. GB-4-5. "This argument is a non-starter," courts in this Circuit have recognized, "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as 'either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.'" *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, 2023 WL 348320, at *4 (S.D. Ill. Jan. 20, 2023) (quoting *Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012)); *see also Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). Similarly, the Seventh Circuit has held: "Under Illinois law, a plaintiff pleading willful and wanton misconduct must establish the same basic elements of a negligence claim, which are the existence of a duty, breach of that duty, and an injury proximately resulting from the breach. A willful and wanton claim has the additional requirement that the breach be not merely negligent, but with conscious disregard for the welfare of the plaintiff." *Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 514 (7th Cir. 2010) (internal quotations and citations omitted). Johnson's claim has been recognized by the Illinois Supreme Court and the Seventh Circuit, and Defendant Officers' argument to the contrary should be rejected. Particularly

126

so given that federal pleading rules only required Johnson to plead facts in his complaint, not legal theories. *Reeves v. Jewel Food Stores*, 759 F.3d 698, 701 (7th Cir. 2014).[24]

Defendants do not argue that Johnson has failed to create a genuine dispute of fact on any element of this claim. Nonetheless, to succeed on this claim at trial, Johnson must show that the Officer Defendants owed him duty of care, breached this duty, that this breach caused Johnson's injuries, and that Defendants either deliberately intended to harm Johnson or consciously disregarded his welfare. *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *10 (N.D. Ill. Apr. 13, 2018). For all of the reasons set out above, there are genuine disputes of fact on all of these elements as to each Defendant. *See* Argument IV(A)-(C) *supra*.

## V. SUMMARY JUDGMENT IS UNAVAILABLE TO THE CITY OF CHICAGO

Though the City purports to move for summary judgment on all claims, it does not come close to making a showing that justifies that relief. The City moves for summary judgment on *Monell* claims whose theories are supported by evidence that multiple courts in this District have already determined survive summary judgment, on which federal juries have already found the City liable, after which multiple judges have denied the City's post-trial motions, and the Seventh Circuit in one case has affirmed. *Fields v. Chicago*, No. 10 C 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *affirmed*, 981 F.3d 534 (7th Cir. 2020), *Rivera v. Guevara*, No. 12 C 4428, 2019 WL 13249674 (N.D. Ill. Sept. 20, 2019); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1067 (N.D. Ill. 2018); *Washington*, 2022 WL 4599708, at *17. Like in those cases, the City fails to establish its entitlement to summary judgment on those same claims here.

---

[24] Johnson pleaded the claim this way initially because Illinois law might provide a defense to public employees who act with negligence, requiring a heightened showing of "willful and wanton conduct." 745 ILCS 10/2-202.

Moreover, although Johnson's *Monell* claims are supported by extensive evidence separate from and alongside expert reports and testimony, the City's arguments for summary judgment depend nearly entirely on challenges to the experts that Johnson has disclosed. Not only do those arguments ignore the separate supporting Johnson's *Monell* claims, but the same types of challenges have already been rejected already by other courts in this District, which have held that juries may consider nearly the exact expert opinions the City seeks to exclude here. *E.g.*, *Fields v. Chicago*, 2017 WL 4553411, at *5; *Rivera*, 2019 WL 13249674, at *3; *Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *24 (N.D. Ill. Sept. 30, 2023); *Washington*, 2022 WL 4599708, at *11.

Indeed, Johnson's experts do better than what has been deemed admissible in past cases, and their examinations of the City's policies and practices are among the most comprehensive and careful analyses ever produced regarding the Chicago Police Department. The City asks this Court to depart from these sound past court opinions and robust evidence and instead grant the City judgment in advance of trial. This Court should decline that invitation.

The Court should deny the City's motion for summary judgment for at least five reasons. First, the City does not move for summary judgment on all *Monell* theories against it. Second, the City has no evidence to contest that City policymakers, who were on notice of the need for policies governing the recording and disclosure of investigative materials in homicide cases, promulgated facially deficient written policies, leading to the suppression of evidence.

Third, there is ample evidence, even ignoring expert opinions entirely, that would permit a reasonable jury to conclude that the City knew of and was indifferent to a widespread practice of suppressing evidence, which risked *Brady* violations in criminal cases. The central premise of the City's entire motion is that Johnson's *Monell* claims are based entirely on the reports of Johnson's

retained experts, which is not true. Because the City raises challenges in its brief solely to Johnson's experts (and only partial challenges to those experts' opinions), it effectively does not challenge the large record of evidence supporting Johnson's *Monell* claims.

Fourth, material disputes of fact preclude summary judgment on the City's widespread practice of fabricating witness identifications using unnecessarily suggestive and improperly documented identification procedures in homicide cases, which risked that unreliable identifications would be used in criminal cases.

Fifth, the City's arguments regarding the admissibility of the expert opinions are without merit and do not entitle the City to summary judgment on any theory. Johnson responds to the City's *Daubert* motions separately, *see* Dkt. 338 (Mr. Tiderington), Dkt. 336 (Dr. Steblay), and he incorporates those responses here. Many of the City's arguments in its summary judgment motion are copied from its *Daubert* motions.

Throughout its summary judgment motion, the City impermissibly ignores evidence, construes the record in the light favorable to the City, and draws inferences in its favor. When the record is properly construed for Johnson and inferences are drawn in his favor, it is obvious the City's official policies and customs caused innocent civilians to be framed in homicide investigations where evidence was manufactured and suppressed and witness identifications were fabricated using suggestive identification procedures, thereby violating the rights of countless individuals. The City is responsible for violating Johnson's rights, and it should not be permitted to sit on the sidelines at trial.

A.     **The City Misstates the Legal Framework Governing *Monell* Claims**

The City ignores recent Seventh Circuit cases discussing *Monell* liability and provides an incomplete outline of the legal standard governing § 1983 claims against municipalities. CB-4-5 (incorrectly identifying only three avenues to municipal liability).

The *en banc* Seventh Circuit has held recently that municipalities are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of a plaintiff's constitutional rights was caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding a jury correctly found a municipality liable for gaps in a jail sexual assault policy when decisionmakers knew of the risk of sexual assault of detainees); *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 379-81 (2017) ("[I]n situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable."); (2) a widespread custom or practice that pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Board of Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30.

"The central question is always whether an official policy, however expressed (and we have no reason to think that the list in *Monell* is exclusive), caused the constitutional deprivation," the Seventh Circuit has explained. *Glisson*, 849 F.3d at 379. "It does not matter if the policy was

duly enacted or written down, nor does it matter if the policy counsels aggressive intervention into a particular matter or a hands-off approach." *Id.*

### B. The City Does Not Move for Summary Judgment On A Number of Johnson's *Monell* Theories, and So A *Monell* Trial Will Occur No Matter What

The City's motion inexplicably asserts that Johnson is only pursuing three *Monell* theories, and the City goes on to address only three widespread practice theories regarding evidence suppression and identification procedures. CB-4-6 (describing theories); CB-8-16 (Part II, addressing widespread practice regarding eyewitness identifications); CB-16-34 (Part III, addressing widespread practice of evidence suppression). The City makes no meaningful argument about any other *Monell* theory.[25]

The City thus ignores *Monell* theories at issue in the case. In addition to the theories discussed by the City, Johnson pursues the following theories, which the City has not addressed:

- The Chicago Police Department's express written policies governing the creation, maintenance, and production of investigative information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case. PSOF ¶¶301-356, 359, 362-366, 368-372, 376-393, 409;[26] *see Glisson*, 849 F.3d at 379-80 (holding that a conscious municipal decision not to adopt or to omit needed policies creates liability under the express policy framework of *Monell*); *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (holding that a single application of a deficient express policy resulting in a constitutional violation is enough to establish liability).

- The City's final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in so doing made a decision that

---

[25] To the extent that the City's brief attempts to argue that Plaintiff is also unable to succeed on a failure to train or discipline theory with regard to identification procedures, CB-16, the City omits this theory from its overall theme that Johnson is only pursuing widespread practice theories, CB-5. The City's weak, one-paragraph argument as to this challenge is addressed *infra* at Part V(E)(3).

[26] Among other things, the City's express policies authorized individual police investigators to subjectively determine what investigative materials to maintain and turn over; they mandated a system of parallel investigative files in homicide investigations; they were devoid of any requirements governing the CPD's transmission of investigative files to prosecutors and others in the criminal justice system; they did not cover gang crimes officers or other non-detective investigators; and they included no rules binding the CPD's subpoena service unit, which was charged with responding to requests for documents and subpoenas. PSOF ¶¶301, 316-17, 323, 326-331, 335, 337-41.

caused suppression of exculpatory materials in Johnson's case. PSOF ¶¶301-341, 342-355; *see Vodak v. City of Chicago*, 639 F.3d 738, 747-48 (7th Cir. 2011) (policymakers' decision about how to implement policy gives rise to liability when it violates constitutional rights); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (final policymaker who is aware of a systematic lapse in policy and who fails to correct it renders municipality liable);

- The City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their investigations, PSOF ¶¶301, 322, 326-27, 332-34, 337, 343, 356, 388-89, 457-470;[27] *e.g.*, *Canton v. Harris*, 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (municipality liable "when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact").[28]

- The Chicago Police Department's express written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications, suggestive identification procedures, and inaccurate or non-documentation of eyewitness identification procedures. PSOF ¶¶301, 400-416, 471-488, 489-493; *e.g.*, *Glisson*, 849 F.3d at 379-80; *Calhoun*, 408 F.3d at 379-80.[29]

- The City's final policymakers, who were on notice of the problem of false identifications, suggestive identification procedures, and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Fred investigation. PSOF ¶¶301, 394-416, 433-435, 443, 445, 447; *see also e.g.*, *Vodak*, 639 F.3d at 747-48; *King*, 680 F.3d at 1021; *Steidl*, 151 F.3d at 741.

- The City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those identification procedures, PSOF ¶¶301, 356, 403–416, 471-488, 489-493; *see also, e.g.*, *Canton*, 489 U.S. at 390; *Jenkins*, 487 F.3d at 492.

---

[27] The City had no policies governing supervision of investigative file production; it did not audit its written policies governing the production of investigative materials, which were promulgated after *Jones* and *Palmer*; and it did not provide training on those policies, PSOF ¶¶301, 317, 322, 323, 326-331, 356, 389, 457-470; *Sornberger*, 434 F.3d 1006, 1029-30 (7th Cir. 2006) (holding that municipalities are liable if they knew more supervision was needed).

[28] The City moves for summary judgment on Johnson's *Monell* theory that the City failed to discipline police officers accused of misconduct generally, but it does not address the separate theories that the City did not provide adequate training, supervision, or discipline on particular subjects relating to homicide investigations.

[29] With respect to its official policies governing eyewitness identification procedures, the City moves on Johnson's widespread practice theory, CB-8-17, but it does not address his express policy/gap in policy theory or his theory regarding actions of final policymakers, or his theory that the City failed to train, supervise, or discipline on this subject.

- The City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions. PSOF ¶¶301, 345-56, 449-456, 471-488, 489-493; *e.g.*, *Jackson v. Marion County*, 66 F.3d 151, 156 (7th Cir. 1995); *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006); *Evans v. City of Chicago*, 2006 WL 463041, at *13 (N.D. Ill. Jan. 6, 2006).

The fact that the City has not moved for summary judgment on these *Monell* theories means they must be tried. *Carmichael*, 605 F.3d at 460 ("The burden of defeating summary judgment did not shift to the plaintiffs on this issue simply because, without citation to relevant facts or authority . . . defendants sought summary judgment on all claims against all parties."); *Sublett*, 463 F.3d at 736 ("As a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Titran*, 893 F.2d at 148 ("When a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on; the number of potential grounds for (and arguments against) summary judgment may be large, and litigation is costly enough without requiring parties to respond to issues that have not been raised[.]"). Any argument the City might have made regarding these theories are now forfeited, *Thompson v. Boggs*, 33 F.3d 847, 854 (7th Cir. 1994); *Fox v. Peters*, 2011 WL 6378826, at *8 (N.D. Ill. 2011), and it will be too late for the City to raise arguments for the first time in reply, *Costello*, 651 F.3d at 635; *Nelson v. LaCrosse Cty*, 301 F.3d 820, 836 (7th Cir. 2002).

To the extent the City states at the start of its motion that Johnson is not pursuing the above *Monell* theories, *e.g.*, CB-5 ("Plaintiff does not identify any express unconstitutional policy and is not claiming that he was directly injured by a person with final policymaking authority."), or implies that the City was not on notice of these theories, CB-1-2 (discussing allegations in Johnson's complaint), those contentions are without merit. First, these theories have been litigated

exhaustively in this case, and Johnson has explained them in detail in response to discovery requests. PSOF ¶301.[30] Second, they are discussed at length in the parties' expert reports. PSOF ¶¶357-374, 417-448.

Third, the City recently has faced multiple trials and cases involving these *Monell* claims, including in Guevara cases, in which it has briefed the theories and evidence just discussed, including *Fields*, No. 10 C 1168, Dkt. 1184 (response to post-trial motion) at 12-25 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 735 (response to post-trial motion) at 78-118 (explaining each of these theories); *Rivera*, No. 12 C 4428, Dkt. 321 (response to summary judgment) at 50-53 (explaining each of these theories). The City cannot attempt to obtain summary judgment without addressing *Monell* theories that Johnson pursues merely by mischaracterizing the nature of Johnson's claims, and this Court should reject the City's attempt to do so. As the court decided in *Rivera*, 319 F. Supp. 3d at 1056-59, a trial is necessary on these *Monell* theories that the City does not challenge.[31] Given the City's forfeiture, Johnson does not address these theories further in this response.

### C. The City Does Not and Cannot Challenge Johnson's *Monell* Theory That City Policymakers Promulgated Policies That Were Deficient to Stop Evidence Suppression

In addition, the City cannot raise any material dispute of fact that its final policymakers put in place express policies that were facially deficient to stop the suppression of evidence in

---

[30] To the extent that the City cites Johnson's complaint in its motion, CB-1-2, the Court should disregard those citations. Not only were the claims explored in richer detail in discovery, as discussed, but the Seventh Circuit has repeatedly reminded that legal theories need not be spelled out in a complaint, and the limitation of theories in a complaint is not relevant at summary judgment. *Streckenbach v. Vandensen*, 868 F.3d 594, 596 (7th Cir. 2017) ("Complaints need not plead law or spell out theories of liability.").

[31] Remarkably, in its summary judgment brief in *Rivera*, filed seven years ago, the City made the same argument that Rivera there had not pursued the *Monell* theories that Johnson sets out above, and Rivera there responded, as Johnson does here, that he had pursued those theories in discovery. No. 12 C 4428, Dkt. 321 at 50-53. The Court then ruled that those theories were in play at trial in *Rivera*. 319 F. Supp. 3d at 1056-59. For the City to suggest seven years later that it is still not on notice of these theories in these closely related cases is incredible.

homicide investigations. Instead, all of the record evidence supports Johnson's view of the facts, and the City has not produced any evidence to point to in response, so summary judgment on this theory should be denied.

First, the fact that the City's policymakers put in place express policies that were facially deficient to stop the suppression of evidence in homicide investigations is clear from the face of the written policies themselves. Detective Division Special Orders 83-1 (effective February 3, 1983), 83-2 (effective May 2, 1983), and 86-3 (effective May 29, 1986), put in place in response to the evidence suppression problem, required that detectives keep notes and memoranda on a new official form called a "General Progress Report" and preserve them in a new "Investigative File" kept in the Detective Area. PSOF ¶¶320-321, 325-30; JSOF ¶11. But the written policies had facial deficiencies, including: (1) the policies did not include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files," PSOF ¶¶323, 326, 329, 330, 335, 337; (2) they allowed for the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations, PSOF ¶¶323, 326, 329, 330, 336, 337; (3) they failed to cover gang crimes officers and other non-detective investigators participating in homicide investigations, meaning there was no change in rules when it came to investigative information gathered by these individuals, PSOF ¶¶323, 326, 338; (4) they left to the discretion of detectives what information to record in official files, based on detectives' own subjective determinations, PSOF ¶¶323, 326, 329, 330, 339; (5) they did nothing to ensure that the Chicago Police Department subpoena service unit (charged with responding to subpoenas from the criminal justice system for investigative information), the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the

135

criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, PSOF ¶¶323, 326, 335, 337, 340, 341.

Second, the City policymakers' deficient response to the evidence suppression problem is evident in the fact that the promulgated policies contained the above facial deficiencies, despite Judge Shadur's identification in *Palmer* of many of these specific problems as those in need of a solution. PSOF ¶¶319, 323. That put the City's policymakers on notice at such a particular level of detail of the failures that needed correcting that the policymakers' decision to leave these particular gaps in policy cannot be construed as anything more than an explicit decision to allow the problem to continue. SOF ¶¶333-341.

Third, the City's deficient response is further shown by the Chicago Police Department's lack of effort to implement the new Special Orders. Policymakers were aware of a substantial resistance with the Chicago Police Department to any change in policies requiring disclosure of information. PSOF ¶¶311-12. Still, the City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies. PSOF ¶¶322, 332.

Fourth, the City's policymakers and designees in charge of this policymaking concede that the Special Orders it put in place did not address Judge Shadur's concerns, and that the policies put forth were insufficient to overcome a problem as entrenched as the Chicago Police Department's evidence suppression policy. PSOF ¶¶332-41, 342-355. And as discussed above, after Special Order 86-3 there was no further change in City policy before the time that Johnson was wrongly convicted of the Fred murder. PSOF ¶¶327, 329-330, 342-345.

In response to the ample evidence above–including, among other things, the City's own written policies, 30(b)(6) designees and district court and appellate rulings–the City has not put forth a single fact witness, Rule 30(b)(6) witness, or even expert witness who challenges

Johnson's evidence. The City's 30(b)(6) designees have admitted that the policies put in place were deficient in various ways, and did not address a number of the deficiencies in the policies that Judge Shadur explicitly identified, including the continued use of parallel files, the lack of any guidance as to what constituted relevant information that needed to be documented, the lack of any guidance to the subpoena service unit about what to gather in response to document requests from prosecutors and criminal defendants, and most fundamentally the lack of any directive to produce all investigative information contained in police investigative files. PSOF ¶¶333-41, 34-45. It is particularly striking that, despite disclosing four experts in this case, the City has not disclosed any expert to defend the City's express written policies governing the documentation and disclosure of exculpatory and impeachment evidence–*i.e.*, Special Orders 83-1, 83-2, and their progeny. PSOF ¶375. The City has not and cannot adduce evidence that creates a genuine issue of material fact on this *Monell* theory, and therefore they are not entitled to summary judgment on this theory.

Moreover, as discussed above, the City does not move for summary judgment on Johnson's express policy and final policymaker *Monell* theories, because it has no evidence permitting it to do so, and thus the City has forfeited any argument for summary judgment on those theories. *See* Argument V(B) *supra*. Accordingly, when this Court disposes of the City's summary judgment motion, there is no need for this Court to address the theory that the City's final policymakers put in place express policies that were facially deficient to stop the suppression of exculpatory evidence in homicide investigations.

### D. A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Evidence Suppression

Turning to the arguments the City has preserved, the City contends it is entitled to summary judgment on Johnson's theory that the Chicago Police Department had a widespread practice of suppressing evidence in homicide investigations. CB-16-38. The City has no hope of summary judgment on this theory.

#### 1. The City's False Premise Regarding Expert Evidence

A few preliminary points are important. First, the City's entire summary judgment motion starts from the premise that Johnson's *Monell* claims depend "entirely upon his expert witness disclosures." CB-1; CB-10; CB-26. As a result, the City discusses only Johnson's experts' opinions relating to the *Monell* theories that the City addresses.[32] In so doing, the City simply ignores the huge volume of evidence supporting Johnson's *Monell* theories that are unrelated to expert testimony. The City's litigation decision to ignore evidence means it cannot meet its burden to show that there are no genuine disputes of material fact in the record. *Adickes*, 398 U.S. at 157; 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE §2727. A party cannot assert that a claim is based entirely on a single item of evidence, ignore all other record evidence, and ask a court to grant it summary judgment by attacking the single item of evidence it has identified.

#### 2. The City Invokes the Wrong Legal Standard for Widespread Practice Claims

Second, it is important to clarify what sort of pattern must be shown in order to succeed on a *Monell* widespread practice theory. The City wrongly suggests in various places throughout its motion and in its *Daubert* briefing that Johnson must present evidence of a pattern of repeating

---

[32] As discussed below, the City challenges only a small portion of Johnson's experts' opinions in its motion, and so even if its false premise were correct, the City would not be entitled to summary judgment.

*constitutional violations* to succeed on this *Monell* theory. The Seventh Circuit rejected exactly this argument when it affirmed the verdict against the City on the evidence-suppression widespread practice theory in *Fields* saying, "We have rejected that narrow interpretation of *Monell* liability." 981 F.3d at 562. The *en banc* court of appeals in *Glisson* reiterated the long-standing rule that a *Monell* plaintiff need only show a repeated pattern of *behavior* that provides notice of a *risk of harm*, and not a repeated pattern of *actual harms* to others, to establish a widespread practice. 849 F.3d at 381-82.

Accordingly, to proceed with a widespread practice theory, Johnson need only establish a repeated pattern of behavior that provided notice of a risk of harm to which the City did not respond, and not a pattern of constitutional violations. *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) (custom and notice shown by "evidence tending to show a general pattern of repeated behavior," without "evidence that . . . systemic failings affected other[s]"). So, for example, Johnson can show a repeating pattern of evidence suppression in homicide cases that provided notice of the risk that exculpatory or impeachment evidence would be suppressed in criminal cases, and he need not show a repeating pattern of *Brady* due process violations. Or he may show a repeating pattern of fabricating identifications using suggestive identification procedures in homicide cases, which provided notice of the risk that unreliable identifications would taint criminal proceedings. Or he may show a repeating pattern of failing to train, supervise, and discipline police officers, which gave notice of the risk that officers would violate the rights of civilians. Ample Seventh Circuit precedent confirms that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated *behavior* (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734 (7th Cir. 2016) (emphasis added); *see also Dixon v. Cook County*, 819 F.3d 343, 348-49

139

(7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook County*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis*, 452 F.3d at 694-95 (rejecting the same argument the City makes here); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760-61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."). Johnson proffers record evidence to establish each of these widespread practices.

In addition, the summary judgment record *also* includes evidence of repeating constitutional violations caused by the City's widespread practices of evidence suppression and fabricating identifications with suggestive procedures. PSOF ¶¶345-356, 369-72, 376-393, 425, 438-443, 449-488, 48-491. So, even applying the City's incorrect legal standard, summary judgment would be inappropriate.

### 3. The City Has Already Lost the Widespread Practice of Evidence Suppression Theory Multiple Times, Which Makes Its Argument for Summary Judgment Frivolous

Third, before diving into the record evidence that precludes summary judgment, it is worth reiterating that the City lost the *Monell* theory regarding its widespread practice of evidence suppression at trial in *Fields* and *Rivera*; the City's post-trial motions were denied; and the Seventh Circuit expressly found in affirming the *Fields* verdict that (1) the City's widespread practice of evidence suppression was well established, (2) City policymakers were on notice of the practice, and (3) there was sufficient evidence to support a verdict against the City on this theory. *Fields*, 981 F.3d at 563. For the City to argue after such rulings that there is insufficient evidence for a trial on the same theory is meritless. Worse yet, the City does not even reference the Seventh Circuit's *Fields* decision in its motion for summary judgment, which is at odds with the City's

140

duty of candor to this Court. *Beam v. IPCO Corp.*, 838 F.2d 242, 249 (7th Cir. 1988). These past verdicts affirmed by the Seventh Circuit[33] make its argument for summary judgment frivolous.

### 4. Non-Expert Evidence Establishing the City's Evidence Suppression Practice

Setting aside Johnson's expert opinions for the moment, there is a huge volume of evidence in the record supporting Johnson's claim that the City had a widespread practice of evidence suppression, including:

- Starting in at least 1982, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.) (*see also Jones*, 856 F.3d at 996), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of investigative materials and violations of due process, PSOF ¶¶302-305, 308-310, 312-313, JSOF ¶121; *see also Fields*, 981 F.3d at 563 (concluding that *Palmer* and *Jones* establish the City was aware that the failure to ensure production of evidence in police investigations "presented a constitutional problem");[34]
- James Hickey, the City's designated Rule 30(b)(6) witness on this topic, testified, among other things, that (a) in light of *Palmer* and *Jones*, City policymakers knew that they had an evidence suppression problem, (b) he reviewed evidence disclosure practices across the department prior to 1983 and determined that the problem was citywide, (c) the problem stemmed from a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and

[33] These past verdicts affirmed by the Seventh Circuit also make evident that the City is precluded from litigating its policy of evidence suppression. Johnson will raise his preclusion argument before trial proceeds in this litigation.

[34] The City engages in a long, largely revisionist history regarding the *Jones* and *Palmer* litigation and the policies it promulgated in response. CB-18-23. This discussion is largely irrelevant to the fact disputes at summary judgment. Particularly so given that the Seventh Circuit has already concluded in *Fields* that *Jones* and *Palmer* provided the City notice of a widespread practice that risked constitutional harm, and that its practice of evidence suppression continued after that time. 981 F.3d at 563. Moreover, the City's discussion plainly does not construe the facts in the light most favorable to Johnson, which is required at this stage.

To the extent, however, that the City is suggesting that the *Jones* and *Palmer* cases are themselves ultimately not evidence of a widespread practice of evidence suppression, that is not correct. *Jones* involved the suppression of critical exculpatory information and resulted in a large damages verdict approved by the Seventh Circuit. 856 F.2d 985. *Palmer* caused numerous City policymakers to take notice of a widespread problem of evidence suppression, *according to the testimony of those City policymakers themselves*, PSOF ¶¶302, 308-313, and the City's pronouncement that none of the *Palmer* files revealed exculpatory information is undermined by the fact that those files were never analyzed in a systematic fashion, PSOF ¶305. As the Seventh Circuit noted in *Jones*, the *Palmer* litigation was resolved "without a formal ruling on the lawfulness of the practice," thought the Court in *Jones* concluded that the record supported that the practice was in place and that "[t]he City sensibly does not attempt to defend such behavior in this court." *Jones*, 856 F.3d at 995-96.

internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files; and (d) entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead written in memos and notes that were not disclosed and were eventually destroyed, PSOF ¶¶306-310;

- City officials were aware of substantial resistance within the Police Department to any change in policies requiring disclosure of information or the practice of keeping parallel, "personal" files not available to the criminal justice system, and they were aware of the risk of wrongful prosecutions and convictions if the evidence suppression problem was not solved, PSOF ¶¶311-313;

- As stated previously *supra* at Argument V(C), Detective Division Special Orders 83-1, 83-2, and 86-3 were implemented in response to the evidence suppression problem, but had numerous facial deficiencies, including: (1) leaving to the discretion of detectives what information to record in the Chicago Police Department's official files, based on detectives' own subjective determinations; (2) failing to include any instruction to disclose to prosecutors and criminal defendants investigative information, and they did not require the disclosure of the newly created "investigative files;" (3) permitting the continued use of a decentralized, parallel file system in which investigative information was kept in different places, perpetuating the risk that material would not be gathered from all of those locations; (4) failing to cover gang crimes officers and other non-detective investigators participating in homicide investigations; and (5) failing to ensure that the Chicago Police Department subpoena service unit, the Detective Divisions, or anyone else in the Chicago Police Department actually produced to the criminal justice system all of the different investigative information created by the Chicago Police Department during an investigation, PSOF ¶¶320-23, 325-330, 335-341; Argument V(C) *supra*;

- Despite Judge Shadur's identification in *Palmer* of many of these specific problems as requiring a solution, PSOF ¶¶319, 323, City policymakers decided to leave these particular gaps in Chicago Police Department written policies, PSOF ¶¶333-341; Argument V(C) *supra*;

- City policymakers and designees in charge of this policy-making concede that the Special Orders the City implemented did not address Judge Shadur's concerns, PSOF ¶¶332-41, 342-355, and the City did not audit the effect of the new policies or take any steps to monitor compliance with the new policies; PSOF ¶¶322, 332; Argument V(C) *supra*;

- The City acknowledges that its continued system of having multiple parallel files instead of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations, PSOF ¶337;

- The Defendant officers in this case testified that they had no knowledge of the requirements of the post-*Palmer* Special Orders, received no training on the Special Orders or on the obligation to preserve notes or disclose exculpatory information, and continued to keep unofficial, personal notes that they destroyed, PSOF ¶356;

- The Chicago Police Department suppressed evidence in the case of Nathson Fields, who was convicted of the 1984 double murder and eventually re-tried and acquitted in 2009, a case in which civil discovery revealed a street file—sitting among hundreds of other files in a file cabinet at Area Central—of over a hundred pages of handwritten notes, memos,

and other documents identifying multiple alternate suspects and potential leads demonstrating that Fields was innocent, PSOF ¶¶345-349;

- Ample evidence from the 2016 *Fields* trial, in which a jury found that the failure to disclose evidence to Fields was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Fields compensatory damages of $22 million, including (a) dozens of other street files in the Area Central basement, including the cases of Jon Fulton, Timothy Malone, and James Crockett, (b) the testimony of Defendant officers in that case about the continued use of informal notes and memoranda and a lack of training on the new Special Orders, and (c) the testimony of the City's defense experts, supporting the conclusion that the street files practice continued, PSOF ¶¶349, 376-380;

- The Chicago Police Department suppressed evidence in the case of James Kluppelberg, who was convicted for a 1984 fire that killed six people and later exonerated, a case in which civil discovery in 2014 revealed a newly-discovered file from the original investigation that contained numerous handwritten notes and memoranda, including a memo between detectives about an alternate suspect who was intoxicated at the time and had started a fire in a building nearby just hours before the fire for which Kluppelberg was convicted, PSOF ¶350;

- The Chicago Police Department suppressed evidence in the case of Jacques Rivera, another Guevara case, including an August 27 GPR containing the critical first memorialization of the sole eyewitness's account that put the witness further away from the scene of the crime than police reports documented; an August 27 GPR regarding the same witness that contradicted Defendants' story about an identification procedure that happened on that date; Guevara falsely claimed that the shooting victim had identified Rivera as the shooter before he died, but suppressed that the victim was in a medically induced coma at the supposed time of the identification. PSOF ¶¶351-354. The City's Rule 30(b)(6) designee Hickey admitted that all of these documents should have been disclosed. PSOF ¶351.

- Ample evidence from the 2018 *Rivera* trial, in which a jury found that the failure to disclose evidence to Mr. Rivera was the result of a pattern and practice of the Chicago Police Department and awarded Mr. Rivera compensatory damages of $17 million, supported that the City had a pattern and practice of evidence suppression. For instance:

  o Rivera's expert, Michael Brasfield, testified that the City's written policies were plainly deficient because they retained the decentralized record-keeping system that perpetuated the system of multiple, unofficial parallel files that were at the heart of the *Jones* and *Palmer* litigation, did not cover gang crimes units and other investigators involved in homicide investigations, did not define what investigative information had to be documented in reports, and did not contain instructions to ensure that the investigative file and each of the various other parallel sources of police documents were searched for and produced in response to criminal court subpoenas. PSOF ¶¶353, 384;

  o Brasfield conducted an analysis of 435 CPD Area Five homicide files for the years 1985 to 1991, and his analysis of the data revealed that, in 61% of the cases, the requirement to create GPRs was not being complied with, in 37% of the cases the rule requiring inventories was disregarded, and in 92% of the cases documents contained in the unofficial investigative files were not making it to

the criminal justice system. A full 100% of the files contained evidence of failures to follow the post-*Palmer* policies. PSOF ¶385;

o Defendants' expert, Bernard Murray, chose not to conduct his own corresponding review to see if the practices changed after the new policies were enacted, and so Brasfield's testimony on these issues was unrebutted. PSOF ¶385;

o Brasfield also testified that his review of the City's permanent retention files revealed that the problems identified in *Jones* and *Palmer* persisted, as the CPD permanent retention files he reviewed only told the single branch of the story that let from crime to charged suspect, in effect excluding alternate suspects, different witnesses, and other types of materials a criminal defendant would need to build a defense. Defendants' expert, Bernard Murray, failed to rebut this testimony. PSOF ¶386;

o Brasfield also compared investigative files to their corresponding criminal defense files and determined that materials from the investigative file were missing from more than 90% of the defense files, and 74% were missing police notes, the sort of crucial material that had been the subject of *Jones* and *Palmer*. Only 8% included the inventories that were supposed to be disclosed to defense attorneys under the new policies. Brasfield and Murray testified about multiple cases—*e.g.*, Nathson Fields, James Kluppelberg, Samuel Robinson, Demetrius Johnson, David Quinones, Miguel Borrotto, and Curtis Kirkland—in which the withheld materials were the type of important investigative material that by all accounts should have been turned over, and that a jury could deem material. Murray conceded that material missing from criminal defense attorney files was also missing from the prosecutor files, including many of the specific examples above of highly exculpatory material missing from criminal defense files. PSOF ¶387;

o Brasfield's testimony also revealed that Gang Crimes officers were fully involved in homicide investigations, as they were in the Valentin investigation. Gang Crimes officers should have been subject to the rules governing detectives with regard to documenting investigative steps and ensuring that such material was produced to the criminal justice system. But Gang Crimes officers were permitted to keep their own personal notes in their own set of parallel files. They were exempt from these rules despite the City designee Hickey's recommendation in the early 1980s that gang crimes be included in the new Special Orders. PSOF ¶388;

o The City's own witness, James Hickey, confirmed in his trial testimony that the CPD was fully aware of its evidence suppression problem, yet did not implement any policy or formal training to ensure disclosure. He confirmed that there was no auditing of detectives following Special Orders, either. PSOF ¶389; and

o Finally, there was testimony that, as a result of the practice of evidence suppression, Rivera and his criminal attorney never received a number of important documents from the investigative file during the criminal

proceedings, although the police department was responsible for ensuring their production. PSOF ¶390.

- After Special Order 86-3 there was no further change in City policy of evidence suppression before the time that Johnson was wrongly convicted of the Fred murder in 1991. PSOF ¶¶327, 330, 342.
- The City has admitted that its relevant policies were the same from 1983 all the way into the 2000s, PSOF ¶342.
- Consistent with the above, the City of Chicago's own Inspector General issued a report in 2020 finding that the Chicago Police Department's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations remained inadequate, stating, "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." PSOF ¶341.
- The Inspector General issued a follow-up report in 2021, following an inquiry into the status of corrective actions taken by the City of Chicago in response to its 2020 recommendations. In that report, the Inspector General concluded that "CPD has yet to implement most of the improvements to which it committed. Specifically, CPD has yet to conduct a comprehensive staffing and resource analysis, develop and implement standard operating procedures for the management and production of records, or develop necessary trainings." In particular, it found that the CPD "cannot ensure that it identifies and produces all relevant records in its possession as required." Without making these improvements, the Inspector General's follow-up report concluded that "Not having made these improvements, CPD is now—just as it was when OIG published its 2020 report— unable to ensure that it can meet legal and constitutional *obligations* which are at the core of its function as a law enforcement agency. This is an area of very serious risk for CPD and for the City." PSOF ¶341.

Accordingly, even if this Court ignores the evidence relating to Johnson's retained experts, the summary judgment record establishes disputes of material fact that preclude summary judgment for the City on Johnson's *Monell* theory that the City had a widespread practice of evidence suppression. As a result, the Court need not even address the City's arguments or the City's *Daubert* motions on this theory to deny the City's summary judgment motion.

### 5. Expert Evidence Demonstrating the City's Evidence Suppression Practice

Expert opinion evidence also supports Johnson's widespread evidence suppression theory. At trial, Johnson will present Mr. Tiderington's expert testimony in support of this *Monell* theory,[35] including but not limited to opinions that:

- The City's written policies did not solve the evidence suppression problem because they: (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document in police files; and (d) did nothing ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation, PSOF ¶359;
- The Chicago Police Department's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders, PSOF ¶¶359, 360-374;
- Mr. Tiderington's analysis and findings from the review of 475 homicide files from Area Five for the period 1991-1995 (the five-year period beginning with and through Johnson's wrongful prosecution), and 344 Area Five investigative files from 1995-1998 revealed that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports. Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. Relatedly, Tiderington found no handwritten notes or GPRs in the entire investigative file from Guevara or Halvorsen, the lead detectives in this case. In his decades of experience, he was "not aware of a single homicide investigation in which the lead detectives took no notes." PSOF ¶362; JSOF ¶91.
- Mr. Tiderington's review of these investigative files revealed that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms, despite the Special Order's requirements and the City's knowledge of this deficiency, PSOF ¶363;

---

[35] As discussed in Johnson's response to the City's motion to exclude Mr. Tiderington's opinions, Mr. Tiderington is a police practices expert with more than 40 years of experience in law enforcement, including experience as a Police Chief for more than 20 years. Mr. Tiderington has trained more than 10,000 federal, state, and local law enforcement officers on police practices and criminal investigations. Further, in two decades of experience as Police Chief, Tiderington reviewed and approved policy and procedures relating to every aspect of police operations, including criminal investigations, case development, report writing, maintenance and retention of police records, complaints against police officers, training, supervision, and employee discipline. PSOF ¶¶357-358.

146

- Mr. Tiderington's review of these investigative files revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which the Special Orders required as a means to ensure disclosure, PSOF ¶364;

- Mr. Tiderington's subsequent review of corresponding permanent retention files during both of these time periods routinely lacked an inventory sheet as required by policy, and his comparison of the investigative files and corresponding criminal defense files for the years 1995-1998 demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding Chicago Police Department homicide files, PSOF ¶¶365-369;

- Mr. Tiderington's review of opinions regarding police practices expert Michael Brasfield's analysis in *Fields* of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas One, Two, Three, and Four. PSOF ¶¶347-348, 361, 370;

- Mr. Tiderington's review of opinions regarding Mr. Brasfield's findings in *Fields* that comparison of the Chicago Police Department homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives were to take notes), and 36% were missing inventories. PSOF ¶¶348, 370;

- Mr. Tiderington's review of opinions regarding Mr. Brasfield's unrebutted analysis in *Rivera* of 435 Chicago Police Department homicide files from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. PSOF ¶¶385, 370;

- Mr. Tiderington's review of the police homicide files from *Kluppelberg,* as well as the report of Mr. Brasfield in *Kluppelberg* appended to Mr. Tiderington's report, in which Brasfield found that, of the investigative files produced to him (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete inventories or no indication that inventories were sent to Records Divisions. PSOF ¶361, 371;

- These assessments of the City's homicide files demonstrate that the evidence suppression practice as it existed prior to the 1980s Special Orders continued unabated. PSOF ¶¶359-374; and

147

- Mr. Tiderington also identified specific examples of files where investigative materials contained in the City's homicide files were missing from the criminal defense files, were potentially exculpatory information of significant investigative value, and should have been disclosed under standard police procedures, including: (1) RD # C687989 (Defendant Kim Mathis); (2) RD #Z475236 (Defendant Ardell Clemons); (3) RD #B442532 (Defendant Oscar Soto); (4) RD #B023979 (Defendant Leon Fields); and (5) RD #A403252 (Defendant Guy Rainey). For each case, Tiderington reviewed corresponding State's Attorney's Office files. In each, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors, PSOF ¶368; JSOF ¶¶171, 181, 186,188,194.

All of the record evidence above amply supports Johnson's *Monell* theory that the City was indifferent to a widespread practice of suppressing evidence in the relevant time frame, and summary judgment should be denied.

### 6. The City's Arguments for Summary Judgment on the File Suppression *Monell* Theory Lack Merit

The City's arguments for summary judgment on this theory lack merit. First, the City argues that Johnson cannot show that its widespread practice of evidence suppression caused the suppression of evidence that occurred in Johnson's criminal case. CB-22-24. Second, the City contends that Johnson's *Monell* theory is based entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a practice of suppressing exculpatory evidence, largely repeating the arguments the City makes in its *Daubert* motion. CB-25-39. Neither argument has merit.

### (a) The City's Causation-Related Arguments Lack Merit

The City's first argument is difficult to follow. To the extent the City is suggesting Johnson has not shown a genuine dispute that material exculpatory or impeachment evidence was suppressed in Johnson's criminal case, that argument fails for the same reasons the Defendant Officers' arguments for summary judgment on the evidence suppression theories failed. *See* Argument IV(B) *supra*.

148

To the extent the City is arguing it did not have a widespread practice of suppressing the *particular kinds* of evidence in the *particular way* they were suppressed in Johnson's criminal case, that argument depends on construing facts and inferences for the City, which is not permissible. Moreover, the argument understands Seventh Circuit case law governing widespread practice claims too narrowly, and it also construes Johnson's theory too narrowly.

Johnson's theory is that the Chicago Police Department had a widespread practice of suppressing evidence. Naturally, in any given homicide case, the types of evidence suppressed, and the mechanisms of evidence suppression, may vary.[36] Regardless of how any one suppression of evidence occurred, that evidence was suppressed across homicide cases establishes an actionable widespread practice. In other words, *Monell* liability does not require Johnson to show a widespread practice of suppressing the particular types of evidence that were ultimately suppressed in his case in the precise way they were suppressed in his case. Instead, the Seventh Circuit has been clear that a plaintiff meets the burden of establishing a widespread practice "by offering competent evidence tending to show a general pattern of repeated behavior (*i.e.*, something greater than a mere isolated event)." *Daniel*, 833 F.3d at 734; *see also King*, 680 F.3d at 1020-21 (widespread practice of delaying medical care through different mechanisms sufficient to proceed on *Monell* claim where plaintiff was denied needed medication). Johnson has made such a showing.

---

[36] A variety of overlapping mechanisms caused the suppression of investigative information in Chicago homicide cases including: detectives were permitted to decide subjectively what evidence was documented in reports and in official files; there were no policies requiring the disclosure of evidence, governing what had to be kept in official files, or dictating how to respond to requests for investigative files; there were no policies governing non-detectives; there was a decentralized file system, which allowed for parallel files; the written policies that did exist were not followed; notes were not retained or included in files; and officers intentionally did not turn over to the criminal justice system material evidence they learned during their investigations. Different combinations of these mechanisms caused the suppression of different items of evidence in different homicide investigations during the relevant time period. That there were different mechanisms of suppression does not dilute that the City had a widespread practice of suppressing evidence in homicide investigations.

To the extent the City is arguing that Johnson cannot show that its widespread practice of evidence suppression caused the suppression of evidence in his particular case, that causation question must be resolved by a jury. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017); *see also Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (holding that at summary judgment "a plaintiff need only produce evidence sufficient to *potentially* persuade *any* reasonable jury"). If the jury believes that the evidence above establishes that the City had a widespread practice of evidence suppression in homicide cases, it could easily decide that the practice caused the suppression of evidence in Johnson's case.

### (b) The City's Arguments Challenging Mr. Tiderington Lack Merit

The City next argues that Johnson's widespread practice evidence suppression theory depends entirely on Mr. Tiderington's expert opinions, and that those opinions do not establish a widespread practice. CB-26-39. The argument suffers a number of flaws, each of which represents an independently sufficient reason to reject it.

First, the City is simply wrong that the only thing supporting this *Monell* theory is expert opinion evidence. The City ignores the volume of evidence, outlined above, that has nothing to do with Mr. Tiderington and that by itself is sufficient to create genuine disputes of material fact for trial. *See* Argument V(E)(4) *supra*. Johnson has pointed to hundreds of pages of documents, policies, testimony from Rule 30(b)(6) witnesses, prior litigation of the same theory in federal cases, testimony from Defendant Officers, suppressions of exculpatory evidence in other homicide cases (including Guevara cases), and more. This evidence alone justifies denying summary judgment, without any need for the Court to adjudicate Johnson's reliance on expert testimony.

150

This Court should so find, which will eliminate the need for the Court to weigh in on Defendants' *Daubert* motion regarding Mr. Tiderington at this stage.

Second, even supposing Mr. Tiderington's report was the only evidence supporting this theory, the City's challenges to his opinions and methodology lack merit. CB-26-39. In its summary judgment motion, the City repeats arguments it makes in its *Daubert* motion. *Compare* CB-26-38, *with* Dkt. 327. For the same reasons this Court should reject the City's motion to limit Mr. Tiderington's testimony, set forth in Johnson's response to that motion, Dkt. 338, this Court should reject the City's repeated arguments regarding Mr. Tiderington in its summary judgment motions. As set forth in Johnson's response to the City's *Daubert* motion, Mr. Tiderington's *Monell* opinions are laid out in detail over 37 pages of his report. They are amply supported by his review of thousands of pages of police files, policies, deposition testimony, and other records. The City does not challenge Mr. Tiderington's qualifications. Nor does it provide any meaningful methodological attack on his opinions. In particular, as discussed in detail in Johnson's *Daubert* response, Mr. Tiderington analyzes the deficiencies in the CPD's policies, Dkt. 338 at 3-6, 13-17, 21-22; he appropriately relied on data provided by Johnson's counsel, which was mechanically coded based on objective criteria and properly spot-checked; and he conducted a robust analysis based on that data that consumed many hours, *id.* at 19-30, 34-36; his analysis is not statistical in nature but instead applies police expertise to observable data, *id.* at 22-27; his analysis does not require intimate familiarity with each different homicide file, *id.* at 27-31; and he has amply supported his opinions that the Chicago Police Department had a practice of failing to document information learned during homicide investigations, *id.* at 13-19, 36-39.[37]

---

[37] The City also cites cases that generally stand for the proposition that an officer's violation of police policy is not always relevant to showing that the officer committed a constitutional violation in a particular case. CB-26

Moreover, the City argues in its motion for summary judgment, as it did in its *Daubert* motion, that Mr. Tiderington's opinions are not reliable because he compared what was in Area Five homicide files to the materials contained in criminal defense files for the same cases, rather than to materials contained in the Cook County State's Attorney's files. CB-14, 18-20. Johnson has provided a response to that argument in his response to the *Daubert* motion. Dkt. 338 at 31-34. There are several problems with the City's argument. First, the City is simply raising a fact dispute about whether investigative information in the Area Five files was disclosed to prosecutors and criminal defendants, which is inappropriate at this stage of the case. To the extent the City believes that it has evidence that investigative information was disclosed to prosecutors, it can present that evidence, and it may defeat the theory at trial on that basis. But that does not mean that the absence of investigative information in the files of criminal defendants is irrelevant, such that Mr. Tiderington's opinions based on the file comparison can be disregarded. If the Area Five files contained investigative information that the criminal defendants did not receive, that is certainly probative of the City's widespread practice of evidence suppression. The parties' factual dispute is for a jury to resolve.

Second, the City's argument is entirely hypothetical. The City has not developed any evidence—and it points the Court to no evidence—that supports the conclusion that the State's Attorney's files contained any of the investigative information that Mr. Tiderington found in Area Five files but not in criminal defense files. The City cannot hypothesize that perhaps information was turned over without proof, and the City has not developed any of that proof. In other words,

---

(citing *Thompson v. City of Chicago*, 472 F.3d 444, 455 (7th Cir. 2006)). Those cases have no application here. Johnson is not arguing that an officer's violation of policy shows that his constitutional rights were violated. Instead, he will prove at trial that the Chicago Police Department's failure to implement its own policies in a way that would have stopped a widespread practice of evidence suppression, and the continued persistence of that widespread practice, caused the violation of Johnson's constitutional rights. That is the proof that *Monell* requires.

the City's factual dispute, which is already inappropriate, is based on raw supposition without evidence, which is doubly inappropriate. Moreover, the City's expert examined a small number of State's Attorney's files and conceded that documents identified as missing from criminal defense files were also missing from those prosecutor files, *see* PSOF ¶387, corroborating Johnson's evidence.

Third, nowhere in its brief or *Daubert* motion does the City address the fact that the same opinions, based on the same analysis, of the same types of documents (only for a slightly later time period), were admitted in two prior wrongful conviction cases against the City, *Fields* and *Rivera*. In those two cases, Judge Kennelly and Judge Gottschall, respectively, rejected the same arguments the City makes here and permitted police practices experts to offer these same opinions, juries returned verdicts against the City based on this evidence, and in *Fields* the Seventh Circuit affirmed. In those cases, the City's arguments about file comparisons and every other challenge raised to Mr. Tiderington were left for the juries to consider. The City offers no reason why this Court should not follow suit.

Finally, it is important to note that the City does not even challenge all of Mr. Tiderington's opinions. Many of his opinions would survive even if this Court granted the City's *Daubert* motion entirely. Dkt. 327 at 6-9, 10-12, 17-22 (identifying limited portions of Tiderington's opinions implicated by City's arguments)*; see also* Dkt. 338 at 3, 19-22. Accordingly, this Court need not resolve all of the City's challenges to Mr. Tiderington's opinions to deny summary judgment.

### E.    A Jury Must Decide the *Monell* Theory Regarding the City's Widespread Practice of Fabricating Witness Identifications Using Suggestive Identification Procedures

Material disputes of fact also preclude summary judgment on Johnson's theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness

identifications using suggestive identification procedures. In the nine-year period before and after the Fred investigation, an examination of 2,786 identification procedures performed at Area Five between 1989 to 1998 demonstrates that Chicago police officers obtained identifications of their suspects in a staggering and unprecedented 75% of identification procedures that they performed, and identifications of innocent fillers essentially never. PSOF ¶425. These rates represent a dramatic and statistically significant departure from other jurisdictions, and they can only be explained by Chicago police suggestion during identification procedures. In addition, Johnson has amassed evidence of dozens of individual cases in which Chicago police fabricated identifications for use in criminal proceedings using suggestive tactics. Moreover, City policymakers promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. The City was indifferent to this widespread practice of fabricating identifications and the risk it presented that false identifications would taint criminal proceedings, in violation of due process.

### 1. Non-Expert Evidence Supporting the Widespread Practice of Fabricating Identifications

Again, contrary to the City's suggestion, this theory is not based solely on expert testimony. Johnson offers evidence that long before the 1991 Fred investigation it was common knowledge in law enforcement that a large portion of wrongful convictions were caused by improper eyewitness identification procedures. PSOF ¶¶394-398.[38] The City's Rule 30(b)(6) witness

---

[38] Since 1967, the International Association of Chiefs of Police Law Enforcement Policy Center (IACP) has provided training material for law enforcement about the failures in eyewitness identification, writing that "[e]ye-witness identification and description is regarded as a most unreliable form of evidence and causes more miscarriages of justice than any other method of proof. This weakness has long been recognized by the courts"—including the Supreme Court that same year in *United States v. Wade*, 388 U.S. 218 (1967). PSOF ¶¶394, 398. From 1967 until the time of the Fred investigation and thereafter, the risks of improper identification procedure continued to be

154

confirmed that the City had notice of model policies that cautioned law enforcement of the risk posed by suggestive identification procedures. PSOF ¶399.

Despite this notice, in 1991, the City had no written policies whatsoever governing photo identification procedures. PSOF ¶403. With respect to live lineups, the City's written policy in effect required a report to be written for live lineups documenting the date, time, location of the lineup, police conducting, persons viewing, persons present, persons participating in lineup, all persons identified, the person photographing lineup, all comments of counsel for arrestee, and any additional information or unusual circumstance occurring during the lineup. PSOF ¶¶400, 404. The policy does not on its face explain what record must be made when suspects are *not* identified in a lineup. PSOF ¶¶403, 406-07.[39] Nor does the policy on its face require reporting of what police conducting lineups said to witnesses or vice versa, or any other circumstances of the identification (other than what an officer considers relevant or unusual in their own discretion). PSOF ¶¶404-409. Documentation of exculpatory or impeachment information arising from identification procedures was not required by the policy. PSOF ¶409. The policies did not explain what was required before a supervisor approved a lineup report. PSOF ¶408. There was no training to fill these gaps in policy. PSOF ¶¶471-487.

_____

acknowledged within law enforcement. For example, in February of 1992, the IACP confirmed notice of that risk in a Model Policy pertaining to Show-ups, Photographic Identifications, and Line-ups, which cautioned law enforcement that "[w]ords or conduct of any type by officers that may suggest to the witness that the individual is or may be the perpetrator should be scrupulously avoided" to "minimize unjust accusations of innocent persons and to establish evidence that is reliable." Building upon decades of the awareness of such a risk of improper suggestion, the 1993 IACP Concepts and Issues Paper accompanying the 1992 Model Policy quoted from the Supreme Court's 1967 decision in *United States v. Wade*, 388 U.S. 218 (1967), stating that "The influence of improper suggestions upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor. Perhaps it is responsible for more such errors than all other factors combined." PSOF ¶¶395, 398. Thus, long before 1991 and thereafter, police departments have known about the problems with eyewitness identification procedures, and the need for rigorous safeguards to ensure such procedures were being conducted in appropriate cases, and in the appropriate ways. PSOF ¶¶394-398.

[39] The City's Rule 30(b)(6) witnesses have variously testified that filler identifications were not documented, and that filler identifications were documented as negative identifications. PSOF ¶407.

In 1991, there was no policy at all governing photo identification procedures. PSOF ¶403. No written policy required a report of photo identification procedures or required specific documentation about such a procedure. PSOF ¶403. No policy or training provided instruction on identifications made as part of gang book procedures—although both detectives and gang specialists used gang books during homicide investigations—and gang specialists were not provided any training relative to their participation in homicide investigations in general. PSOF ¶¶415, 472, 475-76. No policy prohibited showing a single photo of a suspect or suggesting to a witness who the suspect was during a photo array, or showing the witness a photo of the suspect prior to a live lineup, or repeating identification procedures with the same witnesses and suspects, or providing confirming statements about a suspect before or after an identification procedure. PSOF ¶¶409-411. The only training manuals the City has produced on identification procedures come from 1996, five years after the Fred investigation. PSOF ¶472.

Moreover, the City had the ability to audit the conduct and accuracy of identification procedures, but it did not actually conduct any audits of these identification procedures from at least 1986 to 1998, including the year of Mr. Johnson's wrongful conviction. It did not track misconduct during identification procedures in any way. It did not ensure that it received notice or took steps to learn of situations where motions to suppress identifications generated by the Chicago Police Department were granted. PSOF ¶¶478-487.

In this absence of policy, training, supervision, and review, Chicago police officers fabricated identifications using suggestive identification procedures that were not properly documented. There is ample evidence in the record that the practice of fabricating identifications using suggestive techniques persisted citywide at the relevant time period.

156

Johnson has identified multiple instances in which Guevara or his colleagues procured wrongful convictions and false charges using fabricated identifications, including but not limited to cases involving Robert Brown, Vincent Goldstein, James Newsome, Donald Reynolds, Billy Wardel, Reynaldo Munoz, Virgilio Calderon Muniz, Victor Vera, Xavier Arcos, Wilfredo Rosario, Daniel Rodriguez, David Velazquez, David Lugo (Colon), Santos Flores, Gloria Ortiz Bordoy, Edwin Davila, Luis Serrano, Evlyn Diaz, Angel Diaz, Luis Figueroa, Ricardo Rodriguez, Rodolfo Zaragoza, Angel Gaya, Maria Rivera, Freddy and Concepcion Santiago, Robert Ruiz, Ariel Gomez, Ruth Antonetty, Jaime Rios, Geraldo Iglesias, Robert Bouto, Roberto Almodovar, Thomas Sierra, Jose Melendez, William Negron, Nelson Gonzalez, Carlos Anindo, Gamalier Rivera, Louis Robinson, John Martinez, Eruby Abrego, Jeremiah Cain, Jacques Rivera, Orlando Lopez, Felix Valentin, Juan Johnson, Samuel Perez, Johnny Flores, Marilyn Mulero, Francisco Vicente, Armando Serrano, Jorge Pacheco, Jose Montanez, Juan and Rosendo Hernandez, and Johnson. PSOF ¶¶452, 453, 486, 489-491, 492.

## 2. Expert Evidence Supporting the Widespread Practice of Fabricating Identifications Using Suggestive Identification Procedures

Johnson also presents compelling expert evidence in support of this widespread practice theory. First, the City never introduced accountability systems that would identify and correct incorrect or improper eyewitness identifications and manipulation of witnesses. PSOF ¶¶472-487. And second, Johnson's expert Dr. Nancy Steblay provides extremely strong evidence of the City's widespread practice of fabricating identifications using suggestive identification procedures.[40] Dr.

---

[40] To the extent that the City attempts to argue that this case solely involves fabrication claims and not the use of suggestive identification procedures, CB-8 n.2, that argument fails for the simple fact that Johnson's theory here specifically involves the use of suggestive identification procedures, and Dr. Steblay's finding of abnormally high suspect identification rates and abnormally low filler identification rates in her Chicago dataset supports that theory. PSOF ¶423.

Steblay is a leading expert on eyewitness identification.[41] In this case (and other Guevara cases), Dr. Steblay conducted an exhaustive analysis of data obtained from 2,786 identification procedures (including live lineups and photo arrays) reported in Area Five homicide files produced by the City from the period of 1989 to 1998. PSOF ¶¶419-420; Dkt. 336 at 6. Each lineup was coded using objective criteria to reflect information about each lineup including: the number of witnesses participating, the number of suspects, whether multiple suspects were included, the number of fillers, the total number of individuals in the lineup or array, whether the witnesses were previously familiar with the perpetrator, the total number of possible positive identifications (the number of witnesses viewing the lineup multiplied by the number of suspects), and the number of reported positive, negative, and filler identifications in each procedure.[42] PSOF ¶¶420-421.

The data were assembled in a spreadsheet, which contains many tens of thousands of coded variables, across nearly 2,800 lineup procedures. PSOF ¶420. Dr. Steblay participated in the design of the data summary, ensured that the variables were objective and clearly defined, and verified the data.[43] The data was shared with all parties, and Defendants have not identified any error in any of the data coded.[44] PSOF ¶423-424. Indeed, Defendants' expert responding to Dr.

---

[41] Dr. Nancy Steblay is an expert on topics of social influence, memory, decision-making, and jury decision processes, with specific expertise in eyewitness identification evidence collection procedures. She has authored over 45 publications, which involve a quantitative method called meta-analysis as well as the analysis of empirical data from the lab and from real witnesses to crime in the field. She has served on the editorial boards of four major scientific journals that publish research on eyewitness identification. PSOF ¶¶417-418; JSOF ¶¶208, 209.

[42] The task of coding these data based on police reports "borders on the mechanical." *Rivera v. Guevara*, 319 F. Supp. 3d at 1067. Reading a police report and transferring to a spreadsheet what the report says about the criteria just mentioned does not call for any subjective decision making, as Dr. Steblay explains. PSOF ¶422.

[43] Dr. Steblay ensured that the coding team "was using objective and clear definitions for the coding variable." The coding was undertaken by at least two independent coders, who compared their work to catch discrepancies. The coding process did not call for any subject decision making. Dr. Steblay also conducted a robust reliability check, verifying approximately 200 lineups, randomly selected from the court-ordered homicide files produced in this case. She agreed with the coders in 98% of the instances, "strong interrater agreement" that gave her confidence in the quality of the underlying data. PSOF ¶¶421, 422; JSOF ¶219.

[44] In Defendants' *Daubert* motion, Defendants make much of what they assert are errors in the coded data. Dkt. 326. As Johnson explains in his response to Defendant's *Daubert* motion to bar the opinions of Dr. Steblay, Dkt.

Steblay concedes that he does not challenge the data on which Dr. Steblay relies and has not identified any error in that data. PSOF ¶424; JSOF ¶221.

Dr. Steblay observed that between 1989 and 1998, witnesses participating in Chicago procedures picked the police officer's suspect a whopping 75% of the time, made no identification 25% of the time, and selected a filler less than 1% of the time (in only nine instances in the entire dataset). PSOF ¶425. Moreover, 23% of identification procedures in the Chicago dataset included multiple suspects, and 20% concerned a repeat identification procedure with the same suspect and witness. PSOF ¶426. In 74% of identification procedures, the witness did not know the perpetrator prior to the crime, and in 26% the perpetrator was familiar to the witness. PSOF ¶426.

In addition to making these observations, Dr. Steblay compared the results of Chicago identification procedures to 11 major peer-reviewed field studies which report lineup outcome data for live and photo identification procedures conducted by police in actual cases across varied jurisdictions, including Northern California, San Diego, Houston, Tucson, Austin, Charlotte, and London, England. PSOF ¶¶427, 428; JSOF ¶230. The 11 field studies report the frequencies of lineup outcomes—suspect/positive identifications, filler identifications, and non-identifications— for a total of 6,734 field lineups. PSOF ¶427, JSOF ¶231. The aggregated field studies revealed that witnesses selected a suspect 40.8% of the time, a known-innocent filler 23.7% of the time, and no one 35.5% of the time. [45] PSOF ¶430; JSOF ¶229.

_____

336, the asserted errors reflect the ongoing quality control measures between Dr. Steblay's analysis in the earlier *Sierra* case—another Guevara case—and her analysis in this case, and regardless, are immaterial given the total quantity of coded data such that they would have no effect on Dr. Steblay's analysis.

[45] The outcomes of each study are collected in Table 1 of Dr. Steblay's report. PSOF ¶427; JSOF ¶231.

Dr. Steblay then compared the Chicago comparison subset of data to the field studies.[46] PSOF ¶¶431-433. She observed that while in the field studies revealed witnesses selected suspects 41% of the time, in the Chicago comparison subset, suspects were identified in 70% of lineups. PSOF ¶433. In field studies, witnesses identified no one 35% of the time, while in Chicago there was no identification in 30% of cases. PSOF ¶433. And in the field studies, witnesses picked a filler 24% of the time, while in Chicago that occurred *less than 1%* of the time. PSOF ¶433. Dr. Steblay opined that the difference between the field studies and Chicago's high suspect identification rate and low filler identification rate was statistically significant, and that there was less than a 1-in-100,000 chance that the difference could be explained by chance.[47] PSOF ¶434.

Dr. Steblay then analyzed why Chicago has a dramatically higher suspect identification rate and lower filler identification rate than other jurisdictions. Her analysis shows that the only explanation is that suspect identifications are fabricated using suggestive identification procedures. PSOF ¶¶436-444. Dr. Steblay identified all possible explanations for the elevated suspect identification rate in Chicago: (a) familiar perpetrator identifications (where the witness knows the suspect); (b) multiple suspect lineups, including those with too few fillers; (c) repeated

---

[46] To compare the Chicago data to the field data, Dr. Steblay had to make the two datasets as similar as possible. She determined the field data did not have lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, or lineups with repeated procedures. This determination was "favorable to the defense case" as the presence of unreported multiple-suspect lineups, familiar-suspect identifications, or repeated identifications would potentially inflate suspect ID rates. PSOF ¶429. Therefore, for the comparison, Dr. Steblay screened out from the Chicago data lineups in which witnesses were already familiar with the perpetrator, multiple-suspect lineups, and lineups that were repeated procedures with the same witness viewing the same suspect. In addition, removing these lineups from the Chicago data eliminated lineups more likely to obtain a suspect identification, reducing the suspect identification rate, and therefore giving the City the benefit of the doubt. Dr. Steblay thus limited her comparison analysis to Chicago lineups from unfamiliar-perpetrator, first viewing, single-suspect lineups. PSOF ¶¶429, 431, 432.

[47] These conclusions are consistent with Steblay's findings in other cases, as the *Johnson* report includes the data provided and used in those other cases and analyzes all lineups conducted at Area Five between 1989 and 1998. She notes in her *Johnson* report that the Chicago suspect identification rate was consistent across all of the cases for which she had datasets. Indeed, she concluded that the Chicago suspect identification rate as found in *all* of those cases is statistically significantly higher than the aggregate field studies. PSOF ¶¶435, 447.

identification procedures with the same suspect and witness, and instances in which police show the witness the suspect, in a photo or show-up, prior to the line-up; (d) steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly; (e) a failure to report filler identifications; and (f) biased lineup constructions where the suspect stands out. PSOF ¶436.

Dr. Steblay eliminated explanations (a), (b) and (c) from the Chicago data that she compared to the field studies, as discussed above, *supra* at 159 n.46, and so those could not be the explanation for Chicago's significantly higher suspect identification rate. PSOF ¶437, JSOF ¶251. Explanation (e)—that the City does not report filler identifications—is denied by the City and would violate its policies, and so that explanation can be eliminated.[48] That leaves fabrication of identifications using the improper techniques identified in explanations (d) and (f)—steering and suggestion to witnesses and presenting lineups where the suspect stands out—as the only explanation for Chicago's radically high suspect identification rate. PSOF ¶438.

In sum, the Chicago Police Department's identification procedures between 1989 and 1998 resulted in suspect identifications approximately 75% of the time overall, and 70% of the time in Dr. Steblay's comparison dataset (and almost never filler identifications). PSOF ¶¶425, 433. This is a remarkably significant departure from the results of identification procedures everywhere else. PSOF ¶¶427, 428, 433, 443. The only possible explanation for the rate is that Chicago police

---

[48] The theory here is that a total failure to record filler identifications *might* elevate the suspect identification rate because the set of filler identifications that one would expect to exist based on field studies is simply absent from the Chicago data. However, the City has contended that its police officers recorded filler identifications as non-identifications. PSOF ¶407. That fact is disputed, both by the City's own Rule 30(b)(6) witness and by Dr. Steblay. PSOF ¶407, 439; JSOF ¶270; Dkt. 336 at 37 n.6. Moreover, recording filler identifications as non-identifications would itself present a risk of constitutional violations. *Rivera*, 319 F. Supp. 3d at 1067. Regardless, accepting the City's position for purposes of summary judgment only, not recording filler identifications is not the explanation for Chicago's elevated suspect identification rate.

systematically fabricated identifications using overtly and covertly suggestive procedures. This comprehensive analysis of all of the lineups conducted in all homicide investigations at Area Five in the relevant time period is confirmed by Johnson's evidence of dozens of cases in which Guevara and others fabricated identifications for use in criminal proceedings, alongside other unlawful actions. PSOF ¶¶449-454, 489-492. Moreover, these fabricated identifications using suggestive techniques all occurred against the backdrop of City policymakers having notice of a serious risk of false identifications in identification procedures, but responding with deficient policies, training, and supervision on the subject of identification procedures. PSOF ¶¶399, 401, 406-416, 455-456, 471-488. The jury in this case should hear that a careful analysis of Chicago's homicide files reveals that eyewitnesses in Chicago nearly always pick the police officer's suspect and never select an innocent filler, contrary to eyewitness science and eyewitness behavior everywhere else.

Johnson has offered far more than enough evidence to establish the City's widespread practice of fabricating identifications using suggestive identification procedures. That widespread practice presented the acute risk that fabricated identifications would be used in and would taint criminal proceedings, in violation of due process. "A city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *J.K.J.*, 960 F.3d at 378 (cleaned up). And Johnson presents evidence that, in fact, that risk came to pass, not only in his case, but also in many other homicide cases that were prosecuted based on fabricated identifications.

### 3. The City's Arguments for Summary Judgment on the Fabricated Identification *Monell* Theory Lack Merit

The City's remaining arguments for summary judgment on this theory lack merit. First, the City incorporates the Defendant Officers' argument that § 1983 claims regarding suggestive identification procedures are not cognizable, CB-7-8, which the Court should reject for the reasons discussed already, *see* Argument IV(C)(1)(b) *supra*.

Second, the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications. CB-9-10. But that is a theory that depends on rejecting the evidence set out above in favor of a reading of the City's limited policies and training materials that draws unreasonable inferences for the City, which the Court cannot do. *Tolan*, 572 U.S. at 656. Moreover, the City's argument that its policies were sufficient to stop fabricated identifications obtained in suggestive identification procedures runs headfirst into the evidence that those fabricated identifications occurred routinely across all cases, a finding that the City does not meaningfully challenge in this case.

Third, the City again deploys the argument that only expert opinions support this theory, CB-10, which again ignores the other record evidence discussed above. Then, the City goes on to attack Dr. Steblay's expert opinions in summary terms, contending that they do not establish a widespread practice, rely on data prepared by Johnson's attorneys, and do not identify particular cases in which identifications were fabricated. CB-10-12. These arguments are addressed in rich detail in Johnson's response to the City's *Daubert* motion to exclude Dr. Steblay, which Johnson incorporates here. Dkt. 336.

Fourth, in a long passage the City takes issue with Dr. Steblay's discussion of the possible mechanisms that could cause the City's remarkably high suspect identification rate and absence of

filler identifications. CB-12-16. To the extent that the City is challenging the reliability of Dr. Steblay's opinions, Johnson responds to these arguments in his *Daubert* response. Dkt. 336. Otherwise, the City is merely disagreeing in its summary judgment motion with conclusions that Dr. Steblay has reached, which is nothing more than an effort to contest the facts at summary judgment, which the City cannot do as the moving party.[49] The City's assertions about the relevance of Dr. Steblay's opinions sets out what appears to be a weak cross-examination of Dr. Steblay for trial. Indeed, the whole section highlights disputes of fact, and there is no argument that the City has thereby established an *absence* of genuine disputes of material fact about whether Dr. Steblay's opinions support Johnson's widespread practice theory.

Fifth, the City asserts in two paragraphs that Johnson cannot proceed on this *Monell* theory because his evidence does not create a genuine dispute of material fact about whether the City was on notice and indifferent. CB-15-16. Not so. A persistent widespread pattern of behavior risking constitutional harm *is itself* notice to the municipality—*e.g.*, *J.K.J.*, 960 F.3d at 383—and the City's Rule 30(b)(6) witness admitted the City was on notice that if proper policies were not followed, it could result in false identifications or misidentifications and that unduly suggestive

---

[49] The City's discussion misstates and mischaracterizes Dr. Steblay's opinions in every respect: The City complains that an expert presenting "possible explanations" for a phenomenon does not create a dispute of fact, CB-12, which is both an inaccurate statement of what experts do and a misapprehension of Dr. Steblay's analysis, which identifies *all* possible explanations for the City's high suspect identification rate, and then explains why some of them cannot explain the high rate. The City also asserts that Johnson cannot contend that factors such as familiar perpetrators, multiple suspect identifications, and repeated identification procedures with the same suspect and witness caused the City's high identification rate because Dr. Steblay excluded those factors from the lineup dataset. CB-12-13. But Johnson *agrees* that they were excluded, and the City does not seem to recognize that the exclusion of all of those lineups from the dataset reduced the City's suspect identification rate by only a couple of percentage points, and also eliminated the more benign explanations that the City might have offered to explain the data. In addition, the City says that Dr. Steblay cannot account for whether Chicago lineups were conducted by non-blind administrators, CB-13, leaving out that its policies never called for blind administration of lineups, PSOF ¶405 (as was the case for Johnson's lineups), and leaving out that this factual dispute has no bearing on Dr. Steblay's testimony or conclusions. Finally, the City asserts that some of Dr. Steblay's proffered explanations for the high suspect identification rate are irrelevant to the case—for example the contention that Chicago did not record filler identifications. CB-14. As discussed above, Johnson accepts for purposes of summary judgment that this is not the explanation for the City's high suspect identification rate, but that has no effect on his widespread practice theory.

identification procedures presented a risk of unreliability and the "abuse" of these processes. PSOF ¶¶399, 401. Yet the City did nothing to institute policies for photographic lineups, gang books, or photo books before Johnson's prosecution, and did nothing at all to account for situations where identification procedures went wrong, or to address its high rate of suspect identifications, at any time, from long before Johnson's prosecution to long after his conviction. PSOF ¶¶403-416, 471-488. That is enough to create a dispute of fact about the City's indifference. *J.K.J.*, 960 F.3d at 383.

Finally, the City asserts that Johnson cannot proceed with a failure to train argument relating to this theory. CB-16. But the City's earliest training manuals produced in this case on the subject of identification procedures are from 1996, PSOF ¶472; JSOF ¶36, which is five years *after* the investigation at issue in this case. The City may contend that it trained its officers before that, but the proof presents a dispute of fact for trial.

At the end of the day, all of the evidence in the record firmly supports Johnson's *Monell* theory that the City had a widespread practice of fabricating identifications using suggestive identification techniques. Disputes of fact preclude summary judgment for the City.

### F. The City's Remaining Arguments for Summary Judgment on the *Monell* Claims Lack Merit

None of the City's more general arguments for summary judgment have merit, and so Johnson addresses them only briefly. The City argues that it cannot be liable under *Monell* if summary judgment is granted to the Defendant Officers on Johnson's constitutional claims. CB-6-8. It also argues that there is no dispute of fact about whether the City's official policies caused the violations of Johnson's constitutional rights. CB-39-41. Both arguments fail.

### 1. The City's Liability Does Not Necessarily Depend on Individual Liability

The Court can disregard the argument that the City is not liable if no Defendant Officer is liable because the Defendant Officers do not move for summary judgment on all of Johnson's constitutional claims, and they are not entitled to summary judgment on any claim, for the reasons explained above. *See* Argument IV *supra*. Accordingly, this Court need not decide at this stage whether the City's liability depends on a finding of Defendant Officer liability.

Still, the City is incorrect that it cannot be liable unless a Defendant Officer is found liable. The Seventh Circuit's rule, set forth in *Thomas*, is that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." 604 F.3d at 305 (emphases in original); *see also Swanigan v. Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("In some civil-rights cases, . . . a verdict in favor of individual defendants would not necessarily be inconsistent with a plaintiff's verdict on a factually distinct *Monell* claim."). Numerous judges in this district have applied this rule that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. *See Bonds v. City of Chicago*, 16-cv-5112, 2018 WL 1316720, at *4-5 (N.D. Ill. Mar. 14, 2018); *Pickett v. Dart*, 2014 WL919673 (N.D. Ill. Mar. 10, 2014); *Wells v. Coker*, 2014 WL 716518 (C.D. Ill. Feb. 25, 2014); *Martinez v. Cook County*, No. 11 C 1794, 2011 WL 4686438, at *1; *Cage v. City of Chicago*, 9 C 3078, 2010 WL 3613981, at *1; *Evans v. Chicago*, 2010 WL 3075651 (N.D. Ill. Aug. 5, 2010).

In the case of a theory of municipal liability that depends entirely on a particular officer's act of misconduct—*e.g.*, a municipal policy of using excessive force where there was no excessive force used by any officer, as in *City of Los Angeles v. Heller*, 475 U.S. 706 (1986)—a *Monell* claim will fail if an individual defendant did not violate the Constitution. But that is not the case here.

For example, a jury might find that the City's official policy of evidence suppression caused investigative information not to reach prosecutors, Johnson, and his attorneys—particularly given the game of hot potato that the Defendant Officers play about who fabricated and suppressed what evidence. In that case, a verdict against the City but for the Defendant Officers would not be inconsistent as a matter of law. The City argues that this theory depends on a finding of individual liability, but that argument assumes facts in the Defendants' favor, which is not permissible here. This Court should reject the City's argument that its liability depends on the Defendant Officers.

## 2.  The City's Causation Argument Is Meritless

The City's causation argument also fails. A municipality's official policy "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs*, 368 F.3d 917, 927 (7th Cir. 2004) (cleaned up). Here, where a plaintiff has put forth evidence of municipal action (or inaction) and deliberate indifference—here in the form of express policies and gaps in policies, widespread practices, actions of final policymakers, and failures to train, supervise, and discipline—the question whether municipal policies and practices caused the plaintiff's constitutional injuries must be resolved by a jury, like most other causation questions. *See*, *e.g.*, *Thomas*, 604 F.3d at 303 (holding that the jury must make a factual determination about whether the evidence establishes that a widespread practice caused the alleged constitutional harm); *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017) ("As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury.").

In this case, there is no distance between the risks of harm presented by the City's official policies and practices—evidence suppression, fabricated identifications, and untrained and unsupervised police officers—and the particular constitutional injuries that Johnson suffered. A

reasonable jury could conclude that the City's policies caused the violations of Johnson's constitutional rights, as many other courts have concluded in analogous circumstances. *See*, *e.g.*, *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) ("Plaintiff has pointed to a variety of evidence, in the form of the DOJ and PATF Reports, public officials' statements, expert testimony, other lawsuits, and evidence about CPD training and accountability that create a genuine issue of fact about the causal link between Godinez's death and CPD practices and the City's *Monell* liability. That is enough to survive summary judgment."); *see also Washington*, 2022 WL 4599708, at *18; *Hudson v. City of Chicago*, No. 16-CV-4452, 2019 WL 1112260, at *7 (N.D. Ill. Mar. 11, 2019); *Thomas*, 604 F.3d at 303; *Woodward*, 368 F.3d at 927; *LaPorta*, 277 F. Supp. 3d at 991. The City's arguments to the contrary, like the Defendant Officers' arguments throughout their motion, "reflect[] a kind of self-hypnosis that no lawyer can afforded to practice in the summary judgment context— a view of the evidence through the lens of the Rule 56 movant rather than, as the Rule expressly mandates, that of the nonmovant[.]" *Escobedo v. Ram Shirdi*, No. 10 C 6598, 2013 WL 1787819, at *4 (N.D. Ill. Apr. 25, 2013). This Court should reject the City's arguments that depend on viewing the facts in the City's own favor.

### G. The *Respondeat Superior* and Indemnification Claims Survive Summary Judgment

Finally, the City asserts that it is entitled to judgment on Johnson's *respondeat superior* and indemnification claims, arguing these claims are derivative of others. Johnson's underlying claims survive, and so, too, should these derivative claims.

### CONCLUSION

Construing the record in the light most favorable to Johnson and drawing inferences in his favor, none of Defendants is entitled to summary judgment on any of the theories on which they

have moved for summary judgment. Johnson is entitled to a trial against Defendants on all of his claims. For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**DEMETRIUS JOHNSON**

By:    /s/ Steve Art
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com

169

**CERTIFICATE OF SERVICE**

I, Steve Art, an attorney, hereby certify that, on June 11, 2024, I filed the foregoing PLAINTIFF'S DEMETRIUS JOHNSON'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected service on all counsel of record.

 /s/ Steve Art               
*One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steve Art
Rachel Brady
Sean Starr
Alyssa Martinez
Meg Gould
Ruth Brown
**LOEVY + LOEVY**
311 N. Aberdeen St.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com
