**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | Case No. 20 cv 4156 |
| *Plaintiff*, | ) | |
| | ) | Judge Sara L. Ellis |
| *v.* | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| REYNALDO GUEVARA, the ESTATE of | ) | |
| ERNEST HALVERSON, DARRYL DALEY, | ) | |
| WILLIAM ERICKSON, JOHN HEALY, and | ) | |
| the CITY OF CHICAGO | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Defendants*. | ) | |

**DEFENDANTS HALVORSEN, ERICKSON, DALEY AND HEALY'S REPLY
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Dated: August 9, 2024

Respectfully submitted,

/s/ Josh M. Engquist
Josh M. Engquist, Attorney No. 06242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

Josh M. Engquist
James G. Sotos
Josh M. Engquist
David A. Brueggen
Elizabeth R. Fleming
Daniel McGinnis
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, IL 60604
(630) 735-3300
jengquist@jsotoslaw.com

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................1

I.   Johnson's Response Distorts the Record, Disregards the Parties JSOF, Inserts new Theories Into Dispute, and Misrepresents Summary Judgment Law to Sow Confusion ....2

    a.   Johnson's statement of "disputed facts" is a misnomer...........................................3

    b.   Johnson's newly asserted theories of liability are untimely and brazenly asserted now to inappropriately argue Movants waived summary judgment.......................5

    c.   Johnson's attempt to rewrite the plain meaning of Rule 56 to avoid summary judgment has no support. .......................................................................9

    d.   Guevara's assertion of the Fifth cannot be imputed against Movants. .................12

II.   Movants Are Entitled to Summary Judgment as a Matter of Law as to Johnson's Due Process – Fabrication Claims In Count I ...........................................................13

    a.   Movants Erickson, Healy and Daley did not interact with Ricardo, Elba or Rosa Burgos relating to their identifications of Johnson and nothing they did enabled the alleged fabricated identifications. ...................................................14

        1.   There is no evidence Erickson "directly enabled" the alleged false Burgos identifications....................................................................17

        2.   There is no evidence Daley "directly enabled" the alleged false Burgos identifications....................................................................19

        3.   There is no evidence "directly enabled" the alleged false Burgos identifications....................................................................20

    b.   On the merits, Johnson's fabrication theories based on identifications of him y Rosa, Ricardo and Elba Burgos fail....................................................22

    c.   Johnson's fabrication theories based on police reports documenting Burgoses' identifications and documenting the non-identification of Johns fail because there is no evidence the reports were knowingly false. .................................................28

        1.   Johnson lacks evidence the to show the police reports related to the Burgoses' identifications were fabricated................................................28

i

## TABLE OF CONTENTS
### -Continued-

PAGE

    2.  Johnson lacks evidence to show the police reports related to Johns's non-identification were knowingly fabricated. ................................................29

    d.  On the merits, Johnson's two newly disclosed (and otherwise waived) fabrication contentions cannot survive summary judgment....................................................35

III.  Johnson's Due Process Rights Were Not Violated by the Introduction of Ricardo, Elba or Rosa Burgos's Identifications at his Criminal Trial ........................................................37

    a.  Unduly suggestive identification procedures is not cognizable under §1983........37

    b.  Johnson cannot establish that Movants Erickson, Daley and Healy were involved in any suggestive identification procedures.........................................................42

    c.  Alternatively, Johnson's unduly suggestive identification claim fails against all Movants because he cannot point to evidence establishing Movants intentionally used forbidden techniques to obtain unreliable identifications that unfairly tainted his criminal trial. ...................................................................................................42

        1.  Evidence of fabrication does not establish that the identification procedures were unduly suggestive. ........................................................43

        2.  Additional evidence does not establish that the identification procedures were unduly suggestive.............................................................................46

        3.  The witness identifications were sufficiently reliable to overcome the taint of any unduly suggestive procedures.......................................................48

    d.  Johnson lacks evidence that any Movant acted with the requisite intent necessary to confer Section 1983 liability...........................................................................52

        1.  Johnson fails to defeat Movants' entitlement to qualified immunity. .......53

        2.  The Court should disregard Johnson's request to waive decades of precedent as qualified immunity remains the law......................................54

IV.  Movants Are Entitled to Judgment as a Matter of Law on Johnson's Brady Claims, Including his new Brady Contentions....................................................................................56

    a.  Johnson's previously identified *Brady* contentions fail against Movants. ............57

### TABLE OF CONTENTS
### -Continued-

**PAGE**

1. Johnson's attempts to recast his fabrication claims as *Brady* contentions fail. ...........................................................................57

2. June 13 six-witness lineup report. ...........................................................61

b. Johnson's newly raised *Brady* theories fail against Movants. ..............................67

1. Johnson cannot establish that Halvorsen and Erickson suppressed evidence undermining the Burgos identifications. .....................................67

2. Halvorsen and Daley did not decide Johnson was their suspect before there was any evidence implicating him, so this was not suppressed. .......72

3. The investigation of alternative suspect Robert Weeks was not suppressed by Halvorsen. .......................................................................73

4. Johnson's counsel knew Johns was a cooperating witness in another case. ...........................................................................74

5. Johnson's theory that Defendants suppressed their own pattern of misconduct fails. ....................................................................75

V. Johnson's Unlawful Detention and State law Malicious Prosecution Claims Fail. ...........76

a. The uncontested evidence establishes that Erickson, Daly and Healy were not personally involved in the commencement or initiation of Johnson's criminal prosecution entitling them to summary judgment. .................................76

b. Johnson cannot present any admissible evidence defeating the existence of probable cause. ..................................................................79

VI. Johnson Fails to Support his Supervisor Liability Claim Against Healy .........................80

VII. Movants are Entitled to Summary Judgment on Johnson's Failure to Intervene Claim ...82

VIII. Movants are Entitled to Summary Judgment on Johnson's Derivative IIED and Conspiracy Claims. ..................................................................84

a. There remains no evidence to support an IIED claim. ...........................................84

**TABLE OF CONTENTS**
**-Continued-**

PAGE

      b.   Johnson lacks evidence to support his conspiracy theory claims and Movants are otherwise entitled to qualified immunity. ...............................................85

IX.    Johnson Cannot State an Independent Claim for Willful and Wanton Conduct Under Illinois State Law ...........................................................................................................89

CONCLUSION.................................................................................................................90

## TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Aguilar v. Gaston-Camara*, 861 F.3d 626 (7th Cir. 2017) ...........................................................16

*Alexander v. City of S. Bend,* 433 F.3d 550 (7th Cir. 2006) .................................................. *passim*

*Ashcroft v. Al-Kidd,* 563 U.S. 731 (2011)..................................................................................53

*Alvarado v. Hudak,* 14-cv-9641, 2015 WL 4978683 (N.D. Ill. 2015)......................................58

*Amicorp Mgmt. v. Insight Securities, Inc.,* 19-cv-03745, 2021 WL 4502177 (N.D. Ill. Sept. 30, 2021) ..........................................................................................................................................64

*Anderson v. City of Rockford,* 932 F.3d 494 (7th Cir. 2019).................................................10, 31

*Anderson v. Creighton,* 483 U.S. 635 (1987) .............................................................................54

*Avery v. City of Milwaukee,* 847 F.3d 433 (7th Cir. 2017).........................................32, 59, 66, 75

*Azami v. Village of Wilmette,* 14-cv-2592, 2016 WL 1298672 (N.D. Ill. Apr. 4, 2016)...............11

*Baker v. McCollan*, 443 U.S. 137 (1979) ...................................................................................39

*Beaman v. Freesmeyer,* 2019 IL 122654 ...................................................................................78

*Bedford v. Dewitt,* 19-cv-00001, 2023 WL 6312107 (N.D. Ill. Sept. 28, 2023) .....................21, 81

*Bell v. City of Milwaukee,* 746 F.2d 1205 (7th Cir. 2005).......................................................24, 86

*Bianchi v. McQueen,* 818 F.3d 309 (7th Cir. 2016)....................................................................32

*Blackmon v. City of Chi.*, 700 F. Supp. 3d 617 (N.D. Ill. 2023)........................................... *passim*

*Bolden v. Pesavento,* 623 F. Supp. 3d 897 (N.D. Ill. 2022)........................................................38

*Bolden v. Pesavento,* 17-cv-417, 2024 WL 1243004 (N.D. Ill. March 23, 2024).......................38

*Bonte v. U.S. Bank, N.A.,* 624 F.3d 461 (7th Cir. 2010) ........................................................ 64, 65

*Boyd v. City of Chi.,* 225 F. Supp. 3d 708 (N.D. Ill. 2016)....................................................27, 66

*Briscoe v. Lahue,* 460 U.S. 325 (1983)...................................................................................36, 78

*Brown v. City of Chicago,* 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ........................................ *passim*

v

**TABLE OF AUTHORITIES**
**-Continued-**

<u>**CASES**</u> <u>**PAGE**</u>

*Burks v. Raemisch,* 555 F.3d 592 (7th Cir. 2009) .......................................................16

*Butler v. Indianapolis Metro. Police Dep't,* 07-cv-1103-DFH-TAB, 2009 WL 2092416 (S.D. Ind. July 13, 2009) ......................................................................................................4

*Buttron v. Sheehan,* 00-cv-4451, 2003 WL 21801222 (N.D. Ill. Aug. 4, 2003) ...........18

*Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972)...............................................................83

*Cairel v. Alderden,* 821 F.3d 823 (7th Cir. 2016)...............................................74, 79

*Camm v. Faith,* 937 F.3d 1096 (7th Cir. 2019)...............................................11, 23, 60

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................10

*Chaney-Snell v. Young*, No. 22-1990, 2024 WL 1616406 (6th Cir. Apr. 15, 2024) ....................84

*Colbert v. City of Chicago,* 851 F.3d 649 (7th Cir. 2017) ..............................................56

*Coleman v. City of Peoria, Illinois,* 925 F.3d 336 (7th Cir. 2019) ........................ *passim*

*Colyer v. City of Chicago,* 12-cv-04855, 2014 WL 8796112 (N.D. Ill. Dec. 8, 2014) .................89

*de Lima Silva v. Wisconsin Dep't of Corr.,* 917 F.3d 546, 564 (7th Cir. 2019) ...........................16

*Doe-3 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs.,* 2012 IL 112479 .........................................90

*Donald v. Outlaw,* 2:17-cv-32-TLS, 2023 WL 2346270 (N.D. Ind. Mar. 3, 2023) ...............20, 38

*Edwards v. Joliff-Blake,* 13-cv-4558, 2017 WL 1134473 (N.D. Ill. Mar. 27, 2017)....................82

*Engel v. Buchan,* 710 F.3d 698 (7th Cir. 2013) ............................................................60

*Ezell v. City of Chicago,* 18-cv-1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024) .............. *passim*

*Fields v. City of Chicago*, 10-cv-1168, 2014 WL 12778835 (N.D. Ill. Apr. 29, 2014)................27

*Fields v. City of Chicago (Fields II),* 740 F.3d 1107 (7th Cir. 2014) ...........................................23

*Fisher v. Krajewski*, 873 F.2d 1057 (7th Cir. 1989) .......................................................27

**TABLE OF AUTHORITIES**
**-Continued-**

**CASES**                                                                                           **PAGE**

*Gauger v. Hendle,* 349 F.3d 354 (7th Cir. 2003)..........................................................31, 59, 60, 61

*Gill v. City of Milwaukee,* 850 F.3d 335 (7th Cir. 2017) .............................................................53

*Gossmeyer v. McDonald,* 128 F.3d 481 (7th Cir. 1997)............................................20, 21, 80, 81

*Goudy v. Cummings,* 922 F.3d 834, 837. 838-842 (7th Cir. 2019)........................................10, 11

*Gray v. City of Chicago*, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) ..........................................31

*Grayson v. City of Aurora,* 157 F. Supp. 3d 725 (N.D. Ill. 2016) ...............................................22

*Grayson v. O'Neil*, 308 F.3d 808 (7th Cir. 2002) .........................................................................89

*Green v. Benden,* 281 F.3d 661 (7th Cir. 2002)............................................................................85

*Green v. Thomas,* No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133
(S.D. Miss. May 20, 2024)..............................................................................................................55

*Gregory-Bey v. Hanks*, 332 F.3d 1036 (7th Cir. 2003)................................................................47

*Gregory-Bey v. Hanks,* No. IP 94-903-C H/G, 2000 WL 1909642 (S.D. Ind. Nov. 29, 2000) (7th
Cir. 2003) .......................................................................................................................................50

*Grider v. City of Auburn, Ala.,* 618 F.3d 1240 (11th Cir. 2010) .................................................87

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008)..................................................................76

*Gunville v. Walker*, 583 F.3d 979 (7th Cir. 2009) ..........................................................................4

*Haliw v. City of South Elgin,* No. 19 C 01515, 2020 WL 1304697 (N.D. Ill. Mar. 18, 2020)......88

*Harris v. City of Chicago,* 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020) ........................................87

*Heidelberg v. Manias,* 18-cv-01161, 2024 WL 1316206 (C.D. Ill. Mar. 27, 2024)..................9, 84

*Hensley v. Carey*, 818 F.2d 646 (7th Cir. 1987)....................................................................25, 54

*Hill v. City of Chicago,* 06-cv-6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) .....................4, 42

*Holland v. City of Chicago*, 643 F.3d 248 (7th Cir. 2011) ..............................................66, 69, 74

**TABLE OF AUTHORITIES**
**-Continued-**

**CASES**                                                                                    **PAGE**

*Holloway v. City of Milwaukee,* 43 F.4th 760 (7th Cir. 2022)................................................37, 38

*Humphrey v. City of Anderson,* 19-cv-00764-JRS-TAB, 2021 WL 4477806 (S.D. Ind. Sept. 30, 2021) ......................................................................................................................................23

*Hunter v. Mueske,* 73 F.4th 561 (7th Cir. 2023) ....................................................................31, 41

*Hurt v. Wise,* 880 F.3d 831 (7th Cir. 2018) ...................................................................................31

*Jackson v. City of Chicago,* 20-cv-5886, 2024 WL 1142015 (N.D. Ill. Mar. 15, 2024) ..............59

*Jackson v. City of Cleveland,* 925 F.3d 793 (6th Cir. 2019)..........................................................87

*Jackson v. Willis,* 844 F.3d 696 (7th Cir. 2016) ...........................................................................40

*Jarrett v. Headley,* 802 F.2d 34 (2d Cir. 1986)..............................................................................47

*Johnson v. Advoc. Health & Hosps. Corp.,* 892 F.3d 887 (7th Cir. 2018) ...................................73

*Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) ................................................................77

*Kincaid v. Sangamon County,* 09-cv-3053, 2015 WL 4624631 (C.D. Ill. Aug. 3, 2015) ............81

*Kubat v. Thieret,* 867 F.2d 351 (7th Cir. 1989) ............................................................................50

*Kuhn v. Goodlow,* 678 F.3d 552 (7th Cir. 2012) ..........................................................................39

*Kyles v. Whitley,* 514 U.S. 419 (1995)..........................................................................................40

*Leiser v. Kloth,* 933 F.3d 696 (7th Cir. 2019)...............................................................................53

*Lewis v. City of Chicago,* 914 F.3d 472 (7th Cir. 2019)..........................................................31, 60

*Logan v. City of Chicago,* 891 F. Supp. 2d 897 (N.D. Ill. 2012).............................................12, 13

*Long v. Weeks,* No. 23-55004, 2024 WL 1672258 (9th Cir. Apr. 18, 2024)................................88

*Lopez v. Sheriff of Cook Cnty.,* 993 F.3d 981 (7th Cir. 2021) ......................................................54

*Lunini v. Grayeb,* 395 F.3d 761 (7th Cir. 2005) ...........................................................................54

**TABLE OF AUTHORITIES**
-Continued-

<u>**CASES**</u>                                                                          <u>**PAGE**</u>

*Manson v. Braithwaite,* 432 U.S. 98 (1977) .................................................................54

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,* 994 F.3d 869
(7th Cir. 2021)............................................................................................................37

*Matsushita v. Zenith,* 475 U.S. 574 (1986) ...................................................................71

*Moorer v. City of Chicago,* 92 F.4th 715 (7th Cir. 2024) .............................................49

*Moorer v. Valkner,* No. 18 CV 3796, 2021 WL 5998533 (N.D. Ill. Dec. 20, 2021).............43, 47

*Moran v. Calumet City,* 54 F.4th 483 (7th Cir. 2022) ........................................ *passim*

*Mullenix v. Luna,* 577 U.S. 7 (2015)..............................................................................87

*Mwangangi v. Nielsen,* 48 F.4th 816, 832 (7th Cir. 2022) .....................................83, 84

*Myvett v. Heerdt,* 2015 WL 12745087 (N.D. Ill. 2015)................................................58

*Neil v. Biggers,* 409 U.S. 188 (1972) .................................................................. *passim*

*Newsome v. McCabe,* 319 F.3d 301 (7th Cir. 2003).....................................................52

*Olivia v. City of Chicago,* 21-cv-06001, 2023 WL 2631575 (N.D. Ill. Mar. 24, 2023) ...............84

*Oregon v. Elstad,* 470 U.S. 298 (1985)..........................................................................40

*Padilla v. City of Chicago,* 2013 WL 1208567 (N.D. Ill. Mar. 26, 2013)....................77

*Palmer v. City of Decatur,* 17-cv-3268, 2021 WL 7707939 (C.D. Ill. Sept. 20, 2021)................70

*Palmer v. Marion Cnty.,* 327 F.3d 588 (7th Cir. 2003) ................................................14

*Patrick v. City of Chicago,* 974 F.3d 824 (7th Cir. 2020).......................................30, 32

*Patrick v. City of Chicago,* 103 F. Supp. 3d 907 (N.D. Ill. 2015) ...............................58

*People v. Dixon,* 122 Ill. App. 3d 141 (1st Dist. 1984) ...........................................47, 50

*People v. Palmer*, 188 Ill. App. 3d 414 (1st Dist. 1989) ..............................................46

**TABLE OF AUTHORITIES**
**-Continued-**

<u>**CASES**</u>                                                                                                           <u>**PAGE**</u>

*People v. Rodgers,* 53 Ill. 2d 207 (1972) ...................................................................51

*People v. Williams,* 143 Ill.App.3d 658 (1st Dist. 1986) ...........................................50

*Pepper v. Village of Oak Park,* 430 F.3d 805 (7th Cir. 2005) ...............................15, 16

*Petty v. City of Chi.,* 754 F.3d 416 (7th Cir. 2014) ..............................................66, 72

*Phillips v. Allen,* 668 F.3d 912 (7th Cir. 2012) ................................................. *passim*

*Phillips v. City of Chicago,* 2015 WL 5675529 (N.D. Ill. 2015) .................................58

*Rabin v. Flynn,* 725 F.3d 628 (7th Cir. 2013) .............................................................53

*Rasho v. Elyea,* 856 F.3d 469 (7th Cir. 2017) ............................................................16

*Rehberg v. Paulk,* 566 U.S. 356 (2012) ......................................................................36

*Reyes v. Nurse,* 38 F.4th 636 (7th Cir. 2022) .............................................................40

*Rice v. Burks,* 999 F.2d 1172 (7th Cir. 1993) ............................................................. 2

*Richardson v. Diversified Consultants, Inc.,* 17-cv-4047, 2019 WL 3216030 (N.D. Ill. July 17, 2019) ............................................................................................................88

*Rivera v. Guevara,* 319 F.Supp.2d 1004 (N.D. Ill. 2018) ...........................................70

*Roberts v. Broski,* 186 F.3d 990 (7th Cir. 1999) ........................................................48

*Rogers v. Jarrett,* 63 F.4th 971 (5th Cir. 2023) ..........................................................55

*Russ v. Watts,* 414 F.3d 783 (7th Cir. 2005) ..............................................................86

*RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.,* 672 F.3d 476 (7th Cir. 2012) .....................90

*Salgado by Salgado v. Gen. Motors Corp.,* 150 F.3d 735 (7th Cir. 1998) .....................8

*Sanders v. City of Chicago Heights,* 13-cv-0221, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ..................................................................................................................54

*Saunders-El v. Rohde,* 778 F.3d 556 (7th Cir. 2015) ..............................58, 59, 60, 61

# TABLE OF AUTHORITIES
## -Continued-

**CASES**                                                                          **PAGE**

*Schultz v. Thomas*, 832 F.2d 108 (7th Cir. 1987) ...........................................................27

*Serrano v. Guevara,* No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020)..............58, 60

*Simmons v. U.S.,* 390 U.S. 377 (1968)...........................................................................54

*Smith v. Burge,* 222 F. Supp. 3d 669 (N.D. Ill. 2016) .....................................................60

*Snider v. Pekny,* 899 F. Supp. 2d 798 (N.D. Ind. 2012) ..................................................16

*Spalding v. City of Chicago,* 186 F. Supp. 3d 884 (N.D. Ill. 2016).................................86

*Stinson v. Gauger,* 868 F3d 516 (7th Cir. 2017)...........................................................31

*Stockton v. Milwaukee County,* 44 F.4th 605 (7th Cir. 2022)...................................21, 80

*Strauss v. City of Chicago,* 346 F. Supp. 3d 1193 (N.D. Ill. 2018) ...............................87

*Taylor v. Ways,* 999 F.3d 478 (7th Cir. 2021) .........................................................21, 80

*U.S. ex rel. Kosik v. Napoli,* 814 F.2d 1151 (7th Cir. 1987)............................................51

*U.S. v. Bagley,* 473 U.S. 667 (1985)..............................................................................59

*U.S. v. Gonzalez,* 863 F.3d 576 (7th Cir. 2017).............................................................. 48

*U.S. v. Goodman,* 797 F.2d 468 (7th Cir. 1986) ............................................................51

*U.S. v. Johnson,* 745 F.3d 227 (7th Cir. 2014) ..............................................................40

*U.S. v. Nolan,* 910 F.2d 1553 ......................................................................................73

*U.S. v. Recendiz,* 557 F.3d 511 (7th Cir. 2009) .............................................................49

*U.S. v. Sanchez,* 251 F.3d 598 (7th Cir. 2001)..........................................................58, 68

*U.S. v. Williams,* 522 F.3d 809 (7th Cir. 2008).............................................................40

*United States v. Fawley,* 137 F.3d 458 (7th Cir. 1998) ..................................................40

*Vega v. Tekoh,* 142 S. Ct. 2095 (2022) ..................................................................37, 38, 39

## TABLE OF AUTHORITIES
### -Continued-

**CASES**                     **PAGE**

*Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954 (7th Cir. 2019).........................................16

*Walton v. U.S. Steel Corp.,* 497 F. App'x 651 (7th Cir. 2012).......................................................29

*Washington v. Boudreau,* 16-cv-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) ............... 38

*Watts v. Laurent,* 774 F.2d 168 (7th Cir. 1985)..............................................................................10

*White v. Pauly,* 137 S.Ct. 548 (2017) .......................................................................................53, 54

*Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012)...............................................10, 30, 32, 41

*Winskunas v. Birnbaum,* 23 F.3d 1264 (7th Cir.1994) ...................................................................18

*Wright v. Ill. Dep't of Child. & Fam. Servs.,* 40 F.3d 1492 (7th Cir. 1994)..................................86

*Yand v. Hardin,* 37 F.3d 282 (7th Cir. 1994).................................................................................83

*Zambrano v. City of Joliet,* 21-cv-4496, 2024 WL 532175 (N.D. Ill. Feb. 9, 2024).........32, 33, 34

*Ziglar v. Abbasi,* 137 S. Ct. 1843 (2017) .................................................................................87, 88


**OTHER AUTHORITIES**         **PAGE**

*Alexander A. Reinert, Qualified Immunity's Flawed Foundation,* 111 Cal. L. Rev. 201 (2023) ..55

42 U.S.C. § 1983....................................................................................................................*Passim*

Fed. R. Civ. P. 26.........................................................................................................................8, 68

Fed. R. Civ. P. 37(c)(1)....................................................................................................................8

Fed. R. Civ. P. 56........................................................................................................................1, 9

Fed. R. Evid. 801(c).......................................................................................................................27

Defendants Halvorsen, Daley, Erickson and Healy ("Movants") by their attorneys, The Sotos Law Firm, P.C., and pursuant to Fed. R. Civ. P. 56, respectfully submit this reply memorandum in support of their motion for summary judgment and state:

## INTRODUCTION

Rather than responding to Movants'[1] arguments in their Memorandum in Support of Summary Judgment ("Memo," Dkt. 323), Johnson has veered to instead spread confusion and create the illusion of factual disputes based on speculative inferences tied together with circular legal arguments. This method of response is not new, rather it is designed to frustrate this Court into throwing up its hands and holding that there must be issues for trial against the Movants. This Court should not take the bait. Johnson's scheme to ignore agreed facts from the Parties' Joint Statement of Undisputed Material Facts ("JSOF," Dkt 313) and replace them with his speculative inferences and unfounded assertions demonstrates that he simply cannot meet his burden of proof.

At the put up or shut up stage of this case, Johnson's 168-page Summary Judgment Response brief ("Response," Dkt. 341) and over 500 "disputed facts" in his Plaintiff's Statement of Disputed Facts ("PSODF," Dkt. 340) fails to direct the Court to admissible evidence to meet his burden and preclude summary judgment. Instead, without any evidentiary support, Johnson asserts conclusions and regurgitates his allegations despite being directly contradicted by the record evidence set forth in the JSOF. To be sure, Johnson's brief exudes his belief to never let an undisputed fact get in the way of a good allegation. But this perverts summary judgment.

To further create the illusion of material disputes of fact, Johnson relies on a theory of group accountability, half-truths, and speculation while ignoring the undisputed facts with which

---

[1] "Movants" refers to Defendants Daley, Erickson, Halvorsen, and Healy.

he agreed. The investigation into the June 12, 1991, murders of Edwin Fred and Raul Ortiz had two distinct parts—the first night investigating Johns and the continuing investigation when three witnesses positively identified ***Johnson*** as the killer, none of whom have recanted or disavowed their trial testimony nor testified that any Movant did anything inappropriate. Despite the clear timeline and two parts to the investigation, Johnson goes to great lengths in his "disputed facts" and confusing arguments to attempt to argue that all Movants were involved throughout the events giving rise to his claims. In the absence of record evidence, Johnson repeatedly points to his *allegations* and related speculation rather than material disputed facts that warrant denial of summary judgment. *See Rice v. Burks*, 999 F.2d 1172, 1175 (7th Cir. 1993) ("Just because an unfortunately (perhaps purposely) unclear record leaves open a universe of possibilities . . . does not mean a trial is necessary to sort through the hypothetical possibilities."). And while there is concern about whether the six-witness lineup report was produced, Johnson cannot tie any Movant to the non-production, or any specific allegations related to that report.

Johnson's response is long on rhetoric and conclusions but lacks record support. Cutting through Johnson's unfounded assertions, this case is straightforward. The claims on which Movants seek summary judgment fail because (1) Johnson lacks evidence that Movants committed or were even present for the alleged misconduct, and/or (2) legal defenses defeat his claims. The undisputed facts make clear that Movants are entitled to judgment as a matter of law. Nothing in Johnson's response demonstrates otherwise.

## I.      Johnson's Response Distorts the Record, Disregards the Parties JSOF, Inserts new Theories Into Dispute, and Misrepresents Summary Judgment Law to Sow Confusion.

Johnson's Response and plethora of "disputed facts" do not demonstrate a question of material fact regarding the Movants. To start, Johnson neglects to follow the Court's rules and

evidentiary law for asserting disputed facts by regurgitating many of the parties' undisputed facts in the JSOF and claiming they are disputed, either by adding inferences and arguments under the guise of facts or relying on inadmissible evidence to support his alleged disputes. Johnson then indiscriminately cites to his disputed facts throughout his Response to imply his arguments are supported by the record where they are not. Johnson also manufactures new theories never previously referenced in his complaint or any discovery response arguing that Movants failed to address them. Johnson doubles down on this by contorting the law of summary judgment to argue if any of his theories move to trial, then all must go to trial. Finally, in arguing Guevara cannot move for summary judgment, he implies that Guevara's assertion of the Fifth Amendment can be imputed to Movants by creating evidence against them.  As set forth below, these arguments must be rejected.

     a.  **Johnson's statement of "disputed facts" is a misnomer.**

Movants have joined with all Defendants in moving to strike Johnson's PSODF for violating this Court's rules and incorporate that motion herein. To be brief, Johnson's "disputed facts" are neither not all disputed nor all facts. Nestled in the over 283 "disputed facts" directed at Movants are verbatim facts from the Parties' JSOF, in addition to thinly veiled argument and speculation passed off as facts. Additionally, Johnson sets forth generalized theories and ideas which he seeks to specifically apply to this case without any context or support.

Lacking facts and evidence to dispute Rosa Burgos's testimony and identification of him, Johnson disregards the Court's direction from the hearing on the Motion to Resolve Disputed Facts (Dkt. 302) and reasserts "facts" this court has already ruled were improper. For example, Johnson attributes statements to Rosa Burgos that she denies making, based solely on the hearsay notes and testimony from his deceased criminal defense attorney Assistant Public Defender Jack

Carey ("APD Carey"). *See Hill v. City of Chicago,* No. 06 C 6772, 2011 WL 3876915, at \*2–4 (N.D. Ill. Sept. 1, 2011) (ruling that the former testimony of a deceased witness did not qualify for Hearsay Rule 804(b)(1) admission because different stakes faced by civil municipal defendants and criminal prosecutors inherently lead to divergent motives); *Butler v. Indianapolis Metro. Police Dep't,* No. 1:07-cv-1103-DFH-TAB, 2009 WL 2092416, at \*2 (S.D. Ind. July 13, 2009) (same). Hearsay is not properly considered in assessing a motion for summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). Despite being fully aware of the hearsay admissibility problem with APD Carey, Johnson fails to address how this evidence is admissible to create the dispute he argues.

As with Rosa Burgos, Johnson has taken substantial liberties with his PSODF, despite the Court's direction, so that he can use argument and inference under the guise of facts without regard to admissibility. In many instances, Johnson directs the Court to several different parts of the record, the vast majority of which address the topic but provide little or no support for the cited proposition. Johnson's PSODF and corresponding brief obfuscate rather than promote an understanding of the facts. The Court should hold Johnson to the facts set forth in the JSOF that the parties created in good faith, after considerable time and effort, and refuse to allow Johnson to contort and ignore the Court's rules so he can fabricate illusory questions of fact that are completely unsupported by the record. For all these reasons, and those set forth in Movants' joint motion to strike, the Court should at a minimum disregard Johnson's statements in the PSODF that violate the Court's rules and are otherwise inappropriate and hold Johnson to his agreed facts in the JSOF. *See* Defendants' Joint Motion to Strike, Dkt. 367.

> **b. Johnson's newly asserted theories of liability are untimely and brazenly asserted now to inappropriately argue Movants waived summary judgment.**

Johnson shamelessly attempts to default Movants for failing to respond to several due process contentions, arguing their failure to respond results in waiver. (Response at 48–50, 59–60, 63, 76, 89, 91, Dkt. 341.) But Johnson distorts the record. Movants *responded to all* his due process contentions directed against them that were found in his Complaint and identified in his answers to discovery. However, in the face of Movants' summary judgment motion, Johnson's contentions have morphed dramatically into what appears to be a concerted effort to evade summary judgment. Due to the sheer number of new due process theories Johnson asserts he is now pursuing, along with the number of defendants, Movants have compiled a *Brady* chart and fabrication chart to organize and summarize the status of Johnson's contentions now.

The status of each due process theory is organized into three categories: (1) "**New at summary judgment and waived**" under Rule 37(c) for failing to supplement or disclose (discussed in detail below); (2) "**At issue**" are contentions that Johnson properly disclosed, and that Movants addressed in their Memorandum; and (3) "**Against Guevara only**" includes contentions that Johnson directs against Defendant Guevara despite trying to bootstrap the Movants to him.

| *Brady* Allegations | Status |
|---|---|
| (1) Guevara and Halvorsen suppressed that Johns was a cooperating witness in another pending homicide case. | **New at summary judgment and waived.** (Addressed on the merits *infra* §IV(b)(4).) |
| (2) Guevara, Halvorson, and Erickson suppressed key evidence undermining the Burgos identifications. | **New at summary judgment and waived.** (Addressed on the merits *infra* §IV(b)(1).) |
| (3) Guevara, Halvorsen, and Daley suppressed the fact that Johnson was made a suspect before any evidence implicated him. | **New at summary judgment and waived.** (Addressed on the merits *infra* §IV(b)(2).) |
| (4) Guevara and Halvorsen suppressed their entire investigation of alternative suspect Robert Weeks. | **New at summary judgment and waived.** (Addressed on the merits *infra* §IV(b)(3).) |
| (5) Defendants all suppressed that Guevara had committed similar fabrications and | **New at summary judgment and waived.** (Addressed on the merits *infra* §IV(b)(5).) |

| | |
|---|---|
| suppressions of evidence in multiple homicide cases. | |
| (6) Defendants suppressed their own fabrications: (1) that they had fabricated the July 22 live lineup identifications of Johnson by Ricardo Burgos, Elba Burgos, and Rosa Burgos; (2) fabricated the July photo identification by Elba Burgos; (3) fabricated that Ricardo Burgos had not made a photo identification of Johnson; (4) fabricated that Elba Burgos had not followed the shooter through the neighborhood; (5) fabricated false police reports saying that Johns had not been identified. | **At issue.** (Memo at 27–28; Response at 82-83; *Infra* at §IV(a)(1).) |
| (7) Defendants suppressed the Erickson Report documenting the June 12, 1991 live lineup wherein Bryan Johns was identified as the shooter. | **At issue.** (Memo at 28–31; Response at 75-87; *Infra* at §IV(a)(2).) |

| Fabrication theory | Status |
|---|---|
| (1) Defendant Guevara fabricated entirely that Ricardo Burgos had identified Johnson in a photo identification procedure in June 1991, when no array occurred on that date, and when Johnson was not even a suspect at that time. | **Against Guevara only. (**Response at 62; Not applicable against Movants.) |
| (2) Defendants Guevara, Halvorsen, and Daley fabricated that there was a reason to suspect Johnson in the Fred homicide in July 1991, before there was any evidence implicating him and before any witness identified him, when they actually had arbitrarily swapped Johnson into the case in the place of Johnson's older brother, who they also had no reason to suspect. | **New at summary judgment and waived.** (Response at 48, 62; Addressed on the merits *infra* §II(d).) |
| (3) Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Elba Burgos's identification of Johnson in a photograph show-up on July 15, 1991, and a live lineup procedure on July 22, 1991. | **At issue.** (Memo at 11-13; Response at 62; *Infra* at §II(a and b).) |
| (4) Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Ricardo Burgos's identification of Johnson in a live lineup procedure on July 22, 1991. | **At issue.** (Memo at 11-13; Response at 62; *Infra* at §II(a and b).) |
| (5) Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated Rosa Burgos's | **At issue.** (Memo at 11-13; Response at 62; *Infra* at §II(a and b).) |

| | |
|---|---|
| identification of Johnson in a live lineup procedure on July 22, 1991. | |
| (6) Defendant Guevara fabricated a story that Elba Burgos had followed the shooter through the neighborhood, to bolster her identification, even though she had never followed the shooter. | **Directed against Guevara only. (**Response at 62; Not applicable against Movants.) |
| (7) Defendants Guevara, Halvorsen, and Healey fabricated a July 23 closing report for their investigation (Ex. 6), which included a summary of the evidence that they had fabricated implicating Johnson. | **At issue.** (Memo at 14-15; Response at 62; *Infra* at §II(c).) |
| (8) Defendants Guevara, Halvorsen, and Healey fabricated a July 22 lineup report (Ex. 51) claiming falsely that the Burgos witnesses had each positively identified Johnson in a live lineup, independently and without police manipulation. | **At issue.** (Memo at 14-15; Response at 62; *Infra* at §II(c).) |
| (9) Defendants Guevara, Halvorsen, Erickson, Daley, and Healey fabricated a lineup report, backdated to June 12 (Ex. 34) claiming falsely that witnesses had not identified Bryan Johns during a live lineup conducted on the night of the shootings (the "Guevara lineup report"). | **At issue.** (Memo at 14-16; Response at 41; *Infra* at §II(c).) |
| (10) Defendant Daley fabricated a June 13 report (Ex. 19) claiming falsely that witnesses had not identified Bryan Johns during a live the night of June 12, 1991. | **At issue.** (Memo at 14-16; Response at 48 63; *Infra* at §II(c).) |
| (11) Defendant Guevara fabricated a June 20 report (Ex. 65) claiming falsely that Rosa Burgos told them that she could identify the shooter, when she repeatedly said the opposite. | **Directed against Guevara only. (**Response at 63; Not applicable against Movants.) |
| (12) Defendant Daley fabricated a false account that Demetrius Johnson's nickname was "Little D," when he knew that was in fact Bryan Johns's nickname. | **New at summary judgment and waived.** (Response at 63; Addressed on the merits *infra* §II(d).) |

Johnson's addition of five new *Brady* and two new fabrication theories severely prejudices Movants and violates the Federal Rules of Civil Procedure. Movants served Johnson with interrogatories requesting that: he identify the specific conduct he attributes to each Defendant which he claims led to his arrest, prosecution and conviction for the murder of Edwin Fred and identify all reports and testimony that he alleges were falsified and the specific

information he claims to be false, but nowhere in Johnson's responses does he put Movants on notice of the new *Brady* and fabrication theories. (Dkt. 313-1, Ex. 40, Plaintiff's Fourth Supplemental Answer to Defendant Daley's Interrogatories at 1, 13.)

A party who has "responded to an interrogatory" must supplement that response "in a timely manner if the party learns that in some material respect the…response is incomplete, and if the additional or corrective information has not otherwise been made known." Fed. R. Civ. P. 26(e)(1)(A). Pursuant to Rule 37, "[i]f a party fails to provide *information* …the party is not allowed to use that *information*…on a motion…unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added). This is an "automatic sanction," meant to "provide[] a strong inducement for disclosure of material that the disclosing party would expect to use as evidence . . . on a motion, such as one under Rule 56." Rule 37 advisory committee's note to 1993 amendment. *See also Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) (sanction of exclusion is automatic and mandatory unless justified or harmless).

Rule 37 is contextualized in *Moran v. Calumet City*, where the Seventh Circuit affirmed the district court's holding that the plaintiff waived a *Brady* claim—claiming defendants withheld a dispatch log—because he failed to mention it in response to interrogatory requests that "ask[ed] him to '[s]tate the factual basis for the allegation' that defendants 'deliberately with[held] exculpatory evidence.'" 54 F.4th 483, 497 (7th Cir. 2022). The plaintiff merely asserted "boilerplate objections," referred to the "allegations in his complaint," but never referred to the dispatch log as *Brady* material until filing his summary judgment response. *Id.* Because of this failure, he was ***not allowed*** to use that information at summary judgment because he could not show that "the failure was substantially justified or is harmless." *Id.* (citing Fed. R. Civ. P. 37(c)(1)). The Seventh Circuit summarily rejected the plaintiff's argument that the dispatch log

8

was "part of a single *Brady* suppression claim" and "not a freestanding claim" because Rule 37

refers to a party's failure to provide "'information,' not 'claims.'" *Id.* Moreover, the Seventh

Circuit stated that the plaintiff's failure "would prejudice the defendants if they had to contend

with allegations at summary judgment that [the plaintiff] did not disclose during discovery." *Id.*

The Seventh Circuit made it clear that "poor discovery practice" is "costly." *Id.*

*Moran* applies with full force here. Johnson never disclosed the new *Brady* or fabrication

theories set forth above in the Fabrication and Brady Charts and Movants are now severely

prejudiced by being forced to investigate these theories on the back foot in reply. Based on the

length of time this matter has been pending, the closure of fact and expert discovery, and a

potential trial on the horizon, Johnson cannot seriously contend the nondisclosure was justified.

Accordingly, Johnson should not be permitted to pursue these theories and the mandatory

exclusion language contained in Rule 37 should apply. *See also Heidelberg v. Manias*, 18-cv-

01161-SLD-JEH, Dkt. 220, at 38, n. 21 (C.D. Ill. Mar. 27, 2024) (holding plaintiff's unduly

suggestive identification claim "is new at summary judgment and is thus barred.").

### c. Johnson's attempt to rewrite the plain meaning of Rule 56 to avoid summary judgment has no support.

Johnson pronounces, without any support, that if he "show[s] a genuine dispute of fact on

any of his fair trial theories against a Defendant," the Court "can move forward with a trial on

Johnson's fair trial claims without exploring every argument made by Defendants in their

motion, and it can deny summary judgment on that basis." (Response at 30.) This assertion is

directly contradicted by Rule 56, which expressly permits a party to move for summary

judgment on "part of each claim." Fed. R. Civ. P. 56(a). Indeed, "[o]ne of the principal purposes

of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).[2]

Here, Johnson alleges several "baskets" of evidence were fabricated and suppressed. (*See generally* Response at 49–50.) Under such circumstances, he must separately satisfy the elements of a fabrication or *Brady* claim for each "basket" to survive summary judgment. *See, e.g.*, *Moran,* 54 F.4th at 493–94. (Evaluating several different alleged *Brady* violations separately to determine whether the plaintiff had produced sufficient evidence to survive summary judgment as to each evidentiary "basket"). This is nothing novel. The Seventh Circuit took the same approach in *Anderson v. City of Rockford*, in separately addressing and analyzing each category of allegedly withheld or fabricated evidence in reviewing a summary judgment decision. 932 F.3d 494, 503–12 (7th Cir. 2019). In doing so, the court thoroughly analyzed which "aspects of claims" could proceed on remand "in part to aid and sharpen the focus of the proceedings" where plaintiffs' contentions were "expansive," and their arguments were "sprawling." *Id.* at 511–12.

To counter this well-entrenched approach, Johnson relies primarily on *Goudy v. Cummings*, but that case does not even arguably support his "sub-theories of liability" strategy for avoiding summary judgment. 922 F.3d 834, 838 (7th Cir. 2019). Rather, *Goudy* merely stood for the unremarkable proposition that, where evidence indicates more than one officer suppressed evidence, they are subject to joint and several liability as opposed to percentage-based apportionment of fault. *Id.* at 843 (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012); *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985)).

---

[2] Johnson's understanding of this truth is revealed by his brief in support of his own motion for partial summary judgment against Defendant Guevara where he states, "[a] plaintiff need not seek summary judgment on an entire claim, but instead *may seek partial summary judgment on a portion of a claim.*" (Pl. Memorandum of Law in Support of Partial MSJ Against Guevara, Dkt. 211, at 11) (emphasis added).

Indeed, in *Goudy*—and *Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019), the other case Johnson relies on—the Seventh Circuit assessed each of the plaintiffs' fair trial claims, including the "baskets" of their alleged fabrication, suggestive identification, and *Brady* claims to determine if the plaintiffs produced admissible evidence to satisfy the elements of each claim. *Goudy*, 922 F. 3d at 838–842; *Camm*, 922 F.3d at 1109–10. In fact, in *Camm*, the plaintiff brought three *Brady* claims, one of which was expressly rejected because plaintiff did not have evidence to show that the *Brady* material was suppressed. 937 F.3d at 1110–12. Similarly, in *Goudy*, the court evaluated each alleged *Brady* violation separately to determine if the plaintiff produced admissible evidence on each contention to establish a triable issue. 922 F.3d at 837. Thus, both cases endorse Rule 56(a) allowing a court to enter judgment on parts of a plaintiff's due process claim when the evidence supporting each "basket" is considered.

This Court is no stranger to summary judgment and the requirement that a plaintiff, like Johnson, must demonstrate personal involvement in the alleged constitutional violation to attach liability to that individual. The merits of claims against each individual defendant are considered separately. The allegations against defendant officers must be considered separately in § 1983 actions and summary judgment is appropriate to some officers even when the claims continue against others. *See, e.g.*, *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024); *Azami v. Village of Wilmette*, No. 14 C 2592, 2016 WL 1298672, *3-*5 & n.4 (N.D. Ill. Apr. 4, 2016) (granting summary judgment as to excessive force and failure to intervene for two of five officers for lack of personal involvement). The law is simply not what Johnson purports it to be, and this Court can and should consider whether Johnson has sufficient evidence against each Movant for each theory he alleges.

**d. Guevara's assertion of the Fifth cannot be imputed against Movants.**

Johnson seeks to impute an adverse inference to Movants from Guevara's Fifth Amendment assertion, (*see generally* Response at 31–36), by improperly using Guevara's invocation to establish facts that he then uses against all Movants. For example, Johnson argues:

- Based on the facts above alone, Johnson is entitled to the inference at summary judgment that Defendant Officers fabricated the identifications, telling Elba, Ricardo, and Rose who to pick, and reporting falsely that they had made positive identifications of Johnson without suggestion. *When asked if Defendants did exactly this*, Guevara asserted his Fifth Amendment rights. (Response at 50.)

- In sum, Defendants got all three witnesses to each identify the same innocent person who Defendants had selected as their suspect. The only way this could have happened is if Defendants fabricated the identifications, telling Elba, Ricardo, and Rosa who to pick, and reporting falsely that they had made positive identifications of Johnson without suggestion. When Guevara was asked if he did exactly that, he pleaded his Fifth Amendment right not to incriminate himself. (Response at 93–94.)

- In this case, the record is replete with evidence from which a reasonable jury could draw the inference that Defendant Officers had the intent to obtain fabricated identifications using unduly suggestive procedures. One officer involved in those procedures, Guevara, has taken the Fifth. (Response at 104.)

When a witness in a civil case remains silent, an "adverse factual inferences may be drawn against that witness's silence," and **only** that witness. *See Logan v. City of Chicago*, 891 F. Supp. 2d 897, 900 (N.D. Ill. 2012). It would obviously be inequitable to draw a negative inference against Movants, who testified or are deceased, based solely on Guevara's assertion. To be sure, Johnson blatantly seeks to capitalize on the deaths of three of the Movants and contradict the testimony of Movant Daley solely using "facts" derived from an allowed, though not commanded, negative inference against Guevara. (Response at 50, 93–94, 104.)

The unfairness to Movants is palpable here where the undisputed evidence in the record shows that Movants Daley, Erickson and Healy were not even involved in, present for, or informed of the alleged constitutional violations related to interactions with the Burgoses for which Johnson seeks to hold them liable. (JSOF ¶¶ 21, 22, 32, 38–39.) Further, Guevara's Fifth Amendment invocation cannot be used to disparage the dead or contradict sworn testimony of

Movant Daley. *See Logan*, 891 F. Supp. 2d at 900. Johnson's improper use and reliance on Guevara's Fifth Amendment assertion to argue for denial of summary judgment shows he lacks sufficient evidence to meet his burden of proof against the Movants.

## II. Movants Are Entitled to Judgment as a Matter of Law as to Johnson's Due Process – Fabrication Claims In Count I.

To prove fabrication, Johnson must show that a Defendant knowingly manufactured false evidence that he knew with certainty was false and that it was used to deprive him of his liberty. (Memo at 11). In their Memo, Movants demonstrated that Johnson could not prevail on his fabrication theories against them for three reasons: (1) Movants Erickson, Healy and Daley were not involved with the Burgoses' identifications of Johnson (*See* Fabrication Chart *supra* at Nos. 3-5); (2) Johnson cannot establish that Rosa, Ricardo or Elba Burgos' identifications were false or knowingly manufactured, nor can he establish that any Movant fabricated false testimony from the Burgoses (*See* Fabrication Chart *supra* at Nos. 3-5); and (3) there is no evidence that police reports documenting the identification procedures were fabricated, nor were they used to establish Johnson's conviction (*See* Fabrication Chart *supra* at Nos. 7-10). (Memo at 11-16.)[3]

In response, Johnson argues that Movants "cherry pick snippets of the record relating to the Burgos" and contends, without support, that whether the Burgos "made legitimate identifications, always told the truth and never recanted" is "hotly contested." (Response at 42–43.) As to Movants Erickson, Healy and Daley's personal involvement argument, Johnson seemingly concedes that these three Defendants were not present for, nor involved in the Burgos' lineup identifications of Johnson but still contends their "involvement in the fabrication and suppression" of other items of evidence "directly enabled the false Burgos identifications." (*Id.*

---

[3] Movants do not address the fabrication theories directed solely at Defendant Guevara. (*See* Fabrication Chart *supra* at Nos. 1, 6, 11.)

at 53–55.) As to Movants final argument, Johnson responds that "Defendants' fabrication of Guevara's false lineup report was used to deprive Johnson of his liberty," contending Movants argument that the June 12, 1991 Guevara lineup report was not "introduced as evidence at trial" is "wrong on the law and the facts." (*Id*. at 55.) As explained below, each argument fails under scrutiny with a clear review of the record.

Further, as to Johnson's two new fabrication theories—that Movants Halvorsen and Daley fabricated a reason to suspect Johnson and that Movant Daley "fabricated a false account" that Johnson's nickname was "Little D"— these claims are waived. *Moran*, 54 F.4th at 497. But even if the Court were to consider them, each similarly fails based on the law and factual record. (*See* Fabrication Chart *supra* at Nos. 2 and 12.)

> **a. Movants Erickson, Healy and Daley did not interact with Ricardo, Elba or Rosa Burgos relating to their identifications of Johnson and nothing they did enabled the alleged fabricated identifications.**

The crux of Johnson's disclosed fabrication contentions against Movants concerned Elba Burgos, Ricardo Burgos and Rosa Burgos' identifications of Johnson (Fabrication Chart Nos. 3-5). As Movants Erickson, Healy and Daley explained in their Memo, Johnson cannot demonstrate that they were personally involved in any fabrication of identifications sufficient to support Section 1983 liability against them. (Memo at 13–14.) *See Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003) ("Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue."). Because there is no evidence that Erickson, Healy and Daley interacted with, or were present for, Rosa, Ricardo and Elba Burgos' identifications of Johnson, they therefore could not have "knowingly procured false identifications." (Memo at 13–14.)

Johnson seemingly concedes that Erickson, Healy and Daley were not present for, or involved in these identifications. (Response at 53–54.) However, not being able to dispute the law or factual involvement head on, Johnson pivots to argue that Erickson, Healy and Daley were "personally involved" in the Burgos' lineup identifications, so as to give rise to §1983 liability because of "their [alleged] involvement in the fabrication or suppression of any of the items of evidence that *directly enabled* the false Burgos identifications." (*Id.*) (emphasis added.)

But Johnson's expansive interpretation of the law does not save this claim. The problem with Johnson's argument is two-fold: (1) he cannot point to any evidence in the record to substantiate any of this "direct enabling" conduct; and (2) even if he did, Johnson's position is at odds with well-established jurisprudence regarding Section 1983 liability which is predicated on personal responsibility and requires evidence that each defendant "deliberately and knowingly created" evidence that he "knew with certainty to be false." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156–57 (N.D. Ill. 2022).

Taking the latter first, Johnson offers a gross distortion of the law contending §1983 liability "does not require each defendant to have participated in each event in a causal chain leading to a constitutional violation." (Response at 54.) In doing so, he relies on *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) for the proposition that "[t]he law requires each defendant to have caused or participated in conduct leading to a constitutional violation." (Response at 54) (emphasis added). But *Pepper* says nothing of the sort. Indeed, nowhere in *Pepper* does it state individual liability under § 1983 can be predicated upon a defendant's conduct that "lead[s] to a constitutional violation." *Pepper*, 430 F.3d at 805. Rather, it stands for the proposition that Johnson provided in his parenthetical (Response at 54), that "to be liable under § 1983, the individual defendant must have caused or participated in a

constitutional deprivation." *Id*. at 810. (quotation omitted.) This, of course, is consistent with well-established Seventh Circuit precedent governing § 1983 claims.

Under § 1983, "a public employee's liability is premised on her own knowledge and actions, and therefore requires evidence that each defendant, *through her own actions*, violated the Constitution." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630 (7th Cir. 2017) (citing *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009)) (emphasis added). Without evidence of personal involvement, a defendant cannot be liable under § 1983. *Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 966 (7th Cir. 2019); *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (holding that there is no Section 1983 liability unless defendant participated in the misconduct or "it occurred with his knowledge or consent."); *de Lima Silva v. Wisconsin Dep't of Corr.*, 917 F.3d 546, 564 (7th Cir. 2019) (finding no personal involvement of defendants who participated in an investigation but were not involved in the decision to discharge plaintiff). *See also Snider v. Pekny*, 899 F. Supp. 2d 798, 815 (N.D. Ind. 2012) (granting officer defendant's motion for summary judgment relative to an illegal search claim based on lack of personal involvement stating while the officer's conduct "*may have enabled* the other officers to search without interference, there is no evidence that [the officer] directed, countenanced, or even knew of the initial search of the pole barn. As such, he cannot be held liable under § 1983.") (emphasis added). Simply put, Johnson's position expands liability far beyond the governing principles of § 1983 jurisprudence. It  is at odds with the requirement that a plaintiff must prove not only that the evidence was false, but that the defendant "manufactured it." *Coleman*, 925 F.3d at 344.

Even if Johnson's expansive interpretation of the law was correct, Erickson, Daley and Healy were not involved in "the fabrication or suppression" of evidence that "directly enabled" the Burgoses' purported "false identifications." Johnson identifies the following conduct that he

claims "directly enabled" the "false Burgos identifications:" "(1) Erickson's authorship of the false Guevara lineup report denying the Johns identification, which Healey approved; (2) Erickson's and Daley's suppression of the Johns identification; (3) all Defendants' suppression of Erickson's report documenting that identification; (4) Daley's false report denying the Johns identification; (5) Rosa's statement to Erickson that she could not identify the shooter; (6) Daley's participation in selecting Demetrius Johnson as the suspect with Guevara and Halvorsen; (7) Daley's identification of a three-person show up photo to show the Burgoses; and (8) Healey's approval of numerous false reports by Guevara and Halvorsen." (Response at 54–55.) Each will be addressed in turn.

### 1. There is no evidence Erickson "directly enabled" the alleged false Burgos identifications.

Johnson claims Erickson "directly enabled the false Burgos [sic] identifications" because Erickson: (1) authored the "false Guevara lineup report denying the Johns identification;" (2) suppressed the Johns identification; (3) suppressed the six-witness lineup report that Erickson drafted documenting the Johns identification; and (4) "Rosa's statement to Erickson that she could not identify the shooter [before the June 12th lineup." (Response at 54–55.) However, it is undisputed that Guevara, not Erickson, authored the negative four-witness lineup report. (JSOF ¶¶ 23, 24.) Indeed, Johnson, himself, argues throughout his Response that the "false Guevara lineup report" was written by Guevara and "backdated," meaning it was created at the end of the investigation (Response at 19, 58 n. 9, 78) when Erickson was no longer involved in the investigation, a fact that is undisputed. (JSOF ¶ 21, Memo at 14). The fact that Johnson is willing to assert inconsistent arguments as to the author of the negative four-witness lineup report lays bare his persistent attempts to manufacture a factual dispute where none exists.

17

As to Johnson's claim that Rosa Burgos stated to Erickson that she could not identify the shooter, there simply is no admissible evidence in the record to support this statement. Johnson relies on the hearsay notes and testimony of APD Carey, his deceased criminal defense attorney, who interviewed Rosa (PSODF ¶138), but as noted *supra* §I(a), this Court already addressed this to ensure that APD Carey's statements of what Rosa said are not misrepresented to be directly from her.[4] Indeed, this Court instructed Johnson to rewrite the statement attributing APD Carey's testimony to him not Rosa. *See* Ex. 1, Feb. 29, 2024, Hearing Transcript, at 7:23-9:15; *see also Id.* at 10:5-7 (relating to ¶131). Despite the Court's admonitions to not misrepresent, that is precisely what Johnson does repeatedly throughout his Response, passing off statements Rosa purportedly made to APD Carey, that she denies making, as statements Rosa made to "the police." APD Carey's statements are hearsay and insufficient to defeat summary judgment. *See Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *4 (N.D. Ill. Aug. 4, 2003) (citing *Winskunas v. Birnbaum,* 23 F.3d 1264, 1268 (7th Cir.1994) (hearsay incapable of creating a genuine issue of material fact). It is undisputed that Rosa testified that she saw the person who shot Raul Ortiz from approximately 10 feet away, saw his face for four (4) seconds and identified Johnson from a lineup. (JSOF ¶¶ 103–07.)

Johnson's claims that Erickson suppressed the Johns identification and his own report documenting the Johns identification fair no better, *see infra* § IV(a)(2). It is unintelligible to argue that Erickson suppressed the six-witness lineup report for the purpose of enabling the

---

[4] Johnson's exploitation of what Rosa actually said to the police versus statements APD Carey attributes Rosa as saying to the police is important to flag because the Court previously addressed the issue during the hearing on the parties' motion to resolve disputed facts. (2/29/24 Transcript of Hearing on Motion to Resolve Disputed Facts, 7:24-9:15, Dkt. 308, Attached as Exhibit A.) Despite the Court's direction at the February 29, 2024 hearing, Johnson simply reasserts as disputed facts statements the Court explained were **not** facts, including misrepresenting statements Rosa purportedly made to APD Carey as statements she made to the police.

"false Burgos identifications" when those identifications did not come until over a month later. And it is undisputed that Erickson was only involved in the murder investigation the first night and retired long before Johnson's criminal trial. (JSOF ¶¶ 21, 22.)

### 2. There is no evidence Daley "directly enabled" the alleged false Burgos identifications.

Johnson claims Daley "directly enabled the false Burgos identification," by purportedly (1) suppressing the Johns identification; (2) suppressing the Erickson report documenting the Johns identification; (3) authoring a "false report denying the Johns identification;" (4) his "participation in selecting Demetrius Johnson as a suspect.;" and (5) his "identification of a three-person show up photo to show the Burgoses." (Response at 54–55.) Again, there is no evidence in the record to substantiate any of this conduct. Daley took Johns to Area 5 the night of the shooting, but he is not listed in any reports as being present at the lineups the night of the shooting.

Further, it is undisputed by the Parties that he ***was not*** involved in the line-up process. (JSOF ¶ 13.) It is further undisputed by the Parties that Daley "was informed that Bryan Johns was **not** identified in the lineup and that he would be subsequently released." (*Id*. ¶ 28.) (emphasis added). Thus, Daley had no first-hand knowledge of the lineup procedures the night of the shooting and therefore, could not have knowingly created false evidence, nor could he knowingly have suppressed the Johns identification.

As to Johnson's claim that Daley authored a "false report denying the Johns identification," Johnson cannot establish Daley had the requisite intent necessary to establish a fabrication claim. Daley was not present for the lineup procedures on the night of the shooting,

and that he was told Bryan Johns was not identified. (*See* § II(c), *infra*.)[5]  Nor does Johnson's claim that Daley "participat[ed] in selecting Demetrius Johnson as a suspect" or his "identification of a three-person show up photo to show the Burgoses [sic]" equate to conduct that directly enabled the Burgoses identifications. (Response at 54–55.) Indeed, Johnson knows full well that Daley did not show any photo to the Burgoses as it is undisputed he did not interact with any of the witnesses who identified him. (JSOF ¶ 32.)  In short, Daley is entitled to judgment as a matter of law.

### 3. There is no evidence  Healy "directly enabled" the alleged false Burgos identifications.

As to Healy, Johnson claims he "directly enabled the false Burgos identifications" by approving the "false Guevara lineup report denying the Johns identification;" (2) suppressing the Erickson report documenting the Johns identification; and (3) his "approval of numerous false reports by Guevara and Halvorsen." (Response at 54–55.) But as Movants explained, Healy is entitled to summary judgment on all claims because there is a complete absence of any evidence that Healy actively participated in the Fred murder investigation or directed the conduct of which Johnson complains. (Memo at 13–14,  28, 33–34, 36–37.)

As a supervisor, Healy cannot be liable for the misconduct of his subordinates simply because he was in charge. *See Gossmeyer v. McDonald*, 128 F.3d 481, 495 (7th Cir. 1997) ("Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved."). Rather, Healy can be liable only if Johnson's injury occurred at

---

[5] Johnson himself acknowledged in his Petition for Post-Conviction Relief that Daley "may have been merely repeating what he was told about the lineup or read in the official report." (Plaintiff Ex. 41, Johnson Post Conviction Petition, at Johnson 811, fn 2, Dkt 339-2.) "Whether he knew it or not, Officer Daley's testimony was a lie." (*Id.* at Johnson 812, ¶ 7.) But unlike his post-conviction proceedings, to prevail on his fabrication theory, Johnson must prove that Daley deliberately created evidence he knew with certainty to be false. He cannot do so in light of the record.

his "direction or with [his] knowledge and consent and that the defendants acted either knowingly or with deliberate, reckless indifference." *Stockton v. Milwaukee County*, 44 F.4th 605, 619 (7th Cir. 2022). Johnson was obligated to present evidence that Healy engaged in misconduct. *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (internal quotation marks and citations omitted). He did not because he cannot.

Johnson wholly ignores the law, and the record, and instead makes the unsupported leap that because Healy approved four police reports that Johnson now claims were fabricated, Healy must have "had knowledge of [] false evidence." (Response at 55.) But this leap is unsubstantiated speculation because the parties agree that there is no evidence that he was present at Area 5 at any time before he signed the four reports, which was after charges against Johnson were approved. (JSOF ¶¶ 38, 39.) In the absence of any specific evidence establishing Healy was present for, or knew of the alleged constitutional violation, Johnson's allegations are meaningless speculation. *See Gossmeyer*, 128 F.3d at 494–97 (no personal involvement where supervisors were either not present for or did not participate in search of workplace desk). Johnson makes no attempt to explain how Healy's after-the-fact approval of these reports, somehow "directly enabled" the purported "false Burgos identifications." *See Bedford v. Dewitt*, No. 19 C 00001, 2023 WL 6312107, at *3 (N.D. Ill. Sept. 28, 2023) (after-the-fact approval of tactical response report did not rise to the level of personal involvement necessary to sustain constitutional violation.) Indeed, the purported false identifications all occurred prior to Healy's approval of reports. This hardly can be said to be enabling conduct.

Johnson's inability to identify any evidence tying Erickson, Healy or Daley to any Burgos identifications of Johnson, entitles them to summary judgment on these fabrication theories.

**b. On the merits, Johnson's fabrication theories based on identifications of him by Rosa, Ricardo and Elba Burgos fail.**

In their opening Memo, Movants argued that Johnson could not prevail on his fabrication theories that Defendants "knowingly procured false identifications of Plaintiff as the person responsible for the Fred murder from Ricardo, Rosa, and Elba Burgos" and manufactured false testimony. (Fabrication Chart Nos. 3-5) (Memo at 11-13.) All three witnesses have consistently maintained their testimony was truthful, including their identifications of Johnson as the shooter. (*Id.*) In response, Johnson contends Movants' "argument flies in the face of strong direct and circumstantial evidence that Defendant Officers fabricated the Burgos identifications." (Response at 43.) But Johnson fails to set forth any direct evidence of fabrication because there is none. Instead, he argues: (1) "neither Elba, Ricardo nor Rosa could have made an identification given the circumstances of what they observed…"; (2) none of the Burgoses "could provide a description of the perpetrator"; (3) alleged statements made by Ricardo and Rosa to Guevara and Halvorsen that they would not be able to identify the perpetrator; and (4) Johnson's COI. (Response at 43–44.) None of these arguments salvage this claim.

To be sure Johnson buries the elephant in the room: one would never know from Johnson's 191-page brief that Ricardo and Rosa Burgos maintain their testimony was truthful, including their identifications of Johnson as the shooter, and there is no evidence that Elba's testimony was anything but truthful including her identification of Johnson as the shooter. (JSOF ¶¶ 117–19.) This direct evidence is critical because, in the absence of contrary evidence, a witness's affirmation that her prior testimony was truthful defeats a fabrication claim. *See, e.g.*, *Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 740 (N.D. Ill. 2016) (granting summary judgment on fabrication claims because "the two witnesses who testified at Grayson's criminal trial, universally stated that the Defendants did not provide them with what to say or force them

to make statements at trial that they knew to be untrue."). *See also Fields v. City of Chicago (Fields II)*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it."). Tellingly, Johnson does not even try to address Movants' case law vitiating any contention that Movants fabricated false identifications, reports and testimony.

Johnson begins his fabrication argument attacking the "reliability" of the Burgos' identifications contending "neither Elba, Ricardo nor Rosa could have made an identification given the circumstances of what they observed" and because "[n]one of the Burgoses could provide a description of the perpetrator." (Response at 44–46.) But this misunderstands a fabrication claim because whether the identifications were in fact accurate or reliable does not advance the ball on his fabrication claim. *See Camm*, 937 F.3d at 1112.) ("He argues instead that the investigators used suggestive interrogation methods to elicit a story they should have known was unreliable. Without more, however, the claim for evidence fabrication cannot succeed."). *See also Humphrey v. City of Anderson*, 19-cv-00764-JRS-TAB, 2021 WL 4477806, at *7 (S.D. Ind. Sept. 30, 2021) ("Fabricated evidence by definition cannot be reliable, but an unreliable statement is not necessarily fabricated.") Indeed, evidence that merely impeaches an aspect of a witness' statement or suggests that the officer may have had reason to doubt the witness' ability to perceive hardly establishes knowledge of falsity. *Coleman*, 925 F.3d at 345. Regardless, Johnson's arguments attacking the "reliability" of the Burgos' identifications are largely unsupported by the record.

Johnson argues that Rosa could not have made an identification because she "was coming downstairs inside a building behind the victim, Ortiz, who was shot as soon as he opened the

23

front door, at which time she immediately shut the door and ran back upstairs." (Response at 64.) Johnson further contends that Rosa "reported this information to Guevara and Halvorsen." (Response at 64.) But Johnson's version of what Rosa observed is directly contradictory to the Parties Joint Statement of Undisputed Material Facts. (*See* JSOF ¶ 103 ("Rosa Burgos testified that on June 12, 1991, at about 7:45 p.m., she was coming out of her building with Raul Ortiz. She saw the person shoot Raul Ortiz, then she ran back upstairs. She was approximately 10 feet from the person who shot Raul Ortiz and saw his face for four seconds.").) And Johnson again relies on hearsay from his former defense attorney about what Rosa allegedly said, but that too does not change the analysis. In the end, there is no evidence contradicting that Rosa: witnessed the shooting, did not identify Johns in a lineup, identified Johnson in a lineup, testified under oath to all this, was challenged during the criminal trial by Johnson's criminal defense attorney using his interview of her, maintained her testimony that Johnson was the shooter and, at deposition, confirmed she testified truthfully. (JSOF ¶¶ 35, 103-108, 119.) Johnson's fabrication claim centered on Rosa fails as a matter of law.

As to Ricardo Burgos, Johnson argues that Ricardo could not have made an identification because he did not see the crime and "was driving his car during the shooting, did not see the crime but heard shots, and was 60-70 feet away from a person he saw running southbound down Campbell away from him, such that he only saw his back and never saw his face." (Response at 43.) Johnson further contends that Ricardo "reported this information to Guevara and Halvorsen." (Response at 43.) However, Ricardo testified at Johnson's criminal trial, and it is undisputed by the Parties, that on June 12, 1991, at approximately 7:45, he was driving with a friend east down North Avenue, when "he saw a black guy wearing a T-shirt and gray pants walking North down Claremont with a gun in his hand." (JSOF ¶ 88.) Ricardo further testified at

trial, and also it is undisputed by the Parties, that he observed "a black guy" with a gun from across the street, approximately sixty feet away, and saw him fire the gun. (JSOF ¶¶ 88–90.) Ricardo also testified at Johnson's criminal trial, and is undisputed by the Parties, that he looked at the man who fired the gun for about forty-five (45) seconds and could see his face. (JSOF ¶ 91.). At core, Johnson is simply arguing that Ricardo's testimony should not have been credited. But that is not fabrication and no basis to attach liability to Movants here. The reliability of an eyewitness and a challenge to the admissibility of that identification are uniquely issues for the criminal trial court to consider applying the *Biggers* factors. *See* § III, *infra*. The Constitution does not establish a "right to be free of suggestive" identification procedures or mandate a that photo arrays or lineups meet a standard of quality. *See Hensley v. Carey*, 818 F.2d 646, 648, 7th Cir. 1987); *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019).

Finally, with respect to Elba, Johnson claims that she "did not see the shooting either, and instead heard the shots and saw a person running down the sidewalk more than 60 feet away, across a street, and she only saw the individual in profile." (Response at 43.) Johnson argues Elba "reported this information to Guevara and Halvorsen." (*Id.*) While Elba was not an "eyewitness" to the shooting in the sense that she saw the shots fired she did witness, after the gunshots rang out, a young black man running in her direction with a gun while she stood on her front porch. (JSOF ¶¶ 95–97.) It is undisputed by the Parties that the young black man Elba observed running with a gun was about 25 feet away from her, not "more than 60 feet away" as Johnson posits. (JSOF ¶ 97.) Johnson knows full well there simply is nothing in the record to substantiate Johnson's belief that the distance was more than 60 feet away, as this Court

previously instructed Plaintiff counsel on the lack of foundation for this statement.[6] (2/29/24 Transcript of Hearing on Motion to Resolve Disputed Facts, 10:9-11:13, Dkt 308, Attached as Exhibit A; *Compare* PSODF ¶ 99, *with*, Joint Motion to Resolve Disputed Facts at ¶ 97 and 136, Dkt. 302.) Indeed, it is undisputed that Elba testified that she was 25 (twenty-five) feet away from the young Black man with the gun, who she identified as Johnson. (JSOF ¶¶ 97–98.)

In an attempt to create an issue as to Movant Halvorsen's involvement, Johnson states "[t]he Burgoses reported this information to Guevara and Halvorsen." (Response at 43, citing PSODF ¶ 128 ("a]fter the shooting, Burgos got out of the car to see if he could help the victim. It turned out to be someone he knew, Edwin Fred. He stayed around and was there when officers arrived at the scene and asked people what they saw. Ricardo told police at the scene that he heard the shots and saw someone running away, but did not see the person's face.") and  PSODF ¶ 138 (citing APD Carey's hearsay "Rosa told police 'everything happened so fast and that she wasn't sure' who the shooter was.").) But the PSODF paragraphs cited say nothing of the sort, nor do they give rise to a reasonable inference that Halvorsen was in any way provided this information. Again, Plaintiff's counsel knows there is no support in the record to attribute Rosa making this statement to the police, let alone to Halvorsen, as the Court instructed Plaintiff counsel "131, you need to remove the portion that says: '[s]he told police everything happened so fast and she wasn't sure who the shooter was." (2/29/24 Transcript of Hearing on Motion to Resolve Disputed Facts, 10:5-7, Dkt 308, Ex. A.) Johnson cannot avoid summary judgment by offering unsubstantiated assertions and misrepresentations of fact.

---

[6] Similarly, Plaintiff cites to paragraph 97 to support his assertion that Elba "only saw the individual in profile," as ¶ 97 states "She could only see the side of the shooter's face." (PSODF ¶ 97.) This is an improper inference that this Court previously instructed the Parties to remove from a paragraph in the JSOF, stating specifically "130 should be edited to remove 'and so could only have seen the side of the shooter's face.' That's an inference. It's not a fact."

Johnson further argues that his certificate of innocence (COI) means that Rosa, Ricardo and Elba's identifications of him were wrong, which according to Johnson is evidence that the identifications were fabricated. (Response at 44.) But the COI is not proof of misconduct. *See Boyd v. City of Chi.*, 225 F. Supp. 3d 708, 723–24, 729 (N.D. Ill. 2016) (granting summary judgment on fabrication claim because "no reasonable juror could find that the Movants fabricated [the witness's] testimony" even though plaintiff had a COI as that "ultimately amounts to . . . an argument that his version of events, rather than the state's, should have been accepted at [his criminal] trial."). "[A] wrongful conviction is not, by itself, evidence of '"a tapestry of wrongdoing."' *Id.* at 729. Further, the COI cannot be used as affirmative evidence of innocence because it is inadmissible hearsay.  Here, Johnson plainly seeks to use the COI to establish the "fact" of innocence, but the COI and any declarations (or "findings") therein are out-of-court statements being offered to prove the truth of the matter asserted. (Fed. R. Evid. 801(c)). But no exception warrants its admission. *See Fields v. City of Chicago*, 2014 WL 12778835, at *4 (N.D. Ill. Apr. 29, 2014)(holding denial of a COI is inadmissible). *See also Schultz v. Thomas*, 832 F.2d 108, 111 (7th Cir. 1987) (holding that a judge's reasoning, prior fact and credibility determinations, not based on first-hand knowledge, are "irrelevant to an adjudication of a civil rights claim."); *Fisher v. Krajewski*, 873 F.2d 1057, 1063-64 (7th Cir. 1989) (affirming exclusion of evidence of judge's determinations in prior case where it was based on credibility determination of judge in prior proceedings).

At bottom, Johnson lacks evidence that Movants fabricated the Burgoses' identifications and, in the absence of evidence, makes the cosmic leap that there must have been misconduct because he claims he is innocent. That inference is not reasonable. No reasonable juror could find that any Movant knowingly manufactured false evidence or testimony from Ricardo, Elba or

Rosa Burgos. The record is devoid of evidence indicating Movants told, pressured, or threatened them on what to say by any police officer. Accordingly, Movants are entitled to judgment on this fabrication theory.

### c. Johnson's fabrication theories based on police reports documenting Burgoses' identifications and documenting the non-identification of Johns fail because there is no evidence the reports were knowingly false.

Movants argued in their opening Memo that Johnson could not prevail on his claim that Defendants wrote false police reports documenting the identification procedures, or fabricated reports regarding the identifications made by Elba, Ricardo and Rosa Burgos because there is no evidence to support a plausible inference that these identifications were false, let alone that Movants knew with certainty that the identifications were false. (Fabrication Chart Nos. 7-10.) (Memo at 14–16.) Additionally, there is no evidence of certain Movants' involvement in drafting any of these reports and therefore they were not personally involved and cannot be liable. (Memo at 16.)

### 1. Johnson lacks evidence the to show the police reports related to the Burgoses' identifications were fabricated.

Movants argued that there is no evidence that the Burgoses' identifications were fabricated and so the July 22nd lineup report (JSOF ¶ 35) and July 23rd closing report (JSOF ¶¶ 35–37), documenting those identifications cannot be fabricated. (Fabrication Chart Nos. 7-8.) (Memo at 11-16.) Johnson does not separately address the issue of reports— rather, he commingles it within his arguments regarding the Burgoses' identifications addressed above. See *supra* § II(a and b). However, because Johnson lacks evidence to show the identifications were fabricated, he lacks evidence to show that any reports documenting those identifications were fabricated. And putting a finer point on it, as noted above for Healy, there is no evidence he had any involvement with the investigation or saw the reports while the investigation was active.

(JSOF ¶¶ 38, 39.) Healy could not have known of any fabrication because he simply had no first-hand knowledge of the interactions between the witnesses and investigating detectives and did not observe any of the Burgoses' identifications.

### 2. Johnson lacks evidence to show the police reports related to Johns's non-identification were knowingly fabricated.

Movants explained that Johnson could not prevail on his fabrication theory related to the four-witness lineup report (JSOF ¶¶ 23–24) and Daley's June 13th report (JSOF ¶¶ 13, 28–29), which both noted that Johns was not identified because those reports were not used to obtain his conviction at trial. (Fabrication Chart Nos. 9-10.) (Memo at 15-16.) Additionally, Movants Halvorsen, Daley and Healy argued they were entitled to summary judgment on this fabrication theory based on a lack of personal involvement because they did not create the June 12 four-witness lineup report and there is no evidence they were involved in, or present for the lineup referenced in this report. (Memo at 16.) Similarly, to the extent Johnson now seeks to impose liability against Movants Halvorsen, Erickson and Healy based upon Daley's June 13th report, they are entitled to summary judgment on this fabrication theory based on a lack of personal involvement because they did not create the report.

In response, Johnson argues that Movant's are "wrong on the law and facts," contending there is no requirement that the fabricated evidence must be "used at trial" to support a due process/unfair trial claim. (Response at 55.) But it is Johnson who is wrong on both the law and facts. As to Halvorsen, Daley and Healy's noninvolvement argument, Johnson offers a perfunctory and undeveloped response, relegated to a footnote and so its waived. (Response at 58 n 9.) *See Walton v. U.S. Steel Corp.*, 497 F. App'x 651, 655 (7th Cir. 2012) (non-movant waived argument "by failing to raise it in response to summary judgment."). Waiver aside,

Johnson's argument that "factual disputes" preclude Movant Halvorsen, Daley and Healy from arguing they did not create the Guevara lineup report, is not supported by the record.

Indeed, the parties agree that Halvorsen was not involved in the investigation until more than two weeks after the June 12 lineup. (JSOF ¶ 30.) There is no dispute that Daley did not participate in the lineup and was simply informed of the result. (JSOF ¶¶ 13, 28.) And it is also undisputed that there is no evidence Healy was at Area 5 at any point until after Johnson was charged, more than one month after the June 12 lineup. (JSOF ¶ 39.) Thus, factual disputes can only exist if Plaintiff goes back on his agreement to facts in the JSOF.

As to his claim that Movants "fundamentally misunderstand[] Seventh Circuit law governing fabrication due process claims," Johnson contends that "officer[s] who fabricat[e] evidence violat[e] due process if their fabrication causes *any* deprivation of liberty . . . regardless of the stage of the criminal case . . . and however the evidence comes to impact the criminal proceedings." (Response at 55–56.) In support, Johnson selectively quotes *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) for the proposition that there is no requirement for the fabricated evidence at issue be used at trial. (Response at 56.)  But all the cases Johnson cites to support his interpretation, actually undercut it.

In *Patrick v. City of Chicago*, the Seventh Circuit held that a jury instruction  was "incomplete in that it failed to explain that [the plaintiff] had the burden to prove that the fabricated evidence was used against him *at his criminal trial* and was material." 974 F.3d 824, 835 (7th Cir. 2020) (emphasis added). The *Patrick* Court further differentiated a Fourth Amendment claim, that only requires some deprivation of liberty, from a fair trial due process claim *Id.* at 834 ("[i]f fabricated evidence is *later used at trial* to obtain a conviction, the accused may have suffered a violation of his due process right to a fair trial.") (emphasis added).

30

Additionally, Johnson's citations to *Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) and *Stinson v. Gauger*, 868 F3d 516 (7th Cir. 2017) further support Movants' position that the false evidence must be used at trial consistent with his parentheticals indicating the false evidence was ***introduced at trial***. (Response at 56–57.) *See also Anderson*, 932 F.3d at 511 (affirming summary judgment on one of the plaintiffs' fabrication claims because "plaintiffs cannot show that the prosecution used Croft's second statement (the one prepared by [the defendant]) to convict any of the plaintiffs."); *Gauger*, 868 F.3d at 521–22 (affirming lower court's denial of summary judgment on claim alleging that defendants fabricated evidence used at the plaintiff's criminal trial that the plaintiff's bite impressions matched the bite mark found on the victim.) Johnson also cites to *Hurt v. Wise*[7] (Response at 57), to support his interpretation, but the selective quote he relies on that false evidence "furthered the prosecution" is made in the context of a Fourth Amendment pretrial detention claim, not a due process fabrication claim. 880 F.3d 831, 844 (7th Cir. 2018), overruled on other grounds by *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). To be clear, to establish a due process claim based on the fabrication of evidence, Johnson must demonstrate that the fabricated evidence was **used at his criminal trial**. *See Coleman v. City of Peoria*, 925 F.3d 336, 344-45 (7th Cir. 2019); *see also Brown v. City of Chicago*, 633 F.Supp.3d 1122, 1156-57 (N.D. Ill. 2022)(same); *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022)(same).

Finally, Johnson forgets that a plaintiff must establish causation for all Section 1983 claims. *See Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) ("In assessing causation in § 1983 cases, we look to general principles of causation from tort law.") *Patrick*'s recognition that

---

[7] Johnson concludes this argument by stating "[a]ccordingly, there is no support for Defendants' position that they can be liable only if a particular item of fabricated evidence was actually introduced at trial *in its original form*." (Dkt. 341 at 78.)

an unfair trial cannot be realized where a fabricated piece of evidence is not introduced at, and therefore could not have impacted, a criminal trial, is consistent with the requirement in all § 1983 cases that proximate cause be established. In this regard, the cause of injury in a fabrication claim is the ***introduction*** of the evidence, not its ***creation***. *See Patrick*, 974 F.3d at 835. The Seventh Circuit illustrated this principle in *Bianchi v. McQueen*, stating, "[i]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." 818 F.3d 309, 319 (7th Cir. 2016). *See also Moran*, 54 F.4th at 499 (rejecting plaintiff's reliance on fabricated police reports as a basis for a due process claim "[b]ecause the evidence we assume was fabricated—the police report and the detectives' pretrial testimony—was not introduced at the trial, it could not have influenced the jury's verdict."); *Brown*, 633 F.Supp.3d at 1159-60 (granting summary judgment on due process fabrication of evidence claim because the supplementary reports that allegedly contained false information were not used against the plaintiff at his criminal trial).

*Whitlock's* use of the phrase "in any way" must, therefore, be read in the context of the additional requirement that a fabrication of evidence claim is only complete when the evidence is introduced at trial and actually causes the conviction. *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) ("the due-process violation wasn't complete until the false [evidence] was introduced at Avery's trial, resulting in his conviction and imprisonment"). A plaintiff must show that "fabricated evidence was used against him *at his criminal trial.*" *Patrick,* 974 F.3d at 835 (emphasis added); *see also Avery*, 847 F.3d at 442 ("[I]t was the *admission* of the false confession that made [the plaintiff's] trial unfair.") (emphasis added). "After all, remember the constitutional foundation. A Fourteenth Amendment claim is about a denial of due process and a

32

deprivation of 'liberty' after a judgment of conviction." *Zambrano v. City of Joliet*, No. 21-CV-4496, 2024 WL 532175, at *10 (N.D. Ill. Feb. 9, 2024).

Here, Johnson lacks evidence that the allegedly fabricated police reports (the four-witness lineup report, Daley's June 13th report, the July 22nd lineup report and the July 23rd clear closed report) were used at his trial to cause a violation of his due process rights, his related fabrication contentions fall flat. With this clarification of the governing law, Movants turn to the remaining merits of Johnson's fabrication theories.

Here, Johnson lacks any evidence that Daley's June 13th indicating Johns was not identified, or the four-witness lineup report were introduced at trial. Thus, he cannot not meet his burden to show that even if either document was fabricated that it caused his trial to be unfair— simply because neither were introduced at trial. While Johnson claims that "the [ four-witness line-up] report was admitted as evidence at trial, while Guevara was testifying on the stand, PSODF ¶¶250" and "[e]ven if it were not, the Guevara false lineup report need not itself have been introduced as an exhibit at trial, because its contents were introduced through the testimony of Guevara and Daley, who testified to the contents..." (Response at 57–58.) Once again none of Johnson's assertions have factual support in the record.

Indeed, it is undisputed that no police reports were admitted into evidence at trial. (JSOF ¶84.) Moreover, there simply is nothing in the record to support Johnson's assertion that the four-witness line-up report was admitted as evidence at trial. Again, Johnson argues that his PSODF has the support (Response at 57), but the paragraph he cites states:

> All of Guevara's reports that prosecutors and defense counsel possessed—including the Johns negative lineup report, the June 20 report reflecting that Rosa Burgos said she could identify the shooter, July 22 lineup report, and the closing report documenting the fabricated identifications and attributing to Johnson a false alibi, *see supra* ¶¶189-205—were shown to Guevara at trial and admitted at trial as Defendant's Group Exhibit 6. Ex. 17 [Guevara trial testimony] at B-43:18-21; Ex. 34

[four-witness lineup report]; Ex. 65 [Jun 20 Supp report]; Ex. 51 [July 22 Supp report]; Ex. 6 [July 23 Supp report].[8]

(PSODF ¶ 250). But this fact is blatantly, and likely purposely, wrong. The only evidence of what occurred at trial is the cited portion of Guevara's trial testimony where he is asked:

```
18      Q    Do you have all your reports with you?
19      A    They're right there.
20           MS. GUBIN:  Your Honor, I'm marking this as
21   Defendant's Exhibit No. 6.
22
23
24
                              B-43
```

Johnson 001219

Nowhere in the cited portion of Guevara's trial testimony does it establish that any report was admitted as evidence at Johnson's criminal trial. (Dkt. 339-1, Ex. 17, Guevara trial testimony at 456, Page ID # 29619.) Nor does it establish that the report was shown to the jury. *Id*.

Johnson's contention that the "Guevara false lineup report" need not have been introduced as an exhibit at trial, because its contents were introduced through the testimony of Daley (and Guevara), who testified that Johns had not been identified by anyone in the lineup on the night of the shooting," also misses the mark. (Response at 57–58.) Johnson ignores a critical component of his fabrication claim: a fabricated evidence claim requires a showing of "knowingly falsified evidence," incorrect or inaccurate evidence does not suffice. *Zambrano*, 2024 WL 532175, at *8. When it comes to police reports, [p]roving that the police report contained inaccurate information is necessary, but not sufficient. A mistake is different than a lie,

---

[8] According to Johnson's exhibit list, the exhibits Johnson cites to as evidentiary support for this proposition include: Guevara's trial testimony (Ex. 17), Guevara and Erickson's 6/12/1991 report (Ex. 34), Guevara's 6/20/1991 report (Ex. 65), Guevara and Halvorsen's 7/22/1991 report (Ex. 51), and Guevara and Halvorsen's 7/23/1991 report (Ex. 6). (Dkt. 339.)

and when it comes to a fabricated evidence claim, the difference is everything. The issue is *not* whether a reasonable jury could find that the police report contained inaccurate information. The issue is whether a reasonable jury could find that the officer prepared an inaccurate report deliberately." *Zambrano*, 2024 WL 532175, at *9. The fact that an officer testifies to events that are consistent with reports is not a basis to attach liability for a due process fabrication of evidence claim. *See Brown*, 633 F.Supp.3d at 1159-60.

On this record, no reasonable jury could find that Daley deliberately falsified his report, and he is absolutely immune for his trial testimony. (*See* §II(d), *infra*.) It is undisputed by the Parties that Daley *was not* involved in the line-up process. (JSOF ¶ 13.) It is further undisputed by the Parties that Daley "*was informed* that Bryan Johns was not identified in the lineup and that he would be subsequently released." (*Id*. at ¶ 28.) The record at hand includes no evidence that could support a finding by a reasonable jury that Daley deliberately falsified the police report. Without that evidence, Johnson cannot get to trial on the fabricated evidence claim and summary judgment is proper.

### d. On the merits, Johnson's two newly disclosed (and otherwise waived) fabrication contentions cannot survive summary judgment.

As noted above, Johnson adds two new fabrication theories, including that Halvorsen and Daley fabricated the reason Johnson became a suspect and that Daley fabricated that Johnson's nickname was "Little D." (Fabrication Chart Nos. 2, 12). These unpled theories are waived. *See* § I(b), *supra*. Waiver aside, both new theories fail against Movants because Johnson lacks support in the record and the law.

First, these new theories are not alleged against Erickson or Healy. Consequently, they are entitled to summary judgment on them. Second, Johnson relies on Daley's trial testimony wherein he testified that Johnson's nickname was "Little D" as the basis for fabrication and

35

supports that fabrication with his own affidavit and testimony of his girlfriend contending that he didn't have that nickname, and no one ever called him that. (Response at 42 (citing PDSOF ¶¶ 251, 252, 278).) However, Johnson fails to develop this argument and instead just asserts it as a valid claim. It is not.

Daley is entitled to absolute immunity for his testimony, which is the only source where he indicates that Johnson's nickname is "Little D." In *Briscoe v. Lahue*, the Court held "all witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their testimony in judicial proceedings." 460 U.S. 325, 328 (1983). The Court reaffirmed *Briscoe* in *Rehberg v. Paulk*, holding that absolute immunity applies to law enforcement and lay witnesses alike, regardless of whether the witness is characterized as a "complaining witness" or alleged to have conspired with others to present fabricated testimony. 566 U.S. 356, 359, 369 (2012). Under *Briscoe* and *Rehberg*, Daley is absolutely immune from civil liability for testifying that Johnson's nickname was "Little D" regardless of whether that testimony is true or false and this fabrication theory must fail.

Regarding Johnson's assertion that Halvorsen and Daley fabricated how Johnson became a suspect, Johnson points to no support for this beyond his own assertion and yet again ignores the facts to which he agreed. There is no dispute that Halvorsen and Guevara showed Elba a photo array "in which she indicated that the male she saw running from the scene of the murder with a gun in his hand resembled Darrell Johnson, but a little younger. (JSOF ¶ 31.) Darrell is Johnson's older brother. Johnson also agrees that Halvorsen and Guevara had knowledge that Darrell had a younger brother, Johnson, asked Daley for a photo of Johnson, and showed that photo to Elba in a three-person photo (JSOF ¶¶ 32-33), and she identified Johnson as the person she saw running from the shooting scene with a gun. (JSOF ¶¶ 32, 33.) Thus, the basis for

Johnson becoming a suspect is not only in the record, but it is agreed by him in the JSOF. His allegation/inference otherwise is not reasonable in the face of undisputed contradictory facts. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) ("An inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage.") Halvorsen and Daley are entitled to summary judgment on this new theory of fabrication as well.

### III. Johnson's Due Process Rights Were Not Violated by the Introduction of Ricardo, Elba or Rosa Burgos's Identifications at his Criminal Trial

#### a. Unduly suggestive identification procedure is not cognizable under §1983.

As argued in their Memo, Johnson cannot bring a § 1983 claim for unduly suggestive identification procedures because it is an evidentiary protection, not a constitutional right. (Memo at 17.) Rather, the rules that provide protections against suggestive identifications are prophylactic under *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006) and *Vega v. Tekoh*, 142 S. Ct. 2095, 2101 (2022), a violation of which does not create Section 1983 liability. In *Holloway v. City of Milwaukee*, 43 F.4th 760, 766 (7th Cir. 2022), the Seventh Circuit questioned whether suggestive identification claims are viable after *Vega*, and Movants explained why they are not. (Memo at 17.)

Johnson initially responds that Movants' arguments based on a future change in law are premature because the Seventh Circuit recognized such claims in *Alexander* and confirmed it more recently in *Holloway.* (Response at 87-88.) Not so. First, *Alexander* did not hold that a *Biggers* analysis was sufficient to assess the constitutionality of police conduct, *see* 433 F.3d at 555, and, in any event, was decided before *Vega*. 142 S. Ct. 2095 (2022).  Further, *Holloway* acknowledged the tension *Vega* created in its prior jurisprudence and expressly invited parties in future cases to address the issue, and declined to decide it only because it was not briefed.

*Holloway*, 43 F.4th at 766. Since *Holloway*, at least three courts in this district, including this Court, have weighed in on whether suggestive identification claims survive *Vega*, and none found that *Alexander* or *Holloway* prevented them from deciding the issue. *Ezell*, No. 18 C 1049, 2024 WL 278829, at *23–24 (N.D. Ill. Jan. 24, 2024) (Ellis, J.); *Bolden v. Pesavento*, No. 17-cv-417, 2024 WL 1243004, at *15–19 (N.D. Ill. March 23, 2024); *Blackmon v. City of Chi.*, 700 F. Supp. 3d 617, 641 n.19 (N.D. Ill. 2023) (Audio of Oral Argument, *Blackmon v. City of Chi.*, 23-3288, held on August 6, 2024, available at media.ca7.uscourts.gov/oralArguments/oar.jsp.).

Further, as Movants argued in their brief, (Memo at 17), earlier this year, this Court held that suggestive identification claims are not cognizable under §1983 in light of *Vega* and cited both *Alexander* and *Holloway* in support. *Ezell*, 2024 WL 278829 at *23–24. Johnson claims that *Ezell* was wrongly decided, and that four other district courts have rejected "Defendants' argument" (Response at 88, n. 13). But Johnson does not establish why Ezell was wrongly decided and he misrepresents the authorities cited. First, two of those four cases, *Donald v. Outlaw* and *Washington v. Boudreau*, never even cited *Vega* or addressed its impact on suggestive identification jurisprudence. *Outlaw*, No. 2:17-cv-32-TLS, 2023 WL 2346270, at *11–12 (N.D. Ind. Mar. 3, 2023); *Washington*, No. 16-cv-01893, 2022 WL 4599708, at *22–23 (N.D. Ill. Sept. 30, 2022).

Second, *Bolden*, 2024 WL 1243004, at *15–19[9] and *Blackmon*, 700 F. Supp. 3d at 641 n. 19—both of which are on appeal[10]—reconciled *Vega* with the Seventh Circuit's pre-*Vega* framework by concluding that suggestive identification claims remain actionable when they are

---

[9] Johnson cited the wrong *Bolden* opinion, *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 908-09 (N.D. Ill. 2022), a 2022 pretrial decision which did not consider *Vega*. (Response at 109, n. 13.) However, Judge Seeger addressed *Vega* in the post-trial decision cited and sided with Johnson's view of the issue.

[10] Oral argument in *Blackmon*, 23-3288, was held on August 6, 2024, as is available here: media.ca7.uscourts.gov/oralArguments/oar.jsp.

based on the introduction of identifications that are so unreliable that they tainted the entire criminal trial. However, *Vega* completely forecloses the use of prophylactic rules aimed to guide the admissibility of identification evidence, into bases for civil liability. *Vega*, 142 S. Ct. at 2101. Further, each case does not adhere to the "guiding principle" underlying Section 1983 that "liability is premised on the wrongdoer's personal responsibility," (*Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012), rather than on criminal court judges' decisions to admit or exclude witness identifications based on the totality of the circumstances, which turns on a host of factors over which the Movants have no control. Such factors include lighting, distance, opportunity to observe, whether the witnesses were under the influence when the crime occurred, and the impact of stress on the witnesses. *Neil v. Biggers*, 409 U.S. 188, 198–201 (1972) (setting forth the factors for criminal court trial judges to consider—opportunity to view, degree of attention, accuracy of prior suspect description, certainty and timing—in determining whether suggestive identifications are otherwise reliable enough for admission).

Police officers should not risk civil liability for the correctness of decisions assigned to other participants in criminal proceedings, including prosecutors who decide whether to introduce identifications, judges who decide whether to admit them, and juries who decide whether to credit them. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 145–46 (1979) (officer executing arrest warrant not required by Constitution to investigate every claim of innocence, a matter "placed in the hands of the judge and the jury"); *Phillips v. Allen*, 668 F.3d 912, 914 (7th Cir. 2012) (arresting officers "are entitled to leave to the criminal process the full examination of potential defenses"). Indeed, due process allows for the "reasonable division of functions" within the criminal justice system, (*Baker*, 443 U.S. at 145), and this division of functions breaks any

affirmative link between an officer's use of unduly suggestive identification procedures and any due process violation at trial.

Again, the *Biggers* factors are prophylactic rules intended to guide prosecutors on whether to introduce, and judges on whether to admit, witness identifications. They were never intended to function as the parameters of a legal duty or as determinants for civil liability against police officers. *See Phillips*, 668 F.3d at 915 (refusing to extend the *Biggers* framework "from trials to arrests, and from a rule of evidence to a rule of damages").

The two-step inquiry applied in criminal cases asks first whether the identification procedures were unduly suggestive and if so, whether the ensuing identification was so unreliable, based on the totality of the circumstances, that its admission offends due process. *Reyes v. Nurse*, 38 F.4th 636, 644–45 (7th Cir. 2022). This determination is made only after the court takes evidence and hears testimony from eyewitnesses about the reliability of an identification. *See, e.g.*, *Coleman, v. City of Peoria*, 925 F.3d 336, 348–49 (7th Cir. 2019). This task is an evidentiary one, falling squarely within the "broad discretion" of the trial court, *Jackson v. Willis*, 844 F.3d 696, 701 (7th Cir. 2016), and its unique expertise. *United States v. Fawley*, 137 F.3d 458, 464 (7th Cir. 1998). And the courts may not "substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Police officers "are ill-equipped" to construe "murky and difficult" evidentiary questions. *Oregon v. Elstad*, 470 U.S. 298, 316 (1985). And whether to admit an eyewitness identification is often among the murkiest and most difficult of these questions because it is fact-bound. *U.S. v. Johnson*, 745 F.3d 227, 228–29 (7th Cir. 2014); *U.S. v. Williams*, 522 F.3d 809, 811–12 (7th Cir. 2008). It is "devoid of" any "precise formula" or "clear benchmarks." *Reyes*, 38 F.4th at 645.

Attorneys and judges scrutinizing the evidence—sometimes years later—have the luxury of time to evaluate, in hindsight, the circumstances of a particular identification procedure. Police officers, by contrast, must make quick decisions in the moment or risk losing an opportunity to apprehend a dangerous offender.

Subjecting officers to liability for landing on the wrong side of the sometimes-unclear line between proper and improper identification procedures may compel them to avoid taking any risks, even when it is in the public interest for them to do so. In such circumstances, police cannot know whether a court will later deem their identification procedures too suggestive or that the identification is too unreliable to be used at a criminal trial. But Section 1983 requires personal responsibility, not prescience. *Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) (officials liable only for reasonably foreseeable harms). Nor does it condone "damages against police" based on "hindsight." *Phillips*, 668 F.3d at 915. Recognizing liability against Movants here would run roughshod over those principles and stretch the concept of personal responsibility too far.

Finally, Johnson's exaggerated warnings about the risks of a world without suggestive identification claims miss the mark. Police officers can be sued for *fabricating* identifications and for purposely withholding material exculpatory evidence. However, unlike falsified or withheld exculpatory evidence, evidence collected with "suspect techniques" does not diminish the ability of prosecutors, defense attorneys, judges, or juries to fairly evaluate the reliability of evidence, so that, in such instances, any "due process violation that occurs when the evidence is introduced at trial cannot be traced back as far as its creation." *Whitlock*, 682 F.3d at 584-85. The use of "suggestive" techniques to procure an identification should be treated no differently than "coercive" techniques to procure a witness statement, which are not actionable against officers

under § 1983. *See id.* at 584. Here, where Movants have done nothing to undermine the ability of a prosecutor or judge to evaluate whether unduly suggestive procedures impact the reliability of an identification, its admission at trial cannot be traced back to the officers investigating the crime. Johnson's suggestive identification claim is not cognizable under Section 1983 and summary judgment should be granted to all Movants.

### b. Johnson cannot establish that Movants Erickson, Daley and Healy were involved in any suggestive identification procedures.

Regardless of whether a suggestive identification claim is cognizable, Johnson failed to point to any evidence that Movants Erickson, Daley or Healy interacted with Ricardo, Elba or Rosa Burgos relating to their identifications of Johnson, or in any way knowingly used a forbidden technique to suggest who they should identify. (*See* § II(a) *supra*.) Accordingly, they are entitled to summary judgment on Johnson's suggestive identification claim because personal involvement is a prerequisite for § 1983 liability. *See Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *5 (N.D. Ill. Jan. 26, 2009) (finding certain defendants not involved in Fifth Amendment deprivation where undisputed evidence revealed that they had no interaction or contact with plaintiff during his interrogation).

### c. Alternatively, Johnson's unduly suggestive identification claim fails against all Movants because he cannot point to evidence establishing Movants intentionally used forbidden techniques to obtain unreliable identifications that unfairly tainted his criminal trial.

Even if such a claim were cognizable, Movants would still be entitled to summary judgment. In their Memo, Movants explained that Johnson must put forward, but cannot, evidence that established: (1) Movants conducted an unduly suggestive identification procedure using forbidden techniques; (2) under the totality of the circumstances the identifications were so

inherently unreliable that they unfairly tainted Johnson's criminal trial; and (3) Movants acted with the requisite intent necessary to confer Section 1983 liability. (Memo at 16–24.)

In response, Johnson argues that Movants failed to address whether the identification procedures rendered the criminal proceeding unfair. (Response at 91.) However, Movants fully addressed this issue in their Memo explaining "[t]he witness identifications were sufficiently reliable to overcome the taint of any unduly suggestive procedure." (Memo at 20-21.) Johnson's remaining argument is that "disputed facts preclude summary judgment on [his] claim that Defendants used improper identification techniques to obtain false identifications that were introduced in and tainted Johnson's criminal case." (Response at 112.) But as explained below, Movants are entitled to summary judgment on this claim as well.

## 1. Evidence of fabrication does not establish that the identification procedures were unduly suggestive.

Starting with the first pillar, Johnson must have evidence that Movants used a "specific interrogation technique clearly proscribed by existing law" to extract an identification. *Coleman*, 925 F.3d at 347–48; *see also Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012) (explaining in dicta that "showing a witness just one photo and asking her to 'confirm' that the photo depicts the culprit" is an example of a forbidden technique). In his Response, however, Johnson "hasn't pointed to any constitutionally forbidden technique that Movants used in order to coerce or manipulate" Rosa, Elba or Ricardo Burgos into identifying him. *See Moorer v. Valkner*, No. 18 CV 3796, 2021 WL 5998533, at *14 (N.D. Ill. Dec. 20, 2021) (granting summary judgment on suggestive identification claim). Rather, he employs misdirection[11] by dedicating over three pages of argument contending "[e]vidence of fabrication establishes that the identification

---

[11] Johnson conflates the issue of unduly suggestiveness—whether Movants used a forbidden technique— by raising issues that deal with his fabrication and *Brady* claims.

procedures were unduly suggestive" (Response at 92-94), before relying nearly exclusively on his eyewitness expert. (*Id.* at 94-97.)

As to his pronouncement that "[e]vidence of fabrication establishes that the identification procedures were unduly suggestive," Johnson merely repeats and rehashes arguments he made in his fabrication and *Brady* sections. (Response at 92-94.) Accordingly, Movants incorporate their prior arguments made in § II, *supra*, and §IV, *infra*. But because Johnson makes patently false statements in his argument, Movants take a moment to address those. The first falsehood is Johnson's contention that "Ricardo told Guevara and Halvorsen he had not seen the shooter's face and could not make an identification." (Response at 92.) As discussed below, §IV(b)(1), Johnson has no evidence to support this.

The second alleged falsehood—that Defendants Erickson and Daley set Johns free after telling eyewitnesses who allegedly identified Bryan Johns during the live lineup the night of the shooting "they had selected the wrong person." (Response at 92.) Again, it is undisputed by the Parties that Daley **was not** involved in the line-up process and that Daley "was informed that Bryan Johns was not identified in the lineup and that he would be subsequently released." (JSOF ¶¶ 13, 28.) As to Erickson, Johnson simply does not have any admissible evidence to substantiate this contention. The PSODF paragraphs that he points to, ¶¶ 37, 84–87, offer nothing in terms of evidentiary support that Erickson set Johns free after telling witnesses that they identified the wrong person. Instead, Johnson blatantly mispresents the record by contending "Rosa Burgos testified that after three individuals had identified Johns, they were told by the police that Johns was the wrong guy." (PSODF ¶ 37.) But Johnson cites to APD Carey's testimony from the criminal trial, not any actual testimony by Rosa, which as discussed, is inadmissible hearsay. (PSODF ¶ 37.) Johnson cannot salvage his claim by misstating the record.

Johnson impermissibly relies on his COI to argue that there must be a genuine issue of material fact because "Johnson is an innocent man and was not involved in the crime, so he was not the person who any witness saw commit the crime." (Response at 92.) This argument defies logic. As explained above, this COI argument is contrary to the law and improper because regardless of whether he is innocent or guilty, he still must prove his rights were violated intentionally by Movants and a COI is not probative of a civil rights violation. *See* § II(b), *supra*.

Johnson, relying on APD Carey's hearsay, further claims that Rosa did not identify Johnson as the shooter during the July 22 live lineup and that Guevara and Halvorsen "*falsely reported* that she had positively identified Johnson." (Response at 93 (emphasis added).) According to Johnson, "Rosa told Guevara and Halvorsen during the July 22 live lineup that she was not sure who the shooter was" and "[i]n response, they pressured her to select someone." (*Id*.) Rosa then purportedly stated "Johnson resembled the shooter, but she did not tell them that Johnson was the shooter." (*Id*.)  This argument suffers from a fatal flaw—Johnson cannot proceed on a claim that Movants utilized unduly suggestive identification procedures to procure Rosa's identification while simultaneously claiming Rosa did not make an identification at all. In other words, Johnson's claim fails with respect to Rosa because if she didn't make an identification, Johnson cannot establish  Movants used a "specific interrogation technique clearly proscribed by existing law" to extract an identification. *Coleman*, 925 F.3d at 347–48. But as discussed above, there is no admissible evidence in the record that gives any support to the notion that Rosa was told to select Johnson during the July 22 lineup. Certainly, Rosa did not testify that she was told to select Johnson. (*See* Rosa Deposition, Movant Ex. 34, Dkt. 313–5, (absence of testimony); Rosa trial testimony, Movant Ex. 5, JGS-JOHNSON 42-78 (A31-66), Dkt. 313–2,  (absence of testimony). To the contrary, Rosa testified that she saw the person who

shot Raul Ortiz from approximately 10 feet away, saw his face for 4 seconds, and identified Johnson from a lineup. (JSOF ¶¶ 103–07.)

### 2. Additional evidence does not establish that the identification procedures were unduly suggestive.

Forbidden techniques aside, Johnson makes minimal effort to attack the identification procedures, instead relying largely on his eyewitness identification expert, Dr. Jennifer Dysart. (Response at 94.) Johnson, starts out his argument with a misrepresentation—this time, he misrepresents his expert's opinion by boldly stating Dr. Dysart opined that the identifications in this case "were obtained using suggestive techniques from eyewitnesses who could not have made identifications." (*Id*.) But Dr. Dysart did not go this far in her opinion as evidenced by the fact that there is no citation to the record.

To show suggestibility, Johnson, alleges a series of "facts" relying on Dr. Dysart, and contends: (1) each of the three witnesses had limited opportunities to see the shooter's face and form memories of it that would allow them to make accurate identifications;" (2) "Ricardo Burgos's identification shows signs of being contaminated, since he originally described the shooter as Hispanic…;" (3) the polaroid depicting three individuals shown to Elba "did not demonstrate a careful selection of fillers…since Johnson clearly stood out as the shortest person;" (4) "the witnesses were shown an unduly suggestive photos, [so] the results from any subsequent procedure were relatively meaningless;" (5) the live lineup was not conducted blind; and (6) "the live lineup itself was suggestive" because "Johnson was again the shortest person, and the only one with a tattoo... ." (*Id*. at 95-97.)

Dr. Dysart first takes issue with the witnesses' opportunity to observe the shooter, (*Id*. at 95), however, the conditions need not be perfect, and the observation does not have to be prolonged for an identification to be reliable. *People v. Palmer*, 188 Ill. App. 3d 414, 421 (1st

Dist. 1989). Furthermore, the fact that the period of observation may be short does not render the identification insufficient as a matter of law. *People v. Dixon*, 122 Ill. App. 3d 141, 152 (1st Dist. 1984.).

Johnson further contends that the identification procedures were suggestive because "the live lineup was not conducted blind." (*Id*. at 96.) But case law does not support Johnson's proposition that failing to comply with modern best practices amounts to using an improper technique. *See Moorer*, 2021 WL 5998533, at *13 (rejecting the plaintiff's argument that the officers conducted an unduly suggestive identification since "they did not use a 'double-blind' method" because "procedural flaws like these do not necessarily establish police coercion or manipulation.").

Johnson makes another unsupported contention, again through his expert, that because "the witnesses were shown an unduly suggestive photo, the results from any subsequent procedure were relatively meaningless." (*Id*. at 96.) Johnson, however, misses the point. He fails to establish that subsequent identifications are constitutionally prohibited, which under binding caselaw he could not do anyway. *Gregory-Bey v. Hanks*, 332 F.3d 1036 (7th Cir. 2003) ("We have held previously that there is nothing *per se* unconstitutional about showing witnesses the photograph of a particular suspect multiple times as part of an array.") (citations omitted). This is especially true when the subsequent identification procedure only reaffirms a previous positive identification. *See, e.g.*, *Jarrett v. Headley*, 802 F.2d 34, 41–42 (2d Cir. 1986) (collecting cases that hold repeated showing are not unduly suggestive "when the witness's identification was already positive.").

In the end, Johnson's attempt to utilize Dysart to contest the reliability of the witnesses' identifications is simply a distraction from the salient issues. Johnson bears the burden to

47

"identify evidence that would permit the jury to find in his favor." *Roberts v. Broski*, 186 F.3d

990, 995 (7th Cir. 1999). Here, Johnson failed to produce any evidence that Movants knowingly

used a forbidden technique during identification procedures that was so unduly suggestive as to

create the "substantial likelihood of irreparable misidentification." *See Neil v. Biggers,* 409 U.S.

188, 198 (1972). Movants are entitled to summary judgment on Johnson's suggestive

identification claim.

### 3. The witness identifications were sufficiently reliable to overcome the taint of any unduly suggestive procedures.

Alternatively, and only if the Court finds that Johnson identified evidence that Movants

utilized clearly proscribed identification procedures that caused an unduly suggestive

identification, need the Court consider whether the identifications were sufficiently reliable that

their mere introduction at trial did not taint the entire proceeding. *See Coleman*, 925 F.3d 336,

347 (7th Cir. 2019) (reliability of identification is assessed if procedure was unduly suggestive).

Nonetheless, in considering reliability, courts analyze the *Biggers* factors as well as the

*Alexander* factors, which evaluate how the identifications were presented at the criminal trial.

(Memo at 20-21.)

In his Response, Johnson starts off by distorting the law. He boldly pronounces, ***without***

***any support***, that "in a case where the record reflects an actual misidentification of an innocent

person, it is established that the identification was not reliable." (Response at 97-98.) Johnson's

argument is misplaced and only serves to confuse the issue. He attempts to interchange the

meaning of ***reliable***—whether the identifications meet the minimal threshold of reliability to be

admitted at trial as to not so unfairly taint his trial—with ***correct***—whether Ricardo, Rosa and

Elba Burgos' identifications were correct beyond a reasonable doubt. *U.S. v. Gonzalez*, 863 F.3d

576, 587 (7th Cir. 2017) ("Although there were significant problems with the identification

procedures employed by the untrained officers, there was no error in the court finding that the evidence was reliable enough to go to the jury with the usual procedural safeguards of a trial in place.").

The Seventh Circuit has made clear that a court's "role is not to judge the accuracy of an identification," but whether such testimony should have been kept from the jury because it was unreliable. *U.S. v. Recendiz*, 557 F.3d 511, 526 (7th Cir. 2009). In other words, the "validity of an eyewitness identification" was for the jury to determine at Johnson's criminal trial because "it is not tortious to obtain [identifications] in order to have evidence to present at trial." *See Phillips v. Allen*, 668 F.3d 912, 917 (7th Cir. 2012). Indeed, police officers are tasked with collecting evidence and "are constantly faced with reluctant witnesses, recanted confessions, and witness identifications replete with inconsistencies, but the weighing of evidence is for the judge and jury." *Moorer v. City of Chi.*, 92 F.4th 715, 722 (7th Cir. 2024). Johnson must do more than make repeated claims of innocence to demonstrate the identifications were unreliable. *See Alexander v. City of South Bend*, 433 F.3d 550, 556 (7th Cir. 2006) ("That [the plaintiff] was later exonerated does not, without more, make his case that a due process violation has occurred.").

Focusing on the *Biggers* factors in his Response, Johnson, through his expert, takes issue with the Burgos' initial descriptions, the distance and obstructions between them and the shooter, and the length of time they had to view the shooter. These are the same issues already known and addressed by the State, Johnson's defense attorneys and the court during his criminal trial. And, as explained—with supporting authority—none of these issues even approach the level of rendering confirmed eyewitness identifications to be so unreliable that they unfairly tainted his trial and should never have been admitted.

For example, Johnson makes much to do with the Elba, Rosa and Ricardo Burgos's descriptions of the offender, contending based on their descriptions alone, this testimony should have been kept from the jury. However, such a premise is unfounded. *Kubat v. Thieret*, 867 F.2d 351, 358–59 (7th Cir. 1989) (holding identifications were reliable even though "the witnesses had given no prior description"); *see also Gregory-Bey v. Hanks*, No. IP 94-903-C H/G, 2000 WL 1909642, at *19 (S.D. Ind. Nov. 29, 2000) *aff'd* 332 F.3d 1036 (7th Cir. 2003) ("The absence of a description also does not weigh against reliability of [the witness's] identification."). Johnson wholly ignores this precedent.

Similarly, Johnson points to the short period of time the Burgoses had to view the shooter, contending the identifications were unreliable because they did not have sufficient time to view the offender. However, a positive identification need not be based upon perfect conditions for observation, nor does the observation have to be of a prolonged nature. *People v. Williams*, 143 Ill.App.3d 658. 493 N.E.2d 362 (1st Dist. 1986). And the fact that the period of observation was very short does not render the identification insufficient as a matter of law. *Dixon*, 122 Ill. App. 3d at 152.

As to certainty of the identifications, it is undisputed that Elba, Ricardo, and Rosa testified under oath at trial that they accurately identified Johnson as the shooter when they viewed the July 22 lineup. (JSOF ¶¶ 91, 101, 107.) It is also undisputed that when questioned during their depositions in this matter, Rosa and Ricardo confirmed that they would have told the truth when under oath and giving testimony in a courtroom. (JSOF ¶¶ 117, 119.) Johnson cannot dispute this unrebutted evidence. Lastly, the span of time between the shooting and the pretrial identifications, here less than two months, does not cast doubt on the reliability of Rosa's, Ricardo's and Elba's identifications. Courts have found identifications to be reliable where

50

significantly more time has elapsed between the crime and the identification. *See People v. Rodgers*, 53 Ill. 2d 207, 213–14 (1972) (upholding an identification made two years after the crime); *U.S. ex rel. Kosik v. Napoli*, 814 F.2d 1151 (7th Cir. 1987) (holding that two-month gap does not by itself raise serious question about reliability of identification); *U.S. v. U,* 797 F.2d 468, 471 (7th Cir. 1986) (two months from incident and the "suggestive pretrial identification" and five months from incident to identification at trial did not under the circumstances render the identification inadmissible).

Nor is Johnson helped by his eyewitness expert. Dr. Dysart was not present to experience the conditions herself (as Ricardo, Elba and Rosa were), and the salient question is whether the *officers* had reason to believe the witnesses' identifications were unreliable. *See Coleman*, 925 F.3d 349 (finding no evidence that defendant officers knew the identifications were tainted). Certainly, Movants in 1991 cannot be expected to have the ability to dissect the reliability of an eyewitness at the level of a Ph.D. expert. In sum, Johnson offers nothing more than bare-boned conclusions, none of which detract from the Burgoses' unequivocal testimony establishing the reliability of their identifications.

Finally, even if reliability were uncertain, Johnson offers no evidence that the admission of the identifications tainted his trial. The circumstances surrounding the Burgoses' identifications were subject to extensive cross-examination by Johnson's defense counsel during his criminal proceedings, including on their ability to see and statements the police may or may not have said before and after the identifications. While Johnson claims in boilerplate fashion Movants' "suppression of the true circumstances of the Burgoses identifications…rendered cross-examination effectively impossible," (Response at 101), the record eviscerates that

characterization and Johnson cannot demonstrate that the Burgoses' identifications were so unreliable that their admission tainted the trial in violation of his right to a fair trial.

On this record, Johnson has no evidence to suggest the identifications were unreliable. As the record overwhelmingly supports, they were reliable based on the witnesses' opportunity to observe, degree of attention, and certainty of their identifications.

### d. Johnson lacks evidence that any Movant acted with the requisite intent necessary to confer Section 1983 liability.

Rounding out the elements to prove a suggestive identification claim, is Johnson's burden to produce evidence at summary judgment that demonstrates Movants acted deliberately when conducting the identifications. (Memo at 21–23.) *See also Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003) ("Because recollection is suggestible, it was important in this civil case to explore the question whether the testimony of [the witnesses] identifying [the plaintiff] at the criminal trial was attributable to deliberate manipulation or instead to chance"); *Blackmon*, 700 F.Supp.3d at 645 ("The Court is not required to consider these lineup procedures in a vacuum without taking Defendants' conduct and inferences from that conduct into account—due process claims under § 1983 require a showing of intent."). Having no evidence to show this requisite level of culpability, Johnson points only to Guevara's assertion of the Fifth Amendment. (Response at 103-104–25.) He even proclaims that "[i]t is highly problematic for a party's lawyers to argue for judgment by disclaiming that the party acted with intent when the party has exercised his right to remain silent." (*Id.* at 123.) But Movants have not asserted their Fifth Amendment right and it is utterly improper to suggest otherwise.

Lastly, Johnson argues that Movants' intent is derived from their fabrication and suppression of evidence. (Response at 104-105.) But there is no evidence that Movants were involved in the suppression of any evidence. *See infra* § IV. Nor is there evidence Movants

fabricated evidence. *See supra* § II. In conclusion, Johnson cannot point to any evidence sufficient to satisfy his burden to show that Movants' actions were carried out with the necessary level of culpability for his suggestive identification claim to survive.

### 1. Johnson fails to defeat Movants' entitlement to qualified immunity.

In their opening Memo, Movants explained they are entitled to qualified immunity on Johnson's suggestive identification claim. (Memo at 24-26.) Movants also explained having raised qualified immunity, the burden is on Johnson to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). To discharge that burden, Johnson needed to show that "at the time of the challenged conduct," the law was "'sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d]' [Johnson's] constitutional rights," by identifying "' existing precedent [that]… placed the…constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). "While a case directly on point is not required, the clearly established law must be particularized to the facts of the case" and "existing precedent must have placed the statutory or constitutional question beyond debate." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (citation omitted).

Defining the applicable law "at a high level of generality" will not do. *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741–42 (2011). And "the clearly established law must be 'particularized' to the facts of the case. Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity…into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483

U.S. 635, 639–640 (1987)). *See also Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005), as amended on denial of reh'g and reh'g en banc (Mar. 4, 2005) ("[T]he plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right.").

Johnson cites *Simmons v. U.S.*, 390 U.S. 377 (1968), *Manson v. Brathwaite*, 432 U.S. 98 (1977), *Neil v. Biggers*, 409 U.S. 188 (1972), *Sanders v. City of Chicago Heights*, No. 13 C 0221, 2016 WL 2866097, at *10 (N.D. Ill. May 17, 2016) and *Hensley*, 818 F.2d at 649 to demonstrate that "the illegality of the Defendants' conduct was established long before the events at issue in his case." (Response at 108–09.) But he offers those cases only for the broad proposition that the use of unreliable identifications that taint a criminal trial violates due process— he offers no argument at all that any of those cases involved analogous facts that would have put a reasonable officer on notice that the procedures that were utilized in this case were constitutionally prohibited in relation to the "particularized . . . facts of [this] case," *White*, 137 S. Ct. at 552. Therefore, none of Johnson's cases satisfy the "high bar" of particularly similar facts required to defeat qualified immunity. *Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 988 (7th Cir. 2021). Johnson has failed to come forward with any, let alone sufficient, evidence that any Movants' actions were constitutionally prohibited. See Memo at 16–17. *See also* § III(a), *supra*.

## 2. The Court should disregard Johnson's request to waive decades of precedent as qualified immunity remains the law.

Although foreclosed by existing law, Johnson also challenges the constitutionality of the qualified immunity doctrine, arguing the doctrine is not supported by the text, history or structure

of § 1983. (Response at 106-108.) Johnson does so for the purpose of appellate review. (*Id*. at 108.)

While Johnson's position certainly finds some support within the Fifth Circuit, there is no such support in the Seventh Circuit. In *Rogers v. Jarrett*, 63 F.4th 971 (5th Cir. 2023), Judge Willett wrote "separately only to highlight newly published scholarship that paints the qualified-immunity doctrine as flawed—foundationally—from its inception." *Id*. at 979 (Willett, J., concurring) (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023)). In doing so, Judge Willett discussed the same article that Johnson substantially relies on in asserting this argument. (*See* Response at 107; *see also Rogers*, 64 F.4th 979 n.1). But the Supreme Court has not overruled itself and qualified immunity remains good law.

Indeed, *Green v. Thomas*, did not, as Johnson suggests, toss out decades of case law on the applicability of qualified immunity to § 1983 actions. No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133 (S.D. Miss. May 20, 2024). To the contrary, the court in *Green*, in ruling on a motion to dismiss, summarized the plaintiff's argument "that 'the qualified immunity doctrine, noted that "[j]ustices, judges, advocates and scholars have long found fault with qualified immunity" and  summarized some "of the more compelling critiques." *Id*. at 17–19. But ultimately, the *Green* court stated "[n]o decisive judgment has been returned on this line of inquiry…As we wait, it remains true that qualified immunity is the law of the land and commands respect under stare decisis." *Id*. at 19.

Until there is clear, binding authority holding otherwise on the doctrine of qualified immunity, this Court is compelled by controlling precedent to apply it. *See Rogers*, 63 F.4th at 981. ("[H]owever seismic the implications of this lost-text research, '[a]s middle-management circuit judges,' we cannot overrule the Supreme Court.' Only that Court can definitively grapple

with § 1983's enacted text and decide whether it means what it says—and what, if anything, that means for § 1983 immunity jurisprudence.") (citations omitted).

## IV.    Movants Are Entitled To Judgment As A Matter Of Law On Johnson's Brady Claims, Including His New Brady Contentions.

To succeed on a *Brady* claim against each Movant, Johnson must prove that there existed undisclosed material evidence favorable to him, that this undisclosed evidence was concealed by the officer, and the concealed evidence resulted in prejudice. Moran v. Calumet City, 54 F.4th 483, 492 (7th Cir. 2022). " In their Memo, Movants addressed each of the *Brady* theories that Johnson disclosed in response to interrogatories, which included suppressing:

1) the alleged false identifications of Johnson by Ricardo, Rosa, and Elba Burgos;
2) the six-witness lineup report (Erickson Report);
3) fabrication of witness testimony;
4) non-descript general documents; and
5) "'street files' and/or 'personal notes' and/or 'personal files' kept by detectives working on and in regard to the Edwin Fred murder were fabricated, withheld, destroyed or concealed." (JSOF ¶ 124.)

(Memo at 26-33.)

For each theory, Movants explained that Johnson lacked evidence to support all *Brady* elements and demonstrated that for many of the *Brady* theories, Movants were not personally involved with the alleged suppressed evidence. (*Id*. at 23-24, 26-29); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). In response, Johnson simply ignores the agreed undisputed evidence in the JSOF, fails to identify evidence that supports all elements of a *Brady* claim, and relies on speculation under the guise of reasonable inference. He also uses his response to inflate his *Brady* claim with five new Brady theories:

1) Guevara, Halvorsen and Erickson suppressed evidence undermining the Burgos identifications;
2) Guevara, Halvorsen and Daley suppressed that they decided Johnson was their suspect before there was any evidence implicating him;
3) Guevara and Halvorsen suppressed their investigation of alternative suspect Robert Weeks;

4)  Guevara and Halvorsen suppressed that Johns was a cooperating witness in another case; and

5)  Defendants suppressed their own pattern of misconduct.

(Response at 27-28, 66-75.)

As discussed above, § I(b), these new contentions must be dismissed outright because none were disclosed in Johnson's complaint or in his answers to interrogatories and are therefore waived. Waiver aside, Johnson cannot prevail on his old or new *Brady* theories because he fails to direct the Court to evidence sufficient to meet ***each*** element of a *Brady* claim. *Moran*, 54 F.4th at 494 (holding that the plaintiff "bears the burden to produce sufficient admissible evidence on every element of his [*Brady*] claims, including the defendant's state of mind."). Moreover, many of his new contentions reflect Johnson's initiative to reframe his fabrication theories under *Brady*. Accordingly, the Court should grant Movants summary judgment on all of Johnson's *Brady* contentions.

### a.  Johnson's previously identified *Brady* contentions fail against Movants.

#### 1.  Johnson's attempts to recast his fabrication claims as *Brady* contentions fail.

Johnson argues that Defendants violated *Brady* by failing to disclose their purported fabrications of: (1) July 22 live lineup identification of Johnson by Ricardo Burgos, Elba Burgos and Rosa Burgos or the July photo identification by Elba Burgos; (2) "that Ricardo Burgos had not made a photo identification of Johnson, which would have impeached both Ricardo and Guevara at trial;" (3) "that Elba Burgos had not followed the shooter through the neighborhood, which would have undermined her identification and impeached Guevara at trial;" and (4) "that Defendants had fabricated false police reports saying that Johns had not been identified, which would have impeached Defendants' entire investigation at trial." (Response at 82–83.)

Initially, Movants have already demonstrated that all of Johnson's fabrication claims against them fail. (*See* § II, *supra*). Because the evidence was not fabricated, Movants could not have withheld evidence of the alleged fabrications. *U.S. v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) (holding evidence that does not exist cannot be suppressed in violation of *Brady*). Regardless, Movants demonstrated in their Memo that suppression of one's misconduct does not give rise to a viable *Brady* claim and the Seventh Circuit does not permit the recasting of fabrication contentions as *Brady* suppression claims. (Memo at 27-28.) In response, Johnson incorrectly claims "[t]his made-up legal rule has no support in the law and Defendants cite none," yet he simultaneously acknowledges the validity of Defendants premise but argues it does not apply to Johnson. (Response at 62, 64 ("[t]he cases Defendants rely upon (*Saunders-El*) do not apply in the context presented by Johnson's case.").).

As Movants explained, and Johnson concedes, this so called "made-up legal rule" has ample support in the law, as Movants cited. (Memo 323 at 27-28) (citing *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 915 (N.D. Ill. 2015), *Phillips v. City of Chicago*, 2015 WL 5675529, *5-6 (N.D. Ill. 2015), *Myvett v. Heerdt*, 2015 WL 12745087, *6 (N.D. Ill. 2015), *Alvarado v. Hudak*, 14 cv 9641, 2015 WL 4978683, *3 (N.D. Ill. 2015), *Saunders-El*, 778 F.3d at 562, *Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at *19 (N.D. Ill. June 4, 2020)). Moreover, Johnson's qualms with *Saunders-El* are misplaced.

*Saunders-El v. Rohde* addressed a "dual-pronged [due process claims where plaintiff] alleges both that the fabrication of evidence violated his constitutional rights and, separately, that the police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence in violation of *Brady*." 778 F.3d 556, 562 (7th Cir. 2015). Simply put, the plaintiff's "*Brady* claim is premised on the police officers' silence following their alleged

fabrication of the evidence." *Id.* And therein was the problem because "in the end, [the plaintiff] seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence* to the prosecution." *Id.* (emphasis in original). But "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Id.*

*Saunders-El* is on sound footing and is grounded in a desire to avoid the litigation of superfluous claims as well as its concern that the recasting of fabrication claims under *Brady* "implies that the state has a duty not merely to disclose but also to create truthful exculpatory evidence." *Saunders-El*, 778 F.3d at 562 (citing *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). The purpose of *Brady* is "to disclose evidence favorable to the accused . . . not to displace the adversary system as the primary means by which truth is uncovered." *U.S. v. Bagley*, 473 U.S. 667 at 675 (1985).

In fact, courts in this District adhere to *Saunders-El's* "made-up legal rule." *See Jackson v. City of Chicago*, No. 20 C 5886, 2024 WL 1142015, at *12 (N.D. Ill. Mar. 15, 2024) (rejecting recasting of evidence-fabrication claims under *Brady* because plaintiff "seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing," or lying about what they observed, and "not for failing to disclose any particular piece of *evidence…*"). Johnson cites *Avery v. City of Milwaukee*, which held that *Brady* required police to "disclose the details of the pressure and inducements they brought to bear to extract false statements" from three informants who testified against plaintiff at trial. 847 F.3d 433, 443 (7th Cir. 2017). *Avery's* holding is reconcilable with *Saunders-El* because it merely recognizes a *Brady* claim may exist when police deprive a criminal defendant of impeachment evidence by withholding their coercion of

statements from the state's testifying witnesses. *See Serrano v. Guevara,* No. 17 CV 4560, 2020 WL 3000284, *19 (N.D. Ill. 6/4/2020) (Shah, J.) (explaining that under *Saunders-El,* fabrication claims cannot be recast as *Brady* claims whereas withholding evidence of "pressure tactics and inducements" used against a third-party testifying witness "is relevant impeachment evidence" under *Avery*).

Johnson cites a few other cases, but none supports his argument that he may recast his fabrication claims as *Brady* claims. (Response at 62-66.) In *Engel v. Buchan*, the court never even addressed the issue of recasting; instead, it evaluated whether a federal agent could be sued for a due process claim under the *Bivens* doctrine, including under *Brady* for withholding evidence that the police paid a witness to testify. 710 F.3d 698, 710 (7th Cir. 2013). In *Lewis v. City of Chicago*, the court—without any analysis or recognition of *Saunders-El*, merely stated in dicta that suppression of evidence of fabrication *might* by cognizable under *Brady*. 914 F.3d 472 at 480 (7th Cir. 2019) (emphasis added). Johnson's citation to *Smith v. Burge* supports Movants' position because there the *Brady* claim was based on the suppression of specific pieces of evidence—the "implements of their torture"—such as, bloody clothes and a nightstick. 222 F. Supp. 3d 669, 681 (N.D. Ill. 2016).

Johnson also cites this Court's opinion in *Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at *22 (N.D. Ill. Jan. 24, 2024), for the proposition "that courts have limited *Gauger* to the context of cases where police interrogate and coerce a confession from a criminal defendant, and the criminal defendant then contends that the police should have disclosed the circumstances of the interrogation and false confession." (Response, at 68.) However, the *Ezell* opinion did not even discuss *Gauger*. And further, this Court rejected the *Ezell* plaintiffs' *Brady* claims which alleged that defendant officers withheld evidence that they coerced and fabricated

each of their co-plaintiffs' respective confessions. *Ezell*, 2024 WL 278829 at *21.[12] Finally, Johnson's claim that the Seventh Circuit recently held that "a police officer's lie about evidence in an investigation is itself actionable under Brady, regardless of the exculpatory value of the evidence being lied about" finds no support in *Camm v. Faith*, 973 F.2d 1096 (7th Cir. 2019). (Response at 66.)

In sum, Johnson's allegations are indistinguishable from the *Brady* claims rejected in *Gauger*, *Sornberger*, *Harris*, and *Saunders-El*. And like the failed *Brady* claims in those cases, Johnson's attempted *Brady* claims here must similarly be dismissed

### 2. June 13 six-witness lineup report.

In their opening memorandum, Movants raised three arguments pertaining to the June 13 six-witness lineup report: (1) Movants Daley, Halvorsen and Healy argued Johnson lacked sufficient evidence to demonstrate that they were aware of the report and therefore could not be liable due to lack of personal involvement; (2) Movant Erickson retired before Johnson's criminal trial and there is no evidence that he was involved in producing documents to the State's Attorney's Office; and (3) as to all Movants, Johnson's theory failed because he was aware of the information contained in the report and advised his attorney of that information before his criminal trial. (Memo at 40–41.)

---

[12] In doing so, the court relied on the fact that the plaintiffs already knew the police had coerced their own confessions and those of their respective co-plaintiffs and explained that "[p]laintiffs cooperated throughout their prosecutions, …or had the opportunity to otherwise learn about the coercive methods the Defendant Officers employed to obtain their respective confessions by reading each other's motions to suppress. This provided them ample opportunity to gather evidence concerning the Defendant Officers' tactics of coercion and fabrication, removing such evidence from *Brady*'s reach." *Ezell*, 2024 WL 278829 at *21.

In response, Johnson contends that his *Brady* theory that "Defendants suppressed evidence that eyewitnesses selected Bryan Johns during a live lineup on the night of the crime," "encompasses the suppression of multiple pieces of evidence," including:

- "Guevara, Erickson, and Daley participated in the identification procedure with Johns on the night of June 12-13, 1991, during which three eyewitnesses identified Johns as the shooter, these Defendants told witnesses they had selected the wrong person, Johns was released, and these witnesses later wrote false reports stating that Johns had not been identified in the lineup procedure. PSOF ¶¶ 37, 55-66."

- "Second, Erickson documented this identification of Johns in a lineup supplementary report, which was made part of the investigative file available in the Sergeant's office, but was not sent to central records, to prosecutors, or to Johnson or his attorneys (the Erickson Report). PSOF ¶¶38-42, 67-81, 206, 218-223, 231-236."

- "That report documented that key eyewitness Aby Gonzalez, who was closest to the shooter at the scene, selected Johns as the shooter, and it documented that eyewitnesses Forest Garnett, Rosa Burgos, Rosaline Morales, Angel Cordova and Fina Montanez also participated in the identification procedure. PSOF ¶¶38-41."

(Response at 75-76.) He further argues that Halvorsen, Daley, Erickson and Healy "knew of and did not disclose this evidence" and contends the fact that Erickson retired before Johnson's trial "is irrelevant." (Response at 77-78, n 11.) Finally, Johnson does not dispute that he was told by Johns that Johns committed the Fred murder and had been identified in a lineup, "[b]ut Johnson and his attorneys…did not have all of the information" contained in the report. (Response at 79–82.) None of these arguments defeat Movants' entitlement to summary judgment.

First, Johnson claims "Daley and Erickson participated in the identification procedure on the night of the crime when Johns was identified," (Response at 77), imputing knowledge of the identification procedure to Daley because Daley "identified Johns as a suspect, arrested him, brought him to Area Five for the lineup, falsely reported the result of the lineup right after it occurred, and testified consistent with his false report about the lineup at Johnson's trial." (Response at 77 n. 10.) While it is undisputed that Erickson participated in the June 12 lineup

identification procedure, it is also undisputed by the parties that Daley was not present for the June 12th lineup identification procedure identification procedure. (JSOF ¶¶ 13, 28.) Thus, Johnson's premise that Daley participated in the identification procedure and therefore knew of but did not disclose this evidence is contradicted by the fact to which he agreed, and he points to no other evidence to support his allegation that Daley was present at the line-up.

Indeed, Johnson does not dispute that "Officer Daley was informed that Bryan Johns was not identified in the lineup" (JSOF ¶ 28), which further undercuts Johnson's unfounded allegation that Daley was present because if he was present, he would not need to be informed of the outcome. Once again Johnson has argued a position that lacks any evidence in the record for the sole purpose of creating a false question of fact to defeat summary judgment.

Johnson further argues that "[d]uring their work on the Fred murder investigation, each one of these Defendants (Halvorsen, Daley, Erickson and Healey [sic]) had access to the investigative file sitting in the Sergeant's office, which contained the Erickson report, starting on June 13, 1991..." (Response at 77.) He then contends "[a]t the very minimum, Johnson is entitled to the inference that the investigating officers knew the evidence in their own file. Thus, all of the Defendant Officers saw the Erickson report in the file." But the inference Johnson seeks is not reasonable considering the record and more importantly does not rise to the level of suppression for *Brady*.

Knowing of evidence and concealing evidence are two different things, yet Johnson argues that knowledge of a document's existence means it was concealed. Such a position flies in the face of the requirement that to prove liability, Johnson must demonstrate the officer concealed the evidence. Johnson's leap to liability conveniently overlooks the law. Additionally, Johnson lacks evidence to substantiate his vague claim of access. Paragraph 69 of his PSODF,

cited by Johnson, provides nothing in support of his assertion: "Defendant Erickson's lineup report was found in the Investigative File kept at the Area Five Detective Division during litigation in *Rivera v. Guevara*. (PSODF ¶ 69.) Further, Johnson overlooks the fact that Daley was not a detective—he was a tactical officer assigned to the 14th district and thus had no access to the files. Johnson simply has no evidence that would suggest a tactical officer from a district could walk into Area Five and access a homicide investigative file. Johnson further overlooks that there is no evidence Healy was present at Area 5 at any time prior to or after his charging (JSOF ¶ 39). As such this argument fails.

As to Erickson, Johnson's argument is relegated to a footnote and so it is waived. *Amicorp Mgmt. v. Insight Securities, Inc.*, No. 19-cv-03745, 2021 WL 4502177, at *7 (N.D. Ill. Sept. 30, 2021) (stating "the [plaintiffs] only attempt to distinguish those cases in a footnote, and arguments made in footnotes are typically waived"). But even if not waived, Johnson does not rebut the fact that there is no evidence Erickson failed to put his report in the police file. Indeed, Johnson is arguing that very fact by stating the Movants had access to it in the file. (Response at 77.) The uncontroverted evidence is that the document was placed in the CPD investigative file as the report was in that file when produced in this case. (JSOF ¶ 14.) Further, Johnson failed to respond to Erickson's argument that he had no opportunity to suppress the report because he was retired (JSOF ¶¶ 22, 58) except to simply conclude it is "irrelevant." (Response at 78, n. 11.) But it is absolutely relevant because Erickson was no longer employed when the file was disclosed so he could not have concealed it.

Moreover, Johnson fails to rebut Movants argument that he has no evidence upon which a reasonable jury could find that Erickson intentionally concealed the report. (Memo at 30.) As a result, any argument is waived. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)

("plaintiff failed to respond at all to this point in his reply to defendants' motion for summary judgment and has therefore waived his right to challenge this claim."). As Johnson lacks evidence to show that any Movant intended to suppress the six-witness lineup report, he cannot prevail on this *Brady* theory. *See Moran*, 54 F.3d at 493 (plaintiff must show "intentional or at least reckless failure to disclose).

Finally, in an attempt to get around the undisputed facts that— Johns informed Johnson that he had been identified as the shooter in a lineup the night of the shooting (JSOF ¶ 51); Johnson shared this information with his attorney (JSOF ¶ 53);  his public defender interviewed Johns (JSOF ¶¶ 59, 60); Gubin, was aware of Johns' statement,  but chose not to interview Johns (JSOF ¶ 71); and  his attorneys pursued a theory at trial that Johns was the true perpetrator (JSOF ¶ 113)—Johnson now argues that he and his attorneys "did not have all the information that Defendants were hiding…" (Response at 79–80.) That information includes things such as the officers who conducted the lineup, the individuals who viewed the lineup, and statements purportedly made to the three witnesses who made an identification. (*Id*.) From that one report, Johnson parses out nine separate "baskets" of *Brady* evidence that he claims not to have known. *Id*.

First, Movants were not put on notice that this *Brady* theory encompassed the suppression of nine (9) separate sub-theories and for the reasons noted above, should be waived. *See* § I(b), *supra*. Notwithstanding, a number of these theories, again, reflect Johnson's attempt to reframe his fabrication claim into *Brady*, which is improper. (*See* §IV(c)(1), *supra*.) For the remaining sub theories, Movants have addressed these in their Memo and this reply brief, and accordingly reincorporate their arguments here. (*See* Memo at 28–31; § II(a)(c), *supra*.)

Many of these suppressions Johnson simply either have no supporting evidence (i.e., Daley conducted the lineup the night of the shooting) or the information was known to him (i.e., the witnesses were told they selected the wrong person was in his public defender's notes which he had before trial. (JSOF ¶ 64.).) Nonetheless, Johnson overlooks that information known to the defendant is not suppressed. *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017).

What's more, is that the true value of the six-witness lineup report is that it revealed an alleged identification of Johns. But Johnson was already aware of that, Johns allegedly admitted to him that Johns was the murderer (JSOF ¶ 52), and his entire defense was to blame Johns. For Johnson to argue his attorney was diligent and could not locate that report is beyond the pale. Johnson's attorney had plenty of evidence to dig further into the investigation the first night but even knowing what she did, she chose not to interview Aby Gonzalez (JSOF ¶ 69) who participated in a lineup in which she knew someone was identified. *See Boyd v. City of Chi*, 225 F. Supp. 3d 708, 721, 723 (N.D. Ill. 2016) (no suppression of statement related to a witness's role in crime where it was reasonable to expect defense counsel to interview the witness on that topic); *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011) ("A defendant in a criminal case that actually goes to trial has the responsibility to probe the witnesses and investigate their versions of the relevant events.").

Johnson had all the material exculpatory information, plus more, that is contained in the six-witness lineup report, yet he and his attorneys chose not to pursue it. Thus, the information was not suppressed, and there was nothing preventing Johnson's defense counsel from calling Erickson at trial as a witness. *See Petty v. City of Chi.*, 754 F.3d 416, 423–24 (7th Cir. 2014) (summary judgment on *Brady* claim affirmed where defense counsel knew of suppressed

statement prior to criminal trial). Accordingly, Movants are entitled to summary judgment on

this *Brady* theory.

**b.  Johnson's newly raised *Brady* theories fail against Movants.**

**1.  Johnson cannot establish that Halvorsen and Erickson suppressed evidence undermining the Burgos identifications.**

Johnson alleges "Defendants suppressed ample evidence about their interactions with the

Burgoses that undermined the Burgos identifications," specifically:

- "Guevara and Halvorsen suppressed that Ricardo Burgos told them he had not seen the shooter's face and could not identify the shooter."

- "Guevara and Erickson suppressed that Rosa Burgos told them that the shooting had happened so fast she could not tell who the shooter was, and therefore could not make an identification."

- "Guevara and Halvorsen suppressed what information caused them to identify Elba Burgos weeks after the shooting."

- "Defendants Guevara and Erickson suppressed his interviews with Rosa Burgos, Fina Montanez and Stanley Jewell on the night of the crime."

- "Guevara suppressed that Ricardo Burgos selected a different suspect during a photo identification procedure conducted in June 1991, before Demetrius Johnson was a suspect."[13]

- "Guevara and Halvorsen suppressed that they pointed out Darrell's Johnson's photo to Elba Burgos in the first identification procedure conducted with her."

- "Guevara and Halvorsen also suppressed that during the July 22 live lineup they told Rosa Burgos 'who are you going to pick,' suggesting that she had to pick someone, and that Rosa told them she was not sure who the shooter was."

- "And they suppressed the critical information that Rosa Burgos in fact did not positively identify Johnson as the shooter in the July 22 lineup— instead, she told them that Johnson resembled the shooter, not that he was the shooter. PSOF ¶¶149-150."

(Response at 68–69.)

---

[13] As this is directed against Guevara only, Movants make no response.

To the extent this Court is inclined to consider this newly asserted *Brady* theory (that encompasses eight (8) sub-theories), they amount to mere reformulations of the various fabrication claims Johnson has already asserted, which are not viable under *Brady* as discussed in §IV(a)(2), *supra*.[14] If Johnson's *Brady* theories are not dismissed on the basis of being improper recasts of his fabrication claim, Movants stand on their arguments set forth in §II, *supra*, that where his fabrication theories fail, Johnson's related *Brady* theories fail—one cannot withhold (here alleged fabrication of evidence) that which does not exist. *U.S. v. Sanchez*, 251 F.3d at 603 (holding evidence that does not exist cannot be suppressed in violation of *Brady*).

As to Erickson, Johnson's *Brady* theory that he (and Guevara) "suppressed that Rosa Burgos told them that the shooting had happened so fast she could not tell who the shooter was, and therefore could not make an identification" (Response at 68), fails for several reasons. First, Johnson cannot point to any admissible evidence in the record to support that Rosa made this statement to Erickson (or any other police officer for that matter). As explained *supra* §§ I(a), II(a and b), Rosa did not say that, rather it was from APD Carey's notes of his interview with her, and he is deceased, so it is hearsay.

Even if Johnson had admissible evidence, the theory still fails because the information was not suppressed because it was in APD Carey's notes which defense counsel (JSOF ¶75) had prior to trial and was used  at trial through the testimony of APD Carey. (JSOF ¶ 139.) APD Carey's notes provided Johnson and his defense team with the very information he contends Erickson concealed and the very information he needed to interview Rosa, ask her what she saw

---

[14] The fact that Johnson's new *Brady* theories amount to mere reformulations of his various fabrication claims does not relieve him of his obligation and duty to supplement his responses to written discovery as required pursuant to Rule 26(e). Fed. R. Civ. P. 26(e)(1)(A). *See also Moran*, 54 F.4th at 497(affirming the district court's holding that the plaintiff waived a *Brady* claim, that defendants withheld a dispatch log, because the plaintiff failed to mention it in response to interrogatory requests that "ask[ed] him to '[s]tate the factual basis for his allegation that defendants 'deliberately with[held] exculpatory evidence.'").

and call her as a witness if he thought the answers would help his case. *See Holland*, 643 F.3d at 256 ("A defendant in a criminal case that actually goes to trial has the responsibility to probe the witnesses and investigate their versions of the relevant events.").

Johnson also alleges that Erickson (and Guevara) "suppressed his interviews with Rosa Burgos, Fina Montanez and Stanley Jewell on the night of the crime. PSOF ¶20." (Response at 68.) This *Brady* theory fails because there is no evidence in the record that supports a reasonable inference that Erickson interviewed Rosa Burgos, Fina Montanez or Stanley Jewell on the night of the shooting. To support his claim, Johnson cites to paragraph 20 of PSODF, which states "***Guevara admitted*** at trial that ***he interviewed Rosa Burgos, Fina Montanez and Stanley Jewell on the night of the shooting…*** However, Guevara's June 13 report did not document any interview of Fina Montanez, Stanley Jewell, or Rosa Burgos." (PSODF ¶20 (emphasis added).) It is impossible for Erickson to have concealed interviews with witnesses when he did not even interview them. Moreover, Johnson has failed to identify any evidence that these interviews were exculpatory or impeaching. To the extent Johnson contends otherwise, it is rank speculation. Thus, this *Brady* theory fails.

As to Johnson's new *Brady* theories against Halvorsen, he first alleges that Halvorsen (and Guevara) "suppressed that Ricardo Burgos told them he had not seen the shooter's face and could not identify the shooter." (Response at 68.) Similar to his new contentions against Erickson, Johnson has no evidence that would suggest Ricardo Burgos told Halvorsen that he did not see the shooter's face. Johnson relies on Ricardo Burgos' sworn declaration and deposition testimony as evidentiary support, but neither bridges the evidentiary void. (PSODF ¶¶ 127–28.) Indeed, based on this record, Johnson faces an insurmountable hurdle.

As noted in his declaration and as explained in their Memo, Ricardo Burgos suffered a serious head injury in 1996 or 1997 that caused memory issues. (JSOF ¶ 117; Memo at 24.) "[Ricardo] remember[s] some things well, and other things [he] can't remember at all." (Ricardo Burgos Declaration at ¶ 8, Dkt. 339-1, Ex. 62.) For example, Ricardo purportedly remembers his interactions with the responding officers to the Fred shooting really well. His declaration states that when the uniformed officers on scene asked him what he saw, Ricardo "told them the same information above[15]—that I heard the shots and then saw someone running away but did not see that person's face." (Ricardo Burgos Declaration at ¶ 5, Dkt. 339-1, Ex. 62.)

On the other hand, unlike his interactions with the uniformed officers, Ricardo does not remember his interactions with any detectives: "[s]ome time later, detectives came to speak to me, I think outside my house. They got my name from a family member of the victim. ***I do not remember my interaction with the detectives that came to see me.***" (Ricardo Burgos Declaration at ¶ 6, Dkt. 339-1, Ex. 62.) (emphasis added). Ricardo also does not remember testifying in Johnson's criminal trial. (JSOF ¶ 117.) Ricardo testified at Johnson's criminal trial that he did see the shooter's face.(JSOF ¶ 91.) A "witnesses' inability to recall a fact cannot be used to create a genuine dispute about it; no recollection yields no competent evidence." *Rivera v. Guevara*, 319 F.Supp.2d 1004, 1044 (N.D. Ill. 2018) (citation omitted); *Palmer v. City of Decatur*, No. 17-CV-3268, 2021 WL 7707939, at *29 (C.D. Ill. Sept. 20, 2021) (when a witness confirms his trial testimony was the truth the "failure to recall, more than [30] years later, the statements he made to police and testified to at trial, is not evidence that [Movants] manufactured or fabricated his testimony"). Having no memory of his interactions with the detectives and

---

[15] Johnson cannot say it's possible Ricardo gave this information to Halvorsen because it is undisputed by the Parties that Halvorsen was not involved in the Fred investigation the night of the shooting (along with the fact that he was a detective and not a uniformed beat officer).

lacking any other evidence in the record to the contrary, it cannot be said that Ricardo told Halvorsen he could not make an identification because he did not see the shooter's face.

Johnson next contends Halvorsen (and Guevara) "suppressed what information caused them to identify Elba Burgos weeks after the shooting." (Response at 68.) But Johnson does not identify what evidence was concealed or how it was exculpatory or impeaching. At this point in the litigation, Johnson must have some proof to demonstrate actual evidence was concealed from him during the criminal proceedings and that it was exculpatory or impeaching. Johnson has not done so, and instead, he wants this Cout to not only assume that there must be such evidence, assume it was exculpatory or impeaching, and assume it was concealed. But assumption and speculation does not meet his burden. *Brown*, 633 F. Supp. 3d at 1158 ("This theory is too speculative to overcome" summary judgment."); *Matsushita v. Zenith*, 475 U.S. 574, 586 (1986) (nonmovant must show more than some metaphysical doubt as to material facts and is not entitled to inferences supported by speculation).

Johnson alleges Halvorsen (and Guevara) "suppressed that they pointed out Darrell Johnson's photo to Elba Burgos in the first identification procedure conducted with her." (Response at 68.) But just as his other theories, Johnson again, lacks necessary evidentiary support. To the extent Johnson relies on Elba's trial testimony for support, Elba's testimony makes clear that Detective Guevara came to her house and showed her a series of photographs and she selected one. At trial, Elba is asked "What did you tell Detective Guevara about that photograph [that she had selected]?" and she responded "[h]e asked if it was this one, I said no, it looked like this one but a little younger." (JSOF ¶ 99; Trial Testimony (Elba), Movant Ex. 5, at JGS_JOHNSON 106 (A95:2-12), Dkt. 313-2.) Elba's testimony simply does not support the

notion that Halvorsen, let alone Guevara, pointed out Darrell Johnson's photo for Elba for her to identify.

Finally, Johnson claims Halvorsen (and Guevara) "suppressed that during the July 22 live lineup they told Rosa Burgos 'who are you going to pick,' … and that Rosa told them she was not sure who the shooter was" and suppressed that Rosa did not identify Johnson as the shooter during the July 22 lineup, instead telling them Johnson "resembled the shooter." (Response at 90.) There is no admissible evidence to support this contention. Rosa has denied it. (*See* Rosa trial testimony, Movant Ex. 5, JGS-JOHNSON 42-78 (A35:23–A36:2), Dkt. 313–2.) But even setting both of those barriers to Johnson's claim, this theory fails for the same reasons Roas's purported statements to Erickson the night of the shooting fail—this evidence was simply not concealed. APD Carey spoke with Rosa prior to trial, notes were apparently created supplying Johnson's criminal defense with the exact same impeaching / exculpatory information Johnson claims was concealed, and Johnson used that information to attack Rosa's identification. *See* § II(a and b).

### 2. Halvorsen and Daley did not decide Johnson was their suspect before there was any evidence implicating him, so this was not suppressed.

Johnson also contends that Guevara, Halvorsen and Daley "suppressed the fact that Johnson was their suspect before any witness identified him or any evidence implicated him." (Response at 70.) As addressed *supra* at § II(d), evidence about how Johnson became a suspect was set forth in the police reports indicating Elba advised the suspect looked like Darrell Johnson but younger and Guevara and Halvorsen knew Darrell and knew Darrell had a younger brother--Johnson. (JSOF ¶¶ 31, 32.) Because evidence is not suppressed under *Brady* where the criminal defendant is aware of the evidence or could have learned of it through reasonable diligence, he cannot proceed on this new theory. *Petty*, 754 F.3d at 423–24.

### 3. The investigation of alternative suspect Robert Weeks was not suppressed by Halvorsen.

Johnson alleges that Guevara and Halvorsen "suppressed their investigation into alternative suspect Robert Weeks, including their interview of him." (Response at 72.) Weeks was arrested on June 29, 1991, by fourteenth district tactical Officers Crespo and Roman who believed he may have been the shooter, prepared a report detailing their evidence and belief, and contacted Halvorsen for further investigation. (PSODF ¶¶ 177-181 (citing report of Crespo and Weeks, P. Exhibit 138. Crespo and Roman's report was not suppressed, and Johnson does not contend otherwise[16]. Rather he asserts that there was additional investigation of Weeks by Guevara and Halvorsen, including an interview of him, that was not disclosed. (Response at 72.) Johnson then claims that he is "entitled to the inference based on the above evidence that the information Guevara and Halvorsen learned about Weeks exculpated Johnson, possibly by inculpating Weeks—if it had not, there was no reason that Guevara and Halvorsen would not have documented it in the file." (*Id*. at 72-73.) But this is not a reasonable inference, and this *Brady* contention fails.

To start, Johnson points to no evidence in the record to support his belief that Weeks "exculpated Johnson" instead, relying on rank speculation that the investigation/interview of Weeks was exculpatory, which is not enough to create a dispute of fact to survive summary judgment. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) ("Inferences supported only by speculation or conjecture will not suffice."). *See also U.S. v. Nolan*, 910 F.2d 1553, 1558 ("Speculation is not sufficient to establish that the government has suppressed evidence."). Speculation aside, this *Brady* theory fails for two additional reasons.

---

[16] Nor could he because Johnson's criminal defense attorney examined Guevara extensively regarding Robert Weeks and the contents of the Crespo and Roman report at trial. (*See* Trial Testimony (Guevara), Movant Ex. 5, at JGS_JOHNSON 230-233 (B 55-57), Dkt. 313-2.))

First, Crespo and Roman's report was disclosed to Johnson which included their belief and corresponding evidence of Weeks' being the shooter. That report was sufficient to signal to Johnson's criminal defense attorneys that Weeks might have valuable information about the shooting. The disclosed report gave Johnson all the information he needed to diligently investigate and develop a theory that Robert Weeks was the true killer. *See Holland*, 643 F.3d at 256 ("A defendant in a criminal case that actually goes to trial has the responsibility to probe the witnesses and investigate their versions of the relevant events."); *Cairel v. Alderden*, 821 F.3d 823, 882 (7th Cir. 2016) (opining that Brady claim failed where plaintiffs could have developed the evidence that they argued was suppressed).

Second, at Johnson's trial Guevara was examined extensively by defense counsel regarding Robert Weeks, addressing the information from the Crespo and Roman report and inquiring about any interview or reports of the Weeks investigation and whether Weeks photo was shown to any witnesses in the case. (Trial Testimony (Guevara), Movant Ex. 5, at JGS_JOHNSON 230-246 (B 55:5-71:18), Dkt. 313-2.) Thus, it hardly can be said that this information was concealed by Halvorsen.

### 4. Johnson's counsel knew Johns was a cooperating witness in another case.

Johnson contends that Halvorsen and (Guevara) "suppressed that [Bryan] Johns was a cooperating witness participating in another case they were investigating at Area Five, and they suppressed that this was the reason Johns was released after being identified in a lineup on the night of the murder." (Response at 73.) This theory fails for several reasons. First, Johns's involvement as a witness in another case was not suppressed because while APD Carey represented Johnson, he also was the attorney of record for the defendant in the case that Johnson contends Johns was a cooperating witness in and in fact, examined Johns at that trial in July

1991. (Plaintiff Exhibit 49, 7/17/91 Pagan murder trial transcript, at 1, 28 (testimony of Brian Johns).)[17] Information known to a defendant, or his attorney is not suppressed. *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). Further, APD Carey met with and spoke to Johns in jail on August 28, 1991. (JSOF ¶ 59.)

But there is more reason Johnson cannot sustain this *Brady* theory; he lacks evidence of Halvorsen's involvement. As noted above, Halvorsen was not involved in the Fred murder investigation the night of the shooting which was the night Bryan Johns was arrested and released. (JSOF ¶¶ 29, 30.) Moreover, the only "evidence" Johnson cites to in support of this theory is "[w]hen asked in his deposition whether Johns was a cooperating witness who he and Halvorsen were protecting at the time of the Fred homicide, Guevara asserted his Fifth Amendment rights." (*Id*. at 74). But the evidentiary basis for this statement as it relates to Halvorsen is missing from the record because Guevara's Fifth amendment assertion cannot be imputed to Halvorsen. (*See* §I(d) *supra*.) Accordingly, the record before the Court does not support the notion that Halvorsen was protecting Johns, a cooperating witness who worked for Halvorsen, as Johnson claims. Summary judgment on this theory is proper.

### 5. Johnson's theory that Defendants suppressed their own pattern of misconduct fails.

Johnson argues that Defendants suppressed that "Guevara had been involved in a number of cases where he fabricated and suppressed evidence, coerced false statements from witnesses and suspects, obtained false identifications using suggestive procedures, and wrote false police reports." (Response at 74-75.) Johnson uses group accountability to bootstrap the Movants to Defendant Guevara's prior allegations of misconduct with perfunctory and undeveloped

---

[17] Johnson's family hired an attorney to replace APD Carey in February 1992 and his trial did not begin until November 18, 1992. (JSOF ¶ 63, 85.) Accordingly, APD Carey represented Johnson in July 1991 when he examined Johns in the case in which Johns was a cooperating witness.

argument. Johnson asks this Court to speculate that Movants knew and should have disclosed that Guevara had committed misconduct before Johnson's trial that was exculpatory and material to its outcome. *See Johnson*, 892 F.3d at 894 ("Inferences supported only by speculation or conjecture will not suffice"). Absent evidence of any Defendants' knowledge or personal involvement, this theory fails against Movants. *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008).

## V.     Johnson's Unlawful Detention and State law Malicious Prosecution Claims Fail

In their opening Memo, Movants argued Johnson's unlawful pretrial detention and state malicious prosecution claims failed because: 1) against Erickson, Daley and Healy due to a lack of personal involvement, 2) against all Movants due to the existence of probable cause, and alternatively, 3) on the unlawful detention claim, the existence of arguable probable cause entitles Movants to qualified immunity. (Memo at 33-36.) In response, Johnson argues that Erickson, Daley and Healy initiated the prosecution of Johnson, disputes that the Burgoses' identifications provided probable cause, and contends that Movants are not entitled to qualified immunity. (Response at 110-116.)

### a.     The uncontested evidence establishes that Erickson, Daley and Healy were not personally involved in the commencement or initiation of Johnson's criminal prosecution entitling them to summary judgment.

As established in their opening Memo, Movants Healy, Daley and Erickson are entitled to summary judgment on Johnson's unlawful detention and malicious prosecution claims because he lacks evidence to show that Erickson, Daley and Healy commenced or continued his criminal proceedings. (Memo at 33-34.) Johnson, in response, contends "[t]his argument is wrong on the law and facts," because "[t]he Seventh Circuit holds, '[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to

proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision' as these Defendants did here." (Response at 110 citing *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)). But Johnson points to no evidence that Healy, Daley or Erickson "deliberately supplied misleading information that influenced" the decision to charge.

First, Healy's only involvement in the Fred homicide investigation, signing and approving certain reports, occurred *after* the decision was made to charge Johnson. Thus, it cannot be said that he supplied any information, let alone misleading information, which influenced the decision to prosecute. Second, with respect to Erickson and Daley, there simply is no evidence in the record upon which a jury could find they "deliberately supplied misleading information" that influenced the decision to charge as neither were involved in the investigation at the point Johnson was charged. (JSOF ¶¶ 21, 32.) Indeed, Erickson was retired at the time Johnson's case went to trial. (JSOF ¶ 22.)

Johnson further argues that Illinois law extends liability "to all persons who played a significant role in causing the prosecution of the plaintiff," (Response at 110) and "[p]olice who engage together in misconduct to deceive other actors in the criminal justice system are routinely found to have commenced and continued criminal prosecutions." (*Id.*, citing *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013)). Johnson also argues that Erickson, Daley and Healy's contention that they did not cause Johnson's criminal proceedings "cannot be reconciled with the record either" because "[t]he charges were based entirely on the Burgos identifications, and the suppression of evidence, and each of the Defendants was involved intimately in those fabrications and suppressions.". (Response at 110.) But it is Johnson's contention that cannot be reconciled with the record.

None of these Movants were involved in, or were present when Ricardo, Elba or Rosa Burgos identified Johnson in the live lineup. (*See* § II(a), *supra*.) Therefore, it cannot be said that these Movants "were involved intimately" in the alleged fabrication of the Burgoses identifications or suppression of evidence when they were no longer involved in the investigation. As discussed extensively throughout this memorandum and their opening Memo, these Movants were not intimately involved in the fabrication or suppression of evidence. (*Supra* §§ II-IV.)

Lastly, Johnson points to the fact that Daley testified at trial as evidence that he "cause[d] Johnson's criminal proceedings." (Response at 110.) However, even assuming Daley's testimony was false, which there is no evidence of, false testimony at trial does not give rise to a malicious prosecution claim because witnesses are entitled to absolute immunity. *Briscoe*, 460 U.S. at 327 (police officers are immune from claims of false testimony). Moreover, as noted in their opening Memo, Daley testified on behalf of the ***defense*** at trial. (JSOF ¶ 86.) The relevant inquiry on the "commencement or continuance" element is whether the defendant, here Daley, proximately caused the commencement or continuance of the criminal proceeding. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 33,  131 N.E.3d 488, 496.

It is unclear how Daley's testimony at trial proximately caused the commencement or continuance of Johnson's criminal proceedings where he testified on behalf of the defense, not the State. Johnson cannot establish but for Daley's testimony at trial, the State's attorney would not have pursued or continued to pursue criminal charges or how it played a significant role in his criminal proceedings because Daley testified for the defense, and not the State. (JSOF ¶ 86.)

> **b.  Johnson cannot present any admissible evidence defeating the existence of probable cause.**

Movants additionally argued that they were entitled to summary judgment on Johnson's malicious prosecution and unlawful detention claims because of the presence of probable cause based on Rosa, Elba and Ricardo's identifications. (Memo at 34-35.) In response, Johnson, once again, argues whether the Burgos identifications established probable cause is disputed. (Response at 111.) Johnson concedes that "[a] positive identification from a photo array would constitute probable cause," (PSODF ¶ 145), but counters that all three witnesses' identifications were fabricated, which cannot support probable cause. (Response at 112.)

As discussed throughout, Johnson lacks evidence that any of the Burgos identifications were fabricated because they maintain that their identifications were truthful. (JSOF ¶¶ 117-119.) As such, their identifications establish that there was probable cause to detain Johnson. Because probable cause existed to detain and prosecute Johnson, his unlawful detention and malicious prosecution claims fail.

Even if Johnson argued that the photo procedures make the identifications of Elba and Ricardo less than perfect and insufficient for probable cause, there is no admissible evidence undercutting Rosa Burgos's identification of Johnson. Indeed, Rosa also participated in the lineup including Johns as a suspect and did not identify him. Johnson cannot overcome or discredit Rosa's testimony to show probable cause was lacking. A single witness identification is sufficient to support probable cause as a matter of law, even if that witness's identification is called into question. *See Moran,* 54 F.4th at 499-500 (eye-witness identification, even if questionable, is sufficient to provide probable case); *Coleman*, 925 F.3d at 351; *Cairel*, 821 F.3d at 835 (eyewitness identification gave defendants probable cause to arrest plaintiff, despite witness's hesitancy and inconsistencies with earlier descriptions). *See also Blackmon*, 700 F.Supp.3d at 632-34 (granting summary judgment to police officer defendants as to Fourth

Amendment unlawful pretrial detention claim and malicious prosecution claim based on single, questionable, eye-witness identification).

Finally, Movants also demonstrated that they are entitled to qualified immunity on the basis that arguable probable cause existed (Memo at 35-36). Johnson's Response states that arguable probable cause is a question of fact for the jury and reiterates his arguments as to probable cause addressed above. (Response at 114–116.) Not so.  Again, even a single eye-witness identification can supply probable cause. *See Moran*, 54 F.4th at 499-500; *Blackmon*, 700 F.Supp. 3d at 632. But absent any evidence that the eyewitnesses' identifications were fabricated, Johnson's argument goes nowhere, and Movants are qualifiedly immune.

## VI.    Johnson Fails to Support his Supervisor Liability Claim Against Healy

Movants explained in their opening Memo, that the absence of any evidence that Healy actively participated in the investigation or directed the conduct of which Johnson complains entitles him to summary judgment on all claims. In response, Johnson was obligated to come forward with evidence that Healy engaged in misconduct but failed to do so. *Taylor,* 999 F.3d at 493 (internal quotation marks and citations omitted).

As a supervisor,  Healy cannot be liable for the misconduct of their subordinates simply because they are in charge. *Taylor*, 999 F.3d at 493; *Gossmeyer*, 128 F.3d at 495 ("Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved."). Rather, a supervisor can be liable only if the plaintiff's injury occurred at the supervisor's "direction or with [his] knowledge and consent and that the defendants acted either knowingly or with deliberate, reckless indifference." *Stockton*, 44 F.4th at 619.

Johnson argues that "the record supports the conclusion at summary judgment that these Defendants were involved in misconduct that occurred in the investigation they oversaw."

80

(Response at 116.) As anticipated, this argument is premised on the simple fact that Healy approved four reports. (Response at 116–17.) Johnson's arguments do not carry the weight. The mere fact that Healy signed off on reports as approving supervisors fails to demonstrate he was present for or had any knowledge that any officer involved in questioning Sierra or any of the witnesses acted improperly. *See Bedford,* 2023 WL 6312107 at *3 (after-the-fact approval of tactical response report did not rise to level of personal involvement necessary to sustain constitutional violation.).

Johnson presented no evidence that Healy was present when the alleged constitutional violations occurred. Indeed, Johnson cannot do so. It is undisputed that Healy had no other involvement in the Fred investigation other than signing the four reports (JSOF ¶ 38), and it is undisputed that there is no evidence in the record that Healy was at Area 5 on any date other than July 24, 1991. (JSOF ¶ 39.) *See Gossmeyer*, 128 at 494-97 (no personal involvement where supervisors were either not present for or did not participate in search of workplace desk). Significantly, Johnson does not point to a single piece of evidence that Healy was present when *any* witness was questioned or for any of the identification procedures.

To hold Healy liable on this record would amount to *respondeat superior* liability, which is not available for constitutional claims. *Gossmeyer*, 128 F.3d at 495; s*ee also Kincaid v. Sangamon County*, No. 09-cv-3053, 2015 WL 4624631, at *4 (C.D. Ill. Aug. 3, 2015) (granting sheriff's motion for summary judgment where he was "not on-site" or personally involved in the denial of adequate medical care). Healy cannot be held liable simply because he held the position of sergeant, particularly given the absence of any evidence suggesting that he was present when the alleged constitutional violations occurred, somehow turned a blind eye to any predictable violations or had any reason to believe unconstitutional conduct  took place. To hold otherwise

would eviscerate § 1983's personal involvement requirement and permit plaintiffs to enmesh government officials in litigation based on routine and perfunctory tasks, such as reviewing and approving reports.

## VII.    Movants are Entitled to Summary Judgment on Johnson's Failure to Intervene Claim

In their Memo, Movants argued that Johnson cannot prevail on his failure to intervene claim because: (1) for there to be a failure to intervene there must be a constitutional violation, which is absent here against these Movants[18]; (2) Johnson cannot point to evidence that Movants knew of or had a realistic opportunity to intervene in the alleged constitutional violations; and (3) for purposes of preservation in the event of an appeal, such a claim is not cognizable as it violates Section 1983's bar to vicarious liability. (Memo at 37-39.)

In response, Johnson contends dismissal is not warranted on this count because "material disputes of fact require a trial on Johnson's other claims." (Response at 118.) But as demonstrated in their Memo, and as discussed herein, there are no genuine issues of fact on Johnson's other claims as they relate to the Movants. To the extent Johnson contends otherwise, the factual disputes he conjured up are unsupported by the record and thus, cannot be used to create an issue of fact.

As to whether Movants knew of or had a realistic opportunity to intervene in the alleged constitutional violations, Johnson responds that Movants' argument is "not developed in any way" and therefore "forfeited." (*Id*. at 118-119.) But throughout Movants' Memo they demonstrated where Healy, Daley, Erickson and Halverson were not involved with the alleged

---

[18] For there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation in which the defendant could intervene. *Edwards v. Joliff-Blake*, No. 13-cv-4558, 2017 WL 1134473 (N.D. Ill. Mar. 27, 2017) (dismissing supervisor liability, failure to intervene, and indemnification claims for lack of an underlying constitutional violation).

constitutional violations and specifically incorporated that into their failure-to-intervene

argument. (Memo at 38-39.) Indeed, Johnson does not identify a single fact suggesting

Halverson, Healy, Erickson or Daley had any opportunity to intervene.

Johnson sidesteps his lack of evidence by asserting whether an officer had sufficient time

or was capable of preventing the harm is generally a question of fact. (Response at 119 (citing

*Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022)). While generally true, the evidence

here forecloses the timing question:

- Erickson was only involved the night of the shooting and retired about a month and a half later—he did not interact with, nor was he present for, any of the identification procedures wherein Johnson was identified as the shooter by Ricardo, Rosa or Elba Burgos;

- Daley did not interact with, nor was he present for, any of the identification procedures wherein Johnson was identified as the shooter by Ricardo, Rosa or Elba Burgos and he was not involved in Johns's lineup;

- Healy's only connection and involvement to the investigation was signing certain detective reports (none of which were introduced at the criminal trial) two days after Johnson was arrested and charged; and

- while Halvorsen was involved in the identification procedures with Ricardo, Elba and Rosa Burgos wherein they identified Johnson, all three maintain their trial testimony and identification of Johnson was true.

Without evidence suggesting Movants knew or, or were capable of preventing the alleged

harm, which Johnson does not have, he cannot show that Healy, Erickson, Daley and Halvorsen

had a realistic opportunity to intervene.

In response to Movants' preservation argument that failure to intervene is not cognizable

under Section 1983, Johnson cites *Mwangangi*, 48 F.4th at 816, *Byrd v. Brishke,* 466 F.2d 6 (7th

Cir. 1972) and *Yand v. Hardin*, 37 F.3d 282 (7th Cir. 1994) that a failure to intervene claim is

viable under §1983. (Response at 118.) To be clear, Movants are aware that at the present failure

to intervene claims are frequently raised, recognized, and litigated in Section 1983 litigation.

Movants' argument, rather, presents an emerging view that the years-long recognition of the tort rests upon a presumption of its validity that has never been tested. *See Mwangangi*, 48 F.4th at 834 (Easterbrook, J., concurring). And just this past April, the Sixth Circuit echoed Judge Easterbrook's sentiments in *Chaney-Snell v. Young*, noting that its case law left the source of a failure to intervene theory unclear and stating, "[p]erhaps one day we will have to identify the source of this failure to intervene claim." No. 22-1990, 2024 WL 1616406, at *16 (6th Cir. Apr. 15, 2024); *see also Heidelberg v. Manias,* No. 18-cv-01161, 2024 WL 1316206, at *25 (C.D. Ill. Mar. 27, 2024) (describing argument that there is no constitutional support for a failure-to-intervene claim as "compelling"). Thus, Movants are seeking to preserve their arguments challenging this is a viable theory of Section 1983 tort liability.

## VIII. Movants are Entitled to Summary Judgment on Johnson's Derivative IIED and Conspiracy Claims

As to his remaining conspiracy (state and federal) and IIED claims, Johnson does not dispute that these claims are derivative and therefore to the extent his underlying constitutional violations fail, his derivative claims fail as well. *See Olivia v. City of Chicago*, No. 21-cv-06001, 2023 WL 2631575, at *6 (N.D. Ill. Mar. 24, 2023 ("Derivative claims fail when the underlying claim upon which they rely fails").

### a. There remains no evidence to support an IIED Claim.

In their Memo, Movants explained that where a plaintiff lacks evidence to support underlying Section 1983 violations and state law civil rights torts, an IIED claim premised on the same facts cannot be established. (Memo at 39-40.) Rather than counter this argument, Johnson merely recites the boilerplate IIED standard and asserts that his "allegations fit the tort perfectly." (Response at 120.) This, of course, is not a substantive rebuttal to Movants' caselaw, which quite clearly demonstrates that the IIED threshold can never be reached when the same

conduct purportedly grounding that claim does not rise to the level of less demanding civil rights torts.

Moreover, allegations are not evidence and Johnson fails to come forward with any evidence that Movants abused their power in committing an act beyond all bounds of decency. Movants demonstrated Johnson lacks evidence to support his allegations that they violated his rights. *See supra* §§ II, III, IV, V. For that reason, as already laid out by Movants, summary judgment on Johnson's IIED claim is warranted.

### b. Johnson lacks evidence to support his conspiracy claims and Movants are otherwise entitled to qualified immunity.

To the extent any underlying claims survive, Johnson has insufficient evidence that Movants had an express or implied agreement to deprive Johnson of his constitutional rights. *Schere v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (holding that "to establish a prima facie case of a civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement."). While Johnson is correct that circumstantial evidence may provide adequate proof of conspiracy (Response at 121-122), the circumstantial evidence must be "sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." *Green v. Benden*, 281 F.3d 661, 666 (7th Cir. 2002). Here, Johnson's evidence fails to do so.

Because he has no direct evidence of a conspiracy, Johnson goes back to the inference well and argues there is "ample evidence on which a jury could infer an agreement between the [Movants]" because "Defendants all worked together as a small team on the Fred homicide investigation…" (Response at 122.) But it is well established that a working relationship is

insufficient to prove a conspiratorial agreement. *See Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 914 (N.D. Ill. 2016) (finding that evidence that police officer plaintiffs worked for a specific defendant's third watch team did not demonstrate any evidence of an agreement).

Indeed, a similar argument was recently rejected in *Jackson v. City of Chicago*, No. 20-cv-5886, 2024 WL 1142015, *12 (N.D. Ill. Mar. 15, 2024) (stating "Jackson lacks evidence that anyone besides Eichman was involved or conspired to violate Jackson's rights—Plaintiff instead merely speculates there was a conspiracy because Defendants worked together, which does not defeat summary judgment."). Here too, Johnson "merely speculates there was a conspiracy because Defendants worked together." *Id*. As to Healy, Johnson's sole evidence that he engaged in a conspiracy is because he approved reports. (Response at 122.) But a person's supervisory position cannot be the basis for an inference that he was involved in the conspiracy. *Bell v. City of Milwaukee*, 746 F.2d 1205, 1255 (7th Cir. 2005), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783 (7th Cir. 2005). Because Johnson's purported evidence does not support a reasonable inference of an agreement to conspire, Movants are entitled to summary judgment on the Section 1983 and state law conspiracy claims.

Movants are also entitled to qualified immunity on the conspiracy claims based upon the intracorporate conspiracy doctrine. (Memo at 41-42.) Johnson contends the doctrine "has no place in §1983 cases." (Response at 124.) Although the Seventh Circuit has not yet decided if it applies to Section 1983, it has long held that the intracorporate conspiracy doctrine applies to § 1985 conspiracy claims. *See Wright v. Ill. Dep't of Child. & Fam. Servs.*, 40 F.3d 1492, 1508–09 (7th Cir. 1994) ("except in egregious circumstance, intra-entity discussions…lie outside the scope of § 1985"). There is no conceptual difference between Section 1985 and Section 1983 for purposes of intracorporate conspiracy, and Johnson did not attempt to describe one. For that

reason, Movants urges the Court to apply the body of law that strongly counsels in favor of applying the intracorporate-conspiracy doctrine to Section 1983. *See Jackson v. City of Cleveland*, 925 F.3d 793, 819 (6th Cir. 2019); *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1261 (11th Cir. 2010) (intracorporate-conspiracy doctrine bars plaintiffs' Section 1983 conspiracy claims); *Strauss v. City of Chicago*, 346 F. Supp. 3d 1193, 1210, 1210 n.6 (N.D. Ill. 2018) (same, noting that "[m]ost courts in this district have held that [the intracorporate-conspiracy doctrine] applies to conspiracy claims under 42 U.S. § 1983" and the court has seen no "reason why the Seventh Circuit's logic [applying the doctrine to § 1985] should not apply with equal force to conspiracy claims under Section 1983").

If this Court is disinclined to apply the intracorporate conspiracy doctrine, Movants are still shielded from liability based upon qualified immunity. "When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1868 (2017). No reasonable officer in Movants' position would have known with certainty that any of their actions subjected them to liability for conspiracy under Section 1983. (Memo at 41-42.)

Johnson also argues that uncertainty over the applicability of the intracorporate conspiracy doctrine to Section 1983 cases does not entitle them to qualified immunity, citing *Harris v. City of Chicago*, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020). (Response at 125.) But as the Supreme Court noted in a case awarding qualified immunity based on uncertainty around the intracorporate conspiracy doctrine, "'the dispositive question is whether the violative nature of particular conduct is clearly established.'" *Ziglar,* 137 S. Ct. at 1866 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). Because of the uncertainty surrounding the reach of the intracorporate-conspiracy doctrine, the Supreme Court held that "it must be concluded that

reasonable officials in petitioners' positions would not have known, and could not have predicted, that § 1985(3) prohibited their joint consultations and the resulting policies that caused the injuries alleged." *Id.* at 1867.

In fact, that "*particular* conduct…officers in the same branch of the Government" conducting a "conspiracy"—was precisely what the Supreme Court held "would not have been known or anticipated by reasonable officials in their position." *Ziglar*, 137 S. Ct. at 1866–67. The key to circumventing qualified immunity is that the conduct itself must be clearly established as violative of a constitutional right. (Response at 125.) As set forth in their Memo, any alleged conspiracy by the Movants was and remains not clearly established as violating a constitutional right, due to the unsettled status of the intracorporate-conspiracy doctrine. (Memo at 41-42.) As set forth in *Ziglar* and recognized in *Haliw v. City of South Elgin*, No. 19 C 01515, 2020 WL 1304697 (N.D. Ill. Mar. 18, 2020), such uncertainty requires entry of summary judgment on qualified immunity grounds. *See also Long v. Weeks*, No. 23-55004, 2024 WL 1672258, at *1 (9th Cir. Apr. 18, 2024) (holding "[a]ppellants are entitled to qualified immunity on the conspiracy claim because it is not clearly established that the intracorporate conspiracy doctrine is inapplicable to Section 1983 claims" (citing *Ziglar*, 582 U.S. at 153)).

Finally in classic throw away argument fashion, Johnson for the first time ever claims that Movants conspired with Elba, Rosa and Ricardo Burgos. He has never identified any Burgos as a co-conspirator throughout this case. Johnson's eleventh-hour attempt to advance a new legal theory for the first time in response to a summary judgment motion is wholly improper and results in waiver. *Richardson v. Diversified Consultants, Inc.*, No. 17-cv-4047, 2019 WL 3216030, at *7 (N.D. Ill. July 17, 2019). As the state of law remains in flux, and Johnson has

failed to cite any case law that would put Movants on notice their conduct was unconstitutional, they are entitled to qualified immunity.

## IX.    Johnson Cannot State an Independent Claim for Willful and Wanton Conduct Under Illinois State Law

In their Memo, Movants demonstrated that they were entitled to summary judgment on Johnson's claim of willful and wanton conduct under Illinois state law. (Memo at 42.) Johnson does not dispute that under Illinois law there is no separate, independent tort of willful and wanton conduct, but rather contends his claim is an aggravated form of negligence. (Response at 126.) As an initial matter, to the extent Johnson is attempting to amend his complaint through his response to summary judgment, such a tactic is inappropriate. *Colyer v. City of Chi.*, 12 C 04855, 2014 WL 8796112, at *4 (N.D. Ill. Dec. 8, 2014). Count VIII is plainly entitled "State Law Claim-Willful and Wanton Conduct." (Complaint, at 39, Dkt. 1.) This matter has been pending for four years. At no point during discovery or in responses to interrogatories did Johnson clarify that he was asserting a negligence claim aggravated by willful and wanton conduct. As such, Movants did not have notice of this theory of liability which warrants summary judgment in their favor. *Grayson v. O'Neil*, 308 F.3d 808, 817 (7th Cir. 2002) ("Although it is true that [the plaintiff] argued in opposition to summary judgment that the [defendant] retaliated against him for filing EEOC complaints, 'a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'") (citations omitted).

But even if Johnson did properly provide notice of this claim, it still fails for other reasons. First, willful and wanton conduct is regarded as an aggravated form of negligence, but to recover damages, a plaintiff must plead and prove the basic elements of a negligence claim and additionally allege either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare. *Doe-3 v. McLean Cty. Unit Dist. No. 5 Bd. of Dirs.*, 2012 IL 112479, ¶19, 362

Ill. Dec. 484, 491. Here, Johnson has not identified a duty owed to him or a breach of that duty. In fact, all Johnson has pleaded—a duty "to refrain from willful and wanton conduct in connection with the Fred murder investigation" (Complaint at ¶¶ 162)—is too vague to support a negligence claim. On this record, there is no evidence of a duty or breach of duty to support Johnson's claim, and Movants are entitled to summary judgment on Count VIII.[19]

## CONCLUSION

WHEREFORE Movants Halvorsen, Daley, Erickson and Healy respectfully request this Court grant their motion for summary judgment, enter an order granting summary judgment in their favor on all of Johnson's claims and for such further relief as the Court deems appropriate.

Dated: August 9, 2024                          Respectfully submitted,

                                               /s/ Josh M. Engquist
                                               Josh M. Engquist, Attorney No. 06242849
                                               Special Assistant Corporation Counsel
                                               *One of the Attorneys for Individual Defendants*

Josh M. Engquist
James G. Sotos
Josh M. Engquist
David A. Brueggen
Elizabeth R. Fleming
Daniel McGinnis
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, IL 60604
(630) 735-3300
jengquist@jsotoslaw.com

---

[19] In the event this Court dismisses Johnson's federal claims leaving only state-law claims, this Court has discretion to relinquish supplemental jurisdiction over the state-law claims. *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012).

## CERTIFICATE OF SERVICE

I, Josh M. Engquist, certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on Thursday, August 15, 2024, I electronically filed the foregoing **Defendants Halvorsen, Erickson, Daley and Healy's Reply Memorandum of Law in Support of Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

**_Attorneys for Plaintiff:_**

Jon Loevy
Anand Swaminathan
Joshua Tepfer
Rachel Brady
Steven Art
Sean Starr
Alyssa Martinez
Margaret Gould
Ruth Brown
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312-243-5900
jon@loevy.com
anand@loevy.com
josh@loevy.com
brady@loevy.com
steve@loevy.com
sean@loevy.com
alyssa@loevy.com
gould@loevy.com
ruth@loevy.com

**_Attorneys for City of Chicago:_**

Eileen E. Rosen
Austin G. Rahe
Catherine M. Barber
Theresa B. Carney
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker Drive, 19th Fl.
Chicago, Illinois 60606
312-494-1000
erosen@rfclaw.com
arahe@rfclaw.com

cbarber@rfclaw.com
tcarney@rfclaw.com
lferrise@rfclaw.com

**_Attorneys for Defendant Guevara:_**

Steven Blair Borkan
Timothy P Scahill
Whitney Hutchinson
Emily E. Schnidt
Christine E. Murray
Amanda Guetler
Krystal Gonzalez
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, IL 60603
(312) 580-1030
sborkan@borkanscahill.com
tscahill@borkanscahill.com
whutchinson@borkanscahill.com
eschnidt@borkanscahill.com
cmurray@borkanscahill.com
aguertler@borkanscahill.com
kgonzalez@borkanscahill.com

/s/ Josh M. Engquist
Josh M. Engquist