**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20-cv-04156 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| REYNALDO GUEVARA, JOANNE | ) | |
| HALVORSEN as PERSONAL | ) | Magistrate Judge Heather K. McShain |
| REPRESENTATIVE to the ESTATE of | ) | |
| ERNEST HALVORSEN, DARRYL DALEY, | ) | |
| WILLIAM ERICKSON, JOHN HEALY, and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S REPLY IN
FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 5

I.   PLAINTIFF HAS CREATED A "JUMBLED MASS" OF SUMMARY JUDGMENT. .......................................................................................................... 5

    A.   Plaintiff is wrong about the legal framework governing *Monell* claims. ................ 8

    B.   Plaintiff's statement of disputed facts is improper, should be stricken and those facts disregarded. ..................................................................................................... 10

    C.   Plaintiff impermissibly repeats arguments throughout his summary judgment brief. ........................................................................................................................ 13

II.   THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S *MONELL* THEORIES BECAUSE PLAINTIFF HAS FAILED TO DEVELOP SUFFICIENT EVIDENCE. ....................................................................... 14

III.  SUMMARY JUDGMENT IN THE CITY'S FAVOR IS REQUIRED IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF DEFENDANT OFFICERS. ................................................................................................................. 19

IV.  THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S FABRICATED IDENTIFICATION *MONELL* THEORY. ............. 21

    A.   The non-expert evidence does not establish a widespread practice of fabricating witness identifications using suggestive identification procedures. ....................... 22

    B.   The expert evidence does not establish a widespread practice of fabricating witness identifications using suggestive identification procedures. ....................... 25

    C.   Plaintiff's remaining arguments fail. ...................................................................... 30

V.   THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S EVIDENCE SUPPRESSION *MONELL* THEORY. ......................... 31

    A.   There is no evidence of a widespread practice of evidence suppression. ............... 31

    C.   The expert evidence does not establish a widespread practice of evidence suppression. ............................................................................................................. 37

VI.  PLAINTIFF FAILED TO DEMONSTRATE THAT AN ILLEGAL PATTERN OR PRACTICE AMOUNTED TO "DELIBERATE INDIFFERENCE" OR WAS THE "MOVING FORCE" BEHIND THE DEFENDANT OFFICERS' CONDUCT. ..... 48

VII. PLAINTIFF FORFEITS ANY ARGUMENT THAT SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* (COUNT X) AND IDEMNIFICATION (COUNT XI). ................................................................................................................................. 51

CONCLUSION .................................................................................................................. 51

## CASES

*Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006) ..................................................... 29

*Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809 (7th Cir. 2004).................................. 11

*Baldwin Graphic Systems, Inc. v. Siebart, Inc*., 2005 WL 1300763 (N.D. Ill. 2005) .................. 12

*Bd. of Cnty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397 (1997) ................ 5, 49, 50

*Black v. City of Chicago*, 2022 WL 425586 (N.D. Ill. Feb. 11, 2022) ....................... 34, 37, 49, 50

*Bonds v. City of Chicago*, No. 16-CV-5112, 2018 WL 1316720 (N.D. Ill. Mar. 14, 2018) ........ 21

*Bryant v. Bd. Of Educ., Dist. 228*, 347 F. App'x 250 (7th Cir. 2009) .......................................... 13

*Butler v. Sears Roebuck & Co*., 06 C 7023, 2010 WL 2697601 (N.D. Ill. 2010) ........................ 12

*Cage v. City of Chicago*, No. 9 C 3078, 2010 WL 3613981 (N.D. Ill. Sep. 8, 2010) ................. 21

*Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2020 WL 996498 (N.D. Ill. Mar. 2, 2020).. 6

*Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628 (7th Cir. 2024) ..................................... 9

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019)............................................................. 29

*Connick v. Thompson*, 563 U.S. 51 (2011) ................................................................................... 49

*Daniel v. Cook Cnty.*, 833 F.3d 728 (7th Cir. 2016)..................................................................... 49

*Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021)........................................... 49

*Evans v. City of Chicago*, No. 10 C 542, 2010 WL 3075651(N.D. Ill. Aug. 5, 2010) ................ 21

*Fields v. Chicago*, 981 F.3d 534 (7th Cir. 2020) .................................................................... 32, 33

*First Midwest Bank, Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) ................................................................................................................................ 4, 9, 50

*Frake v. City of Chicago*, 210 F.3d 779 (7th Cir. 2000)......................................................... 23, 39

*FTC v. Bay Area Business Council, Inc.*, 423 F.3d 627 (7th Cir. 2005)......................................... 6

*Gbur v. City of Harvey*, 835 F. Supp. 2d 600 (N.D. Ill. 2011) ...................................................... 6

*Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372 (7th Cir. 2017).................................. 32, 33, 34

*Godinez v. City of Chicago*, 2019 WL 5597190 (N.D. Ill. Oct. 30, 2019) ................................... 48

*Greer v. Bd. of Ed.*, 267 F.3d 723 (7th Cir. 2001) ....................................................... 5, 14, 15, 38

*Hellbachs Café LLC v. City of Madison*, 46 F.4th 525 (7th Cir. 2022)......................................... 49

*Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.,* 2008 WL 11463582 (E.D. Wis. Nov. 24, 2008) ............................................................................................................................................. passim

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020)...................................................................... 8

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ......................................................................... 8

*Johnson v. Obaisi,* No. 22-1620, 2023 WL 5950125 (7th Cir. Sept. 13, 2023) ........................... 12

*Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676 (N.D. Ill. 2015).................................................... 6

*Manarite v. City of Springfield*, 957 F.2d 953 (1st Cir. 1992)...................................................... 23

*Miller v. Mascillino*, No. 15-cv-11746, 2023 WL 6276526 (N.D. Ill. Sep. 26, 2023)................ 13

*Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018) .......................................................... 49

*Mirza v. Dep't of the Treasury ex rel. Rubin*, 17 F. Supp. 2d 759 (N.D. Ill. 1998)....................... 8

*Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) .............................................................. 9

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ................................................................. 51

*Murray v. Avon Products, Inc.*, No. 03 C 7594, 2004 WL 2921867 (N.D. Ill. Dec. 16, 2004)...... 5

*Natale v. Camden County Correctional Facility*, 318 F.3d 575 (3d Cir. 2003) ........................... 33

*Outlaw v. Newkirk*, 259 F.3d 833 (7th Cir. 2001).......................................................................... 11

*Palmer v. City of Chicago,* 562 F. Supp. 1067 (N.D. Ill. 1983) ................................................... 12

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987).................................................... 16, 36

*Palmquist v. Selvik*, 111 F.3d 1332 (7th Cir. 1997)..................................................................... 22

*Pickett v. Dart*, No. 13 C 1205, 2014 WL 919673 (N.D. Ill. Mar. 10, 2014).............................. 21

*Pursley v. City of Rockford*, 2024 WL 1050242 (N.D. Ill. Mar. 11, 2024) ...................... 6, 10, 15

*Rice v. Burks*, 999 F.2d 1172 (7th Cir. 1993) ............................................................................... 6

*Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015)............................................................... 26

*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003)............................................................. 42, 43, 44

*Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) ........................................................................... 37

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ............................................. 8, 49

*Spiegel v. McClintic*, 916 F.3d 611 (7th Cir. 2019)....................................................................... 9

*Stevo v. Frasor*, 662 F.3d 880 (7th Cir. 2011).............................................................................. 11

*Stockton v. Milwaukee County*, 44 F.4th 605 (7th Cir. 2022)...................................................... 49

*Taylor v. City of Chicago,* 2012 WL 669063 (N.D. Ill. Feb. 29, 2012)................................. 12, 36

*Tel-Lock, Inc. v. Thomson Consumer Elecs.*, 2005 WL 741390 (N.D. Ill. Mar. 30, 2005).......... 11

*Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293 (7th Cir. 2010)............................................. 20

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006).................................................. 42, 44

*Tillman v. Burge*, 813 F. Supp. 2d 946 (N.D. Ill. 2011) .............................................................. 34

*Tyler v. Runyon*, 70 F.3d 458 (7th Cir.1995)........................................................................ passim

*Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825 (N.D. Ill. 2018)....................................... 11

*Velez v. City of Chicago*, 2023 WL 6388231 (N.D. Ill. Sep. 30, 2023)................................... 4, 18

*Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994)............................................. 5

*Woodward v. Corr. Med. Servs.*, 368 F.3d 917 (7th Cir. 2004)..................................................... 34

## **RULES**

Fed. R. Civ. P. 26(C)(1) ............................................................................................................. 35

Fed. R. Civ. P. 37(c)(1) .............................................................................................................. 35

Fed. R. Evid. 1006 ..................................................................................................................... 13

L.R. 56.1(a)(2) ........................................................................................................................... 11

L.R. 56.1(a)(3) ........................................................................................................................... 11

L.R. 56.1(b)(3) ........................................................................................................................... 10

L.R. 56.1(d)(1) ..................................................................................................................... 10, 12

L.R. 56.1(d)(2) ................................................................................................................. 6, 12, 13

L.R. 56.1(d)(4) ....................................................................................................................... 6, 11

L.R. 56.1(e)(2) ............................................................................................................................. 6

L.R. 56.1(g) ................................................................................................................................ 32

Defendant City of Chicago (the "City"), by and through its undersigned counsel, in further support of its Memorandum of Law in Support of its Motion for Summary Judgment on Plaintiff's *Monell* claim (Count V) (Dkt. 330, Mem. Law Supp. City's Mot. Summ. J.) ("City's MSJ"), and in reply to Plaintiff's Consolidated Response in Opposition to Defendants' Summary Judgment Motions (Dkt. 341, Pl.'s Resp. Opp'n Defs' Mots. Summ. J.) ("Plaintiff's Response")[1], states as follows:

## INTRODUCTION

To avoid summary judgment on his *Monell* claim, Plaintiff filed a 40 plus page response, 10 pages of which are single spaced bullet points, and nearly 200 "fact" statements that are not, by any definition, concise (and would likely total nearly 500 if Plaintiff had abided by the Local Rules). Plaintiff does so in order to create the illusion that there are material facts in dispute that warrant the denial of the City's MSJ. Hoping to avoid summary judgment and instead of addressing the City's arguments, Plaintiff distracts with wholly irrelevant incidents that pre-date Plaintiff's arrest, in some cases by decades, and involve allegations that Plaintiff does not make, including allegations involving experts disclosed in other cases but not this one, irrelevant inspector general reports that also post-date Plaintiff's arrest by decades, as well as the reports of

---

[1] For ease of reference, the City includes the following list of shorthand terms used herein for all the frequently referred to docket cites.
- Parties' Joint Statement of Facts is cited as **"JSOF" (Dkt. 320)**.
- Memorandum of Law in Support of Defendant City of Chicago's Motion for Summary Judgment is cited as **"City's MSJ" (Dkt. 330)**.
- Defendant Officers' Memorandum of Law in Support of Motion for Summary Judgment is cited as **"Officers' MSJ" (Dkt. 323)**.
- Defendant Guevara's Motion to Join the Parties' Joint Statement of Uncontested Facts and Memorandum of Law in Support of Their Motion for Summary Judgment is cited as **"Guevara's MSJ" (Dkt. 309)**.
- Plaintiff's Statement of Disputed Facts in Support of His Opposition to Defendants' Motions for Summary Judgment is cited as **"PSODF" (Dkt. 340)**.
- Plaintiff Demetrius Johnson's Consolidated Response in Opposition to Defendants' Summary Judgment Motions is cited as **"Plaintiff's Response" (Dkt. 341)**.

Plaintiff's experts, Thomas Tiderington and Nancy Steblay, which Plaintiff relies on nearly exclusively (*see* Dkt. 340, PSODF, at ¶¶ 357-74, 402, 417-48, 461, 466, 468, 470), even when their deposition testimony conflicts with their reports. In fact, in support of his *Monell* theory based on CPD's identification procedures, Plaintiff cites to his expert Nancy Steblay in support of over 30 paragraphs (*see* Dkt. 340, PSODF, at ¶¶ 402, 417-48) but relies on her deposition in support of *only two* paragraphs (*see* Dkt. 340, PSODF, at ¶¶ 422, 423). Similarly, in support of his evidence suppression *Monell* theory, commonly referred to as a "street file" theory, Plaintiff cites to his expert Thomas Tiderington in support of over 20 paragraphs (*see* Dkt. 340, PSODF, at ¶¶ 357-74, 461, 466, 468, 470) but relies on his deposition in support of *only one* paragraph (*see* Dkt. 340, PSODF, at ¶ 368). Recognizing that his experts uniformly did not stand up to cross-examination at their respective depositions, Plaintiff, in an attempt to convert inadmissible expert report hearsay into admissible evidence to defeat the City's MSJ, filed sworn declarations from his experts ***after*** the parties engaged in this Court's JSOF process and the City lodged its hearsay objection to Plaintiff's use of his expert reports, which was quite obviously long after his Rule 26(a)(2) disclosures were due, and his experts were deposed. (Dkt. 339-17, Ex. 230, Declaration of Thomas Tiderington signed 1/22/24; Ex. 1, Declaration of Nancy Steblay signed 1/22/24). These belatedly disclosed affidavits should be stricken because they were produced in violation of Rule 26(a). However, even with these declarations, the bare conclusions that Plaintiff advocates for based on these unrelated cases and reports, and his retained experts, do not give rise to any material factual dispute warranting denial of summary judgment for the City.

Plaintiff either ignores or distorts the City's arguments when he claims there are at least five reasons this Court should deny the City's MSJ. (Dkt. 341, Pl. Resp., at 128-29). First, Plaintiff's argument that the City did not move for summary judgment on **all** of Plaintiff's *Monell*

theories against it is fanciful. Plaintiff identified the *Monell* theories he was pursuing in response to the City's interrogatories, and he has never supplemented them. More importantly, his "additional" *Monell* theories are simply restated arguments of the theories that he did identify. In any event, Plaintiff has no evidence to support any of his theories. Specifically, Plaintiff has developed no evidence, including from his expert, that the City has a widespread practice of fabricating witness identifications. Second, Plaintiff's quasi-issue preclusion argument is undeveloped and relies on evidence that does not support his theory (the cases – *Fields* and *Rivera* - upon which he relies focus on a "street files" theory and Plaintiff has not identified a "street file" in this case). That argument is also belied by Plaintiff's years-long quest in discovery to obtain the evidence that he now claims he never needed. Specifically, he sought and obtained hundreds of unrelated homicide investigative files, Records Division ("RD") files, companion Cook County State's Attorney ("CCSAO") files and companion Cook County Public Defender ("CCPDO") files to establish the City's practices. Plaintiff has failed to show that these files support his claims (because they do not). And so now Plaintiff says the City's arguments are frivolous and the record does not matter because his claims have already been established by *Fields* and *Rivera*. Third, Plaintiff's argument that the City has no evidence to contest that City policymakers were both on notice of the need for policies governing the recording and disclosure of investigative materials in homicide cases and promulgated facially deficient written policies that lead to the suppression of exculpatory evidence is devoid of any merit. Fourth, Plaintiff's claim that there is ample evidence, even without his infirm experts, that would permit a reasonable jury to conclude that the City knew of and was indifferent to a widespread practice of suppressing exculpatory evidence rests exclusively on distortions of decades old cases, court rulings, and inspector general reports that post-date the events in this case by 27 years. Critically, Plaintiff has not identified any "file"

containing exculpatory evidence that he maintains was withheld from him by the City resulting from the City's policies and practices (and his belated disclosures, discussed *infra* at 34-35, do not save the claim). Fifth, with respect to the City's purported widespread practice of fabricating witness identifications, his own identification expert does not even support that theory. Specifically, Steblay testified that she did not evaluate whether any of the eyewitness identifications from the datasets were fabricated because "[t]here's no way to know that[]". (*See* Dkt. 320, JSOF, at ¶ 276). Judge Chang recently rejected Steblay's opinion to support this very same theory. *See Velez v. City of Chicago*, No. 1:18-CV-08144, 2023 WL 6388231, at *23 n.10 (N.D. Ill. Sep. 30, 2023) (finding that Steblay's report was not probative for summary judgment purposes because the case involved fabrication claims, and not suggestive identification). As the City explained in its *Daubert* motions as well as in its MSJ, when scrutinized, none of Plaintiff's experts can get past this Court's gatekeeping function.

Once Plaintiff's convoluted submissions are untangled and stripped of hyperbole, and the Court can assess the record in light of the City's specific arguments, it is clear no genuine issues of fact remain on any of the myriad of *Monell* theories that Plaintiff has advanced in the hope that something will survive summary judgment. Summary judgment must be granted in favor of the City on the *Monell* claim because Plaintiff cannot demonstrate through admissible evidence that the City itself violated his rights. The City's MSJ demonstrated that Plaintiff's "widespread practice" *Monell* claims based on alleged withholding of *Brady* evidence and alleged fabricated witness identifications with unduly suggestive identification procedures fail when tested against the rigorous *Monell* requirements that must be proved to impose direct liability against the City. *See First Midwest Bank, Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (a *Monell* claim asserting a widespread practice theory must establish that the

municipality indeed had an unconstitutional practice that was widespread, it was deliberately indifferent to such a practice, and that the practice caused plaintiff's constitutional injury). Plaintiff utterly failed to address the essential elements of municipal fault. The Court has purposefully erected rigorous standards of causation and deliberate indifference which must be satisfied before claims seeking to hold municipalities *directly* liable for their employees' constitutional violations can be submitted to federal juries. *Bd. of Cnty. Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 407 (1997). Those standards plainly have not been satisfied here.

For the reasons set forth in its MSJ and as stated herein, the City is entitled to summary judgment on Count V, the *Monell* claim. Accordingly, the City's Motion for Summary Judgment should be granted in its entirety.

## ARGUMENT

## I.   PLAINTIFF HAS CREATED A "JUMBLED MASS" OF SUMMARY JUDGMENT.

The Seventh Circuit and courts in this district have repeatedly warned plaintiffs who craft their summary judgment submissions as a "veritable catapult to hurl a jumbled mass of information at the [court and the defense] in the hope of avoiding summary judgment." *See, e.g., Greer v. Bd. of Ed.*, 267 F.3d 723, 727 (7th Cir. 2001); *Murray v. Avon Products, Inc.*, No. 03 C 7594, 2004 WL 2921867, at \*6 (N.D. Ill. Dec. 16, 2004). In *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994), the court stated: "[M]any non-movants are satisfied to submit virtually all the discovery they have performed . . .. remind the court that they are 'entitled to all inferences,' and that 'jury trials are favored' and then let the court sort it all out. Not one of these things is even remotely helpful to resolving the issues succinctly framed by Rule 56." The Seventh Circuit has long condemned such strategies: "Just because an unfortunately (perhaps purposefully) unclear record leaves open a universe of possibilities . . . does not mean a trial is necessary to sort through

the hypothetical possibilities." *Rice v. Burks*, 999 F.2d 1172, 1175 (7th Cir. 1993). In response to the City's summary judgment motion, Plaintiff has failed to heed these warnings and, indeed, hurled a "jumbled mass" before this Court in contravention of L.R. 56.1 and in the hopes this Court will throw up its hands and find fact disputes preclude summary judgment. *See Cesario v. Jewel Food Stores, Inc.*, No. 17 CV 319, 2020 WL 996498, at *1 (N.D. Ill. Mar. 2, 2020); *Pursley v. City of Rockford*, No. 3:18-cv-50040, 2024 WL 1050242, at *19 (N.D. Ill. Mar. 11, 2024) (admonishing the parties for failing to comply with L.R. 56.1 and stating "in the future, the Court will simply strike all the statements and corresponding briefs and require that they be resubmitted in compliance with the rule. Please do better."). For example, Plaintiff includes 88 paragraphs in the PSODF, which Plaintiff claims are "disputed," that are identical, nearly identical or partial duplication to paragraphs in the JSOF, which Plaintiff claims are "undisputed." (Compare Dkt. 340, PSODF with Dkt. 320, JSOF and Dkt. 313).

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). "In theory, the statements serve a valuable purpose: they help the Court in 'organizing the evidence and identifying disputed facts.'" *Pursley*, 2024 WL 1050242, at *1 (quoting *FTC v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633 (7th Cir. 2005)). Factual allegations "should not contain legal argument." L.R. 56.1(d)(4). A statement of material facts "must be supported by citation to the specific evidentiary material" and may be disregarded if not. L.R. 56.1(d)(2). "District courts are entitled to expect strict compliance with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 607 (N.D. Ill. 2011) (internal quotations omitted). *See also Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000)

("Factual allegations not properly supported by citation to the record are nullities"). Neither the language nor intent of L.R. 56.1 was followed in this case. Given this flagrant flouting of the Rules, Defendants were granted leave to file a motion to strike the PSODF (Dkt. 347), and those arguments are incorporated herein. (*See* City's Mot. Strike PSODF).

In total, Plaintiff has presented the Court with 493 paragraphs of what Plaintiff calls "Plaintiff's Statement of Disputed Facts in Support of his Opposition to Defendants' Motions for Summary Judgment" (Dkt. 340, PSODF) in contravention of Rule 56.1(b)(3), which allows the opposing party to submit a "statement of additional material facts that complies with Rule 56.1(d)", and 169 total pages of Rule 56.1(b)(1) memorandum of law in response to Defendants' Motions for Summary Judgment (Dkt. 341, Pl.'s Resp.). The paragraphs are not short (*see, e.g.,* Dkt. 340, PSODF, at ¶¶ 489 (four pages long and single-spaced) and 492 (over seven pages long and single-spaced)), nor do they "contain only one or two individual allegations." *Malec*, 191 F.R.D. at 583. The statements are also not limited to material facts—some are immaterial (*see, e.g.,* Dkt. 340, PSODF, at ¶¶ 301, 303-29), others are not facts (*see, e.g.,* Dkt. 340, PSODF, at ¶¶ 323, 334, 336). Nearly all are argumentative and most rely on inadmissible evidence. In sum, the PSODF violates each and every one of Rule 56's prohibitions in nearly every paragraph. Beginning with PSODF ¶ 301 (the first paragraph to address Plaintiff's *Monell* theories), which is three pages long (single-spaced) and contains multiple sub-paragraphs that include lines and lines of argument (often relying on inadmissible evidence) and ending with ¶¶ 489-492, which are fourteen pages long (single-spaced) and contain multiple sub-paragraphs that reference over sixty separate individuals or incidents that also include lines and lines of argument (again, often relying on inadmissible evidence or distorting admissible evidence), the vast majority of the paragraphs in the PSODF run counter to both the language and intent of Rule 56.1. Rule 56.1 was intended to simplify the

summary judgment process. *Mirza v. Dep't of the Treasury ex rel. Rubin*, 17 F. Supp. 2d 759, 762 (N.D. Ill. 1998). That certainly did not happen in this case.

### A.   Plaintiff is wrong about the legal framework governing *Monell* claims.

At the outset, it is imperative to note that Plaintiff argues that the City misstates the legal framework governing *Monell* claims and that there are actually four potential avenues, rather than three, through which municipal liability could theoretically attach: 1) an express policy; 2) a widespread custom or practice; 3) action of a person with final policy making authority; and 4) a failure to train, supervise or discipline officers that amounts to deliberate indifference. (Dkt. 341, Pl.'s Resp., at 130). Plaintiff is incorrect. First, the cases which Plaintiff cites for his purported "failure to train" avenue for *Monell* liability do not support his position. For instance, in *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007), the court did not hold that failure to train is one of the types of actions that can support municipal liability, rather, the court merely noted that there can be "no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights." The same is true for *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006), which merely notes that "establishing *Monell* liability based on evidence of inadequate training or supervision requires proof of "deliberate indifference" on the part of the local government. In fact, a number of the cases that Plaintiff cites in support of his purported "four theories" argument belie his position. For instance, *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020) expressly found that "[a] municipal action can take the form of an express policy (embodied, for example, in a policy statement, regulation, or decision officially adopted by municipal decisionmakers), an informal but established municipal custom, or even the action of a policymaker authorized to act for the municipality." Moreover, the holding in *Polk*, which Plaintiff cites to regarding a municipality's failure to adopt a needed policy has no

application here because the holding was specifically confined to the factual circumstances of that case. *Id.*

Moreover, the 7th Circuit recently reaffirmed in 2021, the three potential avenues for *Monell* liability. *First Midwest Bank*, 988 F.3d at 986. To prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself. *Id.* Specifically, the plaintiff must prove that the constitutional violation was caused by a governmental "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978)). "We have interpreted this language to include *three types* of actions that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Id.* (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)) (emphasis added). (*See also Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628 (7th Cir. 2024)) (again reaffirming the three avenues for *Monell* liability).

However, even accepting Plaintiff's misunderstanding of the legal standards governing *Monell*, Plaintiff's argument still fails because the only avenue through which he has developed any evidence, though insufficiently, is based on a widespread practice theory. When asked in numerous different ways throughout discovery to state the basis for his *Monell* theories, Plaintiff did not once identify any actual, admissible evidence of written policies that he maintained were unconstitutional, an action of a specific person with final policymaking authority, or a failure to train, supervise or discipline officers that amounted to deliberate indifference. (Dkt. 320, JSOF, at ¶¶ 3-8). Nor does it suffice for Plaintiff to simply repeat bare, conclusory allegations made in

his complaint in his answer to written discovery and recharacterize it as "evidence" without any support. (*See* Dkt. 340, PSODF, ¶ 301). Thus, as with his *Monell* theories, Plaintiff's avenues for *Monell* liability are limited to his interrogatory responses, or lack thereof. *Pursley*, 2024 WL 1050242 at *14. Additionally, even ignoring Plaintiff's written discovery responses, the PSODF contains no admissible evidence to support a *Monell* claim based on anything other than a widespread practice framework. Moreover, even if this Court were to rely on the inadmissible evidence Plaintiff offers in support of these other theories, the evidence is insufficient to support a *Monell* claim, as set forth more fully below. Accordingly, the City analyzed Plaintiff's *Monell* theories under a widespread practice framework only.

### B. Plaintiff's statement of disputed facts is improper, should be stricken and those facts disregarded.

Pursuant to L.R. 56.1(b)(3), (d)(1), Plaintiff was required to serve and file a "concise" statement of additional facts *not* set forth in the JSOF. Plaintiff flagrantly violated the Local Rule as well as this Court's standing orders. Judge Ellis Standing Order, Summary Judgment Practice. 88 of the "disputed" facts in Plaintiff's SODF (*see* dkt. 340, PSODF) also appear verbatim, nearly verbatim or as a partial duplication in the JSOF (*see* dkt. 320, JSOF and dkt. 313), which Plaintiff claims are undisputed material facts. It simply cannot stand that the *exact same* facts are either characterized as disputed or undisputed depending on whether it serves Plaintiff.

This Court's standing order provides that **"[t]he Local Rules and the Court's procedures are not mere technicalities. Failure to abide by any of them, especially the joint statement requirement, will result in the Court striking briefs, disregarding statements of fact, deeming statements of fact admitted, denying summary judgment, and/or imposing sanctions."** Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, the Seventh Circuit has "repeatedly held that district judges are entitled

to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011); *see also, e.g.*, *Ammons v. Aramark Uniform Services, Inc*., 368 F.3d 809, 817-18 (7th Cir. 2004).

In addition to recasting paragraphs from the parties' JSOF, Plaintiff advances argument and inference in place of facts that often do not provide any material bearing on summary judgment or, worse, do not support the record citations, in violation of L.R. 56.1(a)(2), which may be grounds for denial of the motion under L.R. 56.1(a)(3). A summary of the City's objections to PSODF is as follows:

1. Contradicts already admitted facts. Plaintiff impermissibly disputes facts that he has already agreed are undisputed. (Dkt. 340, PSODF, at ¶¶ 323, 324, 326, 411).

2. Duplicative. Plaintiff impermissibly repeats facts in the PSODF that are already included in the JSOF. (Dkt. 340, PSODF, at ¶¶ 301, 302, 320, 323-324, 326-327, 357-358, 368, 400, 405-407, 417-418, 421, 435, 447).

3. Improperly contains legal arguments or is argumentative. *See Uncommon, LLC v. Spigen, Inc.,* 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (statements of fact should not contain legal argument), *aff'd,* 926 F.3d 409 (7th Cir. 2019) (responses to the opposing party's statement of facts are not the place for "purely argumentative details"); L.R. 56.1(d)(4). (Dkt. 340, PSODF, at ¶¶ 301-05, 308, 310-13, 325-26, 329, 331-32, 335-36, 338-47, 349, 351-56, 362-66, 368, 370-71, 375-83, 385-94, 397-99, 402, 407-11, 415-16, 419-20, 423-25, 427-29, 431-33, 435-36, 438-40, 442-43, 446-47, 449, 452-56, 459-68, 471-72, 476-79, 481-82, 485-93).

4. Improperly states a legal conclusion. *See Tel-Lock, Inc. v. Thomson Consumer Elecs.*, No. 03 C 320, 2005 WL 741390, at *2 (N.D. Ill. Mar. 30, 2005) (striking portions of party's 56.1 that contained legal conclusions); *see also Uncommon,* 305 F. Supp. 3d at 838, *aff'd,* 926 F.3d 409 (responses to the opposing party's statement of facts are not the place for "legal conclusions"). (Dkt. 340, PSODF, at ¶¶ 301-05, 308, 310-13, 332, 335-56, 359, 362-63, 366, 368, 370-71, 376-94, 397-99, 402, 449, 457-63, 471-72, 477, 488).

5. Does not assert "material" facts that warrant denial of Defendants' motions for summary judgment. L.R. 56.1(d)(1); *see Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001); s*ee also Malec*, 191 F.R.D. at 583 (material fact is fact that is "pertinent to the outcome of the issues identified in the summary judgment motion"). (Dkt. 340,

PSODF, at ¶¶ 302-06, 308-29, 332-36, 338-39, 341, 343-44, 346-48, 350-55, 362, 368, 372, 375, 378-79, 383-90, 392, 395-98, 402-25, 427-47, 449-56, 457-85, 488, 490-93).

6.  Not supported by the record or admissible evidence. *See Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000); L.R. 56.1(d)(2). (Dkt. 340, PSODF, at ¶¶ 301-05, 308-13, 315, 318-20, 323, 327-29, 331-50, 352, 354-72, 376-99, 402-05, 408-09, 411-12, 414-15, 417-25, 427-47, 449-55, 457-63, 465-66, 468-72, 475-77, 480, 485, 488-93).

7.  Improperly contains multiple allegations. *See Malec*, 191 F.R.D. at 583 ("[T]he numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response"); L.R. 56.1(d)(1). (Dkt. 340, PSODF, at ¶¶ 301-03, 305, 308, 310, 349, 351-53, 375, 394, 397-99, 415, 423-25, 427-29, 432-33, 446, 453, 467, 471, 476, 485-87, 489-93).

8.  Improperly fails to cite any "specific evidentiary material." *See Malec*, 191 F.R.D. at 583 ("The court may disregard any asserted fact that is not supported with a citation"); L.R. 56.1(d)(2). (Dkt. 340, PSODF, at ¶¶ 347, 349).

9.  Relies on materials that are not part of the record in this case because it is not bates stamped with any of the bates stamp designations connected to this case. *See Johnson v. Obaisi,* No. 22-1620, 2023 WL 5950125, at \*2 (7th Cir. Sept. 13, 2023) (Rule 56(c)(3) assigns the parties the duty to "cit[e] to particular parts of materials *in the record*" when asserting that genuine factual disputes foreclose summary judgment) (emphasis added). (Dkt. 340, PSODF, at ¶¶ 305, 451, 453, 487, 492).

10. Improperly relies on experts' reports (and their testimony) who were not disclosed in violation of Fed. R. Civ. P. 26(a)(2)(D). (Dkt. 340, PSODF, at ¶¶ 301, 305, 345-50, 353, 370-71, 385, 446-47).

11. Improperly relies on experts' rebuttal opinions. *See Butler v. Sears Roebuck & Co*., 06 C 7023, 2010 WL 2697601 at \*1 (N.D. Ill. 2010) ("A rebuttal report should be limited to 'contradict[ing] or rebut[ting] evidence on the same subject matter identified by another party'" it cannot be used to advance new arguments or new evidence to support plaintiff's expert's initial opinions) (quoting Rule 26(a)(2)(C)); *see also Baldwin Graphic Systems, Inc. v. Siebart, Inc*., 03 C 7713, 2005 WL 1300763 at \*2 (N.D. Ill. 2005) ("The rebuttal report is no place for presenting new arguments"). (Dkt. 340, PSODF, at ¶¶ 402, 417, 422-24, 427-29, 439, 443-45).

12. Improperly relies on the courts' opinions in *Palmer v. City of Chicago,* 562 F. Supp. 1067 (N.D. Ill. 1983) and *Jones v. City of Chicago,* 856 F.2d 985 (7th Cir. 1988) to establish "facts" recited in court opinions. *See Taylor v. City of Chicago,* No. 09 C 5092, 2012 WL 669063 (N.D. Ill. Feb. 29, 2012) (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). (Dkt. 340, PSODF, at ¶¶ 302, 304-05, 312, 318-19, 323, 337, 339).

13. Improperly relies on "summaries" prepared by an unidentified source, thereby requiring the City, and this Court, to sort through hundreds of thousands of pages of documents to understand the nature and basis of each purported fact. *See* Fed. R. Evid. 1006; L.R. 56.1(d)(2) ("Each asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it"). Further, Plaintiff provides no foundation for the "summaries," and they are inadmissible hearsay. (Dkt. 340, PSODF, at ¶¶ 347, 349).

The Court should disregard in their entirety the offending statements and the arguments that flow from them, as they cannot create a genuine dispute of fact for trial. *Miller v. Mascillino*, No. 15-cv-11746, 2023 WL 6276526, at *4 (N.D. Ill. Sep. 26, 2023); *see also Bryant v. Bd. Of Educ., Dist. 228*, 347 F. App'x 250, 253 (7th Cir. 2009) ("The district court was entitled to disregard those assertions in [the] proposed statement of facts that violated Local Rule 56.1 by not being properly supported"). Per the objections listed above, the Court should disregard and strike the PSODF in its entirety.

### C. Plaintiff impermissibly repeats arguments throughout his summary judgment brief.

Plaintiff impermissibly repeats arguments within his Response. For instance, Plaintiff's heading for Section (V)(D)(6)(a) of his Response is "The City's Causation-Related Arguments Lack Merit." (Dkt. 341, Pl.'s Resp., at 148). Then, in Section (V)(F)(2), Plaintiff's heading repeats nearly verbatim "The City's Causation Argument Is Meritless." (*Id.* at 167). Plaintiff also makes the argument that the City is wrong that the only thing supporting his *Monell* theory regarding evidence suppression is expert evidence (*id.* at 150); however, Plaintiff makes this exact same argument at Section (V)(D)(1) of his Response, titled "The City's False Premise Regarding Expert Evidence." (*Id.* at 138). Finally, Plaintiff repeats entire arguments in his Response regarding the City's challenges to Tiderington's opinions that he admits to having already included in his response to the City's *Daubert* motion. (*Id.* at 151-52). For this, the City refers the Court to its

Reply in Support of its Motion to Bar Tiderington. (*See generally,* City's Reply Mot. Bar Tiderington).

Plaintiff impermissibly repeating arguments already made throughout the summary judgment briefing represents yet another example of his deliberate attempt to confuse and overwhelm the Court by creating a "jumbled mass of information." *Greer*, 267 F.3d at 727. To the extent Plaintiff repeats arguments in his Response that have already been made throughout his Response or *Daubert* Responses, the Court should disregard those arguments.

## II. THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S *MONELL* THEORIES BECAUSE PLAINTIFF HAS FAILED TO DEVELOP SUFFICIENT EVIDENCE.[2]

Plaintiff argues that the City "inexplicably asserts that Johnson is only pursuing three [sic] *Monell* theories," *i.e.*, evidence suppression and identification procedures, and that the City makes no argument about any other *Monell* theory. However, Plaintiff's own responses to written discovery demonstrate his theories. When asked to "state the factual basis and evidence upon which Plaintiff [would] rely to establish how [each] theory [of liability that Plaintiff intends to purse] amounts to a 'policy' pursuant to *Monell*," Plaintiff listed only three theories: (1) eyewitness identifications; (2) file suppression or "street files;" and (3) supervision and discipline, and Plaintiff ultimately abandoned his failure to supervise and discipline theory. (Dkt. 320, JSOF, ¶

---

[2] As stated in the City's MSJ, Plaintiff has developed *no* evidence to support the following *Monell* theories alleged in his complaint: (1) routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person; (2) operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct; (3) condoned and facilitated a code of silence within the Chicago Police Department; (4) failed to track and identify police officers who are repeatedly accused of serious misconduct; and (5) declined to provide adequate training to Chicago police detectives. (Dkt. 330, City's MSJ, at 2). Because Plaintiff fails to dispute the City's legal argument regarding these theories, any dispute Plaintiff may have against the City has been forfeited. *See Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995) ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point"). Accordingly, Plaintiff forfeits any argument with respect to these five theories and summary judgment should be granted as a matter of course.

3). While interrogatory responses generally are not binding, if an answer becomes outdated, a party should supplement or change its previous interrogatory response. *Pursley*, 2024 WL 1050242 at *14. Thus, Plaintiff's *Monell* claim is limited to his interrogatory responses. It is not asking a lot of Plaintiff to explain his claim when he alleges law enforcement officers framed him, resulting in decades of incarceration. *Id.*

Plaintiff goes on to argue that the City ignores, and therefore forfeits, other *Monell* theories at issue in the case and cites one and a half pages of single-spaced, non-numbered bullet points of other theories that Plaintiff claims to pursue, thereby, again, hurling an impermissible "jumbled mass of information" at the Court. (Dkt. 341, Pl.'s Resp., at 131-33). *Greer*, 267 F.3d at 727. However, the Court should not accept Plaintiff's "jumbled mass" of *Monell* theories for several reasons. First, setting aside the fact that Plaintiff did not identify any of these purported additional theories in his answers to written discovery, all of Plaintiff's additional "theories" pertain to and can be subcategorized under his two overall *Monell* theories that are at issue in this case (fabricated and suggestive identifications and "street files"), for which the City addressed at length in its MSJ. Moreover, much of what Plaintiff claims constitutes additional theories are not even alleged in the complaint and Plaintiff cannot, retroactively, invent additional theories now.

Finally, even if Plaintiff did allege these additional theories in his complaint and written discovery, Plaintiff has set forth no evidence in support of any of them. The City discusses each purported additional theory, in turn, below:

| Plaintiff's New Unsupported Theory: | The City's Response: |
|---|---|
| Plaintiff claims to pursue the theory that CPD's "express written policies governing the creation, maintenance, and production of investigative | Plaintiff cites 86 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301-356, 359, 362-366, 368-372, 376-393, 409) that he claims support this "theory" without any discussion whatsoever of what any of these "facts" show about the City's policies. None of the cited "facts" establish |

15

| Plaintiff's New Unsupported Theory: | The City's Response: |
|---|---|
| information were deficient (or non-existent) and caused the suppression of exculpatory investigative materials in homicide cases, including in this case." (Dkt. 341, Pl.'s Resp., at 131). | that the CPD's written policies were "deficient," let alone unconstitutional.  For example, PSODF ¶ 316 simply states that Notice 82-2 did not require detectives to preserve notes or memos that had not already been turned in a police file.  (Dkt. 340, PSODF, ¶ 316).  Plaintiff provides no evidence or argument to suggest that this policy was constitutionally deficient.  Moreover, the 1982 directive was replaced multiple times and was no longer in effect at the time of Plaintiff's arrest and the homicide investigation at issue in this lawsuit, and thus, does not demonstrate the express policy Plaintiff suggests caused his constitutional harms.  And, as another example, Plaintiff's criticisms of S.O. 86-3 as set forth in PSODF ¶ 329 are similarly flawed in that Plaintiff provides no evidence or argument that this policy was constitutionally deficient. Additionally, while Plaintiff claims that there were "non-existent" policies, he fails to identify a single written policy that did not exist but was required by the constitution.  And finally, Plaintiff provides no explanation for how the purportedly deficient and/or nonexistent policies resulted in the suppression of exculpatory materials in Plaintiff's case. |
| Plaintiff claims to pursue the theory that the "City's final policymakers, who were on notice of the problem of systemic suppression of investigative materials, chose not to adopt needed policies to ensure transmission of police investigative information in homicide cases, and in doing so made a decision that caused suppression of exculpatory materials in Johnson's case." (Dkt. 341, Pl.'s Resp., at 131-32). | The premise for this theory that *Jones* and *Palmer* established "the problem of systemic suppression of investigative materials" is flawed.  *Jones* did not establish "systemic suppression of investigative materials." *Jones*, 856 F.2d at 991. Rather, in *Jones*, the Seventh Circuit simply noted that "although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law." *Id.* at 995.  In *Palmer*, the Court affirmatively held that the class plaintiffs failed to prove any systemic constitutional violations as a result of the City's "street file" practice. *Palmer v. City of Chicago*, 806 F.2d 1316, 1320-21 (7th Cir. 1987). Specifically, the Seventh Circuit found that the class plaintiffs' claims "depend[] on there being exculpatory material in the street files – *and there isn't any.* The suit has been abandoned because it has been shown to have, in fact, no legal merit." *Id.* (emphasis added).  Further, the 55 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301-341, 342-355) that Plaintiff cites to support this "theory" lack any discussion whatsoever of what any of these |

| Plaintiff's New Unsupported Theory: | The City's Response: |
|---|---|
|  | "facts" actually show about the City's policies. None of these "facts" establishes that the City's policymakers were on notice of systemic suppression or chose not to adopt needed policies. For example, PSODF ¶ 309 simply states that James Hickey, the City's 30(b)(6) witness in previous litigation, conducted an internal review of CPD's practice in 1982 after *Jones* and *Palmer*. (Dkt. 340, PSODF, ¶ 309). Plaintiff provides no explanation for how the City's final policymakers, who Plaintiff does not identify, "made a decision that caused suppression of exculpatory materials in Johnson's case" other than to generally claim that these unidentified final policymakers failed to adopt undefined "needed policies." |
| Plaintiff claims to pursue the theory that the "City failed to adequately train, supervise, and discipline its police officers regarding documentation of investigative information, maintenance of investigative files, production of investigative materials to the criminal justice system, and the documentation of their investigations." (Dkt. 341, Pl.'s Resp., at 132). | Plaintiff cites 24 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301, 322, 326-27, 332-334, 337, 343, 356, 388-389, 457-470) that he claims support this "theory," again without any discussion whatsoever of what any of these "facts" show about the City's policies. But none of the cited "facts" establish that the City failed to adequately train, supervise, and discipline its police officers regarding documentation. For example, PSODF ¶ 460 states that there was a three-hour training on notetaking after the 1983 change. (Dkt. 340, PSODF, ¶ 460). To the contrary, this fact establishes that the City *did* train its police officers. Moreover, even assuming that this was the only training provided in the immediate aftermath of the change, which it was not (*see* Dkt. 340, PSODF, at ¶ 460)[3], Plaintiff provides zero explanation for why it was constitutionally deficient. |
| Plaintiff claims to pursue the theory that CPD's "express | Similarly, Plaintiff cites 41 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301, 400-416, 471-488, 489-493) |

---

[3] First, the record citation (*see* Dkt. 340, PSODF, ¶ 460) does not support the assertion that, "[t]he only training that happened after the 1983 changes was a 'three-hour training' on note taking." Furthermore, Commander Winstrom testified that detectives were trained on the Standard Operating Procedures (SOP) changes, and more specifically that they attended a 3-hour in-service training after the implementation of the 1982-83 directives, and after the 1986 directives were implemented, new detectives received training in their "service detective training," and if the police officer was already a detective when S.O. 86-3 was issued, they received a copy of S.O. 86-3, and were given "roll-call" training by their Sergent for five or seven straight days. (Dkt. 321-16, Ex. 16, at 151:3-152:24). Answering further, the assertion that the "[t]he only training that happened after the 1983 changes as a 'three-hour training' on note taking" is directly contradicted by Plaintiff's assertion in paragraph 462 (*see* Dkt. 340, PSODF, ¶ 462).

| Plaintiff's New Unsupported Theory: | The City's Response: |
|---|---|
| written policies governing the conduct and documentation of identification procedures were deficient (or non-existent) and caused the fabrication of false identifications, suggestive identification procedures, and inaccurate or non-documentation of eyewitness identification procedures." (Dkt. 341, Pl.'s Resp., at 132). | that he claims support this "theory," but does not discuss what any of these "facts" show about the City's written policies. None of the cited "facts" establish that CPD's written policies were "deficient," let alone unconstitutional. For example, PSODF ¶ 400 states that the City's policy regarding lineup procedures, effective at the time of the Fred investigation, was General Order 88-18. (Dkt. 340, PSODF, ¶ 400). Plaintiff provides no further support for his claim that G.O. 88-18 was deficient, let alone unconstitutional. Moreover, while Plaintiff again claims that there were "non-existent" policies, he again fails to identify a single written policy that did not exist but was required by the constitution. |
| Plaintiff claims to pursue the theory that the "City's final policymakers, who were on notice of the problem of false identifications, suggestive identification procedures, and inaccurate documentation of eyewitness identification procedures, chose not to adopt needed policies to ensure that accurate identification procedures were conducted and fairly reported at the time of the Fred investigation." (Dkt. 341, Pl.'s Resp., at 132). | In support, Plaintiff cites 30 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301, 394-416, 433-435, 443, 445, 447) that he claims support this "theory" without any discussion whatsoever of what any of these "facts" show about the City's policies. And, again, none of the cited "facts" establish that the City's policymakers were on notice of false identifications or chose not to adopt needed policies. For example, PSODF ¶ 447 simply states that Dr. Steblay concluded that the Chicago suspect identifications rate in the current case was "significantly higher" than the aggregate field studies. (Dkt. 340, PSODF, ¶ 447). More importantly, Dr. Steblay testified that she could not conclude that the differences were the result of fabrication. (Dkt. 320, JSOF, at ¶ 276) (Steblay testified that she did not evaluate whether any of the eyewitness identifications from the datasets were fabricated because "[t]here's no way to know that[]"). *See also Velez*, 2023 WL 6388231, at *23 n.10 (finding that Steblay's report was not probative for summary judgment purposes because the case involved fabrication claims, and not suggestive identification). |
| Plaintiff claims to pursue the theory that the "City is liable for its failure to adequately train, supervise, and discipline its officers to properly conduct identification procedures and to accurately record the results of those identification procedures." (Dkt. 341, Pl.'s Resp., at 132). | Plaintiff cites 39 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301, 356, 403-416, 471-488, 489-493) that he claims support this "theory" without any discussion whatsoever of what any of these "facts" show about the City's policies. But none of the cited "facts" establish that the City failed to adequately train, supervise, and discipline its police officers regarding identification procedures. For example, PSODF ¶ 485 states that 30(b)(6) representative Denham testified that he was unaware of any City |

| Plaintiff's New Unsupported Theory: | The City's Response: |
|---|---|
| | investigations or audits that were prompted by individual CR investigations from 1986 to 1998, or that evaluated whether there were problems with supervision of eyewitness procedures, or that the City conducted any criminal investigations of CPD officers for misconduct in connection with eyewitness identifications in this timeframe. (Dkt. 340, PSODF, ¶ 485). |
| Finally, Plaintiff claims to pursue the theory that the "City had notice of and was deliberately indifferent to a widespread practice among its police officers of fabricating false evidence used in criminal cases, and the City failed to train, supervise, and discipline officers who fabricated evidence, which resulted in violations of due process and numerous wrongful convictions." (Dkt. 341, Pl.'s Resp., at 133). | Plaintiff cites 44 paragraphs from the PSODF (*see* Dkt. 340, PSODF, at ¶¶ 301, 345-56, 449-456, 471-488, 489-493) that he claims support this "theory" without any discussion whatsoever of what any of these "facts" show about the City's policies. In addition to failing to identify this theory in his discovery responses, Plaintiff's purported "evidence" falls woefully short. For example, Plaintiff relies on PSODF ¶¶ 433-434 and 443-444 that focus on Steblay who affirmatively stated that there was no way to know from her work whether any identifications were fabricated. (*See* Dkt. 320, JSOF, at ¶ 276). |

## III. SUMMARY JUDGMENT IN THE CITY'S FAVOR IS REQUIRED IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF DEFENDANT OFFICERS.

The non-Guevara Defendants moved for summary judgment on *all* counts against them, including, as it pertains to the City, Plaintiff's Fourteenth Amendment due process *Brady* claim (Count I) and Plaintiff's Fourteenth Amendment due process fabricated or unduly suggestive identification procedures claim (Count I). (*See generally* Dkt. 323, Officers' MSJ). Additionally, Defendant Guevara joined the Officers' MSJ with respect to all the claims against him. (*See generally* Dkt. 264, Guevara's MSJ). In its MSJ, the City argued that if Defendant Officers did not commit any constitutional wrongs and summary judgment is granted in their favor, there could be no *Monell* liability, and summary judgment must be granted in favor of the City as well. (*See*

Dkt. 330, City's MSJ, at 6-8). Without any underlying constitutional violation against Defendant Officers relating to the conduct of photographic and live line up procedures, Plaintiff cannot proceed with a *Monell* claim on the same basis because doing so would create an inconsistent verdict. *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 305 (7th Cir. 2010).

In opposition to the City's MSJ, Plaintiff inexplicably argues that the Court can disregard the argument that the City is not liable if no Defendant Officer is liable because the Defendant Officers do not move for summary judgment on all of Plaintiff's constitutional claims. (Dkt. 341, Pl.'s Resp., at 166). Thus, according to Plaintiff, this Court need not decide at this stage whether the City's liability depends on a finding of Defendant Officer liability. (*Id.*). However, as explained above, Defendant Officers do move on all of Plaintiff's constitutional claims. Moreover, as it pertains to Defendant Officer liability, the only constitutional claims that are relevant for the City's purposes are the constitutional claims where Plaintiff has developed evidence, though insufficiently, to support his *Monell* theories, which are 1) fabricated and unduly suggestive identification procedures and 2) "street files" and withholding of *Brady* evidence. Therefore, Plaintiff's argument is beside the point.

Plaintiff also argues that the City is incorrect that it cannot be liable unless a Defendant Officer is found liable. (Dkt. 341, Pl.'s Resp., at 166). Plaintiff contends that *Thomas* created an exception to this rule which permits a plaintiff to proceed against a municipality even if the court finds in favor of the individual officers if doing so would not create an inconsistent verdict. 604 F.3d at 305. Plaintiff further cites numerous cases which he claims demonstrate that a municipal policy can cause a constitutional deprivation even if a jury finds the individual officers not liable. (Dkt. 341, Pl.'s Resp., at 166-67). However, the cases which Plaintiff relies on are not applicable to the present case because they either dealt with different *Monell* theories and/or the individual

20

officers were not named as parties. *See Bonds v. City of Chicago*, No. 16-CV-5112, 2018 WL 1316720, at *1 (N.D. Ill. Mar. 14, 2018) (excessive force and no individual officers were sued, yet still acknowledging that a § 1983 plaintiff who sues a municipality based on its employee's conduct must show that the employee violated the constitution); *Pickett v. Dart*, No. 13 C 1205, 2014 WL 919673, at *1 (N.D. Ill. Mar. 10, 2014) (no individual officers were sued); *Cage v. City of Chicago*, No. 9 C 3078, 2010 WL 3613981, at *1-2 (N.D. Ill. Sep. 8, 2010) (alleged policy of not providing exculpatory lab evidence to the defense); *Evans v. City of Chicago*, No. 10 C 542, 2010 WL 3075651, at *3-4 (N.D. Ill. Aug. 5, 2010) (individual officers not sued). Moreover, each required, as a threshold matter, that plaintiff demonstrate the violation of a constitutional right. Here, as it relates to the constitutional right at the core of his *Monell* claims, Plaintiff claims the Defendant Officers engaged in deliberate and intentional conduct to deprive him of his right to a fair trial. *Thomas* in no way informs that analysis and the *Thomas* exception does not apply to this case given the nature of the alleged constitutional violations and theories of municipal liability. Thus, the City's liability *does* depend on individual liability.

## IV. THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S FABRICATED IDENTIFICATION *MONELL* THEORY.

Plaintiff argues that material disputes of fact also preclude summary judgment on Plaintiff's *Monell* theory that the City was indifferent to a widespread practice of Chicago police officers fabricating witness identifications using suggestive identification procedures. (Dkt. 341, Pl.'s Resp., at 153-54). In apparent recognition of the vulnerability of Steblay's analysis, Plaintiff makes the overstated and unsubstantiated claim that he amassed "evidence of dozens of individual cases" in which Chicago police fabricated identifications using suggestive tactics. (*Id.*). Next, relying solely on his Steblay's suspect analysis, Plaintiff makes the shockingly illogical leap (one that even his own expert does not make nor can conclude), which is that CPD identification rates

represent a "dramatic and statistically significant departure from other jurisdictions, and [therefore] can *only* be explained by Chicago police suggestion during identification procedures." (*Id.*) (emphasis added). Plaintiff goes so far as to conclude that the error-ridden data analysis coded by Plaintiff's legal team (*see* Dkt. 326, City's Mot. Bar Steblay, at 11-22) "demonstrates a staggering and unprecedented" positive identification procedure rate. (Dkt. 341, Pl.'s Resp., at 154). Finally, in desperation, Plaintiff asserts, again without supporting evidence, that City policymakers promulgated deficient written policies, provided no training on proper identification procedures, took no steps to assess whether police identification procedures resulted in false identifications, and never disciplined officers who fabricated identifications. (*Id.*). As explained below, none of Plaintiff's arguments warrant denial of the City's MSJ.

### A. The non-expert evidence does not establish a widespread practice of fabricating witness identifications using suggestive identification procedures.

Plaintiff claims his fabricated and suggestive identification *Monell* theory is not based solely on expert testimony and points to various City policies regarding identification procedures which he claims are deficient. (Dkt. 341, Pl.'s Resp., at 154-57).[4]

Even if this Court considers the information Plaintiff cites, nothing in these statements demonstrates the City's policies were unconstitutional. Plaintiff fails to explain exactly *how* the City's policies on identification procedures are unconstitutional, and, more importantly, fails to demonstrate how these policies were "so obviously deficient and so likely to result in constitutional injury," which is required for *Monell* liability to attach. *See Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997) (stating that before liability can attach, the municipality must be on notice that their practices were so obviously deficient and so likely to result in constitutional injury).

---

[4] As an initial matter, the evidence upon which Plaintiff relies in the PSODF does not comply with Local Rule 56.1 or this Court's Standing Order for the reasons listed in Section I(B) above, and therefore, the PSODF should be stricken in its entirety.

"The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) (citing *Manarite v. City of Springfield*, 957 F.2d 953 (1st Cir. 1992)).

Plaintiff notes that the City's written policies did not address photo identification procedures. (Dkt. 341, Pl.'s Resp., at 155). But this statement ignores the City's 30(b)(6) witness who testified that officers were trained on how to conduct photo identification procedures. (Dkt. 340, PSODF, at ¶ 410).[5] Similarly, Plaintiff's contention that the policy "does not on its face explain what record must be made when suspects are *not* identified in a lineup" is a gross distortion of the evidence in this case. (Dkt. 341, Pl.'s Resp., at 155) (emphasis in original). This contention is irrelevant because Plaintiff makes no claim here that he suffered a constitutional deprivation resulting from the purported failure to record a filler identification. In any event, Plaintiff's contention is belied by the record. The City's written policy states: "In no case will a lineup be conducted without a Supplementary Report being completed." (Dkt. 320, JSOF, at ¶ 28). The City's 30(b)(6) witnesses made clear that the City's policies dictate that when a filler is identified that is to be recorded as a non-identification or a negative identification. (Dkt. 320, JSOF, at ¶ 272). Finally, Plaintiff's complains that the City's written policies did not require reporting discussions with witnesses, documentation of exculpatory or impeachment information, or an explanation of what was required before a supervisor approved a lineup report, and Plaintiff contends that these purported deficiencies represented a "gap" that was not filled by training. (Dkt. 341, Pl.'s Resp., at 155). These contentions are not supported by or distort the record evidence in this case (*see* dkt. 320, JSOF, at ¶¶ 16, 18, 19), and are irrelevant to Plaintiff's claim because

---

[5] Lt. Foster testified that detectives were trained that having four fillers in a suspect photo array was the ideal course of action. (Dkt. 321-14, Ex. 14, at 208:5-23).

Plaintiff makes no connection between these alleged "gaps" in policy and Plaintiff's constitutional injury. For example, Plaintiff ignores that undisputed fact that S.O. 83-1 expressly stated that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." (Dkt. 320, JSOF, at ¶ 16). Moreover, S.O. 83-1 specifically states that Detectives use GPRs to document "handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (Dkt. 320, JSOF, at ¶ 19).

Plaintiff then illogically argues that in the "absence of policy, training, supervision, and review, Chicago police officers fabricated identifications using suggestive identification procedures that were not properly documented." (Dkt. 341, Pl.'s Resp., at 156). As explained above, Plaintiff's "evidence" of the absence of policies, training, supervision and review is nonexistent, distorted and irrelevant to Plaintiff's claim, but that aside, it does not logically follow that the absence of such a policy would lead to fabricated identifications using suggestive identification procedures, of which Plaintiff has no evidence. Thus, Plaintiff lacks evidence to establish both prongs of his argument. He has not established that the absence of policies, training, supervision and review necessarily lead to fabricated identifications and, more importantly, lacks evidence that any identifications were fabricated. The City further refers the Court to its MSJ Section II(A)(1) regarding the lack of a causal connection between CPD's express written policies and Plaintiff's alleged constitutional injuries, and further refers the Court to Section II(B) of its

24

MSJ regarding Plaintiff's inability to succeed on a failure to train or discipline theory. (Dkt. 330, City's MSJ, at 9-10, 16).

> **B.** **The expert evidence does not establish a widespread practice of fabricating witness identifications using suggestive identification procedures.**

In its Motion, the City demonstrated that Plaintiff did not identify a single fabricated or suggestive identification, (dkt. 330, City's MSJ, at 9-15). and in its *Daubert* Motion, the City demonstrated that his expert relied on unreliable data. (Dkt. 326, Defendant City of Chicago's Motion to Bar Plaintiff's Expert Dr. Nancy Steblay). Remarkably, in response, Plaintiff purports that his eyewitness identification expert, Nancy Steblay, provides "extremely strong" evidence of the City's alleged widespread practice of fabricating identifications using suggestive identification procedures. (Dkt. 341, Pl.'s Resp., at 157). Plaintiff's fails to respond to the blatant errors and fatal flaws in Steblay's analysis the City identified in both its MSJ and *Daubert* motion. As a result, Plaintiff forfeits any dispute he may have with respect to the City's legal argument. *See Tyler*, 70 F.3d at 464.

Instead of rebutting the City's arguments, Plaintiff falsely claims that Steblay participated in the design of the data summary that she relies on for her analysis by ensuring that the variables were objective and clearly defined and verifying the data. (Dkt. 341, Pl.'s Resp., at 158). This is false. First, the City denies that Steblay independently verified all of the data within the dataset. (Dkt. 326, City's Mot. Bar Steblay, at 3). Additionally, the portion of Steblay's Report that Plaintiff relies on in support of this proposition (*see* dkt. 340, PSODF, ¶ 421) contradicts his assertion. Steblay's Report explicitly states that "[t]he variables coded in this current set are for the *most part* objective with no interpretation necessary." (Dkt. 340, PSODF, ¶ 421) (emphasis added). The dataset that Steblay relies upon was prepared by Plaintiff's counsel, adding a whole host of reliability concerns with the information contained in it and any resulting analysis based

on it. (Dkt. 330, City's MSJ, at 10). Even if the Court were to credit Steblay's data, Plaintiff does not rebut the fact that in reviewing the 2,786 witness outcomes from CPD identification procedures reported at Area 5 from 1989 to 1998, Steblay could not identify *a single instance* of either a fabricated or unduly suggestive identification. (Dkt. 330, City's MSJ, at 10-12).[6] In fact, in response to the City's *Daubert* motion, Plaintiff concedes that the lineup practices identified by Steblay do not violate the Constitution. (Dkt. 336, Pl.'s Resp. City's Mot. Bar Steblay, at 37). Plaintiff also concedes that Steblay did not identify a single instance of a fabricated or unduly suggestive false identification. (*Id.* at 42). Despite these concessions, Plaintiff insists that Steblay's opinions provide evidence of a "systemic" practice of violating individuals' due process rights by fabricating and unduly suggesting false identifications. (*Id.* at 38, 42). Respectfully, Plaintiff's reasoning is so lacking, it is difficult to respond. (*See* City's Reply Mot. Bar Steblay, at 23-24). Plaintiff cannot even identify one instance from the data let alone a series of incidents that demonstrate "widespread practice that permeates a critical mass of an institutional body." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015).

Given Steblay's inability to point to *any* evidence of lineup coercion, manipulation, or outright falsification in the dataset, Plaintiff next points to Steblay's opinion that the rate of suspect identification for CPD, 75%, is higher than what would be expected based on the aggregated data collected from 11 studies. (Dkt. 341, Pl.'s Resp., at 159). First, Plaintiff claims that the CPD suspect identification rate is 75% is not correct. Steblay excluded certain categories to derive her "comparison" subset. The rate for the comparison subset was only 70%. (Dkt. 326, City Ex. 2, at 11). But that included "tentative identifications." Excluding "tentative identifications," which are

---

[6] Plaintiff incorrectly asserts that Defendants have not identified any error in any of the data coded. (Dkt. 341, Pl.'s Resp., at 158). The City refers the Court to its *Daubert* motion on this point. (Dkt. 326, City's Mot. Bar Steblay, at 11-22).

not positive identifications, the rate comes to 61% (*id.* at 9) which is very close to the rate identified in the Behrman and Richards studies, which Steblay relies upon to make her comparative opinion. Further, Steblay admits the average rate from the field studies will change when more field studies are conducted. (Dkt. 326, City Ex. 10, at 54-55, 62). (*See* City's Reply Mot. Bar Steblay, at 21, n. 9). Plaintiff argues that Steblay opined that the difference between the field studies and Chicago's high identification rate and low filler identification rate was "statistically significant" and that there was less than a 1 in 100,000 chance that the difference could be explained by chance. (Dkt. 341, Pl.'s Resp., at 160). The City, of course, disagrees that any conclusions can be properly drawn from the statistical analysis Steblay conducted due, in part, to the extensive coding errors that the City has identified (and Plaintiff has not disputed), including that the results were statistically significant. (Dkt. 326, City's Mot. Bar Steblay, at 11-22). However, even assuming *arguendo*, that Steblay's analysis of the dataset and her comparison to the field studies is sound, notably absent from Steblay's Report and her testimony, is *any* opinion that CPD had a widespread practice of fabricating or suggesting witness identifications. (Dkt. 330, City's MSJ, at 11-12). Steblay testified that there was "no way to know [whether any eyewitness identifications were fabricated] from my data set – the data set." (Dkt. 320, JSOF, at ¶ 276). Moreover, Steblay testified that she did not evaluate whether any of the eyewitness identifications from the datasets had been intentionally manipulated by the police because that was "not the purpose" of her data analysis. (*Id.* at ¶ 279).

Despite the testimony from Steblay, Plaintiff argues that the "*only explanation*" for the City's purportedly higher suspect identification rate than other jurisdictions is because CPD fabricated identifications using suggestive identification procedures. (Dkt. 341, Pl.'s Resp., at 160) (emphasis added). That argument is wholly unsupported by the record. In the very next

27

sentence, Plaintiff identifies Steblay's "*possible explanations*" for the so-called elevated suspect identification rates in Chicago. (*Id.*) (emphasis added). Moreover, Plaintiff mischaracterizes the language of Steblay's factors so that they read more favorably for Plaintiff. (Compare *id.* at 160-61 with dkt. 330, City's MSJ, at 12 and dkt. 320, JSOF, at ¶ 249). The actual "possible explanations" as they are listed in Steblay's Report are: (a) familiar (non-stranger) perpetrator identifications; (b) lineup structure, including lineup size and multiple suspects; (c) first identification attempts vs. repeated procedures among single-suspect stranger-perpetrator lineups; (d) suggestion from lineup administrators; (e) fewer filler selections recorded; and (f) lineup quality. (Dkt. 321-1, JSOF, Ex. 1, Steblay's Report, at 12-19). Steblay does **not** opine that any of the six factors that she identified necessarily resulted in the difference between CPD's identification rate and identification rate from the 11 field studies she considered; only that they were *possible* factors. (Dkt. 330, City's MSJ, at 12). Plaintiff correctly notes that Steblay eliminated factors (a), (b) and (c) from the Chicago dataset as possible explanations. (Dkt. 341, Pl.'s Resp., at 161). Plaintiff then incorrectly notes that Steblay's factor (e) Fewer Filler Selections Recorded—which Plaintiff mischaracterizes as "a failure to report filler identifications"— "is denied by the City and would violate its policies, and so that explanation can be eliminated." (*Id.*). This is a gross misstatement. Filler identifications are recorded, as required but the City's written policies, as either non-identifications or negative identifications. (Dkt. 320, JSOF, at ¶ 272). Moreover, as to Steblay's factor (e), the evidence cited by Plaintiff confirms that the City has consistently stated that filler identifications are recorded as "non-identifications" making this possible explanation a nullity. (Dkt. 330, City's MSJ, at 14).

Based on this sleight of hand, Plaintiff then, mischaracterizing the factors, concludes, "[t]hat leaves fabrication of identifications using the improper techniques identified in

explanations (d) and (f)—steering and suggestion to witnesses and presenting lineups where the suspect stands out—as the only explanation for Chicago's radically high suspect identification rate." (Dkt. 341, Pl.'s Resp., at 161). As it pertains to Steblay's factor (d) Suggestion from Lineup Administrators—which Plaintiff mischaracterizes as "steering and suggestion where police direct the witness toward the suspect, whether overtly or covertly"—Plaintiff cannot claim that non-blind administrators contributed to the rate of allegedly high suspect identifications in Chicago because Steblay conceded that she did not even independently verify that the lineups in the Dataset were not all non-blind. (Dkt. 330, City's MSJ, at 13-14). Additionally, Steblay admitted that so-called suggestive behavior may be unintentional and that not all non-blind lineups are inherently inaccurate. (Dkt. 330, City's MSJ, at 13). As to Steblay's factor (f) Lineup Quality—which Plaintiff mischaracterizes as "biased lineup constructions where the suspect stands out"—Steblay relied on data collected from lineups in 2004-2005 for this possible explanation, which has absolutely no bearing as it is too remote in time from the underlying misconduct alleged in 1991 to be relevant in establishing a widespread practice. (Dkt. 330, City's MSJ, at 14-15). In conclusion, all of Steblay's "possible" explanations for the City's purportedly higher than expected suspect identification rates do not amount to unconstitutional practice. (Dkt. 330, City's MSJ, at 12-16). Moreover, the U.S. Constitution does not mandate that photo arrays and lineups meet a certain standard of quality. *Coleman v. City of Peoria*, 925 F.3d 336, 347 (7th Cir. 2019) (citing *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006)).

Plaintiff also argues that the City never introduced accountability systems to identify and correct improper identifications. (Dkt. 341, Pl.'s Resp., at 157). The City disputes Plaintiff's assertions and misstatements regarding its accountability systems. The City's 30(b)(6) witnesses consistently testified that in addition to CR investigations into allegations of misconduct related to

improper identification procedures, the supervisors within CPD were there to ensure that all policies were being followed. Ex. 2, Deposition of James Hickey 244:5-19; Ex. 3, Deposition of Lt. Foster 284:17-285:3; Ex. 4, Deposition of Denham 45:8-13.

### C. Plaintiff's remaining arguments fail.

First, Plaintiff distorts the City's causation argument. The City argues that Plaintiff has failed to establish a causal connection between the City's express written policies and training and his alleged constitutional injury in this case. (Dkt. 330, City's MSJ, at 9). Plaintiff incorrectly states that the City contends that its policies and training governing identification procedures were sufficient to stop fabricated identifications, which Plaintiff claims, in his usual sweeping fashion and without any citation to the record, "runs headfirst into the evidence that those fabricated identifications *occurred routinely across all cases*." (Dkt. 341, Pl.'s Resp., at 163) (emphasis added). But, as set forth in the City's Motion to Bar Steblay (dkt. 326), there is no evidence of fabricated identifications in *any case*. Plaintiff misrepresents the City's arguments in an effort to shift the burden away from himself.

Second, Plaintiff argues that to the extent the City contests Steblay's conclusions, this merely highlights disputes of fact. (Dkt. 341, Pl.'s Resp., at 164). For certain the City contests many of Steblay's conclusions as well as the reliability of her findings. But that does not create genuine issues of material fact because Steblay herself makes clear that she could not identify a single instance of a fabricated or suggestive identifications. (Dkt. 330, City's MSJ, at 11).

Third, Plaintiff argues that the City's Rule 30(b)(6) witnesses, Lt. John Foster, admitted that City was on notice that if proper policies were not followed, it could result in false identifications or misidentifications, and that unduly suggestive identification procedures presented a risk of unreliability. (Dkt. 341, Pl.'s Resp., at 164-65). Plaintiff again attempts to

evade his burden. Being on notice of a risk of false identifications if proper policies were not followed and being on notice that proper policies were systematically not being followed which systematically resulted in false identifications are two totally different concepts. Plaintiff misrepresents Lt. Foster's testimony. (*See* Dkt. 340, PSODF, at ¶ 399). Lt. Foster testified regarding the policies and training that were in place in relation to identification procedures, and that the supervisors in the Detective Division were there to ensure that the policies were being followed so that the ultimate goal was to find the truth and the right person who committed the crime. (Dkt. 321-14, Ex. 14, at 284:17-285:7).

Finally, Plaintiff contends that the City's failure to train argument cannot proceed because the City's earliest training manuals produced in this case on the subject of identification procedures are from 1996, five years after the investigation in this case. (Dkt. 341, Pl.'s Resp., at 165). Again, Plaintiff misrepresents the record. The City denies that "[t]he City of Chicago did not produce any training policies or manuals regarding eyewitness identifications for the time period leading up to Johnson's wrongful conviction" and denies that "the only training materials provided are from 1996." (*See* Dkt. 340, PSODF, at ¶ 472). Moreover, the testimony that Plaintiff cites in support of his contention does not support it.

## V. THE CITY IS ENTITLED TO JUDGMENT AS A MATTER OF LAW AS TO PLAINTIFF'S EVIDENCE SUPPRESSION *MONELL* THEORY.

### A. There is no evidence of a widespread practice of evidence suppression.

As with identifications, Plaintiff first argues that the City's entire MSJ starts from the "false premise" that Plaintiff's *Monell* claim depends entirely on his expert witness disclosures, and therefore, the City ignores the "huge volume of evidence supporting Johnson's *Monell* theories that are unrelated to expert testimony." (Dkt. 341, Pl.'s Resp., at 138). Despite filing a 493 paragraph PSODF, Plaintiff fails to identify the evidence or even include a citation for this

position. *See* L.R. 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the L.R. 56.1 statements or responses"). When asked in written discovery to "identify all evidence known to Plaintiff that establishes why" the City's policies on eyewitness identification and "street files" were unconstitutional, Plaintiff responded regarding the street files theory by incorporating the expert report of his disclosed expert, Thomas Tiderington, from the *Solache/Reyes*, *Sierra*, and *Iglesias* cases, and the eyewitness identification theory by incorporating the expert report of his disclosed expert, Nancy Steblay, from the *Velez v. City of Chicago* case. (Dkt. 320, JSOF, ¶ 6). Tiderington and Steblay were eventually disclosed in the present case and their opinions are virtually the same as in *Solache/Reyes, Sierra*, and *Iglesias*, and *Velez*, respectively.

Next, Plaintiff argues that the City invokes the wrong legal standard for widespread practice claims. (Dkt. 341, Pl.'s Resp., at 138-40). Plaintiff asserts that rather than a repeated pattern of *constitutional violations* or *actual harms* to others, Plaintiff need only show a repeated pattern of *behavior* that provides notice of a *risk of harm* in order to establish a widespread practice. (*Id*. at 139) (emphasis in original). Plaintiff cites *Fields v. Chicago*, 981 F.3d 534, 562 (7th Cir. 2020) and *Glisson v. Ind. Dep't of Corrections*, 849 F.3d 372, 381-82 (7th Cir. 2017) for this proposition. (*Id.*). For example, Plaintiff asserts that he could show a repeating pattern of evidence suppression in homicide cases that provided notice of the risk that exculpatory or impeachment evidence would be suppressed in criminal cases, and need not show a repeating pattern of *Brady* violations, and same for his identification and failure to discipline *Monell* theories. (*Id.* at 139). Plaintiff purports to proffer "record evidence," without reference to a single citation, to establish each of these widespread practices. (*Id.* at 140). *See* L.R. 56.1(g) ("When addressing facts, the memorandum must cite directly to specific paragraphs in the L.R. 56.1 statements or responses").

Moreover, Plaintiff misrepresents the "narrower" interpretation of the standard that was adopted for widespread practice claims in *Fields*.[7] Specifically, the *Fields* court held that "notice can be established in various ways, such as through proof of a prior pattern of similar constitutional violations, or through a demonstration that the need for governmental action is *so obvious*, and the inadequacy *so likely* to result in constitutional violations, that the failure to act constitutes deliberate indifference even in the absence of similar prior constitutional violations." 981 F.3d at 562 (emphasis added). The *Fields* court further expanded that "[r]egardless of the approach taken, '[t]he critical question under *Monell*, . . . is whether a municipal policy or custom gave rise to the harm (that is, caused it).'" *Id.* at 562-63. For the reasons stated in Section IV of the City's MSJ, Plaintiff has not and cannot establish causation. (Dkt. 330, City's MSJ, at 39-41).

Likewise, Plaintiff skews the exact rule that was established in *Glisson.* There, the court looked to the Third Circuit which concluded in a *Monell* suit brought by diabetic inmate that "[a] reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is *sufficiently obvious* as to constitute deliberate indifference to those inmates' medical needs." 849 F.3d at 381 (citing *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (emphasis added). Again, even accepting a narrower interpretation of the standard, it is not merely a *risk of harm*, as Plaintiff suggests, but a risk of harm that is *so "sufficiently obvious"* that it is "*so likely*" to result in constitutional violations. In closing, the *Glisson* court noted that it was not holding that the Constitution or any other source of federal law required municipalities to adopt

---

[7] Plaintiff goes so far as to suggest that the City failed to meet its duty of candor to this Court by not referencing the Seventh Circuit's *Fields* decision in its motion for summary judgment. (Dkt. 341, Pl.'s Resp., at 140-41). The City did not mention the holding in *Fields* because it was not relevant. Moreover, the City finds Plaintiff's accusation ironic given his misrepresentation of the holding in *Fields*, discussed herein.

particular policies, but the Constitution does require it to ensure that a well-recognized risk not be deliberately left to happenstance. 849 F.3d at 382. There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent. *See Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004). The other incidents need to be sufficiently similar to support an inference of a broader pattern. *Black v. City of Chicago*, No. 18-cv-6518, 2022 WL 425586, at *5-6 (N.D. Ill. Feb. 11, 2022). The greater the dissimilarity, the greater the skepticism that there is a single actionable municipal practice or custom. *Id. See, e.g.*, *Tillman v. Burge*, 813 F. Supp. 2d 946, 978 (N.D. Ill. 2011) (explaining that in establishing the existence of such a policy or practice, it is insufficient to "splatter-paint a picture of scattered violations" through "collateral accusations of marginally related incidents") (citation omitted).

Plaintiff contends that *Monell* liability does not require the Plaintiff "to show a widespread practice of suppressing the *particular types* of evidence that were ultimately suppressed in this case the *precise way* they were suppressed in this case." (Dkt. 341, Pl.'s Resp., at 149) (emphasis added). Despite Plaintiff's attempted sleight of hand on the issue, *Monell* liability in this case does require Plaintiff to show that evidence was suppressed in a "street file" because that is what he alleges. (Dkt. 1, Compl., ¶ 52) ("As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Officer and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.").

Finally, in a hail Mary attempt to salvage his *Brady* claim, Plaintiff raises, for the first time in opposition to summary judgment, five new *Brady* contentions against Defendant Officers: 1) Guevara and Halvorsen suppressed that Johns was a cooperating witness in another pending homicide case; 2) Guevara, Halvorson, and Erickson suppressed key evidence undermining the

34

Burgos identifications; 3) Guevara, Halvorsen, and Daley suppressed the fact that Johnson was made a suspect before any evidence implicated him; 4) Guevara and Halvorsen suppressed their entire investigation of alternative suspect Robert Weeks; and 5) Defendants all suppressed that Guevara had committed similar fabrications and suppressions of evidence in multiple homicide cases. (Officers' Reply Mem. Supp. Summ. J., at 6). First, because Plaintiff raised these new *Brady* theories for the first time at summary judgment, they are forfeited. The City served Plaintiff with interrogatories requesting that he "state with *particularity* each document and/or piece of information that Plaintiff alleges was not provided to the criminal defendant(s) or the criminal defense attorney(s)." (Dkt. 321-20, JSOF, Ex. 20, Pl.'s Resp. City's First Set of Interrogs., at ¶ 15). Plaintiff responded with boilerplate objections and referred to his forthcoming expert reports and depositions. (*Id.*). A party who has "responded to an interrogatory" must supplement that response "in a timely manner if the party learns that in some material respect the…response is incomplete, and if the additional or corrective information has not otherwise been made known." Fed. R. Civ. P. 26(C)(1). Pursuant to Rule 37, "[i]f a party fails to provide *information* …the party is not allowed to use that *information*…on a motion…unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added). Second, Plaintiff's last-ditch effort to cling to the aforementioned, newly asserted *Brady* "evidence" does not represent a "street file," like the file in *Jones*, or even, arguably, like the file in *Fields* or *Rivera* (which the City disputes). "Street files" is the crux of Plaintiff's *Monell* theory. Third, as non-Guevara Defendants more fully explain, all of Plaintiff's new *Brady* contentions fail and, as such, the City is entitled to judgment as a matter of law as to each of them. (Officers' Reply Mem. Supp. Partial Summ. J.).

**B. The non-expert evidence does not establish a widespread practice of evidence suppression.**

Plaintiff includes five pages of single-spaced non-numbered bullet points of what he claims is non-expert evidence establishing the City's widespread practice of evidence suppression. (Dkt. 341, Pl.'s Resp., at 141-45). To make sense of Plaintiff's "jumbled mass," the City categorizes Plaintiff's purported non-expert evidence and responds to each, in turn, below:

| Plaintiff's Alleged Non-Expert Evidence: | The City's Response: |
|---|---|
| Plaintiff includes 5 bullet points that cite to *Jones*, *Palmer*, and/or Judge Shadur's order in *Palmer*. (Dkt. 341, Pl.'s Resp., at 1141-45). | *Jones* and *Palmer* are irrelevant to the present litigation as both cases predate by nearly a decade the policy that was in place at the time of the Fred investigation, and both resulted in dramatic changes in policy in the immediate aftermath. More importantly, neither of these cases stands for the proposition that the City had an evidence suppression policy. (*See* Dkt. 330, City's MSJ, at 17-21). Specifically, and contrary to Plaintiff's assertion in this case, the *Jones* case did not find that CPD's practice of maintaining "street files" was designed to secrete exculpatory information. 856 F.2d at 991. Rather, in *Jones*, the Seventh Circuit simply noted that "although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law." *Id.* at 995. In *Palmer*, the Court affirmatively held that the class plaintiffs failed to prove any systemic constitutional violations as a result of the City's "street file" practice. 806 F.2d at 1320-21. Specifically, the Seventh Circuit found that the class plaintiffs' claims "depend[] on there being exculpatory material in the street files – *and there isn't any. The suit has been abandoned because it has been shown to have, in fact, no legal merit.*" *Id.* (emphasis added). |
| Plaintiff includes 20 bullet points that cite to *Fields*, *Rivera*, and/or *Kluppelberg*. (Dkt. 341, Pl.'s Resp., at 141-45). | The events in *Fields*, *Rivera*, and *Kluppelberg* all pre-date the criminal investigation and prosecution of Plaintiff by anywhere from 5 to 9 years. Moreover, opinions from previous litigation are inadmissible hearsay. *See Taylor*, 2012 WL 669063 at *1 (A Judge's finding does not qualify as a hearsay exception under Rule 803(8) or Rule 803(22)). Finally, even if this so-called evidence were admitted, at best, it represents three examples of alleged "evidence suppression" in 12 years. In the same time period, the City conducted over one thousand homicide investigations. ([1984](#) |

| Plaintiff's Alleged Non-Expert Evidence: | The City's Response: |
|---|---|
| | [Annual Report](https://home.chicagopolice.org/wp-content/uploads/2014/12/1984-Annual-Report.pdf)[8], [1985 Annual Report](https://home.chicagopolice.org/wp-content/uploads/2014/12/1985-Annual-Report.pdf)[9], [1986 Annual Report](https://home.chicagopolice.org/wp-content/uploads/2014/12/1986-Annual-Report.pdf)[10], [1987 Annual Report](https://home.chicagopolice.org/wp-content/uploads/2014/12/1987-Annual-Report.pdf)[11], and [1988 Annual Report](https://home.chicagopolice.org/wp-content/uploads/2014/12/1988-Annual-Report.pdf)[12]). Plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision. *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir. 1990). The Seventh Circuit has not adopted any bright-line rules defining "custom or practice," but it has found that "it must be more than one instance." *Black*, 2022 WL 425586, at *5-6. That said, a practice may not be widespread if it took place two, three, or four other times. *Id.* |
| Plaintiff includes 6 bullet points that cite to experts in other cases, Michael Brasfield and Bernard Murray. (Dkt. 341, Pl.'s Resp., at 141-45). | Not only does Plaintiff include this expert testimony in his purported "non-expert evidence," but Plaintiff also improperly relies on experts that have not been disclosed in this case. *See Ideal Mfg. & Sales Corp. v. Pase Grp., Inc.,* No. 06-C-0590, 2008 WL 11463582, at *9 (E.D. Wis. Nov. 24, 2008). |
| Plaintiff includes 2 bullet points that cite to Inspector General Reports. (Dkt. 341, Pl.'s Resp., at 141-45). | These reports are not material to the City's MSJ because they are too remote in time. Specifically, the June 2020 and September 2021 OIG reports that are cited reviewed the processes and directives from 2017 through 2019, twenty-six (26) years *after* the arrest and prosecution of Plaintiff. |

**C.  The expert evidence does not establish a widespread practice of evidence suppression.**

The City demonstrated that even if the Court permitted Tiderington to testify, Plaintiff's

*Monell* claim still fails because Tiderington does not establish a policy and practice of maintaining

and concealing exculpatory evidence in clandestine "street files." (Dkt. 330, City's MSJ, at 26).

His opinions regarding the City's report writing are thin and rely exclusively on speculation and

---

[8] https://home.chicagopolice.org/wp-content/uploads/2014/12/1984-Annual-Report.pdf
[9] https://home.chicagopolice.org/wp-content/uploads/2014/12/1985-Annual-Report.pdf
[10] https://home.chicagopolice.org/wp-content/uploads/2014/12/1986-Annual-Report.pdf
[11] https://home.chicagopolice.org/wp-content/uploads/2014/12/1987-Annual-Report.pdf
[12] https://home.chicagopolice.org/wp-content/uploads/2014/12/1988-Annual-Report.pdf

his opinions regarding record keeping practices are equally weak. (*Id.*). Additionally, Plaintiff's theory suffers from a failure to establish a causal link between Plaintiff's alleged constitutional violations and this particular *Monell* theory. (*Id.*). Plaintiff, in an attempt to save his *Monell* claim from the problematic testimony of his expert, Thomas Tiderington, argues that non-expert evidence justifies denying summary judgment, which it does not (see *supra* at 35-37), it eliminates the need for the Court to weigh in on the City's *Daubert* motion regarding Tiderington at this stage. (Dkt. 341, Pl.'s Resp., at 150-51). Plaintiff wholly fails to address the City's argument that even if the Court were to permit Tiderington to testify, Plaintiff's *Monell* claim still falls woefully short. (Dkt. 330, City's MSJ, at 25-39). Plaintiff fails to respond to the City's direct challenges regarding: 1) Tiderington's reliance on spreadsheets that he had no hand in preparing and which he could not manipulate (*id*. at 27-30); 2) Tiderington's concession that it would not have been "humanly possible" to become familiar with each of the investigations (*id.* at 30-34); 3) Tiderington's concession that he never reviewed any CCSAO files (*id.* at 34); 4) Tiderington's haphazard statistically insignificant review of 64 CCPDO (*id.* at 34-37); and 5) the fact that Tiderington's "failure to document" opinions are not supported by any of the data in his Report (*id*. at 37-39). Because Plaintiff fails to dispute the City's legal argument, any dispute that Plaintiff may have of the City's position has been forfeited. *See Tyler*, 70 F.3d at 464.

Again, Plaintiff presents the Court with three pages of single-spaced non-numbered bullet points, included below, of what he claims is expert evidence supporting his widespread evidence suppression theory, based on the anticipated testimony of Thomas Tiderington. (Dkt. 341, Pl.'s Resp., at 146-48). *See Greer*, 267 F.3d at 727 (warning plaintiffs who craft their summary judgment submissions as a "veritable catapult to hurl a jumbled mass of information at the [court and the defense] in the hope of avoiding summary judgment"). The City addresses them below:

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| Plaintiff argues that the City's written policies did not solve the evidence suppression problem because they: (a) allowed for the continued use of a decentralized, parallel file system in which investigative material was kept in different places, creating the risk that material would not be gathered from all of those locations; (b) failed to cover gang crimes officers, despite their significant role as investigators in homicide cases, like this one; (c) left too much discretion to detectives about what to document in police files; and (d) did nothing to ensure that the subpoena service unit, detective division, or anyone else produced all of the parallel files created for an investigation. (Dkt. 341, Pl.'s Resp., at 146). | Plaintiff does not identify anything about the aforementioned policies that is unconstitutional. "The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake*, 210 F.3d at 782. Moreover, Plaintiff's alleged constitutional injury did not result from any of these purported deficiencies – he is not missing any documents (the newly identified *Brady* contentions that are addressed more fully *supra* at 34-35 cannot fairly be characterized as missing files or documents); there are no gang crimes officers involved in Plaintiff's arrest and prosecution; he does not allege that leaving too much discretion to detectives caused his injury; he does not claim the subpoena service unit failed to disclose something to him; and he does not cite to any evidence to support a failure to produce a "parallel file" that caused him a constitutional deprivation. |
| Plaintiff argues that CPD's efforts to implement the new Special Orders were woefully inadequate, including a failure to provide proper training and oversight to ensure compliance with the Special Orders. (Dkt. 341, Pl.'s Resp., at 146). | The paragraphs Plaintiff cites in support of this position rely on his expert Thomas Tiderington's report, and do not establish woefully inadequate training and oversight. (*See* Dkt. 340, PSODF, at ¶¶ 359-60, 372)[13]. Specifically, the evidence establishes that the City provided training immediately after it established the new policy.[14] And continued training with every change thereafter, which included both in-service and roll call training. (*Id.*). Moreover, Plaintiff fails to explain how the aforementioned failure to train is connected to his alleged constitutional injury. |

[13] The City denies Tiderington has any foundation to provide opinion testimony related to CPD's policies and further states that many of the conclusions drawn in his report are contradicted by his deposition testimony. (*See* Dkt. 327, City's Mot. Bar Tiderington).

[14] Commander Winstrom testified that detectives were trained on the Standard Operating Procedures (SOP) changes, and more specifically that they attended a 3-hour in-service training after the implementation of the 1982-83 directives, and after the 1986 directives were implemented, new detectives received training in their "service detective training," and if the police officer was already a detective when S.O. 86-3 was issued, they received a copy of S.O. 86-3, and were given "roll-call" training by their Sergent for five or seven straight days. (Dkt. 321-16, Ex. 16, at 151:3-152:24).

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| Plaintiff argues that Tiderington's analysis and findings from the review of 475 homicide files from Area 5 for the period 1991-1995 (the five-year period beginning with and through Johnson's wrongful prosecution), and 344 Area 5 investigative files from 1995-1998 revealed that approximately 50% (1991-1995) and approximately 46% (1995-1998) of investigative files he reviewed contained handwritten notes not taken on general progress reports. Plaintiff also argues that Tiderington's analysis found many examples where the information on handwritten notes not transferred to official reports was "potentially exculpatory," including handwritten notes containing cryptic notations on a page without any context: a name, phone number, address, etc., where the relevance of the information and its potential inculpatory or exculpatory value is lost without being transcribed into an official report. Finally, Plaintiff argues that relatedly, Tiderington found no handwritten notes or GPRs in the entire investigative file from Guevara or Halvorsen, the lead detectives in this case, and that in Tiderington's decades of experience, he was "not aware of a single homicide investigation in which the lead detectives took no notes." (Dkt. 341, Pl.'s Resp., at 146). | The foundation upon which Tiderington relies for these opinions is based, in part, upon a spreadsheet for which Tiderington had no hand in preparing and for which he could not manipulate. (Dkt. 330, City's MSJ, at 27-30). Moreover, the spreadsheet that Tiderington relies on was created by Plaintiff's counsel creating a whole host of reliability and objectivity concerns. (*Id.*). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.[15]

Tiderington concedes that it would not have been "humanly possible" to review all the investigative files, and therefore, he cannot establish the City had a policy and practice of maintaining clandestine exculpatory evidence in street files. (Dkt. 330, City's MSJ, at 30-34). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.

Tiderington further concedes that handwritten notes not on a GPR is not unconstitutional, making Plaintiff's argument above entirely null and void. (Dkt. 330, City's MSJ, at 32). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464. Moreover, the fact of whether GPRs or handwritten notes were in the Fred investigative file is immaterial to summary judgment.

Moreover, the fact that the investigative file contains notes not on GPRs focuses on form over substance and misses the point. If those GPRs were in the files, |

---

[15] Plaintiff makes the shocking and conclusory argument that the City does not provide any "meaningful methodological attack" on Tiderington's opinions. (Dkt. 341, Pl.'s Resp., at 151). This is simply not true. In summary judgment, the City argues that Tiderington's reliance on the spreadsheets created by Plaintiff's counsel renders his opinions without foundation and unreliable; Tiderington's concessions that it would not have been "humanly possible" to become familiar with each of the investigative files and that he never reviewed any of the CCSAO files renders his opinions irrelevant; and Tiderington's haphazard statistically insignificant review of 64 CCPDO files renders his opinions irrelevant and unreliable. (*See* Dkt. 330, City's MSJ, at 27-39). In the City's *Daubert* motion, the City argues, *inter alia*, that Tiderington's opinions should be excluded because his methodology is non-existent. (Dkt. 327, City's Mot. Bar Tiderington, at 16-23).

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| | which they quite obviously were, then the policy was being followed because the notes were being retained, filed and maintained, and not destroyed as they would have been prior to 1983.<br><br>Finally, Plaintiff did not suffer a constitutional injury from any failure of policy related to file retention and disclosure policies. |
| Plaintiff argues that Tiderington's review of these investigative files revealed that approximately 10% (1991-1995) and approximately 28% (1995-1998) of the files he reviewed contained to-from memos not on official police forms, despite the Special Order's requirements and the City's knowledge of this deficiency. (Dkt. 341, Pl.'s Resp., at 146). | The foundation upon which Tiderington relies for these opinions is based, in part, upon a spreadsheet for which Tiderington had no hand in preparing and for which he could not manipulate. (Dkt. 330, City's MSJ, at 27-30). Moreover, the spreadsheet that Tiderington relies on was created by Plaintiff's counsel creating a whole host of reliability and objectivity concerns. (*Id.*). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Tiderington concedes that it would not have been "humanly possible" to review all the investigative files, and therefore, he cannot establish the City had a policy and practice of maintaining clandestine exculpatory evidence in street files. (Dkt. 330, City's MSJ, at 30-34). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Additionally, the fact that investigative files contain notes on to-from memos instead of GPRs (which, is not in violation of any CPD directive notwithstanding Plaintiff's argument that is not supported by the record) focuses on form over substance and misses the point. If those to-from memos were in the files, which they quite obviously were, then the policy was being followed because the notes were being retained, filed and maintained, and not destroyed as they would have been prior to 1983.<br><br>Additionally, at best, Tiderington is simply identifying a potential failure to follow directives, |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| | which does not equal a constitutional violation. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or [] departmental regulations and police practices.'") (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003).<br><br>Finally, Plaintiff did not suffer a constitutional injury from any failure of policy related to file retention and disclosure policies. |
| Plaintiff argues that Tiderington's review of these investigative files revealed that 24% (1991-1995) and 17% (1995-1998) of total investigative files contained no inventory sheet, which the Special Orders required as a means to ensure disclosure. (Dkt. 341, Pl.'s Resp., at 147). | The foundation upon which Tiderington relies for these opinions is based, in part, upon a spreadsheet for which Tiderington had no hand in preparing and for which he could not manipulate. (Dkt. 330, City's MSJ, at 27-30). Moreover, the spreadsheet that Tiderington relies on was created by Plaintiff's counsel creating a whole host of reliability and objectivity concerns. (*Id.*). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Moreover, Tiderington admitted that he did not know how the coders determined the inventory sheets were incomplete. (Dkt. 330, City's MSJ, at 28).<br><br>Tiderington concedes that it would not have been "humanly possible" to review all the investigative files, and therefore, he cannot establish the City had a policy and practice of maintaining clandestine exculpatory evidence in street files. (Dkt. 330, City's MSJ, at 30-34). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument may have. *See Tyler*, 70 F.3d at 464.<br><br>Additionally, Tiderington is simply identifying a potential failure to follow directives, which does not equal a constitutional violation. *Thompson*, 472 F.3d at 454 ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| | violations, not violations of state laws or [] departmental regulations and police practices.'") (citing *Scott*, 346 F.3d at 760).<br><br>Finally, Plaintiff does not cite to a single example where evidence was withheld from a criminal defendant because the inventory sheet was not in the investigative file, and had it been in the investigative file, the withheld evidence would have been disclosed. Thus, this argument is entirely speculative. |
| Plaintiff argues that Tiderington's subsequent review of corresponding permanent retention files during both of these time periods routinely lacked an inventory sheet as required by policy, and his comparison of the investigative files and corresponding criminal defense files for the years 1995-1998 demonstrated that important investigative materials were regularly withheld from criminal defendants, as nearly all of the criminal defense files were missing documents contained in the corresponding CPD homicide files. (Dkt. 341, Pl.'s Resp., at 147). | The foundation upon which Tiderington relies for these opinions is based, in part, upon a spreadsheet for which Tiderington had no hand in preparing and for which he could not manipulate. (Dkt. 330, City's MSJ, at 27-30). Moreover, the spreadsheet that Tiderington relies on was created by Plaintiff's counsel creating a whole host of reliability and objectivity concerns. (*Id.*). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Tiderington concedes that it would not have been "humanly possible" to review all the investigative files, and therefore, he cannot establish the City had a policy and practice of maintaining clandestine exculpatory evidence in street files. (Dkt. 330, City's MSJ, at 30-34). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Moreover, Tiderington's haphazard statistically insignificant review of 64 CCPDO files does not establish any material was withheld. (Dkt. 330, City's MSJ, at 34-37). Plaintiff does nothing to dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464.<br><br>Additionally, Tiderington is simply identifying a potential failure to follow directives, which does not |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| | equal a constitutional violation. *Thompson*, 472 F.3d at 454 ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or [] departmental regulations and police practices.'") (citing *Scott*, 346 F.3d at 760).<br><br>Finally, Tiderington admits that he did not review any CCSAO files that were available to him, and therefore, cannot say if any documents were actually withheld, let alone exculpatory. (Dkt. 330, City's MSJ, at 34). Plaintiff does nothing to dispute the City's argument on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464. |
| Plaintiff argues that Tiderington's review of opinions regarding police practices expert Michael Brasfield's analysis in *Fields* of 429 CPD homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in CPD Detective Areas One, Two, Three, and Four. (Dkt. 341, Pl.'s Resp., at 147). | Plaintiff's reliance on experts not disclosed in this case is improper. *See Ideal Mfg.*, 2008 WL 11463582, at *9. Furthermore, Plaintiff's reliance on a "summary" of unknown origin without any identifying information violates Fed. R. Evid. 1006.<br><br>Moreover, Tiderington did not have the proper foundation to opine on the civil trial or civil case in *Fields*, including any purported comparisons drawn between his opinions and the expert opinions in that case. Tiderington testified that the only information he had regarding that case came from Brasfield's report. (*See* Dkt. 321-6, JSOF, Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 384:7-14). Further, Tiderington was unable to answer any questions regarding what Brasfield reviewed with specificity and even testified, erroneously, that he believed he and Brasfield worked off the same spreadsheet. (*Id.* at 387:1-15). |
| Plaintiff argues that Tiderington's review of opinions regarding Brasfield's findings in *Fields* that comparison of the CPD homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information— | Plaintiff's reliance on experts not disclosed in this case is improper. *See Ideal Mfg.*, 2008 WL 11463582, at *9.<br><br>Tiderington did not have the proper foundation to opine on the civil trial or civil case in *Fields*, including any purported comparisons drawn between his opinions and the expert opinions in that case. |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives were to take notes), and 36% were missing inventories. (Dkt. 341, Pl.'s Resp., at 147). | Tiderington testified that the only information he had regarding that case came from Brasfield's report. (*See* Dkt. 321-6, JSOF, Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 384:7-14). Further, Tiderington was unable to answer any questions regarding what Brasfield reviewed with specificity and even testified, erroneously, that he believed he and Brasfield worked off the same spreadsheet. (*Id.* at 387:1-15).<br><br>Moreover, Brasfield's testimony in this regard makes clear that he only looked at a total of 23 criminal defense files from 1983-1989 and 27 criminal defense files from 1999-2009. (*See* Dkt. 340, PSODF, at ¶ 348)[16]. Therefore, collectively and at best, Tiderington and Brasfield looked at just over 100 files and claim to draw conclusions about systemic evidence suppression over a 23-year period of time (*i.e.*, 1983-1989, 1991-1995, 1999-2009).<br><br>Most importantly, unlike in *Fields*, Plaintiff cannot establish that he suffered a constitutional injury from file suppression or underproduction, even with his belated *Brady* contentions. |
| Plaintiff argues that Tiderington's review of opinions regarding Brasfield's unrebutted analysis in *Rivera* of 435 CPD homicide files from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in CPD files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. (Dkt. 341, Pl.'s Resp., at 147). | Plaintiff's reliance on experts not disclosed in this case is improper. *See Ideal Mfg.*, 2008 WL 11463582, at *9.<br><br>Like his testimony regarding *Fields*, Tiderington did not have the proper foundation to opine on the civil trial or civil case in *Rivera*, including any purported comparisons drawn between his opinions and the expert opinions in that case. Tiderington testified that the only information he had regarding these cases came from Brasfield's reports. (*See* Dkt. 321-6, JSOF, Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 384:7-14). Further, Tiderington was unable to answer any questions regarding what |

---

[16] The City admits that Brasfield testified to those calculations and statistics but clarifies that he testified that those calculations were based upon his comparison of 23 criminal defense files from the 1983 to 1989 time period and 27 criminal defense files from the 1999 to 2009 time period to the "basement files." (Dkt. 339-5, Ex. 96, at 6:9-23, 7:7-8:8).

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| | Brasfield reviewed with specificity and even testified, erroneously, that he believed he and Brasfield worked off the same spreadsheet. (*Id*. at 387:1-15). |
| | Moreover, Brasfield admitted at trial that he only reviewed six State's Attorney's files, specifically ones provided to him by Rivera's counsel only. (Dkt. 339-4, Ex. 81, at 2303:7-17). Additionally, Brasfield did not review 435 files, but rather, only reviewed 138 files, which "contained any evidence of a lineup having been conducted." (*Id.*). |
| Plaintiff argues that Tiderington's review of the police homicide files from *Kluppelberg,* as well as the report of Brasfield in *Kluppelberg* appended to Tiderington's report, in which Brasfield found that, of the investigative files produced to him (from 1983-1991), there were (1) repeated instances of not using official forms to ensure file integrity, including that there was a widespread practice of disregarding the use of Major Crime Worksheets, Investigative Case File Controls, Supervisory (Chain of Command) Reviews, Detective Division Personnel Forms, and Case Assignment Slips; (2) Material information was repeatedly omitted from official police reports, including 100% of the case files reviewed being replete with examples of handwritten pages and informal memos between detectives containing potentially exculpatory information regarding leads for other avenues of investigation, as well as names or descriptions of possible alternative suspects, additional witnesses, and possible alibi witnesses; (3) incomplete investigative files; (4) permanent retention files containing limited information; and (5) incomplete | Plaintiff's reliance on experts not disclosed in this case is improper. *See Ideal Mfg.*, 2008 WL 11463582, at *9. <br><br> Tiderington did not have the proper foundation to opine on the civil case in *Kluppelberg*, including any purported comparisons drawn between his opinions and the expert opinions in that case. Tiderington testified that the only information he had regarding that case came from Brasfield's reports. (*See* Dkt. 321-6, JSOF, Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 384:7-14). Further, Tiderington was unable to answer any questions regarding what Brasfield reviewed with specificity and even testified, erroneously, that he believed he and Brasfield worked off the same spreadsheet. (*Id*. at 387:1-15). <br><br> None of the record cited by Plaintiff supports that Tiderington reviewed the "police homicide files from *Kluppelberg*," and therefore violates L.R. 56.1(d). (*See* Dkt. 340, PSODF, at ¶ 371). |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| inventories or no indication that inventories were sent to Records Divisions. (Dkt. 341, Pl.'s Resp., at 147). | |
| Plaintiff argues that these assessments of the City's homicide files demonstrate that the evidence suppression practice as it existed prior to the 1980s Special Orders continued unabated. (Dkt. 341, Pl.'s Resp., at 147). | Plaintiff's reliance on experts not disclosed in this case is improper. *See Ideal Mfg.*, 2008 WL 11463582, at *9. Notwithstanding, the City further argues that Tiderington does not have the proper foundation to opine on any purported comparisons drawn between his opinions and Brasfield's opinions in *Jones, Palmer, Rivera,* or *Fields.*

Moreover, the alleged "evidence suppression" practice prior to the 1980s directive was never proven. In *Jones*, the Seventh Circuit simply noted that "although the lawfulness of the street-files practice has never been adjudicated, the City, which has abandoned the practice, does not challenge the jury's implicit finding that it denied criminal defendants due process of law. 856 F.2d at 995. In *Palmer*, the Court affirmatively held that the class plaintiffs failed to prove any systemic constitutional violations as a result of the City's "street file" practice. 806 F.2d at 1320-21. Specifically, the Seventh Circuit found that the class plaintiffs' claims "depend[] on there being exculpatory material in the street files – *and there isn't any.* The suit has been abandoned because it has been shown to have, in fact, no legal merit." *Id.* (emphasis added).

Most importantly, Plaintiff fails to establish that he suffered a constitutional injury. |
| Plaintiff argues that Tiderington also identified five specific examples of files where investigative materials contained in the City's homicide files were missing from the criminal defense files, were potentially exculpatory information of significant investigative value, and should have been disclosed under standard police procedures. Plaintiff argues that for each case, | The City refers the Court to its MSJ regarding Tiderington's "failure to document" opinions not being supported by any of the data in his Report. (Dkt. 330, City's MSJ, at 37-39). The City argues that, contrary to Plaintiff's assertion above, Tiderington's Report does not address missing documentation at all as it pertains to these cases. (*Id.*). Plaintiff does not dispute the City's arguments on this point, and thus, forfeits any argument he may have. *See Tyler*, 70 F.3d at 464. |

| Plaintiff's Alleged Expert Evidence: | The City's Response: |
|---|---|
| Tiderington reviewed the corresponding State's Attorney's Office files, and in each case, the police documents were withheld, were of potential exculpatory value, and were not given to prosecutors. (Dkt. 341, Pl.'s Resp., at 148). | Moreover, Plaintiff's record citations do not support his contention that the aforementioned cases are "examples of files where…exculpatory information of significant investigative value" was not disclosed. |

For the reasons stated above, what Plaintiff claims is ample "record evidence" is nothing more than red-herrings, hasty generalizations, and at times, outright distortions of the truth, which do nothing more than illustrate the weaknesses with his case. The evidence does not support Plaintiff's *Monell* theory that the City was indifferent to an alleged widespread practice of suppressing evidence during the relevant time frame, and summary judgment should be granted in favor of the City on this theory.

## VI. PLAINTIFF FAILED TO DEMONSTRATE THAT AN ILLEGAL PATTERN OR PRACTICE AMOUNTED TO "DELIBERATE INDIFFERENCE" OR WAS THE "MOVING FORCE" BEHIND THE DEFENDANT OFFICERS' CONDUCT.

In opposition to the City's MSJ, Plaintiff argues that he has put forth evidence of municipal action and deliberate indifference, such that the question of whether municipal policies and practices caused the Plaintiff's constitutional injuries "must be resolved by a jury." (Dkt. 341, Pl.'s Resp., at 167). Plaintiff further asserts that there is "no distance between the risks of harm presented by the City's official policies and practices" and the constitutional injuries Plaintiff suffered, and cites to *Godinez v. City of Chicago*, No. 16-CV-07344, 2019 WL 5597190, at *6 (N.D. Ill. Oct. 30, 2019) in support of his position. (*Id.*). However, unlike in *Godinez*, and contrary to Plaintiff's conclusory assertion, Plaintiff has not put forth a "variety of evidence" sufficient to

create a genuine issue of fact. Nor does Plaintiff even cite to or expound upon the so-called evidence to which he refers. He merely states it to be so without any support.

For *Monell* liability to attach, first, there needs to be a deprivation of a federal right. *Hellbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022). A plaintiff must then connect that deprivation of a constitutional right to a municipal action, such as a widespread custom or practice. *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). Setting aside the fact that Plaintiff has failed to carry his burden on these first two prongs, next, the plaintiff must show the municipal action amounts to deliberate indifference, a high hurdle to clear. *Id.* "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Brown*, 520 U.S. at 410). In other words, a municipality shows deliberate indifference when it (1) fails "to provide adequate training in light of foreseeable consequences;" or (2) fails "to act in response to repeated complaints of constitutional violations by its officers." *Miranda v. County of Lake*, 900 F.3d 335, 345 (7th Cir. 2018) (quoting *Sornberger*, 434 F.3d at 1029-30).

And finally, to avoid summary judgment, the plaintiff must provide evidence that the municipal action was the "moving force" behind the constitutional injury, a "rigorous" causation standard demanding a "direct causal link between the challenged municipal action and the violation of [plaintiff's] constitutional rights." *Stockton*, 44 F.4th at 617 (citing *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (internal quotations omitted); *see also Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016)). It is not enough to simply submit evidence of a widespread unconstitutional practice and ask the jury to infer causation. *Black*, 2022 WL 425586, at *11 ("Far from it. The existence of a problem is not the same thing as deliberate

indifference to a problem . . . There's no *Monell* double-dipping.") (internal citations omitted).  No such showing was made here.  If the mere existence of a widespread practice sufficed, then deliberate indifference would melt away as a requirement.  *Id.*  And watering down the requirements for a *Monell* claim is exactly what the Supreme Court has instructed courts not to do. *Id.* at *26-27.  *See Brown*, 520 U.S. at 415 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights.") (emphasis in original); *see also First Midwest Bank*, 988 F.3d at 987 ("These requirements—policy or custom, municipal fault, and 'moving force' causation—must be scrupulously applied in every case alleging municipal liability.").

Because Plaintiff fails to present evidence sufficient to establish that any illegal practice or custom existed at the time of the Fred investigation in 1991, he clearly cannot show that City policymakers condoned or were indifferent to the practice.  But even if Plaintiff demonstrated a custom, he does not show that custom and indifference were the moving force behind any alleged misconduct.  As demonstrated above, and in the City's Motion, Plaintiff's alleged constitutional violations are not tethered to the *Monell* theories he is pursuing.  Specifically, Plaintiff has not established the identification procedures resulting in Plaintiff's arrest, prosecution and conviction, the alleged failure to produce a single report during Plaintiff's criminal prosecution, and Plaintiff's hail Mary *Brady* contentions against Defendant Officers, result from any City policy.  Moreover, Plaintiff has failed to come forward with evidence sufficient to meet the rigorous standard of culpability and causation that are required for *Monell* liability under any of his theories.  The City

refers the Court to the arguments made in Section IV of its MSJ. (Dkt. 330, City's MSJ, at 39-41).

## VII. PLAINTIFF FORFEITS ANY ARGUMENT THAT SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* (COUNT X) AND IDEMNIFICATION (COUNT XI).

The City argues that summary judgment should be granted in favor of the City on Plaintiff's derivative claims – *respondeat superior* (Count X) and indemnification (Count XI). (Dkt. 330, City's MSJ, at 41). "[C]laims…for respondeat superior and indemnity" against a municipal entity "are derivative liability claims that depend on [Plaintiff] prevailing against at least one of the individual defendants." *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). "Because the individual defendants are entitled to summary judgment in their favor, the claims against [the City] must fail as well." *Id.* Plaintiff does not set forth any argument in response to the City's argument that claims for *respondeat superior* and indemnity are derivative claims that depend on individual liability, and thus, forfeits any argument. *See Tyler*, 70 F.3d at 464 ("We have made it clear that a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point").

## CONCLUSION

For the foregoing reasons, the City respectfully requests this Honorable Court grant, in its entirety, the City's motion for summary judgment against the Plaintiff.

Dated: August 9, 2024                    Respectfully Submitted,

/s/ Eileen E. Rosen
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney

Austin G. Rahe
Lauren M. Ferrise
Jessica L. Zehner
ROCK FUSCO & CONNELLY, LLC
333 W. Wacker Dr., 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com