## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DEMETRIUS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 4156 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| REYNALDO GUEVARA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

After a judge vacated his conviction, Plaintiff Demetrius Johnson filed this suit against the City of Chicago ("City") and multiple officers of the Chicago Police Department ("CPD") asserting state and federal law claims. In three separate motions now before the Court, Defendants Guevara, Halvorsen, Daley, Erickson, and Healy (the "Individual Defendants"), and the City move for summary judgment on all claims against them. In connection with his response, Johnson filed an oversized statement of disputed facts, which Defendants move to strike. The City also moves to bar the opinions of Johnson's experts Dr. Steblay and Mr. Tiderington.

Due to Johnson's failure to comply with this Court's case management procedures, the Court grants Defendants' motion to strike in part. Because this Court finds the opinions of Dr. Steblay and Mr. Tiderington to be reliable and meet the requirements for admissibility, the Court denies the City's motions to bar their opinions. Finally, the Court grants in part and denies in part Defendants' motions for summary judgment, as described below.

## BACKGROUND

### I.    Motion to Strike

The Court begins with Defendants' motion to strike Johnson's statement of disputed facts. This Court's summary judgment procedures require parties to submit a joint statement of undisputed facts. Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice. The party opposing summary judgment may submit additional facts it contends demonstrate a genuine issue of material fact with citations to supporting material. *Id.* The additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process. *See id.* Further, the Court's procedures specifically caution parties that the Court's procedures are not optional and that failure to abide by them can result in the Court striking briefs, disregarding statements of facts, and imposing sanctions. *Id.* This Court's process accords with Local Rule 56.1 governing summary judgment and allows the parties to file 120 statements of undisputed material facts without prior leave, whereas Local Rule 56.1 allows the movant to file 80 statements and the non-movant to file 40 additional statements without the court's permission. *See* N.D. Ill. LR 56.1(d)(5); *Sweat v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's case management procedure regarding summary judgment).

In this case, the Court worked extensively with the parties to ensure their understanding and cooperation with these procedures, engaging in a detailed process to resolve disputed material facts. *See, e.g.*, Docs. 306, 307, 308 (working with the parties on their joint motion to resolve disputed material facts). Despite the lengthy process during which this Court involved the parties to resolve the factual disputes, following the submission of the joint statements of undisputed facts, Johnson submitted a 493-paragraph statement of disputed facts without pre-

2

approval from this Court. Further, Johnson's statement of disputed facts includes many facts that the parties plainly do not dispute, facts that the undisputed statements of facts already contain, and statements that are inferences or arguments from facts but not directly supported by cited material.

Defendants argue that the Court should strike the entirety of Johnson's statement of disputed facts because Johnson violated this Court's summary judgment procedures. After carefully and extensively reviewing the entirety of Johnson's statement of disputed facts and the parties' briefing, this Court will disregard portions of Johnson's statements of disputed fact that make legal arguments, assert legal conclusions, or do not include any factual statements. *See Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 WL 792296, at \*8 (N.D. Ill. Mar. 1, 2016) ("[L]egal arguments in Rule 56.1 submissions are improper so the court will disregard legal arguments and conclusions in the plaintiff's Rule 56.1 submissions."). The Court will also disregard the portions of Johnson's statements of disputed facts that restate facts already contained in the joint statements of undisputed facts or are not supported with citations to admissible evidence. *See Phillips v. Quality Terminal Servs.*, LLC, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that statement."). The Court, however, will not strike the entirety of the noncompliant paragraphs as, in some cases, they contain properly supported and disputed assertions along with the legal argument or duplicative material. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (disregarding portions of noncompliant paragraphs in order to preserve the properly supported assertions in the paragraphs); *see also Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015)

("[D]istrict courts are not required to 'wade through improper denials and legal arguments in search of a genuinely disputed fact.'" (citation omitted)).

That being said, this Court sternly admonishes Johnson for filing his voluminous statement of disputed facts without leave of Court and without due regard to the Court's summary judgment procedures. His filing blatantly subverts the purposes of this Court's summary judgment procedures and egregiously disregards this Court's repeated directions to the parties. The Court warns Johnson that future instances of noncompliance with the Court's procedures will result in sanctions, up to and including, dismissal of this case.

## II.     Factual Background[1]

On June 12, 1991, at approximately 7:45 p.m., at the intersection of Claremont and North Avenue in Chicago, a gunman shot at Edwin Fred, Raul Ortiz, and Forrest Garnett. The shooter hit both Fred and Ortiz, and Fred died from his injuries. Ortiz survived and went to a hospital before returning to the scene.

Chicago police officers reported to the scene and identified four witnesses: Aby Gonzales, Stanley Jewel, Fina Montanez[2], and Omar Ortiz. Guevara, a CPD Detective, arrived to investigate the case and interviewed Raul Ortiz, Gonzales, and Garnett. Daley, a CPD Officer, also responded to the shooting. Officers on the scene received initial flash messages in the

---

[1] The Court derives the facts in this section from the Joint Statements of Undisputed Material Facts (Docs. 313 and 320), admissible portions of Johnson's Statement of Disputed Facts (Doc. 340), and the exhibits attached to the factual statements. The Court takes all facts in the light most favorable to Johnson, the non-movant. As discussed above, the Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment. The Court will address facts specific to Johnson's *Monell* claims in the Section II.A.7 of the Analysis, below.

[2] The name of this individual is unclear. In one police report from the night of the shooting, the individual's name is spelled "Fina Martinez." Doc. 313-2 at 69. In one lineup report, the individual's name is spelled "Fina Motanez." *Id.* at 73. In a different lineup report, the individual's name is spelled "Fina Montanez." Doc. 313-3 at 28. The Court understands these documents to be referring to the same person, and, for the sake of clarity, the Court will refer to this individual as Fina Montanez.

minutes after the shooting, indicating that the shooter was a "male Black," with the name "Little D" or "Bryan Johnson."  The messages also indicated that there may have been a second offender who was male and Hispanic.

Daley knew Bryan Johns matched the description of the shooter and went by the nickname "Little D."  Further, Daley had seen Johns approximately one hour before the shooting at a location less than a mile away.  With this information, Daley drove to the location where he had previously seen Johns and observed Johns leaving a van with two Hispanic men.  Daley arrested Johns and a search of the van revealed at least one gun.[3]

### A.     The Johns Lineup Reports

Daley drove Johns to the Area 5 precinct where Johns participated in at least one lineup viewed by some of the eyewitnesses.  A lineup report authored by Erickson (the "Erickson lineup report"), a CPD Detective, documents a lineup that Erickson and Guevara conducted at approximately 11:30 p.m. on June 12, 1991, with Johns as the suspect.  The Erickson lineup report lists Guevara's name incorrectly as "Raymond Guevara."  Doc. 313-3 at 27.  The Erickson lineup report indicates that Aby Gonzales, Forrest Garnett, Fina Montanez, Rosaline Morales, Angel Cordova, and Rosa Burgos viewed the lineup.  The Erickson lineup report lists the individuals standing in the lineup as Johns, Jozell Hobbs, Terrell Agee, James Brown, and Fabian Wells.  CPD records indicate that Hobbs, Brown, and Wells were all arrested on June 12 or 13, 1991, with the same arrest numbers as listed in the Erickson lineup report.  Further, Agee declared under penalty of perjury that he stood in a lineup with Johns in the summer of 1991.

---

[3] The van may have contained two guns, or the gun recovered may have been inconsistently described. *Compare* Doc. 339-1, Ex. 19 ("[A] check of the vehicle revealed a 2inch chrome 'AMT' .25 cal handgu[n] secreted under a vinyl covering for the motor cover."), *with* Doc. 339-2, Ex. 22 (listing one "AMT 380-9mm Kurz semi-auto pistol with a 4'' barrel stainless S[teel]").  Regardless of the number of guns discovered in the van, Johnson has adequately established the material fact that CPD officers arrested Johns less than a mile from the scene of the shooting, after leaving a van that contained at least one handgun.

The Erickson lineup report states that Gonzales positively identified Johns as the shooter who killed Fred.[4] Although Erickson signed the Erickson lineup report and CPD officers are supposed to include completed lineup reports in Records Division ("RD") files pursuant to CPD policy, the Erickson lineup report was not in the permanent retention file produced in this case and it does not have a permanent retention file stamp.

Guevara also wrote a lineup report (the "Guevara lineup report") documenting a lineup conducted at 11:00 p.m. on June 12, 1991. The Guevara lineup report states that Guevara and Erickson conducted a lineup viewed by Gonzales, Garnett, Montanez, and Rosa Burgos. The Guevara lineup report indicates that Johns, Dewan Patterson, Carlos McFadden, Dwayne David, and Michael Robinson comprised the lineup. CPD has no arrest reports for any individual named Dwayne David at any period, and the criminal histories of McFadden and Patterson do not reflect any arrests in June 1991. According to the Guevara lineup report, the lineup was negative, meaning no witnesses viewing the lineup selected Johns or any other individual.

Guevara and Erickson signed the Guevara lineup report. Healy, a sergeant in Area 5, also signed the Guevara lineup report on July 24, 1991. The Guevara lineup report contains a permanent retention file stamp and was included in the permanent retention file.

CPD officers released Johns from police custody the same night as the lineups. Someone informed Daley that no witnesses identified Johns in the lineup.

---

[4] Johnson points out in his statement of disputed facts that notes and deposition testimony from his Cook County Public Defender Jack Carey indicate that Carey interviewed Rosa Burgos in 1992, and she told him that she had viewed a lineup on the night of the shooting and three people viewing the lineup, including herself, had picked someone from the lineup. Rosa Burgos also allegedly stated that she had not seen the shooter and told the police that the person in the lineup looked like the shooter, but she was unsure. Because she has never made these statements herself in evidence presented in this case, and the notes and deposition transcript from Carey are inadmissible hearsay, this Court will not consider that evidence for the truth of the statements asserted when deciding the motions for summary judgment. *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023) ("To be considered on summary judgment, evidence must be admissible at trial . . . . If the evidence is inadmissible hearsay, the courts may not consider it.").

Erickson retired from CPD on August 2, 1991. Erickson's name does not appear on any police records related to the Fred murder investigation after the Erickson lineup report and Guevara lineup report.

### B. The Johnson Photo Identifications and Lineup

According to a written report by Guevara and Halvorsen, another CPD Detective, on July 11, 1991, they interviewed Elba Burgos at her residence near the location of the shooting. She reported to the officers that she had seen a Black male running away from the shooting with a gun in his hands. Guevara and Halvorsen showed Elba Burgos a photo array consisting of five Black men. Elba Burgos stated that the shooter resembled the photo of Darrell Johnson. Elba Burgos testified at trial that when Guevara showed her this photo array, he may have singled out the photo of Darrell Johnson and asked her "if it was the one." Doc. 340 ¶ 109; Doc 339-3, Ex. 52.

Guevara and Halvorsen knew that Darrell Johnson had a younger brother and asked Daley for a photo of the younger brother. Daley provided Guevara and Halvorsen with a photo of Johnson with two other individuals. On July 15, Guevara and Halvorsen returned to Elba Burgos and showed her the photo of Johnson. She positively identified Johnson as the person she saw running away from the shooting.

Guevara and Halvorsen also showed the photo of Johnson to Angel Cordova, who stated that he had seen the shooting. According to the Erickson lineup report, he also viewed the lineup the night of the shooting. After seeing the photo of Johnson, Angel Cordova positively identified Johnson as the shooter.

Based on the identifications of Johnson by Elba Burgos and Angel Cordova documented in Guevara and Halvorsen's report, CPD arrested Johnson on July 22, 1991. Johnson was only fifteen years old at this time.

After Johnson's arrest, on July 22, 1991, Halvorsen and Guevara conducted a lineup viewed by Elba Burgos, Rosa Burgos, Angel Cordova, Victor Cordova, and Ricardo Burgos. Elba Burgos, Rosa Burgos, and Ricardo Burgos each positively identified Johnson in the lineup. Neither Victor Cordova nor Angel Cordova identified Johnson as the shooter. Following the lineup, the State charged Johnson with the murder of Fred and the attempted murder of Ortiz.

### C. Other Key Events Before Trial

On June 29, 1991, CPD Officers Crespo and Roman arrested a man named Robert Weeks. According to a police report prepared by Crespo and Roman, while processing Weeks, they noticed that he fit the description of the person who shot Fred and Ortiz. Crespo and Roman then allegedly spoke on the phone with someone named Juan Lopez who stated that he had witnessed the Fred shooting and described the shooter as a Black man, who was approximately twenty years old, and that he had seen the shooter enter a specific building. The officers then spoke to other informants who verified that Weeks frequented the specific building identified by Lopez. Crespo and Roman then contacted CPD Area 5. Halvorsen responded and went to where Weeks was in custody. Crespo and Roman then turned the investigation over to Halvorsen. CPD police reports contain no further information about what happened with Weeks after Halvorsen went to see him.

Johnson was detained at the Cook County Jail before his trial. Johns was also in custody there at the same time. Johnson knew Johns socially from the neighborhood. Johnson testified that Johns said he was the shooter, but that he would not help Johnson defend himself from the

8

charges or testify on Johnson's behalf. Further, according to Johnson, Johns told Johnson that a witness pointed Johns out in a lineup the day the crime happened, but Johns did not identify who picked him out. Johnson informed his defense counsel about this conversation, to which Johnson's defense counsel responded that they would need proof.

In July 1991, unrelated to the Fred investigation, Johns testified as a witness for the prosecution in a different murder trial and identified an alleged shooter. Halvorsen was also involved in that murder trial and investigation, including testifying at trial about conducting a lineup where Johns identified the alleged shooter. One of Johnson's defense attorneys, Carey, also represented the defendant that case and examined both Johns and Halvorsen during the trial.

### D. Johnson's Trial and Subsequent Exoneration

At Johnson's trial in November 1992, there was no mention of any positive identification of Johns by any witness or the Erickson lineup report. Prior to trial, the prosecutor requested that Halvorsen bring him the files related to the case, as indicated by a note in the Investigation File that contained the Erickson lineup report. Defense counsel also subpoenaed CPD for all records related to the Fred investigation and later filed a motion for additional discovery seeking a photo of the lineup taken on June 13, 1991, which could have referred to either the Erickson lineup report or the Guevara lineup report. Both defense counsel and the prosecutor testified that they never received the Erickson lineup report. Further, it is undisputed that if defense counsel had known about the Erickson lineup report, where a witness positively identified Johns as the shooter, defense counsel would have used it at trial.

Johnson's defense counsel advanced a theory that Johns was the true perpetrator, witnesses misidentified Johnson, and Johnson had an alibi. The defense argued that Johnson looked like Johns, which could have contributed to misidentification. The defense also advanced

evidence of Johnson's alibi that he was watching the Bulls championship game on TV with friends. Two individuals testified that they watched the game with Johnson during the time the shooting occurred. The defense argued that this alibi was uniquely credible because the two witnesses were not regular basketball fans but watched the game that evening due to the special circumstances of the championship.

The prosecution argued that witnesses identified Johnson as the shooter, not Johns. Specifically, in the State's closing argument, the prosecutor stated that none of the witnesses who viewed the June 12, 1991, lineup had identified Johns, including Gonzales. Gonzales did not testify. Guevara and Daley both testified that Johns was not positively identified in a lineup. Ricardo Burgos, Elba Burgos, and Rosa Burgos each testified at trial and identified Johnson as the shooter, or the person they saw running from the shooting with a gun.

Additionally, at Johnson's trial, Guevara stated that he had interviewed Weeks. Guevara stated that he did not recall if he wrote a report concerning his interview with Weeks. Further, although his testimony is not entirely clear, Guevara also made statements which arguably support that he interviewed Montanez, Jewel, and Rosa Burgos on the night of the shooting.

Ultimately, Johnson was convicted and sentenced to twenty-five years in prison for the murder of Fred and ten years in prison for the attempted murder of Ortiz to be served concurrently.

Johnson moved for post-conviction relief. On November 19, 2019, a state court judge granted Johnson relief, vacating his conviction and ordering a new trial. Shortly thereafter, on December 20, 2019, prosecutors dropped all charges against Johnson.

### E. Statements by Witnesses

Some witnesses in this case made potentially inconsistent statements in their deposition and earlier criminal trial testimony about what they saw the night of the shooting and what identifications they made during the police investigation. Further, in his deposition for this case, Guevara invoked his Fifth Amendment right when asked if he told the witnesses whom to identify during the investigation, fabricated police reports claiming that witnesses identified Johnson, or whether Elba Burgos, Rosa Burgos, or Ricardo Burgos told him they could not identify the shooter.

#### 1. Ricardo Burgos

At Johnson's trial, Ricardo Burgos testified that on the evening of the shooting, he was driving down North Avenue when he saw a Black man wearing a t-shirt and gray pants shoot a gun from across the street. Ricardo Burgos estimated that he viewed the shooter from about sixty feet away and that he had a view of the shooter, including his face, for about forty-five seconds. He identified Johnson as the shooter. Further, Ricardo Burgos testified that CPD officers showed him Polaroid photos on June 21, 1991, including a photo of Johnson.

CPD written police records do not contain any information about a CPD officer showing Ricardo Burgos photos during the investigation. But at Johnson's trial, Guevara testified that he

showed Ricardo Burgos a photo array on June 21, 1991. However, during the investigation in June 1991, Guevara authored a police supplemental report that stated that on June 21, 1991, he interviewed Ricardo Burgos, who told him that that the shooter was a Hispanic man.

In his deposition in this case, Ricardo Burgos testified that he only saw the shooter from behind as he was running away, and that he never saw the shooter's face. Ricardo Burgos testified that any claim by the police that he could identify the shooter was false. However, Ricardo Burgos also stated that he suffered a serious head injury in 1996 or 1997 that impacts his memory, and that while he does not recall testifying in Johnson's criminal case, he would not have lied under oath in front of a judge.

### 2. Elba Burgos

At Johnson's trial, Elba Burgos testified that on the evening of the shooting, she lived on the 1500 block of Claremont and heard gunshots at about 7:45 p.m. From where she sat on her front porch, she saw a young, Black man running with a gun south on Claremont. She testified that the man was across the street when she saw him. Further, she testified that she had viewed a photograph lineup on July 11, 1991, and told Guevara that the shooter resembled someone in the photos but was younger. She also confirmed that she had positively identified Johnson in a photo shown to her on July 15, 1991, and in a lineup on July 22, 1991. Elba Burgos also positively identified Johnson as the person she saw running away from the shooting with a gun during trial.

In a deposition in this case, a woman named Ada Elba Burgos testified that she recalled living in the area of North Avenue and Claremont, but did not recall living on the 1500 block, talking to police after a shooting in 1991, or testifying at a criminal trial in 1992. However, Ada

12

Elba Burgos could not recall her husband's name, when she got married, and other facts about her life.

### 3. Aby Gonzales

A police report written by Guevara that details the night of the shooting states that Gonzales told officers that he had seen a Black man run towards him, pull out a gun, point the gun at him, run further down the street, and shoot Fred and Ortiz. The Erickson lineup report states that Gonzales identified Johns as the shooter the same night. The Guevara lineup report states that Gonzales viewed a lineup the same night and did not make a positive identification. At his civil deposition in this case, Gonzales denied that he identified someone as the shooter on the night of the shooting and denied that he saw the shooting. Gonzales did not recall participating in a lineup related to the shooting at all.

## ANALYSIS

### I. Motions to Bar Expert Opinions

Before reaching the substantive motions for summary judgment, the Court first addresses the City's motions to bar the opinions of Johnson's experts, Dr. Steblay and Mr. Tiderington. Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert evidence. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the

expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. An expert's opinion may be grounded in "personal knowledge or experience" rather than pure scientific analysis. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]here are many different kinds of experts, and many different kinds of expertise."). "The Rule 702 inquiry is 'a flexible one,'" and the Seventh Circuit grants "the district court wide latitude in performing its gate-keeping function." *Bielskis*, 663 F.3d at 894 (quoting *Daubert*, 509 U.S. at 594). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination" or the presentation of contrary evidence. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (citation omitted); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). The party seeking to admit the expert's testimony must show that it satisfies this test by a preponderance of the evidence. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017).

The City does not challenge the qualifications of Dr. Steblay and Mr. Tiderington. Rather, it argues their opinions (1) lack a reliable foundation; (2) utilize flawed methodologies; and (3) would not be helpful to the trier of fact. The Court finds that Dr. Steblay and Mr. Tiderington are qualified to offer testimony on the subjects for which they have been retained. Dr. Steblay has a Ph.D. in Experimental Social Psychology and is currently a Professor Emeritus of Psychology at Augsburg University. In her career, she has studied topics related to eyewitness identification for over two decades; authored multiple publications on police lineups and eyewitness identifications; and trained law enforcement and legal professionals on

eyewitness memory. Mr. Tiderington has over forty years of experience in law enforcement, thirty years of experience providing law enforcement training, and twenty years of experience as a Chief of Police. Through his professional experience, Mr. Tiderington has reviewed and engaged with police department policies, procedures, criminal investigations, recordkeeping, training, supervision, and discipline. Having found their qualifications appropriate, the Court turns to the City's challenges to each expert.

### A. Dr. Steblay

Dr. Steblay's report states that her "question[s] of interest" for this case were:

> [W]hether the rate at which eyewitnesses made suspect identifications is within numerical ranges that would be expected based on what we know about eyewitness lineup identifications. If the Chicago rates are different, in what ways do they differ? And, if they differ, what are the possible explanations for the differences?

Doc. 326-3 at 3. In summary, Dr. Steblay concludes that the suspect identification rate for CPD from 1989 to 1998 was significantly higher than the average suspect identification rate, or any individual suspect identification rate, reported in 11 individual field studies. Dr. Steblay explains that she reached her conclusion using a spreadsheet from Johnson's counsel, which Johnson's counsel coded with information contained in Chicago Area Five homicide files from 1989 to 1998. Dr. Steblay performed quality control to check the reliability of the coding in the spreadsheet. She also discusses factors that could be associated with the greater CPD suspect identification rates, and for which factors she attempted to control in her analysis. Specifically, she identifies that suggestion from lineup administrators, failure to record when eyewitnesses select fillers[5] from the lineup, and the quality of fillers in the lineup could be associated with the greater suspect identification rates in Chicago.

---

[5] "Fillers" in a lineup are additional individuals added to the lineup, other than the suspect.

The City challenges Dr. Steblay's report as improperly: (1) relying on flawed or unreliable data; (2) using data from a small subset of CPD case files to extrapolate an opinion regarding CPD as a whole; (3) applying her methodology without the rigor of quality control she would normally apply in her academic field; (4) comparing the CPD data to materially distinguishable studies; and (5) containing information that is not helpful to the jury. The Court analyzes each of these points in turn and concludes that, while the City has raised issues appropriate for cross-examination, Dr. Steblay's opinion is sufficiently reliable and relevant to be presented to the trier of fact.

### 1.    Reliability

First, the City notes that Dr. Steblay's opinions rely on spreadsheets provided by Johnson's counsel and the spreadsheets seemingly contain inconsistencies with other spreadsheets that Johnson's counsel prepared for Dr. Steblay in other cases. In short, this Court finds that the City's arguments regarding Dr. Steblay's data goes to the probative weight of that data, not its admissibility. *See Washington v. Boudreau*, No. 16-cv-01893, 2022 WL 4599708, at *8–11 (N.D. Ill Sept. 30, 2022) (holding that concerns about the quality of data in a spreadsheet compiled by an individual employed by counsel to summarize CPD files went to the probative weight, not the admissibility, of an expert's testimony); *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1066–67 (N.D. Ill. 2018) (finding that an expert's methodology was reliable where the expert relied on a spreadsheet prepared by plaintiff's counsel, even where a defendant argued that the spreadsheet contained "sketchy data").

Reliability "is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). "The

soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.* (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)).  The Court still has a duty to ensure an expert's opinions are supported by "sufficient facts or data," and materials created by counsel can cross the line into unreliability.  *Id.* at 808; *see also Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1025–27 (N.D. Ill. June 2, 2011) (excluding an expert's opinion where he relied, uncritically, on counsel's summaries of depositions); *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill Nov. 3, 2008) (similar).  There must be "a connection between the data employed and the opinion offered" and courts should exclude an "opinion connected to existing data 'only by the *ipse dixit* of the expert'" under Rule 702.  *Gopalratnam*, 877 F.3d at 781 (quoting *Manpower*, 732 F.3d at 806).

Here, Johnson's counsel created the spreadsheet with the contents of CPD case files in columns that require specific numeric entries, yes or no answers, or to be left blank where information is not reported or ascertainable.  The coding of the chart does not fall into the same category as counsel's creation of narrative summaries on which an expert then improperly relies.  *See Rivera*, 319 F. Supp. 3d at 1067 (holding that coding information regarding the results of lineups into a spreadsheet "borders on the mechanical" and is materially distinguishable from relying on an attorney's summary of a deposition); *cf. Sommerfield*, 254 F.R.D. at 321 ("Here, the expert is assuming that the selected version has been accurately reported by the lawyer of the party employing him, and no case permits that.").  Dr. Steblay implemented quality control measures into the coding to ensure uniformity and performed a quality control assessment of the spreadsheets herself.  She ensured the coding team used objective and clear definitions for the

coding variables and that the coding was done by at least two independent coders, who compared their work to catch discrepancies.  Dr. Steblay also randomly selected a subset of the lineups studied and verified the coding accuracy for those selected lineups.  While experts are not required to verify all the facts on which they rely, Dr. Steblay's quality control actions in this case adequately assure the Court she is not merely a "hired gun."  *See Greene v. Sears Prot. Co.*, No. 15 CV 2546, 2018 WL 4716189, at *8 (N.D. Ill. Mar. 8, 2018) ("[A]n expert witness is not required to verify all the facts upon which he relies."), *report & recommendation adopted*, 2018 WL 3104300 (N.D. Ill. June 25, 2018); *Rivera*, 319 F. Supp. 3d at 1067 ("[T]he court must ensure that testimony comes from an independent expert rather than a 'hired gun.'").

The potential inconsistencies between the spreadsheet in this case and similar spreadsheets used by Johnson's counsel and Dr. Steblay in other cases raise a factual issue: either the previous spreadsheets were incorrect, the current spreadsheet is incorrect, or there is a way to factually reconcile the seeming inconsistencies.  At this phase, where the Court takes the facts in the light most favorable to the non-moving party and does not resolve factual disputes, it is not proper for the Court to determine the cause of the potential inconsistencies between the spreadsheets that the City identifies.  *See Rivera*, 319 F. Supp. 3d at 1067 (finding that if the City was suggesting that counsel mischaracterized the data in the coding process, the court would not resolve any such suggestion at summary judgment).  Rather, the City can raise the potential inconsistencies at trial, and the trier of fact will then factor the arguments into assessing the probative value of Dr. Steblay's opinions.

Next, the City argues that Dr. Steblay's data is not quantitatively sufficient to support her methodology because her dataset only includes data from homicide investigations in Area 5, from which Dr. Steblay extrapolated to form opinions about CPD as a whole.  Again, this issue

goes to the probative value of Dr. Steblay's opinions, not their admissibility. *See Washington*, 2022 WL 4599708, at *9 (finding that a party's concerns about the generalizability of an expert's conclusions based only on a subset of CPD case files, went to the probative weight of the expert's opinions, not their admissibility). Dr. Steblay has adequate quantitative data to apply her methodology. The spreadsheet upon which she relied in forming her opinion contains data from 2,786 lineups reported in Chicago Area 5 homicide case files from 1989 to 1998. This is sufficient data for Dr. Steblay to run multiple numeric analyses in her report, such as identifying the number of single-suspect, stranger-perpetrator, first-identification lineups for her to compare to studies that assess those types of lineups. This is not a scenario where an expert attempts to form an opinion about an "average gross sales price" using data from "only one customer," which does not provide a "sufficient basis for calculating an average." *See Gopalratnam*, 877 F.3d at 781.

The City also argues that Dr. Steblay's data is not qualitatively sufficient because she did not apply the level of rigor to check the accuracy of the spreadsheet that she applied in some of her academic studies. For an expert's data to be qualitatively adequate, it must be "'those kinds of facts or data' on which experts in the field would reasonably rely." *Manpower*, 732 F.3d at 809. "[A]n expert witness is not required to verify all the facts on which [s]he relies." *Greene*, 2018 WL 4716189, at *8 (citation omitted). Here, Dr. Steblay used the kind of data on which she and other experts in her field routinely rely, namely information coded into a spreadsheet to assess multiple lineups for certain key information. Further, Dr. Steblay implemented quality control for the data coding in the spreadsheet to ensure it met her professional standards. She ensured that the coders used "objective and clear definitions for the coded variables," "the coding was done by at least two independent coders, who compared their work to catch

19

discrepancies," and Dr. Steblay herself "spot-checked a subset of files in order to ascertain whether there is clear agreement and understanding between the coders and the analyst about each variable in the set." Doc. 326-3 at 6–7. While the City identifies some ways in which the coding in this case differs from the coding of some of Dr. Steblay's previous studies, such as the coders not being blind to the purpose of the study, the kind of data on which Dr. Steblay relies is the same kind of data she utilized in those studies and Dr. Steblay implemented a quality control system as she did in those studies. *See Washington*, 2022 WL 4599708, at *9–11 (rejecting challenges to certain aspects of the coding of a spreadsheet on which an expert relied, and accepting that social scientists commonly rely on spreadsheets "compiled by others"). She need not have personally verified all of the coding in the chart to give opinions based on that chart. *See id.*; *Greene*, 2018 WL 4716189, at *8.

Dr. Steblay's comparisons of her findings from the CPD data to the eleven field studies also do not render the application of her methodology unreliable. The City points out that the eleven field studies differ from the CPD data in several ways, including that the field studies include studies from the United Kingdom and other types of lineups than the simultaneous lineups documented in the CPD files, the CPD files were all for cleared or closed investigations, and there may have been additional evidence against the suspects in addition to the CPD lineup identification. The City supports its arguments with an expert opinion from Dr. John Wixted, who supports their points about the differences between the field studies and Dr. Steblay's analysis. In conducting her analysis, Dr. Steblay exercised professional judgment in only including certain CPD lineups in her comparative analysis that matched certain characteristics of the eleven field studies, namely those lineups that were single-suspect, stranger-perpetrator, first-identification lineups.

It is outside of this Court's gatekeeping function to weigh the characteristics of the field studies that Dr. Steblay identified as important and for which she controlled in her analysis, against the characteristics she did not consider important, but that Dr. Wixted emphasizes. *See Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) ("Rule 702 [does] not require, or even permit, the district court to choose between those two studies at the gatekeeping stage."). The studies are not so dissimilar to the relevant question in this case as to justify their exclusion. *See in re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, No. 12 C 6279, 2015 WL 3669933, at *25 (N.D. Ill. June 12, 2015) (discussing a Court's obligation to assess the studies cited by an expert witness and to evaluate the manner in which the expert utilizes the studies). Rather, "the merits and demerits of each study can be explored at trial." *Schultz*, 721 F.3d at 433.

In short, the Court finds that Dr. Steblay's methodology is reliable and based on sufficient facts and data such that Johnson may present her opinions to the trier of fact. The Court denies the City's motion to bar Dr. Steblay on this basis.

## 2.    Helpfulness to the Jury

The Court also finds that Dr. Steblay's opinions would be potentially helpful to the trier of fact. The City argues that Dr. Steblay's opinions are not helpful and could potentially confuse the jury because she does not identify the specific cause of the high rate of suspect identifications she calculated from the CPD data, she criticizes CPD lineup practices that were commonly used in law enforcement and that she cannot show were not followed in all instances, and she applies best practices for lineups that were not accepted at the time of Johnson's arrest.

Here, among other claims, Johnson attempts to show that the City had a pattern or practice of unconstitutionally manipulating identification procedures to procure suspect

identifications. Dr. Steblay's opinions, if credited by the jury, support that CPD had a higher than normal suspect identification rate from lineups and provide a possible explanation for the abnormally high suspect identification rate, specifically, suggestion from lineup administrators. Dr. Steblay does not need to specifically prove or identify a practice by CPD that is unconstitutional. *See Bielskis*, 663 F.3d at 896 (an expert's "inability to opine on the ultimate issue for the trier of fact did not mean they could not testify regarding other relevant factual issues"). Rather, it is sufficient that Dr. Steblay's opinion lends support to Johnson's arguments that lineup administrators may have had a practice of being suggestive. Dr. Steblay's opinions also do not appear likely to confuse the jury because the City can explore its concerns with Dr. Steblay's testimony on cross-examination or through its own experts' testimony.

Therefore, the Court denies the City's motion to bar Dr. Steblay.

### B. Mr. Tiderington

Mr. Tiderington's report states two main opinions: First, that he "conclude[s] to a reasonable degree of professional certainty that the homicide investigation conducted in this case grossly deviated from generally accepted police practices . . . [and] the defendants knowingly and intentionally suppressed evidence of Demetrius Johnson's innocence." Doc. 327-2 at 5. Second, that he opines "to [a] reasonable degree of professional certainty that CPD's policies and practices related to homicide file documentation, storage/preservation and disclosure were woefully inadequate, deviated substantially from accepted practices in other departments, and resulted in the routine failure to disclose documents and information to criminal defendants." *Id.* at 7.

Mr. Tiderington's report starts with summarizing the Fred murder investigation, providing a timeline of the investigation, and focusing on the actions of the investigating CPD

officers, including what documents they created. Mr. Tiderington then analyzes the actions of the officers in this case, using his experience and understanding of generally accepted police practices. Next, Mr. Tiderington moves to CPD's general policies and practices. Mr. Tiderington describes standard police practice in the 1990s, the practice of keeping "street files" that was the subject of litigation in *Jones* and *Palmer*[6], and the series of CPD policies that followed the *Jones* and *Palmer* decisions. Mr. Tiderington then describes why CPD policies in place at the time of Johnson's arrest and trial failed to remedy identified issues. Further, Mr. Tiderington reviewed CPD files from 1991 to 1998 and concluded that CPD files commonly did not include several kinds of documents, using certain cases as examples. Finally, Mr. Tiderington explains his opinion that the failure to turn over crucial documents in the Fred murder investigation resulted from the poor policies and practices he identified.

The City argues that the Court should exclude Mr. Tiderington's expert opinions because they: (1) "lack a foundation, and when tested, do not withstand scrutiny;" (2) are not based on a reliable methodology; and (3) are not helpful to the jury.

### 1. Foundation

First, the City argues that Mr. Tiderington's discussion of the *Jones* and *Palmer* cases lacks foundation because he did not read the cases himself but rather relied upon a report drafted by a different expert, Mike Brasfield, provided to him by Johnson's counsel. A review of the extensive deposition testimony reveals that Mr. Tiderington never stated that he did not read the cases he cites, relied entirely on Mr. Brasfield's opinion to form his own, or relied on summaries of the cases prepared by Johnson's counsel. *See, e.g.*, Doc. 327-14, Ex. M, 292:13–295:5.

---

[6] In *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), and *Palmer v. City of Chicago*, 755 F.2d 560 (7th Cir. 1985), the Seventh Circuit considered cases against CPD officers for suppressing evidence and keeping "street files" of documents that they did not share with prosecutors but could contain exculpatory materials. *See Rivera*, 319 F. Supp. 3d at 1059–61 (summarizing portions of the *Jones* and *Palmer* cases, and their impacts on CPD).

Rather, Mr. Tiderington stated that he reviewed *Palmer* and discussed specifics of an affidavit filed in *Palmer*. *See, e.g.*, *id.* at 294:24–295:2 ("And did you personally review the Seventh Circuit decision? A. I did."); *see also* Doc. 327-3, Ex. B, 420:3–423:2 (discussing details of the *Jones* case in a deposition). Further, he represented in his expert report that he did review *Palmer* and *Jones* and provided several specific citations to those cases, indicating a familiarity with their content. *E.g.*, Doc. 327-2 at 36–38 (describing the *Palmer* and *Jones* decisions, including quotations and specific citations); *id.* at 77 (listing the *Palmer* and *Jones* decisions among the materials he reviewed). However, in a deposition in 2022, Mr. Tiderington stated he did not read the *Palmer* case "in specific detail" and he could not recall exactly from where he got certain information, but he believed he "cut and pasted" the information from the Seventh Circuit's ruling. Doc. 327-3, Ex. B, 447:16-449:1.

Based on his statements, Mr. Tiderington's discussion of the cases does not reflect an improper reliance on the work of another expert or materials prepared by counsel. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613–14 (7th Cir. 2002) (describing how an expert can use the opinion of another expert in reaching their conclusions without the other expert being required to testify, particularly where the testifying expert is not simply the "mouthpiece" of the other expert); *Washington*, 2022 WL 4599708, at *9–11 (holding that a party's concerns about an expert using information from a professional retained by counsel were best addressed by cross-examination). To discount Mr. Tiderington's representations about what he has read and reviewed at this phase would usurp the role of the jury to assess credibility. *Godinez v. City of Chicago*, No. 16 CV 7344, 2019 WL 5290901, at *6 (N.D. Ill. Oct. 18, 2019) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after

24

opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (quoting *Smith*, 215 F.3d at 719)). The City will have the opportunity to question Mr. Tiderington about his knowledge and review of the cases in his cross-examination.

Similarly, the City seeks to bar Mr. Tiderington's discussion of the "civil trials in *Fields*, *Rivera*, or *Kluppelberg*" because he "testified that the only information he had regarding these cases came from reviewing Brasfield's report in each case." Doc. 237 at 13. But Mr. Tiderington testified not that the only information he had regarding these cases was from Brasfield, but rather that the only "information [he knew] about *the work that Mr. Brasfield did* on the *Fields* case, the *Rivera* case, and the *Kluppelberg* case [came] solely from the reports that he prepared in those cases." Doc. 327-3, Ex. B, 384:7–14 (emphasis added). Mr. Tiderington states in his report that he reviewed Brasfield's expert reports from the *Fields* and *Rivera* cases to compare to his analysis regarding the CPD file in this case. He also states that he "reviewed the underlying police files and related records from the[ *Fields*, *Rivera*, and *Kluppelberg*] cases" and provides summaries of how he believes these cases are examples of other cases where officers withheld exculpatory information. Doc. 327-2 at 60–63. Experts frequently compare their analyses with others in their field using the information in those experts' written studies. *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) ("[C]ourts have frequently pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable."); *In re Allstate Corp. Secs. Litig.*, No. 16 C 10510, 2022 WL 842737, at *6 (N.D. Ill. Jan. 10, 2022) ("[A]n expert may rely on another expert's admissible opinion as a basis for forming his own opinion."). Similarly, using the information in Mr. Brasfield's report, Mr. Tiderington has a sufficient foundation to conduct a comparison between his and Mr. Brasfield's

analyses. Mr. Tiderington does not wholesale adopt Mr. Brasfield's opinions, rather he has conducted his own analysis to reach his own conclusions, which he then compares with Mr. Brasfield's work. The City can explore Mr. Tiderington's understanding of Mr. Brasfield's reports, and whether Mr. Brasfield's analyses are fairly comparable, on cross-examination. *Schultz*, 721 F.3d at 433.

Next, the City argues that Mr. Tiderington's deposition testimony shows that he lacks familiarity with and understanding of the subject matter and opinions contained in his report. Specifically, the City takes issue with Mr. Tiderington pointing to the spreadsheets from Johnson's counsel and RD numbers listed in the expert report as examples of cases with inventory sheet issues, in response to a question asking for examples of cases where detectives failed to document information. A full review of Mr. Tiderington's deposition testimony indicates that he had both a familiarity with and understanding of the opinions in his report, however.

Mr. Tiderington's answers to the questions about examples other than *Jones* and *Soto* where detectives failed to document information did not indicate he lacked critical information about his report. For his answer regarding the spreadsheets, Mr. Tiderington explained that the spreadsheets contain columns stating whether certain types of documents were in the police files for a case, and that if a police file did not contain certain types of documents that he would expect, that could indicate a failure to document. That answer appears fairly responsive to the question and accurate to the contents of the spreadsheets. It does not matter that the spreadsheets do not include a specific column for "failure to document." Second, Mr. Tiderington's reference to RD numbers for cases where there are issues with inventory sheets that were not "contemporaneously updated" or contained other issues could also be fairly responsive to the

26

question because failure to update inventory sheets could amount to a failure to document. While the City or this Court could imagine better answers to the question posed to Mr. Tiderington in his deposition based on the contents of his report, his answers do not necessitate the exclusion of his report and the City can explore them on cross-examination.

The City also challenges Mr. Tiderington's use of two spreadsheets prepared by Johnson's counsel both as it relates to Mr. Tiderington's methodology and the foundation for his opinions. First, the City argues that because Mr. Tiderington supposedly only had these large spreadsheets in paper or PDF format, not native format, it is not credible to believe that he totaled results and calculated percentages based on the information in the spreadsheets. For example, the City argues that "it strains credulity to believe" that Mr. Tiderington could calculate information like the number of investigative files that contained handwritten notes and the number that contained handwritten notes not on general progress reports ("GPRs"). Doc. 327 at 16. A review of the spreadsheets show that they contain simple yes or no columns for the questions: "Are there any handwritten notes?" and "Are there Handwritten Notes in the file not on GPRs?" Doc. 327-2 at 91. Although more tedious, it appears fully possible that Mr. Tiderington could have totaled the results of these columns without the native version of the spreadsheet. Moreover, the City does not identify any specific errors with Mr. Tiderington's calculations based on the spreadsheets. Because this Court should not assess Mr. Tiderington's credibility at this stage to determine if he "physically flipped through" the spreadsheets to reach his findings, the Court must reject the City's argument. *See Smith*, 215 F.3d at 719.

### 2. Methodology

Second, the City argues that Mr. Tiderington's methodology and analysis based on the spreadsheets is unreliable because he received the spreadsheet from counsel, he did not know the

27

coders, he only spot checked thirty or forty of the cases in the spreadsheet, and potential inconsistencies exist between the spreadsheets Mr. Tiderington has used in different cases. As discussed above, the City's arguments go to the probative weight of the data, not its admissibility. Again, the coding of the spreadsheets differs from narrative summaries written by counsel. *Rivera*, 319 F. Supp. 3d at 1067 (holding that coding information regarding the results of lineups into a spreadsheet "borders on the mechanical" and is materially distinguishable from relying on an attorney's summary of a deposition). Further, Mr. Tiderington's work spot checking the spreadsheet and performing his own analysis of the data in the spreadsheet assures the Court that his opinion is not connected to the data "only by the *ipse dixit* of the expert." *See Gopalratnam*, 877 F.3d at 781. That the City has identified seeming inconsistencies between the spreadsheets Tiderington relied on in *Solache/Reyes* and *Sierra* is a topic for cross-examination, not a reason to exclude Mr. Tiderington's report. *See Rivera*, 319 F.Supp.3d at 1067.

The City also argues that Mr. Tiderington did not bill enough time in this case, and in the *Solache/Reyes* and *Sierra* cases, to complete his analysis for the *Monell* section of his opinion. This argument again more appropriately goes to the probative weight of Mr. Tiderington's opinions, not their admissibility. *See Manpower*, 732 F.3d at 806 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact[.]"). Mr. Tiderington has reviewed documents and drafted similar *Monell* analyses in the *Iglesias*, *Solache/Reyes,* and *Sierra* cases for Johnson's counsel, which he has admitted comprised part of the work he did in reviewing materials in preparation for creating his expert report in this case. To review documents and draft his expert reports, Mr. Tiderington billed 78 hours in *Solache/Reyes*, 65.75 hours in *Sierra*, 58.15 hours in *Iglesias*, and 40.25 hours in this case. He also stated that he spent

28

an additional twenty to fifty hours reviewing materials for which he did not bill when working on other matters, listening to deposition tapes in his car, or waiting at the airport. This totals to approximately 242 billed hours, with the additional twenty to fifty unbilled hours. Because this Court cannot say it is impossible for Mr. Tiderington to have reviewed the documents he claims to have reviewed in that time and formed his opinions, the City can instead question Mr. Tiderington about his knowledge and review of the underlying materials he cites at trial. *See Greene*, 2018 WL 4716189, at *8.

On reply, the City raises for the first time an argument that Mr. Tiderington's report amounts to hearsay. By not raising this in its initial brief, the City waived the argument; moreover, this argument is undeveloped and further waived because the City does not explain how Mr. Tiderington's report amounts to hearsay. *See United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023) ("Just as undeveloped arguments are waived, so are arguments raised for the first time in reply briefs."); *White v. United States*, 8 F.4th 547, 552–53 (7th Cir. 2021) (holding that arguments raised for the first time in a reply brief are waived because they leave no opportunity for the other party to respond).

Mr. Tiderington uses a reliable methodology in his report of comparing the documents included in police investigative files with the documents included in criminal defense files to assess if the criminal defense files lacked any materials found in the police investigative files. From those missing documents, Mr. Tiderington determines that certain categories of important documents were routinely absent and concludes that CPD routinely did not produce important documents from the police files to criminal defendants. Other courts have accepted similar methodologies performed by other experts. *See Rivera*, 319 F. Supp. 3d at 1065–66 (holding that a police procedures expert's methodology was reliable where he compared criminal defense

29

files, police permanent retention files, and police investigative files); *Fields v. City of Chicago*, No. 10 C 1168, 2017 WL 4553411, at *3 n.8 (N.D. Ill. Oct. 12, 2017) (overruling a challenge to an expert's methodology of comparing files to find an underproduction of exculpatory materials).

The City challenges Mr. Tiderington's methodology as unreliable because the defense files may not contain documents found in the investigative files for reasons other than failure by CPD to provide all documents in the investigative files, such as the loss of files over time due to errors with file maintenance, the redaction of materials in the files by the defender's office, or failure by the prosecutor's office to disclose documents. Several courts have addressed similar arguments and found that such questions go "to the weight and not the admissibility of the expert's testimony." *DeLeon-Reyes v. Guevara*, No. 18 C 1028, 2019 WL 4278043, at *6–7 (N.D. Ill. Sept. 10, 2019); *Rivera*, 319 F. Supp. 3d at 1065–66; *Fields*, 2017 WL 4553411, at *3 n.8. This conclusion is logical because while it is possible that some documents were lost over time, redacted, or withheld due to error by the prosecutor, Mr. Tiderington detected a pattern of certain types of documents that were routinely missing from the defense files, and a reasonable inference from this is that there was systematic underproduction of materials to prosecutors and defense counsel. *See Fields*, 2017 WL 4553411, at *3n.8. "Systematic exclusion of certain categories of documents weakens the inference that the absences are the result of the files' age or something else equally innocuous, and that is what will aid the jury in weighing the facts." *Rivera*, 319 F. Supp. 3d at 1066.

### 3. Helpfulness to the Jury

Finally, the City argues that Mr. Tiderington's opinions would not be helpful to the jury. Specifically, the City argues that Mr. Tiderington cannot identify any documents that CPD

created that were withheld from Johnson during his prosecution, Mr. Tiderington does not provide evidentiary support for his opinions regarding what policies should have been in place between 1991 and 1995, and Mr. Tiderington's opinions would confuse the jury because his criticisms of CPD practices do not establish a link between the challenged policies and the alleged constitutional violations.

Mr. Tiderington expressly identifies documents and materials that CPD arguably withheld from Johnson during his prosecution, specifically the Erickson lineup report, photo identification procedures documentation, supplementary reports of critical witness interviews, interview notes, and a .25 caliber gun. As discussed further below, it is fairly disputed whether some CPD officers improperly withheld the Erickson lineup report and other police records from the defense. Thus, Mr. Tiderington's opinions could assist the jury in determining disputed issues in the case.

Further, Mr. Tiderington's grounds his opinions on standard police practices from 1991 to 1995 in sufficient support to be helpful to the jury. His professional education and experience in the field of police procedures supports his knowledge and experience with law enforcement practices during that timeframe. *Kumho Tire*, 526 U.S. at 150 (holding that an expert's opinion may be reliably based on their "personal knowledge or experience"). Further, Mr. Tiderington stated that model policies promulgated by professional organizations, such as the Commission on Accreditation for Law Enforcement, informed his opinions on appropriate police practices. Despite this, Mr. Tiderington's references to acceptable police practices generally lack citations. Thus, while a close question, this Court understands Mr. Tiderington's references to standard police practice to be based on his past experiences and review of model policies, and finds such opinions admissible. *See Gayton*, 593 F.3d at 616 ("Determinations on admissibility should not

31

supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.").

The Court also finds it unlikely that Mr. Tiderington's opinions would improperly confuse the jury. The City can fully explore the weaknesses, support, and limitations of his opinions on cross-examination. It is not Mr. Tiderington's duty alone to establish the causation element of Johnson's *Monell* claim. Rather, Mr. Tiderington's report provides support for the idea that the City's recordkeeping policies and procedures caused potentially exculpatory evidence to be withheld or not documented in Johnson's case. The Court will evaluate Johnson's other evidence below. A jury will determine the appropriate weight to give Mr. Tiderington's opinions based on the full record and cross-examination.

For these reasons, the Court denies the City's motion to exclude Tiderington's expert opinions.

## II. Motions For Summary Judgement

The Court now turns to Defendants' motions for summary judgment. Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on

mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

### A. Constitutional Claims

#### 1. Fabrication of Evidence

Johnson argues that the Individual Defendants fabricated the Guevara lineup report, which stated that no one identified Johns, or anyone else, as the shooter. Johnson also argues that the Individual Defendants fabricated the identifications of him by Elba Burgos, Rosa Burgos, and Ricardo Burgos by creating entirely false records and using unduly suggestive identification techniques. Further, Johnson argues Daley fabricated his statement at trial that he knew Johnson to go by the nickname "Little D." As a result of these fabrications, Johnson claims that many of the other case records and reports were also fabricated to document the false identifications and fabricated facts.[7] The Individual Defendants argue that Johnson cannot prevail on any aspect of this claim.

---

[7] The Court addresses Johnson's arguments concerning fabrication based on unduly suggestive identification techniques in Section II.A.2.

Fabricated evidence can violate an individual's Fourteenth Amendment due process rights. "The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). The plaintiff must prove that the defendant "(1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his criminal trial, and (4) it was material to his conviction." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *12 (N.D. Ill. Mar. 29, 2022) (citing *Patrick*, 974 F.3d at 835).

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (citation omitted). This does not mean that the defendant must have personally participated in the violation of the plaintiff's constitutional rights. *See id.* at 833–34. Rather, the plaintiff "must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401–02 (7th Cir. 2018). It is sufficient "if the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with [the defendant's] knowledge and consent.'" *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir.1982)). Put differently, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see" such that their actions are either knowing or done with reckless indifference. *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011) (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)).

First, Johnson argues that if this Court finds that a question of fact exists as to whether his right to a fair trial was violated on any theory of liability that he advances, then this Court should

advance all his fair trial claims, with each sub-theory of liability, to trial. Johnson misunderstands this Court's responsibility at the summary judgment stage, however.[8] While the Court must assess all allegedly suppressed evidence together to determine if the suppressed evidence deprived a plaintiff of a fair trial, that does not mean that once Johnson establishes that one defendant may have violated his right to a fair trial based on one theory of liability, that his claims as to all defendants on any theory of fair trial liability can advance to trial. *See Camm v. Faith*, 937 F.3d 1096, 1108–10 (7th Cir. 2019) (explaining that the materiality of suppressed evidence is assessed cumulatively, but ultimately assessing each defendant's liability for a *Brady* violation separately). Summary judgment is intended to narrow the issues for trial. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("At the summary-judgment stage, the court can properly narrow the individual factual issues for trial by identifying the material disputes of fact that continue to exist." (emphasis omitted)). Courts routinely and appropriately assess sub-theories of fabrication and suppression claims to determine which sub-theories are adequately factually supported to advance to trial. *See, e.g.*, *Camm*, 937 F.3d at 1108–10 (reviewing three "baskets" of evidence that the plaintiff alleged were suppressed and finding that one of those baskets could not support his *Brady* claim); *Moran v. Calumet City*, 54 F.4th 483, 493–99 (7th Cir. 2022) (reviewing the different "baskets" of evidence that the plaintiff claimed the defendants suppressed or fabricated individually).

---

[8] *Goudy v. Cummings*, on which Johnson relies, does not stand for the proposition that district courts cannot or should not review sub-issues of liability. 922 F.3d 834 (7th Cir. 2019). Rather, in *Goudy*, the Seventh Circuit reversed a finding that a plaintiff could not survive summary judgment on any fair trial claim and, in choosing to not address one sub-theory of liability regarding the plaintiff's right to a fair trial, the court stated that "the district court is free to consider this issue" in light of the court's guidance. *Id.* at 844.

Having resolved that preliminary issue, the Court turns to the Individual Defendants' arguments as to the separate pieces of allegedly fabricated evidence and their involvement in any alleged fabrication.

### a.      The Guevara Lineup Report

The Court finds that an issue of material fact exists as to whether some of the Individual Defendants fabricated the Guevara lineup report.  Guevara, the author of the Guevara lineup report, pleaded the Fifth in response to questions about whether he fabricated the Guevara lineup report.  *See Evans v. City of Chicago*, 513 F.3d 735, 740–41 (7th Cir. 2008) (holding that the finder of fact in a civil case may draw a negative inference against an individual who pleads the Fifth).  Other than Michael Robinson, CPD records show that the other three individuals named in the Guevara lineup report as standing in the lineup with Johns were not arrested or in CPD custody at the time of the lineup.  The Guevara lineup report also arguably conflicts with the Erickson lineup report because the lineups reportedly occurred at approximately the same time (11:00 p.m. and 11:30 p.m.), and Gonzales identified Johns as the shooter in the Erickson lineup report and not the Guevara lineup report.  The seeming conflicts between the Erickson and Guevara lineup report, in addition to the evidence that supports that the individuals named in the Guevara lineup report were not present at Area 5 the night of the shooting, sufficiently create an issue of material fact as to whether it is false or fabricated.

The Individual Defendants argue that Johnson cannot prove that the Guevara lineup report was used against him at trial, a required element of fabrication, because the physical lineup report was not admitted as an exhibit at trial and the defense, not the prosecution, elicited information from Guevara about the lineup at trial.  It is undisputed that Guevara testified about the contents of the Guevara lineup report at trial when questioned by the defense and when cross-

36

examined by the prosecution. However, the prosecution also utilized the substance of the Guevara lineup report in its affirmative case and during closing arguments. Witnesses and defense counsel also mentioned the written Guevara lineup report at trial and defense counsel used it to refresh the memory of witnesses at trial. *See, e.g.*, Doc. 313-2, Ex. 5, B56:2–B57:8 ("Q. Is there anything that would refresh your memory? A. It would be the first lineup report. . . . Q. When was the first lineup? A. The first lineup was on the night of the shooting."). The Court finds that even if neither party introduced the Guevara lineup report into evidence as an exhibit at Johnson's trial, it was effectively used at trial both in substance through testimony and physically to refresh witnesses' recollections. *See Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) ("It is well-established that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'"). Further, the Guevara lineup report was material to Johnson's conviction because one of the defense's main arguments was that Johns was the true perpetrator and the prosecution used the Guevara lineup report to refute that defense, including in closing arguments. *Patrick*, 974 F.3d at 835–36 (explaining that fabricated evidence is material if there is a reasonable likelihood that the evidence affected the judgment of the jury).

### b. The Identifications of Johnson

Next, the Individual Defendants argue that Johnson cannot prove that they fabricated any of the identifications by Elba Burgos, Rosa Burgos, and Ricardo Burgos because no evidence exists that any of those identifications were false. To be clear, Johnson challenges the following identifications: (1) Ricardo Burgos' identification of Johnson in a photo in June 1991; (2) Elba Burgos' identification of Johnson in a photo on July 15, 1991; (3) Ricardo Burgos', Elba Burgos', and Rosa Burgos' identifications of Johnson in a lineup on July 22, 1991. The

Individual Defendants are correct that in order to support his claim, Johnson needs to present sufficient evidence to suggest that each defendant knowingly fabricated evidence that is false. *See Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("Fabricated testimony is testimony that is made up; it is invariably false.")

Reviewing the evidence closely, no evidence in the record suggests that Elba Burgos' photo or lineup identifications of Johnson were false or that a basis exists for the Individual Defendants to have known of the falsity of the identifications.[9] According to the police reports, Guevara showed Elba Burgos a photo of Johnson on July 15 and a lineup on July 22, and in response to both, Elba Burgos identified Johnson as the person she saw running away from the shooting. Elba Burgos testified at trial the same way. Elba Burgos' subsequent statements during her deposition in this case that she does not recall seeing the shooting do not contradict her identifications. *See Brown v. Chi. Transit Auth. Ret. Plan*, 197 F. App'x 475, 481 (7th Cir. 2006) (holding that a witness failing to recall something does not create an issue of material fact as to whether their previous statements regarding that topic were true). Moreover, Elba Burgos identified Johnson as the person she saw running away after she heard the shooting; whether she actually saw the shooting was never at issue.

Further, Johnson's expert testimony regarding the likelihood that Elba Burgos' identification was unreliable given several factors in the identification does not raise more than speculation that Elba Burgos' identifications were false. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("Speculation cannot create a genuine issue of fact that defeats summary judgment." (citation omitted)). Elba Burgos' testimony that Guevara pointed at Johnson's brother in the photo and asked if he "was the one" does not support that Guevara or

---

[9] Again, the Court will separately address the question of undue influence with respect to the identifications in Section II.A.2.

Elba Burgos intended for her response to be inaccurate. Such a method may have influenced her identification, but it does not suggest falsity. In other words, Johnson's claim that Elba Burgos did not see the shooter's face well enough or long enough to make an identification remains pure speculation, not supported by evidence, and Johnson cannot proceed on this aspect of his fabrication claim.

Similarly, no evidence exists that Rosa Burgos' lineup identification of Johnson was false or that the Individual Defendants knew of its falsity. To the extent that Johnson argues that Rosa Burgos did not see the shooter's face because Johnson asserts that she must have focused on the gun during the shooting, this Court does not need to resolve the issue of whether Rosa Burgos' identification was false because Johnson has not presented any evidence that any of the Individual Defendants knew it was false. *See Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *25 (N.D. Ill. Mar. 13, 2018) (explaining that to state a fabrication claim, a plaintiff "must show that Defendants knew the confessions were false"). Rosa Burgos stated that she identified Johnson as the shooter in a lineup at trial, and police records document her identification. She said in her civil deposition that she would not have lied to the police and would have told the truth under oath in court. Johnson points to notes from defense counsel that state that Rosa Burgos told defense counsel that she had told the police that she was unsure in her identification. But as discussed above, that assertion contains multiple levels of hearsay and is not admissible under any exception. *See* Fed. R. Evid. 801, 803. Further, expert testimony regarding the circumstances of the identifications rendering them unreliable cannot establish fabrication, without more. As such, no evidence supports the conclusion that any of the Individual Defendants knew or had reason to know that Rosa Burgos' identification was false.

An issue of material fact exists, however, as to whether Ricardo Burgos' photo identification of Johnson in June 1991 or his identification of Johnson in the July 22 lineup were knowingly fabricated. Ricardo Burgos and Guevara both testified at trial that in June 1991, Guevara showed Ricardo Burgos a photo of Johnson and Ricardo Burgos then identified Johnson as the shooter. No police records exist that document any such photo identification. Other police records and testimony instead support that Daley did not secure a photo of Johnson for Guevara until July 15, 1991. Further, a supplemental report authored by Guevara from June 21, 1991, states that Ricardo Burgos told Guevara that the shooter was a Hispanic man. On July 22, 1991, Ricardo Burgos identified Johnson as the shooter in a lineup, as documented in a police report and reiterated by Ricardo Burgos at trial. Ricardo Burgos made statements in his deposition for this case that he did not see the shooter's face, did not recall testifying at all in the trial, and would not have lied under oath in front of a judge. Taking the evidence in the light most favorable to Johnson, he has established an issue of material fact as to whether Ricardo Burgos falsely identified Johnson in the photo or the lineup. Some of the Individual Defendants may also have known that Ricardo Burgos' identification was false because of the inconsistency with his statement in June that the shooter was Hispanic or because he identified Johnson as the shooter before the Individual Defendants had a photo of Johnson.

The last remaining question is whether the Ricardo Burgos identifications were material, meaning, "there is a reasonable likelihood the evidence affected the judgment of the jury." *Moran*, 54 F.4th at 499 (quoting *Patrick*, 974 F.3d at 835). Ricardo Burgos identified Johnson as the shooter in court and described his lineup identification of Johnson in July 1991. Both Ricardo Burgos and Guevara testified regarding the photo identification, and it was the only identification of Johnson as the shooter in June 1991. Further, the defense attempted to impeach

40

Ricardo Burgos' identifications of Johnson by pointing out his statement in June 1991 that the shooter was a Hispanic man, which Guevara had documented in a report. A reasonable juror could find that eliminating Ricardo Burgos' photo and lineup identifications could have affected the judgment of the jury, because it could have undermined one of the three key witnesses who identified Johnson as the shooter and made the other identifications appear more suspect. *See id.*

In summary, Johnson has presented sufficient evidence to create an issue of material fact as to whether one or more of the Individual Defendants fabricated Ricardo Burgos' identifications of Johnson.

### c. The Personal Involvement of the Individual Defendants in the Alleged Fabrications

Next, the Court addresses the personal involvement of each Individual Defendant with respect to the Guevara Lineup Report and Ricardo Burgos' identifications, as well as, with respect to Daley, Johnson's claim that Daley fabricated his statement that Johnson went by the nickname "Little D."

### i. Guevara

As described above, Guevara authored the Guevara lineup report and pleaded the Fifth in response to questions about whether he fabricated that report. Guevara also testified that he showed Ricardo Burgos a photo of Johnson in June 1991, but a police report and Daley's testimony support that Guevara did not have a photo of Johnson until July 1991. Guevara also authored a police supplemental report, which states that on June 21, 1991, he interviewed Ricardo Burgos who told him that the shooter was a Hispanic man. Guevara was also involved in conducting the July 22, 1991 lineup in which Ricardo Burgos identified Johnson. Guevara pleaded the Fifth in response to questions about whether he fabricated Ricardo Burgos' identifications.

41

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In criminal cases, no negative inferences can be drawn against a defendant through their exercise of their Fifth Amendment rights. *Baxter v. Palmigiano*, 425 U.S. 308, 317–18 (1976). In civil cases, no such prohibition on negative inferences exists; the finder of fact may, but is not required to, draw a negative inference against a witness who invokes their Fifth Amendment rights. *Evans*, 513 F.3d at 740–41 (citing *Baxter*, 425 U.S. at 318). However, "the direct inference of guilt from silence is forbidden"; a party may not rest on the negative inference alone. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995); *Clancy v. Coyne*, 244 F. Supp. 2d 894, 899 (N.D. Ill. 2002) ("[A] moving party must introduce actual evidence that the elements of its case exist and cannot rest solely on the negative inference associated with the assertion of the Fifth Amendment privilege.").

Here, Johnson has sufficiently created a genuine dispute of material fact as to whether Guevara fabricated the Guevara lineup report. Guevara's authorship and pleading the Fifth support that he took these actions knowingly. Further, Guevara's pleading the Fifth, the lack of contemporaneous arrest records for the individuals who allegedly stood in the lineup with Johns according to the Guevara lineup report, and the contradicting Erickson lineup report, support that Guevara personally fabricated the Guevara lineup report.

An issue of material fact also exists as to whether Guevara fabricated the Ricardo Burgos identifications. No police record of any June 1991 photo identification exists, and, instead, both police records and Daley's testimony support that Guevara did not have a photo of Johnson until July 1991. Further, Guevara's own supplemental police report from June 1991 supports that he did not conduct a photo identification at that time and instead states that Ricardo Burgos

42

indicated that the shooter was a Hispanic man. Further, Guevara administered the July 22, 1991, lineup in which Ricardo Burgos identified Johnson, which also conflicts with Guevara's written report from June 1991 in which he claimed Ricardo Burgos stated that the shooter was a Hispanic man. Guevara also pleaded the Fifth in response to questions about whether he falsified the Ricardo Burgos identifications. From this evidence, a reasonable jury could find that Guevara personally fabricated the identifications.

Evidence certainly exists that suggests that Guevara did not fabricate the Guevara lineup report or Ricardo Burgos identifications. For example, in his civil deposition, Gonzales denied that he identified anyone the night of the shooting or saw the shooter. Further, it may be that at trial, a jury finds that the lack of documentation for the Ricardo Burgos photo identification was due to inadvertence. But at this stage, these remain questions for the trier of fact.

ii.   <b>Halvorsen</b>

Although no evidence exists to support that Halvorsen was involved in the Fred murder investigation on June 12 or 13, 1991, Halvorsen was actively involved in the investigation in July 1991. Halvorsen's name appears nowhere on the Erickson or Guevara lineup reports. But in July 1991, Halvorsen and Johns both testified for the prosecution in a different murder case where Halvorsen had conducted a lineup where Johns identified the alleged killer. Further, prior to Johnson's trial, the prosecutor wrote a note to Halvorsen requesting the files related to the case. That note was located in the investigative file for the case, which contained the Erickson lineup report. The Guevara lineup report was turned over to the prosecutor, but the Erickson lineup report was not.

Having reviewed these facts, the Court finds an issue of material fact exists as to whether Halvorsen helped fabricate the Guevara lineup report. Although the evidence does not support

43

that Halvorsen helped physically create the Guevara lineup report, a reasonable jury could conclude that Halvorsen learned of the existence of both the Erickson and Guevara lineup reports during his work on the investigation and turned a blind eye or facilitated the fabrication. *See McQueen v. City of Chicago*, 803 F. Supp. 2d 892, 901 (N.D. Ill. 2011) ("A defendant may be personally liable if he 'acquiesced in some demonstrable way to the alleged constitutional deprivation,' or if the 'conduct causing the constitutional deprivation' occurred at his 'direction or with [his] knowledge and consent.'" (citations omitted)). Particularly, the presence of a note to Halvorsen in the investigative file suggests that Halvorsen knew of the Erickson lineup report. If Halvorsen knew about both reports and that they contradicted one another, Halvorsen may have well realized or known that the Guevara lineup report was fabricated. From this knowledge of the contradicting lineup report, a genuine issue of material fact exists as to whether the fabrication could have occurred with Halvorsen's knowledge and consent. Further, the evidence of Halvorsen testifying in July 1991 with Johns supports that Halvorsen acted knowingly, having a reason to help fabricate evidence to protect Johns. *See White v. City of Chicago*, No. 17-cv-02877, 2018 WL 1702950 at *5 (N.D. Ill. Mar. 31, 2018) (finding that additional defendants who collaborated and helped further the initial fabricated story could be personally liable for fabrication).

The Court does not find sufficient evidence exists from which a reasonable juror could conclude that Halvorsen fabricated the Ricardo Burgos identifications, however. The Fred investigation records do not mention Halvorsen before July 1991. Further, neither Guevara nor Ricardo Burgos mentioned Halvorsen in their testimony about the photo identification, or Guevara's supplemental police report from June 1991. While Halvorsen participated in the July 22, 1991, lineup, no evidence suggests that he had knowledge that Guevara may have fabricated

44

Ricardo Burgos' identification. There is no evidence that Halvorsen reviewed or possessed Guevara's June 1991 report, in which Guevara wrote that Ricardo Burgos stated that the shooter was a Hispanic man. There is also no evidence that anything occurred at the July 22, 1991 lineup, that would have given Halvorsen knowledge that the Ricardo Burgos identification may have been false. Therefore, Johnson cannot proceed on this aspect of his fabrication claim against Halvorsen.

### iii. Erickson

Johnson has presented sufficient evidence to create an issue of material fact as to whether Erickson fabricated the Guevara lineup report. Erickson's name and signature appears on both the Guevara and Erickson lineup reports. A reasonable jury could find that the Erickson lineup report contradicts the contents of the Guevara lineup report because they both occurred at approximately the same time and Gonzales identified Johns in one report and not the other. The Erickson lineup report was not put in the permanent retention file for the case, although it was in the investigative file. In combination, this suffices for a reasonable jury to find that Erickson had some involvement in fabricating the Guevara lineup report. That Erickson's name does not appear on any of the Fred investigation records after June 13, 1991, and he retired from CPD in August 1991, does not affect his previous signatures on the two seemingly contradictory lineup reports.

Johnson has not presented sufficient evidence to create an issue of material fact as to whether Erickson fabricated the Ricardo Burgos identifications, however. No evidence supports that Erickson was involved in the Fred investigation after June 13, 1991. Further, Guevara and Ricardo Burgos did not mention Erickson in their testimony about the photo identification, and

Guevara's supplemental police report from June 1991 and the July 1991 lineup report do not reference Erickson.

### iv.      Daley

Johnson has not presented sufficient evidence to create an issue of material fact as to whether Daley fabricated the Guevara lineup report.  There is no evidence that Daley knew of the Erickson lineup report or any positive lineup on the night of the shooting.  Although Daley arrested Johns on the night of the shooting and brought him to Area 5, when Johns left CPD custody, someone informed Daley that the result of the lineup had been negative.  Daley did testify at Johnson's trial that the lineup involving Johns on the night of the shooting had been negative.  But Daley never stated that he was present for the lineup, and Daley is not named in either lineup report.  Further, no testimony from any witness suggests that Daley was present at the lineup where Gonzales identified Johns as the shooter.  Because no evidence exists that Daley knew of a positive identification or of the falsity of the information he received about the negative lineup, a reasonable juror could not conclude that Daley knew any evidence was fabricated or had any involvement in the fabrication.

Johnson has also not presented sufficient evidence to create an issue of material fact as to whether Daley fabricated the Ricardo Burgos identifications.  Daley was not named as being involved in the Ricardo Burgos photo identification and instead testified unambiguously that he did not bring Guevara a photo of Johnson until mid-July 1991.  In his civil deposition, he could not explain how Guevara would have been able to conduct a photo identification of Johnson with Ricardo Burgos before July 1991, with his testimony supporting Johnson's argument that the Ricardo Burgos photo identification may have been fabricated.  Daley was also not involved in

46

the July 22, 1991, lineup. Daley's conduct does not suggest that he knew of, facilitated, or condoned the fabrication of the Ricardo Burgos identifications.

Separately, Johnson argues that Daley fabricated the testimony he provided at trial that Johnson was known as "Little D." At Johnson's trial, Daley testified that he knew Johns had the nickname "Little D" and that Johnson also had the nickname "Little D." Daley testified that he had known Johnson for years and personally knew him to go by that nickname. Rosa Burgos testified at Johnson's trial that she knew Johns to have the nickname "Little D" and Johnson's older brother to have the nickname "D." The prosecution advanced a theory that Johnson also went by the nickname "Little D" because he was the little brother of the person whose nickname was "D." Elizabeth Martinez, who testified she was with Johns on the night of the shooting, testified that Johns was "Little D" and Johnson did not go by the nickname "Little D," however.

These facts do not create an issue of fact as to whether Daley fabricated that Johnson went by the nickname "Little D." Even accepting that Daley's statement was factually false, and Johnson did not go by the nickname "Little D," one witness' testimony that she did not know Johnson to go by the nickname "Little D" does not suffice to suggest that Daley knew his statement was false. *See Coleman v. City of Peoria*, 925 F.3d 336, 344–45 (7th Cir. 2019) (explaining that a plaintiff must show that a defendant knew "with certainty" that the alleged fabricated evidence was false and that evidence that merely impeaches a defendant's statement is insufficient to show knowledge).

### v.      Healy

Healy's only involvement in the case is that, as a supervisor, he signed four documents prepared by other officers on July 24, 1991: (1) the Guevara lineup report; (2) the lineup report where Rosa, Elba, and Ricardo Burgos identified Johnson; (3) a supplemental report

47

documenting Guevara interviewing Rosa Burgos and Victor Cordova that included no

identifications; and (4) a supplemental report documenting that Johnson had been identified in

photos, taken into custody, and identified in a lineup. "Under § 1983, there is no *respondeat*

*superior* liability." *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). However, "a

supervisor may still be personally liable for the acts of his subordinates if he 'approves of the

conduct and the basis for it.'" *Backes*, 662 F.3d at 870 (quoting *Chavez v. Ill. State Police*, 251

F.3d 612, 651 (7th Cir. 2001)). The supervisor must have known about the conduct and

facilitated it, approved it, condoned it, or turned a blind eye to it. *Id.*

Here, Johnson has not presented evidence from which a reasonable juror could conclude

that Healy knew of the wrongful conduct. While Healy reviewed the Guevara lineup report,

nothing suggests that Healy ever saw the Erickson lineup report or knew of a positive lineup

identification of Johns on the night of the shooting. And nothing on the face of the Guevara

lineup report suggests that it is fabricated, meaning Healy would have to possess additional

knowledge for him to know of its fabrication. But Johnson has not presented any additional

evidence that would suggest that Healy knew of Johns' positive lineup identification on the

same night or that some of the individuals named in the Guevara lineup report were not in police

custody at the time of the lineup. Further, no written report exists for the Ricardo Burgos photo

identification and neither Guevara nor Ricardo Burgos mentioned Healy when they described

that supposed identification. And nothing on the face of the July 22, 1991, lineup report would

give Healy knowledge of the potential fabrication of Ricardo Burgos' identification.

Johnson argues that Healy should have known of the fabrications because of his duty as a

supervisor to monitor homicide investigations. However, beyond Johnson's argument that

Healy's position as a supervisor required his involvement in homicide investigations and

subsequent knowledge of the fabrication, Johnson has not presented any specific evidence to suggest that Healy knew of any of the allegedly wrongful conduct by the investigating officers. And Johnson's speculation does not create an issue of material fact as to knowledge. *See Rivera*, 319 F. Supp. 3d at 1051 (finding that a plaintiff does not create a genuine issue of material fact as to knowledge of a police supervisor who testified he was kept generally apprised of an investigation because that does not demonstrate knowledge of specific steps of wrongful conduct by subordinates). Further, to the extent that Johnson argues that Healy's review of the case documents would have provided him with enough information for him to discern the fabrication due to irregularities or inconsistencies in the documents, Healy's failure to notice the irregularities suggests, at most, negligence, which does not suffice to subject Healy to liability under § 1983 as a supervisor. *Id.* (holding that a police supervisor's failure to notice irregularities or defects in reports from subordinates was, at most, negligence).

In summary, the Court allows Johnson's due process fabrication claim regarding the Erickson lineup report to proceed against Guevara, Halvorsen, and Erickson, and his fabrication claim regarding the Ricardo Burgos identifications against Guevara. The Court grants summary judgment in favor of the Individual Defendants as to the remainder of Johnson's due process fabrication claims.

### 2. Unduly Suggestive Identifications

Johnson also argues that the Individual Defendants fabricated various witnesses' identifications of him by using unduly suggestive identification techniques. The Individual Defendants argue that the Supreme Court's holding in *Vega v. Tekoh*, 597 U.S. 134 (2022), forecloses this claim.

In *Vega*, a plaintiff brought a § 1983 claim against an officer who obtained a statement from the plaintiff in violation of the plaintiff's *Miranda* rights, after the government used that statement against the plaintiff in criminal proceedings. *Id.* at 138. The Supreme Court held that such a violation of *Miranda* rights does not give rise to a § 1983 claim, reasoning that because § 1983 only creates a cause of action for deprivations of "rights, privileges, or immunities secured by the Constitution and laws," and a *Miranda* violation does not amount to a violation of the Fifth Amendment, such a violation could not give rise to a § 1983 claim. *Id.* at 141 (quoting 42 U.S.C. § 1983).

Recently, in *Blackmon v. Jones*, the Seventh Circuit applied the *Vega* decision in a case where a plaintiff brought a § 1983 claim against officers, arguing that the defendant officers used unconstitutionally suggestive identification procedures to obtain identifications of him in a photo array and lineup. --- F.4th ---, 2025 WL 869045, at *1 (7th Cir. 2025). The Seventh Circuit reasoned that *Vega*'s holding that "[e]xcept in unusual circumstances, the 'exclusion of unwarned statements' should be 'a complete and sufficient remedy'" is "equally true of eyewitness identifications potentially influenced by suggestive procedures." *Id.* at *2 (quoting *Vega*, 597 U.S. at 152). Further, the Seventh Circuit clarified that "unusual circumstances," the only circumstances in which a claim involving unduly suggestive identifications would be actionable, involve assertions that officers had deceived prosecutors and coerced witnesses into testifying at trial. *Id.* at *2–3. Finally, the Seventh Circuit found that qualified immunity would bar a § 1983 claim against an officer for using unduly suggestive identification procedures because "[b]efore 2002, neither this circuit, nor any other, had held that an officer could be liable for employing suggestive identification procedures." *Id.* at *3 (citation omitted).

50

Here, while Johnson's unduly suggestive identification procedures claim may raise unusual circumstances because he argues that the Individual Defendants coerced the witnesses into identifying Johnson and that the Individual Defendants did not disclose to the prosecutor that they fabricated the identifications, qualified immunity bars Johnson's claims against the Individual Defendants. *Id.* The Court therefore grants summary judgment in favor of the Individual Defendants on Johnson's unduly suggestive identification claims.

### 3. *Brady* Violations

Next, Johnson argues that the Individual Defendants wrongfully suppressed the following categories of evidence: (1) the Erickson lineup report; (2) the Individual Defendants' fabrication of evidence against Johnson; (3) personal notes or "street files;" and (4) miscellaneous other evidence that would support that the Individual Defendants wrongfully prosecuted Johnson.[10]

"Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel under *Brady v. Maryland*." *Coleman*, 925 F.3d at 349 (citing *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016)). A civil *Brady*-based due process claim against a police officer requires the plaintiff to demonstrate: (1) the evidence in question was favorable to him; (2) the police suppressed the favorable evidence; and (3) prejudice ensued because the suppressed evidence was material. *Moran*, 54 F.4th at 492; *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008.

---

[10] The Individual Defendants point out that Johnson raises many of his arguments regarding what specific evidence they allegedly suppressed for the first time in his response in opposition to summary judgment. The Individual Defendants argue that Johnson waived these new arguments because he failed to include them in his interrogatory responses. A review of the interrogatories and responses show that both parties' phrasing was unclear. For that reason, and in pursuit of fairness, this Court will rule on the merits of all aspects of Johnson's suppression claims.

Evidence is suppressed for *Brady* purposes if the "prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence" and "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Further, withheld evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Coleman*, 925 F.3d at 349 (quoting *Carvajal*, 542 F.3d at 566–67). The "materiality of suppressed evidence is considered collectively, not item by item" to assess if "the defendants are liable for causing [the plaintiff] to receive an unfair trial in violation of his due process rights." *Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019).

### a.        Erickson Lineup Report

### i.        Suppression of the Erickson Lineup Report

A genuine issue of material fact exists as to whether the Erickson lineup report was suppressed in violation of *Brady*.[11] Both the prosecutor and defense attorney in Johnson's criminal trial, who requested records for the case, testified that they never received the Erickson lineup report. The Erickson lineup report is not part of the case's permanent retention file. No one mentioned the Erickson lineup report at trial. While Johns and Johnson were incarcerated together before Johnson's trial, Johns told Johnson that he was the shooter and that he had been pointed out in a lineup the night of the shooting. However, Johns told Johnson that he was not willing to testify to this or otherwise help Johnson's defense. Johnson shared this information with his defense counsel and defense counsel told Johnson that they needed proof. Defense counsel filed a motion for additional discovery seeking a photo of the lineup taken on June 13,

---

[11] This Court already addressed issues related to this in its July 31, 2023, opinion on Johnson's motion for summary judgment. *See Johnson v. Guevara*, No. 20 C 4156, 2023 WL 4864313, at *5–6 (N.D. Ill. July 31, 2023).

1991. Defense counsel also testified that she did not interview Johns because she did not know if he was represented by counsel, and she thought he would not talk to her.

The Individual Defendants nonetheless argue that the Erickson lineup report was not suppressed for *Brady* purposes because the defense knew of its contents or could have become aware of them through reasonable diligence. But a reasonable jury could find that the defense did not know of and could not discover the full contents of the Erickson lineup report. The defense subpoenaed records and expressly filed an additional motion seeking more information on the lineup. Despite these efforts, the defense seemingly never received the Erickson lineup report. Further, although Johns told Johnson a witness picked him out of a lineup and Johnson shared this information with his counsel, Johns did not say who had picked him out or provide any evidence to support his assertion. Thus, the defense lacked critical information from the Erickson lineup report that would have facilitated their development of an argument on the contents of the Erickson lineup report. *See Boss*, 263 F.3d at 740–44 (allowing a *Brady* claim regarding information possessed by the government that was not disclosed to proceed, finding that defense counsel was not required to ask a witness about something about which defense counsel could not have reasonably expected the witness to know). Defense counsel did not know that Gonzales supposedly identified Johns and thus did not know to interview Gonzales. Further, because of the negative Guevara lineup report from the same night that also stated that it involved Johns, the defense may have reasonably concluded Johns was mistaken and no positive lineup report existed. Therefore, a reasonable juror could find that the defense did not know about the Erickson lineup report and was reasonably diligent in seeking the relevant information.

Finally, even if the defense knew of the contents of the Erickson lineup report and could have developed testimony on it from witnesses, the form of the Erickson lineup report may have

been more helpful for the jury as it contained more specific details about the positive lineup, including who specifically identified Johns as the shooter. *See Moran*, 54 F.4th at 496 ("The form of evidence produced is only relevant for *Brady* purposes when evidence in one form would be more helpful to the defense than evidence in another form—that is, when there is a material difference between the two forms of evidence."). For example, in *Goudy*, the Seventh Circuit found that even if defense counsel could have located an affidavit that stated that a third party had been identified in a lineup, a *Brady* violation occurred because the defense could not access a video recording of the lineup. 922 F.3d at 840. The court reasoned that the affidavit did not contain "the specific exculpatory and impeachment material—such as the identities of the witnesses that identified Harvell in conflict with their trial testimony, or Nunn's identification of a non-suspect—found in the video." *Id.* Similarly, even if Johns did tell Johnson he was picked out in a lineup and Johnson's counsel could have learned more about that lineup from individual witnesses, the Erickson lineup report contained the specific exculpatory and impeachment material that would have most supported Johnson's defense, such as the identity of the individual who identified Johns.

Additionally, the Erickson lineup report would have been favorable to Johnson's defense because it contains a positive identification of Johns as the shooter, which supports the defense's primary argument that Johns, not Johnson, was the true shooter. It also serves as impeachment evidence that the defense could have used to contradict the multiple witnesses' testimony of a negative lineup on the night of the shooting during which no witnesses identified Johns.

A reasonable juror also could find that a reasonable probability exists that, if the Individual Defendants disclosed the Erickson lineup report to the defense, the result of the trial would have been different. Johnson's defense attorney testified clearly that she would have used

54

the Erickson lineup report at trial. And an eyewitness identification of a different person as the shooter, on the night of the shooting, would have undermined the reliability of the identifications of Johnson as the shooter a month after the shooting, which were central to the prosecution's case. The Erickson lineup report would have also supported the defense's primary theory that Johnson was innocent because Johns was the true shooter. *See Boss*, 263 F.3d at 745–46 (finding that withheld exculpatory evidence was material where it suggested that a different person was the true perpetrator of the offense and would have corroborated the defense's theory).

### ii.      Each Individual Defendant's Involvement

The Court now turns to each Individual Defendant's personal involvement in the suppression of the Erickson lineup report. First, as discussed above, no evidence exists that Daley or Healy knew of the Erickson lineup report or any positive Johns lineup. For that reason, a reasonable juror could not find them liable for suppressing the Erickson lineup report. *See, e.g.*, *United States v. Walker*, 746 F.3d 300, 306–07 (7th Cir. 2014) (finding that a *Brady* claim failed where the criminal defendant "failed to show that the government or any actors assisting the government in its investigation had any access to or knowledge of the suppressed evidence"); *United States v. Burnside*, 824 F. Supp. 1215, 1251 (N.D. Ill. 1993) ("[I]f the government had no knowledge of undisclosed *Brady* material at the time of a defendant's trial, then the government could not be held to have suppressed that *Brady* material.").

A reasonable juror could find that Guevara suppressed the Erickson lineup report. A jury could infer that Guevara knew of the Erickson lineup report because Guevara pleaded the Fifth in response to questions about the report and the Erickson lineup report names him as being present, although his name appears incorrectly as "Raymond." As this Court explained in its

previous opinion addressing Johnson's request for summary judgment on this claim as to Guevara, Doc. 273, ample evidence exists on both sides, leaving the question for the trier of fact.

Sufficient evidence also exists to create an issue of material fact as to whether Halvorsen suppressed the Erickson lineup report. A note in the investigation file, which also contained the Erickson lineup report, stated that the prosecutor requested that Halvorsen bring him the files from the case. As discussed above, from the note, a reasonable jury could infer that Halvorsen had access to the investigation file, including the Erickson lineup report, and therefore knew of the Erickson lineup report and suppressed it by not providing it to the prosecutor.

Finally, the Court finds that this claim can proceed to trial against Erickson. While Erickson is not named on any case documents from the Fred murder investigation after June 13, 1991, he authored the Erickson lineup report and signed the seemingly contradictory Guevara lineup report as well. The Erickson lineup report was also not stamped with the permanent retention file stamp, put into the permanent retention file, or seemingly presented to a supervisor for review. From these facts, a reasonable jury could find that Erickson suppressed the Erickson lineup report by signing a contradictory report and not putting the Erickson lineup report into the permanent retention file. That Erickson retired shortly after the lineup is not enough to conclusively refute the possible inference of his involvement.

### b.     Fabrication of Evidence

Next, Johnson argues that the Individual Defendants suppressed information of their own fabrication of evidence against Johnson by not disclosing the fabrication or their wrongful conduct. Essentially, Johnson's argument is that the Individual Defendants suppressed evidence by not disclosing their own misconduct. To the extent that this Court previously found that

56

certain evidence was not fabricated, Johnson's argument fails because there was no fabrication for the Individual Defendants to fail to disclose.

As for the remaining allegedly fabricated evidence, "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015). While defendants do not violate *Brady* by failing to disclose the fact of their fabrication, defendants do violate *Brady* by failing to disclose any evidence of the fabrication. *See, e.g.*, *Bouto v. Guevara*, No. 19-cv-02441, 2024 WL 4346561, at *7 (N.D. Ill. Sept. 30, 2024); *Smith v. Burge*, 222 F. Supp. 3d 669, 680–81 (N.D. Ill. 2016). For example, defendants must disclose notes documenting their fabrication, reports documenting exculpatory witness statements, and implements of coercing witnesses into giving fabricated statements. *See Bouto*, 2024 WL 4346561, at *7. Based on this authority, Johnson has no colorable *Brady* claim to the extent that he asserts that the Individual Defendants should have affirmatively disclosed their fabrications. *See Myvett v. Heerdt*, No. 12 C 09464, 2015 WL 12745087, at *6 (N.D. Ill. May 28, 2015). To the extent that Johnson argues that the Individual Defendants suppressed additional evidence of their fabrication such as notes, the Court addresses this argument in connection with Johnson's other arguments that the Individual Defendants suppressed their notes and street files below.

### c.  Handwritten Notes and "Street Files"

Johnson also argues that the Individual Defendants suppressed information contained in handwritten notes and "street files" that the Individual Defendants never produced and have never been located. To support this contention, Johnson points out that Guevara admitted at trial that he would take handwritten notes when he interviewed someone and then base his police

reports on those handwritten notes. Additionally, in an unclear exchange at trial, Guevara admitted to taking notes of his interview with Elba Burgos, stated that he believed that he had documented his interviews with her in two supplemental reports, and, after defense counsel showed him the single supplemental report discussing his interview with her that defense counsel possessed, he stated no other supplemental reports regarding her existed. Johnson argues Guevara's statements at his criminal trial establish that Guevara took notes during his interview with Elba Burgos that were not disclosed to the defense. Johnson also attempts to again utilize the notes and deposition testimony from defense counsel regarding his discussions with Rosa Burgos for the truth asserted therein in a manner that is impermissible hearsay. Fed. R. Evid. 801, 803.

Johnson has presented sufficient evidence to create an issue of material fact as to whether Guevara suppressed his handwritten notes and street file evidence. In combination, the evidence Johnson has presented would allow a reasonable jury to conclude that Guevara had additional handwritten notes, in other words, a "street file," that he did not disclose to the prosecution or defense. Guevara pleaded the Fifth in response to questions about his notes, the contents of his notes, and whether he suppressed evidence. Because Guevara admitted to taking handwritten notes, pleaded the Fifth in this case as to the issue, and the exculpatory Erickson lineup report was not disclosed to the defense, a reasonable jury could conclude that Guevara's handwritten notes might have contained exculpatory materials. *See Fields*, 2014 WL 477394, at *7 (finding sufficient evidence for a jury to find that a street file included exculpatory documents when some of the other documents withheld from the defense would cast doubt on the prosecution's theory of the case). A reasonably jury could also conclude that the handwritten notes may have been material. In combination with the Erickson lineup report, which would undermine the credibility

of the Guevara lineup report and the officers who testified at trial, the handwritten notes and street file similarly may have changed the outcome of the case because materials in the notes could have undermined witness identifications of Johnson or provided further evidence to support that someone else was the true perpetrator.

The Court also finds an issue of material fact exists as to whether the defense could have discovered the contents of Guevara's handwritten notes and street file using reasonable diligence. The defense and prosecution both sought all documents related to the case. Defense counsel also interviewed some of the witnesses, such as Rosa Burgos, but did not interview Weeks. While it appears possible that the defense could have learned some of the material in the handwritten notes by talking to witnesses, it is unclear whether the notes included additional exculpatory or impeachment evidence that the defense could not learn from other witnesses, such as Guevara's impressions or statements witnesses could not later recall. Guevara testified that his handwritten notes would contain "not word for word what [the witnesses] say, but basically what they're telling you." A reasonable jury could thus infer that the handwritten notes would contain information that the defense could not obtain through other sources. *See Goudy*, 922 F.3d at 840; *Rivera*, 19 F. Supp. 3d at 1046 (rejecting an argument that a defendant could have learned about information from interviewing witnesses when it was not clear what information the witnesses would have shared or if they would have recanted). Further, handwritten reports from Guevara could have been used to impeach his testimony about the steps he took during the investigation or the testimony of others, if they were not honest with defense counsel.

Johnson has not created an issue of material fact as to whether any of the other Individual Defendants suppressed handwritten notes or street file evidence, however. "[I]f there is no proof of a document's existence, government officials cannot be held liable under *Brady*." *Hill v. City*

*of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4 (N.D. Ill. Jan. 26, 2009) (collecting cases).

Other than as to Guevara, Johnson has not presented evidence that any other Individual

Defendant possessed any handwritten or street file evidence that the official permanent retention

or investigative files did not contain. To extrapolate that the other Individual Defendants

suppressed handwritten notes or street file evidence from Guevara's statements or the mere fact

of their involvement in the homicide investigation amounts to mere speculation. *See id.* (finding

that it was mere speculation to suppose that documents had been withheld when the record

contained no evidence of the existence of documents beyond the fact that defendants were

involved in an investigation and took actions that were not documented with materials in the

police file); *see also Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383 (N.D. Ill. Sept.

23, 2019) (collecting cases).

### d. Miscellaneous Other Evidence

Johnson argues that the Individual Defendants suppressed miscellaneous other

information that would have been material to his defense, including: (1) evidence that

undermined the reliability of the identifications by Rosa Burgos, Ricardo Burgos, and Elba

Burgos; (2) undefined evidence that would show Johnson was a suspect before any evidence

implicated him; (3) evidence of the investigation of an alternative suspect, Weeks; (4) evidence

that Johns was a cooperating witness in another case; and (5) evidence of the Individual

Defendants' own pattern of misconduct.

Other than as to Guevara potentially withholding handwritten notes, Johnson's argument

regarding alleged evidence that would undermine the reliability of the identifications by Rosa

Burgos, Ricardo Burgos, and Elba Burgos fails because Johnson has not established an issue of

material fact that such evidence existed or that the Individual Defendants knew of it. To support

his argument that such evidence existed, Johnson points to Ricardo Burgos' testimony in this case that he did not see the shooter; the notes and deposition testimony of Johnson's defense counsel, which are inadmissible hearsay in the manner Johnson attempts to utilize them; Guevara's statements at trial that he believed that he interviewed Rosa Burgos, Montanez, and Jewel on the night of the shooting, but the lack of documentation of those interviews in the police reports; that Ricardo Burgos and Guevara stated at trial that Guevara showed Ricardo Burgos a photo in June 1991; and that Guevara allegedly pointed to the photo of Johnson's older brother when he showed it to Elba Burgos in July 1991.

To the extent that Johnson alleges that Guevara suppressed potentially exculpatory handwritten notes, and those notes may have included materials related to interviews with Rosa Burgos, Montanez, and Jewel, Johnson has established an issue of material fact. As discussed above, Guevara indicated that he would take handwritten notes of interviews, and his trial testimony also arguably supports that he interviewed Rosa Burgos, Montanez, and Jewel on the night of the shooting. The Court found above, and reiterates now, that an issue of material fact exists as to whether Guevara suppressed his potentially exculpatory handwritten notes. But Johnson has not identified an issue of fact as to the other Individual Defendants with respect to such evidence. As discussed above, Johnson has not presented any evidence that would suggest that any other Individual Defendants possessed any evidence that was outside of the official police file. *See Hill*, 2009 WL 174994, at *4.

Similarly, Johnson's argument that the Individual Defendants suppressed evidence that would state that Johnson was a suspect before the Individual Defendants had evidence implicating him cannot succeed because Johnson has not presented sufficient evidence to show any such evidence existed. While Guevara and Ricardo Burgos testified that Guevara showed

Ricardo Burgos a photo of Johnson in June 1991, Johnson has not presented any other evidence suggesting that he was a suspect before the police had any evidence implicating him. According to case documents, Johnson became a case suspect in July 1991 after Elba Burgos viewed a photo lineup, in which she stated the shooter looked like Johnson's brother. As discussed above, Johnson can argue that Guevara suppressed potential handwritten notes of his investigation and interview with Ricardo Burgos in June 1991. But because Johnson knew of the only evidence he has mustered as to his status as a suspect before Elba Burgos implicated him, his *Brady* claim based on the alleged suppression of such evidence fails.

Further, to the extent Johnson argues that Guevara suppressed his handwritten notes of his interview with Weeks, Johnson's arguments about Guevara and his handwritten notes extend to this point. Guevara admitted at trial that he interviewed Weeks and did not recall if he wrote a report regarding that interview. Guevara also testified that he took handwritten notes during interviews that he would use to create police reports. Guevara also pleaded the Fifth regarding whether he suppressed evidence relating to Weeks. As described above, in combination, this suffices to create an issue of material fact as to whether Guevara created and suppressed handwritten notes.

A reasonable jury could also infer that those notes would be favorable to the defense as Weeks was a different suspect for the crime and case documents do not include any information about why Guevara cleared Weeks from suspicion. Even if Guevara's notes documented why he did not think Weeks committed the crime, defense counsel could have used those notes to cross-examine Guevara. In combination with the other evidence Guevara may have suppressed, the notes on Weeks may have been material because they could have undermined the reliability of Guevara's investigation and supported the defense's claim that Johnson was not the true shooter.

Further, a reasonable issue of material fact exists as to whether the defense could have learned of Guevara's notes concerning Weeks through reasonable diligence. The defense possessed the police report identifying Weeks as a suspect but did not interview him. It is not clear if the defense could have learned from that interview why Guevara and Halvorsen did not move forward with Weeks as a suspect. *See Rivera*, 19 F. Supp. 3d at 1046 (finding that defense counsel did not fail to use reasonable diligence by not interviewing a witness when it was not clear that the witness would have provided useful information). A reasonable jury could find that Guevara's handwritten notes may have contained exculpatory information that Weeks himself could not have provided.

Johnson cannot establish an issue of material fact as to the other Individual Defendants because insufficient evidence exists to suggest that they possessed or knew of exculpatory evidence. The case evidence only mentions Halvorsen and Guevara in connection with Weeks, which at least makes clear that the other Individual Defendants cannot be held liable on this aspect of Johnson's claim. Further, while the police report did state that Halvorsen went to speak with Weeks, Johnson has not presented any evidence that Halvorsen took notes of speaking with Weeks or that Halvorsen knew of other materials related to Weeks that were not disclosed. *See Hill*, 2009 WL 174994, at *4 (requiring that plaintiff present sufficient evidence to show that the suppressed evidence actually existed for a *Brady* claim). Because Johnson's counsel had the police report stating that Halvorsen went to see Weeks and Johnson has not presented evidence that his counsel attempted to question Halvorsen about his conversation with Weeks, Johnson has not shown that his counsel exercised reasonable diligence to find any potentially exculpatory information.

Finally, Johnson cannot establish an issue of material fact as to whether the Individual Defendants suppressed evidence of Halvorsen's and Johns' involvement in a different criminal case. One of Johnson's defense attorneys, Carey, also represented the defendant in the case in which Johns and Halvorsen were witnesses for the prosecution in July 1991. Johnson cannot reasonably dispute that his defense attorney had knowledge that Halvorsen and Johns were both witnesses for the prosecution in a different case in which Johns identified the defendant as the shooter. In similar circumstances, such knowledge by defense counsel has defeated *Brady* claims. *See Moran*, 54 F.4th at 496–97 (rejecting a *Brady* claim where defense counsel knew of the allegedly suppressed arrests, even where the criminal defendant himself did not know of the information). Here, because Johnson's defense counsel knew of the disputed evidence, Johnson's *Brady* claim necessarily fails. *Id.*

Ultimately, the Court denies the Individual Defendants' motions for summary judgment on Johnson's *Brady* claim as to Guevara, Halvorsen, and Erickson's alleged suppression of the Erickson lineup report, and Guevara's alleged suppression of his handwritten notes and street file. The Court grants summary judgment for the Individual Defendants as to all other aspects of Johnson's *Brady* claim.

### 4. Unlawful Detention

To prove an unlawful detention claim, a plaintiff must show that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [the] plaintiff's favor." *Hernandez v. Guevara*, No. 23 CV 15375, 2024 WL 4299046, at *10 (N.D. Ill. Sept. 26, 2024) (quoting *Bahena v. Kennedy*, No. 17 CV 8532, 2021 WL 8153974, at *6 (N.D. Ill. Oct. 25, 2021) (collecting cases)). For an unlawful detention claim, the Court assesses probable cause for the defendant's arrest. *Coleman*,

925 F.3d at 351. An officer has probable cause to arrest a defendant when "the police officer is aware of facts and circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Id.* at 350 (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

Here, Johnson's unlawful detention claim fails because no reasonable juror could find that the Individual Defendants lacked probable cause to arrest him. As discussed above, while some of the Individual Defendants may have fabricated the Guevara lineup report and Ricardo Burgos' identifications, no issue of material fact exists as to whether the Individual Defendants had reason to know of the falsity of the July 15, 1991, photo identifications of Johnson by Elba Burgos or Angel Cordova. An eyewitness identification, "even if questionable," sufficed to give the Individual Defendants probable cause to arrest Johnson. *Id.* at 351. Because multiple eyewitnesses identified Johnson as the shooter and no issue of material fact exists as to whether the Individual Defendants had reason to believe those identifications were false, the Individual Defendants had probable cause to arrest Johnson.

Thus, the Court grants the Individual Defendants summary judgment on Johnson's unlawful detention claim.

### 5. Failure to Intervene

Johnson argues that the Individual Defendants each failed to intervene to prevent the violation of his constitutional rights.[12] An officer who is present and fails to prevent another law

---

[12] This Court acknowledges and rejects the Individual Defendants' argument that a "failure to intervene" is not a cognizable claim under § 1983 because, as acknowledged by the Individual Defendants, the Seventh Circuit recognizes such a theory of liability. *See, e.g.*, *Watkins v. Ghosh,* No. 11 C 1880, 2014 WL 840949, at *3 (N.D. Ill. Mar. 4, 2014) ("The Seventh Circuit acknowledges a 'failure to intervene' basis for a constitutional violation under the Eighth Amendment." (citing *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)); *Fields v. City of Chicago*, No. 10 C 1168, 2014 WL 477394, at *10 (N.D. Ill. Feb. 6, 2014) ("Failure to intervene is not a claim for relief; rather, it is a theory of liability under section 1983, specifically, a way to prove the liability of a state actor who was not a direct participant in the

enforcement officer from infringing on the constitutional rights of a citizen is liable under § 1983 if that officer: (1) knew that the citizen's rights were being infringed; and (2) had a "realistic opportunity" to intervene. *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005)).

First, because a failure to intervene claim rises and falls with the merits of the underlying constitutional violation, the failure to intervene claim fails as to each claim that the Court has rejected above. *See Clements v. City of Elgin*, No. 18-CV-3935, 2024 WL 1328759, at *11 (N.D. Ill. Mar. 28, 2024) (describing relevant authority). Further, as discussed above, because no evidence indicates that Healy or Daley knew of the alleged constitutional violations, Johnson's claims against them for failure to intervene fail as well. *See Jakes v. Boudreau*, No. 19 CV 2204, 2023 WL 3585629, at *15 (N.D. Ill. May 22, 2023) (rejecting a failure to intervene claim as to certain defendants when no evidence indicated that they knew or should have known about the constitutional violations by other defendants).

For the remaining claims, based on the evidence presented, no reasonable jury could find that Erickson or Halvorsen failed to intervene to prevent Guevara's alleged fabrication of the Ricardo Burgos identifications. Ricardo Burgos and Guevara mentioned the Ricardo Burgos photo identification at trial for the first time, and no evidence indicates that Erickson or

---

challenged wrongdoing."); *cf. Kyles v. Beaugard,* No. 15 C 8895, 2017 WL 2559038, at *4 (N.D. Ill. June 13, 2017) (considering a failure to protect claim where another inmate assaulted the plaintiff and explaining that "[c]orrectional officials have a duty to protect inmates from violent assaults by other inmates" (emphasis added)). *But see Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) ("The Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability. 'Failure to intervene' sounds like vicarious liability." (citations omitted)).

Halvorsen knew of it before trial or would have had any opportunity to prevent its fabrication. Similarly, no evidence exists that Erickson or Halvorsen knew that Guevara may have fabricated Ricardo Burgos' identification of Johnson at the July 22, 1991, lineup.

For the Erickson and Guevara lineup reports, the trier of fact must determine whether the Individual Defendants knew other Individual Defendants were infringing on Johnson's rights and whether they had a realistic opportunity to intervene. Johnson has identified evidence that creates questions of fact as to whether Guevara, Erickson, or Halvorsen knew that others were suppressing the Erickson lineup report, Guevara was keeping handwritten notes, or others had fabricated the Guevara lineup report. It is worth noting, however, that "one cannot fail to intervene in one's own conduct." *Thompson v. Vill. of Monee*, No. 12 C 5020, 2013 WL 3337801, at *13 (N.D. Ill. July 1, 2013); *Jackson v. City of Chicago*, No. 20 C 5886, 2024 WL 1142015, at *13 (N.D. Ill. Mar. 15, 2024) ("Because an officer cannot fail to intervene in his own conduct, the failure-to-intervene claims against Defendant Eichman must be dismissed."). In other words, Guevara, Halvorsen, and Erickson cannot have failed to intervene in the conduct Johnson alleges they committed, and Johnson's claims fail as to each defendant to this extent.

Accordingly, the Court grants summary judgment on the failure to intervene claim in part and denies it in part. Johnson's claims that Erickson, Halvorsen, and Guevara failed to intervene in the others' actions in fabricating the Guevara lineup report and suppressing the Erickson lineup report can proceed, solely to the extent that Johnson does not assert that they themselves did not participate in the alleged wrongful conduct.

**6.    Conspiracy to Deprive Johnson of his Constitutional Rights**

To hold an officer liable for conspiracy under § 1983, a plaintiff must prove: (1) the defendants reached an agreement to deprive him of his constitutional rights, and (2) the

defendants took overt acts in furtherance of actually depriving him of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (quoting *Beaman*, 776 F.3d at 511). Initially, because a plaintiff cannot state a conspiracy claim without an underlying constitutional violation, Johnson's conspiracy claims necessarily fail as to the claims this Court is otherwise rejecting. *See Rivera*, 319 F.Supp.3d at 1049; *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) ("We note at the outset that conspiracy is not an independent basis of liability in § 1983 actions.").

Johnson has presented sufficient circumstantial evidence to create an issue of material fact as to whether Guevara, Erickson, and Halvorsen conspired to suppress the Erickson lineup report and instead put forward the fabricated Guevara lineup report. Viewing the evidence in the light most favorable to Johnson, a reasonable jury could find that because Erickson signed the two seemingly contradictory reports, and Guevara authored the seemingly fabricated Guevara lineup report, that Erickson and Guevara were in agreement together. *See Williams v. City of Chicago*, No. 08 C 6409, 2011 WL 133011, at *1 (N.D. Ill. Jan. 14, 2011) ("The existence of a mutual understanding can be inferred from evidence of joint conduct that is unlikely to have occurred absent the existence of a conspiratorial agreement." (citation omitted)). Further, a reasonable jury could find that Halvorsen joined the agreement, as evidenced by his failure to turn over the Erickson lineup report to the prosecution despite a request in the file containing the Erickson lineup report asking that he bring the case materials to the prosecutor. As discussed above, there is no evidence that Healy and Daley knew of the Erickson lineup report being

68

suppressed or the Guevara lineup report being fabricated. The Court therefore finds that Johnson cannot proceed on his conspiracy claim against Healy and Daley.

The Individual Defendants nonetheless argue that qualified immunity protects them on the federal conspiracy claim. A defendant officer is entitled to qualified immunity under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time'" of the alleged violation. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Unlawfulness is clearly established if, "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful." *Id.* at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In response to a defendant asserting qualified immunity, the plaintiff must prove that qualified immunity does not apply. *See Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017).

The Individual Defendants argue that it was not clearly established that "a conspiracy amongst employees of a single municipality [could] violate the Constitution (no matter what the underlying substantive right is at stake)." Doc. 323 at 41–42. To support that it was clearly established that officers in the same municipality could be held liable for a conspiracy, Johnson points to cases such as *Jones* and *Bell*, where the Seventh Circuit affirmed conspiracy claims against individual officers who worked for the same municipality. *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (affirming a jury's decision to hold individuals liable for a conspiracy with other officers at the same municipality); *Bell v. Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) (affirming a jury's judgment that multiple officers at the same municipality were involved in a conspiracy), *overruled on other grounds by Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005). A review of the case law cited by Johnson, and other available case law from the time period when

69

the alleged violation of Johnson's rights occurred, shows it was clearly established that officers

of the same municipality could be liable for conspiring to violate the rights of an individual in

1991 and 1992. *See, e.g.*, *Jones,* 856 F.2d at 992–93; *Wilson v. City of Chicago*, 707 F. Supp.

379, 385–86 (N.D. Ill. 1989) (denying summary judgment on a § 1983 conspiracy claim

involving multiple defendant officers who worked at the same police station).

Despite this authority, the Individual Defendants argue that it was not clearly established

that officers working at the same municipality could be liable for a conspiracy because it is

unsettled whether the intracorporate conspiracy doctrine applies to § 1983 claims. The

Individual Defendants' argument misses the mark. The Individual Defendants correctly observe

that it is disputed whether the intracorporate conspiracy doctrine applies to § 1983 claims. *See*

*Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1085 (N.D. Ill. 2015) (describing Seventh Circuit case

law on the applicability of the intracorporate conspiracy doctrine to § 1983 claims). However,

even assuming that the intracorporate conspiracy doctrine applies to § 1983 claims, it would not

apply to Johnson's claims against the Individual Defendants.

The intracorporate conspiracy doctrine provides that "an agreement between or among

agents of the same legal entity, when the agents act in their official capacities, is not an unlawful

conspiracy." *Ziglar v. Abbasi*, 82 U.S. 120, 153 (2017) (citation omitted). The intracorporate

conspiracy doctrine "applies only when the agents of a corporation or government entity act

within the scope of their employment in joint pursuit of the entity's *lawful* business." *Gray v.*

*City of Chicago,* No. 18 C 2624, 2022 WL 910601, at *14 (N.D. Ill. Mar. 29, 2022) (quoting

*Harris v. City of Chicago*, No. 20 CV 4521, 2020 WL 7059445, at *5 (N.D. Ill. Dec. 2, 2020)).

Here, Johnson contends that the Individual Defendants acted unlawfully through their individual

actions to deprive him of his civil rights, and so this conduct is "not the product of routine police

department decision-making" because CPD could not have lawfully planned to violate individuals' rights. *See Harris*, 2020 WL 7059445, at *5; *Salaita*, 118 F. Supp. 3d at 1085. Because it is clearly established that the intracorporate conspiracy doctrine does not apply to the Individual Defendants, qualified immunity does not protect them from Johnson's conspiracy claim.

The Court therefore grants summary judgment on this claim for Daley and Healy, but denies it as to Guevara, Halvorsen, and Erickson.

### 7. The *Monell* Claim against the City

Johnson raises multiple *Monell* theories against the City, which generally challenge CPD identification procedures and suppression of evidence. *See* Doc. 320 ¶ 3; Doc. 341 at 131–68 ("Plaintiff has only developed evidence related to his theories based upon (i) Plaintiff's eyewitness identification theory and (ii) Plaintiff's file suppression or street files theory.").[13]

Under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), a plaintiff can bring a § 1983 claim against a municipal entity for: "(1) an express policy that, when enforced, causes a constitutional violation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law;" or (3) a constitutional injury caused by a person with final policymaking authority. *Est. of Moreland v. Dieter*, 395 F.3d 747, 758–59 (7th Cir. 2005); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000).

---

[13] The list of specific theories that Johnson advances in his response brief can each be fairly encapsulated within these categories. The City has responded to each of these theories, at least generally, and the Court will address the City's arguments on the merits. To the extent that these categories do not capture Johnson's *Monell* claims, Johnson has failed to adequately develop evidence and legal argument to support his claims. *See Hossfeld v. Lifewatch, Inc.*, No. 1:13-cv-9305, 2021 WL 1422785, at *7 (N.D. Ill. Feb. 5, 2021) (finding that undeveloped and unsupported arguments at summary judgment stage failed); *Kelley v. Hardy*, No. 14 C 1936, 2016 WL 375970, at *6 (N.D. Ill. July 14, 2016) (similar).

In addition to proving a policy or custom, to survive summary judgment, a plaintiff must also show municipal fault and causation. *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022) ("These three requirements to establish a *Monell* claim—policy or custom, municipal fault, and 'moving force' causation—are by now familiar. And they 'must be scrupulously applied' to avoid a claim for municipal liability backsliding into an impermissible claim for vicarious liability."). Specifically, a plaintiff must prove that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights and that the municipality's action was the "moving force" behind the violation of the plaintiff's constitutional rights. *Id.* at 675; *First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). For a municipality's action to have been deliberately indifferent, negligence or gross negligence is not enough, rather it must have been "obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank*, 988 F.3d at 987. Further, for a municipality's action to have been the "moving force" behind a constitutional violation, there must be a "direct causal link" between the challenged municipal action and the violation of the plaintiff's constitutional rights. *Id.*

### a. Underlying Violation

First, the City argues that because Johnson's § 1983 due process claim against the Individual Defendants fails, Johnson's claims regarding identification procedures against the City also fail as a matter of law. *See, e.g.*, *Fulton v. Bartik*, 547 F. Supp. 3d 799, 819 (N.D. Ill. 2021) ("*Monell* liability cannot survive without an underlying constitutional violation by an individual defendant."). But this Court found above that Johnson has adequately established issues of material fact as to his due process claim regarding: (1) the fabrication of the Guevara

lineup report; (2) the fabrication of the Ricardo Burgos identifications; (3) the suppression of the Erickson lineup report; and (4) the suppression of Guevara's handwritten notes or street file. Thus, the City's argument fails.

### b.  Identifications and Fabrication Based on Suggestive Procedures

Johnson argues that the City was deliberately indifferent to a "widespread practice of Chicago police officers fabricating witness identifications using suggestive identification procedures." Doc. 341 at 153–54.  As discussed above, § 1983 claims based on unduly suggestive identification procedures are not actionable.  *See Vega*, 597 U.S. at 141–43; *Blackmon*, 2025 WL 869045, at *2; *Alexander*, 433 F.3d at 555.  Thus, because Johnson's argument regarding this widespread practice relies on unduly suggestive identification procedures being actionable under § 1983, it fails as a matter of law.[14]

### c.  Suppression of Evidence

Johnson argues that the City put in place facially deficient policies that did not stop the suppression of evidence in homicide investigations.  To support this argument, Johnson points to Detective Division Special Orders 83-1, 83-2, and 86-3, which CPD put in place following the *Jones* and *Palmer* cases.  In both *Jones* and *Palmer*, courts examined claims that CPD officers kept two sets of records, one set that was turned over to prosecutors, and a second set of street files that were kept by the officers investigating into the case.  *See Rivera*, 319 F. Supp. 3d at 1059–61 (describing the *Jones* and *Palmer* cases and their impact on the CPD).  Plaintiffs argued

---

[14] Johnson also seemingly advances similar arguments recast as failures to train and deficient written policies.  Those arguments also fail as a matter of law for the same reason as his widespread practice claim.  *See Vega*, 597 U.S. at 141–43; *Blackmon,* 2025 WL 869045, at *2; *Alexander*, 433 F.3d at 555.  Further, to the extent that Johnson is arguing that a widespread practice of fabrication, without regards to unduly suggestive lineup procedures, existed, Johnson does not develop argument or point to sufficient evidence on this point.  *See Baker v. Ghidotti*, No. 11 C 4197, 2014 WL 1289566, at *7 (N.D. Ill. 2014) ("[F]ailure to develop argument on summary judgment waives the argument[.]" (citations omitted)).

that the street files were designed to conceal exculpatory documents. *See id*.; *see also Palmer v. City of Chicago*, 806 F.2d 1316, 1317 (7th Cir. 1986) (finding that a review of withheld files did not disclose exculpatory material). *Jones* and *Palmer* involved conduct that occurred in the 1980s. *Rivera*, 319 F. Supp. 3d at 1061 ("The *Palmer* and *Jones* cases give helpful background on the evolving practices of the CPD in the first half of the 1980s, but they do not purport to explore, much less settle, what the City's widespread practices were in 1988.").

The CPD instituted Detective Division Special Order 83-1 ("83-1") in 1983 to "institutionalize the control of all [Detective Division] violent crime field investigation documents and files, which previously may have been referred to as working files, running files, or detective's personal files and notes." 83-1 required an investigative file to be maintained in a folder and contain an inventory sheet of its contents. While the investigative file was "designed to provide all parties engaged in a criminal proceeding . . . with a comprehensive account of the subject criminal case," 83-1 does not specifically instruct personnel to disclose the investigative file to prosecutors or criminal defendants. Simultaneously, a RD file, also known as a permanent retention file, was kept separately.

CPD also created GPRs, which were preprinted forms for detectives to use for notes. Officers were to keep GPRs in the investigative file, but not in the RD file. Officers received a three-hour training on GPRs, which did not include training on what information to put into supplemental reports.

Plaintiff's expert, Mr. Tiderington, criticized 83-1 for not requiring the creation of an investigative file in every case, unless the crime fit certain violent crime categories and felony charges were approved, and for not providing any direction on how CPD should respond to

subpoenas or requests for production related to criminal proceedings when an investigative file exists.

In May 1983, CPD instituted Detective Division Special Order 83-2 ("83-2"). 83-2 was designed to institutionalize the control of all field investigation documents, such as street files. 83-2 did not require a single repository for all investigative information maintained by the lead investigator, provide any guidance on what information was required to be included in supplemental reports beyond information deemed "relevant," or direct the production of investigative files.

In 1986, CPD issued Detected Division Special Order 86-3 ("86-3"), intended to improve the maintenance of investigative files by mandating inspections. The City's Rule 30(b)(6) representative did not know whether any auditing of investigative files under 86-3 ever occurred.

Johnson has provided sufficient evidence from which a reasonable jury could find that the City of Chicago's written policies concerning document maintenance caused Johnson's constitutional violation. *See Fields*, 2014 WL 477394, at *11 (concluding that a reasonable jury could find that Special Orders 83-1 and 86-3 failed to stop the previous practice of police officers of maintaining separate investigatory files that were not turned over to prosecutors or defense counsel). The policies establishing the investigative file institutionalized the practice of keeping different sets of materials for a case in different locations, and expressly contemplated that some potentially exculpatory material, the "GPRs," would not be kept in the permanent retention file. Further, the policies did not contain any requirement that officers provide investigative files to prosecutors or defense attorneys or provide any guidance on responding to subpoenas. Officers also were not expressly required to keep all of their notes in the investigative file or even create an investigative file for many cases. The enforcement of the policies as written could violate a

constitutional right because an officer fully complying with these policies still could refrain from providing the investigative file to the prosecution, even if it contained exculpatory evidence that was not contained in the permanent retention file. *See Calhoun v. Ramsey*, 408 F.3d 375, 380–81 (7th Cir. 2005) (describing how a policy could violate a constitutional right when enforced).

Johnson also argues that CPD had a widespread practice of evidence suppression. No brightline rule exists as to what constitutes a "widespread custom or practice." *Washington*, 2022 WL 4599708, at *16 (quoting *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). A plaintiff can satisfy his burden to show a widespread custom or practice with evidence that shows a series of bad acts or evidence from which the factfinder could infer that the municipality was bound to have noticed the issue. *See id.*

Johnson has presented sufficient evidence from which a reasonable jury could find that the City had a widespread practice of evidence suppression in the CPD. The *Jones* and *Palmer* cases represent cases by citizens where they alleged officers suppressed evidence using the lax file keeping system in place. The lawsuits at least made the City aware that its dual file or street file system was either leading to the suppression of evidence or created a significant risk of suppression of evidence. Further, Johnson's expert, Mr. Tiderington, conducted a review of investigation files, permanent retention files, and criminal defense files from 1991 to 1998. He found that 81% of the total investigative files from 1995 to 1998 included incomplete inventory sheets. He also found that when comparing investigative files to defense attorney files, 59% of defense files were missing handwritten notes that were present in the investigative file and 41% of defense files were missing GPRs that were present in the investigative file. This information, in combination, is enough for a jury to find that the City should have noticed the issue. *See Rivera*, 319 F. Supp. 3d at 1063–66.

Johnson has also adequately shown deliberate indifference. Due to the *Jones* and *Palmer* cases, the ongoing changes in CPD policies, and the potential lack of audits, despite a policy directing otherwise, a reasonable jury could find that "it was obvious that the municipality's action would lead to constitutional violations and the municipality consciously disregarded those consequences." *First Midwest Bank*, 988 F.3d at 987.

Finally, Johnson has adequately shown causation. The Erickson lineup report was present in the investigative file but not turned over to the prosecutor or defense. Further, enough evidence exists for the jury to find that Guevara kept notes that were not included in the investigative file or disclosed to the defense. A reasonable jury could find a direct causal link between the Erickson lineup report and Guevara's notes not being disclosed to the prosecution and defense, and the City's policies and widespread practices concerning street files. *See Fields*, 2014 WL 477394, at *11 (finding that the non-production of certain documents in Fields' case, together with the circumstantial evidence that the documents were suppressed, was sufficiently connected to longstanding police department custom or practice).

The Court, therefore, grants summary judgment for the City on all of Johnson's *Monell* claims except for the suppression of evidence claims.

### B.     State Law Claims

#### 1.     Malicious Prosecution

To establish a malicious prosecution claim under Illinois law, a plaintiff must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) the damages resulting to the plaintiff." *Moran*, 54 F.4th at 499 (quoting *Swick v. Liautaud*, 169 Ill. 2d 504, 512 (1996)).

Like for unlawful detention, "[t]he existence of probable cause for each offense charged is a complete defense to an action for malicious prosecution." *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) (citing *Howard v. Firmand*, 378 Ill. App. 3d 147, 149 (2007)).

As discussed above, because multiple witnesses identified Johnson as the shooter, the Individual Defendants had probable cause to initiate the proceedings against Johnson. Even discounting Ricardo Burgos' identifications of Johnson, Elba Burgos and Angel Cordova identified Johnson as the shooter from a photo. Additionally, after Johnson's arrest, Rosa Burgos and Elba Burgos identified Johnson in a lineup as the shooter. As discussed above, sufficient evidence does not exist to conclude that the Individual Defendants had reason to believe the identifications were false. Thus, they had probable cause to charge Johnson for the shooting.

The Court grants summary judgment to Individual Defendants on this claim.

### 2. Intentional Infliction of Emotional Distress

Under Illinois law, to recover on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove: (1) the defendant's conduct was extreme and outrageous, (2) the defendant intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct in fact caused severe emotional distress. *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (citing *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 447 (2005)). To assess whether a defendant's conduct was outrageous such that it goes "beyond all bounds of decency and [is] considered intolerable in a civilized community," courts examine the degree of power the defendant held over the plaintiff; whether the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge; and whether the defendant reasonably

believed that his objective was legitimate. *See Cairel*, 821 F.3d at 835–36 (describing Illinois law).

Johnson's IIED claim cannot succeed as to Healy and Daley because, as described above, they were not adequately involved in the wrongful conduct and their conduct does not rise to the level of outrageous or extreme. *See Bailey*, 779 F.3d at 696–97 (rejecting an IIED claim where the record included no evidence to support that defendants engaged in wrongful conduct and therefore the plaintiff could not show that their conduct was extreme, outrageous, or intended to inflict emotional distress); *Pursley v. City of Rockford*, No. 3:18-cv-50040, 2024 WL 1050242, at *16 (N.D. Ill. Mar. 11, 2024) (finding that certain defendants could not be liable for IIED where the plaintiff did not present adequate evidence to show they engaged in intentional misconduct). Specifically, Healy's only involvement in the alleged wrongful conduct is the review of four reports, which did not apprise him of the alleged fabrication or suppression. Daley brought Johns to Area Five on the night of the shooting and someone informed him that the lineup involving Johns was negative. Daley also provided Guevara and Halvorsen with a photo of Johnson. But this evidence does not show that Daley knew of the alleged fabrication or suppression.

That said, taking the facts in the light most favorable to Johnson, a reasonable jury could find that Guevara's, Halvorsen's, and Erickson's conduct was extreme and outrageous. *See Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003) (describing how officers fabricating evidence of a plaintiff's and suppressing evidence of the plaintiff's evidence is outrageous enough to support a claim for intentional infliction of emotional distress). Courts have found that "[a]n average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen." *Washington*, 2022 WL

4599708, at *25 (quoting *Henry v. Ramos*, No. 97 C 4025, 1997 WL 610781, at *2 (N.D. Ill. Sept. 28, 1997)). Here, Guevara, Halvorsen, and Erickson allegedly used their positions of power as police officers to suppress Gonzales' identification of Johns as the shooter and fabricate a negative lineup report. Further, Guevara allegedly fabricated the Ricardo Burgos identifications and withheld his handwritten notes. Guevara, Halvorsen, and Erickson could reasonably have expected that their conduct would be extremely emotionally distressing to Johnson. *See Pursley*, 2024 WL 1050242, at *16 ("It is also reasonable to infer that the officers who knowingly created false evidence would have known there to be a high probability of inflicting severe emotional distress by falsely framing an innocent person.").

Therefore, the Court grants summary judgment on the IIED claim to Healy and Daley but denies it as to Guevara, Halvorsen, and Erickson.

### 3. Willful and Wanton Conduct

The Individual Defendants argue that Johnson's Count VIII, which alleges "Willful and Wanton Conduct," must fail because no separate and independent tort of "willful and wanton conduct" exists under Illinois law. The Individual Defendants misunderstand the applicable case law. "While there is no independent tort of willful and wanton conduct in Illinois, it is regarded as an aggravated form of negligence and can be pleaded as such by alleging the basic elements of a negligence claim—duty, breach, and causation—as well as either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Pennington v. Flora Cmty. Unit Sch. Dist. No. 35*, No. 3:20-CV-11, 2023 WL 348320, at *5 (S.D. Ill. Jan. 20, 2023) (internal quotation omitted). Courts regularly accept claims that are pleaded with the title "willful and wanton" conduct and assess those claims under the aggravated negligence standard set by Illinois courts. *See, e.g.*, *id.* (rejecting an argument that claims pleaded as willful and wanton conduct should be

dismissed because such a theory is not an independent theory of tort in Illinois); *Stevenson v. City of Chicago*, No. 17 CV 4839, 2018 WL 1784142, at *9–11 (N.D. Ill. Apr. 13, 2018) (recognizing that willful and wanton conduct is not a separate and independent tort but is treated as an aggravated form of negligence, and then denying the motion to dismiss the willful and wanton conduct counts).

With this authority in mind, this Court finds that while willful and wanton conduct does not amount to a separate tort under Illinois law, it is appropriately understood as a form of aggravated negligence where the plaintiff must prove: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; (3) the plaintiff suffered an injury that proximately resulted from the defendant's breach; and (4) the defendant's breach of duty was not merely negligent, but done with "conscious disregard for the welfare of the plaintiff." *See Gonzales-Loza v. Downey*, No. 19 C 3046, 2023 WL 6198787, at *10 (N.D. Ill. Sept. 22, 2023) (citing *Doe-2 v. McLean Cnty. Unit Dist. No. 5*, 593 F.3d 507, 514 (7th Cir. 2010)).

The Individual Defendants did not challenge any of the elements of willful and wanton conduct in their opening brief, focusing instead on whether the Court can even recognize such a claim. In reply, they challenge for the first time whether they owed Johnson a duty of care which they violated. Because the Individual Defendants raise this argument for the first time on reply, they have waived it. *See United States v. Williams*, 85 F.4th at 849. Because the Individual Defendants do not otherwise challenge this cause of action, the Court denies summary judgment on this claim as to Guevara, Erickson, and Halvorsen, but grants it for Daley and Healy.

### 4.    Civil Conspiracy

Under Illinois law, in order to show a conspiracy, a plaintiff must prove: (1) the existence of an agreement between two or more persons for the purpose of accomplishing either an

unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused the injury to the plaintiff. *Washington*, 2022 WL 4599708, at *25 (quoting *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007)).  An express agreement is not necessary, rather the existence of a conspiracy can be inferred through "the combination of common sense and circumstantial evidence."  *Id.* (citing *Beaman*, 776 F.3d at 511).

As discussed above, in this case, sufficient circumstantial evidence exists for a reasonable jury to find that Guevara, Halvorsen, and Erickson entered into a conspiracy to suppress the identification of Johns and fabricate evidence, and that they did so by suppressing the Erickson lineup report and fabricating the Guevara lineup report.  Sufficient evidence does not exist to prove a conspiracy involving Daley or Healy, as neither knew of the positive Erickson lineup report and there is not sufficient evidence to establish an issue of material fact as to whether they are liable for fabrication or suppression.  *See Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *16–17 (N.D. Ill. Mar. 19, 2021) (granting judgment as a matter of law as to the defendants where a plaintiff could not provide sufficient evidence that the defendants had committed an underlying tort).  The Court grants summary judgment on the civil conspiracy claim to Daley and Healy but denies it as to Guevara, Erickson, and Halvorsen.

### 5.   *Respondeat Superior* and Indemnification

The City argues that the Court should grant summary judgment for it on Johnson's *respondeat superior* and indemnification claims because Johnson's underlying claims have no merit.  *Respondeat* superior and indemnification are derivative liability claims that rise or fall with the claims against the Individual Defendants.  *See Brown v. City of Chicago*, 709 F. Supp. 3d 558, 580 (N.D. Ill. 2023) (citing *Moran*, 54 F.4th at 500).  Because the Court allows claims to

proceed against at least some of the Individual Defendants, the City must stay in the case for indemnification and *respondeat superior* purposes.  Thus, the Court denies the City's motion for summary judgment on the *respondeat superior* and indemnification counts.

## CONCLUSION

For the foregoing reasons, the Court grants the Defendants' motion to strike [367] in part. The Court denies the City's motions to bar Johnson's expert opinions [326, 327].  The Court grants in part and denies in part Defendants' motions for summary judgment [309, 311, 317].  In the manner discussed above, the Court grants summary judgment for Healy and Daley, and denies summary judgment as to Guevara, Erickson, and Halvorsen on Johnson's fabrication of evidence and suppression of evidence claims (Count I).  Similarly, for the theories where Johnson has established an issue of material fact as described above, the Court denies summary judgment on Johnson's conspiracy, failure to intervene, intentional infliction of emotional distress, and willful and wanton conduct claims as to Guevara, Erickson, and Halvorsen, and grants summary judgment for Healy and Daley on these claims (Counts III, IV, VII, VIII, and IX).  The Court denies summary judgment for the City on the indemnification and *respondeat superior* claim to the extent that the underlying claims against the City's employees remain (Count XI), and denies summary judgment on Johnson's *Monell* suppression of evidence claims, but grants summary judgment as to all other Monell theories (Count V).  The Court enters summary judgment for all Defendants as to Johnson's unlawful detention (Count II) and malicious prosecution (Count VI) claims.

Dated:  March 24, 2025

_____
SARA L. ELLIS
United States District Judge