**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DEMETRIUS JOHNSON | ) | |
| | ) | Case No. 20 CV 4156 |
| *Plaintiff*, | ) | |
| | ) | Judge Sara L. Ellis |
| v. | ) | |
| | ) | Magistrate Judge Heather K. McShain |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| *Defendants*. | ) | JURY TRIAL DEMANDED |
| | ) | |

**PLAINTIFF DEMETRIUS JOHNSON'S MOTIONS *IN LIMINE***

**TABLE OF CONTENTS**

1.  PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO BAR GANG EVIDENCE ..................... 1

2.  PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO BAR ALL
    REFERENCES TO ANY ALLEGED OTHER BAD ACT OR
    CHARACTER EVIDENCE ................................................................................................ 5

3.  PLAINTIFF'S MOTION *IN LIMINE* NO. 3 TO BAR REFERENCES TO
    ANY CRIMINAL CONVICTION, PRIOR ARRESTS, OR OTHER BAD
    ACTS OF THIRD-PARTY WITNESSES .......................................................................... 14

4.  PLAINTIFF'S MOTION *IN LIMINE* NO. 4 TO BAR TAG-TEAM
    CROSS EXAMINATION ................................................................................................... 23

5.  PLAINTIFF'S MOTION *IN LIMINE* NO. 5 TO BAR UNDISCLOSED
    NON-RETAINED EXPERT OPINIONS ........................................................................... 24

6.  PLAINTIFF'S MOTION *IN LIMINE* NO. 6 TO BAR "GANG EXPERT"
    RALPH RIDER ................................................................................................................... 25

7.  PLAINTIFF'S MOTION *IN LIMINE* NO. 7 TO BAR POLICE
    PRACTICES EXPERT MUICH .......................................................................................... 36

8.  PLAINTIFF'S MOTION *IN LIMINE* NO. 8 TO LIMIT OPINIONS OF
    DEFENDANTS' PROSECUTOR EXPERT BERNAND MURRAY ............................... 43

Plaintiff Demetrius Johnson, by his attorneys, respectfully submits the following motions *in limine*:

## 1. PLAINTIFF'S MOTION *IN LIMINE* NO. 1 TO BAR GANG EVIDENCE

Defendants are going to great lengths to make this case about gangs, even filing a rare motion to *admit* gang evidence, when this case has nothing to do with gangs. With little defense to liability or damages, Defendants apparently intend to muck up the case and invite the jury to decide against Plaintiff based on prejudices and other improper grounds, hoping to escape a verdict against them by focusing on highly prejudicial issues. But there is next to no evidence that suggests that the Plaintiff, crime, witnesses, suspects, investigation, prosecution, conviction, exoneration, or any other issue in the case has anything to do with street gangs.

The man who shot Edwin Fred did not make, or yell out, a gang slogan or gang insult, before shooting him. No evidence has ever been introduced to suggest this shooting was retaliation by one gang for some prior shooting by another gang. And nowhere in the police reports or testimony is there any indication that the eyewitnesses in this case were subjected to threats or intimidation by gangs to prevent them from testifying. In fact, so irrelevant are gangs to this investigation that the CPD gang crimes specialists that often assist in investigating gang-related shootings had no involvement in this case. Instead, the only gang evidence in this case is the simple fact that the victim happened to be a member of the Spanish Lords, and the initial suspect (Johns) and subsequent suspect (Johnson) were affiliated with the Maniac Latin Disciples.[1]

---

[1] While there is limited testimony that there was an ongoing feud at the time of the shooting between the MLDs and the Latin Kings, there is *no* evidence that there was any such war or feud going on between the MLDs and the Spanish Lords, the victim's gang affiliation.

Put simply, this is not a gang case. Accordingly, gang evidence has almost zero probative value, and it presents danger of extreme, unfair prejudice. This Court should exclude any reference to street gangs and all evidence relating to street gangs at trial.

It is well established that gang evidence is highly unfairly prejudicial and rarely probative. The terms "gang" and "street gang" are inherently and extremely prejudicial and inflammatory. Such evidence would inflame the jury's prejudices and invite unfounded speculation that Plaintiff, witnesses, or issues in this case are connected in some way to street gangs. "Our Court of Appeals has repeatedly recognized 'the insidious quality' of evidence of gang membership as well as 'the damage it can do.'" *Finley v. Lindsay*, No. 97 C 7634, 1999 WL 608706, at *1-2 (N.D. Ill. Aug. 5, 1999) (quoting *United States v. Sargent*, 98 F.3d 325, 328 (7th Cir. 1996)). Because there is a "substantial risk of unfair prejudice attached to gang affiliation evidence," courts must closely scrutinize its admissibility. *United States v. Irvin*, 87 F.3d 860, 864-67 (7th Cir. 1996) (citing a substantial "danger of unfair prejudice" in that "[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes to [witnesses] who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a genuine concern whenever gang evidence is admitted."); *Case v. Town of Cicero*, No. 10CV7392, 2013 WL 5645780, at *5 (N.D. Ill. Oct. 16, 2013) ("Evidence of a witness's affiliation with a gang is highly prejudicial, especially when the gang evidence is not relevant to a central issue in a case.") (internal citation and quotation marks omitted); *United States v. Molton*, 743 F.3d 479, 482 (7th Cir. 2014) ("Evidence of gang affiliation must be handled with care, because a jury is likely to associate gangs with criminal activity and deviant behavior, raising the specter of guilt by association or a verdict influenced by emotion." (internal citation and

quotation marks omitted)); *Taylor v. City of Chicago*, No. 09 C 5092, 2012 WL 3686642, at *2 (N.D. Ill. Aug. 24, 2012) (evidence of gang membership runs risk of eliciting "guilt by association") (internal citation omitted); *Jones v. City of Chicago*, No. 14-CV-4023, 2017 WL 413613, at *12 (N.D. Ill. Jan. 31, 2017) (granting motion to exclude all gang references due to risk of guilt by association); *Anderson v. City of Chicago*, No. 09 C 2311, 2010 WL 4811937, at *1-*2 (N.D. Ill. Nov. 19, 2010) (finding no relevance to gang references, even when Defendants sought to introduce it to show reasonableness of defendants' actions, motive or bias, or impeachment); *Kennedy v. Lockyer*, 379 F.3d 1041, 1055 (9th Cir. 2004) (holding that "evidence relating to gang involvement will almost always be prejudicial and will constitute reversible error. Evidence of gang membership may not be introduced ... to prove intent or culpability."); *Valtierra v. City of Los Angeles,* No. 2:13CV07562(CAS), 2015 WL 1644894, at *3 (C.D. Cal. Apr. 13, 2015) (excluding testimony regarding civil rights plaintiff's gang affiliation); *United States v. Reyes*, No. 11CR1(MRK), 2012 WL 3727995 at *2 (D. Conn. May 1, 2012) ("Evidence that a defendant is a member of a gang can be highly prejudicial" and should be treated with particular caution where membership in the gang is not an element of the offense.").

Based on this case law, courts in the Seventh Circuit frequently bar references to gangs in § 1983 cases. See *Charles v. Cotter*, 867 F. Supp. 648, 657-58 (N.D. Ill. 1994) ("Identifying Charles as a gang member is unfairly prejudicial insofar as it encourages the inference that Charles is an evil and menacing person. Because the court finds that the prejudicial effect of evidence of Charles' gang affiliation substantially outweighs its probative value, Charles' motion to exclude any such evidence is granted."); see also *Gonzalez v. Olson*, No. 11 C 8356, 2015 WL 3671641, at *2 (N.D. Ill. June 12, 2015) (granting motion *in limine* to bar all "gang evidence," including evidence that neighbor of § 1983 plaintiff had recently been killed in a gang-related

3

shooting, reasoning, among other things, that gang evidence was not probative of any fact the

jury had to decide and that "any mention of gangs or gang activity" "or characterization of the

neighborhood in which [plaintiff] lived and the shooting occurred as being a 'bad

neighborhood'"); *Lopez v. City of Chicago*, No. 01 C 1823, 2005 WL 563212, at *5 (N.D. Ill.

Mar. 8, 2005) (granting motion *in limine* to bar any references to gang members' gang

membership); *United States v. Davis*, No. 99 C 928, 2001 WL 1195729, at *2 (N.D. Ill. Oct. 9,

2001) (excluding gang references as "enormously and unfairly prejudicial" under FRE 403);

*Finley*, 1999 WL 608706, at *1-2 ("Given the highly prejudicial nature of gang affiliation

evidence and the tenuous, unsupported basis for Officers' argument that such evidence is

relevant to this case at all, Finley's motion is granted. Evidence of his gang affiliation and tattoos

are excluded, as is any evidence relating to Teddy or Ronald Finley."). This Court should adhere

to this case law. This case should be tried without reference to gangs.

## 2.     PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO BAR ALL REFERENCES TO ANY ALLEGED OTHER BAD ACT OR CHARACTER EVIDENCE

The primary issue for trial is whether Defendants violated Plaintiff's constitutional rights by framing him for murder, and whether any such violation resulted from the City's policies and practices. These issues are hotly contested, and the jury will have to wrestle with an ample body of disputed facts in resolving these issues.

The jury should not be sidetracked by irrelevant and unfairly prejudicial facts, such as, for example, whether Plaintiff made certain unrelated mistakes in his life. During discovery, Defendants scoured Plaintiff's entire life looking for dirt, and some of Defendants' deposition questions and exhibits suggest that they may try to defend this case by smearing Plaintiff with as much irrelevant, ancient, and inadmissible character evidence as they can muster.

That would be improper. Case law in this Circuit and elsewhere is very clear that prior bad acts are generally inadmissible. Fed. R. Evid. 404(a)(1), (b)(1); *Barber v. City of Chicago*, 725 F.3d 702, 709 (7th Cir. 2013) ("The well-established, general rule is that a witness's credibility may not be impeached by evidence of his or her prior arrests, accusations, or charges."); *Burton v. City of Zion*, 901 F.3d 772, 779 (7th Cir. 2018) (noting that other-act evidence is admissible only if "its relevance to 'another purpose'" is "established through a chain of reasoning that does not rely on the forbidden inference that the person has a certain character and acted in accordance with that character" on a particular occasion); *United States v. Morgan*, 929 F.3d 411 (7th Cir. 2019) ("[A] court may not allow in evidence of prior acts to show that the defendant is 'the kind of person who would do such a thing.'"); *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997) (courts must act to prevent a jury from generalizing a party's "earlier bad act into bad character and taking that as raising the odds that he did the latter bad act now.").

This is especially true in Section 1983 cases, where there is a danger that unsympathetic background facts could make it difficult for civil rights plaintiffs to get a fair hearing on important constitutional claims. *Geitz v. Lindsey*, 893 F.2d 148, 151 (7th Cir. 1990) ("We are mindful of our duty to ensure that this class of civil rights plaintiffs are not unfairly prejudiced by the use of their criminal pasts against them."); *Nelson v. City of Chicago*, 810 F.3d 1061, 1069 (7th Cir. 2016) (in a wrongful conviction case, evidence of past bad acts could "invite the jury to infer 'that the plaintiff is a serial lawbreaker and general troublemaker and the police must have had probable cause to arrest him.'").

And to the extent that Defendants attempt to conjure a non-prohibited use for this character evidence, its relevance to any other issue would pale in comparison to the unfair prejudice that the evidence would inflict as propensity evidence. See *Burton*, 901 F.3d at 779 ("The court's Rule 403 balancing should take account of the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case.").

Applying these principles here, references to the following alleged prior bad acts of Plaintiff should be barred at trial.

### A. Plaintiff's Prior Arrests

It is well-established in civil rights cases that prior arrests that do not result in convictions are inadmissible. Absent convictions, arrests are just non-proven prior bad acts. The law is uniform on this point. See *Anderson v. Sternes*, 243 F.3d 1049, 1054 (7th Cir. 2001) ("The law is clear that a defendant's prior arrest record is inadmissible, and while the reference to Anderson's past arrest was only indirect, it was still improper"); *Dyson v. Szarzynski*, 2014 WL 7205591, at *6 (N.D. Ill. Dec. 18, 2014) ("However, the risk of unfair prejudice to Dyson is considerable if prior arrest evidence is admitted without the door being opened first. For these reasons, Dyson's motion No. 5 is granted with respect to prior arrests."); *Gregory v. Oliver*, No. 00 C 5984, 2003 WL 1860270,

at *1 (N.D. Ill. Apr. 9, 2003) ("Arrests that have not led to convictions are classic candidates for exclusion under [FRE] 404(b)"); *Jones v. Scientific Colors, Inc*., 2001 WL 668943, at *2 (N.D. Ill. June 14, 2001) ("Whether any of the claimants have been previously arrested—as opposed to convicted—is a matter of slight probative value in relationship to the claims before the Court. Such inquiries threaten more to confuse than enlighten"); *Brandon v. Village of Maywood*, 179 F. Supp. 2d 847, 853-55 (N.D. Ill. 2001) (carefully considering and rejecting all arguments for admission of arrest record such as "bias" or damages-because prejudice outweighs probative value where officers did not know about it); *Mowrey v. City of Fort Wayne*, 2013 WL 6512664, at *2 (N.D. Ind. Dec. 12, 2013) ("Prior arrests that did not lead to a conviction are usually inadmissible under Rule 403's balancing test and Rule 404(b)'s bar against character evidence."); *cf. Earl v. Denny's, Inc*., 2002 WL 31819021, at *8 (N.D. Ill. Dec. 13, 2002) ("[A] jury may deny plaintiff a verdict and an award, not because it doubts its veracity, but because it is appalled by his prior conduct that has nothing to do with the events in question. That is precisely the kind of unfair prejudice that Rule 403 seeks to prevent.").

Under this well-settled law, all arrests of Plaintiff that did not lead to convictions should be barred. This includes any of Plaintiff's juvenile arrests, along with his arrests for possession of drugs, traffic infractions, and assault—the charges for which were all dropped. Ex. 1 (Johnson Criminal History) at RFC-Johnson 025791-025832.

## B. Plaintiff's Lone Criminal Conviction

Plaintiff has one extremely old felony conviction. *Id*. In 2006, he was convicted for being in possession of a firearm with a felony conviction on his record (his wrongful conviction, which obviously has been set aside), and he was sentenced to three years and six months in prison.

This conviction is categorically inadmissible under Rule 609 because it is far more than ten years old. The Seventh Circuit has held that evidence of a prior conviction is inadmissible if it

has been more than ten years since the witness's release from confinement on the conviction. *United States v. Rogers*, 542 F.3d 197, 200 (7th Cir. 2008). And although Rule 609 permits the introduction of prior convictions older than ten years under limited circumstances, none of those circumstances exists here. See *THK America, Inc. v. NSK, Ltd*., 917 F.Supp. 563, 570 (N.D. Ill. 1996) ("Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances"") (citing *Zinman v. Black & Decker, Inc*., 983 F.2d 431 (2d Cir. 1993)). Plaintiff's past conviction is nearly 20 years old and had nothing to do with dishonesty. There is no argument consistent with Rule 609 that this conviction could be admitted.

Even if there were, the conviction should still be excluded. First, the prior conviction is inadmissible because it is not probative of a single issue the jury will consider. Second, even if it had probative value, that value would be entirely eliminated due to the fact that this incident happened nearly 20 years ago. See *United States v. Shapiro*, 565 F.2d 479, 481 (7th Cir. 1977) ("Because the probative value of a prior conviction on the issue of credibility tends to decrease with the passage of time, the danger of prejudice clearly increases."). Third, the risk of unfair prejudice to Plaintiff if this conviction is admitted massively outweighs any probative value. *Townsend v. Benya*, 287 F. Supp. 2d 868, 874 (N.D. Ill. 2003) (barring reference to the plaintiff's prior convictions as the unfair prejudice "substantially outweighs any probative value the conviction offers."); *Jones v. Sheahan,* 2003 WL 21654279, at *2 (N.D. Ill. 2003) (evidence of the plaintiff's prior conviction might lead a jury to deny him an award "'not because it doubts its veracity, but because it is appalled by his prior conduct that has nothing to do with the events in question'" resulting in unfair prejudice) (quoting *Earl v. Denny's, Inc.*, 2002 WL 31819021, at *3 (N.D. Ill. 2002)); *Barber v. City of Chicago*, 725 F.3d 702, 714 (7th Cir. 2013) ("[P]resenting a § 1983 Plaintiff's criminal history to the jury presents a substantial risk that the jury will render a

defense verdict based not on the evidence but on emotions or other improper motives, such as belief that bad people should not be permitted to recover from honorable police officers."); *Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir. 1993) (same).

Lastly, the status offense was premised on the felony conviction that Plaintiff received for his wrongful conviction for the Fred murder—a conviction that has since been thrown out and resulted in a certificate of innocence. The same conduct, if Plaintiff's wrongful conviction had not occurred, would not have been a crime. References to Plaintiff's conviction should be barred.

### C. Prison Misconduct and Related Discipline

This Court should also bar evidence related to misconduct and discipline in prison. Prison is a difficult place, and sometimes prisoners receive tickets and get punished. Plaintiff moves to bar any evidence Defendants seek to introduce of alleged prior bad acts related to prison misconduct and discipline. Ex. 2 (Johnson IDOC Discipline History) at SDT IDOC 5.

Any allegations of prison misconduct are based upon hearsay, and would be disputed and irrelevant. Moreover, the risk of unfair prejudice is overwhelming, and any such claims have insufficient probative value to outweigh the danger of unfair prejudice. Accordingly, all references to prison misconduct and discipline must be barred. *Buck v. Rigdon*, No. 18-CV-2125-DWD, 2024 WL 3470372 (S.D. Ill. June 20, 2024) (holding that evidence of the plaintiff's "prison disciplinary record shall be excluded as not relevant and improper character evidence"); *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 818 (N.D. Ill. 2010) (barring reference to plaintiff's time incarcerated as not having probative value, and "even if such evidence is probative, the court finds that the danger of unfair prejudice greatly outweighs the probative value of the evidence."); *Jacques Rivera v. Guevara, et al.*, No. 12-cv-04428 (N.D. Ill. May 30, 2018) (Gottschall, J.), Dkt. 532 (granting plaintiff's motion to bar alleged misconduct committed while plaintiff was incarcerated and any discipline that stemmed from the misconduct).

### D. Plaintiff's Association with Gangs

Any reference to Plaintiff's alleged gang membership, affiliation, or ties should be excluded under Federal Rules of Evidence 403 and 404, because such references are highly prejudicial, misleading, and not probative of any material issue. Defendants have made clear throughout this litigation that they intend to try this case by inflaming the jury's passions about criminal street gangs. That approach should not be permitted. As discussed in Plaintiff's Motion *In Limine* No. 1, no evidence has ever been introduced to suggest this shooting was gang retaliation or gang-related in any way. Further, there is no evidence that his association with any individuals involved in a gang played any role in the homicide or investigation. Allowing any such reference to Plaintiff's association with individuals in gangs, and inflaming the jury's passion about criminal street gangs, risks misleading the jury, encouraging improper character inferences, and unfairly prejudicing Plaintiff.

As argued in Plaintiff's Motion *In Limine* No. 1, *supra,* courts have repeatedly recognized the "insidious quality" of gang-related evidence and the serious risk of "guilt by association," *Finley*, 1999 WL 608706, at *1–2; *Sargent*, 98 F.3d at 328, and gang affiliation often invokes "images of criminal activity and deviant behavior," leading jurors to assign a "propensity for committing crimes," *Irvin,* 87 F.3d at 865. Given the "substantial risk of unfair prejudice attached to gang affiliation evidence," *id.* at 864-67, courts must closely scrutinize its admissibility. See *supra* Plaintiff's Motion *in Limine* No. 1 (citing cases).

Moreover, Rule 404 prohibits character evidence, including evidence of prior or subsequent bad acts, in order to show conformity with that character. Defendants should not be able to use gang references or associations as a proxy for bad character. The undeniable inference they seek to establish is that people in gangs, or even associated with gangs, are criminals who do

10

violent things, thereby unfairly prejudicing Plaintiff. This reasoning is inadmissible under Rule 404(b) and *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014).

Referring to Plaintiff as a "gang member" or as being associated with a street gang invites the jury to draw unfair and unsupported conclusions about his character, propensity for violence, and credibility. It risks transforming the trial into a referendum on Plaintiff's associations rather than the merits of his claims. Even if some gang affiliation were marginally relevant (which Plaintiff disputes), the inaccurate and conclusory label of "gang member" unfairly suggests criminality and violence, which would mislead the jury and cause undue prejudice in violation of Rule 403—particularly in a case like this where there is absolutely no evidence that the homicide was gang-related. Accordingly, the Court should preclude any party or witness from referring to Plaintiff as a being a gang member, having gang associations or ties, participating in gang activity, as being affiliated with gangs, or any similar language.

### E. Plaintiff's Romantic Partners

Any evidence, testimony, or argument regarding Plaintiff's consensual sexual relationships following his release from prison should be excluded. This evidence is irrelevant and highly prejudicial. Such evidence has no bearing on any issue in this case, including liability or damages. Plaintiff's personal relationships after release do not make any material fact more or less probable.

Even if marginally relevant, this evidence should be excluded under Rule 403 due to its risk of unfair prejudice and its tendency to distract the jury. Defendants afforded a significant amount of time at Plaintiff's deposition to inquire as to his sexual and romantic partners, the number of times he engaged in intimacy with those individuals, and his relationships with those women today—to the point of being harassing. Ex. 3 (Johnson Deposition) at 257:13-274:24. Any reference to the jury of Plaintiff's intimate moments or relationship timelines with his chosen partners is completely irrelevant. Accordingly, the Court should preclude Defendants from

introducing any evidence, testimony, or argument regarding his consensual sexual activity. *Wanke v. Lynn's Transp. Co.*, 836 F. Supp. 587, 598 (N.D. Ind. 1993) (barring reference to party's sexual history as not relevant to damages and "[i]f some trace of probative value can be found, it is overwhelmingly outweighed by the risk of jury confusion and waste of time.").

### F. Plaintiff's Use of Drugs

There is nothing about the murder of Edwin Fred or anything else about the fact pattern in this case that has anything to do with drugs. Indeed, there is no claim that Plaintiff was intoxicated at any point during his interactions with any police or witnesses during the course of the Fred investigation. The fact that Plaintiff may or may not have used drugs at any point in his life is not probative to anything legitimately at issue, and should be barred.

It is well settled that the subject of drugs is enormously prejudicial and inflammatory. The case law is well settled that testimony on that subject is to be avoided unless absolutely necessary. See *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (discussing the possibility that witness testimony will be unduly discounted once jury hears about drugs). Indeed, the Seventh Circuit has been consistently clear (reaffirmed at least twice in the last several years) about the "considerable danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *Kunz v. City of Chicago*, 538 F.3d 667, 677 (7th Cir. 2008); *Gallardo*, 497 F.3d at 733 (7th Cir. 2007) (citing *United States v. Robinson*, 956 F.2d 1388, 1397 (7th Cir. 1992) and *United States v. Cameron*, 814 F.2d 403, 405 (7th Cir. 1987)); see also *Buffone v. Rosebud Restaurants, Inc.*, 2006 WL 2425327 (N.D. Ill. Aug. 21, 2006) ("Even if relevant, any arguable probative value of evidence about their drug use is substantially outweighed by the danger of unfair prejudice") (citing *Mankey v. Bennett,* 38 F.3d 353, 360 (7th Cir. 1994)).

12

Here, where there is nothing relevant whatsoever about past drug use that would add anything at trial, the danger for unfair prejudice far outweighs any probative value than even the most creative mind could contemplate. Any evidence or argument relating to Plaintiff's use of drugs should be excluded.

The foregoing alleged acts and other character evidence have no probative value but a high risk of unfair prejudice, and they should be barred from evidence at trial. Accordingly, Plaintiff respectfully requests that this Court bar any reference to Plaintiff's alleged prior acts or character evidence.

3.    **PLAINTIFF'S MOTION *IN LIMINE* NO. 3 TO BAR REFERENCES TO ANY CRIMINAL CONVICTION, PRIOR ARRESTS, OR OTHER BAD ACTS OF THIRD-PARTY WITNESSES**

Plaintiff expects that Defendants will try to improperly press their natural credibility advantage in this case by painting third parties involved in this investigation as simply bad people who commit crimes, by virtue of their criminal history and gang-related association or affiliation. This Court should bar Defendants from introducing any such evidence of these witnesses' arrests or bad acts, including gang affiliation, because they are flatly inadmissible under Rule 404(b). This Court should further bar, or alternatively limit, evidence regarding these witnesses' prior convictions or bad acts in order to prevent substantial prejudice to Plaintiff and confusion to the jury.

A.  **Evidence of a Third-Party Witnesses' Prior Convictions Should Be Excluded**

Plaintiff anticipates that Defendants intend to introduce evidence regarding the prior convictions of third parties, including Darrell Johnson and Terrell Agee, among others. These decades-old convictions should be barred. In particular, Plaintiff's motion includes a request to bar the 1997 felony conviction for aggravated battery and 1992 misdemeanor conviction for liquor license violation for witness Darrell Johnson, and a request to bar the following convictions for third-party witness Terrell Agee:

1.  1998 conviction for unauthorized possession of title/registration (misdemeanor);

2.  1997 conviction for armed robbery (felony);

3.  1996 conviction for possession of cannabis (misdemeanor);

4.  1994 convictions (multiple) for possession of cocaine with intent to deliver, and other controlled substances (felonies); and

5.  1993 conviction for unlawful use of a weapon (misdemeanor).

The Seventh Circuit has held that evidence of a prior conviction is inadmissible if it has been more than ten years since the witness's release from confinement on the conviction. *United States v. Rogers*, 542 F.3d 197, 200 (7th Cir. 2008). And although Rule 609 permits the introduction of prior convictions older than ten years under limited circumstances, none of those circumstances exist here. See *THK America, Inc. v. NSK, Ltd.*, 917 F.Supp. 563, 570 (N.D. Ill. 1996) ("Congress intended that convictions over ten years old be admitted very *rarely* and only in *exceptional* circumstances"") (citing *Zinman v. Black & Decker, Inc.*, 983 F.2d 431 (2d Cir. 1993)) (emphasis added).

Here, all of these convictions are over two decades ago—far beyond the ten-year threshold. Second, a number of the convictions are not felonies. Further, Defendants have not disclosed any information or evidence that would establish that any such conviction is admissible pursuant to Rule 609 for any witness who might testify in this case, as the marginal probative value—if any—of these old convictions is substantially outweighed by their unfairly prejudicial effect. There is no argument consistent with Rule 609 that these convictions could be admitted. Accordingly, this court should enter an order confirming that no prior conviction of any third-party witness who may testify in this case shall be received.

In weighing the probative value against the potential for unfair prejudice, courts should "take care . . . "ensure that a civil rights plaintiff's criminal past is not being used to unfairly prejudice him or her." *Jones,* 2017 WL 413613, at *9 (quoting *Gora v. Costa*, 971 F.2d 1325, 1331 (7th Cir. 1992)). The same principle applies for third parties in a civil rights case, particularly when the crimes in these witness's criminal histories are largely not probative of truthfulness or credibility. Introduction of these offenses would cause a substantial risk of confusing the jury and wasting their time.

15

Moreover, if the Court permits Defendants to introduce—assuming they meet their burden in providing admissible evidence sufficient for this Court to determine that the convictions comply with the Federal Rule's requirements—any such convictions, it should also ensure that Defendants do not introduce anything but the name, date, and fact of the conviction. See *Gora*, 971 F.2d at 1330 ("[F]or purposes of challenging a witness's propensity for truth and veracity opposing parties cannot harp on a witness's past crime and in fact can elicit no more than the crime charged, the date, and the disposition."); *Warfield v. City of Chicago*, No. 05 C 3712, 2009 WL 10739476, at *3 (N.D. Ill. Mar. 9, 2009).

## B. Evidence of a Third-Party Witness's Prior Arrests Should Be Excluded

Defendants should be barred from attempting to introduce evidence or argument about any prior arrests or bad acts of any third parties, including Terrell Agee, Aby Gonzalez, and Darrell Johnson.

As argued in Plaintiff's Motion *In Limine* No. 2, *supra,* it is well-established in civil rights cases that prior arrests that do not result in convictions are inadmissible. The law is uniform on the point that, absent convictions, arrests are just non-proven prior bad acts. See *Anderson*, 243 F.3d at 1054; *Dyson*, 2014 WL 7205591, at *6; *Gregory*, 2003 WL 1860270, at *1; *Jones*, 2001 WL 668943, at *2; *Brandon*, 179 F. Supp. 2d at 853-55; *Mowrey*, 2013 WL 6512664, at *2. These arrests and other bad acts are inadmissible here.

Under well-settled law, all arrests of third-parties that did not lead to convictions should be barred. Introduction of this evidence would simply "excite the jury to make a decision on the basis of a factor unrelated to the issues properly before it" in violation of Rules 403 and 404. *Mullen v. Princess Anne Volunteer Fire Co.*, 853 F.2d 110, 134 (4th Cir. 1988). So too would introduction of third party witness's general arrest history. See*, e.g., Cotter*, 867 F. Supp. at 658

("[T]he court does find that the probative value of Charles' general arrest history as evidence of his motive to avoid arrest is substantially outweighed by its prejudicial effect. . .").

### C. Evidence of a Third-Party Witness's Alleged Drug Use Should Be Excluded

As discussed, there is nothing about the murder of Edwin Fred or anything else about the fact pattern in this case that has anything to do with drugs. Thus, any reference to third parties using drugs at any point in their lives is not probative to anything legitimately at issue, and should be barred. See*, e.g., Kunz v. DeFelice*, 538 F.3d 667, 676–67 (7th Circ. 2008) (discussing the possibility that evidence will be unduly discounted once the jury hears about illegal drugs); *Morris v. Bland*, 666 F. App'x 233, 238 (4th Cir. 2016) (affirming exclusion of drug and alcohol evidence, writing that "Given the likely prejudicial effect of such evidence, and given Appellants' failure to articulate the relevance or probative value of this evidence, we find no abuse of discretion in its exclusion under Federal Rule of Evidence 403"); *United States v. McDonald*, 905 F.2d 871, 875 (5th Cir. 1990) (drug use is not probative of truthfulness). Indeed, "[i]n today's climate, any evidence as to a litigant's use of drugs has an obvious potential for being extraordinarily prejudicial—for creating the prospect of deflecting the factfinders' attention from the matters that are really at issue in the case to everyone's universally shared concerns as to the problems that drug usage is creating for our society." *Volland-Golden v. Chicago*, 2016 WL 4678299, at *2 (N.D. Ill. Sept. 7, 2016). This is more critical in a case where drug use is not at issue, and therefore these arrests or bad acts should be excluded.

### D. Evidence of a Third-Party Witness's Gang Affiliation or Involvement Should Be Excluded

Defendants will also try to offer evidence that third-party witnesses, including Aby Gonzalez, Darrell Johnson, and Terrell Agee were gang-involved, despite the lack of relevance to the issues at stake here and its highly inflammatory nature. For instance, Defendants seek

admission of Terrell Agee's testimony about having physical conflicts with a member of a rival gang to infer that Plaintiff had a motive to have not only hurt, but murdered a man. See Ex. 4 (Rider Report) at 13-14, 19. As yet another example, Defendants also seek to admit Agee's testimony about gang conflict to paint Johnson as a Latin King "hunt[er]." *Id.* at 15. Defendants obviously intend to argue that Plaintiff was allegedly out to get members of a rival gang. Of course, this makes no sense: there is no evidence that Fred's shooting resulted from any physical confrontation or instance of "hunting." And the victim was not even a Latin King (the purported targets of the "hunting" Agee testified about). Allowing any such reference to Plaintiff's association with individuals in gangs, and inflaming the jury's passion about the violent behavior of street gangs—whether through Plaintiff or through third parties like Terrell Agee Or Darrel Johnson—risks misleading the jury, encouraging improper character inferences, and unfairly prejudicing Plaintiff.

Such evidence about gang affiliation is not only highly prejudicial, but will confuse the jury by casting third parties as "criminals" and imputing such unfair criminality, inevitably, to Plaintiff. Such evidence should not be permitted. As repeatedly argued in Plaintiff's Motions *In Limine* Nos. 1 and 2, *supra,* the highly prejudicial and "insidious quality" of gang-related evidence and the serious risk of "guilt by association," *Finley*, 1999 WL 608706, at *1–2; *Sargent*, 98 F.3d at 328, would improperly lead jurors to assign a criminal propensity to individuals associated with this evidence, *Irvin,* 87 F.3d at 865; see also *supra* Plaintiff's Motions *In Limine* Nos. 1 & 2 (citing additional cases). Any such claims have insufficient probative value to outweigh the extreme danger and risk of unfair prejudice. See*, e.g., Anderson*, 2010 WL 4811937 (excluding evidence of plaintiff's gang affiliation in an excessive force case); *Warfield*, 2009 WL 10739476, at *4 ("Plaintiffs' Motion *in Limine* No. 9 seeks to bar reference to Plaintiffs' tattoos or any gang

affiliation. The motion is GRANTED. The Court agrees that such evidence is of very marginal probative value and would be unduly prejudicial to Plaintiffs."); *Cotter,* 867 F. Supp. at 658; *Kennedy*, 379 F.3d at 1055; *Valtierra,* 2015 WL 1644894, at *3; see also *supra* Plaintiff's Motions *In Limine* Nos. 1 & 2.

Moreover, Rule 404 prohibits character evidence, including evidence of prior or subsequent bad acts, in order to show conformity with that character. Defendants should not be able to use gang references or associations as a proxy for bad character for third parties. The undeniable inference they seek to establish is that people in gangs, or even associated with gangs, are criminals who do violent things, thereby unfairly prejudicing Plaintiff. This reasoning is inadmissible under Rule 404(b) and *Gomez*, 763 F.3d at 856.

Referring to third parties as "gang members" or as being associated with a street gang invites the jury to draw unfair and unsupported conclusions about their characters, propensity for violence, and credibility. It risks transforming the trial into a referendum on Plaintiff's associations rather than the merits of his claims. Even if some gang affiliation were marginally relevant (which Plaintiff disputes), the inaccurate and conclusory label of "gang member" unfairly suggests criminality and violence, which would mislead the jury and cause undue prejudice in violation of Rule 403—particularly in a case like this where there is absolutely no evidence that the homicide was gang-related.

Accordingly, the Court should preclude any party or witness from referring to any third-party as a being a gang member, having gang associations or ties, participating in gang activity, as being affiliated with gangs, or any similar language.

### E. Evidence of Third-Party Tattoos Should Be Excluded

References to tattoos are routinely excluded in Section 1983 trials on grounds of unfair prejudice, and there is no reason to make an exception here. Such references are inadmissible.

19

See *Warfield*, 2009 WL 10739476, at *4; *Finley v. Lindsay*, 1999 WL 608706, *1 (N.D. Ill. Aug. 5, 1999) (barring all references to tattoos); *Williams v. Derifield*, 2006 WL 1120490, *2 (N.D. Ill. April 25, 2006) (granting motion to bar evidence of tattoos); *Brown v. Joswiak*, 2004 WL 40700, *1 (N.D. Ill. Feb. 24, 2004) (Kocoras, J.) (barring without objection all references to tattoos); see also *Henderson v. City of Houston*, 273 F.3d 1108, 2001 WL 1131861, *4 (5th Cir. 2001) (barring references to confederate flag tattoo); *United States v. Smith*, 1997 U.S. Dist. LEXIS 1388, at *4 (D. Kan. 1997) (barring government from mentioning or referencing tattoo). This Court should exclude any evidence or argument relating to any third party's tattoos at trial.

### F. Other Purported Bad Acts Lack Foundation and Should Be Excluded

Defendants will attempt to introduce testimony that one witness, Aby Gonzalez, was subject to ill-defined threats during the period of civil litigation, in an attempt to connect Plaintiff to those threats (he is not connected). Specifically, Defendants will attempt to admit testimony that Aby Gonzalez texted to Plaintiff's counsel, "Hey good morning, sorry but I do not want anything to do with this case it's to (sic) risky for me and my family." Ex. 4 (Rider Report) at 13. They already mischaracterize this text to unfairly impute that Gonzalez faced vague threats of "gang retribution," without foundation. *Id.* Defendants will continue by arguing that this "retribution" is from "some other gang pressure or concern" than from a witness who has died—leaving open the obvious possibility that Defendants will attempt to make it seem that Demetrius Johnson was somehow involved in that intimidating "pressure" (which he is not, nor has there ever been an indication that he was). Indeed, notably absent from this evidence from Aby Gonzalez is any indication that Plaintiff authorized, directed, or knew of any of the ill-defined intimidation that Defendants seek to admit.

State and federal courts agree that absent a foundation tying a party to another person's alleged threat or bribery attempt, testimony regarding such evidence is unduly prejudicial and

inadmissible. See *Dudley v. Duckworth*, 854 F.2d 967, 969-72 (7th Cir. 1988) (uncorroborated threats to a witness that "were not traced to [the defendant] or his codefendants, except by innuendo" were improperly admitted and deprived the defendant of a fundamentally fair trial); see also *State v. Ofield*, 635 S.W.2d 73, 76 (Mo. Ct. App. 1982) (excluding evidence that defendant's husband had attempted to bribe witness because there was no evidence the defendant knew of or authorized the bribe). Absent a link between Plaintiff and the persons vaguely inferred by Gonzalez, there is no good-faith basis to solicit this highly inflammatory testimony.

Moreover, evidence of threats is subject to the same Rule 403 balancing test as other evidence. See *United States v. Qamar*, 671 F.2d 732, 736 (2nd Cir. 1982). Evidence of the alleged threats would be unduly prejudicial because it would suggest directly to the jury that Plaintiff was involved in them (he was not). See *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996) (holding that "evidence of threats on witnesses can be highly prejudicial . . . [such] threats constitute a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case." (internal quotations omitted)). Here, this testimony about bad acts by third parties risks inflaming the jury and lacks reliability.

Finally, there is no evidence that the purported "gang retribution" influenced Gonzalez's testimony in any way. To the contrary, Gonzalez testified in a 2022 deposition. And the sole text that Defendants use to make this argument has no valid connection to gang "retribution" whatsoever. For these reasons, allowing evidence about third-party bad acts that did not influence testimony and that have not been linked to Plaintiff in any way would constitute prejudicial error.

For these reasons, Defendants should be barred from referencing any criminal conviction, prior arrest, or other bad act of third-party witnesses in this matter.

4. **PLAINTIFF'S MOTION *IN LIMINE* NO. 4 TO BAR TAG-TEAM CROSS EXAMINATION**

Defendants in this matter have been represented by three sets of attorneys—one set for the City of Chicago, one for Guevara, and one for the remaining individual Defendants. Defendants' interests in this case are aligned in nearly all respects.

It would unnecessarily prolong the trial, to say nothing of the inherent unfairness, to permit counsel for one Defendant to duplicate cross-examination areas already covered by counsel for the other. The only fair method is to require the Defendants to do what Plaintiff is going to do, namely, designate one primary attorney per witness per cross-examination. If an area or topic exists which was not covered by that defense attorney, counsel for other Defendants could supplement as necessary—without repeating cross-examination on topics already covered. For example, after a comprehensive cross-examination of a witness by Guevara's counsel, Chicago's counsel might be permitted to follow-up with questions that bear on the *Monell* claims against it. But duplicative cross-examination should be barred. Any other approach risks a free-for-all of redundancy. *United States v. Mills*, 138 F.3d 928, 937 (11th Cir. 1998) (frowning upon "tag team" cross examinations by counsel representing the same interest); *United Nat. Records, Inc. v. MCA, Inc.*, 106 F.R.D. 39, 41 -42 (N. D. Ill. 1985) ("tag team" questioning by counsel improper); *Cable Belt Conveyors, Inc. v. Alumina Partners of Jamaica*, 717 F. Supp. 1021, 1027 1028 (S.D.N.Y. 1989) ("double teaming" during witness exams is improper); *Warfield v. City of Chicago*, No. 05 C 3712, 2009 WL 10739476, at *3.

This Court should direct Defendants to designate one primary attorney per witness per cross-examination, with counsel for the other defendants to follow-up only with topic areas not previously covered bearing on their client's defenses.

23

5. **PLAINTIFF'S MOTION *IN LIMINE* NO. 5 TO BAR UNDISCLOSED NON-RETAINED EXPERT OPINIONS**

As far as Plaintiff can tell, Defendants in this case have not identified any non-report-writing experts (often called "treating experts") under Federal Rule of Civil Procedure 26(a)(2)(C). Rule 26(a)(2)(C) by its terms provides that witnesses not retained by the parties who do not provide a written report are limited to those subject areas included in the disclosing party's summary. See Fed. R. Civ. P. 26(a)(2)(C)(ii) and 2010 Committee note thereto. Defendants' expert disclosures contain four retained, report-writing experts, disclosed under 26(a)(2)(B), but no non-reporting-writing experts. See Ex. 5 (Defendants' Rule 26(a)(2) expert disclosure). As a result, Defendants may not call any non-retained witness to provide opinion testimony in this case.

6.    **PLAINTIFF'S MOTION *IN LIMINE* NO. 6 TO BAR "GANG EXPERT" RALPH RIDER**

The remainder of Plaintiff's motion concern expert opinion testimony. The admissibility

of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the Court to ensure that expert evidence "is not only relevant, but

reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The reliability

requirement serves to distinguish a well-grounded expert opinion, which is admissible, from

"subjective belief," which is not. *Id.* at 590. The purpose of this judicial gatekeeping is "to make

certain that an expert employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*,

561 F.3d 698, 705 (7th Cir. 2009). Furthermore, "Rule 703 requires the expert to rely on 'facts or

data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d

765, 772 (7th Cir. 2014). Expert testimony may be properly excluded "if people of common

understanding are as capable of comprehending the primary facts and of drawing correct

conclusions from them as are witnesses possessed of special or peculiar training, experience, or

observation in respect of the subject under investigation." *United States v. Dewitt*, 943 F.3d 1092,

1096 (7th Cir. 2019) (quoting *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)) (quotations

omitted). 526 U.S. 137, 152 (1999). "'[N]othing . . . requires a district court to admit opinion

evidence'" that rests solely on "'the *ipse dixit* of the expert.'" *Id.* at 157 (quoting *Gen. Elec. Co. v.*

*Joiner*, 522 U.S. 136, 146 (1997)).

25

The Court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. 137 at 152. Courts consider the proposed expert's full range of experience and training in the subject area, as well as their methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In addition to being reliable, expert testimony must "assist the trier of fact to understand the evidence or determine a fact at issue." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis*, 561 F.3d at 705; *Dukes v. Ill. Cent. R. Co.*, 934 F. Supp. 939, 946 (N.D. Ill. 1996) (party that proffers an expert's testimony bears the burden, by a preponderance of the evidence, of establishing its admissibility).

Ralph Rider has been disclosed as a "gang expert," offering opinions "on the impact of gangs on the crime, investigation, and witnesses, surrounding the June 12, 1991 murder of Edwin Fred[.]" He defines the scope of his opinions as "focused on the culture of Chicago Street Gangs during the early 1990s through Plaintiffs conviction so as to help the trier of fact assess the role that gang culture plays on both the crime and the investigation." His goal, he says, "is to provide guidance and understanding of gangs and gang culture." Ex. 4 (Rider Report) at 1.

By his own admission, Rider's report is nothing more than an attempt to place gangs at the center of this case, and infuse this case with vague and amorphous discussion of "gang culture" that will serve no purpose other than to severely prejudice Plaintiff. In reality, gangs play hardly any role in this case, or more importantly, in the homicide investigation that followed. Rider's attempt to offer opinions to the contrary fails to pass muster under the Federal Rules of Evidence on nearly every basis, and is additionally inadmissible because it is improper

propensity evidence under Rule 404(b), and unduly prejudicial under Rule 403. His opinions should be barred in their entirety.

As discussed at length already, gangs are of nearly no relevance to this case. See *supra* Motions *In Limine* Nos. 1-3. That is enough reason to exclude Rider. But beyond that fundamental mismatch between Rider's opinions and this case, his opinions should be barred on additional grounds: he lacks the qualifications to offer opinions about the workings of this homicide investigation; his opinions lack any methodology or reliability; they will confuse rather than assist the trier of fact; they are improper "propensity" evidence; and last but not least, they are wildly prejudicial. For each of these reasons, his opinions should be barred.

### A. Rider Lacks the Necessary Qualifications to Offer Opinions In this Case

The threshold problem with Rider's opinions is that he is not qualified to offer opinions. Although he claims to offer opinions about the "impact of gangs" on the Fred homicide investigation, he is not qualified by experience or training to offer opinions about any aspect of a homicide investigation or how detectives go about conducting such investigations. See *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.'") (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). Put another way, while Rider may have some expertise in dealing with gangs, he has no expertise from which he can offer opinions about their impact on how this homicide investigation was conducted, the only possible subject of relevant opinions in this matter. *Baker*, 2024 WL 5112495, at *18 ("Even if an expert 'is qualified in general' he or she must still have expertise in the specific area about which they seek to offer testimony.") (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)).

Rider spent his whole career as a federal agent for the Bureau of Alcohol, Tobacco and Firearms ("ATF"). He never worked in the Chicago Police Department, or any state or municipal police department. He has never been a homicide detective, or supervised homicide detectives. Ex. 4 at 1 (discussing background), A1-A2 (CV); Ex. 6 (Rider Deposition) at 110:24-111:15. He has no knowledge of the policies and practices applicable to homicide investigators, or the generally accepted police standards for detectives investigating homicide cases. Ex. 6 at 127:4-11. Instead, his experience is in working with gang crimes officers, Ex. 4 at 1, but there are no gang crimes officer defendants in this case. When he was involved in criminal investigations, they were narcotics and firearms cases; he has no experience investigating homicide cases except tangentially where there may have been some connection to a firearms or narcotics case he was involved with. Ex. 6 at 110:9-23.

Put simply, while Rider may know a lot about gangs generally, he has no relevant experience or training on homicide investigations or how they were conducted, the only possible subject of relevant police practices opinions in this case. As such he is not qualified to offer opinions and should be barred.

### B. Rider's Opinions Lack any Methodology and are Not Reliable

Rider's opinions are not rooted in any application of relevant standards, guidelines or other principles; they are simply his say-so. Such testimony is prohibited by Fed. R. Evid. 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999) ("'[N]othing . . . requires a district court to admit opinion evidence'" that rests solely on "'the *ipse dixit* of the expert.'"); *Manpower*, 732 F.3d at 806 (noting that "it is the opinion connected to existing data only by the *ipse dixit* of the expert that is properly excluded under Rule 702"); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

28

Here, Rider did not review any CPD policies or practices in preparing his report, and neither his report nor his materials reviewed makes reference to any national standard, professional guideline, or gang treatise. Ex. 4 (absence of any such references), at B1 (Materials Reviewed). He has previously admitted that he has no familiarity with CPD's—or any police department's—policies or practices. Ex. 6 at 145:2-15. Instead, he reviewed a paltry total of *ten documents* (one of which was the deposition of Plaintiff's police practices expert, Thomas Tiderington). The rest were the depositions of Plaintiff, his brother, and a few others; as well as the criminal trial transcripts, the CPD homicide file, and Plaintiff's prison files. Without reviewing the depositions of the three critical eyewitnesses or their other testimony and statements, the Defendant detectives, or any of the rest of the massive record in this case, he purports to offer opinions about how the investigation in this matter had been impacted by "gang culture." Put simply, Rider's opinions lack any methodology or other indicia of reliability, and they should be barred for that reason.

### C. Rider's Opinions Will Not Assist the Trier of Fact

Rider's opinions are not helpful to the jury in any way. As discussed above, there is hardly any relevance to gang involvement in this matter, other than the simple fact that the victim was a member of the Spanish Lords, and the initial suspect (Johns) and subsequent suspect (Johnson) were MLDs. This fact is irrelevant and should be barred, see *supra* Plaintiff's Motion *In Limine* Nos. 1-2. But even if such evidence is permitted at trial, it is readily apparent in the record and can be testified to by numerous CPD witnesses and other fact witnesses that will testify in this matter. It requires no expert.

Without any actual relevance of gangs in this matter, Rider tried to create one by offering opinions about the history and culture of gangs. See*, e.g.*, Ex. 4 at 2-4, 14-16. He spends pages waxing poetic about everything from "gang structure" to gang rules and trust, to gang signs, to

gang involvement in the drug trade. *Id.* at 12-16. None of this is remotely relevant to the core issue to be resolved by the jury in this case: whether Defendants fabricated and suppressed evidence in violation of Plaintiff's constitutional rights, in order to obtain charges against an innocent man.

The real crux of this case is whether Defendants fabricated the purported photo array and lineup identifications of Plaintiff, and suppressed evidence including a positive identification of the original suspect, Bryan Johns. But Rider does not offer any opinions that go to those central questions, and he does not explain their connection to his opinions about "gang culture." For example, he has a section entitled "Witness Intimidation," but nowhere in that section does he offer any evidence that Plaintiff had any involvement in any witness intimidation, or that any of the three Burgoses were ever subjected to witness intimidation.[2]

Likewise, Rider spends pages talking about ways in which purported "gang influence" impacted this investigation, but none of it is remotely relevant to the jury's assessment or the subject of expert testimony. Ex. 4 at 12-15. Like the "witness intimidation" example, the next section is entitled "Gang Territories and Actions," and explains how the Maniac Latin Disciples and Spanish Lords were rival gangs that controlled nearby territory. Ex. 1 at 13.[3] From this fact, no opinions flow. Instead, the section morphs into a bizarre discussion of how members of the

---

[2] Instead, he simply recites facts that are either undisputed or irrelevant. For instance, that some witnesses at the scene of the shooting refused to provide their names but named Bryan Johns aka "Little D" as the shooter. Ex. 4 at 12. So what? Plaintiff is not asserting any police misconduct associated with the original witnesses' refusal to provide their names. It is simply a common, undisputed fact that, if relevant at all, can be introduced through Detective Daley or whatever other initial scene officers are called to testify as fact witnesses. Or this instance: when Bryan Johns told Terrell Agee that he had been selected from a lineup on the first night, Agee didn't ask him if he had committed the murder. *Id.* at 12. Rider posits that this refusal to confront a fellow gang member is common gang practice. Even if true, what does this have to do with anything at issue in this case?

[3] Again, this fact can be elicited from any of the scene officers and detectives disclosed in this case. And more importantly, so what? No evidence has ever been presented in this case that among all the other rival gangs in the surrounding area, the MLDs were at war with this one, the Spanish Lords. And even if such evidence existed, expert testimony on this point would serve no purpose.

MLDs would sometimes go "hunting" for Latin Kings to beat up. *Id.* First, the victim in this case was not a Latin King. Second, there is no evidence that the Fred shooting had anything to do with someone "hunting," or being hunted (nor does Rider claim that such evidence exists). It is entirely gratuitous, and will serve only to distract, rather than assist, the jury. See, *e.g.*, *Sullivan v. Alcatel-Lucent USA Inc.*, No. 12 C 07528, 2014 WL 3558690, at *5 (N.D. Ill. July 17, 2014) (excluding expert testimony that "simply reads and interprets documents" because it "does not draw on any expert qualifications or experience" and therefore is "merely gratuitous").

Ultimately, Rider is a type of police practices expert, and as courts have repeatedly explained, such experts can meet the gatekeeper requirements of Federal Rule of Evidence 702 when they avoid reaching legal conclusions and resolving actual disputes, and instead limit their opinions to whether the defendant officers followed generally accepted police practices. See, *e.g.*, *Jimenez v. Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (affirming admission of police practices testimony concerning "reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures"). Rider offers no such opinions. Nor could he. He has no idea what generally accepted police practices related to homicide investigations are, because that is outside the bounds of his experience, and he did not review any such policies or practices (either of CPD, or nationally) in preparing his report. See Section B, *supra*.

Relatedly, to the extent there even were any portion of Rider's opinions that actually go to the question whether Defendants followed generally accepted police practices in this investigation—and Plaintiff contends there are not—his opinions would be cumulative, because Defendants separately retained a police practices expert, Ronald Muich, to offer these very

opinions. There is no basis to allow a second law enforcement expert to offer the same opinions, especially where his qualifications and methodology are so plainly deficient.

### D. Rider's Opinions Are Improper "Propensity" Evidence

In addition to all the problems above, Rider's opinions are classic propensity evidence that is inadmissible under Federal Rule of Evidence 404(b). At base, the purpose of Rider's report is rather obvious: to imply to the jury that because Plaintiff was affiliated with a gang, and because gangs engage in violent conduct such as shooting others, Plaintiff shot Edwin Fred. Throughout the report are scattered more granular versions of this same logic. In the "Witness Intimidation" section, for example, the section can serve no purpose relevant to this case other than to convince a jury that because Plaintiff was affiliated with a gang, and gangs engage in witness intimidation, Plaintiff intimidated witnesses in this case. Or, gang members go "hunting" for members of rival gangs, and so because Plaintiff was affiliated with a gang he must have been hunting for Edwin Fred. These are classic examples of prohibited propensity inferences.

Put another way, if there was any actual evidence on these points related to the underlying investigation in this case, it could be elicited from the officers and other fact witnesses that will testify at trial (assuming it were admissible). It requires no expert opinion. The only reason Rider is necessary is because there is no such evidence or connection, and so Rider's improper propensity testimony is needed to close the gap.

### E. Rider's Opinions are Highly Prejudicial and Should be Barred On that Basis

Even if the Court were to find that some portion of Rider's opinions were relevant, they should be barred because their prejudice far outweighs their probative value. Even where expert testimony is relevant, it may nevertheless be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Indeed,

the Supreme Court has explained that expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it," and that risk means a judge "weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (further citation omitted).

Here, Rider's opinions serve primarily to inject gangs into the case to the maximum extent possible. As discussed in Plaintiff's Motion *In Limine* No. 1 to bar gang evidence in this matter, courts have repeatedly recognized "'the insidious quality' of evidence of gang membership as well as 'the damage it can do.'" *Finley*, No. 97 C 7634, 1999 WL 608706, at *1-2 (citing *Sargent*, 98 F.3d at 328). Because there is a "substantial risk of unfair prejudice attached to gang affiliation evidence," courts closely scrutinize its admissibility. *Irvin*, 87 F.3d at 865 ("Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. . . . Guilt by association is a genuine concern whenever gang evidence is admitted.").

Indeed, such gang-related evidence is "routinely excluded" in civil rights suits of this kind. *Christmas*, 691 F. Supp. 2d at 817 (citing *Irvin*, 87 F.3d at 865-66 and *Cotter*, 867 F. Supp. at 658) (naming § 1983 plaintiff "as a gang member is unfairly prejudicial insofar as it encourages the inference that [plaintiff] is an evil and menacing person"); see also *Gonzalez*, No. 11 C 8356, 2015 WL 3671641, at *2 (barring gang evidence because it was irrelevant to the jury's inquiry into whether Plaintiff's constitutional rights were violated, and unduly prejudicial); *Johnson v. Guevara*, No. 05 C 1042, 2010 WL 11711974, at *2 (N.D. Ill. Feb. 18, 2010) (in wrongful conviction damages suit, gang evidence "simply was not necessary for a full and fair presentation of the defense, whereas, even if arguably relevant, its admission would have seriously prejudiced the plaintiff."); see also *Taylor*, No. 09 C 5092, 2012 WL 3686642, at *2

(barring evidence of gang membership which risked eliciting "guilt by association") (citing *Ramirez v. City of Chicago*, No. 05 C 317, 2009 WL 3852378, at *1-2 (N.D. Ill. Nov. 17, 2009); *Fisher v. Fapso*, No. 12 C 00403, 2015 WL 5692901, at *3 (N.D. Ill. Sept. 25, 2015); *Padilla v. City of Chicago*, No. 06 C 5462, 2013 WL 6354169, at *6 (N.D. Ill. Dec. 3, 2013).

Here, Defendants seek to have Rider offer gang testimony of the most prejudicial, and speculative, nature: that gangs generally engage in the drug business, the violent control and defense of their territory, witness intimidation and various other crimes. Without any actual evidence that any of this occurred in this case, let alone that Plaintiff engaged in any such conduct in this case, the sole purpose of Rider's testimony is to insinuate to the jury that, because Plaintiff was affiliated with a gang, he must have engaged in such activities. The prejudice is enormous. Meanwhile, as discussed repeatedly, none of this has any relevance to this case, let alone relevance that outweighs the inflammatory and insidious prejudice inherent in such gang testimony.

Take, for example, the multiple pages Rider spends talking about "hunting," where members of the MLDs would sometimes be together and find members of the Latin Kings to beat up.[4] Ex. 1 at 13-14, 15. There is no evidence in this case that the Fred murder had anything to do with anyone out "hunting"; neither that word, or concept, comes up even once in the police reports or criminal proceedings. Indeed, the sole witness who described the practice of hunting said it occurred between MLDs and *Latin Kings*; but Fred was a member of the *Spanish Lords*. It simply has no relevance to this case, or the critical issue to be resolved by the jury, *i.e.*, the

---

[4] All of this discussion of hunting is based on the testimony of one witness, Terrell Agee, whose only role in this case is that he was a filler in the Johns lineup on the night of the crime and spoke to Johns that night at the station.

34

conduct of the Defendants during the critical aspects of this investigation. Its prejudicial nature, however, is undeniable. Rider's gang testimony should be barred under Fed. R. Evid. 403.

### F. Plaintiff's "Police Expert"

In connection with Defendants' disclosure of Rider as an expert as to how gang members operate, Plaintiff disclosed in rebuttal a reciprocal "police officer expert" (Andrea Lyon) who offered testimony analogous to Rider concerning the gang-like tendencies, habits, and misconduct among some police officers. Ex. 3 (Lyon Report). For example, just as Rider discusses the code of silence within gangs, there is a code of silence within groups of rogue officers. To be clear, Plaintiff's position is that neither side's "propensity" expert should be permitted to testify at trial, but that if Rider is allowed, then Lyon should be allowed too. Plaintiff has communicated to defense counsel a request to mutually withdraw these experts, but the Defendants rejected it, choosing instead to seek to bar Lyon, but retain their ability to call Rider. Hence, the need for this motion.

For each of the reasons set forth above, Rider should be barred from testifying in this matter.

7.    **PLAINTIFF'S MOTION *IN LIMINE* NO. 7 TO BAR POLICE PRACTICES EXPERT MUICH**

As is typical in wrongful conviction cases, both sides have disclosed police practices

experts. Admittedly, such testimony can be fraught, because the opinions are often mired in

disputed facts (depending on whether one accepts the officers' testimony or the

plaintiffs'/recanting witnesses' testimony), and have a tendency to resolve such facts in a way

that invades the province of the jury (*e.g.*, there was/wasn't probable cause, the officer did/didn't

act reasonably, etc.). Given these concerns, courts have set forth a basic framework in which

such testimony constitutes legitimate expert opinion that will assist the trier of fact: where the

police practice expert offers opinions on what the nationally or generally accepted standards

were, and whether the defendant officers in the given case followed or violated those standards.

In this way—so long as the opinions are based on a sound methodology and meet other standards

of reliability—opinions by police practice experts can be admissible at trial.

Here, Defendants' police practices expert, Ronald Muich, fails on every level. His

opinions, or lack thereof, do not contain any discussion of nationally or generally accepted police

standards, or apply such standards to the conduct of the Defendants in this case. Instead, his

report is simply a recitation of the factual record drawing all inferences in Defendants' favor, and

along the way hits on every one of the no-nos for admissibility. It is full of credibility

determinations, rank speculation, and factual determinations on many of the most hotly disputed

issues in the case. In total, Muich's opinions are not based on any sound methodology, and will

confuse rather than assist the trier of fact in weighing the evidence in this case. He has no

opinions that pass muster under Fed. R. Evid. 702, and his testimony should be barred in its entirety.[5]

It is broadly accepted that expert testimony concerning professional standards in policing can be helpful to juries and is often admissible. See, e.g., *Jimenez v. Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) (affirming admission of police practices testimony concerning "reasonable investigative procedures and ways in which evidence from other witnesses did or did not indicate departures from those reasonable procedures"). "In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful." *Id.* at 721. In §1983 suits, negligence is insufficient and liability is more stringent than at common law. As a result, "[e]xpert testimony regarding relevant professional standards can give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights." *Id.* at 721-22. To be sure, a police practices expert may testify about "standard criminal investigation procedures from a law enforcement officer's perspective" and if they were followed in the case at issue, but opinions that stray into the provinces of the judge and jury—legal conclusions and resolving factual disputes—are impermissible. See, e.g., *Brown v. City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *6 (N.D. Ill. Mar. 17, 2023) (cataloging cases); *Kladis v. Brezek*, 823 F.2d 1014, 1019 (7th Cir. 1987)).

---

[5] During the parties' conferral on May 15, 2025, Plaintiff offered to forego his motion to bar Muich, if Defendants would forego their anticipated motion to bar Plaintiff's police practices expert Tiderington. After all, all counsel in this case are experienced in wrongful conviction trials, and know the general contours of acceptable police practices testimony. If questions were asked to elicit inadmissible testimony or opinions, that could be addressed at the time. Defense counsel rejected that proposed agreement. But so there is no confusion: Plaintiff believes there is a substantial difference in the admissibility of the parties' respective reports. Because Tiderington's analysis contains actual opinions rooted in the consideration of accepted police practices and their application here, his opinions are admissible. Because Muich lacks such analysis or opinions, his opinions are not.

**A. Muich's Opinions Are Not Tied to Any Discussion of Relevant Policies or Standards and Should Be Excluded**

Muich has failed to stay in the limited, accepted lane of admissible police practices expert testimony. Indeed, in his entire report, there is not a single reference to nationally or generally accepted standards of any kind, or any discussion of the ways in which the actions the Defendants allegedly took complied with, or deviated from, accepted police practices. Nor is there a reference to a single Chicago Police Department policy, none of which he reviewed before offering his opinions. This fatal flaw alone—the failure to offer opinions in the limited area of admissible police practices testimony—justifies barring his opinions.

In fact, there is only one reference to standards or accepted practices in Muich's entire 26-page report: "the written documentation by all the parties involved in this case, including police, public defenders and states attorneys etc., appears consistent with standard documentation in the early 1990's." Ex. 8 (Muich Report) at 20. First, Muich has no basis to offer opinions about "standard documentation" for public defenders and state's attorneys, and certainly doesn't provide any justification in his report for this wide departure from his purported expertise as a former police officer.

Second, even as to "standard documentation" for police officers, his opinion is entirely lacking because it fails to reference a single national standard, guideline or practice guide from which he reaches his conclusions about "standard documentation." Instead, his reference point is one thing alone: his own practices during his career. This is not a reliable or sound methodology from which to reach conclusions about deviations or compliance with accepted police standards. Especially where, as here, he did not begin his law enforcement career until 1995—four years after this investigation—and did not become a detective and receive any training on homicide investigations *until 2005*—14 years after this investigation. Ex. 8 at 2; Ex. 9 at 12:18-21 (began

38

law enforcement career in 1995), 271:15-272:23 (first trained as a homicide detective in 2005), 278:8-25 (did not receive training on policies or practices going back to early 1990s). And so this single opinion referencing "standard documentation" does not rely on any standards at all, it turns out; it is mere *ipse dixit*. See *Andersen v. City of Chicago*, 454 F. Supp. 3d 740, 745 (N.D. Ill. 2020) (citing *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013)) (barring police practices expert who" did not discuss nationally or even regionally accepted standards," and could not articulate what constituted "sound professional standards," relying instead only on his say-so).

## B. Muich's Opinions Are Not Tied to Any Discussion of Relevant Policies or Standards and Should Be Excluded

Rather than offer opinions in a police practices expert's lane, Mr. Muich's report is instead loaded with credibility determinations, speculation, and conclusions that invade the province of the jury. Plaintiff will not inundate the Court with every instance of these improprieties, but instead provide a few illustrative examples:

- *Opinions on Plaintiff's guilt*: "Detectives in this case followed all the evidence which led them to the appropriate offender." Ex. 8 at 2-3.
- *Credibility determinations, and resolution of the very disputes the jury will be asked to resolve*: "The detectives let the facts and evidence lead them to Demetrius Johnson through their investigation." *Id.* at 14.
- *Credibility determinations, and insinuation of credibility findings by trial court*: "Both [Plaintiff's alibi witnesses'] answers were nearly identical. This is quite odd that two separate people can give almost the exact testimony related to their movements. . . . The Judge at Johnson's bench trial also heard this mirrored testimony that indicated Johnson was not the shooter yet still found Johnson guilty." *Id.* at 15.
- *Credibility determinations, and speculation*: "If Reyes could provide a solid alibi on the night of the shooting for the father of her child, she would be adamantly sharing the information with the police and anyone who would listen." Id. at 16.
- *Unqualified expert opinions*: "When eyewitnesses are viewing a lineup, their focus is on the facial features of the person they have seen[.]" *Id.* at 17.
- *Unqualified expert opinions, and speculation*: "If Ms. Gubin thought there was enough proof to tie Bryan Johns to the murder, she would have followed up by taking

initial steps including interviewing witnesses and interviewing Bryan Johns himself. If this, is in fact true, Ms. Gubin, as a competent criminal defense attorney, would have had the opportunity at trial to undercut the prosecution's case by calling the alleged real killer to the stand instead of just implying Johns was the real killer." *Id.* at 20.

- *Credibility determinations, speculation, and resolution of central dispute the jury will be asked to resolve*: "In regards to the Bryan Johns lineup report that was allegedly only "found" decades later, it does not make sense that the police were trying to hide that report when a copy of it was placed in and maintained in the investigative file." *Id.* at 21.

As these examples show, much of Muich's report, and his anticipated testimony, simply resolves factual disputes based on his own speculation and credibility assessments. Such testimony invades the province of the jury and is outside the bounds of acceptable expert testimony. *United States v. Vance*, No. 07 CR 0351, 2011 WL 2633842, at *5 (N.D. Ill. July 5, 2011) (expert would not be permitted to testify about his review of discovery materials and his weighing of the evidence because that is the jury's role). *Estate of Arama v. Winfield*, No. 2:13-CV-381-JD, 2017 WL 1951462 at *4 (N.D. Ind. May 11, 2017) (expert "must testify to something more than what the jury can decide for itself"); *Baker*, 2024 WL 5112495, at *11, 15 (citing *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert witness may not opine on the credibility of witnesses, as those are within the province of the trier of fact."); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("It goes without saying that expert testimony cannot 'be based on subjective belief or speculation.'")).

The remainder of the report is a slanted recitation of the evidence Defendants find most favorable to them *without any application of police practices expertise or analysis to that evidence*. In other words, page after page of Muich's report simply catalogs the evidence and testimony the jury will hear, without then considering that evidence in the context of accepted police practices, or even engaging in any analysis of that evidence whatsoever. This is improper.

40

See *Wells v. City of Chicago*, 2012 WL 116040, at *12 (N.D. Ill. Jan. 16, 2012) (where expert merely summarized the evidence, the court found that he was "no better placed to review these facts than the jury; his opinion is not an expert opinion"); *Pursley v. City of Rockford*, 2024 WL 1050242, at *5 n.4 (N.D. Ill. Mar. 11, 2024).

Indeed, it is not clear that Muich's report contains any opinions at all. He has no section in which he lays out his opinions. The entire report is simply a detailed recitation of Defendants' favorite evidence. Ex. 8 at 3-25. The section headings reveal as much: *e.g.*, "Synopsis of Initial Incident," "Rosa Burgos (Witness)," "Initial Incident," "Aby Gonzalez Viewing Lineup," "Demetrius Johson Deposition," "Bryan Johns 'Jailhouse Confession.'" Each of these sections simply summarizes evidence. Not a single section in those 22 pages contains a subsection, or even a paragraph, analyzing Defendants' alleged *conduct* in the context of accepted police standards, or offering opinions on whether they complied or deviated from such standards. *Id.* The only places in which there is anything that sounds remotely like an opinion, rather than mere recitation, is a single sentence at the beginning and end of the report, in the Overview and the Conclusion: respectively, "Detectives in this case followed all the evidence which led them to the appropriate offender"; "…the police appropriately investigated and documented their investigative steps laying out how they came to identify Demetrius Johnson as a suspect and then the [sic] took the steps they took to confirm or deny his involvement." *Id.* at 2-3, 25-26. These two entirely conclusory statements are so devoid of reasoning or analysis, or application of generally accepted police standards, that they are neither reliable, nor helpful to the jury.

For these reasons, Muich should be barred, and Defendants should not be permitted to call him at trial to simply recite their version of events to the jury.

### C. Muich's Opinions Simply Criticizing Plaintiff's Expert, Tom Tiderington, Should Be Excluded

Muich dedicates a section of his report to criticizing Plaintiff's police practices expert, Tom Tiderington, challenging his command of the evidence in this case. Ex. 8 at 24-25. These ancillary opinions invade the provinces of the Court and the jury, and involve no application of his expertise as a police practices expert, and accordingly they should be barred.

In particular, Muich has a section of his report entitled "Thomas Tiderington Deposition," where he claims "Tiderington appeared to now know or forget facts that were not convenient for his opinions." *Id.* at 24. He then spends the next six paragraphs discussing Tiderington's deposition testimony about whether Plaintiff and Bryan Johns were friends, and comparing it to his review of the evidence in the case. *Id.* at 24-25. This is not expert opinion at all. Indeed, Defendants' counsel will have an opportunity to cross-examine Tiderington, and confront him with whatever deposition testimony or other evidence they would like, and then the jury will have the opportunity to decide what weight to give Tiderington's testimony. It is not for Muich—or any of either side's expert at trial, for that matter—to replace the role of the jury in making those assessments.

For these reasons, Muich should be barred from testifying at trial in this matter.

8.    **PLAINTIFF'S MOTION *IN LIMINE* NO. 8 TO LIMIT OPINIONS OF DEFENDANTS' PROSECUTOR EXPERT BERNAND MURRAY**

Plaintiff disclosed a police practices expert, Tom Tiderington, to offer opinions related to his *Monell* claim regarding the CPD's widespread practice of failing to disclose exculpatory or impeaching evidence. In partial response, Defendants disclosed a former Cook County State's Attorney, Bernard Murray. Murray is the same expert who Defendants disclosed in the first two cases concerning the same file-suppression *Monell* claim that plaintiff pursues here, *Fields v. City of Chicago* and *Rivera v. Guevara*, which are discussed at length in the summary judgment briefing. Murray has been disclosed since in each of the Guevara cases that has reached expert discovery.

So, this ground is well-trodden. At summary judgment, the Court denied the City's motion to bar Tiderington's *Monell* opinions, and Plaintiff understands there will be a battle of experts between Tiderington and Murray on the *Monell* claim. That is fair. This motion seeks to bar only limited portions of Murray's opinions that he is either unqualified to offer—and was previously barred from offering in other cases—or that are likely to confuse the jury.

A.  **Bar Opinion About "Prosecutor's Perspective" On CPD Policy**

Murray offers a brief opinion about CPD Special Order 83-1 and its subsequent revisions, which regard documenting, storing, and disclosing police investigative material. Those written policies are central to the dispute between the parties on this *Monell* theory. Murray opines that "[f]rom the perspective of a prosecutor, the CPD's policy is good." Ex. 10 (Murray Report) at 5-6. This opinion is irrelevant, unsupported, cumulative, and should be barred.

Beyond the imprimatur of being an attorney and prosecutor, Murray has no qualifications or expertise to offer an opinion about whether CPD's policy was a "good" one. As he has admitted in past depositions regarding the same opinions, Mr. Murray has no knowledge or

expertise in national standards related to police file keeping and disclosure practices, or whether the CPD complied with them. Ex. 11 (Murray Dep. in *Iglesias/Sierra*) at 82:10-16; Ex. 12 (Murray Dep in *Reyes*) at 94:2-96:5.

In addition to his lack of qualifications, and in part because of it, Murray's opinion on this topic is likely to confuse the jury. Whether or not the CPD's policy is good "from the perspective of a prosecutor" is irrelevant, and it does little to assist the juror. Fed. R. Evid. 702. A jury would be left to wonder what to do with such a claim even if they accepted it. And given the lack of relevance and risk of confusion, it is also inadmissible under Fed. R. Evid. 403 because it is more unfairly prejudicial than probative.

Indeed, Murray previously offered this exact same opinion in *Rivera v. Guevara, et al.*, 1:12 Civ. 4428 (N.D. Ill.), where it was barred. Ex. 13 (MIL Ruling in *Rivera*) at 5-6. The same result is warranted here.

### B. Limit His Opinions Regarding Illinois Supreme Court Rules and Law Regarding Prosecutors' Discovery Obligations

Murray spends several pages discussing the discovery obligations of prosecutors, including the requirements set forth by Illinois Statute, Illinois Supreme Court Rules, and the Supreme Court in *Brady* and *Giglio*. Ex. 10 at 4-6. Plaintiff does not have a problem with Murray providing basic testimony or explanation of a prosecutor's discovery obligations, the thrust of which, according to Murray, is that prosecutors had an obligation to obtain and disclose to the defense the police records they received. *Id.* So be it. Plaintiff's only concern is if Murray's discussion of such discovery obligations spills over into prohibited territory, in one of two ways:

First, if his testimony about a prosecutor's obligation to obtain all police records is then used to state, or imply, that this means the prosecutors *actually did* obtain all police records.

Murray did not review the vast majority of the hundreds of *Monell*-related homicide files, and dozens of criminal defense files and prosecutor files produced in this case. Instead, he reviewed only a small subset of 17 homicide files, 9 of the comparison criminal defense files, and 8 of the comparison prosecutor files. Ex. 10 at 30-32 (Materials Reviewed). From that small subset, he cannot possibly opine that the prosecutor's discovery obligation to seek all police records generally (undisputed and unopposed) implies that they *in fact did* receive all such records. As he has admitted, the prosecutor's discovery obligation ultimately requires her to trust that the police actually turned over everything, because the prosecutor cannot know. Ex. 12 (Murray Dep in *Reyes*) at 146:11-148:12. Indeed, the primary gist of Murray's criticism of Tiderington is not that Murray conducted a thorough comparison of the homicide files and prosecutor files (he did not) and concluded that they proved everything was being turned over and disclosed. Instead, his argument is only that Tiderington's analysis, based on the comparison to criminal defense files, is ultimately flawed or otherwise inadequate to answer the question. The latter is a fair debate between experts for the jury to resolve; the former would be an improper expansion of his opinions beyond what he has disclosed.

Second, Murray's testimony about the legal requirements set forth in caselaw and statute cannot veer into the area of legal conclusions that are inconsistent with the instructions that this Court will give the jury. The point is, the Court will instruct the jury on Plaintiff's due process suppression of evidence claim, and Murray cannot offer testimony that muddies the Court's instructions on the law.

In either of these instances, the expansion of Murray's opinion would not only be undisclosed, it would unfairly confuse the jury and usurp the Court's role. It should be prohibited. But so long as Murray's opinions about Illinois and Supreme Court discovery

obligations do not expand into these two areas, or other undisclosed topics, Plaintiff does not oppose them here.

Dated: May 16, 2025

RESPECTFULLY SUBMITTED,

/s/ Steve Art
*Counsel for Plaintiff*

Jon Loevy
Steve Art
Anand Swaminathan
Sean Starr
Alyssa Martinez
Meg Gould
Loevy & Loevy
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
steve@loevy.com