# EXHIBIT 8

**TO:**     David A. Brueggen
141 W. Jackson Boulevard
Suite #1240A
Chicago, IL. 60604

**FROM:**   Ronald S. Muich

**RE:**     Demetrius Johnson
        (Plaintiff)
          VS
     Reynaldo Guevara
     Geri Lynn Yanow as special representative for
       William Erickson (deceased),
       Ernest Halvorsen (deceased) and
       John Healy (deceased);
     Darryl Daley;
     (and the) City of Chicago
       (Defendants)

**CASE NO.** 1:20-CV-04156
     United States District Court – Northern District of Illinois

**ASSIGNMENT**

I was asked by The Sotos Law Firm P.C. to review documents pertaining to the Demetrius Johnson case # 1:20-CV-04156 and provide opinions on the homicide investigation based upon my training, knowledge & experience. The report that I submit is based on the records I reviewed and may be amended upon review of additional material.

I am being compensated at a rate of $195 per hour for document review, statement preparation and attorney consultation, and $245 per hour for testimony with a six-hour minimum for remote testimony, and an eight-hour minimum for in person testimony. I have not provided any testimony as an expert in the last four years.

1

## BACKGROUND & EXPERIENCE

I have been professionally involved in Law Enforcement for over twenty-eight years (1995-2023) with the Rosemont Public Safety Department. During the first ten years of my career, eight of those years were spent as a patrol officer; the remaining two years were spent as a fire fighter. As a Rosemont Public Safety Officer, you are cross trained in performing both jobs, police, and fire. During my first ten years of employment, I was certified as an evidence technician, a field training officer, and an arson investigator.

Over the next eighteen years, I was assigned to the Investigations Unit as a Detective and progressed through the ranks (Sergeant, Lieutenant, and Commander), ultimately retiring as a Captain. While as a supervisor, I had as many as six Detectives and three Tactical Unit Officers under my command at any given time. While as a Detective I was the lead on several homicide cases and also as a supervisor I was the Commanding Officer overseeing several more homicide investigations. Throughout my tenure as a Detective, I attended numerous homicide classes where I was certified as a Lead Homicide Investigator with the State of Illinois. One year after being brought in as a Detective (Dec 2005) I joined the Major Case Assistance Team (MCAT), consisting of a team of investigators from the northern Illinois police jurisdictions to investigate violent crimes which were predominately homicides. Throughout my tenure on MCAT I was an investigator and assisted in numerous homicide investigations. Around 2020 I was assigned to the Officer Involved Death (O.I.D.) unit through MCAT. After working several cases through the unit, I was promoted to a supervisory role. I resigned from the MCAT team at the end of 2022 due to my upcoming retirement in June of 2023.[1]

## OVERVIEW

Based on my review of the materials provided,[2] the investigation of this homicide proceeded appropriately. The investigators initiated six lineups with six different witnesses. Bryan Johns who was initially taken into custody after the shooting occurred, participated in all six lineups. Five witnesses could not pick anyone out of that lineup, which resulted in five negative lineups. The sixth witness, a fourteen-year-old Aby Gonzales, picked out Bryan Johns as the offender in the homicide. Four additional lineups were performed including four of the six witnesses and in these lineups no one identified Bryan Johns including Aby Gonzalez. Bryan Johns was released from custody for continuing investigation. Detectives needed to determine if he was the "Lil D" that was broadcasted immediately after the shooting. As the investigation continued witnesses were shown photos by detectives, and one witness stated that one of the photos resembled the shooter. Detectives knowing that this individual has a younger brother located a photo of the younger brother (Demetrius Johnson). This photo was shown to two eyewitnesses where both identify Demetrius Johnson as the offender in the shooting. The detectives proceeded to pick up Demetrius Johnson and run five additional lineups, including the two witnesses who had identified him in the photo. Three of the five witnesses identified Demetrius Johnson as the shooter. Detectives in this case followed all the evidence which led them to the appropriate

---

[1] For additional information on my background see my curriculum vitae, Addendum A.
[2] For a complete list of the materials I reviewed see the list of materials reviewed, Addendum B.

offender. Detectives presented information/evidence to the Assistant State's Attorney who approved charging Demetrius Johnson with murder and attempted murder.

## SYNOPSIS OF INITIAL INCIDENT

On the evening of June 12, 1991 a subject began to shoot near the intersection of North Ave. and Claremont. The subject killed victim Edwin Fred and injured victim Raul Ortiz. The subject then fled on foot south bound on Claremont without saying anything. Additional information was broadcasted naming the shooters as both "Lil D" and "Bryan Johnson." Officer Daley was aware that "Lil D" was a street name for a known Maniac Latin Disciple ("MLD") Bryan Johns. Officer Daley had seen Johns approximately an hour prior in the area of Talman and Wabansia. Officer Daley along with other Officers went to the area of 1651 N. Talman where they observed two subjects leave a black van and cross the street with Johns following behind them. Johns was taken into custody along with two other subjects. The van in question, along with the three subjects, were taken to Area Five Chicago Police Violent Crimes. A check of the van revealed a handgun. The gun was collected and was subsequently sent to the Chicago crime lab for analysis. It was later determined that the weapon in question had nothing to do with the shooting that occurred earlier that evening.

According to a supplementary line up report six witnesses viewed a lineup with Johns participating in that lineup. Three witnesses viewing the line-up (Forrest Garnett, Rosa Burgos, and Fina Montanez) were not able to pick out the shooter from the lineup. Two witnesses (Rosalina Morales and Angel Cordova) noted that the shooter was not in the lineup. The sixth witness, Aby Gonzales, made a positive identification picking out Johns in the lineup. A supplementary line-up report from the same night notes that another set of line-ups was performed with four of the six witnesses, (Forrest Garnett, Rosa Burgos, Fina Montanez, and Aby Gonzalez). In that set of line ups, Gonzalez did not identify Johns, nor did the other three witnesses. Johns was released due to the fact that further investigation was needed to determine if he was the "Little D" sought in this shooting.

As the investigation continues another suspect is identified by the name of Demetrius Johnson. This occurred as one of the witnesses (Elba Burgos) was viewing a photo array that had an individual in said array with the name of Darrell Johnson. Elba Burgos could not make an identification but stated that the shooter looked like Darrell Johnson. Detectives in the case, knowing Darrell Johnson had a younger brother, contacted Officer Daley to inquire about Darrell Johnson's younger brother. Daley stated that he knew Darrell Johnson's brother and his name was Demetrius Johnson and he was fifteen years of age. Daley was able to obtain a photo of Demetrius Johnson and two other persons which was subsequently shown to Elba Burgos and Angel Cordova. Both Elba Burgos and Angel Cordova identified Demetrius Johnson as the suspect in the shooting.

After Demetrius Johnson was located and taken into custody, Elba Burgos viewed a lineup with Demetrius Johnson in said lineup. She identified him as the individual she saw run past her

home on Claremont with a gun in his hand immediately after hearing gunshots being fired at the corner of North Ave. and Claremont. Rosa Burgos and Ricardo Burgos also after viewing the lineup with Demetrius Johnson in it both identified Demetrius Johnson as the person they saw shoot Edwin Fred. Angel and Victor Cordova both viewed the lineup but did not identify anyone.

Victim Raul Ortiz who was wounded in the shooting initially gave a statement to the Police but was uncooperative throughout the remainder of the investigation.

Assistant State's Attorney Bob Buckley responded to Area Five Violent Crimes where he reviewed the case and interviewed the witnesses and Demetrius Johnson. Assistant State's Attorney Bob Buckley approved charging Demetrius Johnson with first degree murder.

## ROSA BURGOS (WITNESS)

On the night of the incident, June 12, 1991, Rosa Burgos went to Area 5 Violent Crimes and viewed a line up with Bryan Johns in that line-up.[3] Rosa Burgos was unable to make an identification.[4]

*Rosa Burgos on June 20, 1991 was interviewed on the street in the 1500 block of Claremont. She stated that she and Raul ORTIZ were walking down the stairs, Raul was in front of her. Raul then open the door to walk out on the sidewalk when a Male black was standing outside the door pointing a handgun at him. Rosa then stated that the male fire one shot at Raul striking him in the shoulder. She then went on to say that after seeing that she slam the door and ran upstairs avoiding getting shot. Rosa then stated that she would be able to identify the person that was doing the shooting.*[5] (Actual statement from Chicago Police Department reports)

The above statement by Rosa Burgos reveals she was with the second victim Raul Ortiz when he was shot in the shoulder and witnessed the entire shooting. She goes on to say that she would be able to identify the person who did the shooting. Her statement alone corroborates that she would be able to make an identification if a suspect were presented to her via a line up or a photo array.

Rosa Burgos on July 22, 1991 at Area 5 Violent Crimes viewed a second line-up with Demetrius Johnson in the lineup. After viewing this line up Rosa Burgos identified Demetrius Johnson as the person who shot Edwin Fred and Raul Ortiz. [6]

During Demetrius Johnson's trial it is evident, through testimony, that Rosa Burgos confidently knew the neighborhood where the shooting took place. In fact, she knew certain individuals

---

[3] RFC-Johnson 000026
[4] RFC-Johnson 000027
[5] RFC-Johnson 000021
[6] RFC-Johnson 000023; RFC-Johnson 000078

that were active gang members and their affiliations. During testimony she stated that Raul Ortiz was a Spanish Lord[7] and Little D was a Disciple.[8] She went on to say that Little D's real name is Bryan Johns.[9]

During her testimony she was asked by Assistant States Attorney Kevin Sheehan,

Q: *"Now, this was on June the 12th of 19 – June the 12th of 1991. Later in the evening of June the 12th of 1991 did you go to Area 5 Violent Crimes and view a lineup?"*

A: *"Yes."*

Q: *"And did you pick anybody out of a lineup at that time?"*

A: *"No."*

Q: *"Did you know anyone in that lineup?"*

A: *"No."*

Q: *"The first lineup?"*

At this point per the trial transcripts the answer was an (Indication).

Q: *"Do you know a person by the name of Little D?*

*A: "Yes."*

Q: *"And how do you know a person by the name of Little D? How do you know that person?"*

A: *"Because it was an incident with my son before."*

Q: *"Okay. How old is Little D?"*

A: *"Fifteen, sixteen, I really don't know."*

Q: *"Is he white or black?"*

A: *"Black."*

---

[7] JGS_JOHNSON 54 (A-43)
[8] JGS_JOHNSON 54 (A-43)
[9] JGS_JOHNSON 55 (A-44)

Q: *Was Little D the person you saw shoot Raul?"*

A; *"No."*

Q; *"That night?"*

A; *"No."*

Q: *"How long had you known Little D before June the 12th of 1991?"*

A: *"Long time."*

Q: *"When you say you saw the person shoot Raul did you have an opportunity to see his face?"*

A: *"Yes."* [10] (Actual trial testimony)

Based off the Chicago Police reports and Rosa Burgos's testimony, Rosa Burgos was familiar with various people in the neighborhood and got a good look at the person who shot Raul Ortiz. On June 12, 1991 Rosa Burgos's non-identification of Bryan Johns supports that Bryan Johns was not the shooter. At the time of the shooting, she was familiar with and knew who Bryan Johns was, which makes her non-identification more reliable than if she had no knowledge of Johns. If Bryan Johns were the shooter, Rosa Burgos would have known him immediately due to the fact that she knew him from the prior incident involving her son.

## ELBA BURGOS (WITNESS)

A point of clarification, upon reviewing the records Elba Burgos[11] is identified in the Chicago Police Reports as Elva Burgos on multiple occasions. From review of the records, "Elba" and "Elva" refer to the same person. In the continuing investigation, Elba Burgos was interviewed by detectives.

*R/d in continuance of the above captioned investigation on 11 July 91 had the occasion to interview Elva Burgos at her place of residence. During this interview r/d also showed a photo array to Elva a circumstantial witness. The results of the interview as follows.*
*Elva related in essence but no* [sic] *verbatim, she was sitting on the front porch of her house when she heard numerous gunshots. Elva then looked up and saw a male black running south bound Claremont on the west sidewalk past her with a gun in her hands. She went on to say that she follow him to see where he was going and lost on Western Ave.*
*R/d then asked Elva if she can make an identification on the person she saw running the day of the shooting, she said she could. R/d then showed Elva an IR photo of male blacks consisting of five photos. Elva looked at all five of them and could not make an identification, but stated that*

---

[10] JGS_JOHNSON 47 (A-36) & JGS_JOHNSON 48 (A-37)
[11] According to trial transcript Elba is her first name. JGS_JOHNSON 101 (A-90)

6

*the person that ran past her the day of the shooting resembled Darrell Johnson.*[12] (Actual statement from Chicago Police Department reports)

Elba Burgos gave her statement to Detectives on July 11, 1991 regarding what she witnessed on June 12, 1991, the evening of the shooting. Elba Burgos was appropriately described as a circumstantial witness because she did not view the shooting but saw the shooter, holding a gun in his hand, running south on Claremont before heading west. On July 11, 1991 when she gave her statement and was shown the five photos, she stated that she could not pick anyone out of those photos. Showing her a photo array was appropriate because she advised she could identify the suspect she saw running with a gun. She said that the person that ran past her on the day of the shooting looked like Darrell Johnson, one of the five photos that were presented to her. Elba Burgos did get a good look at the subject that ran past her on the evening of June 12, 1991. If she did not get a good look at that subject, she never would have been able to say that it "resembled" someone in one of those photos that she viewed.

*On 15 July Officer Daly contacted the r/d and informed r/d that he had found the photo of Demetrius Johnson but with two other male blacks in it, he then turned it over to r/d. The r/d then went back to the witness Elva's house around 1800 hrs. and showed her the photo of the three male blacks. Elva then viewed the photo and made a positive identification on Demetrius Johnson as the person she saw running with the gun in his hands after the shooting.*[13] (Actual statement from Chicago Police Department reports)

Detectives obtaining a photo of Darrell Johnson's brother was appropriate considering Elba's statement that the suspect with the gun resembled Darrell. Further it was good police work to then show Elba the three-person photo containing Demetrius Johnson. Elba's identification of Demetrius in the photo allowed the police to then bring in Demetrius for a live line up.

*On 22 July 91, at 2030 hrs. the R/Dets. Conducted a line-up at Area Five, relative to a suspect in the murder of Edwin Fred. After viewing this line-up, the witnesses made the following identifications. Elva Burgos identified #3) Demetrius Johnson as the person she saw run past her home, with a gun in his hand, immediately after hearing gunshots being fired at the corner of North Ave. & Clairmont.*[14] (Actual statement from Chicago Police Department reports)

On July 22, 1991 she viewed a line-up at Area Five Violent Crimes and identified Demetrius Johnson in that line-up. There is nothing documented in any Chicago Police reports that Elba Burgos knew that the person resembling Darrell Johnson and the person identified in the lineup, Demetrius Johnson, were brothers. When she saw Darrell Johnson's photo she knew, which she stated and testified to, looked like the person who ran past her. But when she saw Demetrius Johnson in the line-up, she knew that was the person who ran past her on the evening of the shooting.

---

[12] RFC-Johnson 000019
[13] RFC-Johnson 000019
[14] RFC-Johnson 000023

**RICARDO BURGOS (WITNESS)**

On June 21, 1991 Ricardo Burgos was interviewed by Detective Reynaldo Guevara at his place of residence. The interview went as follows:

*Related in essence but not verbatim, He was driving in the neighborhood of North and Western with his friend Ramon on the day of the incident. Ricardo the* [sic] *related that as they got to North and Claremont he notice a male hispanich* [sic]*, coming out of Claremont pulling out a big gun from his waist. He then said that after he pulled the gun out he fired one shot at Raul first, Ricardo then saw Edwin trying to get up and run. At this time the shooter turned and fire* [sic] *twice at Edwin striking both times. The shooter then turned and started walking toward Claremont, He then spotted a police car that was parked or waiting for the light on Oakley and started running down Claremont.* [15] (Actual statement from Chicago Police Department report)

On July 22, 1991 Ricardo Burgos viewed a lineup at Area Five. After viewing this line-up Ricardo Burgos identified Demetrius Johnson as being the person he saw shoot Edwin Fred.[16]

*Q: "And did you look at a lineup at that time?"*

A: *"Yes, I did."*

Q: *"And was that a live lineup with people standing in it?"*

A: *"Yes."*

Q: *"And did you pick someone out of that lineup?"*

A: *"Yes, I did."*

Q: *"And the person that you picked out of that lineup is he in court today?"*

A: *"Yes, he is."*

Q: *"Would you please point to him?"*

A: *"The gentleman sitting right there."*

Assistant States Attorney Kevin Sheehan stated, *"Again for the record he has identified Demetrius Johnson"[17]* (Actual trial testimony)

---

[15] RFC-Johnson 000025
[16] RFC-Johnson 000023 & RFC-Johnson 000016
[17] JGS_JOHNSON 84 (A-73) & JGS_JOHNSON 85 (A-74)

Ricardo Burgos gave a detailed statement on June 21, 1991. At the time of his statement he was able to provide street names and direction of travel after the shooting took place. He was also able to provide an account of seeing the individual pull the gun from his waistband and fire at least three shots. His ability to provide a rather detailed account of the incident supports what he saw and is corroborated by his statement's consistency with other witness statements. In fact, Ricardo Burgos testified that he watched the incident for approximately 45 seconds.

Ricardo Burgos then testified in open court on what his statement was on June 21, 1991. After reviewing his statement from June 21, 1991 and his court testimony they were very similar in nature. The only discrepancy was the race of the person he saw. In his statement on June 21, 1991, he states that he notices a male "hispanich"[18] (This appears to be misspelling in the Chicago Police report) and in his court testimony he states that the person that he saw was "black".[19] There is no other documentation in any other reports or court testimony that I reviewed that would indicate why Ricardo Burgos gave two different races. In his court testimony, Ricardo Burgos testified under oath that the person he saw was "black." The two different races that Ricardo Burgos identified was neither brought up by Demetrius Johnson's Defense Attorney, Deborah Gubin, nor Assistant States Attorney Kevin Sheehan at the trial.

## INITIAL INCIDENT:

On June 12, 1991 you have Officer Daley from the Chicago Police department responding from a simulcast to the area of Bell and North for a "man shot". More information was broadcasted naming one of the attackers as both "Lil D" and "Bryan Johnson."  Officer Daly knew a subject that went by the street name "Lil D" and actually saw that individual about an hour prior to the shooting in that area. Officer Daley found Bryan Johns who he knew went by the street name "Lil D" and took him into custody and transported him back to the Police Department for further investigation. [20]

Detectives arrived on the scene and began taking witness statements. The witnesses Aby Gonzales, Forrest Garnett, Fina Montanez and Jewel Stanley provide statements. Detectives went to St. Elizabeth hospital and spoke to the second victim, Raul Ortiz.[21]

In my experience, it is typical that when you hear the broadcast or dispatch of a shooting, you are continually going to get different updated messages of what people saw as they are calling this incident in. On the day of the shooting many people were calling the Police to report the shooting. As the Police dispatchers were fielding the calls, information was changing call to call. Even though the initial broadcast was naming "attackers" it is the responsibility of the responding officers to sort out witnesses, begin taking statements and ultimately pass that

---

[18] RFC-Johnson 000025
[19] JGS_JOHNSON 80 (A-69)
[20] RFC Johnson 000034
[21] RFC Johnson 000030

information on to responding Detectives. A shooting like what happened in daylight on a busy street would be a chaotic scene which in turn leads to varying witness statements including the number of attackers. Arriving units wouldn't have known, prior to an investigation, a definitive number of "attackers." Again, it is the job of the first responders and Detectives to gather all the information and pass on to investigating officers.

During my career we had an incident of a shooting in a mall, the dispatch message came out as multiple shooters. As I arrived on the scene, the dispatch messages were changing minute by minute but I had to maintain the mindset that there were multiple shooters. Until it could be proven otherwise, we had to investigate with the initial report of multiple shooters. In my case the situation changed as we began to interview multiple witnesses. The investigation and evidence eventually led us to the conclusion that there was only one shooter; we were then able to focus our efforts on identifying one suspect. That appears to be what happened in the June 12, 1991 Fred murder. Broadcasts, and at least four witness statements, were being told that there were "attackers," but as the investigation and evidence moved forward it was determined there was a single suspect.

## ABY GONZALES VIEWING LINEUP:

We know through Chicago Police Department reports that after the shooting Bryan Johns was taken into custody by Officer Daley. He was taken back to the Police department and ultimately participated in a live lineup. In that lineup it was viewed by six witnesses at separate times:

Forrest Garnett- Unable to make any identification
Rosa Burgos- Unable to make any identification (see Rosa Burgos section above)
Rosalina Morales- She stated she was positive that the offender was not any of the participants in the lineup.
Angel Cordova- He stated the offender was not one of the participants in the lineup.
Fina Martinez- Unable to make any identification.
Aby Gonzales- He identified Bryan Johns as the offender in said homicide.[22] In Aby Gonzales's statement on June 13, 1991 he refers to there only being one shooter. [23]

After this lineup was completed five of six witnesses did not pick out an offender. According to the police reports another set of line ups were performed with four of the above six witnesses viewing them with Bryan Johns and new fillers. In this set of lineups Gonzalez did not identify Johns. The Detectives did not charge Bryan Johns and determined further investigation was needed relating to Bryan Johns as the "Lil D" sought in the shooting and follow up investigation continued.[24]

---

[22] RFC Johnson 000027
[23] RFC-Johnson 000031
[24] RFC Johnson 000031

During investigations lineups may need to be re-run or repeated because of information learned from or about a witness. On one occasion I was working an armed robbery case, and I formed a suspect. I found out he was being held at the DuPage County jail on other armed robbery charges. While conducting lineups at the jail, I had a female eyewitness view the live lineup. After making a positive identification on a subject she later stated that she wasn't sure because they all looked alike because they were all in orange jail jump suits. Luckily she was still at the jail when she stated this. Coordinating through the sheriffs at the jail, we were able to get the suspect and the fillers into regular street clothes. She did not make an identification the second time she viewed the lineup. I believe re-running the lineup was the best thing to do because of the eyewitness's statement made after she viewed the original lineup. You never know what reaction or what the person viewing the lineup is going to say once the lineup viewing is complete. Even though the eyewitness in my case ended up not making a positive identification, I needed to be sure that she was positive that she was picking out, who she believed in her mind was the right offender.

In regards to the Bryan Johns lineup which Detective Erickson reported about six eyewitnesses who viewed it and one identification was made by a fourteen-year-old boy, Aby Gonzales. Later a second lineup was conducted and reported by Detective Guevara and notes Detective Erickson's involvement with the lineup. This time it was viewed by four eyewitnesses, including Aby Gonzales and three other witnesses involved in the other lineups, and this netted four negative lineups. Unfortunately there is no documentation that I have seen that explains the concern about the initial lineups and why they were re-run. There could be many explanations, including Aby Gonzalez was questioning the identification he initially made. It could be that Gonzalez said something after the first lineup that made the detectives decide to re-run the lineup. Aby Gonzales was a known affiliate of the Latin King Gang and Bryan Johns a rival Maniac Latin Disciple; Gonzalez could have picked him out of the first lineup for some sort of revenge as more fully explained in Ralph Rider's report. The detectives decided to do a second lineup so they could be certain that they had a good identification made against the suspect. Regardless, running additional lineups with the same witnesses indicates that there was some concern about the propriety of the first lineups.

Officer Daley, in his supplemental report, stated that a lineup was done with Bryan Johns and that he was released because no one was able to make a positive identification.[25] Officer Daley was not present during any lineups. This is confirmed as his name or signature does not appear on any of the lineup reports. Officer Daley would not have had any knowledge of why Bryan Johns was released other than what he was told by the detectives. In fact through Officer Daley's testimony all he knew was that Bryan Johns participated in a lineup,[26] and that Bryan Johns was not identified in that lineup.[27] It is very common that once an investigation is turned over to Detectives that the patrol officer will no longer be involved in that particular investigation. That appears to be the case with Officer Daley.

---

[25] RFC Johnson 000034
[26] JGS_JOHNSON 202 (Page B-27)
[27] JGS_JOHNSON 206 (Page B-31)

Officer Daley also testified that he had been a police officer for the City of Chicago for ten years. He stated that nine out of those ten years he had been assigned to the Fourteenth District. He said that he was familiar with the activities of the gangs in that area.[28] He also stated that besides knowing that Bryan Johns goes by the street name "Little D," he knows Demetrius Johnson to also be called "Little D."[29] This is important as it demonstrates that Officer Daley is an experienced officer that knows the gang members by their street names that hang out in the district that he had patrolled for many years.

## CONTINUING INVESTIGATION (WITNESSES):

As the investigation continued, Detectives interviewed witnesses. Elba Burgos was interviewed (see the section on her above) and shown five photos of male blacks, a photo array. Elba could not identify the shooter out of those photos but did say that the photo of Darrell Johnson resembled the shooter. Detectives knew that Darrell Johnson had a younger brother. Detectives contacted Officer Daley and inquired about Darrell Johnson's younger brother. Officer Daley stated that he knew the younger brother, Demetrius Johnson, and stated that he was fifteen years old. Officer Daley located a photo of Demetrius Johnson (with two other males) and turned it over to the Detectives. Elba was shown the photo and she made a positive identification of Demetrius Johnson as the person she saw running with the gun in his hands after the shooting.

The Detectives thought outside the box and followed where the new information/evidence led them. The Detectives did not have "tunnel vision." They initially investigated Bryan Johns but determined that further investigation was needed which shows they were focusing on all the evidence. They continued to do their due diligence as investigators have to and go where the information and evidence leads them. Detectives used proper police procedures by interviewing witnesses to continue their investigation and obtain more evidence or leads. To do this they properly used photo arrays to attempt to identify the shooter. After Demetrius Johnson was identified in the three-person photo as the shooter, the detective then conducted live lineups with the Demetrius Johnson in it. Five witnesses (Elba Burgos, Rosa Burgos, Angel Cordova, Victor Cordova, and Ricardo Burgos) viewed that lineup. Detectives do not determine whether a suspect is guilty or innocent, that is the duty of a Judge or jury. Detectives gather all the evidence, whether that is physical, eyewitness, or circumstantial, and present that to the State's Attorney. The State's Attorney decides whether or not that there is enough evidence to charge the individual and try the case in court. A State's Attorney can ask the Detective to continue the investigation to provide more detailed information as they see fit.

The three main witnesses, Rosa Burgos, Ricardo Burgos, and Elba Burgos all had different vantage points of what they witnessed on June 12, 1991 and all three witnesses identified Demetrius Johnson as the offender.

---

[28] JGS JOHNSON 193 & JGS_JOHNSON 194 (Pages B-18 & B-19)
[29] JGS_JOHNSON 205 & JGS_JOHNSON 206 (Pages B-30 & B-31)

12

Eyewitness identifications tend to be reliable, as long as they provide consistent statements throughout the investigation and their ability to perceive the offender makes sense. In this case, Ricardo Burgos was sitting in a stopped car on North Avenue and viewed the shooting from the north. He maintained his description of events. Rosa Burgos was in the middle of the shooting and saw her friend (Ortiz) shot right in front of her and would have been just west of the shooter. Her story was consistent throughout her interviews. Finally Elba Burgos saw the shooter running south on Claremont before heading west. Her story was consistent throughout her involvement. And so police had three witnesses, from three different vantage points that all identified Demetrius Johnson as the shooter. While these witnesses do not recall the events as clearly, or at all, some 30 years later, none have recanted and all maintain they testified truthfully at trial. Also none of them have said that the police told them who to choose or coerced them.

**DEMETRIUS JOHNSON DEPOSITION:**

In Demetrius Johnson's deposition he states that when he was walking home from school with his mom (no indication what year this was or how old Johnson was), he saw Detective Guevara hit a kid with his vehicle. He stated that his mom told him it was Guevara. The following is direct testimony from the deposition:

Q: Okay. All right. And so then a couple year—well, some period of time later, Guevara gets out of a car and arrests you, right?

A: The day they arrested me?

Q: In July of 1991

A: Yes. He got out of the car and arrested me.

Q: Okay. Between the time that you saw him get out of a car and hit the kid, after he hit the kid, and the time that he got out of the car to arrest you, did you ever see Guevara again?

A: Not that I can remember.

Q: Did you ever have any interactions with Guevara prior to your arrest in the summer of 1991?

A: No.

Q: Between the time you say you saw Guevara hit the child, whenever that was, right, when you were walking home from school and the time he arrested you—

A: Uh-hmm

13

Q: --did you have any interactions with him?

A: No

Q: Okay. When he got out of the car to arrest you, did you recognize him right away?

A: No [30] Actual Deposition Testimony

This deposition testimony demonstrates that Plaintiff had no previous contact with Detective Guevara. None of his prior interactions with police involved Det. Guevara. It is clear from the record that there is nothing indicating any bad blood between Det. Guevara and Plaintiff and no indication as to why Det. Guevara would allegedly intentionally "frame" Plaintiff for the shooting. The Detectives let the facts and evidence lead them to Demetrius Johnson through their investigation.

## MADALIA REYES & ELIZABETH MARTINEZ

At the time of the shooting, Madalia Reyes was Demetrius Johnson's girlfriend and pregnant with his child. Elizabeth Martinez was Madalia Reyes' friend. Reyes and Martinez both testified at Demetrius Johnson's trial that they were both with him during the time that the shooting occurred. They both gave almost identical testimony about the route that they took when Demetrius Johnson met them and went back to his house to watch the Chicago Bulls championship game.

Demetrius Johnson's attorney Ms. Gubin asked the following questions to Madalia Reyes:

Q: Okay, after you met up with her at Wabansia and Mozart which way did you go?

A: We went down Wabansia to Washtenaw.

Q: Okay. And when you got to Washtenaw what did you do?

A: We went down Washtenaw to Le Moyne.

Q: And when you got to Le Moyne what did you do?

A: From Le Moyne we went to Talman and cut through the school yard.

Q: Do you know what school that is?

A: Humboldt.

---

[30] Demetrius Johnson Deposition (Pages 76-77)

Q: And when you cut through the school at Humboldt school what did you do?

A: It was on Rockwell so we took Rockwell to Hirsch all the way to Campbell.

Q: And when you got to Campbell what did you do?

A: We took Campbell down to before Potomac, went through a gangway and that leads to the back of his house and we went up to his house. [31] Actual Trial testimony

Ms. Gubin then asked Elizabeth Martinez one question and Elizabeth gave the following answer.

Q: After you met up with Madilia and Demetrius what did you do?

A: We walked through Wabansia to Washtenaw, Washtenaw we took down to Le Moyne, Le Moyne we took to Talman. On Talman there is a school called the Humboldt school so we cut through the school yard and we ended up on Rockwell, Rockwell, and Hirsch. We took Hirsch down to Campbell and Campbell, down from Campbell before Potomac we took a gangway and it lead up to his house right there on Artesian. [32] Actual Trial Testimony

Reyes was asked multiple questions by Ms. Gubin about the route that Johnson, Reyes, and Martinez took. When Ms. Gubin questioned Martinez, she was only asked one question about the route. Both Martinez's and Reyes' answers were nearly identical.

This is quite odd that two separate people can give almost the exact testimony related to their movements. One person answering a series of questions about the route, the other person who was asked just one question and then proceeded to mirror the other person's response. The Judge at Johnson's bench trial also heard this mirrored testimony that indicated Johnson was not the shooter yet still found Demetrius Johnson guilty.

Assistant State's Attorney Kevin Sheehan asked Madalia Reyes the following:

Q: Well, did you tell them oh wait a second I was with Demetrius on that day, he picked me up from work, we went to my house, we went picked up Elizabeth and went to his house. Did you tell him that then?

A: No

Q: When was the first time you told any law enforcement officers about his alibi?

---

[31] JGS_JOHNSON 140 & JGS_JOHNSON 141 (Pages A-129 & A-130)
[32] JGS_JOHNSON 167 (Page A-156)

15

A: I told the public defender.

Q: Oh, you never told the police though?

A: No

Reyes, in her testimony, had this detailed route that she, Johnson, and Martinez took the evening of the shooting. At no time did she ever speak to the police during the investigation while her boyfriend was being held for this shooting. The first time she mentioned being Johnson's alibi was to the Public Defender Jack Carey, well after Demetrius Johnson was charged in this case. In fact, nowhere in the police investigation did this route/alibi ever come up. Detectives never had an opportunity to investigate Reyes' statement simply because it did not exist during their investigation and accordingly could not be considered in their investigation.

Reyes was also subpoenaed three times as Demetrius Johnson's alibi and girlfriend. She finally showed up on August 19, 1991 in front of the Grand Jury and did not speak.[33]

If Reyes could provide a solid alibi on the night of the shooting for the father of her child, she would be adamantly sharing the information with the police and anyone who would listen. For whatever reason Reyes did not want to share this vital information with the police.

Demetrius Johnson, while being interviewed by Assistant State's Attorney Buckley, stated that he did not recall where he was on the night of June 12, 1991. He also stated that he did not pick up his girlfriend on Wednesday or Sunday. It was pointed out that June 12, 1991, the day of the shooting was a Wednesday night. Johnson was not able to provide any additional alibi.[34]

When Johnson spoke to the Assistant State's Attorney it was approximately six weeks after the initial incident. For some, six weeks might be considered a long time. However, it is pertinent that the Chicago Bulls were on the verge of winning an NBA Championship that evening. Martinez and Reyes testified regarding the detailed route to Johnson's home to watch the game. This would seemingly be a memorable evening and details should be easily recalled. However, during this crucial interview with State's Attorney, Johnson could not provide any specific details about his alibi. This directly conflicts with the testimony that Reyes and Martinez both gave and the lack of information that Demetrius Johnson provided to Assistant State's Attorney Buckley during that interview.

**LINEUPS:**

---

[33] CCSAO 018
[34] RFC-Johnson 000017

16

Eyewitnesses, when giving a description, usually give an approximation of the person's height, weight, and age. It would not be uncommon for a witness to describe, for example, someone as, "real tall and skinny, somewhere between 40-50 years of age". As investigators we have to take what that eyewitness is telling us and attempt to create a lineup as close as we can to their description. For example, if you are told "real tall" and that's all the witness can describe the offender as. What actual height, as investigators are you going to insert in that lineup?

In the case of Demetrius Johnson, you have eyewitnesses describing the shooter as, "short" and "shorter." The Detectives put together an acceptable lineup. If you look at that lineup, it appears that subject three and subject five are very close in height.[35] When I examined the lineup photos there is no way I can give an exact height on any of the five subjects without me standing next to them and comparing them to my height.

There have been some questions regarding why the individuals in the live lineup were all shirtless.[36] I have had on two occasions in my career performed a lineup using shirtless males. In one, the eyewitnesses viewed a series of photo arrays. Next we were moving on to a live lineup with the subject from that lineup in one of those photo arrays. We decided that since the eyewitnesses saw the subject in said photo array with a shirt on, we were going to change it up by having the male participants be viewed with no shirts.  Also I have seen actual suspects and or fillers that were participating in live lineups have derogatory sayings on their shirts. Instead of having the eyewitnesses viewing the lineup see these shirts, we had the participants go shirtless. We did this so the eyewitnesses viewing the lineup were not subject to seeing these shirts. I am not saying this is why the participants in the Demetrius Johnson lineup are shirtless, but rather pointing out there are times when a lineup will be of shirtless people. Also as noted in Mr. Rider's report on gangs, gang colors were a way to identify gang members and could play a role in the lineup if the suspect or fillers had on gang colors that could influence the lineup, this would be another example of making the participants be shirtless. I do not take issue with having the lineup include shirtless participants.

When eyewitnesses are viewing a lineup, their focus is on the facial features of the person they have seen and are asked questions, like if they recognize anyone which would depend on facial features. Physical attributes such as height, weight and age may contribute but usually secondary to the face identification. The photo array that contained three male blacks was shown to Elba Burgos.[37] The photo in question showed the three subjects photographed from approximately the chest up. Burgos did not know how tall these three individuals were in the photo but made an identification solely on who she saw the evening of the shooting and who was in the photo.

**BRYAN JOHNS "JAILHOUSE CONFESSION":**

---

[35] Photograph from RD File, RFC 000089 (Page 1)
[36] Photograph from RD File, RFC 000089-000091 (Pages 1-3)
[37] Expert report of Thomas J. Tiderington (Page 15)

Demetrius Johnson stated in his deposition while incarcerated at the Cook County jail with Bryan Johns, Johns confessed that he was actually the person who committed the murder and that he was the person who was picked out of a lineup.[38] Mr. Johns is deceased and so cannot admit nor deny this occurred and there are no other witnesses to this jailhouse confession.

Ms. Rosen asked Demetrius Johnson the following during the deposition:

Q: Mr. Johns told you that he stood in a lineup the day of the shooting and somebody picked him out.

A: Yes.

Q: Okay. Did you tell your Lawyer that that happened?

A: Yes

Q: Which attorney did you tell?

Q: What's that person's name?

A: Oh, man. I want to be for sure. Debra?

Q: Gubin, I said it wrong. Is that who you told?

A: Yes.

Q: Did you tell your—what did your attorney tell you when you told her that Mr. Johns told you that he had been picked out of a lineup the night of the murder.

A: What did she say?

Q: Yeah

A: We need proof. We need to prove that.

Q: Okay. Did she say anything else about that?

A: Yes.

Q: What else did she say?

A: She asked me was he willing to testify to that in court.

---

[38] Demetrius Johnson Deposition – (Pages 307 -308)

Q: Yeah. And what did –what did—what did you say to that?

A: No.

Q: And how did you know he wasn't willing to testify?

A: Because I asked him.

Q: Did you tell her that that Bryan Johns said that he actually committed the murder?

A: Yes.

Q: And what did she say to that.

A: Same thing we need proof.

Q: And what else did she say, if anything?

A: We came to the conclusion that the best way to approach the situation, since we had no proof and he wouldn't help me, that she would ask the police officers when they got on the stand whether or not that was true or not.

Q: She didn't talk about subpoenaing Bryan Johns and putting him up on the stand?

A: I can't remember. I don't—I can't remember.

Q: She didn't talk about in any way about compelling Mr. Johns to come to court and—and appear and testify. She never had that conversation with you?

A: No, I don't remember nothing like that.

Q: She didn't explain to you that you, as the criminal defendant, have the ability to call witnesses, to issue subpoenas, to bring them to court to testify? She didn't talk to you about that?

A: Not that I can remember.

Q: And that you could do that even if the person didn't want to.

A: Not that I can remember.[39] Actual Deposition Testimony

---

[39] Demetrius Johnson Deposition – (Pages 311, 313-317, 322-323)

19

Demetrius Johnson stated that Bryan Johns admitted to him that he was the person responsible for the murder. Johnson said he took this information and presented it to his attorneys. Through Johnson's own deposition he stated on several occasions that Ms. Gubin, his own lawyer, said they could not do anything because they would need proof. If Ms. Gubin thought there was enough proof to tie Bryan Johns to the murder, she would have followed up by taking initial steps including interviewing witnesses and interviewing Bryan Johns himself. If this, is in fact true, Ms. Gubin, as a competent criminal defense attorney, would have had the opportunity at trial to undercut the prosecution's case by calling the alleged real killer to the stand instead of just implying Johns was the real killer.

While reviewing all the documentation listed in the document index, you have to be mindful that this case occurred in 1991. I can say that the written documentation by all the parties involved in this case, including police, public defenders and states attorneys etc., appears consistent with standard documentation in the early 1990's.

I started handwriting reports in 1995 and continued that process for years before we began to use any sort of computer system. In regards to our handwritten reports, you would physically have to hand them over to a supervisor in order for them to be signed and approved. If edits were needed, they would be handed back for the corrections to be made. Once the corrections were made, they were again handed back to the supervisor. Once a report was completed and approved it was physically handed over to the records division where it was filed. This method of report writing, approval and filing was difficult and a time-consuming task. On occasion you would come across missing documentation that was vital to a case. You would also find that paperwork was just misfiled in a different location that was likely related to a filing error. It wasn't until we started to evolve with technology that I started seeing less and less filing errors. Technology has also greatly impacted the way cases are investigated such as photo lineups, DNA, latent prints, and the way evidence is processed at the crime lab, etc. Back in 1991, if you were looking for a photo of an individual that was described in an incident, you would have had to search physical photos until you came across the one(s) you wanted to use, but there may not even be a photo available. This was a very time-consuming process. With today's technology, you are able to enter the descriptors and search databases for a photo, and have that photo at your disposal within no time.

While the existing file does not contain general progress reports, there is evidence that GPRs were prepared.[40] CPD rules did not require creation of notes, and Detectives could conduct interviews and complete their reports upon conclusion of the interviews. [41]

---

[40] CCSAO 005; Guevara trial testimony B-52
[41] Demetrius Johnson's own lawyers state that they had notes but once they completed the report, the notes were thrown away.

We know that Bryan Johns participated in a lineup on June 12, 1991 that a line up report was created with Detective Erickson's name on it.[42] Six witnesses viewed this lineup, and five out of the six did not make an identification. Aby Gonzales was the only witness that identified Bryan Johns. Aby Gonzales at the time viewing the lineup was fourteen years of age. Expert witness Thomas Tiderington wrote the following on individuals viewing lineups.

"The presence of a weapon during an incident can draw visual attention away from other things, such as the perpetrator's face, and thus affect the eyewitness's ability to identify the holder of the weapon. This is further aggravated when the lineup does not contain the actual offender. In that situation young children and the elderly commit mistaken identifications at a rate higher than young adults.[43]

My experience is consistent with Mr. Tiderington's in that younger witnesses are not as reliable as adults in providing details about the crime and descriptions of suspects. For example, in one investigation of a victim who was found frozen to death inside a hotel freezer we discovered that the victim was attending a party that was being thrown inside a hotel room. Through our investigation we had to locate and interview seventy-eight people that attended that party. Approximately twelve of the party attendees were juveniles. When interviewing an adult about the party they were able to articulate and give a solid statement about the events that occurred. When interviewing the juveniles, their attention to detail was not as precise as the adults, their stories would change as the interview proceeded. The maturity level between the juveniles and the adults was noticeably different and this is something that needs to be considered in investigating, consistent with what Mr. Tiderington noted. The age of the witness needs to be considered by investigators and juveniles stories need to be corroborated with other witness statements to ensure that investigators are getting accurate information.

This could explain why the Detectives ran additional lineups with Aby Gonzalez, having concerns given his age.[44] And then having conflicting identification/non-identification of the same suspect, by the same witness. Detectives released Bryan Johns for continuing investigation. They also had five people unable to make an identification on Bryan Johns, including one who knew him, and then what appears to be a questionable identification. Perhaps the Detectives were in alignment with what Mr. Tiderington wrote decades later; young children commit mistaken identities at a higher rate than young adults.

In regards to the Bryan Johns lineup report that was allegedly only "found" decades later, it does not make sense that the police were trying to hide that report when a copy of it was placed in and maintained in the investigative file. Unfortunately Detective Erickson is deceased and cannot explain what happened. But what we do know is that the report was created and for some reason it was not submitted to the sergeant for approval but was placed in the file.

---

[42] CPD Records RFC-Johnson 000026 & 000027
[43] Expert report of Thomas Tiderington – (Page 24)
[44] Ralph Rider opines that the identification by Gonzales could have been impacted by gang affiliation and prior interactions.

The lineups were re-run and the report that was submitted noted that Gonzalez did not identify Johns. Gonzalez was asked about this, and he now denies ever viewing a line up and has no recollection of the events, which would mean that the lineup report with Erickson's name on it was not accurate.

Demetrius Johnson alleges that the lineup report by Detective Erickson was purposefully hidden because it was exculpatory. However, the evidence shows that Johnson and his attorney were both aware of this lineup identification. Johnson explained that while in the Cook County jail, Johns told him that he was the shooter and that he was also picked out of a lineup the night of the shooting. Johnson told his attorney what Johns's said to him. This means that Johnson and his attorney had not only the alleged exculpatory information from the report, but also a confession from Johns. What is interesting is there is evidence in the records that Johnson's attorney spoke to Johns, while he was incarcerated on another matter, at the same time the attorney was representing Demetrius Johnson. It appears that Johnson and his attorney were fully aware of John's alleged identification and involvement, which would have only strengthened the case for the defense of misidentification.

Again they had Bryan Johns in custody, five of six people could not make an identification, including one witness who knew Bryan Johns which provides strong evidence that he was not the shooter. For whatever reason, a second lineup was done with four people viewing the lineup with no identification. They released Bryan Johns pending continuing investigation. As the investigation went forward, they let the information and evidence lead them to the correct offender.

## INDIVIDUAL DEFENDANTS' ACTION AND INVOLVEMENT

The Defendant Officers were of varying ranks and had different involvement throughout this case as noted in the records. The police reports and testimony identify what they did and when they did it.

From review of the record, Officer Daley's involvement from the first night of the investigation was as follows: He heard a simulcast message and used that information to seek out the "Lil D" that he knew from working his district and took Bryan Johns into custody. He brought Johns to Area 5 police department and turned him over to detectives to investigate. There is some indication he may have assisted with the fillers and suspect, but no evidence he interacted with any witnesses or was involved in the identifications. Daley created a supplementary report that explained what he did. Later in the investigation, detectives reached out to him for intelligence. Daley was an experienced tactical officer who knew of the incident because he initially responded to the radio broadcast. Daley knew many of the gang members in that area because that was the district he had been assigned to for nine years. As noted in the depositions, Daley got along with the gang members and interacted with them regularly. Detectives investigating the case had knowledge that Darrell Johnson had a younger brother and they reached out to Daley for intelligence. Daley told detectives that the younger brother's name was Demetrius Johnson and that he was fifteen years old. He further stated that he might be able to produce a

photo of Demetrius Johnson. Daley was able to provide a photograph to the detectives to help further their investigation. After the photograph was turned over to the investigating detectives this was the end of Daley's involvement in the case. Daley performed his duties as a tactical officer the first night the shooting occurred by using his knowledge of the gang members that were located in his district that he patrolled. He then assisted in the investigation by providing intelligence to investigating detectives which is what is expected of tactical officers.

From review of the reports, there is no indication that Detective Erickson had any more involvement in the case after the first night, June 12, 1991. Reports indicate that he was involved only in conducting lineups. Erickson did not participate at the trial and retired shortly after being involved in the investigation.[45] There is no testimony that he had any additional involvement in this investigation and his name is not found on any later reports. This is consistent with how CPD investigated cases in that a detective may be involved and assist on a case. That detective may not be needed anymore and will go back to work their originally assigned duties. It would not be out of the norm that after a detective goes back to their original duties they get called back to assist in the original case. In this matter there is no indication that Erickson got called back to assist on the case.

Sgt. Healy was one of the investigative supervisors that signed off on the police reports regarding this case. There is nothing indicated in any reports that he was actively involved in the investigation by speaking to witnesses or suspects. His job as a supervisor was to ensure that the investigators had whatever resources they needed to aid them in the case. A supervisor's role could also include case coordination. They typically offer guidance and expertise to the investigators. A supervisor will generally check in to see how the investigation is proceeding but will usually keep a hands-off approach and allow the detectives to investigate the case. Sgt. Healy did not participate at the trial.

Detective Halvorsen who later was one of the investigating detectives was not referenced the first night on any of the reports. There is no evidence in the records that indicates that Detective Halvorsen was involved in this case on the first night or even on duty. His name first appears on a supplementary report narrative on June 29, 1991. This report was written by an Officer Crespo #11202 and indicated that Halvorsen arrived at the fourteenth district police department to gather some information regarding the homicide that occurred on June 12, 1991.[46] On July 17, 1991 there is a supplementary interview report indicating Halvorsen's name on it.[47] On July 22, 1991 there is a supplementary lineup report that Halvorsen signed[48] and another supplementary lineup report where his name is indicated on it.[49] On July 23, 1991 there are two supplementary reports that were signed by Halvorsen. The

---

[45] RFC- Johnson 34610
[46] RFC-Johnson 000032
[47] RFC-Johnson 000019
[48] RFC-Johnson 000022
[49] RFC-Johnson 000023

first was a summary of the investigative case[50] and second is a supplementary interview report.[51] The final report which is an ASA interview report of Demetrius Johnson has Halvorsen's name indicated on it.[52]

The investigatory actions in which he was involved are documented fully and show how the investigation proceeded properly and thoroughly. This investigation showed how Detective Halvorsen established and prioritized leads. By good investigative work and working together with other officers within the Chicago Police Department he was able to identify a suspect. After interviewing witnesses, showing photo arrays, and conducting lineups there was enough evidence that the case was presented to the Assistant State's Attorney. After reviewing the case the ASA approved first degree murder charges against the sole offender Demetrius Johnson.

**THOMAS TIDERINGTON DEPOSITION:**

Tiderington appeared to not know or forget facts that were not convenient for his opinions. In his deposition that was taken on May 9, 2023 and then resumed on September 20, 2023, he was asked a question regarding if Demetrius Johnson and Bryan Johns were friends. His answer was that he does not know nor did he see any documentation that the two were friends. I reviewed two separate documents that showed Johnson and Johns were admitted Maniac Latin Disciple gang members and also friends.

Q: I'm just going off your understanding of -- because you reviewed this case and you have this report here of your understanding of their relationship. Let me ask you -- when you were evaluating this case as a reported expert in police procedure, did you consider the relationship between Bryan Johns and Demetrius Johnson relevant at all to, -- to note?

A: I don't know if I had any information. There – there certainly wasn't anything in the police reports that would reflect that there was a close relationship between these two. That's certainly where I would have expected to see that if it had something to do with the investigative actions or the strategies on the part of the police department, but I don't recall seeing any of that.[53]

During ASA Buckley's interview with Demetrius Johnson he states, "He knew about the murder having been told by his friend, Brian Johns.[54]

In reviewing Terrell Agee's deposition, he stated that Demetrius Johnson, Bryan Johns's and himself were members of the Maniac Latin Disciple gang. He said that they would all hang out

---

[50] RFC-Johnson 000015
[51] RFC-Johnson 000018
[52] RFC-Johnson 000017
[53] Thomas Tiderington Deposition - Page 117-118
[54] RFC Johnson 000017

together and go driving around looking for Latin Kings to beat up. He said they referred to this as, "hunting for kings."[55]

Just in these two instances it shows that Demetrius Johnson and Bryan Johns were friends. They were in the same gang together and would go looking for rival gang members. There had to be some sort of trust and loyalty between the two of them. Even in the ASA interview Johnson stated unprovoked that Johns was his friend.

I completely disagree with the statement of "tunnel vision" that Tiderington described detectives having throughout the investigation. The detectives actually showed the opposite of what he describes as tunnel vision. The first night of the investigation Bryan Johns is investigated as a suspect and was picked out of a lineup by Aby Gonzales, a fourteen-year-old juvenile. He is one of six people that viewed that lineup and was the only one to make an identification. The detectives could have simply said Bryan Johns got picked out by one person so he must be the offender. They could have focused their tunnel vision solely on Bryan Johns. The detectives did not do this. For whatever reason they reran the lineup with Aby Gonzales, and he was unable to make an identification. The detectives then continued with their investigation until another suspect became known. Through eyewitnesses with different vantage points of the incident, Demetrius Johnson was picked out as the shooter. This was achieved through photo arrays and lineups. The detectives did not display tunnel vision, but they let the information and evidence lead them to the correct offender.

## CONCLUSION

In the investigation in the murder of Edwin Fred and attempt murder of Raul Ortiz on June 12, 1991 police had a suspect Bryan Johns in custody shortly after the shooting occurred. Detectives were conducting live lineups later that evening into the next early morning. Two sets of lineups took place during this time with only one identification made by a fourteen-year-old eyewitness. A second lineup was conducted with this same fourteen-year-old but this time he did not make an identification. Detectives made a decision and released Bryan Johns pending continuing investigation. As the investigation continued another suspect was identified by the name of Demetrius Johnson. During three live lineups Johnson was identified by all three eyewitnesses, all of which had different vantage points as the incident occurred. Detectives took the evidence and presented it to Assistant State's Attorney Buckley. ASA Buckley interviewed Johnson and the witnesses and approved the charges of murder and attempted murder. Even though an alibi was presented at trial from Johnson's girlfriend and her friend, the police never looked into this alibi because it was never brought to their attention during the investigation, it simply never existed. In fact the first time it was ever brought up was to the defense's own investigator right before trial. The detectives in this case did their due diligence by looking at all the information they had, interviewing witnesses, and following all the evidence to where it led and then presenting that evidence to the ASA to consider charging. While there is a question about what happened the first night with the lineups, following that

---

[55] Terrell Agee Deposition – Pages 116-118

night the police appropriately investigated and documented their investigative steps laying out how they came to identify Demetrius Johnson as a suspect and then the steps they took to confirm or deny his involvement.

Respectively submitted,

_____          10/13/2023
Ronald S. Muich                                              Dated

# ADDENDUM A
# CURRICULUM VITAE and
# Experience

# Ronald Muich

## PERFORMANCE SUMMARY

Dedicated law enforcement professional with 27 years of experience in public service capacities. Documented success in diffusing volatiles situations, conducting thorough investigations and delivering results in high pressure situations.

## MAJOR ACHIEVEMENT

- Member of the Major Case Assistance Team (MCAT) from 2005-2022; participated in numerous murder investigations in the Northwest suburbs of Chicago. Lead Investigator and Supervisor of the Officer Involved Death (OID) from 2019-2022.

## PROFESSIONAL EXPERIENCE

**Commander/Captain**                                                        January 2020 to Present
**Rosemont Public Safety Department**

- Managed Rosemont Public Safety Investigation Unit including case review, ensuring thorough investigations, and oversight of the evidence room & custodian.
- Supervised Sergeant and Detectives on day-to-day operations.
- Attended command staff meetings that pertained to daily matters of the Rosemont Public Safety Department, manpower concerns, and personnel matters.
- Reviewed policies and procedures, including but not limited to, those that impacted the Bureau of Investigations.
- Oversight of high profile cases including physical investigation, written reports and court proceedings.

**Lieutenant Detective/Sergeant Detective**                                  January 2015-January 2020
**Rosemont Public Safety Department**

- Supervised Detectives while managing active caseload.
- Conducted investigations, interviewed victims, potential offenders and witnesses, and prepared finding reports.
- Acted as the primary evidence room custodian.
- Ensured Detectives were prepared to discuss and analyze cases during weekly case review.
- Represented the Detective Bureau at monthly statistical (COMPSTAT) meeting; identified crime trends, determined hot zones and suggested deployment of manpower.

**Detective**                                                                December 2004-January 2015
**Rosemont Public Safety Department**

- Investigated assigned cases; interviewed victims, witnesses and potential suspects.
- Represented Rosemont Public Safety Depart in court proceedings..

**Public Safety Officer**                                                           **April 1987-April 1995**
**Rosemont Public Safety Department**

- Patrolled community to ensure the safety of residents, quickly responded to 911 dispatch calls.
- Diffused volatile situations; apprehended and arrested potential suspects.
- Enforced traffic laws and investigated vehicle collisions.
- Selected to train and develop new recruits (FTO).

---

## EDUCATION

**Triton Community College**
Associate of Criminal Justice/Police Science

---

## CERTIFICATIONS & TRAININGS

- Cook County Police Department Training Academy
- Crime Scene Technology I
- Crime Scene Technology II
- Basic Narcotics Investigator
- Criminal Investigation for the New Investigator
- Advanced Homicide Investigator
- Death Investigator
- Lead Homicide Investigator
- Hostage Negotiator

**PATROL OFFICER/INVESTIGATIONS EXPERIENCE:**

For over twenty-eight years, I served as a Public Safety Officer for the Village of Rosemont (IL.) From April 1995 to December 2004, eight years were spent on the patrol side of the department and the remaining two were spent as a firefighter. As a patrol officer I responded to 911 dispatch calls. I apprehended and arrested suspects, and when it was warranted, I represented the department in court proceedings. I enforced traffic laws and investigated vehicle collisions. I was selected to train and develop new recruits. When our department was transitioning to body worn and in car cameras, I was the officer that tested these cameras in the field before policy was written and they went live.

In December 2004, I was transferred to the investigation division and served as a Detective. I served in this unit until I retired in June 2023.

From December 2004 – January 2015 I served as a Detective. I investigated assigned cases, interviewed victim and witnesses and apprehended suspects/offenders. I testified in court proceedings on cases where an arrest was made. I completed background investigations on all potential hires.

From January 2015 – October 2018 I was promoted to Sergeant and began to review and assign active cases to detectives. I oversaw day to day operations and I would report directly to the Lieutenant. I would assist detectives in locating and interviewing potential offenders/suspects. I also oversaw the tactical unit that was part of investigations. This unit focused their attention on drugs, guns, and prostitution.

From October 2018 – January 2020 I was promoted to Lieutenant and supervised the entire investigations unit. I made the final approval on all reports, case files and arrests.

From January 2020 – June 2023 I was promoted to Commander and assumed the same detective duties that I had as a Lieutenant. My role expanded to partaking in the hiring process for new recruits and reviewing department policies and procedures.

From 2015 – 2023 I served as the Department's property and evidence custodian.

In January of 2022 the department dissolved the rank of Commander, and replaced it with rank of Captain. Throughout my time as a supervisor in investigations, I had as many as six detectives and three tactical officers under my command.

In December of 2005, I joined the Major Case Assistance Team (MCAT), comprising of investigators, forensics, and surveillance officers. This team consisted of police officers from the northern Illinois police jurisdictions to investigate violent crimes, which were predominately homicides. I was assigned to the investigative part of the team where I responded to dozens of homicide callouts.

In 2020, I was reassigned to the Officer Involved Death (O.I.D.) unit through MCAT. I worked several cases as an investigator and then was promoted to a supervisory role with the O.I.D. team until my retirement from law enforcement in June of 2023.

A3

**NOTABLE CASES:**

State of Illinois VS Kenneth Sharples: March 2005 (Lead Investigator)

Offender stabbed and slashed the victim 61 times with a knife. Through interviews we located the offender. The offender led officers to where he dumped the victim's body in a creek.

Bench trial – Guilty, 80 Years I.D.O.C.


Dismembered Body: August 2005 (Lead Investigator)

A dismembered body was located in a trunk of a vehicle in a multi-level parking garage. The investigation led us to an apartment complex in Lafayette, Indiana where the murder and dismemberment occurred. Through our investigation and working closely with the Shanghai police, the offender was apprehended at an airport attempting to re-enter China. Subject was tried and sentenced to death in China.


State of Illinois vs Cesar Garay: January 2015 (Supervised Investigation)

A fourteen year old male juvenile was shot in the head outside an apartment complex. Investigation led us to a twenty year old offender. That individual was charged with first degree murder.

Plea Deal: Guilty, 28 years I.D.O.C.


Kenneka Jenkins: September 2017 (Supervised Investigation):

The body of Kenneka Jenkins was discovered frozen to death in a freezer located at the Crowne Plaza Hotel. After months of investigation, her death was ruled an accident.


State of Illinois vs Gerard Delgado Calderon: December 2019 (Supervised Investigation)

Offender strangled the twenty-four year old victim to death in an apartment. Offender then concealed the victim's body in a box and disposed of it near a garbage dumpster. The offender was apprehended and charged with first degree murder.

Court Proceedings: Pending

A4

State of Illinois vs Jose Matias: March 2022 (Supervised investigation):

An altercation happened at the Fashion Outlet mall. Offender began firing at the victim, striking him several times. The victim died minutes after being shot.

Court proceedings: Pending

**OTHER RELATED TRAINING:**

April 1995- I attended the Cook County Sheriff's Police Department Training Academy. The academy provides a series of educational and physical modules that help prepare potential law enforcement officers for handling the demands of the position.

April 2001- I attended a two-week Crime Scene Technology training at Northwestern University Center for Public Safety. We were trained on how to locate, collect, and properly secure evidence left at a crime scene. We were instructed how to provide oral and written reports on the findings.

January 2005- I attended a four week Criminal Investigation for the New Investigator course at Northwestern University Center for Public Safety. Training consisted of evidence collection, interviewing witnesses and suspects, report writing, securing a crime scene and crime scene recognition.

April 2005- I attended a week long Death Investigation training at the North East Multi-Regional Training facility. The training consisted of scene walkthrough, photography, evidence collection, witness interviews, external body examination, and post mortem changes.

April 2005- I attended a two week long Basic Narcotic Investigator training. This consisted of emerging drug trends, undercover operations, surveillance, report writing and court room testimony.

June 2005- I attended an Advanced Homicide Investigation training at Northwestern University Center for Public Safety. The training included approaches to homicide investigations, child death investigation, interrogation techniques for homicide suspects and drug related homicides.

November 2005- I attended a two week training on Fire and Arson Investigation at Kankakee College. Training included basic fire science, documentation of the investigation, cause and origin, analysis of the incident and evidence collection.

A5

January 2008- I attended a D.O.A. Homicide Investigation training at the Suburban Law Enforcement Academy. Training topics included evidence collection, autopsies, suspect interviews, trial testimony.

I was certified through the State of Illinois as a Lead Homicide Investigator. I maintained my certification through the Illinois Law Enforcement Training and Standards Board, by completing the required homicide investigation in-service training hours required by the State of Illinois.

**ADDENDUM B**
**DOCUMENT INDEX**

CPD Files- RFC-Johnson 000001 – RFC-Johnson 000122
Criminal Trial Transcript JGS_JOHNSON 01 – JGS JOHNSON 310
Cook County State's Attorney Office (CCSAO) for Demetrius Johnson – CCSAO 1-1229
Cook County Public Defender (CCPD) Privileged Log Documents: pages 1-30
Cook County Public Defender (CCPD) File: pages 1-126
Chicago Police Department (CPD) Lineup Procedures/General Orders
Expert Report of Thomas Tiderington
Complaint and Answer
Johnson post trial documents (Johnson 214-263, 604-807, 997)
Opinion and Order
Motion for Discovery and Additional Discovery
Answers to Discovery
Lineup Photos
Photo Array
Impound Order (RFC_Johnson 144)
RFC Johnson 34610
IMPOUND EVIDENCE (328—338; 343-44; 373-74)
Aby Gonzalez communications (Johnson 2561-1565)
NBC Log Time for WMAQ-TV Chicago
Grand Jury Transcripts – August 1991 (JGS_JOHNSON 403-409)
Ralph Rider's gang expert report


**Depositions of:**
Demetrius Johnson
Darrell Johnson
Honorable Ruth Miller
Joshua Tepfer
Lt. John Foster
Terrell Agee
Judge Kevin Sheehan
Elba Burgos
Ricardo Burgos
Rosa Burgos
Reynaldo Guevara
Trenisa Johnson
Aby Gonzales
Deborah Gubin
Carlos McFadden

Charlette Galvez
Daryl Daley
Thomas Tiderington

**<u>Declarations:</u>**
Fabian Wells
Carlos McFadden
Terrell Agee
Ricardo Burgos