# EXHIBIT 9

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 1:20-CV-4156**

**DEMETRIUS JOHNSON**

**V.**

**REYNALDO GUEVARA, ET AL.**

**DEPONENT:**

**RONALD S. MUICH**

**DATE:**

**November 15, 2023**



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF ILLINOIS

3                   EASTERN DIVISION

4                HON. SARA L. ELLIS,

5                  DISTRICT JUDGE

6             HON. HEATHER K. MCSHAIN,

7                 MAGISTRATE JUDGE

8             CASE NO. 1:20-CV-4156

9

10

11

12              DEMETRIUS JOHNSON,

13                   Plaintiff

14

15                      V.

16

17           REYNALDO GUEVARA, ET AL.,

18                  Defendants

19

20

21

22

23   DEPONENT:  RONALD S. MUICH

24   DATE:       NOVEMBER 15, 2023

25   REPORTER:  KYRA TATE



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 2

APPEARANCES

1                    APPEARANCES
2    ON BEHALF OF THE PLAINTIFF, DEMETRIUS JOHNSON:
3    Alyssa Martinez, Esquire
4    Steve Art, Esquire
5    Loevy & Loevy
6    311 North Aberdeen
7    3rd Floor
8    Chicago, Illinois 60607
9    Telephone No.: (312) 243-5900
10   E-mail: alyssa@loevy.com
11        steve@loevy.com
12   (Appeared via videoconference)
13
14   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
15   Michael Schalka, Esquire
16   Leinenweber, Baroni & Daffada, LLC
17   120 North LaSalle Street
18   Suite 2000
19   Chicago, Illinois 60602
20   Telephone No.: (866) 786-3705
21   E-mail: mjs@ilesq.com
22   (Appeared via videoconference)
23
24
25

Page 3

1               APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
4    Theresa Berousek Carney, Esquire
5    Rock, Fusco & Connelly, LLC
6    333 West Wacker Drive
7    19th Floor
8    Chicago, Illinois 60606
9    Telephone No.: (312) 494-1000
10   E-mail: tcarney@rfclaw.com
11   (Appeared via videoconference)
12
13   ON BEHALF OF THE DEFENDANTS, JOANN HALVORSEN, JOHN
14   HEALY, DARRYL DALEY, WILLIAM ERICKSON:
15   David Brueggen, Esquire
16   The Sotos Law Firm, P.C.
17   141 West Jackson Boulevard
18   Suite 1240A
19   Chicago, Illinois 60604
20   Telephone No.: (630) 735-3303
21   E-mail: dbrueggen@jsotoslaw.com
22   (Appeared via videoconference)
23
24
25

Page 4

1                       INDEX
2                                              Page
3    PROCEEDINGS                                 6
4    DIRECT EXAMINATION BY MS. MARTINEZ          7
5    CROSS-EXAMINATION BY MR. BRUEGGEN         281
6    REDIRECT EXAMINATION BY MS. MARTINEZ      288
7
8                     EXHIBITS
9    Exhibit                                   Page
10   1 - Expert Report of Ronald S. Muich
11       and Curriculum Vitae                   24
12   2 - Excerpt from Transcript - CCSAO 1084   66
13   3 - Supplementary Report - June 12, 1991 -
14       RFC-Johnson 000026-000027              70
15   4 - Supplementary Report with Permanent
16       Retention File Stamp - June 12, 1991 -
17       RFC-Johnson 000040-000043              73
18   5 - Expert Report of Thomas J. Tiderington 78
19   6 - Photograph Impound Evidence 410        84
20   7 - Rosa Burgos Trial Testimony -
21       JGS_Johnson 01-310                     97
22   8 - Photograph Of Line Up of Five Shirtless
23       Black Males - RFC-Johnson 000090      178
24   9 - Deposition Testimony Kevin Sheehan    242
25

Page 5

1                     STIPULATION
2
3    The VIDEO deposition of RONALD S. MUICH was taken at
4    KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE
5    101, LOUISVILLE, KENTUCKY 40202, via videoconference in
6    which all participants attended remotely, on WEDNESDAY
7    the 15TH day of NOVEMBER 2023 at 10:02 a.m. (CT); said
8    deposition was taken pursuant to the FEDERAL Rules of
9    Civil Procedure. The oath in this matter was sworn
10   remotely pursuant to FRCP 30.
11
12   It is agreed that KYRA TATE, being a Notary Public and
13   Court Reporter for the State of ILLINOIS, may swear the
14   witness and that the reading and signing of the
15   completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
 1              PROCEEDINGS
 2       THE REPORTER:  We are now on record.  My name
 3  is Kyra Tate.  I'm the online video technician and
 4  court reporter today representing Kentuckiana Court
 5  Reporters, located at 730 West Main Street, Suite
 6  101, Louisville, Kentucky, 40202.  Today is the 15th
 7  day of November 2023.  The time is 10:10 a.m.
 8  Central.  We're convened by video conference to take
 9  the deposition of Ronald S. Muich in the matter of
10  Demetrius Johnson v. Reynaldo Guevara, et al,
11  pending in the United States District Court for the
12  Northern District of Illinois, Eastern Division,
13  case number 1:20-CV-4156.  Will everyone, but the
14  witness, please state your appearance, how you're
15  attending, and the location you're attending from
16  beginning with Plaintiff's counsel?
17       MS. MARTINEZ:  Good morning.  This is Alyssa
18  Martinez representing Plaintiff Demetrius Johnson,
19  and I'm appearing remotely from our offices in
20  Chicago.
21       MS. CARNEY:  Theresa Carney on behalf of the
22  City of Chicago, appearing from Chicago.
23       MR. BRUEGGEN:  Dave Brueggen on behalf of the
24  defendant officers, except for Guevara, appearing
25  remotely with the witness from the city of Chicago.
```

Page 7

```
 1       MR. SCHALKA:  And Michael Schalka on behalf of
 2  Defendant Guevara, appearing remotely from Chicago.
 3       THE REPORTER:  Thank you.  Mr. Muich, will you
 4  please state your full name for the record?
 5       THE WITNESS:  Yes.  Ronald S. Muich, M as in
 6  Mary, U-I-C-H.
 7       THE REPORTER:  Thank you.  And before we did go
 8  on record, Counsel agreed to stipulate that the
 9  witness is in fact Ronald S. Muich?
10       THE WITNESS:  Correct.
11       MR. BRUEGGEN:  Agreed.
12       THE REPORTER:  Okay.  Thank you.
13       MS. CARNEY:  Agreed.
14       THE REPORTER:  Mr. Muich, will you please raise
15  your right hand?  Do you solemnly swear or affirm
16  that the testimony you're about to give will be the
17  truth, the whole truth, and nothing but the truth?
18       THE WITNESS:  I do.
19       THE REPORTER:  You may begin.
20  DIRECT EXAMINATION
21  BY MS. MARTINEZ:
22       Q.   Good morning, Mr. Muich.  Thank you for taking
23  the time today.  As I said, my name is Alyssa Martinez
24  and I represent Plaintiff Demetrius Johnson in this
25  case.  First, I think I'll go over some ground rules for
```

Page 8

```
 1  our deposition today.  First, to the best of your
 2  ability, please try to give verbal answers.  It's hard
 3  on the record to reflect head nods and head shakes; does
 4  that sound good?
 5       A.   Yes, ma'am.
 6       Q.   Okay.  And at times, your counsel may object.
 7  Unless you're instructed not to answer, please answer
 8  the question; does that sound good?
 9       A.   Yes, ma'am.
10       Q.   Let's -- to the best of our ability, let's try
11  to talk one at a time just so we can have a clean
12  record.  I won't cut you off and I ask that you let me
13  finish my question before you respond; does that sound
14  good?
15       A.   Understood.
16       Q.   If at any point you need a break, please feel
17  free to ask and we can take one.  I only ask that it
18  doesn't happen while a question is pending; is that
19  fair?
20       A.   Yes, ma'am.
21       Q.   If a question doesn't make sense, please let
22  me know, or if it's confusing and I'll ask it in a
23  different way.  If you answer, I'm going to assume you
24  understand the question; is that fair?
25       A.   Yes, ma'am.
```

Page 9

```
 1       Q.   Okay.  Are you under the influence of any
 2  medications or other condition that might affect your
 3  memory?
 4       A.   I am not.
 5       Q.   And is there anything that would prevent you
 6  from answering truthfully today?
 7       A.   Nothing.
 8       Q.   Okay.  And right now, you currently have your
 9  report in front of you, correct, and your counsel said
10  the other documents are going to be brought in?
11       A.   I do.  I have a copy of my written report and
12  I also have a copy of the CPD records.
13       Q.   Perfect.  Okay.  Thank you for that.  Did you
14  prepare for your deposition today?
15       A.   I did.
16       Q.   What did you do to prepare?
17       A.   I -- I went over documents that were sent to
18  me.  Approximately 30 hours I did review of the
19  documents.  And also via Zoom and also in person, I met
20  with the lawyers at Sotos.
21       MS. MARTINEZ:  Okay.  Quickly for the record, I
22       want to reflect that my colleague, Steve Art, has
23       joined the call.
24  BY MS. MARTINEZ:
25       Q.   So about how many times would you say you met
```

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 6 of 114 PageID #:53917
The Deposition of RONALD J. MURCH, taken on November 15, 2023
10..13

Page 10

1  with your attorneys?
2     A.   On Zoom, I would say probably three times. And
3  live in person, besides today, was once on Monday.
4     Q.   Okay.  And if you had to approximate the total
5  time you spent -- oh, apologies.  You said "30 hours."
6  How much time on Monday in person?
7     A.   Roughly, if you want to include lunch, five
8  hours.
9     Q.   Okay.
10    A.   Five and a half hours.
11    Q.   Okay.  Did you review any documents?
12    A.   Yes.
13    Q.   Which documents?
14    A.   My report and looked at the CPD report.
15    Q.   Did you speak with anyone else about your
16  deposition?
17    A.   Besides my attorneys?
18    Q.   Yes.
19    A.   Nobody else.
20    Q.   Is there anything else you did to prepare?
21    A.   Besides reviewing the documentation that was
22  sent to me and reading my report, no.
23    Q.   So I'm going to ask you a couple of questions
24  about your background and your professional experience
25  now.  So you first joined the Rosemont Public Safety

Page 11

1  Department in 1987; is that correct?
2     A.   So 1987 I became an auxiliary in Rosemont, and
3  that was all the way through April 1, 1995, when I was
4  hired full-time as a public safety officer.
5     Q.   Okay.  And when you say auxiliary, what were
6  some of your responsibilities?
7     A.   Basically, it was traffic control, which
8  turned into indoor security for the Village, and then
9  eventually for about, I would say five years, I was put
10 on patrol as an auxiliary, basically in the Village
11 area.  Did tasks at the school, followed the school bus,
12 made sure that the kids made it to and from, you know,
13 school.
14    Q.   Okay.  And when you say 5 years, was that the
15 last 5 years of that time?
16    A.   That is correct.  The last 5 years.
17    Q.   And then where did you go after that?
18    A.   So then I was hired full-time with Rosemont
19 and then I was sent to Triton College to the police
20 academy.
21    Q.   Okay.  And then after your time at the police
22 academy, you were brought on and what were your
23 responsibilities and duties you said?
24    A.   So just to be clear, after I finished the
25 police academy, then I attended the fire academy.  In

Page 12

1  Rosemont, we are cross-trained, so we're police, fire,
2  and then I also had to go through a semester of EMTB is
3  basic -- basically emergency medical technician.
4  Basically, the only thing I cannot do is push drugs like
5  a paramedic would do on a call.
6     Q.   Okay.  Sorry.  Apologies.  So after you
7  completed that cross-training, where did you then go?  Is
8  that when you were brought on as a detective?
9     A.   No, Ma'am.  So after my training, I served
10 approximately about a year on the street as a patrol
11 officer.  So basic duties of you, you know, patrolling the -
12 - the Village area, the residential area, conducting
13 traffic stops, answered any calls that would come across
14 during the tour of duty.  And then after that year, I
15 was placed in the firehouse for 3 years.  So basically
16 my duties were on the -- on the fire side of the
17 department.
18    Q.   Okay.  And when you say that first year,
19 approximately what year was that where you were working
20 on the street?
21    A.   Say late '95 to '96.
22    Q.   Okay.  So --
23    A.   Because I don't know exactly when my, I
24 apologize.  I don't know exactly when my training ended,
25 but I believe that I -- I did my EMT semester while I

Page 13

1  was on the street.  I just went at nighttime.
2     Q.   Okay.  So then the next three years until
3  would you say '99 is when you did your firehouse work?
4     A.   Approximately '99, I believe I came back out
5  to the street.
6     Q.   Okay.  So then in 1999, is that when you were
7  brought on as a detective?
8     A.   No.  So from 1999, I'm sorry, from 1999 --
9     Q.   No, that's --
10    A.   -- to the end of 2004, December of 2004, I was
11 on the street as a patrol officer.  And if I do happen
12 to say public safety officer, that's what we're
13 considered, but I'll try to keep it to patrol officer,
14 if that doesn't confuse you.  And then December of 2004
15 is when I interviewed for investigations, and that's
16 when I was brought up to investigations, December of
17 2004.
18    Q.   Okay.  So then when you were brought to
19 investigations in 2004, you were a detective in this
20 division until 2015, correct?
21    A.   That is correct.
22    Q.   Okay.  And what types of cases did you work
23 on, and if it changed throughout that time period,
24 please include that as well.
25    A.   So in Rosemont, you are a general detective,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 7 of 114 PageID #:53918
The Deposition of RONALD J. MESCALL, taken on November 15, 2023
14..17

Page 14

1  so basically you can work as a simple crime as a theft
2  to any kind of criminal -- anything, crimes against
3  persons, all the way up to robberies, sexual assaults,
4  homicides. So basically there wasn't anything that we
5  did not do. Whatever -- whatever investigation came our
6  way is what we did. And we also did do financial
7  crimes. So we weren't -- we weren't basically subject
8  to just work one certain type of crime.
9      Q.  Okay. And to the best of your knowledge, if
10 you had to make an estimate of potentially how many
11 homicide investigations you participated in each year,
12 what would you ballpark say?
13     A.  So if I could back up for a second? So in
14 2005, I also joined a major case assistance team, which
15 is a task force that basically investigates violent
16 crime on the north -- on the north side. So basically,
17 I believe there was 21 different jurisdictions in this -
18 - in this unit. So if -- if I'm going to give you a
19 number, I would have to say it's going to be a guess,
20 because with my Rosemont -- the homicides we had in
21 Rosemont and my MCAT experience with the task force, it
22 would not be an accurate number, so I just want to make
23 sure that you're clear on that.
24     Q.  Okay.
25     A.  So I would -- I would say with Rosemont,

Page 15

1  approximately six, that includes death investigations.
2  And then with MCAT, we could be talking 30 to 40. But
3  again, that number, I -- I never kept track of it. So
4  that number is a total -- total, just an estimate on my
5  part.
6      Q.  Okay. And when you say 30 to 40, is that what
7  MCAT would participate in or is that what you, as an
8  individual, would participate in?
9      A.  So let's say a town had some sort of homicide,
10 suspicious death -- death investigation. They would
11 call out the other investigators from the team and we
12 would respond, and I would respond as an investigator.
13 And I would respond, and I'm just going to throw a town
14 out, Schaumburg. If Schaumburg called us out, we would
15 respond to Schaumburg and then we would go to work,
16 basically doing whatever task that we needed assisting
17 with the detectives in Schaumburg.
18     Q.  Okay. During your time in MCAT, did you work
19 in close proximity with officers from the Chicago Police
20 Department?
21     A.  No.
22     Q.  And you, apologies, you said you joined MCAT
23 in 2005. When did you, I think I saw that you were
24 reassigned to the officer involved, deaths agent?
25     A.  Yes, that was -- yes, Ma'am, that was later

Page 16

1  on. And again, without looking at my report, I think it
2  was in 2021. I knew I was coming up to retirement, so I
3  -- I planned that I wanted to come off of MCAT just due
4  to my upcoming retirement. And my supervisors at
5  Rosemont wanted me to get involved in the officer
6  involved death unit before I left. So I did join that
7  unit. I was a lead on one case in Palatine. It was
8  actually officer involved shooting/ homicide. And after
9  that I was a supervisor in one of the officer involved
10 deaths. And then after that, I retired on June 21,
11 2023. So I don't know exactly when I came off of the
12 MCAT team, but I believe it was, I think it was October
13 or November of 2022.
14     Q.  Okay. And then switching back to your time at
15 Rosemont, in 2015 you became a sergeant; is that
16 correct?
17     A.  Yes. Without looking at my report with the
18 exact date, I think it was 2015.
19     Q.  Okay. And how would you say your duties
20 changed when you were promoted to sergeant?
21     A.  So basically I became a -- in a supervisory
22 role. So instead of me getting assigned cases, I would
23 be the one that would be assigning the cases out. I
24 would be the one that would be reviewing the cases,
25 basically taking care of day-to-day operations with the

Page 17

1  other detectives in the office.
2      Q.  Okay. And I believe in your report, you said
3  that the focus of this unit was drugs, guns, and
4  prostitution; is that correct?
5      A.  So we did have a tactical unit and their focus
6  was guns, drugs and prostitution, which I would oversee
7  also. It was part of my duties to oversee the tact
8  unit. And that was also when I got promoted, you know,
9  through the department.
10     Q.  During your time as a sergeant, approximately
11 how many officers would you say you supervised?
12     A.  So we kind of rotated in and out because
13 again, we're very unique with our public safety with
14 police fire, so they kind of take personnel as needed.
15 So I think at the highest manpower I ever had was, I
16 believe I had five detectives and three tact officers.
17 So I believe it was eight was my highest.
18     Q.  Okay.
19     A.  And again, I would have to look at my report
20 to confirm that number eight.
21     Q.  Okay. And would you -- strike that, please.
22 How many homicide investigations would you say that you
23 oversaw?
24     A.  Are you saying in Rosemont?
25     Q.  Well, during your time as a sergeant. Per --

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1    A.   As a sergeant?
2    Q.   Yeah.
3    A.   Again, without looking at my report, because
4  again, I -- I made the -- I went through the ranks as
5  sergeant, lieutenant, commander and ultimately retired
6  as a captain.  So as a sergeant, and again, I'm just
7  guessing without looking at my report, it was one or
8  two, but I believe it was four or five that I actually
9  supervised as a either a sergeant, lieutenant,
10  commander, or captain.  But to answer's your question as
11  a sergeant, I cannot give you the exact answer without
12  looking at my report.
13    Q.   Okay.  That's fine.  And just to clarify, to
14  make sure I'm understanding your testimony correct.
15  During your time as a sergeant, lieutenant, commander,
16  and captain, you say you oversaw four to five homicide
17  investigations?
18    A.   Supervised four to five homicide
19  investigations, yes.  And as a detective, I was a lead
20  on two homicide investigations.
21    Q.   Okay.
22    A.   So that's where I'm coming up with a number
23  six or seven total.
24    Q.   Yeah.  I -- that makes sense.  And then quick
25  clarifications and then we'll be done with your

Page 19

1  professional history.  From 2018 to 2020, is that
2  approximately the time you served as lieutenant?
3    A.   It sounds right.  Again, I would have to look
4  at my report to get the exact years.
5    Q.   Okay.  And then does 2020 to 2023 sound right
6  as commander?
7    A.   Yes.  Commander and then they dissolved the
8  rank of commander and they just -- they just switched me
9  to a captain.
10    Q.   Okay.
11    A.   No reason for that, they just dissolved the
12  rank of commander for whatever reason, I was never
13  privileged to that information.
14    Q.   Okay.  Approximately, how many officers would
15  you say work at Rosemont Public Safety Department?
16    A.   On the highest end in my career there, we --
17  we touched about 79 to 80 officers and then we were as
18  low as 65 to 68 officers, which was on the real low end
19  for us.  And that's again, public safety, police and
20  fire.
21    Q.   Okay.  And how many homicides per year would
22  you say happened during your time?  Is it the same
23  amount that you oversaw or --
24    A.   Per year?  I mean, we -- I did six or seven,
25  so it would be tough to say per year without me looking

Page 20

1  at the years and actually figuring out what the
2  calculation to see how many that we had.
3    Q.   Okay.  And of those six or seven, are there
4  any that you remember being gang-related homicides that
5  you participated or supervised the investigation of?
6    A.   Yes.  There was several, I would say, at least
7  two to three that were definitely gang related that we
8  figured out through our investigation.
9    Q.   And this is over the entire duration of your
10  career at RPSD?
11    A.   That is correct.
12    Q.   And I'm going to bring up your report in a
13  second, but would you say that your CV is accurate?
14    A.   Yes, ma'am.
15    Q.   And are there any relevant publications or
16  articles to -- that would relate to your opinions that
17  are not listed in your CV?
18    A.   No, ma'am.  The only thing that I did realize
19  last night that was not in my additional training was I
20  did attend a homicide conference in New Jersey at
21  Princeton.  And again, last night when I was reviewing
22  my report, I realized that I did not put that in my --
23  in my additional training, which will be updated, you
24  know --
25    Q.   Okay.

Page 21

1    A.   -- late.
2    Q.   When was that training?
3    A.   I believe that was in 2009, 2010.  I know it
4  was the summer.  It was June.  It was '09 or '10.  I
5  just don't remember the exact year without looking at my
6  certificate.
7    Q.   And how long was that conference?
8    A.   That was a five day conference.
9    Q.   Five days.  And what was the focus of the
10  conference?  What were some of the main takeaways?
11    A.   So basically they brought in speakers from all
12  over the country.  You -- they talked about evidence.
13  They talked about interviewing.  They talked about
14  suspects, offenders, crime scenes.  They just -- they
15  just kind of touched on everything.  It was one of those
16  conferences to where you can bounce from room to room.
17  And, you know, if you found that you liked the speaker,
18  you know, on evidence or crime scene, you -- you could
19  just stay in there for that conference.  So it was -- it
20  was kind of a conference like that.
21    Q.   Okay.  And was there any session you sat in on
22  that was related to report writing and documenting
23  homicide investigations?
24    A.   I can't recall if there was anything.
25    Q.   So that's all the questions that I have about

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1 your professional experience. Have you ever been
2 involved in a prosecution of someone you later found out
3 was innocent? Do you think that's a problem in our
4 justice system?
5        MR. BRUEGGEN: Object to form.
6 BY MS. MARTINEZ:
7    Q.   I'll rephrase. Do you think innocent people
8 being incarcerated for crimes they did not commit is a
9 problem in our justice system?
10       MR. BRUEGGEN: Objection.
11       MS. CARNEY: Object to form. Foundation.
12 BY MS. MARTINEZ:
13   Q.   You can answer.
14       THE WITNESS: Answer?
15       MR. BRUEGGEN: Yeah.
16       THE WITNESS: I -- I -- I really don't give it
17 any thought. I -- through my career, I was the type
18 of person that basically took the task at hand. If
19 I had an investigation, if I was a lead on an
20 investigation, if I was a supervisor in an
21 investigation, I just focus on the -- on the -- the
22 investigation. I don't -- I don't listen to other
23 things. I just go according to the way I
24 investigate, the way that I supervise and I've
25 always done that through my career.

Page 23

1 BY MS. MARTINEZ:
2    Q.   Okay. Do you believe that innocent people
3 sometimes go to prison?
4    A.   Again --
5        MR. BRUEGGEN: Object to form. Speculation --
6        MS. CARNEY: Form. Foundation.
7 BY MS. MARTINEZ:
8    Q.   You can answer.
9    A.   Can you repeat the question, please?
10   Q.   Yes. Do you believe that innocent people
11 sometimes go to prison?
12       MR. BRUEGGEN: Same objections. Go ahead and
13 answer.
14       THE WITNESS: Again, I -- I don't have any
15 opinion on that. Today I'm here to focus on this --
16 the -- my report that I wrote, the -- the case, the
17 documentation that I reviewed. I don't have an
18 opinion on that.
19 BY MS. MARTINEZ:
20   Q.   Are you personally aware of any law
21 enforcement agent that has ever intentionally sent an
22 innocent person to prison?
23   A.   No.
24       MR. BRUEGGEN: Object to form. Go ahead.
25       THE WITNESS: No, I have not.

Page 24

1 BY MS. MARTINEZ:
2    Q.   Did you come in into this case with a view
3 about whether the defendant officer's investigation was
4 reasonable?
5        MR. BRUEGGEN: Object to the form.
6        THE WITNESS: Can you repeat that question? I'm
7 a little confused on the back end of it.
8 BY MS. MARTINEZ:
9    Q.   Yes. Did you come into this case, before you
10 reviewed any of the materials, with an opinion about
11 whether the defendant officers in this case, their
12 investigation was reasonable?
13   A.   I --
14       MR. BRUEGGEN: Object to the form.
15       THE WITNESS: I took the documentation and I
16 reviewed the documentation. I had no opinion on
17 anything until I started reading my report, or I'm
18 saying of reading the documentation --
19 documentation, apologize, that was sent to me.
20 BY MS. MARTINEZ:
21   Q.   Okay. So I'm going to bring up your report.
22 We'll mark as Exhibit 1.
23       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
24       MR. BRUEGGEN: And Alyssa, is it okay if you
25 use the hard copy in front of him?

Page 25

1        MS. MARTINEZ: Yes, absolutely. Feel free to -
2 - or please do, because I think that's easier than
3 me sharing my screen and then stopping and sharing
4 and stopping.
5 BY MS. MARTINEZ:
6    Q.   But just to make sure, would you agree that
7 this is the report you submitted in this case?
8    A.   That is the first page of, yes, first page of
9 my report.
10   Q.   Okay. And then I'm going to go to the
11 signature block. Would you agree that this is your
12 signature?
13   A.   Yes ma'am, that is my signature.
14   Q.   Okay. And you would agree that the date you
15 issued your report was October 13, 2023?
16   A.   That is correct.
17   Q.   Okay. And all of the opinions you intend to
18 offer in this case are contained within this report is
19 that correct?
20   A.   That is correct.
21   Q.   Okay. And did you arrive at opinions prior to
22 issuing your report and choose to not exclude them from
23 this report? Or apologies, sorry, let me rephrase that.
24 Did you come to any opinions in this case before issuing
25 this report that you chose to exclude?



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 10 of 114 PageID #:53921
Video Deposition of RONALD J. WATSON, taken on November 15, 2023
26..29

Page 26

1          MR. BRUEGGEN: Object to the form and privilege
2     to the extent you're trying to figure out the report
3     writing process. So if you can rephrase it. Don't
4     answer that as phrased.
5  BY MS. MARTINEZ:
6          Q.    Yes. Are there -- excluding any conversations
7     on strategy or substance that you had with the attorneys
8     in this case, was there anything -- any opinion that you
9     came to during your review that you decided to not put
10    in this report?
11         MR. BRUEGGEN: Object to form. Go ahead.
12         THE WITNESS: So I received the documentation.
13    I reviewed the documentation. My report is based on
14    a documentation that I reviewed and read. Some
15    cases, some documentation I've reviewed several
16    times and came to the conclusion in my report that
17    is in front of me right now on the screen.
18 BY MS. MARTINEZ:
19         Q.    Okay. Then I'm going to scroll one more time
20    before I take this down. Addendum B on page B-1 of your
21    report lists the materials you reviewed, correct?
22         A.    That is correct.
23         Q.    Are these all the materials that you relied
24    upon in arriving at the opinions expressed in your
25    report?

Page 27

1          A.    That is correct. Yes, ma'am.
2          Q.    I'll scroll from B-1 to B-2. I'm going to
3     stop sharing. Okay. Did you write this report?
4          MR. BRUEGGEN: Object to form. Attorney-work
5     product. But go ahead.
6          THE WITNESS: I did write this report. Yes,
7     ma'am.
8  BY MS. MARTINEZ:
9          Q.    Okay. Did anyone else write parts of it for
10    you?
11         MR. BRUEGGEN: Objection. Form. Don't answer
12    that. Attorney-work product.
13 BY MS. MARTINEZ:
14         Q.    Okay. So just for clarification, on the
15    advice of Counsel, you refuse to answer that question?
16         MR. BRUEGGEN: Answer that.
17         THE WITNESS: Yes. My Counsel advised me not
18    to answer that question, so I will not be answering
19    that question.
20 BY MS. MARTINEZ:
21         Q.    Okay. Did anyone else tell you what to write?
22         MR. BRUEGGEN: Same objection. Don't answer
23    that.
24 BY MS. MARTINEZ:
25         Q.    So you're refusing to answer that question on

Page 28

1     the advice of your Counsel?
2          A.    My Counsel is advising of me not to answer
3     that question, so I will not answer that question.
4          MR. BRUEGGEN: For the record, the objections,
5     attorney work product, it goes beyond what's allowed
6     to be done at -- under Rule 26(a)(2).
7  BY MS. MARTINEZ:
8          Q.    Okay. Did you type this report in its
9     entirety?
10         MR. BRUEGGEN: Object to form. And --
11 BY MS. MARTINEZ:
12         Q.    You can answer. Apologies.
13         MR. BRUEGGEN: And then same objection to the
14    extent you're trying to figure out what, you know,
15    was done as far as creating a report, which you're
16    not allowed to find out under the rules. So same
17    objection. So don't answer it. Maybe it could be
18    rephrased?
19 BY MS. MARTINEZ:
20         Q.    Okay. On the advice of your Counsel, are you
21    refusing to answer this question?
22         A.    My Counsel is advising me not to answer that
23    question, the last question you asked, so I will not be
24    answering that question.
25         MS. MARTINEZ: Okay. And I am going to ask

Page 29

1     that we try to limit speaking objections in this
2     deposition.
3  BY MS. MARTINEZ:
4          Q.    Did anyone tell you to make any assumptions in
5     drafting this report?
6          A.    No.
7          Q.    Did anyone provide you with any facts that are
8     not included in the materials you reviewed, that you
9     include in this report?
10         A.    Everything that came to the conclusion that I
11    wrote this report were the documents that were sent to
12    me that are on Page B-1 and B-2 on the Addendum document
13    index.
14         Q.    Okay. Thank you, sir. When were you retained
15    in this case?
16         A.    I don't know the exact date. Maybe -- I don't
17    know the exact date. I want to say April, but I -- I --
18    I cannot give you an exact answer without looking back
19    at my -- my -- actually my first day when I started
20    documenting my hours.
21         Q.    Okay. And is that April of 2023?
22         A.    Yes. It's definitely 2023, this year. Yes,
23    ma'am.
24         Q.    Okay. Excuse me. What discussion did you
25    have with Defendant's Attorneys prior to agreeing to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 11 of 114 PageID #:53922
Civil Deposition of DR. RONALD S. MATECKI, taken 4th November, 15, 2023
30..33

Page 30

1    service as their expert in this case?
2          MR. BRUEGGEN: Objection. Calls for attorney
3    work product. Again, you're not entitled to that.
4    Don't answer.
5    BY MS. MARTINEZ:
6          Q.  On the advice of your Counsel, are you
7    refusing to answer this question?
8          A.  My Counsel advised me not to answer that
9    question, so I'm not answering the last question.
10         Q.  Okay.  What was your assignment in this case?
11         A.  So my assignment was basically reviewing
12   documentation that was sent to me, and reviewing
13   basically the files from the CPD reports, and basically
14   coming to a conclusion and opinion on the investigation.
15         Q.  Okay.  Who chose the documents that you
16   received?
17         MR. BRUEGGEN: Object to form.  Go ahead.
18         THE WITNESS:  The documents were sent to me by
19   the Sotos Law Firm.
20   BY MS. MARTINEZ:
21         Q.  Were you retained to address Mr. Tiderington's
22   opinions in this case?
23         MR. BRUEGGEN: Object to form.  Go ahead.
24         THE WITNESS:  I did receive Mr. Tiderington's
25   opinion and I did review it.

Page 31

1    BY MS. MARTINEZ:
2          Q.  Okay.  Your report includes all your
3    criticisms of Mr. Tiderington's report that you intend
4    to offer in this case, correct?
5          MR. BRUEGGEN: Object to form.  Go ahead.
6          THE WITNESS:  I guess you're going to use the
7    word criticisms?  I'm just going to use that I did
8    not agree with some of his opinions.  I think
9    criticism might be a word you want to use, but I
10   think it's such a strong word.  I just think the way
11   I looked at it was, I did not agree with some of his
12   opinions.
13   BY MS. MARTINEZ:
14         Q.  Okay.  We can use your terminology.  So just
15   to be clear, your report includes all of your points of
16   disagreement with Mr. Tiderington's report that you
17   intend to offer in this case; is that correct?
18         A.  Not all.  Just, I put some points in there.
19         Q.  Okay.  So you have points of disagreement that
20   are outside the scope of your report.  Apologies, not
21   the scope.  That are outside the opinion you submitted
22   in this report?
23         MR. BRUEGGEN: Object to form.  Go ahead.
24         THE WITNESS:  No, I just put these opinions in
25   here.  I don't know why I only put several.  I

Page 32

1    believe I put maybe two or three.  I don't know if
2    there was a reason why I didn't put more in there,
3    but I stopped at two or three.  I don't know why.
4    BY MS. MARTINEZ:
5          Q.  Okay.  And were you asked not to look at
6    certain opinions in Tiderington's report?  In
7    Mr. Tiderington's report?
8          MR. BRUEGGEN: Object to the form.  Vague.
9          MS. MARTINEZ: I --
10         MR. BRUEGGEN: And that's like --
11         MS. MARTINEZ: I can --
12         MR. BRUEGGEN: Are you asking --
13         MS. MARTINEZ: I can rephrase --
14         MR. BRUEGGEN: Okay.  Go ahead.
15         MS. MARTINEZ: I can rephrase.
16   BY MS. MARTINEZ:
17         Q.  So Mr. Tiderington provides two separate
18   opinions in his report.  Were you asked to not look at
19   one of those opinions or to not opine on one of those
20   opinions?
21         MR. BRUEGGEN: Object to the form.  Go ahead.
22         THE WITNESS:  No, I viewed whatever opinion I
23   got from Mr. Tiderington, and to be honest with you,
24   I -- I don't even remember if there's two, three
25   different opinions, I just reviewed whatever I got.

Page 33

1    I believe there were -- I believe there were two
2    separate reports.  One was a longer report.  I
3    believe it was like -- it was a long report and I
4    believe I viewed one that was maybe three or four
5    pages.  So again, I don't know the difference
6    between, if he submitted different reports, I just
7    reviewed what I thought was Mr. Tiderington's
8    opinion.
9    BY MS. MARTINEZ:
10         Q.  Okay.  So I just have a couple of questions
11   about your experience as an expert and previous cases
12   that you've worked on.  When is the last time you were
13   retained as an expert prior to this case?
14         A.  I was not.  This is my first one.
15         Q.  Okay.  Have you ever sat for a deposition in a
16   civil case?
17         A.  So I'm going to need you to rephrase that
18   question, because I was deposed, but it was something
19   that happened while I was working in Rosemont.  So I
20   don't know if I was named in a lawsuit, is that
21   considered civil?  Or is that while I'm on the job? so
22   I'm a little --
23         Q.  Yes --
24         A.  -- confused.
25         Q.  Yes.  Apologies.  Have you ever sat for any

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  kind of deposition before?
2      A.  Yes, I have.
3      Q.  Okay.  And that -- you said that was while you
4  were an active officer?
5      A.  Yes.  I believe I was on three depositions,
6  two of them being accidents that occurred in the Village
7  while I was working.  I was not involved, I was the
8  officer who took the report.  And then one was on a
9  traffic stop that I made while I was working and
10  basically, when I pulled the individual over, it was the
11  day of President Obama Election.  It was Election Day,
12  and that was the day he was going to appear at Grant
13  Park to do his celebratory speech or whatever you want
14  to call it.  When I pulled this individual over, first
15  thing I found was he had a gun in the car between the
16  seat and the console.  And then he also had an open
17  laptop with some Grant Park, Obama stuff on it.  And
18  then further investigation with that, I think we took
19  out another eight or nine weapons out of the car,
20  including long guns, rifles, bunch of ammunition.  So at
21  this time, with what we found in the car and his laptop
22  being open to this, we decided to call down to the
23  Secret Service and we were advised by the Secret Service
24  to detain this individual.  And basically he was not
25  charged.  He was actually just written one citation by

Page 35

1  me.  And then later on he did file suits and I was named
2  in that suit.
3      Q.  Okay.
4      A.  I hope that answers the question then.
5      Q.  Yes.  And do you know approximately the year
6  of your last deposition that you sat for?
7      A.  It would be -- so we would just have to look
8  to see when President Obama was -- I don't know what
9  year -- what year?  I don't know a date.
10     Q.  I think 2008.
11     A.  Yeah.  I think he -- he did an eight year
12  term.  So I think -- I believe his first term, this was
13  the first term, yeah, 2008, sounds like.
14     Q.  Okay.  And what would you say your political
15  views are?
16         MR. BRUEGGEN:  Objection.  Form.  Relevance.
17         MS. MARTINEZ:  I can reword that.
18  BY MS. MARTINEZ:
19     Q.  Would you say you identify as a Republican or
20  a Democrat?
21         MR. BRUEGGEN:  Object to form.  Relevance.  Go
22  ahead.
23         THE WITNESS:  I don't -- I'm sorry, someone
24  just knocked on the door.
25         MS. MARTINEZ:  It's okay.

Page 36

1         MR. BRUEGGEN:  These might be the documents. We
2  have copies to the exhibits now.
3         MS. MARTINEZ:  Oh, perfect.  Okay.  Thank you.
4         THE WITNESS:  I -- I -- to be honest with you,
5  I don't -- I don't, I'm not a Democrat.  I'm not a
6  Republican.  Rosemont, when I worked there was
7  generally a Republican town, but I always -- my view
8  is I go to the best candidate that I see fit.  I
9  don't care if it's Democrat -- Democrat, Republican
10  -- I don't care, I just want the best candidate in
11  there.  So I don't go one way or the other on -- on
12  political and I don't talk political, and I never
13  get drawn into talking political because I -- I just
14  don't want to do it.
15  BY MS. MARTINEZ:
16     Q.  Okay.  That's fair.  Okay.  Did you do any
17  type of consulting at all in the last four years?
18     A.  I have not.
19     Q.  So from your CV that you've provided and your
20  additional trainings, it's clear you've received a lot
21  on a number of topics.  Pardon me.  Trainings on a
22  number of topics, including crime scene, technology,
23  narcotics, investigations, hostage negotiations,
24  criminal investigations, wholesale, homicide
25  investigations, and then fire and arson because of the

Page 37

1  joint system in Rosemont.  What would you consider your
2  area of expertise?
3      A.  You said "wholesale"; what is that?
4      Q.  Apologies.  Kind of the entire system of
5  criminal investigations.
6      A.  Okay.  I -- thank you.  And can you say the
7  last part of your question again?
8      Q.  Yes.  What would you consider your area of
9  expertise?
10     A.  Well, seeing that I was a detective from the
11  end of 2000 -- December of 2004 to retirement, it would
12  be criminal investigation.  And that would be 11 years I
13  was a detective, so I did investigate all sorts of cases
14  and I did supervise to the end of my career.  So I would
15  -- it would be criminal investigations.
16     Q.  Okay.  And were there any other classes or
17  degrees you attained separate from the trainings that
18  you listed in your CV?
19     A.  No, Ma'am.
20     Q.  And did you receive any certifications?
21     A.  So when you say certifications, we -- we've
22  done in-house training throughout the years.  And when,
23  and -- and again, I don't have that list for you, but
24  when we did do in-house trainings, you did get
25  certifications.  But again, that's such a broad



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    question, I -- I don't have an answer for you on that.
2        Q.   Okay.  In-house is sufficient.  Okay.  So your
3    area of expertise is criminal investigations.  And would
4    you agree that you're not an expert in constitutional
5    law or elements of constitutional tort?
6        A.   That is correct.
7        Q.   Okay.  In your work history, have you ever
8    encountered an officer that committed misconduct?
9        MR. BRUEGGEN:  Object to form.  Vague.  Go
10   ahead.
11       THE WITNESS:  So as a supervisor, we did not
12   have a internal department.  If an internal what
13   happened to happen the chief, on occasion would
14   assign me to run that internal, which basically
15   would mean that I would get all the facts of
16   whatever the internal was, and I would assign a
17   detective to it and then I would, you know, assist
18   the detective and you, know, possibly interview the
19   officer or officers, you know, with that internal
20   and then go ahead and complete a report and give
21   that to the chief with our findings.
22   BY MS. MARTINEZ:
23       Q.   Okay.  And has any -- strike that, please.  Of
24   those internal investigations that you participated in,
25   was any officer ever disciplined?

Page 39

1        A.   So when it came to the disciplining part of
2    it, that was out of our area.  On some internals, we
3    would give our recommendation for discipline.  But after
4    the report was turned in, we very, very rarely ever got
5    involved in the discipline part of it.  And if we heard
6    something, it was just through word of mouth, but the
7    chief never told us what the discipline was.
8        MS. MARTINEZ:  Okay.  And are you currently
9    serving as an expert in any other case?
10       THE WITNESS:  No, ma'am.
11   BY MS. MARTINEZ:
12       Q.   Okay.  Are you consulting on any other case?
13       A.   No, ma'am.
14       Q.   Okay.  Thank you, sir.  Now I just have a
15   couple quick questions about the time you've spent on
16   this case.  And just to clarify, your compensation rate
17   for document review, statement preparation, attorney
18   consultation, and testimony is listed in your report,
19   correct?  On that front page?
20       A.   Yes, ma'am.  Front page, I believe the last
21   two paragraphs.
22       Q.   Perfect.  Okay.  And so your rate for document
23   review, statement preparation, and attorney consultation
24   is $195 per hour, correct?
25       A.   Correct.

Page 40

1        Q.   Okay.  And your rate for giving testimony is
2    $245 per hour; is that correct?
3        A.   Correct.  I believe that's six hours remote
4    minimum and eight hours maximum in-person, I -- or
5    minimum in-person, I believe.
6        Q.   Okay.
7        A.   I'm looking at the front page.
8        Q.   Okay.  As you work on a project, how do you
9    keep track of your hours?
10       A.   I basically put it in word form.  So if I work
11   that day -- so let's say today, November 15th, I started
12   working reviewing documentation at 8:00 in the morning
13   and I stopped at 4:00, I would document it at the end of
14   my workday.
15       Q.   And what's the approximate number of hours
16   you've spent working on this case?
17       A.   So reviewing documentation, approximately 268
18   hours.  And then deposition preparation besides today,
19   I'm not concluding today, would approximately about
20   30 hours.
21       Q.   Okay.  And then approximately how much time
22   for writing the actual report?
23       MR. BRUEGGEN:  Objection.  Calls for attorney
24   work product.  Don't answer that.
25   BY MS. MARTINEZ:

Page 41

1        Q.   Okay.  On the advice of your Counsel, you're
2    refusing to answer that question?
3        A.   Yes.  My counselor is advising me not to
4    answer that question, so I will not be answering that
5    question.
6        Q.   What is the total amount you have billed in
7    this case to date?
8        A.   Without doing the math, I cannot give you an
9    approximate answer.  I would have to -- I would have to
10   do the math of 268 times what I'm making an hour.
11       Q.   Okay.  So at the very minimum, it would be the
12   268 hours you spent reviewing the materials and then the
13   30 hours you spent preparing for this deposition, times
14   the appropriate multiplier for your rate?
15       A.   Yes.  And what I do is, at the end of the
16   month, I go ahead and send my invoice to the admin and
17   basically I'm submitting my hours and then they are --
18   whatever they're doing to receive the payment, they're
19   sending me the check.
20       Q.   Okay.  So you're at the end of the month?
21       A.   Yes, ma'am.  And I don't know when I receive
22   the check.  It just depends on when -- when the check is
23   processed, but I always -- I submit my hours at the last
24   day.
25       Q.   Okay.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1   A.   For that -- for that month.
2   Q.   Okay.  Will you bill for every hour you've
3  worked on this case?
4   A.   I will bill for every hour that I work on this
5  case.  Yes, ma'am.
6   Q.   Okay, great.  Thank you, sir.  So now I want
7  to get into the materials that you reviewed.  So again,
8  please feel free to look at your report, flip to the
9  pages that you think are appropriate because I just want
10 your most truthful and fullest answer.
11  A.   Yes, ma'am.
12  Q.   And so to clarify, are there any documents you
13 reviewed before your report was disclosed that are not
14 listed in this report?
15  A.   You froze up there for about a half a second.
16 Can you repeat?
17  Q.   Yes.  Sorry.  Sometimes we get some tech
18 problems.  Are there any documents that you reviewed
19 before your report was disclosed that are not listed on
20 your report?
21  A.   No.  Everything that I reviewed is on my
22 addendum B, document index.
23  Q.   Okay.  And you only reviewed the investigative
24 files listed on this report, correct?
25  A.   The investigative files.  Are you talking

Page 43

1  about the Chicago Police Department file?
2   Q.   Yes.
3   A.   Yes.  And I believe that was 88 or 89 pages.
4  Without looking at it, that's what I --
5   Q.   Okay.  Please feel free to look.  Apologies.  I
6  did not mean to cut you off, sir.  Please feel free to
7  look at your report, flip around, take the time you
8  need.
9   A.   Yes.  So the CPD report, the RFC Johnson, it
10 goes up to 80, zero, whatever.  So many zeros with 87.
11 That's the CPD file that I reviewed, which is on my
12 addendum B.
13  Q.   Okay.  And for the materials you did receive,
14 did you receive them all at once or did you receive them
15 in batches?
16  A.   I received them in batches.
17  Q.   Okay.  And do you know approximately when you
18 received that first batch?
19  A.   Without looking at a past e-mail, I cannot
20 answer that question.
21  Q.   Okay.  And when you were provided materials
22 that you reviewed in this case, were they provided to
23 you electronically, in paper, or both?
24  A.   Electronically.
25  Q.   Okay.  And then did you take notes on

Page 44

1  electronic versions of the documents?  I'll apologize.
2  I'll rephrase.
3   A.   Thank you.
4   Q.   When you were reviewing these materials, did
5  you print them out and take notes on them?
6   A.   Some documents I did print out.  Like I did
7  print out the CPD file, but I did not put any notes on
8  there.  And then I would say most of the documents, I
9  just viewed electronically on my laptop without printing
10 those documents out.  Yes, ma'am.
11  Q.   Okay.  Have you reviewed any other material
12 since you issued this report?
13  A.   New material?
14  Q.   New material.
15  A.   No.  Whenever -- I -- I re-reviewed
16 information that I had just to prepare for the
17 deposition.
18  Q.   Okay.  Are there any materials that you asked
19 for and were not provided?
20  A.   No.
21  Q.   So now I'm just going to go through a couple
22 of the materials that you reviewed.  So your report
23 states that you reviewed the complete CPD investigative
24 files, correct?
25  A.   Correct.

Page 45

1   Q.   Did you review each page of the investigative
2  files?
3   A.   I did.
4   Q.   Okay.  Your report states that you reviewed
5  the entire criminal transcript in this case; is that
6  correct?
7   A.   Is that the 1200 page 1 from the State's
8  Attorney?
9   Q.   Apologies.  The criminal trial transcript.  So
10 JGS_Johnson one 01-310.
11  A.   I reviewed that.  Yes, ma'am.
12  Q.   Okay.  Did you review each page?
13  A.   I did.
14  Q.   Okay.  Your report states that you reviewed
15 the complete State's Attorney's files in this case.
16 That's the CCSAO 121229; is that correct?  Because you
17 reviewed that entire document?
18  A.   Correct.
19  Q.   Okay.  Your report states that you reviewed
20 the complete criminal defense file.  So that would be
21 the Cook County Public Defender file, pages one to 126.
22      MR. BRUEGGEN:  Objection.
23 BY MS. MARTINEZ:
24  Q.   Did you --
25      MR. BRUEGGEN:  Go ahead.  Sorry.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

BY MS. MARTINEZ:

2     Q.   Did you -- oh, no, it's okay. Did you review

3 that entire file?

4     A.   I did.

5     Q.   Your report states that you reviewed portions

6 of the impound evidence. I believe you put 328 to 338,

7 343 to 344, and 373 to 374; is that correct?

8     A.   Apologize. I need to put my glasses on to

9 follow it.

10     Q.   That's okay.

11     A.   Impound evidence 328 to 38, 343 to -- to 44,

12 373 to 74. Correct.

13     Q.   Okay. How did you decide which portions of

14 the impound evidence to review?

15     A.   That is what I received.

16     Q.   Okay. Do you think there could have been

17 relevant information in the other impounded evidence

18 documents?

19        MR. BRUEGGEN: Object to form and speculation.

20 Go ahead.

21        THE WITNESS: That I cannot answer. Without

22    reviewing documentation, I cannot come to any sort

23    of conclusion or opinion on that.

24 BY MS. MARTINEZ:

25     Q.   Okay. For each of the depositions you list,

Page 47

1 did you read every page?

2     A.   I did.

3     Q.   And for each of the declarations, did you read

4 every page?

5     A.   I did. I believe there was four of them, yes

6 -- yes, ma'am.

7     Q.   And is the lineup procedures slash general

8 orders the only CPD policy you reviewed?

9     A.   Yes, ma'am.

10     Q.   In the opinion and order that you refer to,

11 can you clarify to what documents specifically you're

12 referring?

13     A.   Without going back and reviewing that and

14 looking at that, I cannot give an answer right now on

15 that.

16     Q.   Okay. Do you remember if it was related to

17 Mr. Johnson's criminal case?

18     A.   Again, I would have to go back and look at the

19 opinion order to give you any kind of answer on that.

20     Q.   Okay. I have the same question for the motion

21 for the discovery and additional discovery. Was that in

22 relation to Mr. Johnson's criminal case?

23     A.   Again, I would have to go back and look at --

24 look at that section.

25     Q.   Same question for the answers to discovery. Do

Page 48

1 you know if that is for the criminal case?

2     A.   Again, I would have to go back and look at the

3 documentation.

4     Q.   And then for the Aby Gonzalez communications,

5 is that the correct Bates stamp to the best of your

6 knowledge?

7     A.   The only thing I can say on that is I remember

8 was some sort of text messages between an investigator

9 and Aby Gonzalez. But to go further with that, I would

10 have to go back to that documentation and look at that.

11     Q.   Okay. Did you review any documents about

12 investigations into Detective Guevara?

13     A.   No.

14     Q.   Any FBI documents mentioning Detective

15 Guevara?

16     A.   No, ma'am.

17     Q.   Any documents related to the City's internal

18 investigation of Detective Guevara?

19     A.   No, ma'am.

20     Q.   And any post-conviction cases regarding people

21 wrongly convicted by Detective Guevara and freed by the

22 Illinois Courts?

23        MR. BRUEGGEN: Object to form. Go ahead.

24        THE WITNESS: No, ma'am.

25 BY MS. MARTINEZ:

Page 49

1     Q.   Do you know why you were not provided all the

2 Guevara CR files and any other documents related to

3 Detective Guevara's previous bad acts?

4        MR. BRUEGGEN: Object to form, speculation. Go

5    ahead and answer.

6        THE WITNESS: I received documentation.

7    Whatever documentation I received, I reviewed. And

8    that's how I formed my opinion on my report. I did

9    not give any thoughts or would I even know anything

10    about what you're bringing up in that question.

11 BY MS. MARTINEZ:

12     Q.   Okay. And the -- relatedly, is it your view

13 that the CPD'S discipline or lack thereof of Detective

14 Guevara postdating Plaintiff's arrest in this case is

15 irrelevant to your opinions in this report?

16        MS. CARNEY: Objection.

17        MR. BRUEGGEN: Object to form.

18        MS. MARTINEZ: I can -- yeah. Let me reword.

19 BY MS. MARTINEZ:

20     Q.   Is it your opinion that any investigation or

21 documents reflecting bad acts by Defendant Guevara are

22 irrelevant for the purposes of your report?

23        MR. BRUEGGEN: Object to form, foundation,

24    speculation. Go ahead, sir.

25        THE WITNESS: So I received -- again, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

```
 1    received the documentation.  I did not have any
 2    opinion except the documentation that I read in
 3    which I read each page and I formed my report or I
 4    formed an opinion.  I wrote it on my report.  I did
 5    not give any thoughts to -- and again, that -- that
 6    long sentence that you just gave at me, so.
 7  BY MS. MARTINEZ:
 8    Q.  Okay.  Did you review any expert reports in
 9  this case other than Mr. Tiderington's, which you list
10  in your materials?
11    A.  No.  Tiderington was the only -- oh, I'm
12  sorry.  I apologize.  There was another one.  Ralph
13  Rider's gang expert report, I did review.
14    Q.  Yes.  Okay.  So just for clarification, you
15  did not reveal the Dysart report on eyewitness
16  identifications dated March 8th of 2023; is that
17  correct?
18    A.  What was the first -- is that a name?
19    Q.  Dysart.  Yes.
20    A.  I don't know a Dysart.  I -- first I'm hearing
21  of that.
22    Q.  Okay.  And you did not review the Nancy
23  Stubley report on eyewitness lineup identifications
24  dated March 1st of 2023; is that correct?
25    A.  Correct.  I don't know that name either.
```

Page 51

```
 1    Q.  Okay.  Did you review any other depositions
 2  other than those listed on your report?
 3    A.  No.  Just the depositions that are listed on
 4  B1 and the three on B2.  No other depositions.
 5    Q.  And your report doesn't rely on any academic
 6  paper article or other publication on policing
 7  practices; is that correct?
 8    A.  No, just what I read in the documentation that
 9  was sent to me.
10    Q.  Okay.  Are you aware that Plaintiff Demetrius
11  Johnson received a Certificate of Innocence in this
12  case?
13    A.  I believe I read that somewhere in the
14  documentation that was provided to me.  But without --
15  I'm looking at my --
16    Q.  Please.
17    A.  -- documented index.  Now it was somewhere --
18  I did -- I did read that somewhere, but again, I don't
19  know what document that was on.
20    Q.  Okay.
21    A.  Without me going back and -- and going through
22  all the documents.
23    Q.  Okay.  And so just to clarify, you did not
24  read or review his certificate of innocence petition?
25  That's the first question.
```

Page 52

```
 1    A.  Can you --
 2    Q.  Yeah, apologies.  Strike -- yeah.  Strike that
 3  question.  So to clarify, you did not review his
 4  Certificate of Innocence petition, correct?  Plaintiff's
 5  Certificate of Innocence petition?
 6    A.  Again, I remember reading something.  I don't
 7  know the exact title of that documentation was.  I'm
 8  trying to look at my document index, but nothing is
 9  ringing a bell on what document that would be on.  But
10  it was in some sort of documentation that I did receive.
11    Q.  Okay.  And do you recall ever reviewing his
12  certificate of innocence order that was issued by the
13  judge?
14    A.  I -- I cannot answer that.  I do not know
15  without going back to the document.
16    Q.  Do you think that the State's finding of
17  innocence would be relevant for your review of the
18  investigation of the officers?
19      MR. BRUEGGEN:  Object to form.  Speculation.
20      THE WITNESS:  So again, I took all the
21    documentation that I received and I went through the
22    CPD, Chicago Police Department reports.  I looked at
23    their investigation and that's the opinion that I
24    formed on the investigation.
25  BY MS. MARTINEZ:
```

Page 53

```
 1    Q.  Okay.  And as you sit here and I tell you that
 2  the Certificate of Innocence Order found that the
 3  officers did commit a Brady violation, would that affect
 4  your opinion?
 5      MR. BRUEGGEN:  Objection.  Form.
 6      THE WITNESS:  Answer?
 7      MR. BRUEGGEN:  Go ahead.
 8      THE WITNESS:  Again, I'm going to go -- I'm
 9    going to defer back to my other answer is -- is I
10    was provided with this documentation.  I looked at
11    the investigation as a whole, and that's the opinion
12    that I came up with.
13  BY MS. MARTINEZ:
14    Q.  All right.  Just a few more questions about
15  the materials that you reviewed.  To clarify, you did
16  not review the detective division standard operating
17  procedures from 1988; is that correct?
18    A.  Again, I -- I would have to look.  I don't
19  believe so unless it was in -- I apologize.  I'm going
20  to look here really quick.
21    Q.  No, please.  Please do.
22    A.  Unless something was in the Chicago Police
23  Department lineup procedure general orders, which is I
24  believe the sixth line down, I -- if it was in there,
25  then I reviewed it.  But without reviewing that
```



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 17 of 114 PageID #:53928
Video Deposition of RONALD S MUICH, taken on November 15, 2023

54..57

Page 54

1  documentation right now, I cannot answer your question.
2      Q.   Okay.  I can tell you it is not included in
3  that document.
4      A.   Okay.
5      Q.   And last one, did you review Special Orders
6  83-1?
7      A.   Special Orders 83-1 does not ring a bell with
8  my documentation.  I -- that's the first I've ever heard
9  of Special 83-1.
10     Q.   Okay.
11     A.   I think that would've been an easy one to
12  remember.
13     Q.   Is that the same for 83-2?
14     A.   Yes.  I don't -- first I'm hearing of that.
15     Q.   Okay.  And lastly, is that the same for 86-3?
16     A.   First I'm hearing of that.
17     Q.   Okay.  Great.
18         MS. MARTINEZ:  Okay.  Do the parties want to
19  take a quick five-minute break?
20         MR. BRUEGGEN:  Yeah, that would be great.
21         MS. MARTINEZ:  Okay.  So it's 11:01.  We'll go
22  off and we'll come back 11:06?
23         MR. BRUEGGEN:  Sounds good.
24         THE WITNESS:  Thank you.
25         MR. BRUEGGEN:  Okay.  No problem.

Page 55

1          THE REPORTER:  We're going off record.  The
2  time is 11:01 a.m. Central.
3          (OFF THE RECORD)
4          THE REPORTER:  Okay.  We are back on record for
5  the deposition of Ronald Muich, being conducted by
6  video conference.  My name is Kyra Tate.  Today is
7  November 15, 2023.  The time is 11:07 a.m. Central.
8  BY MS. MARTINEZ:
9      Q.   So Mr. Muich, now I want to start getting into
10  the substance of your report.  So first, you are not
11  giving opinions in your report about CPD policies or
12  widespread practices as being appropriate or not,
13  correct?
14     A.   That is correct.
15     Q.   And you're not giving opinions in your report
16  about training of Chicago Police officers?
17     A.   Correct.
18     Q.   You're not giving opinions in your report
19  about homicide file retention policies, correct?
20     A.   That is correct.
21     Q.   And you're not giving opinions in your report
22  about the truth of the facts of Demetrius Johnson's
23  case; is that correct?
24         MR. BRUEGGEN:  Object to form.  Go ahead and
25   answer.

Page 56

1          THE WITNESS:  Can you rephrase that question --
2   question please?
3  BY MS. MARTINEZ:
4      Q.   Yes.  You -- in formulating your opinion, you
5  worked off of the documents that you received; is that
6  correct?
7      A.   That is correct.
8      Q.   And it wasn't part of your opinion on
9  whether or not the facts as you reviewed them were
10  truthful or untruthful; is that correct?
11     A.   I just went off the documentation that was
12  sent to me, reviewed the documentation, and that's how I
13  formed my opinion.
14     Q.   Okay.  And you're not giving an opinion in
15  your report about who killed Edwin Fred; is that
16  correct?
17     A.   Again, I am reading the reports, I'm looking
18  at the investigation, and I'm giving my opinion on the
19  investigation.
20     Q.   And you're not giving an opinion in your
21  report about whether there was probable cause to arrest
22  Mr. Johnson; is that correct?
23     A.   So again, I'm reading my report, I'm looking
24  at the full investigation, and I'm giving an opinion on
25  the investigation.

Page 57

1      Q.   You are not giving an opinion in your report
2  about whether Mr. Johnson was wrongly prosecuted or
3  convicted; is that correct?
4          MR. BRUEGGEN:  Object to form.  Go ahead.
5          THE WITNESS:  Again, same answer.  I'm looking
6   at the investigation, reviewing the documents, and
7   giving an opinion.
8  BY MS. MARTINEZ:
9      Q.   You're not giving an opinion in your report
10  about whether Mr. Johnson is innocent or guilty; is that
11  correct?
12     A.   Again, reviewing the documents and giving an
13  opinion on the documents that I've reviewed.
14     Q.   Okay.  Does the fact that he was granted a
15  Certificate of Innocence by the state of Illinois
16  suggest to you that he is, in fact, innocent?
17         MS. CARNEY:  Object to form.  Asked and
18   answered.  Go ahead.
19         THE WITNESS:  Again, I'm reviewing the
20   documents that were sent to me and I'm forming an
21   opinion on the documents that I reviewed.
22         MR. BRUEGGEN:  Alyssa, you're on mute.
23         MS. MARTINEZ:  Thank you.  I accidentally
24   pressed the space bar.  I do that all the time.
25  BY MS. MARTINEZ:



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 18 of 114 PageID #:53929
Video Deposition of RONALD S. RUFO, Taken November 15, 2023

58..61

Page 58

1     Q.   Okay.  You are not giving any opinion about
2  whether Rey Guevara engaged in a pattern of misconduct;
3  is that correct?
4     A.   Again, same answer.  I reviewed the
5  documentation that was sent to me, reviewed all the
6  documentation and wrote my report on reviewing the
7  documentation.
8     Q.   All right.  You are not giving any opinion
9  about whether Rey Guevara should have been disciplined
10  in general by the Chicago Police Department; is that
11  correct?
12     A.   Same answer.  Reviewed my documentation and
13  wrote my report.
14     Q.   Okay.  And you're not giving any legal
15  conclusions in your report; is that correct?
16     A.   Again, reviewed documentation, gave an opinion
17  in the report.
18     Q.   Okay.  And so now I want to get into the
19  opinions you are giving.  So on page 3, that first full
20  paragraph.  And please take as much time as you need to
21  flip to the relevant section.  So in that first full
22  paragraph, you detail how Bryan Johns, Elliot Berverena,
23  and Jose Medina were picked up along with a handgun from
24  the vehicle that they were found in; is that correct?
25     A.   So I believe the names that you are saying, I

Page 59

1  did not put those names in the -- in my report.  Can you
2  clarify that?
3     Q.   Yes.  The two other men he was found, those
4  are their names, but --
5     A.   Okay.
6     Q.   -- I can -- with that aside, is the other
7  information contained in that paragraph?
8     MS. CARNEY:  Object to form.  On can you repeat
9  the question?
10  BY MS. MARTINEZ:
11     Q.   Yes.  In that first full paragraph on Page 3,
12  you detail how Bryan Johns and the two men he was found
13  with were picked up along with a handgun from the
14  vehicle they were found in; is that correct?
15     A.   That is correct.
16     Q.   Okay.  And is it fair to say that under
17  standard policing practices in the early '90s, if three
18  people matching the initial description coming in about
19  the perpetrators of a shooting were found, and one of
20  those people was ID'd by a witness, that officers would
21  investigate those individuals?  Is that a fair
22  statement?
23     MR. BRUEGGEN:  Object to form.
24     THE WITNESS:  I'm going to have to have you
25  repeat the question because you put about three

Page 60

1  questions in one question.  So I want to make sure
2  that I understand the complete question.
3  BY MS. MARTINEZ:
4     Q.   Okay.  So is it fair to say that under
5  standard policing practices in the early '90s, if three
6  individuals were found that matched the description of
7  three people who committed a crime, would it be proper
8  to investigate those individuals?
9     MR. BRUEGGEN:  Object to form.  Incomplete
10  hypothetical.  Go ahead, sir.
11     THE WITNESS:  So again, I'm -- I'm taking that
12  as a hypothetical because you're talking about three
13  men that committed a crime.  So are you talking a
14  hypothetical crime or are you talking about this
15  case in general?
16  BY MS. MARTINEZ:
17     Q.   I'm talking about this case here.  I can --
18  let me reword it to make it a little easier to respond
19  to.  So would you agree that the initial reports coming
20  in, Bryan Johns and the two men he were with matched the
21  description?
22     MR. BRUEGGEN:  Object to form.  Go ahead.
23     THE WITNESS:  I would say that the information
24  that did come out, they did say that it was Lil D
25  and Bryan Johnson, and then the officer knowing a

Page 61

1  Lil D, I would say that would be correct.
2  BY MS. MARTINEZ:
3     Q.   Okay.  And then after bringing those gentlemen
4  in, would it be standard policing practices to
5  interrogate them about the shooting?
6     MR. BRUEGGEN:  Object to form.  Vague.  Go
7  ahead.
8     THE WITNESS:  It is a very vague question.  But
9  if you were going to bring somebody in and if they
10  did meet a description, you can question them.  I
11  would say that would be correct.
12  BY MS. MARTINEZ:
13     Q.   Okay.  And if one of these individuals were
14  ID'd by an eyewitness -- strike that, please.  Is it
15  standard policing practice to document leads as they're
16  received?
17     MR. BRUEGGEN:  Object to form.  Go ahead.
18     THE WITNESS:  Are you talking about back in
19  1991 or are you talking about now?
20  BY MS. MARTINEZ:
21     Q.   Yes.  That -- apologies.  Yes.  In 1991, would
22  it be standard policing practice to document leads as
23  they are received?
24     A.   Again, I would have to look at their policy to
25  see if the policy did state that they had to document



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1    every lead.  So I -- I cannot give you an accurate
2    answer right now without viewing their policy.
3        Q.   Okay.  So is it your opinion, then, that there
4    was no standard policing practice at the time around
5    investigation or -- apologies.  Strike that, please.  Is
6    it your opinion, then, that there was no standard
7    policing practice about documenting leads as they
8    received?  It was on a policy by policy basis?
9        A.   Well, I would have --
10            MR. BRUEGGEN:  Object to form.
11           MS. CARNEY:  And misstates his testimony, and
12       outside the scope of his report.  You can answer.
13       Sorry.
14           THE WITNESS:  So again, I would -- I would have
15       to look at the policy again --
16   BY MS. MARTINEZ:
17       Q.   But I'll rephrase.  In your experience, when
18   you were an officer at that time -- I believe that's
19   when you were with the auxiliary unit; is that correct?
20            1991?
21       A.   1987.
22       Q.   But in 1991 when the shooting happened, that's
23   the unit that you were with, correct?
24       A.   Yes.
25       Q.   So in your experience in 1991, was it standard

Page 63

1    policing practice to document leads?
2            MS. CARNEY:  Object to form.
3            THE WITNESS:  So in 1991 --
4    BY MS. MARTINEZ:
5        Q.   Apologies.  I missed --
6        A.   So in 1991, I was an auxiliary officer, so I
7    would not be able to answer that question because I
8    wasn't involved in arrests.  I was doing traffic control
9    and patrol in the village and following the school bus
10   and making sure that the kids got home safe.  So I cannot
11   answer that 1991 on my own personal experience.
12       Q.   So you don't have -- just, sorry, just for
13   clarification.  So you don't have an opinion on what the
14   prevailing practice was in 1991 regarding documenting
15   leads?
16            MR. BRUEGGEN:  Object to form.
17            THE WITNESS:  Correct.
18   BY MS. MARTINEZ:
19       Q.   Okay.  In your experience in 1991, was it
20   standard policing practices for detectives to take notes
21   of interviews that they had with witnesses or suspects?
22       A.   It would depend.  It would depend on the
23   interview.  Some took notes.  Some didn't take notes.  I
24   -- I -- I can't answer that one way or the other.
25       Q.   Okay.  So it's your opinion that there was no

Page 64

1    prevailing practice in 1991 around whether detectives
2    took notes of interviews with witnesses or suspects?
3            MR. BRUEGGEN:  Object to form.  Misstates his
4       testimony.
5            THE WITNESS:  Answer?
6            MR. BRUEGGEN:  Yeah.
7            THE WITNESS:  Correct.
8    BY MS. MARTINEZ:
9        Q.   Okay.  In your experience, is it standard
10   policing practice -- strike that, please.  In your
11   experience, was it standard policing practice in 1991 to
12   check the alibis of individuals suspected of committing
13   a crime?
14            MR. BRUEGGEN:  Object to form.  Incomplete
15       hypothetical.  Go ahead, sir.
16            THE WITNESS:  And again, I would have to
17       hearsay 1991.  With my experience, I would have to
18       go to 1995 because that's when I became a full-time
19       police officer and actually engaged in those kind of
20       jobs, but it would depend.  It would depend on the
21       interview and on witnesses.  It would just -- it
22       would just depend.  So it's -- it's too broad of a
23       question.
24   BY MS. MARTINEZ:
25       Q.   In your experience in 1991, would it be

Page 65

1    standard policing practice to search the area where
2    suspects were picked up that were -- strike that,
3    please.  In your experience in 1991, would it have been
4    standard policing practice to conduct a search of the
5    area where suspects were picked up that were -- that
6    officers suspected committed a homicide?
7            MR. BRUEGGEN:  Object to form.  Incomplete
8       hypothetical.  Go ahead, sir.
9            THE WITNESS:  So again, it just depends on the
10      situation.  It depends on what information they're
11      receiving.  Again, it's a very broad question.
12   BY MS. MARTINEZ:
13       Q.   So specifically in this case, you offer no
14   opinion about why the officers did not search the
15   building that Mr. Johns and his two associates were
16   found in; is that correct?
17       A.   Well, it's not that I'm not going to give an
18   opinion.  Again, you have to look at the whole
19   investigation like I looked at, that you're getting that
20   broadcast, and again, when the broadcast is coming out,
21   it's changing literally second by second, minute by
22   minute.  So just to say that officers are going to go
23   into a building and search it just because someone came
24   out, again, it's a very broad question.  It's not as
25   black and white as -- as you're giving me the question.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    So it would just, again depend on the situation.  And
2    again, I wasn't there in 1991.  I only can go according
3    to what I reviewed in the reports.  And so I -- I -- I
4    cannot answer that.  You know, that they should've went
5    a building, they shouldn't have went a building, what
6    they should've did.  I hope that answers your question.
7        Q.   Yes.  I just want to clarify that in your
8    report, you don't offer an opinion about why those
9    officers did or did not enter that building; is that
10   correct?
11       A.   That is correct.
12       Q.   Okay.  I'm now going to share my screen again.
13   Let's mark this Exhibit 2.  And Mr. Muich, I'd like to
14   draw your -- are you able to see the document?
15            (EXHIBIT 2 MARKED FOR IDENTIFICATION)
16            THE WITNESS:  Yes.
17   BY MS. MARTINEZ:
18       Q.   Okay.  So I'd like to draw your attention to
19   quote, Daley sees Bryan Johns, Lil D, leaving a van with
20   two male Hispanics with a gun found in the car.  Well,
21   no, it's not the same gun.  It couldn't have been.  One
22   is a .25.  One is a .38.  One is automatic and one is
23   a revolver.  Do you see that section right here, sir?
24       A.   I do.
25            MR. BRUEGGEN:  And Alyssa, I just gave him a

Page 67

1    hard copy of the Exhibit 2 that you guys saw this
2    morning.
3    BY MS. MARTINEZ:
4        Q.   Perfect.  Okay.  Thank you.  I'm going to stop
5    the share then just to make it easier for the video.  In
6    your report, page 3 in paragraph 1, you only discussed
7    one gun that was found and the test results for that
8    gun; is that correct?
9        A.   That is correct.
10       Q.   Okay.  Were you told by anyone to assume that
11   there was only one weapon?
12       A.   I was not.
13       Q.   What is your factual basis for assuming there
14   was only one?
15       A.   I would have to go back to the CPD report and
16   actually see that section with the van and the gun.  But
17   without going back to that section, I would not be able
18   to answer that question.
19       Q.   Okay.  With that aside, do you agree that in
20   1991 it would be standard policing procedures to test
21   every weapon that was brought in by officers that would
22   match the weapon used to commit a crime?
23            MR. BRUEGGEN:  Object to form.  Incomplete
24       hypothetical.  Go ahead.
25            THE WITNESS:  I would say that weapons would

Page 68

1    probably be sent down to the crime lab for
2    examination.
3    BY MS. MARTINEZ:
4        Q.   Okay.  And assuming for a moment that both
5    guns were recovered and only one were tested, would that
6    change your opinion on whether a proper investigation
7    was conducted as it pertains to Mr. Johns and the two
8    men he was found with?
9            MR. BRUEGGEN:  Objection, incomplete
10       hypothetical.  Are you asking him to assume there
11       were two guns found?
12            MS. MARTINEZ:  Yes.
13            MR. BRUEGGEN:  Oh.  Same objection.  Go ahead.
14            THE WITNESS:  Can you repeat the question
15       please?
16   BY MS. MARTINEZ:
17       Q.   Yes.  So if it were true that two guns were
18   found as that testimony states instead of one, would
19   that change your opinion at all concerning whether there
20   was a proper investigation conducted into Mr. Johns and
21   the two men he was with?
22            MR. BRUEGGEN:  Objection.  Incomplete
23       hypothetical.  Go ahead, sir.
24            THE WITNESS:  So again, you're giving me a
25       hypothetical situation.  If two guns were found, I

Page 69

1    would say both guns would go to the crime lab.  If
2    three guns were found, three guns would go to the
3    crime lab or more investigation would occur.
4    BY MS. MARTINEZ:
5        Q.   Okay.  So just for a -- just for a clean
6    transcript, if that testimony were true and two guns
7    were found, you would expect that under standard
8    policing procedures, both of those guns would be tested;
9    is that correct?
10       A.   Again, you're giving me a hypothetical
11   situation and you're saying two guns.  And if, you know,
12   and -- and I'm not trying to be smart back at you, but
13   if -- if one gun was a -- and I'm going to go on -- on
14   this hard copy, I have a .25 and one gun was a bazooka,
15   I don't think they would send the bazooka to the crime
16   lab.  And again, I'm not being smart with you.  I'm
17   trying to get my point to you.  So again, you're giving
18   me a hypothetical situation and I don't think I could
19   fairly answer that question because you're just saying
20   two guns.
21       Q.   Okay.  To your response, if that bazooka was
22   a .38, do you think that that gun would be tested?
23            MR. BRUEGGEN:  Objection, incomplete
24       hypothetical.  Answer.
25            THE WITNESS:  I mean, I -- I can't say if it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 21 of 114 PageID #:53932
Video Deposition of RONALD S. MUNCY, taken on November 15, 2023

70..73

Page 70

1  would be tested or not.  It just depends on the
2  whole investigation.  And again, the hypothetical, I
3  -- I -- I can't answer that question.
4  BY MS. MARTINEZ:
5      Q.   Okay.
6           MR. BRUEGGEN:  And Alyssa, just for the record,
7  did you say whose testimony that was?  Because I
8  just have an excerpt.  So -- just so I'm clear.
9           MS. MARTINEZ:  Yes.  Oh, apologies.  I -- my
10 notes are -- I will get that information on the next
11 break and I'll get that over to you and put it on
12 the record.  It's --
13          MR. BRUEGGEN:  Great.  Thank you.
14          MS. MARTINEZ:  -- having some trouble.  Yeah,
15 no problem.
16 BY MS. MARTINEZ:
17     Q.   Okay.  Let me just -- okay.  So now I'd like
18 to look at Page 3, the second full paragraph on Page 3.
19     A.   Okay.
20     Q.   And this is where you described two lineups
21 that occurred the night of June 12, 1991; is that
22 correct?
23     A.   Correct.
24     Q.   Okay.  So I'm going to share my screen again
25 and let's mark this as Exhibit 3.  Okay.

Page 71

1           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
2           MR. BRUEGGEN:  Alyssa, can you tell us what
3  page that is?  Is that RFC Johnson 26?
4           MS. MARTINEZ:  Yes.  This is RFC Johnson 26,
5  correct.
6  BY MS. MARTINEZ:
7      Q.   Okay.  Let me know when you have that in front
8  of you, and I'm also sharing my screen.
9      A.   Yes, I have it in front of me.
10     Q.   Okay.  So you reviewed this document, correct?
11     A.   Correct.
12     Q.   Okay.  And you see where it says the time for
13 the lineup, would you agree that that says 22:30?
14     A.   I'm trying to find where you're at.
15     Q.   Apologies, right here.
16     A.   Yes, ma'am.
17     Q.   Okay.  And then would you agree that for
18 Forrest Garnett, it says he viewed the lineup at 22:37?
19     A.   Yes, I see that.
20     Q.   Okay.  Would you agree that for Rosa Burgos,
21 it says that she viewed the lineup at 22:40?
22     A.   I see that.
23     Q.   Would you agree that for Aby Gonzalez, it says
24 he viewed the lineup at 22:43?
25     A.   Yes, ma'am.

Page 72

1      Q.   Okay.  Let me scroll -- would you agree that
2  for Rosaline Morales, it says that she viewed the lineup
3  at 23:50?
4      A.   Yes, ma'am.
5      Q.   Would you agree that for Angel Cordova, it
6  says he viewed the lineup at 23:55?
7      A.   Yes, ma'am.
8      Q.   And lastly, for Fina Montanez, would you agree
9  that it says she viewed the lineup at 1:15?
10     A.   Yes, ma'am.
11     Q.   Okay.  And would you agree that this report
12 has the information of the fillers contained in the
13 section where it says "persons participating in lineup"?
14     A.   Yes, ma'am.
15     Q.   Okay.  And would you agree that it says
16 "person identified in lineup number two, Bryan Johns"?
17     A.   Yes, ma'am.
18     Q.   And would you agree that on the third
19 paragraph in history and investigation, it says, "Aby
20 Gonzalez then viewed the lineup.  He viewed the lineup
21 as the participants were sitting side by side in chairs.
22 The participants were not required to make any movements
23 or repeat any phrases.  After viewing this lineup, he
24 identified the number two participant Bryan Johns as the
25 offender and said homicide." Do you see that part?

Page 73

1      A.   I do.
2      Q.   Okay.  And lastly, would you agree that this
3  document does not have any stamp that says "permanent
4  retention file" on it?  Feel free to take your time to
5  look at it.
6      A.   So I'm looking at the -- the first page you
7  put -- okay.  This one here?
8      Q.   Yes.  Either page.
9      A.   That is correct.
10     Q.   Okay.  And this is what you refer to in your
11 report as the Erickson report, the report drafted by
12 defendant Erickson; is that correct?
13     A.   I apologize.  I'm looking at my report.
14     Q.   I suppose back to the document, would you
15 agree that here it says the reporting officer printed
16 name is Detective William Erickson?
17     A.   It appears.  I see the first two letters.  It
18 looks like a W.M.  And then it looks like it's an E.  I
19 mean -- I would have to say they --
20     Q.   Yes.  One lineup.  Does it say that the
21 reporting officer was Detective W.M. Erickson?
22     A.   Yes, ma'am.
23     Q.   Okay, perfect.  All right.  I'm going to
24 briefly stop sharing and then actually re-share Exhibit
25 -- well, what we can please mark as Exhibit number 4.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    (EXHIBIT 4 MARKED FOR IDENTIFICATION)
2    MR. BRUEGGEN: Is that RFC Johnson 40?
3    MS. MARTINEZ: Yes. 40 and -- apologies. 40
4    through 43.
5  BY MS. MARTINEZ:
6    Q. Okay. You reviewed this document, correct --
7    apologies. Strike that, please. You reviewed this
8    document, is that correct, Mr. Muich?
9    A. Correct.
10   Q. All right. And do you see where it says the
11   time for the lineup right here?
12   A. I do.
13   Q. Would you agree that it says "23:00 hours"?
14   A. Correct.
15   Q. Okay. And would you agree that this document
16   does not have the times that the persons viewing the
17   lineup, viewed the lineup?
18   A. Yes, there is no time.
19   Q. Okay. And would you agree that the date that
20   this report was submitted, I think that's Box 91, it's a
21   very small print, was June 12, 1991?
22   A. Correct.
23   Q. Okay. And would you agree that it appears
24   that the report was approved on July 24, 1991? I
25   believe that's box 95?

Page 75

1    A. Correct.
2    Q. Okay. And then scrolling down to the third
3    page, so RFC Johnson 42, would you agree that it says
4    "persons identified in lineup: negative
5    lineup"?
6    A. Correct.
7    Q. And lastly, would you agree that there is a
8    stamp on this file that says permanent retention file?
9    A. Correct.
10   Q. Okay. And then so last question for this
11   document.  Would you agree that the reporting officer as
12   listed in Box 93 is Detective Reynaldo Guevara?
13   A. Correct.
14   Q. Okay. Thank you, sir. Stop sharing. Okay.
15   So we have these two separate reports detailing lineups
16   that happened within half-an-hour of each other with
17   four witnesses from the first set being put in the
18   lineup in the second. Does that sound correct to you?
19   MR. BRUEGGEN: Object to form.
20   THE WITNESS: I'm going to need you to --
21   MS. MARTINEZ: I can --
22   THE WITNESS: -- rephrase that, please.
23   BY MS. MARTINEZ:
24   Q. Okay. So we have these two separate reports
25   that detail lineups approximately half an hour apart; is

Page 76

1    that correct?
2    MR. BRUEGGEN: Alyssa, I'm going to give him
3    both so he can reference them.
4    MS. MARTINE: Okay, perfect. Thank you.
5    THE WITNESS: Yes, that is correct.
6  BY MS. MARTINEZ:
7    Q. Okay. And would you agree that of the six
8    witnesses that saw the first lineup, the second report
9    lists four of those witnesses as doing that lineup?
10   A. That is correct.
11   Q. Okay. And in your report, you don't offer any
12   opinion as to whether either of these lineups actually
13   happened; is that correct?
14   MR. BRUEGGEN: Object to form.
15   BY MS. MARTINEZ:
16   Q. I can rephrase it. In your report, you're
17   assuming that both of these lineups happened; is that
18   correct?
19   MR. BRUEGGEN: Object to form.
20   THE WITNESS: Well, I don't want to use the
21   word assumed. I'm going by the CPD reports with the
22   documentation that does state that both these
23   lineups did occur.
24   BY MS. MARTINEZ:
25   Q. And as pertaining to the second lineup, did

Page 77

1    you find any other factual support in the record that
2    that second lineup did occur? This is Exhibit 4.
3    A. Just with the documentation that I reviewed.
4    Q. In Exhibit 4, that report?
5    MR. BRUEGGEN: Go ahead.
6    THE WITNESS: That is correct.
7  BY MS. MARTINEZ:
8    Q. Okay. And then -- sorry, I don't mean to have
9    you flipping between so many documents, but Page 11 in
10   your report.
11   A. Okay. Page 11.
12   Q. Second full paragraph. Yes. Let me know when
13   you're there.
14   A. Second full paragraph?
15   Q. Yes.
16   A. Okay. I'm there.
17   Q. Okay. So there's a part where you say the
18   detectives decided to do a second lineup so they could
19   be certain that they had a good identification made
20   against the suspect. Do you see that?
21   A. I do see that.
22   Q. Okay. Would you agree that there is nothing
23   in the record that explains why a second lineup might've
24   been run?
25   A. Correct.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    Q.   Okay.  And in that same paragraph you state,
2  regardless, running additional lineups with the same
3  witnesses indicates that there was some concern about
4  the propriety of the first lineups.  Do you see that?
5    A.   Yes, I do.
6    Q.   Okay.  And similarly, would you agree that
7  there is nothing in the record that explains why a
8  second lineup might've been run with the same witnesses
9  and the same suspect?
10   A.   Correct.
11   Q.   Okay.  And now I'm going to share my screen
12 one more time and then I promise we'll have a quick
13 break from it.  I'm going to share Mr. Tiderington's
14 report on Page 19.  This is Exhibit 5.  Make sure it's -
15 - okay.
16         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
17       THE WITNESS:  Page 19; is that correct?
18 BY MS. MARTINEZ:
19   Q.   Yes.  I found it and also brought it up, if
20 that's easier.  I'm referring to the last paragraph on
21 Page 19 that says, all of this is in addition to the
22 positive identification documented in the Erickson
23 report.  I note that it would be highly suspicious and a
24 gross deviation from accepted police practices to
25 conduct two lineups within a half hour of each other

Page 79

1  with the same witnesses.  In my 40 years of police
2  experience, I have never heard of two lineups being
3  conducted so close in time.  There is no reasonable
4  explanation for such a procedure.  This, in addition to
5  the evidence above corroborating Erickson's lineup
6  report and contradicting Guevara's lineup report leads
7  me to question whether the lineup conducted by Guevara
8  and documented in his report may not have happened at
9  all.  Do you see that section?
10   A.   I do.
11   Q.   Okay.  And so then my question for you, I
12 think I can stop sharing this.  So my question is, if
13 the report drafted by Defendant Guevara had been
14 fabricated and that lineup did not happen, would that
15 change your opinion about whether the defendants
16 properly investigated Mr. Johns and his two associates?
17       MR. BRUEGGEN:  Object to form.  Incomplete
18 hypothetical.  Answer.
19       THE WITNESS:  So again, I'm going off of the
20 CPD records.  I do not know why there were two
21 lineup reports made.  I do give an opinion in my
22 report possibly what could have happened.  I've also
23 gave some details during my experience as a
24 detective why I reran lineups.  I did not give an
25 opinion on Mr. Tiderington's section that you just

Page 80

1  read.  But again, this is Mr. Tiderington's opinion,
2  and if he's calling in a gross whatever he called
3  it, that's his opinion.  And again, I'm only going
4  according to the CPD reports, my experience, and I
5  do give examples of -- I've seen lineups being
6  rerun.  So I hope that answers your question.
7  BY MS. MARTINEZ:
8    Q.   Not exactly.  So my question posed to you was,
9  if that report drafted by Defendant Guevara had been
10 fabricated and that second lineup had not occurred,
11 would that change your opinion in any way about whether
12 the investigation by defendant officers into Mr. Johns
13 was appropriate?
14       MR. BRUEGGEN:  Object to form.
15       THE WITNESS:  But again, you're giving me a
16 hypothetical situation.  I'm only going according to
17 the CPD reports and what I'm -- I am reviewing.
18 Nothing in this report says that the lineup was
19 fabricated.  So again, you're giving me a
20 hypothetical situation.
21 BY MS. MARTINEZ:
22   Q.   I am, but I'm asking you to answer that
23 hypothetical situation.
24   A.   And -- and again, I don't -- I don't -- I
25 don't want to say feel comfortable saying, giving you an

Page 81

1  answer on that.  But again, I'm going off of what I
2  reviewed on the CPD reports.  Yes, I do have two lineup
3  reports.  We don't know what the reason is, why there's
4  two lineup reports, but I'm only going according to what
5  the CPD reports I reviewed.  I can't say that they were
6  right.  They were wrong.  I -- I can't give an answer to
7  a hypothetical situation.
8    Q.   Okay.  So just for the record, you're choosing
9  not to respond to that hypothetical question?
10       MR. BRUEGGEN:  Objection.  Misstates his
11 testimony.
12       THE WITNESS:  Answer?
13       MR. BRUEGGEN:  Yeah.  You can answer.
14       THE WITNESS:  Again, it's a hypothetical
15 situation.  And again, I -- I'm only giving my
16 opinion on what I viewed and -- and reviewed in the
17 reports and this one we're talking about, the CPD
18 records and we're talking I believe what's Exhibit 3
19 and 4, which are two lineup reports.  Again, there's
20 no documentation why there were two lineup reports.
21 So I can't say -- in a hypothetical situation, I
22 cannot answer why there were two lineup reports.
23 BY MS. MARTINEZ:
24   Q.   Right.  And that's not the question that I'm
25 asking you.  In the hypothetical, I'm asking that if



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 24 of 114 PageID #:53935
Video Deposition of RONALD S WATD, taken on November 15, 2023
82..85

Page 82

1  that second report, Exhibit 4, by Defendant Guevara were
2  fabricated, would that change your opinions in your
3  report?
4       A.   But I would have to --
5            MR. BRUEGGEN: Object to form. And I need to
6       clarify. She wants you to assume that the Guevara
7       report was fabricated.
8            THE WITNESS: Okay.
9            MR. BRUEGGEN: Am I correct there?
10           MS. MARTINEZ: Yes.
11           MR. BRUEGGEN: That's, I think the -
12      disconnect, if you will. Okay. So --
13           THE WITNESS: Okay. So if you're -- you're
14      saying that if the Guevara -- hypothetically if the
15      Guevara report was fabricated?
16  BY MS. MARTINEZ:
17      Q.   Yes, sir. Would that affect your opinions
18  that you gave in the report as to whether Mr. Johns was
19  fully and appropriately investigated?
20      A.   Well, if it -- if there was proof or there was
21  documentation that the report was fabricated, then my
22  opinion would be that, of course, there was something
23  wrong with the -- with the lineup report that if the
24  report -- if there's documentation that he lied on the
25  report, it would change my opinion. But again, we're in

Page 83

1  a hypothetical situation. I did not view anything in
2  the CPD reports stating that this report -- lineup
3  report was fabricated. So I just want to be sure,
4  because again -- again, I'm not trying to go back and
5  forth with you. I just want to be sure that I'm saying
6  it in a hypothetical situation.
7       Q.   No. Thank you, sir. I appreciate you
8  answering the question. And kind of a follow-up to that
9  question. Assuming Exhibit 4 were fabricated, would it
10  change your opinion in relation to Defendant Guevara and
11  whether he committed misconduct in connection with that
12  report?
13      A.   Again, going back to the same situation, if
14  there was documentation that I reviewed that the report,
15  the lineup report -- report was fabricated, yes, it
16  would change my opinion. But again, I would have to see
17  the proof. We're talking in a hypothetical situation.
18      Q.   Okay. So back to your report on Page 3 in the
19  third full Paragraph -- I'll give you a second to flip
20  back.
21      A.   Okay. I'm back.
22      Q.   Okay. So you describe how Elba and Angel
23  identified Mr. Johnson in the three-man photo; is that
24  correct?
25      A.   Correct.

Page 84

1       Q.   Okay. And then on Page 7 in the third full
2  paragraph, you say it was good police work to then show
3  Elba the three person photo containing Demetrius
4  Johnson. Do you see that?
5       A.   I do.
6       Q.   Okay. So I'm going to bring up the photo that
7  was shown to Elba. We'll mark this as Exhibit 6. Is
8  this the photo that you were referring to, sir?
9            (EXHIBIT 6 MARKED FOR IDENTIFICATION)
10           THE WITNESS: Yes, it is. Okay.
11           MR. BRUEGGEN: Melissa, we have a hard copy of
12      that. Is it all four pages that we saw or?
13           MS. MARTINEZ: Just the first page for this
14      purpose.
15           MR. BRUEGGEN: Okay.
16           THE WITNESS: First page? Got it.
17  BY MS. MARTINEZ:
18      Q.   Yes. Okay, perfect. So I'm going to take the
19  photo down for a second, but I'm going to bring it back
20  up in just a moment. Would you agree that it's
21  important to choose fillers that resemble a suspect when
22  you're doing lineups?
23           MR. BRUEGGEN: Object to form. Incomplete
24      hypothetical.
25           THE WITNESS: You're going to -- can you

Page 85

1  rephrase that for me, please?
2  BY MS. MARTINEZ:
3       Q.   Yes. In your experience, would it be in line
4  with standard policing practices to choose fillers that
5  look like a suspect?
6       A.   To the best of your --
7            MR. BRUEGGEN: Objection. Form. Incomplete
8       hypothetical. Go ahead, sir.
9            THE WITNESS: To the best of your ability, yes.
10  BY MS. MARTINEZ:
11      Q.   Okay. And why is that important?
12      A.   Because you want to be sure that you show
13  whoever you're showing a lineup to a fair lineup. You
14  want to be sure that they, best of your ability, that
15  they do look alike, you don't want to put anything
16  that's going to, you know, hinder the photo lineup with
17  the witness.
18      Q.   And would you agree that this applies to
19  fillers for both in-person lineups and also photo
20  lineups and photo arrays?
21      A.   Correct.
22      Q.   Okay. And so I'll bring the photo back up
23  now. So if the description of a suspect was that the
24  suspect was a person who was short, young and black, do
25  you agree you would want to find other individuals who



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 25 of 114 PageID #:53936
Video Deposition of RONALD S MUNCY, taken on November 15, 2023
86..89

Page 86

1  were short, young and black?
2      MR. BRUEGGEN: Object to form. Incomplete
3  hypothetical. Go ahead, sir.
4      THE WITNESS: Are you asking me about this
5  photo in general?
6  BY MS. MARTINEZ:
7      Q.  Not yet. I'm asking -- I'm asking in general,
8  if those were the three descriptors that you received
9  about a suspect, that they were short, young and black,
10 would you want to include fillers that also were short,
11 young and black?
12     A.  Yes.
13     Q.  Okay. And so now talking about this photo
14 specifically, would you agree that Mr. Johnson is the
15 shortest person in this photo?
16     A.  Yes.
17     Q.  Okay. Would you agree that Mr. Johnson
18 appears to be the youngest person in this photo?
19     A.  That I do not agree with.
20     Q.  Okay.
21     A.  I cannot -- I cannot tell the ages of the
22 three participants that are in this photo just by
23 looking at their faces.
24     Q.  Okay. Do either of the other individuals in
25 this photo appear young to you?

Page 87

1      A.  They look young.
2      Q.  Okay. Both of them?
3      A.  Yes.
4      Q.  Okay. As young as Mr. Johnson appears?
5      A.  Again, I look at the three photos here. They
6  all appear to be young to me.
7      Q.  Okay. Would you agree that not all three men
8  have the same skin tone?
9      A.  Well, it appears that there is a little
10 differential, but the skin tone is dark.
11     Q.  Okay. And when you say differential, are you
12 referring to the differential between Mr. Johnson in the
13 middle and the man on the left?
14     A.  So the man on the left is a little lighter.
15     Q.  Okay. Apologies, sir. I didn't mean to cut
16 you off.
17     A.  No. And again, I'm looking at a -- I'm
18 looking at a photo here. You know, I don't know the
19 lighting situation. I don't know the backdrop, but to
20 me, I mean, the -- the gentleman on the left is a little
21 bit lighter and then number two and number three,
22 they're darker skin.
23     Q.  Okay. Thank you, sir. I'm going to stop
24 sharing again. Okay. So having gone through that,
25 where you -- strike that, please. So after looking at

Page 88

1  that photo, you agreed that Mr. Johnson is the shortest
2  person in the lineup and that he has a different skin
3  tone from one of the men in the photo; is that correct?
4      A.  Correct.
5      MR. BRUEGGEN: Objection, misstates his
6  testimony. Go ahead.
7      THE WITNESS: Correct. Apologize.
8  BY MS. MARTINEZ:
9      Q.  And so with that being said, is it still your
10 opinion that showing this photo to Elba was in line with
11 standards of policing in 1991?
12     A.  Yes.
13     Q.  Okay. So it's your opinion that having three
14 men who, some of which do not resemble each other or
15 fully match part of the description, is standard police
16 practices in 1991?
17     MR. BRUEGGEN: Objection, misstates his
18 testimony.
19 BY MS. MARTINEZ:
20     Q.  You can answer.
21     A.  I'm going to -- I'm going to need you to
22 rephrase. I apologize.
23     Q.  That's okay. So if your opinion is that
24 showing this photo was in line with standard policing
25 practices, is it then your opinion that having a lineup

Page 89

1  with three men, some of which -- strike that, please. So
2  we agreed that your opinion still holds that showing
3  this photo to Elba was in line with standards of
4  policing, correct?
5      A.  Correct.
6      Q.  Okay. So then is your -- is it your opinion
7  that including fillers that do not resemble the suspect
8  on some of the descriptors of that suspect is
9  appropriate under standard police procedures?
10     MR. BRUEGGEN: Objection. Form. Misstates the
11 testimony, but go ahead.
12     THE WITNESS: So -- I'm going to need you to
13 repeat that. But then I have to say that in my
14 experience, and I've given -- I've been in a lot of
15 lineups, I can't give you an exact number, and even
16 going back to 1995 when I started putting lineups
17 together, you are not going to get a lineup that all
18 five or six individuals are going to look the same.
19 It was just this is, according to my experience,
20 that there are going to be some differentials in the
21 photo. It could be talking skin color a little bit,
22 a little bit off, a little bit of weight, a little
23 bit of height. It just depends. And again, we're
24 talking back in 1991 with this photo, and 1995 again
25 with my experience. Again, I've done a lot of



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 26 of 114 PageID #:53937
Video Deposition of RONALD S. RIDER, taken 15 November, 2012

90..93

Page 90

1    lineups and when I went ahead and had to put a
2    lineup together, we were basically pulling Polaroids
3    out and trying to put up -- put a lineup together.
4    So I just want to go on record to say that there is
5    no exact science to putting a lineup together, but
6    you want to try to get it as close as you could and
7    the best that you could with the circumstances that
8    you're dealing with.
9    BY MS. MARTINEZ:
10       Q.   Okay.  A quick follow up.  Were there any
11   descriptors of a suspect that in your experience were
12   more important to match than others?
13       MR. BRUEGGEN:  Object to form.  Incomplete
14   hypothetical.  Go ahead.
15       THE WITNESS:  Maybe tattoos, scars on the face.
16   BY MS. MARTINEZ:
17       Q.   So --
18       A.   Missing body limbs.  It just -- it would just,
19   you know, if you're asking, that would -- that would --
20   what would come to mind.
21       Q.   Would race be one of them?
22       A.   Race would be one, yes.
23       Q.   Okay.  Great.  Thank you, sir.  And as it
24   pertains to this photo, I'm not going to bring it back
25   up, because we don't need to be looking at it anymore.

Page 91

1    But on July 11, 1991, Defendant Guevara supposedly
2    showed this picture to Elba Burgos and Angel Cordova
3    with both of them identifying Mr. Johnson as the person
4    who perpetrated the shooting on June 12, 1991.  Would
5    you agree that means a month had passed?
6        A.   Roughly a month, yes.
7        Q.   Okay.  And for clarification, in your report,
8    you don't make any opinions as to the decreasing
9    reliability of eyewitness identifications over time; is
10   that correct?
11       A.   I do not.
12       Q.   Okay.  But would you agree that memories are
13   fallible and eyewitness IDs could become less reliable
14   over time?
15       MR. BRUEGGEN:  Object to form.  Beyond the
16   scope of this expert.
17       THE WITNESS:  And my answer would be, I'm not a
18   memory expert, so I would have to stick to that
19   answer.
20   BY MS. MARTINEZ:
21       Q.   Okay.  In your experience investigating the
22   cases you investigated, did you ever have a situation
23   where, as time passed a witness was -- became unable to
24   identify the alleged perpetrator of a crime?
25       MR. BRUEGGEN:  Objection.  Speculation.  Go

Page 92

1    ahead and answer.
2        THE WITNESS:  I'm sure I have and I've also
3    experienced that as time went on, the witness became
4    even stronger because sometimes witnesses, they
5    witnessed a traumatic event and they were so scared.
6    And in this case, I think we could all agree that
7    this was some sort of gang related, according to
8    Mr. Rider's expert witness testimony, that a -- a
9    witness could be scared.  And -- and again, I --
10   I've ran into situations to where witnesses become
11   stronger down the road, so I -- I guess you could --
12   you could -- you could see it, I guess.
13   BY MS. MARTINEZ:
14       Q.   Okay.
15       A.   -- it looked like.
16       Q.   Okay.  I'll pause just to make sure I'm
17   understanding your testimony.  So is it your opinion
18   that in certain instances, the fear and trauma of a
19   situation can cause someone to remember the perpetrator
20   better as time goes on?
21       A.   Yes.
22       Q.   Okay.  And do you believe that the opposite
23   could also be true, that due to the fear and trauma of
24   an event, the person was more focused on that aspect and
25   thus they forget details as time goes on?

Page 93

1        MR. BRUEGGEN:  Object to form.
2        THE WITNESS:  It could happen.
3    BY MS. MARTINEZ:
4        Q.   Okay.  Thank you, sir.  As a general matter,
5    would you agree that same day identifications tend to be
6    more reliable than IDs made a month later?
7        MR. BRUEGGEN:  Object to form.  Beyond scope.
8    Go ahead -- incomplete hypothetical.  Go ahead, sir.
9        THE WITNESS:  And again, it just depends on the
10   investigation.  No two investigations are the same,
11   so it -- again, it would just depend on the -- the
12   crime, the investigation, what witnesses we're
13   dealing with, what suspects we're dealing with.  It
14   would just -- it would just depend, it would also
15   depend even internally how much manpower you would
16   have to go out and gather up all these witnesses and
17   suspects and do interviews.  So again, we're looking
18   at a whole broad scope of an investigation, but I --
19   like I said, in my, you know, almost 18 years in
20   investigations, I can say that no two investigations
21   ever were the same.
22   BY MS. MARTINEZ:
23       Q.   Okay.  Thank you, sir.  And would you agree
24   that your report offers no opinion about whether an in-
25   person lineup ID can be tainted in any way by seeing a



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 27 of 114 PageID #:53938
Video Deposition of Ronald S. Bretz, taken on November 15, 2022
94..97

Page 94

1 picture of someone in the lineup beforehand?
2     A.   That is correct.
3     Q.   So now I'd like to go to Page 4 of your
4 report, which is Exhibit 1 and the third paragraph,
5 please.  Okay.  And so apologies, the third paragraph
6 below the section titled, Rose Burgos (Witness).  And in
7 that paragraph, you state that, "Her statement alone
8 corroborates that she would be able to make an
9 identification if a suspect were presented to her via a
10 lineup or a photo array and both."  Do you see that
11 section, sir?
12     A.   Is that the one that starts, "The above
13 statement by Rose Burgos"?  Okay.
14     MS. MARTINEZ:  Perfect.  Yes.  Perfect.  Thanks,
15 David.
16 BY MS. MARTINEZ:
17     Q.   So kind of similar to my earlier questioning,
18 are there any time limits to that statement?  So I'll
19 rephrase.  This statement by Rose was made eight days
20 after the shooting; in your opinion, would Rose still be
21 able to make a clean identification two weeks later?
22     MR. BRUEGGEN:  Object to form.  Beyond his
23 opinions, but go ahead, sir.
24     THE WITNESS:  I would believe she would be able
25 to.

Page 95

1 BY MS. MARTINEZ:
2     Q.   Okay.  What about three weeks?
3     MR. BRUEGGEN:  Same objection.  Go ahead.
4     THE WITNESS:  I believe she would be able to.
5 BY MS. MARTINEZ:
6     Q.   Okay.  And then what about a month?
7     MR. BRUEGGEN:  Same objection.  Go ahead, sir.
8     THE WITNESS:  I believe she would be able to.
9 BY MS. MARTINEZ:
10     Q.   Okay.  And what about six months?
11     MR. BRUEGGEN:  Objection.  Form.  Incomplete
12 hypothetical.  Go ahead, sir.
13     THE WITNESS:  Again, I stick to the same
14 answer, I believe so.
15 BY MS. MARTINEZ:
16     Q.   Okay.  Is there any kind of end point in your
17 opinion or in your experience by which that ability to
18 make a clean identification decreases?
19     MR. BRUEGGEN:  Object to form.  Beyond his
20 opinions.  Go ahead, sir.
21     THE WITNESS:  I don't have an exact date that
22 when you would stop -- start -- or stop remembering
23 somebody's face or action so I -- I cannot answer
24 that question.
25 BY MS. MARTINEZ:

Page 96

1     Q.   Okay.  And in your experience, would it be
2 standard police practice in the early '90s to attempt to
3 evaluate whether an eyewitness was reliable and
4 truthful?
5     A.   Yes.
6     Q.   Okay.  And how would a detective go about
7 that?
8     MR. BRUEGGEN:  Object to form.  A complete
9 hypothetical.  Go ahead, sir.
10     THE WITNESS:  You could interview other
11 witnesses, you could interview people who have known
12 him or her.  It -- it just depends, it depends which
13 way the investigation is going, but there are
14 different ways.
15 BY MS. MARTINEZ:
16     Q.   Okay.  And in your experience under standard
17 police practices in 1991, would it be good practice to
18 get a description by the witness of the suspect when
19 interviewing that eyewitness?
20     MR. BRUEGGEN:  Object to form.  Incomplete
21 hypothetical.  Go ahead, sir.
22     THE WITNESS:  I would say it would be.
23 BY MS. MARTINEZ:
24     Q.   Okay.  Would it be good practice to consider
25 the motivations of the eyewitness?

Page 97

1     MR. BRUEGGEN:  Same objection.  Go ahead, sir.
2     THE WITNESS:  It could be.
3 BY MS. MARTINEZ:
4     Q.   And could -- would it be considered good
5 practice to consider the identity of the party and any
6 potential issues that person would have making a clean
7 identification?
8     MR. BRUEGGEN:  Object to form.
9 BY MS. MARTINEZ:
10     Q.   You know, for example, if they needed really
11 strong glasses and they weren't wearing their glasses
12 that night, would that be an important consideration?
13     A.   Well, again, you're -- you're -- you're giving
14 me a hypothetical.  I'm not a, nor was I ever an eye
15 optometrist or -- unless the person told me, listen, I
16 need glasses, I'm legally blind without glasses, then I
17 would take that in effect, but I can't answer that
18 question because again, I'm not an expert in eyesight or
19 optometrist.
20     Q.   Okay.  So I'm going to share my screen again
21 in what we'll mark Exhibit 7.  And that's Bates stamped
22 JGS_Johnson 1 through 310.  And I will be on Page --
23 sorry.  One second, stop sharing.  There we go.  Okay.
24 I'm on Page JGS_Johnson 66.  Let me know when you're
25 there, sir.  And I also have it up on the screen.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 28 of 114 PageID #:53939
Civil Deposition of RONALD S. WATD, taken November 15, 2023
98..101

Page 98

1    (EXHIBIT 7 MARKED FOR IDENTIFICATION).
2        MR. BRUEGGEN:  Is it JGS_Johnson, what number?
3        MS. MARTINEZ:  66.
4        MR. BRUEGGEN:  What's -- the large one?
5        MS. MARTINEZ:  Yeah.
6        MR. BRUEGGEN:  Oh, all right.
7        MS. MARTINEZ:  You're good, take your time.
8    Okay.  Is everybody there?
9        MR. BRUEGGEN:  Yep.
10       MS. MARTINEZ:  Okay.  I would like to --
11       THE WITNESS:  I'm sorry, did you say 56 or 66?
12   BY MS. MARTINEZ:
13       Q.   66.
14       A.   Oh, okay.  Got it.
15       Q.   So this page of the document is Rose Burgos
16   trial testimony in Mr. Johnson's criminal trial, and
17   she's being crossed by Deborah Gubin.  And so I'd like
18   to draw your attention to starting at Line 6, Question,
19   "You have made the statement to me, didn't you that you
20   had trouble distinguishing Black people because all
21   those people look alike to you?  Isn't that right?"
22   Answer, "Yes.  I did say that."  I'm going to stop
23   sharing because that's the only part that we need.  But
24   would you agree that cross-racial identifications could
25   have an increased likelihood of resulting in mistaken

Page 99

1    identifications?
2        MR. BRUEGGEN:  Objection.  Form.  Foundation.
3        THE WITNESS:  They could.
4    BY MS. MARTINEZ:
5        Q.   Okay.  And you testified earlier that you
6    reviewed documents Bates Stamped JGS_Johnson 1 through
7    310; is that correct?
8        A.   Correct.
9        Q.   Okay.  So you saw this statement; is that
10   correct?
11       A.   Correct.
12       Q.   Okay.  And why did you choose to not include
13   it in your report?
14       MR. BRUEGGEN:  Object to form.  And attorney
15   work product to the extent what's included in the
16   report or not.  You don't need to answer that, sir.
17   BY MS. MARTINEZ:
18       Q.   Okay.  So are you refusing to answer that
19   question on advice of your Counsel?
20       A.   Yes, ma'am.
21       Q.   Okay.  Do you think that a witness that has
22   trouble distinguishing between people of a certain race
23   would be relevant to the credibility of that witness's
24   ID of a person of that race?
25       MR. BRUEGGEN:  Object to form.  Incomplete

Page 100

1    hypothetical.  Go ahead, sir.
2        THE WITNESS:  You would have to take into
3    consideration --
4    BY MS. MARTINEZ:
5        Q.   Okay.  Or let me --
6        A.   -- the investigation.
7        Q.   Apologies, sir, I didn't mean to cut you off.
8    So without making any reference to information from your
9    attorneys or conversations that you had with your
10   attorneys, why did you choose to not include that
11   statement in your report?
12       MR. BRUEGGEN:  Object to form.
13       THE WITNESS:  What statement?
14       MS. MARTINEZ:  Apologies, the statement from
15   Ms. Burgos about her inability to tell the
16   difference between Black individuals?
17       MR. BRUEGGEN:  Object to form.  And as far --
18       MS. CARNEY:  I think --
19       MR. BRUEGGEN:  Go ahead.
20       MS. CARNEY:  I think that misstates the
21   testimony that she said.  So I think it might be
22   beneficial to keep it up on the screen if you're
23   going to keep quoting it.
24       MS. MARTINEZ:  Oh, sure.  Yeah.  I'll put it
25   back up on the screen, it does not go on from there.

Page 101

1    And I can also bring up the part of
2    Mr. Tiderington's report that addresses it.  Sorry,
3    it's not sharing.  Here we go.  Okay.  So I have it
4    on the screen.
5    BY MS. MARTINEZ:
6        Q.   And so I'm going to repeat my question to you,
7    sir.  Without referencing any conversations with your
8    attorney or any information from your attorneys, why did
9    you choose to not include this statement in your report?
10       MR. BRUEGGEN:  Object to form.  Go ahead.
11       THE WITNESS:  Answer?
12       MR. BRUEGGEN:  Yeah.
13       THE WITNESS:  Just did not make my report, it -
14   - I did not give an opinion on it.
15   BY MS. MARTINEZ:
16       Q.   Okay.  And I'd like to repeat my second
17   question that I don't think you answered.  In your
18   experience, would it be relevant if a person --
19   apologies, strike that, please.  In your experience, if
20   an individual had difficulty distinguishing between
21   people of a certain race and then were asked to make an
22   eyewitness ID of someone of that race, would you have
23   concerns as an investigator?
24       MR. BRUEGGEN:  Objection.  Form.  Asked and
25   answered.  Incomplete hypothetic.  Go ahead, sir.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 29 of 114 PageID #:53940
Oral Deposition of RONALD S. BRETZ, taken on November 15, 2023
102..105

Page 102

1    THE WITNESS:  So if I had that situation, that
2    hypothetical situation, I would pursue the interview
3    more to see if this was just a statement the person
4    -- person made or does this person really have, you
5    know, concerns.  So I think my investigation would
6    have to go a little bit further before I would have
7    this person do, you know, a lineup or anything.
8    Again, I -- I -- I think the answer that -- that I'm
9    going to give is -- is my investigation would have
10   to go farther.
11        MS. MARTINEZ:  Okay.  And apologies for
12   extending the hypothetical, but if that
13   investigation went further and you found there was
14   credibility to the fact that the eyewitness does
15   struggle to distinguish between people of a certain
16   race, would that affect their credibility, in your
17   opinion?
18        THE WITNESS:  Yes.
19        MR. BRUEGGEN:  Object to form.
20   BY MS. MARTINEZ:
21        Q.   Okay.  Thank you, sir.  Are the parties okay
22   if I take -- if I stop sharing the screen?
23        MR. BRUEGGEN:  Yeah, that's fine, if you're
24   moving on to something else.
25        MS. MARTINEZ:  Yes.

Page 103

1        MR. BRUEGGEN:  And if you are, we can take a
2    break here either now or think -- stop to --
3    continue on and we'll move to another topic?
4        MS. MARTINEZ:  I have a few more questions
5    related to this line and then we can break for
6    lunch, does that sound good?
7        MR. BRUEGGEN:  Yeah, I don't know if we need a
8    full on lunch, but we can take a longer break than
9    we did, so.
10       MS. MARTINEZ:  Okay.  Perfect.  Yes.
11   BY MS. MARTINEZ:
12       Q.   So just a few more questions for you, sir
13   about this exhibit.  Have you ever received any training
14   on cross-racial identifications?
15       A.   Not to my knowledge.  I -- I don't believe so,
16   nothing that comes to mind.
17       Q.   Okay.  And were you aware at the time of
18   writing your report that Elba Burgos, Rose Burgos and
19   Ricardo Burgos are all white and Hispanic?
20       MR. BRUEGGEN:  Object to foundation.
21       THE WITNESS:  I did not know what their race
22   was.
23   BY MS. MARTINEZ:
24       Q.   Okay.  Now, knowing what their race is, does
25   it change your opinions at all concerning the

Page 104

1    reliability of their identification of a young, Black
2    male?
3        A.   Absolutely not, my opinion still stands.
4        Q.   Okay.  Oh.
5        MR. BRUEGGEN:  That's a pretty picture.
6        MS. MARTINEZ:  Apologies.  I can't -- yeah,
7    sorry.  Thank you, not mine.  I have my notes over
8    my keyboard, which is not the best set up.  Okay.
9    Let me just quickly make sure I don't have any other
10   questions about this exhibit.  All right.  I'll
11   pause.
12   BY MS. MARTINEZ:
13       Q.   Related to the answer you just gave, sir, why
14   would that not affect your opinion?
15       MR. BRUEGGEN:  Object to form.
16       THE WITNESS:  Can we go back to the --
17   BY MS. MARTINEZ:
18       Q.   Yes.
19       THE WITNESS:  -- question and answer?
20   BY MS. MARTINEZ:
21       Q.   Yes.  So I had asked you about now knowing
22   that Elba, Rose, and Ricardo are white Hispanic, would
23   that -- did that -- would that affect your opinion on
24   whether they were able to make credible identifications
25   of a young, Black male?  And you said that it would not

Page 105

1    affect your opinion whatsoever.  And so then my
2    follow-up question is:  Why would it not affect your
3    opinion?
4        A.   So again, with my experience, it didn't matter
5    to me if a witness -- an eyewitness was white, Black,
6    yellow, red, blue, green, it didn't matter.  I would
7    just interview the witness and I would want to know if
8    they could make a good identification.  If they could
9    make a good identification they can, if they can't, they
10   can't, they -- they don't, I move on.  So again, this is
11   in my own -- my experience to me it doesn't matter when
12   you're saying a white Hispanic, that -- that has no
13   bearing on my opinion whatsoever.
14       MS. MARTINEZ:  Okay.  That was the last
15   question that I had for that exhibit so if it works
16   for the parties, it's 12:10 right now, do we want to
17   come back at 12:50, 1:00?
18       MR. BRUEGGEN:  I guess, Alyssa, do you have a
19   general idea of how long you're taking stuff?  Are
20   you -- the full seven hours or?  I'm just thinking -
21   -
22       MS. MARTINEZ:  No.
23       MR. BRUEGGEN:  -- because it's going to be --
24   no?  Okay.
25       MS. MARTINEZ:  No.  I mean, I probably have two



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1  to three hours more worth of questions.
2       MR. BRUEGGEN: Okay. Yeah. I mean, if you
3  want to take a longer break so that you can grab
4  something to eat, that's fine. We don't necessarily
5  -- are you -- Ron, do you need to take a longer
6  break to get food or no?
7       THE WITNESS: I'm good.
8       MR. BRUEGGEN: So we'll defer to you, if you
9  want to take a half an hour or so that's fine by us.
10      MS. MARTINEZ: Okay. Let's do let's do till
11  12:50. Let's do till 12:50.
12      THE WITNESS: Okay. All right.
13      MS. MARTINEZ: Okay. Great. Okay. Thank you
14  everyone.
15      MR. BRUEGGEN: Thank you.
16      THE REPORTER: Okay. The time is 12:11 p.m.
17  Central and we are going off record.
18      MS. MARTINEZ: Recording stopped.
19      (OFF THE RECORD)
20      THE REPORTER: Okay. We are back on record for
21  the deposition of Ronald Muich being conducted by a
22  video conference. My name is Kyra Tate. Today is
23  November 15, 2023. The time is 12:51 p.m. Central.
24 BY MS. MARTINEZ:
25      Q. So Mr. Muich, I'd like you to look back at

Page 107

1  your report, Exhibit 1, Page 9, the second full
2  paragraph.
3       A. Okay.
4       Q. So in that paragraph, you state, "The only
5  discrepancy was the race of the person he saw," and this
6  is regarding Mr. Ricardo Burgos's testimony; is that
7  correct?
8       A. Correct.
9       Q. All right. And then further down in that same
10  paragraph, you state, "There is no other documentation
11  in any other reports or court testimony that I reviewed
12  that would indicate why Ricardo Burgos gave two
13  different races." Is that correct?
14      A. That is correct.
15      Q. Okay. So is it your opinion that eyewitness
16  identifications that changed the purported race of the
17  suspect do not make that identification unreliable?
18      MR. BRUEGGEN: Object to form. Incomplete
19  hypothetical. Go ahead, sir.
20      THE WITNESS: So in my reports that I did
21  review and Ricardo Burgos's testimony at Court, he
22  did testify under oath that the person he saw was
23  Black. So in my own opinion, I believe that was
24  either a mistake on the CPDs end, a typo, or I have
25  no other explanation. But again, I'm taking what

Page 108

1  Ricardo -- Ricardo did say in -- in court that he
2  did say he was Black.
3  BY MS. MARTINEZ:
4       Q. Okay. And when you say a typo on CPDs end,
5  are you referring to the first statement he gave where
6  he described the suspect as being Hispanic?
7       A. Yes. The one that's in quotations and the way
8  he spells it or the way whoever typed up the report was
9  Hispanage. So I'm tending to believe in my opinion that
10  was just a typo because, again, he testified under oath
11  that the person he saw was Black.
12      Q. And you're referring to the testimony
13  that you put on Page 8 of your report? In that second
14  paragraph, that's italicized.
15      A. Yes, because he does point him out. He does
16  point him out in open court.
17      Q. Okay. And then just to make sure I'm fully
18  understanding your testimony, when you read this
19  statement from CPD about what Ricardo said, you assumed
20  that the word "Hispanic" after "male Hispanic" was the
21  typo?
22      MR. BRUEGGEN: Object to form. Go ahead.
23      THE WITNESS: The first time I read it, it went
24  into my mind that it possibly could have been a
25  typo. And then when I read Ricardo's testimony

Page 109

1  again, under oath that it was Black, that's when I
2  came to conclusion that it possibly could have been
3  a -- a -- a typo -- a typo on the report writer's
4  end, whoever did that report.
5  BY MS. MARTINEZ:
6       Q. Okay. So if that were not a typo and
7  Mr. Burgos did first testify that he thought the
8  perpetrator was Hispanic and then later changed his
9  opinion to say that the perpetrator were Black, would
10  that, in your opinion, call his identification into
11  question?
12      A. Sure.
13      MR. BRUEGGEN: Form.
14      THE WITNESS: Sure, if that was the
15  circumstances in that hypothetical situation, that
16  would change the whole aspect of his testimony and
17  his statement at the beginning. So yes.
18  BY MS. MARTINEZ:
19      Q. Okay. And, in your opinion, is it common for
20  -- apologies. Strike that, please. Along this same
21  hypothetical, when, in his first testimony, he did state
22  that the perpetrator was male and Hispanic, is it your
23  experience that because -- in your experience, is it
24  common for witnesses who purport to have witnessed a
25  crime happening for 45 seconds to change the race of the



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1  person that they saw during that event?
2      MR. BRUEGGEN: Objection, misstates the
3  testimony, and form. Go ahead.
4      THE WITNESS: So again, I -- I can't take any
5  of my experiences to say I had a situation where it
6  was 45 seconds, and this is what happened. I -- I -
7  - I can't do that. I've had I've had numerous
8  investigations, but again, I would interview a
9  witness, which I've interviewed numerous witnesses
10 and suspects throughout my career, and basically I
11 would take their -- their interview, I would take
12 their statement, and I would question them further.
13 If I felt that there was something wrong with their
14 statement, I would -- I would question them further.
15 Again, that's what that's what me being in my
16 position for 18 plus years in investigations. You
17 know, my experience, the more witnesses that I
18 talked to and did interview, of course, I became
19 better. You know, you -- you start you start with
20 your training, you know, interviewing witnesses and
21 suspects, but then you have to take that to real
22 life. And the more you do it, the more you get
23 better. And, you know, again, that would be my
24 situation if I thought the statement was a little --
25 I needed to ask more questions, I would. Because

Page 111

1      again, that would be going back to my experience.
2  BY MS. MARTINEZ:
3      Q.  Okay. So in your experience, have you ever
4  had a witness change the race that they said the suspect
5  was?
6      A.  I cannot answer that. I -- I don't know. I
7  have no specific investigation I can answer that
8  question.
9      Q.  Okay. Just so -- off the top of your head
10 right now, you don't recall that ever happening?
11     A.  In my experience, I do not recall that.
12     Q.  Okay. And just for clarification again, to
13 make sure I'm understanding your testimony, in drafting
14 your report, you made the assumption that there was a
15 typo and that Mr. Burgos's testimony across the
16 different times he spoke with officers was that the
17 perpetrator was Black?
18     MR. BRUEGGEN: Objection, misstates the record,
19 and form. Go ahead.
20     THE WITNESS: I'm going to need you to repeat
21 that question, please.
22 BY MS. MARTINEZ:
23     Q.  Okay. Let's see. I can -- let me me -- earlier,
24 you had mentioned that you had testified that you
25 assumed that the male Hispanic from the quote on page 8

Page 112

1  was a typo. And how did you decide that that was --
2  strike this, please. Strike that, please. Okay. Why
3  did you assume that his testimony in open court was
4  correct and that this earlier statement was a typo?
5      MR. BRUEGGEN: Objection. Form. Go ahead.
6      THE WITNESS: So when I started reviewing the
7  CPD records and I did come across the, and I'm going
8  to say now the -- the Hispanich, I -- I -- I didn't
9  know what that -- what that was. I knew how to
10 spell Hispanic. I didn't know how to spell the
11 Hispanich. I didn't know if that was just a
12 different way of saying Hispanic. So I kept that in
13 mind. And as I went to reviewing my reports,
14 documentation, and I got to the trial testimony,
15 that's when I came upon Ricardo's testimony that
16 again, under oath, that he said the individual was
17 Black. So I'm taking his trial testimony, which is
18 under oath, and he's saying it's -- the person's
19 Black. So my opinion is that -- that was a -- a
20 typo on the CPDs end and that he is testifying to
21 the person that was Black. So again, I have to come
22 to some sort of conclusion when I see those two
23 situations.
24 BY MS. MARTINEZ:
25     Q.  Okay. And if his statement to police that the

Page 113

1  perpetrator were Hispanic were true, in your opinion,
2  then would the investigation into Mr. Johnson be
3  questionable pertaining to his identification to
4  Mr. Ricardo's identification?
5      MR. BRUEGGEN: Object to form.
6      THE WITNESS: If Mr. Burgos told him that he
7  was Hispanic and that's the way they took it, I'm
8  going to assume again, with my experience, if I was
9  told that -- that I was looking for a male Hispanic,
10 I would not be talking to a male Black or I would
11 have to take into consideration. Again, you know, I
12 don't know how dark skin is on a Hispanic or how
13 dark skin is on a male Black. It just depends all
14 those situations. So again, I'm just showing
15 according to Ricardo Burgos's testimony that he said
16 under oath that the individual was Black.
17 BY MS. MARTINEZ:
18     Q.  Okay. Thank you, sir. And would you agree
19 that, for identification purposes, it's more useful to
20 know the amount of time a witness saw the suspect's face
21 as opposed to seeing the crime in general?
22     MR. BRUEGGEN: Object to form. Vague.
23     THE WITNESS: Again, depending on the
24 situation. Person could've seen the suspect for a
25 few seconds, but we get a good identification. They



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 32 of 114 PageID #:53943
Civil Deposition of RONALD S. MUECK, taken 6 November, 15, 2022
114..117

Page 114

1  could've seen a suspect for a minute, get a bad
2  identification vice versa.  You just don't know,
3  different situations.  There is no exact science in
4  that statement there or that question you just asked
5  me.
6  BY MS. MARTINEZ:
7      Q.   Okay.  So in your opinion, sir, if you have
8  eyewitnesses to a crime where the longest anyone saw the
9  perpetrator's face was four to five seconds at max,
10  would you have any reservations about their
11  identifications of the perpetrator?
12      A.   No, not --
13          MR. BRUEGGEN:  Object to form, incomplete
14  hypothetical.  Go ahead.
15          THE WITNESS:  Not at all.
16  BY MS. MARTINEZ:
17      Q.   Okay.  What if in this hypothetical, the
18  longest anyone saw the person's face was two seconds?
19          MR. BRUEGGEN:  Same objections.  Go ahead.
20          THE WITNESS:  Again, I would have no problem
21  whatsoever.  I'm interviewing the witness and
22  they're giving me the identification and I feel that
23  the identification is strong to me, I don't care how
24  long they saw the person for.  If it was one second
25  or 60 seconds or three minutes, it doesn't matter to

Page 115

1  me.  I have to take the whole totality of the
2  interview and the whole totality of investigation at
3  hand.
4  BY MS. MARTINEZ:
5      Q.   Okay.  And if a witness testified that they
6  never saw the shooter's face, would you have
7  reservations about their eyewitness identification?
8          MR. BRUEGGEN:  Object to form.  Incomplete
9  hypothetical.  Go ahead.
10          THE WITNESS:  If a witness told me they never
11  saw the person's face, I --
12  BY MS. MARTINEZ:
13      Q.   Yes, sir.
14      A.   I would assume that they didn't see the
15  person, because they're telling me they didn't see their
16  face.
17      Q.   Okay.  So --
18      A.   Unless they're telling me -- unless they're
19  telling me that, you know, the individual was missing a
20  limb or some other, you know, identification on the
21  body, a -- a tattoo, then I would have to take that in
22  consideration.  Okay, the individual witness did not see
23  the face, but they saw a pink elephant on his or her
24  left arm.  Okay.  Well, I have some sort of
25  identification, even though they didn't see the face, I

Page 116

1  do still have some sort of identification and I can take
2  my investigation further with that information.
3      Q.   Okay.  And sir, would you agree that there is
4  nothing in the record that would support any other
5  identifying feature that Mr. Ricardo Burgos saw of the
6  perpetrator of the shooting on June 12th?
7      A.   I would have to look at my report.
8          MR. BRUEGGEN:  Object.
9          MS. MARTINEZ:  No, please go ahead.
10          MR. BRUEGGEN:  Other identifying feature?
11  BY MS. MARTINEZ:
12      Q.   Yes.  Apologize.  In line with your answer,
13  any tattoo, missing limb, was there anything else that
14  Mr. Ricardo Burgos might -- that -- in your review, that
15  he saw that might have helped him identify who the
16  perpetrator was?
17      A.   No.  He did say that he -- he observed them
18  for about 45 seconds in his statement.
19      Q.   Yes.  Okay.  So now I'd like you to go to --
20  oh, still Page 9, but the last paragraph.  And it
21  continues on to Page 10, where you say, quote, "A
22  shooting like what happened in daylight on a busy street
23  would be a chaotic scene, which in turn leads to varying
24  witness statements, including the number of attackers."
25  Do you see that, sir?

Page 117

1      A.   I do.
2      Q.   Okay.  And then continuing on to Page 10, you
3  conclude that there was only one assailant.  Do you see
4  that, sir?
5          MR. BRUEGGEN:  Object to form.  Go ahead.
6  BY MS. MARTINEZ:
7      Q.   It's the end of the first full paragraph on
8  page 10?
9      A.   Yes.  I'm just finishing reading after --
10  okay.  I see.
11      Q.   Okay.  So on what sources do you rely to
12  definitively assume that there was only one attacker?
13      A.   Well, again, when you're responding to a
14  scene, again, in my experience, and I've responded to
15  numerous chaotic scenes where you have individuals who
16  are witnessing it or just seeing the aftereffects,
17  calling 911, trying to get their information to the
18  police, and the information is being relayed to
19  responding units, including myself.  You're not going to
20  know if there's one attacker, two attackers, 10
21  attackers, until you actually get on the scene and you
22  start interviewing witnesses and trying to corroborate
23  all their stories and figure out how many attackers, how
24  many suspects there were.
25          I give an example in my report about the mall



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 33 of 114 PageID #:53944
Video Deposition of RONALD S. WATSON, taken on November 15, 2023
118..121

**Page 118**

1  shooting that we had at Rosemont and I was leaving the
2  Allstate Arena under the assumption that there was an
3  active shooter or shooters in the mall. And until I
4  arrived on scene and it was later on that it was -- well
5  later on determined that it was just one shooter, it was
6  an isolated incident. But again, talking about myself
7  and my experience, I went there thinking that we had
8  numerous attacker -- or numerous shooters. You don't
9  know that, and you don't assume that until you get all
10 the information and you let the evidence -- or you let
11 the investigation lead to where the evidence is going to
12 take you. And that's when you make your assumptions.
13       Q.  I appreciate that, sir. My question for you
14 is: What is the factual basis on which you rely in
15 assuming in your report that there was, the -- as you
16 say, a single suspect?
17       A.  Well, you can go back to -- we can go back to
18 the one individual that -- that did make the
19 identification, Aby Gonzalez. He basically said that
20 there was one -- that there was one shooter in his
21 statement. So you know, we -- I know we talked about
22 his identification and his -- and then his negative
23 lineup. But again, you -- you have him right there
24 saying that there was just one shooter. And again, when
25 the police went to the scene, again, they were getting

**Page 119**

1  the information that it was Lil John -- Bryan Johnson,
2  and then they said there was attackers. Again, they have
3  to -- they have to investigate. Again, with my
4  experience, you have to investigate the scene, you have
5  to talk to witnesses and then you'll figure out if there
6  was one shooter or two shooter.
7        Q.  Okay. A quick point to that, and I can share
8  my screen if that would be easier. But in Exhibit 5,
9  Mr. Tiderington cites to the CPD report prepared by
10 Officer Hernandez, which lists that Aby Gonzalez
11 actually identified two separate offenders in his
12 statements to that officer. And so is there anything
13 else that you found in the record that supports your
14 assertion that there was only one attacker, outside of
15 Aby Gonzalez?
16       A.  Again, I'm going to -- I'm going to let the --
17 the -- the officers who did the investigation. They
18 eventually got on scene. I know they took Bryan Johns
19 into custody. They did their lineups. And -- and
20 again, my experience, even after someone was taken into
21 custody, we would still be getting calls. We would be
22 talking to witnesses that would say there were numerous
23 attackers or numerous shooters or numerous suspects. But
24 again, with the documents that I reviewed, that never
25 went past that initial broadcast with the so- called

**Page 120**

1  attackers. So again, with my experience, just because I
2  heard the word attackers, I'm not going to keep looking
3  for attackers when the evidence doesn't show that there
4  was more than one attacker. So that's what I'm -- my
5  opinion is that after they were able to interview
6  witnesses, sort out the scene, that they determined that
7  there was just one shooter.
8        Q.  Okay. And just to clarify, you were not
9  pointing to any specific witness or specific interview
10 that rules out the premise that there might be two
11 shooters. You're just saying in general, that's the
12 process the officers would take to rule that out; is
13 that correct?
14       MR. BRUEGGEN: Objection. Form. Misstates his
15 testimony. Go ahead, sir.
16       THE WITNESS: And I'm also going according to
17 the CPD reports, there was just the one incident to
18 where it was attackers. So again, it never
19 mentioned again in the report that they brought in
20 numerous attackers or there was two shooters or
21 there was two descriptions. So I believe that
22 again, that Chicago Police did their job, they did
23 their investigation to where they determined that
24 there was one shooter.
25 BY MS. MARTINEZ:

**Page 121**

1        Q.  Okay. And if it had turned out that the
2  shooting was perpetrated by two separate individuals,
3  would that change your opinion on whether or not the
4  investigation was appropriate?
5        MR. BRUEGGEN: Object to form. Go ahead.
6        THE WITNESS: Well, if the evidence led that
7  there were two shooters, then the police would be
8  looking for two shooters. That's what I would do.
9  BY MS. MARTINEZ:
10       Q.  So in your opinion, again, following this --
11 the same hypothetical, and there were two shooters, the
12 fact that the officers in this case did not fully pursue
13 that lead and only identified one person, would that not
14 be a proper investigation?
15       MR. BRUEGGEN: Objection. Form.
16       THE WITNESS: But you're saying that they
17 didn't properly follow the leads when they --
18 according to their reports, they did follow the
19 leads that there was only one shooter because that's
20 basically what their conclusion was, that there was
21 one shooter. And again, if the evidence would've
22 led that there be two shooters and they didn't
23 do that, yes. Then it would've been wrong that they
24 didn't go after the second shooter. But the
25 evidence and the reports don't show it that way in

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 34 of 114 PageID #:53945
Video Deposition of RONALD S WIECZOREK taken 4 November 15, 2023
122..125

Page 122

1    the investigation.
2  BY MS. MARTINEZ:
3      Q.   Okay.  Thank you, sir.  Okay.  On Page 12 in
4  the third full paragraph of your report -- let me know
5  when you're there.
6      A.   I'm on Page 12.
7      Q.   Okay, perfect.  In the third full paragraph,
8  you state, "The detectives did not have tunnel vision."
9  How would you -- oh, apologies.  Are you there, sir?
10     A.   I am.
11     Q.   Okay.  How would you define tunnel vision?
12     A.   Well, I don't use the word tunnel vision.  I
13  never has -- have used the word tunnel vision in any of
14  my experiences in my investigations.  Because when I
15  investigated, I looked at everything.  But if you're
16  asking me what I think tunnel vision means, and I never
17  looked up the word tunnel vision, any kind of
18  definition, but I would say tunnel vision is that you
19  focus on one object, one person, one thing in general,
20  and just keep going after that object, person, whatever.
21  That's a definition of tunnel vision in -- in my -- but
22  again, I never looked up the word tunnel vision.
23     Q.   Okay.  And from your understanding of that
24  term and then stating that the detectives did not have
25  tunnel vision, what is the factual basis for that

Page 123

1  opinion?
2      A.   Well, they took an initial report.  They did
3  hear that -- saw a suspect was possibly Lil John -- Lil
4  John or Lil -- I'm sorry, Lil -- Lil D and Bryan Johnson.  Okay.
5  Officer Daley, knowing Lil D, which I believe he did a -
6  - a very good job, you know, taking him into custody to
7  do a further investigation.  And they brought Bryan
8  Johns in, did -- did lineups with him.  Now, if you want
9  to talk about tunnel vision, the detectives could've had
10  tunnel vision right then and there.  They had what
11  Detective -- or Officer Daley would describe as Bryan
12  Johns.  His name is -- street name is Lil D, who Officer
13  Daley in the 14th District basically served nine years
14  under, you know, knowing all the -- the gang members,
15  all the players in that area.  They could've just went
16  ahead and charged Bryan Johns with Aby Gonzalez's
17  identification.  But they didn't.  They -- they -- first
18  six lineups, five were negative.  Aby Gonzalez
19  identified for whatever reason, we don't know.  I don't
20  think any of us know why they re-ran the lineups.
21  Second time they re-ran the lineups, which I did -- I do
22  give examples in my report, four people did not pick out
23  the suspect. Again, if they would've just charged right
24  then and there, okay, then I guess I can agree with that
25  word, tunnel vision.  But the detectives didn't have

Page 124

1  tunnel vision.  They went on with their investigation.
2  They took the investigation.  They looked at all the
3  evidence and they led to a different suspect and they
4  furthered that investigation.  And then they brought the
5  whole case to felony review.  Felony review approved the
6  charges, and then that was turned over to the Court's
7  hand.  And that was for a judge and jury to decide.  So
8  again, the word tunnel vision, there was no tunnel
9  vision in this case.  I believe that they -- that they
10  would've had tunnel vision if they just would've charged
11  Bryan Johns with the, I believe, lack of information
12  that they had.  But I believe they did do it.  And I put
13  in my report, they did their due diligence and they
14  expanded the investigation and they uncovered a
15  different suspect.
16     Q.   Okay.  A quick follow up to that.  In your
17  review of the materials, did you find anything in the
18  record that states why Mr. Johns was never spoken to
19  again after being released that night?
20     A.   I did not see anything.
21     Q.   Okay.  In your opinion, would that be unusual
22  under standard police procedures to have an eyewitness
23  ID a suspect and then have that suspect be released and
24  never spoken to again?
25         MR. BRUEGGEN:  Object to form.

Page 125

1         THE WITNESS:  Well, again, we don't know why
2  there was a second lineup that was rerun.  Whatever
3  information the detectives could've gotten during
4  those two lineups.  They could've deemed that Aby
5  Gonzalez was not a credible witness.  Again, we
6  don't know.  And in my experience, if I don't have a
7  credible witness, I'm going to move on.  I'm not
8  going to -- I'm not going to keep pursuing that
9  witness.  And I gave you an example in my report
10  when I did have an identification and then the --
11  the -- the female witness basically recanted her
12  statement.  So I reran a lineup and she didn't pick
13  anybody out.  I was okay with that.  I would rather
14  have it that way than have some sort of uncredible
15  identification.  So you know, I -- I --
16  BY MS. MARTINEZ:
17     Q.   So in -- apologies, sir.  I didn't mean to cut
18  you off.
19     A.   No, that's okay.  I was just saying again, I
20  gave you an example in my -- in my report.
21     Q.   So in that same vein, would you then expect
22  there to be some form of documentation as to why an IDed
23  suspect was no longer considered a lead?
24         MR. BRUEGGEN:  Object to form.
25         THE WITNESS:  I mean, there could be a report.



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 35 of 114 PageID #:53946
The Deposition of RONALD S. WATCH, taken on November 15, 2022
126..129

Page 126

1  There could be a supplemental report. I don't know.
2  I mean, we know that it's an incomplete file. We
3  don't know if a report ever was constructed. We
4  don't know that. I mean, if we -- if we had the
5  whole complete file, I think we would be on
6  different circumstances here. But we do know that
7  we -- we have an incomplete file. And again, I'm
8  trying to take the information that I have and I'm
9  trying to form an opinion on it and try to give the
10 answers to the best that I can. And again, I don't
11 have all the exact answers. And I'm just giving you
12 some of my experience of possibly why this would've
13 happened.
14 BY MS. MARTINEZ:
15    Q.  Yes, sir. And in your experience, would you
16 expect there to be some kind of supplemental report in
17 the full file about why an IDed suspect was no longer
18 being considered as a suspect?
19    A.  I would expect a -- some sort of report to be
20 in there.
21    Q.  Okay.
22    A.  And that would be a complete file.
23    Q.  Okay. And then to quickly backtrack to tunnel
24 vision again, you explained the basis for believing that
25 the officers did not have tunnel vision when it comes to

Page 127

1  Mr. Johns. Can you please tell me your factual basis
2  for not believing the officer's had tunnel vision with
3  regard to Plaintiff Mr. Johnson?
4       MR. BRUEGGEN:  Object to form. Misstates his
5  testimony. Go ahead.
6       THE WITNESS:  Again, because I'm reviewing all
7  the documentation and again, there had to be
8  something between that first lineup with Aby
9  Gonzalez and that second lineup with Aby Gonzalez.
10 There had to be a reason why the detectives released
11 him, continued investigation, and moved on. And if
12 they still thought Bryan Johns was a suspect due to
13 Aby Gonzalez's identification, I would think that
14 there would be more documentation, unless it's
15 missing, why they were still going after him, why
16 they thought he was a suspect. But again, in my
17 experience, if I have a suspect and the suspect is
18 not IDed or I don't like the suspect, I let the
19 suspect go, it's over. I'm - - I'm
20 done with this -- I'm done with that suspect. I'm
21 not going to, you know, I -- I may make note of it
22 in my report but due to the fact of the witness's
23 credibility, you know, this is why the -- the
24 suspect was released. And -- and that's the end of
25 the story. I mean, it could be as short as a -- a

Page 128

1  two line sentence in my supplemental report.
2  BY MS. MARTINEZ:
3     Q.  Would you agree that the lack of documentation
4  makes it difficult to ascertain if this investigation
5  was proper into Mr. Johns?
6       MR. BRUEGGEN:  Objection. Form.
7       THE WITNESS:  Well, you're going to call it
8  lack of documentation. I'm going to call it missing
9  paperwork in the file. So with that missing
10 paperwork in the file, it -- it is tough to answer
11 some of these questions. And again, if we had the
12 full file and everybody agreed it was the full file,
13 I think we would get some of these -- these
14 questions answered. But unfortunately we don't have
15 the full file. And this is why me and you are
16 sitting talking over Zoom.
17 BY MS. MARTINEZ:
18    Q.  Absolutely. And just to be clear, you are
19 assuming that the supplemental reports in these
20 documents that talk about why Mr. Johns is no longer a
21 suspect were created, correct?
22    A.  I would think they were created. Maybe they
23 were created. I don't have an answer for that because
24 again, I wasn't there and I don't have any documentation
25 to support my opinion on that. I can give you

Page 129

1  hypotheticals, but that's all it would be is
2  hypothetical.
3     Q.  Sorry, let me just make sure I'm done with
4  this section. Okay. So in that same -- oh, strike
5  that, please. In that same paragraph, you state, quote,
6  "Detectives use proper police procedures by interviewing
7  witnesses to continue their investigation and obtain
8  more evidence or leads." Do you see that, sir?
9     A.  I am looking for it right now. Yes, I found
10 it.
11    Q.  Okay. Perfect. And first, what is the
12 factual basis for that opinion?
13    A.  Well, that's through my experience and my
14 training. They went ahead, they -- they took the
15 information that they received via the broadcast. They
16 took in a suspect. They went ahead and did lineups. In
17 fact, they did two sets of lineups. They decided for
18 whatever reason to let Bryan Johns go and they went on
19 with the investigation and they let the investigation
20 lead them to where it needed to lead them, where the
21 evidence led them.
22    Q.  Okay. And that statement also refers to the
23 interviews of Elba Burgos, Rosa Burgos, and Ricardo
24 Burgos, correct?
25    A.  Correct.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 36 of 114 PageID #:53947
Video Deposition of RONALD S. RUFO, taken 15 November, 2023
130..133

Page 130

1  Q.   Okay.  Can you please state the factual basis
2  for the opinion that the detectives used proper police
3  procedures by interviewing those individuals to continue
4  their investigation?
5  A.   Well --
6      MR. BRUEGGEN:  Object to form.  Go ahead.
7      THE WITNESS:  Well, that one's actually simple.
8  You -- you have -- you have Rosa Burgos, who
9  participated in a lineup, who knew Bryan Johns.  She
10 admitted in her statement and also in testimony that
11 her son and Bryan Johns had some sort of problem
12 with each other.  Rosa Burgos knew Bryan Johns.  If
13 Bryan Johns was the shooter, I think Rosa Burgos
14 would've known that.  So again, with the proper
15 police procedure, detectives hear this.  Me as a
16 detective, I don't think I would go after that
17 individual with the statement from Rosa Burgos, but
18 she knows Bryan Johns because they had a problem or
19 he had a problem with the son.  So right away, that
20 would discard Bryan Johns in my head.
21 BY MS. MARTINEZ:
22 Q.   And as it relates to Plaintiff, Mr. Johnson,
23 what is the factual basis for your opinion that the
24 detectives used proper police procedures when
25 interviewing Elba, Rosa, and Ricardo?

Page 131

1  A.   Sure.  A photo was shown.  Elba, who didn't
2  know the individual, she pointed to Darrall Johnson and
3  basically said that the suspect looked like Darrall.  And
4  again, that's why I think the police did good work.  They
5  -- you know, they knew that he had a younger brother.
6  They went ahead, contacted Daley again, who was a tech
7  officer in 14 for nine years, who admits in his
8  testimony that he knows all the players in the 14th
9  District.  They all get along with him in the 14th
10 District.  They all talk to him in the 14th District.  No
11 one ever had a problem with him.  So I -- I mean, I
12 think that just speaks -- that just speaks on its own.
13 Q.   And then -- excuse me.  And then for Rosa and
14 for Ricardo?
15 A.   Well again, Rosa -- Rosa, again, making that
16 statement that she knew Bryan Johns.  And again, Rosa -
17 - here, if you -- if you think about it, if Rosa really
18 wanted to pin this crime on Bryan Johns because of what
19 happened with her son -- and again, there's no
20 documentation of what happened between Bryan Johns and
21 her son.  We don't know.  Again, with my experience, I
22 would think it was some sort of gang-related incident.
23 But again, that's just -- that's just the hypothetical
24 on my end.  And if Bryan -- if -- if Rosa really wanted
25 to pin this on Bryan Johns, she could've said, that's

Page 132

1  the guy, and she would've did it for a revenge factor.
2  But she didn't do it.  She knew right away it wasn't
3  Bryan Johns.
4      And again, the detectives, they used good
5  police procedure by not following that.  I mean, can you
6  imagine if they would've -- if they would've tried to
7  pin this on Bryan Johns with Rosa Burgos' statement?  I
8  would call that tunnel vision.  Mr. Tiderington would be
9  100 percent right, that would be tunnel vision because
10 they just focused on Bryan Johns.  But I disagree with
11 Mr. Tiderington.  They did not have tunnel vision.  They
12 -- they went outside just one suspect.  And I'm sure
13 they still had Bryan Johns maybe in their crosshair for
14 whatever reason, or they dismissed it.  Again, we don't
15 know.  We know there's missing file.  We know there's
16 missing paperwork.
17 Q.   And as a quick clarification, are you assuming
18 that the incident that Rosa talks about between her son
19 and Mr. Johns was negative?
20 A.   When you say "negative," I don't know what you
21 mean by that.
22 Q.   That it was some kind of negative interaction
23 between her son and Mr. Johns.  That it --
24 A.   That's what --
25 Q.   -- it wasn't.  Yep, sorry.  Apologies, sir.

Page 133

1  A.   I apologize.  That's what I believe.  Yes.  I
2  took that -- I took that as -- incident as some sort of
3  negative issue that they had between the two.
4  Q.   Okay.  And then in -- apologies, I combined
5  words.  In regards to Mr. Ricardo Burgos, what is the
6  factual basis for your opinion that the detectives used
7  proper investigative procedures in interviewing him?
8  A.   Well, again, they -- he -- I think he gave a
9  decent statement.  He does say that he did view it for
10 45 seconds.  He -- you know, he also looked at a photo.
11 You know, again, I know there's the -- I know there's
12 the talk of the Spanish, but again -- you know, again,
13 we're talking 1991 and -- and I do make mention that
14 even with the police reports, the state's attorney
15 paperwork and the public defender's paperwork, there's -
16 - there's -- there's errors.  There's misspellings.
17 There's -- you know, so again, 1991 paperwork was a
18 little bit different.  So -- but I believe that the
19 detectives did do a good job with Ricardo -- Ricardo
20 here.  Ricardo, Rosa, and Elba basically never came off
21 their statement.  The statements that they give -- that
22 they gave, the IDs that they did, that they -- that they
23 picked out Demetrius.  They never came off their
24 statements.  They never said that they were coerced,
25 told who to pick out.  There's no documentation



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1  whatsoever of that.
2       Now I know 30 years later, there's some issues
3  where everybody's having memory problems. But again, you
4  know, you're talking dementia, you're talking whatever
5  their diagnosis is. It is what it is. Again, we're
6  going off the statements, we're going off their
7  testimony, and they never veered off that testimony.
8       Q.  Okay. And as a quick follow-up question to
9  something you said in your answer, if Ricardo testified
10  that he never saw the face of the perpetrator of the
11  shooting, would that -- should that have affected the
12  investigating officer's reliance on his eyewitness
13  identification?
14       MR. BRUEGGEN: Object to form. Misstates the
15  record in complete hypothetical. Go ahead, sir.
16       THE WITNESS: Again, that would -- I would say
17  yes, but again, we don't know. We're going
18  according to his testimony in court. But again, to
19  answer your question, yes.
20  BY MS. MARTINEZ:
21       Q.  Okay. Thank you, sir. Okay. I'm going to
22  pull back up a part of Exhibit 5, Mr. Tiderington's
23  report on Page 30. And let -- please let me know if it
24  would be easier for me to share my screen.
25       MR. BRUEGGEN: Yeah. If you would, just to

Page 135

1  make sure we're on the same page.
2       MS. MARTINEZ: Okay.
3       MR. BRUEGGEN: That way we can --
4       MS. MARTINEZ: Okay, perfect.
5       THE WITNESS: Okay, I am on Page 30.
6       MR. BRUEGGEN: Screen right here --
7       THE WITNESS: Okay.
8  BY MS. MARTINEZ:
9       Q.  Okay. And so this -- I want to -- I would
10  like to draw your attention to the statement of
11  Mr. Tiderington that, quote, "At least 14 witnesses were
12  identified in the various police reports relating to
13  this case. Yet there is no contemporaneous notes or
14  detailed documentation of any statements provided."
15  Okay. Stop sharing. Would you agree that that is a
16  problem in this case?
17       A.  I'm not going to say it's a problem, but
18  again, we -- I think we both agree that there are --
19  there is missing documentation in the file. You know, I
20  believe in Detective Guevara's testimony that he said
21  there was GPR notes, that he did take GPR notes. We
22  don't know where those notes are at. So with
23  Mr. Tiderington's 14 witnesses were identified, I would
24  love for you to let me know in what part of the report
25  those 14 witnesses are because I think I only count

Page 136

1  about -- off the top of my head, maybe 10. I would love
2  to know who the 14 witnesses are.
3       Q.  I don't unfortunately have a list in front of
4  me, but I'm sure Mr. Tiderington has what --
5       A.  But again, you asked me that -- so just again,
6  I said you asked me that question about 14 witnesses. I
7  want to know what 14 witnesses we're talking about. So
8  you know what I'm saying? Because again, I don't know
9  about any 14 witnesses. But I can go through all the
10  witnesses right now where we can mark them. But again,
11  he's -- I think he's speaking out of -- I think he's
12  speaking out of turn here. And again, just because I
13  didn't -- just because I didn't document -- I only
14  documented a few of Mr. Tiderington's -- you know, that
15  I disagreed with. You know, I reflect that my -- my
16  report -- I disagree with Mr. Tiderington. Again, I
17  disagree with the 14 witnesses.
18       Q.  Okay. So just to be clear, to make sure I'm
19  understanding your testimony, you disagree with
20  Mr. Tiderington's assertion that there were 14 witnesses
21  interviewed in this case?
22       A.  Well, it says, "At least 15 witnesses were
23  identified."
24       Q.  But would that be a correct statement, that
25  you disagree with the number 14 as it pertains to

Page 137

1  witnesses that were identified in this investigation?
2       A.  I can say that I -- reviewing my report, I
3  don't recall seeing 14 different witnesses.
4       Q.  Okay. In your experience in a homicide
5  investigation where five witnesses are interviewed,
6  would you expect there to be documentation reflecting
7  those interviews?
8       A.  Yes.
9       Q.  And so would it then also be the case where if
10  there were 14 witnesses that were identified and spoken
11  to, you would expect some kind of documentation
12  reflecting those interviews?
13       MR. BRUEGGEN: Object to form. Incomplete
14  hypothetical. Go ahead, sir.
15       THE WITNESS: I would expect to see 14 reports.
16  But again, we're -- we agree that we're missing, you
17  know, the missing documentation. Are these -- are
18  we missing witness reports? I don't know. I can't
19  answer that. I'm only going off the CPD reports
20  that I'm reading.
21  BY MS. MARTINEZ:
22       Q.  So in your experience, particularly when you
23  were a supervisor, if you were supervising a homicide
24  investigation and there were no contemporaneous notes of
25  interviews with witnesses, would you have questions for



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 38 of 114 PageID #:53949
Oral Deposition of RONALD S. WATSON, taken on November 15, 2019
138..141

Page 138

1    those officers?
2        A.   I would not question my officers.
3        Q.   No?  Why not?
4        A.   Because I know -- I knew my detectives and I
5    knew that my detectives, they could do interviews
6    without taking any notes.
7        Q.   Okay.  And --
8        A.   I guess you have to know your -- I guess you
9    have to know your -- you have to know your detectives.
10       Q.   But in your experience, would it be best
11   practice to take contemporaneous notes when interviewing
12   a witness?
13       A.   Again --
14            MR. BRUEGGEN:  Object to form.  Incomplete
15   hypothetical.  Go ahead, sir.
16            THE WITNESS:  Again, depends on the
17   investigation.  Like I -- like I said a few hours
18   ago, there's not one investigation in my 18-year
19   career as a detective supervisor that has ever been
20   the same.  I can't tell you that if there's a
21   homicide, you -- you should have 300 pages of notes.
22   I -- I can't say that because every investigation is
23   the same and no, I would not question my -- my
24   detectives.
25   BY MS. MARTINEZ:

Page 139

1        Q.   Okay.  And just to make sure I'm not
2    misunderstanding your testimony.  You -- in your
3    experience, you would not question the officers for not
4    taking contemporaneous notes.  But would you still
5    expect to see some kind of report about their interview
6    with a witness?
7        A.   Yes.
8        Q.   Okay.  And in your experience, would it be
9    preferable or better policing practice to have
10   documented that interaction sooner rather than later?
11            MR. BRUEGGEN:  Object to form.
12   BY MS. MARTINEZ:
13       Q.   I can rephrase.  In your opinion -- or --
14   pause.  Strike that, please.  In your experience, would
15   you expect your -- the officers under your supervision
16   to document their interview with a witness at the end of
17   their tour of duty the day they spoke to them?
18            MR. BRUEGGEN:  Object to form.  Incomplete
19   hypothetical.  Go ahead.
20            THE WITNESS:  Again, it just depends on the
21   investigation.  In a -- in a perfect world,
22   absolutely. But if you're working a homicide case
23   and I have -- you know, I have six detectives, but I
24   have two out on injury, I got one on vacation, and I
25   only have three detectives and they have to go do

Page 140

1    follow-ups, they have to do interviews, I wouldn't
2    expect them to come back after each interview and
3    type up a report.  It's just - - it's -- it's -- it
4    -- in a -- in a perfect world, yes.  But when we
5    have investigations, it's not a perfect world.  I go
6    back to no investigation's the same.  Or there are
7    times that the investigators did come back and type
8    up the report.  I'm sure there was.  Was there times
9    when I had to send the investigators home due to
10   budget crunches?  For sure.  You got to do your
11   report another day.  And then another lead comes up
12   the next day or another lead comes up the following
13   day.  So again, I can't answer that question.  In a
14   perfect world, I'd love for detectives to be typing
15   the report as they're talking to the person, but
16   it's never going to happen.  So again, I know I've
17   said it several times, but no investigation is the
18   same.
19   BY MS. MARTINEZ:
20       Q.   In your experience, would you be concerned
21   about the reliability of an officer's report if it were
22   written one day after speaking with the witness?
23            MR. BRUEGGEN:  Objection.  It's an incomplete
24   hypothetical.
25            THE WITNESS:  I'm going to have to have you

Page 141

1    rephrase that, please.
2    BY MS. MARTINEZ:
3        Q.   Okay.  So in your experience -- you testified
4    previously that it would be all right if your officers
5    did not take contemporaneous notes and just wrote a
6    report reflecting their interview with a witness; is
7    that correct?
8        A.   Correct.
9        Q.   And so in your experience, would you have any
10   concerns about the reliability of that report?  Like if
11   the officer remembered everything from that interaction,
12   if they wrote the report the day after they spoke with
13   the witness?
14       A.   I would have no problem.
15            MR. BRUEGGEN:  Go ahead.  Answer.
16            THE WITNESS:  I would have no problem with that
17   whatsoever.
18   BY MS. MARTINEZ:
19       Q.   Okay.  What about a week after?
20       A.   Again, I would have no problem with that.  As
21   long as I knew that the detective was putting down
22   whatever that detective heard in that interview, I would
23   have no problem with that.  I would never sit there and
24   second guess my detective.  Again, I go back to
25   Mr. Tiderington's opinion and I did not put that in my



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 39 of 114 PageID #:53950
Oral Deposition of RONALD S. MOODY, taken November 15, 2022

142..145

Page 142

1 opinion because, again, I let my whole report speak for
2 itself. But Mr. Tiderington did say, in his 40 year
3 career that he was involved in every aspect, every dot
4 of an I, everything that his detectives did. It's
5 impossible. Could never do that.
6    Q.   Okay. I have two follow-up questions. The
7 first is, would you be concerned about the reliability
8 of the report if the detective wrote it a month later?
9       MS. CARNEY: Objection. Form. Incomplete
10    hypothetical.
11 BY MS. MARTINEZ:
12    Q.   You can answer, sir.
13    A.   So again, you're -- I -- I -- you're going a
14 day, a week, a month. Again, you're talking about my
15 experiences. You're talking about the detectives that I
16 basically interviewed, brought up to the detective
17 division under my command. I knew their strengths in
18 writing reports. I would have no problem with it
19 whatsoever. And if I did have a problem with it, the
20 detective would not be under my command anymore. They
21 would be reassigned to a different aspect of the job. So
22 to answer your question, you can say a month, six
23 months, I would say that I trust my detectives and my
24 detectives always did a good job. And again, I'm not a
25 memory expert, but I do know officers, I do know

Page 143

1 detectives that it's incredible the things that they can
2 remember. They remember better than I've ever seen
3 before. So to answer your question, I would not have a
4 problem with it whatsoever.
5    Q.   Okay. And just to clarify to make sure I'm
6 understanding your testimony correctly, for the officers
7 that were under your purview, there is no set time limit
8 by which you would start to question the reliability of
9 their report as it pertains to a witness they
10 interviewed?
11    A.   Correct.
12       MR. BRUEGGEN: Object to form.
13       THE WITNESS: Apologize. Correct.
14 BY MS. MARTINEZ:
15    Q.   Okay. And then my follow-up is a
16 hypothetical. If you, while you were serving in your
17 supervisory capacity, had an officer under your purview
18 that was consistently not writing reports on interviews
19 with witnesses or was writing those reports very late.
20 And by very late, we'll say two months later, would you
21 question that officer?
22       MR. BRUEGGEN: Objection. Form. Incomplete
23    hypothetical. Go ahead, sir.
24       MS. CARNEY: Compound.
25       THE WITNESS: In your hypothetical -- in your

Page 144

1 hypothetical situation that you just gave me, yes, I
2 would've a conversation with that detective to find
3 out, and I would hope it wouldn't even have come to
4 that far because I would've, you know, found out
5 earlier, you know. And we're not even talking a
6 homicide, just in any day-to-day activity, so. But
7 again, I -- in your hypothetical situation, I
8 would've a talk with the detective for sure.
9       THE REPORTER: Ms. Carney, I just want to make
10 sure, did you object?
11       MS. CARNEY: I did. I said it was a compound
12 question.
13       THE REPORTER: Okay. Thank you.
14       MS. CARNEY: Thank you.
15 BY MS. MARTINEZ:
16    Q.   And just to -- again, to make sure I'm
17 understanding, you're -- in that hypothetical, you're
18 saying that ideally you would've seen that this was
19 happening sooner and spoken with that officer sooner; is
20 that a fair statement?
21    A.   Hypothetically, if I would've caught onto it,
22 I would've talked to the officer.
23    Q.   Okay. Thank you for that, sir.
24    A.   You're welcome.
25    Q.   Okay. So I'm going to go back to

Page 145

1 Mr. Tiderington's report on Page 28. And let me know
2 when you're there.
3    A.   I am on Page 28.
4    Q.   Okay. So on Page 28, Mr. Tiderington states,
5 quote, "Oral communication of information during a
6 homicide investigation is insufficient" --
7       MR. BRUEGGEN: Alyssa?
8       MS. MARTINEZ: Oh, apologize.
9       MR. BRUEGGEN: Can you direct us where at page
10 28, just so we can read along with you?
11       MS. MARTINEZ: Yes. It's the first full
12 paragraph under subheading 4.
13       MR. BRUEGGEN: I got it. Starting, "Oral
14 communication," correct?
15       MS. MARTINEZ: Yes. That second sentence.
16 Okay.
17 BY MS. MARTINEZ:
18    Q.   So he says, quote, "Oral communication of
19 information during a homicide investigation is
20 insufficient. A written record is necessary to
21 communicate relevant information among investigating
22 personnel in order to identify suspects and develop
23 evidence leading to the apprehension of the true
24 perpetrators of the crime. A homicide file should --
25 excuse me, should allow the reader, including fellow

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 40 of 114 PageID #:53951
Video Deposition of RONALD S. MOODY, taken on November 15, 2023
146..149

Page 146

1  detectives, supervisors, and eventually prosecutors and
2  criminal defendants to see the investigative steps that
3  were taken and all potentially relevant information must
4  be reported because the investigator will not know at
5  the time information is received that it is or is not
6  important to the ultimate case.  Contemporaneous
7  documentation is critical to ensure that information is
8  accurately recorded and communicated.  For this reason,
9  police officers and detectives and other investigators
10 in particular are trained that to take contemporaneous
11 notes in order to assist them in preparing accurate and
12 complete reports.
13         Homicide investigations are often fast moving
14 and ever changing, involve interviews of numerous
15 witnesses and can depend on new details to develop
16 critical leads.  Relying on memory alone to prepare
17 reports weeks, days, or even hours later creates the
18 risk of losing critical information and failing to
19 accurately document investigative information as
20 detectives are routinely trained." Apologies.  That's
21 quite the long section to quote. But the CV you supplied
22 in your report details multiple trainings you've
23 attended that address report writing; is that correct?
24     A.   Correct.
25     Q.   And in particular, I was looking at the

Page 147

1  January 2005 training at Northwestern and the April 2005
2  training; is that correct?
3      A.   Correct.
4      Q.   Okay.  So with that training and in your
5  experience, would you agree with Mr. Tiderington that,
6  quote, "oral communication of information during a
7  homicide investigation is insufficient"?
8          MR. BRUEGGEN:  Objection.  Incomplete
9      hypothetical.  Go ahead, sir.
10         THE WITNESS:  I'm just going to read that line
11     again.
12 BY MS. MARTINEZ:
13     Q.   Oh, please.
14     A.   I -- I'm going to be honest with you.  I don't
15 understand what it means by that line.
16     Q.   Okay.  So let's -- assuming he's saying that
17 the officers in a homicide investigation are not taking
18 any form of notes and they are purely investigating
19 based on oral communication between each other, would
20 you agree with that statement?
21         MR. BRUEGGEN:  Object to form.
22         THE WITNESS:  But again, this is -- and I'll
23     answer your question, but this is Mr. Tiderington's
24     opinion.
25 BY MS. MARTINEZ:

Page 148

1      Q.   Yeah.  I'm just asking if you agree.
2      A.   Okay.
3      Q.   I apologize.  I didn't mean to cut you off,
4  sir.
5      A.   You know, and again, oral communication
6  between detectives, it's -- it's -- it's good.  I'm not
7  going to disagree with that.  I mean, I don't know if
8  you're asking me in this -- in this sentence that -- are
9  -- are you asking me that -- if there's no communication
10 whatsoever, is that bad?
11     Q.   I'm asking if --
12     A.   Because I'm not understanding --
13     Q.   -- the only form of communication is oral
14 communication.
15     A.   There's different -- there's -- oral is not
16 the only information.  I mean, you do have reports.  You
17 do have oral.  I mean, there's -- there's several.
18     Q.   Okay.  So would it be fair to say that you
19 disagree with that statement on the grounds you just
20 said?
21     A.   Again, I'm just having a hard time figuring
22 out what context he's referring to.  So I don't want to
23 answer it one way when I'm not understanding the -- the
24 way he's putting it in context, because he's putting --
25     Q.   In answering -- oh, apologies, sir.

Page 149

1      A.   He's putting a -- he's putting a lot in this -
2  - in this one paragraph.
3      Q.   In answering the question to this specific
4  sentence, please also feel free to explain what your
5  basis is for responding if you agree or disagree and
6  what your understanding of the sentence is.
7          MS. CARNEY:  Objection.  Form.  What sentence
8      are you referring to?
9          MS. MARTINEZ:  The first sentence of the quote
10     that's found in the first paragraph on Page 28 under
11     Subsection 4, that oral communication of information
12     during a homicide investigation is insufficient.
13         THE WITNESS:  So the way that I'm gathering
14     this -- this statement, basically, if there's no
15     oral communication, that could be bad.  I agree with
16     that.
17 BY MS. MARTINEZ:
18     Q.   Okay.
19     A.   I -- I also -- I -- I mean, I disagree with
20 sections in -- in this -- you know, again, this is
21 Mr. Tiderington, who basically says that he has overseen
22 in 40 years every interview, every witness statement,
23 everything.  I disagree with that.  It's impossible.
24 He's -- he's -- what I'm gathering here is he's talking
25 in a -- in a perfect world and -- and -- and really,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1  Mr. Tiderington, the way he describes a homicide
2  investigation, he's in a perfect world in his head, and
3  that's not the way it happens in my experience.  You
4  don't know how it's going to happen.  I could talk -- I
5  could talk to Dave next to me who's a witness and out of
6  that interview, Dave can tell me about three other
7  people I need to talk to.  And then yes, I could
8  communicate with detectives, which I believe is
9  sufficient or I can follow the lead and move on.  So I
10 don't know if we're -- if we're communicating the same.
11 I just feel like this whole -- if we're going to break
12 down this whole section, I think we need to break it
13 down line for line because he talks about -- again, this
14 is not a perfect world.  An investigation, like I said
15 before, they're never the same.  And again, I didn't put
16 it in my report, but Mr. Tiderington believes that all
17 investigations are the same, A, B, C, D, E.  It doesn't
18 happen that way.
19         Q.   Okay.  I do plan on breaking it down line by
20 line, so you'll have an opportunity --
21         A.   Okay.
22         Q.   -- to speak to each one.  But so in your
23 experience and with your training, do you agree that,
24 quote, "A written record is necessary to communicate
25 relevant information among investigating personnel in

Page 151

1  order to identify suspects and develop evidence leading
2  to the apprehension of the true perpetrators of the
3  crime"?  That's the second sentence that he has in that
4  quote.
5         A.   Yep.  Yes.  And I believe that a written
6  record should be formulated somewhere during the
7  investigation.  I don't think that the written record
8  has to be done immediately, but when you have the final
9  record and you're going to be turning over the record to
10 felony review, that's when you have your final record.
11 But again, it doesn't have to be done that day, next
12 day, a week.  It just depends on the investigation.
13        Q.   Okay.  And why is that important?  Why is
14 creating that written record and turning it over
15 important?
16        A.   Well, because at the end of the day, when
17 you're going to present your case to felony review, you
18 do want felony review to have the facts of the case.  And
19 then if they're going to approve charges or they're not
20 going to approve charges, that's on them.  They decide
21 to bring it to court, then now it's in the Court system.
22 Now it's in front of a judge and jury.  And again, I
23 just want to say that I understand what
24 Mr. Tiderington's saying, but I also understand that
25 there are missing files from this case that we both

Page 152

1  agreed upon earlier.  So again, it would be that perfect
2  world if we had all this documentation, if a witness was
3  interviewed, say at 9:00 in the morning, a report was
4  done at 9:15 a.m.  If an -- a witness was interviewed at
5  9:30, a report would be done at 9:45.  Again, we're
6  talking about the perfect world, perfect circumstances.
7  Again, investigations are all different.  You never know
8  where it's going to lead you.  When you find evidence,
9  you talk to people, you don't know where it's going to
10 lead you.
11        Q.   I'm going to move on to the next sentence.  In
12 your experience and with your training, do you agree
13 that, quote, "A homicide file should allow the reader,
14 (including fellow detectives, supervisors and eventually
15 prosecutors and criminal defendants) to see the
16 investigative steps that were taken and all potentially
17 relevant information must be reported because the
18 investigator will not know at the time information is
19 received, that it is or is not important to the ultimate
20 case"?
21        A.   Again, it's up to the detective.  What that
22 detective wants -- feels relevant to put in that case or
23 put in that case file, it -- it's -- it's up to the
24 detective.  I mean, relevant information should go in
25 there but again, if I am on an investigation and I come

Page 153

1  up to you and I say, excuse me, do you know where
2  Ms. Doe lives?  And you point me down the street, is
3  that relevant information that needs to go to the
4  report?  Again, there's still discretion in the
5  detective's job.  In my 18 years, there's always been
6  discretion.  If I feel like it shouldn't go in a report,
7  it's not going to go in a report.  If I feel like it's
8  going to go in a report, it should go in a report.  I
9  don't think Mr. Tiderington is -- should say it should
10 all go in a report.  If that was his views, if that was
11 his way that he handles his investigations, so that's
12        Q.   And just for clarification, when you say it's
13 up to the investigator's discretion, discretion as to
14 what?
15        A.   To knowing what facts -- what needs to go into
16 a report.
17        Q.   And in determining what those facts should be,
18 what's the benchmarker?  And I guess I mean by that, for
19 example, is it things that a detective would think would
20 lead to a criminal prosecution?
21        MR. BRUEGGEN:  Object to form.
22        THE WITNESS:  It could.
23 BY MS. MARTINEZ:
24        Q.   Could it be things that -- things that an
25 investigator thinks might exclude a subject?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    MR. BRUEGGEN: Object to form. Go ahead.
2    THE WITNESS: If that detective feels like it
3    should be in there, sure.
4 BY MS. MARTINEZ:
5    Q. Could it be things that an investigator thinks
6 introduces a new lead as to who the perpetrator of a
7 crime is?
8    A. If they feel like it should be in there, sure.
9    Q. Okay. So it's -- my understanding from what
10 you're saying is that it's the -- it's at the discretion
11 of the individual detective to determine what should go
12 in the investigative file; is that correct; is that
13 fair?
14    A. Yes.
15    MR. BRUEGGEN: Form.
16    THE WITNESS: Yes. With their training, with
17    their experience, best police practice, absolutely.
18    They should -- they -- they should have the
19    discretion. And my detectives, through my career,
20    they've always had the discretion to put -- they
21    felt like this needed to be in there, it goes in
22    there. Again, I go back to the -- if I asked you
23    about, you know, where does Ms. Doe live? Do I
24    think that -- that should be a supplemental report?
25    If it has anything to do with the case, sure, it

Page 155

1    should be in the report. I would never question a
2    detective if they put more information in the case,
3    but I'm also not going to question, again, with my
4    experience, a detective that they didn't put
5    something that they didn't feel relevant to go in
6    the case. They're trained. They're experienced. I
7    wouldn't send anybody out on a -- on a -- homicide
8    investigation if I didn't feel that they had the
9    training, they had the experience.
10 BY MS. MARTINEZ:
11    Q. Okay. And a quick follow-up question to that.
12 In your capacity as a supervisor, did you ever have an
13 officer under your purview that did not include what you
14 would determine to be relevant information for an
15 investigation?
16    A. Not to my knowledge, no.
17    Q. So I'm going to move on to the next sentence
18 in Mr. Tiderington's opinion. So in your experience and
19 with your training, do you agree that, quote,
20 "Contemporaneous documentation is critical to ensure
21 that information is accurately recorded and
22 communicated"?
23    MR. BRUEGGEN: Object to the form.
24    THE WITNESS: I mean, I don't know if I agree
25    that it's critical. Could it be in the report?

Page 156

1    Sure, but I don't know if it's actually critical, if
2    that's going to hinder a case, what he's saying.
3    Again, we're going -- we're going base by base
4    investigation. You know, I would like to know --
5    again, he's just -- he's kind of going perfect
6    scenario here.
7 BY MS. MARTINEZ:
8    Q. Would you agree that contemporaneous
9 documentation could help to ensure that information is
10 accurately recorded and communicated?
11    A. Yes.
12    MR. BRUEGGEN: Object to form.
13 BY MS. MARTINEZ:
14    Q. Okay. And I'm going to --
15    THE REPORTER: I didn't catch -- sorry. I
16    didn't catch your answer. It kind of overlapped.
17    MR. BRUEGGEN: I object to the form. What'd
18    you answer, sir?
19    THE WITNESS: I answered yes.
20    THE REPORTER: Okay. Thank you.
21    THE WITNESS: You're welcome.
22 BY MS. MARTINEZ:
23    Q. And then -- okay, I'm going to move on to the
24 next sentence. In your experience and with your
25 training, sir, do you agree that, quote, "For this

Page 157

1 reason, police officers and detectives and other
2 investigators in particular are trained that to take
3 contemporaneous notes in order to assist them in
4 preparing accurate and complete reports"?
5    MR. BRUEGGEN: Object to form.
6    THE WITNESS: Again, I dealt with detectives
7    that do not take notes and they could write an
8    excellent report and get all the facts in the report
9    and just because they don't have no notes, I don't
10    see a problem with that.
11 BY MS. MARTINEZ:
12    Q. In your experience, both training to become a
13 police officer and as a supervising officer, is it part
14 of police training to take contemporaneous notes and why
15 that's important?
16    MR. BRUEGGEN: Object to form.
17    THE WITNESS: So again, going back to my police
18    academy back in 1995, it was a 10-week course. I'm
19    sure we had a section on report writing. I'm not
20    sure how in-depth we got into report writing, but
21    I'm sure, you know, without going through all of my
22    notes from 1995 how much we actually did report
23    writing, or I'm saying, were trained in report
24    writing.
25 BY MS. MARTINEZ:



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 43 of 114 PageID #:53954
Civil Deposition of RONALD S WATTS, taken on November 15, 2023
158..161

Page 158

1    Q.    I'm going to move on to the next sentence.  In
2  your experience and with your training, do you agree
3  that, quote, "Homicide investigations are often fast
4  moving and ever changing, involve interviews of numerous
5  witnesses and can depend on minute details to develop
6  critical leads"?
7    A.    I agree with that.
8    Q.    Okay.  And then the last sentence.  In your
9  experience and with your training, do you agree that,
10 quote, "Relying on memory alone to prepare reports
11 weeks, days, or even hours later creates the risk of
12 losing critical information and failing to accurately
13 document investigative information as detectives are
14 routinely trained?"
15       MR. BRUEGGEN:  Object to form.  Go ahead, sir.
16       THE WITNESS:  Again, depends on the interview,
17   depends on the investigation.  I mean, it could be a
18   simple interview to where the detective can do the
19   report.  So again, you know, it'd be a hypothetical
20   situation if I kept throwing, you know, scenarios at
21   you.
22 BY MS. MARTINEZ:
23    Q.    This sentence in particular, just to make sure
24 I'm getting your full and accurate testimony, I'm going
25 to break down.  So the first piece about, quote,

Page 159

1  "Relying on memory alone to prepare reports weeks, days,
2  and even hours later creates the risk of losing critical
3  information," that piece, do you agree or disagree?
4    A.    Well, again, I'm not a memory person.  It
5  could, it could not.  So I have to go both ways on the
6  answer.
7    Q.    And then the second piece, would you agree
8  that detectives are routinely trained that failing to
9  prepare a report weeks, days, or hours after they get
10 some kind of critical information is a failure to
11 accurately document that information?
12       MR. BRUEGGEN:  Object to form.
13       THE WITNESS:  I disagree with that.  It's not a
14   failure.  Just because they write a report an hour
15   later, two hours later, a day later, it's not a
16   failure.  You would have to come up with a specific
17   report and interview.
18 BY MS. MARTINEZ:
19    Q.    Okay.  And then to the --
20    A.    And --
21    Q.    -- the last -- oh, apologies.  Sorry.  I
22 didn't mean to cut you off.
23    A.    I was just saying for me to determine if it's
24 a failure or not, so I totally disagree with that.
25    Q.    Okay.  And then just to clarify, you also

Page 160

1  would disagree that it's a failure to prepare it weeks
2  later?
3    A.    I never said it would be a failure to prepare
4  weeks.
5    Q.    It's in the sentence.  So if you're
6  disagreeing with that part of the quote, would you
7  disagree for days and hours, but maybe agree if it were
8  weeks later?
9       MR. BRUEGGEN:  Object to form.
10       THE WITNESS:  Again, depends on the situation.
11   I wouldn't have a problem if -- if a report was done
12   weeks later.  Again, it depends on the interview.
13   It depends on -- it just depends on the situation.
14   Again, like I stated before, investigations, they're
15   not the same, so I can't take an investigation and
16   compare it to another investigation.  There isn't --
17   again, in my 18-year career as an investigator and a
18   supervisor, I've never come across investigation
19   that was the same.
20 BY MS. MARTINEZ:
21    Q.    So in, I believe it's in the same -- okay.
22 Apologies.  So back in your report now, on Page 12 in
23 the third full paragraph.
24    A.    Give me one second.
25    Q.    Absolutely.  Take your time.

Page 161

1    A.    Okay.  I'm on Page 12.
2    Q.    Okay.  Where you say -- let me make sure that
3  this is -- yes.  Okay.  It's toward the bottom of the
4  third full paragraph on Page 12, where you say, quote,
5  "Detectives gather all the evidence, whether that is
6  physical, eyewitness, or circumstantial and present that
7  to the state's attorney."  Do you see that, sir?
8    A.    I do.
9    Q.    Okay.  You would agree that this is best
10 practice, yes?
11    A.    Yes, I believe that.
12    Q.    Okay.  And would you agree that it would be
13 misconduct for an officer to not turn such materials
14 over to the state's attorney?
15       MR. BRUEGGEN:  Object to form.  Incomplete
16   hypothetical.
17       THE WITNESS:  I can't say if there would be
18   misconduct.  I would agree that all the evidence or
19   all the -- everything should be turned over, but I'm
20   not going to say it should be misconduct.
21 BY MS. MARTINEZ:
22    Q.    Okay.  And forgive me if this feels like an
23 obvious question and with the caveat that I know you're
24 not a lawyer or a Brady expert, but are you familiar
25 with a Brady obligation?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1    A.   Yes.
2    Q.   Okay.  And could you define that for me
3  please, in your own words?
4    A.   So basically that all the documentation must
5  be turned over.  Can't hold anything back.
6    Q.   And would you agree that part of the rationale
7  of a Brady obligation is that ensuring the
8  constitutional rights of criminal defendants is
9  important, yes?
10    MR. BRUEGGEN:  Object to form and foundation.
11   Go ahead, sir.
12    THE WITNESS:  Yes.
13  BY MS. MARTINEZ:
14    Q.   Okay.  And would you agree that ensuring the
15  right person is caught and prosecuted is also important,
16  correct?
17    A.   Yes.
18    Q.   So now I'd like to go to Page 13, the first
19  full paragraph.
20    A.   Okay.
21    Q.   Where you state that, quote, "Eyewitness
22  identifications tend to be reliable as long as they
23  provide consistent statements throughout the
24  investigation and their ability to perceive the offender
25  makes sense."  Do you see that, sir?

Page 163

1    A.   I do.
2    Q.   Okay.  Could you please first state for me the
3  factual basis for this opinion?
4    MR. BRUEGGEN:  Object to form.  Go ahead.
5    THE WITNESS:  Well, again, with my experience,
6   whenever I interviewed witnesses, first I needed to
7   deem if they were reliable.  If their stories kept
8   changing, then to me, they would not be a credible
9   witness.  I always wanted consistent statements and
10   that should be any investigator interviewing
11   witnesses because once the story starts changing,
12   then you have a possibility of a not credible
13   witness.
14  BY MS. MARTINEZ:
15    Q.   Okay.  And then regarding the end of that
16  sentence where you discuss the eyewitness's ability to
17  perceive the offender making sense, in what instances
18  would a person's ability to perceive the offender not
19  make sense?
20    A.   If their statement basically was going all
21  over the place.  If let's say, I'm interviewing a
22  witness and they're telling me the male white subject
23  with one arm, and then later on, it's the male -- female
24  or female white subject with no legs.  And again, I'm
25  being very just to get my point across.  If -- if it

Page 164

1  doesn't make sense to me, then again, it's not a
2  reliable witness.  If the story's changing, if -- if --
3  if they're going so off key like that.  The, you know --
4  the female Black with white hair and then I got the male
5  Hispanic with no hair.  So again, I can keep going on,
6  but, you know, instances like that where it wouldn't be
7  reliable and it would not make sense.
8    Q.   Okay.  Are there any specific contexts in
9  which, in your opinion, you might think the eyewitness's
10  ability to perceive the offender did not make sense?
11  And I'll give you a few examples to respond to.  Do you
12  think that it would make sense for an eyewitness to
13  perceive the offender if they were in a moving car?
14    MR. BRUEGGEN:  Object to form.  Incomplete
15   hypothetical.  Go ahead.
16    THE WITNESS:  Again, hypothetically, is the car
17   going 100 miles an hour?  Is the car rolling through
18   -- it just stopped at a stop sign?  Is it stopped at
19   a red light?  It would just depend on -- when you
20   say moving car, you know, we have a lot of factors
21   there to consider.
22  BY MS. MARTINEZ:
23    Q.   Okay.  And what about if they perceived the
24  suspect while that person were running through a crowd?
25    MR. BRUEGGEN:  Object to form.  Incomplete

Page 165

1  hypothetical.  Go ahead.
2    THE WITNESS:  Again, just because somebody's
3   running through a crowd, if somebody's focused on
4   somebody and sees something, you know, if they're
5   saying that's a statement and it's a reliable
6   statement, we have to take what they're saying.
7  BY MS. MARTINEZ:
8    Q.   And if you have a witness who claims they saw
9  the crime but did not see the perpetrator's face, would
10  that then qualify as an instance in which their ability
11  to perceive the offender did not make sense, in your
12  experience?
13    MR. BRUEGGEN:  Object to form.  Incomplete
14   hypothetical.  Go ahead, sir.
15    THE WITNESS:  Well, again, we talked about this
16   earlier, just because you don't see a face doesn't
17   mean that you can't make an identification.  So
18   again, it could be -- no investigation is the same.
19   So it -- again, it's just going to depend.
20  BY MS. MARTINEZ:
21    Q.   Okay.
22    MR. BRUEGGEN:  Alyssa, when you're at a
23   breaking point, can we take a break, please?
24    MS. MARTINEZ:  Yes, absolutely.  I'm going to
25   quickly check to see if I have any other questions

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1   on this section and if not, I'm ready to break.
2          MR. BRUEGGEN:  All right.  Thanks.
3   BY MS. MARTINEZ:
4      Q.   I have one last question for you, sir, on this
5   line of questioning, and it's a clarification question.
6   In your report, you don't opine on any factors that
7   might have drawn a witness's attention away from the
8   face of the shooter; is that correct?
9      A.   I believe I do not.
10         MS. MARTINEZ:  Okay.  That's all I have on that
11  line, sir.  So the parties want to meet back in 10
12  minutes, at 2:18?
13         MR. BRUEGGEN:  Five minutes, 10 minutes,
14  whatever you need.  I just want to run to the
15  bathroom.
16         MS. MARTINEZ:  Yeah, I am also going to do
17  that.  So let's say 2:18.
18         MR. BRUEGGEN:  All right.  Sounds good.  Thanks.
19         MS. MARTINEZ:  Okay.  Thanks.
20         THE REPORTER:  Okay.  We are off record.  The
21  time is 2:08 p.m. Central.
22         (OFF THE RECORD)
23         THE REPORTER:  We are back on record for the
24  deposition of Ronald Muich being conducted by video
25  conference.  My name is Kyra Tate.  Today is

Page 167

1   November 15, 2023.  The time is 2:18 p.m. Central.
2   BY MS. MARTINEZ:
3      Q.   So Mr. Muich, on Page 13 of your report in the
4   first full paragraph, you state that, "And so police
5   have three witnesses from three different vantage points
6   that all identified Demetrius Johnson as the shooter."
7   Do you see that, sir?
8      A.   You said Page 13?
9      Q.   Yes.  In the first full paragraph toward the
10  bottom.  I believe it's five lines up from the bottom.
11     A.   Okay.  I got it.
12     Q.   Okay.  So with that statement, after you have
13  these three witnesses make their identification, Elba,
14  Rosa, and Ricardo, would it affect your opinion on --
15  strike that, please.  After you have this identification
16  of Mr. Johnson from these three eyewitnesses, would it
17  affect your opinion if one of those witnesses after said
18  that he or she was not sure about the identification
19  that they made?
20         MR. BRUEGGEN:  Object to form.  Incomplete
21  hypothetical.
22         THE WITNESS:  So to answer your hypothetical
23  question, which nowhere in my report that I read or
24  wrote in my documentation and said that, but in your
25  hypothetical question, yes, it would change my mind.

Page 168

1   And I'm not sure what I would do, but I would have
2   to further interview that person to see why him or
3   her did change their mind.
4   BY MS. MARTINEZ:
5      Q.   Okay.  And just to confirm your testimony, you
6   said that in none of the documents that you reviewed did
7   you see any of the eyewitnesses state that they were
8   unsure of the identification they had made after they
9   made that identification?
10     A.   I'm going off of when they made the
11  identification and when they testified at trial,
12  everybody stayed under identification.
13     Q.   Would you agree that in general, a longer a
14  witness sees a suspect's face, the more likely that
15  person is to be able to make a positive identification?
16         MR. BRUEGGEN:  Objection.  Form.  Foundation.
17  Incomplete hypothetical.  Go ahead, sir.
18         THE WITNESS:  That's a hard question to answer
19  because, again, there is no perfect world, perfect
20  science that, if I tell you if you stare at somebody
21  for 63 seconds, you're going to make a great
22  identification, or if you see someone for two
23  seconds, you're going to make a great
24  identification.  So it just depends on the person,
25  depends on the trauma the person's going through as

Page 169

1   they're seeing whatever they're seeing.  It just
2   depends.  So again, no investigation is the same, so
3   it would just depend on the situation.
4   BY MS. MARTINEZ:
5      Q.   Okay.  But in general; would you agree that
6   that's a true statement or no?
7      A.   I --
8          MR. BRUEGGEN:  Objection.  Asked and answered.
9   Go ahead, sir.
10         THE WITNESS:  Again, it -- it would -- it would
11  just depend situation by situation.  I cannot -- I
12  cannot -- if -- if I would give you answer with
13  that, it would be a hypothetical, and that's the
14  best I could do.
15  BY MS. MARTINEZ:
16     Q.   Okay.  What would your hypothetical answer be?
17     A.   I mean, I -- I -- hypothetically, I guess --
18  and I'll just take myself.  If I looked at someone
19  longer, I guess I would get a better description of the
20  person, but I'm also the person, because I've been doing
21  this for 28 years, that I do have a real good memory,
22  too.  If I look at somebody for a few seconds, I can
23  pick out that person also, so --
24     Q.   Okay.  In your experience, if there were three
25  witnesses who IDed a suspect as being the perpetrator of



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 170

1   a crime, but two eyewitnesses that still did not ID that
2   person, what would be the appropriate next steps in the
3   investigation?
4       MR. BRUEGGEN:  Object to form.  Incomplete
5   hypothetical.  Go ahead.
6       THE WITNESS:  Okay.  So can we break down that
7   question?  So you're saying I have three
8   eyewitnesses, right?
9   BY MS. MARTINEZ:
10      Q.   Uh-huh.
11      A.   And only two of those people picked somebody
12  up?
13      Q.   Apologize.  I'll rephrase, sir.
14      A.   Please.
15      Q.   Let's say you have several witnesses that ID a
16  suspect as being the perpetrator of a crime, but you
17  still have some eyewitnesses that do not identify that
18  person as being the suspect.  Are there subsequent
19  investigative steps that officers should take?
20      MR. BRUEGGEN:  Objection.  Incomplete
21  hypothetical.
22      THE WITNESS:  Well, hypothetically, I would
23  interview the witnesses further, again, to figure
24  out if they did make -- or did they -- did they see
25  the suspect offender good?  Again, if I feel that

Page 171

1   the eyewitness is not credible, then I'm not going
2   to use that person, you know, to do a lineup or use
3   that witness at all.  I'll dismiss that witness.
4   BY MS. MARTINEZ:
5       Q.   And for the eyewitnesses that still have not
6   identified that person as the perpetrator, would you
7   also conduct follow-up steps with them regarding their
8   eyewitness identification?
9       MR. BRUEGGEN:  Object to form.  Incomplete
10  hypothetical.
11      THE WITNESS:  So hypothetically, have I ran a
12  lineup already with them, or have I not run a
13  lineup?
14  BY MS. MARTINEZ:
15      Q.   They -- apologize.  I will rephrase.  In the
16  instance where you have a lineup run, and this is the
17  same lineup that all of the eyewitnesses are seeing,
18  some of the eyewitnesses identify one of the lineup as
19  the perpetrator, some of the eyewitnesses do not
20  identify that person.  You testified about follow-up
21  steps that you would conduct for the eyewitnesses who
22  identified the perpetrator.  Are there any follow-up
23  steps you would conduct with regard to the eyewitnesses
24  that did not identify that suspect as the perpetrator?
25      MR. BRUEGGEN:  Objection.  Incomplete

Page 172

1   hypothetical.  Go ahead.
2       THE WITNESS:  So with the people that did not
3   identify -- and I put an expert in my -- in my
4   report, it -- it would just depend, again, on the
5   investigation.  If somebody is viewing a lineup and
6   they are just having a hard time, they're -- they're
7   -- they can't see properly, the lighting is not
8   good, and they make a statement like that, I could
9   pursue the lineup.  But if they come out and say, I
10  can't pick anybody out.  The person's not there, I
11  would be done with that person.  I'm not going to --
12  I'm not going to push that person and -- and -- and
13  basically say, well, why didn't you pick so-and-so
14  on, or why didn't you do this?  If they can't pick
15  anybody out, they can't pick anybody out.
16  BY MS. MARTINEZ:
17      Q.   Okay.  So in line with that, in this case,
18  when there is the lineup with Elba, Rosa, Ricardo, Angel
19  Cordova, and Victor Cordova, and Angel and Victor do not
20  identify Mr. Johnson as the perpetrator of the shooting,
21  you're saying that you would not conduct any follow-up
22  with those eyewitnesses?
23          I want to make sure I'm understanding your
24  testimony.
25      MR. BRUEGGEN:  Object to form.  Go ahead, sir.

Page 173

1       THE WITNESS:  So when you say that Cordova is -
2   - you're saying that they did not pick anybody out?
3   BY MS. MARTINEZ:
4       Q.   They did not.
5       A.   In a photo array, they didn't pick anybody
6   out?
7       Q.   This was the in-person lineup that was held on
8   July 22, 1991.
9       A.   Okay.  Because Angel Cordova did pick out in a
10  photo array, and then he did not pick out in a lineup,
11  which --
12      Q.   Correct, sir.
13      A.   Which, for me, again, I have -- I have a
14  section in my report.  I don't have a problem with that.
15  For whatever reason, like I stated before, the - the
16  female eyewitness picked somebody out and then there was
17  a question with they were all in the same orange
18  jumpsuit in a county jail, and she didn't feel
19  comfortable with that.  So coordinating with the
20  sheriffs, I got everybody put into plain clothes.  She
21  viewed the lineup again.  She couldn't pick anybody out.
22  That was the end of the story.  If you can't pick
23  someone out, you can't pick someone out.  But again, the
24  circumstances were when she did pick somebody out the
25  first time, I took in consideration her statement why.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 47 of 114 PageID #:53958
Video Deposition of RONALD S. RIDER, taken on November 15, 2023
174..177

Page 174

1  So again, when I talked about discretion before as a
2  detective, you know, I felt that was good police
3  practice. I took her statement. She made the statement
4  about the orange jump clothes. I got the clothing
5  changed. She couldn't pick anybody out. End of story.
6  Thank you for participating. Have a nice day.
7      Q. Okay. So in your experience and with your
8  training then, in the case of Angel Cordova. Who did
9  identify Mr. Johnson in the photo, but then did not
10 identify him in the subsequent in-person lineup, would
11 you then dismiss him along with the photo identification
12 that he had made?
13     MR. BRUEGGEN: Object to form. Compound. Go
14 ahead.
15     THE WITNESS: Well, the photo identification, I
16 would still document that he picked Demetrius out.
17 And then when he participated in -- in the photo
18 lineup to attempt to identify, he didn't pick
19 anybody out. It is what it is at that point. I'm
20 not going to push the person, "Why didn't you pick
21 him out? You picked him out in the photo array." He
22 didn't pick him out, he didn't pick him out. That
23 would not be good police practice if -- if -- if I
24 did that. I think it --
25 BY MS. MARTINEZ:

Page 175

1      Q. Okay.
2      A. -- I think it speaks more highly of the
3  detectives who actually did this investigation, that
4  Angel did pick out an individual. And then when he did
5  a photo lineup, for whatever reason, and we don't know
6  that reason, he did not pick anybody out. I don't see a
7  problem with that whatsoever. It could be anything.
8  Again, we -- I think we could all agree that this was
9  some sort of gang. There was gang people involved. We
10 don't know what -- why he did what he did.
11     Q. Okay. A quick clarification to make sure I'm
12 understanding your testimony. In what way in your
13 experience could the fact that this homicide may have
14 been gang related have affected Angel Cordova's lineup
15 identifications?
16     A. And again, I'm giving you a hypothetical that,
17 if this was gang related, we don't know what his
18 thinking was. Just like when I dealt with my experience
19 as a detective, and I had a 14 year old boy that was
20 shot in the head and he was killed, it was gang related.
21 And I had statements all over the place because this was
22 gang related. So again, this is just a hypothetical.
23 You know, a lot of the people that -- the documentation
24 that I read, you know, I would say a handful had gang
25 ties. So we -- we just -- we don't -- we don't know why

Page 176

1  Angel changed his mind. But again, I feel more
2  comfortable that someone who picked somebody out of a
3  photo array and then doesn't pick out a photo lineup,
4  they -- they didn't pick somebody out. We're not going
5  to push it. We're going to move on. We're going to go
6  where the investigation takes us, where the evidence
7  leads us. So again, we can go back to Mr. Tiderington's
8  tunnel vision. If you want to have tunnel vision, let's
9  just stick with the early on -- the people who picked
10 someone out. Let's just go charge those people and be
11 done with it.
12     Again, I don't think the detectives did it. I
13 think they did a good job. Again, they investigated
14 this case, and they let the evidence lead them to where
15 it led them. They presented the case to the felony
16 review and then felony reviewed. It's their job to
17 present it to the -- to the -- to the Court system, and
18 then that's the job of a judge or jury to decide if that
19 person is guilty or innocent. We're just there to --
20 we're just there to - - to gather the facts, complete
21 the investigation and bring all the information to
22 felony review. And then it's out of our hands unless
23 they need us for any other future questions they have.
24     Q. I just have a quick follow-up to make sure
25 that I'm understanding your statements about the

Page 177

1  connection between this potentially being a gang related
2  homicide and Angel Cordova. Are you implying that
3  potentially the fact that this could be a gang related
4  homicide might have impacted Mr. Cordova in his
5  identifications?
6      A. So just to be clear, I never said it was a
7  gang related homicide. I just said a lot of the players
8  had gang affiliation. I know Mr. Rider talks about --
9  he's the gang expert. He talks more about the gangs and
10 who was involved. I'm just saying that there were
11 people involved that were gang affiliated. We talked
12 about Angel Cordova picking somebody out. Again, I don't
13 know why he changed his mind or couldn't pick anybody
14 out. Hypothetically, was he in a gang? Did he know
15 people in a gang? I don't know if it was a hypothetical
16 situation, but I never said that this was gang related -
17 - a gang related homicide.
18     Q. Okay. So -- okay. In your experience, if an
19 eyewitness makes an ID at the beginning of an
20 investigation, would you expect officers to follow up
21 with that person about subsequent suspects?
22     MR. BRUEGGEN: Objection. Incomplete
23 hypothetical. Go ahead.
24     THE WITNESS: Well, that person would've been
25 already interviewed, and if we feel like a follow-up



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 48 of 114 PageID #:53959
Civil Deposition of RONALD S VAUGHN, taken on November 15, 2023
178..181

Page 178

1    interview would be needed, I would assume that that
2    person would be talked to again. I don't know. Was
3    that person talked to? Again, this is where I go
4    back to all investigations are not the same. Was
5    that person interviewed? Was lineups done the first
6    night? Was somebody picked out? Was somebody not
7    picked out? Again, hypothetical. We would have to
8    get the whole story before I could really answer
9    that question. We just don't know. They could be
10   talked to. They could not. It depends.
11   BY MS. MARTINEZ:
12       Q.   Okay. And in your review of the materials
13   that you relied on in your report, did you find anything
14   in the record that indicates why after Aby Gonzalez made
15   his ID of Bryan Johns who was never contacted again by
16   the investigating detectives?
17       A.   I did not see anything regarding that.
18       Q.   Okay. And then would you agree that, in your
19   report, you don't offer an opinion as to whether a
20   conviction based purely on eyewitness identifications is
21   as strong as one with physical evidence linking the
22   suspect to the crime?
23       A.   I do not.
24       Q.   Okay. Thank you, sir. Okay. I'm going to
25   bring up what we'll mark as Exhibit Number 8. Do you

Page 179

1    see the photo, sir?
2            (EXHIBIT 8 MARKED FOR IDENTIFICATION)
3            THE WITNESS: I do. And I have a hard copy in
4        front of me.
5    BY MS. MARTINEZ:
6        Q.   Oh, perfect. Okay. Have you seen this photo
7    before?
8        A.   I have.
9        Q.   Okay. And can you tell me what it is?
10       A.   It is a lineup conducted, it looks like, at a
11   police station with five male Blacks.
12       Q.   Okay. And as you testified earlier, it's
13   important to have fillers that look like the suspect so
14   that the suspect doesn't stand out, correct?
15       A.   Correct.
16       Q.   Okay. And the description we discussed
17   earlier from Rosa was that the suspect was short, Black,
18   and young; is that correct?
19       A.   I would have to go back to Rosa's section to
20   see if that's exactly the words that she used.
21       Q.   Okay. I'll rephrase. If the depiction of a
22   suspect was that the individual was short, Black, and
23   young, do you think that this would be an appropriate
24   lineup?
25       A.   The lineup that I'm looking at now?

Page 180

1        Q.   Yes, sir.
2        A.   I don't believe it's appropriate. I do
3    believe that it's not -- well, let me rephrase that.
4            I believe this lineup is appropriate.
5        Q.   Okay.
6        A.   I'm sorry. It's --
7        Q.   It's been a long day. I know. Okay. With
8    this lineup, would you agree that Mr. Johnson is still
9    the shortest person?
10       A.   In this lineup, he is the shortest person,
11   yes.
12       Q.   Okay. And in your opinion, in your
13   experience, is it -- is it standard policing practice to
14   put the suspect in the middle of a lineup in person when
15   that person was also the middle of a photo lineup?
16       A.   When I ran lineups, we would put the
17   individual wherever we saw fit. We never had a -- that
18   he's going to be or she's going to be one, two, or
19   three. We just put the subject wherever we put the
20   subject. There was really never no talk about it.
21       Q.   Okay. In your experience, if you knew that a
22   witness IDed the suspect in the middle of a photo lineup
23   and that same witness was coming in to see an in-person
24   lineup, would you consider putting them in a different
25   spot?

Page 181

1        A.   I don't even think I would think of that. I
2    don't -- I -- I would -- if I put the subject in the
3    middle, if he was in the middle or she was in the middle
4    of a photo, I wouldn't even think about it.
5        Q.   Okay. And I want to briefly touch on
6    something you testified to earlier as a tattoo
7    potentially being a strong indicator of a person's
8    identity. And -- so would you agree that, in your
9    experience, if a lineup were shirtless and only one
10   person had tattoos, could that be a cause for concern?
11           MR. BRUEGGEN: Form. Incomplete hypothetical.
12       Go ahead.
13           THE WITNESS: Again, it depends on the
14       investigation. It would depend on interviews. It
15       would -- it would just depend. So hypothetically, I
16       -- I -- I would say even if somebody had a tattoo
17       and they were in a lineup, again, unless my witness
18       was talking about tattoos and there was something
19       that would make me feel uncomfortable running this
20       lineup showing somebody a tattoos -- again, it just
21       depends on the investigation.
22   BY MS. MARTINEZ:
23       Q.   If you, sir, were staffing a lineup and you
24   knew that your suspect had tattoos, would you try and
25   find other people that matched that person's description



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 49 of 114 PageID #:53960
Video Deposition of RONALD S. WRIGHT, taken November 15, 2023
182..185

Page 182

1  with tattoos?
2      A.  We would --
3          MR. BRUEGGEN:  Form.  Incomplete hypothetical.
4      THE WITNESS:  We would possibly try.  But
5  again, in the '90s, again, the perfect world, it
6  might not -- it might be -- it might be a little
7  tough to do that.  So you have to put the lineup to
8  the best of your ability.
9  BY MS. MARTINEZ:
10     Q.  Would you agree that there is nothing in the
11 record that would suggest why the young men in this
12 lineup had their shirts off?
13     A.  There is nothing that I know of.
14     Q.  Oh, I'll stop sharing it, too.  Okay.  And
15 would you agree also that you didn't find anything in
16 the record that explains why it appears the lineup is
17 happening in a common area rather than a secluded room?
18         MR. BRUEGGEN:  Object to form.  Misstates the
19 evidence.  Go ahead.
20     THE WITNESS:  Well, looking at that photo,
21 ma'am, I don't know if that's a common room.  I -- I
22 don't know what that room is whatsoever.
23         I can just see what the background is, but I
24 can't tell you if that's a common room or not.
25 BY MS. MARTINEZ:

Page 183

1      Q.  So moving on from that, on Page 14 in the
2  first full paragraph of your report, sir -- I'll give
3  you a moment to get there.
4      A.  page 14, first full paragraph.  Yes, ma'am.
5      Q.  Okay.  You state that, "It is clear from the
6  record that there is nothing indicating any bad blood
7  between Detective Guevara and Plaintiff and no
8  indication as to why Detective Guevara would allegedly
9  intentionally 'frame Plaintiff' for the shooting."  Do
10 you see that, sir?
11     A.  I do.
12     Q.  Okay.  Is it your opinion that there needs to
13 be specific bad blood between an individual and an
14 officer for that officer to frame that person?
15         MR. BRUEGGEN:  Objection.  Form.
16     THE WITNESS:  Well, I'm just going off the
17 facts of the reports on this, that in Demetrius
18 Johnson's deposition, these are his words.
19 Hypothetically, if people have bad blood between
20 each other doesn't mean that they're going to do
21 something bad to them.  But again, with what you
22 read, I'm only going according to what I viewed in
23 Demetrius Johnson's deposition.  These are his own
24 words.
25 BY MS. MARTINEZ:

Page 184

1      Q.  Right.  But is it your opinion that having bad
2  blood is a requirement for an officer to attempt to
3  frame someone?
4          MR. BRUEGGEN:  Object to form.
5      THE WITNESS:  You don't have to have bad blood
6  or you have to have bad blood.  I mean, it's a very
7  hypothetical question.
8          I mean, just because someone has bad blood with
9  someone or doesn't have bad blood doesn't mean
10 they're not going to do something or do something.
11 BY MS. MARTINEZ:
12     Q.  Yeah, I appreciate that answer.  But the
13 direct question that I'm asking you is, if you think
14 that having blood -- excuse me -- strike that, please.
15 If you think having bad blood is a requirement to an
16 officer framing an individual?
17         MR. BRUEGGEN:  Object to form.  Speculation.  Go
18 ahead.
19     THE WITNESS:  If I could ask you to rephrase
20 the question, I'm a little confused on the -- the
21 context of the question.
22 BY MS. MARTINEZ:
23     Q.  Sure.  So my question to you is, in your
24 experience, is it a requirement that an officer needs to
25 have bad blood with a suspect for that officer to frame

Page 185

1  that suspect?
2          MR. BRUEGGEN:  Object to form.  Foundation.
3  Speculation.
4      A.  Again, I --
5          MR. BRUEGGEN:  Go ahead.
6      THE WITNESS:  -- I think you said the same
7  question.  You didn't change it.  So again, I -- I
8  apologize.  I don't -- it's getting a little bit
9  later in the day, but I -- I'm having a real hard
10 time understanding that question.
11 BY MS. MARTINEZ:
12     Q.  No, it's okay.  I'm -- I suppose a way to
13 reword it is, in your opinion, in -- every individual
14 who has -- who is innocent and has been framed by a
15 police officer, does there need to be bad blood for that
16 to have happened?
17         MR. BRUEGGEN:  Object to form.  Foundation.
18 Speculation.  Go ahead, sir.
19     THE WITNESS:  Well, in my 28 years of
20 experience, I've never come across a police officer
21 framing anybody, so I -- I -- I guess to answer your
22 question, hypothetically, there doesn't need to be
23 bad blood.  I guess -- again, that's hypothetical.
24 But again, I also want -- I -- I've never come
25 across in 28 years, you know, a police officer ever



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 50 of 114 PageID #:53961
Video Deposition of RONALD S. BITECK, taken on November 15, 2023
186..189

Page 186

1    framing anybody, so I can't answer that question
2    except in a hypothetical situation.
3    BY MS. MARTINEZ:
4        Q.   Thank you, sir.  And just to clarify, your
5    report does not opine as to Defendant Guevara's
6    motivations; is that correct?
7            MR. BRUEGGEN:  Object to form.
8            THE WITNESS:  Correct.
9    BY MS. MARTINEZ:
10       Q.   Thank you, sir.  Now I am ready to move to
11   page 15.  And on page 15, it is the last two paragraphs.
12   Oh, I see.  Okay.  I apologize.  It is the last two
13   paragraphs that you cite when you are putting in the
14   criminal trial transcript and the questioning of
15   Elizabeth Martinez.  Do you see that part, sir, where it
16   starts with the question "After you met up with"?
17       A.   Yes.
18       Q.   Okay.  So in your report, you state in citing
19   to that transcript, Question, "After you met up with
20   Madalia and Demetrius, what did you do?"  Answer, "We
21   walked through Wabansia to Washtenaw.  Washtenaw, we
22   took down to Le Moyne.  Le Moyne, we took to Talman.  On
23   Talman, there's a school called the Humboldt School, so
24   we cut through the schoolyard and we ended up on
25   Rockwell and Hirsch.  We took Hirsch down to Campbell,

Page 187

1    and Campbell -- down from Campbell, before Potomac, we
2    took a gangway, and it led up to his house right there
3    on Artesian."  Would you agree that's what that says,
4    sir?
5        A.   I agree.
6        Q.   Okay.  And then you continue on Page 15 in the
7    -- not the paragraph right after the testimony, but that
8    second paragraph.  You state, "This is quite odd that
9    two separate people can give almost the exact testimony
10   related to their movements, one person answering a
11   series of questions about the root, the other person who
12   was asked just one question, and then proceeded to
13   mirror the other person's response."  Do you see that,
14   sir?
15       A.   I do.
16           MS. MARTINEZ:  Okay.  Next, I'm going to bring
17       up Exhibit 7 again, but instead this time on page
18       16, so it's going to be Bates stamped JGS_Johnson
19       16.  And I will put that on the screen as well.  Oh,
20       apologies.  I believe I have the wrong number.  Let
21       me quickly find the correct -- apologies.  I
22       scrolled a little too far.
23           MR. BRUEGGEN:  Are we still on Exhibit 7?
24           MS. MARTINEZ:  Yes.  I'm just -- I'm trying to
25       find the proper site that I was looking for.  Okay.

Page 188

1        Perfect.  Found it.  That's -- okay.  Apologies.
2        It's JGS_Johnson 166, not 16.  And then I will share
3        my screen to make this a little easier since this
4        transcript is a little messy.
5    BY MS. MARTINEZ:
6        Q.   And so I want to -- are you there, sir?
7        A.   I am.
8        Q.   Okay.  So then I want to read off the criminal
9    trial testimony from the same section that you cite.  And
10   this is, Question, "After you met up with Madalia and
11   Demetrius, what did you do?"  Answer, "I went with them
12   to their -- to his house."  Question, "Do you know where
13   Demetrius lives?"  Answer, "Yes, on Artesian and
14   Potomac."  Question, "Do you know how you got there?"
15   Answer, "We walked through Wabansia to Washtenaw --
16   Washtenaw, we took down to Le Moyne.  And Le Moyne, we
17   took to Talman.  On Talman, there's a school called the
18   Humboldt School, so we cut through the schoolyard and we
19   ended up on Rockwell and Hirsch.  We took Hirsch down to
20   Campbell, and Campbell, down from Campbell, before
21   Potomac, we took gangway, and it led up to his house
22   right there on Artesian."  Would you agree that it says
23   that, sir?
24       A.   (No audible response).
25       Q.   Is it easier if I scroll to use the electronic

Page 189

1    version?
2            MR. BRUEGGEN:  I'm sorry.  We just dropped Wi-
3        Fi on the iPad we're using, so you cut off.  I can
4        see you on my computer, but the sound cut out, so --
5            MS. MARTINEZ:  Okay.  No worries.  No worries.
6        Are we are we back, Mr. Brueggen?
7            MR. BRUEGGEN:  Getting there.
8            MS. MARTINEZ:  Okay.  The joys of Zoom
9        depositions.
10           MR. BRUEGGEN:  And Wi-Fi cut kicks you out, you
11       know, after a while.
12           MS. MARTINEZ:  Right.  I have three hot spots
13       ready just in case.  Okay.  Just let me know when
14       you're back.  Oh, we're good?  Okay.
15           THE WITNESS:  We're back.  Yes, ma'am.
16   BY MS. MARTINEZ:
17       Q.   Okay.  Were you able to hear the transcript
18   that I read?
19       A.   So you cut off.  You finished JGS_Johnson 166.
20   You got cut off at 167.
21       Q.   Oh, okay.  So 167 is the same testimony that
22   you incorporate in your report.  And so I guess my first
23   question is, these two transcripts are different,
24   correct?  With the one being the way that you articulate
25   the testimony in your report and the second being the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 51 of 114 PageID #:53962
Video Deposition of RONALD S. MUECH, taken on November 15, 2023
190..193

Page 190

1 transcript from the exhibit?

2     A.   I am looking at my report right now.

3     Q.   Okay. So yeah, take your time.

4     A.   So I'm looking at appear to be the same.

5     Q.   Would you agree that your report leaves out

6 lines 21 to 24 from JGS_Johnson 166? And I also have it

7 up on the screen, if that helps between -- flipping

8 between papers.

9     MR. BRUEGGEN: Object to form.

10     THE WITNESS: So it looks like I do not have 21

11 through 24 in my report.

12 BY MS. MARTINEZ:

13     Q.   Okay. Thank you, sir. So with that in mind,

14 I'll leave this up on my screen for right now in case

15 it's useful to look at it. When you say on Page 15 of

16 your report that this is quite odd, that two separate

17 people can give almost the exact testimony related to

18 their movements, one person answering a series of

19 questions about the route, the other person who was

20 asked just one question and then proceeded to mirror the

21 other person's response, that Ms. Martinez's response to

22 that one question is not the one that is in your report?

23     MR. BRUEGGEN: Object to form.

24 BY MS. MARTINEZ:

25     Q.   It's -- I can -- yeah, I can reword. So, in

Page 191

1 your report, you state that Ms. Martinez was asked,

2 "After you met up with Madalia and Demetrius, what did

3 you do?" And then she responded with, "We walked," and

4 then detailed her route, would you agree?

5     A.   So I'm going to have to disagree, because I do

6 put both statements in my report.

7     Q.   I see the statement from Ms. Reyes. I don't

8 see lines 21 through 24 as it pertains to Ms. Martinez

9 in your report. Could you point out where that is,

10 please?

11     A.   So I do not have 21 through 24, but I do have

12 Elizabeth Martinez's statement and Madalia Reyes's

13 statement, the direction that they went where they're

14 explaining how they walked to Demetrius Johnson's house.

15 One being asked a question and one basically being asked

16 -- asked several questions on the location, how they got

17 to the house.

18     Q.   Yes. I agree that your report has lines 19

19 and 20 from JGS_Johnson 166, and then 1 through 8 from

20 167. My question to you is that -- or first, I should

21 say the statement. You agreed that you do not

22 incorporate lines 21 through the 24 on JGS_Johnson 166;

23 is that correct?

24     A.   Correct.

25     Q.   Okay. And that is the part where Ms. Martinez

Page 192

1 is directly asked, "Do you know how you got to

2 Demetrius's house?" Correct?

3     MR. BRUEGGEN: Can I assist him, Melissa?

4     MS. MARTINEZ: Yes.

5     MR. BRUEGGEN: I think I understand what you're

6 what you're asking.

7     MS. MARTINEZ: Yes.

8     MR. BRUEGGEN: So your report, see this?

9     THE WITNESS: Uh-huh.

10     MR. BRUEGGEN: Matches up with this and the

11 answer that starts the next page.

12 That's what she's asking about.

13     THE WITNESS: Okay. Which I said, I did not

14 incorporate 21 through 24.

15 BY MS. MARTINEZ:

16     Q.   Yes. So then --

17     A.   Okay.

18     Q.   Apologize. Yes. So then my follow-up

19 question is, would it then make sense for Ms. Martinez

20 to testify how she got to Demetrius's house when

21 directly asked that question?

22     A.   So basically, in my report I found it puzzling

23 that basically they did give the same testimony. Again,

24 in my report I was only putting the direct, what I

25 viewed as pretty much the same exact testimony.

Page 193

1     Q.   Okay. And in your opinion, could these

2 testimonies also be the same because they are simply the

3 truth?

4     A.   Well, I did not believe they were the truth,

5 only because when the -- I was reviewing the CPD

6 reports, the investigative part of it, an alibi never

7 came up. They never once talked about an alibi. Police

8 didn't know about an alibi, which good police practice,

9 I'm sure if they would've knew about a alibi, they

10 would've interviewed people. Again, I would think.

11 This alibi only came up later on right before trial to

12 the public defender's investigator Jack Carey, is when

13 this alibi came out and then it came out in court. So

14 again, I know I left out line 21 through 24. I was only

15 making the point that I found it, and again I'll get my

16 wording here, quite odd. That two separate people gave

17 almost the exact testimony on an alibi that was given

18 almost before trial.

19     And again, with Reyes being Demetrius

20 Johnson's girlfriend, pregnant with his child, again,

21 with my experience, I think that individual would be

22 kicking down my police door to try to get me that alibi.

23 Because when I dealt with alibis in the past and someone

24 has something to say, they're going to say it. I did

25 not find it there. It was nowhere in the police reports,



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 52 of 114 PageID #:53963
Video Deposition of RONALD S. RUFO, taken 4th November, 2022

194..197

Page 194

1  nowhere anywhere else except in the testimony.  And then
2  in fact, when Reyes testifies in her deposition, she's
3  subpoenaed three times.  She doesn't show up, and then
4  when she shows up on the third time, she refuses to
5  talk.  So again, I'm taking the whole -- I'm taking the
6  whole complex of the alibi.  And when I wrote down -- or
7  when I, in my report, I took the one statement and the
8  second statement, that's what I was saying about
9  mirroring.
10      Q.   Yes.  I --
11      A.   So yeah, 21 through 24 was not put in my
12  report.
13      Q.   Okay.  I'm going to ask about the alibi in a
14  moment, but first I would like, if you could, answer the
15  question that I had posed about if it's possible that
16  the two testimonies are similar because they are the
17  truth.  Is that a possibility?
18      A.   Anything's a possibility.  I find it quite
19  odd.  In my report, I -- it's odd.  I -- I -- I don't -
20  - anything is possible, but I don't see how both were
21  almost mere testimonies.  And again, that's my opinion.
22      Q.   Yep.  Okay.  Understood.  And then a
23  clarification.  You were not retained in this case to
24  evaluate the truth of statements from Plaintiff's alibi
25  witnesses; is that correct?

Page 195

1       A.   I was brought on to review the case, the
2  investigative case.
3       Q.   The investigation as pertaining to the
4  defendant officers, correct?
5       A.   Part of it.  And then -- which also led me to
6  everything else that I have had listed on my Addendum E,
7  document index.
8       Q.   Yes.  I just am asking you that you were not,
9  in fact, retained in this case to evaluate the truth of
10  statements from Plaintiff's alibi witnesses, correct?
11      A.   Not specifically, no.
12      Q.   Thank you, sir.  Okay.  On page -- okay, so
13  now moving on to the alibi.  On Page 16, you make a few
14  different statements regarding Mr. Johnson's girlfriend
15  at the time who was pregnant with his child.  So on page
16  16, in the first full paragraph after the testimony that
17  starts, "Reyes, in her testimony," at the end of that
18  paragraph -- apologies, I'll give you a moment to get
19  there.
20      A.   Okay.
21      Q.   At the end of that -- oh, excuse me.  At the
22  end of that paragraph, you say, "Detectives never had an
23  opportunity to investigate Ray as a statement simply
24  because it did not exist during their investigation and,
25  accordingly, could not be considered in their

Page 196

1  investigation."  Do you see that, sir?
2       A.   I do.
3       Q.   Okay.  And then you also say that --
4  apologies.  I'm going to -- I didn't write down exactly
5  where.  And then right above that, you say that -- in
6  the same paragraph, you say, "The first time she
7  mentioned being Johnson's alibi was to the public
8  defender Jack Carey well after Demetrius Johnson was
9  charged in this case.  In fact, nowhere in the police
10  investigation, did this route/alibi ever come up."  Do
11  you see that, sir?
12      A.   I do.
13      Q.   Okay.  What is the factual basis for your
14  opinion that the investigating officers never knew about
15  Mr. Johnson's alibi?
16      A.   Because in the documentation -- documentation
17  that I reviewed, I never saw anything about an alibi --
18  an alibi.  I never saw any interview that Reyes did talk
19  to the police.  In fact, in her own testimony she
20  basically said that the first time she ever spoke about
21  an alibi was to Jack Carey, the investigator from the
22  public defender.
23      Q.   In your experience, would you agree that
24  investigating a suspect's potential alibi is an
25  important investigative step?

Page 197

1            MR. BRUEGGEN:  Objection.  Form.  Incomplete
2  hypothetical.  Go ahead, sir.
3            THE WITNESS:  Yes.  Through my experience and
4  even back to my training, we would always try to
5  find an alibi.  Again, when we're investigating a
6  case we want to know everything involving that case.
7  And if there was an alibi, absolutely we would want
8  to hear that alibi.  But in this case, there was no
9  documentation of an alibi.  And when I said the
10  police never had a chance to investigate an alibi,
11  there was one that never existed so they -- they
12  could never investigate that alibi.
13  BY MS. MARTINEZ:
14      Q.   Okay.  And in your experience, would you agree
15  that speaking to a suspect's -- strike that, please.  In
16  your experience, would you agree that speaking to a
17  person that a suspect is dating would be an appropriate
18  investigative step in ascertaining if there is an alibi?
19            MR. BRUEGGEN:  Objection.  Incomplete
20  hypothetical.  Go ahead, sir.
21            THE WITNESS:  I would hope that if that
22  individual had an alibi, that individual would want
23  to come and talk to us to supply us with that alibi.
24  Again, this is her boyfriend.  She's pregnant with
25  his child.  She has this supposed alibi.  Again, I

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 53 of 114 PageID #:53964
Video Deposition of RONALD S WATTS, Taken on November 15, 2023

198..201

Page 198

1    find it very -- very puzzling why this young lady
2    would not want to come and speak to the police to
3    try to help her boyfriend.  So again, the alibi
4    never came out until almost right before trial.
5  BY MS. MARTINEZ:
6         Q.   So and just to make sure I'm understanding
7    your testimony as you're giving it, is it your opinion
8    then that the onus is on civilians to prove their
9    innocence rather than the State to prove a person's
10   guilt?
11             MR. BRUEGGEN:  Object to form.  Misstates his
12       testimony.  Go ahead, sir.
13             THE WITNESS:  In my opinion, I would hope that
14       if I have a suspect in a homicide, and if there's
15       any information out there, good, bad, indifferent,
16       it doesn't matter, that that person would come
17       forward and talk to us.  And if we can corroborate
18       that alibi, then I guess us as detectives, we either
19       need to figure out if that alibi is true.  If it is
20       true, then we need to move out and find another
21       suspect.
22   BY MS. MARTINEZ:
23        Q.   Okay.  And just to -- apologies, I missed if
24   you gave a direct answer to the question, but in your
25   experience, would you agree that speaking to the person

Page 199

1    a suspect is dating could be an inappropriate step in
2    figuring out if that person has an alibi?
3             MR. BRUEGGEN:  Objection.  Form.  Incomplete
4        hypothetical.
5             THE WITNESS:  You said could be appropriate?
6   BY MS. MARTINEZ:
7         Q.   Yes.
8         A.   Could be appropriate.  Could be helpful, yes.
9         Q.   Okay.  Thank you, sir.  Okay.  So it --
10   relatedly [sic], on the same page, Page 16, two
11   paragraphs down, you state, "If Reyes could provide a
12   solid alibi on the night of the shooting for the father
13   of her child, she would be adamantly sharing the
14   information with the police and anyone who would
15   listen."  Do you see that, sir?
16        A.   I do.
17        Q.   Okay.  Can you please tell me the factual
18   basis for that opinion?
19        A.   Well, again, in my experience, I've dealt with
20   a lot of suspects, I've dealt with a lot of people, I've
21   dealt with a lot of family members who would nonstop,
22   keep continuing to try to talk to us and provide us
23   information.  So again, regarding Reyes, I would hope
24   that she would come and give this alibi if, in fact,
25   there actually was an alibi.  Again, with my experience,

Page 200

1    my training, I find it very -- very odd that a person
2    who has this sort of alibi that can potentially help her
3    boyfriend, she would not share this with the police.
4         Q.   Okay.  And my follow-up question to that is,
5    as you've said multiple times today, every investigation
6    is different.  Would you agree that every individual is
7    different?
8         A.   Yes.
9         Q.   Okay.  So things that certain individuals may
10   do in response to someone being a suspect in an
11   investigation may not be true for someone else, correct?
12        A.   Can you repeat the question, please?
13        Q.   Yes.  So certain things that an individual may
14   do when someone they know is being investigated of a
15   crime are not the same steps that another person may
16   take.  Would you agree with that?
17        A.   I would agree with that.
18        Q.   Okay, sir.  And apologize, I know we've gone
19   over your trainings a few times, but I'd like to ask:
20   Have you ever received specific training on working with
21   juveniles?
22        A.   I was never a juvenile officer, but we did do
23   in-house juvenile training, but I was never actually
24   certified in becoming a juvenile officer.
25        Q.   Okay.  And what were some of the in-house

Page 201

1    trainings that you participated in regarding juveniles?
2         A.   Just basically when we do house a juvenile,
3    what the juvenile's rights are.  Throughout my career,
4    the age did change with juveniles.  When I first
5    started, I believe it -- the juvenile -- they deemed the
6    juvenile being under 18 years old and then they -- they
7    changed the age.  So it was just in-house training like
8    that, just to kind of familiarize us with basically
9    housing the juveniles.
10        Q.   Okay.  And just a point of clarification, your
11   report does not opine on what civilian actions should
12   have been taken during defendant officer's investigation
13   into the Fred murder, correct?
14             MR. BRUEGGEN:  Object to form.  Did you say
15       civilian actions?
16             MS. MARTINEZ:  Yes.
17             MR. BRUEGGEN:  Objection.  Form.  Go ahead,
18       sir.
19             THE WITNESS:  I'm going to need you to repeat
20       that, please.
21   BY MS. MARTINEZ:
22        Q.   Yes.  Okay.  I just want to make sure, you
23   know, that your report does not opine on what
24   individuals like Mr. Johnson's girlfriend should have
25   done during the defendant officer's investigation into

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  the Fred murder, correct?
2      A.   Well, again, being an investigator for 18
3  years and working some of the cases that I've worked and
4  supervised, again, I just find it odd.  I'm not saying
5  that what she should've did.  My opinion is that she
6  should've came forward with this alibi if, in fact, this
7  alibi was true.  Again, with my experience, I've had
8  people every day at our station door waiting for us to
9  get to work to talk to us.  And again, her boyfriend is
10 charged with first degree murder and she's withholding
11 this information and not giving it until a later date,
12 and then not talking while she's subpoenaed.  Again, I
13 just find it odd.  I'm not saying what she should have
14 done or what she shouldn't have done.  I just made a --
15 a -- my opinion was, I found it quite odd that both of
16 these statements were almost the same and they weren't
17 brought up earlier in investigation, and that the police
18 officers could not investigate an alibi that basically
19 never existed.  If they would've pulled an alibi out of
20 thin air, then we would've had a problem, but it never
21 was there.
22      Q.   Okay.  So on Page 16, sir, in the last
23 paragraph that starts, "When Johnson spoke," you see
24 that?
25      A.   I do.  I'm reviewing it now.

Page 203

1      Q.   Okay.  So in that paragraph you say, "This
2  would seemingly be a memorable event and detail should
3  be easily recalled when discussing the Chicago Bulls NBA
4  championship game."  Let me know when you've had a
5  chance to review.
6      A.   Okay.
7      Q.   So in your experience, in a normal case, when
8  nothing exciting happened the night of a crime, would
9  you have any reservations about asking a suspect where
10 they were on a weekday six weeks previous?
11          MR. BRUEGGEN:  Object to form.  Go ahead, sir.
12          THE WITNESS:  No.
13 BY MS. MARTINEZ:
14      Q.   Why not?
15      A.   Because again, I talked about time frame
16 before.  A day, two days, three days, a week.  You're
17 still going to ask that person a question.  I don't care
18 if it's six weeks later.  A person could remember
19 something.  I'm just not going to dismiss it because
20 it's six weeks later.
21      Q.   Yes, sir.  I can rephrase.  I don't mean not
22 asking them at all, whatsoever.  I think my question is
23 more in a normal case, when you're asking a suspect
24 about what they did on a weekday six weeks previously,
25 would you expect them to remember details?

Page 204

1      A.   Again, I've said it several times.  I'm not a
2  memory expert.  I don't -- never studied the memory.  I
3  don't know an individual, what they can remember what
4  they can't remember.  Some people I've encountered have
5  great memories.  Some people I've encountered had
6  terrible memories, so.
7      Q.   So you wouldn't have any reservations
8  immediately?
9      A.   I would not have --
10         MR. BRUEGGEN:  Object to form.
11         THE WITNESS:  I would have not -- I would've no
12 reservations at all.
13 BY MS. MARTINEZ:
14      Q.   Okay.  From the materials you've reviewed of
15 the record, did you find anywhere where, while someone
16 was questioning Mr. Johnson before he was formally
17 charged, they told him that the murder happened the
18 night the Bulls won the NBA championship?
19      A.   I know there's a conversation between ASA
20 Buckley and Demetrius Johnson.  I would have to go back
21 to that CPD report and -- to answer that question for
22 you.
23      Q.   You can if you have it in front of you, but I
24 can --
25      A.   I do.

Page 205

1      Q.   -- also tell you.  Yeah, they say June 12th.
2  There is no mention of the NBA championship game.
3      A.   Okay.  I'll -- I'll take your word for that.
4      Q.   Is there anywhere else in the record you can
5  think of that you might've seen someone telling Mr.
6  Johnson that that night was the same night that the
7  murder happened, before he was charged?
8      A.   Nothing that I can recall in the report, but
9  again, I'm not privileged to any kind of information
10 that was between him and his attorney.
11     Q.   Okay.  So if Mr. Johnson were asked about his
12 alibi six weeks previously and not told that it was the
13 same night as the NBA championship game, would that
14 affect your opinion that he should have been -- it --
15 that it should have been easy to recall what he was
16 doing that night?
17         MR. BRUEGGEN:  Object to form.  Go ahead, sir.
18         THE WITNESS:  And I apologize, I'm going to
19 have to have you repeat that.
20 BY MS. MARTINEZ:
21     Q.   I can, yes.
22     A.   I'm -- a little confusing two-part question.
23     Q.   Yes.  So if ASA Buckley had never told
24 Mr. Johnson that the night of the murder was the same
25 night as the championship game, which, from the record

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 55 of 114 PageID #:53966
Civil Deposition of RONALD S. WATT(26)taken on November 15, 2022
206..209

Page 206

1  we cannot tell if he did at any point, would it affect
2  your opinion on the -- strike that, please.  When you
3  say that this would seemingly be a memorable evening and
4  detail should be easily recalled, would that still be
5  true if Mr. Johnson didn't have any flagship for that
6  evening?  If he didn't know it was the night of the
7  championship game?
8          MR. BRUEGGEN:  Object.  Go ahead, sir.
9          THE WITNESS:  Well, when you put it that way,
10      he would have no -- possibly have no recollection of
11      it, but basically in the testimony they were going,
12      his girlfriend and a friend, they were going to his
13      house because he wanted to watch the basketball
14      game.  In fact, they really weren't interested in
15      watching the basketball game.  He went into his
16      bedroom, watched the basketball -- basketball game
17      while they sat in the kitchen and -- and talked.  So
18      in what I reviewed, and the understanding that I
19      got, and the opinion that I give is that Demetrius
20      Johnson did, in fact, want to watch that game.  And
21      in fact, getting to the two girls, they knew it was
22      really, really important for the Bulls to win the
23      championship on that Wednesday night only because,
24      and I, again, I think it was Clemente High School,
25      that Clemente High School's graduation was Friday.

Page 207

1      And if there would've been another game that
2      would've interfered with Clemente, and that was
3      another part of the testimony that they did talk
4      about.  So yeah, I do believe that this Chicago
5      Bulls, it was important to the three parties
6      involved, the two females and Demetrius Johnson.
7  BY MS. MARTINEZ:
8      Q.  Yes, but would it affect your opinion on
9  Mr. Johnson's conversation with ASA Buckley, which is
10  what you are analyzing in that paragraph of your report,
11  if he only found out that the shooting happened the same
12  night as the championship after he were charged?
13          MR. BRUEGGEN:  Object to form.  Go ahead.
14          THE WITNESS:  I don't know if I can honestly
15      say it would affect my opinion.  I don't know.
16      Again, investigations are different.  What I do know
17      is that it's a very small statement with Mr. Buckley
18      and Demetrius Johnson.  Again, I think we're in
19      agreement that there is part of the file that is
20      missing.  In my experience with being a detective,
21      and even being a patrol officer and having felonies,
22      that if felony review came out, they would be
23      filling out what we would call a jacket.  They would
24      be interviewing witnesses.  They would be asking for
25      evidence.  They would be doing all of that.  Again,

Page 208

1      we only have that small blurb with the conversation.
2      So to answer your question, I can't answer that
3      because, again, I don't have all of the information.
4      Possibly that information is some of that reports
5      that are missing.
6  BY MS. MARTINEZ:
7      Q.  Okay.  And apologies again if this is
8  repetitive.  I just want to make sure I'm understanding
9  your testimony.  If Mr. Johnson, when he was being
10  questioned by ASA Buckley, did not know that the night
11  of the shooting was the same night as the championship,
12  would it be fair for him to not know where he was or
13  exactly where he was when first asked?
14          MR. BRUEGGEN:  Object to form, speculation.  Go
15      ahead.
16          THE WITNESS:  Again, I -- I -- I -- I don't
17      know.  I -- I can't answer that.  I cannot give you
18      -- maybe.  Maybe yes, maybe no.
19  BY MS. MARTINEZ:
20      Q.  And then my last question in this line of
21  questioning.  In your experience, have you ever
22  investigated a case where a suspect, upon initial
23  questioning, did not know where they were the night of a
24  crime, but when given context was able to provide an
25  alibi?

Page 209

1      A.  So I know during my time with Rosemont and,
2      again, on my task force team, which was a major case
3      assistance team where we investigated 30 to 40 homicides
4      and I did do a lot of interviewing with witnesses,
5      suspects, and there were times where they didn't give an
6      alibi and then they came back with an alibi and we would
7      follow through with it.  There's times -- times where
8      they'd give an alibi and we tore apart that alibi.  So I
9      think to answer your questions, there's different times
10      when you would have an alibi, there's different times
11      you wouldn't.  And again, being with Rosemont and also
12      the major case assistance team, we investigated a lot of
13      homicides and we talked to a lot of people.  And without
14      giving you a number, I'm sure we followed up with a lot
15      of alibis and I'm sure we tore apart a lot of alibis.
16      Q.  Okay.
17          MR. BRUEGGEN:  It's getting real blurry.
18          THE WITNESS:  I'm sorry.  Your -- the screen is
19      getting a little blurry.
20          MR. BRUEGGEN:  Melissa, she's got the sun
21      coming in.
22          THE WITNESS:  Okay.
23  BY MS. MARTINEZ:
24      Q.  Oh, I'm sorry.  We don't have -- I can try to
25  angle myself a little bit; is that better?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 56 of 114 PageID #:53967
Video Deposition of RONALD S. MUSCH, taken on November 15, 2023
210..213

Page 210

1    A.   Yes.  That's a little better.  Yeah.  You just
2  started getting a little like you were --
3         MS. MARTINEZ:  Sorry, I'm attracting the sun.
4  Sorry about that.
5         MR. BRUEGGEN:  3:15 in November.  The sun's
6  setting.
7         MS. MARTINEZ:  It's so sad.
8         THE WITNESS:  Thank you.
9  BY MS. MARTINEZ:
10   Q.   Yes.  No problem at all, and just let me know
11 if I need to adjust further.  So on Page 17, in the last
12 full paragraph right before the subsection Brian
13 Johnson's Jailhouse Confession, do you see that
14 paragraph, sir?
15   A.   Yes, I'm looking now.
16   Q.   Okay.  So you state that, "When eyewitnesses
17 are viewing a lineup, their focus is on the facial
18 features of the person they have seen and are asked
19 questions like if they recognize anyone, which would
20 depend on facial features.  Physical attributes such as
21 height, weight, and age may contribute, usually
22 secondary to the face identification."  Do you see that?
23   A.   I do.
24   Q.   Okay.  Can you please tell me the factual
25 basis for that opinion?

Page 211

1    A.   So with my training and my experience, again,
2  with my task force training, this is kind of what we
3  started to establish as people giving identifications.
4  And I specifically remember at Northwestern that we did
5  talk about facial features and other features, and then
6  kind of carried into Rosemont.  But then it really -- it
7  really took off when we were doing the task force
8  training.  It's kind of what we found that people were
9  identifying more with the facial features than any other
10 features.
11   Q.   Okay.  And in your review of the materials of
12 this case, and in particular the IDs made by Elba, Rosa,
13 and Ricardo, do you believe that the facial feature
14 identification is primary -- strike that, please.  In
15 your review of the materials in this case, specifically
16 the identifications of Elba, Rosa, and Ricardo, is it
17 your opinion that physical attributes are still
18 secondary to facial features?
19        MR. BRUEGGEN:  Object to form.
20        THE WITNESS:  Well, let me start with Rosa.  So
21 Rosa was coming down the stairs when the gentleman
22 she was with, Ortiz, I believe is his name.  I'm
23 sorry.
24 BY MS. MARTINEZ:
25   Q.   Yes, Raul Ortiz.

Page 212

1    A.   Yes, was -- he was shot in the shoulder.  She
2  was basically behind.  She basically looked.  She saw -
3  - she admitted that she saw the shooter and then she ran
4  up the stairs.  So she saw the facial feature.  Elba, who
5  was in front of her house, basically saw individual run
6  past her house with the gun in his hand.  She saw him.
7  Ricardo, who basically says he was driving and he saw
8  the shooting, so he witnessed the shooting.  So again,
9  there's no indication on if Ricardo saw face, hands,
10 legs, but he didn't make an identification.  And again,
11 I don't know if this is something that's missing from
12 the reports that were missing, further that would answer
13 those questions.  But again, you do have -- but again,
14 when I gave my opinion on the facial features, I believe
15 that the facial features played a big part of these
16 identifications.
17   Q.   Thank you, sir.  On Page 20 of your report,
18 we're making our way through it.  On Page 20, you
19 discussed, and apologies, I don't have the paragraph
20 number in front of me so let me -- in paragraphs two and
21 three, and feel free to take a moment to review those,
22 but you discussed your experience in transitioning to
23 computer systems and seeing less filing errors; is that
24 correct?
25   A.   I'm reviewing that right now.

Page 213

1    Q.   Okay.
2    A.   If you could just give me a few seconds.
3    Q.   Absolutely.
4    A.   Okay.  I see the part you are referring to.
5    Q.   Okay.  And just a clarification question.  Is
6  it your opinion in this case that the Erickson report,
7  which is Exhibit Number 3, was not turned over because
8  of a filing error?
9    A.   I never said that it was turned -- that it was
10 not turned over because of a filing error.  I was just
11 making reference to back in 1991.  And again, I got on
12 the job in '87 and then hired full-time in 1995.  I knew
13 how we did reports.  Everything was handwritten.  In
14 fact, sometimes we would have to use erasable pen to
15 correct errors.  And once your report was done, you
16 would have to walk over to your supervisor's office,
17 hand that over to be reviewed.  If there were errors or
18 corrections needed to be done, they would hand it back
19 to you.  You could do that several times.  Then once a
20 supervisor was done with it, they basically would have
21 to walk it up to records, where records would file that
22 by hand.  And during my career, there are instances
23 where I was missing paperwork.
24        I have one instance where I was missing
25 Miranda rights, and it was misfiled, and there was

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1  occasions where I was never able to find it. So I went
2  through the transition. And what I was trying to give an
3  opinion on is that I went through the transition of how
4  reports were written early on in the early '90s, mid-
5  '90s, late '90s, to when we started transitioning over
6  to computers. And that could be just typing and being able
7  to correct your, you know, whatever error. If you
8  wanted to change your thought without have to start a
9  new report. And then we got through our career where
10 everything went, basically, through the computer. That
11 we could send everything to records through the
12 computer. So I'm not saying that anything was misfiled
13 on the Erickson report. Never made mention of that. I
14 could just see how things could have happened.
15 Especially with the size of Chicago. The documentation
16 -- that when they gave documentation to supervisors,
17 they literally put it in a basket. And it depends on
18 supervisors, days off, the basket gets full, when
19 they're going to approve these reports. So again, I
20 could just see a lot of problems occurring with this
21 method that we had in 1990s. And again, not our fault,
22 it's just the way that technology evolved.
23        Q.  Okay. Thank you. Thank you for the
24 clarification, sir. I'm going to come back to the
25 Erickson report later on in your opinion. But yeah, no

Page 215

1  other questions on your opinions as to the transition
2  from papers to computer systems. So on Page 20, in the
3  first paragraph, we're jumping back just a tiny bit, the
4  very top of the page; do you see that, sir?
5        A.  Starts, "Demetrius Johnson stated"?
6        Q.  Yes. Exactly. You state that, quote, "If
7  Ms. Gubin thought there was enough proof to tie Bryan
8  Johns to the murder, she would've followed up by taking
9  initial steps, including interviewing witnesses and
10 interviewing Bryan Johns himself." Do you see that?
11       A.  Reviewing that right now. Okay.
12       Q.  Okay. This is a clarifying question. Your
13 report does not opine on proper criminal defense
14 strategies, correct?
15       A.  Correct.
16       Q.  Okay. Thank you, sir. And then on the same
17 page, in the second paragraph that starts, "While
18 reviewing all". Do you see that, sir?
19       A.  I do. I'm reviewing it now.
20       Q.  Okay. You state that, quote, "If Miss" -- oh,
21 apologies. Strike that, please. You state that, "I can
22 say that the written documentation by all the parties
23 involved in this case, including police, public
24 defenders, and state's attorneys, et cetera, appears
25 consistent with standard documentation in the early

Page 216

1  1990s." Do you see that, sir?
2        A.  I do.
3        Q.  What is the basis for this opinion
4  specifically in regard to -- or strike that, please.
5  What is the factual basis for this opinion?
6        A.  So I look at -- when I reviewed all the
7  documentation, and I could just see the way that -- and
8  I'll just start with the Chicago Police reports. The
9  way that they were -- looks like they were typed with a
10 typewriter. That would be consistent, in my experience,
11 the way that reports were done late '80s, early '90s.
12 When I look at -- and -- and this -- please don't take
13 this out of line Dave or ma'am. That the way lawyers
14 write, when I looked at the state's attorney file and I
15 looked at the public defender's file, I mean, I have
16 doctors that write better than -- you know, than what I
17 was reviewing. But I did find that consistent just the
18 way that things were done back in the day. You know,
19 I'm not -- I'm not making a joke of it, but that's just
20 -- again, that when I go back to the way that technology
21 has, you know, progressed, it's just the way things were
22 done. And, you know, not so much with the CPD reports,
23 but with state's attorney file, public defender file,
24 things were hard to read because it was just all
25 scribble.

Page 217

1        Q.  Yes. Thank you, sir. And I promise no
2  offense taken at the shot at lawyers' handwriting.
3        A.  Thank you.
4        Q.  Okay. So this is tying back to something that
5  you had very briefly testified to earlier, but on Page
6  20, the last paragraph, you state, quote, "While the
7  existing file does not contain general progress reports,
8  there is evidence that GPRs were prepared." Do you see
9  that, sir?
10       A.  I do.
11       Q.  So first, can you please provide the factual
12 basis for that statement?
13       A.  Yes. So in Detective Guevara's trial
14 testimony, he did make mention that there were GPRs.
15       Q.  Okay. And when you were first reviewing this
16 case, were you concerned with the lack of police reports
17 and interview notes in the files that defendant officers
18 -- I'll reword. When you were first reviewing this
19 case, and we've talked about the missing documents
20 multiple times today, were you concerned with the lack
21 of police reports in the investigative file?
22       A.  So when I was going through everything, in my
23 head I wanted to be sure that I reviewed everything
24 before I started to come to any opinion, conclusion. I
25 don't like to use the word disturbed. I guess I'll use



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 58 of 114 PageID #:53969
Civil Deposition of RONALD G. MUSCH, taken 4th November, 15, 2022
218..221

Page 218

1  the word mystery where some of these files are.
2      Q.   So let me -- oh, apologies, sir.  I didn't
3  mean to cut you off.
4      A.   No, that's okay.  It just -- it just -- I just
5  wish when I was reviewing -- when I reviewed the whole
6  case, I wish I could have read some of the missing
7  files.  I don't want to say I was disturbed by it
8  because, again, I give the opinion to the way things
9  happened back, again, we're talking about 1991.  So I
10 wish I could have reviewed missing documents.  But
11 again, I wasn't surprised, shocked that there were
12 documents not where they were supposed to be.  Just with
13 the way that I knew how reporting, recording was all
14 done back in the 1990s.  If that makes sense to you.
15     Q.   Yes, sir.  So would it be fair to say -- not
16 disturbed -- would it be fair to say that, in your
17 review, you were curious why certain documents were not
18 in the file?
19     A.   I would say -- you could say curious.  That --
20 I'm okay with that word.
21     Q.   Okay.  And then to the other point you
22 mentioned about looking at Defendant Guevara's testimony
23 as to supporting the fact that GPRs may have been
24 created in this case.  You testified earlier that you
25 reviewed his deposition transcript for this case,

Page 219

1  correct?
2      A.   Correct.
3      Q.   And you're aware that a defendant may plead
4  the Fifth when a truthful answer could subject that
5  person to criminal prosecution, correct?
6          MR. BRUEGGEN:  Object to form.  Misstates the
7  law.  Go ahead.
8          THE WITNESS:  I'm going to need you to rephrase
9  that, please?
10 BY MS. MARTINEZ:
11     Q.   Are you aware in what instances a person may
12 plead the Fifth Amendment?
13         MR. BRUEGGEN:  Object to form.  Go ahead.
14         THE WITNESS:  I don't know specific instances,
15 but I believe that everybody does have the right to
16 plead the Fifth.
17 BY MS. MARTINEZ:
18     Q.   And in your words, what does it mean when a
19 person pleads the Fifth?
20     A.   Well, again, to --
21         MR. BRUEGGEN:  Form.  Go ahead.
22         THE WITNESS:  I reviewed this documentation.  I
23 reviewed the investigative part of it.  I reviewed
24 deposition of Detective Guevara.  I reviewed that
25 depositions, that everything was on my appendix.  So

Page 220

1  again, I don't really think about the Fifth.  I
2  don't have an opinion on the Fifth, nor did I put
3  any kind of opinion in my report about the Fifth.
4  BY MS. MARTINEZ:
5      Q.   Were you concerned -- I'll -- these -- this
6  next line of questioning is related to your review of
7  Defendant Guevara's deposition.  Were you concerned when
8  you read that he pled the Fifth in response to questions
9  about whether he framed Mr. Johnson?
10         MR. BRUEGGEN:  Object to form.  Go ahead, sir.
11         THE WITNESS:  No, I wasn't concerned.
12 BY MS. MARTINEZ:
13     Q.   Why not?
14     A.   I read the deposition.  He pled the Fifth.  I
15 read my reports.  I read other documentation.  And
16 that's the opinion I gave.
17     Q.   Okay.  Were you concerned when you read that
18 he pled the Fifth in response to questions about whether
19 he manipulated and suppressed eyewitness
20 identifications?
21         MR. BRUEGGEN:  Object to form.  Go ahead.
22         THE WITNESS:  Are you talking about --
23 BY MS. MARTINEZ:
24     Q.   In his deposition?
25     A.   Okay.  No, I did not give any thought.  Again,

Page 221

1  I don't -- I didn't really concern myself why he gave
2  the Fifth.
3      Q.   Okay.  Were you concerned when you read that
4  Defendant Guevara pled the Fifth in response to
5  questions about whether he fabricated evidence in this
6  case?
7      A.   No.
8      Q.   Why not?
9      A.   Again, he pled to Fifth.  And I reviewed the
10 case, and I gave my opinion on the investigation.  And
11 that's how I gave my opinion.
12     Q.   Okay.  When you were reading through his
13 deposition transcript, were you concerned that he pled
14 the Fifth when asked whether he engaged in misconduct
15 during live lineups and photo identification procedures
16 used in this case?
17     A.   No.
18         MR. BRUEGGEN:  Object to form.  Go ahead.
19         THE WITNESS:  No.
20 BY MS. MARTINEZ:
21     Q.   Okay.  Why not?
22     A.   Again, I focused on the case.  When I read his
23 deposition, I read it through.  He pled the Fifth, and I
24 gave my opinion on a case.
25     Q.   Do you think it's permissible for a police

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 59 of 114 PageID #:53970
Civil Deposition of RONALD S MITCH, taken on November 15, 2023
222..225

Page 222

1  officer to plead the Fifth about an investigation that
2  they conducted?
3         MR. BRUEGGEN:  Object to form.
4         THE WITNESS:  Again, I have --
5         MR. BRUEGGEN:  Go ahead, sir.
6         THE WITNESS:  Again, I have no opinion on that.
7  I -- again, I don't understand, but that's the
8  person's right.
9  BY MS. MARTINEZ:
10     Q.   Are you -- just for clarification, are you
11  saying you don't understand why Defendant Guevara did
12  that in this case?
13     A.   No.  I just basically read the deposition.  He
14  gave the Fifth, and I just moved on from it.  I mean, no
15  opinion one way or the other.
16     Q.   Okay.  Are there any -- just one moment.  So
17  just -- apologies.  Just for clarification so we can
18  have a clean record.  In response to, do you think it's
19  permissible for a police officer to plead the Fifth
20  about an investigation they have conducted, you
21  responded, you have no opinion one way or the other,
22  correct?
23     A.   Correct.
24     Q.   Thank you, sir.  Are there any circumstances
25  you can think of under which you think it might be

Page 223

1  permissible for a police officer to plead the Fifth in
2  response to an investigation that they conducted?
3         MR. BRUEGGEN:  Object to form.  Speculation.
4  Foundation.  Go ahead.
5         THE WITNESS:  No.  I don't give no opinion on
6  that.
7  BY MS. MARTINEZ:
8     Q.   In your experience outside of Defendant
9  Guevara's deposition, have you seen it happen any other
10  time?
11        MR. BRUEGGEN:  Object to form.
12        THE WITNESS:  If I've seen -- what have I seen?
13  BY MS. MARTINEZ:
14     Q.   Maybe -- have you seen -- I'll rephrase the
15  question.  In your experience, excluding Defendant
16  Guevara's deposition testimony, have you ever seen an
17  investigating officer plead the Fifth in relation to an
18  investigation that they conducted?
19     A.   No.
20     Q.   When you were reviewing his -- strike that,
21  please.  When you were reviewing Defendant Guevara's
22  consistent taking of the Fifth in his deposition, did
23  you weigh that in any way when determining his
24  credibility and his -- and the -- apologies, David.  In
25  determining his credibility and the credibility of the

Page 224

1  reports that he drafted?
2         MR. BRUEGGEN:  Object to form.
3         THE WITNESS:  No.  I read his deposition.  And
4  once I was done with it, I moved on to another
5  document.  I don't know which one it was, but I just
6  moved on from it --
7  BY MS. MARTINEZ:
8     Q.   Okay.  So --
9     A.   -- on it.
10     Q.   Okay.  So Defendant -- just for -- again, for
11  a clean record.  For Defendant Guevara's deposition
12  testimony, you did not give any weight to his continuous
13  taking of the Fifth Amendment in response to questioning
14  of his investigation?
15        MR. BRUEGGEN:  Object to form.  Go ahead.
16        THE WITNESS:  I did not.
17  BY MS. MARTINEZ:
18     Q.   Okay.  And the last one, because it
19  particularly relates to the support that you cite for
20  whether GPRs were created.  When you were reviewing
21  Defendant Guevara's deposition testimony, were you
22  concerned that he pled the Fifth when asked about the
23  testimony he gave at Mr. Johnson's criminal trial?
24     A.   No.
25     Q.   No.  Even though you were relying on that

Page 225

1  testimony to support one of your opinions?
2     A.   I did not.
3     Q.   Okay.  And why not?
4     A.   Again, I read his deposition.  I read that he
5  pled the Fifth.  I finished the deposition.  I moved on
6  to other documentation.  And then when it was time, I
7  gave my opinion.
8     Q.   Okay.  If Defendant Guevara's trial testimony
9  about the existence or creation of GPRs were false,
10  would that change your opinion on whether or not those
11  reports were prepared in this case?
12        MR. BRUEGGEN:  Object to form.  Foundation.
13        THE WITNESS:  So if there was documentation
14  that I've read and it stated that that was the
15  truth, then I would have a different opinion.  I
16  would have to.
17  BY MS. MARTINEZ:
18     Q.   And last question in this line of questioning.
19  Would you agree that even if GPRs were prepared in this
20  case, they still would need to be turned over to the
21  defense?
22     A.   If there were GPRs and they were in the file,
23  I'm sure they would've been turned over to the defense.
24     Q.   Okay.  But would you agree that officers have
25  an obligation to turn those reports over to the defense?

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 60 of 114 PageID #:53971
Video Deposition of RONALD 'S MUICH, taken November 15, 2023
226..229

Page 226

1    MR. BRUEGGEN:  Objection.  Misstates the law.
2    THE WITNESS:  Again, I believe that -- and I
3    would have to go back to the -- to the policy in
4    Chicago, that do not believe that they had to create
5    GPRs.  And if the detectives did create GPRs, would
6    I expect it to be in the file?  I guess in 1991 I
7    would expect to.  I've also read that the defense
8    attorneys created notes in their own testimony at
9    court.  I believe it was Ms. Gubin, along with
10   Ms. Miller, they created notes, and they admitted
11   under oath -- or I don't even know if it was under
12   oath.  If it was a -- just a discussion with the
13   judge, that they created notes in interviews and
14   they destroyed them.  So I guess if we're talking
15   about GPRs on the police end and notes on the public
16   defender side, should they have saved their notes?
17   You know, so you -- you know what I'm saying?
18   They're admitting that --
19   BY MS. MARTINEZ:
20   Q.   Yes.
21   A.   -- they're getting rid of notes.  There were
22   GPR notes, but we know there's a missing file or missing
23   parts of the file.  So we don't know that those notes
24   are missing or if those notes -- where are those notes?
25   But we know that, on the public defender side, they

Page 227

1    admitted they destroyed them.
2    Q.   Yes.  I just want to clarify that in this
3    case, as asked previously, you were not retained to
4    opine on how defense counsel should have acted in
5    Mr. Johnson's defense, correct?
6    A.   Well, but when I review all the documentation
7    and I do get to points that are being questioned in
8    different sections of the reports, I want to make sure
9    that my opinion is put together with all the
10   documentation that I read.  So if I'm going to read --
11   if I'm going to read, let's just say -- I'll just say
12   paper A, if I read it and I feel like something has to
13   go in my report with my opinion, I'm going to add it
14   because I read it.
15   Q.   Right.  I just want to clarify.  You're not an
16   expert in criminal defense, right?
17   A.   That is correct.
18   Q.   Okay.  Thank you, sir.
19   MR. BRUEGGEN:  Alyssa, can we take a break when
20   you move to a new topic?
21   MS. MARTINEZ:  Yes.
22   MR. BRUEGGEN:  Is this a --
23   MS. MARTINEZ:  Yeah.  I'm -- yeah.  I'm about
24   to move to something else, so now is a good time.
25   How much time is good?

Page 228

1    MR. BRUEGGEN:  Just five minutes.  Just run to
2    the bathroom.
3    MS. MARTINEZ:  Yeah.  Sounds good.  Okay.  We'll
4    meet back at 3:48.
5    MR. BRUEGGEN:  Sounds good.
6    MS. MARTINEZ:  Okay.  Great.
7    THE REPORTER:  Okay.  We are going off record.
8    The time is 3:42 p.m. Central.
9    (OFF THE RECORD)
10   THE REPORTER:  We are back on record for the
11   deposition of Ronald Muich being conducted by video
12   conference.  My name is Kyra Tate.  Today is
13   November 15, 2023.  The current time is 3:53 p.m.
14   Central.
15   BY MS. MARTINEZ:
16   Q.   Mr. Muich, on Page 20, in the last paragraph,
17   the section we were just looking at, you state that,
18   quote, "CPD rules did not require creation of notes and
19   detectives could conduct interviews and complete their
20   reports upon conclusion of the interviews."  You see
21   that?
22   A.   I do.
23   Q.   Okay.  Could you please tell me the factual
24   basis for this opinion?
25   A.   I'm sorry, I'm just rereading it one more

Page 229

1    time.
2    Q.   Take your time.
3    A.   So like I said before, that during this case
4    there was indication that there were GPRs made.
5    Detective Guevara said that in his testimony, that they
6    were made.  That that missing GPR could be missing.
7    Also, in the state's attorney file, there was mention
8    that there was GPR notes turned over, and those notes
9    are missing.  Like I made reference to Demetrius
10   Johnson's old lawyers, basically, with notes.  And
11   again, I know they're not GPR notes, but they had notes,
12   and then those notes were -- were destroyed or thrown
13   away.  So my opinion is there were GPR notes.  Some.  I
14   don't know how many.  That these GPR notes are missing.
15   Part of the missing documents.  So again, I can't -- I
16   don't know how many were written, how many are missing.
17   I can't answer that.
18   Q.   Okay.  And you testified previously that the
19   only Chicago Police Department policy that you reviewed
20   for this report was the general orders around lineups;
21   is that correct?
22   A.   So I reviewed Chicago Police Department, CPD
23   lineup procedure general orders.  I believe that's all I
24   reviewed.
25   Q.   Okay.  So then for this statement, is there



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 61 of 114 PageID #:53972
Video Deposition of RONALD S. YAWGER, taken 4th November, 15, 2022

230..233

Page 230

1  any other policy that you reviewed that allowed you to
2  come to the conclusion that CPD rules did not require
3  the creation of notes?
4      A.  No, I did not review anything like that.
5      Q.  Okay.  Thank you, sir.  And then on Page 21,
6  in the third paragraph that starts with, "My experience
7  is consistent".  Let me know when you get there.
8      A.  Okay.
9      Q.  You state that, quote, "Juvenile stories need
10 to be corroborated with other witness statements to
11 ensure that investigators are getting accurate
12 information."  Do you see that part?
13     A.  I do not see that part.  Which line are you
14 going down when you started that?
15     Q.  It is -- I believe it's halfway through.  It's
16 the very last sentence of that paragraph on Page 21.
17     A.  Is that the one where it begins, "The age of
18 the witness"?
19     Q.  No, sir.  It begins, "My experience is
20 consistent." Page 21, the third paragraph.
21     A.  21?
22     Q.  Oh, apologies.  Yes.  That sentence begins --
23     A.  Okay.
24     Q.  Yeah.  Okay.  So yes, you state, "Both
25 juvenile stories need to be corroborated with other

Page 231

1  witness statements to ensure that investigators are
2  getting accurate information."  Can you please tell me
3  the factual basis for that opinion?
4      A.  So like I gave through my experience when I
5  dealt with juveniles, when I worked the frozen young
6  lady that was found in a freezer and she was deceased,
7  and when I give the example that we had to locate and
8  interview 78 people, and I believe a dozen of those
9  individuals were juveniles.  Again, I -- I -- I did
10 agree with Mr. Tiderington that younger witnesses, and
11 I'm going to say younger witnesses as in juveniles,
12 they're not as reliable as adults, just with their
13 statements.  And again, this is -- this is with my
14 experience when dealing with juveniles.  And even when I
15 was with the major case assistant team and we had a deal
16 with juveniles and interviewed juveniles, it was - - it
17 was really a test only because, you know, I mean, the
18 maturity level when you're talking to a juvenile and
19 you're talking to an adult, at least adult can formulate
20 sentences and keep their point going.  Juveniles would
21 tend to, basically their thought process would go all
22 over the place.  They would be afraid of the police and
23 you could not get a -- an -- an accurate -- an accurate
24 summary of what happened.
25     Q.  A quick clarification question, sir.  You

Page 232

1  testified earlier that the age with which your
2  department classifies juvenile has changed over the
3  years.  As you use the term, what age are you referring
4  to?
5      A.  So going through my training while I was
6  active on the police department, there was a time and I
7  don't know the year when a juvenile was classified under
8  the age of 18, and then they'd change a juvenile under
9  the age of 17.  So the age would change.  So that was a
10 training that we were receiving.  And without me going
11 back and looking, I -- I couldn't tell you specifically
12 when or what age, you know, the time frame when ages
13 were, you know, being changed in the state of Illinois.
14     Q.  Okay.  As you use it in your report, which age
15 do you refer to?
16     A.  In this section that we're talking about?
17     Q.  Yes, sir.
18     A.  I would believe anybody under the age of 17.
19     Q.  17.
20     A.  And again, in my case that -- that I do talk
21 about with the girl in the freezer, I was talking to
22 witnesses as -- as young as 12 and 13, not even
23 teenagers.
24     Q.  Okay.  In your opinion, is there a distinction
25 between pre-teens that are 12 and 13 and people that are

Page 233

1  16, 17 when it comes to how inconsistent their stories
2  can be?
3          MR. BRUEGGEN:  Object to form.  Foundation.  Go
4  ahead, sir.
5          THE WITNESS:  So I specifically would look at
6  their age.  I would actually look how they are able
7  to tell me what happened, form a sentence, keep the
8  sentence going.  Just pretty much their demeanor.
9  Just because, you know, I'm sure I talked to,
10 especially in -- in the -- where the girl was found
11 in the freezer, I'm sure I talked, without looking
12 at that case, the paperwork in that case, I'm sure I
13 talked to teenagers who were 12, 13, 14-year-olds,
14 who were, you know, maybe more advanced and able to
15 talk better and, you know, bring their point home
16 more than I would talk to someone who's maybe 15,
17 16, 17.  So again, I wouldn't look at it -- I
18 wouldn't put an age number on it.  I would have to
19 talk to the individual.  I would not dismiss a
20 witness just because they were 12, 13, 14-
21 years-old.  I would have to talk to the -- talk to
22 the individual.  And again, through my career, we
23 also, you know, laws have changed now that where we
24 would actually, you know, bring witnesses, you know,
25 over to the Children's Advocate Center to where, you

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 62 of 114 PageID #:53973
Civil Deposition of RONALD S MUZZY, taken on November 1, 2022
234..237

Page 234

1    know, they have trained advocates who would talk to
2    them and -- and stuff like that.  So things have
3    changed through the career.  But again, I think to
4    answer your question, I would not put a -- a
5    specific number on someone where I would think that
6    they wouldn't be able to, you know, formulate
7    something.
8  BY MS. MARTINEZ:
9       Q.   Okay.  So is it fair to say it would be a case
10  by case determination?
11      A.   That is correct.
12      Q.   Okay.  Thank you, sir.  And so it's not your
13  opinion that juveniles can never give a correct
14  identification and need to always be corroborated; is
15  that fair to say?
16      A.   That is not my opinion, no.
17      Q.   Okay.  And it's then, relatedly, not your
18  opinion that adults never need to be corroborated; is
19  that fair?
20      A.   Again, case by case situation.  I've talked to
21  adults to where, you know, I could be talking to, and
22  this is hypothetical, you know, a 50-year-old adult and
23  I walk away and I -- I feel like I was talking to a
24  15- year-old.  So you know, again, it's a case by case
25  situation.  And you just -- like I said earlier, and

Page 235

1    I've said it several times, that no investigation's the
2    same.  So you just have to see where the investigation's
3    going to take you.
4       Q.   Okay.  Thank you, sir.  So moving on to Page
5    22 of your report.  In the first paragraph, you state,
6    quote, "The lineups were rerun and the report that was
7    submitted noted that Gonzalez did not identify Johns.
8    Gonzalez was asked about this, and he now denies ever
9    viewing the lineup and has no recollection of the
10   events, which would mean that the lineup report with
11   Erickson's name on it was not accurate."  Do you see
12   that part, sir?
13      A.   I do.
14      Q.   Would you agree that this would also mean that
15   the Guevara report was not accurate if Mr. Gonzalez
16   testified he never viewed a lineup?
17      A.   No, I would not.
18      Q.   Why not?  Because I can also bring up Exhibit
19   4 again.  But Aby Gonzalez is also on Defendant
20   Guevara's report of the lineup.
21      A.   I'm just rereading this section again.
22      Q.   Please take your time.
23      A.   So we know that Aby Gonzalez is claiming that
24   he's never did a -- a lineup report.  I'm sorry.  I'm
25   just rereading it again.

Page 236

1       Q.   No, please take your time.  But just to make
2    clear, my question isn't about every single thing that
3    Aby Gonzalez said and did.  My question is, in your
4    report you state that Aby Gonzalez denies ever giving a
5    lineup and has no recollection of the events, which
6    would mean that, in your words, "the lineup report with
7    Erickson's name on it was not accurate."  My question to
8    you is that would this also mean then that the Guevara
9    report was not accurate?
10      A.   Well, in regards with the Erickson report, I
11   guess we can't get an -- an answer on that because
12   Detective Erickson is deceased, so we cannot get an
13   answer on that.  So I guess I would say I don't know.
14      Q.   Okay.  So your answer would be that despite
15   Mr. Gonzalez saying he doesn't remember a lineup or
16   anything, that we don't know if that statement is
17   truthful and if the lineups -- strike that, please.  And
18   if the lineup reports are correct?
19           MR. BRUEGGEN:  Object to form.  Go ahead, sir.
20           THE WITNESS:  Yeah.  I would just have to say
21       that without Detective Erickson giving any kind of
22       explanation that, yeah, I just -- I cannot answer.
23       I don't know.
24   BY MS. MARTINEZ:
25      Q.   Okay.  And would you agree also with Defendant

Page 237

1    Guevara not giving any explanation?
2            MR. BRUEGGEN:  Again, form.  Go ahead.
3            THE WITNESS:  There was no -- nothing that I
4        reviewed that he gave any kind of explanation.
5    BY MS. MARTINEZ:
6       Q.   Okay.  Certainly.  Is it possible in your
7    experience that Mr. Gonzalez simply forgot that he
8    participated in the lineups?
9       A.   Anything is possible.
10      Q.   Okay.  Is it possible that Mr. Gonzalez
11   decided for some reason to now be untruthful?
12      A.   Again, anything is possible.  I don't know.
13      Q.   Sure.  And then in your experience, have you
14   ever had a witness give a statement or make an
15   identification and then rescind that statement or
16   identification?
17      A.   Yes, I have.
18      Q.   Okay.  Can you tell me a little just about the
19   context in which that has happened?
20      A.   So like I think we talked about it before in
21   my -- when I did that lineup at the DuPage County Jail
22   and all the individuals were in orange jumpsuits and my
23   witness made an identification, and then we were done.
24   She -- she picked out whatever subject she picked out.
25   And then as we were walking away, she made the comment

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 63 of 114 PageID #:53974
Video Deposition of RONALD S. BIEDER, taken 9th November 15, 2023
238..241

Page 238

1 that she wasn't comfortable making identification
2 because everybody was in orange jumpsuits. So I took
3 that as I wasn't just going to take her identification
4 and move on with it, because that's not following proper
5 police practices. It's not what I was trained for.
6 That's not what I did in investigations. I took an
7 extra step. I coordinated with the sheriff, got
8 everybody in different clothes, reran the lineup. She
9 looked at the individual and -- or she looked at the
10 lineup and she could not pick out the individual. And
11 again, I was fine with that because again, when I did
12 lineups, I wanted to make sure that I had a good lineup
13 and I had a good identification and that's the person
14 that the person was going to stick to, especially when
15 they went to trial, follow it all the way to the end.
16     Q.  Okay.  On Page 21 the last paragraph, let
17 me know when you get there.
18     A.  Okay.  I am on the last paragraph, Page 21.
19     Q.  Okay.  You say, quote, "In regards to the
20 Bryan Johns lineup report that was allegedly only,
21 quote-unquote, 'found decades later,' it does not make
22 sense that the police were trying to hide that report
23 when a copy of it was placed in and maintained in the
24 investigative file."  And so my first question is, if
25 the report that you're referring to, which is the

Page 239

1 Erickson report or Exhibit 3 in this case, if that
2 report were intentionally hidden, do you agree that
3 would be misconduct?
4     A.  So I don't want to use the word misconduct, so
5 --
6     Q.  I can reword.  I can reword, sir.
7     A.  Yeah.  I just don't want to use the word
8 misconduct --
9     Q.  Yes.
10     A.  -- because misconduct could -- can mean a lot
11 of different things and --
12     Q.  Yes, I'll reword the question.  If that report
13 were intentionally hidden, would that be out of line
14 with standard policing practices in 1991?
15     A.  So if there was any documentation that I
16 reviewed that specifically said that that report was
17 hidden purposely, yes, I would agree with you.  But that
18 report, it wouldn't make sense for that report for
19 anybody to hide it, because the information was already
20 out there that Aby Gonzalez picked out Bryan Johns. It
21 was not a -- it wasn't a secret.  Even at trial it could
22 have been brought up at trial by the defense that Aby
23 Gonzalez picked out Bryan Johns.  They could have
24 brought Bryan Johns in.  They could have subpoenaed
25 Bryan Johns to -- trial, but they didn't.

Page 240

1     Q.  Yeah, I apologize.  I didn't mean to cut you
2 off, sir.  Just for clarification.  In your report, you
3 don't opine on criminal defense trial strategy, correct?
4     A.  That is correct.
5     Q.  Okay.  Thank you, sir.  Are you familiar with
6 the Chicago Police Department's history of maintaining
7 separate files with evidence from investigations, not
8 all of which are turned over to the defense?
9         MS. CARNEY:  Objection.  Form.
10         MR. BRUEGGEN:  Object to foundation.
11         MS. CARNEY:  Foundation.  Misstates the
12     evidence.
13         MR. BRUEGGEN:  You can answer, sir.
14         THE WITNESS:  No, I do not.
15 BY MS. MARTINEZ:
16     Q.  Sure.  And in your review of the materials in
17 this case, particularly the defense's documents, did you
18 find the report authored by Defendant Erickson?
19         MR. BRUEGGEN:  Object to form.
20         THE WITNESS:  I would have to see.  Was that
21     the earlier exhibit that we saw?
22         MS. MARTINEZ:  Yes, sir.  Exhibit Number 3.
23         THE WITNESS:  I would have to -- I would have
24     to see that report.
25 BY MS. MARTINEZ:

Page 241

1     Q.  Okay.  Because you don't recall off the top of
2 your head seeing it in the --
3     A.  I don't recall off the top of my head.  Yes,
4 ma'am.
5     Q.  -- the criminal defense documents?  Okay.
6 Thank you, sir.  Did you find anything in the record
7 from the materials you reviewed showing that Mr. Johnson
8 or his attorneys received that document?
9         MS. CARNEY:  Objection.  Form.
10         THE WITNESS:  Can you repeat the question,
11     please?
12         MS. MARTINEZ:  You can answer.  Yeah.  Yes, I
13     can.  Did you find anything in the record from the
14     materials you reviewed which would show that Mr.
15     Johnson or his attorneys received the lineup report
16     authored by Defendant Erickson?
17         MS. CARNEY:  Same objection.
18     A.  So I -- so I do know that in RFC Johnson 12,
19 that there is a Chicago Police message to Detective --
20 to Halverson from Sheehan, Kevin Sheehan, and it says,
21 bring file.  So I'm assuming that whatever paperwork was
22 in the file was turned over to Mr. Sheehan, which then I
23 would think that whatever was in that file would be
24 turned over to the defense.
25     Q.  Okay.  On that note, I would like to share my

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 64 of 114 PageID #:53975
Video Deposition of RONALD S. MICCO, taken on November 15, 2023
242..245

Page 242

1  screen for our final exhibit, which we'll mark as
2  Exhibit 9, which is the deposition testimony from
3  Mr. Sheehan. And I'm on page 43, and I'm also sharing
4  my screen if that's easier for you to look at as opposed
5  to flipping through the pages.
6        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
7        THE WITNESS: We're finding it right now,
8  ma'am.
9  BY MS. MARTINEZ:
10       Q.  Okay. No worries.
11       A.  Page 43?
12       Q.  Yes, sir.
13       A.  Okay. Which section, what number?
14       Q.  We're starting at Line 1, where -- and I'll
15  just recite the testimony. Or apologies, starting on
16  Page 42, Line 23. And the testimony goes, Question,
17  "All right. So we've been discussing the arguments that
18  were and were not made at trial. I have to ask this
19  question, but is there any chance that you were tendered
20  that report that we looked at, Exhibit 4?" And this is
21  where they're referring to the report drafted by
22  Defendant Erickson. Answer, "You're talking about the
23  lineup where Bryan Johns was picked out?" Question,
24  "Yes." Answer, "No, because if I had it, I have to sleep
25  at night. It goes to the defense." Question, "And does

Page 243

1  the information in the transcripts we just reviewed,
2  including -- apologies, including your closing argument,
3  confirm to you or give you confidence that you had not
4  been provided a copy of that report marked as Exhibit
5  4?" An objection by Ms. Rosen. Answer, "It's not the
6  argument that gives me confidence. What gives me
7  confidence is the truth. I never got it." Do you see
8  that, sir?
9        A.  I do.
10       Q.  Okay. So with this, after reading this
11  testimony, would you believe that Mr. Sheehan never
12  received the report drafted by Mr. Erickson?
13       MS. CARNEY: Objection. Form. Calls for
14  speculation.
15       MS. MARTINEZ: You can answer, sir.
16       THE WITNESS: So if this is what Mr. Sheehan is
17  testifying to, it would give me no other reason not
18  to believe him.
19  BY MS. MARTINEZ:
20       Q.  Okay. And so then would you agree that as far
21  as Mr. Sheehan knows that report was never tendered to
22  Plaintiff?
23       MR. BRUEGGEN: Object to form.
24       THE WITNESS: Again, I would have to say if
25  this is what Mister -- Mr. Sheehan said, I would

Page 244

1  have no other reason not to believe him.
2  BY MS. MARTINEZ:
3        Q.  Okay, sir. And then back to your report, sir,
4  on page 22 in the second paragraph. Are you there?
5        A.  Starting "Demetrius Johnson"? Yes.
6        Q.  Yes.
7        A.  Starting, "Demetrius Johnson"?
8        Q.  Yes. Perfect. You state that, "Demetrius
9  Johnson alleges that the lineup report by Detective
10 Erickson was purposely hidden because it was
11 exculpatory. However, the evidence shows that Johnson
12 and his attorney were both aware of this line of
13 identification. Johnson explained that while in the
14 Cook County Jail, Johns told him that he was the shooter
15 and that he was also picked out of a lineup the night
16 of the shooting. Johnson told his attorney what Johns said
17 to him. This means that Johnson and his attorney had
18 not only the alleged exculpatory information from the
19 report, but also a confession from Johns." Would you
20 agree that's what that says, sir?
21       A.  That is what that says, correct.
22       Q.  Okay. Pardon me. Regardless of whether this
23 statement is true or not, in your experience and
24 training, would the fact that a plaintiff might already
25 know information have any bearing on an investigating

Page 245

1  officer's duty to turn over reports related to the
2  suspect's defense?
3        MR. BRUEGGEN: Objection. Form. Foundation.
4        THE WITNESS: So in my experience, if I had a
5  suspect and the suspect, and we'll just stick with
6  the -- what you just read to me, if the suspect told
7  me what was just read to me, I would definitely look
8  into it. Best police practice would be not just to
9  hear it and blow it off. I would look into it. If
10 I felt like I was that far already with the state's
11 attorney Felony Review, I would bring it to their
12 attention. I would hope that the state's attorney
13 Felony Review would have me act on it. They would
14 do something about it. So I guess the answer to
15 your question that if this information was -- was
16 brought to me, yeah, I would definitely look into it
17 and -- and see where it would take me. Because
18 again, if there was another individual that was
19 responsible for the crime that I was charging
20 someone else with, again, I guess I'll use the --
21 the words of Kevin Sheehan, I wouldn't be able to
22 sleep at night either. Again, with why I got into
23 this profession, with all the training that I went
24 to, with the almost 17 years on the Major Case
25 Assistance Team doing all of this, I -- I did it

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 65 of 114 PageID #:53976
Video Deposition of RONALD S. RUFO, taken on November 15, 2023
246..249

Page 246

because I wanted to make sure that I put the right
person to be responsible for their crimes. So I
hope I answered my question without getting into a
little more.
BY MS. MARTINEZ:
     Q.   Oh yes. Thank you, sir. And just to clarify,
regardless of what the -- strike that, please.
Regardless of what a criminal defendant may or may not
know about the investigation into what they're charged
with, officers still have a Brady obligation to turn
over the appropriate materials; is that correct?
          MR. BRUEGGEN: Objection. Form and Foundation.
Go ahead, sir.
          THE WITNESS: Correct. And when I do -- when I
-- I -- I -- I will admit I -- I was a little taken
back by this when I didn't review this part, that
when Demetrius Johnson gave this information to his
attorney, you know, the attorney, they basically
said, "Well, we need evidence." We need the
whatever. If there was any indication that Bryan
Johns was the offender in this case, I would hope
that Ms. Gubin and Ms. Miller would have exercised
whatever power they could to bring Bryan Johns in to
have the public defender investigator speak to this
individual. But then showing me that going through

Page 247

the case from the very beginning, when Bryan Johns
was brought in, one 14-year-old, Aby Gonzalez,
identified Bryan Johns again. They reran the
lineup, did not pick anybody out. He was released
for continuing investigation. Found another suspect,
Demetrius Johnson. So let's fast forward to where
this information, this jailhouse confession or
whatever you want to call it, was given. That if
there was any truth to it, and there was anything
that the attorneys would have did or could have
done, I would have expected that they would have
acted on it. But nothing was done. So that means,
in my opinion, that even Demetrius Johnson's own
attorneys, own investigators, didn't take this as
merit that this was a true statement.
BY MS. MARTINEZ:
     Q.   I believe we've already discussed this, but
just for clarification, your report does not opine on
criminal defense strategies, correct?
     A.   Correct.
     Q.   Okay. Thank you, sir. And relatedly, in your
report, you're not opining as to what the plaintiff or -
- I'll strike that, please. In this case, you're not
opining as to what Mr. Johnson or his attorneys might
have known or not known about the investigation during

Page 248

the course of his defense, correct?
          MR. BRUEGGEN: Object to form.
          THE WITNESS: But I did review the
documentation that was sent to me, and this was the
documentation that I did review. So I was
privileged to read this information that Demetrius
Johnson gave his attorneys.
BY MS. MARTINEZ:
     Q.   Correct, correct. Yes. You read the
documents. But you are not opining in this case as to
what he might have known and what him and his attorneys
may have done with that information, correct?
     A.   Correct.
          MR. BRUEGGEN: Object to form.
BY MS. MARTINEZ:
     Q.   Okay. Thank you, sir. On Paragraph 23, the
second full paragraph, I'll give you a second to get
there.
     A.   Page 23?
     Q.   Yeah.
     A.   You said "paragraph." Paragraph.
     Q.   Oh, apologies, sir. Yes. Page 23, the second
full paragraph.
     A.   Okay. I'm on the second full paragraph.
     Q.   Okay, perfect. So you state, and this is in

Page 249

reference to Sergeant Healy, quote, "His job as a
supervisor was to ensure that the investigators had
whatever resources they needed to aid them in the case.
A supervisor's role could also include case
coordination. It typically offered guidance and
expertise to the investigators. A supervisor will
generally check in to see how the investigation is
proceeding but will usually keep a hands-off approach
and allow the detectives to investigate the case." Do
you see that, sir?
     A.   I do.
     Q.   Okay. In your opinion, is this the full
extent of a supervisor's role in a homicide
investigation?
          MR. BRUEGGEN: Object to form.
          THE WITNESS: It is not their full role, but
again, based on my experience as a sergeant, I went
from being a detective to a sergeant after 11 years,
which I changed roles, so it is partially the job of
the sergeant, the supervisor, to get this to the
detectives, to give them support, to get whatever
they need for the investigation. Again, this isn't
the only role of a sergeant. But again, when you're
a supervisor, you do have your detectives who are
basically your feet on the ground investigating



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 66 of 114 PageID #:53977
Evid. Deposition of RONALD G. MUSCH, taken on November 15, 2023
250..253

Page 250

1    these cases.
2    BY MS. MARTINEZ:
3        Q.   All right.  In your experience -- or strike
4    that, please.  As a supervisor, in your supervisory
5    capacity, did you want to be sure that you laid eyes on
6    all the reports that you were going to sign off on?
7        A.   So me as a supervisor, when the reports did
8    come to me, I did read the reports.  I checked for
9    grammar.  I checked for misspelling.  I made sure all
10   the boxes were checked.  I made sure that the reports
11   were basically in good condition to come to me.  And
12   then once that was done, we would get that up to
13   records.  And then once the state's attorney wanted the
14   files, we would get the files over to the state's
15   attorney's office.
16       Q.   Okay.  And would it be -- would it be fair to
17   say that this paragraph is the only opinion in your
18   report that you give about the role of a supervisor in
19   investigating a homicide?
20       A.   No.  This paragraph is my opinion on what
21   Sergeant Healy did through this investigation.
22       Q.   Okay.  And then on Page 24, the full --
23   apologies, first full paragraph.  Yes.  The first full
24   paragraph that starts, "The investigatory actions."  And
25   this is the part where you're talking about Defendant

Page 251

1    Halverson.  Let me know when you get there.
2        A.   Okay.  I see that.
3        Q.   You state that, quote, "Investigatory actions
4    in which he was involved are documented fully and show
5    how the investigation proceeded properly and
6    thoroughly."  Do you see that, sir?
7        A.   I do.
8        Q.   Can you please tell me the factual basis for
9    this claim?
10       A.   Well, reviewing the documents that I reviewed,
11   the CPD reports, I find that the -- when the
12   investigation started, again, when they initially
13   responded to the call on the street to when they took
14   Bryan Johns into custody, where they did the first
15   lineup, where they did the second lineup.  They released
16   Bryan Johns.  They established another lead.  They
17   actually used Officer Daley again, who was a proven tech
18   officer in the 14th District for nine years, who knew
19   basically the players in that district.  He was able to
20   provide a picture due to the fact that another person
21   looking at a photo basically said that this individual
22   here looks like the basic -- the -- basically the
23   suspect.  So we go on.  They form another -- they form
24   another suspect.  They do lineups.  Three people pick
25   Demetrius Johnson out of a lineup.  So yes, my opinion

Page 252

1    is that I believe they took this investigation, which
2    through my experience for even going back as a patrol
3    officer for 28 years and also cross-training as a
4    fireman coming up the chaotic scenes, that it -- it's --
5    it's -- it's crazy when you pull up the things.  I
6    believe they stayed focused.  I believe they
7    investigated thoroughly.  I believe they followed the
8    evidence.  And I believe that they followed the evidence
9    and they got the right suspect and they presented their
10   case to Felony Review.  And then Felony Review did what
11   they have to do to bring it to court, whether to Judge
12   and/or jury.
13       Q.   Two follow-up questions.  When you say you
14   believe they found the right suspect, are you stating
15   that you believe Mr. Johnson is guilty of what he was
16   charged with?
17            MR. BRUEGGEN:  Objection.  Asked and answered.
18   Go ahead, sir.
19            THE WITNESS:  No.  As an officer for 28 years,
20   that's not my job to say if a person is guilty or
21   innocent.  My job is, as an officer and slash
22   detective and supervisor, that we take the
23   investigation.  We follow the evidence.  We talk to
24   Felony Review if we have enough to charge the
25   individual.  Then we charge the individual, turn

Page 253

1    everything over into the Court system.  And then
2    again, that's Judge or jury to decide.  We do never
3    -- I would never through my whole career ever say if
4    a person is guilty or innocent.  My job is -- is
5    just to get that from basically from A, do my
6    investigation, to Felony Review to the Court system.
7    BY MS. MARTINEZ:
8        Q.   Okay.  And then my second follow-up question
9    is, what is the factual basis for the first half of that
10   statement?  So I'll reread your statement.  Quote, "The
11   investigatory actions in which Detective Halverson were
12   involved are documented fully and show how the
13   investigation proceeded properly and thoroughly."  So my
14   question is, what is the factual basis for your opinion
15   that the investigative actions of Defendant Halverson
16   are documented fully when we've discussed at length that
17   there are quite a few missing documents?
18       A.   There are missing documents.  I -- I will
19   agree to that.  But again, I'm taking -- I'm taking my
20   training.  I'm taking my experience, not only with
21   Rosemont with the Major Case Assistance Team, which
22   again for 17 years, and I look at how this case started
23   at the very beginning.  Form suspects, I can go through
24   that whole thing.  They brought the suspect to Felony
25   Review.  Felony Review approved charges, brought it to

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 254

1  the Court system, and Demetrius Johnson was given his
2  opportunity in court.  And that's where the judge did
3  whatever the judge was -- had to do after he reviewed
4  the case.
5       MS. MARTINEZ:  Okay.  Thank you, sir.  So David
6  and Theresa -- are the parties okay if I take maybe
7  ten-minutes, just to -- a quick break to go through
8  my notes, see if I have any final questions?
9       MR. BRUEGGEN:  Yeah, that's fine.  I'm -- are
10  we getting close to the end basically, or near the
11  end?
12       MS. MARTINEZ:  Yeah.
13       MR. BRUEGGEN:  Okay.
14       MS. MARTINEZ:  Yes.
15       MR. BRUEGGEN:  Yeah, that's fine.
16       MS. MARTINEZ:  I'm just going to go through and
17  see if there's any follow-up or any additional
18  questions I have.
19       MR. BRUEGGEN:  Sounds good.  Thanks.
20       MS. MARTINEZ:  Okay, thank you.  So we'll meet
21  back at 4:42?
22       MR. BRUEGGEN:  Sounds good.
23       MS. MARTINEZ:  Okay, great.
24       THE REPORTER:  Okay.  The time is 4:32 p.m.
25  Central.  We're off record.

Page 255

1       (OFF THE RECORD)
2       THE REPORTER:  We are back on record for the
3  deposition of Ronald Muich being conducted by video
4  conference.  My name is Kyra Tate.  Today is
5  November 15, 2023.  The time is 4:48 p.m. Central.
6  BY MS. MARTINEZ:
7       Q.  I do have a few more questions for you,
8  Mr. Muich.  The first is in writing your report.  How
9  did you resolve disputes between contradicting facts?
10       A.  So basically reviewed all the documentation.  I
11  took all of my training, all of my experience on the
12  street as a detective -- on the patrol officer
13  detective, also being on a task force.  And again, I
14  read all the documentation and I formulated my opinion.
15       Q.  Okay.  Is it then your testimony that when you
16  encountered contradicting facts in the record, you used
17  your experience to determine which you believed to be
18  true?
19       MR. BRUEGGEN:  Objection.  Form.
20       THE WITNESS:  I had to take everything that I
21  read, the facts of the case, the investigative part
22  of the case, the evidence of the case.  And that's
23  how I form my opinion.
24  BY MS. MARTINEZ:
25       Q.  Okay.  So would it be fair to say then that

Page 256

1  when you came across contradicting facts in the record,
2  you would look at all the documents and see which was
3  more credible with your experience?
4       MR. BRUEGGEN:  Objection.  Form.
5       THE WITNESS:  So if I did come across
6  contradicting documentation, I would go through the
7  file.  If it was something that had to do with a
8  different part of the file, I would go to that file.
9  I would reread that.  I'd have to come back to it
10  and I would form my opinion.  I mean, when you --
11  when you talk about an investigation and especially
12  one of this magnitude where there's two individuals
13  that were shot, you get the broadcast that
14  attackers, you have detectives that have to go out
15  there, they have to gather information.  There's --
16  investigations, there's all kinds of contradicting
17  information, but that's where you have to take your
18  training, your experience, and you have to find out
19  and come to the truth and come to basically the
20  investigation and where the evidence leads you.  I
21  can't stress enough about where the evidence leads
22  you, where the information takes you. If you don't
23  have the information and the evidence, you -- you --
24  you're -- you're not going to solve the
25  investigation.  And again, no two investigations are

Page 257

1  alike.  You show me an investigation to where
2  something's not contradicting in a report or a
3  testimony or a deposition.  Like it just -- it --
4  I've never seen it before in my 28 years of law
5  enforcement and especially my 17 years on the task
6  force team, where you would come to complex
7  investigations.  You know, where you would have a
8  double, a triple, a quadruple homicide.
9       So I guess to answer your question, you
10  come to those contradicting parts in the
11  investigation in the report and you have to follow
12  the evidence, see where the investigation takes you
13  and do whatever you have to do.  You have to follow
14  the -- evidence.  I think that's the most
15  important part that I'm going to say is you have to
16  follow the evidence. And when you say contradicting.
17  Again, you know, there has to be a decision made on
18  an investigator's end.  The investigator just can't
19  come to a contradicting part in the investigation or
20  report and just drop it and say, well, I can't do
21  this no more.  There's a contradicting, you know,
22  interview.  Well, then I guess you have to go
23  further.  You might have to talk to a half a dozen
24  more people.  Might have to bring more witnesses in.
25  You might have to corroborate this contradicting

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 68 of 114 PageID #:53979
Civil Deposition of RONALD S WATTS, taken 4 November 15, 2022

258..261

Page 258

1    story.  So again, I don't want to keep saying all
2    investigate -- we know that all investigations are
3    not alike.  But again, I couldn't give you just a
4    very simple answer about contradicting.
5  BY MS. MARTINEZ:
6       Q.   Okay.  Would it be fair to say then when you
7    were following the evidence as you put it in this case
8    and where the evidence might conflict, you dealt with
9    that on a case by case basis?
10      MR. BRUEGGEN:  Object to form.
11      THE WITNESS:  So I dealt with it with this case
12   when I came to something.  And again, if you can
13   point out to me something that you would deem
14   contradicting, we could look at that.  But again, I
15   reviewed the case and when I looked at the
16   investigation and followed the evidence, I feel
17   that, again, the detectives, the officer, the
18   detectives did a good job, you know, in going
19   through this investigation, following the evidence
20   and eventually being able to bring a case to the
21   State's Attorney.
22  BY MS. MARTINEZ:
23      Q.   Okay.  My next question, would you agree that
24   it's generally accepted police practice to follow up on
25   credible leads?

Page 259

1       A.   I'm sorry, you broke up at the end.  Did --
2    did you say credible leads?
3       Q.   Yes, sir.
4       A.   If you could repeat the question --
5       Q.   Okay, yes --
6       A.   -- because you'd break up a little bit --
7       Q.   -- I'll repeat the question.  Would you agree
8    that it's generally accepted police practice to follow
9    up on credible leads?
10      A.   Yes.
11      Q.   Okay.  And in your experience, would that
12   include credible leads relating to alternative suspects?
13      A.   If that's where the investigation and the
14   evidence would lead in an investigation, yes.  And I
15   believe that -- that actually was in this case.  There
16   was one suspect that was taken into custody and then the
17   investigation and the evidence led to another suspect.
18   Instead of just having tunnel vision at the very
19   beginning of June 12, 1991, and just focusing on the one
20   suspect they brought in having tunnel vision and trying
21   to bring that suspect, that the offender to felony
22   review, charging that offender and moving on to your
23   next case.
24      Q.    So if the defendant officers in this case were
25   made aware of another alternative suspect besides Mr.

Page 260

1    Johnson and Mr. Johnson, would you expect them to
2    investigate that person?
3       MR. BRUEGGEN:  Object to form, speculation.
4       THE WITNESS:  So in this case, in the
5    documentation that I reviewed, I did not find that
6    besides Brian Johnson, Demetrius Johnson, that there
7    was any other subject that was possibly looked at in
8    this case.
9  BY MS. MARTINEZ:
10      Q.   I'm very quickly going to share my screen.
11   This is Exhibit 5 on Page 23 of Mr. Tiderington's
12   report, which you testified that you reviewed.  And I'll
13   give you a moment to get there.
14      A.   Okay.  I'm there.
15      Q.   Okay.  So Mr. Tiderington notes, "On June 29,
16   1991, CPD Officer Cresco report that he arrested an
17   individual identified as Robert Weeks and determined
18   that Weeks fit the description of the suspect wanted for
19   the Fred homicide.  Cresco also documented that received
20   a phone call and spoke with a citizen identified Juan
21   Lopez.  According to Hernandez's Police report, Lopez
22   told the officer that he, "Witnessed the homicide that
23   occurred on 12, June '91 at 2311 West North."  He
24   followed the offender to a building located at Le Moyne
25   and Western above a tire shop.  Also noted by these

Page 261

1    informants was the fact that Weeks is a member of the
2    Spanish Cobra Street Gang and that he has a distinctive
3    tattoo of a pitchfork and a large cobra snake on his
4    right arm.  RO's on today's date contacted Area 5
5    Violent Crimes.  Detective Halverson arrived at 14th
6    District at which time the investigation was turned over
7    to him."  Do you see that, sir?
8       A.   I do.
9       Q.   Okay.  So and you reviewed this report,
10   correct?
11      A.   I did.
12      Q.   Okay.  If assuming that that is true, the
13   evidence is correct and someone came forward identifying
14   Robert Weeks as a potential suspect in this shooting.
15   Would you expect the investigating officers to
16   investigate into that lead?
17      MR. BRUEGGEN:  Object to form.  Go ahead.
18      THE WITNESS:  Well, this report was in the CPD
19   file.  There was no indication that he was the
20   offender in a homicide.  And if I'm correct, I think
21   Mr. Tiderington does leave out that he was arrested
22   for an assault and that's how he was brought into
23   the station.  There's nothing that I have read about,
24   besides a phone call from a Juan Lopez, I don't know
25   what that phone call entailed.  To me, it was turned



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 69 of 114 PageID #:53980
Video Deposition of RONALD S. KIMBALL taken on November 15, 2023

262..265

Page 262

1    over to Detective Halverson who was brought on to
2    this case.  I know he wasn't there the first night,
3    but he came on later on. I believe the first time I
4    saw his name on a report was June 29th.  So he came
5    on between the 12th and the 29th and started with
6    this case.  And to me, being a detective/supervisor,
7    if this information was brought to me, I would've
8    looked into it.  Again, we don't know what the
9    outcome was this because we all can agree that
10   there's missing documentation.  So maybe Detective
11   Halverson did a report.  And again, we can't get
12   those answers because Detective Halverson is -- is
13   deceased.  So I understand what Mr. Tiderington is
14   trying to say that there's a third suspect here, but
15   I have to disagree with him that besides getting a
16   phone call we really don't know what else that
17   phone call entailed, and we don't know what
18   Detective Halverson's follow-up was that Mr. Weeks
19   would be a credible suspect.
20   BY MS. MARTINEZ:
21       Q.   You predicted my next question.  In your
22   review of the materials and writing your report, did you
23   find anything in the record that would show that the
24   investigating officers followed up on this lead pointing
25   to Mr. Weeks?

Page 263

1        A.   There's nothing that I saw in the report.  But
2    again, we do have missing documentation, so I don't know
3    if a supplemental report was done or, you know, it
4    could've went as far as that the detective knew a Juan
5    Lopez and Mr. Juan Lopez was not credible with
6    information he's given detectives officers.  I mean,
7    hypothetically, we can even go there.  So we just don't
8    know without actually reading the documentation.  I
9    cannot answer Mister -- you know, Mr. Week's involvement
10   in this, except what I understand again, what
11   Mr. Tiderington wrote and what Mr. Lopez, you know, did
12   with his phone call.
13       Q.   In your report, you do not opine on the
14   propriety of having multiple witnesses together at the
15   State Attorney's office as they prepare for trial; is
16   that correct?
17       A.   I do not.
18       Q.   Okay.  Thank you, sir.  I just have two more -
19   - two more things I'd like to hit on and then we can
20   wrap up this long day.  The first is that I have a
21   couple of clarifying questions regarding your
22   professional experience.  So over the span of the
23   entirety of your career.  So when you were first brought
24   on full-time in 1995, up until your retirement of June
25   of 2023, how many homicide investigations would you say

Page 264

1    you participated in?
2        A.   And when you say participated, would you say
3    as a lead investigator/investigator or supervisor?
4        Q.   Let's break them out into buckets.  So first,
5    I'll say strictly for RSPD, how many would you say you
6    were involved in?
7        A.   So I was a lead investigator on two homicides
8    and I was a supervisor, I believe on, and if you want
9    the exact number, it was four or five, but I would have
10   to look through my documentation.
11       Q.   Is your -- actually, in your report, I think
12   you detail the cases that you served as either the lead
13   or supervisor on.  Is that list up to date?
14       A.   It is up to date.  Yes, ma'am.
15       Q.   Okay.  And is that --
16       A.   So it was four.  I apologize for interrupting.
17   It was four as a supervisor for Rosemont.
18       Q.   Okay.  And are there any other cases from the
19   time that you were at RSPD that you served as either a
20   lead investigator or supervised the entire investigation
21   other than those six?
22       A.   Yes.
23       Q.   Okay.  How many?
24       A.   So if I'm getting your question correct.  Are
25   you asking me, because I was a detective from say end of

Page 265

1    2004 to '15.  And when I took on whatever case it would
2    be, you're not talking just the homicide.  You're
3    talking any case in general?  If I were --
4        Q.   Apologies.  No.  Apologies.  My question is,
5    and I'm sorry, I didn't mean to cut you off, sir.  My
6    question is outside of the six that you note in your
7    report at any point during your time at RSPD, this is
8    not including MCAT, did you serve as either the lead
9    investigator or supervise investigator -- supervisory
10   investigator for a homicide investigation?
11       A.   No, just the ones that I've listed that -- on
12   the report that you have in front of you.
13       Q.   Okay.  Thank you.  I apologize.  I think I
14   worded that weird.  Okay.  And now, actually two of
15   these -- two of the six that you go through, I believe
16   you put dates in your report.  Okay, perfect.  So I just
17   want to confirm with you the two that you were the lead
18   investigator on, the first being the State of Illinois
19   v. Kenneth Sharples, that's March of 2005?
20       A.   Correct.  That was four months after I came
21   into the Investigations Bureau.
22       Q.   Okay.  And then the second one is from August
23   of 2005?
24       A.   Correct.
25       Q.   Do you know the name of the case or the name



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 70 of 114 PageID #:53981
Video Deposition of RONALD S. WATTS, taken on November 15, 2023
266..269

Page 266

1  of the victim?  I only see, "Dismembered body."
2      A.   I think the individual's last name was Lau,
3  L-A-U.  They were foreign exchange students from Beijing
4  and they were at Purdue University.
5      Q.   Okay.  And then for the four that you
6  supervised, the first is the State of Illinois v. Cesar
7  Garay?  I'm not sure if I pronounced that correctly.
8      A.   Garay.
9      Q.   Okay.  And is that from January of 2015?
10     A.   Correct.
11     Q.   The second one being Kenneka Jenkins, is that
12 from September of 2017?
13     A.   Correct.  That's Kenneka Jenkins.  And that's
14 the young lady that was found in the freezer.
15     Q.   Okay.  The third one is the State of Illinois
16 verse Gerard Delgado Calderon.  And is that --
17     A.   Correct.  And that is -- that is still
18 pending.
19     Q.   Okay.  And that was from December of 2019?
20     A.   Correct.
21     Q.   And then the final one is the State of
22 Illinois verse Jose Matias?
23     A.   Correct.
24     Q.   And that's from March of 2022?
25     A.   Correct.  And that is also pending.

Page 267

1      Q.   Okay.  I'm just making sure I've got that all
2  taken down.  And now for your participation in MCAT.  So
3  you talked about how MCAT, I believe you stated that
4  MCAT participated in 30 to 40 homicide investigations?
5      A.   I assisted in 30 to 40 homicide --
6      Q.   Assisted.
7      A.   Investigative with various towns.  I believe
8  it's 21 surrounding Northwest Suburban towns.  And
9  again, 30 to 40 is just a complete estimate.  I don't
10 have an exact number.  I never kept track.
11     Q.   Okay.  And when you say participated in, what
12 does that mean for the purposes of MCAT?
13     A.   So when a town would have a, let's just say
14 and again, I'll just use Schaumburg as an example.  If
15 Schaumburg had a double homicide and they had no
16 suspects, no offender in custody, they would basically
17 activate MCAT.  MCAT would come out with investigators,
18 including myself.  We would report to the director of
19 MCAT who would be on scene and also report with the
20 commander of Schaumburg.  We'd work along with their
21 detectives.  So basically we would not come to their
22 town to take over the investigation.  We would just come
23 in to assist.  So basically, if they had interviews,
24 they would do one of their detectives along with an MCAT
25 guy, we would go canvas the area, do door knocks.  We'd

Page 268

1  go look for potential witnesses.  Basically, whatever
2  Schaumburg needed us to do in an assist, we would do it.
3      Q.   Okay.  So is it fair to say that the
4  department of where the crime happened would ask MCAT to
5  perform discrete tasks as part of the investigation?
6          MR. BRUEGGEN:  Object to form.  Go ahead, sir.
7          THE WITNESS:  They would ask any tasks that we
8  needed to do because, again, when you go to
9  different departments, sometimes you're manpower.
10 Again, Schaumburg had a bigger detective division
11 with attack unit, but then you can go to, like, a
12 Mount Prospect, and they would only have two
13 detectives.  So it would just really depend on the
14 situation, again, investigation to investigation.
15 BY MS. MARTINEZ:
16     Q.   Okay.  And apologies if I misunderstood your
17 previous testimony, but when -- during your time as a
18 member of MCAT, how many distinct homicide
19 investigations did you assist with?
20     A.   Again, it would be just an estimate number.  I
21 would say between 30 and 40 throughout my career with
22 MCAT.  It could be less.  It could be more.  I don't
23 know.
24     Q.   Okay.  And for any of those investigations,
25 were you assigned as lead?

Page 269

1      A.   No.
2      Q.   Okay.  Did -- this might be a basic question.
3  Did MCAT assign leads for their investigations or did
4  they defer to the local municipality?
5      A.   Local municipality would always be the lead in
6  the case.  We would just be the assist.
7      Q.   Okay.  Thank you.  And were you assigned to
8  homicide investigations from the very first year that
9  you joined MCAT?
10     A.   Yes, I was.
11     Q.   Okay.  Perfect.  And for the -- apologies, I'm
12 backtracking slightly -- for the two cases at RSPD that
13 you were the lead investigator on, did either one of
14 them involve eyewitness identifications?  And feel free
15 to --
16     A.   Sorry, I got to --
17     Q.   Oh, yeah.  Feel -- please, feel free to look
18 through your report.
19         MR. BRUEGGEN:  A4.
20 BY MS. MARTINEZ:
21     Q.   Yes, A4.  Thank you.
22     A.   So -- yes, the first case, State of Illinois
23 v. Kenneth Sharples, there was -- I believe we did
24 several lineups on that one.  And then the dismembered
25 body was a little bit different because that was the

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 270

1  body that was found dismembered in one of our parking
2  garages, so there were no lineups or anything.  But that
3  investigation led us to Lafayette, Indiana, and then
4  ultimately to Beijing.
5      Q.   Okay.  Did any of the four homicide
6  investigations that you were the supervisor on involve
7  eyewitness identifications?
8      A.   So the State of Illinois v. Cesar Garay, I
9  would have to look at that file to see if there were
10  lineups.  I don't recall at this time.  Kenneka Jenkins,
11  again, was a death investigation.  That was the young
12  lady that was found in the freezer.  So that case
13  basically was 70 something interviews with that.  That
14  was the one I talked about with at least a dozen
15  juveniles.  State of Illinois v. Gerard Delgado.  Again,
16  that was a case that we worked with the Des Plaines
17  because the body was actually found in a -- a Christmas
18  tree box next to a dumpster in Des Plaines, but she was
19  actually murdered in Rosemont.  So that was a -- a case
20  that we worked with Des Plaines.  I'd have to look to
21  see if there was lineups done with those. And then the
22  State of Illinois v. Jose Matias, that was actually a
23  shooting at our Chicago Fashion Outlet Mall. And I
24  believe that there -- I do not believe there were any
25  lineups in that.  But again, that's just a guess on

Page 271

1  that.  I would have to go back to that file and look at
2  it.
3      Q.   Fair.  Okay.  And then my last set of
4  questions as to those six cases, did any of the six
5  involve multiple suspects?
6      A.   So the only one that started out, and we
7  talked about this earlier when I talked about the
8  attackers, the Matias case, the mall shooting, that's
9  the one where we had to formulate.  When we got the
10  call, we believed and I believed it was multiple
11  shooters, but it turned out to be just one shooting, an
12  isolated incident.  So I guess your question -- the
13  answer to your question is, no, there were not multiple
14  offenders in these cases.
15      Q.   Okay.  Thank you for that, sir.  And then my
16  second line of question related to your professional
17  experience is just getting a little more clarification
18  on your trainings.  Were you -- when were you first
19  trained in homicide investigations?
20      A.   So in January 2005, when I attended the 4-week
21  criminal investigation, they did touch on homicides, but
22  it actually wasn't a homicide training, but they did
23  touch on it.  They also touched on it in April 2005, at
24  the investigation at the Northeast Multi-Regional
25  Training facility.  June 2005, is when I attended the

Page 272

1  advanced homicide investigation training at Northwestern
2  University Center for Public Safety. This is where they
3  -- they dove more into the approaches to homicide
4  investigations, child death investigations,
5  interrogation techniques for homicide suspects,
6  drug-induced homicides.  So we -- we talked - - we -- we
7  trained more in a homicide with that training.  January
8  2008, I attended a death on arrival homicide
9  investigation at Suburban Law Enforcement Academy.
10  Basically, this was evidence collection, autopsy,
11  suspect interview, trial testimonies.
12          And again, they -- they touched on the
13  homicide investigations also.  And then also, being a
14  lead homicide investigator in the state of Illinois, you
15  had to keep up your certification, which, again, I
16  believe I would have to double check if you needed the
17  exact numbers, but I believe you needed to maintain 100
18  hours of some sort of homicide training in a four year
19  period to keep your certification.  And if you were
20  unable to keep your certification, you wouldn't -- if
21  you did not have a certification in homicide, you would
22  not be able to be a lead investigator -- a lead
23  investigator on a homicide investigation.
24      Q.   Okay.  Thank you for that clarification.  Do
25  you know what year you became certified?

Page 273

1      A.   I believe -- so the way my understanding was
2  with the way it happened, once you start your process as
3  a lead investigator, the state of Illinois acknowledges
4  you being a lead investigator as long as you keep up
5  with your hours.  Now, again, my understanding was --
6  let's say, when I started in 2005, and I started going
7  to trainings.  If, say in 2009 or 2010, the state
8  realized that I didn't have my certification, then I
9  would run into problems with being a lead investigator,
10  if that makes sense.  So they almost give you that
11  window.  They wouldn't make you go through the four
12  years, become a lead investigator, and then you could be
13  a lead investigator on a homicide.  They'd almost give
14  you that grandfather -- that grandfather clause, that
15  window to -- to be a lead investigator.
16      Q.   Okay.  I just want to make sure I'm
17  understanding.  So you're saying that when you were
18  first made a lead investigator on the Kenneth Sharples
19  case in March 2005, that is when you were given the
20  certification to --
21      A.   That's when I --
22      Q.   -- to be a lead investigator?  Oh, apologies.
23      A.   That's when I started the process of becoming
24  --
25      Q.   Started the -- okay.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 72 of 114 PageID #:53983
Video Deposition of RONALD S. YAWGER, taken 15 November, 2023

274..277

Page 274

1    A.   -- a lead -- yeah.  So I had to keep
2 documentation of the trainings that I went to.  And as
3 long as I was able to prove that I had 100 hours, and I
4 believe, I would have to look again, in four years, then
5 your certification would -- would -- would be fine and
6 you would start the process over again.
7    Q.   Okay.  And when you say, start the process,
8 did you fill out an application?
9    A.   Yes, with the state of Illinois.
10   Q.   Okay.  That's the piece I was missing.  Okay.
11 Perfect.  That makes sense.  Are you still certified to
12 this day?
13   A.   Well, I'm -- I guess I'm certified on paper
14 with the state of Illinois, but I don't know what
15 homicide I would go investigate because I'm not employed
16 anymore.  I'm retired and I'm not with MCAT anymore, so
17 I don't think it would look good if I went out and
18 investigated homicides.
19   Q.   Yeah.  Hopefully, there's none you get called
20 out to.  Okay.  And again, just from my understanding,
21 so if you were still qualified on paper, does that mean
22 that, every four years from 2005, that you met this
23 requirement and filed all of your certifications?
24   A.   Yes.
25   Q.   Okay.  So 2009, 2013, and then -- sorry,

Page 275

1 apologies.  Yes.  Can you give verbal answers?
2    A.   Correct.
3    Q.   Okay.  In 2017?
4    A.   Yeah, and there were times we would send the
5 paperwork in early to the state, so they would accept --
6 they would accept early registration.  As long as you
7 were up to date with your hours, we would send it in.
8    Q.   Okay.  And would serving as a supervisor on a
9 homicide investigation count toward that 100 hours?
10   A.   That question I never asked because I would
11 still attend training, so I never asked that question.
12 But if I had to guess, I don't think so because that's
13 an active investigation.
14   Q.   Okay.  I suppose my follow-up question then is
15 from my understanding and from your previous testimony,
16 all of your trainings are in your report with the
17 exception of the one that you told me about earlier,
18 that I believe you said was in 2009 or 2010.  Are there
19 other trainings you attended that would meet that 100
20 hour requirements for 2013 to 2017?
21   A.   Yeah.  So every year, usually in October, they
22 would have a -- multi-region homicide conference, and
23 that was usually in Itasca.  And that was a three day --
24 three or four day training.  And we would attend the --
25 the training throughout those three or four days, which

Page 276

1 would count towards our lead investigator.
2    Q.   Okay.  And would you say you went to this
3 training every year?
4    A.   I went to that training every year.
5    Q.   Okay.  And what were some of the specific
6 practices that they would put on?
7    A.   Again, that would be -- they would be, like,
8 breakout sessions.  I mean, they had the detectives from
9 the Sandy Hook incident.  They had the investigators
10 from Columbine.  One time they had the Gacy retired
11 investigators come in and talk.  They would do evidence
12 clinics.  They would do interview.  So it was basically
13 anything involving homicide.  But again, it would be a
14 breakout session, whichever you felt like you wanted to
15 go to.  You could just kind of go in, scan in, listen to
16 their presentation.  Two hours later, go to another
17 presentation.  So you just kind of bounced around the
18 whole seminar.
19   Q.   Okay.  And to the best of your knowledge,
20 what's the first year you went to this conference?
21   A.   It would be a total guess if I would even --
22 I'm -- I'm sure -- I'm sure it was pretty shortly after
23 I became a detective because it was a big deal for the
24 detectives to go to it.
25   Q.   Okay.

Page 277

1    A.   So I'm -- I -- I assure -- or I'm pretty sure
2 that it was pretty -- if it wasn't that first year, it
3 was probably the second year.
4    Q.   Okay.  So you'd say maybe 1996 at the latest?
5    A.   No.  So I became a detective December 2004.
6    Q.   Oh, apologies, sir.  Okay.
7    A.   And then -- so I might've went to the seminar
8 in Itasca 2005 or 2006.  I don't know.
9    Q.   Okay.  And do you remember the most recent one
10 you went to?
11   A.   I think they canceled due to Covid.  I'm not
12 sure if they canceled one or two years, so it might've
13 been the previous year, maybe '19 --
14   Q.   Okay.
15   A.   -- before they canceled with Covid.
16   Q.   Okay.
17   A.   And I didn't -- and I did not attend the one
18 in '22 only because I knew I was retiring.
19   Q.   Okay.
20   A.   And I knew I had enough hours and the
21 department, I believe, wasn't going to send me to the --
22 to the training just due to --
23   Q.   Okay.
24   A.   -- monetary.
25   Q.   Okay.  And at these conferences, would it be

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

1  fair to say that the trainings were regarding best
2  practices at the time?
3      A.   Yes, Illinois best practices.
4      Q.   Okay.  And they would usually be current, is
5  that a fair statement?  Like, current best practices,
6  not what was best practice in 1975?
7      A.   No, they would be current.
8      Q.   Thank you for all those explanations, sir. Let
9  me make sure I don't have any other questions about your
10 training.  Okay.  So my final question about your
11 training is, was there any training that you went to
12 that detailed what best practices would be in a homicide
13 investigation in 1991?
14     A.   I can't specifically give you a training.  I
15 feel that the training that I did -- and I did do a lot
16 of training -- I feel that I took that training in along
17 with my experience, not only being a patrol officer,
18 which was a good experience, but also being a detective
19 and a supervisor.  And I did apply training experience
20 when I reviewed this case, so -- and especially looking
21 at the investigative part of this case, the way that the
22 detectives did go through their transition of the case,
23 I would say that my experience helped me understand it,
24 helped me formulate my opinion to the report that we
25 talked about most of the day today.

Page 279

1      Q.   Okay.  And actual last final question related
2  to your training.  Was there any training specifically
3  that you received that -- strike that.  Strike that,
4  please.  No other questions on your trainings.  And so
5  my last set of questioning is, sir, are you aware that
6  Defendant Guevara's 40th victim was just exonerated?
7      A.   I'm sorry, can you repeat that?
8      MR. BRUEGGEN:  Object to form.
9  BY MS. MARTINEZ:
10     Q.   Yes.
11     MR. BRUEGGEN:  Go ahead.
12 BY MS. MARTINEZ:
13     Q.   Are you aware that Defendant Guevara's 40th
14 victim was just exonerated?
15     MS. CARNEY:  Objection.  Form.
16     MR. BRUEGGEN:  Object to form.  Argumentative.
17 Go ahead, sir.
18     THE WITNESS:  No, I'm not.
19 BY MS. MARTINEZ:
20     Q.   Okay.  If that were true, would that be
21 concerning to you?
22     MS. CARNEY:  Objection.  Form.
23     MR. BRUEGGEN:  Object to form.
24     MS. CARNEY:  Foundation.
25     MR. BRUEGGEN:  Argumentative.

Page 280

1      THE WITNESS:  Again, I know nothing about that.
2  There was nothing that I reviewed in my
3  documentation.  I would have to review that
4  documentation, and I -- I did not.  I know nothing
5  about that.
6  BY MS. MARTINEZ:
7      Q.   Would knowing that -- or strike that, please.
8  Does knowing that cause you to question the integrity of
9  this investigation on behalf of Defendant Guevara?
10     MR. BRUEGGEN:  Object to form and foundation.
11 Go ahead, sir.
12     THE WITNESS:  Well, what you're telling me, no,
13 it doesn't.
14 BY MS. MARTINEZ:
15     Q.   Okay.  And why not?
16     A.   Again, I reviewed the documentation that was
17 provided to me, and I went through the investigation.  I
18 went through depositions.  I went through other
19 documents, and I formed an opinion.
20         I was looking at the case, and that's how I
21 formed my opinion.
22     MS. MARTINEZ:  I believe that is all that I
23 have for you, sir.
24     MR. BRUEGGEN:  Mike, Theresa, do you guys have
25 anything?

Page 281

1      MS. CARNEY:  Not right now.
2      MR. SCHALKA:  Nope.
3      MR. BRUEGGEN:  All right.  I just have a
4  couple quick areas of follow up.
5  CROSS-EXAMINATION
6  BY MR. BRUEGGEN:
7      Q.   So we talked about your involvement as a lead
8  investigator at Rosemont.  Other than those two cases we
9  talked about, did you ever assist in homicide
10 investigations while you were with Rosemont just on the
11 Rosemont Safety Patrol?
12     A.   No, just with the -- the -- two we talked
13 about as the lead investigator and the supervisor, I
14 don't recall as a patrolman if we did have any
15 homicides.  I do not believe so.  And if there was, the
16 only thing I would do is lend support as a patrol
17 officer.
18     Q.   And then -- I'm doing that, so we got to be
19 careful, but based on that 100 hours every four years,
20 is it -- strike that.  Based on the -- needing 100 hours
21 of homicide training every four years to keep the
22 Illinois certification; did I understand that correctly?
23     A.   Yes.
24     Q.   And having done it since 2004 to the present,
25 is that -- you have over 500 hours in homicide training

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 74 of 114 PageID #:53985
The Deposition of RONALD S. RUFO, taken on November 15, 2022
282..285

Page 282

1  investigations?
2      A.  I should have -- well, I would have to look at
3  the numbers, but that -- that could be right.  It -- it
4  could actually be more.  It's not that you just do 400
5  hours or whatever, you're done.  You keep continuing
6  your education.  Training was a huge part as being an
7  investigator, so we continuously went the training and
8  documented our hours and -- you know, I mean, 500 could
9  be, or it could be more.  I -- I don't know.
10     Q.  And then in addition, I think we talked about
11 your CV and it has certifications and trainings, but
12 there's additional training that you talked about that
13 would be these 100 hours you needed for the
14 certification?
15     A.  Yes.  So I attended a five day homicide
16 investigation at Princeton University.  It was a
17 nationally presented homicide conference.  So you know,
18 I talked about Illinois best police practices.  This
19 state touched upon nationally best police practices.
20 They talked a lot about homicides, not only, you know,
21 just in -- in my area, but, you know, in New York, New
22 Jersey area.  So it was a full five day advanced
23 homicide conference.  A very good conference.
24     Q.  And then today there were lots of questions
25 about your experience in training in police practices.

Page 283

1  Can you explain how your experiences in training played
2  a role in your development of the generally accepted
3  police practices to apply here today and answer
4  questions about today?
5      A.  Absolutely.  I mean, all of my training, you
6  know, that I had, you know, through conferences and
7  department training and my experience, like I just told
8  the last Counsel, everything that I have trained with,
9  learned, experienced throughout my career, I feel that I
10 brought it to -- looking at this report -- best police
11 practices.  Looking at this report, trying to, again,
12 look at every angle of it.  Again, my experience is
13 huge.  My training is huge, and that's how I formulated
14 this report that we were looking at today.
15     Q.  And then earlier there were some questions
16 about the -- I think it was Ricardo Burgos and the
17 Hispanage (phonetic).  Do you remember those questions?
18     A.  I do, yes.
19     Q.  And you basically said it could be a typo,
20 that -- just the word Hispanage.  Well, it actually is a
21 typo because Hispanage is not a word, but Hispanic could
22 be a typo.  Do you remember --
23     A.  Yes, I do.
24     Q.  -- something like that?  Could it also be just
25 incomplete and should have said a Black Hispanic?

Page 284

1      A.  I have heard the term before, Black Hispanic.
2      Q.  And the only testimony under oath that we have
3  of Ricardo Burgos from around that time is his trial
4  testimony.  Is that your recollection from reviewing the
5  documents?
6      A.  That is my recollection, yes.
7      Q.  And then you touched upon documentation for
8  detectives earlier; do you remember talking about that?
9      A.  I do.
10     Q.  And there was talk about detectives have to
11 use the discretion when they document?
12     A.  Yes.
13     Q.  Are -- do detectives need to document all
14 relevant information -- or strike that.  Let me rephrase
15 that.  Do detectives need to document all information
16 that is relevant to their investigation?
17     A.  So again, when I use the word discretion,
18 again, if the detective feels that -- that information
19 is going to be relevant to the investigation, to the
20 case, to it being brought to trial, it should be
21 documented.  My detectives would document.  But again, I
22 also gave my -- my detectives the discretion.  Again, I
23 brought up the scenario as if I was going to ask Dave a
24 question about Ms. Doe, and David pointed that Ms. Doe
25 lives four houses down.  I don't know if that would be

Page 285

1  relevant for the information.  It could be.  It can't
2  be.  Again, investigations are all different. But again,
3  if the detective deemed that it was relevant
4  information, then I expected the detectives to put that
5  information in there.  But again, when I say discretion,
6  I left that up to the detectives because I knew my
7  detectives and work that they did, the reports that they
8  wrote, so that's why I gave them that discretion.
9      Q.  And I also heard that there was some reference
10 to the reports needed to provide basically the progress
11 or how investigation proceeded from basically start to
12 finish; do you recall discussing that earlier?
13     A.  Yes.
14     Q.  And in this case, based on your review of the
15 CP reports that you had access to, were you able to
16 determine whether the reporting complied with that
17 requirement to dictate what happened from start to
18 finish?
19     A.  Well, when I reviewed the documentation and
20 was going through it all, you know, I was finding that
21 there was some lack of information.  And then going
22 through, you know, Cook County, state attorneys' office
23 files and public defenders' files, that's when it
24 occurred to me that there possibly could have been
25 missing documents.  And in fact, I would have to look, I



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 75 of 114 PageID #:53986
Oral Deposition of RONALD S. MUICH, taken on November 15, 2022
286..289

Page 286

1  believe in the public defender's -- or Cook County state
2  attorney's file, they make a reference of missing
3  documents and even looking at the public defender's
4  file, which is just a small file, it -- it just -- it --
5  it just -- to me, it was an incomplete file.  I don't
6  know if it's missing documents in that file.  I don't
7  know.  And in going to the assistant state's attorney
8  report when he was with Demetrius Johnson, again, with
9  my experience, when I dealt with felony review, I saw
10 what felony review did when they started filling out
11 their big yellow -- we call it a jacket -- their big
12 file folder and then interviewing witnesses and asking
13 us to bring witnesses in and just the documentation that
14 they had.  So to me, I, again, questioned if, you know,
15 part of the state's attorney file was missing.
16      Q.   And I think you explained this, but you only
17 looked at the Johnson materials, right, materials in
18 this case alone, right?
19      A.   Oh, this case alone, yes.
20      Q.   And can you tell us -- when you said that
21 there were documents missing, can you tell us what you
22 mean by that?
23      A.   So again, when I reviewed -- when I reviewed
24 the documentation, to me, some of it just seemed that
25 some paperwork was incomplete.  Again, I looked at the

Page 287

1  Cook County state's attorney office file where there was
2  mention that possibly the documents were missing.  Again,
3  when I looked at that -- that note that Detective
4  Halverson got from Kevin Sheehan to bring the file, and
5  I believe that was November, I don't know what was in
6  that file.  I don't know if there were GPRs in that --
7  in that file.  I just don't know because the documents
8  that I reviewed just doesn't clarify somebody's
9  documents that, I believe, are missing.
10      Q.   And then just to kind of clarify that point, I
11 think you told us you saw some documentation by the
12 state's attorney that they -- there were GPRs that were
13 turned over.  Did I recall that testimony correctly?
14      A.   Correct.  I believe that was on Page 20.  Yeah,
15 I believe I read -- I -- again, I would have to go
16 through the report again, that there were GPRs that were
17 -- were missing.  I'm not sure exactly how many GPRs
18 there were that were missing.
19      Q.   And then when you reviewed the documentation
20 that we have now, you did not see any GPRs?
21      A.   I did not see any.  Not that I can recall.
22      Q.   And so they existed back in 1991, '92 when
23 trial occurred, right?
24      A.   Yes.
25      Q.   And we just don't know where they are now?

Page 288

1      A.   That is correct.
2      Q.   You haven't been provided any information
3  about where they are?
4      A.   I have not.
5      MR. BRUEGGEN:  That's all I have.  Alyssa, do
6  you have some follow-up, or Mike or Theresa, or
7  whoever wants to go, so we can all go home?
8      MS. CARNEY:  I don't have anything.
9      MS. MARTINEZ:  I have a couple quick
10 follow- ups.  I promise I'm not trying to stall.
11 REDIRECT EXAMINATION
12 BY MS. MARTINEZ:
13      Q.   Very briefly, Mr. Muich, I just want to
14 clarify a couple of questions that Counsel just asked
15 you.  The first, I want to make sure that 2005 was the
16 year that you applied for this homicide -- strike that,
17 please.  Homicide investigator certification, correct?
18 So that would be when your 100 year -- strike that as
19 well, please.  So that would be when your 100 hours
20 clock started?
21      A.   I don't know the exact date when I actually
22 applied, but I would say it would've had to have been
23 shortly after I became a detective in December 2004.
24 Because the department wouldn't have allowed me to, you
25 know --

Page 289

1      Q.   Right.
2      A.   -- being a lead investigator if I wasn't on
3  the course to get my lead certification from the state
4  of Illinois.
5      Q.   Okay.  And then my second question is, the
6  Princeton five day training that you mentioned, which
7  year was that?  I missed that.
8      A.   I believe it was 2009 or '10.
9      Q.   That's okay.
10      A.   But I -- I don't recall without looking at my
11 certification.
12      Q.   Okay.  Third question.  Are you aware sitting
13 here right now that Demetrius Johnson is not Black
14 Hispanic?
15      A.   I believe the CPD reports, and I would have to
16 go back to it, stated that he was a male Black.  But
17 again, I would have to go back to the CPD reports to
18 actually find out where I -- I found that information.
19      Q.   Okay.  And then my final question for you,
20 sir, is, did you ever attend a training on homicide
21 investigations that taught standard policing practices
22 in 1991?
23      MR. BRUEGGEN:  Objection.  Asked and answered.
24 Go ahead, sir.
25      THE WITNESS:  I did not.

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 76 of 114 PageID #:53987
The Deposition of RONALD S MUSICH, taken on November 15, 2023
290..292

Page 290

1    MS. MARTINEZ:  Okay.  Thank you, sir.  That's
2  all I have for you.
3    THE WITNESS:  Thank you, ma'am.
4    MR. BRUEGGEN:  Mike, Theresa, anything?
5    MS. CARNEY:  No, I'm good.  Thank you.
6    MR. SCHALKA:  I'm good, too.  And we can
7  reserve signature.
8    THE REPORTER:  Okay.  And then I'll just go
9  ahead and get orders really quickly while we're
10  still on record.  Ms. Martinez, how would you like
11  your copy?
12    MS. MARTINEZ:  Electronically.
13    THE REPORTER:  Okay.  Would you like a copy of
14  the video?
15    MS. MARTINEZ:  Yes, please.
16    THE REPORTER:  Okay.  And then I'll go to you,
17  Mr. Brueggen?
18    MR. BRUEGGEN:  Yes.  Can I get an electronic
19  copy as well, PDF, whatever your standard electronic
20  format is with the exhibits attached?  Do you have
21  the exhibits?
22    THE REPORTER:  I don't have them yet, but I put
23  my e-mail --
24    MR. BRUEGGEN:  Okay.  You'll get them.  You can
25  attach --

Page 291

1    MS. MARTINEZ:  Oh, okay.  I --
2    MR. BRUEGGEN:  -- Okay.
3    MS. MARTINEZ:  -- I can e-mail them to you
4  here.
5    THE REPORTER:  Yeah, I put my e-mail --
6    MS. MARTINEZ:  Okay.
7    THE REPORTER:  -- in the chat.
8    MS. MARTINEZ:  Perfect.
9    THE REPORTER:  Would you like a copy --
10    MS. MARTINEZ:  Okay.
11    THE REPORTER:  -- of the video?
12    MR. BRUEGGEN:  I do not need a copy of the
13  video now.  Thank you.
14    THE REPORTER:  Okay.  Ms. Carney?
15    MS. CARNEY:  Nothing from me.  Thanks.
16    THE REPORTER:  Okay.  And Mr. Schalka?
17    MR. SCHALKA:  Nothing from me.
18    THE REPORTER:  Okay.  And with that, I will
19  take us off the record.  The time is 5:38 p.m.
20  Central.
21    (DEPOSITION CONCLUDED AT 5:38 P.M.)
22
23
24
25

Page 292

1    CERTIFICATE OF DIGITAL REPORTER
2    STATE OF ILLINOIS
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof by me after first
7  being duly sworn to testify the truth, the whole truth,
8  and nothing but the truth; and that the said matter was
9  recorded digitally by me and then reduced to typewritten
10  form under my direction, and constitutes a true record
11  of the transcript as taken, all to the best of my skills
12  and ability. I certify that I am not a relative or
13  employee of either counsel, and that I am in no way
14  interested financially, directly or indirectly, in this
15  action.
16
17
18
19
20
21
22  KYRA TATE,
23  DIGITAL REPORTER / NOTARY
24  COMMISSION EXPIRES ON: 01/09/2024
25  SUBMITTED ON: 11/27/2023

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_**
**Muich** 24:22,23
94:4 107:1

**Exhibit 2_**
**Muich** 66:13,15
67:1

**Exhibit 3_**
**Muich** 70:25
71:1 81:18
213:7 239:1
240:22

**Exhibit 4_**
**Muich** 73:25
74:1 77:2,4
82:1 83:9
235:18,19
242:20 243:4,5

**Exhibit 5_**
**Muich** 78:14,16
119:8 134:22
260:11

**Exhibit 6_**
**Muich** 84:7,9

**Exhibit 7_**
**Muich** 97:21
98:1 187:17,23

**Exhibit 8_**
**Muich** 178:25
179:2

**Exhibit 9_**
**Muich** 242:2,6

**$**

**$195** 39:24

**$245** 40:2

**0**

**01-310** 45:10

**09** 21:4

**1**

**1** 11:3 24:22,23
45:7 67:6 94:4
97:22 99:6
107:1 191:19
242:14

**10** 21:4 116:21
117:2,8,20
136:1 166:11,
13 289:8

**10-week**
157:18

**100** 132:9
164:17 272:17
274:3 275:9,19
281:19,20
282:13 288:18,
19

**101** 6:6

**10:10** 6:7

**11** 37:12 77:9,
11 91:1 249:18

**11:01** 54:21
55:2

**11:06** 54:22

**11:07** 55:7

**12** 70:21 74:21
91:4 122:3,6
160:22 161:1,4
232:22,25
233:13,20
241:18 259:19
260:23

**1200** 45:7

**121229** 45:16

**126** 45:21

**12:10** 105:16

**12:11** 106:16

**12:50** 105:17
106:11

**12:51** 106:23

**12th** 116:6
205:1 262:5

**13** 25:15 162:18
167:3,8 232:22,
25 233:13,20

**14** 131:7
135:11,23,25
136:2,6,7,9,17,
20,22,25 137:3,
10,15 175:19
183:1,4

**14-** 233:20

**14-year-old**
247:2

**14-year-olds**
233:13

**14th** 123:13
131:8,9,10
251:18 261:5

**15** 55:7 106:23
167:1 186:11
187:6 190:15
228:13 233:16
255:5 265:1

**15-** 234:24

**15th** 6:6 40:11

**16** 187:18,19
188:2 195:13,
16 199:10
202:22 233:1,
17

**166** 188:2
189:19 190:6
191:19,22

**167** 189:20,21
191:20

**17** 210:11
232:9,18,19
233:1,17
245:24 253:22
257:5

**18** 93:19 110:16
153:5 201:6
202:2 232:8

**18-year** 138:18
160:17

**19** 78:14,17,21
191:18 277:13

**1975** 278:6

**1987** 11:1,2
62:21

**1988** 53:17

**1990s** 214:21
216:1 218:14

**1991** 61:19,21
62:20,22,25
63:3,6,11,14,19
64:1,11,17,25
65:3 66:2 67:20
70:21 74:21,24
88:11,16 89:24
91:1,4 96:17
133:13,17
173:8 213:11
218:9 226:6
239:14 259:19
260:16 278:13
287:22 289:22

**1995** 11:3
64:18 89:16,24
157:18,22
213:12 263:24

**1996** 277:4

**1999** 13:6,8

**1:00** 105:17

**1:15** 72:9

**1:20-CV-4156**
6:13

**1st** 50:24

**2**

**2** 66:13,15 67:1

**20** 191:19
212:17,18
215:2 217:6
228:16 287:14

**2000** 37:11

**2004** 13:10,14,
17,19 37:11
265:1 277:5
281:24 288:23

**2005** 14:14
15:23 147:1
265:19,23
271:20,23,25
273:6,19

**274:22 277:8**
288:15

**2006** 277:8

**2008** 35:10,13
272:8

**2009** 21:3
273:7 274:25
275:18 289:8

**2010** 21:3
273:7 275:18

**2013** 274:25
275:20

**2015** 13:20
16:15,18 266:9

**2017** 266:12
275:3,20

**2018** 19:1

**2019** 266:19

**2020** 19:1,5

**2021** 16:2

**2022** 16:13
266:24

**2023** 6:7 16:11
19:5 25:15
29:21,22 50:16,
24 55:7 106:23
167:1 228:13
255:5 263:25

**21** 14:17 16:10
190:6,10 191:8,
11,22 192:14
193:14 194:11
230:5,16,20,21
238:16,18
267:8

**22** 173:8 235:5
244:4 277:18

**22:30** 71:13

**22:37** 71:18

**22:40** 71:21

**22:43** 71:24

**23** 242:16
248:16,19,22
260:11

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 78 of 114 PageID #:53989
The Deposition of RONALD's MUTCH, taken on November 9, 2023

294

**2311** 260:23

**23:00** 74:13

**23:50** 72:3

**23:55** 72:6

**24** 74:24 190:6,
11 191:8,11,22
192:14 193:14
194:11 250:22

**25** 66:22 69:14

**26** 71:3,4

**26(a)(2)** 28:6

**268** 40:17
41:10,12

**28** 145:1,3,4,10
149:10 169:21
185:19,25
252:3,19 257:4

**29** 260:15

**29th** 262:4,5

**2:08** 166:21

**2:18** 166:12,17
167:1

———

**3**

———

**3** 12:15 58:19
59:11 67:6
70:18,25 71:1
81:18 83:18
213:7 239:1
240:22

**30** 9:18 10:5
15:2,6 40:20
41:13 134:2,23
135:5 209:3
267:4,5,9
268:21

**300** 138:21

**310** 97:22 99:7

**328** 46:6,11

**338** 46:6

**343** 46:7,11

**344** 46:7

**373** 46:7,12

**374** 46:7

**38** 46:11 66:22
69:22

**3:15** 210:5

**3:42** 228:8

**3:48** 228:4

**3:53** 228:13

———

**4**

———

**4** 73:25 74:1
77:2,4 81:19
82:1 83:9 94:3
145:12 149:11
235:19 242:20
243:5

**4-week** 271:20

**40** 15:2,6 74:2,3
79:1 142:2
149:22 209:3
267:4,5,9
268:21

**400** 282:4

**40202** 6:6

**40th** 279:6,13

**42** 75:3 242:16

**43** 74:4 242:3,
11

**44** 46:11

**45** 109:25 110:6
116:18 133:10

**4:00** 40:13

**4:32** 254:24

**4:42** 254:21

**4:48** 255:5

———

**5**

———

**5** 11:14,15,16
78:14,16 119:8
134:22 260:11
261:4

**50-year-old**
234:22

**500** 281:25
282:8

**56** 98:11

**5:38** 291:19,21

———

**6**

———

**6** 84:7,9 98:18

**60** 114:25

**63** 168:21

**65** 19:18

**66** 97:24 98:3,
11,13

**68** 19:18

———

**7**

———

**7** 84:1 97:21
98:1 187:17,23

**70** 270:13

**730** 6:5

**74** 46:12

**78** 231:8

**79** 19:17

———

**8**

———

**8** 108:13 111:25
178:25 179:2
191:19

**80** 19:17 43:10

**80s** 216:11

**83-1** 54:6,7,9

**83-2** 54:13

**86-3** 54:15

**87** 43:10 213:12

**88** 43:3

**89** 43:3

**8:00** 40:12

**8th** 50:16

———

**9**

———

**9** 107:1 116:20
242:2,6

**90s** 59:17 60:5
96:2 182:5
214:4,5 216:11

**91** 74:20 260:23

**911** 117:17

**92** 287:22

**93** 75:12

**95** 12:21 74:25

**96** 12:21

**99** 13:3,4

**9:00** 152:3

**9:15** 152:4

**9:30** 152:5

**9:45** 152:5

———

**A**

———

**a.m.** 6:7 55:2,7
152:4

**A4** 269:19,21

**ability** 8:2,10
85:9,14 95:17
162:24 163:16,
18 164:10
165:10 182:8

**absolutely**
25:1 104:3
128:18 139:22
154:17 160:25
165:24 197:7
213:3 283:5

**Aby** 48:4,9
71:23 72:19
118:19 119:10,
15 123:16,18
125:4 127:8,9,
13 178:14
235:19,23
236:3,4 239:20,
22 247:2

**academic** 51:5

**academy**
11:20,22,25
157:18 272:9

**accept** 275:5,6

**accepted**
78:24 258:24
259:8 283:2

**access** 285:15

**accidentally**
57:23

**accidents** 34:6

**accurate** 14:22
20:13 62:1
146:11 157:4
158:24 230:11
231:2,23
235:11,15
236:7,9

**accurately**
146:8,19
155:21 156:10
158:12 159:11

**acknowledges**
273:3

**act** 245:13

**acted** 227:4
247:12

**action** 95:23

**actions**
201:11,15
250:24 251:3
253:11,15

**activate**
267:17

**active** 34:4
118:3 232:6
275:13

**activity** 144:6

**acts** 49:3,21

**actual** 40:22
279:1

**adamantly**
199:13

**add** 227:13



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**addendum** 26:20 29:12 42:22 43:12 195:6

**addition** 78:21 79:4 282:10

**additional** 20:19,23 36:20 47:21 78:2 254:17 282:12

**address** 30:21 146:23

**addresses** 101:2

**adjust** 210:11

**admin** 41:16

**admit** 246:15

**admits** 131:7

**admitted** 130:10 212:3 226:10 227:1

**admitting** 226:18

**adult** 231:19 234:22

**adults** 231:12 234:18,21

**advanced** 233:14 272:1 282:22

**advice** 27:15 28:1,20 30:6 41:1 99:19

**advised** 27:17 30:8 34:23

**advising** 28:2, 22 41:3

**Advocate** 233:25

**advocates** 234:1

**affect** 9:2 53:3 82:17 102:16 104:14,23 105:1,2 167:14, 17 205:14

206:1 207:8,15

**affected** 134:11 175:14

**affiliated** 177:11

**affiliation** 177:8

**affirm** 7:15

**afraid** 231:22

**aftereffects** 117:16

**age** 201:4,7 210:21 230:17 232:1,3,8,9,12, 14,18 233:6,18

**agent** 15:24 23:21

**ages** 86:21 232:12

**agree** 25:6,11, 14 31:8,11 38:4 60:19 67:19 71:13,17,20,23 72:1,5,8,11,15, 18 73:2,15 74:13,15,19,23 75:3,7,11 76:7 77:22 78:6 84:20 85:18,25 86:14,17,19 87:7 91:5,12 92:6 93:5,23 98:24 113:18 116:3 123:24 128:3 135:15, 18 137:16 147:5,20 148:1 149:5,15 150:23 152:12 155:19,24 156:8,25 158:2, 7,9 159:3,7 160:7 161:9,12, 18 162:6,14 168:13 169:5 175:8 178:18 180:8 181:8 182:10,15 187:3,5 188:22 190:5 191:4,18

196:23 197:14, 16 198:25 200:6,16,17 225:19,24 231:10 235:14 236:25 239:2, 17 243:20 244:20 253:19 258:23 259:7 262:9

**agreed** 7:8,11, 13 88:1 89:2 128:12 152:1 191:21

**agreeing** 29:25

**agreement** 207:19

**ahead** 23:12,24 26:11 27:5 30:17,23 31:5, 23 32:14,21 35:22 38:10,20 41:16 45:25 46:20 48:23 49:5,24 53:7 55:24 57:4,18 60:10,22 61:7, 17 64:15 65:8 67:24 68:13,23 77:5 85:8 86:3 88:6 89:11 90:1,14 92:1 93:8 94:23 95:3,7,12,20 96:9,21 97:1 100:1,19 101:10,25 107:19 108:22 110:3 111:19 112:5 114:14, 19 115:9 116:9 117:5 120:15 121:5 123:16 127:5 129:14, 16 130:6 131:6 134:15 137:14 138:15 139:19 141:15 143:23 147:9 154:1 158:15 162:11 163:4 164:15 165:1,14 168:17 169:9

170:5 172:1,25 174:14 177:23 181:12 182:19 184:18 185:5, 18 197:2,20 198:12 201:17 203:11 205:17 206:8 207:13 208:15 219:7, 13,21 220:10, 21 221:18 222:5 223:4 224:15 233:4 236:19 237:2 246:13 252:18 261:17 268:6 279:11,17 280:11 289:24 290:9

**aid** 249:3

**air** 202:20

**alibi** 193:6,7,8, 9,11,13,17,22 194:6,13,24 195:10,13 196:7,15,17,18, 21,24 197:5,7, 8,9,10,12,18, 22,23,25 198:3, 18,19 199:2,12, 24,25 200:2 202:6,7,18,19 205:12 208:25 209:6,8,10

**alibis** 64:12 193:23 209:15

**alike** 85:15 98:21 257:1 258:3

**alleged** 91:24 244:18

**allegedly** 183:8 238:20

**alleges** 244:9

**allowed** 28:5, 16 230:1 288:24

**Allstate** 118:2

**alternative** 259:12,25

**Alyssa** 6:17 7:23 24:24 57:22 66:25 70:6 71:2 76:2 105:18 145:7 165:22 227:19 288:5

**Amendment** 219:12 224:13

**ammunition** 34:20

**amount** 19:23 41:6 113:20

**analyzing** 207:10

**and/or** 252:12

**Angel** 72:5 83:22 91:2 172:18,19 173:9 174:8 175:4,14 176:1 177:2,12

**angle** 209:25 283:12

**answer's** 18:10

**answering** 9:6 27:18 28:24 30:9 41:4 83:8 148:25 149:3 187:10 190:18

**answers** 8:2 35:4 47:25 66:6 80:6 126:10,11 262:12 275:1

**anymore** 90:25 142:20 274:16

**Anything's** 194:18

**apologies** 10:5 12:6 15:22 25:23 28:12 31:20 33:25 37:4 43:5 45:9 52:2 61:21 62:5 63:5 70:9 71:15 74:3,7 87:15 94:5 100:7,14



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 80 of 114 PageID #:53991
The Deposition of RONALD's MUTCH, taken on November 9, 2023
296

101:19 102:11
104:6 109:20
122:9 125:17
132:25 133:4
146:20 148:25
159:21 160:22
187:20,21
188:1 195:18
196:4 198:23
208:7 212:19
215:21 218:2
222:17 223:24
230:22 242:15
243:2 248:22
250:23 265:4
268:16 269:11
273:22 275:1
277:6

**apologize**
12:24 24:19
44:1 46:8 50:12
53:19 73:13
88:7,22 116:12
133:1 143:13
145:8 148:3
170:13 171:15
185:8 186:12
192:18 200:18
205:18 240:1
264:16 265:13

**appearance**
6:14

**appearing**
6:19,22,24 7:2

**appears** 73:17
74:23 86:18
87:4,9 182:16
215:24

**appendix**
219:25

**application**
274:8

**applied**
288:16,22

**applies** 85:18

**apply** 278:19
283:3

**apprehension**
145:23 151:2

**approach**
249:8

**approaches**
272:3

**appropriately**
82:19

**approve**
151:19,20
214:19

**approved**
74:24 124:5
253:25

**approximate**
10:4 40:15 41:9

**approximately**
9:18 12:10,19
13:4 15:1 17:10
19:2,14 35:5
40:17,19,21
43:17 75:25

**April** 11:3
29:17,21 147:1
271:23

**area** 11:11
12:12 37:2,8
38:3 39:2 65:1,
5 123:15
182:17 261:4
267:25 282:21,
22

**areas** 281:4

**Arena** 118:2

**argument**
243:2,6

**Argumentativ
e** 279:16,25

**arguments**
242:17

**arm** 115:24
163:23 261:4

**array** 94:10
173:5,10
174:21 176:3

**arrays** 85:20

**arrest** 49:14
56:21

**arrested**
260:16 261:21

**arrests** 63:8

**arrival** 272:8

**arrive** 25:21

**arrived** 118:4
261:5

**arriving** 26:24

**arson** 36:25

**Art** 9:22

**Artesian** 187:3
188:13,22

**article** 51:6

**articles** 20:16

**articulate**
189:24

**ASA** 204:19
205:23 207:9
208:10

**ascertain**
128:4

**ascertaining**
197:18

**aspect** 92:24
109:16 142:3,
21

**assailant**
117:3

**assault** 261:22

**assaults** 14:3

**assertion**
119:14 136:20

**assign** 38:14,
16 269:3

**assigned**
16:22 268:25
269:7

**assigning**
16:23

**assignment**
30:10,11

**assist** 38:17
146:11 157:3

192:3 267:23
268:2,19 269:6
281:9

**assistance**
14:14 209:3,12
245:25 253:21

**assistant**
231:15 286:7

**assisted**
267:5,6

**assisting**
15:16

**associates**
65:15 79:16

**assume** 8:23
67:10 68:10
82:6 112:3
113:8 115:14
117:12 118:9
178:1

**assumed**
76:21 108:19
111:25

**assuming**
67:13 68:4
76:17 83:9
118:15 128:19
132:17 147:16
241:21 261:12

**assumption**
111:14 118:2

**assumptions**
29:4 118:12

**assure** 277:1

**attach** 290:25

**attached**
290:20

**attack** 268:11

**attacker**
117:12,20
118:8 119:14
120:4

**attackers**
116:24 117:20,
21,23 119:2,23
120:1,2,3,18,20
256:14 271:8

**attained** 37:17

**attempt** 96:2
174:18 184:2

**attend** 20:20
275:11,24
277:17 289:20

**attended** 11:25
146:23 271:20,
25 272:8
275:19 282:15

**attending** 6:15

**attention**
66:18 98:18
135:10 166:7
245:12

**attorney** 28:5
30:2 39:17,23
40:23 45:8
99:14 101:8
133:14 161:7,
14 205:10
216:14,23
229:7 244:12,
16,17 245:11,
12 246:18
250:13 258:21
286:7,15 287:1,
12

**attorney's**
45:15 250:15
263:15 286:2

**Attorney-work**
27:4,12

**attorneys**
10:1,17 26:7
29:25 100:9,10
101:8 215:24
226:8 241:8,15
247:10,14,24
248:7,11

**attorneys'**
285:22

**attracting**
210:3

**attributes**
210:20 211:17

**audible** 188:24

**August** 265:22



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 81 of 114 PageID #:53992
The Deposition of RONALD S. MUTCH, taken on November 10, 2023
297

**authored**
240:18 241:16

**automatic**
66:22

**autopsy**
272:10

**auxiliary** 11:2,
5,10 62:19 63:6

**aware** 23:20
51:10 103:17
219:3,11
244:12 259:25
279:5,13
289:12

———————

**B**

**B-1** 26:20 27:2
29:12

**B-2** 27:2 29:12

**B1** 51:4

**B2** 51:4

**back** 13:4
14:13 16:14
24:7 29:18
47:13,18,23
48:2,10 51:21
52:15 53:9
54:22 55:4
61:18 67:15,17
69:12 73:14
83:4,13,18,20,
21 84:19 85:22
89:16,24 90:24
100:25 104:16
105:17 106:20,
25 111:1
118:17 134:22
140:2,6,7
141:24 144:25
154:22 157:17,
18 160:22
162:5 166:11,
23 176:7 178:4
179:19 189:6,
14,15 197:4
204:20 209:6
213:11,18
214:24 215:3
216:18,20
217:4 218:9,14

226:3 228:4,10
232:11 244:3
246:16 252:2
254:21 255:2
256:9 271:1
287:22 289:16,
17

**backdrop**
87:19

**background**
10:24 182:23

**backtrack**
126:23

**backtracking**
269:12

**bad** 49:3,21
114:1 148:10
149:15 183:6,
13,19,21 184:1,
5,6,8,9,15,25
185:15,23
198:15

**ballpark** 14:12

**bar** 57:24

**base** 156:3

**based** 26:13
147:19 178:20
249:17 281:19,
20 285:14

**basic** 12:3,11
251:22 269:2

**basically** 11:7,
10 12:3,4,15
14:1,4,7,15,16
15:16 16:21,25
21:11 22:18
30:11,13 34:10,
24 38:14 40:10
41:17 90:2
110:10 118:19
121:20 123:13
125:11 131:3
133:20 142:16
149:14,21
162:4 163:20
172:13 191:15
192:22,23
196:20 201:2,8
202:18 206:11
212:2,5,7

213:20 214:10
222:13 229:10
231:21 246:18
249:25 250:11
251:19,21,22
253:5 254:10
255:10 256:19
267:16,21,23
268:1 270:13
272:10 276:12
283:19 285:10,
11

**basis** 62:8
67:13 118:14
122:25 126:24
127:1 129:12
130:1,23 133:6
149:5 163:3
196:13 199:18
210:25 216:3,5
217:12 228:24
231:3 251:8
253:9,14 258:9

**basket** 214:17,
18

**basketball**
206:13,15,16

**batch** 43:18

**batches** 43:15,
16

**Bates** 48:5
97:21 99:6
187:18

**bathroom**
166:15 228:2

**bazooka**
69:14,15,21

**bearing** 105:13
244:25

**bedroom**
206:16

**begin** 7:19

**beginning**
6:16 109:17
177:19 247:1
253:23 259:19

**begins** 230:17,
19,22

**behalf** 6:21,23
7:1 280:9

**Beijing** 266:3
270:4

**believed**
255:17 271:10

**believes**
150:16

**believing**
126:24 127:2

**bell** 52:9 54:7

**benchmarker**
153:18

**beneficial**
100:22

**Berverena**
58:22

**big** 212:15
276:23 286:11

**bigger** 268:10

**bill** 42:2,4

**billed** 41:6

**bit** 87:21 89:21,
22,23 102:6
133:18 185:8
209:25 215:3
259:6 269:25

**black** 65:25
85:24 86:1,9,11
98:20 100:16
104:1,25 105:5
107:23 108:2,
11 109:1,9
111:17 112:17,
19,21 113:10,
13,16 164:4
179:17,22
283:25 284:1
289:13,16

**Blacks** 179:11

**blind** 97:16

**block** 25:11

**blood** 183:6,
13,19 184:2,5,
6,8,9,14,15,25
185:15,23

**blow** 245:9

**blue** 105:6

**blurb** 208:1

**blurry** 209:17,
19

**body** 90:18
115:21 266:1
269:25 270:1,
17

**bottom** 161:3
167:10

**bounce** 21:16

**bounced**
276:17

**box** 74:20,25
75:12 270:18

**boxes** 250:10

**boy** 175:19

**boyfriend**
197:24 198:3
200:3 202:9

**Brady** 53:3
161:24,25
162:7 246:10

**break** 8:16
54:19 70:11
78:13 103:2,5,8
106:3,6 150:11,
12 158:25
165:23 166:1
170:6 227:19
254:7 259:6
264:4

**breaking**
150:19 165:23

**breakout**
276:8,14

**Brian** 210:12
260:6

**briefly** 73:24
181:5 217:5
288:13

**bring** 20:12
24:21 61:9
84:6,19 85:22
90:24 101:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151:21 176:21
178:25 187:16
233:15,24
235:18 241:21
245:11 246:23
252:11 257:24
258:20 259:21
286:13 287:4

**bringing** 49:10
61:3

**broad** 37:25
64:22 65:11,24
93:18

**broadcast**
65:20 119:25
129:15 256:13

**broke** 259:1

**brother** 131:5

**brought** 9:10
11:22 12:8
13:7,16,18
21:11 67:21
78:19 120:19
123:7 124:4
142:16 195:1
202:17 239:22,
24 245:16
247:2 253:24,
25 259:20
261:22 262:1,7
263:23 283:10
284:20,23

**Brueggen** 6:23
7:11 22:5,10,15
23:5,12,24
24:5,14,24
26:1,11 27:4,
11,16,22 28:4,
10,13 30:2,17,
23 31:5,23
32:8,10,12,14,
21 35:16,21
36:1 38:9 40:23
45:22,25 46:19
48:23 49:4,17,
23 52:19 53:5,7
54:20,23,25
55:24 57:4,22
59:23 60:9,22
61:6,17 62:10
63:16 64:3,6,14
65:7 66:25

67:23 68:9,13,
22 69:23 70:6,
13 71:2 74:2
75:19 76:2,14,
19 77:5 79:17
80:14 81:10,13
82:5,9,11
84:11,15,23
85:7 86:2 88:5,
17 89:10 90:13
91:15,25 93:1,7
94:22 95:3,7,
11,19 96:8,20
97:1,8 98:2,4,6,
9 99:2,14,25
100:12,17,19
101:10,12,24
102:19,23
103:1,7,20
104:5,15
105:18,23
106:2,8,15
107:18 108:22
109:13 110:2
111:18 112:5
113:5,22
114:13,19
115:8 116:8,10
117:5 120:14
121:5,15
124:25 125:24
127:4 128:6
130:6 134:14,
25 135:3,6
137:13 138:14
139:11,18
140:23 141:15
143:12,22
145:7,9,13
147:8,21
153:21 154:1,
15 155:23
156:12,17
157:5,16
158:15 159:12
160:9 161:15
162:10 163:4
164:14,25
165:13,22
166:2,13,18
167:20 168:16
169:8 170:4,20
171:9,25
172:25 174:13
177:22 181:11
182:3,18

183:15 184:4,
17 185:2,5,17
186:7 187:23
189:2,6,7,10
190:9,23 192:3,
5,8,10 197:1,19
198:11 199:3
201:14,17
203:11 204:10
205:17 206:8
207:13 208:14
209:17,20
210:5 211:19
219:6,13,21
220:10,21
221:18 222:3,5
223:3,11 224:2,
15 225:12
226:1 227:19,
22 228:1,5
233:3 236:19
237:2 240:10,
13,19 243:23
245:3 246:12
248:2,14
249:15 252:17
254:9,13,15,19,
22 255:19
256:4 258:10
260:3 261:17
268:6 269:19
279:8,11,16,23,
25 280:10,24
281:3,6 288:5
289:23 290:4,
17,18,24 291:2,
12

**Bryan** 58:22
59:12 60:20,25
66:19 72:16,24
119:1,18 123:4,
7,11,16 124:11
127:12 129:18
130:9,11,12,13,
18,20 131:16,
18,20,24,25
132:3,7,10,13
178:15 215:7,
10 238:20
239:20,23,24,
25 242:23
246:20,23
247:1,3 251:14,
16

**buckets** 264:4

**Buckley**
204:20 205:23
207:9,17
208:10

**budget** 140:10

**building** 65:15,
23 66:5,9
260:24

**Bulls** 203:3
204:18 206:22
207:5

**bunch** 34:20

**Bureau** 265:21

**Burgos** 71:20
91:2 94:6,13
98:15 100:15
103:18,19
107:12 109:7
113:6 116:5,14
129:23,24
130:8,12,13,17
133:5 283:16
284:3

**Burgos'** 132:7

**Burgos's**
107:6,21
111:15 113:15

**bus** 11:11 63:9

**busy** 116:22

———

C

**calculation**
20:2

**Calderon**
266:16

**call** 9:23 12:5
15:11 34:14,22
109:10 128:7,8
132:8 207:23
247:8 251:13
260:20 261:24,
25 262:16,17
263:12 271:10
286:11

**called** 15:14
80:2 119:25

186:23 188:17
274:19

**calling** 80:2
117:17

**calls** 12:13
30:2 40:23
119:21 243:13

**Campbell**
186:25 187:1
188:20

**canceled**
277:11,12,15

**candidate**
36:8,10

**canvas** 267:25

**capacity**
143:17 155:12
250:5

**captain** 18:6,
10,16 19:9

**car** 34:15,19,21
66:20 164:13,
16,17,20

**care** 16:25
36:9,10 114:23
203:17

**career** 19:16
20:10 22:17,25
37:14 110:10
138:19 142:3
154:19 160:17
201:3 213:22
214:9 233:22
234:3 253:3
263:23 268:21
283:9

**careful** 281:19

**Carey** 193:12
196:8,21

**Carney** 6:21
7:13 22:11 23:6
49:16 57:17
59:8 62:11 63:2
100:18,20
142:9 143:24
144:9,11,14
149:7 240:9,11
241:9,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 83 of 114 PageID #:53994
The Deposition Of RONALD's MUTCH taken 16, November 30, 2023
299

243:13 279:15,
22,24 281:1
288:8 290:5
291:14,15

**carried** 211:6

**case** 6:13 7:25
14:14 16:7
23:16 24:2,9,11
25:7,18,24 26:8
29:15 30:1,10,
22 31:4,17
33:13,16 39:9,
12,16 40:16
41:7 42:3,5
43:22 45:5,15
47:17,22 48:1
49:14 50:9
51:12 55:23
60:15,17 65:13
92:6 121:12
124:5,9 135:13,
16 136:21
137:9 139:22
146:6 151:17,
18,25 152:20,
22,23 154:25
155:2,6 156:2
172:17 174:8
176:14,15
189:13 190:14
194:23 195:1,2,
9 196:9 197:6,8
203:7,23
208:22 209:2,
12 211:12,15
213:6 215:23
217:16,19
218:6,24,25
221:6,10,16,22,
24 222:12
225:11,20
227:3 229:3
231:15 232:20
233:12 234:9,
10,20,24 239:1
240:17 245:24
246:21 247:1,
23 248:10
249:3,4,9
252:10 253:21,
22 254:4
255:21,22
258:7,9,11,15,
20 259:15,23,
24 260:4,8

262:2,6 265:1,
3,25 269:6,22
270:12,16,19
271:8 273:19
278:20,21,22
280:20 284:20
285:14 286:18,
19

**cases** 13:22
16:22,23,24
26:15 33:11
37:13 48:20
91:22 202:3
250:1 264:12,
18 269:12
271:4,14 281:8

**catch** 156:15,
16

**caught** 144:21
162:15

**caveat** 161:23

**CCSAO** 45:16

**celebratory**
34:13

**Center** 233:25
272:2

**Central** 6:8
55:2,7 106:17,
23 166:21
167:1 228:8,14
254:25 255:5
291:20

**certificate**
21:6 51:11,24
52:4,5,12 53:2
57:15

**certification**
272:15,19,20,
21 273:8,20
274:5 281:22
282:14 288:17
289:3,11

**certifications**
37:20,21,25
274:23 282:11

**certified**
200:24 272:25
274:11,13

**Cesar** 266:6
270:8

**cetera** 215:24

**chairs** 72:21

**championship**
203:4 204:18
205:2,13,25
206:7,23
207:12 208:11

**chance** 197:10
203:5 242:19

**change** 68:6,
19 79:15 80:11
82:2,25 83:10,
16 103:25
109:16,25
111:4 121:3
167:25 168:3
185:7 201:4
214:8 225:10
232:8,9

**changed** 13:23
16:20 107:16
109:8 174:5
176:1 177:13
201:7 232:2,13
233:23 234:3
249:19

**changing**
65:21 146:14
158:4 163:8,11
164:2

**chaotic** 116:23
117:15 252:4

**charge** 176:10
252:24,25

**charged** 34:25
123:16,23
124:10 196:9
202:10 204:17
205:7 207:12
246:9 252:16

**charges** 124:6
151:19,20
253:25

**charging**
245:19 259:22

**chat** 291:7

**check** 41:19,22
64:12 165:25
249:7 272:16

**checked**
250:8,9,10

**Chicago** 6:20,
22,25 7:2 15:19
43:1 52:22
53:22 55:16
58:10 120:22
203:3 207:4
214:15 216:8
226:4 229:19,
22 240:6
241:19 270:23

**chief** 38:13,21
39:7

**child** 193:20
195:15 197:25
199:13 272:4

**Children's**
233:25

**choose** 25:22
84:21 85:4
99:12 100:10
101:9

**choosing** 81:8

**chose** 25:25
30:15

**Christmas**
270:17

**circumstance
s** 90:7 109:15
126:6 152:6
173:24 222:24

**circumstantial**
161:6

**citation** 34:25

**cite** 186:13
188:9 224:19

**cites** 119:9

**citing** 186:18

**citizen** 260:20

**city** 6:22,25

**City's** 48:17

**civil** 33:16,21

**civilian** 201:11,
15

**civilians** 198:8

**claim** 251:9

**claiming**
235:23

**claims** 165:8

**clarification**
27:14 50:14
63:13 91:7
111:12 132:17
153:12 166:5
175:11 194:23
201:10 213:5
214:24 222:10,
17 231:25
240:2 247:18
271:17 272:24

**clarifications**
18:25

**clarify** 18:13
39:16 42:12
47:11 51:23
52:3 53:15 59:2
66:7 82:6 120:8
143:5 159:25
186:4 227:2,15
246:6 287:8,10
288:14

**clarifying**
215:12 263:21

**classes** 37:16

**classified**
232:7

**classifies**
232:2

**clause** 273:14

**clean** 8:11 69:5
94:21 95:18
97:6 222:18
224:11

**clear** 11:24
14:23 31:15
36:20 70:8
128:18 136:18
177:6 183:5
236:2

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 84 of 114 PageID #:53995
The Deposition of RONALD'S MUTCHLER, taken on November 10, 2023
300

Clemente 206:24,25 207:2

clinics 276:12

clock 288:20

close 15:19 79:3 90:6 254:10

closing 243:2

clothes 173:20 174:4 238:8

clothing 174:4

cobra 261:2,3

coerced 133:24

colleague 9:22

collection 272:10

College 11:19

color 89:21

Columbine 276:10

combined 133:4

comfortable 80:25 173:19 176:2 238:1

command 142:17,20

commander 18:5,10,15 19:6,7,8,12 267:20

comment 237:25

commit 22:8 53:3 67:22

committed 38:8 60:7,13 65:6 83:11

committing 64:12

common 109:19,24

182:17,21,24

communicate 145:21 150:8, 24

communicated 146:8 155:22 156:10

communicating 150:10

communication 145:5,14,18 147:6,19 148:5, 9,13,14 149:11, 15

communications 48:4

compare 160:16

compensation 39:16

complete 38:20 44:23 45:15,20 60:2 96:8 126:5,22 134:15 146:12 157:4 176:20 228:19 267:9

completed 12:7

complex 194:6 257:6

complied 285:16

compound 143:24 144:11 174:13

computer 189:4 212:23 214:10,12 215:2

computers 214:6

concern 78:3 181:10 221:1

concerned 140:20 142:7 217:16,20

220:5,7,11,17 221:3,13 224:22

concerns 101:23 102:5 141:10

conclude 117:3

CONCLUDED 291:21

concluding 40:19

conclusion 26:16 29:10 30:14 46:23 109:2 112:22 121:20 217:24 228:20 230:2

conclusions 58:15

condition 9:2 250:11

conduct 65:4 78:25 171:7,21, 23 172:21 228:19

conducted 55:5 68:7,20 79:3,7 106:21 166:24 179:10 222:2,20 223:2, 18 228:11 255:3

conducting 12:12

conference 6:8 20:20 21:7, 8,10,19,20 55:6 106:22 166:25 228:12 255:4 275:22 276:20 282:17,23

conferences 21:16 277:25 283:6

confession 210:13 244:19 247:7

confidence 243:3,6,7

confirm 17:20 168:5 243:3 265:17

conflict 258:8

confuse 13:14

confused 24:7 33:24 184:20

confusing 8:22 205:22

connection 83:11 177:1

consideration 97:12 100:3 113:11 115:22 173:25

considered 13:13 33:21 97:4 125:23 126:18 195:25

consistent 162:23 163:9 215:25 216:10, 17 223:22 230:7,20

consistently 143:18

console 34:16

constitutional 38:4,5 162:8

constructed 126:3

consultation 39:18,23

consulting 36:17 39:12

contacted 131:6 178:15 261:4

contained 25:18 59:7 72:12

contemporaneous 135:13 137:24 138:11

139:4 141:5 146:6,10 155:20 156:8 157:3,14

context 148:22,24 184:21 208:24 237:19

contexts 164:8

continue 103:3 129:7 130:3 187:6

continued 127:11

continues 116:21

continuing 117:2 199:22 247:5 282:5

continuous 224:12

continuously 282:7

contradicting 79:6 255:9,16 256:1,6,16 257:2,10,16,19, 21,25 258:4,14

contribute 210:21

control 11:7 63:8

convened 6:8

conversation 144:2 204:19 207:9 208:1

conversations 26:6 100:9 101:7

convicted 48:21 57:3

conviction 178:20

Cook 45:21 244:14 285:22 286:1 287:1



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

coordinated 238:7

coordinating 173:19

coordination 249:5

copies 36:2

copy 9:11,12 24:25 67:1 69:14 84:11 179:3 238:23 243:4 290:11, 13,19 291:9,12

Cordova 72:5 91:2 172:19 173:1,9 174:8 177:2,4,12

Cordova's 175:14

correct 7:10 9:9 11:1,16 13:20,21 16:16 17:4 18:14 20:11 25:16,19, 20 26:21,22 27:1 31:4,17 38:6 39:19,24, 25 40:2,3 42:24 44:24,25 45:6, 16,18 46:7,12 48:5 50:17,24, 25 51:7 52:4 53:17 55:13,14, 17,19,20,23 56:6,7,10,16,22 57:3,11 58:3, 11,15,24 59:14, 15 61:1,11 62:19,23 63:17 64:7 65:16 66:10,11 67:8,9 69:9 70:22,23 71:5,10,11 73:9,12 74:6,8, 9,14,22 75:1,6, 9,13,18 76:1,5, 10,13,18 77:6, 25 78:10,17 82:9 83:24,25 85:21 88:3,4,7 89:4,5 91:10 94:2 99:7,8,10,

11 107:7,8,13, 14 112:4 120:13 128:21 129:24,25 136:24 141:7,8 143:11,13 145:14 146:23, 24 147:2,3 154:12 162:16 166:8 173:12 179:14,15,18 186:6,8 187:21 189:24 191:23, 24 192:2 194:25 195:4, 10 200:11 201:13 202:1 212:24 213:15 214:7 215:14, 15 219:1,2,5 222:22,23 227:5,17 229:21 234:11, 13 236:18 240:3,4 244:21 246:11,14 247:19,20 248:1,9,12,13 261:10,13,20 263:16 264:24 265:20,24 266:10,13,17, 20,23,25 275:2 287:14 288:1, 17

corrections 213:18

correctly 143:6 266:7 281:22 287:13

corroborate 117:22 198:17 257:25

corroborated 230:10,25 234:14,18

corroborates 94:8

corroborating 79:5

could've 113:24 114:1

123:9,15 125:3, 4 131:25 263:4

counsel 6:16 7:8 8:6 9:9 27:15,17 28:1, 2,20,22 30:6,8 41:1 99:19 227:4 283:8 288:14

counselor 41:3

count 135:25 275:9 276:1

country 21:12

county 45:21 173:18 237:21 244:14 285:22 286:1 287:1

couple 10:23 33:10 39:15 44:21 263:21 281:4 288:9,14

court 6:4,11 107:11,21 108:1,16 112:3 134:18 151:21 176:17 193:13 226:9 252:11 253:1,6 254:1,2

Court's 124:6

Courts 48:22

Covid 277:11, 15

CP 285:15

CPD 9:12 10:14 30:13 43:9,11 44:7,23 47:8 52:22 55:11 67:15 76:21 79:20 80:4,17 81:2,5,17 83:2 108:19 112:7 119:9 120:17 137:19 193:5 204:21 216:22 228:18 229:22 230:2 251:11 260:16 261:18 289:15,17

CPD'S 49:13

CPDS 107:24 108:4 112:20

CR 49:2

crazy 252:5

create 226:4,5

created 128:21,22,23 218:24 224:20 226:8,10,13

creates 146:17 158:11 159:2

creating 28:15 151:14

creation 225:9 228:18 230:3

credibility 99:23 102:14, 16 127:18,23 223:24,25

credible 104:24 125:5,7 163:8,12 171:1 256:3 258:25 259:2,9,12 262:19 263:5

Cresco 260:16, 19

crime 14:1,8, 16 21:14,18 36:22 60:7,13, 14 64:13 67:22 68:1 69:1,3,15 91:24 93:12 109:25 113:21 114:8 131:18 145:24 151:3 154:7 165:9 170:1,16 178:22 200:15 203:8 208:24 245:19 268:4

crimes 14:2,7 22:8 246:2 261:5

criminal 14:2 36:24 37:5,12, 15 38:3 45:5,9,

20 47:17,22 48:1 98:16 146:2 152:15 153:20 162:8 186:14 188:8 215:13 219:5 224:23 227:16 240:3 241:5 246:8 247:19 271:21

critical 146:7, 16,18 155:20, 25 156:1 158:6, 12 159:2,10

criticism 31:9

criticisms 31:3,7

CROSS-EXAMINATIO N 281:5

cross-racial 98:24 103:14

cross-trained 12:1

cross-training 12:7 252:3

crossed 98:17

crosshair 132:13

crowd 164:24 165:3

crunches 140:10

curious 218:17,19

current 228:13 278:4,5,7

custody 119:19,21 123:6 251:14 259:16 267:16

cut 8:12 43:6 87:15 100:7 125:17 148:3 159:22 186:24 188:18 189:3,4, 10,19,20 218:3 240:1 265:5

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 86 of 114 PageID #:53997
The Deposition of RONALD S. HUTCHINSON, taken on November 9, 2023

302

**CV** 20:13,17
36:19 37:18
146:21 282:11

---

**D**

**Daley** 66:19
123:5,11,13
131:6 251:17

**dark** 87:10
113:12,13

**darker** 87:22

**Darrall** 131:2,3

**date** 16:18
25:14 29:16,17
35:9 41:7 74:19
95:21 202:11
261:4 264:13,
14 275:7
288:21

**dated** 50:16,24

**dates** 265:16

**dating** 197:17
199:1

**Dave** 6:23
150:5,6 216:13
284:23

**David** 94:15
223:24 254:5
284:24

**day** 6:7 21:8
29:19 34:11,12
40:11 41:24
93:5 139:17
140:11,12,13,
22 141:12
142:14 151:11,
12,16 159:15
174:6 180:7
185:9 202:8
203:16 216:18
263:20 274:12
275:23,24
278:25 282:15,
22 289:6

**day-to-day**
16:25 144:6

**daylight**
116:22

**days** 21:9
94:19 146:17
158:11 159:1,9
160:7 203:16
214:18 275:25

**deal** 231:15
276:23

**dealing** 90:8
93:13 231:14

**dealt** 157:6
175:18 193:23
199:19,20,21
231:5 258:8,11
286:9

**death** 15:1,10
16:6 270:11
272:4,8

**deaths** 15:24
16:10

**Deborah** 98:17

**decades**
238:21

**deceased**
231:6 236:12
262:13

**December**
13:10,14,16
37:11 266:19
277:5 288:23

**decent** 133:9

**decide** 46:13
112:1 124:7
151:20 176:18
253:2

**decided** 26:9
34:22 77:18
129:17 237:11

**decision**
257:17

**declarations**
47:3

**decreases**
95:18

**decreasing**
91:8

**deem** 163:7
258:13

**deemed** 125:4
201:5 285:3

**defendant**
6:24 7:2 24:3,
11 49:21 73:12
79:13 80:9,12
82:1 83:10 91:1
186:5 195:4
201:12,25
217:17 218:22
219:3 220:7
221:4 222:11
223:8,15,21
224:10,11,21
225:8 235:19
236:25 240:18
241:16 242:22
246:8 250:25
253:15 259:24
279:6,13 280:9

**Defendant's**
29:25

**defendants**
79:15 146:2
152:15 162:8

**defender**
45:21 196:8,22
216:23 226:16,
25 246:24

**defender's**
133:15 193:12
216:15 286:1,3

**defenders**
215:24

**defenders'**
285:23

**defense** 45:20
215:13 225:21,
23,25 226:7
227:4,5,16
239:22 240:3,8
241:5,24
242:25 245:2
247:19 248:1

**defense's**
240:17

**defer** 53:9
106:8 269:4

**define** 122:11
162:2

**definition**
122:18,21

**definitively**
117:12

**degree** 202:10

**degrees** 37:17

**Delgado**
266:16 270:15

**demeanor**
233:8

**dementia**
134:4

**Demetrius**
6:10,18 7:24
51:10 55:22
84:3 133:23
167:6 174:16
183:17,23
186:20 188:11,
13 191:2,14
193:19 196:8
204:20 206:19
207:6,18 215:5
229:9 244:5,7,8
246:17 247:6,
13 248:6
251:25 254:1
260:6 286:8
289:13

**Demetrius's**
192:2,20

**Democrat**
35:20 36:5,9

**denies** 235:8
236:4

**department**
11:1 12:17
15:20 17:9
19:15 38:12
43:1 52:22
53:23 58:10
229:19,22
232:2,6 268:4
277:21 283:7
288:24

**Department's**
240:6

**departments**
268:9

**depend** 63:22
64:20,22 66:1
93:11,14,15
146:15 158:5
164:19 165:19
169:3,11 172:4
181:14,15
210:20 268:13

**depending**
113:23

**depends** 41:22
65:9,10 70:1
89:23 93:9
96:12 113:13
138:16 139:20
151:12 158:16,
17 160:10,12,
13 168:24,25
169:2 178:10
181:13,21
214:17

**depiction**
179:21

**deposed** 33:18

**deposition** 6:9
8:1 9:14 10:16
29:2 33:15 34:1
35:6 40:18
41:13 44:17
55:5 106:21
166:24 183:18,
23 194:2
218:25 219:24
220:7,14,24
221:13,23
222:13 223:9,
16,22 224:3,11,
21 225:4,5
228:11 242:2
255:3 257:3
291:21

**depositions**
34:5 46:25
51:1,3,4 189:9
219:25 280:18

**Des** 270:16,18,
20

**describe** 83:22
123:11

**describes**
150:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 87 of 114 PageID #:53998
The Deposition of RONALD S. HUTCH, taken on November 10, 2023

303

description
59:18 60:6,21
61:10 85:23
88:15 96:18
169:19 179:16
181:25 260:18

descriptions
120:21

descriptors
86:8 89:8 90:11

destroyed
226:14 227:1
229:12

detail 58:22
59:12 75:25
203:2 206:4
264:12

detailed
135:14 191:4
278:12

detailing 75:15

details 79:23
92:25 146:15,
22 158:5
203:25

detain 34:24

detective 12:8
13:7,19,25
18:19 37:10,13
38:17,18 48:12,
14,18,21 49:3,
13 53:16 73:16,
21 75:12 79:24
96:6 123:11
130:16 135:20
138:19 141:21,
22,24 142:8,16,
20 144:2,8
152:21,22,24
153:19 154:2,
11 155:2,4
158:18 174:2
175:19 183:7,8
207:20 217:13
219:24 229:5
236:12,21
241:19 244:9
249:18 252:22
253:11 255:12,
13 261:5 262:1,
10,12,18 263:4

264:25 268:10
276:23 277:5
278:18 284:18
285:3 287:3
288:23

detective's
153:5

detective/
supervisor
262:6

detectives
15:17 17:1,16
63:20 64:1
77:18 122:8,24
123:9,25 125:3
127:10 129:6
130:2,15,24
132:4 133:6,19
138:4,5,9,24
139:23,25
140:14 142:4,
15,23,24 143:1
146:1,9,20
148:6 150:8
152:14 154:19
157:1,6 158:13
159:8 161:5
175:3 176:12
178:16 195:22
198:18 226:5
228:19 249:9,
21,24 256:14
258:17,18
263:6 267:21,
24 268:13
276:8,24
278:22 284:8,
10,13,15,21,22
285:4,6,7

determination
234:10

determine
154:11 155:14
159:23 255:17
285:16

determined
118:5 120:6,23
260:17

determining
153:17 223:23,
25

develop
145:22 146:15
151:1 158:5

development
283:2

deviation
78:24

diagnosis
134:5

dictate 285:17

difference
33:5 100:16

differential
87:10,11,12

differentials
89:20

difficult 128:4

difficulty
101:20

diligence
124:13

direct 7:20
145:9 184:13
192:24 198:24

direction
191:13

directly 192:1,
21

director
267:18

disagree
132:10 136:16,
17,19,25 148:7,
19 149:5,19,23
159:3,13,24
160:1,7 191:5
262:15

disagreed
136:15

disagreeing
160:6

disagreement
31:16,19

discard 130:20

discipline

39:3,5,7 49:13

disciplined
38:25 58:9

disciplining
39:1

disclosed
42:13,19

disconnect
82:12

discovery
47:21,25

discrepancy
107:5

discrete 268:5

discretion
153:4,6,13
154:10,19,20
174:1 284:11,
17,22 285:5,8

discuss
163:16

discussed
67:6 179:16
212:19,22
247:17 253:16

discussing
203:3 242:17
285:12

discussion
29:24 226:12

dismembered
266:1 269:24
270:1

dismiss 171:3
174:11 203:19
233:19

dismissed
132:14

disputes 255:9

dissolved
19:7,11

distinct 268:18

distinction
232:24

distinctive

261:2

distinguish
102:15

distinguishing
98:20 99:22
101:20

district 6:11,12
123:13 131:9,
10 251:18,19
261:6

disturbed
217:25 218:7,
16

division 6:12
13:20 53:16
142:17 268:10

doctors 216:16

document
29:12 39:17,22
40:13 42:22
45:17 51:19
52:8,9 54:3
61:15,22,25
63:1 66:14
71:10 73:3,14
74:6,8,15 75:11
98:15 136:13
139:16 146:19
158:13 159:11
174:16 195:7
224:5 241:8
284:11,13,15,
21

documentatio
n 10:21 23:17
24:15,16,18,19
26:12,13,14,15
30:12 40:12,17
46:22 48:3,10
49:6,7 50:1,2
51:8,14 52:7,
10,15,21 53:10
54:1,8 56:11,12
58:5,6,7,12,16
76:22 77:3
81:20 82:21,24
83:14 107:10
112:14 125:22
127:7,14 128:3,
8,24 131:20
133:25 135:14,


Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RONALD S. MUTCH taken on November 9, 2023
Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 88 of 114 PageID #:53999
304

19 137:6,11,17
146:7 152:2
155:20 156:9
162:4 167:24
175:23 196:16
197:9 214:15,
16 215:22,25
216:7 219:22
220:15 225:6,
13 227:6,10
239:15 248:4,5
255:10,14
256:6 260:5
262:10 263:2,8
264:10 274:2
280:3,4,16
284:7 285:19
286:13,24
287:11,19

**documented**
51:17 78:22
79:8 136:14
139:10 251:4
253:12,16
260:19 282:8
284:21

**documenting**
21:22 29:20
62:7 63:14

**documents**
9:10,17,19
10:11,13 29:11
30:15,18 36:1
42:12,18 44:1,
6,8,10 46:18
47:11 48:11,14,
17 49:2,21
51:22 56:5
57:6,12,13,20,
21 77:9 99:6
119:24 128:20
168:6 217:19
218:10,12,17
229:15 240:17
241:5 248:10
251:10 253:17,
18 256:2
280:19 284:5
285:25 286:3,6,
21 287:2,7,9

**Doe** 153:2
154:23 284:24

**door** 35:24

193:22 202:8
267:25

**dot** 142:3

**double** 257:8
267:15 272:16

**dove** 272:3

**dozen** 231:8
257:23 270:14

**drafted** 73:11
79:13 80:9
224:1 242:21
243:12

**drafting** 29:5
111:13

**draw** 66:14,18
98:18 135:10

**drawn** 36:13
166:7

**driving** 212:7

**drop** 257:20

**dropped** 189:2

**drug-induced**
272:6

**drugs** 12:4
17:3,6

**due** 16:3 92:23
124:13 127:12,
22 140:9
251:20 277:11,
22

**dumpster**
270:18

**Dupage** 237:21

**duration** 20:9

**duties** 11:23
12:11,16 16:19
17:7

**duty** 12:14
139:17 245:1

**Dysart** 50:15,
19,20

---

## E

**e-mail** 43:19
290:23 291:3,5

**earlier** 94:17
99:5 111:23
112:4 144:5
152:1 165:16
179:12,17
181:6 202:17
217:5 218:24
232:1 234:25
240:21 271:7
275:17 283:15
284:8 285:12

**early** 59:17
60:5 96:2 176:9
214:4 215:25
216:11 275:5,6

**easier** 25:2
60:18 67:5
78:20 119:8
134:24 188:3,
25 242:4

**easily** 203:3
206:4

**Eastern** 6:12

**easy** 54:11
205:15

**eat** 106:4

**education**
282:6

**Edwin** 56:15

**effect** 97:17

**Elba** 83:22
84:3,7 88:10
89:3 91:2
103:18 104:22
129:23 130:25
131:1 133:20
167:13 172:18
211:12,16
212:4

**Election** 34:11

**electronic**
44:1 188:25
290:18,19

**electronically**
43:23,24 44:9
290:12

**elements** 38:5

**elephant**
115:23

**Elizabeth**
186:15 191:12

**Elliot** 58:22

**emergency**
12:3

**employed**
274:15

**EMT** 12:25

**EMTB** 12:2

**encountered**
38:8 204:4,5
255:16

**end** 13:10
19:18 24:7
37:11,14 40:13
41:15,20 95:16
107:24 108:4
109:4 112:20
117:7 127:24
131:24 139:16
151:16 163:15
173:22 174:5
195:17,21,22
226:15 238:15
254:10,11
257:18 259:1
264:25

**ended** 12:24
186:24 188:19

**enforcement**
23:21 257:5
272:9

**engaged** 58:2
64:19 221:14

**ensure** 146:7
155:20 156:9
230:11 231:1
249:2

**ensuring**
162:7,14

**entailed**

261:25 262:17

**enter** 66:9

**entire** 20:9
37:4 45:5,17
46:3 264:20

**entirety** 28:9
263:23

**entitled** 30:3

**erasable**
213:14

**Erickson**
73:11,12,16,21
78:22 213:6
214:13,25
236:10,12,21
239:1 240:18
241:16 242:22
243:12 244:10

**Erickson's**
79:5 235:11
236:7

**error** 213:8,10
214:7

**errors** 133:16
212:23 213:15,
17

**establish**
211:3

**established**
251:16

**estimate** 14:10
15:4 267:9
268:20

**et al** 6:10

**evaluate** 96:3
194:24 195:9

**evening** 206:3,
6

**event** 92:5,24
110:1 203:2

**events** 235:10
236:5

**eventually**
11:9 119:18
146:1 152:14
258:20

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**everybody's**
134:3

**evidence**
21:12,18 46:6,
11,14,17 79:5
118:10,11
120:3 121:6,21,
25 124:3 129:8,
21 145:23
151:1 152:8
161:5,18 176:6,
14 178:21
182:19 207:25
217:8 221:5
240:7,12
244:11 246:19
252:8,23
255:22 256:20,
21,23 257:12,
14,16 258:7,8,
16,19 259:14,
17 261:13
272:10 276:11

**evolved**
214:22

**exact** 16:18
18:11 19:4 21:5
29:16,17,18
52:7 89:15 90:5
95:21 114:3
126:11 187:9
190:17 192:25
193:17 264:9
267:10 272:17
288:21

**examination**
7:20 68:2
288:11

**examples** 80:5
123:22 164:11

**excellent**
157:8

**exception**
275:17

**excerpt** 70:8

**exchange**
266:3

**exciting** 203:8

**exclude** 25:22,
25 153:25

**excluding** 26:6
223:15

**exculpatory**
244:11,18

**excuse** 29:24
131:13 145:25
153:1 184:14
195:21

**exercised**
246:22

**exhibit** 24:22,
23 66:13,15
67:1 70:25 71:1
73:24,25 74:1
77:2,4 78:14,16
81:18 82:1 83:9
84:7,9 94:4
97:21 98:1
103:13 104:10
105:15 107:1
119:8 134:22
178:25 179:2
187:17,23
190:1 213:7
235:18 239:1
240:21,22
242:1,2,6,20
243:4 260:11

**exhibits** 36:2
290:20,21

**exist** 195:24

**existed** 197:11
202:19 287:22

**existence**
225:9

**existing** 217:7

**exonerated**
279:6,14

**expanded**
124:14

**expect** 69:7
125:21 126:16,
19 137:6,11,15
139:5,15 140:2
177:20 203:25
226:6,7 260:1
261:15

**expected**
247:11 285:4

**experience**
10:24 14:21
22:1 33:11
62:17,25 63:11,
19 64:9,11,17,
25 65:3 79:2,23
80:4 85:3
89:14,19,25
90:11 91:21
95:17 96:1,16
101:18,19
105:4,11
109:23 110:17
111:1,3,11
113:8 117:14
118:7 119:4,20
120:1 125:6
126:12,15
127:17 129:13
131:21 137:4,
22 138:10
139:3,8,14
140:20 141:3,9
147:5 150:3,23
152:12 154:17
155:4,9,18
156:24 157:12
158:2,9 163:5
165:12 169:24
174:7 175:13,
18 177:18
180:13,21
181:9 184:24
185:20 193:21
196:23 197:3,
14,16 198:25
199:19,25
202:7 203:7
207:20 208:21
211:1 212:22
216:10 223:8,
15 230:6,19
231:4,14 237:7,
13 244:23
245:4 249:17
250:3 252:2
253:20 255:11,
17 256:3,18
259:11 263:22
271:17 278:17,
18,19,23
282:25 283:7,
12 286:9

**experienced**
92:3 155:6

283:9

**experiences**
110:5 122:14
142:15 283:1

**expert** 30:1
33:11,13 38:4
39:9 50:8,13
91:16,18 92:8
97:18 142:25
161:24 172:3
177:9 204:2
227:16

**expertise** 37:2,
9 38:3 249:6

**explain** 149:4
283:1

**explained**
126:24 244:13
286:16

**explaining**
191:14

**explains** 77:23
78:7 182:16

**explanation**
79:4 107:25
236:22 237:1,4

**explanations**
278:8

**expressed**
26:24

**extending**
102:12

**extent** 26:2
28:14 99:15
249:13

**extra** 238:7

**eye** 97:14

**eyes** 250:5

**eyesight** 97:18

**eyewitness**
50:15,23 61:14
91:9,13 96:3,
19,25 101:22
102:14 105:5
107:15 115:7
124:22 134:12
161:6 162:21

164:12 171:1,8
173:16 177:19
178:20 220:19
269:14 270:7

**eyewitness's**
163:16 164:9

**eyewitnesses**
114:8 167:16
168:7 170:1,8,
17 171:5,17,18,
19,21,23
172:22 210:16

---

**F**

**fabricated**
79:14 80:10,19
82:2,7,15,21
83:3,9,15 221:5

**face** 90:15
95:23 113:20
114:9,18 115:6,
11,16,23,25
134:10 165:9,
16 166:8
168:14 210:22
212:9

**faces** 86:23

**facial** 210:17,
20 211:5,9,13,
18 212:4,14,15

**facility** 271:25

**fact** 7:9 57:14,
16 102:14
121:12 127:22
129:17 175:13
177:3 194:2
195:9 196:9,19
199:24 202:6
206:14,20,21
213:14 218:23
244:24 251:20
261:1 285:25

**factor** 132:1

**factors** 164:20
166:6

**facts** 29:7
38:15 55:22
56:9 151:18
153:15,17

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 90 of 114 PageID #:54001
The Deposition of RONALD S. HUTCH, taken on November 9, 2023
306

157:8 176:20
183:17 255:9,
16,21 256:1

**factual** 67:13
77:1 118:14
122:25 127:1
129:12 130:1,
23 133:6 163:3
196:13 199:17
210:24 216:5
217:11 228:23
231:3 251:8
253:9,14

**failing** 146:18
158:12 159:8

**failure** 159:10,
14,16,24 160:1,
3

**fair** 8:19,24
36:16 59:16,21
60:4 85:13
144:20 148:18
154:13 208:12
218:15,16
234:9,15,19
250:16 255:25
258:6 268:3
271:3 278:1,5

**fairly** 69:19

**fallible** 91:13

**false** 225:9

**familiar** 161:24
240:5

**familiarize**
201:8

**family** 199:21

**farther** 102:10

**Fashion**
270:23

**fast** 146:13
158:3 247:6

**father** 199:12

**fault** 214:21

**FBI** 48:14

**fear** 92:18,23

**feature** 116:5,

10 211:13
212:4

**features**
210:18,20
211:5,9,10,18
212:14,15

**feel** 8:16 25:1
42:8 43:5,6
73:4 80:25
114:22 149:4
150:11 153:6,7
154:8 155:5,8
170:25 173:18
176:1 177:25
181:19 212:21
227:12 234:23
258:16 269:14,
17 278:15,16
283:9

**feels** 152:22
154:2 161:22
284:18

**feet** 249:25

**fellow** 145:25
152:14

**felonies**
207:21

**felony** 124:5
151:10,17,18
176:15,16,22
207:22 245:11,
13 252:10,24
253:6,24,25
259:21 286:9,
10

**felt** 110:13
154:21 174:2
245:10 276:14

**female** 125:11
163:23,24
164:4 173:16

**females** 207:6

**Fi** 189:3

**figure** 26:2
28:14 117:23
119:5 170:23
198:19

**figured** 20:8

**figuring** 20:1
148:21 199:2

**file** 35:1 43:1,
11 44:7 45:20,
21 46:3 55:19
73:4 75:8
126:2,5,7,17,22
128:9,10,12,15
132:15 135:19
145:24 152:13,
23 154:12
207:19 213:21
216:14,15,23
217:7,21
218:18 225:22
226:6,22,23
229:7 238:24
241:21,22,23
256:7,8 261:19
270:9 271:1
286:2,4,5,6,12,
15 287:1,4,6,7

**filed** 274:23

**files** 30:13
42:24,25 44:24
45:2,15 49:2
151:25 217:17
218:1,7 240:7
250:14 285:23

**filing** 212:23
213:8,10

**fill** 274:8

**fillers** 72:12
84:21 85:4,19
86:10 89:7
179:13

**filling** 207:23
286:10

**Fina** 72:8

**final** 151:8,10
242:1 254:8
266:21 278:10
279:1 289:19

**financial** 14:6

**find** 28:16
71:14 77:1
85:25 124:17
144:2 152:8
178:13 181:25
182:15 187:21,

25 193:25
194:18 197:5
198:1,20 200:1
202:4,13
204:15 214:1
216:17 240:18
241:6,13
251:11 256:18
260:5 262:23
289:18

**finding** 52:16
242:7 285:20

**findings** 38:21

**fine** 18:13
102:23 106:4,9
238:11 254:9,
15 274:5

**finish** 8:13
285:12,18

**finished** 11:24
189:19 225:5

**finishing** 117:9

**fire** 11:25 12:1,
16 17:14 19:20
36:25

**firehouse**
12:15 13:3

**fireman** 252:4

**Firm** 30:19

**fit** 36:8 180:17
260:18

**five-minute**
54:19

**flagship** 206:5

**flip** 42:8 43:7
58:21 83:19

**flipping** 77:9
190:7 242:5

**focus** 17:3,5
21:9 22:21
23:15 122:19
210:17

**focused** 92:24
132:10 165:3
221:22 252:6

**focusing**

259:19

**folder** 286:12

**follow** 46:9
90:10 121:17,
18 124:16
150:9 177:20
209:7 238:15
252:23 257:11,
13,16 258:24
259:8 281:4

**follow-** 288:10

**follow-up** 83:8
105:2 134:8
142:6 143:15
155:11 171:7,
20,22 172:21
176:24 177:25
192:18 200:4
252:13 253:8
254:17 262:18
275:14 288:6

**follow-ups**
140:1

**food** 106:6

**force** 14:15,21
209:2 211:2,7
255:13 257:6

**foreign** 266:3

**forget** 92:25

**forgive** 161:22

**forgot** 237:7

**form** 22:5,11
23:5,6,24 24:5,
14 26:1,11
27:4,11 28:10
30:17,23 31:5,
23 32:8,21
35:16,21 38:9
40:10 46:19
48:23 49:4,17,
23 52:19 53:5
55:24 57:4,17
59:8,23 60:9,22
61:6,17 62:10
63:2,16 64:3,14
65:7 67:23
75:19 76:14,19
79:17 80:14
82:5 84:23 85:7

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 91 of 114 PageID #:54002
The Deposition of RONALD's MUTCH, taken November 10, 2023

307

86:2 89:10
90:13 91:15
93:1,7 94:22
95:11,19 96:8,
20 97:8 99:2,
14,25 100:12,
17 101:10,24
102:19 104:15
107:18 108:22
109:13 110:3
111:19 112:5
113:5,22
114:13 115:8
117:5 120:14
121:5,15
124:25 125:22,
24 126:9 127:4
128:6 130:6
134:14 137:13
138:14 139:11,
18 142:9
143:12,22
147:18,21
148:13 149:7
153:21 154:1,
15 155:23
156:12,17
157:5,16
158:15 159:12
160:9 161:15
162:10 163:4
164:14,25
165:13 167:20
168:16 170:4
171:9 172:25
174:13 181:11
182:3,18
183:15 184:4,
17 185:2,17
186:7 190:9,23
197:1 198:11
199:3 201:14,
17 203:11
204:10 205:17
207:13 208:14
211:19 219:6,
13,21 220:10,
21 221:18
222:3 223:3,11
224:2,15
225:12 233:3,7
236:19 237:2
240:9,19 241:9
243:13,23
245:3 246:12
248:2,14

249:15 251:23
253:23 255:19,
23 256:4,10
258:10 260:3
261:17 268:6
279:8,15,16,22,
23 280:10

**formally**
204:16

**format** 290:20

**formed** 49:8
50:3,4 52:24
56:13 280:19,
21

**forming** 57:20

**formulate**
231:19 234:6
271:9 278:24

**formulated**
151:6 255:14
283:13

**formulating**
56:4

**Forrest** 71:18

**forward** 198:17
202:6 247:6
261:13

**found** 21:17
22:2 34:15,21
53:2 58:24
59:3,12,14,19
60:6 65:16
66:20 67:7
68:8,11,18,25
69:2,7 78:19
102:13 119:13
129:9 144:4
149:10 188:1
192:22 193:15
202:15 207:11
211:8 231:6
233:10 238:21
247:5 252:14
266:14 270:1,
12,17 289:18

**foundation**
22:11 23:6
49:23 99:2
103:20 162:10
168:16 185:2,

17 223:4
225:12 233:3
240:10,11
245:3 246:12
279:24 280:10

**frame** 183:9,14
184:3,25
203:15 232:12

**framed** 185:14
220:9

**framing** 184:16
185:21 186:1

**Fred** 56:15
201:13 202:1
260:19

**free** 8:17 25:1
42:8 43:5,6
73:4 149:4
212:21 269:14,
17

**freed** 48:21

**freezer** 231:6
232:21 233:11
266:14 270:12

**Friday** 206:25

**friend** 206:12

**front** 9:9 24:25
26:17 39:19,20
40:7 71:7,9
136:3 151:22
179:4 204:23
212:5,20
265:12

**froze** 42:15

**frozen** 231:5

**full** 7:4 56:24
58:19,21 59:11
70:18 77:12,14
83:19 84:1
103:8 105:20
107:1 117:7
122:4,7 126:17
128:12,15
145:11 158:24
160:23 161:4
162:19 167:4,9
183:2,4 195:16
210:12 214:18
248:17,23,24

249:12,16
250:22,23
282:22

**full-time** 11:4,
18 64:18
213:12 263:24

**fullest** 42:10

**fully** 82:19
88:15 108:17
121:12 251:4
253:12,16

**furthered**
124:4

**future** 176:23

___

**G**

**Gacy** 276:10

**game** 203:4
205:2,13,25
206:7,14,15,16,
20 207:1

**gang** 20:7
50:13 92:7
123:14 175:9,
14,17,20,22,24
177:1,3,7,8,9,
11,14,15,16,17
261:2

**gang-related**
20:4 131:22

**gangs** 177:9

**gangway**
187:2 188:21

**garages** 270:2

**Garay** 266:7,8
270:8

**Garnett** 71:18

**gather** 93:16
161:5 176:20
256:15

**gathering**
149:13,24

**gave** 50:6
58:16 66:25
79:23 82:18
104:13 107:12

108:5 125:9,20
133:8,22 144:1
193:16 198:24
212:14 214:16
220:16 221:1,
10,11,24
222:14 224:23
225:7 231:4
237:4 246:17
248:7 284:22
285:8

**general** 13:25
47:7 53:23
58:10 60:15
86:5,7 93:4
105:19 113:21
120:11 122:19
168:13 169:5
217:7 229:20,
23 265:3

**generally** 36:7
249:7 258:24
259:8 283:2

**gentleman**
87:20 211:21

**gentlemen**
61:3

**Gerard** 266:16
270:15

**get all** 38:15
118:9 157:8

**get along**
131:9

**girl** 232:21
233:10

**girlfriend**
193:20 195:14
201:24 206:12

**girls** 206:21

**give** 7:16 8:2
14:18 18:11
22:16 29:18
38:20 39:3 41:8
47:14,19 49:9
50:5 62:1 65:17
76:2 79:21,24
80:5 81:6 83:19
89:15 101:14
102:9 117:25
123:22 126:9



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 92 of 114 PageID #:54003
The Deposition of RONALD "RUTCH" WILCH, taken on November 21, 2023
308

128:25 133:21
160:24 164:11
169:12 183:2
187:9 190:17
192:23 195:18
199:24 206:19
208:17 209:5,8
213:2 214:2
218:8 220:25
223:5 224:12
231:7 234:13
237:14 243:3,
17 248:17
249:21 250:18
258:3 260:13
273:10,13
275:1 278:14

**giving** 40:1
55:11,15,18,21
56:14,18,20,24
57:1,7,9,12
58:1,8,14,19
65:25 68:24
69:10,17 80:15,
19,25 81:15
97:13 114:22
126:11 175:16
198:7 202:11
209:14 211:3
236:4,21 237:1

**glasses** 46:8
97:11,16

**Gonzalez** 48:4,
9 71:23 72:20
118:19 119:10,
15 123:18
125:5 127:9
178:14 235:7,8,
15,19,23 236:3,
4,15 237:7,10
239:20,23
247:2

**Gonzalez's**
123:16 127:13

**good** 6:17 7:22
8:4,8,14 54:23
77:19 84:2
96:17,24 97:4
98:7 103:6
105:8,9 106:7
113:25 123:6
131:4 132:4
133:19 142:24

148:6 166:18
169:21 170:25
172:8 174:2,23
176:13 189:14
193:8 198:15
227:24,25
228:3,5 238:12,
13 250:11
254:19,22
258:18 274:17
278:18 282:23
290:5,6

**GPR** 135:21
226:22 229:6,8,
11,13,14

**GPRS** 217:8,14
218:23 224:20
225:9,19,22
226:5,15 229:4
287:6,12,16,17,
20

**grab** 106:3

**graduation**
206:25

**grammar**
250:9

**grandfather**
273:14

**Grant** 34:12,17

**granted** 57:14

**great** 42:6
54:17,20 70:13
90:23 106:13
168:21,23
204:5 228:6
254:23

**green** 105:6

**gross** 78:24
80:2

**ground** 7:25
249:25

**grounds**
148:19

**Gubin** 98:17
215:7 226:9
246:22

**guess** 14:19
31:6 92:11,12

105:18 123:24
138:8 141:24
153:18 169:17,
19 185:21,23
189:22 198:18
217:25 226:6,
14 236:11,13
245:14,20
257:9,22
270:25 271:12
274:13 275:12
276:21

**guessing** 18:7

**Guevara** 6:10,
24 7:2 48:12,
15,18,21 49:2,
14,21 58:2,9
75:12 79:7,13
80:9 82:1,6,14,
15 83:10 91:1
183:7,8 219:24
221:4 222:11
229:5 235:15
236:8 237:1
280:9

**Guevara's**
49:3 79:6
135:20 186:5
217:13 218:22
220:7 223:9,16,
21 224:11,21
225:8 235:20
279:6,13

**guidance**
249:5

**guilt** 198:10

**guilty** 57:10
176:19 252:15,
20 253:4

**gun** 34:15
66:20,21 67:7,
8,16 69:13,14,
22 212:6

**guns** 17:3,6
34:20 68:5,11,
17,25 69:1,2,6,
8,11,20

**guy** 132:1
267:25

**guys** 67:1

280:24

---

**H**

**hair** 164:4,5

**half** 10:10
42:15 75:25
78:25 106:9
253:9 257:23

**half-an-hour**
75:16

**halfway**
230:15

**Halverson**
241:20 251:1
253:11,15
261:5 262:1,11,
12 287:4

**Halverson's**
262:18

**hand** 7:15
22:18 115:3
124:7 212:6
213:17,18,22

**handful** 175:24

**handgun**
58:23 59:13

**handles**
153:11

**hands** 176:22
212:9

**hands-off**
249:8

**handwriting**
217:2

**handwritten**
213:13

**happen** 8:18
13:11 38:13
79:14 93:2
140:16 150:4,
18 223:9

**happened**
19:22 33:19
38:13 62:22
75:16 76:13,17
79:8,22 110:6

116:22 126:13
131:19,20
185:16 203:8
204:17 205:7
207:11 214:14
218:9 231:24
233:7 237:19
268:4 273:2
285:17

**happening**
109:25 111:10
144:19 182:17

**hard** 8:2 24:25
67:1 69:14
84:11 148:21
168:18 172:6
179:3 185:9
216:24

**head** 8:3 111:9
130:20 136:1
150:2 175:20
217:23 241:2,3

**Healy** 249:1
250:21

**hear** 123:3
130:15 189:17
197:8 245:9

**heard** 39:5
54:8 79:2 120:2
141:22 284:1
285:9

**hearing** 50:20
54:14,16

**hearsay** 64:17

**height** 89:23
210:21

**held** 173:7

**helped** 116:15
278:23,24

**helpful** 199:8

**helps** 190:7

**Hernandez**
119:10

**Hernandez's**
260:21

**hidden** 239:2,
13,17 244:10



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hide 238:22 239:19

High 206:24,25

highest 17:15, 17 19:16

highly 78:23 175:2

hinder 85:16 156:2

hired 11:4,18 213:12

Hirsch 186:25 188:19

Hispanage 108:9 283:17, 20,21

Hispanic 103:19 104:22 105:12 108:6, 20 109:8,22 111:25 112:10, 12 113:1,7,9,12 164:5 283:21, 25 284:1 289:14

Hispanich 112:8,11

Hispanics 66:20

history 19:1 38:7 72:19 240:6

hit 263:19

hold 162:5

holds 89:2

home 63:10 140:9 233:15 288:7

homicide 14:11 15:9 16:8 17:22 18:16,18, 20 20:20 21:23 36:24 55:19 65:6 72:25 137:4,23 138:21 139:22 144:6 145:6,19,

24 146:13 147:7,17 149:12 150:1 152:13 155:7 158:3 175:13 177:2,4,7,17 198:14 249:13 250:19 257:8 260:19,22 261:20 263:25 265:2,10 267:4, 5,15 268:18 269:8 270:5 271:19,22 272:1,3,5,7,8, 13,14,18,21,23 273:13 274:15 275:9,22 276:13 278:12 281:9,21,25 282:15,17,23 288:16,17 289:20

homicides 14:4,20 19:21 20:4 209:3,13 264:7 271:21 272:6 274:18 281:15 282:20

honest 32:23 36:4 147:14

honestly 207:14

Hook 276:9

hope 35:4 66:6 80:6 144:3 197:21 198:13 199:23 245:12 246:3,21

hostage 36:23

hot 189:12

hour 39:24 40:2 41:10 42:2,4 75:25 78:25 106:9 159:14 164:17 275:20

hours 9:18 10:5,8,10 29:20 40:3,4,9,15,18, 20 41:12,13,17,

23 74:13 105:20 106:1 138:17 146:17 158:11 159:2,9, 15 160:7 272:18 273:5 274:3 275:7,9 276:16 277:20 281:19,20,25 282:5,8,13 288:19

house 187:2 188:12,21 191:14,17 192:2,20 201:2 206:13 212:5,6

houses 284:25

housing 201:9

huge 282:6 283:13

Humboldt 186:23 188:18

hypothetic 101:25

hypothetical 60:10,12,14 64:15 65:8 67:24 68:10,23, 25 69:10,18,24 70:2 79:18 80:16,20,23 81:7,9,14,21,25 83:1,6,17 84:24 85:8 86:3 90:14 93:8 95:12 96:9,21 97:14 100:1 102:2,12 107:19 109:15, 21 114:14,17 115:9 121:11 129:2 131:23 134:15 137:14 138:15 139:19 140:24 142:10 143:16,23,25 144:1,7,17 147:9 158:19 161:16 164:15 165:1,14 167:21,22,25 168:17 169:13, 16 170:5,21

171:10 172:1 175:16,22 177:15,23 178:7 181:11 182:3 184:7 185:23 186:2 197:2,20 199:4 234:22

hypothetically 82:14 144:21 164:16 169:17 170:22 171:11 177:14 181:15 183:19 185:22 263:7

hypotheticals 129:1

___

**I**

ID 93:25 99:24 101:22 124:23 170:1,15 177:19 178:15

ID'D 59:20 61:14

idea 105:19

ideally 144:18

IDED 125:22 126:17 127:18 169:25 180:22

identification 24:23 66:15 71:1 74:1 77:19 78:16,22 84:9 94:9,21 95:18 97:7 98:1 104:1 105:8,9 107:17 109:10 113:3,4, 19,25 114:2,22, 23 115:7,20,25 116:1 118:19, 22 123:17 125:10,15 127:13 134:13 165:17 167:13, 15,18 168:8,9, 11,12,15,22,24 171:8 174:11, 15 179:2 210:22 211:14

212:10 221:15 234:14 237:15, 16,23 238:1,3, 13 242:6 244:13

identifications 50:16,23 91:9 93:5 98:24 99:1 103:14 104:24 107:16 114:11 162:22 175:15 177:5 178:20 211:3,16 212:16 220:20 269:14 270:7

identified 72:16,24 75:4 83:23 119:11 121:13 123:19 135:12,23 136:23 137:1, 10 167:6 171:6, 22 247:3 260:17,20

identify 35:19 91:24 116:15 145:22 151:1 170:17 171:18, 20,24 172:3,20 174:9,10,18 235:7

identifying 91:3 116:5,10 211:9 261:13

identity 97:5 181:8

IDS 91:13 93:6 133:22 211:12

Illinois 6:12 48:22 57:15 232:13 265:18 266:6,15,22 269:22 270:8, 15,22 272:14 273:3 274:9,14 278:3 281:22 282:18 289:4

imagine 132:6

immediately 151:8 204:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 94 of 114 PageID #:54005
The Deposition of RONALD'S MUTCH, taken on November 10, 2023

310

**impacted**
177:4

**implying** 177:2

**important**
84:21 85:11
90:12 97:12
146:6 151:13,
15 152:19
157:15 162:9,
15 179:13
196:25 206:22
207:5 257:15

**impossible**
142:5 149:23

**impound** 46:6,
11,14

**impounded**
46:17

**in-** 93:24

**in-depth**
157:20

**in-house**
37:22,24 38:2
200:23,25
201:7

**in-person**
40:4,5 85:19
173:7 174:10
180:23

**inability**
100:15

**inappropriate**
199:1

**incarcerated**
22:8

**incident** 118:6
120:17 131:22
132:18 133:2
271:12 276:9

**include** 10:7
13:24 29:9
86:10 99:12
100:10 101:9
155:13 249:4
259:12

**included** 29:8
54:2 99:15

**includes** 15:1
31:2,15

**including**
34:20 36:22
89:7 116:24
117:19 145:25
152:14 215:9,
23 243:2 265:8
267:18

**incomplete**
60:9 64:14 65:7
67:23 68:9,22
69:23 79:17
84:23 85:7 86:2
90:13 93:8
95:11 96:20
99:25 101:25
107:18 114:13
115:8 126:2,7
137:13 138:14
139:18 140:23
142:9 143:22
147:8 161:15
164:14,25
165:13 167:20
168:17 170:4,
20 171:9,25
177:22 181:11
182:3 197:1,19
199:3 283:25
286:5,25

**inconsistent**
233:1

**incorporate**
189:22 191:22
192:14

**increased**
98:25

**incredible**
143:1

**index** 29:13
42:22 51:17
52:8 195:7

**Indiana** 270:3

**indicating**
183:6

**indication**
183:8 212:9
229:4 246:20
261:19

**indicator**
181:7

**indifferent**
198:15

**individual** 15:8
34:10,14,24
101:20 112:16
113:16 115:19,
22 118:18
130:17 131:2
154:11 175:4
179:22 180:17
183:13 184:16
185:13 193:21
197:22 200:6,
13 204:3 212:5
233:19,22
238:9,10
245:18 246:25
251:21 252:25
260:17

**individual's**
266:2

**individuals**
59:21 60:6,8
61:13 64:12
85:25 86:24
89:18 100:16
117:15 121:2
130:3 200:9
201:24 231:9
237:22 256:12

**indoor** 11:8

**influence** 9:1

**informants**
261:1

**information**
19:13 44:16
46:17 59:7
60:23 65:10
70:10 72:12
100:8 101:8
116:2 117:17,
18 118:10
119:1 124:11
125:3 126:8
129:15 145:5,
19,21 146:3,5,
7,18,19 147:6
148:16 149:11
150:25 152:17,
18,24 153:3

155:2,14,21
156:9 158:12,
13 159:3,10,11
176:21 198:15
199:14,23
202:11 205:9
208:3,4 230:12
231:2 239:19
243:1 244:18,
25 245:15
246:17 247:7
248:6,12
256:15,17,22,
23 262:7 263:6
284:14,15,18
285:1,4,5,21
288:2 289:18

**initial** 59:18
60:19 119:25
123:2 208:22
215:9

**initially** 251:12

**injury** 139:24

**innocence**
51:11,24 52:4,
5,12,17 53:2
57:15 198:9

**innocent** 22:3,
7 23:2,10,22
57:10,16
176:19 185:14
252:21 253:4

**instance**
165:10 171:16
213:24

**instances**
92:18 163:17
164:6 213:22
219:11,14

**instructed** 8:7

**insufficient**
145:6,20 147:7
149:12

**integrity** 280:8

**intend** 25:17
31:3,17

**intentionally**
23:21 183:9
239:2,13

**interaction**
132:22 139:10
141:11

**interested**
206:14

**interfered**
207:2

**internal** 38:12,
14,16,19,24
48:17

**internally**
93:15

**internals** 39:2

**interrogate**
61:5

**interrogation**
272:5

**interrupting**
264:16

**interview**
38:18 63:23
64:21 96:10,11
102:2 105:7
110:8,11,18
115:2 120:5,9
139:5,16 140:2
141:6,22
149:22 150:6
158:16,18
159:17 160:12
168:2 170:23
178:1 196:18
217:17 231:8
257:22 272:11
276:12

**interviewed**
13:15 110:9
136:21 137:5
142:16 143:10
152:3,4 163:6
177:25 178:5
193:10 231:16

**interviewing**
21:13 96:19
110:20 114:21
117:22 129:6
130:3,25 133:7
138:11 163:10,
21 207:24
209:4 215:9,10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 95 of 114 PageID #:54006
The Deposition of RONALD S. MUTCH, taken 16, November 9, 2023
311

286:12

**interviews**
63:21 64:2
93:17 129:23
137:7,12,25
138:5 140:1
143:18 146:14
158:4 181:14
226:13 228:19,
20 267:23
270:13

**introduces**
154:6

**investigate**
22:24 37:13
59:21 60:8
119:3,4 195:23
197:10,12
202:18 249:9
258:2 260:2
261:16 274:15

**investigated**
79:16 82:19
91:22 122:15
176:13 200:14
208:22 209:3,
12 252:7
274:18

**investigates**
14:15

**investigating**
91:21 134:12
145:21 147:18
150:25 178:16
196:14,24
197:5 223:17
244:25 249:25
250:19 261:15
262:24

**investigation**
14:5 15:10
20:5,8 22:19,
20,21,22 24:3,
12 30:14 34:18
37:12 48:18
49:20 52:18,23,
24 53:11 56:18,
19,24,25 57:6
62:5 65:19
68:6,20 69:3
70:2 72:19
80:12 93:10,12,

18 96:13 100:6
102:5,9,13
111:7 113:2
115:2 116:2
118:11 119:17
120:23 121:4,
14 122:1 123:7
124:1,2,4,14
127:11 128:4
129:7,19 130:4
137:1,5,24
138:17,18,22
139:21 140:17
145:6,19 147:7,
17 149:12
150:2,14 151:7,
12 152:25
155:8,15 156:4
158:17 160:15,
16,18 162:24
165:18 169:2
170:3 172:5
175:3 176:6,21
177:20 181:14,
21 195:3,24
196:1,10 200:5,
11 201:12,25
202:17 221:10
222:1,20 223:2,
18 224:14
246:9 247:5,25
249:7,14,22
250:21 251:5,
12 252:1,23
253:6,13
256:11,20,25
257:1,11,12,19
258:16,19
259:13,14,17
261:6 264:20
265:10 267:22
268:5,14 270:3,
11 271:21,24
272:1,9,23
275:9,13
278:13 280:9,
17 282:16
284:16,19
285:11

**investigation'
s** 140:6 235:1,2

**investigations**
13:15,16,19
14:11 15:1
17:22 18:17,19,

20 21:23 36:23,
24,25 37:5,15
38:3,24 48:12
93:10,20 110:8,
16 122:14
140:5 146:13
150:17 152:7
153:11 158:3
160:14 178:4
207:16 238:6
240:7 256:16,
25 257:7 258:2
263:25 265:21
267:4 268:19,
24 269:3,8
270:6 271:19
272:4,13
281:10 282:1
285:2 289:21

**investigative**
42:23,25 44:23
45:1 133:7
146:2,19
152:16 154:12
158:13 170:19
193:6 195:2
196:25 197:18
217:21 219:23
238:24 253:15
255:21 267:7
278:21

**investigator**
15:12 48:8
101:23 146:4
152:18 153:25
154:5 160:17
163:10 193:12
196:21 202:2
246:24 257:18
264:7,20 265:9,
10,18 269:13
272:14,22,23
273:3,4,9,12,
13,15,18,22
276:1 281:8,13
282:7 288:17
289:2

**investigator's**
153:13 257:18

**investigator/
investigator**
264:3

**investigators**

15:11 140:7,9
146:9 157:2
230:11 231:1
247:14 249:2,6
267:17 276:9,
11

**investigatory**
250:24 251:3
253:11

**invoice** 41:16

**involve** 146:14
158:4 269:14
270:6 271:5

**involved** 15:24
16:5,6,8,9 22:2
34:7 39:5 63:8
142:3 175:9
177:10,11
207:6 215:23
251:4 253:12
264:6

**involvement**
263:9 281:7

**involving**
197:6 276:13

**ipad** 189:3

**irrelevant**
49:15,22

**isolated** 118:6
271:12

**issue** 133:3

**issued** 25:15
44:12 52:12

**issues** 97:6
134:2

**issuing** 25:22,
24

**italicized**
108:14

**Itasca** 275:23
277:8

---

**J**

**Jack** 193:12
196:8,21

**jacket** 207:23
286:11

**jail** 173:18
237:21 244:14

**jailhouse**
210:13 247:7

**January** 147:1
266:9 271:20
272:7

**Jenkins**
266:11,13
270:10

**Jersey** 20:20
282:22

**JGS_
JOHNSON**
45:10 97:22,24
98:2 99:6
187:18 188:2
189:19 190:6
191:19,22

**job** 33:21
120:22 123:6
133:19 142:21,
24 153:5
176:13,16,18
213:12 249:1,
19 252:20,21
253:4 258:18

**jobs** 64:20

**John** 119:1
123:3,4

**Johns** 58:22
59:12 60:20
65:15 66:19
68:7,20 72:16,
24 79:16 80:12
82:18 119:18
123:8,12,16
124:11,18
127:1,12 128:5,
20 129:18
130:9,11,12,13,
18,20 131:16,
18,20,25 132:3,
7,10,13,19,23
178:15 215:8,
10 235:7
238:20 239:20,
23,24,25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 96 of 114 PageID #:54007
The Deposition of RONALD S. HUTCH, taken November 10, 2023

312

242:23 244:14,
16,19 246:21,
23 247:1,3
251:14,16

**Johnson** 6:10,
18 7:24 43:9
51:11 56:22
57:2,10 60:25
71:3,4 74:2
75:3 83:23 84:4
86:14,17 87:4,
12 88:1 91:3
113:2 119:1
123:4 127:3
130:22 131:2
167:6,16
172:20 174:9
180:8 196:8
202:23 204:16,
20 205:6,11,24
206:5,20 207:6,
18 208:9 215:5
220:9 241:7,15,
18 244:5,7,9,
11,13,16,17
246:17 247:6,
24 248:7
251:25 252:15
254:1 260:1,6
286:8,17
289:13

**Johnson's**
47:17,22 55:22
98:16 183:18,
23 191:14
193:20 195:14
196:7,15
201:24 207:9
210:13 224:23
227:5 229:10
247:13

**join** 16:6

**joined** 9:23
10:25 14:14
15:22 269:9

**joint** 37:1

**joke** 216:19

**Jose** 58:23
266:22 270:22

**joys** 189:8

**Juan** 260:20

261:24 263:4,5

**judge** 52:13
124:7 151:22
176:18 226:13
252:11 253:2
254:2,3

**July** 74:24 91:1
173:8

**jump** 174:4

**jumping** 215:3

**jumpsuit**
173:18

**jumpsuits**
237:22 238:2

**June** 16:10
21:4 70:21
74:21 91:4
116:6 205:1
259:19 260:15,
23 262:4
263:24 271:25

**jurisdictions**
14:17

**jury** 124:7
151:22 176:18
252:12 253:2

**justice** 22:4,9

**juvenile**
200:22,23,24
201:2,5,6
230:9,25
231:18 232:2,7,
8

**juvenile's**
201:3

**juveniles**
200:21 201:1,4,
9 231:5,9,11,
14,16,20
234:13 270:15

___

**K**

**Kenneka**
266:11,13
270:10

**Kenneth**
265:19 269:23

273:18

**Kentuckiana**
6:4

**Kentucky** 6:6

**Kevin** 241:20
245:21 287:4

**key** 164:3

**keyboard**
104:8

**kicking** 193:22

**kicks** 189:10

**kids** 11:12
63:10

**killed** 56:15
175:20

**kind** 14:2
17:12,14 21:15,
20 34:1 37:4
47:19 64:19
83:8 94:17
95:16 122:17
126:16 132:22
137:11 139:5
156:5,16
159:10 201:8
205:9 211:2,6,8
220:3 236:21
237:4 276:15,
17 287:10

**kinds** 256:16

**kitchen** 206:17

**knew** 16:2
112:9 130:9,12
131:5,16 132:2
138:4,5 141:21
142:17 180:21
181:24 193:9
196:14 206:21
213:12 218:13
251:18 263:4
277:18,20
285:6

**knocked** 35:24

**knocks** 267:25

**knowing** 60:25
103:24 104:21
123:5,14

153:15 280:7,8

**knowledge**
14:9 48:6
103:15 155:16
276:19

**Kyra** 6:3 55:6
106:22 166:25
228:12 255:4

___

**L**

**L-A-U** 266:3

**lab** 68:1 69:1,3,
16

**lack** 49:13
124:11 128:3,8
217:16,20
285:21

**lady** 198:1
231:6 266:14
270:12

**Lafayette**
270:3

**laid** 250:5

**laptop** 34:17,
21 44:9

**large** 98:4
261:3

**lastly** 54:15
72:8 73:2 75:7

**late** 12:21 21:1
143:19,20
214:5 216:11

**latest** 277:4

**Lau** 266:2

**law** 23:20 30:19
38:5 219:7
226:1 257:4
272:9

**laws** 233:23

**lawsuit** 33:20

**lawyer** 161:24

**lawyers** 9:20
216:13 229:10

**lawyers'** 217:2

**Le** 186:22
188:16 260:24

**lead** 16:7 18:19
22:19 62:1
118:11 121:13
125:23 129:20
140:11,12
150:9 152:8,10
153:20 154:6
176:14 251:16
259:14 261:16
262:24 264:3,7,
12,20 265:8,17
268:25 269:5,
13 272:14,22
273:3,4,9,12,
13,15,18,22
274:1 276:1
281:7,13 289:2,
3

**leading** 145:23
151:1

**leads** 61:15,22
62:7 63:1,15
79:6 116:23
121:17,19
129:8 146:16
158:6 176:7
256:20,21
258:25 259:2,9,
12 269:3

**learned** 283:9

**leave** 190:14
261:21

**leaves** 190:5

**leaving** 66:19
118:1

**led** 121:6,22
124:3 129:21
176:15 187:2
188:21 195:5
259:17 270:3

**left** 16:6 87:13,
14,20 115:24
193:14 285:6

**legal** 58:14

**legally** 97:16

**legs** 163:24
212:10

___



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

lend 281:16

length 253:16

letters 73:17

level 231:18

lied 82:24

lieutenant 18:5,9,15 19:2

life 110:22

light 164:19

lighter 87:14, 21

lighting 87:19 172:7

likelihood 98:25

Lil 60:24 61:1 66:19 119:1 123:3,4,5,12

limb 115:20 116:13

limbs 90:18

limit 29:1 143:7

limits 94:18

lines 167:10 190:6 191:8,18, 22

lineup 47:7 50:23 53:23 71:13,18,21,24 72:2,6,9,13,16, 20,23 73:20 74:11,17 75:4, 5,18 76:8,9,25 77:2,18,23 78:8 79:5,6,7,14,21 80:10,18 81:2, 4,19,20,22 82:23 83:2,15 85:13,16 88:2, 25 89:17 90:2, 3,5 93:25 94:1, 10 102:7 118:23 125:2, 12 127:8,9 130:9 171:2,12, 13,16,17,18 172:5,9,18

173:7,10,21 174:10,18 175:5,14 176:3 179:10,24,25 180:4,8,10,14, 15,22,24 181:9, 17,20,23 182:7, 12,16 210:17 229:23 235:9, 10,16,20,24 236:5,6,15,18 237:21 238:8, 10,12,20 241:15 242:23 244:9,15 247:4 251:15,25

lineups 70:20 75:15,25 76:12, 17,23 78:2,4,25 79:2,24 80:5 84:22 85:19,20 89:15,16 90:1 119:19 123:8, 18,20,21 125:4 129:16,17 178:5 180:16 221:15 229:20 235:6 236:17 237:8 238:12 251:24 269:24 270:2,10,21,25

linking 178:21

list 37:23 46:25 50:9 136:3 264:13

listed 20:17 37:18 39:18 42:14,19,24 51:2,3 75:12 195:6 265:11

listen 22:22 97:15 199:15 276:15

lists 26:21 76:9 119:10

literally 65:21 214:17

live 10:3 154:23 221:15

lives 153:2 188:13 284:25

local 269:4,5

locate 231:7

located 6:5 260:24

location 6:15 191:16

long 21:7 33:3 34:20 50:6 105:19 114:24 141:21 146:21 162:22 180:7 263:20 273:4 274:3 275:6

longer 33:2 103:8 106:3,5 125:23 126:17 128:20 168:13 169:19

longest 114:8, 18

looked 10:14 31:11 52:22 53:10 65:19 92:15 122:15, 17,22 124:2 131:3 133:10 169:18 212:2 216:14,15 238:9 242:20 258:15 260:7 262:8 286:17, 25 287:3

Lopez 260:21 261:24 263:5, 11

losing 146:18 158:12 159:2

lot 36:20 89:14, 25 149:1 164:20 175:23 177:7 199:20, 21 209:4,12,13, 14,15 214:20 239:10 278:15 282:20

lots 282:24

Louisville 6:6

love 135:24 136:1 140:14

low 19:18

lunch 10:7 103:6,8

_____

M

Madalia 186:20 188:10 191:2,12

made 11:12 18:4 34:9 77:19 79:21 93:6 94:19 98:19 102:4 111:14 167:19 168:8,9, 10 174:3,12 178:14 202:14 211:12 214:13 229:4,6,9 237:23,25 242:18 250:9, 10 257:17 259:25 273:18

magnitude 256:12

main 6:5 21:10

maintain 272:17

maintained 238:23

maintaining 240:6

major 14:14 209:2,12 231:15 245:24 253:21

make 8:21 14:10,22 18:14 25:6 29:4 60:1, 18 67:5 72:22 78:14 91:8 92:16 94:8,21 95:18 101:13, 21 104:9,24 105:8,9 107:17 108:17 111:13 118:12,18 127:21 129:3 133:13 135:1 136:18 139:1

143:5 144:9,16 158:23 161:2 163:19 164:1,7, 10,12 165:11, 17 167:13 168:15,21,23 170:24 172:8, 23 175:11 176:24 181:19 188:3 192:19 195:13 198:6 201:22 208:8 212:10 217:14 227:8 236:1 237:14 238:12, 21 239:18 246:1 273:11, 16 278:9 286:2 288:15

makes 18:24 128:4 162:25 177:19 218:14 273:10 274:11

making 41:10 63:10 97:6 100:8 131:15 163:17 193:15 212:18 213:11 216:19 238:1 267:1

male 66:20 104:2,25 108:20 109:22 111:25 113:9, 10,13 163:22, 23 164:4 179:11 289:16

mall 117:25 118:3 270:23 271:8

man 87:13,14

manipulated 220:19

manpower 17:15 93:15 268:9

March 50:16, 24 265:19 266:24 273:19

mark 24:22 66:13 70:25



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

73:25 84:7 97:21 136:10 178:25 242:1

**marked** 24:23 66:15 71:1 74:1 78:16 84:9 98:1 179:2 242:6 243:4

**MARTINE** 76:4

**Martinez** 6:17, 18 7:21,23 9:21,24 22:6,12 23:1,7,19 24:1, 8,20 25:1,5 26:5,18 27:8, 13,20,24 28:7, 11,19,25 29:3 30:5,20 31:1,13 32:4,9,11,13, 15,16 33:9 35:17,18,25 36:3,15 38:22 39:8,11 40:25 45:23 46:1,24 48:25 49:11,18, 19 50:7 52:25 53:13 54:18,21 55:8 56:3 57:8, 23,25 59:10 60:3,16 61:2, 12,20 62:16 63:4,18 64:8,24 65:12 66:17 67:3 68:3,12,16 69:4 70:4,9,14, 16 71:4,6 74:3, 5 75:21,23 76:6,15,24 77:7 78:18 80:7,21 81:23 82:10,16, 10 86:6 88:8,19 90:9,16 91:20 92:13 93:3,22 94:14,16 95:1, 5,9,15,25 96:15,23 97:3,9 98:3,5,7,10,12 99:4,17 100:4, 14,24 101:5,15 102:11,20,25 103:4,10,11,23 104:6,12,17,20 105:14,22,25

106:10,13,18, 24 108:3 109:5, 18 111:2,22 112:24 113:17 114:6,16 115:4, 12 116:9,11 117:6 120:25 121:9 122:2 125:16 126:14 128:2,17 130:21 134:20 135:2,4,8 137:21 138:25 139:12 140:19 141:2,18 142:11 143:14 144:15 145:8, 11,15,17 147:12,25 149:9,17 153:23 154:4 155:10 156:7, 13,22 157:11, 25 158:22 159:18 160:20 161:21 162:13 163:14 164:22 165:7,20,24 166:3,10,16,19 167:2 168:4 169:4,15 170:9 171:4,14 172:16 173:3 174:25 178:11 179:5 181:22 182:9,25 183:25 184:11, 22 185:11 186:3,9,15 187:16,24 188:5 189:5,8, 12,16 190:12, 24 191:1,8,25 192:4,7,15,19 197:13 198:5, 22 199:6 201:16,21 203:13 204:13 205:20 207:7 208:6,19 209:23 210:3,7, 9 211:24 219:10,17 220:4,12,23 221:20 222:9 223:7,13 224:7,

17 225:17 226:19 227:21, 23 228:3,6,15 234:8 236:24 237:5 240:15, 22,25 241:12 242:9 243:15, 19 244:2 246:5 247:16 248:8, 15 250:2 253:7 254:5,12,14,16, 20,23 255:6,24 258:5,22 260:9 262:20 268:15 269:20 279:9, 12,19 280:6,14, 22 288:9,12 290:1,10,12,15 291:1,3,6,8,10

**Martinez's** 190:21 191:12

**Mary** 7:6

**match** 67:22 88:15 90:12

**matched** 60:6, 20 181:25

**Matches** 192:10

**matching** 59:18

**material** 44:11, 13,14

**materials** 24:10 26:21,23 29:8 41:12 42:7 43:13,21 44:4, 18,22 50:10 53:15 124:17 161:13 178:12 204:14 211:11, 15 240:16 241:7,14 246:11 262:22 286:17

**math** 41:8,10

**Matias** 266:22 270:22 271:8

**matter** 6:9 93:4 105:4,6,11 114:25 198:16

**maturity** 231:18

**max** 114:9

**maximum** 40:4

**MCAT** 14:21 15:2,7,18,22 16:3,12 265:8 267:2,3,4,12, 17,19,24 268:4, 18,22 269:3,9 274:16

**means** 91:5 122:16 147:15 244:17 247:12

**medical** 12:3

**medications** 9:2

**Medina** 58:23

**meet** 61:10 166:11 228:4 254:20 275:19

**Melissa** 84:11 192:3 209:20

**member** 261:1 268:18

**members** 123:14 199:21

**memorable** 203:2 206:3

**memories** 91:12 204:5,6

**memory** 9:3 91:18 134:3 142:25 146:16 158:10 159:1,4 169:21 204:2

**men** 59:3,12 60:13,20 68:8, 21 87:7 88:3,14 89:1 182:11

**mention** 133:13 205:2 214:13 217:14 229:7 287:2

**mentioned** 111:24 120:19 196:7 218:22

289:6

**mentioning** 48:14

**mere** 194:21

**merit** 247:15

**message** 241:19

**messages** 48:8

**messy** 188:4

**met** 9:19,25 186:16,19 188:10 191:2 274:22

**method** 214:21

**Michael** 7:1

**mid-** 214:4

**middle** 87:13 180:14,15,22 181:3

**might've** 77:23 78:8 205:5 277:7,12

**Mike** 280:24 288:6 290:4

**miles** 164:17

**Miller** 226:10 246:22

**mind** 90:20 103:16 108:24 112:13 167:25 168:3 176:1 177:13 190:13

**mine** 104:7

**minimum** 40:4,5 41:11

**minute** 65:21, 22 114:1 158:5

**minutes** 114:25 166:12, 13 228:1

**Miranda** 213:25

**mirror** 187:13

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 99 of 114 PageID #:54010
The Deposition of RONALD J. MUICH, taken on November 9, 2023
315

190:20

**mirroring**
194:9

**misconduct**
38:8 58:2 83:11
161:13,18,20
221:14 239:3,4,
8,10

**misfiled**
213:25 214:12

**missed** 63:5
198:23 289:7

**missing** 90:18
115:19 116:13
127:15 128:8,9
132:15,16
135:19 137:16,
17,18 151:25
207:20 208:5
212:11,12
213:23,24
217:19 218:6,
10 226:22,24
229:6,9,14,15,
16 253:17,18
262:10 263:2
274:10 285:25
286:2,6,15,21
287:2,9,17,18

**misspelling**
250:9

**misspellings**
133:16

**misstates**
62:11 64:3
81:10 88:5,17
89:10 100:20
110:2 111:18
120:14 127:4
134:14 182:18
198:11 219:6
226:1 240:11

**mistake**
107:24

**mistaken**
98:25

**Mister** 243:25
263:9

**misunderstan
ding** 139:2

**misunderstoo
d** 268:16

**moment** 68:4
84:20 183:3
194:14 195:18
212:21 222:16
260:13

**Monday** 10:3,6

**monetary**
277:24

**Montanez** 72:8

**month** 41:16,
20 42:1 91:5,6
93:6 95:6
142:8,14,22

**months** 95:10
142:23 143:20
265:20

**Morales** 72:2

**morning** 6:17
7:22 40:12 67:2
152:3

**motion** 47:20

**motivations**
96:25 186:6

**Mount** 268:12

**mouth** 39:6

**move** 103:3
105:10 125:7
150:9 152:11
155:17 156:23
158:1 176:5
186:10 198:20
227:20,24
238:4

**moved** 127:11
222:14 224:4,6
225:5

**movements**
72:22 187:10
190:18

**moving** 102:24
146:13 158:4
164:13,20
183:1 195:13

235:4 259:22

**Moyne** 186:22
188:16 260:24

**Muich** 6:9 7:3,
5,9,14,22 55:5,
9 66:13 74:8
106:21,25
166:24 167:3
228:11,16
255:3,8 288:13

**multi-region**
275:22

**Multi-regional**
271:24

**multiple**
146:22 200:5
217:20 263:14
271:5,10,13

**multiplier**
41:14

**municipality**
269:4,5

**murder** 201:13
202:1,10
204:17 205:7,
24 215:8

**murdered**
270:19

**mute** 57:22

**mystery** 218:1

_____

**N**

_____

**named** 33:20
35:1

**names** 58:25
59:1,4

**Nancy** 50:22

**narcotics**
36:23

**nationally**
282:17,19

**NBA** 203:3
204:18 205:2,
13

**necessarily**

106:4

**needed** 15:16
17:14 97:10
110:25 129:20
154:21 163:6
178:1 213:18
249:3 268:2,8
272:16,17
282:13 285:10

**needing**
281:20

**negative** 75:4
118:22 123:18
132:19,20,22
133:3

**negotiations**
36:23

**nice** 174:6

**night** 20:19,21
70:21 97:12
124:19 178:6
199:12 203:8
204:18 205:6,
13,16,24,25
206:6,23
207:12 208:10,
11,23 242:25
244:15 245:22
262:2

**nighttime** 13:1

**nods** 8:3

**nonstop**
199:21

**normal** 203:7,
23

**north** 14:16
260:23

**Northeast**
271:24

**Northern** 6:12

**Northwest**
267:8

**Northwestern**
147:1 211:4
272:1

**note** 78:23
127:21 241:25

265:6 287:3

**noted** 235:7
260:25

**notes** 43:25
44:5,7 63:20,23
64:2 70:10
104:7 135:13,
21,22 137:24
138:6,11,21
139:4 141:5
146:11 147:18
157:3,7,9,14,22
217:17 226:8,
10,13,15,16,21,
22,23,24
228:18 229:8,
10,11,12,13,14
230:3 254:8
260:15

**November** 6:7
16:13 40:11
55:7 106:23
167:1 210:5
228:13 255:5
287:5

**number** 6:13
14:19,22 15:3,4
17:20 18:22
36:21,22 40:15
72:16,24 73:25
87:21 89:15
98:2 116:24
136:25 178:25
187:20 209:14
212:20 213:7
233:18 234:5
240:22 242:13
264:9 267:10
268:20

**numbers**
272:17 282:3

**numerous**
110:7,9 117:15
118:8 119:22,
23 120:20
146:14 158:4

_____

**O**

_____

**oath** 107:22
108:10 109:1
112:16,18

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 100 of 114 PageID #:54011
The Deposition of RONALD S. HUTCHI, taken on November 15, 2023

316

113:16 226:11,
12 284:2

**Obama** 34:11,
17 35:8

**object** 8:6
22:5,11 23:5,24
24:5,14 26:1,11
27:4 28:10
30:17,23 31:5,
23 32:8,21
35:21 38:9
46:19 48:23
49:4,17,23
52:19 55:24
57:4,17 59:8,23
60:9,22 61:6,17
62:10 63:2,16
64:3,14 65:7
67:23 75:19
76:14,19 79:17
80:14 82:5
84:23 86:2
90:13 91:15
93:1,7 94:22
95:19 96:8,20
97:8 99:14,25
100:12,17
101:10 102:19
103:20 104:15
107:18 108:22
113:5,22
114:13 115:8
116:8 117:5
121:5 122:19,
20 124:25
125:24 127:4
130:6 134:14
137:13 138:14
139:11,18
143:12 144:10
147:21 153:21
154:1 155:23
156:12,17
157:5,16
158:15 159:12
160:9 161:15
162:10 163:4
164:14,25
165:13 167:20
170:4 171:9
172:25 174:13
182:18 184:4,
17 185:2,17
186:7 190:9,23
198:11 201:14

203:11 204:10
205:17 206:8
207:13 208:14
211:19 219:6,
13 220:10,21
221:18 222:3
223:3,11 224:2,
15 225:12
233:3 236:19
240:10,19
243:23 248:2,
14 249:15
258:10 260:3
261:17 268:6
279:8,16,23
280:10

**objection**
22:10 27:11,22
28:13,17 30:2
35:16 40:23
45:22 49:16
53:5 68:9,13,22
69:23 81:10
85:7 88:5,17
89:10 91:25
95:3,7,11 97:1
99:2 101:24
110:2 111:18
112:5 120:14
121:15 128:6
140:23 142:9
143:22 147:8
149:7 168:16
169:8 170:20
171:25 177:22
183:15 197:1,
19 199:3
201:17 226:1
240:9 241:9,17
243:5,13 245:3
246:12 252:17
255:19 256:4
279:15,22
289:23

**objections**
23:12 28:4 29:1
114:19

**obligation**
161:25 162:7
225:25 246:10

**observed**
116:17

**obtain** 129:7

**obvious**
161:23

**occasion**
38:13

**occasions**
214:1

**occur** 69:3
76:23 77:2

**occurred** 34:6
70:21 80:10
260:23 285:24
287:23

**occurring**
214:20

**October** 16:12
25:15 275:21

**odd** 187:8
190:16 193:16
194:19 200:1
202:4,13,15

**offender** 72:25
162:24 163:17,
18 164:10,13
165:11 170:25
246:21 259:21,
22 260:24
261:20 267:16

**offenders**
21:14 119:11
271:14

**offense** 217:2

**offer** 25:18
31:4,17 65:13
66:8 76:11
178:19

**offered** 249:5

**offers** 93:24

**office** 17:1
213:16 250:15
263:15 285:22
287:1

**officer** 11:4
12:11 13:11,12,
13 15:24 16:5,
8,9 34:4,8 38:8,
19,25 60:25
62:18 63:6
64:19 73:15,21

75:11 119:10,
12 123:5,11,12
131:7 141:11
143:17,21
144:19,22
155:13 157:13
161:13 183:14
184:2,16,24,25
185:15,20,25
200:22,24
207:21 222:1,
19 223:1,17
251:17,18
252:3,19,21
255:12 258:17
260:16,22
278:17 281:17

**officer's** 24:3
127:2 134:12
140:21 201:12,
25 245:1

**officers** 6:24
15:19 17:11,16
19:14,17,18
24:11 38:19
52:18 53:3
55:16 59:20
65:6,14,22 66:9
67:21 80:12
111:16 119:17
120:12 121:12
126:25 138:1,2
139:3,15 141:4
142:25 143:6
146:9 147:17
157:1 170:19
177:20 195:4
196:14 202:18
217:17 225:24
246:10 259:24
261:15 262:24
263:6

**offices** 6:19

**one's** 130:7

**online** 6:3

**onus** 198:8

**open** 34:16,22
108:16 112:3

**operating**
53:16

**operations**

16:25

**opine** 32:19
166:6 186:5
201:11,23
215:13 227:4
240:3 247:18
263:13

**opining**
247:22,24
248:10

**opinion** 23:15,
18 24:10,16
26:8 30:14,25
31:21 32:22
33:8 46:23
47:10,19 49:8,
20 50:2,4 52:23
53:4,11 56:4,8,
13,14,18,20,24
57:1,7,9,13,21
58:1,8,16 62:3,
6 63:13,25
65:14,18 66:8
68:6,19 76:12
79:15,21,25
80:1,3,11 81:16
82:22,25 83:10,
16 88:10,13,23,
25 89:2,6 92:17
93:24 94:20
95:17 101:14
102:17 104:3,
14,23 105:1,3,
13 107:15,23
108:9 109:9,10,
19 112:19
113:1 114:7
120:5 121:3,10
123:1 124:21
126:9 128:25
129:12 130:2,
23 133:6
139:13 141:25
142:1 147:24
155:18 163:3
164:9 167:14,
17 178:19
180:12 183:12
184:1 185:13
193:1 194:21
196:14 198:7,
13 199:18
202:5,15
205:14 206:2,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

19 207:8,15
210:25 211:17
212:14 213:6
214:3,25 216:3,
5 217:24 218:8
220:2,3,16
221:10,11,24
222:6,15,21
223:5 225:7,10,
15 227:9,13
228:24 229:13
231:3 232:24
234:13,16,18
247:13 249:12
250:17,20
251:25 253:14
255:14,23
256:10 278:24
280:19,21

**opinions** 20:16
25:17,21,24
26:24 30:22
31:8,12,24
32:6,18,19,20,
25 49:15 55:11,
15,18,21 58:19
82:2,17 91:8
94:23 95:20
103:25 215:1
225:1

**opportunity**
150:20 195:23
254:2

**opposed**
113:21 242:4

**opposite** 92:22

**optometrist**
97:15,19

**oral** 145:5,13,
18 147:6,19
148:5,13,15,17
149:11,15

**orange** 173:17
174:4 237:22
238:2

**order** 47:10,19
52:12 53:2
145:22 146:11
151:1 157:3

**orders** 47:8
53:23 54:5,7

229:20,23
290:9

**Ortiz** 211:22,25

**outcome** 262:9

**Outlet** 270:23

**overlapped**
156:16

**oversaw** 17:23
18:16 19:23

**oversee** 17:6,7

**overseen**
149:21

———

**P**

**p.m.** 106:16,23
166:21 167:1
228:8,13
254:24 255:5
291:19,21

**pages** 33:5
42:9 43:3 45:21
84:12 138:21
242:5

**Palatine** 16:7

**paper** 43:23
51:6 227:12
274:13,21

**papers** 190:8
215:2

**paperwork**
128:9,10
132:16 133:15,
17 213:23
233:12 241:21
275:5 286:25

**paragraph**
58:20,22 59:7,
11 67:6 70:18
72:19 77:12,14
78:1,20 83:19
84:2 94:4,5,7
107:2,4,10
108:14 116:20
117:7 122:4,7
129:5 145:12
149:2,10
160:23 161:4

162:19 167:4,9
183:2,4 187:7,8
195:16,18,22
196:6 202:23
203:1 207:10
210:12,14
212:19 215:3,
17 217:6
228:16 230:6,
16,20 235:5
238:16,18
244:4 248:16,
17,21,23,24
250:17,20,23,
24

**paragraphs**
39:21 186:11,
13 199:11
212:20

**paramedic**
12:5

**Pardon** 36:21
244:22

**Park** 34:13,17

**parking** 270:1

**part** 15:5 17:7
37:7 39:1,5
56:8 72:25
77:17 88:15
98:23 101:1
134:22 135:24
157:13 160:6
162:6 186:15
191:25 193:6
195:5 207:3,19
212:15 213:4
219:23 229:15
230:12,13
235:12 246:16
250:25 255:21
256:8 257:15,
19 268:5
278:21 282:6
286:15

**partially**
249:19

**participant**
72:24

**participants**
72:21,22 86:22

**participate**
15:7,8

**participated**
14:11 20:5
38:24 130:9
174:17 201:1
237:8 264:1,2
267:4,11

**participating**
72:13 174:6

**participation**
267:2

**parties** 54:18
102:21 105:16
166:11 207:5
215:22 254:6

**parts** 27:9
226:23 257:10

**party** 97:5

**passed** 91:5,
23

**past** 43:19
119:25 193:23
212:6

**patrol** 11:10
12:10 13:11,13
63:9 207:21
252:2 255:12
278:17 281:11,
16

**patrolling**
12:11

**patrolman**
281:14

**pattern** 58:2

**pause** 92:16
104:11 139:14

**payment** 41:18

**PDF** 290:19

**pen** 213:14

**pending** 6:11
8:18 266:18,25

**people** 22:7
23:2,10 48:20
59:18,20 60:7
96:11 98:20,21

99:22 101:21
102:15 123:22
150:7 152:9
170:11 172:2
175:9,23 176:9,
10 177:11,15
181:25 183:19
187:9 190:17
193:10,16
199:20 202:8
204:4,5 209:13
211:3,8 231:8
232:25 251:24
257:24

**perceive**
162:24 163:17,
18 164:10,13
165:11

**perceived**
164:23

**percent** 132:9

**perfect** 9:13
36:3 39:22 67:4
73:23 76:4
84:18 94:14
103:10 122:7
129:11 135:4
139:21 140:4,5,
14 149:25
150:2,14 152:1,
6 156:5 168:19
179:6 182:5
188:1 244:8
248:25 265:16
269:11 274:11
291:8

**perform** 268:5

**period** 13:23
272:19

**permanent**
73:3 75:8

**permissible**
221:25 222:19
223:1

**perpetrated**
91:4 121:2

**perpetrator**
91:24 92:19
109:8,9,22
111:17 113:1

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

114:11 116:6, 16 134:10 154:6 169:25 170:16 171:6, 19,22,24 172:20

**perpetrator's** 114:9 165:9

**perpetrators** 59:19 145:24 151:2

**person** 9:19 10:3,6 22:18 23:22 72:16 84:3 85:24 86:15,18 88:2 91:3 92:24 93:25 97:6,15 99:24 101:18 102:3,4,7 107:5,22 108:11 110:1 112:21 113:24 114:24 115:15 121:13 122:19, 20 140:15 159:4 162:15 164:24 168:2, 15,24 169:20, 23 170:2,18 171:2,6,20 172:11,12 174:20 176:19 177:21,24 178:2,3,5 180:9,10,14,15 181:10 183:14 187:10,11 190:18,19 197:17 198:16, 25 199:2 200:1, 15 203:17,18 210:18 219:5, 11,19 238:13, 14 246:2 251:20 252:20 253:4 260:2

**person's** 112:18 114:18 115:11 163:18 168:25 172:10 181:7,25 187:13 190:21 198:9 222:8

**personal** 63:11

**personally** 23:20

**personnel** 17:14 145:22 150:25

**persons** 14:3 72:13 74:16 75:4

**pertaining** 76:25 113:3 195:3

**pertains** 68:7 90:24 136:25 143:9 191:8

**petition** 51:24 52:4,5

**phone** 260:20 261:24,25 262:16,17 263:12

**phonetic** 283:17

**photo** 83:23 84:3,6,8,19 85:16,19,20,22 86:5,13,15,18, 22,25 87:18 88:1,3,10,24 89:3,21,24 90:24 94:10 131:1 133:10 173:5,10 174:9, 11,15,17,21 175:5 176:3 179:1,6 180:15, 22 181:4 182:20 221:15 251:21

**photos** 87:5

**phrased** 26:4

**phrases** 72:23

**physical** 161:6 178:21 210:20 211:17

**pick** 123:22 125:12 133:25

169:23 172:10, 13,14,15 173:2, 5,9,10,21,22, 23,24 174:5,18, 20,22 175:4,6 176:3,4 177:13 238:10 247:4 251:24

**picked** 58:23 59:13 65:2,5 133:23 170:11 173:16 174:16, 21 176:2,9 178:6,7 237:24 239:20,23 242:23 244:15

**picking** 177:12

**picture** 91:2 94:1 104:5 251:20

**piece** 158:25 159:3,7 274:10

**pin** 131:18,25 132:7

**pink** 115:23

**pitchfork** 261:3

**place** 163:21 175:21 231:22

**plain** 173:20

**Plaines** 270:16,18,20

**plaintiff** 6:18 7:24 51:10 127:3 130:22 183:7,9 243:22 244:24 247:22

**Plaintiff's** 6:16 49:14 52:4 194:24 195:10

**plan** 150:19

**planned** 16:3

**played** 212:15 283:1

**players** 123:15 131:8 177:7 251:19

**plead** 219:3,12, 16 222:1,19 223:1,17

**pleads** 219:19

**pled** 220:8,14, 18 221:4,9,13, 23 224:22 225:5

**point** 8:16 69:17 95:16 108:15,16 119:7 153:2 163:25 165:23 174:19 191:9 193:15 201:10 206:1 218:21 231:20 233:15 258:13 265:7 287:10

**pointed** 131:2 284:24

**pointing** 120:9 262:24

**points** 31:15, 18,19 167:5 227:7

**Polaroids** 90:2

**police** 11:19, 21,25 12:1 15:19 17:14 19:19 43:1 52:22 53:22 55:16 58:10 64:19 78:24 79:1 84:2 88:15 89:9 96:2,17 112:25 117:18 118:25 120:22 121:7 124:22 129:6 130:2,15, 24 131:4 132:5 133:14 135:12 146:9 154:17 157:1,13,14,17 167:4 174:2,23 179:11 185:15, 20,25 193:7,8, 22,25 196:9,19 197:10 198:2 199:14 200:3 202:17 215:23 216:8 217:16,

21 221:25 222:19 223:1 226:15 229:19, 22 231:22 232:6 238:5,22 240:6 241:19 245:8 258:24 259:8 260:21 282:18,19,25 283:3,10

**policies** 55:11, 19

**policing** 51:6 59:17 60:5 61:4,15,22 62:4,7 63:1,20 64:10,11 65:1,4 67:20 69:8 85:4 88:11,24 89:4 139:9 180:13 239:14 289:21

**policy** 47:8 61:24,25 62:2, 8,15 226:3 229:19 230:1

**political** 35:14 36:12,13

**portions** 46:5, 13

**posed** 80:8 194:15

**position** 110:16

**positive** 78:22 168:15

**possibility** 163:12 194:17, 18

**possibly** 38:18 79:22 108:24 109:2 123:3 126:12 182:4 206:10 208:4 260:7 285:24 287:2

**post-conviction** 48:20

**postdating**

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 103 of 114 PageID #:54014
The Deposition of RONALD S. MUTCHI, taken on November 3, 2023

319

49:14

**potential** 97:6 196:24 261:14 268:1

**potentially** 14:10 146:3 152:16 177:1,3 181:7 200:2

**Potomac** 187:1 188:14, 21

**power** 246:23

**practice** 61:15, 22 62:4,7 63:1, 14 64:1,10,11 65:1,4 96:2,17, 24 97:5 138:11 139:9 154:17 161:10 174:3, 23 180:13 193:8 245:8 258:24 259:8 278:6

**practices** 51:7 55:12 59:17 60:5 61:4 63:20 78:24 85:4 88:16,25 96:17 238:5 239:14 276:6 278:2,3, 5,12 282:18,19, 25 283:3,11 289:21

**pre-teens** 232:25

**predicted** 262:21

**preferable** 139:9

**pregnant** 193:20 195:15 197:24

**premise** 120:10

**preparation** 39:17,23 40:18

**prepare** 9:14, 16 10:20 44:16 146:16 158:10

159:1,9 160:1,3 263:15

**prepared** 119:9 217:8 225:11,19

**preparing** 41:13 146:11 157:4

**present** 151:17 161:6 176:17 281:24

**presentation** 276:16,17

**presented** 94:9 176:15 252:9 282:17

**President** 34:11 35:8

**pressed** 57:24

**pretty** 104:5 192:25 233:8 276:22 277:1,2

**prevailing** 63:14 64:1

**prevent** 9:5

**previous** 33:11 49:3 203:10 268:17 275:15 277:13

**previously** 141:4 203:24 205:12 227:3 229:18

**primary** 211:14

**Princeton** 20:21 282:16 289:6

**print** 44:5,6,7 74:21

**printed** 73:15

**printing** 44:9

**prior** 25:21 29:25 33:13

**prison** 23:3,11, 22

**privilege** 26:1

**privileged** 19:13 205:9 248:6

**probable** 56:21

**problem** 22:3, 9 54:25 70:15 114:20 130:11, 18,19 131:11 135:16,17 141:14,16,20, 23 142:18,19 143:4 157:10 160:11 173:14 175:7 202:20 210:10

**problems** 42:18 134:3 214:20 273:9

**procedure** 53:23 79:4 130:15 132:5 229:23

**procedures** 47:7 53:17 67:20 69:8 89:9 124:22 129:6 130:3,24 133:7 221:15

**proceeded** 187:12 190:20 251:5 253:13 285:11

**proceeding** 249:8

**PROCEEDINGS** 6:1

**process** 26:3 120:12 231:21 273:2,23 274:6, 7

**processed** 41:23

**product** 27:5, 12 28:5 30:3 40:24 99:15

**profession** 245:23

**professional** 10:24 19:1 22:1 263:22 271:16

**progress** 217:7 285:10

**progressed** 216:21

**project** 40:8

**promise** 78:12 217:1 288:10

**promoted** 16:20 17:8

**pronounced** 266:7

**proof** 82:20 83:17 215:7

**proper** 60:7 68:6,20 121:14 128:5 129:6 130:2,14,24 133:7 187:25 215:13 238:4

**properly** 79:16 121:17 172:7 251:5 253:13

**propriety** 78:4 263:14

**prosecuted** 57:2 162:15

**prosecution** 22:2 153:20 219:5

**prosecutors** 146:1 152:15

**Prospect** 268:12

**prostitution** 17:4,6

**prove** 198:8,9 274:3

**proven** 251:17

**provide** 29:7 162:23 199:11, 22 208:24 217:11 251:20 285:10

**provided** 36:19 43:21,22 44:19 49:1 51:14 53:10 135:14 243:4 280:17 288:2

**proximity** 15:19

**public** 10:25 11:4 13:12 17:13 19:15,19 45:21 133:15 193:12 196:7, 22 215:23 216:15,23 226:15,25 246:24 272:2 285:23 286:1,3

**publication** 51:6

**publications** 20:15

**pull** 134:22 252:5

**pulled** 34:10, 14 202:19

**pulling** 90:2

**Purdue** 266:4

**purely** 147:18 178:20

**purport** 109:24

**purported** 107:16

**purpose** 84:14

**purposely** 239:17 244:10

**purposes** 49:22 113:19 267:12

**pursue** 102:2 121:12 172:9

**pursuing** 125:8

**purview** 143:7, 17 155:13

**push** 12:4

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

172:12 174:20 176:5

**put** 11:9 20:22 26:9 31:18,24, 25 32:1,2 40:10 44:7 46:6,8 59:1,25 70:11 73:7 75:17 85:15 90:1,3 100:24 108:13 124:12 141:25 150:15 152:22, 23 154:20 155:2,4 172:3 173:20 180:14, 16,19 181:2 182:7 187:19 191:6 194:11 206:9 214:17 220:2 227:9 233:18 234:4 246:1 258:7 265:16 276:6 285:4 290:22 291:5

**putting** 89:16 90:5 141:21 148:24 149:1 180:24 186:13 192:24

**puzzling** 192:22 198:1

**Q**

**quadruple** 257:8

**qualified** 274:21

**qualify** 165:10

**question** 8:8, 13,18,21,24 18:10 23:9 24:6 27:15,18,19,25 28:3,21,23,24 30:7,9 33:18 35:4 37:7 38:1 41:2,4,5 43:20 47:20,25 49:10 51:25 52:3 54:1 56:1,2 59:9,25 60:1,2 61:8,10 63:7 64:23 65:11,24,25 66:6 67:18 68:14 69:19 70:3 75:10 79:7,11,12 80:6,8 81:9,24 83:8,9 95:24 97:18 98:18 99:19 101:6,17 104:19 105:2, 15 109:11 110:12,14 111:8,21 114:4 118:13 134:8, 19 136:6 138:2, 23 139:3 140:13 142:22 143:3,8,21 144:12 147:23 149:3 155:1,3, 11 161:23 166:4,5 167:23, 25 168:18 170:7 173:17 178:9 184:7,13, 20,21,23 185:7, 10,22 186:1,16, 19 187:12 188:10,12,14 189:23 190:20, 22 191:15,20 192:19,21 194:15 198:24 200:4,12 203:17,22 204:21 205:22 208:2,20 213:5 215:12 223:15 225:18 231:25 234:4 236:2,3,7 238:24 239:12 241:10 242:16, 19,23,25 245:15 246:3 253:8,14 257:9 258:23 259:4,7 262:21 264:24 265:4,6 269:2 271:12,13,16 275:10,11,14 278:10 279:1 280:8 284:24 289:5,12,19

**questionable** 113:3

**questioned** 208:10 227:7 286:14

**questioning** 94:17 166:5 186:14 204:16 208:21,23 220:6 224:13 225:18 279:5

**questions** 10:23 21:25 33:10 39:15 53:14 60:1 103:4,12 104:10 106:1 110:25 128:11, 14 137:25 142:6 165:25 176:23 187:11 190:19 191:16 209:9 210:19 212:13 215:1 220:8,18 221:5 252:13 254:8, 18 255:7 263:21 271:4 278:9 279:4 282:24 283:4, 15,17 288:14

**quick** 18:24 39:15 53:20 54:19 78:12 90:10 119:7 124:16 132:17 134:8 155:11 175:11 176:24 231:25 254:7 281:4 288:9

**quickly** 9:21 104:9 126:23 165:25 187:21 260:10 290:9

**quotations** 108:7

**quote** 66:19 111:25 116:21 129:5 135:11 145:5,18 146:21 147:6 149:9 150:24 151:4 152:13 155:19 156:25 158:3,10,25 160:6 161:4 162:21 215:6, 20 217:6 228:18 230:9 235:6 238:19 249:1 251:3 253:10

**quote-unquote** 238:21

**quoting** 100:23

**R**

**race** 90:21,22 99:22,24 101:21,22 102:16 103:21, 24 107:5,16 109:25 111:4

**races** 107:13

**raise** 7:14

**Ralph** 50:12

**ran** 92:10 171:11 180:16 212:3

**rank** 19:8,12

**ranks** 18:4

**rarely** 39:4

**rate** 39:16,22 40:1 41:14

**rationale** 162:6

**Raul** 211:25

**Ray** 195:23

**re-ran** 123:20, 21

**re-reviewed** 44:15

**re-share** 73:24

**read** 26:14 47:1,3 50:2,3 51:8,13,18,24 80:1 108:18,23, 25 145:10 147:10 167:23 175:24 183:22 188:8 189:18 216:24 218:6 220:8,14,15,17 221:3,22,23 222:13 224:3 225:4,14 226:7 227:10,11,12, 14 245:6,7 248:6,9 250:8 255:14,21 261:23 287:15

**reader** 145:25 152:13

**reading** 10:22 24:17,18 52:6 56:17,23 117:9 137:20 221:12 243:10 263:8

**ready** 166:1 186:10 189:13

**real** 19:18 110:21 169:21 185:9 209:17

**realize** 20:18

**realized** 20:22 273:8

**reason** 19:11, 12 32:2 81:3 123:19 127:10 129:18 132:14 146:8 157:1 173:15 175:5,6 237:11 243:17 244:1

**reasonable** 24:4,12 79:3

**reassigned** 15:24 142:21

**recall** 21:24 52:11 111:10, 11 137:3 205:8, 15 241:1,3 270:10 281:14 285:12 287:13, 21 289:10

**recalled** 203:3 206:4

recanted
125:11

receive 30:24
37:20 41:18,21
43:13,14 52:10

received 26:12
30:16 36:20
43:16,18 46:15
49:6,7,25 50:1
51:11 52:21
56:5 61:16,23
62:8 86:8
103:13 129:15
146:5 152:19
200:20 241:8,
15 243:12
260:19 279:3

receiving
65:11 232:10

recent 277:9

recite 242:15

recognize
210:19

recollection
206:10 235:9
236:5 284:4,6

recommendati
on 39:3

record 6:2 7:4,
8 8:3,12 9:21
28:4 55:1,3,4
70:6,12 77:1,23
78:7 81:8 90:4
106:17,19,20
111:18 116:4
119:13 124:18
134:15 145:20
150:24 151:6,7,
9,10,14 166:20,
22,23 178:14
182:11,16
183:6 204:15
205:4,25
222:18 224:11
228:7,9,10
241:6,13
254:25 255:1,2,
16 256:1
262:23 290:10
291:19

recorded
146:8 155:21
156:10

recording
106:18 218:13

records 9:12
79:20 81:18
112:7 213:21
214:11 250:13

recovered
68:5

red 105:6
164:19

REDIRECT
288:11

refer 47:10
73:10 232:15

reference 76:3
100:8 213:11
229:9 249:1
285:9 286:2

referencing
101:7

referring 47:12
78:20 84:8
87:12 108:5,12
148:22 149:8
213:4 232:3
238:25 242:21

refers 129:22

reflect 8:3 9:22
136:15

reflecting
49:21 137:6,12
141:6

refuse 27:15

refuses 194:4

refusing 27:25
28:21 30:7 41:2
99:18

regard 127:3
171:23 216:4

registration
275:6

relate 20:16

related 20:7
21:22 47:16
48:17 49:2 92:7
103:5 104:13
175:14,17,20,
22 177:1,3,7,
16,17 187:10
190:17 220:6
245:1 271:16
279:1

relatedly 49:12
199:10 234:17
247:21

relates 130:22
224:19

relating 135:12
259:12

relation 47:22
83:10 223:17

relayed 117:18

released
124:19,23
127:10,24
247:4 251:15

Relevance
35:16,21

relevant 20:15
46:17 52:17
58:21 99:23
101:18 145:21
146:3 150:25
152:17,22,24
153:3 155:5,14
284:14,16,19
285:1,3

reliability 91:9
104:1 140:21
141:10 142:7
143:8

reliable 91:13
93:6 96:3
162:22 163:7
164:2,7 165:5
231:12

reliance
134:12

relied 26:23
178:13

rely 51:5
117:11 118:14

relying 146:16
158:10 159:1
224:25

remember
20:4 21:5 32:24
47:16 48:7 52:6
54:12 92:19
143:2 203:18,
25 204:3,4
211:4 236:15
277:9 283:17,
22 284:8

remembered
141:11

remembering
95:22

remote 40:3

remotely 6:19,
25 7:2

repeat 23:9
24:6 42:16
59:8,25 68:14
72:23 89:13
101:6,16
111:20 200:12
201:19 205:19
241:10 259:4,7
279:7

repetitive
208:8

rephrase 22:7
25:23 26:3
32:13,15 33:17
44:2 56:1 62:17
75:22 76:16
85:1 88:22
94:19 139:13
141:1 170:13
171:15 179:21
180:3 184:19
203:21 219:8
223:14 284:14

rephrased
28:18

report 9:9,11
10:14,22 16:1,
17 17:2,19
18:3,7,12 19:4

20:12,22 21:22
23:16 24:17,21
25:7,9,15,18,
22,23,25 26:2,
10,13,16,21,25
27:3,6 28:8,15
29:5,9,11 31:2,
3,15,16,20,22
32:6,7,18 33:2,
3 34:8 38:20
39:4,18 40:22
42:8,13,14,19,
20,24 43:7,9
44:12,22 45:4,
14,19 46:5
49:8,15,22
50:3,4,13,15,23
51:2,5 55:10,
11,15,18,21
56:15,21,23
57:1,9 58:6,13,
15,17 59:1
62:12 66:8
67:6,15 72:11
73:11,13 74:20,
24 76:8,11,16
77:4,10 78:14,
23 79:6,8,13,22
80:9,18 82:1,3,
7,15,18,21,23,
24,25 83:2,3,
12,14,15,18
91:7 93:24 94:4
99:13,16
100:11 101:2,9,
13 103:18
107:1 108:8,13
109:3,4 111:14
116:7 117:25
118:15 119:9
120:19 122:4
123:2,22
124:13 125:9,
20,25 126:1,3,
16,19 127:22
128:1 134:23
135:24 136:16
137:2 139:5
140:3,8,11,15,
21 141:6,10,12
142:1,8 143:9
145:1 146:22,
23 150:16
152:3,5 153:4,
6,7,8,10,16
154:24 155:1,

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 106 of 114 PageID #:54017
The Deposition of RONALD S. MUTCHI, taken on November 15, 2023

322

25 157:8,19,20, 22,23 158:19 159:9,14,17 160:11,22 166:6 167:3,23 172:4 173:14 178:13,19 183:2 186:5,18 189:22,25 190:2,5,11,16, 22 191:1,6,9,18 192:8,22,24 194:7,12,19 201:11,23 204:21 205:8 207:10 212:17 213:6,15 214:9, 13,25 215:13 220:3 227:13 229:20 232:14 235:5,6,10,15, 20,24 236:4,6, 9,10 238:20,22, 25 239:1,2,12, 16,18 240:2,18, 24 241:15 242:20,21 243:4,12,21 244:3,9,19 247:18,22 250:18 255:8 257:2,11,20 260:12,16,21 261:9,18 262:4, 11,22 263:1,3, 13 264:11 265:7,12,16 267:18,19 269:18 275:16 278:24 283:10, 11,14 286:8 287:16

**reported** 146:4 152:17

**reporter** 6:2,4 7:3,7,12,14,19 55:1,4 106:16, 20 144:9,13 156:15,20 166:20,23 228:7,10 254:24 255:2 290:8,13,16,22 291:5,7,9,11, 14,16,18

**Reporters** 6:5

**reporting** 73:15,21 75:11 218:13 285:16

**reports** 30:13 33:2,6 50:8 52:22 56:17 60:19 66:3 75:15,24 76:21 79:21 80:4,17 81:2,3,4,5,17, 19,20,22 83:2 107:11,20 112:13 120:17 121:18,25 128:19 133:14 135:12 137:15, 18,19 142:18 143:18,19 146:12,17 148:16 157:4 158:10 159:1 183:17 193:6, 25 208:4 212:12 213:13 214:4,19 216:8, 11,22 217:7,16, 21 220:15 224:1 225:11, 25 227:8 228:20 236:18 245:1 250:6,7, 8,10 251:11 285:7,10,15 289:15,17

**represent** 7:24

**representing** 6:4,18

**Republican** 35:19 36:6,7,9

**require** 228:18 230:2

**required** 72:22

**requirement** 184:2,15,24 274:23 285:17

**requirements** 275:20

**reran** 79:24 125:12 238:8

247:3

**reread** 253:10 256:9

**rereading** 228:25 235:21, 25

**rerun** 80:6 125:2 235:6

**rescind** 237:15

**resemble** 84:21 88:14 89:7

**reservations** 114:10 115:7 203:9 204:7,12

**reserve** 290:7

**residential** 12:12

**resolve** 255:9

**resources** 249:3

**respond** 8:13 15:12,13,15 60:18 81:9 164:11

**responded** 117:14 191:3 222:21 251:13

**responding** 117:13,19 149:5

**response** 69:21 187:13 188:24 190:21 200:10 220:8, 18 221:4 222:18 223:2 224:13

**responsibilitie s** 11:6,23

**responsible** 245:19 246:2

**resulting** 98:25

**results** 67:7

**retained** 29:14 30:21 33:13 194:23 195:9 227:3

**retention** 55:19 73:4 75:8

**retired** 16:10 18:5 274:16 276:10

**retirement** 16:2,4 37:11 263:24

**retiring** 277:18

**reveal** 50:15

**revenge** 132:1

**review** 9:18 10:11 26:9 30:25 39:17,23 45:1,12 46:2,14 48:11 50:8,13, 22 51:1,24 52:3,17 53:16 54:5 107:21 116:14 124:5, 17 151:10,17, 18 176:16,22 178:12 195:1 203:5 207:22 211:11,15 212:21 218:17 220:6 227:6 230:4 240:16 245:11,13 246:16 248:3,5 252:10,24 253:6,25 259:22 262:22 280:3 285:14 286:9,10

**reviewed** 23:17 24:10,16 26:13,14,15,21 29:8 32:25 33:7 42:7,13,18,21, 23 43:11,22 44:11,22,23 45:4,11,14,17, 19 46:5 47:8 49:7 53:15,25 56:9,12 57:13, 21 58:4,5,12,16 66:3 71:10

74:6,7 77:3 81:2,5,16 83:14 99:6 107:11 119:24 168:6 176:16 196:17 204:14 206:18 213:17 216:6 217:23 218:5, 10,25 219:22, 23,24 221:9 229:19,22,24 230:1 237:4 239:16 241:7, 14 243:1 251:10 254:3 255:10 258:15 260:5,12 261:9 278:20 280:2, 16 285:19 286:23 287:8, 19

**reviewing** 10:21 16:24 20:21 30:11,12 40:12,17 41:12 44:4 46:22 47:13 52:11 53:25 57:6,12, 19 58:6 80:17 112:6,13 127:6 137:2 193:5 202:25 212:25 215:11,18,19 216:17 217:15, 18 218:5 223:20,21 224:20 251:10 284:4

**revolver** 66:23

**reword** 35:17 49:18 60:18 185:13 190:25 217:18 239:6, 12

**Rey** 58:2,9

**Reyes** 191:7 193:19 194:2 195:17 196:18 199:11,23

**Reyes's** 191:12

**Reynaldo** 6:10

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

75:12

**RFC** 43:9 71:3, 4 74:2 75:3 241:18

**Ricardo** 103:19 104:22 107:6,12,21 108:1,19 113:15 116:5, 14 129:23 130:25 131:14 133:5,19,20 134:9 167:14 172:18 211:13, 16 212:7,9 283:16 284:3

**Ricardo's** 108:25 112:15 113:4

**rid** 226:21

**Rider** 177:8

**Rider's** 50:13 92:8

**rifles** 34:20

**rights** 162:8 201:3 213:25

**ring** 54:7

**ringing** 52:9

**risk** 146:18 158:11 159:2

**RO's** 261:4

**road** 92:11

**robberies** 14:3

**Robert** 260:17 261:14

**Rockwell** 186:25 188:19

**role** 16:22 249:4,13,16,23 250:18 283:2

**roles** 249:19

**rolling** 164:17

**Ron** 106:5

**Ronald** 6:9 7:5, 9 55:5 106:21

166:24 228:11 255:3

**room** 21:16 182:17,21,22, 24

**root** 187:11

**Rosa** 71:20 129:23 130:8, 12,13,17,25 131:13,15,16, 17,24 132:7,18 133:20 167:14 172:18 179:17 211:12,16,20, 21

**Rosa's** 179:19

**Rosaline** 72:2

**Rose** 94:6,13, 19,20 98:15 103:18 104:22

**Rosemont** 10:25 11:2,18 12:1 13:25 14:20,21,25 16:5,15 17:24 19:15 33:19 36:6 37:1 118:1 209:1,11 211:6 253:21 264:17 270:19 281:8, 10,11

**Rosen** 243:5

**rotated** 17:12

**Roughly** 10:7 91:6

**route** 190:19 191:4

**route/alibi** 196:10

**routinely** 146:20 158:14 159:8

**RPSD** 20:10

**RSPD** 264:5,19 265:7 269:12

**rule** 28:6 120:12

**rules** 7:25 28:16 120:10 228:18 230:2

**run** 38:14 77:24 78:8 166:14 171:12,16 212:5 228:1 273:9

**running** 78:2 164:24 165:3 181:19

— S —

**sad** 210:7

**safe** 63:10

**safety** 10:25 11:4 13:12 17:13 19:15,19 272:2 281:11

**Sandy** 276:9

**sat** 21:21 33:15,25 35:6 206:17

**saved** 226:16

**scan** 276:15

**scared** 92:5,9

**scars** 90:15

**scenario** 156:6 284:23

**scenarios** 158:20

**scene** 21:18 36:22 116:23 117:14,21 118:4,25 119:4, 18 120:6 267:19

**scenes** 21:14 117:15 252:4

**Schalka** 7:1 281:2 290:6 291:16,17

**Schaumburg** 15:14,15,17 267:14,15,20 268:2,10

**school** 11:11, 13 63:9 186:23 188:17,18 206:24

**School's** 206:25

**schoolyard** 186:24 188:18

**science** 90:5 114:3 168:20

**scope** 31:20,21 62:12 91:16 93:7,18

**screen** 25:3 26:17 66:12 70:24 71:8 78:11 97:20,25 100:22,25 101:4 102:22 119:8 134:24 135:6 187:19 188:3 190:7,14 209:18 242:1,4 260:10

**scribble** 216:25

**scroll** 26:19 27:2 72:1 188:25

**scrolled** 187:22

**scrolling** 75:2

**search** 65:1,4, 14,23

**seat** 34:16

**secluded** 182:17

**secondary** 210:22 211:18

**seconds** 109:25 110:6 113:25 114:9, 18,25 116:18 133:10 168:21, 23 169:22 213:2

**secret** 34:23 239:21

**section** 47:24 58:21 66:23 67:16,17 72:13 79:9,25 94:6,11 129:4 146:21 150:12 157:19 166:1 173:14 179:19 188:9 228:17 232:16 235:21 242:13

**sections** 149:20 227:8

**security** 11:8

**seemingly** 203:2 206:3

**sees** 66:19 165:4 168:14

**semester** 12:2, 25

**seminar** 276:18 277:7

**send** 41:16 69:15 140:9 155:7 214:11 275:4,7 277:21

**sending** 41:19

**sense** 8:21 18:24 162:25 163:17,19 164:1,7,10,12 165:11 192:19 218:14 238:22 239:18 273:10 274:11

**sentence** 50:6 128:1 145:15 148:8 149:4,6, 7,9 151:3 152:11 155:17 156:24 158:1,8, 23 160:5 163:16 230:16, 22 233:7,8

**sentences** 231:20

**separate** 32:17 33:2 37:17 75:15,24 119:11 121:2



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 108 of 114 PageID #:54019
The Deposition of RONALD 'S' HUTCHI, taken on November 19, 2023

324

187:9 190:16
193:16 240:7

**September**
266:12

**sergeant**
16:15,20 17:10,
25 18:1,5,6,9,
11,15 249:1,17,
18,20,23
250:21

**series** 187:11
190:18

**serve** 265:8

**served** 12:9
19:2 123:13
264:12,19

**service** 30:1
34:23

**serving** 39:9
143:16 275:8

**session** 21:21
276:14

**sessions**
276:8

**set** 75:17 104:8
143:7 271:3
279:5

**sets** 129:17

**setting** 210:6

**sexual** 14:3

**shakes** 8:3

**share** 66:12
67:5 70:24
78:11,13 97:20
119:7 134:24
188:2 200:3
241:25 260:10

**sharing** 25:3
27:3 71:8 73:24
75:14 79:12
87:24 97:23
98:23 101:3
102:22 135:15
182:14 199:13
242:3

**Sharples**
265:19 269:23

273:18

**Sheehan**
241:20,22
242:3 243:11,
16,21,25
245:21 287:4

**sheriff** 238:7

**sheriffs** 173:20

**shirtless** 181:9

**shirts** 182:12

**shocked**
218:11

**shooter** 118:3,
5,20,24 119:6
120:7,24
121:19,21,24
130:13 166:8
167:6 212:3
244:14

**shooter's**
115:6

**shooters**
118:3,8 119:23
120:11,20
121:7,8,11,22
271:11

**shooting** 16:8
59:19 61:5
62:22 91:4
94:20 116:6,22
118:1 121:2
134:11 172:20
183:9 199:12
207:11 208:11
212:8 244:16
261:14 270:23
271:8,11

**shop** 260:25

**short** 85:24
86:1,9,10
127:25 179:17,
22

**shortest** 86:15
88:1 180:9,10

**shortly** 276:22
288:23

**shot** 175:20
212:1 217:2

256:13

**should've**
66:4,6 202:5,6

**shoulder**
212:1

**show** 84:2
85:12 120:3
121:25 194:3
241:14 251:4
253:12 257:1
262:23

**showed** 91:2

**showing** 85:13
88:10,24 89:2
113:14 181:20
241:7 246:25

**shown** 84:7
131:1

**shows** 194:4
244:11

**sic** 199:10

**side** 12:16
14:16 72:21
226:16,25

**sign** 164:18
250:6

**signature**
25:11,12,13
290:7

**similar** 94:17
194:16

**similarly** 78:6

**simple** 14:1
130:7 158:18
258:4

**simply** 193:2
195:23 237:7

**single** 118:16
236:2

**sir** 29:14 39:14
42:6 43:6 49:24
60:10 64:15
65:8 66:23
68:23 75:14
82:17 83:7 84:8
85:8 86:3
87:15,23 90:23

93:4,8,23
94:11,23 95:7,
12,20 96:9,21
97:1,25 99:16
100:1,7 101:7,
25 102:21
103:12 104:13
107:19 113:18
114:7 115:13
116:3,25 117:4
118:13 120:15
122:3,9 125:17
126:15 129:8
132:25 134:15,
21 137:14
138:15 142:12
143:23 144:23
147:9 148:4,25
156:18,25
158:15 161:7
162:11,25
165:14 166:4,
11 167:7
168:17 169:9
170:13 172:25
173:12 178:24
179:1 180:1
181:23 183:2,
10 185:18
186:4,10,15
187:4,14 188:6,
23 190:13
195:12 196:1,
11 197:2,20
198:12 199:9,
15 200:18
201:18 202:22
203:11,21
205:17 206:8
210:14 212:17
214:24 215:4,
16 216:1 217:1,
9 218:2,15
220:10 222:5,
24 227:18
230:5,19
231:25 232:17
233:4 234:12
235:4,12
236:19 239:6
240:2,5,13,22
241:6 242:12
243:8,15 244:3,
20 246:6,13
247:21 248:16,
22 249:10

251:6 252:18
254:5 259:3
261:7 263:18
265:5 268:6
271:15 277:6
278:8 279:5,17
280:11,23
289:20,24
290:1

**sit** 53:1 141:23

**site** 187:25

**sitting** 72:21
128:16 289:12

**situation** 65:10
66:1 68:25
69:11,18 80:16,
20,23 81:7,15,
21 83:1,6,13,17
87:19 91:22
92:19 102:1,2
109:15 110:5,
24 113:24
144:1,7 158:20
160:10,13
169:3,11
177:16 186:2
234:20,25
268:14

**situations**
92:10 112:23
113:14 114:3

**sixth** 53:24

**size** 214:15

**skin** 87:8,10,22
88:2 89:21
113:12,13

**slash** 47:7
252:21

**sleep** 242:24
245:22

**slightly** 269:12

**small** 74:21
207:17 208:1
286:4

**smart** 69:12,16

**snake** 261:3

**so-** 119:25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**so-and-so** 172:13

**solemnly** 7:15

**solid** 199:12

**solve** 256:24

**somebody's** 95:23 165:2,3 287:8

**something's** 257:2

**son** 130:11,19 131:19,21 132:18,23

**sooner** 139:10 144:19

**sort** 15:9 46:22 48:8 52:10 92:7 112:22 115:24 116:1 120:6 125:14 126:19 130:11 131:22 133:2 175:9 200:2 272:18

**sorts** 37:13

**Sotos** 9:20 30:19

**sound** 8:4,8,13 19:5 75:18 103:6 189:4

**sounds** 19:3 35:13 54:23 166:18 228:3,5 254:19,22

**sources** 117:11

**space** 57:24

**span** 263:22

**Spanish** 133:12 261:2

**speak** 10:15 142:1 150:22 198:2 246:24

**speaker** 21:17

**speakers** 21:11

**speaking** 29:1 136:11,12 140:22 197:15, 16 198:25

**speaks** 131:12 175:2

**Special** 54:5,7, 9

**specific** 111:7 120:9 149:3 159:16 164:8 183:13 200:20 219:14 234:5 276:5

**specifically** 47:11 65:13 86:14 195:11 211:4,15 216:4 232:11 233:5 239:16 278:14 279:2

**speculation** 23:5 46:19 49:4,24 52:19 91:25 184:17 185:3,18 208:14 223:3 243:14 260:3

**speech** 34:13

**spell** 112:10

**spells** 108:8

**spent** 10:5 39:15 40:16 41:12,13

**spoke** 111:16 139:17 141:12 196:20 202:23 260:20

**spoken** 124:18,24 137:10 144:19

**spot** 180:25

**spots** 189:12

**staffing** 181:23

**stairs** 211:21 212:4

**stall** 288:10

**stamp** 48:5 73:3 75:8

**stamped** 97:21 99:6 187:18

**stand** 179:14

**standard** 53:16 59:17 60:5 61:4,15,22 62:4,6,25 63:20 64:9,11 65:1,4 67:20 69:7 85:4 88:15,24 89:9 96:2,16 124:22 180:13 215:25 239:14 289:21 290:19

**standards** 88:11 89:3

**stands** 104:3

**stare** 168:20

**start** 55:9 95:22 110:19 117:22 143:8 211:20 214:8 216:8 273:2 274:6,7 285:11, 17

**started** 24:17 29:19 40:11 89:16 112:6 201:5 210:2 211:3 214:5 217:24 230:14 251:12 253:22 262:5 271:6 273:6,23,25 286:10 288:20

**starting** 98:18 145:13 242:14, 15 244:5,7

**starts** 94:12 163:11 186:16 192:11 195:17 202:23 215:5, 17 230:6 250:24

**state** 6:14 7:4 57:15 61:25 76:22 78:1 94:7 107:4,10

109:21 122:8 129:5 130:1 162:21 163:2 167:4 168:7 183:5 186:18 187:8 191:1 198:9 199:11 210:16 215:6, 20,21 217:6 228:17 230:9, 24 232:13 235:5 236:4 244:8 248:25 251:3 263:15 265:18 266:6, 15,21 269:22 270:8,15,22 272:14 273:3,7 274:9,14 275:5 282:19 285:22 286:1 289:3

**state's** 45:7,15 52:16 133:14 161:7,14 215:24 216:14, 23 229:7 245:10,12 250:13,14 258:21 286:7, 15 287:1,12

**stated** 160:14 173:15 215:5 225:14 267:3 289:16

**statement** 39:17,23 59:22 94:7,13,18,19 98:19 99:9 100:11,13,14 101:9 102:3 108:5,19 109:17 110:12, 14,24 112:4,25 114:4 116:18 118:21 125:12 129:22 130:10, 17 131:16 132:7 133:9,21 135:10 136:24 144:20 147:20 148:19 149:14, 22 163:20 165:5,6 167:12 169:6 172:8

173:25 174:3 191:7,12,13,21 194:7,8 195:23 207:17 217:12 229:25 236:16 237:14,15 244:23 247:15 253:10 278:5

**statements** 116:24 119:12 133:21,24 134:6 135:14 162:23 163:9 175:21 176:25 191:6 194:24 195:10,14 202:16 230:10 231:1,13

**states** 6:11 44:23 45:4,14, 19 46:5 68:18 124:18 145:4

**stating** 83:2 122:24 252:14

**station** 179:11 202:8 261:23

**stay** 21:19

**stayed** 168:12 252:6

**step** 196:25 197:18 199:1 238:7

**steps** 146:2 152:16 170:2, 19 171:7,21,23 200:15 215:9

**Steve** 9:22

**stick** 91:18 95:13 176:9 238:14 245:5

**stipulate** 7:8

**stop** 27:3 34:9 67:4 73:24 75:14 79:12 87:23 95:22 97:23 98:22 102:22 103:2 135:15 164:18 182:14

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of RONALD S. HUTCHI taken on November 19, 2023
Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 110 of 114 PageID #:54021
326

stopped 32:3
40:13 106:18
164:18

stopping 25:3,
4

stops 12:13

stories 117:23
163:7 230:9,25
233:1

story 127:25
163:11 173:22
174:5 178:8
258:1

story's 164:2

strategies
215:14 247:19

strategy 26:7
240:3

street 6:5
12:10,20 13:1,
5,11 116:22
123:12 153:2
251:13 255:12
261:2

strengths
142:17

stress 256:21

strictly 264:5

strike 17:21
38:23 52:2
61:14 62:5
64:10 65:2 74:7
87:25 89:1
101:19 109:20
112:2 129:4
139:14 167:15
184:14 197:15
206:2 211:14
215:21 216:4
223:20 236:17
246:7 247:23
250:3 279:3
280:7 281:20
284:14 288:16,
18

strong 31:10
97:11 114:23
178:21 181:7

stronger 92:4,
11

struggle
102:15

Stubley 50:23

students 266:3

studied 204:2

stuff 34:17
105:19 234:2

subheading
145:12

subject 14:7
153:25 163:22,
24 180:19,20
181:2 219:4
237:24 260:7

submit 41:23

submitted
25:7 31:21 33:6
74:20 235:7

submitting
41:17

subpoenaed
194:3 202:12
239:24

subsection
149:11 210:12

subsequent
170:18 174:10
177:21

substance
26:7 55:10

Suburban
267:8 272:9

sufficient 38:2
150:9

suggest 57:16
182:11

suit 35:2

Suite 6:5

suits 35:1

summary
231:24

summer 21:4

sun 209:20
210:3

sun's 210:5

supervise
22:24 37:14
265:9

supervised
17:11 18:9,18
20:5 202:4
264:20 266:6

supervising
137:23 157:13

supervision
139:15

supervisor
16:9 22:20
38:11 137:23
138:19 155:12
160:18 213:20
249:2,6,20,24
250:4,7,18
252:22 264:3,8,
13,17 270:6
275:8 278:19
281:13

supervisor's
213:16 249:4,
13

supervisors
16:4 146:1
152:14 214:16,
18

supervisory
16:21 143:17
250:4 265:9

supplemental
126:1,16 128:1,
19 154:24
263:3

supplied
146:21

supply 197:23

support 77:1
116:4 128:25
224:19 225:1
249:21 281:16

supporting
218:23

supports
119:13

suppose 73:14
185:12 275:14

supposed
197:25 218:12

supposedly
91:1

suppressed
220:19

surprised
218:11

surrounding
267:8

suspect 77:20
78:9 84:21
85:5,23,24 86:9
89:7,8 90:11
94:9 96:18
107:17 108:6
111:4 113:24
114:1 118:16
123:3,23 124:3,
15,23 125:23
126:17,18
127:12,16,17,
19,20,24
128:21 129:16
131:3 132:12
164:24 169:25
170:16,18,25
171:24 178:22
179:13,14,17,
22 180:14,22
181:24 184:25
185:1 197:17
198:14,21
199:1 200:10
203:9,23
208:22 245:5,6
247:5 251:23,
24 252:9,14
253:24 259:16,
17,20,21,25
260:18 261:14
262:14,19
272:11

suspect's
113:20 168:14
196:24 197:15
245:2

suspected
64:12 65:6

suspects
21:14 63:21
64:2 65:2,5
93:13,17
110:10,21
117:24 119:23
145:22 151:1
177:21 199:20
209:5 253:23
259:12 267:16
271:5 272:5

suspicious
15:10 78:23

swear 7:15

switched 19:8

switching
16:14

system 22:4,9
37:1,4 151:21
176:17 253:1,6
254:1

systems
212:23 215:2

---

**T**

tact 17:7,16

tactical 17:5

tainted 93:25

takeaways
21:10

takes 176:6
256:22 257:12

taking 7:22
16:25 60:11
105:19 107:25
112:17 123:6
138:6 139:4
147:17 194:5
215:8 223:22
224:13 253:19,
20

talk 8:11 36:12
119:5 123:9
128:20 131:10
133:12 144:8

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 111 of 114 PageID #:54022
The Deposition of RONALD S. HUTCHINS, taken on November 1, 2023

327

150:4,5,7 152:9
180:20 194:5
196:18 197:23
198:17 199:22
202:9 207:3
211:5 232:20
233:15,16,19,
21 234:1
252:23 256:11
257:23 276:11
284:10

**talked** 21:12,13
110:18 118:21
144:22 165:15
174:1 177:11
178:2,3,10
193:7 203:15
206:17 209:13
217:19 233:9,
11,13 234:20
237:20 267:3
270:14 271:7
272:6 278:25
281:7,9,12
282:10,12,18,
20

**talking** 15:2
36:13 42:25
60:12,13,14,17
61:18,19 81:17,
18 83:17 86:13
89:21,24
113:10 118:6
119:22 128:16
133:13 134:4
136:7 140:15
142:14,15
144:5 149:24
152:6 181:18
202:12 218:9
220:22 226:14
231:18,19
232:16,21
234:21,23
242:22 250:25
265:2,3 284:8

**talks** 132:18
150:13 177:8,9

**Talman**
186:22,23
188:17

**task** 14:15,21
15:16 22:18

209:2 211:2,7
255:13 257:5

**tasks** 11:11
268:5,7

**Tate** 6:3 55:6
106:22 166:25
228:12 255:4

**tattoo** 115:21
116:13 181:6,
16 261:3

**tattoos** 90:15
181:10,18,20,
24 182:1

**taught** 289:21

**team** 14:14
15:11 16:12
209:2,3,12
231:15 245:25
253:21 257:6

**tech** 42:17
131:6 251:17

**technician** 6:3
12:3

**techniques**
272:5

**technology**
36:22 214:22
216:20

**teenagers**
232:23 233:13

**telling** 115:15,
18,19 163:22
205:5 280:12

**ten-minutes**
254:7

**tend** 93:5
162:22 231:21

**tendered**
242:19 243:21

**tending** 108:9

**term** 35:12,13
122:24 232:3
284:1

**terminology**
31:14

**terrible** 204:6

**test** 67:7,20
231:17

**tested** 68:5
69:8,22 70:1

**testified** 99:5
108:10 111:24
115:5 134:9
141:3 168:11
171:20 179:12
181:6 217:5
218:24 229:18
232:1 235:16
260:12

**testifies** 194:2

**testify** 107:22
109:7 192:20

**testifying**
112:20 243:17

**testimonies**
193:2 194:16,
21 272:11

**testimony**
7:16 18:14
39:18 40:1
62:11 64:4
68:18 69:6 70:7
81:11 88:6,18
89:11 92:8,17
98:16 100:21
107:6,11,21
108:12,18,25
109:16,21
110:3 111:13,
15 112:3,14,15,
17 113:15
120:15 127:5
130:10 131:8
134:7,18
135:20 136:19
139:2 143:6
158:24 168:5
172:24 175:12
187:7,9 188:9
189:21,25
190:17 192:23,
25 193:17
194:1 195:16,
17 196:19
198:7,12
206:11 207:3
208:9 217:14

218:22 223:16
224:12,21,23
225:1,8 226:8
229:5 242:2,15,
16 243:11
255:15 257:3
268:17 275:15
284:2,4 287:13

**text** 48:8

**theft** 14:1

**thereof** 49:13

**Theresa** 6:21
254:6 280:24
288:6 290:4

**thin** 202:20

**thing** 12:4
20:18 34:15
48:7 122:19
236:2 253:24
281:16

**things** 22:23
143:1 153:19,
24 154:5 200:9,
13 214:14
216:18,21,24
218:8 234:2
239:11 252:5
263:19

**thinking**
105:20 118:7
175:18

**thinks** 153:25
154:5

**thought** 22:17
33:7 109:7
110:24 127:12,
16 214:8 215:7
220:25 231:21

**thoughts** 49:9
50:5

**three-man**
83:23

**throw** 15:13

**throwing**
158:20

**thrown** 229:12

**Tiderington**

32:17,23 50:11
119:9 132:8,11
135:11 136:4,
16 142:2 145:4
147:5 149:21
150:1,16 153:9
231:10 260:15
261:21 262:13
263:11

**Tiderington's**
30:21,24 31:3,
16 32:6,7 33:7
50:9 78:13
79:25 80:1
101:2 134:22
135:23 136:14,
20 141:25
145:1 147:23
151:24 155:18
176:7 260:11

**tie** 215:7

**ties** 175:25

**till** 106:10,11

**time** 6:7 7:23
8:11 10:5,6
11:15,21 13:23
15:18 16:14
17:10,25 18:15
19:2,22 26:19
33:12 34:21
39:15 40:21
43:7 55:2,7
57:24 58:20
62:4,18 71:12
73:4 74:11,18
78:12 79:3
91:9,14,23
92:3,20,25
94:18 98:7
103:17 106:16,
23 108:23
113:20 123:21
143:7 146:5
148:21 152:18
160:25 166:21
167:1 172:6
173:25 185:10
187:17 190:3
194:4 195:15
196:6,20
203:15 209:1
223:10 225:6
227:24,25

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 112 of 114 PageID #:54023

228:8,13 229:1,2 232:6,12 235:22 236:1 254:24 255:5 261:6 262:3 264:19 265:7 268:17 270:10 276:10 278:2 284:3 291:19

times 8:6 9:25 10:2 26:16 41:10,13 74:16 111:16 140:7,8, 17 194:3 200:5, 19 204:1 209:5, 7,9,10 213:19 217:20 235:1 275:4

tiny 215:3

tire 260:25

title 52:7

titled 94:6

today 6:4,6 7:23 8:1 9:6,14 10:3 23:15 40:11,18,19 55:6 106:22 166:25 200:5 217:20 228:12 255:4 278:25 282:24 283:3,4, 14

today's 261:4

told 39:7 67:10 97:15 113:6,9 115:10 133:25 204:17 205:12, 23 244:14,16 245:6 260:22 275:17 283:7 287:11

tone 87:8,10 88:3

top 111:9 136:1 215:4 241:1,3

topic 103:3 227:20

topics 36:21, 22

tore 209:8,15

tort 38:5

total 10:4 15:4 18:23 41:6 276:21

totality 115:1,2

totally 159:24

touch 181:5 271:21,23

touched 19:17 21:15 271:23 272:12 282:19 284:7

tough 19:25 128:10 182:7

tour 12:14 139:17

town 15:9,13 36:7 267:13,22

towns 267:7,8

track 15:3 40:9 267:10

traffic 11:7 12:13 34:9 63:8

trained 146:10, 20 155:6 157:2, 23 158:14 159:8 234:1 238:5 271:19 272:7 283:8

training 12:9, 24 20:19,23 21:2 37:22 55:16 103:13 110:20 129:14 147:1,2,4 150:23 152:12 154:16 155:9, 19 156:25 157:12,14 158:2,9 174:8 197:4 200:1,20, 23 201:7 211:1, 2,8 232:5,10 244:24 245:23 253:20 255:11 256:18 271:22, 25 272:1,7,18

275:11,24,25 276:3,4 277:22 278:10,11,14, 15,16,19 279:2 281:21,25 282:6,7,12,25 283:1,5,7,13 289:6,20

trainings 36:20,21 37:17, 24 146:22 200:19 201:1 271:18 273:7 274:2 275:16, 19 278:1 279:4 282:11

transcript 45:5,9 69:6 186:14,19 188:4 189:17 190:1 218:25 221:13

transcripts 189:23 243:1

transition 214:2,3 215:1 278:22

transitioning 212:22 214:5

trauma 92:18, 23 168:25

traumatic 92:5

tree 270:18

trial 45:9 98:16 112:14,17 168:11 186:14 188:9 193:11, 18 198:4 217:13 224:23 225:8 238:15 239:21,22,25 240:3 242:18 263:15 272:11 284:3,20 287:23

triple 257:8

Triton 11:19

trouble 70:14 98:20 99:22

true 68:17 69:6 92:23 113:1 145:23 151:2 169:6 198:19, 20 200:11 202:7 206:5 244:23 247:15 255:18 261:12 279:20

trust 142:23

truth 7:17 55:22 193:3,4 194:17,24 195:9 225:15 243:7 247:9 256:19

truthful 42:10 56:10 96:4 219:4 236:17

truthfully 9:6

tunnel 122:8, 11,12,13,16,17, 18,21,22,25 123:9,10,25 124:1,8,10 126:23,25 127:2 132:8,9, 11 176:8 259:18,20

turn 116:23 136:12 161:13 225:25 245:1 246:10 252:25

turned 11:8 39:4 121:1 124:6 161:19 162:5 213:7,9, 10 225:20,23 229:8 240:8 241:22,24 261:6,25 271:11 287:13

turning 151:9, 14

two-part 205:22

tying 217:4

type 14:8 22:17 28:8 36:17 140:3,7

typed 108:8 216:9

types 13:22

typewriter 216:10

typically 249:5

typing 140:14 214:6

typo 107:24 108:4,10,21,25 109:3,6 111:15 112:1,4,20 283:19,21,22

_____

U

U-I-C-H 7:6

Uh-huh 170:10 192:9

ultimate 146:6 152:19

ultimately 18:5 270:4

unable 91:23 272:20

uncomfortable 181:19

uncovered 124:14

uncredible 125:14

understand 8:24 60:2 147:15 151:23, 24 192:5 222:7, 11 262:13 263:10 278:23 281:22

understanding 18:14 92:17 108:18 111:13 122:23 136:19 143:6 144:17 148:12,23 149:6 154:9 172:23 175:12 176:25 185:10 198:6 206:18



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-9 Filed: 05/16/25 Page 113 of 114 PageID #:54024
The Deposition of RONALD S. HUTCHI, taken on November 19, 2021

329

208:8 273:1,5,
17 274:20
275:15

**Understood**
8:15 194:22

**unique** 17:13

**unit** 14:18 16:6,
7 17:3,5,8
62:19,23
268:11

**United** 6:11

**units** 117:19

**University**
266:4 272:2
282:16

**unreliable**
107:17

**unsure** 168:8

**untruthful**
56:10 237:11

**unusual**
124:21

**upcoming**
16:4

**updated** 20:23

**ups** 288:10

---
**V**
---

**vacation**
139:24

**vague** 32:8
38:9 61:6,8
113:22

**van** 66:19
67:16

**vantage** 167:5

**varying** 116:23

**veered** 134:7

**vehicle** 58:24
59:14

**vein** 125:21

**verbal** 8:2
275:1

**versa** 114:2

**verse** 266:16,
22

**version** 189:1

**versions** 44:1

**vice** 114:2

**victim** 266:1
279:6,14

**Victor** 172:19

**video** 6:3,8
55:6 67:5
106:22 166:24
228:11 255:3
290:14 291:11,
13

**view** 24:2 36:7
49:12 83:1
133:9

**viewed** 32:22
33:4 44:9
71:18,21,24
72:2,6,9,20
74:17 81:16
173:21 183:22
192:25 235:16

**viewing** 62:2
72:23 74:16
172:5 210:17
235:9

**views** 35:15
153:10

**village** 11:8,10
12:12 34:6 63:9

**violation** 53:3

**violent** 14:15
261:5

**vision** 122:8,
11,12,13,16,17,
18,21,22,25
123:9,10,25
124:1,8,9,10
126:24,25
127:2 132:8,9,
11 176:8
259:18,20

---
**W**
---

**W.M.** 73:18,21

**Wabansia**
186:21 188:15

**waiting** 202:8

**walk** 213:16,21
234:23

**walked** 186:21
188:15 191:3,
14

**walking**
237:25

**wanted** 16:3,5
131:18,24
163:9 206:13
214:8 217:23
238:12 246:1
250:13 260:18
276:14

**Washtenaw**
186:21 188:15,
16

**watch** 206:13,
20

**watched**
206:16

**watching**
206:15

**ways** 96:14
159:5

**weapon** 67:11,
21,22

**weapons**
34:19 67:25

**wearing** 97:11

**Wednesday**
206:23

**week** 141:19
142:14 151:12
203:16

**Week's** 263:9

**weekday**
203:10,24

**weeks** 94:21
95:2 146:17
158:11 159:1,9
160:1,4,8,12
203:10,18,20,
24 205:12
260:17,18
261:1,14
262:18,25

**weigh** 223:23

**weight** 89:22
210:21 224:12

**weird** 265:14

**West** 6:5
260:23

**Western**
260:25

**What'd** 156:17

**whatsoever**
105:1,13
114:21 134:1
141:17 142:19
143:4 148:10
175:7 182:22
203:22

**whichever**
276:14

**white** 65:25
103:19 104:22
105:5,12
163:22,24
164:4

**wholesale**
36:24 37:3

**Wi-** 189:2

**Wi-fi** 189:10

**widespread**
55:12

**William** 73:16

**win** 206:22

**window**
273:11,15

**withholding**
202:10

**witness's**
99:23 127:18,

22 166:7

**witnessed**
92:5 109:24
212:8 260:22

**witnesses**
63:21 64:2,21
75:17 76:8,9
78:3,8 79:1
92:4,10 93:12,
16 96:11
109:24 110:9,
17,20 117:22
119:5,22 120:6
129:7 135:11,
23,25 136:2,6,
7,9,10,17,20,22
137:1,3,5,10,25
143:19 146:15
158:5 163:6,11
167:5,13,17
169:25 170:15,
23 194:25
195:10 207:24
209:4 215:9
231:10,11
232:22 233:24
257:24 263:14
268:1 286:12,
13

**witnessing**
117:16

**won** 204:18

**word** 31:7,9,10
39:6 40:10
76:21 108:20
120:2 122:12,
13,17,22
123:25 124:8
205:3 217:25
218:1,20 239:4,
7 283:20,21
284:17

**worded** 265:14

**wording**
193:16

**words** 133:5
162:3 179:20
183:18,24
219:18 236:6
245:21

**work** 13:3,22

Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

14:1,8 15:15,18
19:15 28:5 30:3
38:7 40:8,10,24
42:4 84:2 99:15
131:4 202:9
267:20 285:7

**workday** 40:14

**worked** 33:12
36:6 42:3 56:5
202:3 231:5
270:16,20

**working** 12:19
33:19 34:7,9
40:12,16
139:22 200:20
202:3

**works** 105:15

**world** 139:21
140:4,5,14
149:25 150:2,
14 152:2,6
168:19 182:5

**worries** 189:5
242:10

**worth** 106:1

**would've**
54:11 121:21,
23 123:23
124:10 126:12
130:14 132:1,6
144:2,4,8,18,
21,22 177:24
193:9,10
202:19,20
204:11 207:1,2
215:8 225:23
262:7 288:22

**wrap** 263:20

**write** 27:3,6,9,
21 157:7
159:14 196:4
216:14,16

**writer's** 109:3

**writing** 21:22
26:3 40:22
103:18 142:18
143:18,19
146:23 157:19,
20,23,24 255:8

262:22

**written** 9:11
34:25 140:22
145:20 150:24
151:5,7,14
214:4 215:22
229:16

**wrong** 81:6
82:23 110:13
121:23 187:20

**wrongly** 48:21
57:2

**wrote** 23:16
29:11 50:4
58:6,13 141:5,
12 142:8
167:24 194:6
263:11 285:8

---

**Y**

**year** 12:10,14,
18,19 14:11
19:21,24,25
21:5 29:22
35:5,9,11 142:2
175:19 232:7
269:8 272:18,
25 275:21
276:3,4,20
277:2,3,13
288:16,18
289:7

**year-old**
234:24

**years** 11:9,14,
15,16 12:15
13:2 19:4 20:1
36:17 37:12,22
79:1 93:19
110:16 123:13
131:7 134:2
149:22 153:5
169:21 185:19,
25 201:6 202:3
232:3 245:24
249:18 251:18
252:3,19
253:22 257:4,5
273:12 274:4,
22 277:12
281:19,21

**years-old**
233:21

**yellow** 105:6
286:11

**York** 282:21

**young** 85:24
86:1,9,11,25
87:1,4,6 104:1,
25 179:18,23
182:11 198:1
231:5 232:22
266:14 270:11

**younger** 131:5
231:10,11

**youngest**
86:18

---

**Z**

**zeros** 43:10

**Zoom** 9:19
10:2 128:16
189:8



Kentuckiana Reporters
P.O. Box 3983
Louisville, KY 40201

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com