EXHIBIT 11

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## — COURT REPORTERS —

## CASE NO. 1:19-CV-6508; CASE NO. 1:18-CV-03029

## GERALDO IGLESIAS

## V.

## REYNALDO GUEVARA, ET AL.

## DEPONENT:

## BERNARD MURRAY

## DATE:

## May 10, 2023



a courtroom
**powerhouse**

✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
           HON. FRANKLIN U. VALDERRAMA,
3               DISTRICT JUDGE
             HON. MARIA VALDEZ,
4              MAGISTRATE JUDGE
           CASE NO. 1:19-CV-6508
5           CASE NO. 1:18-CV-03029

6

7              GERALDO IGLESIAS,
                Plaintiff

8

9                  V.

10           REYNALDO GUEVARA, ET AL.,
               Defendants

11

12                  AND

13

14            THOMAS SIERRA,
                Plaintiff

15

16                  V.

17           REYNALDO GUEVARA, ET AL.,
               Defendants

18

19

20

21

22

23  DEPONENT:  BERNARD MURRAY

24  DATE:       MAY 10, 2023

25  REPORTER:  SYDNEY LITTLE



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1                      APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, GERALDO IGLESIAS, THOMAS

4    SIERRA:

5    Anand Swaminathan, Esquire

6    Annie Prossnitz, Esquire

7    Loevy & Loevy

8    311 North Aberdeen Street

9    Third Floor

10   Chicago, Illinois 60607

11   Telephone No.: (312) 243-5900

12   E-mail: anand@loevy.com

13   prossnitz@loevy.com

14   (Appeared via videoconference)

15

16   ON BEHALF OF THE DEFENDANTS, ANTHONY RICCIO, ROBERT

17   BIEBEL, ERNEST HALVORSEN, STEVE GAWRYS:

18   Jeffrey R. Kivetz, Esquire

19   The Sotos Law Firm, P.C.

20   141 West Jackson Boulevard

21   Suite 1240A

22   Chicago, Illinois 60604

23   Telephone No.: (630) 735-3300

24   E-mail:  jkivetz@jsotoslaw.com

25   (Appeared via videoconference)
```

Page 3

```
1                 APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:

4    Theresa Carney, Esquire

5    Rock Fusco & Connelly, LLC

6    321 North Clark Street

7    Chicago, Illinois 60654

8    Telephone No.: (312) 494-1000

9    E-mail: tcarney@rfclaw.com

10   (Appeared via videoconference)

11

12   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

13   Megan McGrath, Esquire

14   Leinenweber Baroni & Daffada LLC

15   120 North LaSalle Street

16   Suite 2000

17   Chicago, Illinois 60602

18   Telephone No.: (866) 786-3705

19   E-mail: mkm@ilesq.com

20   (Appeared via videoconference)

21

22

23

24

25
```

Page 4

```
1                        INDEX

2                                                    Page

3    PROCEEDINGS                                        6

4    DIRECT EXAMINATION BY MR. SWAMINATHAN              8

5

6                      EXHIBITS

7    Exhibit                                          Page

8    1 - Bernard Murray's Expert Report on Thomas Sierra

9        Case                                          27

10   2 - Chicago Police Department Special Order

11       83-1 - RFC- Solache/Reyes 117527              61

12   3 - Bernard Murray's Materials Reviewed on Thomas

13       Sierra Case                                  102

14   4 - Bernard Murray's Curriculum Vitae            103

15   5 - Bernard Murray's Materials Reviewed on Geraldo

16       Iglesias Case                                119

17   6 - Demetrius Johnson Investigative File -

18       RFC-Johnson 1-37                             166

19   7 - Bernard Murray's Expert Report on Geraldo

20       Iglesias Case                                192

21   8 - Geraldo Iglesias Investigative File -

22       RFC-Iglesias 1-112                           197

23

24

25
```

Page 5

```
1                      STIPULATION

2

3    The VIDEO deposition of BERNARD MURRAY was taken at

4    KENTUCKIANA COURT REPORTERS, 110 NORTH WACKER DRIVE,

5    CHICAGO, ILLINOIS 60606, via videoconference in which

6    all participants attended remotely, on WEDNESDAY the

7    10th day of MAY 2023 at 10:05 a.m. (CT); said VIDEO

8    deposition was taken pursuant to the FEDERAL Rules of

9    Civil Procedure. THE OATH IN THIS MATTER WAS SWORN

10   REMOTELY PURSUANT TO FRCP 30.

11

12   It is agreed that SYDNEY LITTLE, being a Notary Public

13   and Court Reporter for the State of ILLINOIS, may swear

14   the witness and that the reading and signing of the

15   completed transcript by the witness is not waived.

16

17

18

19

20

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 5 of 82 PageID #:54293
The Deposition of BERNARD MURRAY, taken on May 10, 2023
6..9

Page 6

PROCEEDINGS

1    THE REPORTER:  We are on record.  My name is
2  Sydney Little.  I'm the online video technician and
3  court reporter today representing Kentuckiana Court
4  Reporters, located 110 North Wacker Drive, Chicago,
5  Illinois, 60606.  Today is the 10th day of May 2023,
6  and the time is 10:06 a.m. Central.  We're convened
7  by videoconference to take the deposition of Bernard
8  Murray in the matter of Geraldo Iglesias v. Reynaldo
9  Guevara et al., and Thomas Sierra v. Reynaldo
10 Guevara et al., pending in the United States
11 District Court for the Northern District of Illinois
12 Eastern Division, case number 1:19-CV-6508 and case
13 number 1:18-CV-03029. Will everyone but the witness
14 please state your appearance, how you're attending,
15 and the location you're attending from, starting
16 with Plaintiff's Counsel?
17    MR. SWAMINATHAN:  Anand Swaminathan for
18 Plaintiffs Thomas Sierra and Geraldo Iglesias,
19 appearing by Zoom from Chicago along with my
20 colleague, Annie Prossnitz.
21    MR. KIVETZ:  Oh, I can go next.
22    MS. CARNEY:  Theresa -- oh, sorry, Jeff.  Go
23 ahead.
24    MR. KIVETZ:  Jeff Kivetz appearing via Zoom in
25

Page 7

1  Chicago, Illinois on behalf of all of the individual
2  defendant officers, except for Guevara and both
3  Iglesias and Sierra.
4     MS. MCGRATH:  Megan McGrath appearing by Zoom
5  in -- for -- in all the cases for Defendant Guevara.
6     MS. CARNEY:  Theresa Carney on behalf of the
7  City of Chicago as well as the witness, appearing
8  from -- on Zoom from Chicago with the witness
9  present.
10    THE REPORTER:  Thank you.  Mr. Murray, will you
11 please state your name for the record?
12    THE WITNESS:  Yes.  Bernard Murray.
13    THE REPORTER:  Thank you.  And do all parties
14 stipulate that the witness is in fact Bernard
15 Murray?
16    MR. SWAMINATHAN:  So stipulated from
17 Plaintiff's side.
18    MS. MCGRATH:  Yes.
19    MS. CARNEY:  Yes.  We have the defense on
20 behalf of City of Chicago.
21    MR. KIVETZ:  Stipulated.
22    THE REPORTER:  Thank you.  And sir, will you
23 please raise your right hand?  Do you solemnly swear
24 or affirm that the testimony you're about to give
25 will be the truth, the whole truth, and nothing but

Page 8

1  the truth?
2     THE WITNESS:  I do.
3     THE REPORTER:  Thank you.  Counsel may begin.
4            DIRECT EXAMINATION
5  BY MR. SWAMINATHAN:
6     Q.  Good morning, Mr. Murray.  How are you?
7     A.  Okay.  Good morning to you.
8     Q.  Good morning to you.  Have you given a
9  deposition before?
10    A.  Yes.
11    Q.  How many times in your capacity as an expert?
12    A.  Four, I think.
13    Q.  Have they all been related to your opinions
14 about Chicago Police Department files and disclosure
15 obligations?
16    A.  They have.
17    Q.  Have you ever offered any expert opinions in
18 any matters not involving the City of Chicago to date?
19    A.  I have not.
20    Q.  And have you ever been deposed in any capacity
21 outside of your role as an expert?
22    A.  Yes.
23    Q.  How many times?
24    A.  Once.
25    Q.  And in that instance, were you deposed based

Page 9

1  on your work as a prosecutor?
2     A.  Yes.
3     Q.  Were you defendant in that case?
4     A.  I was not.
5     Q.  Do you know what the allegations were in that
6  case?
7     A.  Allegations were against the -- the Chicago
8  Police officers and I -- I guess the city regarding
9  charges brought against a criminal defendant.
10    Q.  And in that case, had the criminal defendant
11 been exonerated?
12    A.  He -- I'm not sure if -- if exonerated, you
13 mean actual innocence petition.  I'm not sure if that is
14 -- was true, but I know he was released from custody.
15    Q.  In that case, was the conviction vacated?
16    A.  Yes.
17    Q.  And he filed a lawsuit against the City of
18 Chicago and various officers I take it?
19    A.  Yes.
20    Q.  And you were not sued in that case, correct?
21    A.  I was not.
22    Q.  Were you the trial prosecutor of that case?
23    A.  One of them, yes.
24    Q.  Was there an allegation of a Brady violation
25 in that case?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 6 of 82 PageID #:54294
The Deposition of BERNARD MURRAY, taken on May 31, 2023
10..13

Page 10

1      A.   Not that I'm aware of.  Well, not that I'm
2  aware of.
3      Q.   Is that the Desmond Weston case?
4      A.   Demond Weston.
5      Q.   Thank you.  And you indicated that there were
6  no Brady claims in that case; is that right?
7           MS. CARNEY:  Objection.  Form.  Misstates his
8  testimony.
9           THE WITNESS:  I -- I -- I'm -- frankly, I'm not
10 sure.
11 BY MR. SWAMINATHAN:
12     Q.   In that case, did you disclose all of the
13 information you received from the Chicago Police
14 Department to the criminal defense attorneys?
15     A.   Yes.
16     Q.   Have you had any cases in which you have
17 failed to disclose all of the documents you received
18 from the Chicago Police Department to the criminal
19 defendants?
20     A.   No.
21     Q.   Has it always been your practice to disclose
22 all documents you received from the Chicago Police
23 Department to criminal defendants?
24         MR. KIVETZ:  Objection.  Form.
25         THE WITNESS:  Yes.

Page 11

1  BY MR. SWAMINATHAN:
2      Q.   Go ahead.
3      A.   Yes.
4      Q.   In the Desmond Weston -- in the Demond Weston
5  case, did you go to the police department and personally
6  gather files to ensure that you had everything from the
7  Chicago Police Department?
8          MS. CARNEY:  I'm going to object to the form
9  and foundation.  And to the extent that you're going
10 to continue on this line of questioning, he's
11 already been deposed in the Weston case.  I'm going
12 to object to you asking any more questions on the
13 Weston case.  It is irrelevant.  His attorney in the
14 Weston case is not here, and you're attempting to do
15 additional discovery in an unrelated case.
16         MR. SWAMINATHAN:  Just to -- just -- yeah.  Just
17 so the record's clear, I'm not trying to do
18 discovery in a separate case.  I'm trying to
19 understand his policies and practices as applied as
20 a prosecutor.  He talks about his perspective as a --
21 on what are policy -- good policies from a
22 prosecutor's perspective.  And so, I want to
23 understand a little bit about what his actions have
24 been in other cases.  And this is a case that's easy
25 to talk about because it's one he remembers because

Page 12

1  he got -- because he got deposed on that case.  So I
2  only have a few other questions about it, but I'll
3  just -- that -- that's my response to your -- to
4  your objection.
5          MS. CARNEY:  Okay.  Well, I'm -- I think you've
6  done enough background on the Weston case, and so if
7  you're going to ask him about his practices
8  generally, that's fine.  But I'm not going to let
9  him testify any anymore about what he did personally
10 in the Weston case in light of the fact that he was
11 subpoenaed as a witness, he's given a deposition,
12 and he has a separate attorney that represented him
13 in that deposition.
14         MR. SWAMINATHAN:  All right.  I'm going to ask
15 my question --
16         MS. CARNEY:  And that's --
17         MR. SWAMINATHAN:  I'm going to ask you my -- I
18 have one other question I'm going to ask him, and
19 you can instruct him not to answer if you're going
20 to instruct him not to answer and we'll just
21 litigate it.
22 BY MR. SWAMINATHAN:
23     Q.   Mr. Murray, in the Weston case, are you able
24 to say confidently that the Chicago Police Department
25 provided you with all of the investigative information

Page 13

1  that it learned during the course of that investigation?
2          MR. KIVETZ:  Objection to form.
3          MS. CARNEY:  Objection.  Same objection that
4  I've listed before.  And Mr. Murray, I would advise
5  you not to answer that question.
6  BY MR. SWAMINATHAN:
7      Q.   You're going to follow your attorney's advice?
8      A.   I am.
9      Q.   Mr. Murray, are you being paid for your time
10 in the Geraldo Iglesias matter?
11     A.   I am.
12     Q.   And are you being paid for your time in the
13 Thomas Sierra matter?
14     A.   I am.
15         MR. SWAMINATHAN:  I have not received invoices
16 for either of those matters.  Counsel, do you have
17 invoices for those matters?
18         MS. CARNEY:  Yes.  We just received them either
19 late last night or this morning, so I'm having them
20 Bates stamped and should be able to get them
21 produced shortly.
22 BY MR. SWAMINATHAN:
23     Q.   Okay.  We'll come back to that.  Sir, when I
24 last deposed you, my understanding was that you were
25 unable to receive payment from the city for your

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 7 of 82 PageID #:54295
The Deposition of BERNARD MURRAY, taken on May 31, 2023
14..17

Page 14

1 opinions in the Reyes case. Is that a correct
2 characterization in the Reyes case?
3     A.   Yes, it is.
4     Q.   And it sounds like you resolved that matter
5 how?
6         MS. CARNEY:  Objection.  Form.  You can answer.
7         THE WITNESS:  I discussed the matter with my
8     boss, and he agreed that I could be compensated on
9     these cases.
10 BY MR. SWAMINATHAN:
11    Q.   And what hourly rate are you being paid for
12 your work in the Geraldo Iglesias case?
13    A.   $200.
14    Q.   And what compensation are you being paid for
15 your work in the Sierra case?
16    A.   Same.
17    Q.   And is it 200 -- are you being paid $200 for
18 your review of materials and report preparation?
19         MR. KIVETZ:  Objection.  Form.  $200 per hour
20     is what we're saying, right, on --
21 BY MR. SWAMINATHAN:
22    Q.   Yeah.  Thank you.  Yeah.  Let me clarify.  Are
23 you being paid $200 per hour for your review of
24 materials and doc and report preparation?
25    A.   Yes.

Page 15

1     Q.   And are you being paid a different sum for
2 your deposition time?
3     A.   Deposition and testimony in court would be
4 compensated at a rate of $300 per hour.
5     Q.   Okay.  How many hours did you spend on the
6 preparing your -- strike that.  How many hours did you
7 spend reviewing materials in the Iglesias case?
8     A.   I'd have to look at the -- the invoice.  It
9 was more time on -- on Sierra than Iglesias.
10    Q.   How many hours did you spend reviewing
11 materials in the Sierra case?
12    A.   I'd have to look -- refresh my memory with the
13 invoice.
14    Q.   And why do you spend more time in Sierra than
15 in Iglesias?
16    A.   Well, Iglesias was the expert opinion.  The
17 plaintiff's expert opinion played off in large extent on
18 what was already composed in Sierra.  So in Iglesias, I
19 only had to address some additional matters included in
20 that expert report.
21    Q.   And so, if I understand you correctly, you --
22 I take it you reviewed some additional materials before
23 prepare -- strike that.  After you offered opinions in
24 the Reyes case, you subsequently offered opinions in the
25 Sierra case, correct?

Page 16

1     A.   That is correct.
2     Q.   And then after the Sierra case, you then
3 offered opinions in the Iglesias case, correct?
4     A.   That's correct.
5     Q.   And putting aside your case specific opinions
6 related to Sierra and Iglesias, are you offering any new
7 opinions in Sierra and Iglesias different from what you
8 offered in the Reyes case?
9         MR. KIVETZ:  Objection to form and foundation.
10        THE WITNESS:  I don't think --
11        MR. KIVETZ:  Go ahead.
12        THE WITNESS:  I don't think so.
13 BY MR. SWAMINATHAN:
14    Q.   Okay.  Fair to say that your opinions
15 regarding Chicago Police Department's policies and
16 practices remain the same from Reyes to Sierra and
17 Iglesias?
18    A.   Yes.
19    Q.   And after the Reyes case, when you offered
20 opinions in the Sierra case, what additional materials
21 did you review for offering your opinions in Sierra?
22    A.   In Sierra, there was a discussion of -- I
23 think it's specifically eight cases that the expert
24 talked about specifically.  But in earlier part of the
25 report, he referred to numerous pages that he said were

Page 17

1 not -- either not provided or not transcribed into
2 supplemental reports.  So those numerous pages examined
3 those as well as the -- the eight cases.
4     Q.   You said in addition to the eight cases?  I
5 missed the last part of what you said.
6     A.   I said I examined those pages, specific pages,
7 earlier in his report, and then I examined the eight
8 cases.  So the -- the pages were in a section of reports
9 comparing general progress report notes, investigatory
10 material, and whether it was included or not in -- in
11 the -- in the typed supplemental report.  So after that
12 examination, I also examined the eight cases that he
13 cited as examples.
14    Q.   Okay.  And the eight cases that he cited as
15 examples, were those new or different cases than what he
16 had cited in Reyes?
17    A.   My recollection is they were the same.
18    Q.   Okay.  So did you do additional review of
19 those eight cases for Sierra after you'd already done it
20 in Reyes?
21    A.   Yes.
22    Q.   And what additional review did you do of those
23 cases?
24    A.   Compared the analysis that I had provided
25 earlier.  I think there was some additional information

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  that I included in my reply on the eight cases. And
2  obviously examined the plaintiff's expert's report to
3  see if there's anything different in the way he
4  presented the eight cases.
5      Q.   And did you find there's anything different in
6  how he had presented the eight cases in Sierra?
7      A.   Not that I recall.
8      Q.   And what was different about the -- your
9  conclusions with regard to those eight cases in Sierra
10 compared to your opinions in Reyes?
11     A.   I think on the Johnson case, I had received
12 more information regarding a -- an attorney or in -- I'm
13 sorry, take that back.  Additional information on a
14 deposition of Johnson and information he revealed there.
15 That was information I didn't have in the past.
16     Q.   And what was the deposition that you received
17 from the Johnson case?
18     A.   It was Johnson's deposition.
19     Q.   Demetrius Johnson's deposition.  Is that what
20 you're saying?
21     A.   Yes.
22     Q.   Okay.  Any other depositions that you also
23 reviewed related to the Demetrius Johnson case that you
24 didn't previously have -- didn't have in Reyes?
25     A.   Not -- no.  Not --

Page 19

1      Q.   And so, you had previously reviewed the
2  depositions of then-prosecutor and now Judge Sheehan in
3  that case?
4      A.   I didn't read the whole deposition.  I -- I
5  think I was made aware of it.
6      Q.   You were made aware of the deposition.  Did
7  you actually read it?
8      A.   I did not.
9      Q.   And you -- were you made aware of a deposition
10 of any criminal defense attorneys from the Johnson case?
11     A.   Later I was.
12     Q.   Did you review the deposition of Mr. Johnson's
13 criminal defense attorneys at all?
14     A.   I -- I did not.  I was made aware of private
15 attorney's deposition, but I did not read it.
16     Q.   Okay.  And so, those -- and you -- you're
17 saying you did not review it in advance of your opinions
18 in Sierra, correct?
19     A.   That's correct.
20     Q.   And you did not review the depositions of
21 Mr. Sheehan or any private defense?
22     A.   Wait, can I ask you to clarify that question?
23     Q.   Yes.
24     A.   The one you asked, I did not --
25     Q.   Please.

Page 20

1      A.   Which -- which deposition?
2      Q.   Sierra.
3      A.   Okay.  Prior to Sierra, I had -- I had
4  reviewed the -- the Demetrius Johnson deposition.
5      Q.   Okay.  So let me make sure I understand. After
6  your -- after you offered your opinions in Reyes, you
7  subsequently received the deposition of Demetrius
8  Johnson and reviewed it, correct?
9      A.   Yes.
10     Q.   And that was before you offered your opinions
11 in the Sierra and Iglesias matters, correct?
12     A.   Yes.
13     Q.   Okay.  And prior to offering your opinions in
14 the Sierra matter, you were made aware of the deposition
15 of Prosecutor Sheehan, but you didn't review it,
16 correct?
17     A.   That's correct.
18     Q.   And prior to offering your opinions in the
19 Sierra matter, you were made aware of the depositions of
20 criminal defense attorneys, but you didn't review them,
21 correct?
22     A.   I don't think I knew of a deposition of a
23 criminal defense attorney at the time I wrote the Sierra
24 report.
25     Q.   Okay.  And so, ultimately you didn't rely on

Page 21

1  the depositions of any -- of Mr. Sheehan, the
2  prosecutor, or any private defense attorneys when you
3  offered your opinions in Sierra, correct?
4      A.   That's correct.
5      Q.   And then when you offered your opinions in the
6  Iglesias matter, had you reviewed the deposition of
7  Prosecutor Sheehan at all?
8      A.   I did not review it, no.
9      Q.   And when you offered your opinions in the
10 Iglesias matter, had you reviewed the depositions of any
11 private defense attorneys?
12     A.   I knew that a private defense attorney had
13 given a deposition, but I did not read the deposition.
14     Q.   And you knew at the time that you offered your
15 opinion in Iglesias that the prosecutor, Sheehan, had
16 given a deposition, but you didn't review it, correct?
17     A.   Yes.
18     Q.   Okay.  Other than -- the Johnson case is one
19 of the eight cases that you had reviewed and discussed
20 in the Reyes matter and then again in Sierra and
21 Iglesias, correct?
22     A.   Yes.
23     Q.   And as we've discussed, you reviewed the
24 additional deposition of Demetrius Johnson after the
25 Reyes case and before your opinions in Sierra and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 9 of 82 PageID #:54297
The Deposition of BERNARD MURRAY, taken on May 12, 2023
22..25

Page 22

1  Iglesias, correct?
2      A.  Yes.
3      Q.  Anything else you reviewed that was new
4  related to the eight cases after you had offered your
5  opinions in Reyes?
6      A.  Not that I can think of.
7      Q.  Did -- so -- and so you indicated that you did
8  some additional analysis of the Demetrius Johnson case
9  after Reyes based on the additional information you'd
10 been provided, correct?
11     A.  Yes.
12     Q.  Did you do any additional analysis of any of
13 the other seven -- any of the other eight cases?
14     A.  Other than what I already said, comparing the
15 expert's report and Sierra to the -- to the prior report
16 and then examining my analysis to what I had made
17 before.
18     Q.  Did you consult any notes or other documents
19 that you'd created during the course of the Reyes case
20 when you did that re-comparison?
21     A.  I'm not sure I understand your question.
22     Q.  Yeah.  Do you have any notes or other
23 documentation that you've created related to your review
24 of those eight cases from Reyes?
25     A.  That'd be my typed reports.

Page 23

1      Q.  Anything other than your typed report?
2      A.  Obviously the -- the files themselves.
3      Q.  Did you take any notes on the files?
4      A.  I did not.
5      Q.  Did you take -- did you write any -- did you
6  put any handwriting into the files -- into hard copies
7  of the files themselves as you conducted your review of
8  them?
9      A.  No.  My only recollection is maybe putting a
10 yellow sticky tab on a page so I could get back to
11 rereading it.  I was compiling my report.  I don't
12 recall writing any notes on the actual documents
13 themselves.
14     Q.  Did you write any notes --
15     A.  Many times, I --
16     Q.  Oh, I'm sorry.  Go ahead.  Go ahead.  Sorry.
17     A.  Many times, I would be reviewing police
18 reports on my laptop.  I wouldn't be writing notes.
19     Q.  And so, when you were doing your reanalysis of
20 the eight cases in Iglesias and Sierra, other than
21 comparing Mr. Tiderington's reports and your reports,
22 did you do any re-review of the actual underlying
23 investigative files and public RD files and so on?
24     A.  I don't -- I don't recall doing any re-review
25 of them.  If -- if I had forgotten underlying facts on

Page 24

1  the cases, I might've looked at a police report, but
2  there was no meaningful re-review.
3      Q.  And did you have any new opinions about any of
4  those seven files other than the Demetrius Johnson file?
5      A.  Not that I can recall, no.
6      Q.  Okay.  And then other than your review of
7  those eight cases that were discussed in your -- in
8  Mr. Reyes's opinions in the -- strike that.  Other than
9  your re-review of the eight files that were discussed in
10 Mr. Tiderington's reports in Reyes and Sierra and
11 Iglesias, was there any additional re-review that you
12 conducted when you -- before offering your opinions in
13 Sierra and Iglesias?
14     A.  Re-review, no.
15     Q.  Okay.  Were you provided with copies of
16 additional investigative files or RD files for purposes
17 of your review in Sierra and Iglesias?
18     A.  Yes.  The -- both in Iglesias and Sierra,
19 there were -- well, I take that back.  In Sierra there
20 was a series of documents that -- that -- that the
21 plaintiff's expert referred to, and they were tied to
22 certain RD numbers.  So I would examine those RD
23 numbers, those cases to -- to see what information -- to
24 see the pages that Mr. -- the plaintiff's expert
25 referred to and examine those pages in that fashion, as

Page 25

1  well as looking at the -- at the rest of the RD file.
2      Q.  Do you have a copy of your report in front of
3  you?
4      A.  I do.
5      Q.  Let's take a look at your report in Sierra
6  first, please.
7      A.  I have it in front of me.
8      Q.  You do.  Okay.
9          MR. KIVETZ:  Can you just give me a second?  I
10 need to pull it up.
11         MR. SWAMINATHAN:  Yeah.
12         MR. KIVETZ:  Well, you guys provided a link,
13 right?  Is it all in there?  Everything --
14         MR. SWAMINATHAN:  It's all in there.  Just let
15 us know when you're ready, Jeff.
16         MR. KIVETZ:  Yep.  Sorry.  I'm -- there's two
17 files, so I -- I'm just trying to get --
18 BY MR. SWAMINATHAN:
19     Q.  But maybe while Jeff does that, let me do a
20 little background stuff, Mr. Murray.  I know you've been
21 through the spiel before.  This is a deposition question
22 and answer session.  I'm asking you questions.
23 Obviously, you're answering them to the best of your
24 ability.  Please make sure you give verbal answers so
25 the court reporter can write down everything that's



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

```
 1  being said, okay?
 2       A.  Yes.
 3       Q.  Okay.  If I ask you a question and you don't
 4  understand my question, please tell me and I will
 5  rephrase the question, okay?
 6       A.  Yes.
 7       Q.  Okay.  If you need to take a break --
 8       MR. KIVETZ:  Do you have, like, what number it
 9  is in your deposition exhibits?  Because all I see
10  is Brassfield report Fields.  I mean, I can pull it
11  up obviously, but I'm just trying to work off this
12  one.
13       MR. SWAMINATHAN:  If you go -- if you put them
14  all in order, like in alphabetical order, all the
15  documents that were just sent over to you guys,
16  there should be one called Sierra -- where is it
17  here?
18       MR. KIVETZ:  Got it.
19       MR. SWAMINATHAN:  Sierra --
20       MR. KIVETZ:  It's not numbered.
21       MR. SWAMINATHAN:  Okay.
22       MR. KIVETZ:  Got it.
23  BY MR. SWAMINATHAN:
24       Q.  Okay.  What was I just saying to you?  If you
25  need to take a break at any time, please let us know and
```

Page 27

```
 1  we'll take a break, okay?
 2       A.  Yes.  I understand.
 3       Q.  The only rule is that you answer any pending
 4  question before we take a break, fair?
 5       A.  Yes.  I'll answer the questions before a
 6  break.
 7       Q.  Okay.  This is a yes or no question.  I'm not
 8  asking about your medical history.  Do you have any
 9  medical conditions that would prevent you from being
10  able to understand my questions and answer them today?
11       A.  No.
12       Q.  Are you taking any medications that would
13  prevent you from being able to understand my questions
14  and answer them today?
15       A.  No.
16       Q.  Okay.
17       MR. SWAMINATHAN:  All right.  Jeff, you've got
18  it?
19       MR. KIVETZ:  I'm ready to go on it.  Thank you.
20  BY MR. SWAMINATHAN:
21       Q.  Thank you.  We're on Page 12 of your
22  expert report in Sierra, sir.  And let's mark it.  We'll
23  mark this one as Exhibit 1 to the deposition.  Let me
24  know when you're there, Mr. Murray.
25            (EXHIBIT 1 MARKED FOR IDENTIFICATION)
```

Page 28

```
 1       A.  I have Page -- I have Page 12 in front of me.
 2  BY MR. SWAMINATHAN:
 3       Q.  Okay.  Now starting at Page 12 on -- there's a
 4  section there that begins E.  Actually, let me do it
 5  differently.  You just indicated that there was some
 6  additional analysis that you did in the Sierra matter
 7  based on some of the opinions offered by Mr.
 8  Tiderington.  Can you tell me where that section is in
 9  your report where you address the additional information
10  from Mr. Tiderington?
11       A.  I think you're right in the middle of it right
12  now.
13       Q.  Okay.  So tell me the pages.
14       A.  I think it starts on Page 11.
15       Q.  Okay.  And where does it go through?
16       A.  I'm -- I'm looking.  Looks -- it looks like it
17  goes 11 to 16, and let me just check something else.  And
18  then after the eight questions on Page 23, there's
19  another section that was new material.
20       Q.  And the new material on Page 23 are your case
21  specific opinions related to the Sierra case, correct?
22       A.  Yes.
23       Q.  Okay.  And so, if I understand you correctly,
24  you did some analysis between Pages 11 and 16 of your
25  Sierra report that relate to some additional specific
```

Page 29

```
 1  pages of particular RD files that had not been the
 2  subject of your previous opinions in Reyes, correct?
 3       A.  Yeah.  These are pages that Plaintiff's expert
 4  listed and described in various ways --
 5       Q.  Okay.  And those are --
 6       A.  -- in his report.
 7       Q.  I'm sorry.  Go ahead.  Sorry.
 8       A.  In his report.
 9       Q.  Okay.  And there -- specifically we're on
10  Pages 58 and 59 of his report where he discusses some
11  specific pages, correct?
12       A.  Yes.
13       Q.  And then you responded to his identification
14  of those particular pages on Pages 11 through 16 of your
15  report, correct?
16       A.  Yes.
17       Q.  Okay.  And you looked at some additional
18  police files related to those specific pages that he
19  identified on Pages 58 and 59 of his report, correct?
20       A.  Yes.
21       Q.  And other than looking at some additional
22  police files, did you look at anything else in
23  responding to his opinions about those pages on pages 58
24  and 59 of his report?
25       A.  I think that I might've examined the
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 11 of 82 PageID #:54299
Oral Deposition of Bernard Murray taken on May 12, 2023

30..33

Page 30

1 prosecutor's bluebacks or I'm not exactly sure if I did
2 that, but primarily be Chicago Police Department
3 investigatory and permanent retention files and
4 prosecutor's files if there were -- if I had any.  I
5 don't recall right now if I examined any of those on
6 this specific area, but those would be the areas I would
7 look at.
8     Q.   Okay.  Okay.  And then on Pages 16 through 23
9 of your report, you discussed the eight cases, correct?
10    A.   Hold on one second.  Yes.
11    Q.   Okay.  And when you discussed the eight
12 additional cases there, the only thing new that you
13 looked at was the deposition of Demetrius Johnson,
14 correct?
15    A.   Well, I mean, I -- I re-examined his report
16 and re-examined my report, but the new material I think
17 came from -- let me just take a look.  Came from the
18 Demetrius Johnson deposition.
19    Q.   That's captured on Paragraph 7 on Page 23 of
20 your report, correct?
21    A.   Yes, that's correct.
22    Q.   Okay.  And so, other than Paragraph 7 on Page
23 23 of your reports, there's nothing else that you added
24 new in Pages 16 through 23 based on any new materials
25 that you reviewed; is that fair?

Page 31

1     A.   I'm looking at it again, but I think that is
2 accurate, yes.
3     Q.   Okay.  And on pages -- basically on pages --
4 on the rest of Page 23, you offer your opinion specific
5 to the Thomas Sierra case, correct?
6     A.   Yes.
7     Q.   Okay.  Now, in the Thomas Sierra case,
8 Mr. Tiderington reviewed a large number of additional
9 investigative files and RD files, correct?
10    A.   Yes.
11    Q.   In fact, he looked at all of the Area 5
12 investigative files and RD files that the Chicago Police
13 Department made available for the period from 1991 to
14 1995, correct?
15    A.   I did not --
16         MS. CARNEY:  Objection.  Form.  Foundation. You
17    can answer.
18         THE WITNESS:  I did not examine those files.
19 BY MR. SWAMINATHAN:
20    Q.   I asked you Mr. Tiderington analyzed -- strike
21 that.  Mr. Tiderington did an analysis of all of the
22 investigative files and RD files from the Chicago Police
23 Department for the period from '91 to '95 from Area 5,
24 correct?
25    A.   I don't -- I don't know what he did.

Page 32

1     Q.   Well, you reviewed his report, correct?
2     A.   I know, but I don't physically know what he
3 did.
4     Q.   I'm not asking you about what he -- okay.  So
5 let me ask a different question.  You understand that
6 all of the Area 5 investigative files and RD files the
7 Chicago Police Department collect -- could collect were
8 made available in the Thomas Sierra case, correct?
9         MR. KIVETZ:  Objection.  Form.
10        MS. CARNEY:  Objection.  Form.  Foundation. You
11    can answer.
12        THE WITNESS:  I'm aware from his report that
13    there were a number of files collected that were
14    reviewed.
15 BY MR. SWAMINATHAN:
16    Q.   Chicago Police --
17    A.   I'm sorry, from Area 5.
18    Q.   And these were Chicago Police Department
19 files, correct?
20    A.   Yes.
21    Q.   Investigative files and RD files, correct?
22    A.   Yes.
23    Q.   And in fact, there were hundreds of them,
24 correct?
25    A.   Yes.

Page 33

1     Q.   And he was provided with copies of all of
2 those, correct?
3         MS. CARNEY:  Objection.  Form.  Foundation.
4         THE WITNESS:  I mean, I don't know what he was
5    provided.
6 BY MR. SWAMINATHAN:
7     Q.   Did you look at his materials reviewed?
8     A.   I -- I -- I know what he -- what he -- what --
9 what he had access to.  But I physically don't know how
10 he compiled his review of those files.  If -- if it was
11 -- I know that sometimes he referred to the tables that
12 were compiled by -- by your office.  So to me, he -- I'm
13 being superficial here, but that doesn't mean he
14 necessarily reviewed all those files.
15    Q.   Okay.  I didn't ask you about reviewed.  Let's
16 start -- just focus on the questions I'm asking.  We'll
17 go in order.  First, you reviewed his list of materials
18 reviewed, correct?
19    A.   Yes.
20    Q.   Okay.  And his list of materials reviewed
21 included the hundreds of investigative files and RD
22 files for the period from '91 to '95, correct?
23    A.   Yes.
24    Q.   Okay.  And are you offering an opinion that he
25 actually did not review those materials?



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1        MR. KIVETZ: Objection. Form.
2        THE WITNESS: No. I'm telling you the
3  opposite.
4  BY MR. SWAMINATHAN:
5      Q.  Go ahead.
6      A.  I'm telling you the opposite.
7      Q.  Okay.
8      A.  I don't -- I don't know.
9      Q.  And Mr. -- you understand that Mr. Tiderington
10  -- you're aware that there was that -- you were
11  referring to some attachments containing a bunch of
12  information that our office provided to Mr. Tiderington,
13  right? You're aware of those attachments?
14        MR. KIVETZ: Objection. Form.
15        THE WITNESS: Yes.
16  BY MR. SWAMINATHAN:
17      Q.  And Mr. Tiderington, you're aware from his
18  opinion, offered some opinions related to the analysis
19  of those spreadsheets, correct?
20      A.  Yes.
21      Q.  Okay. And did -- are you offering opinions
22  related to those spreadsheets?
23      A.  I am not.
24      Q.  Did you create your own spreadsheet?
25        MR. KIVETZ: Objection. Form.

Page 35

1        THE WITNESS: I did not.
2  BY MR. SWAMINATHAN:
3      Q.  Did you conduct an analysis of any
4  spreadsheets in Sierra or Iglesias?
5        MR. KIVETZ: Objection. Form. Foundation.
6        THE WITNESS: No.
7  BY MR. SWAMINATHAN:
8      Q.  Did you conduct any analysis of
9  Mr. Tiderington's spreadsheets in Sierra or Iglesias?
10        MS. CARNEY: Objection. Form.
11        THE WITNESS: I did -- I did not.
12  BY MR. SWAMINATHAN:
13      Q.  Did you review the --
14      A.  But --
15      Q.  Strike that.
16        MR. KIVETZ: He wasn't done.
17        THE WITNESS: No, I -- I have nothing to say.
18  I'm sorry.
19  BY MR. SWAMINATHAN:
20      Q.  Okay. Sorry. Did you conduct -- strike that.
21  Did you -- strike that. Were you provided with a set of
22  all of the investigative files and RD files for the
23  period from 1991 to 1995 in Sierra?
24      A.  No.
25      Q.  Did you review all of the files that were

Page 36

1  provided to Mr. Tiderington in the Sierra case?
2      A.  I did not. I -- I reviewed files related to
3  the page numbers he discussed, and previously and -- and
4  had access to the -- the eight files as well as -- I'm
5  sorry, the -- the pages and the eight files. The two
6  areas I had, those RDs.
7      Q.  Sorry, please keep -- go ahead, sorry. Sorry.
8      A.  The -- the pages that he used as examples that
9  we've already discussed, and then -- then the eight
10  cases, I had those RD files. And by that, I mean the
11  investigatory files, and if there were -- were the ones
12  -- or -- and the RD files.
13      Q.  Okay. So in the Sierra case, you reviewed a
14  portion of the files that had been available -- had been
15  made available to Mr. Tiderington, fair?
16      A.  I reviewed the files that related to the
17  specific pages that you were discussing, as well as the
18  eight cases.
19      Q.  I'm just asking, is that a portion of the
20  files that we made available to Mr. Tiderington or all
21  of them?
22        MS. CARNEY: Objection. Form. Foundation.
23        THE WITNESS: They were -- they were not all
24  the -- they were not the files that he referred to,
25  no.

Page 37

1  BY MR. SWAMINATHAN:
2      Q.  It was a portion of them?
3        MR. KIVETZ: Objection. Form.
4        THE WITNESS: You know, it's the files related
5  to the pages that he discussed, specifically. Those
6  are the ones I examined. Not the other files that
7  are included in the table, or the files that he
8  reviewed.
9  BY MR. SWAMINATHAN:
10      Q.  In the Iglesias matter, did you review all of
11  the files that had been made available to Mr.
12  Tiderington for the period from 1991 to 1995?
13      A.  I examined the files that related to the pages
14  that he cited in his report that I replied to, and the
15  eight files. Those are the only files I examined.
16      Q.  And so, was that all of the files that he
17  reviewed, or a portion of the files that he reviewed in
18  the Iglesias?
19        MR. KIVETZ: Objection. Form. Foundation.
20        THE WITNESS: In Iglesias, there -- there may
21  be another file, other than what we looked in
22  Sierra. But I did not look at the whatever hundreds
23  of files that he discussed.
24  BY MR. SWAMINATHAN:
25      Q.  Okay. So you didn't review all of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

---

Page 38

1  hundreds of additional files that he discussed, but you
2  might have reviewed an additional file.  What file is
3  that?
4      A.   Iglesias.
5      Q.   Okay.  So in Iglesias, you reviewed,
6  additionally, the actual police files from the Iglesias
7  case, correct?
8      A.   Well, referring to the pages that he cited as
9  examples, I reviewed that part of the police reports.
10     Q.   Okay.  So in the Iglesias case, you were
11 provided with a copy of all of the police reports from
12 that case, correct?
13     A.   Well, I -- yes.  I examined the -- the -- the
14 -- the material as -- specific as it applied to the
15 pages that he was discussing.
16     Q.   Okay.  So in other words, you were provided
17 with the investigative file, an RD file, from the
18 Iglesias case, when you conducted your -- which -- when
19 you offered your opinions in the Iglesias matter,
20 correct?
21     A.   Yes.
22     Q.   And if I understand you correctly, you then
23 looked at the specific pages that Mr. Tiderington
24 focused on related to the investigative file and RD file
25 from the Iglesias matter, correct?

---

Page 39

1      A.   Yes.
2      Q.   Okay.  So you didn't -- couldn't -- you didn't
3  review the entire investigative file and RD file from
4  the Monica Roman homicide investigation; is that fair?
5      A.   I -- I -- I -- I did not.  I was specifically
6  replying to the pages that he cited and the allegations
7  that he made.
8      Q.   Okay.  And in the Sierra case, you were
9  provided with the investigative file, an RD file,
10 related to the Andujar homicide investigation, correct?
11     A.   I was.
12     Q.   Okay.  And then did you review that entire
13 file, or portions of that file?
14     A.   I -- I had access to the entire file, but I --
15 my focus was on, again, the allegations of withheld
16 documents from Plaintiff's expert's report.
17     Q.   Okay.  So when you -- strike that.  The --
18 with regard to the Andujar homicide investigation in
19 your opinions in the Sierra case, you didn't review that
20 -- the entire Andujar investigative file and RD file,
21 correct?
22     A.   Well, I -- I definitely looked through it.  But
23 I was more focused on the pages he was referring to.  So
24 it's not that I didn't read every single page, I had
25 access to it and -- and looked at whatever is -- whatever I

---

Page 40

1  -- whatever documents I thought I needed to read in --
2  to reply to his claim of withheld documents.
3      Q.   So I understand you had access to the entire
4  investigative file and RD file from the Andujar homicide
5  investigation.  Are you testifying that you read every
6  single page of it?
7      A.   I'm not saying I read every single page.  But
8  to be able to refute his allegations, there were
9  definitely certain supplemental reports that I had to
10 review more extensively than others.
11     Q.   So you didn't read every single page of it; is
12 that fair?
13     A.   I already said that, yes.
14     Q.   Okay.  All right.  Let me ask you about --
15 strike that.  I'm just looking at your report in the
16 Sierra matter, and let me -- we were talking about your
17 opinions on Pages 11 through 16 of your report.  Do you
18 have that in front of you again?
19     A.   I do now.
20     Q.   Did you conduct any -- well, strike that.  You
21 said that between your opinions in the Sierra case and
22 the Iglesias case, you additionally reviewed the
23 homicide file, RD file, and investigative file for the
24 Iglesias matter itself, correct?
25     A.   I'm sorry, Iglesias, you're changing to?

---

Page 41

1      Q.   Yeah.  Strike that.  Let me ask a better
2  question.  After you had offered your opinions in the
3  Sierra case, what additional files did you review before
4  offering your opinions in the Iglesias case?
5      A.   May I look at my report?
6      Q.   Please.
7      A.   In this report, he included a reference to
8  retention use of Polaroid photographs from Solache and
9  Reyes.  That was an opinion that already gave in the
10 Solache Reyes case.  So I re-reviewed that material, and
11 as it applied to his repetition of his allegations, I
12 included that in the report.  And also, obviously being
13 Iglesias matter itself, replying to allegations he made
14 in his report of missing information there.  Missing or
15 withheld information there.  Those are the primary
16 matters I examined.
17     Q.   So before offering your opinions in the
18 Iglesias case, you reviewed the -- then you --
19     A.   And I -- I'm sorry, one more.
20     Q.   It --
21     A.   One more, sir.
22     MS. CARNEY:  Hold on.  Just let him -- sorry,
23 there was a bad pause.  And then you started --
24 BY MR. SWAMINATHAN:
25     Q.   Yeah, please go ahead.  Yeah, go ahead.  Yeah.

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 14 of 82 PageID #:54302
Oral Deposition of BERNARD MURRAY taken on May 10, 2023
42..45

Page 42

1    A.   There -- and also in the Iglesias report,
2  there was additional -- the -- the Sierra information
3  was included, so I replied to that as well, in the
4  Iglesias report.
5    Q.   My question was just what additional
6  documents, new documents, you reviewed after offering
7  your opinions in Sierra, before offering your opinions
8  in Iglesias?
9    A.   Well, probably the Iglesias case may be the
10  only new documents.
11    Q.   Other than the Iglesias-specific police files,
12  are there any additional documents that you reviewed
13  after your Sierra opinion before offering your Iglesias
14  opinion?
15    A.   I don't think there's any new documents, other
16  than the Iglesias file.
17    Q.   Okay.  And with regard to your analysis on
18  Pages 11 to 16 of your Sierra report, did you conduct
19  any new analysis of any of those pages or files, in
20  offering your opinions in the Iglesias case?
21    A.   I believe it's the same.
22    Q.   Okay.  And if you look at -- you have your
23  Iglesias report in front of you?
24    A.   I have it now.
25    Q.   Okay.  Can you turn to Page 12 of that report?

Page 43

1    A.   Yes.
2    Q.   On Pages 12 to 16 of that report, you
3  discussed the same set of pages that you discussed in
4  your Sierra expert opinion, correct?
5    A.   Yes.
6    Q.   And at the time you offered your opinions in
7  Iglesias, with regard to those specific pages discussed
8  on Pages 12 to 16 of your Iglesias report, did you have
9  any new or different opinions with regard to those
10  cases?
11    A.   New and different opinions?  I -- I don't
12  think they -- no, I did not.
13    Q.   Okay.  Your opinions were the same, correct?
14    A.   Yes.
15    Q.   You didn't re-analyze those specific pages
16  between Sierra and Iglesias, correct?
17    A.   Yes.
18    Q.   Okay.  Could -- do you have your CV in front
19  of you?
20    A.   I -- I don't.
21    Q.   You don't need to put it in front of you.  Let
22  me just ask you this simple question.  Between the time
23  of offering your opinions in the Reyes matter and your
24  opinions in the Sierra and Iglesias matters, any changes
25  to your resume -- sorry, strike that.  Let me ask you a

Page 44

1  better question.  Any changes to your resume between the
2  time you offered your opinions in the Reyes case and the
3  time you offered your opinions in the Sierra and
4  Iglesias matters?
5    A.   No.  I think at one point I had provided an
6  older resume.  But I think the only thing different was
7  that reflected my teaching at Harper College.  Other
8  than that, the resume is the same.
9    Q.   Okay.
10        MR. SWAMINATHAN:  Let me take a quick break.  I
11  need to use the bathroom, if you guys don't mind?
12  Like, just a few minutes.
13        THE REPORTER:  We are off the record.  The time
14  is 10:53 a.m.
15        (OFF THE RECORD)
16        THE REPORTER:  We're back on the record for the
17  deposition of Bernard Murray, being conducted by
18  videoconference.  My name is Sydney Little.  Today
19  is May 10, 2023 and the time is 11:04 a.m. Central.
20        MR. SWAMINATHAN:  As far as I know, I have not
21  received the invoices yet, Tess.  Does that sound -
22  Theresa; does that sound right?
23        MS. CARNEY:  Yeah.  It -- and Kara's just Bates
24  stamping them, and they should go out shortly. This
25  is, like, three pages.  And then it -- it's an

Page 45

1  updated resume as well, that has the teaching thing
2  he just discussed.
3        MR. SWAMINATHAN:  Okay.
4        MS. CARNEY:  I will -- I'll let -- I'll
5  interrupt and let you know when Kara sends them out.
6        MR. SWAMINATHAN:  Okay.
7  BY MR. SWAMINATHAN:
8    Q.   Mr. Murray, you ready to go?
9    A.   I am.
10    Q.   Sir, do you have any family members who are in
11  law enforcement?
12    A.   No.
13    Q.   Did you ever work in Felony Review?
14    A.   I did.
15    Q.   For how long?
16    A.   About 11 or 12 months.
17    Q.   And when was that?
18    A.   I'm estimating now.  1986 into '87.  Or --
19  yeah, that sounds right.
20    Q.   And which areas of the Chicago Police
21  Departments were you going to when you served in Felony
22  Review?
23    A.   All of them.
24    Q.   Any that you went to more often?
25    A.   Not really.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1    Q.    It was pretty spread out across all of the
2  areas, at that time?
3    A.    And our schedules were spread out
4  geographically as well.
5    Q.    During your time in Felony Review, did you
6  form any opinions about Chicago Police officers?
7        MS. CARNEY:  Objection.  Form.
8        THE WITNESS:  Not specifically, no.
9  BY MR. SWAMINATHAN:
10   Q.    Did you learn how Chicago Police Department's
11  file disclosure procedures worked?
12   A.    I'm sorry, say again?
13   Q.    Did you learn how the City of Chicago's file
14  disclosure procedures worked during the time you were on
15  Felony Review?
16   A.    I don't think I learned that specifically from
17  Felony Review.  I think I learned that during my -- the
18  entirety of my career.
19   Q.    Okay.  And when you say you learned it during
20  the course of your entirety of your career, you mean as
21  a prosecutor?
22   A.    Yes.
23   Q.    In other words, you didn't learn specifically
24  how files were disclosed during your time on Felony
25  Review, but over the time -- over your time as a

Page 47

1  prosecutor, you developed some understanding of how the
2  Chicago Police Department went about getting files to
3  you as the prosecutor; is that right?
4    A.    I learned how prosecutors would go about
5  requesting files from Chicago Police Department.  I
6  learned that as early as my assignment to juvenile
7  court.
8    Q.    You indicated that you learned how prosecutors
9  went about obtaining files from the Chicago Police
10  Department, correct?
11   A.    That's what I just said, yes.
12   Q.    Okay.  You -- but you didn't -- but did you
13  develop an understanding of how the Chicago Police
14  Department went about fulfilling the requests from
15  prosecutors for files?
16   A.    I think I had a general overview of it
17  primarily based in the manners that I would request
18  documentation from Chicago Police Department.
19   Q.    So you had a general sense, but you didn't
20  have a specific understanding of how the Chicago Police
21  Department went about disclosing files to the
22  prosecutor's office; is that fair?
23   A.    No, it's not fair.  To --
24   Q.    Then tell me --
25   A.    -- be more accurate is -- to be more accurate

Page 48

1  is the way I would request documents, made me realize
2  how they were providing the documents.  Now, I don't
3  know exactly what went on in their offices, who was
4  assigned to do that type of work, but I know how I went
5  about and where I went about requesting the information.
6    Q.    Okay.  And then what was your understanding
7  about what was happening -- well, strike that.  You said
8  based on your experience in requesting the files, you
9  developed some understanding about what was coming back
10  to you from the Chicago Police Department, correct?
11   A.    I got an understanding of how to request the
12  information that we needed to proceed with the
13  prosecution.
14   Q.    Okay.  And so, based on your time as a
15  prosecutor, what understanding did you develop about how
16  the Chicago Police Department went about gathering files
17  for the prosecutor's office?
18   A.    Well, it evolved.  We started by using --
19  Chicago Police Department had interoffice forms and a
20  phone number we could use to reach -- to obtain material
21  needed to prosecute a case.  So we would send it --
22  forms to the bureau of identification to get rap sheets
23  and photographs.  We would send forms to, at the time,
24  11th and State, or to -- directly to a police area to
25  get police reports.  Phone calls could be made prior to

Page 49

1  4:00 on any given day to ask for permanent retention
2  files.  And they would be sent to us interoffice mail.
3  But as time went on, we started relying more upon
4  subpoenas to gather that information.  The subpoenas
5  would go to the areas.  They would go to, again, 11th
6  and State or 35th and Michigan, eventually. And then at
7  some point, Chicago Police Department desired that we
8  send those subpoenas directly to 11th and State.
9    Q.    Okay.  And so, what you've described for me is
10  a lot of the different -- the ways in which the process
11  of requesting files evolved in terms of how prosecutors
12  went about obtaining the files, fair?
13   A.    Yes.
14   Q.    Okay.  And what understanding did you have
15  about how the Chicago Police Department then went about
16  fulfilling those requests, based on your experience as a
17  trial -- as a prosecutor?
18   A.    Well, if I sent a request for -- to the bureau
19  of identification, that part of the Chicago Police
20  Department would send me a -- whatever I requested.
21  Either the rap sheet, the central booking document, or
22  the photograph.  If I sent a request to crime lab for
23  any and all crime lab reports related to the -- an RD
24  that I was working on, people at the crime lab would
25  reply and send those documents to me.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1    Q.    And if you sent a request to the Chicago
2  Police Department for all files and documents related in
3  any way to a particular homicide investigation, did you
4  develop an understanding of whether they would send that
5  request on to every department that you just described?
6    A.    I did develop a -- an understanding that when
7  I -- when they evolved into us sending our request to --
8  to 11th and State at the time, we would list what we
9  were looking for in our subpoena.  And they would send
10  the subpoena out to different parts of the Chicago
11  Police Department to send the component parts back to
12  us.
13    Q.    And did you develop an understanding of any
14  policy or procedure that the Chicago Police Department
15  had for deciding which units to send your request to?
16    A.    Their -- their policy?  I don't know what it
17  was, but we specifically requested items in our
18  subpoena.  So we did -- those information came back to
19  us, excuse me, usually collected by the 11th and State
20  and sent back to us --
21    Q.    But I understand --
22    A.    -- I don't know how they went about getting
23  it, but it was apparent to us that they were then
24  requesting the specific information we asked for.
25    Q.    And so, when you would make requests to the

Page 51

1  Chicago Police Department -- well, strike that.  What
2  was the point in time at which you started to make the
3  requests to 11th and State rather than to each unit
4  separately?
5    A.    We -- well, we continued to make -- let -- let
6  me rephrase that.  We -- we never stopped making
7  requests to -- for, like, rap sheets and crime lab
8  information.  But when we issued a subpoena, we used to
9  send the subpoenas to all those different units.  So
10  now, we sent the subpoenas to either the area or to 11th
11  and State.  And then 11th and State, the police
12  department, said just send all the subpoenas -- instead
13  of sending the subpoena to the area, just send it to us.
14  Nevertheless, we still requested detectives to provide a
15  copy of the area -- the files of the area, the
16  investigative files, if the Chicago Police Department
17  was slow in replying to our subpoenas.
18    Q.    Okay.  And so, when you issued the subpoenas,
19  you would list all of the different things that you
20  wanted from the various units of the Chicago Police
21  Department; is that right?
22    A.    Yes.  We would.
23    Q.    And why -- and so you didn't just send a
24  request for everything related to a particular case; is
25  that right?

Page 52

1    A.    No.  Each one of the subpoenas were specific
2  as to -- it would start off with the language of any and
3  all reports, including but not limited to, or some
4  verbiage like that.  But we were specific in listing the
5  RD numbers we were looking for, the CB numbers, the IR
6  numbers, any other specific identification numbers
7  related to files and photographs and rap sheets that
8  were collected during the course of the investigation.
9    Q.    Okay.  And so, you made it a point to request
10  specific documents from the various specific units as
11  part of your subpoena in order to ensure that you were
12  actually getting the materials from those locations; is
13  that right?
14    A.    In part, yes.
15    Q.    Okay.  And then in addition to that, you would
16  ask the officers to bring the files to you; is that
17  correct?
18    A.    There would be time -- yes.
19    Q.    Okay.  And did you see any Chicago -- during
20  the time your -- during your time as a prosecutor, did
21  you ever see any Chicago Police Department checklists
22  that identified how the Chicago Police Department would
23  go about fulfilling your subpoena requests?
24    A.    I did not see Chicago Police Department
25  checklists.  But when the material was returned to the

Page 53

1  Court via the subpoenaed material, I could see little
2  check marks next to the documents I had requested.
3    Q.    In other words, on the subpoena -- so your
4  understanding is that the system in the Chicago Police
5  Department was to put check marks next to specific
6  things that they had found; is that correct?
7    A.    That's not my understanding.
8        MR. KIVETZ:  Objection.  Form.
9  BY MR. SWAMINATHAN:
10    Q.    Okay.  What was the Chicago Police Department
11  policy for ensuring that they gathered all the material
12  from all the locations?
13        MR. KIVETZ:  Objection.  Form.
14        THE WITNESS:  I don't know --
15        MS. CARNEY:  Foundation.
16  BY MR. SWAMINATHAN:
17    Q.    What was the Chicago Police -- I'm sorry, go
18  ahead.
19    A.    I don't know what the Chicago Police
20  Department policy was.
21    Q.    What was the Chicago Police Department set of
22  procedures for ensuring that they gathered all of the
23  material from all of the locations?
24        MS. CARNEY:  Objection.  Form.  Foundation.
25        THE WITNESS:  I don't know their specific



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

```
1    procedures.
2    BY MR. SWAMINATHAN:
3        Q.   What was the particular training that was
4    provided to the Chicago Police Department to ensure that
5    they'd gathered all of the material from all of the
6    different units?
7        MS. CARNEY:  Objection.  Form.  Foundation.
8        THE WITNESS:  I don't know.
9    BY MR. SWAMINATHAN:
10       Q.   What was the training that was provided to --
11   strike that.  What were the instructions that were
12   provided to subpoena service unit staff to ensure that
13   they'd gathered all of the material from all of the
14   different units?
15       MS. CARNEY:  Objection.  Form.  Foundation.
16       THE WITNESS:  I don't know.
17   BY MR. SWAMINATHAN:
18       Q.   Another one of the ways in which you
19   identified that you obtained materials from the Chicago
20   Police Department was to ask the detectives in the area
21   to bring documents to you, correct?
22       A.   Yes.
23       Q.   What policies are you aware of that provided
24   guidance to Chicago police officers, about how they
25   should go about ensuring that they obtained all the
```

Page 55

```
1    documents from all the different units, when they came
2    back to you?
3        A.   I don't --
4        MS. CARNEY:  Objection.  Form.  Foundation.
5        MR. KIVETZ:  Yeah.  I don't understand the
6    question.
7    BY MR. SWAMINATHAN:
8        Q.   Go ahead, Mr. Murray.
9        A.   I -- I don't know what their policies were.
10       Q.   And what procedures are you aware of that
11   Chicago police detectives were told to follow when they
12   received a request from a prosecutor to provide them
13   with all documents from all units?
14       MS. CARNEY:  Objection.  Form.  Foundation.
15       THE WITNESS:  I don't know what their policies
16   or procedures were.
17   BY MR. SWAMINATHAN:
18       Q.   And what training are you aware of that
19   Chicago police detectives received about how they were
20   to go about ensuring they -- that they obtained all
21   documents from all units in response to a request from
22   the prosecutors?
23       MR. KIVETZ:  Objection.  Form.
24       MS. CARNEY:  Objection.  Form.  Foundation.
25       THE WITNESS:  I don't know.
```

Page 56

```
1    BY MR. SWAMINATHAN:
2        Q.   Have you ever reviewed any Chicago Police
3    Department policy that says that all documents in these
4    -- in all units related to a specific investigation are
5    to be disclosed to the prosecutor?
6        A.   I believe there's one general order that I
7    became aware of during my work here as an expert, and --
8    and maybe even knew of it superficially before then.
9    Which were -- was a way to ensure that all was referred
10   to as Street Files that they were included in
11   investigatory file, preserved for production to the
12   prosecution and the defense.
13       Q.   Are you referring to Special Order 83-1?
14       A.   One or two.  What -- what if -- yes, it's --
15   it's -- I think that's the one.  But I don't know the
16   exact number on the top of the page.
17       Q.   Why don't you take a look at your list of
18   materials reviewed and tell me if it's -- if you
19   misidentified?  Actually, let's do it this way.  Maybe
20   this is faster.  Why don't you take a look at your
21   expert report of Sierra.  You have that one in front of
22   you, right?
23       A.   Hold on a second.
24       Q.   When you do have --
25       A.   I do have that in front --
```

Page 57

```
1        Q.   Yeah.  When you have your Sierra report in
2    front of you, go to Page 5.
3        A.   Yes, 83-1.
4        Q.   Okay.  On page 5, there's a specific reference
5    to 83-1; do you see that?
6        A.   Yes.
7        Q.   And that's not a general order, that's a
8    special order, correct?
9        A.   It is.
10       Q.   Okay.  And so, that's what you were referring
11   to when I asked you about any Chicago Police Department
12   policies that discuss turning over all information,
13   correct?
14       A.   Yes.
15       Q.   Okay.  And on Page 8 of your report in Sierra,
16   you again make reference to Special Order 83-1, correct?
17       A.   Yes.
18       Q.   Did you review any other Chicago -- so I take
19   it you reviewed Special Order 83-1 at some point?
20       A.   I reviewed it at some point, yes.
21       Q.   And in fact, you reviewed it before you
22   offered opinions in the Reyes case, correct?
23       A.   That -- yes.
24       Q.   Did you review Special Order 83 -- and I --
25   strike that.  Did you review Special Order 83-1 again,
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 18 of 82 PageID #:54306
Oral Deposition of: Bernard Murray — taken on May 18, 2023

58..61

Page 58

1  before offering your opinions in Sierra?
2      A.   I -- I think you just asked that, didn't you?
3      Q.   No.  I asked you before your opinion in Reyes.
4  So let me maybe -- was that clear?  So do you want me to
5  ask it again, just to make sure we're talking about the
6  same cases?
7      A.   Yeah.  Yeah.  Please do.
8      Q.   Okay.  Let me ask it again.  Before you
9  offered your opinion in this -- in the Reyes case, did
10 you review Special Order 83-1?
11     A.   I -- I'm -- I think I did.  I -- I'm not
12 exactly positive right now.
13     Q.   Okay.  But you offered opinions about special
14 Order 83-1 in your Reyes opinion.  So you must've
15 reviewed it at some point for that, correct?
16     A.   I must have reviewed it prior to that report
17 then.
18     Q.   Okay.  And in fact, you reviewed it as part of
19 your opinions in Rivera and Fields; is that right?
20     A.   Definitely Rivera.
21     Q.   Okay.  And so did you actually re-review
22 Special Order 83-1 before offering your opinions in
23 Reyes?
24          MS. CARNEY:  Objection.  Form.  Asked and
25      answered.

Page 59

1          THE WITNESS:  I don't recall.
2  BY MR. SWAMINATHAN:
3      Q.   While you were preparing your reports --
4  strike that.  While you were reviewing materials and
5  preparing your report in Sierra, did you review Special
6  Order 83-1?
7      A.   I did not.
8      Q.   And as you were reviewing materials and
9  preparing your report in Iglesias, did you review
10 Special Order 83-1?
11     A.   I did not.
12     Q.   Other than Special Order 83-1, did you review
13 any other Chicago Police Department policies related to
14 investigative files or street files?
15     A.   No.
16     Q.   Did you review any subsequent iterations or
17 versions of Special Order 83-1 before offering your
18 opinions in Sierra or Iglesias?
19     A.   No.
20     Q.   And so, let me ask you again, does special --
21 so with regard to Special Order 83-1, does it provide --
22 strike that.  Does Special Order 83-1 anywhere in it
23 state that all documents from all units should be
24 gathered and disclosed to the prosecutor?
25          MR. KIVETZ:  Objection.  Form.

Page 60

1          MS. CARNEY:  Objection.  Form.
2          THE WITNESS:  I don't know if it specifically
3      words it that way.  It's -- it does try to retain
4      investigatory materials so it would be made
5      available to the prosecutor and the defense.
6  BY MR. SWAMINATHAN:
7      Q.   Does the Special Order 83-1 say anywhere in
8  the policy to disclose all of the documents in the
9  investigative file to the prosecutor?
10          MS. CARNEY:  Objection.  Form.  Asked and
11      answered.
12          THE WITNESS:  I don't believe it's worded that
13      way.
14  BY MR. SWAMINATHAN:
15     Q.   Well, does it say the exact same thing in
16 other words?
17     A.   Well --
18          MR. KIVETZ:  Objection.  Form.
19          THE WITNESS:  You're preserving -- implicit to
20      me, if you're preserving the information for
21      disclosure to the prosecution and to the defense,
22      then you would make it available to them.
23  BY MR. SWAMINATHAN:
24     Q.   If I understand you correctly, Special Order
25 83-1 does expressly instruct the Chicago Police

Page 61

1  Department to preserve all of the police documents
2  related to its investigation, correct?
3      A.   That's my understanding of it, yes.
4      Q.   Okay.  And other than saying you preserve the
5  information in the investigative file, does it say to
6  disclose all of the information in the investigative
7  file?
8          MS. CARNEY:  Objection.  Form.  Asked and
9      answered.  Answer it again.
10          THE WITNESS:  It -- it makes the -- it makes it
11      -- the -- the preservation of the materials so it's
12      available for prosecution and defense.
13  BY MR. SWAMINATHAN:
14     Q.   I'm asking you a different question.  Does it
15 say that anywhere in that Special Order 83-1, that the
16 entire -- all of the information that has been
17 preserved, must be disclosed?
18          MR. KIVETZ:  Objection.  Form.  Asked and
19      answered.
20          THE WITNESS:  And as I answered before, to me
21      it's implicit that if you're preserving it for the
22      prosecution and defense, you're obviously going to
23      make it available to them.
24          MR. SWAMINATHAN:  Let's mark Special Order
25      83-1 as Exhibit 2.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1   (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2   BY MR. SWAMINATHAN:
3      Q.  I'll put it up on my screen here.  I'm showing
4   you a document we've marked as Exhibit 2.  It's Special
5   Order 83-1.  It's RFC Solache Reyes 117527 through
6   117531.  This is the special order that you reviewed in
7   offering your opinions in the Sierra-Iglesias matters,
8   correct?
9      A.  Yes.
10     Q.  Okay.  And tell me where in Special Order 83-1
11  it says to disclose everything contained in the
12  investigative file to the prosecutor?
13         MS. CARNEY:  Objection.  Form.  Misstates his
14     testimony.  And I'm just going to, for the record,
15     object to the extent that this entire line of
16     questioning is almost verbatim from the Solache-
17     Reyes deposition.  Like, almost word for word.  You
18     can answer.
19         THE WITNESS:  As I said before, it doesn't say
20     the word disclose.  It says preserved for -- for
21     prosecution and defense.  And I said to you that's
22     implicit to me that you're making it available to
23     the prosecution and defense after you preserve it.
24     So again, the word disclosed to my recollection is
25     not in there.

Page 63

1   BY MR. SWAMINATHAN:
2      Q.  Does this policy -- strike that.  In anywhere
3   in Special Order 83-1 does it say -- does it instruct
4   detectives or anyone in the Chicago Police Department to
5   gather up all documents from all units and provide them
6   to the prosecutor?
7         MS. CARNEY:  Same objection.
8         THE WITNESS:  I believe I answered that before
9     that it does not say that.
10  BY MR. SWAMINATHAN:
11     Q.  Okay.  And if from a prosecutor's perspective,
12  do you believe it would be helpful to you as a
13  prosecutor for the Chicago Police Department to have a
14  policy that directs its officers to produce the entire
15  files to the prosecutor's office?
16     A.  It's -- by -- by them preserving the
17     information, I'm available to obtain it either by
18     informal requests or by subpoenas.  So it -- to me, it
19     doesn't have to be spelled out in an order, gee, you
20     should also send everything over, because it should come
21     upon my request for the information.  So if they wanted
22     to conclude that in there, the -- the -- that policy, it
23     -- it wouldn't really affect the way I obtained the
24     information for use at trial.
25     Q.  What is your -- strike that.  So if I

Page 64

1   understand you correctly, there's no value in
2   instructing Chicago police officers that they should
3   disclose the entirety of their files to the prosecutor
4   when they receive such a request?
5         MS. CARNEY:  Objection.  Form.  Misstates his
6     testimony.  You can answer.
7         THE WITNESS:  You know, I -- I believe we're
8     going round in circles.  I've already said to me
9     [sic], it's implicit if you're preserving it for the
10    prosecution and for the defense, then you're -- then
11    it's available to me.  Is there any value and then
12    adding another sentence, oh, by the way, disclose
13    it?  Well, I'm already getting it by my uses of the
14    fact that you preserved it and I've got a subpoena
15    to obtain it and informal requests.  So if you want
16    to add in other ideas into the 83-1, great, but it
17    doesn't affect my ability to get it.  I'm just --
18    it's a -- a great policy from the point of view that
19    they're told to preserve the investigatory
20    materials.
21  BY MR. SWAMINATHAN:
22     Q.  Okay.  And --
23     A.  And be made available to the prosecution and
24  defense.
25     Q.  If I understand your opinion correctly from a

Page 65

1   prosecutor's perspective, a policy that says to preserve
2   something is just as good as a policy that says to
3   disclose something; do I have that right?
4      A.  No.
5         MS. CARNEY:  Objection.  Form.  Misstates his
6     testimony.  You can answer.
7         THE WITNESS:  No, you've got it wrong.
8   BY MR. SWAMINATHAN:
9      Q.  If a prosecutor's - if - strike that.  From a
10  prosecutor's perspective, if a policy says to preserve
11  something, is that just as good as a policy that says to
12  disclose something?
13     A.  From a prosecutor's perspective, we're - we're
14     glad that the policy says preserve investigatory
15     materials and we're very pleased with the fact that they
16     also be made available to us and to the defense.  That's
17     what the part of the policy that - that is - that is
18     good from our point of view.
19     Q.  Okay.  And from a prosecutor's perspective, is
20  there any additional value in actually instructing the
21  Chicago Police Department to disclose the information
22  that has been preserved to the prosecutors?
23     A.  And as I said about five times now, to me it's
24     implicit if you're preserving it and making it available
25     to the prosecutor and to the defense, then it is being



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 20 of 82 PageID #:54308
The Deposition of BERNARD MURRAY, taken on May 12, 2023
66..69

Page 66

1  disclosed to us.
2      Q.  I'll ask it for a sixth time because you're
3  not answering my question.  We'll move on when you
4  answer my question.  I'm asking you not about
5  implicitness and explicitness.  I'm asking you about
6  whether there's value.  So let me ask the question
7  again.  From a prosecutor's perspective, is there value
8  in instructing Chicago police detectives that when they
9  receive a request from the prosecutor that in addition
10  to preserving all the documents they should disclose all
11  the documents?
12      MS. CARNEY:  Objection.  Form.  Asked and
13  answered.  Argumentative.
14      THE WITNESS:  So the - the 83-1 tells them to
15  preserve investigatory material and to make it
16  available to the prosecution and to the defense.  If
17  the policy added more words in there saying doing
18  other things with it, such as your request that -
19  that - the way you would write their report, thei-
20  order, great, that's fine.  But the order as written
21  is - is - is more than adequate for us to prepare
22  our materials for our prosecution.
23  BY MR. SWAMINATHAN:
24      Q.  Okay.  And if police experts testify that, in
25  fact, it is important to provide specific instruction to

Page 67

1  police detectives and staff to actually disclose all
2  materials contained in their file, are you offering an
3  opinion contrary to the opinions of the police practices
4  expert or are you focusing specifically on the expertise
5  as a prosecutor?
6      MR. KIVETZ:  Objection.  Objection.  Form,
7  foundation, speculative, incomplete hypothetical.
8  BY MR. SWAMINATHAN:
9      Q.  Do you understand my question, Mr. Murray?
10      A.  Not at all.
11      Q.  Okay.  Do you have any expertise as a police
12  policy maker?
13      A.  No.  I - I would defer to you on that.
14      Q.  Do you have any expertise in policymaking as a
15  prosecutor?
16      A.  Specific to the role of the prosecutor, yes.
17      Q.  Have you written policies?
18      A.  I've not written policies, but not - not
19  regarding these type of matters, but -
20      Q.  I'm sorry, what -
21      A.  -- policy how a prosecutor should handle
22  different assignments in the office.
23      Q.  Have you written any policy documents in the
24  Cook County State's Attorney's Office in all your years
25  there?

Page 68

1      A.  I - I'm - I'm - I'm trying to - to think.
2  They're not - not what you consider formal policy
3  documents.  No, I have not.
4      Q.  Have you written any - when you say - strike
5  that.  Have you been responsible for creating any
6  written policies as a prosecutor?
7      A.  There's a memo I authored regarding how to
8  handle cases on eight Chicago police detectives who are
9  indicted by the federal governments and how we should
10  handle their cases.  So I'm not sure if that's what you
11  consider a policy directive, but it was specific to
12  those eight police officers.
13      Q.  Are you saying that a memo that you wrote
14  about the indictment of eight police officers is a
15  policy of the Cook County State's Attorney's Office that
16  you wrote?
17      MS. CARNEY:  Objection.  Form.  Misstates his
18  testimony.
19      THE WITNESS:  I'm not saying that.
20  BY MR. SWAMINATHAN:
21      Q.  Have you written any policies for the Cook
22  County State's Attorney's Office in your time there?
23      MS. CARNEY:  Objection.  Asked and answered.
24      THE WITNESS:  That memo that I sent out
25  directed prosecutors on how to handle pending cases

Page 69

1  involving those eight police officers.  And --
2  BY MR. SWAMINATHAN:
3      Q.  And I just -
4      A.  So to the extent that - I'm sorry?
5      MR. KIVETZ:  No, you finish your answer,
6  Mr. Murray.  He's interrupted.
7      THE WITNESS:  To the extent that it was
8  directing prosecutors in the office on how to handle
9  those cases, I guess you could term that as a policy
10  of going forward on those cases.  But if you're
11  talking about a -- a -- a non-specific policy that
12  would be applied in the future on all cases, no,
13  I've never written a policy like that.
14  BY MR. SWAMINATHAN:
15      Q.  I -- I'm just asking a simple question.  You've
16  already told me that the memo that you wrote with regard
17  to the indictment of the eight officers is not a policy
18  of the Cook County State's Attorney's office, correct?
19      A.  No, I didn't say that.
20      Q.  Okay.  So it is a policy?
21      A.  It was a policy -- it was a policy of the
22  office and how to handle innumerable cases that were
23  still pending at the time that those eight officers were
24  indicted.  So to me, that is a policy document.
25      Q.  And it was a policy document in the form of a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  memo, if I'm understanding you correctly?
2     A.   Yes.
3     Q.   Okay.  So other than the memo that you wrote
4  regarding the indictment of eight Chicago police
5  officers, are there any other policies that you've
6  written for the Cook County State's Attorney's Office?
7     A.   No.
8     Q.   Have you been responsible for, in the course
9  of your entire career as a Cook County state's attorney
10 -- strike that.  As a longtime member of the Cook County
11 State's Attorney's Office, have you ever been
12 responsible for developing training materials to
13 implement a formal written policy of the Cook County
14 State's Attorney's Office?
15    A.   I'm sorry, I don't understand that question.
16    Q.   For any written policies of the Cook County
17 State's Attorney's Office, have you ever been tasked
18 with preparing training materials to instruct
19 prosecutors on how to follow those policies?
20    A.   I -- I'm sorry, I don't understand your
21 question, but I -- I've not created training on policy
22 if that's your question.
23    Q.   Okay.  So -- yeah, let me just ask.  Have you
24 ever created any training materials related to any
25 policies of the Cook County State's Attorney's office?

Page 71

1        MR. KIVETZ:  Objection.  Form.  Go ahead.
2        THE WITNESS:  I think not that I recall, no.
3  BY MR. SWAMINATHAN:
4     Q.   Have you ever been responsible for preparing
5  any type of auditing of any policies of the Cook County
6  State's Attorney's office?
7        MS. CARNEY:  Objection.  Form.
8        THE WITNESS:  I'm not sure what it means -- by
9     what you mean by auditing.
10 BY MR. SWAMINATHAN:
11    Q.   Have you ever -- do you know what auditing is?
12    A.   I don't know how you -- what you mean by it,
13 so I'd like to understand that first.
14    Q.   You know, have you ever heard of the idea of
15 doing auditing of policies?
16    A.   No, I have not.
17    Q.   Okay.  And have you ever been responsible for
18 reviewing cases or files in the form of an audit or
19 investigation to determine whether or not policies that
20 have been implemented are actually being followed?
21    A.   No.
22    Q.   Have you ever been responsible for conducting
23 a review of any kind to ensure that policies that had
24 been formed were actually being followed?
25    A.   No.

Page 72

1     Q.   Okay.  Let me ask you about -- do you have
2  your materials reviewed in front of you?
3     A.   Hold on.
4        MS. CARNEY:  For which report?
5        MR. SWAMINATHAN:  Yeah.  Let's do Sierra first.
6     Thank you.
7        THE WITNESS:  I have it in front of me.
8  BY MR. SWAMINATHAN:
9     Q.   Okay.  Okay.  Taking a look at your materials
10 reviewed in the Sierra matter, is this a list of
11 materials reviewed that you prepared?
12    A.   Yes.
13    Q.   Okay.  And were you capturing here the set of
14 documents that you reviewed in preparing your opinions?
15    A.   Yes.
16    Q.   Okay.  And are there any documents that you
17 reviewed in preparing your opinions in the Sierra matter
18 that are not disclosed here?
19    A.   No.
20    Q.   Okay.  And when you prepared this list of
21 materials reviewed, did you go through the files that
22 you actually had received from Counsel and then list
23 them?
24    A.   I definitely -- like the RD numbers, I was
25 trying to make sure I listed all of those.  Yes, so I

Page 73

1  did list the -- these materials.
2     Q.   Okay.  And then did you have any other files
3  in your folder or collection that you had reviewed that
4  you didn't list on your materials reviewed in the Sierra
5  case?
6     A.   I don't think so.
7     Q.   Okay.  And so, for purposes in the Sierra case
8  itself -- well, strike that.  So looking at this list of
9  materials reviewed, you looked at the expert report of
10 Mr. Tiderington in the Reyes and Sierra matters,
11 correct?
12    A.   I certainly had them available since I relied
13 upon them in the past.  I didn't necessarily re-review
14 them, but they were materials I had reviewed in the
15 past, putting together the prior -- my prior expert
16 opinions.
17    Q.   Did you review the entire expert report of
18 Mr. Tiderington in Sierra before offering your opinions
19 in Sierra?
20    A.   I read the entire report, but I was more
21 focused on the issues dealing with this that we've
22 discussed earlier today, the specific pages that he
23 cited and the cases that he cited as well as here
24 itself.  So though I -- I looked at the entire report, I
25 was not so much focused on those other parts.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q.   Okay.  Mr. Tiderington has a portion of his
2  report that discusses the Sierra case specifically and
3  any deviations from generally accepted police practices
4  during the course of the Andujar investigation.  You are
5  not opining on that issue, correct?
6    A.   I'm not.
7    Q.   Okay.  And then Mr. Tiderington has a set of
8  opinions in his Sierra report that have to do with the
9  Jones and Palmer cases and the special orders that came
10  out of those -- that -- the Jones and Palmer cases.
11  You're not offering any opinions in response to Mr.
12  Tiderington's opinions about that part, correct?
13    A.   I am not.
14    Q.   Okay.  And so, your opinions in this -- in
15  your Sierra report are focused on Mr. Tiderington's
16  analysis related to the specific set of investigative
17  files and RD files that were made available to him,
18  correct?
19    A.   Focused on my reply to the specific pages that
20  he cites and what he -- he claims they stand for as well
21  as the cases at the back end, as well as the Sierra case
22  that -- the -- the specific pages on Sierra near the end
23  of his report.
24    Q.   Okay.  And then your items five -- strike
25  that.  You have listed in your materials reviewed the

Page 75

1  depositions of Thomas Tiderington in Reyes and Sierra.
2  Did you go through those?
3    A.   Only as it was pertinent to -- to my report.
4  So I had them available, but did not go -- only went
5  through the parts that I thought were necessary for --
6  to reply to the allegations in his -- or the -- his
7  analysis in his report.
8    Q.   And how did you decide which portions to go to
9  in those depositions?
10    A.   I was made aware of -- of some of the comments
11  he made and then -- then I just read the deposition to
12  find parts that I thought would be pertinent.
13    Q.   Well, were you pointed to specific pages in
14  his report to go to to find certain information?
15    A.   Actually, I was given his entire deposition,
16  but I -- I was -- I was told one part of his analysis
17  that was different than what was written in the -- what
18  -- than what I thought was written in his expert report.
19    Q.   And so, did you have to go through the entire
20  report, the entire deposition, to find that or were you
21  given some guidance about where in his report -- his
22  deposition you should look?
23    A.   I -- I read the entire thing.
24    Q.   Okay.  And so, you read his entire report --
25  strike that.  You read his entire --

Page 76

1    A.   Entire deposition.
2    Q.   In Reyes, you read his entire deposition?
3    A.   You know, I think it was in Sierra is the
4  deposition that I'm referring.
5    Q.   Okay.  Let me just make sure I'm clear then.
6  So you reviewed his Reyes deposition Parts 1 and 2.  Did
7  you read those in their entirety?
8    A.   No, I did not.
9    Q.   What portions did you review?  What portion of
10  that -- those set of transcripts did you review in the
11  Reyes matter?
12    A.   I -- I -- I don't recall if I reviewed any
13  specific portions of Reyes' deposition.  It was the
14  Sierra deposition I read.
15    Q.   Okay.  And so, in the Thomas -- in
16  Mr. Tiderington's Sierra deposition, did you read the
17  entire transcript?
18    A.   I read the -- the -- the Rock Fusco attorney's
19  part of the deposition.
20    Q.   Okay.  So you read the -- just the part of the
21  deposition where the attorney from Rock Fusco was asking
22  questions; is that right?
23    A.   That's correct.
24    Q.   Okay.  And did you read the entire section in
25  which the Rock Fusco attorney was asking questions?

Page 77

1    A.   I did.
2    Q.   Okay.  And then item number five and six on
3  your list are certain RD numbers?
4    A.   Yes.
5    Q.   So those are particular permanent retention
6  file or RD files, correct?
7    A.   That's what they are, yes.
8    Q.   Okay.  And you -- in your materials review you
9  list them as RD file, correct?
10    A.   Right.  In other words, they were the
11  permanent retention file and not the investigative file.
12    Q.   Okay.  So RD file is a reference to the
13  permanent retention file, correct?
14    A.   The phrase commonly used with it, yes.
15    Q.   Okay.  And when you were a prosecutor, would
16  you typically refer to the permanent retention files as
17  RD files?
18    A.   I refer to them as police reports.
19    Q.   When you were a prosecutor, did you have some
20  understanding of the idea of there being a separate
21  investigative file and a separate permanent retention
22  file or RD file?
23    A.   We had more of an understanding that the
24  investigative file at the area, various areas, contains
25  the investigatory material.  We're more attuned to that.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 23 of 82 PageID #:54311
Oral Deposition of: Bernard Murray, Taken on: May 12, 2023
78..81

Page 78

1    Q.   Okay.  And if the prosecutor -- if someone was
2    referring to the RD file, what would be your
3    understanding of what file they're referring to?
4    A.   We -- you know, we didn't dwell on that
5    distinction at the time.  But during the time of my
6    career with the -- with the Cook County, we didn't
7    necessarily say where's the RD file, where's the
8    Investigative file?  We -- we -- we knew the
9    Investigative file with GPR notes were -- were available
10   from the areas.  So we ensured that we obtained police
11   reports from the areas as well as from 11th and State.
12   Q.   Okay.  And how did you go about ensuring that
13   the files that you had included everything from the RD
14   file at 11th and State?
15   A.   By initially informal paper requests, even
16   phone calls to 11th and State.  And then as time
17   developed, subpoenas to 11th and State.
18   Q.   Oh, sorry.  Sorry.  I wasn't asking how you
19   went about requesting them.  I'm asking how you went
20   about ensuring that what was provided to you was
21   everything from the permanent retention file or RD file?
22   A.   Well, we would read the police reports and
23   there's a certain pattern to all reports.  There's a --
24   a scene supplemental report and a closing supplemental
25   report and look for people interviewed, people charged.

Page 79

1    So you -- you read the report to see if -- if you --
2    from what you're reading of it, you can determine
3    whether you've got a complete set of reports.  Obviously,
4    a case report is different than a supplemental report.
5    A rap sheet is different than other police reports.  So
6    we would -- once we obtained those reports, we would
7    review them to -- to understand if we had all the -- the
8    supplemental materials as well as the -- the case
9    report.  As I said before, the scene report might not
10   say it's a scene report, but it's pretty obvious from
11   that supplemental report that it is the first report
12   issued and you'd always be looking for the closing
13   report.  At the end of that -- that report would say
14   closing and cleared or closed based upon the charges,
15   whatever it might be.  So those are the indicators that
16   we'd have as we've read the reports to make sure we had
17   what we believed would be a complete file.
18   Q.   And so, if I understand you correctly, is it
19   fair to say there are certain types of reports that show
20   up in the police files so regularly that if they weren't
21   there you'd know that something was missing, fair?
22   A.   Yeah, that's true.
23   Q.   Okay.  And there are other reports in the
24   police files that -- strike that.  Well -- strike that.
25   And is it your testimony that by -- as a prosecutor

Page 80

1    simply reviewing all the police report reports you'd
2    always be able to tell whether you'd received all of the
3    documents in the police file?
4    A.   Well, it -- we're issuing subpoenas to 11th
5    and State to obtain this material, so if there was a
6    closing supp missing, for example, that would be pretty
7    obvious to us.  But then we'd -- we'd either issue
8    another subpoena looking for the closing supp, for
9    example, or even call the detective saying, where's the
10   closing supp?  We understood that sometimes there was
11   delays in those closing reports being filed in a timely
12   manner.  And obviously with our discovery obligations,
13   we wanted to make sure we had the final, signed reports
14   to be able to tender to counsel.
15   Q.   Okay.  And so, you had a mechanism -- strike
16   that.  If it was a document that you routinely received,
17   you would have a mechanism to be able to catch that that
18   document hadn't been provided to you in a particular
19   instance, correct?
20   A.   Well, the mechanism would be us reading the
21   report and reviewing it.
22   Q.   Okay.  And for documents that were not
23   routinely included in a police file, you wouldn't have
24   the ability to tell just by reviewing the file if it
25   hadn't been disclosed to you; is that fair?

Page 81

1    A.   I don't know what type of documents would not
2    be routinely provided to us.
3    Q.   Would you know that in a police file there
4    were always going to be -- would you know the exact
5    number of supplementary reports that would be in every
6    file?
7    A.   No.
8    Q.   Okay.  And so, if you received ten
9    supplementary reports in the file, when you review the
10   file, how do you know that there must have been an 11th
11   supplementary report?
12   A.   Well, the --
13        MR. KIVETZ:  Objection.  Form.
14   A.   -- you would know from the ones you've read.
15   BY MR. SWAMINATHAN:
16   Q.   Go ahead.
17   A.   You'd know from the reports you've read if --
18   if something was alluded to and it was not there.  For
19   example, based upon the interview of Mr. Jones or Ms.
20   Smith, and you didn't have a supplemental report that
21   included that -- their biographical information and
22   their interview, you'd know that a report was missing
23   that way.  As I said before, generally, the last report
24   in the series was a closing report.
25   Q.   If you had ten reports, ten supplementary



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  reports in the case, and there was an 11th supplementary
2  report that was not alluded to in any of the earlier ten
3  reports, are you saying you had a mechanism to be able
4  to catch that?
5      A.  I did not say --
6          MS. CARNEY:  Objection.  Form.  Misstates his
7  testimony.
8          THE WITNESS:  I did not say that.
9  BY MR. SWAMINATHAN:
10     Q.  Are you opining that a prosecutor's review of
11  the documents provided by the police department will
12  allow them to tell whether they've always received all
13  of the documents from Chicago Police Department?
14         MS. CARNEY:  Objection.  Form.  Misstates his
15  testimony.
16         THE WITNESS:  I did not opine that.
17  BY MR. SWAMINATHAN:
18     Q.  Okay.  I just wanted to make sure I understood
19  that.  Let's go back to your materials reviewed. There's
20  a number of RD number files listed there, number five,
21  six, seven, eight, nine, and -- oh, strike that.  Five
22  and six are listed there as RD numbers where you look at
23  the RD file for two particular RD numbers.  Why did you
24  look at those two particular RD files?
25     A.  I don't recall.

Page 83

1      Q.  Okay.  Number seven through ten are instances
2  in which you looked at an RD file along with public
3  defender files and CCSAO files, correct?
4      A.  Yes.
5      Q.  And those were among the eight cases that are
6  discussed in Mr. Tiderington's report that you then
7  reviewed as well, correct?
8      A.  Yeah.  I recognized at least Kimberly Mathis,
9  yes, and Tony.  Yes.
10     Q.  Number 11 is the homicide file from the Reyes
11  case, correct?
12     A.  It's the investigative file.  Oh, I'm sorry.
13     Q.  Thank you.  I'm sorry.  You're -- yeah.  Let
14  me -- I think you're correct.  Let me re-ask the
15  question.  Number 11 listed in your materials reviewed
16  in Sierra is the Investigative file from the homicide
17  that you opined about in the Reyes case, correct?
18     A.  Number 11 is the investigative file for the
19  Soto homicide, which I opined upon in Reyes-Sierra-
20  Iglesias.
21     Q.  Thank you.  And offering your opinions in the
22  Sierra case, did you review any other files related to
23  the Soto homicide other than the investigative file?
24     A.  I don't think I did, no.
25     Q.  Okay.  And so, you didn't -- did you actually

Page 84

1  re-review the investigative file from the Soto homicide
2  before offering your opinion in Sierra?
3      A.  I did not.
4      Q.  Okay.  So you listed it because it's something
5  that you had reviewed in the past and you were offering
6  opinions in your Sierra case about the Reyes case.  But
7  you didn't -- you were just -- but you hadn't re-
8  reviewed it before you included it in your list here in
9  Sierra; is that fair?
10     A.  It was materials, obviously, that were
11  reviewed initially from what I formed those opinions
12  which were reiterated here in Sierra and Iglesias.  So
13  that's why it's listed as materials reviewed.
14     Q.  Okay.
15     A.  And it was reviewed in the past.
16     Q.  Okay.  And then if you look at 14 and 15,
17  those are additional RD files along with public defender
18  and criminal and Cook County State's Attorney files that
19  you reviewed, correct?
20     A.  Investigative, RD, public defender, and
21  State's Attorney, yes, for both of those.
22     Q.  And, in fact, 14 through 17 are files -- are
23  among the eight cases that were discussed in
24  Mr. Tiderington's report and that you also discussed in
25  your report, correct?

Page 85

1      A.  Yes, yes.
2      Q.  Thank you.  And did you actually re-review --
3  strike that.  You testified about this earlier, but if I
4  understand your testimony correctly, you didn't re-
5  review the investigative file, RD file, public defender
6  file, and state's attorney file for each of those cases
7  listed in 14 through 18, or 14 through 17, before
8  offering your opinion in the Sierra case, correct?
9      A.  That's correct.  They were reviewed earlier.
10  That material, that part of the report was compiled.
11     Q.  It was reviewed earlier, in other words,
12  before your Reyes opinion, correct?
13     A.  Yes.
14     Q.  Okay.  Number 18, do you remember why you
15  looked at that particular file?
16     A.  Off the top of my head, I do not recall.
17     Q.  And then 19 and 20 list the deposition of
18  Deborah Gubin and the deposition of Kevin Sheehan and
19  Johnson. You've already testified about this, but you
20  were made aware of those files, but you did actually
21  review those depositions, correct?
22     A.  I -- I -- I did not review Sheehan's, but --
23  but I think Gubin's was reviewed at some point.  So --
24     Q.  When did you review -- strike that.  So you
25  didn't review -- number 20 on your list of materials



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 25 of 82 PageID #:54313
The Deposition of BERNARD MELEKIAN, taken on May 12, 2023
86..89

Page 86

1  reviewed the deposition of Kevin Sheehan.  You did not
2  review that before offering your opinions in the CR
3  case, correct?
4      A.  I did not.
5      Q.  It's just -- is that correct?
6      A.  That's correct.
7      Q.  Okay.  Thank you.  And in number 19, the
8  deposition of Deborah Gubin, are you saying that at some
9  point before you offered your opinions in Sarah --
10 Sierra, you did review the deposition of Ms. Gubin?
11     A.  I -- I know I -- I reviewed Johnson.  I don't
12 -- I don't believe I reviewed it prior to issuing my
13 opinion in Sierra.
14     Q.  Okay.  You had not reviewed the deposition of
15 Ms. Gubin prior to offering your opinion in Sierra; is
16 that fair?
17     A.  I think that's accurate.
18     Q.  Okay.  Did you review the depositions of
19 Mr. Sheehan or Ms. Gubin before offering your opinions
20 in Iglesias?
21     A.  I don't believe I did.
22     Q.  Okay.  And if you -- and in looking at -- you
23 can look at both of your reports at that -- the expert
24 report of -- in Iglesias and in Sierra, you don't
25 discuss the deposition testimony of Ms. Gubin or

Page 87

1  Mr. Sheehan anywhere in either of those two reports,
2  correct?
3      A.  Right.
4      Q.  Okay.  And in your discussion of the Demetrius
5  Johnson case and Sierra, you don't discuss anywhere the
6  testimony of Ms. Gubin or Mr. Sheehan in your report,
7  correct?
8      A.  I did not.
9      Q.  And in the Iglesias case, nowhere in your --
10 strike that.  In the Iglesias case, in your discussion
11 of the Demetrius Johnson case, you don't include
12 anything about what was said in the depositions of
13 Ms. Gubin or Mr. Sheehan, correct?
14     A.  I do not.
15     Q.  Okay.  And then number -- and so number 19 and
16 20 are listed on your materials reviewed because they
17 were made available to you, but you didn't actually
18 review them; is that fair?
19     A.  That's -- that's accurate.
20     Q.  Okay.  What else on your list here, from 1
21 through 27 of your list of material reviewed, are items
22 that were made available to you, but that you didn't
23 review?
24     A.  Well, I -- I would say all this material had
25 been reviewed.  Like, as we discussed earlier, there's

Page 88

1  materials I reviewed when I was preparing for Reyes, so
2  I would not necessarily re-review it here.  I -- I'm
3  drawing a blank on a couple of the items here, so I
4  don't know if I reviewed them in preparation of these
5  two reports.  But if I'm listing them here, I had them
6  at least available to look at and I -- we have to look
7  at the specific RD numbers related to the pages cited by
8  Plaintiff's expert.  If -- if they relate to that, then
9  yes, I did review them in my replying to the Plaintiff's
10 expert's comments on those pages.
11     Q.  Okay.  And if you look -- it's a little bit on
12 the Items 23 through 26 on your list identified the
13 investigative files and RD files for specific RD
14 numbers.  Do you have a specific memory of what those
15 files were?
16     A.  No, but like I said, they could be referring
17 to the pages that Plaintiff's expert cited, so they may
18 be related to that.
19     Q.  In other words, when Plaintiff's -- when
20 Mr. Tiderington on Pages 58 and 59 of his report and
21 Sierra cited specific pages, you were then provided with
22 the investigative file and RD file for those cases,
23 correct?
24     A.  And matter of fact, I'm -- I'm looking at some
25 of those pages now and these -- those are -- those RD --

Page 89

1  those are the RD numbers that refer to his pages.
2      Q.  And you're referring to 23 through 26,
3  correct?
4      A.  Yes, I am.
5      Q.  Okay.
6      A.  And maybe 27, too.
7      Q.  Okay.  And -- well, number 27, I'll represent
8  to you, that RD number is the RD number for the Andujar
9  homicide investigation, this Sierra case, okay?
10     A.  Well, then -- then obviously that was
11 something I reviewed in replying to his specific page
12 referrals.
13     Q.  With regard to the Sierra case in particular,
14 correct?
15     A.  And -- and all the -- all 23 through 26 as
16 well.  Those are -- appear to me to be the RD numbers
17 associated with the pages that he referred to and I
18 analyzed.
19     Q.  Okay.  And so, let me just ask you about 27,
20 just so I'm clear.  Number 27 is the Sierra
21 investigative file and RD file or should I -- strike
22 that.  Should I say number 27 is RD number Z226760, that
23 is the Andujar homicide investigation that is the
24 subject of the Sierra case, correct?
25     A.  Yes, it is.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 26 of 82 PageID #:54314
Oral Deposition of Bernard Murray Taken on May 18, 2023
90..93

Page 90

1    Q.   Okay.  So you reviewed the investigative file
2  and RD file from the Sierra case, correct?
3    A.   Yes.
4    Q.   Okay.  And as we -- and if I understand your
5  testimony from earlier, you didn't go through that file,
6  the investigative file and RD file, comprehensively, you
7  were focused on the specific pages that were referenced
8  by Mr. Tiderington, correct?
9    A.   Focused on them, but that would often cause me
10 to read other reports to make sure I understood the --
11 the investigation to help me in my analysis and my --
12 and my -- and the analysis I provided in the -- in my
13 expert report.
14   Q.   Okay.  And other than the investigative file
15 and the RD file, did you review any other files related
16 to the Sierra case and the Andujar homicide
17 investigation?
18   A.   No.
19   Q.   And so, in the Sierra case, you did not review
20 the public defender file related to that case, correct?
21   A.   Give me one second.  I do not think I did, but
22 let me just verify.  As far as I recall, I did not
23 review the public defender file.  Think there was one.
24   Q.   Okay.  And you did not review the Cook County
25 State's Attorney's Office file for the Andujar homicide

Page 91

1  investigation in the Sierra case, correct?
2    A.   I don't -- I did not.
3    Q.   Okay.  And then did you review any other
4  related files or -- did you review any other police
5  investigation files that were related in any way to the
6  Andujar homicide investigation?
7         MS. CARNEY:  Objection.  Form.
8         MR. KIVETZ:  Yeah, I'm going to join.
9         THE WITNESS:  I don't know if I understand.
10 BY MR. SWAMINATHAN:
11   Q.   Yeah, I'll ask a better question.
12   A.   Not sure I understand.
13   Q.   Yeah.  I'll ask a better question.  You've
14 indicated that you've listed on your materials reviewed
15 all of the files that you reviewed in preparing your
16 Sierra report.  Your list does not include the RD number
17 for the Ruben Gonzalez file, which is Z220314.  Did you
18 review that investigative file or RD file?
19   A.   I did not.
20   Q.   Okay.  And you understand from
21 Mr. Tiderington's report that he references particular
22 documents in the Ruben Gonzalez file that he indicates
23 are relevant to his opinions about the Sierra case; do
24 you recall that?
25        MR. KIVETZ:  Objection.

Page 92

1         THE WITNESS:  I do.
2  BY MR. SWAMINATHAN:
3    Q.   Okay.  And so, Mr. Tiderington was referring
4  to particular documents in the Ruben Gonzalez file.  Did
5  you review the Ruben Gonzalez file?
6    A.   I already told you, I did not review the Ruben
7  Gonzalez file.
8    Q.   Okay.  Did you review any public defender
9  files or state's attorney files related to the Ruben
10 Gonzalez case?
11   A.   I did not.
12   Q.   And did you review any police reports related
13 to the Ruben Gonzalez investigation?
14   A.   Related to it?  You mean the RD itself?
15   Q.   Strike that.  Let me ask a better question.
16 Did you review any police reports from the Ruben
17 Gonzalez case?
18   A.   I did not.
19   Q.   In offering your opinions related to the
20 Sierra case -- strike that.  You -- well strike.  Let's
21 look at your report.  Your report on, I think it's the
22 what the last page, Page 23 discusses your opinions
23 related specifically to the Sierra case, correct?
24   A.   (coughs) Excuse me.
25   Q.   In other words, to the Andujar homicide

Page 93

1  investigation, correct?
2         MR. KIVETZ:  Do you say 23?
3         THE WITNESS:  Yes, I see that now.
4         MR. SWAMINATHAN:  Yeah, Page 23 of his report.
5         THE WITNESS:  The -- the Sierra report; is that
6  correct?
7  BY MR. SWAMINATHAN:
8    Q.   Yeah, Page 23 of your Sierra report discusses
9  your opinions related to the Andujar homicide
10 investigation.
11   A.   Yes, it does.
12   Q.   Okay.  Do you have any other opinions related
13 to the Andujar homicide investigation that are not
14 captured on Page 23 of your report?
15   A.   No.
16   Q.   Okay.  Did you review -- strike that.  In
17 offering your opinions on Page 23 related to the Andujar
18 homicide investigation, did you review any depositions
19 from the Sierra case?
20   A.   No.
21   Q.   Did you review the deposition of Thomas
22 Sierra?
23   A.   Of who?
24   Q.   Thomas Sierra.
25   A.   I did not.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1    Q.   In offering your opinions related to the
2  Thomas Sierra case, did you review any depositions of
3  the eyewitnesses who had made identifications of Thomas
4  Sierra resulting in his conviction?
5    A.   I did not.
6    Q.   Did you review the deposition of a man named
7  Hector Montanez?
8    A.   I did not.
9    Q.   Did you review any of the transcripts from the
10  criminal trial in Mr. Sierra's case?
11    A.   I did not.
12    Q.   Is that -- is -- the transcripts of the
13  criminal trial, is that information that you think
14  could've been useful to you in offering your opinions
15  related to the Sierra case?
16    MS. CARNEY:  Objection.  Form.  You can answer.
17    THE WITNESS:  I was analyzing Plaintiff's
18    expert's comments regarding certain pages in the
19    Sierra case, so I replied and analyzed those
20    comments.  I didn't have other depositions or police
21    reports that would change my opinion on what I
22    opined on Plaintiff's expert's comments.
23  BY MR. SWAMINATHAN:
24    Q.   Okay.  Did you review the portion of
25  Mr. Tiderington's opinion, the first half of his expert

Page 95

1  report, in which he discussed the depositions and
2  transcripts and all the other evidence specifically
3  related to the Sierra case, beyond what just was written
4  in the investigative file and RD file?
5    A.   I did not review that material.  I was -- when
6  I was analyzing Plaintiff's expert's comments it was
7  related to these pages that are referred to on Page 23
8  of my report.
9    Q.   Okay.  And when you reviewed Mr. Tiderington's
10  report, did you pay any attention to the first part of
11  his report where he discussed specific testimony from
12  witnesses about events that took place during the course
13  of the investigation?
14    A.   I did not analyze that or opine on that.  So I
15  did not review it in great detail.
16    Q.   Did you offer -- strike it.  Are you offering
17  any opinions about -- that are based on some of the --
18  any of the testimony that any of the witnesses provided
19  about what occurred during the course of the Andujar
20  homicide investigation?
21    A.   My opinions regarding the -- the -- the Thomas
22  Sierra case are based upon the pages that were discussed
23  by Plaintiff's expert and -- and I replied to those
24  pages on Page 23.  I did not provide analysis or
25  discussion of the material from the front part of his

Page 96

1  report.
2    Q.   Okay.  And so, to the extent, there are
3  witnesses -- strike that.  To the extent Mr. Tiderington
4  discusses the fact that there were witnesses who
5  testified in their depositions that there were events
6  that took place during the course of Andujar homicide
7  investigation that are not documented in any
8  investigative file or RD file, are off -- are you
9  offering any opinions about whether or not that is
10  information that should have been disclosed to
11  prosecutors and criminal defendants?
12    A.   I'm not offering any opinion on that.
13    MR. KIVETZ:  Objection.  Form.
14  BY MR. SWAMINATHAN:
15    Q.   Go ahead.  Go ahead.
16    MS. CARNEY:  I think he answered.
17    THE WITNESS:  I said I'm not offering an
18    opinion on that.
19  BY MR. SWAMINATHAN:
20    Q.   Okay.  And with regard to any events that took
21  place during the course of the Andujar homicide
22  investigation that are not documented in any police
23  reports, do you have any opinions about whether or not
24  that those are things that should have been disclosed to
25  prosecutors?

Page 97

1    MR. KIVETZ:  Objection.  Form.
2    THE WITNESS:  I'm only -- only opining on the
3    pages cited on Page 23.  I'm not opining on that
4    other material.
5  BY MR. SWAMINATHAN:
6    Q.   If witnesses -- strike that.  If the
7  eyewitnesses in the Andujar homicide investigation
8  provide a testimony that they had initially told
9  detectives that they couldn't make an identification, is
10  that information that you would've expected to be
11  disclosed to you?
12    MR. KIVETZ:  Objection.  Form, foundation.
13    Misstates the evidence.
14    THE WITNESS:  For the purpose of my expert
15    report?
16  BY MR. SWAMINATHAN:
17    Q.   Thank you.  That was a poor question.  If
18  witness -- if the -- strike that.  If the eyewitnesses
19  in the Andujar homicide investigation testified at their
20  depositions that they had provided guidance to the
21  police, that they did not get a good enough look to be
22  able to make an identification, is that information that
23  you would expect to have been disclosed to the
24  prosecutors?
25    MR. KIVETZ:  Objection.  Form, foundation,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 28 of 82 PageID #:54316
The Deposition of BERNARD MURRAY, taken on May 12, 2023
98..101

Page 98

1    misstates the evidence.
2         THE WITNESS:  So I -- I'm trying to understand
3    your question.  So these are depositions taken years
4    after the criminal trial and after the person was
5    convicted?
6    BY MR. SWAMINATHAN:
7         Q.   Yeah.  Yes.  Let's start there.
8         MR. KIVETZ:  Same objections, misstates the
9    evidence, form and foundation, speculation.
10        MS. CARNEY:  If you understand, go ahead.
11        THE WITNESS:  You know, I -- I don't know how
12   to answer that question because the -- are you
13   referring to -- there was a police report back at
14   the time of the -- of the investigation that was not
15   disclosed?
16   BY MR. SWAMINATHAN:
17        Q.   No, I'm not asking you about a police report.
18   I'm asking you about the witnesses indicating particular
19   events took place during the course of the investigation
20   that were not documented in any police reports.  Are you
21   opining that, that's not possible?
22        MR. KIVETZ:  Objection.  Form, foundation,
23   misstates the evidence, speculation.
24        MS. CARNEY:  Misstates his testimony.
25   BY MR. SWAMINATHAN:

Page 99

1         Q.   Go ahead.
2         A.   I -- I have no opinion on that.
3         Q.   Okay.  Are you offering any opinions based on
4    your experience as a prosecutor about whether it's
5    possible for events to have taken place during the
6    course of a homicide investigation that were not
7    documented?
8         MR. KIVETZ:  Objection.  Form.
9         THE WITNESS:  I'm not offering -- I'm not
10   offering an opinion on that.
11   BY MR. SWAMINATHAN:
12        Q.   Okay.  And are you opining at all about
13   whether that occurred in the Andujar homicide
14   investigation?
15        MR. KIVETZ:  Objection.  Form, foundation,
16   speculation.
17        THE WITNESS:  I am not giving an opinion on
18   that.
19   BY MR. SWAMINATHAN:
20        Q.   Are you opining here, based on your experience
21   as a prosecutor, that police officers always document
22   all of the investigative steps that occurred during the
23   course of a homicide investigation?
24        MR. KIVETZ:  Objection.  Form, foundation,
25   speculation, incomplete hypothetical.

Page 100

1         MS. CARNEY:  Go ahead.
2         THE WITNESS:  I'm not offering an opinion on
3    that.
4    BY MR. SWAMINATHAN:
5         Q.   Are you opining here, based on your experience
6    as a prosecutor that -- (cough) excuse me, let me repeat
7    the question, but -- so that I'm being clear because
8    we're talking about two different cases.  So I
9    apologize, I'm going to ask you the question again, but
10   I just want to make sure I have a clear record and
11   that's fair to you.  Are you opining in the Sierra case
12   that Chicago Police detectives always document all of
13   the investigative steps taken during the course of a
14   homicide investigation?
15        MR. KIVETZ:  Objection.  Form, foundation.
16        THE WITNESS:  I'm not offering an opinion on
17   that.
18   BY MR. SWAMINATHAN:
19        Q.   And in the Iglesias case, are you opining that
20   Chicago Police Detectives always document all the steps
21   they took during the course of a homicide investigation?
22        MR. KIVETZ:  Same objection.
23        THE WITNESS:  I'm -- I'm not offering an
24   opinion on that.
25   BY MR. SWAMINATHAN:

Page 101

1         Q.   And in the Sierra case, are you offering an
2    opinion that during the course of the Andujar homicide
3    investigation that the police detectives, in fact,
4    documented all of the investigative steps that occurred
5    during that homicide investigation?
6         MR. KIVETZ:  Objection.  Form, foundation.
7         THE WITNESS:  I'm not offering an opinion on
8    that.
9    BY MR. SWAMINATHAN:
10        Q.   And in the Iglesias case, are you offering an
11   opinion that Chicago Police detectives documented all of
12   the investigative steps that occurred during the course
13   of the Monica Roman homicide investigation?
14        MR. KIVETZ:  Objection.  Form, foundation.
15        THE WITNESS:  I'm not offering an opinion of
16   that.
17        MS. CARNEY:  Anand?
18        MR. SWAMINATHAN:  Yeah.
19        MS. CARNEY:  When you get to a good breaking
20   point, can we take a break?  I want to check on
21   those documents and my computer's about to die.  I
22   need to get it plugged in.
23        MR. SWAMINATHAN:  Let's stop right here.
24        MS. CARNEY:  Okay.
25        THE REPORTER:  All right, we are off the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 102

```
1    record.  The time is 12:14.
2              (OFF THE RECORD)
3         THE REPORTER:  We are back on the record for
4    the deposition of Bernard Murray being conducted by
5    videoconference.  My name is Sydney Little.  Today
6    is May 10, 2023 and the time is 12:45 p.m. Central.
7         MR. SWAMINATHAN:  Okay.  All right.
8         MS. CARNEY:  Anand, they just came through.
9         MR. SWAMINATHAN:  Okay.  So let's take a look
10   at your -- sorry.  Did you said -- Theresa, you said
11   it just got sent?
12        MS. CARNEY:  They just -- the e-mails just came
13   through.
14        MR. SWAMINATHAN:  I see it.  Okay.  Let's start
15   there then.  It looks like they're both the same,
16   right?
17        MS. CARNEY:  Yes, it's pretty much the same
18   thing in both.
19        MR. SWAMINATHAN:  Okay.  Let me open it this
20   way.
21   BY MR. SWAMINATHAN:
22        Q.   Okay.  I'm going to share my screen with you,
23   sir.  I'm showing you the document we've marked as RFC -
24   - oh, it's RFC Murray 1 through 3, and we'll mark this
25   as Exhibit 4.
```

Page 103

```
1              (EXHIBIT 4 MARKED FOR INDENTIFICATION)
2         THE REPORTER:  I'm sorry.  What did you mark as
3    Exhibit 3?
4         MR. SWAMINATHAN:  Oh, good question.  Exhibit 3
5    was the -- was on my list as the materials reviewed
6    from the Sierra case.
7              (EXHIBIT 3 MARKED FOR INDENTIFICATION)
8         THE REPORTER:  Okay.  Great.  Thanks.
9    BY MR. SWAMINATHAN:
10        Q.   Exhibit 4 is -- all right.  Sir, looking at
11   pages -- looking at Page 1, this is a copy of your CV,
12   correct?
13        A.   Yes.
14        Q.   Okay.  And can you tell us what's updated on
15   this version of your CV that was produced to us today?
16        A.   I'm sorry.  What'd you say, sir?
17        Q.   Yeah.  Can you tell us what has been added or
18   changed on this CV as compared to the prior versions of
19   the CV you provided to us?
20        A.   The only thing difference was in professional
21   experience, William Ray -- William Ray -- William Harper
22   College, associate professor.  I've been teaching there
23   one class a semester that was not listed on prior copies
24   of the resume --
25        Q.   Okay.
```

Page 104

```
1         A.   -- at least the -- the most recent copy.
2         Q.   And is the changes you made to your resume
3    that are included in this RFC Murray 1 that you produced
4    to us today, are there any changes based on any errors
5    or inaccuracies in your prior versions of your CV that
6    you produced to us?
7         A.   No.
8         Q.   Okay.  Let's take a look at Pages 2 and 3 of
9    your report -- or I'm sorry, Pages 2 and 3 of Exhibit 4.
10   And let's start with Page 3, which is appears to be an
11   invoice related to the Sierra matter.  Sir, are you
12   familiar with this document?
13        A.   Can you make it a little larger?
14        Q.   Yes.  This is RFC --
15        A.   Yes.
16        Q.   -- Murray 3 that I've just provided to you.
17   Can you tell us what it is?
18        A.   Yes.  It's an invoice for the -- the work
19   I've, to date, completed on the examination of the -- of
20   the expert's report and -- and Sierra, and my report.
21        Q.   Okay.  And so, it lists a total bill of
22   $6,400.  Is that the amount total that you have billed
23   for the Sierra case?
24        A.   Yeah, to date, yes.
25        Q.   Okay.  And when you say to date, does this
```

Page 105

```
1    include any time for preparation for today's deposition?
2         A.   You know, it -- it does not have the
3    deposition prep in there.  It does not.
4         Q.   Okay.  So is this -- would it be fair to say
5    that this listed here, is this all time that you that --
6    you spent on the Sierra case up through the time that
7    you submit -- submitted your report?
8         A.   This is after the report was submitted.  Yeah,
9    yes, through the report being compiled and submitted.
10        Q.   Thank you.  In other words, this is an invoice
11   that you obviously submitted after you completed your
12   expert report, correct?
13        A.   That's correct.
14        Q.   And it captures all the time that you spent
15   reviewing materials and preparing your report in the
16   matter, correct?
17        A.   Yes.
18        Q.   Okay.  And does it include any time you spent
19   on this case after the completion of your report?
20        A.   It -- it does not.
21        Q.   Okay.  And so, the 32 hours that are listed on
22   this invoice, that is the amount of time you spent
23   reviewing documents and preparing your report in the
24   Sierra case; is that fair?
25        A.   That is fair.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 30 of 82 PageID #:54318
Oral Deposition of BERNARD Harvey, Taken on May 12, 2023
106..109

Page 106

1    Q.   Okay.  And then according to this invoice, you
2  spent eight hours reviewing Plaintiff's expert report
3  and deposition; is that right?
4    A.   Yes.
5    Q.   Okay.  And how much -- how -- what portion of
6  that eight hours did you spend on Mr. Tiderington's
7  report, as opposed to his deposition?
8    A.   I would say more on the -- I don't know exact
9  hours, but more on the report than on the deposition.
10   Q.   Okay.  And when you say you, and so the
11 portion of time that you spent on the expert report, as
12 we've discussed earlier, was focused on the last portion
13 of Mr. Tiderington's report that had to do with his
14 review of specific files and specific documents from
15 other Area 5 cases, correct?
16   A.   That's -- yeah, that's right.
17   Q.   Okay.  And then the File and Document Review
18 and Report Compilation portion, it lists 17 hours; do
19 you see that?
20   A.   I see it.
21   Q.   And what are the activities that make up that
22 17 hours?
23   A.   Well, as we discussed earlier, where -- where
24 Plaintiff's expert cites to certain pages and discusses
25 those pages, this -- this part of my work would be

Page 107

1  looking at the RD from where that report came from and
2  I'm compiling -- I'm starting to type the report at the
3  same time that I'm reviewing the different RDs as well
4  as, you know, looking at the in -- at the information
5  provided by Plaintiff's expert in his report relating to
6  those files.
7    Q.   Okay.  And so, it includes all the -- so it --
8  I guess maybe my -- let me ask this question.  The next
9  column lists File Review and Final Report Compilation;
10 do you see that?
11   A.   I do.
12   Q.   So you clearly spent part of the 17 hours in
13 the 17 -- part of the 17 hours in the second column was
14 spent on reviewing actual documents in the case,
15 correct?
16   A.   Yeah.  Part of the time was, yes.
17   Q.   And what about the third column, the seven
18 hours for File Review and Final Report Compilation?  Does
19 that also include time spent reviewing documents?
20   A.   Yeah.  That -- that -- yes, it would include
21 that.  The -- the -- though I'm well on my way to, you
22 know, drafting up a -- a -- a report, now it's making
23 sure that the information that I'm discussing is
24 accurate from the RD, for example, from the RD
25 pertaining to a note that Plaintiff's expert pointed out

Page 108

1  to -- pointed out to.
2    Q.   Okay.  So that seven hours, that includes time
3  spent going back to specific pages of Mr. Tiderington's
4  report and making sure you've accurately described what
5  occurred; is that right?
6    A.   Yes.
7    Q.   Okay.  And what portion of that seven hours is
8  -- was on time spent on the final report compilation?
9    A.   Not as -- maybe a third.
10   Q.   Okay.
11   A.   Again, it's -- it's -- it's checking -- it's -
12 - it's still -- still reviewing back the files, but I'm
13 just making sure that what I've already compiled was
14 accurate.
15   Q.   Okay.  And looking at this -- the middle
16 column, the 17 hours, what portion of that was spent on
17 actually typing or drafting your report?
18   A.   Well there'd be drafting along the way, so as
19 -- as I'm reviewing a -- a -- a note that he refers to
20 and then I'm starting to look at -- I'm looking at the
21 RD as well, I'm -- I'm writing down my -- my
22 observations as I'm going along.  It might not be, you
23 know, might not be a clean copy ready to go, but I'm
24 doing that along the way.  So more file and document
25 review and less report writing at that time, but

Page 109

1  definitely, I am -- I am composing at that time so I
2  will be able to further edit my observations later on.
3    Q.   Your opinions on Page 23 of your expert report
4  in the Thomas Sierra case that are discussing the
5  Andujar homicide investigation in particular, what
6  portion of your 32 hours did you spend on file review
7  and report writing just related to the opinions in Page
8  23?
9    A.   Well, I wouldn't put a -- a -- a specific
10 amount of time on it because, I mean, there was
11 reviewing supplement -- excuse me, I was reviewing
12 supplemental reports as well to -- to understand the --
13 the -- the allegations, the analysis by Plaintiff's
14 expert, so I -- I wouldn't say it was a short period of
15 time, but it was not excessive.
16   Q.   Was it one hour, ten hours?  Can you give me a
17 general sense of how long on the Andujar case in
18 particular?
19   A.   What, maybe a couple of hours.
20   Q.   Okay.  And so, that was a couple of hours
21 including time reviewing the Andujar related file, on
22 police files and on report writing, correct?
23   A.   Mostly reviewing.
24   Q.   Mostly reviewing the Andujar police files?
25   A.   Reviewing the -- the allegations made, the --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 110

1    the analysis provided by Plaintiff's experts and then
2    where -- then that would lead me to where in the police
3    reports I would be reviewing to find those, where that
4    information came from.
5        Q.   Okay.  Looking at your -- going back to your -
6    - oh, sorry, let's look at Page 2 of your -- of RFC
7    Murray 1 through 3, Exhibit 4.  And there it lists your
8    total hours in the Iglesias case; do you see that?
9        A.   I see it.
10       Q.   Okay.  Then is it fair to say that from the
11   time you began working on the Iglesias case through the
12   time of your -- this bill for $3,000 that you spent a
13   total of -- well, strike that.  From the time you began
14   working on the Iglesias case until the time that you
15   completed your expert report in the Iglesias case, how
16   much time did you spend on the case?
17       A.   Well, it -- it's listed here at 15 hours.
18       Q.   Okay.  So this invoice is for all of -- all --
19   this entire invoice is for the time you spent reviewing
20   materials and, ultimately, preparing the Iglesias expert
21   report, fair?
22       A.   That's what the hours reflect.
23       Q.   Okay.  And so, to the extent you have
24   additional time spent preparing for this deposition or
25   any other work after you disclosed your report, that's

Page 111

1    not captured in this invoice, fair?
2        A.   That's accurate.
3        Q.   Okay.  And so, of the 15 hours you spent on
4    the Iglesias case, what portion of that was spent on
5    report writing versus reviewing materials?
6        A.   I don't know.  The method I use I -- it's --
7    it's on -- I can't say on GM 1 certain day, I sit there
8    and did nothing but write.  So I am compiling
9    information that becomes the final report as I'm
10   reviewing both the plaintiff's expert's report and
11   looking at police reports.  So it's hard to put a -- a -
12   - a split on that.
13       Q.   Was it in the ballpark of 50/50 between
14   document review and report writing, or was it more of
15   one or the other?
16       A.   Probably slightly -- probably slightly more on
17   document review.  I find myself going back and forth
18   from the plaintiff's expert's report and when -- also
19   then looking at different police reports.  Sometimes I
20   go down a rabbit hole reading more of a police report
21   than maybe is necessary.  But -- so I would say maybe
22   60/40 is a -- a better way of looking at it.
23       Q.   A 60/40 of the 15 hours, 60/40 in terms of 60
24   percent towards actual -- the file review as opposed to
25   report compilation, as a general ballpark?

Page 112

1        A.   As a general ballpark, that's a -- a good
2    estimate.
3        Q.   Okay.  Let's go back to your list of
4    materials.  We can take this off the screen.  Let's go
5    back to your list of materials reviewed in Sierra.
6    Excuse me.  Fair to say looking at your list of
7    materials reviewed, you did not review the entire body
8    of Area 5 investigative files and RD files that were
9    available from the Sierra matter, fair?
10       MS. CARNEY:  Objection.  Asked and answered.  Go
11   ahead.
12       THE WITNESS:  Yes, I did not.
13   BY MR. SWAMINATHAN:
14       Q.   And why not?
15       A.   I was -- my -- my analysis was pertaining to
16   the documents and pages that Plaintiff's expert pointed
17   out as examples of either information that was not
18   conveyed in discovery or was not recorded in a way that
19   would get the information into the permit retention
20   files.  So I was focused on replying to his specific
21   examples.
22       Q.   And did you feel that in offering opinions
23   about -- strike that.  Did you feel that in offering
24   opinions in this case that you could offer opinions that
25   were reliable without having to review all of the

Page 113

1    materials that were available to you from the Chicago
2    Police Department?
3        MS. CARNEY:  Objection.  Form.  You can answer.
4        THE WITNESS:  What -- I felt the report I
5        compiled was accurate and reliable as to the claims
6        made by Plaintiff's expert.
7    BY MR. SWAMINATHAN:
8        Q.   Okay.  And did you feel you could reliably
9    offer opinions in the Sierra case without having
10   reviewed all of the police files that were available for
11   the period from 1995 to 1998 from the Reyes case?
12       A.   I think I -- by replying to the specific
13   allegations that he raised, I could be accurate and
14   reliable.
15       Q.   And did you feel that in the Sierra case you
16   could offer reliable opinions without having reviewed
17   all of the prosecutor files that were available from the
18   '95 -- 1995 to 1998 period from the Reyes case?
19       A.   I was -- I was -- in the -- the Sierra report,
20   I'm replying to specific examples that Plaintiff's
21   expert provided.  So they were examples that he
22   provided.  So I didn't feel I had to go back and look at
23   the other reports, the other files.
24       Q.   In your Sierra expert report, are you offering
25   an opinion that the Chicago Police Department always



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 32 of 82 PageID #:54320
Oral Deposition of: BERNARD MURRAY taken on May 18, 2023

114..117

Page 114

1  produced all of the police files in its records to
2  prosecutors?
3        MS. CARNEY: Objection. Form. Sorry, I missed
4  some of that. Can you ask that again?
5  BY MR. SWAMINATHAN:
6        Q.   Yeah. In the Sierra case, are you offering an
7  opinion that the Chicago Police Department always
8  produced all of the police reports and records in its
9  files to prosecutors?
10       A.   I -- I'm not offering that opinion. I'm
11  offering opinion on how prosecutors obtained reports
12  from the police department and provided them to defense
13  counsel.
14       Q.   Okay. And in the Iglesias matter, are you
15  offering an opinion that the Chicago Police Department
16  always produced all of the documents in its police files
17  to the prosecutors?
18       A.   I'm not offering an opinion on that.
19       Q.   Okay. In the -- I'm just going to go through
20  the list of questions I asked you before, but for the
21  Iglesias case, I just -- I -- it'll sound like I'm
22  asking the same thing, but that's the only reason I'm
23  doing it. So with my apologies, let me ask you the
24  questions. In the Iglesias matter, is it fair to say
25  that you did not review all of the police investigative

Page 115

1  files for the periods from '91 to '95 and from '95 to
2  '98 that were available to you?
3        A.   I did not review those files.
4        Q.   Okay. And did you feel that you could offer
5  reliable opinions in the Iglesias case without having
6  reviewed all of the police files from '91 to '95 and
7  1995 and '98 that were available to you?
8        A.   Yes, because I was responding to specific
9  examples that Plaintiff's experts had pointed out and
10  described how he thought the -- what his opinions on
11  that were, so I could reply to those specific examples
12  Without reviewing all those other files
13       Q.   In the Iglesias case, did you feel that you
14  could offer reliable opinions without having reviewed
15  all of the public defender files that were available to
16  you for the period from 1995 to 1998?
17       A.   Yes.
18       Q.   And in the Iglesias case, did you feel you
19  could offer reliable opinions without having had the --
20  strike that. In the Iglesias case, did you feel you
21  could offer reliable opinions without having reviewed
22  all of the State's Attorney's Office prosecutor files
23  for the period from 1995 to 1998?
24       A.   Yes.
25       Q.   And in fact, in offering your opinions in

Page 116

1  Sierra and Iglesias cases, you did not review all of the
2  prosecutor files that were available to you, correct?
3        A.   We -- when you say all the prosecutor's files,
4  which -- what prosecutor files are you referring to?
5        Q.   Thank you. You understood that for the period
6  from 1995 to 1998, there were numerous prosecutor files
7  that had been obtained from the Cook County State's
8  Attorney's Office that were available to be reviewed and
9  compared against police investigative files and RD
10  files, correct?
11       A.   I understood there was a lot of prosecutor
12  files compiled.
13       Q.   Okay. And you didn't review all of the files
14  that had been gathered from the prosecutor's office,
15  correct?
16       A.   I reviewed files that were pertinent to the --
17  the -- the pages cited by Plaintiff's expert and the
18  examples that he cited specifically. I did not review
19  the other Plaintiff's -- prosecutor's files.
20       Q.   In other words, you looked only at the -- out
21  of all the prosecutor files that were available in
22  Sierra and Iglesias, you only reviewed the prosecutor
23  files that had also been reviewed by Mr. Tiderington,
24  correct?
25       MS. CARNEY: Objection. Form. Misstates the

Page 117

1  evidence. You can answer.
2        THE WITNESS: I'm sorry. I -- I'm -- I don't
3  think I understood that question.
4  BY MR. SWAMINATHAN:
5        Q.   Okay. In Sierra Iglesia, the only prosecutor
6  files that you reviewed were the ones that were also
7  reviewed by Mr. Tiderington, correct?
8        A.   When I was -- I'm -- I'm examining whatever
9  prosecutor files were available when they when they
10  related to specific pages that he referred to or to the
11  eight or five cases that he referred to. And -- and
12  then the specific case itself, the -- the -- the
13  specific pages he refers to. So those prosecutor files,
14  I would review if --
15       Q.   In other words --
16       A.   -- available.
17       Q.   Thank you. In other words of all the
18  prosecutor files that were available to you in Sierra
19  and Iglesias, you only reviewed the prosecutor files
20  that related to the cases Mr. Tiderington had referred
21  to in his report; is that fair?
22       A.   The ones that he cited as examples, yes.
23       Q.   Okay. And so, you understood that when
24  Mr. Tiderington offered his opinions, he had not
25  reviewed all of the prosecutor files that were available

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

```
 1    from the Cook County State's Attorney's Office, correct?
 2         MR. KIVETZ:  Objection.  Form.
 3         THE WITNESS:  Pretty clear he did not.
 4    BY MR. SWAMINATHAN:
 5         Q.   Go ahead.
 6         A.   Pretty clear they did -- he did not review all
 7    prosecutor files.
 8         Q.   And that's also true for you, correct?
 9         A.   Well, he was allegedly looking at a different
10    universe than I was looking at.
11         Q.   Let me this.  Did you review all of the
12    prosecutor files that were available from the Cook
13    County State's Attorney's Office when you offered your
14    opinions in Sierra and Iglesias?
15         MR. KIVETZ:  Objection.  Form.
16         MS. CARNEY:  Asked and answered.  You can --
17         THE WITNESS:  I reviewed the prosecutor files
18         that related to the specific page examples and case
19         examples that he included in his report, if they
20         were available.
21    BY MR. SWAMINATHAN:
22         Q.   Got it.  Got it.  And all I'm asking is, was
23    that all of the prosecutor files that were available or
24    was it only a portion?
25         MS. CARNEY:  Objection.  Form, foundation.
```

Page 119

```
 1         THE WITNESS:  I -- I don't know what portion it
 2         was.  I'm assuming there were other prosecutor files
 3         that were not related to the pages or cases that he
 4         cited as examples.
 5    BY MR. SWAMINATHAN:
 6         Q.   Okay.  And you didn't review those, correct?
 7         A.   I did not.
 8         Q.   Okay.  And did you feel that you could offer
 9    opinions -- strike that.  Did you feel that you could
10    offer reliable opinions despite relying on only a
11    portion of the available prosecutor files in Sierra and
12    Iglesias?
13         A.   My opinions on those specific pages and those
14    specific cases, I felt I could offer an opinion based
15    upon reviewing police and prosecutor files and public
16    defender files, if any were available, on those specific
17    examples.
18         Q.   Okay.  Let's look at your materials reviewed
19    in the Iglesias matter.  We'll mark it as Exhibit 5.
20         (EXHIBIT 5 MARKED FOR IDENTIFICATION)
21         A.   I have it in front of me now.
22    BY MR. SWAMINATHAN:
23         Q.   Excellent.  Okay.  And if you look at your
24    list of materials reviewed in Iglesias, it indicates
25    that you reviewed several additional documents beyond
```

Page 120

```
 1    the documents you've reviewed in the -- at the time you
 2    offered your Sierra opinions, correct?
 3         A.   I'm -- I'd have to compare it right now.
 4         Q.   Well, why don't we -- let's do that together
 5    just to make it easier.  Items number five and six on
 6    Exhibit 5, your Iglesias materials reviewed are --
 7         A.   Yeah.
 8         Q.   Well -- yeah.  Are the depositions of
 9    Mr. Tiderington, it says, in Sierra and Iglesias; do you
10    see that?
11         A.   I see that.
12         Q.   Okay.  And so -- strike that.  When you -- so
13    if you look at materials reviewed on Exhibit 5, it
14    includes two new items, if you're looking at items one
15    through six.  Item number three and item number six are
16    the expert report of Thomas Tiderington and deposition
17    of Thomas Tiderington in the Iglesias case, correct?
18         A.   I see that, yes.
19         Q.   Okay.  And so, when you offered your opinions
20    in Sierra, you had not reviewed items number three and
21    six on Exhibit 5 because obviously they didn't exist
22    yet, correct?
23         A.   Yes.
24         Q.   Okay.  And so, when you offered your opinions
25    in Iglesias, in addition to the Tiderington related
```

Page 121

```
 1    documents you had in Sierra, you also now had his expert
 2    report from Iglesias and his deposition from Iglesias;
 3    is that fair?
 4         A.   That's accurate.
 5         Q.   Okay.  And fair to say that you spent less
 6    time reviewing Mr. Tiderington's expert report in
 7    Iglesias than you did in Sierra?
 8         A.   That's -- that's accurate.
 9         Q.   And how much time did you spend reviewing
10    Mr. Tiderington's deposition from the Iglesias case?
11         A.   I'm -- it -- maybe not as long as -- as much
12    time as I did in the Sierra case.  I think I reviewed
13    that one more closely, but I did -- I did spend time
14    reviewing it.  I don't remember exactly how long.
15         Q.   Did you read all of it or a portion of it?
16         A.   Looking at it to see may -- maybe what was new
17    to me.  And so, I didn't spend as much time on it.
18         Q.   You had previously indicated that for the
19    Sierra case, you reviewed just a portion of
20    Mr. Tiderington's deposition where the questioning was
21    done by Rock Fusco.  Was that also the case in Iglesias?
22         A.   Yes.
23         Q.   And did you review -- in Iglesias, did you
24    review the entirety of the Tiderington deposition in
25    Iglesias in which Rock Fusco was questioning or only a
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 34 of 82 PageID #:54322
The Deposition of BERNARD MURRAY, taken on May 12, 2023
122..125

Page 122

1  portion of that?
2      A.   I -- I remember going through the -- the whole
3  -- whole thing, but maybe -- I did go through the whole
4  deposition.  I did.
5      Q.   The whole deposition --
6      A.   I'm sorry.  To be accurate -- to be accurate,
7  only -- only the questions asked by Rock Fusco attorney.
8      Q.   Okay.  And then the next set of items listed
9  on your materials reviewed, seven all the way through 26
10 are also items listed on your materials reviewed from
11 Sierra, correct?
12     A.   Yes.
13     Q.   Okay.  And -- okay.  And then item number 27
14 on your list of materials reviewed is one additional new
15 item, and that is the investigative file and RD file
16 from the Iglesias case, correct?
17     A.   That is correct.
18     Q.   Okay.  And again, RD Number X250303, item
19 number 27 on your list of materials reviewed Exhibit 5,
20 is the Iglesias case police files, correct?
21     A.   That's -- that's right.
22     Q.   And I know I asked this about Iglesias
23 -- about Sierra, so I'm just going to go through the
24 same questions here again on Iglesias.  What portion of
25 the Iglesias investigative file and RD files did you

Page 123

1  review?
2      A.   I had access to all -- those -- that file
3  that's listed there, but I -- I was using it to refer to
4  allegations or the analysis made by Plaintiff's expert
5  in his report.  So I was focused on replying to those
6  examples that he cited, the page -- I'm sorry, the pages
7  that he cited from Iglesias.  So I would be -- certainly
8  had access to the whole report.  So I would review what
9  I needed to reply to the examples he gave.  But also, I
10 would occasionally just read other the reports for
11 context.
12     Q.   Okay.  And so, you did not read every page of
13 the Monica Roman investigative files and RD files; is
14 that fair?
15     A.   No.  I mean that -- that -- that's -- that's
16 true.  I did not read every page.
17     Q.   Okay.  And then did you review any Cook County
18 State's Attorney's Office file from the Geraldo Iglesias
19 case or the Monica Roman homicide investigation?
20     A.   I don't recall reviewing the State's Attorney
21 file on that.  I'm not sure, but I'm sure one -- well, I
22 take that back.  I don't know if there was -- was one
23 available, but I don't recall reviewing it.
24     Q.   Okay.  Putting aside the question of whether
25 one was available -- it sounds like you're saying you

Page 124

1  don't know whether one was available; is that fair?
2      A.   It -- it might have been available, but again,
3  my focus was on replying to the examples cited by
4  Plaintiff's experts.  So I really didn't need to -- oh,
5  let -- let me rephrase that.  The -- the plaintiff's
6  expert alleges that pages were not contained the
7  prosecutor's file.  So to that extent, yeah, I had to
8  review -- review the -- those documents, but that's only
9  for context.  The allegation is that they weren't in --
10 in -- they were in the investigative file, but they were
11 not contained in the prosecutor file.  So I had to
12 examine those documents to see what they were.
13     Q.   Okay.
14     A.   So I'm -- I'm trying to understand what the
15 documents are that are alleged to be missing.
16     Q.   Okay.  But when you look at the documents that
17 he is -- that were allegedly missing, you're looking at
18 documents that were in the investigative file, correct?
19     A.   Yes.
20     Q.   Okay.  You didn't also then -- you didn't then
21 look at the prosecutor file, correct?
22     A.   I did not.
23     Q.   Okay.  Because, as I understand, you have not
24 -- you didn't actually review the prosecutor file from
25 the Monica Roman investigation or Thomas Sierra case,

Page 125

1  correct?
2      A.   I did not.
3      Q.   Okay.  Did you review any depositions that
4  were taken in the Geraldo Iglesias civil case?
5      A.   I had the depo -- the deposition of
6  Plaintiff's expert in the Iglesias case.
7      Q.   Thank you.  Yeah.  Put -- putting aside any
8  experts, did you have the depositions of any of the
9  police officers or witnesses from the Geraldo Iglesias
10 case?
11     A.   I did not.
12     Q.   And did you have -- did you review at any
13 point the deposition of Mr. Geraldo Iglesias in that
14 case?
15     A.   I did not.
16     Q.   Do you have any knowledge about what any fact
17 witnesses, you know, police officers, or Mr. Iglesias,
18 or any eyewitnesses, what they testified to at their
19 depositions?
20     A.   I don't -- don't know what they testified to.
21     Q.   And did you take into consideration any of the
22 testimony of anybody who was a police officer or witness
23 in that case in offering your opinions in the Iglesias
24 matter?
25     A.   To the -- the -- my opinion referring to pages



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1   that are allegedly missing or -- or should have been
2   included, so referring to witness depositions or police
3   officer depositions was not necessary for me to compile
4   that opinion.
5       Q.   Okay.  And putting aside the question of
6   whether it was necessary or not, I'm just asking you,
7   did you consider any of -- any deposition testimony in
8   offering your opinion with regard to the Iglesias case?
9       A.   What you mean -- what do you mean by consider?
10      Q.   Yeah.  In other words, did you review any
11  deposition transcripts from any witnesses in the
12  Iglesias case that you took into consideration as you
13  offered your opinions related to the Iglesias case in
14  your expert report?
15      A.   I -- I didn't review any depositions.
16      Q.   Okay.  And so, you weren't taking into
17  consideration any testimony you had reviewed or learned
18  about when you were offering your opinions; is that
19  fair?
20      A.   I didn't read the deposition, so I could not --
21  - I did not rely upon them in offering my -- my opinion.
22      Q.   Okay.  And let me ask you the same question,
23  going back to the Sierra case for a moment.  I
24  appreciate we're jumping around.  In -- when you offered
25  your expert opinions in the Sierra case, did you rely on

Page 127

1   any deposition testimony from anyone in offering those
2   opinions?
3       A.   No, I didn't -- I didn't review any
4   depositions of witnesses, so no.
5       Q.   Okay.  And when you offered your opinion in
6   the Sierra case, did you take into consideration any
7   information you might've learned from any source about
8   what had been testified to in the depositions in the
9   Thomas Sierra case from any fact witnesses?
10           MS. CARNEY:  Objection.  Form.  You can answer.
11           THE WITNESS:  I -- I -- I'm -- I'm not sure I
12      understand the question.
13  BY MR. SWAMINATHAN:
14      Q.   Yeah, it -- yeah.  Let me ask a better
15  question.  I understand you didn't review any
16  depositions of any fact witnesses in the Thomas Sierra
17  case, correct?
18      A.   Well, I had them available to me, but I --
19  they were my opinions in the Sierra case just like in
20  the Iglesias case is based upon my evaluation of the
21  Plaintiff's expert's comments.  So if I -- if I needed
22  to include comments from fact witnesses or -- or others,
23  it would've been cited in my report.
24      Q.   And you did not cite any testimony from any
25  fact witnesses in this -- in your opinions in the Sierra

Page 128

1   case, correct?
2       A.   I didn't do that.
3       Q.   Okay.  And you didn't review any depositions
4   of any fact witnesses in the Sierra case, correct?
5       A.   Well, they were available to be reviewed and
6   that's, you know, that's why the materials are included
7   my materials.  But since I didn't have to rely upon
8   them, I didn't review them in preparation of writing my
9   report.
10      Q.   And maybe we're getting a little bit confused,
11  or at least I'm getting confused.  But looking at your
12  list of materials reviewed, Exhibit 3 from the Sierra
13  case.
14      A.   Yeah, hold on.  Yeah.
15      Q.   It might be that we're talking past each
16  other.  So just to be clear, you just now made reference
17  that caused me to think maybe we're talking past each
18  other.  You made reference to your list of materials
19  reviewed, including certain transcripts.  But I want to
20  be clear, in the Thomas Sierra case, your list of
21  materials reviewed does not include any transcripts of
22  any fact witnesses from the Thomas Sierra case, correct?
23      A.   I am sorry.  I'm on the wrong page again.
24      Q.   No problem.
25      A.   Well, Deborah Gubin and Kevin Sheehan, those

Page 129

1   are -- I -- I believe those are fact witnesses.
2       Q.   Yeah.  Thank you.  So maybe that's the
3   uncertainty.  You -- do you -- what is your
4   understanding of what role Deborah Gubin and Kevin
5   Sheehan played in the Thomas Sierra case and the Andujar
6   homicide investigation?
7       A.   She's the -- the eventual criminal defense
8   attorney who prosecute -- who defended the case.  There
9   was a -- there was a public defender initially who
10  handled the case.  I'm not sure how long, but I reviewed
11  his materials at some point.  And -- and Kevin Sheehan
12  is obviously the prosecutor.
13      Q.   All right.  The purpose of this is not to be a
14  got you.  So let me just try to do the -- 19 and 20 on
15  your list of materials reviewed refer to the depositions
16  of Gubin and Sheehan in the Johnson v. Guevara case,
17  right?  So those were -- those are the trial prosecutor
18  and criminal defense attorney in the Demetrius Johnson
19  case, not the Thomas Sierra case.  Is that is that
20  clarifying things?
21      A.   Oh, right.  Yeah.  Yeah, that does clarify.  So
22  there's no -- I did not review fact witnesses'
23  depositions when I compiled the Sierra report.  I'm
24  sorry.  I -- I'm going to make -- I want to make sure
25  I'm accurate, too.  So fact witnesses from the Sierra



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1  case, I did not review their depositions.
2      Q.  Okay.  And in other words, all the distinction
3  we're making is you did review the transcript of Thomas
4  Tiderington's deposition.  He's obviously the expert,
5  correct?
6      A.  Yes.
7      Q.  But you -- but fact witnesses, meaning non-
8  expert, but people who actually had some involvement in
9  the underlying investigation or were witnesses to the
10  crime, those fact witnesses, you did not review any
11  transcripts from any of those individuals in offering
12  your opinions in the Sierra case, correct?
13      A.  That is correct.
14      Q.  Okay.  And when you offered your opinions in
15  the Sierra case, did you have any knowledge or
16  understanding about what any of the fact witnesses in
17  that case testified to in their deposition?
18      MS. CARNEY:  Objection, asked and answered. You
19    can answer again.
20      THE WITNESS:  I -- since I didn't review them,
21    I -- I did not -- also did not have any information
22    on what they provided in their depositions.
23  BY MR. SWAMINATHAN:
24      Q.  And when you said you had access to the entire
25  file in the Thomas Sierra case, what do you mean by

Page 131

1  that?  Strike that.  When you say you had access to the
2  entire set of transcripts from those fact witnesses,
3  what did you mean by that?
4      A.  I did not have depositions of fact witnesses
5  in the underlying Thomas Sierra case.  I did not.
6      Q.  Okay.  You were aware they existed, correct?
7      A.  Not really.
8      Q.  Well, did you have an understanding that --
9  I'm sorry, go ahead.
10      A.  I don't -- I don't know who was deposed.
11      Q.  Mr. Tiderington's report references the
12  deposition testimony of specific individuals.  Is that -
13  - did you review that portion of Mr. Tiderington's
14  report?
15      A.  I -- I -- I did not give much attention to
16  that part of his report because I was not going to be
17  responding to that part.  So he may have said who was
18  deposed or he may not have said -- I mean, if it said
19  who was deposed and who was not deposed, but that was --
20  was not the focus of my analysis.
21      Q.  And going back -- now, let's go back to
22  the Iglesias case.  So I'll take a pause for a moment.
23  We're back in Iglesias case, and you can pull out your
24  list of materials reviewed from the Iglesias case.
25  That's Exhibit 5.  Did you review any of the underlying

Page 132

1  criminal trial testimony from the Iglesias case?
2      A.  I did not.
3      Q.  Okay.  And did you rely in any way on any of
4  the testimony from the criminal trial of the Iglesias
5  case in offering your opinions in the Iglesias matter?
6      A.  I -- I did not.
7      Q.  Okay.  And in the Sierra and Iglesias cases,
8  did you review any affidavits from any witnesses from
9  those cases?
10      A.  I did not.
11      Q.  And in the Iglesias case, do you have any
12  understanding of what the various pieces of evidence are
13  that Mr. Iglesias's -- Mr. Iglesias alleges were not
14  documented in Chicago Police Department reports?
15      A.  I don't know.
16      Q.  And in the Iglesias case, do you have any
17  knowledge about what various witnesses testified to
18  about steps that took place during the course of the
19  investigation that were not documented?
20      A.  I do not.
21      Q.  And in the Iglesias case, are you opining,
22  sir, that every investigative step taken by the Chicago
23  Police officers during the Monica Roman investigation
24  was documented?
25      MR. KIVETZ:  Objection.  Form.

Page 133

1      THE WITNESS:  My opinion on that case pertains
2    to the pages cited by Plaintiff's expert that were
3    alleged to be not contained in the -- in the
4    prosecutor's file.  Police -- police documents that
5    were not contained in the prosecutor's file.  I
6    limited myself to that analysis and that's -- my
7    opinions related to those pages.
8  BY MR. SWAMINATHAN:
9      Q.  And so, I want to make sure I understand you.
10  Are you opining in the Iglesias case that all of the
11  investigative steps that occurred during the Monica
12  Roman investigation were documented by Chicago Police
13  officers?
14      MR. KIVETZ:  Objection.  Form.  Just asked and
15    answered the same exact question.
16  BY MR. SWAMINATHAN:
17      Q.  Go ahead.
18      A.  I'm not offering opinion on that.
19      Q.  Thank you.  Are you offering an opinion in the
20  Iglesias matter that all of the exculpatory evidence
21  that was ever learned by Chicago police officers was
22  disclosed to the prosecutors?
23      MR. KIVETZ:  Objection.  Form, foundation.
24    Misstates the evidence.
25      THE WITNESS:  I'm not -- not the word all. I'm



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 37 of 82 PageID #:54325
The Deposition of BERNARD MURRAY, taken on May 10, 2023

134..137

Page 134

1    opining on the documents that Plaintiff's experts
2    said were -- were not in the prosecutor file and
3    somehow therefore not provided to them. I'm opining
4    on those pages only.
5  BY MR. SWAMINATHAN:
6        Q.   Okay. So you're offering opinion on about
7    whether particular pieces of evidence were disclosed to
8    the prosecutors, but not whether everything was
9    disclosed to prosecutors; is that fair?
10       MR. KIVETZ:  Objection. Form.
11       THE WITNESS:  I think I just said that, yes.
12  BY MR. SWAMINATHAN:
13       Q.   Go ahead.
14       A.   I think I just said that, yes.
15       Q.   Okay. And in the Sierra case, are you
16   offering an opinion that all of the exculpatory evidence
17   learned by detectives during the course of that
18   investigation was disclosed to prosecutors?
19       MS. CARNEY:  Objection. Form.
20       MR. KIVETZ:  Objection. Form.
21       THE WITNESS:  I'm not offering an opinion on
22   that.
23  BY MR. SWAMINATHAN:
24       Q.   Okay. Let's take a look at your expert report
25   in Sierra. Sir, did you ever ask to review additional

Page 135

1    prosecutor files in offering your opinions in the Reyes
2    -- strike that -- in Sierra or Iglesias matters?
3        MS. CARNEY:  Objection. Form.
4        THE WITNESS:  No, I did not.
5  BY MR. SWAMINATHAN:
6        Q.   Did you ever ask to review any deposition
7    transcripts of fact witnesses in the re -- in the Sierra
8    or Iglesias matters before offering your opinions in
9    those cases?
10       A.   I did not.
11       MR. KIVETZ:  Anand, I'm sorry. When you get a
12   minute, I just need to take a bathroom break.
13       MR. SWAMINATHAN:  Yep. For sure. We could
14   stop right now.
15       THE REPORTER:  All right. We are off the
16   record. The time is 1:29 p.m.
17       (OFF THE RECORD)
18       THE REPORTER:  We are back on the record for
19   the deposition of Bernard Murray being conducted by
20   videoconference. My name is Sydney Little. Today
21   is May 10, 2023. And the time is 1:41 p.m. Central.
22  BY MR. SWAMINATHAN:
23       Q.   Okay. Sir, I'd asked you earlier in the
24   deposition about your practices and you indicated that
25   it was your practice to turn over all of the police

Page 136

1    documents that you received from Chicago Police
2    Department to the criminal defense; is that correct?
3        A.   Yes.
4        Q.   Okay. Now, if you had an instance where some
5    -- you know, a document you had from the Chicago Police
6    Department was discussing a particular witness that you
7    knew defense counsel already knew about, would you then
8    withhold that police report discussing that witness?
9        MS. CARNEY:  Objection. Form, foundation,
10   incomplete hypothetical. You can answer.
11       THE WITNESS:  If I understand your question,
12   I've received a report from the police department.
13  BY MR. SWAMINATHAN:
14       Q.   Yeah. Let's just -- let's do it.
15       A.   Is that what you're asking?
16       Q.   Yeah, let's put -- let's just put a name to
17   it. So it gets easier. If you had a police report that
18   you received from the police department that documents
19   some conversation with Bob Smith and you had reason to
20   know that defense counsel already knew about Bob Smith,
21   would you then withhold that report?
22       MR. KIVETZ:  Objection. Form.
23       MS. CARNEY:  Objection. Form, foundation,
24   incomplete hypothetical. You can answer.
25       THE WITNESS:  I would not withhold it.

Page 137

1  BY MR. SWAMINATHAN:
2        Q.   Are there any circumstances in which you would
3    withhold police reports that you received from the
4    Chicago Police Department from criminal defense
5    attorneys?
6        A.   Off the top of my head, I can't think of that
7    situation.
8        Q.   Were there any circumstances in which criminal
9    defense counsel had knowledge about particular
10   information in a police report, and so you felt you
11   didn't need to turn over that report since they already
12   knew about the information in the report?
13       MS. CARNEY:  Objection. Form, incomplete
14   hypothetical, and asked and answered. You can go
15   ahead.
16       THE WITNESS:  Yeah, if I'm understanding the
17   question, I think I did just answer that two
18   questions ago. I would not withhold it.
19  BY MR. SWAMINATHAN:
20       Q.   And did you ever instruct prosecutors that
21   worked with you that they could withhold police reports
22   from the defense counsel if they had reason to believe
23   defense counsel already knew the information in the
24   report?
25       MS. CARNEY:  Objection. Form. Incomplete



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1  hypothetical.  You can answer.
2         THE WITNESS:  I've never done it.  I never
3  would tell anyone else not to do that.  That's part
4  of our on-duty -- ongoing obligation to provide
5  discovery to opposing counsel.
6  BY MR. SWAMINATHAN:
7      Q.   Okay.  And so, is it fair to say that what
8  information is known to the defense attorney or to the
9  criminal defendant has no bearing on whether or not you
10  had an obligation to disclose that information to the
11  criminal defense?
12         MR. KIVETZ:  Objection.  Form.
13         MS. CARNEY:  Objection.  Asked and answered.
14         THE WITNESS:  Well, it -- it doesn't have an
15  impact on me providing discovery.  I'm going to
16  provide the report.
17  BY MR. SWAMINATHAN:
18      Q.   Okay.  And then -- let me go to your expert
19  report in Sierra, which is Exhibit 1, and your materials
20  reviewed for Sierra, which is Exhibit 3.  And we've
21  already talked about your materials reviewed, but one of
22  the items listed in your materials reviewed is the --
23  are the depositions of Ms. Gubin and Mr. Sheehan, which
24  we've already talked about.  But what I don't see listed
25  here is the investigative files or public defender files

Page 139

1  or state's attorney files for the Demetrius Johnson case
2  unless I'm missing something.
3      A.   I -- I don't see P272087.  That's Demetrius
4  Johnson file.  I don't see it listed there.
5      Q.   And so did you ever -- did you review the
6  Demetrius Johnson investigative file and RD file before
7  offering your opinions in the Sierra case?
8      A.   That -- the very first time I analyzed this
9  case, which I think was in Reyes, I definitely looked at
10  those police reports.  Because in my -- on Page 21 and
11  22, I'm talking about the defense attorney's file,
12  what's contained in there, and also that -- that
13  documents were missing from the prosecutor's file, so I
14  must've had those material -- well, I must've had the
15  defense attorney's file to examine it.
16      Q.   And are you saying you reviewed those
17  materials -- is -- are they saying those are materials
18  you reviewed before either you offered your opinions in
19  the Reyes case, but you didn't re-review them before the
20  Sierra case?  Is that what happened?
21      A.   I think it was an oversight that the
22  P272087 was not listed in materials reviewed because
23  prior to Reyes -- I mean, just reading -- reading my
24  analysis, it -- it -- it's obvious that I -- I must've
25  reviewed some materials related to it because I'm

Page 140

1  discussing how -- in the public defender's file, how it
2  contained 23 pages of VA medical records from the public
3  defender's file before Counsel Deborah Gubin got the
4  file, so I must have had the public defender's file to
5  review.
6      Q.   Do you have any memory of reviewing the police
7  file from the --
8      A.   Yeah.
9      Q.   -- Demetrius Johnson case?
10      A.   I -- I -- I -- I -- I'm looking at it right
11  now.  I definitely looked at the prosecutor's file
12  because I was looking at a state's attorney's blueback.
13  I looked at the defense attorney file.  And like I said,
14  I'm looking at the blueback, so I must have had the
15  prosecutor's file and this -- the investigative file
16  because I'm referencing in the investigative material --
17  the state's attorney's subpoena's present, so I must
18  have had the -- the CPD investigative file to review,
19  too.
20      Q.   Okay.  And so, if I'm understanding you
21  correctly, you did in fact review the Demetrius Johnson
22  investigative file, RD file, PD file, and state's
23  attorney -- CCSAO file, correct?
24      A.   It -- it it -- yes.  Looking at the analysis on
25  Page 21, 22, and I guess into 23, it's obvious from what

Page 141

1  I'm opining on that I reviewed those documents.  For
2  example, I specifically remember the 23 pages of VA
3  medical records.  I definitely remember Public Defender
4  Jack Carey's note in letter -- in number four, that
5  John's -- knows the real D -- real D.  I remember that
6  note as well.  So I -- that -- I have specific examples
7  of looking at those documents, and by the context of my
8  expert opinion, I obviously reviewed the prosecutor file
9  and the investigator file.
10      Q.   Okay.  Did you review those materials -- so
11  that -- that's obviously -- it looks like that's an
12  oversight on your list of materials reviewed in the
13  Sierra case Exhibit 3?
14      A.   I believe it is an oversight.
15      Q.   Okay.  And it -- so Exhibit 3, your list of
16  materials reviewed should include the investigative
17  file, RD file, CCSAO file, and PD file from the
18  Demetrius Johnson case, correct?
19      A.   Yes.
20      Q.   Did you review those materials before you
21  offered your opinions in the Sierra case, or was it from
22  before you offered your opinions in the Reyes case?
23      A.   Before I offered my opinion in the Reyes case.
24      Q.   I see.  Okay.  So you had looked at those
25  things before you offered your opinions in the Reyes



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 39 of 82 PageID #:54327
The Deposition of BERNARD MURRAY, taken on May 12, 2023
142..145

Page 142

1  case, and then you didn't re-review them when you
2  disclosed your Sierra case; is that fair?
3      A.  Yes, that's --
4      Q.  Okay.
5      A.  Yes.
6      Q.  Okay.  And then if you look at Exhibit 5, your
7  list of materials reviewed in the Iglesias case.
8      A.  One second, please.  Okay.
9      Q.  Again, it looks like you have not included the
10 investigative file, RD file, state's attorney file, and
11 PD file from the Demetrius Johnson case; is that fair?
12     A.  One second.  Yeah, I don't see it listed on
13 these materials either.
14     Q.  Okay.  Is that an oversight?
15     A.  Yes, sir.
16     Q.  Did you review the investigative file or RD
17 file or PD file or state's attorney's office file from
18 the Johnson case while you were reviewing materials and
19 writing your report in the Iglesias case, or were you
20 relying on what you had previously -- the work you'd
21 previously done in the Reyes case?
22     A.  I think in large part from the Reyes case.
23     Q.  Okay.  You didn't --
24     A.  I would think --
25     Q.  Go ahead.  Sorry.

Page 143

1      A.  I'd say the comment -- the final comment
2  regarding Deborah Gubin, I think might -- I'd have to go
3  back and look at the Reyes report, but it might be --
4  that might be new from the Reyes report until now.
5      Q.  I think what you had indicated previously was
6  that the one thing that was new in your report was the
7  reference to Demetrius Johnson's deposition, correct?
8      A.  That's right.  I'm sorry.  Demetrius Johnson.
9  Yes.
10     Q.  Okay.  Are there any other oversights on
11 exhibits -- on your Exhibit 3, your list of materials
12 reviewed from Sierra?
13     A.  I -- I don't think so.
14     Q.  Okay.  And look at -- you're looking at
15 Exhibit 5, your list of materials reviewed in Iglesias.
16 Do you see any other oversights other than the failure
17 to include the Demetrius Johnson files that you
18 reviewed?
19     A.  I don't think there are any.
20     Q.  Okay.  Let's turn to Page -- this is Exhibit
21 1, your Sierra report.  Turn to Page 11.
22     A.  Yes.
23     Q.  On Page 11 of your report, in Section 5A --
24     A.  Yes.
25     Q.  -- "Plaintiff's expert claims that he found" -

Page 144

1  - do you see that section?
2      A.  I see it.
3      Q.  All right.  The second sentence says, "He
4  specially identifies a number of these notes and claims
5  that they were either not transferred to an official
6  report or that they were not disclosed to criminal
7  defendants"; do you see that?
8      A.  I see it.
9      Q.  Which one was his claim: That the information
10 was not transferred to an official report, or that it
11 was not disclosed to criminal defendant?
12     A.  When I read his report, the -- that sentence
13 of that area was poorly drafted, in my opinion, by
14 Plaintiff's expert, that I thought it was both.  Looking
15 at his deposition, I think he might even have
16 acknowledged that it was poorly worded, that he was
17 trying to claim that the information in GPRs or
18 investigative materials were not then included in
19 official reports.
20     Q.  Okay.  So what he explained was that -- what
21 he was explaining in that section of his report was that
22 there was information in notes that was not transferred
23 to an official report.  He was not claiming that that
24 information was not disclosed to criminal defendants; is
25 that correct?

Page 145

1      A.  Well, that's the understand -- that's the
2  explanation that he gave, but there were times, I
3  thought, where he would use words, like, "Therefore, the
4  defense -- defendant didn't know," or, "The defense
5  attorney wouldn't know," and that's why I continued to
6  comment through my report it's hard to make that
7  allegation when you -- when you're comparing a permanent
8  retention file with an investigative file.  You know,
9  you're -- you're -- it's specifically saying the
10 information's not in the -- transferred into the RD
11 report, so, therefore, defendant didn't know.  But if
12 the defense -- if he had defense attorney files to
13 examine, and they've got the investigative material as
14 well as the RD material, then the defendant would know.
15 So that is the -- why I continued including those --
16 that analysis in my report.
17     Q.  Take a look at Page 22 of your -- 21 and 22 of
18 your report.
19     A.  Page 21, you said?
20     Q.  Yeah.
21     A.  Yes.
22     Q.  Page 20 -- the bottom of Page 21 is where you
23 begin to discuss your review of the People v. Demetrius
24 Johnson case, correct?
25     A.  I see it.  Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1    Q.   Okay.  And when you offered those opinions, if
2    you look at item number seven, you had -- you discuss
3    specifically the deposition testimony of Demetrius
4    Johnson, correct?  That's on the top of Page 23?
5        A.   I see that.
6        Q.   Okay.  And so, your opinions in Sierra and
7    Iglesias about the Demetrius Johnson case are captured
8    in Paragraphs 1 through 7 on Pages 21 through 23,
9    correct?
10       A.   Yes.
11       Q.   Okay.  All right.  And your opinions there on
12   Pages 21 through 23 about the Demetrius Johnson case are
13   based on your review of the investigative file, RD file,
14   prosecutor file, and state's attorney file from that
15   case; is that correct?
16       A.   Yes.
17       Q.   You did not review any depositions from the
18   Demetrius Johnson case when you offered your opinions in
19   Sierra and Iglesias, correct?
20       A.   Well, I had access to Gubin and -- and
21   Demetrius -- I'm sorry.  I had Kevin Sheehan, but I --
22   for my analysis here, I didn't refer to them.
23       Q.   Okay.  In other words -- we'd already talked
24   about it -- you had access to the depositions of
25   Mr. Sheehan and Ms. Gubin, but you didn't review those,

Page 147

1    correct?
2        A.   For compiling my analysis, no, I did not.
3        Q.   Okay.  And in order to make this go faster, I
4    think, for everybody, I'm just going to -- I'm going to
5    ask you the questions about this Demetrius Johnson case
6    in relation to your report in both Sierra and Iglesias.
7    And I do so because, when I look at these two, they
8    appear to be exactly the same, the sections on the
9    Iglesias and Sierra case.  So let me just ask you the
10   foundational question before I just sort of ask you
11   about both questions at the same time.  So first, let me
12   ask you.  Your opinions with regard to the Demetrius
13   Johnson case are exactly the same in your Iglesias
14   report and in your Sierra report, correct?
15       A.   Yes.
16       Q.   Okay.  All right.  And so, if I ask you about
17   either -- the language in either one of those reports,
18   it applies to your opinions in both the Iglesias case
19   and the Sierra case; is that fair?
20       A.   Yes.
21       Q.   Okay.  All right.  Thank you.  So let's
22   continue to look at your Sierra report.
23       A.   Yes.
24       Q.   Okay.  And you indicated you had not reviewed
25   -- you had been given access to, but had not reviewed,

Page 148

1    the deposition of Mr. Sheehan.  Do you know who
2    Mr. Sheehan is?
3        A.   He is the prosecutor on this -- on the -- this
4    case.
5        Q.   Did you work with the --
6        A.   I'm sorry, on the -- on the Johnson case. Yes,
7    I know him.
8        Q.   Okay.  Did you work with him ever on cases?
9        A.   Yes, I did.
10       Q.   Did you ever try cases together?
11       A.   Yes, we did.
12       Q.   What was your opinion of William [sic]
13   Sheehan?
14       A.   Kevin Sheehan?
15       Q.   Yes.  I'm sorry, Kevin Sheehan.  I'm sorry. My
16   apologies.
17       A.   I have high regard for him.
18       Q.   Is he a judge?
19       A.   I believe he's retired from the bench.
20       Q.   Okay.  He retired.  So he -- after the state's
21   attorney's office, he went on to be a judge for some
22   time?
23       A.   Yes.
24       Q.   Okay.  In your experience working and trying
25   cases with Mr. Sheehan, was he somebody who followed the

Page 149

1    same practice as you to disclose all documents that he
2    received from the Chicago Police Department?
3        A.   I -- I believe he provided all documents he
4    received from the police department.
5        Q.   I --
6        A.   And not that --
7        Q.   I'm sorry.  Go ahead.
8        A.   -- we sat down and talked about it, but I
9    believe he did that.  Yes.
10       Q.   When you worked with -- strike that.  In your
11   experience working with and trying cases with Mr.
12   Sheehan, were there ever any cases in which he chose to
13   hold back any documents he received from the Chicago
14   Police Department?
15           MR. KIVETZ:  Objection.  Form.  Foundation.
16           MS. CARNEY:  Objection.  Form and foundation.
17           THE WITNESS:  No, he would never hold back
18       documents.
19   BY MR. SWAMINATHAN:
20       Q.   Okay.  All right.  Mr. Sheehan testified at
21   his deposition that he was certain that he did not
22   receive the Erickson lineup report that is the subject
23   in part of Mr. Tiderington's opinions; are you aware of
24   that, sir?
25       A.   Yes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 41 of 82 PageID #:54329
Oral Deposition of Bernard Murray - taken on May 18, 2023
150..153

Page 150

1    Q.   Okay.  And how did you become aware of that
2  fact?
3    A.   It was included in his deposition, I believe.
4    Q.   But you didn't review his deposition, correct?
5    A.   I -- I reviewed the deposition not in great
6  detail because it -- it didn't necessarily help me
7  describe the documents at the time I wrote the -- this
8  report that were tendered in discovery or not.
9    Q.   Did you know Deborah Gubin at all?
10   A.   I did know her, yes.
11   Q.   Did you try cases against her?
12   A.   I might have tried one case against her.  I
13  have a vague memory of that.  It may just be from seeing
14  her around the courthouse at 26th Street, though.
15   Q.   Do you have an opinion of Deborah Gubin?
16   A.   Yeah.  She was a thorough criminal defense
17  attorney.
18   Q.   And when you say "thorough," what do you mean?
19   A.   Well, she would obviously get the necessary
20  discovery from the prosecution.  I don't know
21  specifically if she would issue subpoenas, but she would
22  make additional requests for discovery, for example.
23  Then she would file motions maybe to quash arrests and
24  suppress evidence, motions to suppress statements.  She
25  was thorough in the practice of -- of law from a

Page 151

1  criminal defense attorney's point of view.
2    Q.   And in your experience, was she the kind of
3  attorney who was an effective cross-examiner?
4    A.   I -- I don't really have an opinion on that.  I
5  -- I don't recall seeing her do a cross examination, but
6  like I said, she was a competent criminal defense
7  attorney.
8    Q.   If she had a police document that contradicted
9  the testimony of a Chicago police officer on the stand,
10  do you expect she would have used that document to
11  impeach the officer?
12        MS. CARNEY:  Objection.  Form.  Foundation.
13     Incomplete hypothetical.  You can answer.
14        THE WITNESS:  Well, I -- I suppose you would,
15     yes.
16  BY MR. SWAMINATHAN:
17   Q.   And when you reviewed Mr. Tiderington's
18  deposition -- strike that.  When you reviewed Mr.
19  Tiderington's expert report in the Sierra matter, did
20  you see that in his discussion of the Demetrius Johnson
21  case, he referenced the fact that Ms. Gubin was also
22  certain that she had not received the Erickson lineup
23  report that was the subject of Mr. Tiderington's
24  opinions?
25   A.   I -- I don't recall that specifically.  I must

Page 152

1  have reviewed that at some point.
2    Q.   Okay.  But you're aware that both Mr. Sheehan
3  and Ms. Gubin have testified at their depositions that
4  they are certain that they had not received the Erickson
5  lineup report; is that fair?
6    A.   That that's what they testified to, yes.
7    Q.   Okay.  And are you opining here in your Sierra
8  report on Pages 21 through 23 that Mr. Sheehan and
9  Ms. Gubin are both wrong?
10        MS. CARNEY:  Objection.  Form.  You can answer.
11        THE WITNESS:  No, I'm a -- I'm discussing the
12     discovery -- the evidence of discovery that was
13     provided in this -- in this case.
14  BY MR. SWAMINATHAN:
15   Q.   Okay.  And are you opining that the Erickson
16  lineup report that both Ms. -- Mr. Sheehan and Ms. Gubin
17  say they did not receive, that, in fact, they did
18  receive it?
19   A.   The only opinion I have on that area was -- I
20  believe it's in Point 5, where there were a total of 26
21  pages that -- which would include, if we're counting the
22  Erickson lineup report, if we're including that, that
23  would come to 26 pages.  And I know there's a difference
24  in time of -- you know, in months of -- of when that
25  information was recorded or -- or provided, so I -- I

Page 153

1  can only say circumstantially that there's 26 pages, now
2  including that Johns Erickson lineup.  I -- I -- I -- I
3  cannot opine that it was provided other than by the
4  circumstantial evidence of those -- the number of pages.
5    Q.   And so, are you saying that the evidence that
6  you reviewed from the Johnson case that includes a
7  reference to 26 pages causes you to believe that
8  Mr. Sheehan is wrong when he says he was served -- that
9  he had not received that report?
10        MS. CARNEY:  Objection.  Form.  Misstates his
11     testimony.
12        THE WITNESS:  No.  The -- the only opinion I
13     provided was that it was possible that it was
14     provided.  I'm not trying to contradict either Kevin
15     Sheehan or Deborah Gubin, what they testified to.
16  BY MR. SWAMINATHAN:
17   Q.   Okay.  And Mr. Sheehan -- you indicated that
18  you did have some knowledge about what he testified to
19  at his deposition.  Did you also -- are you also aware
20  of the portion of his deposition in which he explained
21  that one of the reasons he knows he didn't have access
22  to the Erickson report is that he would not have made
23  arguments in his closing argument that were contrary to
24  the information contained in the Erickson lineup report
25  if he had actually seen it?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 42 of 82 PageID #:54330
Oral Deposition of: BERNARD MURRAY taken on May 12, 2023
154..157

Page 154

1    A.   I --
2         MS. CARNEY:  Go ahead.
3         THE WITNESS:  I must have reviewed that.  I --
4    I don't recall that now off the top of my head.
5    BY MR. SWAMINATHAN:
6    Q.   Okay.  In your time as a prosecutor, if you
7    had a police report that indicated that an individual
8    had been positively identified in a lineup, would you
9    have argued in closing argument that that witness in
10   fact had never been identified in a lineup?
11        MS. CARNEY:  Objection.  Form.  Incomplete
12   hypothetical.
13        THE WITNESS:  Without knowing more from your
14   hypothetical, I -- I would not make that argument.
15   BY MR. SWAMINATHAN:
16   Q.   Okay.  And you said you didn't review the
17   criminal trial transcripts from the Demetrius Johnson
18   case; is that correct?
19   A.   I did not.
20   Q.   And do you know whether at any point in the
21   Demetrius Johnson criminal trial, any lawyer,
22   prosecutor, or defense ever referenced the existence of
23   a police report in which there was a positive
24   identification of Brian Johns?
25   A.   Since I did not review it, I -- I don't know.

Page 155

1    Q.   And if there is no -- strike that.  If there's
2    not a single instance in the entire criminal proceedings
3    from the Demetrius Johnson case in which either
4    Mr. Sheehan or Ms. Gubin ever provide any indication
5    that they had knowledge of a police report indicating
6    that there was a positive identification of Brian Johns,
7    would that be powerful evidence to you that, in fact,
8    that information had not been disclosed?
9         MS. CARNEY:  Objection.  Form.
10        THE WITNESS:  I -- I -- I'm -- I'm sorry.  I
11   kind of got lost in -- in -- in -- in the question
12   there.
13   BY MR. SWAMINATHAN:
14   Q.   Okay.  If there was --
15   A.   I apologize.
16   Q.   Strike that.  If the criminal -- if -- strike
17   that.  If you had reviewed the criminal trial
18   transcript, and there was no references to a positive
19   identification of Brian Johns whatsoever, would that be
20   evidence to you that, in fact, that information had not
21   been disclosed to Mr. Sheehan or Ms. Gubin?
22        MS. MCGRATH:  Objection.  Form.  Calls for
23   speculation.
24        THE WITNESS:  Well, it -- it's certainly
25   circumstantial evidence that they had not received

Page 156

1    it, other than possibility of some sort of strategic
2    decision why it wasn't made.  But I'm -- now I'm
3    speculating as well.
4    BY MR. SWAMINATHAN:
5    Q.   Okay.  And in their deposition transcripts,
6    did you review the testimony of Ms. Gubin and
7    Mr. Sheehan about whether they had made a strategic
8    decision not to discuss that report?
9    A.   I did not see them discuss a strategic
10   decision why or why not.
11   Q.   Okay.  Looking at Paragraph -- you --
12   you're referring to Paragraph 5 is where you make some
13   discussion about whether or not the Erickson lineup
14   report had in fact been disclosed to Mr. Sheehan,
15   correct?
16   A.   Yes.
17   Q.   Okay.  And your -- can you tell us the entire
18   basis for your opinion that the Erickson lineup report
19   was disclosed to Mr. Sheehan?
20        MS. CARNEY:  Objection.  Misstates his opinion
21   in this paragraph.  You can answer.
22        THE WITNESS:  I -- I -- I do understand.  I --
23   I -- as I said before, it's -- it's merely
24   circumstantial evidence because there was a total of
25   26 pages RD, in -- in -- in parentheses, GPR supp,

Page 157

1    and in the file as it exists today, there was 26
2    pages if you count the Erickson supp.  That was the
3    only circumstantial observation I was making.
4    BY MR. SWAMINATHAN:
5    Q.   And are you saying that -- but when you say
6    it's a circumstantial observation, what do you mean by
7    that?
8    A.   If you remove the Erickson -- or the Erickson
9    lineup report, then we're -- we're at 25 pages, so
10   there's no other police report of any kind to make it to
11   26 pages.  That's why I'm saying it's circumstantial
12   evidence that the Erickson report could have been part
13   of the 26.  I'm not saying it was.  I'm not
14   contradicting Sheehan or Gubin, but I'm saying that was
15   a circumstantial observation I made.
16   Q.   Okay.  And let me just make sure I understand
17   it clearly.  I think I understand what you're saying,
18   but let me ask it so I'm clear.  Are you opining to a
19   reasonable degree of professional certainty that the
20   Erickson lineup report was disclosed to Mr. Sheehan?
21   A.   No, I'm saying it's -- it's possible.  That's
22   what I'm saying, not to a degree of any certainty.  And
23   I'm again saying that it's based upon the number of
24   pages, not anything else.
25   Q.   Are you opining to a reasonable degree of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1  professional certainty that the Erickson lineup report
2  was disclosed to the criminal defense?
3      A.  I'm -- I'm just saying, on the number of
4  pages, it -- it -- it -- it -- that it could be part of
5  the -- could have been part of the 26 pages.  The -- the
6  reason I -- I -- I -- I put that in my opinion -- in my
7  opinion was on the state's attorney blueback, which I
8  believe State's Attorney Sheehan compiled, or his
9  partner did, it -- it indicated that 26 pages RD GPR
10 supp was provided to defense counsel.
11     Q.  And are -- yeah.  And I understand.  So is
12 there anything else you're relying on other than that
13 reference on the blueback?
14     A.  Specifically regarding the Erickson lineup
15 report, no, but in Jack Carey, the -- he was the public
16 defender who initially had the case, he had a note in
17 his material, in the public defender file, that, "Brian
18 Johns knows the real deal -- the real D," so there was
19 some basic information that even the -- the initial
20 public defender had regarding Brian Johns.  Again, that
21 does not -- that -- that note by Public Defender Jack
22 Carey doesn't say, I have a lineup supp that indicates
23 anything.  It just says that, from his review of the
24 file, that, "Brian Johns knows the real deal -- knows" -
25 - I'm sorry, "knows the real D."

Page 159

1      Q.  Okay.
2      A.  That's the only other reference to Brian Johns
3  that was provided from defense discovery that mentions
4  Brian Johns.
5      Q.  Okay.  So let's -- let me -- let me try to
6  break this down to make sure I've got -- I understand it
7  correctly.  You have -- in Paragraph 4, you talk about
8  this idea that there was some knowledge of the criminal
9  defense attorney about Brian Johns, correct?
10     A.  Yes.
11     Q.  And you talk about again on Page -- on
12 Paragraph 7 that Demetrius Johnson himself had reason to
13 believe that Brian Johns was the real perpetrator,
14 correct?
15     A.  That's correct.
16     Q.  Okay.  And are you -- is it your opinion that
17 because Demetrius Johnson had reason to believe that the
18 real perpetrator was Brian Johns, that there was no
19 reason for the prosecutors to disclose the Erickson
20 lineup report?
21         MS. CARNEY:  Objection.  Form.  Misstates his
22 testimony.
23         THE WITNESS:  No, I -- I -- I'm not saying that
24 at all.  In Demetrius Johnson's deposition, he -- he
25 said that Brian's Johns -- Brian Johns told him that

Page 160

1  he himself -- he himself, Johns, was identified in a
2  lineup the night of the murder and that he provided
3  this information to Deborah Gubin.
4  BY MR. SWAMINATHAN:
5      Q.  And is --
6      A.  So is -- I -- again, I'm not -- not discussing
7  the -- the Erickson lineup report.  I'm saying the
8  information provided by Jack Carey's file, and then by
9  Demetrius Johnson to Deborah Gubin, provided information
10 regarding Brian Johns.  So I'm -- I guess what I'm
11 trying to get at is there's indications there that he is
12 a known commodity prior to -- to trial to two different
13 defense attorneys, if we believe Demetrius Johnson.
14     Q.  And if --
15     A.  I am not saying that -- I'm not saying that
16 that means that the report was or was not tendered.
17     Q.  Okay.  I'm -- and so let -- we'll come back to
18 the report for a moment.  I'm just asking you -- where
19 you've indicated here in Paragraph 7 that Demetrius
20 Johnson had reason to believe it was Brian Johns, that
21 in fact Brian Johns had been identified in a lineup, is
22 it your opinion that, because of that fact, there was no
23 reason for the prosecutor to turn over the Erickson
24 lineup report to the criminal defense?
25     A.  No, they should -- if they had the report,

Page 161

1  they should have provided it to the criminal defense
2  attorney.
3      Q.  And is it your opinion that because Demetrius
4  Johnson had reason to suspect Brian Johns and that Brian
5  Johns had been identified in a lineup, that it was
6  appropriate for the Chicago Police Department not to
7  disclose the Erickson lineup report to the prosecution?
8      A.  I'm not saying that at all.
9      Q.  Okay.  And you agree with me that, regardless
10 of what Demetrius Johnson, you, or -- had heard from
11 others, the Erickson lineup reports should have been
12 disclosed to prosecutors and to the criminal defense,
13 correct?
14     A.  All -- all relevant police reports should be
15 provided by the police department to the prosecutors and
16 from the prosecutors to the defense attorney, or from
17 the police department to the criminal defense attorneys.
18     Q.  And in fact, the fact that Demetrius Johnson
19 might have had Brian Johns tell him that he'd been
20 identified, what Demetrius Johnson didn't have was the
21 actual piece of evidence that would allow him to prove
22 that, correct?
23         MS. CARNEY:  Objection.  Form.  Argumentative.
24 You can answer.
25         THE WITNESS:  I assume that he didn't have the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1    piece of paper.
2    BY MR. SWAMINATHAN:
3       Q.   That he did not have the piece of paper.  Is
4    that what you said?
5       A.   Yes.
6       Q.   Okay.  And going back to the question of what
7    was actually disclosed, putting aside the question of
8    what was known to Mr. Demetrius Johnson -- because you
9    agree with me that's irrelevant to the question of
10   whether it should be disclosed, correct?
11      A.   As I said, the report should be disclosed.
12      Q.   Okay.  And so, putting aside the question of
13   what should be disclosed based on what's known to
14   Johnson, now we're going to focus on a different
15   question, which is, what evidence is there that the
16   Erickson lineup report was disclosed to Mr. Sheehan or
17   to the criminal defense?  If I understand you correctly,
18   the only evidence you're aware of on that issue is the
19   reference on the blueback to "26 pages, RD GPR
20   subpoena," correct?
21      A.   Yes.
22      Q.   Okay.  Now, with regard to the 26 pages, RD
23   GPR subpoena, are you testifying to a reasonable degree
24   of professional certainty that that reference on the
25   blueback means Mr. Sheehan was wrong about whether he

Page 163

1    ever received the Erickson lineup report?
2       A.   No.
3       Q.   And are you testifying to a reasonable degree
4    of professional certainty that, based on the reference
5    on the blueback to 26 pages, RD GPR subpoena, that
6    Criminal Defense Attorney Gubin was wrong about not
7    receiving the Erickson lineup report?
8       A.   No.  As I've said, it's only circumstantial
9    evidence that -- it could have been reported, but I'm --
10   I mean, discovered and tendered, but I'm not saying --
11   I'm not contradicting either one of them.
12      Q.   Okay.  And if you look at that reference there
13   to 26 pages, all RD, first of all, where it says "RD,"
14   RD is a reference to a records division, correct?
15      A.   Yes.
16      Q.   Okay.  And so, when it says, "26 pages, RD,"
17   that could be a reference to 26 pages from the records
18   division file, could it not?
19      A.   Yeah, but it's -- it's all one phrase, where
20   he puts the GPR -- GPR subpoena, I suppose, at the main
21   -- so I -- I -- I don't know how Mr. Sheehan terms
22   investigative material and police reports.  As I said to
23   you earlier, in my circle of prosecutors, we didn't
24   really refer to them as RD or GPRs.  We said the police
25   reports.  So I'm assuming that he's tendering what he's

Page 164

1    saying that he's tendered is when he issued a GPR
2    subpoena to get those documents, that he tendered 26
3    pages from the R -- from the RD from the case.
4       Q.   Okay.
5       A.   But I'm really speculating here because I
6    don't know how Mr. Sheehan would designate that on -- on
7    a blueback.  But my point was that there was 26 -- there
8    was 26 pages tendered on that date, and that 26 pages
9    coincides with the total number of -- of pages
10   investigative material, so --
11      Q.   The 26 pages -- where it says 26 pages RD, I
12   think you're acknowledging, you don't know whether that
13   referred -- whether that refers to pages from the RD
14   file or pages from the investigative file; is that fair?
15      A.   Yeah, because I don't know how Mr. Sheehan
16   delineates investigative versus RD material.
17      Q.   Okay.  And you agree that if that 26 pages
18   refers to the RD file, then it would not be referring to
19   the Erickson lineup report because it wasn't in the RD
20   file, correct?
21      A.   Right.  I'm -- but I'm -- I'm pointing out how
22   the subpoena and the investigative material that follows
23   it include -- if you include Johns' unsigned lineup
24   report, does total 26 pages.
25      Q.   Any -- and let's talk about that one now, if

Page 165

1    you're looking at Paragraph 6.  What you're saying is,
2    if you count this -- if you're looking in the
3    investigative file itself, right, that's what you're
4    looking at when you talk about Paragraph 6?
5       A.   Yeah.
6       Q.   Okay.  And in -- so in Paragraph 6, you're
7    saying, if you open up the investigative file, if you
8    count the subpoena page and then the next 25 pages, that
9    adds up to a total of 26 pages.  Is that what you're
10   saying?
11      A.   That's what I'm saying.
12      Q.   Okay.  So in other words, the subpoena is page
13   1, and then you have 25 pages of investigative material,
14   and in the investigative file, which includes the
15   Erickson lineup report?
16      A.   That's what I'm saying.
17      Q.   But what if there were 20 -- so you're saying
18   it's a coincidence that there weren't 27 or 28 or 29
19   pages.  There was exactly 25 pages after the subpoena.
20   Is that what you're saying?
21      A.   I'm saying it was 26 pages total.
22      Q.   Yeah.  One page subpoena plus exactly 25
23   additional pages in the investigative file; is that
24   right?
25      A.   Right.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 45 of 82 PageID #:54333
Oral Deposition of BERNARD MURRAY taken on May 10, 2023
166..169

Page 166

1    Q.  Okay.  And so, if there had been more pages in
2  the investigative file, then it -- that wouldn't really
3  tell us anything, would it?
4    A.  I -- I'm just saying it coincides with the
5  number of pages that Mr. Sheehan wrote down on his
6  blueback.
7    Q.  So let's take a look at the investigative
8  file.
9      MR. SWAMINATHAN:  We at Exhibit 6, yeah?
10      (EXHIBIT 6 MARKED FOR IDENTIFICATION)
11      THE REPORTER:  Yes.
12  BY MR. SWAMINATHAN:
13    Q.  All right.  Sir, I'm showing you the document
14  I've marked as Exhibit 6.  This is the Demetrius Johnson
15  investigative file.  It's Bates stamped RFC Johnson 1
16  through 37.  And so, my first observation is that this
17  document appears to be 37 pages, which includes this
18  first page file folder.  So can you tell us how you're
19  getting to 26 pages?
20    A.  Two ways.  Well, one way.  The other material
21  in the investigative files are court attendance reports,
22  the medical examiner's report, and a case disposition
23  report.  So none of those remaining documents are GPRs
24  or street files.  So when I deduct those pages, it came
25  out to 26 pages.

Page 167

1    Q.  Okay.  So in other words, if you -- so this
2  first page of the -- first full page of the
3  investigative file, RSD Johnson 2, you're not counting
4  this one because it's a court attendance report,
5  correct?
6    A.  Right.
7    Q.  And what about Page 3, The Office of the
8  Medical Examiner Report of Post-Mortem Examination?
9    A.  The post-mortem report created by the medical
10  examiner and then -- and created through the offices of
11  the medical examiner's office, it's not a GPR or a
12  Chicago Police Department RD.
13    Q.  But this report of the post-mortem examination
14  is the kind of document that often is in police
15  department files, whether the investigative file or the
16  RD file, correct?
17    A.  Right.
18    Q.  And so -- but you're nevertheless excluding it
19  from your count?
20    A.  Because Mr. Sheehan wrote down 26 pages, RD
21  GPR.  So he didn't write down medical examiner report or
22  other documents that are not Chicago Police Department
23  reports.
24    Q.  And are you saying that Mr. Sheehan would
25  never have included a Cook County post-mortem report

Page 168

1  that was provided to the Chicago Police Department as
2  part of quote, "26 pages, RD GPR subpoena"?
3    A.  That would -- I'm not saying what do you do
4  ever -- do in regard to this subpoena.  I'm saying --
5  well, other way around.  I'm saying that the -- the
6  medical examiner's report would be something that he
7  would obtained from the medical examiner's office and
8  probably tendered on a prior court date.  The fact that
9  this -- this note on his blueback listed 26 pages RD, in
10  my mind, connotes to me that he was digging for the GPR
11  reports, the investigative materials that had either not
12  been previously tendered or he was re- tendering them to
13  Ms. Gubin at that time.
14    Q.  And by the way, there are no GPRs contained in
15  the investigative file in this case, correct?
16    A.  I'd have to -- it's the R -- there's RD
17  reports.  I'm sorry.  Record divisions report in there.
18    Q.  I'm going through the -- well, I'm just
19  leafing through the investigative file right now on your
20  screen.  There are no general progress reports in this
21  file; is that correct?
22    A.  That's my recollection.
23    Q.  All right.  And so, he -- when he refers to 26
24  pages, is it possible that he's referring to GPRs that
25  have now disappeared?

Page 169

1      MS. CARNEY:  Objection.  Form.
2      THE WITNESS:  I -- I -- I'd be speculating, but
3  I would assume that he sent a subpoena out for, you
4  know, GPRs specifically, and this was the material
5  that was included in the investigatory file.
6  BY MR. SWAMINATHAN:
7    Q.  Okay.  So he didn't get any copies of any
8  actual GPRs because there were not any, as far as you
9  know, correct?
10      MS. CARNEY:  Objection.  Form.  Misstates the -
11  - misstates the evidence.
12      THE WITNESS:  Yeah.  I'm -- I'm really
13  speculating, but that's what I am speculating.
14  BY MR. SWAMINATHAN:
15    Q.  Okay.  So you're -- that's what you're
16  speculating.  And then with regard to Pages 3, 4, 5, and
17  6, which are the Cook County post-mortem examination,
18  you're speculating that those would not have been
19  included in any 26 pages that Mr. Sheehan had provided
20  based on his reference to 26 pages RD GPR subpoena; is
21  that fair?
22    A.  That's my -- that's my analysis, yes.
23    Q.  Okay.  And would you agree that that's
24  speculation?
25    A.  I would agree to that.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1    Q.  Okay.  And then you're also not including Page
2  7, which is the results of toxicology analysis, correct?
3    A.  Right.
4    Q.  Okay.  And Page 8, the disposition report,
5  you're not including that in your count either, correct?
6    A.  I'm not.
7    Q.  Okay.  And that one makes sense.  This
8  document is from 1993, so it wouldn't have been included
9  when Mr. Sheehan produced these documents earlier,
10  correct?
11    A.  Yes.
12    Q.  Okay.  Number 9 and number 10 were both court
13  attendance reports and you're not counting those; is
14  that correct?
15    A.  I am not.
16    Q.  Okay.  And then Page 11 is the subpoena; you
17  see that?
18    A.  I see it.  Yes.
19    Q.  Are you counting that as one of the 26 pages?
20    A.  I'm not.
21    Q.  Okay.  What about Page 12?
22    A.  Well, the -- the initial --
23       MS. CARNEY:  Hold on.  He was still --
24       THE WITNESS:  The initial subpoena, obviously
25    I'm counting, but not other subpoenas.

Page 171

1  BY MR. SWAMINATHAN:
2    Q.  So this will -- this subpoena that's at RFC
3  Johnson 11, are you counting this as one of the 26 pages
4  that Sheehan is referring to, or could be referring to?
5    A.  I -- I -- I'm not exactly sure because I think
6  there's more than one subpoena.  I was trying to examine
7  the subpoena that was close in time to the entry on his
8  blueback.  So that's what I believe I was counting as
9  the -- as the subpoena.
10    Q.  Okay.  Let's keep going, see if we can figure
11  it out.  What about Page 12, this Chicago Police
12  message?  Were you counting this as one of the 26 pages?
13    A.  I don't believe I was, no.
14    Q.  So let's go to this Page 13.  RFC Johnson 13,
15  is this one of the documents you were counting?
16    A.  Yes.
17    Q.  Okay.  So that's Page 1.  RFC Johnson 14?
18    A.  Yes.  That's a Chicago Police Department
19  report.
20    Q.  That's two.  RFC Johnson 15?
21    A.  Yes.
22    Q.  That's three.  RFC Johnson 16?
23    A.  Yes.
24    Q.  That's four.  RFC Johnson 17?
25    A.  Yes.

Page 172

1    Q.  That's five.  RFC Johnson 18?
2    A.  Yes.
3    Q.  Six.  RFC Johnson 19?
4    A.  Yes.
5    Q.  That's seven.  RFC Johnson 20?
6    A.  Yes.
7    Q.  RFC Johnson 21?
8    A.  Yes.
9    Q.  Okay.  We're up to nine.  RFC Johnson 22?
10    A.  Yes.
11    Q.  That's ten.  RFC Johnson 23?
12    A.  Yes.
13    Q.  Okay.  That's 11.  RFC Johnson 24?
14    A.  Yes.
15    Q.  12.  RFC Johnson 25?
16    A.  Yes.
17    Q.  13.  RFC Johnson 26?
18    A.  Yes.
19    Q.  14.  RFC Johnson 27?
20    A.  Yes.
21    Q.  That's 15.  RFC Johnson 28?
22    A.  Yes.
23    Q.  16.  RFC Johnson 29?
24    A.  Yes.
25    Q.  That's 17.  RFC Johnson 30?

Page 173

1    A.  Yes.
2    Q.  18.  RFC Johnson 31?
3    A.  Yes.
4    Q.  19.  RFC Johnson 32?
5    A.  Yes.
6    Q.  Okay.  That's 20.  RFC Johnson 33?
7    A.  It's probably the back of a report, so yes.
8    Q.  Oh, so you're counting RFC Johnson -- you
9  agree that's the back of RFC Johnson 32, correct?
10    A.  Yes.
11    Q.  And typically, that would be, in the Chicago
12  Police Department file, that's a one-page document,
13  correct?
14    A.  It's the -- I think it's the back of that
15  other -- yes.  It's a backup of a one-page document
16  that, you know, on occasion, the narrative could have
17  continued to the backside, but here it did not.
18    Q.  Okay.  And so, typically, if you looked at the
19  Chicago Police Department file, the original of this
20  report, you would expect to just see this be a one-page
21  document, RFC 32 and 33 is a one-page document, correct,
22  front and back?
23    A.  No, I -- I would see both pages.  It -- it --
24  I know what you're saying it's one page, but it's been
25  Xeroxed the front and Xeroxed the back, so it's two



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 47 of 82 PageID #:54335
Oral Deposition of BERNARD MURRAY taken on May 12, 2023
174..177

Page 174

1  pages.
2      Q.  Okay.  And it's been Xeroxed by who?  By the
3  Chicago Police Department?
4      A.  Whoever provide -- yeah.  They -- that they
5  replied to the subpoena, yes.
6      Q.  And so, you know that in this case, they
7  copied -- they Xeroxed the back of the page when they
8  provided it to the prosecutor?
9      A.  Well, that's what's included.  Yes.
10     Q.  This is what's in the investigative file
11  itself?
12     A.  Right.
13     Q.  Do you know that the investigative file copy
14  had a -- well, that they copied the back?
15     A.  Well, when we make requests for the reports, I
16  would assume they would Xerox the entire report.  I -- I
17  don't know if they would Xerox the blank back on every
18  occasion, but I would assume they did.
19     Q.  Well, in your experience, would you always get
20  a blank -- would you -- was it very common for you to
21  get a lot of blank back pages?
22     A.  Yeah, it was common.
23     Q.  Okay.  And so, was it your understanding -- I
24  mean, this is a -- this was the Chicago Police
25  Department file when they produced it to us for purposes

Page 175

1  of this case, 20, what, plus years later.  But are you
2  saying that whenever you see a blank page in the
3  investigative file is produced to us in the last few
4  years, that that was also copied the same way when it
5  went to the prosecutor's office?
6      MR. KIVETZ:  Objection.  Form.
7      MS. CARNEY:  Just incomplete hypothetical.
8  Misstates his testimony.
9      THE WITNESS:  My experience issuing subpoenas
10  to the Chicago Police Department for investigative
11  material, they often Xeroxed blank pages.
12  BY MR. SWAMINATHAN:
13     Q.  Okay.  And so, you counted this as page 21,
14  correct?
15     A.  Yes.
16     Q.  Okay.  RFC Johnson 34?
17     A.  Yes.
18     Q.  Okay.  And that's 22.  RFC Johnson 35?
19     A.  Yes.
20     Q.  Okay.  So you counted -- and this is the back
21  of a page as well, right?
22     A.  Yes.
23     Q.  Okay.  So you counted this back of a page as a
24  separate page, correct?
25     A.  Yes.

Page 176

1      Q.  Even though the original would be -- just be a
2  one-page document, correct, with a front and a back?
3      MR. KIVETZ:  Objection.  Form.
4      THE WITNESS:  I'm -- I'm telling you when we
5      would Xerox -- when we would request copies of -- of
6      GPRs through a subpoena, they would often Xerox the
7      front and the back.  And I would count that as a
8      second page.
9  BY MR. SWAMINATHAN:
10     Q.  Okay.  And so, this is RFC -- this is -- the
11  RFC Johnson 35, you counted towards your total.  RFC
12  Johnson 36, you counted that one?
13     A.  Yes.
14     Q.  Okay.
15     A.  Yes.
16     Q.  That's 24.  And then RFC Johnson 37, you
17  counted that one too, right?
18     A.  Yes.
19     Q.  Okay.  And that gets you to 35 -- that gets
20  you to 25.  And again, RFC Johnson 36 and 37 are the
21  front and back of one general offense case report,
22  correct?
23     A.  Yes.
24     Q.  Okay.  And you counted those as two separate
25  pages for purposes of your count, correct?

Page 177

1      A.  Yes.
2      Q.  Okay.  And that gets you to 25, which is one
3  short.  So you then went back and added the subpoena
4  itself as Page number 26, correct?
5      A.  Yes, I did.
6      Q.  Okay.  And why did you include the subpoena as
7  Page number 26?
8      A.  Well, in my report, it said the examination of
9  the file provided that -- let me just look again.  Yeah.
10  The ASA subpoena's still present.  The subpoena and the
11  investigative material that follows it totals 26 pages.
12     Q.  Right.  So you counted the subpoena as page
13  26, right?
14     A.  As the 20 -- as -- as one of the pages of the
15  26, yes.
16     Q.  And so, what you -- and there's no -- that
17  Mr. Sheehan never provided any indication that when he
18  counts pages, that the way he would've counted 26 pages
19  is to include the subpoena itself as one of the 26
20  pages; is that fair?
21     MR. KIVETZ:  Objection.  Form.
22     THE WITNESS:  He -- there's no -- I have no
23     information on how he counted pages.
24  BY MR. SWAMINATHAN:
25     Q.  Okay.  You just --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 48 of 82 PageID #:54336
The Deposition of BERNARD MURRAY, taken on May 13, 2023
178..181

Page 178

1    MR. KIVETZ:  Can you take a quick break when
2  you get a chance?
3    Q.   -- decided to include the subpoena, right?
4    MR. KIVETZ:  Sorry.  Anand, did you hear me?
5    MR. SWAMINATHAN:  No.  Sorry.  I didn't hear
6  what you said.
7    MR. KIVETZ:  When you get a minute, I just need
8  to take another quick break.  I have to make like a
9  two-minute phone call.
10    MR. SWAMINATHAN:  Okay.  Well, let's -- let me
11  just ask these last few questions.
12    MR. KIVETZ:  Yep.
13    MR. SWAMINATHAN:  Is that fine?
14    MR. KIVETZ:  Yeah, for sure.
15    MR. SWAMINATHAN:  Or do you need to make it at
16  2:30?
17    MR. KIVETZ:  No, it's okay.  They can wait.
18    MR. SWAMINATHAN:  Okay.
19  BY MR. SWAMINATHAN:
20    Q.   So Mr. Sheehan [sic], you -- the only reason
21  you're including the ASA subpoena as part of your 26
22  pages is because you need that to get to 26, correct?
23    MS. CARNEY:  Objection.  Form, argumentative.
24    THE WITNESS:  Well, the subpoena is -- when the
25  discovery is tendered, it's often tendered as part

Page 179

1  of the discovery given to defense counsel too,
2  because we often receive it in court with the
3  subpoena attached to it.  That's why I'm guessing
4  that the subpoena was -- was included in the title
5  of his material, so I was assuming that he included
6  it in the material as well.
7  BY MR. SWAMINATHAN:
8    Q.   When you turned over -- when you would fill
9  out bluebacks, would you always include the subpoena as
10  a matter of practice as one of the pages that you're
11  tendering?
12    MR. KIVETZ:  Objection to form.
13    THE WITNESS:  No.  I would -- I personally
14  would delineate -- to the best of my ability, I
15  would delineate specifically what pages I was
16  giving.
17  BY MR. SWAMINATHAN:
18    Q.   Okay.
19    A.   For example, you know, case report, two pages.
20    Q.   Okay.  And then in your 26 pages, did you --
21  strike that.  Did you see any indication anywhere from -
22  - that Mr. Sheehan had specifically included the
23  subpoena page as part of his 26 pages?
24    MR. KIVETZ:  Objection.  Asked and answered.
25    THE WITNESS:  Not -- not explicit.

Page 180

1  BY MR. SWAMINATHAN:
2    Q.   Go ahead.
3    A.   No.
4    Q.   Okay.  And then when you were working in the
5  State's Attorney's Office, would you ever get documents
6  from the Chicago Police Department in response to
7  subpoenas or informal requests that were two-sided?
8    A.   Do you mean I would get a -- a Xeroxed copy of
9  a -- of a page, and it would be a two-sided Xerox?
10    Q.   Exactly.
11    A.   No.
12    Q.   Would you ever receive, like a general offense
13  case report, you understood was an original document
14  that had a front and a back, correct?
15    A.   I received that generally as two pages.  I'm -
16  - I'm trying to recall if I ever received -- the -- the
17  -- the case report's a little bit different in that I
18  think it was a carbon set.  So there was extra copies,
19  or at least at one point, it was.  So sometimes, you
20  could get a -- a -- a document that was two-sided on a
21  case report.  But I would say the vast majority of the
22  time, it was -- what was provided through subpoenas was
23  a -- a -- the direct material would be one-sided.  It
24  would not be a two-sided document.
25    Q.   Okay.  And then you said -- you just made

Page 181

1  reference to something that was a case report that was
2  sometimes where you'd get it two-sided.  What are you
3  referring to?
4    A.   For example, inventory reports, the -- the
5  police evidence inventory reports, and I think the case
6  reports, but definitely the inventory reports, they were
7  a carbon set.  In other words, there was one copy for
8  the police, one copy for the court file, one copy that
9  went to the evidence section.  So the officer filling
10  out the inventory -- property inventory form, they would
11  press hard and make, you know, five copies at one time.
12  And they would make the front and the back and make five
13  copies.  But there were occasions where we -- there were
14  occasions where we received part of the carbon set and
15  it was not Xeroxed, but it was the original carbon set,
16  so it was two-sided.
17    Q.   And one of the things that --
18    A.   And -- and I'm trying to --
19    Q.   I'm sorry, go ahead.
20    A.   -- I'm trying to remember if that was also
21  true for case reports.  And -- and I had a memory that -
22  - that that might have true at one point, but then I
23  think they went to two -- at least when they provided
24  them to us as two separate pages for the one-page
25  report.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Page 182**

1    Q.   Okay.  And your recollection is -- so your
2  recollection is that case reports originally were the
3  kind of document that was two-sided, but eventually
4  became not a carbon set document, correct?
5    A.   Yeah.  At least as they were provided to us.
6  That's for sure.
7    Q.   And the case report you're referring to is the
8  same thing as a general offense case report, correct?
9    A.   Yes.
10   MR. SWAMINATHAN:  Okay.  Why don't we take the
11  quick break so that Jeff can make the call?
12   THE REPORTER:  All right.  We are off the
13  record.  The time is 2:37.
14      (OFF THE RECORD)
15   THE REPORTER:  We are back on the record for
16  the deposition of Bernard Murray being conducted by
17  videoconference.  My name is Sydney Little.  Today
18  is May 10, 2023 and the time is 2:48 p.m.
19   MR. SWAMINATHAN:  Okay.
20   MS. CARNEY:  And -- hey, Anand, before you
21  start, I just have to put one -- I just want to put
22  one thing on the record.  I just want to ask you a
23  question.  In regards to this line of questioning on
24  Johnson and in light of the recent discovery of the
25  notes that Jack Carey had that were the subject of

**Page 183**

1  the hearing yesterday, I guess I just want to ask
2  you on the record, are you privy to those notes?
3  And if so, we do think it's inappropriate for the
4  line of questioning if you're -- have been -- if you
5  are privy to those notes and we have not -- are not
6  privy to them to have this whole line of questioning
7  on the Johnson case.
8    MR. SWAMINATHAN:  So let me -- what I'll -- I'm
9  happy to say on the record is that I'm aware of the
10  existence of the notes.  I'm not aware of the
11  content -- personally aware of the contents of the
12  notes, but I -- what I am -- can say with -- what I
13  can represent is that I -- all the questions I'm
14  asking now are exclusively around the four walls of
15  the investigative file and the RD file only.  And
16  I'm not asking about anything that I could know from
17  any public defender file notes.
18   MS. CARNEY:  Okay.  Thank you.
19   MR. SWAMINATHAN:  Yeah.
20  BY MR. SWAMINATHAN:
21   Q.   Okay.  I do -- and I'm going to apologize, Mr.
22  Murray, if I asked this before we went to the break, but
23  I was just asking you about the -- when you made
24  reference to the fact that case reports were something
25  that you believe are -- in the past, were a carbon copy

**Page 184**

1  document.  When you say case reports, are you referring
2  to general offense case reports?
3    A.   Yes, I am.
4    Q.   Okay.  And then if the prosecutor file --
5  strike that.  The RD file -- did you review the RD file
6  in this case, the Demetrius Johnson case?
7    A.   I think in this case, we had the RD and the
8  investigative file.  And yeah, I -- I tried to review
9  both.  There was a lot of documents missing in this.
10  That's, I think, part of the reason we were looking at
11  Mr. Sheehan's blueback.
12   Q.   When you looked at the RD file in this case,
13  did you see how many pages it was?
14   A.   I do not recall.
15   Q.   If the RD --
16   A.   Like I said, I -- I did note --
17   Q.   I'm sorry.  I'm sorry.
18   A.   I'm sorry.  I'm -- I'm trying to remember
19  specifically now.  I know the investigative file seemed
20  to be -- as it exists today, seemed to be incomplete.
21  And I -- I don't remember if the RD file was complete or
22  not.  I don't remember that right now, but I -- I did
23  have access to it.
24   Q.   If the RD file consisted of 25 or 26 pages of
25  police reports, would that be an indication that

**Page 185**

1  Mr. Sheehan could have been referring to the police
2  reports in the RD file on his blueback?
3    A.   It's -- it -- it -- it's possible.  The -- the
4  only thing that -- that made me think that that's not
5  true is because the -- the parenthetical, the GPR
6  subpoena.
7    Q.   Okay.  But if the -- and the -- and again, the
8  GPR subpoena parenthetical does not -- is obviously not
9  referring to the production of 26 pages of GPRs because
10  there were no GPRs in the files you reviewed, correct?
11   A.   Well, as the file existed -- I'm sorry.  As
12  the file exists today, there was no pure GPRs in there,
13  but there were other indications in the blueback that,
14  in the past, Mr. Sheehan had provided investigative file
15  material.
16   Q.   And when you look at that 26 pages RD GPR
17  subpoena, I think you've already indicated it could --
18  RD could be a reference to the records division file.
19  GPR subpoena could be a reference to the investigative
20  file.  You don't know either way; is that fair?
21   A.   I don't know how Mr. Sheehan would refer to
22  either.
23   Q.   Okay.  And if there are exactly 25 or 26 pages
24  of police reports in the RD file, you agree that that
25  could very well indicate that this 26 pages RD GPR



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 50 of 82 PageID #:54338
Oral Deposition of: Bernard Murray     Taken on: May 12, 2023
186..189

Page 186

1  subpoena is a reference to the documents in the
2  permanent retention file, correct?
3      A.   Well, it's not as likely because of the GPR
4  sub in -- in the parentheses.
5      Q.   Okay.  And that's your speculation because you
6  agree you don't know what Mr. Sheehan was intending to
7  indicate there; is that fair?
8      A.   I -- I don't know which way, how -- how he
9  refers to RDs in general or GPRs in general.
10     Q.   Let's take a look at Page 23 of your report.
11 All right.  In looking at Page 23, as we discussed
12 before, this is where you offer your opinion specific to
13 the Thomas Sierra case, correct?
14     A.   Specific to certain pages, pointed out by
15 Plaintiff's expert.
16     Q.   And other than your opinions contained in
17 numerical paragraphs 1 through 4 on Page 23, do you have
18 any other opinions about the Thomas Sierra case?
19     A.   I do not.
20     Q.   Okay.  And if -- looking at these paragraphs,
21 you're discussing a particular set of information from
22 the Ruben Gonzalez homicide; is that fair?
23     A.   It's information that was in the Sierra file
24 that referenced the Ruben Gonzalez murder.
25     Q.   Okay.  And so, are you -- you understand that

Page 187

1  Mr. Tiderington offered opinions about information that
2  was learned during the homicide investigation that was
3  not disclosed to the prosecution or criminal defense
4  beyond certain information related to the Gonzalez
5  homicide; you understand that, correct?
6      A.   I don't understand your question.
7      Q.   Yes.  Mr. Tiderington did not talk in his
8  report exclusively about the Gonzalez -- about documents
9  from the Gonzalez file not being disclosed.  He also
10 talked about other information learned during the
11 investigation that was not disclosed; is that fair?
12         MS. CARNEY:  Objection.  Form.  You can answer.
13         THE WITNESS:  He talked about other material,
14     but that's not what I was replying to here.
15 BY MR. SWAMINATHAN:
16     Q.   Understood.  Okay.  So when Mr. Tiderington
17 talked about other investigative steps that were -- that
18 occurred during the course of the investigation and the
19 fact that those weren't documented or disclosed, you're
20 not offering opinions about those other subjects; is
21 that fair?
22         MR. KIVETZ:  Objection to form.
23         THE WITNESS:  I am not offering opinions.
24 BY MR. SWAMINATHAN:
25     Q.   Okay.  And so, the only subject on which

Page 188

1  you're offering an opinion in response to Mr.
2  Tiderington is with regard to the particular documents
3  from the Ruben Gonzalez homicide; is that correct?
4      A.   His claim was the investigative file should
5  have included the police reports from the Gonzalez
6  homicide.  That's what I was replying to.
7      Q.   Okay.  And Mr. Tiderington's opinion is that
8  ultimately there was information contained in the police
9  reports from the Gonzalez homicide investigation that
10 had some relevance to the Andujar homicide
11 investigation; is that fair?
12         MS. CARNEY:  Objection.  Form.  You can answer.
13         THE WITNESS:  Well, that other information was
14     not pertinent to what he claimed was the reason why
15     those police reports should be included.  It was the
16     -- how the detectives put two and two together that
17     Sierra might be involved in the case, based upon the
18     car he was driving, and how they personally learned
19     or personally made observations of that car with the
20     defendant driving it.
21 BY MR. SWAMINATHAN:
22     Q.   Would it be fair to say that Mr. Tiderington's
23 opinions about the information contained in the Gonzalez
24 file was not limited to how Mr. Sierra became a suspect,
25 but also included specific information from the Gonzalez

Page 189

1  homicide file about the description of the vehicle and
2  how that changed, for example?
3          MR. KIVETZ:  Objection.  Form.  Misstates the
4      evidence.
5          THE WITNESS:  The plaintiff's experts
6      specifically discussed that interaction between the
7      detectives and the mother of Reuben Gonzalez, and
8      how they spotted the car with the wheels and the
9      different suspects in the car, and how that led them
10     to pursue identifying the people from that car and
11     how they may be involved -- they may be involved in
12     the Sierra homicide.  So it's that point in his --
13     in his report saying -- in his report saying that
14     that other homicide file, the Gonzalez file, should
15     have been included in the Sierra file.  That's what
16     I was addressing because that's how his whole entry
17     into how the Gonzalez file should have been included
18     in the Sierra file.
19 BY MR. SWAMINATHAN:
20     Q.   Okay.  And so, your opinion in -- on Page 23
21 is focused exclusively on the question of whether there
22 was sufficient documentation in the Andujar
23 investigation about how Thomas Sierra became a suspect;
24 is that fair?
25     A.   And -- and -- and -- and to the claim that the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 51 of 82 PageID #:54339
The Deposition of BERNARD MURRAY, taken on May 12, 2023

190..193

Page 190

1  entire Gonzalez homicide should have been included in
2  the -- in the Sierra RD in Sierra investigative --
3  investigative file.
4      Q.  Okay.  And so, ultimately, your opinion is
5  that there was sufficient information in the Andujar
6  homicide investigation for the prosecution and defense
7  to know how Mr. Sierra had become a suspect in the case,
8  fair?
9      A.  How he became a suspect in the case and how
10  Gonzalez was identified, as well as Gonzalez's mother,
11  and how it was a separate homicide investigation.  So if
12  prosecutor or criminal defense attorney felt a need to
13  order those police reports, they could have.
14      Q.  Okay.  And Mr. Tiderington offered some
15  opinions related to the observations and reports related
16  to an officer named Ron Malczyk.  Are you offering any
17  opinions about that issue?
18      A.  No, I'm not.
19      Q.  Okay.  And Mr. Tiderington's report contains a
20  discussion about information that was learned from
21  various witnesses in the Andujar homicide investigation,
22  including a man named Hector Montanez.  Are you offering
23  any opinions about information that should have been
24  disclosed or was disclosed involving a man named Hector
25  Montanez?

Page 191

1      MR. KIVETZ:  Objection to form.  Assumes facts
2  not in evidence.
3      THE WITNESS:  No.  I'm addressing the issue
4  about including the Gonzalez homicide in the
5  investigative file on Sierra.
6  BY MR. SWAMINATHAN:
7      Q.  Okay.  And Mr. Tiderington offers some
8  opinions about information that was learned from an
9  eyewitness named Jose M. Melendez that should have been
10  documented and disclosed.  Are you offering any opinions
11  on that issue?
12      A.  I am not.
13      Q.  Mr. Tiderington offer some opinions about
14  information that was learned from Thomas Sierra.  Are
15  you offering any opinions about that issue?
16      A.  I'm not.
17      Q.  And Mr. Tiderington offered some opinions
18  about information that was learned during the course of
19  interviews with Lucy Montalvo and whether that should
20  have been documented and disclosed.  Are you offering
21  any opinions about that?
22      A.  I'm offering opinions regarding what the
23  plaintiff's experts said regarding including the
24  Gonzalez investigative RDs and investigative reports in
25  the Sierra RD Investigative File.  That's what I'm

Page 192

1  offering my opinion on.
2      Q.  Anything other than that?
3      A.  No.
4      Q.  Okay.  Let's go to your other report, the
5  Iglesias report, which we'll mark as Exhibit 7.
6      (EXHIBIT 7 MARKED FOR IDENTIFICATION)
7      THE REPORTER:  Yes, 7.
8  BY MR. SWAMINATHAN:
9      Q.  All right.  Your opinions specific to the
10  Geraldo Iglesias case are documented on Pages 22 through
11  24 of your report; is that fair?
12      A.  Hold on.  I'm almost there.  Yes.  Yes.
13      Q.  All right.  And in this section, you talk
14  about your response as to specific pages from the
15  Iglesias investigative file that Mr. Tiderington
16  identified as not being in any prosecutor file or public
17  defender file, correct?
18      A.  Yes.
19      Q.  On -- in this section on Pages 22 through 24 -
20  - well, strike that.  Mr. Tiderington offered some
21  opinions about certain information about Spanish Cobras
22  that was learned during the course of the investigation
23  that was not documented and disclosed.  Are you offering
24  any opinions about that?
25      MR. KIVETZ:  Objection.  Form.

Page 193

1      THE WITNESS:  The -- and -- and I'm replying to
2  -- first off, he's assuming the prosecutor and --
3  and the -- now the prosecutor and the public
4  defender's files are -- are complete today when
5  they're -- when they're obviously not.  But he was
6  addressing certain documents that I was replying to
7  that he says were not included in the prosecutor's
8  file, therefore shows that the police were not
9  providing these documents to the prosecution.  Some
10  of these reports, you -- you couldn't even think of
11  getting ready for trial without them, specifically
12  the property inventory sheets.  That's -- and not
13  exclusively, but that's part of the -- the stuff I
14  was replying to.
15  BY MR. SWAMINATHAN:
16      Q.  Okay.  And so, one --
17      A.  Also, the vehicle inquiry report.
18      Q.  My apologies.  Go ahead.
19      A.  I said all -- there's other documents, but the
20  one that stands out is the property inventory sheets,
21  and then the vehicle inquiry report, and an older arrest
22  report, that those are the documents that Plaintiff's
23  expert says they were not in the prosecution file, and
24  therefore it's indication that the police didn't provide
25  them.  That's what I addressed in this part of my



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 52 of 82 PageID #:54340
Oral Deposition of Bernard Murray    taken on May 10, 2023

194..197

Page 194

1   report.
2      Q.   Okay.  And so, you're addressing the specific
3   documents from the Iglesias investigative file that
4   Mr. Tiderington specifically identifies as not being in
5   the prosecutor file and public defender file, correct?
6      A.   Yeah.  And -- and then he concludes, and
7   therefore, since they're not present, it's further
8   evidence of the police not providing them.
9      Q.   Okay.  And other than responding to his
10  discussion about those specific documents, you're not
11  offering any other opinions in this case; is that fair?
12     A.   That's -- that's accurate.
13     Q.   Okay.  And so, your opinions in this case are
14  limited to your discussion of, if you're looking at Page
15  23 of your report, you identified them.  RFC- Iglesias
16  Pages 1 through 8, 17 through 18, 26 to 27, 32 through
17  37, 44 through 46, 76 to 77, and 83; is that correct?
18     A.   Those are the specific pages that -- that he
19  cited that I'm replying to, and -- and also the premise
20  that the files -- the prosecutor's files in the same
21  condition today and public defender's file in the same
22  condition today as it was that 30 years ago.
23     Q.   Okay.  And so, any -- anything on any other
24  pages of the investigative file are not specific pages
25  that you are addressing in your expert opinion; is that

Page 195

1   fair?
2      A.   That's correct.
3      Q.   Okay.  And any information that is contained
4   in other documents outside of the investigative file,
5   you're not offering any opinions about whether that is
6   information that should have been disclosed or was
7   disclosed, correct?
8         MS. CARNEY:  Objection.  Form.  You can answer.
9         THE WITNESS:  I'm only addressing the -- I'm
10     specifically addressing those pages, and again,
11     saying because of the premise that the files are
12     complete today, that it's somehow -- when they're
13     not, it somehow leads to the belief that the -- the
14     police did not give a -- a pertinent report.  So to
15     that extent, I guess I'm opposed to his whole -- his
16     whole -- his whole analysis on the claims reports
17     were not tendered because they were not found in the
18     prosecutor's or the defense files today.
19  BY MR. SWAMINATHAN:
20     Q.   Okay.  And so, one of the things
21  Mr. Tiderington opines about in his report is that
22  there's certain information that was learned from
23  witnesses during the course of the Iglesias homicide
24  investigation, or more, the Monica Roman homicide
25  investigation, that was not documented or disclosed.  Are

Page 196

1   you offering any opinions about those aspects of
2   Mr. Tiderington's report?
3      A.   No.
4      Q.   Okay.  And so, for example, Mr. Tiderington
5   talks about information that was learned during the
6   interviews of Mr. Iglesias that was not documented and
7   disclosed.  Are you any -- offering any opinions about
8   that subject?
9      A.   I'm not offering any opinion on that.
10     Q.   Mr. Tiderington discusses information from the
11  testimony of Hugo Rodriguez and Rosendo Ochoa about the
12  number of times photos were shown to those witnesses,
13  and that that's information that should have been
14  documented and disclosed.  Are you offering any opinions
15  about that?
16        MR. KIVETZ:  Objection.  Form.
17        THE WITNESS:  I am -- I'm not.
18  BY MR. SWAMINATHAN:
19     Q.   And Mr. Tiderington discusses that there's
20  testimony about photo gang books that were shown to
21  certain fact witnesses or eyewitnesses that are not
22  documented and disclosed.  Are you offering any opinions
23  about that?
24        MR. KIVETZ:  Objection.  Form.
25        THE WITNESS:  No.

Page 197

1   BY MR. SWAMINATHAN:
2      Q.   And Mr. Tiderington discusses the fact that
3   there are documents in other police files that discuss
4   specific leads that were developed in the Monica Roman
5   homicide investigation involving Spanish Cobras that
6   were not documented or disclosed in the Andujar case --
7   in the Monica Roman case.  Are you offering any opinions
8   about that?
9         MR. KIVETZ:  Objection.  Form.
10        THE WITNESS:  That's not one of the documents I
11     was addressing.
12  BY MR. SWAMINATHAN:
13     Q.   Okay.  And since it's not one of the documents
14  that you were focused on, you're not offering opinions
15  about the Spanish Cobras' lead that's discussed in
16  Mr. Tiderington's report, correct?
17     A.   I am not.
18     Q.   Okay.
19        MR. SWAMINATHAN:  And if you -- let's mark the
20     Iglesias Investigative File as Exhibit 8.
21        (EXHIBIT 8 MARKED FOR IDENTIFICATION)
22  BY MR. SWAMINATHAN:
23     Q.   All right.  Let's see.  I'm putting Exhibit 8
24  on the screen.  This is the Iglesias investigative file.
25  It's RFC-Iglesias 1 through 112.  And so, you went



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  through this investigative file and focused on the
2  particular documents that were identified by
3  Mr. Tiderington, correct?
4      A.  Yes.  I focused on the documents, I think you
5  read them off earlier, that were -- that he claims,
6  since they were not in the prosecution file, therefore
7  the police did not provide them to the prosecution or
8  the defense.
9      Q.  Okay.  And if we were looking at the
10  investigative file and want to know which documents you
11  focused on, we could look at Page 23 of your report near
12  the middle of the page where you identify the specific
13  set of pages that you were focused on for your opinions,
14  correct?
15      A.  And as they were identified in Plaintiff's
16  expert's report.
17      Q.  Okay.  All right.  I'm going to show you a
18  document that's RFC-Iglesias 59.  RFC-Iglesias 59 is not
19  listed on Page 23 of your report, fair?
20      A.  It's not.
21      Q.  And RFC-Iglesias 59 is not a document that is
22  discussed anywhere on Pages 22 through 24 of your
23  report, fair?
24      A.  No.  I don't see it.
25      Q.  Okay.  And fair to say you're not offering any

Page 199

1  opinions about whether RFC-Iglesias 59 was disclosed to
2  the prosecution or defense, correct?
3      A.  Well, since the -- the prosecution's file is
4  obviously incomplete, we -- we don't know if it was
5  provided to the prosecution or not.
6      Q.  Okay.  And so, you're -- the most you can say
7  about RFC-Iglesias 59 is that you don't know whether it
8  was disclosed to the prosecution or not; is that fair?
9      A.  I -- based upon the -- the condition of
10  the prosecutor's file today, we -- we can't -- I can't
11  say what the file looked like at the time of trial.
12      Q.  Okay.  And so, let me just ask you, are you
13  opining that RFC-Iglesias 59 was disclosed to the
14  prosecution?
15      A.  I think I just said that since we don't --
16  since the prosecutor's file's obviously not in the same
17  condition as it was 30 years ago, I can't say what was
18  in it or what was provided.
19      Q.  Okay.  And looking at RFC -- looking at Page
20  23 of your report, where you identified --
21      A.  Yes.
22      Q.  -- RFC-Iglesias 1 through 8, 17 through 18, 26
23  through 27, 32, 30 -- 32 through 37, 44 through 46, 76
24  through 77, and 83, are you opining that those documents
25  were in fact turned over to the prosecution?

Page 200

1      A.  I -- I'm -- I'm -- I'm saying that they were
2  obviously turned over to the prosecution.  Let -- let me
3  give you a -- a couple --
4      Q.  And your -- oh, I'm sorry.  Go ahead.
5      A.  And -- and my evidence is that the -- my
6  experience is that the prosecutor could not go to trial
7  without property inventory sheets.  You needed those to
8  reclaim the evidence from the evidence and recovered
9  section, and -- and moreover, those documents, in
10  addition to being provided during the course of
11  discovery, they were also contained in the municipal
12  file in every courtroom, in every case.  There's items
13  like a fired bullet that -- that was recovered from the
14  medical examiner's office.  Obviously, these inventories
15  were critical to the prosecutor's presentation of
16  evidence.  So though I don't have the -- the originally
17  complete prosecutor's file, I know they could not go to
18  trial without those documents.
19      Q.  The RFC-Iglesias 76 to 77, the vehicle inquiry
20  leads request.
21      A.  Yes.
22      Q.  Are you saying that you are -- you can say
23  with certainty that those documents were disclosed to
24  the prosecution?
25      A.  I -- I -- I can't state that with as much

Page 201

1  certainty, but as I pointed out in -- in my report, this
2  crime -- this crime scene was literally the car, and --
3  and the fact that the car was towed and discussed at
4  length through the police reports, there's also a
5  vehicle inquiry report that reflects the tow and the
6  retention of the car, so that we don't have the -- the -
7  - the actual vehicle inquiry leads request, I can't say
8  for certain that it was in there, but there's ample
9  evidence that that -- that that -- that document was --
10  that information of that document was included
11  throughout the report.
12      Q.  And looking at RFC-Iglesias 26 through 27, are
13  you opining that you can say with certainty that that
14  arrest report from a drug possession case was disclosed
15  to the prosecution?
16      A.  The -- I believe it was because one of the
17  supplementary reports indicates that investigating
18  officers had prior contact with the person using the
19  defense nickname, so that's what led the -- if -- if
20  there was a motion to quash arrest or a motion to
21  suppress evidence, I as a prosecutor would want that
22  report.  I'd say, which one is it?  So I -- I -- again,
23  not as much certainty as these other documents, but
24  since it's mentioned explicitly in the reports of how
25  they gathered information to look for him, I would



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 202

1  expect that report to be provided to the prosecutors as
2  well.
3      Q.   And if I understand your opinion, the thrust
4  of your opinion is that there are documents missing from
5  the state's attorney file that has been made available
6  that indicate to you that the state's attorney file is
7  incomplete, correct?
8      A.   It's wholly incomplete, yes.
9      Q.   Okay.  And because the -- that file is
10 incomplete, you can't conduct a -- like a meaningful
11 comparison of the investigative file to the state's
12 attorney file; is that correct?
13     A.   It -- it's -- it -- to use Mr. Tiderington's
14 own theory, an -- an incomplete file, you can't say what
15 was in there.  It's -- it -- I -- I -- I'm adding to
16 that fact that there are certain documents that are
17 missing here that are critical to proceeding the trial.
18 So that also leads me to believe that this file is -- is
19 -- is -- is incomplete in significant ways.
20     Q.   Okay.  Are you offering any opinions in this
21 case about whether information learned during one
22 homicide investigation, how it -- it's required to be
23 documented or disclosed in another investigation?
24         MS. CARNEY:  Objection.  Form.  Incomplete
25     hypothetical.  You can answer.

Page 203

1          THE WITNESS:  My -- my opinion in -- I think it
2  was in the Sierra case where we discussed how the
3  two detectives learned a -- a -- possible leads -- a
4  lead to Sierra from their investigation on another
5  case.  I think that they -- they -- they laid out
6  sufficient information there from that case that
7  would allow the prosecution and the defense to
8  gather that report if they needed to.  My -- my
9  point was, I've never seen an entire RD included in
10 another RD or -- or -- or any event like that.
11 There are, of course, times when an -- another case
12 could be related to the case that's being
13 prosecuted, and a perfect example happens in revenge
14 shootings amongst gang members.  So there's often
15 that information included in the report, so it's
16 easy to identify the other investigation and the
17 other reports and to obtain them through subpoena if
18 need be.
19 BY MR. SWAMINATHAN:
20     Q.   Okay.  And I just want to make sure I
21 understand your opinion.  I understand you're offering -
22 - you -- you're saying something about the Gonzalez
23 shooting in particular in the Sierra case, but I'm
24 trying to understand something different.  You are
25 indicating, if I understand you correctly, that as a

Page 204

1  prosecutor, you are aware of the idea that oftentimes,
2  you know, different crimes or different homicides can be
3  linked to each other, correct?
4      A.   Yes.
5      Q.   And that oftentimes information can be learned
6  during the course of one investigation that is important
7  or pertinent information for another investigation,
8  correct?
9      A.   Yes.
10     Q.   And are you offering a -- or do you have
11 expertise in how Chicago Police Department documentation
12 practices should be in order to account for those kinds
13 of situations in which information is learned in one
14 investigation that's pertinent to another investigation?
15     A.   I don't know what policies they may have in
16 documenting that, but as -- a -- again back to the
17 Sierra case, that was pretty transparent of how that
18 investigation occurred and what the other possible cases
19 are that were -- were related to the Sierra case.
20     Q.   Okay.  Put -- putting the Sierra case --
21     A.   But I don't know what their policy --
22     Q.   I'm sorry.  Go ahead.
23     A.   I don't know what their policy is, but being
24 transparent with the information was obviously very
25 helpful in any case.

Page 205

1      Q.   Okay.  Are you offering any opinions about how
2  Chicago Police Department policy should have operated in
3  instances when information was learned in one
4  investigation that was pertinent to another
5  investigation?
6      A.   As I said before, I -- I don't have any
7  opinion on how they determine policy.
8      Q.   Okay.  And do you have any opinions from a
9  prosecutor's perspective about where particular
10 documents should go in which file when information's
11 learned in one investigation that's pertinent to another
12 investigation?
13     A.   I don't think I understand your question.
14     Q.   Yeah.  In other words, do you have an opinion
15 -- as a prosecutor, do you have an opinion about
16 whether, when the Chicago Police Department learned
17 something in one investigation that's relevant to
18 another investigation, whether that information can be
19 documented in just the first case, or it needs -- or it
20 can be documented in just the second case, or whether it
21 has to be documented in both places, or are you saying
22 that's something on which that's not a prosecutor's job,
23 that's a police officer's -- police expert's job to
24 opine about?
25     A.   Well --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 206

1          MS. CARNEY:  Objection.  Form.  You can answer.
2          THE WITNESS:  I -- I -- I -- I'm -- I'm not
3    saying -- I don't have an opinion on where they
4    should document it, other than -- again, using
5    Sierra's example, it's pretty clear how they
6    developed their -- their leads from one homicide to
7    another homicide.  So I -- I think as long as the
8    information of how cases may be related is -- is
9    described, I think that's fine for the prosecution
10   and for the defense attorney.
11   BY MR. SWAMINATHAN:
12       Q.   If you --
13       A.   I don't have an opinion on their policy.
14       Q.   If you had --
15          MS. CARNEY:  And just because I want it to be a
16   clear record, we're talking about Iglesias -- he's -
17   - you're referring to Iglesias, right?  Sorry.  I'm
18   not trying to coach him, I just, we're --
19          MR. SWAMINATHAN:  I -- no.  Understood.
20          MS. CARNEY:  Those are the two different --
21          MR. SWAMINATHAN:  I understood.  Understood.  I
22   know he's talking about the Sierra case because --
23   but I'm actually asking about neither case.  I'm
24   sort of asking a more general question.
25   BY MR. SWAMINATHAN:

Page 207

1        Q.   And I'll let -- if I'm going to -- because why
2    don't I do this?  Let me ask you about -- yeah.  Let me
3    ask you about just as a general question.  Not you --
4    not specific to the Iglesias case or the Sierra case,
5    okay?  Because I don't want to confuse the fact patterns
6    and suggest that I'm talking about one case and not
7    another.  Let's just do it as a general question, okay?
8    If you are the -- if you were the prosecutor on a case,
9    and information is learned, the police officers learned
10   information from some other police investigation that
11   was relevant to the crime for which you were now
12   prosecuting, would you expect that information that was
13   learned in another case to be disclosed to you?
14       A.   If -- if -- I don't know how -- that -- I
15   can't think of a fact pattern how that would work, but I
16   would definitely seek out that additional information if
17   it was recorded in a -- in -- in a separate case and not
18   recorded in my case.
19       Q.   Okay.  So now let's talk about the Iglesias
20   case in particular, okay?  If you had been the trial
21   prosecutor in the Iglesias case, okay?  If it turned out
22   that the Chicago Police Department had documents, police
23   reports, in which it documented that it had developed
24   leads related to the Andujar homicide investigation
25   pointing at alternate suspects, is that information,

Page 208

1    whether it existed in that other case or whether it
2    existed in the Andujar case, that you would expect to
3    have had been disclosed to you?
4          MR. KIVETZ:  Objection.  Form.
5          THE WITNESS:  Well, I would -- did it -- did --
6    the detectives investigating the Andujar case, I
7    would expect them to provide information to me that
8    would be pertinent to the crime itself, whether it
9    was information gathered elsewhere or not, as long
10   as when they learned of it, they provided it to me.
11   It may -- it may be written up a supplemental -- a
12   supplemental report or a supplemental GPR to include
13   that information.  I'd expect that to be a -- to --
14   I'd be alerted to that.
15   BY MR. SWAMINATHAN:
16       Q.   Okay.  And in -- when you reviewed the
17   investigative file from the Monica Roman homicide
18   investigation, did you see any references to any
19   information that had been learned from other homicide
20   investigations?
21       A.   I didn't investigate -- I didn't review those
22   type of documents for that perspective.
23       Q.   Okay.  And if -- would you agree with me that
24   if information was developed in another case and
25   included in the police file from another case about

Page 209

1    information that had been learned related to the Monica
2    Roman investigation, unless that is referenced in some
3    way in the Monica Roman investigative file, as a
4    prosecutor, you wouldn't know to go request that file?
5          MR. KIVETZ:  Objection.  Form.
6          THE WITNESS:  Well, the -- I mean, there's more
7    than -- than -- than one way for a prosecutor to
8    learn about information related to their case.  It
9    could be from a -- a detective on their case or a
10   detective on another case.  So it doesn't preclude
11   me not learning about it.  And once I would learn
12   about it, I would issue a subpoena.
13   BY MR. SWAMINATHAN:
14       Q.   Okay.  And in other words, and so if I think
15   if I'm understanding your earlier answer, if there was
16   information that was developed in another investigation
17   that was pertinent to your -- to the investigation or
18   the crime that you were prosecuting, you would expect
19   that either the police officer themselves or in
20   documents they provided to you, they would -- you would
21   be receiving the information that would allow you to
22   obtain that information; is that fair?
23       A.   I -- I mean, you have to realize it -- we --
24   when we're preparing documents for discovery or getting
25   ready for pretrial motions, we're -- it's not -- it's



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

1  not like we're doing everything through subpoena.  We
2  talk to the detectives, whether it be on the phone or
3  bring them into the office and say, you know, what else
4  have we learned about the case or what -- what did we
5  learn that led you to the arrest of this person?  So
6  there's going to be a lot of conversation, and if those
7  detectives had not provided other reports to me and if -
8  - if I learned about it during those type of
9  conversations at any time, I would obviously issue
10 subpoenas and get that material.
11     Q.   Okay.
12     A.   So I would pursue that -- there's -- there's -
13 - there's - it's not just learning through subpoenas or
14 learning through the reports on your case.  There's a --
15 a lot of give and take with conversations with law
16 officers involved in the case.
17     Q.   Okay.  And so, if I'm understanding you
18 correctly, there were multiple ways in which information
19 could get to you, whether it's by subpoena or by police
20 reports or by the officers speaking with you directly,
21 but whatever it is, ultimately, if there was information
22 learned in another case that was pertinent to your case,
23 you'd expect it to be communicated to you; is that fair?
24     A.   I - I - I would hope I would learn about it
25 through communication with the police officers, yes.

Page 211

1      Q.   Okay.  All right.  And in the Iglesias case,
2  are you aware of anything from your review of the
3  Iglesias case and the Monica Roman police files that
4  indicated that the - there was - that the prosecutors
5  had been provided with any information about information
6  learned in another homicide investigation that was
7  pertinent to the Iglesias case?
8      MR. KIVETZ:  Objection.  Form.
9      THE WITNESS:  I - I did not review the -- I did
10 not -
11     MS. CARNEY:  Hold on, Bernie.
12     THE WITNESS:  Sorry.
13     MS. CARNEY:  Jeff, are you done with your
14 objection?
15     MR. KIVETZ:  Yeah.
16     MS. CARNEY:  Go ahead.
17     THE WITNESS:  My - my review of - of the
18 Iglesias case was focused on the documents that the
19 plaintiff's expert said were not in the prosecutor's
20 file and therefore not provided to the prosecutor
21 during discovery.  I did not investigate other parts
22 of that file.
23     MR. SWAMINATHAN:  I have no further questions.
24     MS. CARNEY:  Jeff?  Megan?
25     MR. KIVETZ:  Can we just take a four-minute

Page 212

1  break here and -
2      MR. SWAMINATHAN:  Yeah.
3      MR. KIVETZ:  -- come back?  That was a quick
4  stop.
5      MS. CARNEY:  Yep.
6      THE REPORTER:  All right.  We're off the
7  record.  The time is 3:24.
8      (OFF THE RECORD)
9      THE REPORTER:  We are back on the record for
10 the deposition of Bernard Murray being conducted by
11 videoconference.  My name is Sydney Little.  Today
12 is May 10, 2023 and the time is 3:29 p.m.
13     MR. KIVETZ:  I have no questions.  Thank you.  I
14 appreciate your time, Mr. Murray.
15     THE WITNESS:  You're welcome.
16     MS. MCGRATH:  I don't have any questions
17 either.  Thank you for your time, Mr. Murray.
18     THE WITNESS:  You're welcome.
19     MS. CARNEY:  All right.  We'll reserve.
20     THE REPORTER:  Okay.  And then before we go
21 off, I'm just going to get orders really quick.
22 Anand, would you like a copy of the transcript?
23     MR. SWAMINATHAN:  We're good for now.  Thank
24 you.
25     THE REPORTER:  Okay.  Same with the video?

Page 213

1      MR. SWAMINATHAN:  Same.
2      THE REPORTER:  Okay.  Theresa, would you like a
3  copy?
4      MS. CARNEY:  Not right now.
5      THE REPORTER:  Same with the video?
6      MS. CARNEY:  Same.  Thanks.
7      THE REPORTER:  Yep.  And Jeff, would you like a
8  copy?
9      MR. KIVETZ:  No copies of anything.  Thank you.
10     THE REPORTER:  All right.  And Megan, would you
11 like a copy?
12     MS. MCGRATH:  Same as everyone.  Not at this
13 time.
14     THE REPORTER:  Okay.  Let me get us off the
15 record.
16     (DEPOSITION CONCLUDED AT 3:30 P.M. CT)
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 214

1       CERTIFICATE OF DITIGAL REPORTER

2           STATE OF ILLINOIS

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Title page hereof, by me after

7    first being duly sworn to testify the truth, the whole

8    truth, and nothing but the truth; and that the said

9    matter was recorded digitally by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19

20

21

22   SYDNEY LITTLE,

23   DIGITAL REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 03/18/2026

25   SUBMITTED ON:  12/22/2023

OFFICIAL SEAL
SYDNEY LITTLE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES MARCH 18, 2026

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_ Murray** 27:23, 25 138:19 143:20,21

**Exhibit 2_ Murray** 61:25 62:1,4

**Exhibit 3_ Murray** 103:3, 4,7 128:12 138:20 141:13, 15 143:11

**Exhibit 4_ Murray** 102:25 103:1,10 104:9 110:7

**Exhibit 5_ Murray** 119:19, 20 120:6,13,21 122:19 131:25 142:6 143:15

**Exhibit 6_ Murray** 166:9, 10,14

**Exhibit 7_ Murray** 192:5,6

**Exhibit 8_ Murray** 197:20, 21,23

**$**

**$200** 14:13,17, 19,23

**$3,000** 110:12

**$300** 15:4

**$6,400** 104:22

**1**

**1** 27:23,25 76:6 87:20 102:24 103:11 104:3 110:7 111:7 138:19 143:21

146:8 165:13 166:15 171:17 186:17 194:16 197:25 199:22

**10** 44:19 102:6 135:21 170:12 182:18 212:12

**10:06** 6:7

**10:53** 44:14

**10th** 6:6

**11** 28:14,17,24 29:14 40:17 42:18 45:16 83:10,15,18 143:21,23 170:16 171:3 172:13

**110** 6:5

**112** 197:25

**117527** 62:5

**117531** 62:6

**11:04** 44:19

**11th** 48:24 49:5,8 50:8,19 51:3,10,11 78:11,14,16,17 80:4 81:10 82:1

**12** 27:21 28:1,3 42:25 43:2,8 45:16 170:21 171:11 172:15

**12:14** 102:1

**12:45** 102:6

**13** 171:14 172:17

**14** 84:16,22 85:7 171:17 172:19

**15** 84:16 110:17 111:3,23 171:20 172:21

**16** 28:17,24 29:14 30:8,24 40:17 42:18 43:2,8 171:22 172:23

**17** 84:22 85:7 106:18,22 107:12,13 108:16 171:24 172:25 194:16 199:22

**18** 85:7,14 172:1 173:2 194:16 199:22

**19** 85:17 86:7 87:15 129:14 172:3 173:4

**1986** 45:18

**1991** 31:13 35:23 37:12

**1993** 170:8

**1995** 31:14 35:23 37:12 113:11,18 115:7,16,23 116:6

**1998** 113:11,18 115:16,23 116:6

**1:18-CV-03029** 6:14

**1:19-CV-6508** 6:13

**1:29** 135:16

**1:41** 135:21

**2**

**2** 61:25 62:1,4 76:6 104:8,9 110:6 167:3

**20** 85:17,25 87:16 129:14 145:22 165:17 172:5 173:6 175:1 177:14

**200** 14:17

**2023** 6:6 44:19 102:6 135:21 182:18 212:12

**21** 139:10 140:25 145:17,

19,22 146:8,12 152:8 172:7 175:13

**22** 139:11 140:25 145:17 172:9 175:18 192:10,19 198:22

**23** 28:18,20 30:8,19,23,24 31:4 88:12 89:2,15 92:22 93:2,4,8,14,17 95:7,24 97:3 109:3,8 140:2, 25 141:2 146:4, 8,12 152:8 172:11 186:10, 11,17 189:20 194:15 198:11, 19 199:20

**24** 172:13 176:16 192:11, 19 198:22

**25** 157:9 165:8, 13,19,22 172:15 176:20 177:2 184:24 185:23

**26** 88:12 89:2, 15 122:9 152:20,23 153:1,7 156:25 157:1,11,13 158:5,9 162:19, 22 163:5,13,16, 17 164:2,7,8, 11,17,24 165:9, 21 166:19,25 167:20 168:2,9, 23 169:19,20 170:19 171:3, 12 172:17 177:4,7,11,13, 15,18,19 178:21,22 179:20,23 184:24 185:9, 16,23,25 194:16 199:22 201:12

**26th** 150:14

**27** 87:21 89:6,7, 19,20,22 122:13,19 165:18 172:19 194:16 199:23 201:12

**28** 165:18 172:21

**29** 165:18 172:23

**2:30** 178:16

**2:37** 182:13

**2:48** 182:18

**3**

**3** 102:24 103:3, 4,7 104:8,9,10, 16 110:7 128:12 138:20 141:13,15 143:11 167:7 169:16

**30** 172:25 194:22 199:17, 23

**31** 173:2

**32** 105:21 109:6 173:4,9,21 194:16 199:23

**33** 173:6,21

**34** 175:16

**35** 175:18 176:11,19

**35th** 49:6

**36** 176:12,20

**37** 166:16,17 176:16,20 194:17 199:23

**3:24** 212:7

**3:29** 212:12

**3:30** 213:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**4**

**4** 102:25 103:1,
10 104:9 110:7
159:7 169:16
186:17

**44** 194:17
199:23

**46** 194:17
199:23

**4:00** 49:1

**5**

**5** 31:11,23 32:6,
17 57:2,4
106:15 112:8
119:19,20
120:6,13,21
122:19 131:25
142:6 143:15
152:20 156:12
169:16

**50/50** 111:13

**58** 29:10,19,23
88:20

**59** 29:10,19,24
88:20 198:18,
21 199:1,7,13

**5A** 143:23

**6**

**6** 165:1,4,6
166:9,10,14
169:17

**60** 111:23

**60/40** 111:22,
23

**60606** 6:6

**7**

**7** 30:19,22
146:8 159:12
160:19 170:2
192:5,6,7

**76** 194:17
199:23 200:19

**77** 194:17
199:24 200:19

**8**

**8** 57:15 170:4
194:16 197:20,
21,23 199:22

**83** 57:24 194:17
199:24

**83-1** 56:13
57:3,5,16,19,25
58:10,14,22
59:6,10,12,17,
21,22 60:7,25
61:15,25 62:5,
10 63:3 64:16
66:14

**87** 45:18

**9**

**9** 170:12

**91** 31:23 33:22
115:1,6

**95** 31:23 33:22
113:18 115:1,6

**98** 115:2,7

**A**

**a.m.** 6:7 44:14,
19

**ability** 25:24
64:17 80:24
179:14

**accepted** 74:3

**access** 33:9
36:4 39:14,25
40:3 123:2,8
130:24 131:1
146:20,24
147:25 153:21
184:23

**account**
204:12

**accurate** 31:2
47:25 86:17
87:19 107:24
108:14 111:2
113:5,13 121:4,
8 122:6 129:25
194:12

**accurately**
108:4

**acknowledged**
144:16

**acknowledging**
164:12

**actions** 11:23

**activities**
106:21

**actual** 9:13
23:12,22 38:6
107:14 111:24
161:21 169:8
201:7

**add** 64:16

**added** 30:23
66:17 103:17
177:3

**adding** 64:12
202:15

**addition** 17:4
52:15 66:9
120:25 200:10

**additional**
11:15 15:19,22
16:20 17:18,22,
25 18:13 21:24
22:8,9,12
24:11,16 28:6,
9,25 29:17,21
30:12 31:8
38:1,2 41:3
42:2,5,12 65:20
84:17 110:24
119:25 122:14
134:25 150:22
165:23 207:16

**additionally**
38:6 40:22

**address** 15:19
28:9

**addressed**
193:25

**addressing**
189:16 191:3
193:6 194:2,25
195:9,10
197:11

**adds** 165:9

**adequate**
66:21

**advance** 19:17

**advice** 13:7

**advise** 13:4

**affect** 63:23
64:17

**affidavits**
132:8

**affirm** 7:24

**agree** 161:9
162:9 164:17
169:23,25
173:9 185:24
186:6 208:23

**agreed** 14:8

**ahead** 6:24
11:2 16:11
23:16 29:7 34:5
36:7 41:25
53:18 55:8 71:1
81:16 96:15
98:10 99:1
100:1 112:11
118:5 131:9
133:17 134:13
137:15 142:25
149:7 154:2
180:2 181:19
193:18 200:4
204:22 211:16

**alerted** 208:14

**allegation** 9:24
124:9 145:7

**allegations**
9:5,7 39:6,15
40:8 41:11,13
75:6 109:13,25
113:13 123:4

**alleged** 124:15
133:3

**allegedly**
118:9 124:17
126:1

**alleges** 124:6
132:13

**alluded** 81:18
82:2

**alphabetical**
26:14

**alternate**
207:25

**amount** 104:22
105:22 109:10

**ample** 201:8

**analysis** 17:24
22:8,12,16
28:6,24 31:21
34:18 35:3,8
42:17,19 74:16
75:7,16 90:11,
12 95:24
109:13 110:1
112:15 123:4
131:20 133:6
139:24 140:24
145:16 146:22
147:2 169:22
170:2 195:16

**analyze** 95:14

**analyzed**
31:20 89:18
94:19 139:8

**analyzing**
94:17 95:6

**Anand** 6:18
101:17 102:8
135:11 178:4
182:20 212:22

**Andujar** 39:10,
18,20 40:4 74:4
89:8,23 90:16,
25 91:6 92:25
93:9,13,17
95:19 96:6,21
97:7,19 99:13
101:2 109:5,17,
21,24 129:5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**188:**10 **189:**22
**190:**5,21 **197:**6
**207:**24 **208:**2,6

**Annie** 6:21

**answering**
25:23 66:3

**answers** 25:24

**anymore** 12:9

**apologies**
114:23 148:16
193:18

**apologize**
100:9 155:15
183:21

**apparent**
50:23

**appearance**
6:15

**appearing**
6:20,25 7:4,7

**appears**
104:10 166:17

**applied** 11:19
38:14 41:11
69:12

**applies** 147:18

**area** 30:6
31:11,23 32:6,
17 48:24 51:10,
13,15 54:20
77:24 106:15
112:8 144:13
152:19

**areas** 30:6 36:6
45:20 46:2 49:5
77:24 78:10,11

**argued** 154:9

**argument**
153:23 154:9,
14

**argumentative**
66:13 161:23
178:23

**arguments**
153:23

**arrest** 193:21
201:14,20
210:5

**arrests** 150:23

**ASA** 177:10
178:21

**aspects** 196:1

**assigned** 48:4

**assignment**
47:6

**assignments**
67:22

**associate**
103:22

**assume**
161:25 169:3
174:16,18

**Assumes**
191:1

**assuming**
119:2 163:25
179:5 193:2

**attached** 179:3

**attachments**
34:11,13

**attempting**
11:14

**attendance**
166:21 167:4
170:13

**attending**
6:15,16

**attention**
95:10 131:15

**attorney** 11:13
12:12 18:12
20:23 21:12
70:9 76:21,25
84:18,21 85:6
92:9 122:7
123:20 129:8,
18 138:8 139:1
140:13,23
142:10 145:5,
12 146:14
150:17 151:3,7
158:7,8 159:9

**161:**2,16 **163:**6
**190:**12 **202:**5,6,
12 **206:**10

**attorney's**
13:7 19:15
67:24 68:15,22
69:18 70:6,11,
14,17,25 71:6
76:18 90:25
115:22 116:8
118:1,13
123:18 139:11,
15 140:12,17
142:17 148:21
151:1 180:5

**attorneys**
10:14 19:10,13
20:20 21:2,11
137:5 160:13
161:17

**attuned** 77:25

**audit** 71:18

**auditing** 71:5,
9,11,15

**authored** 68:7

**aware** 10:1,2
19:5,6,9,14
20:14,19 32:12
34:10,13,17
54:23 55:10,18
56:7 75:10
85:20 131:6
149:23 150:1
152:2 153:19
162:18 183:9,
10,11 204:1
211:2

——— **B** ———

**back** 13:23
18:13 23:10
24:19 44:16
48:9 50:11,18,
20 55:2 74:21
82:19 98:13
102:3 108:3,12
110:5 111:17
112:3,5 113:22
123:22 126:23
131:21,23

**135:**18 **143:**3
**149:**13,17
**160:**17 **162:**6
**173:**7,9,14,22,
25 **174:**7,14,17,
21 **175:**20,23
**176:**2,7,21
**177:**3 **180:**14
**181:**12 **182:**15
**204:**16 **212:**3,9

**background**
12:6 25:20

**backside**
173:17

**backup** 173:15

**bad** 41:23

**ballpark**
111:13,25
112:1

**based** 8:25
22:9 28:7 30:24
47:17 48:8,14
49:16 79:14
81:19 95:17,22
99:3,20 100:5
104:4 119:14
127:20 146:13
157:23 162:13
163:4 169:20
188:17 199:9

**basic** 158:19

**basically** 31:3

**basis** 156:18

**Bates** 13:20
44:23 166:15

**bathroom**
44:11 135:12

**bearing** 138:9

**began** 110:11,
13

**begin** 8:3
145:23

**begins** 28:4

**behalf** 7:1,6,20

**belief** 195:13

**believed** 79:17

**bench** 148:19

**Bernard** 6:8
7:12,14 44:17
102:4 135:19
182:16 212:10

**Bernie** 211:11

**bill** 104:21
110:12

**billed** 104:22

**biographical**
81:21

**bit** 11:23 88:11
128:10 180:17

**blank** 88:3
174:17,20,21
175:2,11

**blueback**
140:12,14
158:7,13
162:19,25
163:5 164:7
166:6 168:9
171:8 184:11
185:2,13

**bluebacks**
30:1 179:9

**Bob** 136:19,20

**body** 112:7

**booking** 49:21

**books** 196:20

**boss** 14:8

**bottom** 145:22

**Brady** 9:24
10:6

**Brassfield**
26:10

**break** 26:7,25
27:1,4,6 44:10
101:20 135:12
159:6 178:1,8
182:11 183:22
212:1

**breaking**
101:19

**Brian** 154:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

155:6,19
158:17,20,24
159:2,4,9,13,
18,25 160:10,
20,21 161:4,19

**Brian's** 159:25

**bring** 52:16
54:21 210:3

**brought** 9:9

**bullet** 200:13

**bunch** 34:11

**bureau** 48:22
49:18

———————

**C**

———————

**call** 80:9 178:9
182:11

**called** 26:16

**calls** 48:25
78:16 155:22

**capacity** 8:11,
20

**captured**
30:19 93:14
111:1 146:7

**captures**
105:14

**capturing**
72:13

**car** 188:18,19
189:8,9,10
201:2,3,6

**carbon** 180:18
181:7,14,15
182:4 183:25

**career** 46:18,
20 70:9 78:6

**Carey** 158:15,
22 182:25

**Carey's** 141:4
160:8

**Carney** 6:23
7:6,19 10:7
11:8 12:5,16
13:3,18 14:6

31:16 32:10
33:3 35:10
36:22 41:22
44:23 45:4 46:7
53:15,24 54:7,
15 55:4,14,24
58:24 60:1,10
61:8 62:13 63:7
64:5 65:5 66:12
68:17,23 71:7
72:4 82:6,14
91:7 94:16
96:16 98:10,24
100:1 101:17,
19,24 102:8,12,
17 112:10
113:3 114:3
116:25 118:16,
25 127:10
130:18 134:19
135:3 136:9,23
137:13,25
138:13 149:16
151:12 152:10
153:10 154:2,
11 155:9
156:20 159:21
161:23 169:1,
10 170:23
175:7 178:23
182:20 183:18
187:12 188:12
195:8 202:24
206:1,15,20
211:11,13,16,
24 212:5,19
213:4,6

**case** 6:13 9:3,
6,10,15,20,22,
25 10:3,6,12
11:5,11,13,14,
15,18,24 12:1,
6,10,23 14:1,2,
12,15 15:7,11,
24,25 16:2,3,5,
8,19,20 18:11,
17,23 19:3,10
21:18,25 22:8,
19 28:20,21
31:5,7 32:8
36:1,13 38:7,
10,12,18 39:8,
19 40:21,22
41:3,4,10,18
42:9,20 44:2

48:21 51:24
57:22 58:9
73:5,7 74:2,21
79:4,8 82:1
83:11,17,22
84:6 85:8 86:3
87:5,9,10,11
89:9,13,24
90:2,16,19,20
91:1,23 92:10,
17,20,23 93:19
94:2,10,15,19
95:3,22 100:11,
19 101:1,10
103:6 104:23
105:6,19,24
107:14 109:4,
17 110:8,11,14,
15,16 111:4
112:24 113:9,
11,15,18 114:6,
21 115:5,13,18,
20 117:12
118:18 120:17
121:10,12,19,
21 122:16,20
123:19 124:25
125:4,6,10,14,
23 126:8,12,13,
23,25 127:6,9,
17,19,20 128:1,
4,13,20,22
129:5,8,10,16,
19 130:1,12,15,
17,25 131:5,22,
23,24 132:1,5,
11,16,21 133:1,
10 134:15
139:1,7,9,19,20
140:9 141:13,
18,21,22,23
142:1,2,7,11,
18,19,21,22
145:24 146:7,
12,15,18 147:5,
9,13,18,19
148:4,6 150:12
151:21 152:13
153:6 154:18
155:3 158:16
164:3 166:22
168:15 174:6
175:1 176:21
179:19 180:13,
17,21 181:1,5,
21 182:2,7,8

183:7,24 184:1,
2,6,7,12
186:13,18
188:17 190:7,9
192:10 194:11,
13 197:6,7
200:12 201:14
202:21 203:2,5,
6,11,12,23
204:17,19,20,
25 205:19,20
206:22,23
207:4,6,8,13,
17,18,20,21
208:1,2,6,24,25
209:8,9,10
210:4,14,16,22
211:1,3,7,18

**cases** 7:5
10:16 11:24
14:9 16:23
17:3,4,8,12,14,
15,19,23 18:1,
4,6,9 21:19
22:4,13,24
23:20 24:1,7,23
30:9,12 36:10,
18 43:10 58:6
68:8,10,25
69:9,10,12,22
71:18 73:23
74:9,10,21 83:5
84:23 85:6
88:22 100:8
106:15 116:1
117:11,20
119:3,14 132:7,
9 135:9 148:8,
10,25 149:11,
12 150:11
204:18 206:8

**catch** 80:17
82:4

**caused** 128:17

**CB** 52:5

**CCSAO** 83:3
140:23 141:17

**central** 6:7
44:19 49:21
102:6 135:21

**certainty**
157:19,22

158:1 162:24
163:4 200:23
201:1,13,23

**chance** 178:2

**change** 94:21

**changed**
103:18 189:2

**changing**
40:25

**characterizati
on** 14:2

**charged** 78:25

**charges** 9:9
79:14

**check** 28:17
53:2,5 101:20

**checking**
108:11

**checklists**
52:21,25

**Chicago** 6:5,
20 7:1,7,8,20
8:14,18 9:7,18
10:13,18,22
11:7 12:24
16:15 30:2
31:12,22 32:7,
16,18 45:20
46:6,10 47:2,5,
9,13,18,20
48:10,16,19
49:7,15,19
50:1,10,14
51:1,16,20
52:19,21,22,24
53:4,10,17,19,
21 54:4,19,24
55:11,19 56:2
57:11,18 59:13
60:25 63:4,13
64:2 65:21 66:8
68:8 70:4 82:13
100:12,20
101:11 113:1,
25 114:7,15
132:14,22
133:12,21
136:1,5 137:4
149:2,13 151:9
161:6 167:12,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22 168:1
171:11,18
173:11,19
174:3,24
175:10 180:6
204:11 205:2,
16 207:22

**Chicago's**
46:13

**chose** 149:12

**circle** 163:23

**circles** 64:8

**circumstances** 137:2,8

**circumstantial**
153:4 155:25
156:24 157:3,6,
11,15 163:8

**circumstantially** 153:1

**cite** 127:24

**cited** 17:13,14,
16 37:14 38:8
39:6 73:23
88:7,17,21 97:3
116:17,18
117:22 119:4
123:6,7 124:3
127:23 133:2
194:19

**cites** 74:20
106:24

**city** 7:7,20 8:18
9:8,17 13:25
46:13

**civil** 125:4

**claim** 40:2
144:9,17 188:4
189:25

**claimed**
188:14

**claiming**
144:23

**claims** 10:6
74:20 113:5
143:25 144:4
195:16 198:5

**clarify** 14:22
19:22 129:21

**clarifying**
129:20

**class** 103:23

**clean** 108:23

**clear** 11:17
58:4 76:5 89:20
100:7,10 118:3,
6 128:16,20
157:18 206:5,
16

**cleared** 79:14

**close** 171:7

**closed** 79:14

**closely** 121:13

**closing** 78:24
79:12,14 80:6,
8,10,11 81:24
153:23 154:9

**coach** 206:18

**Cobras** 192:21
197:5

**Cobras'**
197:15

**coincidence**
165:18

**coincides**
164:9 166:4

**colleague** 6:21

**collect** 32:7

**collected**
32:13 50:19
52:8

**collection** 73:3

**College** 44:7
103:22

**column** 107:9,
13,17 108:16

**comment**
143:1 145:6

**comments**
75:10 88:10
94:18,20,22

95:6 127:21,22

**commodity**
160:12

**common**
174:20,22

**commonly**
77:14

**communicated** 210:23

**communication** 210:25

**compare**
120:3

**compared**
17:24 18:10
103:18 116:9

**comparing**
17:9 22:14
23:21 145:7

**comparison**
202:11

**compensated**
14:8 15:4

**compensation**
14:14

**competent**
151:6

**compilation**
106:18 107:9,
18 108:8
111:25

**compile** 126:3

**compiled**
33:10,12 85:10
105:9 108:13
113:5 116:12
129:23 158:8

**compiling**
23:11 107:2
111:8 147:2

**complete** 79:3,
17 184:21
193:4 195:12
200:17

**completed**
104:19 105:11

110:15

**completion**
105:19

**component**
50:11

**composed**
15:18

**composing**
109:1

**comprehensively** 90:6

**computer's**
101:21

**conclude**
63:22

**CONCLUDED**
213:16

**concludes**
194:6

**conclusions**
18:9

**condition**
194:21,22
199:9,17

**conditions**
27:9

**conduct** 35:3,
8,20 40:20
42:18 202:10

**conducted**
23:7 24:12
38:18 44:17
102:4 135:19
182:16 212:10

**conducting**
71:22

**confidently**
12:24

**confuse** 207:5

**confused**
128:10,11

**connotes**
168:10

**consideration**
125:21 126:12,

17 127:6

**consisted**
184:24

**consult** 22:18

**contact** 201:18

**contained**
62:11 67:2
124:6,11 133:3,
5 139:12 140:2
153:24 168:14
186:16 188:8,
23 195:3
200:11

**content** 183:11

**contents**
183:11

**context** 123:11
124:9 141:7

**continue** 11:10
147:22

**continued**
51:5 145:5,15
173:17

**contradict**
153:14

**contradicted**
151:8

**contradicting**
157:14 163:11

**contrary** 67:3
153:23

**convened** 6:7

**conversation**
136:19 210:6

**conversations**
210:9,15

**conveyed**
112:18

**convicted** 98:5

**conviction**
9:15 94:4

**Cook** 67:24
68:15,21 69:18
70:6,9,10,13,
16,25 71:5 78:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 63 of 82 PageID #:54351
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
220

84:18 90:24
116:7 118:1,12
123:17 167:25
169:17

**copied** 174:7,
14 175:4

**copies** 23:6
24:15 33:1
103:23 169:7
176:5 180:18
181:11,13
213:9

**copy** 25:2
38:11 51:15
103:11 104:1
108:23 174:13
180:8 181:7,8
183:25 212:22
213:3,8,11

**correct** 9:20
14:1 15:25
16:1,3,4 19:18,
19 20:8,11,16,
17,21 21:3,4,
16,21 22:1,10
28:21 29:2,11,
15,19 30:9,14,
20,21 31:5,9,
14,24 32:1,8,
19,21,24 33:2,
18,22 34:19
38:7,12,20,25
39:10,21 40:24
43:4,13,16
47:10 48:10
52:17 53:6
54:21 57:8,13,
16,22 58:15
61:2 62:8 69:18
73:11 74:5,12,
18 76:23 77:6,
9,13 80:19
83:3,7,11,14,17
84:19,25 85:8,
9,12,21 86:3,5,
6 87:2,7,13
88:23 89:3,14,
24 90:2,8,20
91:1 92:23
93:1,6 103:12
105:12,13,16
106:15 107:15
109:22 116:2,
10,15,24 117:7

118:1,8 119:6
120:2,17,22
122:11,16,17,
20 124:18,21
125:1 127:17
128:1,4,22
130:5,12,13
131:6 136:2
140:23 141:18
143:7 144:25
145:24 146:4,9,
15,19 147:1,14
150:4 154:18
156:15 159:9,
14,15 161:13,
22 162:10,20
163:14 164:20
167:5,16
168:15,21
169:9 170:2,5,
10,14 173:9,13,
21 175:14,24
176:2,22,25
177:4 178:22
180:14 182:4,8
185:10 186:2,
13 187:5 188:3
192:17 194:5,
17 195:2,7
197:16 198:3,
14 199:2 202:7,
12 204:3,8

**correctly**
15:21 28:23
38:22 60:24
64:1,25 70:1
79:18 85:4
140:21 159:7
162:17 203:25
210:18

**cough** 100:6

**coughs** 92:24

**could've** 94:14

**counsel** 6:17
8:3 13:16 72:22
80:14 114:13
136:7,20 137:9,
22,23 138:5
140:3 158:10
179:1

**count** 157:2
165:2,8 167:19
170:5 176:7,25

**counted**
175:13,20,23
176:11,12,17,
24 177:12,18,
23

**counting**
152:21 167:3
170:13,19,25
171:3,8,12,15
173:8

**counts** 177:18

**County** 67:24
68:15,22 69:18
70:6,9,10,13,
16,25 71:5 78:6
84:18 90:24
116:7 118:1,13
123:17 167:25
169:17

**couple** 88:3
109:19,20
200:3

**court** 6:4,12
15:3 25:25 47:7
53:1 166:21
167:4 168:8
170:12 179:2
181:8

**courthouse**
150:14

**courtroom**
200:12

**CPD** 140:18

**CR** 86:2

**create** 34:24

**created** 22:19,
23 70:21,24
167:9,10

**creating** 68:5

**crime** 49:22,
23,24 51:7
130:10 201:2
207:11 208:8
209:18

**crimes** 204:2

**criminal** 9:9,10
10:14,18,23
19:10,13 20:20,

23 84:18 94:10,
13 96:11 98:4
129:7,18 132:1,
4 136:2 137:4,8
138:9,11 144:6,
11,24 150:16
151:1,6 154:17,
21 155:2,16,17
158:2 159:8
160:24 161:1,
12,17 162:17
163:6 187:3
190:12

**critical** 200:15
202:17

**cross** 151:5

**cross-
examiner**
151:3

**CT** 213:16

**custody** 9:14

**CV** 43:18
103:11,15,18,
19 104:5

———————

**D**

———————

**date** 8:18
104:19,24,25
164:8 168:8

**day** 6:6 49:1
111:7

**deal** 158:18,24

**dealing** 73:21

**Deborah** 85:18
86:8 128:25
129:4 140:3
143:2 150:9,15
153:15 160:3,9

**decide** 75:8

**decided** 178:3

**deciding** 50:15

**decision**
156:2,8,10

**deduct** 166:24

**defendant** 7:2,

5 9:3,9,10
138:9 144:11
145:4,11,14
188:20

**defendants**
10:19,23 96:11
144:7,24

**defended**
129:8

**defender** 83:3
84:17,20 85:5
90:20,23 92:8
115:15 119:16
129:9 138:25
141:3 158:16,
17,20,21
183:17 192:17
194:5

**defender's**
140:1,3,4 193:4
194:21

**defense** 7:19
10:14 19:10,13,
21 20:20,23
21:2,11,12
56:12 60:5,21
61:12,22 62:21,
23 64:10,24
65:16,25 66:16
114:12 129:7,
18 136:2,7,20
137:4,9,22,23
138:8,11
139:11,15
140:13 145:4,
12 150:16
151:1,6 154:22
158:2,10 159:3,
9 160:13,24
161:1,12,16,17
162:17 163:6
179:1 187:3
190:6,12
195:18 198:8
199:2 201:19
203:7 206:10

**defer** 67:13

**degree** 157:19,
22,25 162:23
163:3

**delays** 80:11



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 64 of 82 PageID #:54352
The Deposition of BERNARD MURRAY, taken on May 10, 2023
221

delineate
179:14,15

delineates
164:16

**Demetrius**
18:19,23 20:4,7
21:24 22:8 24:4
30:13,18 87:4,
11 129:18
139:1,3,6
140:9,21
141:18 142:11
143:7,8,17
145:23 146:3,7,
12,18,21 147:5,
12 151:20
154:17,21
155:3 159:12,
17,24 160:9,13,
19 161:3,10,18,
20 162:8
166:14 184:6

**Demond** 10:4
11:4

**department**
8:14 10:14,18,
23 11:5,7 12:24
30:2 31:13,23
32:7,18 47:2,5,
10,14,18,21
48:10,16,19
49:7,15,20
50:2,5,11,14
51:1,12,16,21
52:21,22,24
53:5,10,20,21
54:4,20 56:3
57:11 59:13
61:1 63:4,13
65:21 82:11,13
113:2,25 114:7,
12,15 132:14
136:2,6,12,18
137:4 149:2,4,
14 161:6,15,17
167:12,15,22
168:1 171:18
173:12,19
174:3,25
175:10 180:6
204:11 205:2,
16 207:22

**Department's**

16:15 46:10

**Departments**
45:21

**depo** 125:5

**deposed** 8:20,
25 11:11 12:1
13:24 131:10,
18,19

**deposition** 6:8
8:9 12:11,13
15:2,3 18:14,
16,18,19 19:4,
6,9,12,15 20:1,
4,7,14,22 21:6,
13,16,24 25:21
26:9 27:23
30:13,18 44:17
62:17 75:11,15,
20,22 76:1,2,4,
6,13,14,16,19,
21 85:17,18
86:1,8,10,14,25
93:21 94:6
102:4 105:1,3
106:3,7,9
110:24 120:16
121:2,10,20,24
122:4,5 125:5,
13 126:7,11,20
127:1 130:4,17
131:12 135:6,
19,24 143:7
144:15 146:3
148:1 149:21
150:3,4,5
151:18 153:19,
20 156:5
159:24 182:16
212:10 213:16

**depositions**
18:22 19:2,20
20:19 21:1,10
75:1,9 85:21
86:18 87:12
93:18 94:2,20
95:1 96:5 97:20
98:3 120:8
125:3,8,19
126:2,3,15
127:4,8,16
128:3 129:15,
23 130:1,22
131:4 138:23

146:17,24
152:3

**describe** 150:7

**description**
189:1

**designate**
164:6

**desired** 49:7

**Desmond** 10:3
11:4

**detail** 95:15
150:6

**detective** 80:9
209:9,10

**detectives**
51:14 54:20
55:11,19 63:4
66:8 67:1 68:8
97:9 100:12,20
101:3,11
134:17 188:16
189:7 203:3
208:6 210:2,7

**determine**
71:19 79:2
205:7

**develop** 47:13
48:15 50:4,6,13

**developed**
47:1 48:9 78:17
197:4 206:6
207:23 208:24
209:16

**developing**
70:12

**deviations**
74:3

**die** 101:21

**difference**
103:20 152:23

**differently**
28:5

**digging** 168:10

**direct** 8:4
180:23

**directed** 68:25

**directing** 69:8

**directive** 68:11

**directly** 48:24
49:8 210:20

**directs** 63:14

**disappeared**
168:25

**disclose**
10:12,17,21
60:8 61:6
62:11,20 64:3,
12 65:3,12,21
66:10 67:1
138:10 149:1
159:19 161:7

**disclosed**
46:24 56:5
59:24 61:17
62:24 66:1
72:18 80:25
96:10,24 97:11,
23 98:15
110:25 133:22
134:7,9,18
142:2 144:6,11,
24 155:8,21
156:14,19
157:20 158:2
161:12 162:7,
10,11,13,16
187:3,9,11,19
190:24 191:10,
20 192:23
195:6,7,25
196:7,14,22
197:6 199:1,8,
13 200:23
201:14 202:23
207:13 208:3

**disclosing**
47:21

**disclosure**
8:14 46:11,14
60:21

**discovered**
163:10

**discovery**
11:15,18 80:12
112:18 138:5,

15 150:8,20,22
152:12 159:3
178:25 179:1
182:24 200:11
209:24 211:21

**discuss** 57:12
86:25 87:5
145:23 146:2
156:8,9 197:3

**discussed**
14:7 21:19,23
24:7,9 30:9,11
36:3,9 37:5,23
38:1 43:3,7
45:2 73:22 83:6
84:23,24 87:25
95:1,11,22
106:12,23
186:11 189:6
197:15 198:22
201:3 203:2

**discusses**
29:10 74:2
92:22 93:8 96:4
106:24 196:10,
19 197:2

**discussing**
36:17 38:15
107:23 109:4
136:6,8 140:1
152:11 160:6
186:21

**discussion**
16:22 87:4,10
95:25 151:20
156:13 190:20
194:10,14

**disposition**
166:22 170:4

**distinction**
78:5 130:2

**District** 6:12

**division** 6:13
163:14,18
185:18

**divisions**
168:17

**doc** 14:24

**document**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

49:21 62:4
69:24,25 80:16,
18 99:21
100:12,20
102:23 104:12
106:17 108:24
111:14,17
136:5 151:8,10
166:13,17
167:14 170:8
173:12,15,21
176:2 180:13,
20,24 182:3,4
184:1 198:18,
21 201:9,10
206:4

**documentatio
n** 22:23 47:18
189:22 204:11

**documented**
96:7,22 98:20
99:7 101:4,11
132:14,19,24
133:12 187:19
191:10,20
192:10,23
195:25 196:6,
14,22 197:6
202:23 205:19,
20,21 207:23

**documenting**
204:16

**documents**
10:17,22 22:18
23:12 24:20
26:15 39:16
40:1,2 42:6,10,
12,15 48:1,2
49:25 50:2
52:10 53:2
54:21 55:1,13,
21 56:3 59:23
60:8 61:1 63:5
66:10,11 67:23
68:3 72:14,16
80:3,22 81:1
82:11,13 91:22
92:4 101:21
105:23 106:14
107:14,19
112:16 114:16
119:25 120:1
121:1 124:8,12,
15,16,18 133:4

134:1 136:1,18
139:13 141:1,7
149:1,3,13,18
150:7 164:2
166:23 167:22
170:9 171:15
180:5 184:9
186:1 187:8
188:2 193:6,9,
19,22 194:3,10
195:4 197:3,10,
13 198:2,4,10
199:24 200:9,
18,23 201:23
202:4,16
205:10 207:22
208:22 209:20,
24 211:18

**drafted** 144:13

**drafting**
107:22 108:17,
18

**drawing** 88:3

**Drive** 6:5

**driving** 188:18,
20

**drug** 201:14

**dwell** 78:4

———————

**E**

———————

**e-mails** 102:12

**earlier** 16:24
17:7,25 73:22
82:2 85:3,9,11
87:25 90:5
106:12,23
135:23 163:23
170:9 198:5
209:15

**early** 47:6

**easier** 120:5
136:17

**Eastern** 6:13

**easy** 11:24
203:16

**edit** 109:2

**effective** 151:3

**end** 74:21,22
79:13

**enforcement**
45:11

**ensure** 11:6
52:11 54:4,12
56:9 71:23

**ensured** 78:10

**ensuring**
53:11,22 54:25
55:20 78:12,20

**entire** 39:3,12,
14,20 40:3
61:16 62:15
63:14 70:9
73:17,20,24
75:15,19,20,23,
24,25 76:1,2,
17,24 110:19
112:7 130:24
131:2 155:2
156:17 174:16
190:1 203:9

**entirety** 46:18,
20 64:3 76:7
121:24

**entry** 171:7
189:16

**Erickson**
149:22 151:22
152:4,15,22
153:2,22,24
156:13,18
157:2,8,12,20
158:1,14
159:19 160:7,
23 161:7,11
162:16 163:1,7
164:19 165:15

**errors** 104:4

**estimate** 112:2

**estimating**
45:18

**et al** 6:10,11

**evaluation**
127:20

**event** 203:10

**events** 95:12
96:5,20 98:19
99:5

**eventual** 129:7

**eventually**
49:6 182:3

**evidence** 95:2
97:13 98:1,9,23
117:1 132:12
133:20,24
134:7,16
150:24 152:12
153:4,5 155:7,
20,25 156:24
157:12 161:21
162:15,18
163:9 169:11
181:5,9 189:4
191:2 194:8
200:5,8,16
201:9,21

**evolved** 48:18
49:11 50:7

**exact** 56:16
60:15 81:4
106:8 133:15

**examination**
8:4 17:12
104:19 151:5
167:8,13
169:17 177:8

**examine**
24:22,25 31:18
124:12 139:15
145:13 171:6

**examined**
17:2,6,7,12
18:2 29:25 30:5
37:6,13,15
38:13 41:16

**examiner**
167:8,10,21

**examiner's**
166:22 167:11
168:6,7 200:14

**examining**
22:16 117:8

**examples**
17:13,15 36:8
38:9 112:17,21
113:20,21
115:9,11
116:18 117:22
118:18,19
119:4,17 123:6,
9 124:3 141:6

**Excellent**
119:23

**excessive**
109:15

**excluding**
167:18

**exclusively**
183:14 187:8
189:21 193:13

**exculpatory**
133:20 134:16

**excuse** 50:19
92:24 100:6
109:11 112:6

**exhibit** 27:23,
25 61:25 62:1,4
102:25 103:1,3,
4,7,10 104:9
110:7 119:19,
20 120:6,13,21
122:19 128:12
131:25 138:19,
20 141:13,15
142:6 143:11,
15,20 166:9,10,
14 192:5,6
197:20,21,23

**exhibits** 26:9
143:11

**exist** 120:21

**existed** 131:6
185:11 208:1,2

**existence**
154:22 183:10

**exists** 157:1
184:20 185:12

**exonerated**
9:11,12

**expect** 97:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

151:10 173:20
202:1 207:12
208:2,7,13
209:18 210:23

**expected**
97:10

**experience**
48:8 49:16
99:4,20 100:5
103:21 148:24
149:11 151:2
174:19 175:9
200:6

**expert** 8:11,17,
21 15:16,17,20
16:23 24:21,24
27:22 29:3 43:4
56:7,21 67:4
73:9,15,17
75:18 86:23
88:8,17 90:13
94:25 95:23
97:14 105:12
106:2,11,24
107:5,25 109:3,
14 110:15,20
112:16 113:6,
21,24 116:17
120:16 121:1,6
123:4 124:6
125:6 126:14,
25 130:4,8
133:2 134:24
138:18 141:8
143:25 144:14
151:19 186:15
193:23 194:25
211:19

**expert's** 18:2
22:15 39:16
88:10 94:18,22
95:6 104:20
111:10,18
127:21 198:16
205:23

**expertise** 67:4,
11,14 204:11

**experts** 66:24
110:1 115:9
124:4 125:8
134:1 189:5
191:23

**explained**
144:20 153:20

**explaining**
144:21

**explanation**
145:2

**explicit** 179:25

**explicitly**
201:24

**explicitness**
66:5

**expressly**
60:25

**extensively**
40:10

**extent** 11:9
15:17 62:15
69:4,7 96:2,3
110:23 124:7
195:15

**extra** 180:18

**eyewitness**
191:9

**eyewitnesses**
94:3 97:7,18
125:18 196:21

―――――――

**F**

**fact** 7:14 12:10
31:11 32:23
57:21 58:18
64:14 65:15
66:25 84:22
88:24 96:4
101:3 115:25
125:16 127:9,
16,22,25 128:4,
22 129:1,22,25
130:7,10,16
131:2,4 135:7
140:21 150:2
151:21 152:17
154:10 155:7,
20 156:14
160:21,22
161:18 168:8
183:24 187:19
196:21 197:2

199:25 201:3
202:16 207:5,
15

**facts** 23:25
191:1

**failed** 10:17

**failure** 143:16

**fair** 16:14 27:4
30:25 36:15
39:4 40:12
47:22,23 49:12
79:19,21 80:25
84:9 86:16
87:18 100:11
105:4,24,25
110:10,21
111:1 112:6,9
114:24 117:21
121:3,5 123:14
124:1 126:19
134:9 138:7
142:2,11
147:19 152:5
164:14 169:21
177:20 185:20
186:7,22
187:11,21
188:11,22
189:24 190:8
192:11 194:11
195:1 198:19,
23,25 199:8
209:22 210:23

**familiar** 104:12

**family** 45:10

**fashion** 24:25

**faster** 56:20
147:3

**federal** 68:9

**feel** 112:22,23
113:8,15,22
115:4,13,18,20
119:8,9

**Felony** 45:13,
21 46:5,15,17,
24

**felt** 113:4
119:14 137:10
190:12

**Fields** 26:10
58:19

**figure** 171:10

**file** 24:4 25:1
37:21 38:2,17,
24 39:3,9,13,
14,20 40:4,23
42:16 46:11,13
56:11 60:9
61:5,7 62:12
67:2 77:6,9,11,
12,13,21,22,24
78:2,3,7,8,9,14,
21 79:17 80:3,
23,24 81:3,6,9,
10 82:23 83:2,
10,12,16,18,23
84:1 85:5,6,15
88:22 89:21
90:1,2,5,6,14,
15,20,23,25
91:17,18,22
92:4,5,7 95:4
96:8 106:17
107:9,18
108:24 109:6,
21 111:24
122:15,25
123:2,18,21
124:7,10,11,18,
21,24 130:25
133:4,5 134:2
139:4,6,11,13,
15 140:1,3,4,7,
11,13,15,18,22,
23 141:8,9,17
142:10,11,16,
17 145:8
146:13,14
150:23 157:1
158:17,24
160:8 163:18
164:14,18,20
165:3,7,14,23
166:2,8,15,18
167:3,15,16
168:15,19,21
169:5 173:12,
19 174:10,13,
25 175:3 177:9
181:8 183:15,
17 184:4,5,8,
12,19,21,24
185:2,11,12,14,
18,20,24 186:2,

23 187:9 188:4,
24 189:1,14,15,
17,18 190:3
191:5,25
192:15,16,17
193:8,23 194:3,
5,21,24 195:4
197:20,24
198:1,6,10
199:3,10,11
200:12,17
202:5,6,9,11,
12,14,18
205:10 208:17,
25 209:3,4
211:20,22

**file's** 199:16

**filed** 9:17 80:11

**files** 8:14 11:6
23:2,3,6,7,23
24:4,9,16 25:17
29:1,18,22
30:3,4 31:9,12,
18,22 32:6,13,
19,21 33:10,14,
21,22 35:22,25
36:2,4,5,10,11,
12,14,16,20,24
37:4,6,7,11,13,
15,16,17,23
38:1,6 41:3
42:11,19 46:24
47:2,5,9,15,21
48:8,16 49:2,
11,12 50:2
51:15,16 52:7,
16 56:10 59:14
63:15 64:3
71:18 72:21
73:2 74:17
77:6,16,17
78:13 79:20,24
82:20,24 83:3,
22 84:17,18,22
85:20 88:13,15
90:15 91:4,5,15
92:9 106:14
107:6 108:12
109:22,24
112:8,20
113:10,17,23
114:1,9,16
115:1,3,6,12,
15,22 116:2,3,

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 67 of 82 PageID #:54355
THE DEPOSITION OF BERNARD MURRAY taken on May 17, 2023
224

4,6,9,10,12,13,
16,19,21,23
117:6,9,13,18,
19,25 118:7,12,
17,23 119:2,11,
15,16 122:20,
25 123:13
135:1 138:25
139:1 143:17
145:12 166:21,
24 167:15
185:10 193:4
194:20 195:11,
18 197:3 211:3

**fill** 179:8

**filling** 181:9

**final** 80:13
107:9,18 108:8
111:9 143:1

**find** 18:5 75:12,
14,20 110:3
111:17

**fine** 12:8 66:20
178:13 206:9

**finish** 69:5

**fired** 200:13

**focus** 33:16
39:15 124:3
131:20 162:14

**focused** 38:24
39:23 73:21,25
74:15,19 90:7,9
106:12 112:20
123:5 189:21
197:14 198:1,4,
11,13 211:18

**focusing** 67:4

**folder** 73:3
166:18

**follow** 13:7
55:11 70:19

**forgotten**
23:25

**form** 10:7,24
11:8 13:2 14:6,
19 16:9 31:16
32:9,10 33:3
34:1,14,25

35:5,10 36:22
37:3,19 46:6,7
53:8,13,24
54:7,15 55:4,
14,23,24 58:24
59:25 60:1,10,
18 61:8,18
62:13 64:5 65:5
66:12 67:6
68:17 69:25
71:1,7,18 81:13
82:6,14 91:7
94:16 96:13
97:1,12,25
98:9,22 99:8,
15,24 100:15
101:6,14 113:3
114:3 116:25
118:2,15,25
127:10 132:25
133:14,23
134:10,19,20
135:3 136:9,22,
23 137:13,25
138:12 149:15,
16 151:12
152:10 153:10
154:11 155:9,
22 159:21
161:23 169:1,
10 175:6 176:3
177:21 178:23
179:12 181:10
187:12,22
188:12 189:3
191:1 192:25
195:8 196:16,
24 197:9
202:24 206:1
208:4 209:5
211:8

**formal** 68:2
70:13

**formed** 71:24
84:11

**forms** 48:19,
22,23

**forward** 69:10

**found** 53:6
143:25 195:17

**foundation**
11:9 16:9 31:16
32:10 33:3 35:5

36:22 37:19
53:15,24 54:7,
15 55:4,14,24
67:7 97:12,25
98:9,22 99:15,
24 100:15
101:6,14
118:25 133:23
136:9,23
149:15,16
151:12

**foundational**
147:10

**four-minute**
211:25

**frankly** 10:9

**front** 25:2,7
28:1 40:18
42:23 43:18,21
56:21,25 57:2
72:2,7 95:25
119:21 173:22,
25 176:2,7,21
180:14 181:12

**fulfilling** 47:14
49:16 52:23

**full** 167:2

**Fusco** 76:18,
21,25 121:21,
25 122:7

**future** 69:12

_____

**G**

**gang** 196:20
203:14

**gather** 11:6
49:4 63:5 203:8

**gathered**
53:11,22 54:5,
13 59:24
116:14 201:25
208:9

**gathering**
48:16

**gave** 41:9
123:9 145:2

**gee** 63:19

**general** 17:9
47:16,19 56:6
57:7 109:17
111:25 112:1
168:20 176:21
180:12 182:8
184:2 186:9
206:24 207:3,7

**generally** 12:8
74:3 81:23
180:15

**geographicall
y** 46:4

**Geraldo** 6:9,19
13:10 14:12
123:18 125:4,9,
13 192:10

**give** 7:24 25:9,
24 90:21
109:16 131:15
195:14 200:3
210:15

**giving** 99:17
179:16

**glad** 65:14

**GM** 111:7

**Gonzalez**
91:17,22 92:4,
5,7,10,13,17
186:22,24
187:4,8,9
188:3,5,9,23,25
189:7,14,17
190:1,10 191:4,
24 203:22

**Gonzalez's**
190:10

**good** 8:6,7,8
11:21 65:2,11,
18 97:21
101:19 103:4
112:1 212:23

**governments**
68:9

**GPR** 78:9
156:25 158:9
162:19,23
163:5,20 164:1
167:11,21

168:2,10
169:20 185:5,8,
16,19,25 186:3
208:12

**GPRS** 144:17
163:24 166:23
168:14,24
169:4,8 176:6
185:9,10,12
186:9

**great** 64:16,18
66:20 95:15
103:8 150:5

**Gubin** 85:18
86:8,10,15,19,
25 87:6,13
128:25 129:4,
16 138:23
140:3 143:2
146:20,25
150:9,15
151:21 152:3,9,
16 153:15
155:4,21 156:6
157:14 160:3,9
163:6 168:13

**Gubin's** 85:23

**guess** 9:8 69:9
107:8 140:25
160:10 183:1
195:15

**guessing**
179:3

**Guevara** 6:10,
11 7:2,5 129:16

**guidance**
54:24 75:21
97:20

**guys** 25:12
26:15 44:11

_____

**H**

**half** 94:25

**hand** 7:23

**handle** 67:21
68:8,10,25
69:8,22



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

handled
129:10

handwriting
23:6

happened
139:20

happening
48:7

happy 183:9

hard 23:6
111:11 145:6
181:11

Harper 44:7
103:21

head 85:16
137:6 154:4

hear 178:4,5

heard 71:14
161:10

hearing 183:1

Hector 94:7
190:22,24

helpful 63:12
204:25

hey 182:20

high 148:17

history 27:8

hold 30:10
41:22 56:23
72:3 128:14
149:13,17
170:23 192:12
211:11

hole 111:20

homicide 39:4,
10,18 40:4,23
50:3 83:10,16,
19,23 84:1
89:9,23 90:16,
25 91:6 92:25
93:9,13,18
95:20 96:6,21
97:7,19 99:6,
13,23 100:14,
21 101:2,5,13
109:5 123:19

129:6 186:22
187:2,5 188:3,
6,9,10 189:1,
12,14 190:1,6,
11,21 191:4
195:23,24
197:5 202:22
206:6,7 207:24
208:17,19
211:6

homicides
204:2

hope 210:24

hour 14:19,23
15:4 109:16

hourly 14:11

hours 15:5,6,
10 105:21
106:2,6,9,18,22
107:12,13,18
108:2,7,16
109:6,16,19,20
110:8,17,22
111:3,23

Hugo 196:11

hundreds
32:23 33:21
37:22 38:1

hypothetical
67:7 99:25
136:10,24
137:14 138:1
151:13 154:12,
14 175:7
202:25

_____

I

idea 71:14
77:20 159:8
204:1

ideas 64:16

identification
27:25 29:13
48:22 49:19
52:6 62:1 97:9,
22 119:20
154:24 155:6,
19 166:10
192:6 197:21

identifications
94:3

identified
29:19 52:22
54:19 88:12
154:8,10 160:1,
21 161:5,20
190:10 192:16
194:15 198:2,
15 199:20

identifies
144:4 194:4

identify 198:12
203:16

identifying
189:10

Iglesia 117:5

Iglesias 6:9,19
7:3 13:10 14:12
15:7,9,15,16,18
16:3,6,7,17
20:11 21:6,10,
15,21 22:1
23:20 24:11,13,
17,18 35:4,9
37:10,18,20
38:4,5,6,10,18,
19,25 40:22,24,
25 41:4,13,18
42:1,4,8,9,13,
16,20,23 43:7,
8,16,24 44:4
59:9,18 83:20
84:12 86:20,24
87:9,10 100:19
101:10 110:8,
11,14,15,20
111:4 114:14,
21,24 115:5,13,
18,20 116:1,22
117:19 118:14
119:12,19,24
120:6,9,17,25
121:2,7,10,21,
23,25 122:16,
20,22,24,25
123:7,18 125:4,
6,9,13,17,23
126:8,12,13
127:20 131:22,
23,24 132:1,4,
5,7,11,13,16,21
133:10,20

135:2,8 142:7,
19 143:15
146:7,19 147:6,
9,13,18 192:5,
10,15 194:3,15
195:23 196:6
197:20,24
206:16,17
207:4,19,21
211:1,3,7,18

Iglesias's
132:13

Iglesias-
specific 42:11

Illinois 6:6,12
7:1

impact 138:15

impeach
151:11

implement
70:13

implemented
71:20

implicit 60:19
61:21 62:22
64:9 65:24

implicitness
66:5

important
66:25 204:6

inaccuracies
104:5

inappropriate
183:3

include 87:11
91:16 105:1,18
107:19,20
127:22 128:21
141:16 143:17
152:21 164:23
177:6,19 178:3
179:9 208:12

included 15:19
17:10 18:1
33:21 37:7
41:7,12 42:3
56:10 78:13
80:23 81:21

84:8 104:3
118:19 126:2
128:6 142:9
144:18 150:3
167:25 169:5,
19 170:8 174:9
179:4,5,22
188:5,15,25
189:15,17
190:1 193:7
201:10 203:9,
15 208:25

includes 107:7
108:2 120:14
153:6 165:14
166:17

including 52:3
109:21 128:19
145:15 152:22
153:2 170:1,5
178:21 190:22
191:4,23

incomplete
67:7 99:25
136:10,24
137:13,25
151:13 154:11
175:7 184:20
199:4 202:7,8,
10,14,19,24

INDENTIFICAT
ION 103:1,7

indicating
98:18 155:5
203:25

indication
155:4 177:17
179:21 184:25
193:24

indications
160:11 185:13

indicators
79:15

indicted 68:9
69:24

indictment
68:14 69:17
70:4

individual 7:1
154:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 69 of 82 PageID #:54357
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2022
226

**individuals**
130:11 131:12

**informal** 63:18
64:15 78:15
180:7

**information**
10:13 12:25
17:25 18:12,13,
14,15 22:9
24:23 28:9
34:12 41:14,15
42:2 48:5,12
49:4 50:18,24
51:8 57:12
60:20 61:5,6,16
63:17,21,24
65:21 75:14
81:21 94:13
96:10 97:10,22
107:4,23 110:4
111:9 112:17,
19 127:7
130:21 137:10,
12,23 138:8,10
144:9,17,22,24
152:25 153:24
155:8,20
158:19 160:3,8,
9 177:23
186:21,23
187:1,4,10
188:8,13,23,25
190:5,20,23
191:8,14,18
192:21 195:3,6,
22 196:5,10,13
201:10,25
202:21 203:6,
15 204:5,7,13,
24 205:3,18
206:8 207:9,10,
12,16,25 208:7,
9,13,19,24
209:1,8,16,21,
22 210:18,21
211:5

**information's**
145:10 205:10

**initial** 158:19
170:22,24

**initially** 78:15
84:11 97:8
129:9 158:16

**innocence**
9:13

**innumerable**
69:22

**inquiry** 193:17,
21 200:19
201:5,7

**instance** 8:25
80:19 136:4
155:2

**instances** 83:1
205:3

**instruct** 12:19,
20 60:25 63:3
70:18 137:20

**instructing**
64:2 65:20 66:8

**instruction**
66:25

**instructions**
54:11

**intending**
186:6

**interaction**
189:6

**interoffice**
48:19 49:2

**interrupt** 45:5

**interrupted**
69:6

**interview**
81:19,22

**interviewed**
78:25

**interviews**
191:19 196:6

**inventories**
200:14

**inventory**
181:4,5,6,10
193:12,20
200:7

**investigate**
208:21 211:21

**investigating**

201:17 208:6

**investigation**
13:1 39:4,10,18
40:5 50:3 52:8
56:4 61:2 71:19
74:4 89:9,23
90:11,17 91:1,
5,6 92:13 93:1,
10,13,18 95:13,
20 96:7,22
97:7,19 98:14,
19 99:6,14,23
100:14,21
101:3,5,13
109:5 123:19
124:25 129:6
130:9 132:19,
23 133:12
134:18 187:2,
11,18 188:9,11
189:23 190:6,
11,21 192:22
195:24,25
197:5 202:22,
23 203:4,16
204:6,7,14,18
205:4,5,11,12,
17,18 207:10,
24 208:18
209:2,16,17
211:6

**investigations**
208:20

**investigative**
12:25 23:23
24:16 31:9,12,
22 32:6,21
33:21 35:22
38:17,24 39:3,
9,20 40:4,23
51:16 59:14
60:9 61:5,6
62:12 74:16
77:11,21,24
78:8,9 83:12,
16,18,23 84:1,
20 85:5 88:13,
22 89:21 90:1,
6,14 91:18 95:4
96:8 99:22
100:13 101:4,
12 112:8
114:25 116:9
122:15,25

123:13 124:10,
18 132:22
133:11 138:25
139:6 140:15,
16,18,22
141:16 142:10,
16 144:18
145:8,13
146:13 163:22
164:10,14,16,
22 165:3,7,13,
14,23 166:2,7,
15,21 167:3,15
168:11,15,19
174:10,13
175:3,10
177:11 183:15
184:8,19
185:14,19
187:17 188:4
190:2,3 191:5,
24,25 192:15
194:3,24 195:4
197:20,24
198:1,10
202:11 208:17
209:3

**investigator**
141:9

**investigatory**
17:9 30:3 36:11
56:11 60:4
64:19 65:14
66:15 77:25
169:5

**invoice** 15:8,
13 104:11,18
105:10,22
106:1 110:18,
19 111:1

**invoices**
13:15,17 44:21

**involved**
188:17 189:11
210:16

**involvement**
130:8

**involving** 8:18
69:1 190:24
197:5

**IR** 52:5

**irrelevant**
11:13 162:9

**issue** 74:5 80:7
150:21 162:18
190:17 191:3,
11,15 209:12
210:9

**issued** 51:8,18
79:12 164:1

**issues** 73:21

**issuing** 80:4
86:12 175:9

**item** 77:2
120:15 122:13,
15,18 146:2

**items** 50:17
74:24 87:21
88:3,12 120:5,
14,20 122:8,10
138:22 200:12

**iterations**
59:16

———————

**J**

**Jack** 141:4
158:15,21
160:8 182:25

**Jeff** 6:23,25
25:15,19 27:17
182:11 211:13,
24 213:7

**job** 205:22,23

**John's** 141:5

**Johns** 153:2
154:24 155:6,
19 158:18,20,
24 159:2,4,9,
13,18,25 160:1,
10,20,21 161:4,
5,19

**Johns'** 164:23

**Johnson**
18:11,14,17,23
19:10 20:4,8
21:18,24 22:8
24:4 30:13,18
85:19 86:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 70 of 82 PageID #:54358
The Deposition of BERNARD MURRAY, taken on May 10, 2023
227

87:5,11 129:16, 18 139:1,4,6 140:9,21 141:18 142:11, 18 143:8,17 145:24 146:4,7, 12,18 147:5,13 148:6 151:20 153:6 154:17, 21 155:3 159:12,17 160:9,13,20 161:4,10,18,20 162:8,14 166:14,15 167:3 171:3,14, 17,20,22,24 172:1,3,5,7,9, 11,13,15,17,19, 21,23,25 173:2, 4,6,8,9 175:16, 18 176:11,12, 16,20 182:24 183:7 184:6

**Johnson's** 18:18,19 19:12 143:7 159:24

**join** 91:8

**Jones** 74:9,10 81:19

**Jose** 191:9

**judge** 19:2 148:18,21

**jumping** 126:24

**juvenile** 47:6

───────
**K**

**Kara** 45:5

**Kara's** 44:23

**Kentuckiana** 6:4

**Kevin** 85:18 86:1 128:25 129:4,11 146:21 148:14, 15 153:14

**Kimberly** 83:8

**kind** 71:23 151:2 155:11 157:10 167:14 182:3

**kinds** 204:12

**Kivetz** 6:22,25 7:21 10:24 13:2 14:19 16:9,11 25:9,12,16 26:8,18,20,22 27:19 32:9 34:1,14,25 35:5,16 37:3,19 53:8,13 55:5,23 59:25 60:18 61:18 67:6 69:5 71:1 81:13 91:8,25 93:2 96:13 97:1,12, 25 98:8,22 99:8,15,24 100:15,22 101:6,14 118:2, 15 132:25 133:14,23 134:10,20 135:11 136:22 138:12 149:15 175:6 176:3 177:21 178:1,4, 7,12,14,17 179:12,24 187:22 189:3 191:1 192:25 196:16,24 197:9 208:4 209:5 211:8,15, 25 212:3,13 213:9

**knew** 20:22 21:12,14 56:8 78:8 136:7,20 137:12,23

**knowing** 154:13

**knowledge** 125:16 130:15 132:17 137:9 153:18 155:5 159:8

───────
**L**

**lab** 49:22,23,24 51:7

**laid** 203:5

**language** 52:2 147:17

**laptop** 23:18

**large** 15:17 31:8 142:22

**larger** 104:13

**late** 13:19

**law** 45:11 150:25 210:15

**lawsuit** 9:17

**lawyer** 154:21

**lead** 110:2 197:15 203:4

**leads** 195:13 197:4 200:20 201:7 202:18 203:3 206:6 207:24

**leafing** 168:19

**learn** 46:10,13, 23 209:8,11 210:5,24

**learned** 13:1 46:16,17,19 47:4,6,8 126:17 127:7 133:21 134:17 187:2, 10 188:18 190:20 191:8, 14,18 192:22 195:22 196:5 202:21 203:3 204:5,13 205:3, 11,16 207:9,13 208:10,19 209:1 210:4,8, 22 211:6

**learning** 209:11 210:13, 14

**led** 189:9

201:19 210:5

**length** 201:4

**letter** 141:4

**light** 12:10 182:24

**limited** 52:3 133:6 188:24 194:14

**lineup** 149:22 151:22 152:5, 16,22 153:2,24 154:8,10 156:13,18 157:9,20 158:1, 14,22 159:20 160:2,7,21,24 161:5,7,11 162:16 163:1,7 164:19,23 165:15

**link** 25:12

**linked** 204:3

**list** 33:17,20 50:8 51:19 56:17 72:10,20, 22 73:1,4,8 77:3,9 84:8 85:17,25 87:20, 21 88:12 91:16 103:5 112:3,5,6 114:20 119:24 122:14,19 128:12,18,20 129:15 131:24 141:12,15 142:7 143:11, 15

**listed** 13:4 29:4 72:25 74:25 82:20,22 83:15 84:4,13 85:7 87:16 91:14 103:23 105:5, 21 110:17 122:8,10 123:3 138:22,24 139:4,22 142:12 168:9 198:19

**listing** 52:4

88:5

**lists** 104:21 106:18 107:9 110:7

**literally** 201:2

**litigate** 12:21

**located** 6:5

**location** 6:16

**locations** 52:12 53:12,23

**long** 45:15 109:17 121:11, 14 129:10 206:7 208:9

**longtime** 70:10

**looked** 24:1 29:17 30:13 31:11 37:21 38:23 39:22,25 73:9,24 83:2 85:15 116:20 139:9 140:11, 13 141:24 173:18 184:12 199:11

**lost** 155:11

**lot** 49:10 116:11 174:21 184:9 210:6,15

**Lucy** 191:19

───────
**M**

**made** 19:5,6,9, 14 20:14,19 22:16 31:13 32:8 36:15,20 37:11 39:7 41:13 48:1,25 52:9 60:4 64:23 65:16 74:17 75:10,11 85:20 87:17,22 94:3 104:2 109:25 113:6 123:4 128:16,18 153:22 156:2,7 157:15 180:25 183:23 185:4



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 71 of 82 PageID #:54359
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
228

188:19 202:5

**mail** 49:2

**main** 163:20

**majority** 180:21

**make** 20:5 25:24 50:25 51:2,5 57:16 58:5 60:22 61:23 66:15 72:25 76:5 79:16 80:13 82:18 90:10 97:9,22 100:10 104:13 106:21 120:5 129:24 133:9 145:6 147:3 150:22 154:14 156:12 157:10,16 159:6 174:15 178:8,15 181:11,12 182:11 203:20

**maker** 67:12

**makes** 61:10 170:7

**making** 51:6 62:22 65:24 107:22 108:4,13 130:3 157:3

**Malczyk** 190:16

**man** 94:6 190:22,24

**manner** 80:12

**manners** 47:17

**mark** 27:22,23 61:24 102:24 103:2 119:19 192:5 197:19

**marked** 27:25 62:1,4 102:23 103:1,7 119:20 166:10,14 192:6 197:21

**marks** 53:2,5

**material** 17:10 28:19,20 30:16 38:14 41:10 48:20 52:25 53:1,11,23 54:5,13 66:15 77:25 80:5 85:10 87:21,24 95:5,25 97:4 139:14 140:16 145:13,14 158:17 163:22 164:10,16,22 165:13 166:20 169:4 175:11 177:11 179:5,6 180:23 185:15 187:13 210:10

**materials** 14:18,24 15:7,11,22 16:20 30:24 33:7,17,20,25 52:12 54:19 56:18 59:4,8 60:4 61:11 64:20 65:15 66:22 67:2 70:12,18,24 72:2,9,11,21 73:1,4,9,14 74:25 77:8 79:8 82:19 83:15 84:10,13 85:25 87:16 88:1 91:14 103:5 105:15 110:20 111:5 112:4,5,7 113:1 119:18,24 120:6,13 122:9,10,14,19 128:6,7,12,18,21 129:11,15 131:24 138:19,21,22 139:17,22,25 141:10,12,16,20 142:7,13,18 143:11,15 144:18 168:11

**Mathis** 83:8

**matter** 6:9 13:10,13 14:4,7 20:14,19 21:6,10,20 28:6

37:10 38:19,25 40:16,24 41:13 43:23 72:10,17 76:11 88:24 104:11 105:16 112:9 114:14,24 119:19 125:24 132:5 133:20 151:19 179:10

**matters** 8:18 13:16,17 15:19 20:11 41:16 43:24 44:4 62:7 67:19 73:10 135:2,8

**Mcgrath** 7:4,18 155:22 212:16 213:12

**meaning** 130:7

**meaningful** 24:2 202:10

**means** 71:8 160:16 162:25

**mechanism** 80:15,17,20 82:3

**medical** 27:8,9 140:2 141:3 166:22 167:8,9,11,21 168:6,7 200:14

**medications** 27:12

**Megan** 7:4 211:24 213:10

**Melendez** 191:9

**member** 70:10

**members** 45:10 203:14

**memo** 68:7,13,24 69:16 70:1,3

**memory** 15:12 88:14 140:6 150:13 181:21

**mentioned** 201:24

**mentions** 159:3

**message** 171:12

**method** 111:6

**Michigan** 49:6

**middle** 28:11 108:15 198:12

**might've** 24:1 29:25 127:7

**mind** 44:11 168:10

**minute** 135:12 178:7

**minutes** 44:12

**misidentified** 56:19

**missed** 17:5 114:3

**missing** 41:14 79:21 80:6 81:22 124:15,17 126:1 139:2,13 184:9 202:4,17

**misstates** 10:7 62:13 64:5 65:5 68:17 82:6,14 97:13 98:1,8,23,24 116:25 133:24 153:10 156:20 159:21 169:10,11 175:8 189:3

**moment** 126:23 131:22 160:18

**Monica** 39:4 101:13 123:13,19 124:25 132:23 133:11 195:24 197:4,7 208:17 209:1,3 211:3

**Montalvo** 191:19

**Montanez** 94:7

190:22,25

**months** 45:16 152:24

**morning** 8:6,7,8 13:19

**mother** 189:7 190:10

**motion** 201:20

**motions** 150:23,24 209:25

**move** 66:3

**multiple** 210:18

**municipal** 200:11

**murder** 160:2 186:24

**Murray** 6:9 7:10,12,15 8:6 12:23 13:4,9 25:20 27:24 44:17 45:8 55:8 67:9 69:6 102:4,24 104:3,16 110:7 135:19 182:16 183:22 212:10,14,17

**must've** 58:14 139:14,24

———

**N**

**named** 94:6 190:16,22,24 191:9

**narrative** 173:16

**necessarily** 33:14 73:13 78:7 88:2 150:6

**needed** 40:1 48:12,21 123:9 127:21 200:7 203:8

**nickname**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 72 of 82 PageID #:54360
The Deposition of BERNARD MURRAY, taken on May 17, 2023

229

201:19

**night** 13:19
160:2

**non-** 130:7

**non-specific**
69:11

**North** 6:5

**Northern** 6:12

**note** 107:25
108:19 141:4,6
158:16,21
168:9 184:16

**notes** 17:9
22:18,22 23:3,
12,14,18 78:9
144:4,22
182:25 183:2,5,
10,12,17

**number** 6:13,
14 26:8 31:8
32:13 48:20
56:16 77:2 81:5
82:20 83:1,10,
15,18 85:14,25
86:7 87:15
89:7,8,20,22
91:16 120:5,15,
20 122:13,18,
19 141:4 144:4
146:2 153:4
157:23 158:3
164:9 166:5
170:12 177:4,7
196:12

**numbered**
26:20

**numbers**
24:22,23 36:3
52:5,6 72:24
77:3 82:22,23
88:7,14 89:1,16

**numerical**
186:17

**numerous**
16:25 17:2
116:6

---

## O

**object** 11:8,12
62:15

**objection**
10:7,24 12:4
13:2,3 14:6,19
16:9 31:16
32:9,10 33:3
34:1,14,25
35:5,10 36:22
37:3,19 46:7
53:8,13,24
54:7,15 55:4,
14,23,24 58:24
59:25 60:1,10,
18 61:8,18
62:13 63:7 64:5
65:5 66:12 67:6
68:17,23 71:1,7
81:13 82:6,14
91:7,25 94:16
96:13 97:1,12,
25 98:22 99:8,
15,24 100:15,
22 101:6,14
112:10 113:3
114:3 116:25
118:2,15,25
127:10 130:18
132:25 133:14,
23 134:10,19,
20 135:3 136:9,
22,23 137:13,
25 138:12,13
149:15,16
151:12 152:10
153:10 154:11
155:9,22
156:20 159:21
161:23 169:1,
10 175:6 176:3
177:21 178:23
179:12,24
187:12,22
188:12 189:3
191:1 192:25
195:8 196:16,
24 197:9
202:24 206:1
208:4 209:5
211:8,14

**objections**

98:8

**obligation**
138:4,10

**obligations**
8:15 80:12

**observation**
157:3,6,15
166:16

**observations**
108:22 109:2
188:19 190:15

**obtain** 48:20
63:17 64:15
80:5 203:17
209:22

**obtained**
54:19,25 55:20
63:23 78:10
79:6 114:11
116:7 168:7

**obtaining** 47:9
49:12

**obvious** 79:10
80:7 139:24
140:25

**occasion**
173:16 174:18

**occasionally**
123:10

**occasions**
181:13,14

**occurred**
95:19 99:13,22
101:4,12 108:5
133:11 187:18
204:18

**Ochoa** 196:11

**offense** 176:21
180:12 182:8
184:2

**offer** 31:4
95:16 112:24
113:9,16 115:4,
14,19,21 119:8,
10,14 186:12
191:13

**offered** 8:17

15:23,24 16:3,
8,19 20:6,10
21:3,5,9,14
22:4 28:7 34:18
38:19 41:2 43:6
44:2,3 57:22
58:9,13 86:9
117:24 118:13
120:2,19,24
126:13,24
127:5 130:14
139:18 141:21,
22,23,25 146:1,
18 187:1
190:14 191:17
192:20

**offering** 16:6,
21 20:13,18
24:12 33:24
34:21 41:4,17
42:6,7,13,20
43:23 58:1,22
59:17 62:7 67:2
73:18 74:11
83:21 84:2,5
85:8 86:2,15,19
92:19 93:17
94:1,14 95:16
96:9,12,17
99:3,9,10
100:2,16,23
101:1,7,10,15
112:22,23
113:24 114:6,
10,11,15,18
115:25 125:23
126:8,18,21
127:1 130:11
132:5 133:18,
19 134:6,16,21
135:1,8 139:7
187:20,23
188:1 190:16,
22 191:10,15,
20,22 192:1,23
194:11 195:5
196:1,7,9,14,22
197:7,14
198:25 202:20
203:21 204:10
205:1

**offers** 191:7

**office** 33:12
34:12 47:22

48:17 63:15
67:22,24 68:15,
22 69:8,18,22
70:6,11,14,17,
25 71:6 90:25
115:22 116:8,
14 118:1,13
123:18 142:17
148:21 167:7,
11 168:7 175:5
180:5 200:14
210:3

**officer** 125:22
126:3 151:9,11
181:9 190:16
209:19

**officer's**
205:23

**officers** 7:2
9:8,18 46:6
52:16 54:24
63:14 64:2
68:12,14 69:1,
17,23 70:5
99:21 125:9,17
132:23 133:13,
21 201:18
207:9 210:16,
20,25

**offices** 48:3
167:10

**official** 144:5,
10,19,23

**oftentimes**
204:1,5

**older** 44:6
193:21

**on-duty** 138:4

**one-page**
173:12,15,20,
21 176:2
181:24

**one-sided**
180:23

**ongoing** 138:4

**online** 6:3

**open** 102:19
165:7



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**COURT REPORTERS**

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 73 of 82 PageID #:54361
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
230

operated
205:2

opine 82:16
95:14 153:3
205:24

opined 83:17,
19 94:22

opines 195:21

opining 74:5
82:10 97:2,3
98:21 99:12,20
100:5,11,19
132:21 133:10
134:1,3 141:1
152:7,15
157:18,25
199:13,24
201:13

opinion 15:16,
17 21:15 31:4
33:24 34:18
41:9 42:13,14
43:4 58:3,9,14
64:25 67:3 84:2
85:8,12 86:13,
15 94:21,25
96:12,18 99:2,
10,17 100:2,16,
24 101:2,7,11,
15 113:25
114:7,10,11,15,
18 119:14
125:25 126:4,8,
21 127:5 133:1,
18,19 134:6,16,
21 141:8,23
144:13 148:12
150:15 151:4
152:19 153:12
156:18,20
158:6,7 159:16
160:22 161:3
186:12 188:1,7
189:20 190:4
192:1 194:25
196:9 202:3,4
203:1,21 205:7,
14,15 206:3,13

opinions 8:13,
17 14:1 15:23,
24 16:3,5,7,14,
20,21 18:10
19:17 20:6,10,

13,18 21:3,5,9,
25 22:5 24:3,8,
12 28:7,21
29:2,23 34:18,
21 38:19 39:19
40:17,21 41:2,
4,17 42:7,20
43:6,9,11,13,
23,24 44:2,3
46:6 57:22
58:1,13,19,22
59:18 62:7 67:3
72:14,17 73:16,
18 74:8,11,12,
14 83:21 84:6,
11 86:2,9,19
91:23 92:19,22
93:9,12,17
94:1,14 95:17,
21 96:9,23 99:3
109:3,7 112:22,
24 113:9,16
115:5,10,14,19,
21,25 117:24
118:14 119:9,
10,13 120:2,19,
24 125:23
126:13,18,25
127:2,19,25
130:12,14
132:5 133:7
135:1,8 139:7,
18 141:21,22,
25 146:1,6,11,
18 147:12,18
149:23 151:24
186:16,18
187:1,20,23
188:23 190:15,
17,23 191:8,10,
13,15,17,21,22
192:9,21,24
194:11,13
195:5 196:1,7,
14,22 197:7,14
198:13 199:1
202:20 205:1,8

opposed 106:7
111:24 195:15

opposing
138:5

opposite 34:3,
6

order 26:14
33:17 52:11
56:6,13 57:7,8,
16,19,24,25
58:10,14,22
59:6,10,12,17,
21,22 60:7,24
61:15,24 62:5,
6,10 63:3,19
66:20 147:3
190:13 204:12

orders 74:9
212:21

original 173:19
176:1 180:13
181:15

originally
182:2 200:16

oversight
139:21 141:12,
14 142:14

oversights
143:10,16

overview
47:16

———

**P**

———

p.m. 102:6
135:16,21
182:18 212:12
213:16

P272087
139:3,22

pages 16:25
17:2,6,8 24:24,
25 28:13,24
29:1,3,10,11,
14,18,19,23
30:8,24 31:3
36:5,8,17 37:5,
13 38:8,15,23
39:6,23 40:17
42:18,19 43:2,
3,7,8,15 44:25
73:22 74:19,22
75:13 88:7,10,
17,20,21,25
89:1,17 90:7
94:18 95:7,22,
24 97:3 103:11

104:8,9 106:24,
25 108:3
112:16 116:17
117:10,13
119:3,13 123:6
124:6 125:25
133:2,7 134:4
140:2 141:2
146:8,12 152:8,
21,23 153:1,4,7
156:25 157:2,9,
11,24 158:4,5,9
162:19,22
163:5,13,16,17
164:3,8,9,11,
13,14,17,24
165:8,9,13,19,
21,23 166:1,5,
17,19,24,25
167:20 168:2,9,
24 169:16,19,
20 170:19
171:3,12
173:23 174:1,
21 175:11
176:25 177:11,
14,18,20,23
178:22 179:10,
15,19,20,23
180:15 181:24
184:13,24
185:9,16,23,25
186:14 192:10,
14,19 194:16,
18,24 195:10
198:13,22

paid 13:9,12
14:11,14,17,23
15:1

Palmer 74:9,10

paper 78:15
162:1,3

paragraph
30:19,22
156:11,12,21
159:7,12
160:19 165:1,4,
6

paragraphs
146:8 186:17,
20

parentheses
156:25 186:4

parenthetical
185:5,8

part 16:24 17:5
38:9 49:19
52:11,14 58:18
65:17 74:12
75:16 76:19,20
85:10 95:10,25
106:25 107:12,
13,16 131:16,
17 138:3
142:22 149:23
157:12 158:4,5
168:2 178:21,
25 179:23
181:14 184:10
193:13,25

parties 7:13

partner 158:9

parts 50:10,11
73:25 75:5,12
76:6 211:21

past 18:15
73:13,15 84:5,
15 128:15,17
183:25 185:14

pattern 78:23
207:15

patterns 207:5

pause 41:23
131:22

pay 95:10

payment 13:25

PD 140:22
141:17 142:11,
17

pending 6:11
27:3 68:25
69:23

people 49:24
78:25 130:8
145:23 189:10

percent 111:24

perfect 203:13

period 31:13,
23 33:22 35:23
37:12 109:14

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

113:11,18
115:16,23
116:5

**periods** 115:1

**permanent**
30:3 49:1 77:5,
11,13,16,21
78:21 145:7
186:2

**permit** 112:19

**perpetrator**
159:13,18

**person** 98:4
201:18 210:5

**personally**
11:5 12:9
179:13 183:11
188:18,19

**perspective**
11:20,22 63:11
65:1,10,13,19
66:7 205:9
208:22

**pertaining**
107:25 112:15

**pertains** 133:1

**pertinent** 75:3,
12 116:16
188:14 195:14
204:7,14 205:4,
11 208:8
209:17 210:22
211:7

**petition** 9:13

**phone** 48:20,
25 78:8:16 178:9
210:2

**photo** 196:20

**photograph**
49:22

**photographs**
41:8 48:23 52:7

**photos** 196:12

**phrase** 77:14
163:19

**physically**

32:2 33:9

**piece** 161:21
162:1,3

**pieces** 132:12
134:7

**place** 95:12
96:6,21 98:19
99:5 132:18

**places** 205:21

**plaintiff's** 6:17
7:17 15:17 18:2
24:21,24 29:3
39:16 88:8,9,
17,19 94:17,22
95:6,23 106:2,
24 107:5,25
109:13 110:1
111:10,18
112:16 113:6,
20 115:9
116:17,19
123:4 124:4,5
125:6 127:21
133:2 134:1
143:25 144:14
186:15 189:5
191:23 193:22
198:15 211:19

**Plaintiffs** 6:19

**played** 15:17
129:5

**pleased** 65:15

**plugged**
101:22

**point** 44:5 49:7
51:2 52:9
57:19,20 58:15
64:18 65:18
85:23 86:9
101:20 125:13
129:11 151:1
152:1,20
154:20 164:7
180:19 181:22
189:12 203:9

**pointed** 75:13
107:25 108:1
112:16 115:9
186:14 201:1

**pointing**
164:21 207:25

**Polaroid** 41:8

**police** 8:14 9:8
10:13,18,22
11:5,7 12:24
16:15 23:17
24:1 29:18,22
30:2 31:12,22
32:7,16,18
38:6,9,11 42:11
45:20 46:6,10
47:2,5,9,13,18,
20 48:10,16,19,
24,25 49:7,15,
19 50:2,11,14
51:1,11,16,20
52:21,22,24
53:4,10,17,19,
21 54:4,20,24
55:11,19 56:2
57:11 59:13
60:25 61:1
63:4,13 64:2
65:21 66:8,24
67:1,3,11 68:8,
12,14 69:1 70:4
74:3 77:18
78:10,22 79:5,
20,24 80:1,3,23
81:3 82:11,13
91:4 92:12,16
94:20 96:22
97:21 98:13,17,
20 99:21
100:12,20
101:3,11
109:22,24
110:2 111:11,
19,20 113:2,10,
25 114:1,7,8,
12,15,16,25
115:6 116:9
119:15 122:20
125:9,17,22
126:2 132:14,
23 133:4,12,21
135:25 136:1,5,
8,12,17,18
137:3,4,10,21
139:10 140:6
149:2,4,14
151:8,9 154:7,
23 155:5
157:10 161:6,

14,15,17
163:22,24
167:12,14,22
168:1 171:11,
18 173:12,19
174:3,24
175:10 180:6
181:5,8 184:25
185:1,24 188:5,
8,15 190:13
193:8,24 194:8
195:14 197:3
198:7 201:4
204:11 205:2,
16,23 207:9,10,
22 208:25
209:19 210:19,
25 211:3

**policies** 11:19,
21 16:15 54:23
55:9,15 57:12
59:13 67:17,18
68:6,21 70:5,
16,19,25 71:5,
15,19,23
204:15

**policy** 11:21
50:14,16 53:11,
20 56:3 60:8
63:2,14,22
64:18 65:1,2,
10,11,14,17
66:17 67:12,21,
23 68:2,11,15
69:9,11,13,17,
20,21,24,25
70:13,21
204:21,23
205:2,7 206:13

**policymaking**
67:14

**poor** 97:17

**poorly** 144:13,
16

**portion** 36:14,
19 37:2,17 74:1
76:9 94:24
106:5,11,12,18
108:7,16 109:6
111:4 118:24
119:1,11
121:15,19
122:1,24

131:13 153:20

**portions** 39:13
75:8 76:9,13

**positive** 58:12
154:23 155:6,
18

**positively**
154:8

**possession**
201:14

**possibility**
156:1

**post-mortem**
167:8,9,13,25
169:17

**powerful** 155:7

**practice** 10:21
135:25 149:1
150:25 179:10

**practices**
11:19 12:7
16:16 67:3 74:3
135:24 204:12

**preclude**
209:10

**premise**
194:19 195:11

**prep** 105:3

**preparation**
14:18,24 88:4
105:1 128:8

**prepare** 15:23
66:21

**prepared**
72:11,20

**preparing** 15:6
59:3,5,9 70:18
71:4 72:14,17
88:1 91:15
105:15,23
110:20,24
209:24

**present** 7:9
140:17 177:10
194:7

**presentation**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 75 of 82 PageID #:54363
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
232

200:15

**presented**
18:4,6

**preservation**
61:11

**preserve** 61:1,
4 62:23 64:19
65:1,10,14
66:15

**preserved**
56:11 61:17
62:20 64:14
65:22

**preserving**
60:19,20 61:21
63:16 64:9
65:24 66:10

**press** 181:11

**pretrial** 209:25

**pretty** 46:1
79:10 80:6
102:17 118:3,6
204:17 206:5

**prevent** 27:9,
13

**previous** 29:2

**previously**
18:24 19:1 36:3
121:18 142:20,
21 143:5
168:12

**primarily** 30:2
47:17

**primary** 41:15

**prior** 20:3,13,
18 22:15 48:25
58:16 73:15
86:12,15
103:18,23
104:5 139:23
160:12 168:8
201:18

**private** 19:14,
21 21:2,11,12

**privy** 183:2,5,6

**problem**
128:24

**procedure**
50:14

**procedures**
46:11,14 53:22
54:1 55:10,16

**proceed** 48:12

**proceeding**
202:17

**proceedings**
6:1 155:2

**process** 49:10

**produce** 63:14

**produced**
13:21 103:15
104:3,6 114:1,
8,16 170:9
174:25 175:3

**production**
56:11 185:9

**professional**
103:20 157:19
158:1 162:24
163:4

**professor**
103:22

**progress** 17:9
168:20

**property**
181:10 193:12,
20 200:7

**prosecute**
48:21 129:8

**prosecuted**
203:13

**prosecuting**
207:12 209:18

**prosecution**
48:13 56:12
60:21 61:12,22
62:21,23 64:10,
23 66:16,22
150:20 161:7
187:3 190:6
193:9,23 198:6,
7 199:2,5,8,14,
25 200:2,24
201:15 203:7

206:9

**prosecution's**
199:3

**prosecutor**
9:1,22 11:20
20:15 21:2,7,15
46:21 47:1,3
48:15 49:17
52:20 55:12
56:5 59:24
60:5,9 62:12
63:6,13 64:3
65:25 66:9
67:5,15,16,21
68:6 77:15,19
78:1 79:25
99:4,21 100:6
113:17 115:22
116:2,4,6,11,
21,22 117:5,9,
13,18,19,25
118:7,12,17,23
119:2,11,15
124:11,21,24
129:12,17
134:2 135:1
141:8 146:14
148:3 154:6,22
160:23 174:8
184:4 190:12
192:16 193:2,3
194:5 200:6
201:21 204:1
205:15 207:8,
21 209:4,7
211:20

**prosecutor's**
11:22 30:1,4
47:22 48:17
63:11,15 65:1,
9,10,13,19 66:7
82:10 116:3,14,
19 124:7 133:4,
5 139:13
140:11,15
175:5 193:7
194:20 195:18
199:10,16
200:15,17
205:9,22
211:19

**prosecutors**
47:4,8,15 49:11
55:22 65:22

68:25 69:8
70:19 96:11,25
97:24 114:2,9,
11,17 133:22
134:8,9,18
137:20 159:19
161:12,15,16
163:23 202:1
211:4

**Prossnitz** 6:21

**prove** 161:21

**provide** 51:14
55:12 59:21
63:5 66:25
95:24 97:8
138:4,16 155:4
174:4 193:24
198:7 208:7

**provided**
12:25 17:1,24
22:10 24:15
25:12 33:1,5
34:12 35:21
36:1 38:11,16
39:9 44:5 54:4,
10,12,23 78:20
80:18 81:2
82:11 88:21
90:12 95:18
97:20 103:19
104:16 107:5
110:1 113:21,
22 114:12
130:22 134:3
149:3 152:13,
25 153:3,13,14
158:10 159:3
160:2,8,9
161:1,15 168:1
169:19 174:8
177:9,17
180:22 181:23
182:5 185:14
199:5,18
200:10 202:1
208:10 209:20
210:7 211:5,20

**providing** 48:2
138:15 193:9
194:8

**public** 23:23
83:2 84:17,20
85:5 90:20,23

92:8 115:15
119:15 129:9
138:25 140:1,2,
4 141:3 158:15,
17,20,21
183:17 192:16
193:3 194:5,21

**pull** 25:10
26:10 131:23

**pure** 185:12

**purpose** 97:14
129:13

**purposes**
24:16 73:7
174:25 176:25

**pursue** 189:10
210:12

**put** 23:6 26:13
43:21 53:5 62:3
109:9 111:11
125:7 136:16
158:6 182:21
188:16 204:20

**puts** 163:20

**putting** 16:5
23:9 73:15
123:24 125:7
126:5 162:7,12
197:23 204:20

_____

**Q**

_____

**quash** 150:23
201:20

**question**
12:15,18 13:5
19:22 22:21
25:21 26:3,4,5
27:4,7 32:5
41:2 42:5 43:22
44:1 55:6 61:14
66:3,4,6 67:9
69:15 70:15,21,
22 83:15 91:11,
13 92:15 97:17
98:3,12 100:7,9
103:4 107:8
117:3 123:24
126:5,22
127:12,15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 76 of 82 PageID #:54364
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
233

133:15 136:11
137:17 147:10
155:11 162:6,7,
9,12,15 182:23
187:6 189:21
205:13 206:24
207:3,7

**questioning**
11:10 62:16
121:20,25
182:23 183:4,6

**questions**
11:12 12:2
25:22 27:5,10,
13 28:18 33:16
76:22,25
114:20,24
122:7,24
137:18 147:5,
11 178:11
183:13 211:23
212:13,16

**quick** 44:10
178:1,8 182:11
212:3,21

**quote** 168:2

———— **R** ————

**rabbit** 111:20

**raise** 7:23

**raised** 113:13

**rap** 48:22 49:21
51:7 52:7 79:5

**rate** 14:11 15:4

**Ray** 103:21

**RDS** 36:6 107:3
186:9 191:24

**re-** 84:7 85:4
168:12

**re-analyze**
43:15

**re-ask** 83:14

**re-comparison**
22:20

**re-examined**
30:15,16

**re-review**
23:22,24 24:2,
9,11,14 58:21
73:13 84:1 85:2
88:2 139:19
142:1

**re-reviewed**
41:10

**reach** 48:20

**read** 19:4,7,15
21:13 39:24
40:1,5,7,11
73:20 75:11,23,
24,25 76:2,7,
14,16,18,20,24
78:22 79:1,16
81:14,17 90:10
121:15 123:10,
12,16 126:20
144:12 198:5

**reading** 79:2
80:20 111:20
139:23

**ready** 25:15
27:19 45:8
108:23 193:11
209:25

**real** 141:5
158:18,24,25
159:13,18

**realize** 48:1
209:23

**reanalysis**
23:19

**reason** 114:22
136:19 137:22
158:6 159:12,
17,19 160:20,
23 161:4
178:20 184:10
188:14

**reasonable**
157:19,25
162:23 163:3

**reasons**
153:21

**recall** 18:7
23:12,24 24:5
30:5 59:1 71:2

76:12 82:25
85:16 90:22
91:24 123:20,
23 151:5,25
154:4 180:16
184:14

**receive** 13:25
64:4 66:9
149:22 152:17,
18 179:2
180:12

**received**
10:13,17,22
13:15,18 18:11,
16 20:7 44:21
55:12,19 72:22
80:2,16 81:8
82:12 136:1,12,
18 137:3 149:2,
4,13 151:22
152:4 153:9
155:25 163:1
180:15,16
181:14

**receiving**
163:7 209:21

**recent** 104:1
182:24

**reclaim** 200:8

**recognized**
83:8

**recollection**
17:17 23:9
62:24 168:22
182:1,2

**record** 6:2 7:11
44:13,15,16
62:14 100:10
102:1,2,3
135:16,17,18
168:17 182:13,
14,15,22 183:2,
9 206:16 212:7,
8,9 213:15

**record's** 11:17

**recorded**
112:18 152:25
207:17,18

**records** 114:1,
8 140:2 141:3

163:14,17
185:18

**recovered**
200:8,13

**refer** 77:16,18
89:1 123:3
129:15 146:22
163:24 185:21

**reference** 41:7
57:4,16 77:12
128:16,18
143:7 153:7
158:13 159:2
162:19,24
163:4,12,14,17
169:20 181:1
183:24 185:18,
19 186:1

**referenced**
90:7 151:21
154:22 186:24
209:2

**references**
91:21 131:11
155:18 208:18

**referencing**
140:16

**referrals** 89:12

**referred** 16:25
24:21,25 33:11
36:24 56:9
89:17 95:7
117:10,11,20
164:13

**referring** 34:11
38:8 39:23
56:13 57:10
76:4 78:2,3
88:16 89:2 92:3
98:13 116:4
125:25 126:2
156:12 164:18
168:24 171:4
181:3 182:7
184:1 185:1,9
206:17

**refers** 108:19
117:13 164:13,
18 168:23
186:9

**reflect** 110:22

**reflected** 44:7

**reflects** 201:5

**refresh** 15:12

**refute** 40:8

**regard** 18:9
39:18 42:17
43:7,9 59:21
69:16 89:13
96:20 126:8
147:12 148:17
162:22 168:4
169:16 188:2

**regularly**
79:20

**reiterated**
84:12

**relate** 28:25
88:8

**related** 8:13
16:6 18:23
22:4,23 28:21
29:18 34:18,22
36:2,16 37:4,13
38:24 39:10
49:23 50:2
51:24 52:7 56:4
59:13 61:2
70:24 74:16
83:22 88:7,18
90:15,20 91:4,5
92:9,12,14,19,
23 93:9,12,17
94:1,15 95:3,7
104:11 109:7,
21 117:10,20
118:18 119:3
120:25 126:13
133:7 139:25
187:4 190:15
203:12 204:19
206:8 207:24
209:1,8

**relating** 107:5

**relation** 147:6

**released** 9:14

**relevance**
188:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

relevant 91:23
161:14 205:17
207:11

reliable 112:25
113:5,14,16
115:5,14,19,21
119:10

reliably 113:8

relied 73:12

rely 20:25
126:21,25
128:7 132:3

relying 49:3
119:10 142:20
158:12

remain 16:16

remaining
166:23

remember
85:14 121:14
122:2 141:2,3,5
181:20 184:18,
21,22

remembers
11:25

remove 157:8

repeat 100:6

repetition
41:11

rephrase 26:5
51:6 124:5

replied 37:14
42:3 94:19
95:23 174:5

reply 18:1 40:2
49:25 74:19
75:6 115:11
123:9

replying 39:6
41:13 51:17
88:9 89:11
112:20 113:12,
20 123:5 124:3
187:14 188:6
193:1,6,14
194:19

report 14:18,24
15:20 16:25
17:7,9,11 18:2
20:24 22:15
23:1,11 24:1
25:2,5 26:10
27:22 28:9,25
29:6,8,10,15,
19,24 30:9,15,
16,20 32:1,12
37:14 39:16
40:15,17 41:5,
7,12,14 42:1,4,
18,23,25 43:2,8
56:21 57:1,15
58:16 59:5,9
66:19 72:4
73:9,17,20,24
74:2,8,15,23
75:3,7,14,18,
20,21,24 78:24,
25 79:1,4,9,10,
11,13 80:1,21
81:11,20,22,23,
24 82:2 83:6
84:24,25 85:10
86:24 87:6
88:20 90:13
91:16,21 92:21
93:4,5,8,14
95:1,8,10,11
96:1 97:15
98:13,17 104:9,
20 105:7,8,9,
12,15,19,23
106:2,7,9,11,
13,18 107:1,2,
5,9,18,22
108:4,8,17,25
109:3,7,22
110:15,21,25
111:5,9,10,14,
18,20,25 113:4,
19,24 117:21
118:19 120:16
121:2,6 123:5,8
126:14 127:23
128:9 129:23
131:11,14,16
134:24 136:8,
12,17,21
137:10,11,12,
24 138:16,19
142:19 143:3,4,
6,21,23 144:6,
10,12,21,23

145:6,11,16,18
147:6,14,22
149:22 150:8
151:19,23
152:5,8,16,22
153:9,22,24
154:7,23 155:5
156:8,14,18
157:9,10,12,20
158:1,15
159:20 160:7,
16,18,24,25
161:7 162:11,
16 163:1,7
164:19,24
165:15 166:22,
23 167:4,8,9,
13,21,25 168:6,
17 170:4
171:19 173:7,
20 174:16
176:21 177:8
179:19 180:13,
21 181:1,25
182:7,8 186:10
187:8 189:13
190:19 192:4,5,
11 193:17,21,
22 194:1,15
195:14,21
196:2 197:16
198:11,16,19,
23 199:20
201:1,5,11,14,
22 202:1 203:8,
15 208:12

report's
180:17

reported 163:9

reporter 6:2,4
7:10,13,22 8:3
25:25 44:13,16
101:25 102:3
103:2,8 135:15,
18 166:11
182:12,15
192:7 212:6,9,
20,25 213:2,5,
7,10,14

Reporters 6:5

reports 17:2,8
22:25 23:18,21
24:10 30:23

38:9,11 40:9
48:25 49:23
52:3 59:3 77:18
78:11,22,23
79:3,5,6,16,19,
23 80:1,11,13
81:5,9,17,25
82:1,3 86:23
87:1 88:5 90:10
92:12,16 94:21
96:23 98:20
109:12 110:3
111:11,19
113:23 114:8,
11 123:10
132:14 137:3,
21 139:10
144:19 147:17
161:11,14
163:22,25
166:21 167:23
168:11,17,20
170:13 174:15
181:4,5,6,21
182:2 183:24
184:1,2,25
185:2,24 188:5,
9,15 190:13,15
191:24 193:10
195:16 201:4,
17,24 203:17
207:23 210:7,
14,20

represent 89:7
183:13

represented
12:12

representing
6:4

request 47:17
48:1,11 49:18,
22 50:1,5,7,15
51:24 52:9
55:12,21 63:21
64:4 66:9,18
176:5 200:20
201:7 209:4

requested
49:20 50:17
51:14 53:2

requesting
47:5 48:5,8
49:11 50:24

78:19

requests
47:14 49:16
50:25 51:3,7
52:23 63:18
64:15 78:15
150:22 174:15
180:7

required
202:22

rereading
23:11

reserve 212:19

resolved 14:4

responded
29:13

responding
29:23 115:8
131:17 194:9

response 12:3
55:21 74:11
180:6 188:1
192:14

responsible
68:5 70:8,12
71:4,17,22

rest 25:1 31:4

resulting 94:4

results 170:2

resume 43:25
44:1,6,8 45:1
103:24 104:2

retain 60:3

retention 30:3
41:8 49:1 77:5,
11,13,16,21
78:21 112:19
145:8 186:2
201:6

retired 148:19,
20

returned 52:25

Reuben 189:7

revealed 18:14

revenge



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 78 of 82 PageID #:54366
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023

235

203:13

**review** 14:18, 23 16:21 17:18, 22 19:12,17,20 20:15,20 21:8, 16 22:23 23:7 24:6,17 33:10, 25 35:13,25 37:10,25 39:3, 12,19 40:10 41:3 45:13,22 46:5,15,17,25 57:18,24,25 58:10 59:5,9, 12,16 71:23 73:17 76:9,10 77:8 79:7 81:9 82:10 83:22 85:5,21,22,24, 25 86:2,10,18 87:18,23 88:9 90:15,19,23,24 91:3,4,18 92:5, 6,8,12,16 93:16,18,21 94:2,6,9,24 95:5,15 106:14, 17 107:9,18 108:25 109:6 111:14,17,24 112:7,25 114:25 115:3 116:1,13,18 117:14 118:6, 11 119:6 121:23,24 123:1,8,17 124:8,24 125:3, 12 126:10,15 127:3,15 128:3, 8 129:22 130:1, 3,10,20 131:13, 25 132:8 134:25 135:6 139:5 140:5,18, 21 141:10,20 142:16 145:23 146:13,17,25 150:4 154:16, 25 156:6 158:23 184:5,8 208:21 211:2,9, 17

**reviewed** 15:22 18:23

19:1 20:4,8 21:6,10,19,23 22:3 30:25 31:8 32:1,14 33:7, 14,15,17,18,20 36:2,13,16 37:8,17 38:2,5, 9 40:22 41:18 42:6,12 56:2,18 57:19,20,21 58:15,16,18 62:6 72:2,10, 11,14,17,21 73:3,4,9,14 74:25 76:6,12 82:19 83:7,15 84:5,8,11,13, 15,19 85:9,11, 23 86:1,11,12, 14 87:16,21,25 88:1,4 89:11 90:1 91:14,15 95:9 103:5 112:5,7 113:10, 16 115:6,14,21 116:8,16,22,23 117:6,7,19,25 118:17 119:18, 24,25 120:1,6, 13,20 121:12, 19 122:9,10,14, 19 126:17 128:5,12,19,21 129:10,15 131:24 138:20, 21,22 139:16, 18,22,25 141:1, 8,12,16 142:7 143:12,15,18 147:24,25 150:5 151:17, 18 152:1 153:6 154:3 155:17 185:10 208:16

**reviewing** 15:7,10 23:17 59:4,8 71:18 80:1,21,24 105:15,23 106:2 107:3,14, 19 108:12,19 109:11,21,23, 24,25 110:3,19 111:5,10 115:12 119:15

121:6,9,14 123:20,23 140:6 142:18

**Reyes** 14:1,2 15:24 16:8,16, 19 17:16,20 18:10,24 20:6 21:20,25 22:5, 9,19,24 24:10 29:2 41:9,10 43:23 44:2 57:22 58:3,9, 14,23 62:5,17 73:10 75:1 76:2,6,11 83:10,17 84:6 85:12 88:1 113:11,18 135:1 139:9,19, 23 141:22,23, 25 142:21,22 143:3,4

**Reyes'** 76:13

**Reyes's** 24:8

**Reyes-sierra-** 83:19

**Reynaldo** 6:9, 10

**RFC** 62:5 102:23,24 104:3,14 110:6 166:15 171:2, 14,17,20,22,24 172:1,3,5,7,9, 11,13,15,17,19, 21,23,25 173:2, 4,6,8,9,21 175:16,18 176:10,11,16, 20 199:19

**RFC-** 194:15

**RFC-IGLESIAS** 197:25 198:18, 21 199:1,7,13, 22 200:19 201:12

**Rivera** 58:19, 20

**Rock** 76:18,21,

25 121:21,25 122:7

**Rodriguez** 196:11

**role** 8:21 67:16 129:4

**Roman** 39:4 101:13 123:13, 19 124:25 132:23 133:12 195:24 197:4,7 208:17 209:2,3 211:3

**Ron** 190:16

**Rosendo** 196:11

**round** 64:8

**routinely** 80:16,23 81:2

**RSD** 167:3

**Ruben** 91:17, 22 92:4,5,6,9, 13,16 186:22, 24 188:3

**rule** 27:3

—————

**S**

**Sarah** 86:9

**sat** 149:8

**scene** 78:24 79:9,10 201:2

**schedules** 46:3

**screen** 62:3 102:22 112:4 168:20 197:24

**section** 17:8 28:4,8,19 76:24 143:23 144:1, 21 181:9 192:13,19 200:9

**sections** 147:8

**seek** 207:16

**semester** 103:23

**send** 48:21,23 49:8,20,25 50:4,9,11,15 51:9,12,13,23 63:20

**sending** 50:7 51:13

**sends** 45:5

**sense** 47:19 109:17 170:7

**sentence** 64:12 144:3,12

**separate** 11:18 12:12 77:20,21 175:24 176:24 181:24 190:11 207:17

**separately** 51:4

**series** 24:20 81:24

**served** 45:21 153:8

**service** 54:12

**session** 25:22

**set** 35:21 43:3 53:21 72:13 74:7,16 76:10 79:3 122:8 131:2 180:18 181:7,14,15 182:4 186:21 198:13

**share** 102:22

**Sheehan** 19:2, 21 20:15 21:1, 7,15 85:18 86:1,19 87:1,6, 13 128:25 129:5,11,16 138:23 146:21, 25 148:1,2,13, 14,15,25 149:12,20 152:2,8,16 153:8,15,17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 79 of 82 PageID #:54367
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023

236

155:4,21 156:7,
14,19 157:14,
20 158:8
162:16,25
163:21 164:6,
15 166:5
167:20,24
169:19 170:9
171:4 177:17
178:20 179:22
185:1,14,21
186:6

**Sheehan's**
85:22 184:11

**sheet** 49:21
79:5

**sheets** 48:22
51:7 52:7
193:12,20
200:7

**shooting**
203:23

**shootings**
203:14

**short** 109:14
177:3

**shortly** 13:21
44:24

**show** 79:19
198:17

**showing** 62:3
102:23 166:13

**shown** 196:12,
20

**shows** 193:8

**sic** 64:9 148:12
178:20

**side** 7:17

**Sierra** 6:10,19
7:3 13:13 14:15
15:9,11,14,18,
25 16:2,6,7,16,
20,21,22 17:19
18:6,9 19:18
20:2,3,11,14,
19,23 21:3,20,
25 22:15 23:20
24:10,13,17,18,

19 25:5 26:16,
19 27:22 28:6,
21,25 31:5,7
32:8 35:4,9,23
36:1,13 37:22
39:8,19 40:16,
21 41:3 42:2,7,
13,18 43:4,16,
24 44:3 56:21
57:1,15 58:1
59:5,18 72:5,
10,17 73:4,7,
10,18,19 74:2,
8,15,21,22 75:1
76:3,14,16
83:16,22 84:2,
6,9,12 85:8
86:10,13,15,24
87:5 88:21
89:9,13,20,24
90:2,16,19
91:1,16,23
92:20,23 93:5,
8,19,22,24
94:2,4,15,19
95:3,22 100:11
101:1 103:6
104:11,20,23
105:6,24 109:4
112:5,9 113:9,
15,19,24 114:6
116:1,22 117:5,
18 118:14
119:11 120:2,9,
20 121:1,7,12,
19 122:11,23
124:25 126:23,
25 127:6,9,16,
19,25 128:4,12,
20,22 129:5,19,
23,25 130:12,
15,25 131:5
132:7 134:15,
25 135:2,7
138:19,20
139:7,20
141:13,21
142:2 143:12,
21 146:6,19
147:6,9,14,19,
22 151:19
152:7 186:13,
18,23 188:17,
24 189:12,15,
18,23 190:2,7
191:5,14,25

203:2,4,23
204:17,19,20
206:22 207:4

**Sierra's** 94:10
206:5

**Sierra-iglesias**
62:7

**signed** 80:13

**significant**
202:19

**simple** 43:22
69:15

**simply** 80:1

**single** 39:24
40:6,7,11 155:2

**sir** 7:22 13:23
27:22 41:21
45:10 102:23
103:10,16
104:11 132:22
134:25 135:23
142:15 149:24
166:13

**sit** 111:7

**situation** 137:7

**situations**
204:13

**sixth** 66:2

**slightly** 111:16

**slow** 51:17

**Smith** 81:20
136:19,20

**Solache** 41:8,
10 62:5

**Solache-**
62:16

**solemnly** 7:23

**sort** 147:10
156:1 206:24

**Soto** 83:19,23
84:1

**sound** 44:21,
22 114:21

**sounds** 14:4

45:19 123:25

**source** 127:7

**Spanish**
192:21 197:5,
15

**speaking**
210:20

**special** 56:13
57:8,16,19,24,
25 58:10,13,22
59:5,10,12,17,
20,21,22 60:7,
24 61:15,24
62:4,6,10 63:3
74:9

**specially**
144:4

**specific** 16:5
17:6 28:21,25
29:11,18 30:6
31:4 36:17
38:14,23 43:7,
15 47:20 50:24
52:1,4,6,10
53:5,25 56:4
57:4 66:25
67:16 68:11
73:22 74:16,19,
22 75:13 76:13
88:7,13,14,21
89:11 90:7
95:11 106:14
108:3 109:9
112:20 113:12,
20 115:8,11
117:10,12,13
118:18 119:13,
14,16 131:12
141:6 186:12,
14 188:25
192:9,14 194:2,
10,18,24 197:4
198:12 207:4

**specifically**
16:23,24 29:9
37:5 39:5 46:8,
16,23 50:17
60:2 67:4 74:2
92:23 95:2
116:18 141:2
145:9 146:3
150:21 151:25

158:14 169:4
179:15,22
184:19 189:6
193:11 194:4
195:10

**speculating**
156:3 164:5
169:2,13,16,18

**speculation**
98:9,23 99:16,
25 155:23
169:24 186:5

**speculative**
67:7

**spelled** 63:19

**spend** 15:5,7,
10,14 106:6
109:6 110:16
121:9,13,17

**spent** 105:6,
14,18,22 106:2,
11 107:12,14,
19 108:3,8,16
110:12,19,24
111:3,4 121:5

**spiel** 25:21

**split** 111:12

**spotted** 189:8

**spread** 46:1,3

**spreadsheet**
34:24

**spreadsheets**
34:19,22 35:4,9

**staff** 54:12 67:1

**stamped** 13:20
166:15

**stamping**
44:24

**stand** 74:20
151:9

**stands** 193:20

**start** 33:16
52:2 98:7
102:14 104:10
182:21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 80 of 82 PageID #:54368
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
237

**started** 41:23
48:18 49:3 51:2

**starting** 6:16
28:3 107:2
108:20

**starts** 28:14

**state** 6:15 7:11
48:24 49:6,8
50:8,19 51:3,11
59:23 78:11,14,
16,17 80:5
200:25

**state's** 67:24
68:15,22 69:18
70:6,9,11,14,
17,25 71:6
84:18,21 85:6
90:25 92:9
115:22 116:7
118:1,13
123:18,20
139:1 140:12,
17,22 142:10,
17 146:14
148:20 158:7,8
180:5 202:5,6,
11

**statements**
150:24

**States** 6:11

**step** 132:22

**steps** 99:22
100:13,20
101:4,12
132:18 133:11
187:17

**sticky** 23:10

**stipulate** 7:14

**stipulated**
7:16,21

**stop** 101:23
135:14 212:4

**stopped** 51:6

**strategic**
156:1,7,9

**street** 56:10
59:14 150:14
166:24

**strike** 15:6,23
24:8 31:20
35:15,20,21
39:17 40:15,20
41:1 43:25 48:7
51:1 54:11
57:25 59:4,22
63:2,25 65:9
68:4 70:10 73:8
74:24 75:25
79:24 80:15
82:21 85:3,24
87:10 89:21
92:15,20 93:16
95:16 96:3
97:6,18 110:13
112:23 115:20
119:9 120:12
131:1 135:2
149:10 151:18
155:1,16
179:21 184:5
192:20

**stuff** 25:20
193:13

**subject** 29:2
89:24 149:22
151:23 182:25
187:25 196:8

**subjects**
187:20

**submit** 105:7

**submitted**
105:7,8,9,11

**subpoena**
50:9,10 51:8,13
52:11,23 53:3
54:12 64:14
80:8 162:20,23
163:5,20 164:2,
22 165:8,12,19,
22 168:2,4
169:3,20
170:16,24
171:2,6,7,9
174:5 176:6
177:3,6,10,12,
19 178:3,21,24
179:3,4,9,23
185:6,8,17,19
186:1 203:17
209:12 210:19

**subpoena's**
140:17 177:10

**subpoenaed**
12:11 53:1

**subpoenas**
49:4,8 50:18
51:9,10,12,17,
18 52:1 63:18
78:17 80:4
150:21 170:25
175:9 180:7,22
210:1,10,13

**subsequent**
59:16

**subsequently**
15:24 20:7

**sued** 9:20

**sufficient**
189:22 190:5
203:6

**suggest** 207:6

**sum** 15:1

**superficial**
33:13

**superficially**
56:8

**supp** 80:6,8,10
156:25 157:2
158:10,22

**supplement**
109:11

**supplemental**
17:2,11 40:9
78:24 79:4,8,11
81:20 109:12
208:11,12

**supplementar
y** 81:5,9,11,25
82:1 201:17

**suppose**
151:14 163:20

**suppress**
150:24 201:21

**suspect** 161:4
188:24 189:23
190:7,9

**suspects**
189:9 207:25

**Swaminathan**
6:18 7:16 8:5
10:11 11:1,16
12:14,17,22
13:6,15,22
14:10,21 16:13
25:11,14,18
26:13,19,21,23
27:17,20 28:2
31:19 32:15
33:6 34:4,16
35:2,7,12,19
37:1,9,24 41:24
44:10,20 45:3,
6,7 46:9 53:9,
16 54:2,9,17
55:7,17 56:1
59:2 60:6,14,23
61:13,24 62:2
63:1,10 64:21
65:8 66:23 67:8
68:20 69:2,14
71:3,10 72:5,8
81:15 82:9,17
91:10 92:2
93:4,7 94:23
96:14,19 97:5,
16 98:6,16,25
99:11,19 100:4,
18,25 101:9,18,
23 102:7,9,14,
19,21 103:4,9
112:13 113:7
114:5 117:4
118:4,21 119:5,
22 127:13
130:23 133:8,
16 134:5,12,23
135:5,13,22
136:13 137:1,
19 138:6,17
149:19 151:16
152:14 153:16
154:5,15
155:13 156:4
157:4 160:4
162:2 166:9,12
169:6,14 171:1
175:12 176:9
177:24 178:5,
10,13,15,18,19
179:7,17 180:1
182:10,19

183:8,19,20
187:15,24
188:21 189:19
191:6 192:8
193:15 195:19
196:18 197:1,
12,19,22
203:19 206:11,
19,21,25
208:15 209:13
211:23 212:2,
23 213:1

**swear** 7:23

**Sydney** 6:3
44:18 102:5
135:20 182:17
212:11

**system** 53:4

---

**T**

**tab** 23:10

**table** 37:7

**tables** 33:11

**taking** 27:12
72:9 126:16

**talk** 11:25
159:7,11
164:25 165:4
187:7 192:13
207:19 210:2

**talked** 16:24
138:21,24
146:23 149:8
187:10,13,17

**talking** 40:16
58:5 69:11
100:8 128:15,
17 139:11
206:16,22
207:6

**talks** 11:20
196:5

**tasked** 70:17

**teaching** 44:7
45:1 103:22

**technician** 6:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 81 of 82 PageID #:54369
THE DEPOSITION OF BERNARD MURRAY taken on May 6, 2021
238

telling 34:2,6
176:4

tells 66:14

ten 81:8,25
82:2 83:1
109:16 172:11

tender 80:14

tendered
150:8 160:16
163:10 164:1,2,
8 168:8,12
178:25 195:17

tendering
163:25 168:12
179:11

term 69:9

terms 49:11
111:23 163:21

Tess 44:21

testified 85:3,
19 96:5 97:19
125:18,20
127:8 130:17
132:17 149:20
152:3,6 153:15,
18

testify 12:9
66:24

testifying 40:5
162:23 163:3

testimony
7:24 10:8 15:3
62:14 64:6 65:6
68:18 79:25
82:7,15 85:4
86:25 87:6 90:5
95:11,18 97:8
98:24 125:22
126:7,17 127:1,
24 131:12
132:1,4 146:3
151:9 153:11
156:6 159:22
175:8 196:11,
20

That'd 22:25

thei- 66:19

then-
prosecutor
19:2

theory 202:14

there'd 108:18

Theresa 6:23
7:6 44:22
102:10 213:2

thing 30:12
44:6 45:1 60:15
75:23 102:18
103:20 114:22
122:3 143:6
182:8,22 185:4

things 51:19
53:6 66:18
96:24 129:20,
21 141:25
181:17 195:20

Thomas 6:10,
19 13:13 31:5,7
32:8 75:1 76:15
93:21,24 94:2,3
95:21 109:4
120:16,17
124:25 127:9,
16 128:20,22
129:5,19 130:3,
25 131:5
186:13,18
189:23 191:14

thought 40:1
75:5,12,18
115:10 144:14
145:3

thrust 202:3

Tiderington
28:8,10 31:8,
20,21 34:9,12,
17 36:1,15,20
37:12 38:23
73:10,18 74:1,7
75:1 88:20 90:8
92:3 96:3
116:23 117:7,
20,24 120:9,16,
17,25 121:24
187:1,7,16
188:2 190:14
191:7,13,17
192:15,20

194:4 195:21
196:4,10,19
197:2 198:3

Tiderington's
23:21 24:10
35:9 74:12,15
76:16 83:6
84:24 91:21
94:25 95:9
106:6,13 108:3
121:6,10,20
130:4 131:11,
13 149:23
151:17,19,23
188:7,22
190:19 196:2
197:16 202:13

tied 24:21

time 6:7 13:9,
12 15:2,9,14
20:23 21:14
26:25 43:6,22
44:2,3,13,19
46:2,5,14,24,25
48:14,23 49:3
50:8 51:2
52:18,20 66:2
68:22 69:23
78:5,16 98:14
102:1,6 105:1,
5,6,14,18,22
106:11 107:3,
16,19 108:2,8,
25 109:1,10,15,
21 110:11,12,
13,14,16,19,24
120:1 121:6,9,
12,13,17
135:16,21
139:8 147:11
148:22 150:7
152:24 154:6
168:13 171:7
180:22 181:11
182:13,18
199:11 210:9
212:7,12,14,17
213:13

timely 80:11

times 8:11,23
23:15,17 65:23
145:2 196:12
203:11

title 179:4

today 6:4,6
27:10,14 44:18
73:22 102:5
103:15 104:4
135:20 157:1
182:17 184:20
185:12 193:4
194:21,22
195:12,18
199:10 212:11

today's 105:1

told 55:11
64:19 69:16
75:16 92:6 97:8
159:25

Tony 83:9

top 56:16 85:16
137:6 146:4
154:4

total 104:21,22
110:8,13
152:20 156:24
164:9,24 165:9,
21 176:11

totals 177:11

tow 201:5

towed 201:3

toxicology
170:2

training 54:3,
10 55:18 70:12,
18,21,24

transcribed
17:1

transcript
76:17 130:3
155:18 212:22

transcripts
76:10 94:9,12
95:2 126:11
128:19,21
130:11 131:2
135:7 154:17
156:5

transferred
144:5,10,22
145:10

transparent
204:17,24

trial 9:22 49:17
63:24 94:10,13
98:4 129:17
132:1,4 154:17,
21 155:17
160:12 193:11
199:11 200:6,
18 202:17
207:20

true 9:14 79:22
118:8 123:16
181:21,22
185:5

truth 7:25 8:1

turn 42:25
135:25 137:11
143:20,21
160:23

turned 179:8
199:25 200:2
207:21

turning 57:12

two-minute
178:9

two-sided
180:7,9,20,24
181:2,16 182:3

type 48:4 67:19
71:5 81:1 107:2
208:22 210:8

typed 17:11
22:25 23:1

types 79:19

typically 77:16
173:11,18

typing 108:17

————————

U

ultimately
20:25 110:20
188:8 190:4
210:21

unable 13:25

uncertainty



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Case: 1:20-cv-04156 Document #: 401-11 Filed: 05/16/25 Page 82 of 82 PageID #:54370
THE DEPOSITION OF BERNARD MURRAY taken on May 10, 2023
239

129:3

**underlying**
23:22,25 130:9
131:5,25

**understand**
11:19,23 15:21
20:5 22:21 26:4
27:2,10,13
28:23 32:5 34:9
38:22 40:3
50:21 55:5
60:24 64:1,25
67:9 70:15,20
71:13 79:7,18
85:4 90:4 91:9,
12,20 98:2,10
109:12 124:14,
23 127:12,15
133:9 136:11
145:1 156:22
157:16,17
158:11 159:6
162:17 186:25
187:5,6 202:3
203:21,24,25
205:13

**understanding**
13:24 47:1,13,
20 48:6,9,11,15
49:14 50:4,6,13
53:4,7 61:3
70:1 77:20,23
78:3 129:4
130:16 131:8
132:12 137:16
140:20 174:23
209:15 210:17

**understood**
80:10 82:18
90:10 116:5,11
117:3,23
180:13 187:16
206:19,21

**unit** 51:3 54:12

**United** 6:11

**units** 50:15
51:9,20 52:10
54:6,14 55:1,
13,21 56:4
59:23 63:5

**universe**
118:10

**unrelated**
11:15

**unsigned**
164:23

**updated** 45:1
103:14

_____

**V**

**VA** 140:2 141:2

**vacated** 9:15

**vague** 150:13

**vast** 180:21

**vehicle** 189:1
193:17,21
200:19 201:5,7

**verbal** 25:24

**verbatim**
62:16

**verbiage** 52:4

**verify** 90:22

**version** 103:15

**versions** 59:17
103:18 104:5

**versus** 111:5
164:16

**video** 6:3
212:25 213:5

**videoconferen
ce** 6:8 44:18
102:5 135:20
182:17 212:11

**view** 64:18
65:18 151:1

**violation** 9:24

_____

**W**

**Wacker** 6:5

**wait** 19:22
178:17

**walls** 183:14

**wanted** 51:20
63:21 80:13

82:18

**ways** 29:4
49:10 54:18
166:20 202:19
210:18

**Weston** 10:3,4
11:4,11,13,14
12:6,10,23

**What'd** 103:16

**whatsoever**
155:19

**wheels** 189:8

**wholly** 202:8

**William** 103:21
148:12

**withheld** 39:15
40:2 41:15

**withhold**
136:8,21,25
137:3,18,21

**witnesses**
95:12,18 96:3,4
97:6 98:18
125:9,17
126:11 127:4,9,
16,22,25 128:4,
22 129:1,25
130:7,9,10,16
131:2,4 132:8,
17 135:7
190:21 195:23
196:12,21

**witnesses'**
129:22

**word** 62:17,20,
24 133:25

**worded** 60:12
144:16

**words** 38:16
46:23 53:3
60:3,16 66:17
77:10 85:11
88:19 92:25
105:10 116:20
117:15,17
126:10 130:2
145:3 146:23
165:12 167:1

181:7 205:14
209:14

**work** 9:1 14:12,
15 26:11 45:13
48:4 56:7
104:18 106:25
110:25 142:20
148:5,8 207:15

**worked** 46:11,
14 137:21
149:10

**working** 49:24
110:11,14
148:24 149:11
180:4

**would've**
97:10 127:23
177:18

**write** 23:5,14
25:25 66:19
111:8 167:21

**writing** 23:12,
18 108:21,25
109:7,22 111:5,
14 128:8
142:19

**written** 66:20
67:17,18,23
68:4,6,21 69:13
70:6,13,16
75:17,18 95:3
208:11

**wrong** 65:7
128:23 152:9
153:8 162:25
163:6

**wrote** 20:23
68:13,16 69:16
70:3 150:7
166:5 167:20

_____

**X**

**X250303**
122:18

**Xerox** 174:16,
17 176:5,6
180:9

**Xeroxed**

173:25 174:2,7
175:11 180:8
181:15

_____

**Y**

**years** 67:24
98:3 175:1,4
194:22 199:17

**yellow** 23:10

**yesterday**
183:1

_____

**Z**

**Z220314** 91:17

**Z226760** 89:22

**Zoom** 6:20,25
7:4,8



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com